**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| MONSANTO COMPANY, PHARMACIA, LLC, and SOLUTIA, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> MAGNETEK, INC., GENERAL ELECTRIC CO., PARAMOUNT GLOBAL, KYOCERA AVX COMPONENTS, CORNELL DUBILIER ELECTRONICS, INC., and THE GILLETTE COMPANY, LLC, <br><br> Defendants. | CASE NO: 4:23-cv-204 |

## DEFENDANT GENERAL ELECTRIC COMPANY'S NOTICE OF REMOVAL

TO:   THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1446, Defendant General Electric Co. ("GE") removes this action from the Circuit Court of St. Louis County, Missouri ("State Court") (state court case number 17SL-CC03368) to the United States District Court for the Eastern District of Missouri on the ground that there is jurisdiction under 28 U.S.C. § 1442(a)(1). Namely, removal is appropriate because this action involves a dispute over Polychlorinated Biphenyls ("PCBs"), a chemical compound in electrical products that GE sold in large quantities to the Federal Government, and a compound that the Federal Government *required* manufacturers like GE to use in certain applications because of its fire-retardant properties, until

the Federal Government ultimately banned their use in 1979. GE thus submits that federal officer removal is appropriate, and in support, states as follows:

## BACKGROUND

1.     PCBs are man-made chemical fluids that the electrical industry widely used, including in transformers and capacitors, from at least the 1930s through 1979, when the Federal Government banned their manufacture and use. Monsanto was the sole and exclusive manufacturer of PCBs in the United States during this time period. Memorandum from R.W. Frahm to Field Sales District Managers (Apr. 18, 1972), Ex. A. PCBs were so widely used because they are "virtually free of fire and explosion hazards." Interdepartmental Task Force on PCBs, Polychlorinated Biphenyls and the Environment at 12 (May 1972), Ex. B.[1]

2.     However, in the early 1970s, the scientific community, electric industry, and Federal Government began scrutinizing PCBs in response to reports of their bio-persistence and potential resulting health effects. *See id.* By the early- to mid-1970s, most industrial uses of PCBs ceased. However, PCBs continued to be used, and were even *federally mandated*, in

_____

[1] The complete Interdepartmental Task Force memorandum, including all appendices is available at
https://nepis.epa.gov/Exe/ZyNET.exe/9101IMNO.TXT?ZyActionD=ZyDocument&Client=EPA
&Index=Prior+to+1976&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=
n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&
ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C70thru75%5CT
xt%5C00000022%5C9101IMNO.txt&User=ANONYMOUS&Password=anonymous&SortMeth
od=h%7C&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g1
6/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDes
c=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

certain electrical applications, such as transformers and capacitors, until the Environmental

Protection Agency ("EPA") ultimately banned their use and manufacture in 1979. *See* Pet. ¶ 22

("National Electrical Code, other industry codes, and state and federal government regulations

required the use of PCBs in certain electrical applications."), Ex. C; General Electric Company,

The Role of Polychlorinated Biphenyls in Electrical Equipment at 4-5 (Dec. 16, 1971) (referring

to the "various codes, standards, and regulations that now effectively require or encourage the

continued use of askarel-insulated equipment in many applications"), Ex. D.

3.      In their First Amended Petition, which Plaintiffs Pharmacia, LLC f/k/a Old

Monsanto Company a/k/a Monsanto Chemical Co. ("Old Monsanto"), Monsanto Company, and

Solutia, Inc. (collectively "Plaintiffs") filed in the Circuit Court of St. Louis County, Missouri,

Plaintiffs allege that Old Monsanto manufactured and sold PCBs to GE for several decades,

ceasing in 1977.[2] Pet. ¶¶ 4, 22-26, Ex. C. Plaintiffs further allege that GE incorporated those

PCBs into electrical products, such as capacitors, transformers, and light ballasts, which it sold to

customers throughout the United States (*id.* ¶ 4)—including, as critical here, numerous Federal

Government agencies and actors.

4.      Plaintiffs contend that through GE's manufacture, sale, and disposal of PCB-

containing products, GE (and the other defendants) "released into the environment or permitted

the release into the environment" some of the PCBs that it purchased from Old Monsanto. *Id.*

Plaintiffs contend that "[m]ultiple lawsuits have been filed against [them] seeking damages

---

[2] Plaintiffs originally filed this action in the Circuit Court of St. Louis County, Missouri
in 2017, but that action did not name GE as a defendant.

allegedly caused by the release of PCBs into the environment and other exposures to PCBs" and that "[they] have incurred significant defense costs relating to the PCB Lawsuits, have agreed to pay substantial sums to settle various PCB Lawsuits, and have had judgments entered against them in PCB Lawsuits." *Id.* ¶ 5.

5.      Plaintiffs bring five claims for relief against GE, alleging: (1) breach of contract for refusal to defend, (2) breach of contract for refusal to indemnify, (3) declaratory judgment regarding a duty to defend, (4) declaratory judgment regarding a duty to indemnify, and (5) negligence. *Id.* ¶¶ 236-91. Plaintiffs finally bring a claim for equitable contribution in the alternative. *Id.* ¶¶ 303-13.

6.      Regarding their breach of contract and declaratory judgment claims, Plaintiffs allege that GE breached a two-page written agreement from 1972, the Special Undertaking by Purchasers of Polychlorinated Biphenyls ("Special Undertaking"), to defend, indemnify, and hold harmless Plaintiffs for personal injury claims related to PCBs. *Id.* ¶ 3. The Special Undertaking stated that Monsanto has "adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers." GE Special Undertaking, Ex. 2 to Pet. The Special Undertaking further stated that GE: will "defend, indemnify and hold harmless Monsanto . . . from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of [] PCB's" "sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof." *Id.* Plaintiffs allege they are therefore entitled to all amounts paid to resolve claims, whether by

settlement, verdict, judgment, or otherwise, as well as all "attorneys' fees, expert fees, and other costs and expenses incurred to defend Old Monsanto in the PCB Lawsuits." *Id.* ¶¶ 248-49, 261-62.

7.      Regarding their negligence claim, Plaintiffs allege GE breached its "duty to possess, handle, use, sell, and dispose of PCBs . . .  with reasonable care . . . by allowing PCBs purchased from Old Monsanto . . . to be released into the environment through products manufactured by [GE], . . . disposal of PCB-containing products, leaks, spills, dumping and disposal of industrial wastes, and through other means." *Id.* ¶¶ 287-88; *see also id.* ¶ 105 ("PCBs have been released into the environment by Defendants and/or their predecessors-in-interest through their release from products they manufactured, disposal of PCB-containing products, leaks, accidental spills, dumping and disposal of industrial wastes, and through other means."). Similar to their breach of contract claims, Plaintiffs seek all amounts paid to resolve the underlying PCB claims as well as all fees and costs incurred in defending the claims. *Id.* ¶¶ 290-91.

8.      Exhibit 8 to Plaintiffs' First Amended Petition lists the PCB claims for which Plaintiffs allege they are owed damages due to GE's breaches and/or negligence.

9.      Pursuant to 28 U.S.C. § 1446(a) and E.D. Mo. L.R. 2.03, the complete file from the Circuit Court of St. Louis County, Missouri, including copies of all process, pleadings, and orders, is attached to this Notice of Removal as Exhibit E.

10.     A Civil Cover Sheet is attached to the Notice of Removal.

11.     An Original Filing Form is attached to the Notice of Removal.

12.     GE will file a Disclosure of Organizational Interests Certificate within 10 days of the filing of this Notice pursuant to Local Rule 2.09.

**GROUNDS FOR REMOVAL**

**I.     GE TIMELY FILED THIS NOTICE OF REMOVAL**

13.     GE timely removed this action under 28 U.S.C. § 1446(b)(1). Plaintiffs served GE on January 31, 2023, and GE filed this notice of removal within 30 days after service. *See* Waiver of Service, Ex. F (acknowledging "the date of service of the First Amended Petition on [GE] as January 31, 2023.").

**II.     REMOVAL IS PROPER UNDER 28 U.S.C. § 1442(a)(1)**

**A.     28 U.S.C. § 1442(a)(1) Allows a Company Acting Under Direction of a Federal Officer to Remove Actions to Federal Court**

14.     Section 1442(a)(1) allows "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States" to remove a case to federal court. 28 U.S.C. § 1442(a)(1). Private entities, such as government contractors, "fall within the terms of the federal officer removal statute . . . when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 153 (2007).

15.     "The federal officer removal statute is to be 'liberally construed,' and thus the typical presumption against removal does not apply." *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 738 (8th Cir. 2021), *rehearing denied*, No. 21-1010, 2022 WL 521355 (8th Cir. Feb. 22, 2022), *cert. pending*; *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014) ("Defendants enjoy much

6

broader removal rights under the federal officer removal statute than they do under the general removal statute.").

16.     As a private entity, GE must establish four elements to remove under § 1442(a)(1): "(1) [it] has acted under the direction of a federal officer, (2) there was a causal connection between [its] actions and the official authority, (3) [it] has a colorable federal defense to the plaintiff's claims, and (4) [it] is a 'person,' within the meaning of the statute." *Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1230 (8th Cir. 2012), *abrogated on other grounds by BP P.L.C. v. Mayor and City Council of Baltimore*, 141 S.Ct. 1532, 1538 (2021).

17.     GE establishes each of these elements.

**B.      Federal Officer Removal is Appropriate Because GE Acted Under the Federal Government's Direction**

18.     In manufacturing the PCB-containing products at issue in this case, GE acted under the ongoing direction, control, and supervision of the Federal Government. Not only did the Federal Government regularly purchase GE's PCB-containing products, the Federal Government *required* GE to include PCBs in its products.

**1.      GE Sold PCBs to the Federal Government**

19.     As a federal defense contractor, GE sold large quantities of PCB-containing products to numerous agencies of the Federal Government. *See generally* Database of Transformers Containing Polychlorinated Biphenyls at 23, Environmental Protection Agency (Sept. 13, 2019) (listing numerous PCB-containing transformers owned by the Department of

Transportation, Federal Aviation Administration, Department of Energy, Department of Veterans

Affairs, Department of the Interior, Army, and Navy), Ex. G.[3]

20.     GE sold PCB-containing transformers and/or capacitors directly to the

Department of Defense. *See* United States Army, PCB TMDL Action Plan at 23-27 (listing

numerous GE transformers as currently in use at the Fort Myer & Henderson Hall installations);

Memorandum from Henry Vaness Dobson. Jr. to Judge Advocate General (June 26, 1987)

(referring to a General Electric PCB transformer at the Navy's Piti Power Plant), Ex. H. Indeed,

United States military installations included "thousands of electrical transformers and other

electric equipment that either contain or are suspected to contain PCBs," many of which GE

manufactured. *See* U.S. Gen. Accounting Office, Environmental Compliance: DOD Needs to

Better Identify and Monitor Equipment Containing Polychlorinated Biphenyls (hereinafter

"Environmental Compliance") at 2, Ex. I; *id.* at 2 ("The military services have significant

_____

[3] Available at
https://www.epa.gov/sites/default/files/201909/documents/pcb_transformer_database.pdf
(last visited February 11, 2023). "The rules applicable to federal officer removal provide the
court with the discretion to look beyond the complaint and petition to determine whether the
action itself should be removed." *Christensen v. Ward*, 916 F.2d 1462, 1484 (10th Cir. 1990);
*see also Guggenberger v. Starkey Labs., Inc.*, No. 16-2021 (JRT/LIB), 2016 WL 7479542, at *5
(D. Minn. Dec. 29, 2016) ("In addition to the notice of removal and its exhibits, to determine
whether there is jurisdiction, the court may consider documents submitted after the notice of
removal as well as those attached to subsequent motions."). Courts also regularly take judicial
notice of documents available on EPA's website. *Sierra Club v. EPA*, 964 F.3d 882, 893 n.9
(10th Cir. 2020) ("We take judicial  notice of this document, which is published on the EPA's
website."); *Nebraska v. EPA*, 331 F.3d 995, 998 n.3 (D.C. Cir. 2003) (taking judicial notice of
information on the EPA's database).

quantities of PCBs in equipment such as electrical transformers and capacitors on their installations.").

21.    GE's transformers contained a PCB insulation fluid called Pyranol. Mem. Regarding Polychlorinated Biphenyls, General Electric Company (Aug. 26, 1976) ("General Electric's askarels are called Pyranol."), Ex. J; Sales Information Bulletin (Sept. 10, 1973) (referring to Pyranol as a GE product), Ex. K; The Role of Polychlorinated Biphenyls in Electrical Equipment, General Electric Company at 8 (Dec. 16, 1971) (stating that GE exclusively used Pyranol), Ex. D. "Pyranol is the trade-mark of the General Electric Company for cooling and insulating materials which generically are known as askarels"—i.e., PCBs. Pyranol, General Electric, Ex. L. Therefore, the use of Pyranol was specific to GE transformers.

22.    In 1970 alone, the General Services Administration, Department of the Interior, United States Army, United States Navy, and other branches of the Federal Government purchased at least **6,750 pounds** of Pyranol, meaning that each of these federal agencies had previously purchased numerous GE PCB-containing transformers that required replacement Pyranol.[4] Report of Pyranol Sales (Dec. 1971), Ex. M. In 1971, the Federal Government again purchased over 6,000 pounds of Pyranol. *Id.* In a single shipment in December 1971, the United

---

[4] While GE did not enter into the Special Undertaking with Monsanto until January 21, 1972, Monsanto broadly alleges entitlement to indemnity for ***all*** of its alleged PCB liability, including that related to the manufacture, sale, and disposal of PCBs before January 1972. *See* Pet. ¶ 288 ("Defendants and/or their predecessors-in-interest breached their respective duty of care by allowing PCBs purchased from Old Monsanto both before and after signing the Special Undertaking Agreements to be released into the environment through products manufactured by Defendants . . . ."), Ex. C.

States Navy purchased over 2,000 pounds of Pyranol. United States Navy Invoice (Dec. 17, 1971), Ex. N. In February 1972, the Naval Supply Center in Oakland, California again purchased over 2,000 pounds of "Pyranol . . . [manufactured] by General Electric Co." Naval Supply Center Invoice (Feb. 7, 1972), Ex. O.

23.     By no later than February 1972, Monsanto discontinued all direct sales of Pyranol to end-users. Letter from T.L. Gossage to A.E. Peltosalo (Feb. 8, 1972), Ex. P. Accordingly, after February 1972, the Federal Government purchased its Pyranol for GE transformers directly from GE. *See generally id.*

24.     GE's sales of PCB-containing products to the Department of Defense was so widespread that it has even been recognized in case law. As the Ninth Circuit noted in a case related to a ruptured electrical transformer, "GE purchased PCBs from Monsanto in order to produce Pyranol, a fire-resistant dielectric fluid, which GE then used as insulation in electrical transformers and other devices. In 1949, ***GE sold one of its transformers to the Navy and delivered it to Guam***." *Abuan v. Gen. Elec. Co.*, 3 F.3d 329, 331 (9th Cir. 1993) (emphasis added).

25.     Moreover, the New Jersey Army National Guard, which is federally funded and operated under federal control in certain circumstances, also purchased GE transformers. *See* Excerpts of Final Summary Report: Suspected PCB Containing Electrical Equipment Inventory, at 19, 23, 27, 38-40, 42-45, 49-52 (Feb. 2017) (stating that GE PCB-containing transformers exist at various Army National Guard installations in New Jersey), Ex. Q.

26.     GE also sold PCB-containing transformers and capacitors to Amtrak—a federally

owned and controlled corporation. Excerpts of U.S. Dep't of Transp., Polychlorinated Biphenyls

(PCBs) in Transit System Electric Equipment at 4-2 (May 1984) (stating that Amtrak has 75 self-

propelled cars and 26 locomotives with PCB-containing transformers), Ex. R[5]; *id.* at 4-6 (stating

that GE estimates "twenty small [PCB-containing] capacitors and three large [PCB-containing]

capacitors are used per rail car"); *id.* at D-2 (referring to GE as a producer of PCB-containing

transformers).

27.     The above list is not intended to be an exhaustive list of all the times GE sold

products containing PCBs to the Federal Government, but rather an illustrative list of the close

relationship GE and various Federal Government agencies had over this important chemical

compound.

**2.      The Federal Government Supervised, Controlled, and Required GE's
         Production of PCB-Containing Products Until It Banned PCBs in
         1979**

28.     The Federal Government was not just a passive purchaser of PCBs. During the

relevant time period of this case, the Federal Government worked hand-in-hand with GE by

supervising and controlling GE's production of PCB-containing products—and for a period of

time, *required* that manufacturers like GE continue to use PCBs in certain applications.

29.     In May 1972, multiple federal agencies, including the Department of Commerce

and the Environmental Protection Agency, issued an interdepartmental task force report on

---

[5] The entire Department of Transportation report is available at
https://rosap.ntl.bts.gov/view/dot/11961.

PCBs. That report found the continued use of PCBs in the products GE manufactured was

"*necessary* because of the significantly increased risk of fire and explosion and the disruption of

electrical service which would result from a ban on PCB use." Interdepartmental Task Force on

PCBs, Polychlorinated Biphenyls and the Environment at 4 (May 1972) (emphasis added), Ex.

B.

30.     In light of the necessity of PCBs, the Federal Government mandated that GE use

PCBs in the products GE manufactured and the Federal Government purchased. *See* Pet. ¶ 22

("National Electrical Code, other industry codes, and state and federal government regulations

required the use of PCBs in certain electrical applications."), Ex. C; General Electric Company,

The Role of Polychlorinated Biphenyls in Electrical Equipment at 4-5 (Dec. 16, 1971) (referring

to the "various codes, standards, and regulations that now effectively require or encourage the

continued use of askarel-insulated equipment in many applications"), Ex. D. As the

Environmental Protection Agency stated, "[v]arious Federal, state, and local conditions

*require[d]* use of askarel [a generic term for PCB-containing fluids] in transformers."

Environmental Protection Agency, Industry Views on the Use of PCBs at 17 (June 1976), Ex. S

(emphasis added).

31.     As one example, in February 1972, the United States Department of Labor,

Occupational Safety & Health Administration adopted portions of the National Electric Code

that required GE to use PCBs in a number of applications. *See* 37 Fed. Reg., 3,431 (Feb. 16,

1972) (to be codified at 29 C.F.R., pt. 1910) ("Every new electrical installation and all new

utilization equipment installed after March 15, 1972, and every replacement, modification, or

repair or rehabilitation, after March 15, 1972, of any part of any electrical installation or utilization equipment installed before March 15, 1972, shall be installed or made, and maintained, in accordance with the provisions of the 1971 National Electrical Code."); Excerpts of National Electric Code § 410-82 ("Transformers of other than the askarel-insulated or dry-type shall not be used.") (1971), Ex. T.

32.     The Federal Government also set procurement specifications for the PCB-containing products GE made and sold to the Federal Government. *See* Hearing on Toxic Substances Control Act at 80 (1976) (stating that the "Department of Defense, the General Services Administration, and other agencies" had "procurement specifications . . . concerning the purchase of PCBs and materials containing PCBs."), Ex. U.

33.     Then, in April 1979, the EPA issued final regulations banning the manufacture of PCBs and phasing out most PCB use. Press Release, EPA, EPA Bans PCB Manufacture; Phases Out Uses (Apr. 19, 1979), available at https://www.epa.gov/archive/epa/aboutepa/epa-bans-pcb-manufacture-phases-out-uses.html. The EPA also issued final regulations governing PCB disposal. *See* 40 C.F.R. § 761.60. Accordingly, after April 1979, the Federal Government exercised control and direction over the disposal of PCBs as well.

**C.     Plaintiffs' Allegations Relate to GE's Manufacture and Sale of PCBs to the Federal Government**

34.     Plaintiffs' claims in this case relate to the actions GE took under the direction and control of the Federal Government.

35.     Monsanto seeks indemnity from GE as a result of the specific PCB-containing materials that GE sold to the Federal Government.

36.     For instance, Monsanto seeks indemnification for at least three lawsuits related to allegedly contaminated water and other natural resources in the Los Angeles area. List of Indemnification Cases, Ex. 8 to Pet., Ex. C; Compl. in *County of Los Angeles v. Monsanto*, No. 2:19-cv-4694, ECF No. 1 (C.D. Cal. May 30, 2019), Ex. V; Compl. in *California v. Monsanto*, No. 2:22-cv-02399-ODW-SK, ECF No. 1-1 (C.D. Cal. Apr. 8, 2022), Ex. W; Compl. in *City of Long Beach v. Monsanto Co.*, 2:16-cv-03493-FMO-AS, ECF No. 1 (N.D. Cal. May 19, 2016), Ex. 13 to Pet., Ex. C. In 1970 alone, the Federal Government purchased over 2,000 pounds of GE's PCB-containing Pyranol for use in the Los Angeles area. Report of Pyranol Sales (Dec. 1971), Ex. M. In 1971, the United States Marine Corps purchased over 1,000 pounds of Pyranol for use in the Los Angeles area. *Id.* Accordingly, Plaintiffs' defense and indemnification demands relate to actions GE took under the direction and control of the Federal Government— i.e., the sale of Pyranol to multiple federal agencies in the Los Angeles area.

37.     Similarly, Monsanto seeks indemnification for *City of Oakland v. Monsanto Company*, which involved claims that PCBs contaminated the water in Oakland, California and the San Francisco Bay. 4:15-cv-05152 (N.D. Cal). *See* Ex. 8 to Pet., Ex. C. In 1971 and 1972, the United States Navy purchased thousands of pounds of GE's PCB-containing Pyranol each year for use in Oakland and San Francisco. Report of Pyranol Sales (Dec. 1971), Ex. M; United States Navy Invoice (Dec. 17, 1971), Ex. N; Naval Supply Center Invoice (Feb. 7, 1972), Ex. O. Here too, Plaintiffs' defense and indemnification demands relate to actions GE took under the

14

direction and control of the Federal Government—i.e., the sale of Pyranol to the United States Navy in the Bay Area.

38.     Further, Plaintiffs allege GE negligently allowed "PCBs purchased from Old Monsanto . . . to be released into the environment ***through products manufactured by [GE]***." Pet. ¶ 288 (emphasis added), Ex. C; *see also id.* ¶ 105 ("PCBs have been released into the environment by Defendants and/or their predecessors-in-interest through their release from products they manufactured."). In other words, Plaintiffs claim that GE negligently manufactured products containing PCBs, which products then were eventually placed in landfills, releasing PCBs into the environment. *See id.* ¶ 108.

39.     Because Plaintiffs' claims relate to GE's manufacturing and sale of PCB-containing products, a causal connection exists between GE's actions taken under federal authority and Plaintiffs' claims. *See Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) ("[T]here need be only 'a *connection* or *association* between the act in question and the federal office.'") (quoting *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016)); *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020) ("[A]ny civil action that is connected or associated with an act under color of federal office may be removed.").

### D.     GE Has Colorable Federal Defenses

40.     "[A] defense is colorable for purposes of determining jurisdiction under Section 1442(a)(1) if the defendant asserting it identifies facts which, viewed in the light most favorable to the defendant, would establish a complete defense at trial." *Hagen v. Benjamin Foster Co.*,

739 F. Supp. 2d 770, 783 (E.D. Pa. 2010). The defense need not be "clearly sustainable in order to support removal under § 1442(a)(1)." *Jacks*, 701 F.3d at 1235.

41. GE has at least two federal defenses.

42. First, GE has a government contractor defense to Plaintiffs' negligence claim. GE was acting as a government contractor when it engaged in the actions complained of in this case. Indeed, the Federal Government purchased many of the PCBs at issue in the underlying lawsuits for which Plaintiffs seek indemnity. *See* Ex. 8 to Pet. (stating that Plaintiffs seek defense and indemnity for cases brought by the cities of Oakland and Los Angeles that alleged PCB contamination of the cities' water and natural resources), Ex. C; Report of Pyranol Sales (Dec. 1971) (indicating that Federal Government agencies in the Los Angeles and Oakland metropolitan areas purchased thousands of pounds of GE's PCB-containing Pyranol in 1971 and 1972 alone), Ex. M.

43. A government contractor is immune when it establishes: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Tech. Corp.*, 487 U.S. 500, 512 (1988). As explained above, (i) the Federal Government required the use of PCBs in GE's products and set procurement specifications for those products, (ii) GE's products conformed to the Federal Government's requirements and specifications, and (iii) GE informed the Federal Government of any hazards of using PCBs that GE was aware of but the Federal Government was not. Indeed, the Federal Government knew as much, if not more, than GE

regarding the purported dangers in using PCBs. *See* Interdepartmental Task Force on PCBs, Polychlorinated Biphenyls and the Environment at 2 (May 1972) (stating that the government task force completed "a six month review of the chemicals known as PCBs"), Ex. B; Letter from Gerald Barney to Charles Sommer (Jan. 17, 1972) (stating the Navy's belief that "one of the most serious threats to the marine environment is the class of chemicals known as polychlorinated biphenyls."), Ex. X; Pet. ¶ 45 (Plaintiffs allege that they worked "hand-in-hand with the EPA to determine when acceptable substitutes [for PCBs] were available."), Ex. C.

44.     Second, federal law preempts Plaintiffs' negligence claim. As explained above, federal law mandated that GE use PCBs in products it manufactured, and the Federal Government set requirements for GE's use of PCBs. Pet. ¶ 22, Ex. C; Environmental Protection Agency, Industry Views on the Use of PCBs at 17 (June 1976), Ex. S; Hearing on Toxic Substances Control Act at 80 (1976), Ex. U. Because GE could not have complied with these federal requirements and its purported state law tort duty not to manufacture PCB-containing products that Plaintiffs' claim negligently caused their release into the environment, federal law preempts Plaintiffs' state-law negligence claim. *See, e.g.*, *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) ("[S]tate and federal law conflict where it is 'impossible for a private party to comply with both state and federal requirements.'" (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995))).

45.     GE's federal preemption and government contractor defenses constitute "federal defenses under § 1442." *See Isaacson v. Dow Chemical Co.*, 517 F.3d 129, 138 (2d Cir. 2008) (holding that a government contractor defense qualified as a "colorable federal defense" under

§ 1442(a)(1) and noting that "[c]ourts have imposed few limitations on what qualifies as a colorable federal defense."); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 364 F. Supp. 2d 329, 336 (S.D.N.Y. 2004) ("[P]reemption is a colorable federal defense for purposes of the federal officer removal statute."); *Jacks*, 701 F.3d at 1235 (holding that a claim that the Federal Employee Health Benefits Act preempted the plaintiff's state claim was a colorable federal defense); *Guggenberger*, 2016 WL 7479542, at *11 ("Examples of colorable federal defenses include federal immunity or defenses based on federal statutes or regulations.").

46.     Because GE has federal defenses to at least one of Plaintiffs' claims, GE can remove this entire action. *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1182 (7th Cir. 2012) ("If [the defendant] has a colorable defense as to either claim, then the entire case is removable."); *Sawyer*, 860 F.3d at 257 ("[R]emoval need not be justified as to all claims asserted in the plaintiffs' complaint.").

**E.     GE is a "Person" Under § 1442(a)(1)**

47.     As a corporation, GE constitutes a "person" under § 1442(a)(1).  *Jacks*, 701 F.3d at 1230 n.3 ("[T]he 'person' contemplated by the federal officer removal statute includes corporations.").

**F.     GE Can Remove this Entire Action Without the Consent of its Co-Defendants**

48.     GE need not notify, or obtain the consent of, any other defendant in this action to remove this entire suit under § 1442(a)(1). *See, e.g.*, *Iowa Pub. Serv. Co. v. Iowa State Com. Comm'n*, 407 F.2d 916, 918 n.3 (8th Cir. 1969) ("[T]he federal officer alone can remove without other defendants joining in the petition, and the entire case is removed to the federal court."); *see*

*also Citrano v. John Crane-Houdaille, Inc.*, 1 F. Supp. 3d 459, 465 (D. Md. 2014) ("Unlike removal under § 1441, under § 1442(a) the other defendants need not join in or consent for removal to be proper.").

## VENUE

49.    Venue is proper in the Eastern District of Missouri because this is the district court "within which such action is pending." 28 U.S.C. § 1446(a).

## NOTICE OF REMOVAL AND JURY DEMAND

50.    Pursuant to 28 U.S.C. § 1446, filing a copy of this Notice with the Clerk of the State Court effects the removal of the State Court action. A copy of the Notice of Filing of Notice of Removal filed contemporaneously in the State Court is attached as Exhibit Y.

51.    No waiver and no admission of fact, law, or liability, including without limitation the amount of damages, if any, is intended by this Notice of Removal, and all defenses, affirmative defenses, and rights are hereby reserved.

52.    GE demands a trial by jury on all claims so triable.

## CONCLUSION

53.    For the reasons set forth above, GE removes this action to the United States District Court for the Eastern District of Missouri.

Dated:  February 20, 2023                    Respectfully submitted,


                                             */s/ Peter W. Herzog III*
                                             Peter W. Herzog III
                                             Attorney for Defendant General Electric Co.
                                             Wheeler Trigg O'Donnell LLP
                                             One Metropolitan Square
                                             211 N. Broadway, Suite 2825
                                             St. Louis, MO  63102-2723
                                             Telephone: 303.244.1800
                                             Facsimile: 303.244.1879
                                             Email: pherzog@wtotrial.com

                                             Michael L. O'Donnell (*pro hac vice* application forthcoming)
                                             Marissa S. Ronk (*pro hac vice* application forthcoming)
                                             Attorneys for Defendant General Electric Co.
                                             370 Seventeenth Street, Suite 4500
                                             Denver, CO  80202-5647
                                             Telephone: 303.244.1800
                                             Facsimile: 303.244.1879
                                             Email:  odonnell@wtotrial.com
                                                     ronk@wtotrial.com