# Exhibit C

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| MONSANTO COMPANY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PHARMACIA, LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SOLUTIA, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No. 17SL-CC03368 |
| | ) | |
| v. | ) | |
| | ) | |
| MAGNETEK, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GENERAL ELECTRIC CO. | ) | |
| **Serve**: CT Corporation System | ) | |
| 120 S. Central Ave., | ) | |
| Clayton, Mo., 63105 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PARAMOUNT GLOBAL | ) | |
| **Serve**: CSC – Lawyers | ) | |
| Incorporating Service Company, | ) | |
| 221 Bolivar St., | ) | |
| Jefferson City, Mo 65101 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KYOCERA AVX COMPONENTS | ) | |
| CORPORATION | ) | |
| **Serve**: Corporation Service Co. | ) | |
| 251 Little Falls Dr., | ) | |
| Wilmington, DE 19808 | ) | |
| | ) | |
| and | ) | |

1

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

|  |  |
|---|---|
| | ) |
| CORNELL DUBILIER ELECTRONICS INC. | ) |
|     **Serve**: The Corporation Trust Co. | ) |
|     1209 Orange St., | ) |
|     Wilmington, DE 19801 | ) |
| | ) |
| and | ) |
| | ) |
| THE GILLETTE COMPANY LLC | ) |
|     **Serve**: The Corporation Trust Co. | ) |
|     1209 Orange St., | ) |
|     Wilmington, DE 19801 | ) |
| | ) |
|     Defendants. | ) |

## FIRST AMENDED PETITION

COME NOW Plaintiffs Monsanto Company, Pharmacia, LLC, and Solutia, Inc. ("Plaintiffs"), for their First Amended Petition against Magnetek, Inc., General Electric Co., Paramount Global, KYOCERA AVX Components Corporation, Cornell Dubilier Electronics, Inc., and The Gillette Company LLC ("Defendants"), and allege as follows:

### NATURE OF THE CASE

1.      This is an action to enforce Defendants' written agreements to defend, indemnify, and hold harmless Pharmacia, LLC f/k/a Old Monsanto Company a/k/a Monsanto Chemical Co. ("Old Monsanto") relating to Polychlorinated Biphenyls ("PCBs") that Old Monsanto manufactured and sold to Defendants or their predecessors-in-interest.  Defendants have failed and refused to honor their agreements despite multiple demands from Plaintiffs.  As a result, Plaintiffs have incurred defense costs, agreed to and/or paid settlements, and have had judgments entered against them in PCB Lawsuits.  Plaintiffs continue to incur substantial costs to defend against certain PCB Lawsuits that should be borne by Defendants.  This lawsuit seeks to recover all of these amounts from Defendants.  It also seeks a declaration from the Court that Defendants are

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

required to honor the terms of their agreements and defend, indemnify, and hold harmless Old Monsanto in all currently pending and future PCB Lawsuits.

2.      PCBs are a class of unique, chemically inert and heat-resistant, chemicals that were integral to the manufacture of certain products such as transformers and capacitors in the United States.  Between approximately 1935 and 1977, Old Monsanto manufactured and sold PCBs in bulk to a number of industrial customers—including Defendants and/or their predecessors-in-interest—who incorporated those PCBs into a wide variety of finished products that were sold throughout the United States.  In 1970, in response to growing concern regarding the environmental persistence of PCBs, Old Monsanto announced that it would phase out production of PCBs for non-electrical PCB applications.  For electrical applications, because PCBs were the only nonflammable dielectric fluid, Old Monsanto agreed to continue to manufacture and sell PCBs to certain customers for use in closed electrical applications (e.g., transformers and capacitors) until suitable alternatives to PCBs became available, but only if those customers would agree to defend and indemnify Old Monsanto against future PCB-related claims.

3.      Defendants or their predecessors-in-interest were members of the U.S. electrical industry and some of the largest purchasers of PCBs from Old Monsanto.  In early 1972, each Defendant, or their predecessor-in-interest, negotiated and entered into a written agreement with Old Monsanto titled "Special Undertaking by Purchasers of Polychlorinated Biphenyls" (individually a "Special Undertaking Agreement," and collectively, the "Special Undertaking Agreements").  The Special Undertaking Agreements are substantially similar and contractually obligate each Defendant to defend, indemnify, and hold Old Monsanto harmless from "any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses . . . arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

PCB's by, through, or under [Defendants], whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's."  Defendants further acknowledged in the Special Undertaking Agreements that they were aware and had been advised by Old Monsanto that PCBs tend to persist in the environment and that care was required in the handling, possession, use, and disposition of PCBs.

4.      Between 1972 and 1977, Old Monsanto manufactured and sold approximately 143 million pounds of PCBs to customers who entered into Special Undertaking Agreements which remain viable today.  Defendants or their predecessors-in-interest are the six largest purchasers of PCBs from Old Monsanto between 1972 and 1977.  Pursuant to the Special Undertaking Agreements, Defendants or their predecessors-in-interest purchased approximately 133 million pounds of PCBs from Old Monsanto during that time period.  Defendants incorporated the PCBs they purchased from Old Monsanto into electrical products—e.g., capacitors, transformers, and light ballasts—that were sold to customers throughout the United States.  Defendants and/or their predecessors-in-interest also released into the environment or permitted the release into the environment some of the 133 million pounds of PCBs that they purchased from Old Monsanto between 1972 and 1977.

5.      Multiple lawsuits have been filed against Plaintiffs seeking damages allegedly caused by the release of PCBs into the environment and other exposures to PCBs (the "<u>PCB Lawsuits</u>").  The PCB Lawsuits generally predicate Old Monsanto's liability on, *inter alia*, its manufacturing of PCBs for purchase by Defendants.  Plaintiffs have incurred significant defense costs relating to the PCB Lawsuits, have agreed to pay substantial sums to settle various PCB Lawsuits, and have had judgments entered against them in PCB Lawsuits.  Many PCB Lawsuits

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

remain pending against Plaintiffs, and Plaintiffs continue to incur substantial costs to defend those actions.  The plaintiffs in each of the pending PCB Lawsuits seek recovery of significant damages from Plaintiffs.

6.      Defendants individually and collectively have a contractual duty to defend, indemnify, and hold harmless Old Monsanto in the PCB Lawsuits.  Plaintiffs have provided Defendants notice of the PCB Lawsuits, tendered the defense of the PCB Lawsuits to Defendants, and demanded indemnification from Defendants.  Defendants have failed and refused to honor their agreements.  They have failed and refused to provide Old Monsanto with a defense in the PCB Lawsuits and have failed and refused to indemnify Old Monsanto for any of the amounts paid and/or agreed to be paid to resolve the PCB Lawsuits or any of the judgments entered against Old Monsanto in the PCB Lawsuits.  Defendants' refusal to defend and indemnify Old Monsanto in the PCB Lawsuits constitutes one or more breaches of the Special Undertaking Agreements.  As a result of Defendants' breaches of the Special Undertaking Agreements, Plaintiffs have been damaged.  Plaintiffs' damages continue to accrue in that Plaintiffs continue to incur substantial costs to defend the PCB Lawsuits and continue to face significant potential liability in the PCB Lawsuits.

## THE PARTIES

7.      Old Monsanto is a limited liability company organized and existing under the laws of the State of Delaware.  The sole member of Old Monsanto is Wyeth Holdings LLC.  The sole member of Wyeth Holdings LLC is Anacor Pharmaceuticals, Inc., which is incorporated under the laws of Delaware and has its principal place of business in New York.

8.      Plaintiff Solutia, Inc. ("Solutia") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in St. Louis County, Missouri.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Solutia did not manufacture or sell PCBs.  In 1997, Solutia was spun off from Old Monsanto.  In connection with the spin off, Old Monsanto assigned certain rights to Solutia, including the rights to enforce the Special Undertaking Agreements.  In particular, Old Monsanto assigned its "right, title, and interest . . . in and to all of the Chemical Assets" to Solutia, which were defined to include "all rights under insurance policies and all rights in the nature of insurance, indemnification or contribution."  Solutia has the right to enforce the Special Undertaking Agreements.

9.     Plaintiff New Monsanto is a corporation organized and existing under the laws of the State of Delaware with its corporate headquarters and principal place of business in St. Louis County, Missouri.  New Monsanto did not manufacture or sell PCBs.  New Monsanto was spun off from Old Monsanto in 2000.  In 2008, New Monsanto and Solutia entered into the Amended and Restated Settlement Agreement in connection with Solutia's Chapter 11 reorganization. As part of that Amended and Restated Settlement Agreement, New Monsanto agreed to assume financial responsibility for certain Legacy Tort Claims (which include claims for property damage, personal injury, products liability or premises liability or other damages arising out of or related to exposure to PCBs) and Environmental Liabilities related to Legacy Sites.  Old Monsanto executed a Power of Attorney in favor of New Monsanto, which grants New Monsanto authority to take "all actions" over certain claims, including the PCB Lawsuits, and provides that New Monsanto is Old Monsanto's "true and lawful agent and attorney."  The Amended and Restated Settlement Agreement also obligated Solutia to use commercially reasonable efforts to assert indemnification rights (including the Special Undertaking Agreements) for the benefit of New Monsanto and granted New Monsanto the right to any benefits recovered by Solutia through its enforcement of those indemnification rights.  Pursuant to the 2008 Amended and Restated Settlement Agreement and the Power of Attorney, New Monsanto is and has been paying the costs

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

incurred by Plaintiffs to defend the PCB Lawsuits, and has also paid and/or agreed to pay amounts to settle some of the Food Chain cases and Water Cases, which are referred to herein and defined below, for the benefit of Plaintiffs.

10.     Defendant Magnetek, Inc. ("Magnetek") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York. Magnetek is the successor-in-interest to Universal Manufacturing Corporation ("UMC").  UMC merged into Magnetek (d/b/a Delaware Magnetek, Inc.) on or about July 11, 1986, with Magnetek as the surviving corporation.

11.     Defendant General Electric Co. ("General Electric," or "GE") is a corporation organized and existing under the laws of the State of New York with its principal place of business in Massachusetts.  General Electric is registered to do business in Missouri and can be served through its registered agent, CT Corporation System, 120 South Central Avenue, Clayton, Missouri, 63105.

12.     Defendant Paramount Global ("Paramount") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York. Paramount is the successor-in-interest to Westinghouse Electric Corporation ("Westinghouse"). On or about November 10, 1997, Westinghouse changed its name to CBS Corporation.  On or about May 4, 2000, CBS Corporation merged into Viacom Inc. with Viacom Inc. as the surviving corporation.  On or about January 1, 2006, Viacom Inc. spun off CBS Corporation.  In or around December 2019, Viacom Inc. and CBS Corporation merged once again, with ViacomCBS as the surviving entity.  In or around February 2022, Viacom CBS changed its name to Paramount. Paramount is registered to do business in Missouri and can be served through its registered agent, CSC – Lawyers Incorporating Service Company, 221 Bolivar St., Jefferson City, Missouri 65101.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

13.     Defendant KYOCERA AVX Components Corporation ("KYOCERA AVX") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in South Carolina.   KYOCERA AVX is the successor to Aerovox Corporation ("Aerovox").   On June 4, 1973, Aerovox merged with AVX Ceramics Corporation ("AVX Ceramics"), with AVX Ceramics as the surviving entity.   On December 31, 1973, AVX Ceramics changed its name to AVX Corporation.   On January 18, 1990 AVX Corporation merged into KC Subsidiary Corporation with KC Subsidiary Corporation as the surviving corporation.   KC Subsidiary Corporation then changed its name to AVX Corporation ("AVX").   On or about March 30, 2020, KYOCERA Corporation acquired AVX through a second-step merger of a wholly-owned subsidiary of KYOCERA Corporation with and into AVX.   As a result of the merger, AVX became a wholly-owned subsidiary of KYOCERA Corporation.   On October 1, 2021, AVX changed its corporate name to KYOCERA AVX Components Corporation.   KYOCERA AVX can be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

14.     Defendant Cornell-Dubilier Electronics, Inc. ("CDE") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in South Carolina.   On September 19, 1983, Cornell-Dubilier Electric Corp. changed its name to Cornell Dubilier Electronics, Inc.   CDE can be served through its registered agent, The Corporation Trust Company, 1209 Orange St., Wilmington, DE 19801.

15.     The Gillette Company LLC ("Gillette") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Massachusetts.   Gillette is the successor-in-interest to P.R. Mallory & Co. Inc. ("P.R. Mallory").   On February 28, 1980, P.R. Mallory changed its name to Duracell International Inc.   On June 29,

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1989, Duracell International Inc. and Duracell Inc. merged with Duracell Inc. as the surviving company.   On December 31, 1998, Duracell Inc. merged into The Gillette Company.   On August 25, 2016, The Gillette Company entered into a merger agreement with The Gillette Company LLC, with Gillette as the surviving entity.  Gillette is a wholly-owned subsidiary of The Procter & Gamble Company.  Gillette can be served through its agent, The Corporation Trust Company, 1209 Orange St., Wilmington, DE 19801.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over Plaintiffs' breach of contract, negligence, and negligent misrepresentation claims pursuant to Art. 5, § 14 of the Missouri Constitution because circuit courts have original jurisdiction over all civil matters and because Plaintiffs seek recovery of money in excess of $25,000, so RSMo § 517.011 does not apply.  This Court has subject matter jurisdiction over Plaintiffs' declaratory judgment claims pursuant to RSMo §§ 527.010, 527.020, and 527.030.

17.    This Court has personal jurisdiction over Defendants.  First, Defendants satisfy the Missouri long-arm statute because, as described herein, Defendants transacted business within Missouri, made contracts within Missouri, contracted to insure a person, property, or risk located within Missouri at the time of contracting, and, with regard to Magnetek, it also made negligent misrepresentations in Missouri that have resulted in harm being sustained in Missouri.  Some of the Defendants are also registered to do business in Missouri.  Second, Defendants have numerous suit-related contacts with Missouri, including but not limited to various visits to Old Monsanto in Missouri regarding PCBs, communicating with Old Monsanto in Missouri, entering into contracts to purchase PCBs from Old Monsanto that were executed in Missouri and contained Missouri choice-of-law provisions, and/or the purchase of approximately 133 million pounds of PCBs from Old Monsanto which was based in Missouri at the time of those purchases.  Defendants purchased

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

PCBs from Old Monsanto by contacting Old Monsanto in Missouri by telephone and by sending purchase orders to Old Monsanto in Missouri.

18.     Venue is proper in St. Louis County, Missouri pursuant to RSMo § 508.010 because Plaintiffs allege tort claims against Defendants, and Plaintiffs were first injured by Defendants' tortious conduct in St. Louis County, Missouri.

**GENERAL ALLEGATIONS**

**I.      The Manufacture, Sale, Use, and Environmental Persistence of PCBs**

19.     From 1901 to 1997, Old Monsanto operated as a Missouri corporation manufacturing a variety of chemicals and agricultural products.

20.     Old Monsanto manufactured and sold PCBs under the trade name Aroclor between 1935 and 1977.

21.     PCBs are a group of man-made organic chemicals consisting of carbon, hydrogen, and chlorine atoms.  They are extremely stable, chemically inert, resistant to heat and fire, and highly electrically resistive.

22.     For much of the twentieth century, PCBs were recognized as an essential nonflammable fluid in many types of electrical equipment and machinery to mitigate very serious risks, including risk of fatal accidents from fire and explosions.  In fact, the National Electrical Code, other industry codes, and state and federal government regulations required the use of PCBs in certain electrical applications.

23.     General Electric pioneered the use of PCBs in electrical equipment.  By 1936, General Electric's Frank Clark held all initial patents for PCB dielectric applications as well as the transformers and capacitors that use PCBs.  The first change in the National Electric Code to permit the use of askarel-filled electrical equipment occurred in 1935 after a significant effort on the part

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

of General Electric to patent and to obtain an Underwriters' Laboratories "listing" covering four Pyranols, the trade name for General Electric's PCB electrical fluids.

24.     Old Monsanto sold PCBs in bulk to a number of industrial customers who incorporated them into a wide variety of finished products that were sold throughout the United States.

25.     Defendants and/or their predecessors-in-interest purchased millions of pounds of PCBs from Old Monsanto.

26.     Old Monsanto's customers—including Defendants and/or their predecessors-in-interest—incorporated PCBs into finished products, including dielectric fluids used in electrical equipment such as transformers, capacitors, and lighting ballasts.  For example, General Electric blended Aroclor manufactured by Old Monsanto with trichlorobenzene made by other manufacturers to create PCB electrical fluid products.  General Electric also licensed other electrical equipment manufacturers to use PCB electrical fluids in their equipment.  Under this arrangement, General Electric's competitors, such as Westinghouse, bought Aroclor through General Electric rather than directly from Old Monsanto.

27.     Westinghouse's trade name for PCB electrical fluid was Interteen.  During World War II, Westinghouse's arrangements for buying electrical grade Aroclor through General Electric changed.  In late 1942, Westinghouse began purchasing PCBs directly from Old Monsanto.

28.     The Environmental Protection Agency ("EPA") has estimated that approximately 75% of all PCBs manufactured in the United States from 1930 – 1975 were used in electrical transformers and capacitors.  *See* EPA, PCBs in the United States Industrial Use and Environmental Distribution at 215 (Feb. 25, 1976)  ("EPA PCB Report").

29.     Old Monsanto itself never sold finished electrical devices containing PCBs.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

30.     In the late 1960s, PCBs were found to persist in the environment.

31.     On January 21-22, 1970, Old Monsanto representatives met with General Electric representatives in St. Louis, Missouri who advised Old Monsanto that without the continued manufacture and sale of PCBs for electrical applications in the United States, the domestic industry for certain electrical devices would shut down.

32.     In early 1970, Old Monsanto announced that it would phase out production of PCBs for use as plasticizers and heat transfer fluids in food and feed applications.

33.     On or about February 18, 1970, Old Monsanto sent letters to its Aroclor electrical fluid customers calling their attention to recent reports indicating that molecules resembling the higher chlorinated products had been found in marine and wildlife environments. The letter urged Aroclor customers to use "all possible care" to prevent Aroclor products from becoming environmental contaminants.  The letter also pointed out that it was possible for PCB-containing electrically insulating liquids to leak out of sealed electrical devices and suggested that the recipients should notify the purchasers of their electrical equipment about the problem.

34.     In March 1970, General Electric held a full-scale internal review of the PCB situation and concluded that PCBs were a problem for General Electric and that General Electric was on notice from Old Monsanto to work on the problem and to work with its transformer and capacitor customers.  General Electric sent a letter notifying its Pyranol customers about the PCB situation in May 1970.  Despite these actions, General Electric strongly objected to ending the use of Aroclors 1254 and 1260 in electrical equipment and recommended that Old Monsanto continue to manufacture those products.

35.     On or about April 21, 1970, Westinghouse representatives met with Old Monsanto representatives in St. Louis, Missouri.  At that meeting, the Westinghouse representatives were

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

fully advised by Old Monsanto of the background and events involving the discovery of PCBs in the environment, and received information, *inter alia*, about the environmental risk of PCBs to certain forms of animal life.

36.     Starting in or around April 1970, Old Monsanto began labeling its Aroclor products, shipping documents, and invoices with a warning that extreme care should be taken to prevent any entry of PCBs into the environment.  Old Monsanto also undertook efforts to obtain agreement from General Electric and Westinghouse to place similar environmental warnings on Pyranol and Interteen containers.

37.     In or around June 23, 1970, Old Monsanto representatives visited P.R. Mallory and discussed the PCB environmental situation.

38.     In May 1971, the American National Standards Institute ("ANSI") established a PCB committee, designated as C107.  The ANSI C107 Committee was established at the recommendation of Old Monsanto with the objective of developing guidelines to minimize PCB environmental pollution from electric uses.  Representatives from UMC (N. Ray Clark) and General Electric (E. L. Raab) were on the ANSI C107 Steering Committee.

39.     In June 1971, Westinghouse and General Electric were instrumental in creating an industry report regarding the use and disposal of PCB dielectric fluids, which, *inter alia*, described the environmental problems posed by PCB dielectric fluids.

40.     In September 1971, the U.S. government convened an Interdepartmental Task Force on PCBs (the "Task Force").  The Task Force "included operating units of five Executive Branch departments," namely: the Department of Agriculture; Department of Commerce; EPA; Department of Health, Education, and Welfare; and Department of the Interior.  Dept. of Agriculture, et al., *Polychlorinated Biphenyls and The Environment* at 1 (May 1972) ("PCBs And

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

The Environment").  Its purpose was to "coordinate the scientific efforts of the Government aimed at understanding [PCBs], and to strengthen the Government's ability to protect the public from actual or potential hazards from PCBs." *Id*. (abstract).

41.     On or about September 14, 1971, Westinghouse representatives (T. K. Sloat and Don McClain) attended a meeting of electrical industry, utility, and government representatives, at which Old Monsanto representatives discussed the PCB situation in depth.

42.     In or around November 1971, ANSI established subcommittees on the use of PCBs in capacitors and transformers.  Various representatives of Defendants were members of these two committees, including N. Ray Clark (UMC), Dr. A. Pozefsky (GE), E.L. Raab (GE), R. D. McLain (Westinghouse), and T. K. Sloat (Westinghouse).  E. L. Raab (GE) was the chairman of the transformer subcommittee and Dr. A Pozefsky (GE) was the chairman of the capacitor subcommittee.  These ANSI subcommittees met multiple times in late 1971 and early 1972.

43.     On December 16, 1971, Old Monsanto hosted a meeting of Westinghouse representatives in St. Louis, Missouri.  The purpose of the meeting was to acquaint Westinghouse with the latest information concerning PCBs.

44.     On December 21, 1971, Old Monsanto sent a letter to dielectric customers advising that policies effective January 15, 1972 would restrict Old Monsanto's sales of PCBs to those customers who had entered into indemnity agreements with Old Monsanto.  A true and accurate copy of the December 21, 1971 letter is attached hereto as **Exhibit 28** and incorporated herein by reference.

45.     From 1971 forward, Old Monsanto worked hand-in-hand with the EPA to determine when acceptable substitutes were available and Old Monsanto could stop production of PCBs.  *See* EPA, *Industry Views on the Use of PCBs* at 7 (1976) (Statement of F.J. Fitzgerald,

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Vice-President, Monsanto Chemical Company) (Old Monsanto "reaffirm[ing]" its "commitment to continue working with the EPA and the electrical industry in finding solutions to the PCB issue.").

46.     In 1972, the Task Force issued a major report on PCBs, which "reflect[ed] the position of the operating agencies of the Federal Government which have major responsibilities concerning such chemicals as PCBs in food and in the environment."  PCBs And The Environment at 1.  The report found that PCBs had certain "essential or non-replaceable uses."  *Id*. at 3.  After reviewing "all of the available scientific information on various aspects of the PCB problem," *id.* at 2, the Task Force agreed on nine separate conclusions relating to PCBs, including the following:

> The use of PCBs should not be banned entirely.  ***Their continued use for transformers and capacitors in the near future is considered necessary*** because of the significantly increased risk of fire and explosion and the disruption of electrical service which would result from a ban on PCB use.  Also, continued use of PCBs in transformers and capacitors presents a minimal risk of environmental contamination.

*Id*. at 4 (emphasis added).

47.     The Task Force further explained that continued use of PCBs was essential, because there were no present substitutes for the use of PCBs, and that purchasers and users of PCBs understood the need for unusual protective measures to prevent their release into the environment:

> The advantages to the public in terms of safe, reliable, and efficient electrical equipment made possible by the use of PCBs have been documented in the body of, and especially Appendix B to, this report.  It is also clear that there are no present or prospective substitutes for these materials, and that the functions they perform are essential.  Thus the continuing need for PCBs in closed electrical system applications is conclusive.  The electrical industry well understands, however, that continued use of these materials requires unusual protective measures.

*Id*. at 81.

48.     In 1976, Congress enacted the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 *et seq.*, which required that the EPA promulgate rules governing continued use of PCBs.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Pursuant to the TSCA, the EPA promulgated a comprehensive regulatory scheme governing the manufacture, use, distribution, disposal, and remediation of PCBs and, in 1979, banned the intentional manufacture of PCBs without specific authorization from the agency.  *See* 40 C.F.R. § 761.1 *et seq.*

## II.    The Special Undertaking Agreements

49.    By November 1971, Old Monsanto had made the decision to phase out sales for all remaining, non-electrical applications of PCBs.   Because the continued viability of the U.S. electric industry depended upon a domestic source for PCBs, Old Monsanto agreed to continue to supply PCBs for closed electrical applications until suitable alternatives became available, but only if customers would agree to defendant and indemnify Old Monsanto against future PCB-related claims.

50.    Each of the Defendants or their predecessors-in-interest entered into substantially similar Special Undertaking Agreements with Old Monsanto whereby Defendants or their predecessors-in-interest each agreed to defend, indemnify, and hold harmless Old Monsanto from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with Defendants' (or their predecessors-in-interest's) receipt, purchase, possession, handling, use, sale, or disposition of PCBs, whether alone or in combination with other substances.   In reliance on these Special Undertaking Agreements, Old Monsanto continued to manufacture and sell PCBs to Defendants until 1977.   True and accurate copies of the Special Undertaking Agreements entered into by Defendants or their predecessors-in-interest are attached hereto as **Exhibits 1-6**.

51.    Based on available sales records, between 1972 and 1977, Old Monsanto sold approximately 142,971,731 pounds of PCBs to customers who signed Special Undertaking

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Agreements that remain viable today.  Defendants were the top six purchasers of those PCBs, purchasing 133,406,342 pounds or 93% of those PCBs.

52.     Based on available sales records, Defendants purchased the following amounts of PCBs from Old Monsanto between 1972 and 1977:

| PCB Purchaser | Successor (if applicable) | Pounds of PCBs Purchased |
|---|---|---|
| Aerovox Corporation | KYOCERA AVX | 9,395,500 |
| Cornell Dubilier Electronics, Inc. | | 7,446,200 |
| General Electric Company | | 59,910,405 |
| P.R. Mallory & Co. Inc. | The Gillette Company LLC | 7,060,700 |
| Universal Manufacturing Corporation | Magnetek, Inc. | 11,918,600 |
| Westinghouse Electric Corporation | Paramount | 37,674,937 |
| **TOTAL** | | **133,406,342** |

53.     Defendants purchased these PCBs by calling Old Monsanto employees in Missouri or sending purchase orders to Old Monsanto's principal place of business in Missouri.  Old Monsanto accepted these purchase orders in Missouri.

A.     **The Magnetek Special Undertaking Agreement**

54.     On January 7, 1972, UMC and Old Monsanto executed a written agreement entitled "Special Undertaking by Purchasers of Polychlorinated Biphenyls" (the "Magnetek Special Undertaking Agreement").  The final act creating the Magnetek Special Undertaking Agreement—Old Monsanto's execution of the agreement—occurred in Missouri.  A true and correct copy of the Magnetek Special Undertaking Agreement is attached hereto as **Exhibit 1** and incorporated herein by reference.

55.     Prior to signing the Magnetek Special Undertaking Agreement, Old Monsanto sent

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

letters to UMC and met in-person with UMC employees, including its Executive Vice President N. Ray Clark, to discuss PCB environmental pollution.  For example, in 1969, Old Monsanto advised UMC to keep PCBs well-contained and to exercise the highest degree of control in its storage of PCBs.

56.     Magnetek is the successor-in-interest to UMC's obligations under the Magnetek Special Undertaking Agreement.

57.     The Magnetek Special Undertaking Agreement identifies UMC as the "Buyer" and states:

> While Buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.
>
> Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Exhibit 1 at 1.

58.     The Magnetek Special Undertaking Agreement further states that UMC will defend, indemnify, and hold Monsanto harmless against future PCB-related claims as follows:

> Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses (except to the extent arising from failure of PCB to conform to specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale, or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Exhibit 1 at 1.

59.     Further, the Magnetek Special Undertaking Agreement states that "[a]ll existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provision set forth above."  Exhibit 1 at 1.

60.     As shown, the Magnetek Special Undertaking Agreement broadly covers all claims "arising out of" or having any "connection with" the receipt or purchase of PCBs by Magnetek after January 7, 1972.

61.     The Magnetek Special Undertaking Agreement is not limited to claims connected only to PCBs purchased by Magnetek after January 7, 1972, but also applies to claims connected to those PCBs "in combination with other substances."

62.     On January 7, 1972, the President of UMC sent a letter to Old Monsanto in Missouri stating that the Special Undertaking Agreement is covered by a blanket liability policy with Travelers Insurance Company having limits of $10 million dollars.  On January 17, 1972 the insurance manager for UMC's then parent company, Northwest Industries, Inc., sent a letter to Old Monsanto *in Missouri* providing a "Certificate of Insurance" "[i]n furtherance of the undertaking between [Old Monsanto] and our Universal Manufacturing Corporation."  A true and accurate copy of the January 7, 1972 letter is attached hereto as **Exhibit 7** and incorporated herein by reference.

63.     In the following years, UMC and its parent company sent additional correspondence and certificates of insurance to Old Monsanto in Missouri including at least three letters sent by UMC to Old Monsanto in Missouri, three letters sent by Northwest Industries, Inc. to Old Monsanto in Missouri, and various Certificates of Insurance issued to Old Monsanto every

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

year from 1972 to 1977.  Old Monsanto received and processed the letters from UMC and Northwest Industries, Inc., and the Certificates of Insurance, in Missouri.

64.     Representatives from UMC visited Old Monsanto in Missouri on multiple occasions to attend meetings regarding PCBs.  For example, in 1974, the vice president of Magnetek's predecessor, N. Ray Clark, attended two meetings at Old Monsanto's headquarters in St. Louis regarding PCBs—a meeting on Proposed PCB Effluent Standards and an International Dielectrics Symposium presented by Old Monsanto.

**B.      The General Electric Special Undertaking Agreement**

65.     On January 21, 1972, General Electric and Old Monsanto executed a written agreement entitled "Special Undertaking by Purchasers of Polychlorinated Biphenyls" (the "GE Special Undertaking Agreement").   The final act creating the GE Special Undertaking Agreement—Old Monsanto's execution of the agreement—occurred in Missouri.

66.     On February 3, 1972, Canadian General Electric Company Limited (a GE affiliate), Old Monsanto, and Monsanto Canada Limited executed a "Special Undertaking By Purchasers Of Polychlorinated Biphenyls" (the "Canadian GE Special Undertaking Agreement").  The final act creating the Canadian GE Special Undertaking Agreement—Old Monsanto's execution of the agreement—occurred in Missouri. The Canadian GE Special Undertaking Agreement is substantially similar to the GE Special Undertaking Agreement (collectively referred to as the "GE Special Undertaking Agreements"). True and correct copies of the GE Special Undertaking Agreement, an addendum thereto, and the Canadian GE Special Undertaking Agreement are attached hereto as **Exhibit 2** and incorporated herein by reference.

67.     Prior to entering into the GE Special Undertaking Agreements, Old Monsanto advised GE to keep PCBs well-contained and to exercise the highest degree of control in its storage

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

of PCBs.  For example, in February 1970, Old Monsanto sent a letter to GE alerting GE to potential problems of environmental contamination relating to PCBs.  In addition, in January 1970, Old Monsanto representatives met with GE representatives in St. Louis for a discussion of environmental safety aspects associated with the use of PCBs.  Old Monsanto representatives met with GE representatives again in December 1971 to discuss environmental issues with regard to PCBs and the Special Undertaking Agreements.  Old Monsanto sent another letter to GE on or about January 3, 1972 reiterating that PCBs "are not readily biodegradable" and that GE should "take every precaution to prevent any entry of polychlorinated biphenyls into the environment through spills, usage, leakage, disposal, vaporization or otherwise."

68.     The Sales Contract for PCBs between Old Monsanto and GE for the period July 1, 1971 to June 30, 1972 included the following statement:

> It is understood that the products sold hereunder contain polychlorinated biphenyls, which some studies have shown may be an environmental contaminant.  Buyer agrees to use its best efforts to prevent such products from entering into the environment through spills, leakage, use, disposal, vaporization or otherwise.

69.     The GE Special Undertaking Agreement identifies General Electric as the "Buyer" and states:

> While Buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.
>
> Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Exhibit 2 at 1.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

70.     The GE Special Undertaking Agreement further states that General Electric will

defend, indemnify, and hold Monsanto harmless against future PCB-related claims as follows:

> Accordingly, Buyer hereby covenants and agrees that, with respect to any and all
> PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date
> hereof and in consideration of any such sale or delivery, Buyer shall defend,
> indemnify and hold harmless Monsanto, its present, past and future directors,
> officers, employe[e]s and agents, from and against any and all liabilities, claims,
> damages, penalties, actions, suits, losses, costs and expenses arising out of or in
> connection with the receipt, purchase, possession, handling, use, sale, or disposition
> of such PCB's by, through or under Buyer, whether alone or in combination with
> other substances, including, without implied limitation, any contamination of or
> adverse effect on humans, marine and wildlife, food, animal feed or the
> environment by reason of such PCB's.

Exhibit 2 at 1.

71.     Further, the GE Special Undertaking Agreement states that "[a]ll existing contracts

for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provision set forth

above."  Exhibit 2 at 2.

72.     As shown, the GE Special Undertaking Agreement broadly covers all claims

"arising out of" or having any "connection with" the receipt or purchase of PCBs by GE after

January 21, 1972.

73.     The GE Special Undertaking Agreement is not limited to claims connected only to

PCBs purchased by GE after January 21, 1972, but also applies to claims connected to those PCBs

"in combination with other substances."

**C.      The Paramount Special Undertaking Agreement**

74.     On January 15, 1972, Westinghouse and Old Monsanto executed a written

agreement entitled "Special Undertaking by Purchasers of Polychlorinated Biphenyls" (the

"Paramount Special Undertaking Agreement").  The Paramount Special Undertaking Agreement

was negotiated by the legal departments of Old Monsanto and Westinghouse from December 4,

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1971 until January 15, 1972.   The final act creating the Paramount Special Undertaking Agreement—Old Monsanto's execution of the agreement—occurred in Missouri.   A true and correct copy of the Paramount Special Undertaking Agreement is attached hereto as **Exhibit 3** and incorporated herein by reference.

75.     Prior to signing the Paramount Special Undertaking Agreement, Old Monsanto advised Westinghouse to keep PCBs well-contained and to exercise the highest degree of control in its storage of PCBs.  For example, in February 1970, Old Monsanto sent a letter to Westinghouse alerting Westinghouse to potential problems of environmental contamination relating to PCBs.  In April 1970, Old Monsanto hosted a full day meeting with Westinghouse representatives in Missouri to discuss, *inter alia*, PCB toxicity and methods of disposal.  Old Monsanto also recommended to Westinghouse that its Inerteen labels be changed to include an environmental warning stating in part that "some studies have shown [PCBs] may be an environmental contaminant" and that "[e]xtreme care should be taken to prevent any entry into the environment through spills, leakage, use disposal, vaporization or otherwise."  Westinghouse representatives also visited Old Monsanto in Missouri to discuss PCBs, including information regarding the toxicity of PCBs.

76.     Paramount is the successor-in-interest to Westinghouse's obligations under the Paramount Special Undertaking Agreement.

77.     The Paramount Special Undertaking Agreement identifies Westinghouse as the "Buyer" and states:

> While Buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

> Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Exhibit 3 at 1.

78.     The Paramount Special Undertaking Agreement further states that Westinghouse will defend, indemnify, and hold Monsanto harmless against future PCB-related claims as follows:

> Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employe[e]s and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale, or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

Exhibit 3 at 1-2.

79.     Further, the Paramount Special Undertaking Agreement states that "[a]ll existing contracts for the sale of PCB's by Monsanto to Buyer for delivery in the future are hereby amended to contain the provision set forth herein."  Exhibit 3 at 3.

80.     As shown, the Paramount Special Undertaking Agreement broadly covers all claims "arising out of" or having any "connection with" the receipt or purchase of PCBs by Paramount after January 15, 1972.

81.     The Paramount Special Undertaking Agreement is not limited to claims connected only to PCBs purchased by Paramount after January 15, 1972, but also applies to claims connected to those PCBs "in combination with other substances."

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

82.     The Paramount Agreement states that it "shall be governed by and be construed according to the laws of the State of Missouri."  Exhibit 3 at 3.

**D.     KYOCERA AVX Special Undertaking Agreements**

83.     On February 7, 1972, Aerovox, Aerovox Canada Limited, and Old Monsanto executed a written agreement entitled "Special Undertaking by Purchasers of Polychlorinated Biphenyls" (the "KYOCERA AVX Special Undertaking Agreement").  The final act creating the KYOCERA AVX Special Undertaking Agreement—Old Monsanto's execution of the agreement—occurred in Missouri.

84.     On March 20, 1972, Aerovox, Aerovox Canada Limited, Old Monsanto, and Monsanto Canada Limited executed a written agreement entitled "Special Undertaking by Purchasers of Polychlorinated Biphenyls" (the "Canadian KYOCERA AVX Special Undertaking Agreement").  The Canadian KYOCERA AVX Special Undertaking Agreement is substantially similar to the KYOCERA AVX Special Undertaking Agreement (collectively referred to as the "KYOCERA AVX Special Undertaking Agreements").  The final act creating the KYOCERA AVX Special Undertaking Agreement—Old Monsanto's execution of the agreement—occurred in Missouri.  True and correct copies of the KYOCERA AVX Special Undertaking Agreements are attached hereto as **Exhibit 4** and incorporated herein by reference.

85.     KYOCERA AVX is the successor-in-interest to Aerovox's obligations under the KYOCERA AVX Special Undertaking Agreements.

86.     The KYOCERA AVX Special Undertaking Agreements identify Aerovox as a "Buyer" and state:

> While Buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Exhibit 4 at 1, 3.

87.    The KYOCERA AVX Special Undertaking Agreements further state that Aerovox

will defend, indemnify, and hold Monsanto harmless against future PCB-related claims as follows:

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employe[e]s and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale, or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

Exhibit 4 at 1; *see also id.* at 3 (substantially similar provision in Canadian KYOCERA AVX

Special Undertaking Agreement).

88.    Further, the KYOCERA AVX Special Undertaking Agreements state that "[a]ll

existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the

provision set forth above."  Exhibit 4 at 2, 4.

89.    As shown, the KYOCERA AVX Special Undertaking Agreements broadly cover

all claims "arising out of" or having any "connection with" the receipt or purchase of PCBs by

AVX after February 7, 1972.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

90.     The KYOCERA AVX Special Undertaking Agreements are not limited to claims connected only to PCBs purchased by KYOCERA AVX's predecessors-in-interest after February 7, 1972, but also apply to claims connected to those PCBs "in combination with other substances."

**E.    The CDE Special Undertaking Agreement**

91.     On January 26, 1972, CDE and Old Monsanto executed a written agreement entitled "Special Undertaking by Purchasers of Polychlorinated Biphenyls" (the "CDE Special Undertaking Agreement").  The final act creating the CDE Special Undertaking Agreement—Old Monsanto's execution of the agreement—occurred in Missouri.   A true and correct copy of the CDE Special Undertaking Agreement is attached hereto as **Exhibit 5** and incorporated herein by reference.

92.     The CDE Special Undertaking Agreement identifies CDE as the "Buyer" and states:

> While Buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.
>
> Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Exhibit 5 at 1.

93.     The CDE Special Undertaking Agreement further states that CDE will defend, indemnify, and hold Monsanto harmless against future PCB-related claims as follows:

> Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors,

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

officers, employe[e]s and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale, or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

Exhibit 5 at 1.

94.     Further, the CDE Special Undertaking Agreement states that "[a]ll existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provision set forth above."  Exhibit 5 at 2.

95.     As shown, the CDE Special Undertaking Agreement broadly covers all claims "arising out of" or having any "connection with" the receipt or purchase of PCBs by CDE after January 26, 1972.

96.     The CDE Special Undertaking Agreement is not limited to claims connected only to PCBs purchased by CDE after January 26, 1972, but also applies to claims connected to those PCBs "in combination with other substances."

**F.      The Gillette Special Undertaking Agreement**

97.     On February 4, 1972, P.R. Mallory and Old Monsanto executed a written agreement entitled "Special Undertaking by Purchasers of Polychlorinated Biphenyls" (the "Gillette Special Undertaking Agreement").  The final act creating the Gillette Special Undertaking Agreement—Old Monsanto's execution of the agreement—occurred in Missouri.  A true and correct copy of the Gillette Special Undertaking Agreement is attached hereto as **Exhibit 6** and incorporated herein by reference.

98.     Gillette is the successor-in-interest to PR Mallory's obligations under the Magnetek Special Undertaking Agreement.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

99.     The Gillette Special Undertaking Agreement identifies P.R. Mallory as the "Buyer"

and states:

> While Buyer desires to purchase PCB's because of certain desirable flame resistant
> and insulator properties, Buyer acknowledges that it is aware and has been advised
> by Monsanto that PCB's tend to persist in the environment; that care is required in
> their handling, possession, use and disposition; that tolerance limits have been or
> are being established for PCB's in various food products.
>
> Monsanto has therefore adopted certain restrictive policies with respect to its
> further production, sale and delivery of PCB's, including the receipt of
> undertakings from its customers as set forth below, and Buyer is willing to agree to
> such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to
> Buyer.

Exhibit 6 at 1.

100.    The Gillette Special Undertaking Agreement further states that P.R. Mallory will

defend, indemnify, and hold Monsanto harmless against future PCB-related claims as follows:

> Accordingly, Buyer hereby covenants and agrees that, with respect to any and all
> PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date
> hereof and in consideration of any such sale or delivery, Buyer shall defend,
> indemnify and hold harmless Monsanto, its present, past and future directors,
> officers, employe[e]s and agents, from and against any and all liabilities, claims,
> damages, penalties, actions, suits, losses, costs and expenses (except to the extent
> arising from the failure of PCB's to conform with specifications) arising out of or
> in connection with the receipt, purchase, possession, handling, use, sale, or
> disposition of such PCB's by, through or under Buyer, whether alone or in
> combination with other substances, including, without implied limitation, any
> contamination of or adverse effect on humans, marine and wildlife, food, animal
> feed or the environment by reason of such PCB's.

Exhibit 6 at 1.

101.    Further, the Gillette Special Undertaking Agreement states that "[a]ll existing

contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provision

set forth above."  Exhibit 6 at 1.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

102.    As shown, the Gillette Special Undertaking Agreement broadly covers all claims "arising out of" or having any "connection with" the receipt or purchase of PCBs by Gillette after February 4, 1972.

103.    The Gillette Agreement is not limited to claims connected only to PCBs purchased by Gillette after February 4, 1972, but also applies to claims connected to those PCBs "in combination with other substances."

**III.    Defendants Released PCBs into the Environment.**

104.    Defendants were aware of the potential for PCBs to persist in the environment and of the need to use care in the use and handling of PCBs.  Nevertheless, Defendants and their products have been a major source of environmental PCB contamination, and Defendants have released PCBs purchased both before and after signing the Special Undertaking Agreements into the environment.

105.    PCBs have been released into the environment by Defendants and/or their predecessors-in-interest through their release from products they manufactured, disposal of PCB-containing products, leaks, accidental spills, dumping and disposal of industrial wastes, and through other means.

106.    Some PCBs, once released into the environment, do not break down readily and may persist for long periods of time.

107.    PCBs cycle between air, water, and soil and can be carried long distances from the site of original release.

108.    In 1976, EPA estimated that, of the 440 million pounds of PCBs that were estimated to be "in the environment," at least 190 million pounds (or 43%) came from capacitor and

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

transformer production wastes and obsolete electrical equipment in landfills and dumps.  *See* EPA PCB Report at 5, 7, Table 1.2-1.

109.   The EPA also reported that 9.6 million pounds of PCBs were "land-disposed" each year as a result of the production and use of PCBs in transformers and capacitors.  *See id.* at 292 (Ex. A).  The EPA estimated that 2.4 million pounds of PCBs were land disposed annually as a result of PCB production and transformer and capacitor use, another 4.5 million pounds of PCBs enter landfills each year due to failure of PCB-impregnated capacitors, and another 2.7 million pounds enter landfills each year from capacitors that have not failed but are contained in obsolete equipment.  As the EPA explained:  "[T]he current estimated yearly rate of PCBs entering land disposal sites is about 12 million pounds.  The largest source of this material is capacitors which have failed or become obsolete, or which are contained in obsolete equipment."  *Id*. at 8.

110.   Defendants used PCBs in the manufacture of electrical equipment—e.g., capacitors, transformers, and light ballasts—that were sold throughout the United States.  In 1976, General Electric was the leading industrial user of PCBs in the manufacture of capacitor and transformer products.   EPA 560/4-76-003, Industry Views on the Use of Polychlorinated Biphenyls in Transformers and Capacitors at 9 (June 1976) (Statement of John F. Welch, Vice-President, General Electric Company).  The EPA reported in 1976 that General Electric used more PCBs than any other company in the U.S. capacitor manufacturing industry. Westinghouse, Aerovox, UMC, CDE, and P.R. Mallory, respectively, used the second, third, fourth, fifth, and sixth most PCBs in the U.S. capacitor manufacturing industry.  EPA PCB Report at 69, Table 3.1.1-1.

111.   The capacitor industry alone generated over 3 million pounds of PCB waste annually, much of which previously "was not disposed of properly and thus entered the

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

environment directly." *Id.* at 11. The percentage of the total amount of PCBs currently in the environment that were released from transformers and capacitors is predicted to be even higher now, due to the cessation of PCB production for other uses in 1971, and the longer product lifetime for transformers and capacitors. *See, e.g.*, Breivik, K., et al., *Toward a global historical emission inventory for selected PCB congeners – a mass balance approach 2. Emissions*. The Science of the Total Environment 290: 199-224, 216 (2002) ("[T]here has been a shift in the relative importance of emissions attributed to usage, from open sources to closed systems. This is caused by the cessation of open usage and longer product lifetime for closed systems.").

A.     **Magnetek Released PCBs into the Environment**

112.    Magnetek and/or its predecessor-in-interest and their products have been a major source of environmental PCB contamination and have released PCBs purchased both before and after January 1972 into the environment.

113.    UMC released thousands of gallons of PCBs into the environment through spills, leaks, and disposal and dumping.

114.    From the mid-1950s until the late 1970s, UMC manufactured electrical capacitors in a facility in Bridgeport, Connecticut. UMC impregnated capacitors with PCBs at this facility. UMC used as many as 2,000 gallons of PCBs per week prior to February 1978. Upon information and belief, UMC released PCBs into the environment near its Bridgeport facility through spills, leaks, and disposal of materials, including pouring PCBs into sewer drains.

115.    In 1976, the EPA and Connecticut Department of Environmental Protection found UMC likely caused PCB contamination of state waters.

116.    In 1981, the EPA cited UMC for improper disposal and storage of PCBs.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

117.    Upon information and belief, Magnetek discovered PCB contamination at the Bridgeport facility after it acquired the property in 1986.

118.    Upon information and belief, Magnetek and/or UMC entered into a consent decree to clean up pollution in the Passaic River.

119.    UMC also manufactured capacitors in its plant in Totowa, New Jersey.

120.    At least one light ballast containing PCBs that was manufactured by UMC has been recovered from the Sky Valley Education Center in Monroe, Washington.  Testing of this light ballast determined that the light ballast contained Aroclor 1016, which indicates that it was manufactured by UMC after UMC entered into the Magnetek Special Undertaking Agreement.

121.    UMC ultimately released thousands of pounds of PCBs into the environment through spills, leaks, disposal, and dumping.  For example, in *Fruit of the Loom, Inc. v. Travelers Indem. Co.*, the Court summarized testimony from a UMC foreman who stated that UMC "poured PCBs into sewer drains," "pumped probably 3 or 400 gallons right out an exhaust port of a vacuum pump out onto the driveway and down the street and [it] ran into sewer drains and [it] ran into the railroad viaducts on more than one occasions," and that he "poured PCBs into the external drains in the plant."  672 N.E.2d 278, 281 (Ill. App. 1996).  "PCBs escaped from the [UMC] capacitor impregnation room through the wood and steel flooring, down into the underlying oil reclamation room where it leached into the concrete slab beneath the plant and leached through the concrete into the soil and groundwater beneath the oil reclamation room."  *Id.*  There were also "pipe leaks and overflows continually occur[ing] in the impregnation area" with "[a] Monsanto report indicat[ing] that [UMC] was losing about $6^{1/2}$ lbs. [of PCBs] per week out of vent lines" and "conclud[ing] that [UMC] was losing approximately one tank car of [PCBs] per year."  *Id.*

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

**B.      General Electric Released PCBs into the Environment**

122.    General Electric and its products have been a major source of environmental PCB contamination and have released PCBs purchased both before and after January 1972 into the environment.

123.    For example, the General Electric facility in Oakland, California served as a transformer manufacturing plant from 1927 to 1975.  The dielectric fluid in the transformers contained PCBs.  In or around 1980, the State of California Health and Welfare Agency, Department of Health Services, Toxic Substances Control Division found that the soil and groundwater around General Electric's transformer manufacturing plant in Oakland, California were contaminated with PCBs.

124.    General Electric also caused significant PCB contamination of the Hudson River, now one of the largest Superfund sites in the United States.  According to the EPA, "[d]uring an approximate 30-year period ending in 1977, manufacturing processes at two GE facilities, one in Fort Edwards, New York, and the other in Hudson Falls, New York, used [PCBs] in the manufacture of electrical capacitors.  PCBs from both facilities were discharged into the Hudson River."  *See In the Matter of Hudson River PCBs Superfund Site*, Administrative Settlement Agreement and Order on Consent from Remedial Investigation and Feasibility Study, at 6 (Sept. 30, 2014).  The EPA estimates that General Electric discharged approximately 1.3 million pounds of PCBs into the Hudson River from two General Electric capacitor manufacturing plants located in the towns of Fort Edwards and Hudson Falls, New York.

125.    From 1932 to 1977, General Electric manufactured and serviced electrical transformers containing PCBs at its Pittsfield, Massachusetts facility.  The EPA has determined that years of General Electric's use and disposal of PCBs at this facility caused extensive

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

contamination around Pittsfield, Massachusetts as well as down the entire length of the Housatonic River.

126.    General Electric also is responsible for PCB contamination in Spokane, Washington.  The site was used by General Electric to operate a transformer service shop from 1961 to 1980.  After the shop closed, PCBs were found in the groundwater, surface soils, dry wells, and other drainage features.

127.    General Electric is responsible for PCB contamination in Oregon.  From 1952 until 2010, General Electric owned and operated an electrical equipment service and repair facility and warehouse in Portland, Oregon — approximately 3,000 feet from the shore of the Willamette River.  At this facility, General Electric used dielectric fluids likely containing more than 500 parts per million ("ppm") of PCBs from 1972 until 1976, and continued to use dielectric fluids with a PCB concentration greater than 50 ppm until 1978.  In 2003, testing by the City of Portland revealed that PCBs from sediments near the General Electric facility were discharged into the City's stormwater system and, in turn, the Willamette River.

128.    General Electric also stored a variety of transformers and capacitors containing PCBs at a site at 2410 N. Columbia Blvd. in Portland, Oregon.  Officials subsequently discovered PCB contamination at this site as well.

129.    From 1970 until 1974, General Electric stored drums, transformer casings, and other containers at a facility in Eugene, Oregon.  In 1995, testing revealed PCBs persisted in subsurface soils and sludge and water samples from a storm drain on the site.

130.    From 1974 until 1993, General Electric had another facility in Portland, Oregon where GE employees pressure washed and cleaned equipment including transformers.  Water from

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

these cleaning activities was directed to tanks and sumps.  In 1995, testing of groundwater, sludge and water samples from the site revealed PCBs above regulatory levels.

131.    General Electric also is responsible for PCB contamination in Milford, New Hampshire.  The EPA found hundreds of drums of scrap PCB-containing fluids and several had leaked.  The scrap PCBs originated from General Electric which failed to arrange for proper disposal.

132.    General Electric also is responsible for PCB contamination in East Flat Rock, North Carolina.  In 1994, EPA declared the 141-acre General Electric/Shepard Far Site a Superfund Site. EPA placed the site on its Superfund National Priority List because of contaminated groundwater and soil.

133.    General Electric is also responsible for extensive PCB contamination of the soil and water surrounding its plant and other locations in Schenectady, New York.  In March 2005, The New York State Department of Environmental Conservation issued a Record of Decision for the General Electric Main Plant State Superfund site in the City of Schenectady/Town of Rotterdam, Schenectady County, New York.  *See Record of Decision, General Electric Main Plant Site*, New York State Department of Environmental Conservation (March 2005), *available at* https://www.dec.ny.gov/data/DecDocs/447004/ROD.HW.447004.2005-03-30.ge_main_plant_ou3_ou4.pdf;  *see also Documentation of Environmental Indicator Determination, General Electric Main Plant*, Environmental Protection Agency (Sept. 29, 2004), *available at* https://www3.epa.gov/region02/waste/geriv750.pdf.  General Electric's studies at the site found soils containing high levels of PCBs in various areas of the manufacturing plant and on-site landfills.  *Id*.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

134.    Upon information and belief, General Electric also is responsible for PCB contamination around certain of its other facilities, both before and after January 1972, including, but not limited to facilities in: Washington, West Virginia; Shepherdsville, Kentucky; Moreau, New York; Rome, Georgia; Brandon, Florida; and Anaheim, California. *National Union Fire Ins. Co. of Pittsburgh, PA, et al. v. Arkwright Mut. Ins. Co.*, 1993 WL 1448 (S.D.N.Y. Jan. 11, 1993) (noting PCB contamination in General Electric's Brandon, Florida facility and Woodmar Manufacturing Facility in Washington, West Virginia); *GE: Decades of Misdeeds and Wrongdoing*, 22 Multinational Monitor 7/8 (July/August 2001), *available at* http://www.multinationalmonitor.org/mm2001/01july-august/julyaug01corp4.html_(noting PCB contamination in and around Shepherdsville, Kentucky); *Jensen v. General Elec. Co.*, 182 A.D.2d 903, 903 (N.Y. Super. 1992) (noting PCBs in groundwater near Morneau, New York); *General Elec. Co. v. Lowe's Home Centers, Inc.*, 608 S.E.2d 636, 637 (Ga. 2005) (noting PCB property contamination in Rome, Georgia); Marla Cone, *GE Plant Investigated for Chemical Hazards*, Los Angeles Times (Feb. 2, 1992), *available at* http://articles.latimes.com/1992-02-02/news/mn-2080_1_pcb-exposure (noting groundwater contamination at plant in Brandon, Florida and that plant in Anaheim, California handled 2 million pounds of PCB waste per year).

### C.    Paramount Released PCBs Into the Environment

135.    Paramount and/or its predecessors-in-interest and their products have been a major source of environmental PCB contamination and have released PCBs purchased both before and after January 1972 into the environment.

136.    In September 1974, 265 gallons of PCBs were directly released into the Duwamish Waterway in Washington when a transformer manufactured by Westinghouse was dropped while being loaded onto a commercial barge.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

137.     Paramount is responsible for PCB contamination in Oregon.  From 1943 until 1978, Westinghouse conducted electrical equipment repair, maintenance, cleaning and storage activities at multiple properties in the vicinity of the Willamette River, including the Portland Apparatus Service Plant at 614 N. Tillamook St., Portland, Oregon.  At the Portland Apparatus Service Plant, Westinghouse stored transformer oil in multiple underground storage tanks, including a 10,000-gallon tank.  The site also had a designated PCB handling area and catch basins and pits used to collect PCB-containing fluids.  Upon information and belief, PCBs were released into the east bank of the Willamette River, subsurface soils, and surrounding environment through cracks in the building floor and floor drains.  Also, as part of its operations, Westinghouse may have poured old oil from transformers directly onto the ground at the site. The Oregon Department of Environmental Quality has concluded significant environmental releases, including the release of PCBs, occurred at the Portland Apparatus Service Plant.  Testing in 1999, 2000, and 2005 revealed high levels of PCB contamination in the building materials and soils. In 2013, Westinghouse entered into an administrative settlement agreement with the EPA and the City of Portland to pay for testing and remedial work on a portion of the Willamette River.

138.     Westinghouse also repaired, maintained, and stored electrical transformers at two other locations in Portland, Oregon during the 1970's and 1980's — a site on Ramsey Blvd. and an additional site on Kirby Avenue.

139.     From the late 1950s until the 1990s, Westinghouse owned and operated an electrical transmission equipment maintenance and repair plant in Los Angeles, California. This plant discharged PCB-laden wastewater (containing as much as 38,000 pounds of PCBs) into the San Pedro Channel, the Palo Verdes Peninsula, and Los Angeles Harbor.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

140.    From 1958 until 1977, Westinghouse operated a plant in Bloomington, Indiana. Westinghouse disposed of defective capacitors containing PCBs in six local dumps and landfills, contaminating the landfills with PCBs.  Westinghouse also discharged PCBs into the local sewer system, releasing even more PCBs into the environment.  During subsequent investigations, the Center for Disease Control detected elevated PCB levels in Bloomington residents.  The City of Bloomington filed a lawsuit against Westinghouse and Old Monsanto regarding the PCB contamination.  On appeal, the Seventh Circuit Court of Appeals held that Westinghouse—not Monsanto—engaged in abnormally dangerous activity.  *City of Bloomington, Ind. v. Westinghouse, Elec. Corp.*, 891 F.2d 611, 615 (7th Cir. 1989).

141.    From the 1950s until 1974, Westinghouse used PCBs in an electrical transformer manufacturing facility in Sunnyvale, California.  Westinghouse caused soil and groundwater contamination around this facility by allowing a storage tank to leak, permitting localized spills of PCBs, and applying PCBs as a herbicide around the facility.

142.    PCBs were found in the soil around a site in Emeryville, California where Westinghouse manufactured and repaired electrical components including transformers from 1924 until 1992.

143.    PCBs were found in the soil and groundwater around an electrical transformer repair facility in Minneapolis, Minnesota owned by Westinghouse from the 1920s until 1980.

144.    From 1961 until 1989, Westinghouse used PCB fluids as a heat transfer fluid when manufacturing and repairing transformers in Muncie, Indiana, which produced PCB contamination in the soil and sewer system at the plant.

145.    From 1932 until 1976, Westinghouse used PCBs while manufacturing transformers in Sharon, Pennsylvania.  In addition to occasional spills and PCBs surfacing, Westinghouse was

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

investigated for a spill that released more than 6,000 gallons of PCB-contaminated oil.  PCBs have been found in the soil and groundwater near the site.

146.    In 1992, Westinghouse spilled approximately 55 gallons of PCBs in Washington D.C. when removing old transformers from an underground vault.

147.    Upon information and belief, Westinghouse also is responsible for PCB contamination around certain of its other facilities, both before and after January 1972, including, but not limited to facilities in: Cleveland, Ohio; Union City, Indiana; Utica, New York; Yorkville, New York; Horseheads, New York; and Needham, Massachusetts.

D.    **KYOCERA AVX Released PCBs into the Environment**

148.    KYOCERA AVX and/or its predecessors-in-interest and their products have been a major source of environmental PCB contamination and have released PCBs purchased both before and after February 1972 into the environment.

149.    From the 1940s until 1973, Aerovox and then AVX Ceramics used PCBs while manufacturing capacitors at a plant in New Bedford, Massachusetts on the shore of the New Bedford Harbor.

150.    During this time, disposal practices and operations at the plant caused contamination of soils, groundwater, surface water, and building materials and equipment at the plant.  For example, PCBs were spilled upon receipt of large drums of PCBs at rail yards. Employees dumped defective capacitors containing PCBs outside the facility, and over time, the capacitors corroded and released PCBs into the environment.  Upon information and belief, PCBs were also dispersed into the municipal sewer system.  PCB vapor leached onto structures at the facility and waste that left the facility.  PCBs were disposed of at local landfills and were also discharged into the New Bedford Harbor and contaminated the Acushnet River and Buzzards Bay.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

151.    After this contamination, the EPA detected PCB levels well above the safe levels for consumption in fish near the harbor.

152.    In 1983, the New Bedford plant and surrounding area was listed on the EPA's Superfund National Priorities list.  Also, in 1983, the Department of Justice and Commonwealth of Massachusetts filed lawsuits against AVX, seeking injunctive relief and recovery of cleanup costs resulting from Aerovox's and AVX Ceramics' release of PCBs.  In 1989, AVX agreed to pay $2 million to settle these claims.  In 2012, AVX agreed to pay $366 million in a supplemental settlement agreement for continued restoration work.

153.    After the operations at the New Bedford Plant ceased, it lay vacant for years. While the building was vacant, PCB-contaminated wood and other building parts caused runoff contamination in the environment.  In 2013, AVX demolished remaining parts of the building and attempted to cap the site.

154.    From the 1940's until 1972, Aerovox's Canadian affiliate manufactured capacitors in Hamilton, Ontario.  Upon information and belief, activities at this facility resulted in the discharge of PCBs into the Hamilton Harbor.

E.    **CDE Released PCBs into the Environment**

155.    CDE and its products have been a major source of environmental PCB contamination and have released PCBs purchased both before and after January 1972 into the environment.

156.    CDE operated plants, which used PCBs (Aroclor 1015, 1242, 1254) in the manufacture of capacitors, among other places, in New Bedford, Massachusetts.  Between January 1971 and 1976, CDE used more than 3.1 million pounds of Aroclor products.  CDE used PCBs at its New Bedford facility until 1977.  Tests at CDE's New Bedford facility revealed PCB sediment

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

at 99,000 ppm. CDE released PCBs into the environment by, among other things, discharging contaminated wastewater, disposing of materials containing PCBs in local landfills, and releasing waste oil containing PCBs.

157.    In 1983, the Department of Justice and Commonwealth of Massachusetts sued CDE regarding PCB contamination in the New Bedford Harbor. In 1992, CDE entered into a consent decree, which required payment of $10 million for contamination of the Acushnet River Estuary, the New Bedford Harbor, Buzzards Bay, and the Rhode Island and Vineyard Sounds. Consent Decree with Defendants Federal Pacific Electric Company And Cornell Dubilier Electronics, Inc., *United States v. AVX Corporation, et al.*, Docket # 83-3882-Y (D. Mass 1992), *available at* https://semspub.epa.gov/work/01/61973.pdf.

158.    In 1996, CDE settled PCB-related litigation by agreeing to undertake millions of dollars in cleanup work in Norwood, Massachusetts.

159.    In 1997, the EPA oversaw the removal of 1147 tons of PCB-contaminated soil and several thousand capacitors from property in Fairhaven, Massachusetts.  The EPA identified CDE as the manufacturer of the capacitors at the site.

160.    In 2009, CDE's PCB-laden capacitors were found at three privately-owned properties near a middle school in New Bedford, Massachusetts.

**F.    Gillette Released PCBs into the Environment**

161.    Gillette and/or its predecessors-in-interest and their products have been a major source of environmental PCB contamination and have released PCBs purchased both before and after February 1972 into the environment.

162.    From 1969 until 1978, P.R. Mallory manufactured PCB-impregnated electrostatic AC capacitors at a facility in Waynesboro, Tennessee.  The use of PCBs at this facility (primarily

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Aroclors 1242 and 1248) led to widespread contamination.  For example, an underground storage tank containing PCBs leaked.  PCBs were also released into the environment when oil containing PCBs was dumped on the ground outside, and PCBs spills also occurred inside the plant.  P.R. Mallory also used impregnation chambers, which released super-saturated clouds of PCB vapor throughout the Waynesboro plant.  Moreover, in or around 1979, more than 100 drums of waste containing PCBs were discovered at the Waynesboro plant.  These drums were leaking PCB-containing liquids into drains that emptied into the Green River.

163.    After P.R. Mallory sold the Waynesboro facility, the building had to be abandoned due to the extensive and persistent PCB contamination.  PCB levels as high as 100,000 ppm were detected at the facility and in the surrounding environment.

164.    In a 1987 lawsuit, Gillette's predecessor-in-interest stipulated that the use of PCBs by P.R. Mallory at the Waynesboro facility led to the contamination on the floor, roof, and ground. *Emhart Indus. Inc. v. Duracell Int'l*, 665 F.Supp. 549, 555 (M.D. Tenn 1989).  The court decision in that case notes that experts concluded that PCB contamination at the Waynesboro facility was surprisingly widespread with very high levels and that PCB contamination was found at other former P.R. Mallory sites. *Id.* at 560.

165.    P.R. Mallory also operated facilities in Glasgow, Kentucky; Greencastle, Indiana; and Indianapolis, Indiana.  During the 1980s, PCB contamination was discovered at each of these facilities.  For example, PCB (Aroclor 1254) contamination was discovered at P.R. Mallory's Indianapolis plant as a result of its manufacture of radio batteries and capacitors.

166.    P.R. Mallory also released PCBs into the environment when its capacitors were placed in household products.  For example, P.R. Mallory's capacitors were used in air

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

conditioning units and there was a reported incident of a capacitor rupturing, burning, and releasing PCBs into the environment in Louisiana.

### IV.    The PCB Lawsuits.

167.    Multiple lawsuits have been filed against Plaintiffs seeking to impose liability on the Plaintiffs for injuries or damages allegedly caused by the release of PCBs into the environment or other exposures to PCBs.  A list of the PCB Lawsuits that have been, or are being, tendered to Defendants is attached hereto as **Exhibit 8** and incorporated herein by reference.

168.    The PCB Lawsuits can generally be grouped into four categories: (1) The Food Chain Cases; (2) The Water Cases; (3) The School Cases; and (4) The Occupational Cases.

### A.    The Food Chain Cases

169.    Plaintiffs were named as defendants in a series of personal injury cases in which the plaintiffs contended that they suffered from various types of Non-Hodgkin's lymphoma as a result of non-employment, environmental and food chain exposure to PCBs (the "Food Chain Cases").

170.    Plaintiffs in the Food Chain Cases alleged that PCBs are now ubiquitous in the environment because, *inter alia*, the products into which PCBs were incorporated by Old Monsanto's customers permitted their release into the environment.  Plaintiffs also alleged that PCBs were dumped into the environment by Old Monsanto's customers and the end-users of various PCB-containing products.

171.    Plaintiffs in the Food Chain Cases alleged that it is impossible to "disaggregate" the environmental PCBs to which they were exposed and which they alleged caused their injuries or determine their more particular source.  Accordingly, the Food Chain Plaintiffs alleged

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

generally that their injuries were caused by their exposure to the combination of PCBs released into the environment.

172.     The Food Chain Plaintiffs sought to impose liability on Plaintiffs for manufacturing any and all PCBs, including those purchased by Defendants and their predecessors before and after they signed the Special Undertaking Agreements.

173.     Thus, the Food Chain Cases present "liabilities, claims, damages, penalties, actions, suits, losses, costs [or] expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of … PCBs [purchased on or after the date Defendants, or their predecessors, entered into the Special Undertaking Agreements] by, through or under [Defendants, or their predecessors,] … alone or in combination with other substances," within the meaning of the Special Undertaking Agreements.

174.     The Food Chain Cases included approximately 700 plaintiffs.

175.     The Food Chain Cases were filed in state court in Los Angeles County, California, and in state and federal courts in St. Louis, Missouri.

176.     In September 2016, Monsanto agreed to pay a significant amount to settle all of then-pending Food Chain Cases.

177.     The full set of complaints filed in the Food Chain Cases is voluminous and attachment of all such pleadings to this Complaint is impracticable for filing purposes, but examples of complaints filed in the Food Chain Cases are attached hereto as **Exhibits 9 and 10**.[1]

---

[1] **Exhibit** 9 is a true and accurate copy of the complaint in *Bailey, et al. v. Monsanto Co., et al.*, Case 4:15-cv-00844-AGF, United States District Court for the Eastern District of Missouri, Eastern Division and incorporated herein by reference.  **Exhibit** 10 is a true and accurate copy of the complaint in *Kelly, et al. v. Monsanto Co., et al.*, Case 4:15-cv-01825-JMB, United States District Court for the Eastern District of Missouri and incorporated herein by reference.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

**B.**     **The Water Cases**

178.    Plaintiffs have been named as defendants in a series of lawsuits in which cities and various municipal agencies are alleging that the Plaintiffs should bear some cost for water cleanup and wastewater permit costs due to PCB contamination (the "Water Cases").

179.    Plaintiffs in the Water Cases allege generally that PCBs have entered the subject body of water through various sources, including improper disposal by Old Monsanto's customers, PCB releases from products manufactured by Old Monsanto's customers, and leaching from landfills.

180.    Plaintiffs in the Water Cases allege that PCBs easily migrate or leach out of their original source material or enclosure and that "PCBs can also escape from totally-enclosed materials (such as light ballasts) and … escape into the environment." *See San Diego Unified Port District, et al. v. Monsanto Company, et al*., Case 3:15-cv-00578-WQH-JLB, Complaint, ¶ 22 (S.D. Cal. 2015) (the "San Diego Case").

181.    Plaintiffs in the Water Cases specifically allege that Old Monsanto sold PCBs for use in electric transformers and capacitors and that PCBs escape from such products and cause environmental contamination.  Plaintiffs in the Water Cases do not identify more specifically the sources of the PCBs found in the water.

182.    PCBs purchased by Defendants—both before and after the Special Undertaking Agreements were executed—are part of the combined environmental load of PCBs alleged to have contaminated the waterways at issue in the Water Cases.

183.    The Water Cases seek to impose liability on Plaintiffs for manufacturing any and all PCBs, including those purchased by Defendants or their predecessors before and after they signed the Special Undertaking Agreements.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

184.    Thus, the Water Cases present "liabilities, claims, damages, penalties, actions, suits, losses, costs [or] expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of … PCBs [purchased on or after the date Defendants, or their predecessors, entered into the Special Undertaking Agreements] by, through or under [Defendants, or their predecessors,] … alone or in combination with other substances," within the meaning of the Special Undertaking Agreements.

185.    The majority of the Water Cases were filed in California, Washington, and Oregon—states where Defendants or their predecessors used PCBs and caused PCB-related contaminations.

186.    For example, Westinghouse's release of PCBs into the Duwamish Waterway, San Pedro Channel, Palo Verdes Peninsula, Los Angeles Harbor, and Willamette River are all at issue in Water Cases. *City of Seattle v. Monsanto, et al.*, 2:16-cv-00107 United States District Court for the Western District of Washington (the "Seattle Case"); *City of Long Beach v. Monsanto Co., et al.*, 2:16-cv-03493-FMO-AS United States District Court for the Central District of California (the "Long Beach Case"); *City of Portland v. Monsanto Co., et al.*, 3:16-cv-1418-PK United States District Court for the District of Oregon (the "Portland Case").

187.    In June 2020, Plaintiffs agreed to pay substantial sums to settle Water Cases brought by certain municipal entities. Plaintiffs entered into separate agreements with the Attorneys General of New Hampshire, New Mexico, Ohio, Washington, D.C., and Washington to resolve Water Cases brought by those states.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

188.    The full set of complaints filed in the Water Cases is voluminous and attachment of all such pleadings to this Complaint is impracticable for filing purposes, but examples of complaints filed in the Water Cases are attached hereto as **Exhibits 11, 12, 13, 14, and 15.**[2]

**C.    The School Cases**

189.    Plaintiffs have been named as defendants in numerous cases, including multiple cases filed after August 2018, in which it is alleged that the Plaintiffs should bear some cost of cleanup and/or rebuilding of schools due to alleged PCB contamination (the "School Cases").

190.    Plaintiffs in the School Cases allege that PCBs were used in building products such as electrical equipment, lighting ballasts and other materials that were used in the construction of school buildings.

191.    Defendants, or their predecessors, manufactured PCB-containing lighting ballasts and other electrical equipment using PCBs purchased both before and after they signed the Special Undertaking Agreements.

192.    The PCBs at issue in the School Cases include PCBs Defendants or their predecessors purchased after signing the Special Undertaking Agreements.

193.    The Sky Valley School Cases consist of multiple lawsuits, involving hundreds of plaintiffs' claims of personal injuries resulting from PCB exposure at the Sky Valley Education Center in Monroe, Washington (the "Sky Valley School Cases"). At least one PCB-containing light ballast manufactured and sold by UMC was found in the Sky Valley Education Center. Testing revealed that the capacitor in this UMC light ballast contained Aroclors 1016, which

---

[2] **Exhibit 11** is a true and correct copy of the First Amended Complaint in the San Diego Case and incorporated herein by reference.  **Exhibit 12** is a true and correct copy of the Complaint in the Seattle Case and incorporated herein by reference.  **Exhibit 13** is a true and correct copy of the Complaint in the Long Beach Case and incorporated herein by reference.  **Exhibit 14** is a true and correct copy of the Complaint in the Portland Case and incorporated herein by reference.  **Exhibit 15** is a true and accurate copy of the complaint in *City of Oakland v. Monsanto Company, et al.*, 4:15-cv-05152, United States District Court for the Northern District of California and incorporated herein by reference.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

indicates that UMC manufactured and sold the PCB-containing ballast after it entered into the Magnetek Special Undertaking Agreement.

194.     In separate trials ending in June and November 2021 and June 2022, juries in Seattle awarded substantial damages to three groups of plaintiffs in the Sky Valley School Cases against Old Monsanto.  During at least one of the trials, plaintiffs introduced evidence that a source of PCBs at the Sky Valley Education Center were light ballasts manufactured by UMC.

195.     Thus, the School Cases present "liabilities, claims, damages, penalties, actions, suits, losses, costs [or] expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of … PCBs [purchased on or after the date Defendants, or their predecessors, entered into the Special Undertaking Agreements] by, through or under [Defendants, or their predecessors,] … alone or in combination with other substances," within the meaning of the Special Undertaking Agreements.

196.     The full set of complaints filed in the School Cases is voluminous and attachment of all such pleadings to this Complaint is impracticable for filing purposes, but an example of a School Case complaint is attached hereto as **Exhibit 16**.  Exhibit 16 is a true and accurate copy of the complaint in *Heit, et al., v Monsanto Company, et al.*, Case No. 18-2-11915-4, Superior Court of the State of Washington, King County and incorporated herein by reference.

D.      **The Occupational Cases**

197.     Plaintiffs have been named as defendants in several occupational exposure cases (the "Occupational Cases").

198.     The plaintiffs in the Occupational Cases allege that they were exposed to PCBs manufactured by Plaintiffs during the course of their employment through various means,

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

including leaks from light ballasts.  The plaintiffs further allege that, as a result of this exposure, they suffered from various illnesses and personal injuries.

199.    In *Lamkin, et al. v. Monsanto Company, et al.*, the plaintiff alleged that he developed cancer as a result of his exposure to PCBs.  Case 16-0563, Suffolk County Superior Court, Massachusetts.  Plaintiff alleged that he was exposed to PCBs during the course of his employment, from 1992 through 2008, working with power transformers and other electrical equipment.

200.    In or around December 2021, the parties to *Lamkin* entered into a settlement agreement.

201.    Thus, the Occupational Cases present "liabilities, claims, damages, penalties, actions, suits, losses, costs [or] expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of … PCBs [purchased on or after the date Defendants, or their predecessors, entered into the Special Undertaking Agreements] by, through or under [Defendants, or their predecessors,] … alone or in combination with other substances," within the meaning of the Special Undertaking Agreements.

202.    A copy of the complaint filed in the *Lamkin* — an example of one of the occupational Occupational Cases — is attached hereto as **Exhibit 17**. Exhibit 17 is a true and accurate copy of the complaint in *Lamkin, et al. v. Monsanto Company, et al.*, Case 16-0563, Suffolk County Superior Court, Massachusetts and incorporated herein by reference.

## V.    **Defendants' Refusal to Defend and Indemnify**

203.    Counsel for Plaintiffs have repeatedly notified Defendants of the PCB Lawsuits, informed Defendants that the PCB Lawsuits are within the scope of the Special Undertaking

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Agreements, and demanded that Defendants defend and indemnify Old Monsanto in the PCB Lawsuits.

204.    Defendants have failed and refused to honor their agreements to defend or indemnify Plaintiffs.

**A.    Magnetek's Refusal to Defend And Indemnify**

205.    On August 29, 2016, counsel for Plaintiffs sent a letter to counsel for Magnetek. The letter notified Magnetek of the PCB Lawsuits, included a description, list, and docket information for the PCB Lawsuits pending at that time, informed Magnetek that the Special Undertaking Agreement applied to the PCB Lawsuits, and demanded that Magnetek defend and indemnify Plaintiffs in the litigation.  A true and accurate copy of the August 29, 2016 letter to Magnetek is attached hereto as **Exhibit 18** and incorporated herein by reference.

206.    On September 14, 2016, counsel for Magnetek sent a letter to counsel for Plaintiffs rejecting their tender of defense and demand for indemnification of the PCB Lawsuits under the Special Undertaking Agreement.  A true and accurate copy of the September 14, 2016 letter is attached hereto as **Exhibit 19** and incorporated herein by reference.

207.    On September 7, 2016, Magnetek provided notice of Plaintiffs' tender and demand to Travelers Insurance Company ("Travelers") and Transportation Insurance Company ("TIC") and requested that Travelers and TIC defend and indemnify Magnetek pursuant to insurance policies purchased by the parent company of Magnetek's predecessor.  After receiving Magnetek's demand, Travelers tendered a demand on Velsicol Chemical, LLC ("Velsicol") pursuant to prior confidential settlement agreements.  Travelers did not accept Magnetek's demand.  Thereafter, Magnetek, Travelers, and Velsicol filed a series of lawsuits against each other in state and federal court in Chicago, Illinois, including a case filed by Magnetek against Travelers in the United States

District Court for the Northern District of Illinois (Case No. 1:17-CV-03173) (Case No. 1:17-CV-03173) (the "Travelers Litigation").

208.   On May 12, 2017, Magnetek filed an eight-count placeholder declaratory judgment Complaint against Plaintiffs in the Superior Court of New Jersey, Case No. BER-L-3362-17.  That case has since been dismissed.

209.   Counsel for Plaintiffs sent counsel for Magnetek additional correspondence tendering defense and demanding indemnification regarding PCB Lawsuits on the following dates: December 23, 2016, June 1, 2018, November 19, 2018, May 6, 2019, July 23, 2019, October 14, 2019, and April 29, 2022.

210.   Magnetek has refused each of Plaintiffs' demands that Magnetek assume the defense of the PCB Lawsuits and provide indemnification for amounts expended to resolve certain PCB Lawsuits, including in letters dated May 10, 2019 and July 24, 2019.

**B.     General Electric's Refusal To Defend And Indemnify**

211.   Plaintiffs notified GE of the PCB Lawsuits, informed GE that the Special Undertaking Agreement applied to the PCB Lawsuits, and demanded that GE defend and indemnify Plaintiffs in the PCB Lawsuits through meetings and correspondence on or about June 17, 2015, October 27, 2015, September 9, 2015, April 21, 2016, August 18, 2016, and August 29, 2016.  As part of these meetings and correspondence, Plaintiffs provided GE with a complete list of all PCB Lawsuits, including case number, court, and date of filing.

212.   On October 19, 2016, counsel for General Electric sent counsel for Plaintiffs a Letter rejecting Plaintiffs' demand for indemnity and defense.   A true and correct copy of the October 19, 2016 letter is attached hereto as **Exhibit 20** and incorporated herein by reference.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

213.    Plaintiffs sent GE tenders of defense and demands for indemnification for additional PCB Lawsuits on or about November 29, 2016, January 4, 2017, and June 4, 2018. General Electric denied these tenders on July 18, 2018.

214.    On April 29, 2022, counsel for Plaintiffs sent counsel for General Electric a letter recounting the parties' prior correspondence and discussions regarding the GE Special Undertaking Agreement, summarizing the PCB Lawsuits, and tendering the defense and demanding indemnification of an additional Water Case.  This letter emphasized that "time is of the essence."

215.    General Electric has refused Plaintiffs' demands that General Electric assume the defense of the PCB Lawsuits and provide indemnification for amounts expended to resolve certain PCB Lawsuits.

### C.    Paramount's Refusal To Defend And Indemnify

216.    On August 29, 2016, counsel for Plaintiffs sent a letter to counsel for Paramount. The letter notified Paramount of the PCB Lawsuits, included a description, list, and docket information for the PCB Lawsuits pending at that time, informed Paramount that the Paramount Special Undertaking Agreement applied to the PCB Lawsuits, and demanded that Paramount defend and indemnify Old Monsanto in the PCB Lawsuits.  A true and accurate copy of the August 29, 2016 letter to Paramount is attached hereto as **Exhibit 21** and incorporated herein by reference.

217.    On September 22, 2016, counsel for Paramount rejected Plaintiffs' tender of defense and demand for indemnity "completely as to each and every case." A true and accurate copy of the September 22, 2016 letter is attached hereto as **Exhibit 22** and incorporated herein by reference.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

218.    Counsel for Plaintiffs sent counsel for Paramount additional correspondence tendering defense and demanding indemnification regarding PCB Lawsuits on the following dates: December 23, 2016, January 12, 2018, June 6, 2018, February 20, 2019, October 14, 2019, and April 29, 2022.  In response to the letters, Paramount refused Plaintiffs' tenders of defense and demands for indemnity and asserted that Paramount did not have a duty to defend and indemnify Plaintiffs.

219.    Representatives for Plaintiffs and Paramount met to discuss the PCB Lawsuits and the Paramount Special Undertaking Agreement on October 23, 2017 and October 14, 2019.

220.    Paramount has refused Plaintiffs' demands that Paramount assume the defense of the PCB Lawsuits and provide indemnification for amounts expended to resolve certain PCB Lawsuits.

**D.      KYOCERA AVX's Refusal to Defend And Indemnify**

221.    On August 29, 2016, counsel for Plaintiffs sent a letter to counsel for KYOCERA AVX.  The letter notified KYOCERA AVX of the PCB Lawsuits, included a description, list, and docket information for the PCB Lawsuits pending at that time, informed KYOCERA AVX that the KYOCERA AVX Special Undertaking Agreements applied to the PCB Lawsuits, and demanded that KYOCERA AVX defend and indemnify Plaintiffs in the PCB Lawsuits.  A true and accurate copy of the August 29, 2016 letter to KYOCERA AVX is attached hereto as **Exhibit 23** and incorporated herein by reference.

222.    On September 1, 2016, counsel for KYOCERA AVX rejected Plaintiffs' tender of defense and demand for indemnity.  A true and accurate copy of the September 1, 2016 letter is attached hereto as **Exhibit 24** and incorporated herein by reference.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

223.    Counsel for Plaintiffs sent counsel for KYOCERA AVX additional correspondence tendering defense and demanding indemnification regarding PCB Lawsuits on the following dates: December 23, 2016, June 4, 2018, March 26, 2019, October 14, 2019, and May 3, 2022.

224.    KYOCERA AVX has refused Plaintiffs' demands that KYOCERA AVX assume the defense of the PCB Lawsuits and provide indemnification for amounts expended to resolve certain PCB Lawsuits.

**E.    CDE's Refusal to Defend And Indemnify**

225.    On August 29, 2016, counsel for Plaintiffs sent a letter to counsel for CDE.  The letter notified CDE of the PCB Lawsuits, included a description, list, and docket information for the PCB Lawsuits pending at that time, informed CDE that the CDE Special Undertaking Agreement applied to the PCB Lawsuits, and demanded that CDE defend and indemnify Plaintiffs in the PCB Lawsuits.  A true and accurate copy of the August 29, 2016 letter to CDE is attached hereto as **Exhibit 25** and incorporated herein by reference.

226.    On May 18, 2017, counsel for CDE refused Plaintiffs' tender of defense and demand for indemnity. A true and accurate copy of the May 18, 2017 letter is attached hereto as **Exhibit 26** and incorporated herein by reference.

227.    Counsel for Plaintiffs sent counsel for CDE additional correspondence tendering defense and demanding indemnification regarding PCB Lawsuits filed after August 29, 2016 on the following dates: December 23, 2016, June 4, 2018, March 26, 2019, October 14, 2019, and May 3, 2022.

228.    CDE has refused Plaintiffs' demands that CDE assume the defense of the PCB Lawsuits and provide indemnification for amounts expended to resolve certain PCB Lawsuits.

**F.    Gillette's Refusal to Defend And Indemnify**

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

229.    On May 13, 2022, counsel for Plaintiffs sent a letter to counsel for Gillette.  The letter notified Gillette of the PCB Lawsuits, included a description, list, and docket information for the PCB Lawsuits pending at that time, informed Gillette that the Gillette Special Undertaking Agreement applies to the PCB Lawsuits, and demanded that Gillette defend and indemnify Plaintiffs in the PCB Lawsuits.  A true and accurate copy of the May 13, 2022 letter to Gillette is attached hereto as **Exhibit 27** and incorporated herein by reference.

230.    Gillette did not respond to Plaintiffs' letter.

**VI.    Defendants' Individual, Joint, And/Or Collective Liability**

231.    Plaintiffs have incurred significant costs in defending the Food Chain Cases, Water Cases, School Cases, and the Occupational Cases, and will continue to incur significant costs defending the PCB Lawsuits in the foreseeable future.  These costs include but are not limited to attorneys' fees, expert witness fees, fees paid to other consultants and/or experts, and costs of litigation (e.g., deposition costs).

232.    Plaintiffs also have paid and/or agreed to pay significant amounts to resolve certain claims premised on environmental exposure to PCBs, including settlements in the Food Chain Cases and Water Cases.

233.    Three judgments have been entered against Plaintiffs in the Sky Valley School Cases.

234.    Many of the PCB Lawsuits remain pending.  These cases include Water Cases filed by the Attorneys General of Oregon, Pennsylvania, Delaware, and Maryland, a new Water Case filed by the City of Los Angeles on March 4, 2022, and the Sky Valley School Cases (which involve more than 200 plaintiffs).  The plaintiffs in each of the pending PCB Lawsuits seek significant damages from Plaintiffs.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

235.    Defendants individually and collectively have a contractual duty to defend, indemnify, and hold harmless Old Monsanto in the PCB Lawsuits.  Although each Defendants' defense and indemnification obligations arise under separate Special Undertaking Agreements, those agreements are substantially similar, and, more importantly, each Defendant's contractual obligations to defend, indemnify, and hold harmless Old Monsanto are nearly identical. Defendants have separately and individually agreed to insure the same risk and/or same liability or loss under nearly identical terms.  Thus, each Defendant is individually, jointly, and/or collectively liable for the full amount of the defense costs incurred by Old Monsanto in the PCB Lawsuits, all amounts paid and/or agreed to be paid by Plaintiffs to resolve and/or settle the PCB Lawsuits, and the full amount of all judgments entered against Plaintiffs in the PCB Lawsuits.

**COUNT I: Breach of Contract against all Defendants**
**(Refusal to Defend)**

236.    Paragraphs 1 through 235 above are incorporated herein by reference.

237.    Old Monsanto provided valuable consideration to Defendants, or their predecessors-in-interest, in exchange for their agreement to defend Old Monsanto in the PCB Lawsuits.  For example, Old Monsanto agreed to continue, and did continue, to manufacture and sell PCBs to Defendants or their predecessors-in-interest until 1977.

238.    Plaintiffs have performed all obligations and responsibilities required of them under the Special Undertaking Agreements.

239.    The Special Undertaking Agreements are valid contracts that are enforceable against Defendants.

240.    The PCB Lawsuits fall within the scope of claims against which Defendants or their predecessors-in-interest agreed to defend Old Monsanto and its present, past, and future directors, officers, employees and agents.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

241.     Under the Special Undertaking Agreements, Defendants are obligated to provide a defense for Old Monsanto and its present, past, and future directors, officers, employees and agents in the PCB Lawsuits, including, but not limited to, payment of attorneys' fees, expert fees, and all other costs and expenses incurred to defend Old Monsanto in the PCB Lawsuits.

242.     New Monsanto and Solutia are entitled to enforce Old Monsanto's rights under the Special Undertaking Agreements.

243.     New Monsanto is a "future . . . agent" of Old Monsanto and a third-party beneficiary of the Special Undertaking Agreements.

244.     New Monsanto is indemnifying and defending Old Monsanto and Solutia in the PCB Lawsuits.

245.     Plaintiffs notified Defendants of the PCB Lawsuits, tendered the defense of the PCB Lawsuits to Defendants, and demanded that Defendants defend Old Monsanto in the PCB Lawsuits.

246.     Defendants have failed and refused to defend Old Monsanto in the PCB Lawsuits.

247.     Defendants have breached the Special Undertaking Agreements by failing and refusing to defend Old Monsanto and its present, past, and future directors, officers, employees and agents in the PCB Lawsuits.

248.     As a result of Defendants' breaches of their contractual obligation to defend Old Monsanto and its present, past, and future directors, officers, employees and agents in the PCB Lawsuits, Plaintiffs have been damaged in an amount exceeding $25,000.00.  Plaintiffs' damages include, but are not limited to, all of the attorneys' fees, expert fees, and other costs and expenses incurred to defend Old Monsanto in the PCB Lawsuits, foreseeable consequential damages, pre-

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

judgment interest for such liquidated sums, and attorneys' fees and costs in this action, all to be proven at the time of trial.

249.    Plaintiffs continue to incur attorneys' fees, expert fees, and other costs and expenses in defense of the PCB Lawsuits that constitute part of their damages resulting from Defendants' breaches and as such, expressly reserve their rights to seek damages in excess of the amounts referenced in the foregoing paragraph.

**COUNT II: Breach of Contract against all Defendants**
**(Refusal to Indemnify)**

250.    Paragraphs 1 through 235 above are incorporated herein by reference.

251.    Old Monsanto provided valuable consideration to Defendants, or their predecessors-in-interest, in exchange for their agreement to indemnify Old Monsanto in the PCB Lawsuits.  For example, Old Monsanto agreed to continue, and did continue, to manufacture and sell PCBs to Defendants, or their predecessors-in-interest, until 1977.

252.    Plaintiffs have performed all obligations and responsibilities required of them under the Special Undertaking Agreements.

253.    The Special Undertaking Agreements are valid contracts that are enforceable against Defendants.

254.    The PCB Lawsuits fall within the scope of claims against which Defendants or their predecessors-in-interest agreed to indemnify Old Monsanto and its present, past, and future directors, officers, employees and agents.

255.    Under the Special Undertaking Agreements, Defendants are contractually obligated to indemnify Old Monsanto and its present, past, and future directors, officers, employees and agents for all amounts paid and/or agreed to be paid to resolve the PCB Lawsuits (whether through settlement, verdict, judgment, or otherwise), and for all judgments entered against Old Monsanto

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

in the PCB Lawsuits.  These amounts include, but are not limited to, the amounts paid to settle some of the Food Chain Cases, the amounts paid and/or agreed to be paid to settle some of the Water Cases, and the judgments entered in the Sky Valley School Cases.

256.    New Monsanto and Solutia are entitled to enforce the Special Undertaking Agreements with Defendants as the assignees of those rights.

257.    New Monsanto is indemnifying and defending Old Monsanto and Solutia in the PCB Lawsuits.

258.    Plaintiffs notified Defendants of the PCB Lawsuits, the potential settlement of some of the Food Chain Cases, the settlement of some of the Water Cases, the judgments entered in the Sky Valley School Cases, and has demanded that Defendants indemnify Old Monsanto in the PCB Lawsuits.

259.    Defendants have failed and refused to indemnify Old Monsanto and its present, past, and future directors, officers, employees and agents.

260.    Defendants have breached the Special Undertaking Agreements by failing and refusing to indemnify Old Monsanto and its present, past, and future directors, officers, employees and agents for all amounts paid and/or agreed to be paid to resolve the PCB Lawsuits (whether through settlement, verdict, judgment, or otherwise), and for all judgments entered against Old Monsanto in the PCB Lawsuits.

261.    As a result of Defendants' breaches of their contractual obligations to indemnify Old Monsanto and its present, past, and future directors, officers, employees and agents, Plaintiffs have been damaged in an amount exceeding $25,000.00.  Plaintiffs' damages include, but are not limited to, the amounts paid to settle some of the Food Chain Cases, the amounts paid and/or agreed to be paid to settle some of the Water Cases, the judgments entered in the Sky Valley School

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Cases, and all other amounts Plaintiffs have reasonably paid to resolve claims (whether through settlement, verdict, judgment, or otherwise) covered by the Special Undertaking Agreements, plus foreseeable consequential damages, pre-judgment interest for such liquidated sums, and attorneys' fees and costs in this action, all to be proven at the time of trial.

262.    Plaintiffs continue to be subject to significant potential liability in the pending PCB Lawsuits.   Any amounts paid and/or agreed to be paid to resolve any of the PCB Lawsuits or any judgment entered against Old Monsanto in any of the PCB Lawsuits constitutes part of Plaintiffs' damages resulting from Defendants' breaches and as such, Plaintiffs expressly reserve their rights to seek damages in excess of the amounts referenced in the foregoing paragraph.

### COUNT III: Declaratory Judgment against all Defendants
### (Contractual Duty to Defend)

263.    Paragraphs 1 through 235 above are incorporated herein by reference.

264.    This Court has the power to grant a declaratory judgment concerning the rights and obligations of Plaintiffs and Defendants, pursuant to RSMo §§ 527.010, 527.020, and 527.030, because an actual controversy exists between Plaintiffs and Defendants concerning the parties' respective rights and obligations under their respective Special Undertaking Agreements, including Defendants' duty to defend Old Monsanto in the PCB Lawsuits.

265.    The Special Undertaking Agreements require Defendants to defend Old Monsanto and its present, past, and future directors, officers, employees and agents in the PCB Lawsuits and any future PCB Lawsuits filed against Old Monsanto or its present, past, and future directors, officers, employees and agents.

266.    Defendants' refusal to satisfy their obligations to defend Old Monsanto and its present, past, and future directors, officers, employees and agents or pay the costs to defend Old

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Monsanto and its present, past, and future directors, officers, employees and agents in the PCB Lawsuits is contrary to the Special Undertaking Agreements and the law.

267.    New Monsanto and Solutia are entitled to enforce the Special Undertaking Agreements.

268.    New Monsanto is indemnifying and defending Old Monsanto and Solutia in the PCB Lawsuits.

269.    Justiciable controversies have arisen between Plaintiffs and Defendants concerning interpretation of the Special Undertaking Agreements and Defendants' obligation to defend Old Monsanto in the PCB Lawsuits.

270.    This actual controversy is definite and concrete, in that the parties' positions are adverse and Defendants' refusal to defend Old Monsanto and its present, past, and future directors, officers, employees and agents pursuant to the Special Undertaking Agreements causes direct legal injury to Plaintiffs.

271.    This controversy is real and substantial, and ripe for adjudication.  A judicial declaration as to Defendants' obligation to defend Old Monsanto and its present, past, and future directors, officers, employees and agents in the PCB Lawsuits under the Special Undertaking Agreements will resolve the present controversy, and provide conclusive relief.

272.    The harm to Plaintiffs if Defendants are allowed to avoid their obligation to defend Old Monsanto and its present, past, and future directors, officers, employees and agents in the PCB Lawsuits is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment clarifying the legal relations of the parties.  Without a declaration of rights, Plaintiffs will continue to incur attorney's fees, expert fees and other costs and expenses in the PCB Lawsuits.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

273.    Plaintiffs therefore require a declaratory judgment declaring that Defendants have a duty to defend Old Monsanto and its present, past, and future directors, officers, employees and agents in the PCB Lawsuits, and any future PCB Lawsuits, under the Special Undertaking Agreements.

**COUNT IV: Declaratory Judgment against all Defendants**
**(Duty to Indemnify)**

274.    Paragraphs 1 through 235 above are incorporated herein by reference.

275.    This Court has the power to grant a declaratory judgment concerning the rights and obligations of Plaintiffs and Defendants, pursuant to RSMo §§ 527.010, 527.020, and 527.030, because an actual controversy exists between Plaintiffs and Defendants concerning the parties' respective rights and obligations under Defendants' respective Special Undertaking Agreements, including Defendants' obligation to indemnify Old Monsanto in the PCB Lawsuits.

276.    The Special Undertaking Agreements require Defendants to indemnify Old Monsanto and its present, past, and future directors, officers, employees and agents in the PCB Lawsuits and any future PCB Lawsuits filed against Old Monsanto or and its present, past, and future directors, officers, employees and agents.

277.    Defendants' denial of its obligations to indemnify Old Monsanto in the PCB Lawsuits is contrary to the Special Undertaking Agreements and the law.

278.    Justiciable controversies have arisen between Plaintiffs and Defendants concerning interpretation of the Special Undertaking Agreements and Defendants' obligation to indemnify Old Monsanto and its present, past, and future directors, officers, employees and agents in the PCB Lawsuits.

279.    New Monsanto and Solutia are entitled to enforce the Special Undertaking Agreement.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

280.    New Monsanto is indemnifying and defending Pharmacia and Solutia in the PCB Lawsuits.

281.    This actual controversy is definite and concrete, in that the parties' positions are adverse and Defendants' refusal to indemnify Old Monsanto and its present, past, and future directors, officers, employees and agents pursuant to the Special Undertaking Agreements causes direct legal injury to Plaintiffs.

282.    This controversy is real and substantial, and ripe for adjudication.  A judicial declaration as to Defendants' obligation to defend Old Monsanto and its present, past, and future directors, officers, employees and agents in the PCB Lawsuits under the Special Undertaking Agreements will resolve the present controversy, and provide conclusive relief.

283.    The harm to Plaintiffs if Defendants are allowed to avoid their obligation to indemnify Old Monsanto and its present, past, and future directors, officers, employees and agents in the PCB Lawsuits is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment clarifying the legal relations of the parties.  Without a declaration of rights, Plaintiffs will continue to incur expenses in resolving the PCB Lawsuits.

284.    Plaintiffs therefore require a declaratory judgment declaring that Defendants have a duty to indemnify Old Monsanto and its present, past, and future directors, officers, employees and agents for all amounts Plaintiffs have paid, or will pay, to resolve the PCB Lawsuits or future PCB Lawsuits (whether through settlement, verdict, judgment, or otherwise), under the Special Undertaking Agreements.  Specifically, Plaintiffs request and are entitled to a declaration that Defendants have a duty to indemnify Old Monsanto and its present, past, and future directors, officers, employees and agents in all of the PCB Lawsuits, including but not limited to the

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

settlement of some of the Food Chain Cases, the settlement of some of the Water Cases, and the judgments entered in the Sky Valley School Cases.

### COUNT V: Negligence against all Defendants

285.    Paragraphs 1 through 235 above are incorporated herein by reference.

286.    Defendants and/or their predecessors-in-interest were aware of the potential for PCBs to persist in the environment and of the need to use care in the use and handling of PCBs when they purchased PCBs from Old Monsanto.

287.    Defendants and/or their predecessors-in-interest had a duty to possess, handle, use, sell, and dispose of PCBs purchased from Old Monsanto with reasonable care so that they would not be released into the environment.

288.    Defendants and/or their predecessors-in-interest breached their respective duty of care by allowing PCBs purchased from Old Monsanto both before and after signing the Special Undertaking Agreements to be released into the environment through products manufactured by Defendants and/or their predecessors-in-interest, disposal of PCB-containing products, leaks, spills, dumping and disposal of industrial wastes, and through other means.

289.    The PCB Lawsuits have been filed against Plaintiffs as a result of Defendants' and/or their predecessors-in-interests' breaches and release of PCBs into the environment.

290.    As a result of the foregoing breaches by Defendants and/or their predecessors-in-interest, Plaintiffs have been damaged in an amount exceeding $25,000.00.  Plaintiffs' damages include, but are not limited to, the costs of defending the PCB Lawsuits (attorneys' fees, expert witness fees, and other costs and expenses), the amounts paid to settle some of the Food Chain Cases, the amounts paid and/or agreed to be paid to settle some of the Water Cases, the judgments entered in the Sky Valley School Cases, and all other amounts Plaintiffs have reasonably paid

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

and/or agreed to pay to resolve claims (whether through settlement, verdict, judgment, or otherwise) covered by the Special Undertaking Agreements prior to the date of this filing.

291.    Plaintiffs continue to incur attorneys' fees, expert fees, and other litigation costs and expenses in the PCB Lawsuits that constitute part of its damages resulting from Defendants' and/or their predecessors' breaches.  Plaintiffs may also incur additional costs to settle or otherwise resolve PCB Lawsuits after the date of filing of this Amended Petition.  As such, Plaintiffs expressly reserve their right to seek damages in excess of the amounts referenced in the foregoing paragraph.

### COUNT VI: Negligent Misrepresentation against Magnetek

292.    Paragraphs 1 through 235 above are incorporated herein by reference.

293.    Prior to signing the Magnetek Special Undertaking Agreement, UMC supplied Old Monsanto with certain information regarding UMC's intended use of the PCBs and coverage of the Magnetek Special Undertaking Agreement by insurance.

294.    Specifically, UMC told Monsanto that it only intended to use PCBs purchased from Monsanto for closed uses such that PCBs would not escape its products and enter the environment, and that the Magnetek Special Undertaking Agreement was "covered by a blanket liability policy with the Travelers Insurance Company."

295.    The information supplied by UMC to Old Monsanto was false due to UMC's and/or Magnetek's failure to exercise reasonable care.

296.    UMC and/or Magnetek released or permitted the release of some or all of the PCBs purchased from Old Monsanto into the environment after execution of the Magnetek Special Undertaking Agreement.

297.    Magnetek's insurer has also alleged in a lawsuit against Magnetek that the

66

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Magnetek Special Undertaking Agreement is not covered by any insurance policy, or the insurance policy has been released. *See Velsicol Chemical LLC et al. v. Magnetek, Inc.*, Case No. 2017 CH 02118, Complaint (Cook County, Ill. Cir. Court Feb. 14, 2017).

298.    UMC intentionally supplied the false information regarding its use of the PCBs and the insurance coverage to Old Monsanto to induce Old Monsanto to sell its PCBs to UMC after Old Monsanto had decided to limit production of PCBs.

299.    Old Monsanto justifiably relied on the false information supplied by UMC when it decided to sell PCBs to UMC pursuant to the Magnetek Special Undertaking Agreement.

300.    Old Monsanto would not have sold PCBs to UMC if it had not provided the false information regarding its intended use of the PCBs and the insurance coverage for the Magnetek Special Undertaking Agreement.

301.    Magnetek is the successor-in-interest to UMC.

302.    Plaintiffs have suffered loss in the form of attorneys' fees, costs, settlement amounts, judgments, and other damages in an amount in excess of $25,000 as a result of UMC's and/or Magnetek's negligent misrepresentations.  Plaintiffs may also incur additional costs to settle or otherwise resolve PCB Lawsuits after the date of filing of this Amended Petition.  As such, Plaintiffs expressly reserve their right to seek damages in excess of the amounts referenced in the foregoing paragraph.

### COUNT VII: Equitable Contribution against all Defendants
### (Pleaded In The Alternative)

303.    Paragraphs 1 through 235 above are incorporated herein by reference.

304.    This claim for equitable contribution is alleged in the alternative to Counts II and IV and only to the extent that Defendants are not contractually obligated under the Special

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Undertaking Agreements to indemnify and/or hold harmless Old Monsanto in one or more of the PCB Lawsuits.

305.    The PCB Lawsuits premise liability, *inter alia*, on Old Monsanto's manufacture and sale of PCBs.

306.    Old Monsanto manufactured and sold PCBs in bulk to a number of industrial customers, including Defendants or their predecessors-in-interest, who incorporated those PCBs into a wide variety of finished products.  Old Monsanto itself never sold finished products containing PCBs to individuals or consumers.  Old Monsanto never controlled how products incorporating PCBs would be used, serviced, or disposed of by its customers.

307.    The finished products into which Old Monsanto's customers incorporated PCBs included dielectric fluids used in electrical equipment such as transformers, capacitors, and lighting ballasts.

308.    Defendants and/or their predecessors-in-interest purchased PCBs from Old Monsanto and incorporated these PCBs purchased from Old Monsanto into products (e.g., transformers and capacitors) that were sold to customers throughout the United States.

309.    Defendants and/or their predecessors-in-interest released into the environment or permitted the release into the environment some or all of the PCBs that they purchased from Old Monsanto.

310.    Thus, to the extent Plaintiffs are or were liable in the PCB Lawsuits or have or will pay amounts to settle or resolve the PCB Lawsuits, Defendants are jointly liable for those same alleged indivisible injuries.

311.    For example, Plaintiffs' settlement of some of the Food Chain Cases and some of the Water Cases extinguished Defendants' liabilities for those alleged injuries.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

312.    The amount Monsanto paid and/or has agreed to pay in settlement of some of the Food Chain Cases and some of the Water Cases was reasonable.

313.    To the extent Defendants are not contractually obligated to indemnify and/or hold harmless Old Monsanto in the PCB Lawsuits, Defendants are liable to Plaintiffs for their equitable shares of the amounts paid and/or agreed to be paid by Plaintiffs to settle and/or resolve the PCB Lawsuits.  This includes Defendants' equitable share of the amounts paid and/or agreed to be paid by Plaintiffs to settle some of the Food Chain Cases and resolve certain Water Cases.  It also includes Defendants' equitable share of the judgments entered against Plaintiffs in the Sky Valley School Cases.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter an order and judgment granting the following relief in Plaintiff's favor and against Defendants:

A.    Awarding Plaintiffs a sum greater than Twenty-Five Thousand Dollars ($25,000.00) reflective of the damages incurred by Plaintiffs and to be proven prior to the time of such judgment, including such damages Plaintiffs incurred in defending and resolving the PCB Lawsuits;

B.    A declaration that the Special Undertaking Agreements individually and collectively apply to the PCB Lawsuits and impose on Defendants individually and collectively a duty to defend Old Monsanto and its present, past, and future directors, officers, employees and agents in the PCB Lawsuits and any future PCB Lawsuits;

C.    A declaration that Defendants individually and collectively shall bear responsibility for any and all of the defense costs (including attorneys' fees, costs, and expenses) of Old Monsanto and its present, past, and future directors, officers, employees and agents in the

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

PCB Lawsuits and any future PCB Lawsuits, which are being paid and/or have agreed to be paid by New Monsanto;

D.      A declaration that Defendants shall individually and collectively indemnify Old Monsanto and its present, past, and future directors, officers, employees and agents for any and all judgments, settlements, and all other amounts Old Monsanto is required to pay and/or has agreed to pay to resolve the PCB Lawsuits and any future PCB Lawsuits;

E.      A declaration that Defendants shall individually and collectively indemnify Old Monsanto and its present, past, and future directors, officers, employees and agents for the total amount of the settlement of some of the Food Chain Cases, the total amount of the settlement of certain Water Cases, and the total amount of the judgments entered in the Sky Valley School Cases;

F.      A declaration that Defendants, respectively, shall honor all of their obligations and responsibilities set forth in their respective Special Undertaking Agreements regarding the PCB Lawsuits and any future PCB Lawsuits;

G.      Awarding Plaintiffs pre-judgment interest with respect to their damages;

H.      Awarding Plaintiffs post-judgment interest with respect to their damages;

I.      Awarding Plaintiffs their attorneys' fees and costs for prosecution of this lawsuit;

J.      Alternatively, Plaintiffs request that the Court enter a judgment requiring Defendants to pay their equitable share of liability incurred by Plaintiffs in the PCB Lawsuits, including but not limited to Defendants' equitable share of the amounts Plaintiffs has paid and/or has agreed to pay to settle some of the Food Chain Cases and the Water Cases, and the judgments entered against Plaintiffs in the Sky Valley School Cases.

K.      Such other and further relief as the Court deems just and proper.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Respectfully Submitted,

THOMPSON COBURN LLP

By:  /s/ *Christopher M. Hohn*
    Nicholas J. Lamb # 33486
    Dan C. Cox #38902
    Christopher M. Hohn #44124
    Jeffrey A. Masson #60244
    David M. Mangian #61728
    Nicholas T. Schnell #73932
    One U.S. Bank Plaza
    St. Louis, Missouri 63101
    (314) 552-6000 (telephone)
    (314) 552-7000 (facsimile)
    Email:  nlamb@thompsoncoburn.com
    Email :  dcox@thompsoncoburn.com
    Email:  chohn@thompsoncoburn.com
    Email :  jmasson@thompsoncoburn.com
    Email:  dmangian@thompsoncoburn.com
    Email:  nschnell@thompsoncoburn.com

*Attorneys for Plaintiffs Pharmacia, LLC, Solutia,*
*Inc., and Monsanto Company*

## CERTIFICATE OF SERVICE

    I hereby certify that on August 3, 2022, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system to all counsel of record.


    /s/ *Christopher M. Hohn*

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 1

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

## Special Undertaking by Purchasers of Polychlorinated Biphenyls

Monsanto Company (Monsanto) manufacturers certain polychlorinated biphenyls products (PCB's) which Universal Manufacturing Corporation (Buyer) desires to purchase.  While buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in the handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or delivery of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses (except to the extent arising from failure of PCB to conform with specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through or under Buyer, whether alone or in combination with any other substances, including without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provision set forth above.

Nothing herein shall create or imply, any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer.  No conditions, undertakings or agreements purporting to modify the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effected by the acknowledgement or acceptance of any sale document, purchase order, shipping instructions or other forms containing terms or conditions at variance herewith.

Universal Manufacturing Corporation
                    (Buyer)

BY: _____

TITLE: President

DATE: January 7, 1972

MONSANTO COMPANY

BY: _____

0167253

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 2

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

## Monsanto

MONSANTO INDUSTRIAL CHEMICALS CO.
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166
Phone: (314) 694-1000

### SPECIAL UNDERTAKING BY
### PURCHASERS OF POLYCHLORINATED BIPHENYLS

Monsanto Company ("Monsanto") manufactures certain poly-
chlorinated biphenyl products ("PCB's") which _General
Electric Company_ ("Buyer") desires to purchase.  While
Buyer desires to purchase PCB's because of certain
desirable flame resistant and insulator properties, Buyer
acknowledges that it is aware and has been advised by
Monsanto that PCB's tend to persist in the environment;
that care is required in their handling, possession, use
and disposition; that tolerance limits have been or are
being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies
with respect to its further production, sale and delivery
of PCB's, including the receipt of undertakings from its
customers as set forth below, and Buyer is willing to agree
to such undertakings with respect to sales and/or deliveries
of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with
respect to any and all PCB's sold or delivered by or on
behalf of Monsanto to Buyer on or after the date hereof
and in consideration of any such sale or delivery, Buyer
shall defend, indemnify and hold harmless Monsanto, its
present, past and future directors, officers, employes and
agents, from and against any and all liabilities, claims,
damages, penalties, actions, suits, losses, costs and
expenses arising out of or in connection with the receipt,
purchase, possession, handling, use, sale or disposition of
such PCB's by, through or under Buyer, whether alone or in
combination with other substances, including, without implied
limitation, any contamination of or adverse effect on humans,
marine and wildlife, food, animal feed or the environment by
reason of such PCB's.

MONS 072085

a unit of Monsanto Company

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

-2-

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provisions set forth above.

Nothing herein shall create or imply any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer. No conditions, understandings or agreements purporting to modify or vary the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effected by the acknowledgment or acceptance of any sale document, purchase order, shipping instruction or other forms containing terms or conditions at variance herewith.

GENERAL ELECTRIC CO.
(Buyer)

BY: _Walter O. Lichtwardt_

TITLE: Vice President and Corporate Counsel

DATE: January 21, 1972

MONSANTO COMPANY

BY: _[signature]_

MONS 072086

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

**GENERAL ⚡ ELECTRIC**
**COMPANY**
570 LEXINGTON AVE., NEW YORK, N.Y. 10022

WALTER A. SCHLOTTERBECK
VICE PRESIDENT AND CORPORATE COUNSEL

January 21, 1972

E. J. Putzell, Esq.
Vice President and General Counsel
Monsanto Company
800 North Lindbergh Boulevard
St. Louis, Missouri

Dear Mr. Putzell:

I have executed the "Special Undertaking by Purchasers of Polychlorinated Biphenyls" on behalf of General Electric subject to the following understandings, which Mr. Stapleton has informed me Monsanto will accept:

1. The Special Undertaking applies only to PCB's after risk of loss has passed to General Electric from Monsanto;

2. The Special Undertaking is not applicable to PCB's after their return to Monsanto or its agent for disposal or otherwise;

3. Monsanto shall provide General Electric with timely notice of any claims to which the indemnity applies and shall provide General Electric with reasonable assistance (at General Electric's expense) in the defense of any claim covered by the indemnity.

I would appreciate your indicating Monsanto's acceptance of these conditions by signing the copy of this letter and returning it to me.

Very truly yours,

*Walter A. Schlotterbeck*

ACCEPTED:

By: *[signature]*
Vice President

# Monsanto
CANADA LIMITED

425 St. Patrick Street
LaSalle 670, Quebec
(514) 365-4850

### SPECIAL UNDERTAKING BY
### PURCHASERS OF POLYCHLORINATED BIPHENYLS

The undersigned CANADIAN GENERAL ELECTRIC COMPANY LIMITED ("Buyer")
desires to purchase certain polychlorinated biphenyl products
("PCB's") which are manufactured by Monsanto Company ("Monsanto")
and are distributed in Canada by Monsanto Canada Limited ("Monsanto
Canada").   While Buyer desires to purchase PCB's because of
certain desirable flame resistant and insulator properties,
Buyer acknowledges that it is aware and has been advised by
Monsanto and/or Monsanto Canada that PCB's tend to persist
in the environment; that care is required in their handling,
possession, use and disposition; that tolerance limits have
been or are being established for PCB's in various food products.

Monsanto and Monsanto Canada have therefore adopted certain
restrictive policies with respect to the further production,
sale and delivery of PCB's, including the receipt of under-
takings from their customers as set forth below and Buyer is
willing to agree to such undertakings with respect to sales
and/or deliveries of PCB's by Monsanto or by Monsanto Canada
to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with
respect to any and all PCB's sold or delivered by or on behalf
of Monsanto or Monsanto Canada to Buyer on or after the date
hereof and in consideration of any such sale or delivery,
Buyer shall defend, indemnify and hold harmless Monsanto and
Monsanto Canada as well as their respective present, past
and future directors, officers, employees and agents, from
and against any and all liabilities, claims, damages, penalties,
actions, suits, losses, costs and expenses arising out of or
in connection with the receipt, purchase, possession, handling,
use, sale or disposition of such PCB's by, through or under
Buyer whether alone or in combination with other substances,
including, without implied limitation, any contamination of
or adverse effect on humans, marine and wildlife, food,
animal feed or the environment by reason of such PCB's.

MONS 078883

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

- 2 -

All existing contracts for the sale of PCB's by Monsanto
or by Monsanto Canada to Buyer are hereby amended to con-
tain the provisions set forth above.

Nothing herein shall create or imply any duty or obliga-
tion of Monsanto or Monsanto Canada to sell or deliver
any PCB's to Buyer.  No conditions, understandings or
agreements purporting to modify or vary the terms hereof
shall be binding unless hereafter made in writing speci-
fically referring to this agreement and signed by the
party to be bound and no modification or variance of
the above undertaking shall be effected by the acknow-
ledgment or acceptance of any sale document, purchase
order, shipping instruction or other forms containing
terms or conditions at variance herewith.

CANADIAN GENERAL ELECTRIC COMPANY LIMITED        MONSANTO COMPANY
                 (Buyer)

BY _____                BY: _____

TITLE:  General Counsel                    MONSANTO CANADA LIMITED
        and Secretary

DATE:  February 3, 1972                    BY: _____

MONS  078884

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 3

Case 4:22-cv-00808-JRA Doc. #: 1-5 Filed: 08/30/23 Page: 82 of 463 PageID #: 135

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Westinghouse Electric Corporation

S W Harwood
Vice President
Engineering and Development

Westinghouse Building
Gateway Center
Pittsburgh Pennsylvania 15222

January 15, 1972

Monsanto Industrial Chemicals Co.
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166

Gentlemen:

Monsanto Company ("Monsanto") manufactures certain polychlorinated biphenyl products ("PCB's") which Westinghouse Electric Corporation ("Buyer") desires to purchase. While Buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised that PCB's tend to persist in the environment; that care is required in their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to or for the account of Buyer on or after the date hereof, and in consideration of any such sale or delivery, Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of

MONS 077866

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Monsanto Industrial Chemicals Co.
Page Two
January 15, 1972

such PCB's by, through or under Buyer, whether alone or in
combination with other substances, including, without implied
limitation, any contamination of or adverse effect on humans,
marine and wildlife, food, animal feed or the environment by
reason of such PCB's.

The point at and after which the provisions of this
agreement shall apply to PCB's sold or delivered by or on
behalf of Monsanto to or for the account of Buyer on or after
the date hereof, and the point at which title and risk of loss
with respect to such PCB's shall pass from Monsanto to Buyer,
shall be the F.O.B. point at the location from which delivery
to Buyer is initiated by Monsanto, and shall refer to the point
of transfer of possession of the drum, tank car, tank truck,
or other container for such PCB's, from Monsanto to Buyer or
the first receiving carrier utilized to effect delivery of
such PCB's to Buyer.

The provisions of this agreement shall not be applicable
to any PCB's delivered to Buyer prior to the date hereof; and
nothing herein shall create or imply any duty or obligation:
(i) of Monsanto to sell or deliver any PCB's to Buyer; or
(ii) of Buyer to defend, indemnify or hold harmless Monsanto
or any other corporation, or any person, for any damages
resulting from the negligence of Monsanto (in the absence of
negligence of Buyer) in its packaging or shipping of PCB's or
from the failure of PCB's to comply with the contract specifi-
cations applicable to such PCB's.  No conditions, understandings
or agreements purporting to modify or vary the terms hereof
shall be binding unless hereafter made in writing specifically
referring to this agreement and signed by the party to be bound
and no modification or variance of this agreement shall be
effected by the acknowledgment or acceptance of any sale document,
purchase order, shipping instruction or other forms containing
terms or conditions at variance herewith.

MONS  077867

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Monsanto Industrial Chemicals Co.
Page Two
January 15, 1972


In the event of litigation to which these indemnity
provisions shall apply, Monsanto will make available to Buyer
such information as Monsanto has (excluding trade secrets or
proprietary information of Monsanto, or any other information
which Monsanto is not legally free to disclose) which may
reasonably be required by Buyer in the defense of such litigation,
and otherwise will cooperate with Buyer in connection therewith.

This agreement shall be governed by and be construed
according to the laws of the State of Missouri.

All existing contracts for the sale of PCB's by Monsanto
to Buyer for delivery in the future are hereby amended to contain
the provisions set forth herein.

WESTINGHOUSE ELECTRIC CORPORATION

By _____

Title  Vice President

Date  January 15, 1972


MONSANTO COMPANY
ORIGINAL SIGNED BY:

By _____E. J. Putzell_____

MONS 077866

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 4

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

*Original to Neibelin*
*9/8/72*

# Monsanto

MONSANTO INDUSTRIAL CHEMICALS CO.
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166
Phone: (314) 694-1000

### SPECIAL UNDERTAKING BY
### PURCHASERS OF POLYCHLORINATED BIPHENYLS

Monsanto Company ("Monsanto") manufactures certain poly-
chlorinated biphenyl products ("PCB's") which Aerovox Corporation
and Aerovox Canada Limited ("Buyer") desires to purchase.  While
Buyer desires to purchase PCB's because of certain
desirable flame resistant and insulator properties, Buyer
acknowledges that it is aware and has been advised by
Monsanto that PCB's tend to persist in the environment;
that care is required in their handling, possession, use
and disposition; that tolerance limits have been or are
being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies
with respect to its further production, sale and delivery
of PCB's, including the receipt of undertakings from its
customers as set forth below, and Buyer is willing to agree
to such undertakings with respect to sales and/or deliveries
of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with
respect to any and all PCB's sold or delivered by or on
behalf of Monsanto to Buyer on or after the date hereof
and in consideration of any such sale or delivery, Buyer
shall defend, indemnify and hold harmless Monsanto, its
present, past and future directors, officers, employes and
agents, from and against any and all liabilities, claims,
damages, penalties, actions, suits, losses, costs and
expenses arising out of or in connection with the receipt,
purchase, possession, handling, use, sale or disposition of
such PCB's by, through or under Buyer, whether alone or in
combination with other substances, including, without implied
limitation, any contamination of or adverse effect on humans,
marine and wildlife, food, animal feed or the environment by
reason of such PCB's.

*(except to the extent arising from the failure of PCB's to
conform to specifications)

a unit of Monsanto Company          MGNS  078867

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

-2-

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provisions set forth above.

Nothing herein shall create or imply any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer.  No conditions, understandings or agreements purporting to modify or vary the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effected by the acknowledgment or acceptance of any sale document, purchase order, shipping instruction or other forms containing terms or conditions at variance herewith.

AEROVOX CORPORATION
    (Buyer)

BY:

TITLE: Vice President, Manufacturing

DATE: February 7, 1972

MONSANTO COMPANY

BY:

AEROVOX CANADA LIMITED
    (Buyer)

BY:

TITLE: Vice President

DATE: February 7, 1972

MONS  C78868

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# Monsanto

**MONSANTO INDUSTRIAL CHEMICALS CO.**
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166
Phone: (314) 694-1000

### SPECIAL UNDERTAKING BY
### PURCHASERS OF POLYCHLORINATED BIPHENYLS

The undersigned Aerovox Corporation and Aerovox Canada Limited ("Buyer" as used herein shall refer to either or both of such companies) desire to purchase certain polychlorinated biphenyl products ("PCB's") which are manufactured by Monsanto Company and distributed in Canada by Monsanto Canada Limited ("Monsanto" as used herein shall refer to both of such Monsanto companies). While Buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employes and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses (except to the extent arising from the failure of PCB's to conform to specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

-2-

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provisions set forth above.

Nothing herein shall create or imply any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer. No conditions, understandings or agreements purporting to modify or vary the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effected by the acknowledgment or acceptance of any sale document, purchase order, shipping instruction or other forms containing terms or conditions at variance herewith.

AEROVOX CORPORATION                    MONSANTO COMPANY

By: _____         By: _____   *Asst.*
                                                                        *P.P*
Title: _____

Date: _____

AEROVOX CANADA LIMITED                 MONSANTO CANADA LIMITED

By: _____         By: _____   *Asst.*
                                                                        *P.P*
Title: _____

Date: _____

0479402

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 5

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

MONSANTO INDUSTRIAL CHEMICALS CO.
800 N. Lindbergh Boulevard
St Louis, Missouri 63166
Phone .314· 594·1000

SPECIAL UNDERTAKING BY
PURCHASERS OF POLYCHLORINATED BIPHENYL

Monsanto Company ("Monsanto") manufactures certain poly-
chlorinated biphenyl products ("PCB's") which Cornell
Dublier             ("Buyer") desires to purchase.  While
Buyer desires to purchase PCB's because of certain
desirable flame resistant and insulator properties, Buyer
acknowledges that it is aware and has been advised by
Monsanto that PCB's tend to persist in the environment;
that care is required in their handling, possession, use
and disposition; that tolerance limits have been or are
being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies
with respect to its further production, sale and delivery
of PCB's, including the receipt of undertakings from its
customers as set forth below, and Buyer is willing to agree
to such undertakings with respect to sales and/or deliveries
of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with
respect to any and all PCB's sold or delivered by or on
behalf of Monsanto to Buyer on or after the date hereof
and in consideration of any such sale or delivery, Buyer
shall defend, indemnify and hold harmless Monsanto, its
present, past and future directors, officers, employes and
agents, from and against any and all liabilities, claims,
damages, penalties, actions, suits, losses, costs and
expenses arising out of or in connection with the receipt,
purchase, possession, handling, use, sale or disposition of
such PCB's by, through or under Buyer, whether alone or in
combination with other substances, including, without implied
limitation, any contamination of or adverse effect on humans,
marine and wildlife, food, animal feed or the environment by
reason of such PCB's.

0426380

a unit of Monsanto Company

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

-2-

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provisions set forth above.

Nothing herein shall create or imply any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer.  No conditions, understandings or agreements purporting to modify or vary the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effected by the acknowledgment or acceptance of any sale document, purchase order, shipping instruction or other forms containing terms or conditions at variance herewith.


_Carver-DuBuois Elec Co._ MONSANTO COMPANY
      (Buyer)

BY: _Wayne Wilson_            BY: _CR Cumming_

TITLE: _Exec. V.P._

DATE: _1-26-72_


0426381

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 6

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

SPECIAL UNDERTAKING BY

PURCHASERS OF POLYCHLORINATED BIPHENYLS

Monsanto Company ("Monsanto") manufactures certain polychlorinated biphenyl products ("PCB's") which P. R. Mallory & Co. Inc. ("Buyer") desires to purchase. While Buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employes and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses (except to the extent arising from the failure of PCB's to conform with specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provisions set forth above and such provisions shall be applied to and considered part of each future contract for the sale of PCB's by Monsanto to Buyer.

0422151

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

-2-

Nothing herein shall create or imply any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer.  No conditions, understandings or agreements purporting to modify or vary the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effected by the acknowledgment or acceptance of any sale document, purchase order, shipping instruction or other forms containing terms or conditions at variance herewith.

P. R. MALLORY & CO. INC.                    MONSANTO COMPANY
_____                    _____
(Buyer)

BY: _____                  BY: _____

TITLE: _____

DATE: _____

0422152

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 7

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

## UNIVERSAL MANUFACTURING CORPORATION

29-51 EAST SIXTH STREET, PATERSON, NEW JERSEY 07509 • PHONE: (201) 271-3100 • TWX NO. 710 988-5934

January 7, 1972

Mr. H.S. Bergen
Monsanto Company
P.O. Box 14817
St. Louis, Missouri  63178

Dear Mr. Bergen:

Enclosed is the undertaking you requested in connection
with our purchase of PCB.  As previously discussed, we
are executing the undertaking in our own name and are
excepting any liability arising from failure of the
product to conform to specifications.

This undertaking will be covered by a blanket liability
policy with the Travelers Insurance Company having limits
of 10 million dollars.  As of December 31, 1970, Universal's
consolidated net worth was 16.8 million and its current
ratio was 1.7 to 1.

Very truly yours,

UNIVERSAL MANUFACTURING CORPORATION

Paul H. Einhorn
President

PHE/paz

0167252

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 8

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

| Case Name | Court | Docket Number |
|---|---|---|
| Beutler, John, et al. v. Monsanto, et al. | WA - King County Superior Court[1] | 21-2-14302-1 SEA |
| Burke, Leah, et al. v. Monsanto, et al. | WA - King County Superior Court | 18-2-58379-9 SEA |
| Caldwell-Eleazer, Maya, et al. v. Monsanto, et al. | WA - King County Superior Court | 18-2-54572-2 SEA |
| Delaware, State of v. Monsanto, et al. | DE – New Castle County | N21C-09-179 MMJ |
| Donham, Edith, et al. v. Monsanto, et al. | WA – King County Superior Court | 19-2-02161-6 SEA |
| Florey, Catherine, et al. v. Monsanto, et al. | WA - King County Superior Court | 19-2-02266-7 SEA |
| Grant, Donya et al v. Monsanto, et al. | WA – King County Superior Court | 21-2-14304-7 SEA |
| Keeley, Nicole, et al. v. Monsanto, et al. | WA – King County Superior Court | 19-2-02170-5 SEA |
| Keller, Rebecca, et al. v. Monsanto, et al. | WA – King County Superior Court | 19-2-02173-0 SEA |
| Keyser, Shelby, et al. v. Monsanto, et al. | WA – King County Superior Court | 18-2-58331-4 SEA |
| Larson, Corrina, et al. v. Monsanto, et al. | WA – King County Superior Court | 19-2-09686-1 SEA |
| Long, Melanie, et al. v. Monsanto, et al. | WA – King County Superior Court | 18-2-00001-7 SEA |
| Maryland, State of v. Monsanto, et al. | MD – Baltimore City | 24C21005251 |
| Mills Hiley, Holly, et al. v. Monsanto, et al. | WA – King County Superior Court | 21-2-14303-9 SEA |
| New Hampshire, State of v. Monsanto, et al. | NH – Merrimack County | 217-2020-CV-00573 |
| New Mexico, State of v. Monsanto, et al. | United States District Court for the District of New Mexico | 19-cv-01139 |
| Pennsylvania, Commonwealth of v. Monsanto, et al. | PA – Commonwealth of Pennsylvania | 668 MD 2020 |
| Port of Portland v. Monsanto, et al. | United States District Court for the District of Oregon | 3:17-cv-00015-MO |
| Rose, Merrilee, et al. v. Monsanto, et al. | WA – King County Superior Court | 18-2-58239-3 SEA |
| Soley, Hope, et al. v. Monsanto, et al. | WA – King County Superior Court | 18-2-23255-4 SEA |
| Steinman, et al. v. Monsanto, et al. | WA – King County Superior Court | 19-2-02176-4 SEA |
| Stratton, Victoria, et al. v. Monsanto, et al. | WA – King County Superior Court | 19-2-02178-1 SEA |
| Williamson, Vanessa, et al. v. Monsanto, et al. | WA – King County Superior Court | 19-2-02181-1 SEA |
| County of San Mateo, et al. vs. Monsanto Co., et al. | CA – County of San Mateo | 22-CIV-01667 |
| The People of the State of California and The City of Los Angeles v. Monsanto Co., et al. | United States District Court for the Central District of California | 2:22-cv-2399 |
| District of Columbia v. Monsanto Co., et al. | DC – Superior Court | 2020 CA 002445 B |
| Russell Tarbell, et al. v. Monsanto Co., et al. | MO – Circuit Court of St. Louis County | 20SL-CC01017 |
| Bodey, Belva J., et al v. Monsanto Co., et al. | WA – Clallam County Superior Ct. | 19-2-00605-05 |
| County of Los Angeles v. Monsanto Company | United States District Court for the Central District of California | 2:19-cv-4694 |

---

[1] In correspondence with the Defendants, School Cases in King County Superior Court were collectively referred to as the "Sky Valley School Cases."

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

| | | |
|---|---|---|
| State of New Mexico v. Monsanto Co., et al. | NM – County of Santa Fe | D-101-CV-2019-01445 |
| Mayor and City Council of Baltimore v. Monsanto Company | United States District Court for the District of Maryland | 1:19-cv-00483-RDB |
| Allison, Dana J., et al. v. Monsanto Company | WA – King County Superior Court | 18-2-26074-4 SEA |
| City of Chula Vista v. Monsanto Company | United States District Court for the Southern District of California. | 3:18-cv-01942-BEN-JMA |
| Heit, Ceanna, et al. v. Monsanto Company | WA – King County Superior Court | 18-2-11915-4 |
| State of Ohio vs. Monsanto Co. | OH – Hamilton County | 2018-000851 |
| Jackson, Gary v. Monsanto Company | United States District Court for the Southern District of Mississippi. | 5:18-cv-13-DCB-MTP |
| State of Oregon vs. Monsanto | OR – Multnomah County | 18CV00540 |
| Bard, Angela M. & William vs. Monsanto Company | WA – King County Superior Court | 2018-000041 |
| State of Washington v. Monsanto Company | WA – King County Superior Court | 2016-005364 |
| Grant Parish School Board v. Monsanto Company | United States District Court for the Western District of Louisiana. | 1:15-cv-01719-DDD-JDK |
| City of Hartford and Hartford Board of Education v. Monsanto | United States District Court for the District of Connecticut | 2015-004301 |
| Town of Princeton, MA v. Monsanto Company | United States District Court for the District of Massachusetts | 4:15-cv-40096-DJC |
| Town of Westport and Westport Community Schools v. Monsanto | United States District Court for the District of Massachusetts | 1:14-CV-12041-DJC |
| Abston, Bertha v. Monsanto Company | MO – St. Louis County | 12SL-CC01495 |
| Aiken, Ronald v. Monsanto Company | MO – St. Louis City | 1422-CC09436 |
| Ashley, Jerry v. Monsanto | MO – St. Louis County | 12SL-CC01499 |
| Bailey, Roger v. Monsanto Company | MO – Eastern District | 15SL-CC01768 |
| Blum, Robert J., Jr. v. Monsanto | MO – St. Louis County | 10SL-CCO2866 |
| Brownlee, Paul v. Monsanto Company | CA – LA County | BC497582 |
| Brown, Paulette v. Monsanto | MO – St. Louis County | 12SL-CC01498 |
| Burford, Kent N, et al.. v. Monsanto, et al. | MO – St. Louis County | 16SL-CC00928 |
| Burke, Angela v. Monsanto Co. | MO – St. Louis City | 1222-CC10374 |
| Carter, Kevin v. Monsanto Company | CA – LA County | BC484608 |
| Clair, Sanford v. Monsanto Company | MO – St. Louis County | 09SL-CC01964 |
| Craig, Gary v. Monsanto Company | MO – St. Louis County | 12SL-CC01496 |
| Dauber, Roslyn v. Monsanto | CA – LA County | BC483342 |
| Dublin, Sydell v. Monsanto | MO – St. Louis County | 10SL-CC03822 |
| Ferrell, Marinda v. Monsanto | MO – St. Louis City | 1322-CC08915 |
| Gibson, Dennis L. v. Monsanto Company | MO – Eastern District | 11SL-CC04951 |
| Goodman, Betty v. Monsanto | MO – St. Louis City | 1322-CC09213 |
| Granger, Jacqueline v. Monsanto Co. | CA – LA County | BC459770 |
| Guenther, Valerie Anna v. Monsanto | CA – LA County | BC480068 |
| Hearon, Leslie v. Monsanto | MO – St. Louis County | 12S:-CC01497 |
| Kelly, Thomas v. Monsanto Company | MO – St. Louis County | 15SL-CC03845 |
| LaBarge, Dale L. v. Monsanto | MO – St. Louis County | 12SL-CC01263 |

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

| | | |
|---|---|---|
| Mosby, Keith v. Monsanto Co. | MO – St. Louis County | 1122-CCO2206 |
| Murphy, Deborah D. v. Monsanto Company | MO- St. Louis City | 1222-CL09174 |
| Naihe, Edward v. Monsanto | MO – St. Louis County | 12SL-CCO2117 |
| Nishida Nicolas White, Ruth v. Monsanto and Solutia | MO – St. Louis County | 09SL-CC01964 |
| Nunn, Mary vs. Monsanto Co. | MO – St. Louis City | 1122-CC01207 |
| Olson Kathleen R. v. Monsanto Company, et al. | MO – St. Louis County | 16SL-CC00919 |
| Rodriguez, Gullermo v. Monsanto Co. | MO – St. Louis County | 10SLCC03408 |
| Stapleton, Bernadette v. Monsanto | MO - St. Louis City | 1122CC09622 |
| Varela, Jesse v. Monsanto | MO - St. Louis City | BC509170 |
| Walker, Benito v. Monsanto Company | MO - St. Louis City | 1122CC09621 |
| Lamkin, Craig, et al. v. Monsanto Company, et al. | MA – Suffolk County | 16-0563 |
| City of Berkeley v. Monsanto Company | United States District Court for the Northern District of California | 5:16-cv-00071 |
| City of Oakland v. Monsanto Company | United States District Court for the Northern District of California | 4:15-cv-05152 |
| City of San Jose v. Monsanto Company | United States District Court for the Northern District of California | 5:15-cv-03178-NC |
| City of Seattle v. Monsanto, et al. | United States District Court for the Western District of Washington | 2:16-cv-00107 |
| City of Spokane v. Monsanto Company | United States District Court for the Eastern District of Washington | 2:15-cv-00201-SMJ |
| Monsanto PCB Water Case Litigation | Judicial Panel /Multidistrict | MDL No. 2697 |
| San Diego Unified Port and City of San Diego v. Monsanto Co., et al. | United States District Court for the Southern District of California | 3:15-cv-00578-WQH-JLB |
| City of Long Beach v. Monsanto Co., et al. | United States District Court for the Northern District of California | 2:16-cv-03493-FMO-AS |
| City of Portland v. Monsanto Co., et al. | United States District Court for the District of Oregon | 3:16-cv-1418-PK |

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 9

**15SL-CC01768**

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

MISSOURI CIRCUIT COURT
TWENTY-FIRST JUDICIAL CIRCUIT
ST. LOUIS COUNTY

ROGER BAILEY, NICOLETTA CALHOUN,
THOMAS E. CLEARY, CATHERINE
GUIDROZ, CINDY M. HANNON, STANLEY
JOHNSON, PAMELA G. KLES, REBECCA P.
MACKEL, TOMMY D. MOORE, LOUIS D.
OLANDESE,  ANN H. PILACKAS, and ANN
M. STAFFORD,

        **Plaintiffs,**

      v.

**MONSANTO CO.**
Serve: Registered Agent
        CSC - Lawyers Incorporating
        Service Co.
        221 Bolivar St.
        Jefferson City, MO 65101

**SOLUTIA, INC.**
Serve: Registered Agent
        The Corporation Co.
        120 South Central Ave.
        Clayton, MO 63105

**PHARMACIA CORP.**
Serve: Registered Agent
        CT Corporation Systems
        120 South Central Ave.
        Clayton, MO 63105

**PFIZER, INC.**
Serve: Registered Agent
        CT Corporation Systems
        120 South Central Ave.
        Clayton, MO 63105

        **Defendants.**

Cause No.:

Division No.

JURY TRIAL DEMANDED

1

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

## PETITION

COME NOW PLAINTIFFS ROGER BAILEY, NICOLETTA CALHOUN, THOMAS E. CLEARY, CATHERINE GUIDROZ, CINDY HANNON, STANLEY JOHNSON, PAMELA G. KLES, REBECCA P. MACKEL, TOMMY D. MOORE, LOUIS D. OLANDESE, ANN H. PILACKAS, and ANN M. STAFFORD who allege as follows:

### I. PARTIES

1.     Plaintiff ROGER BAILEY resides at 1209 US HIGHWAY 31 SOUTH, ALABAMA 35611.

2.     Plaintiff NICOLETTA CALHOUN resides at 6410 WESTERN AVENUE, WILLOBROOK, IL 60527.

3.     Plaintiff THOMAS E. CLEARY resides at 6671 W. PLACITA DE LAS BOTAS, TUCSON, ARIZONA 85743.

4.     Plaintiff CATHERINE GUIDROZ resides at 12912 PECAN STREET, PORT ALLEN, LOUISIANA 70767.

5.     Plaintiff CINDY M. HANNON resides at 4702 FLATBRUSH AVENUE, SARASOTTA, FLORIDA 34233.

6.     Plaintiff STANLEY JOHNSON resides at 21 ENGLISH ISLE ONE, LINCOLN, ALABAMA 35096.

7.     Plaintiff PAMELA G. KLES resides at 12177 17TH STREET, YUCAIPA, CALIFORNIA 92708.

2

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

8.      Plaintiff REBECCA P. MACKEL resides at 1006 MARVIN GARDEN WAY, LOGANVILLE, GA 30052.

9.      Plaintiff TOMMY D. MOORE resides at 180 SIMS LANE, SYLACAUGA, ALABAMA 35150.

10.     Plaintiff LOUIS D. OLANDESE resides at 5509 MAY AVENUE, RICHMOND, ILLINOIS 60071.

11.     Plaintiff ANN H. PILACKAS resides at 1083 MEADOWSONG ROAD, LEBONON, ILLINOIS 62254.

12.     Plaintiff ANN M. STAFFORD resides at 11361 DELPHENIUM AVENUE, FOUNTAIN VALLEY, CALIFORNIA 92708.

13.     Defendant MONSANTO CO. ("NEW MONSANTO") is a Delaware corporation that has its corporate headquarters and principal place of business in St. Louis County, Missouri.   Monsanto can be served through its registered agent, CSC - Lawyers Incorporating Services, Inc., 221 Bolivar St., Jefferson City, Missouri 65101.

14.     Defendant SOLUTIA, INC. ("SOLUTIA") is a Delaware corporation that has its corporate headquarters and principal place of business in St. Louis County, Missouri. Solutia can be served through its registered agent, The Corporation Co., 120 South Central Ave., Clayton, Missouri 63105.

15.     Defendant PHARMACIA CORP. ("PHARMACIA" a/k/a "OLD MONSANTO") is a Delaware corporation that, since its merger with Defendant Pfizer, Inc. in 2003, has had its headquarters and principal place of business in New York, NY. Pharmacia can be served through its registered agent, CT Corporation System, 120 South Central Ave., Clayton, Missouri 63105.

3

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

16.     Defendant PFIZER, INC. ("PFIZER") is a Delaware corporation that has its corporate headquarters and principal place of business in New York, NY.   Pfizer can be served through its registered agent, CT Corporation System, 120 South Central Ave., Clayton, Missouri 63105.

## II. JURISDICTION AND VENUE

17.     Venue is proper in St. Louis County under MO. STAT. § 508.010(5)(2) because this is a tort case in which Plaintiffs were first injured outside of Missouri, and the registered agent for Defendants Solutia and Pfizer are located in St. Louis County.

18.     THIS CAUSE IS NOT REMOVABLE.   There is no diversity of citizenship among the parties because Defendants Solutia, Inc. and Monsanto Co. are citizens of the State of Missouri for purposes of federal diversity jurisdiction and removal statutes. *See* 28 U.S.C.§ 1332(c)(1) ("a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business..."). Moreover, because at least one Defendant is a resident of Missouri, where this action is filed, Defendants could not, in any event, remove this action on the basis of diversity. 28 U.S.C. § 1441(b). Plaintiffs affirmatively disclaim any damages or action arising under the constitution, treaties, or laws of the United States (including any claim arising from an act or omission on a federal enclave, or of any officer of the U.S. or any agency or person acting under him occurring under color of such office). No claim of admiralty or maritime law is raised. Plaintiffs sue no foreign state or agency. The damages that are sought by the Plaintiffs, exclusive of interests and costs, exceed the minimum jurisdictional limits of this Court.

## III. FACTUAL BACKGROUND

4

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

19.     PLAINTIFFS ROGER BAILEY, NICOLETTA CALHOUN, THOMAS E. CLEARY, CATHERINE GUIDROZ, CINDY HANNON, STANLEY JOHNSON, PAMELA G. KLES, REBECCA P. MACKEL, TOMMY D. MOORE, LOUIS D. OLANDESE, ANN H. PILACKAS, and ANN M. STAFFORD are Alabama, Arizona, California, Florida, Georgia, Illinois, and Louisiana residents who developed lymphohematopietic cancer after being exposed to chemical products designed, manufactured, and distributed by Defendants.     Specifically, Plaintiffs have had substantial dietary and other environmental exposure to polychlorinated biphenyls ("PCBs"), manufactured by the original Monsanto Co. ("Old Monsanto" a/k/a "Pharmacia").

20.     From 1901 to 1997 the original Monsanto Co., also known as Monsanto Chemical Co., operated as a Missouri corporation manufacturing a variety of chemicals and agricultural products. This original corporate Monsanto entity, which is now sometimes referred to as "Old Monsanto," ceased to exist in 1997 as the result of a series of corporate spin-offs and acquisitions. At that time, Old Monsanto's chemical division was split off and reformed into a newly-independent corporation, which was renamed "Solutia, Inc." one of the Defendants in this action. As part of this 1997 spin-off, Solutia assumed certain of Old Monsanto's debts and liabilities, including all liabilities related to Old Monsanto's production and sale of PCBs.     Although Solutia was recently reorganized pursuant to Chapter 11 of the federal bankruptcy laws, it emerged from bankruptcy in February 2008.

21.     In 2000, the remaining portion of Old Monsanto, comprised of Old Monsanto's Life Sciences division, merged with Pharmacia/Upjohn Corp., which meant that Old

5

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Monsanto no longer existed as a separate corporate entity.  Defendant Pharmacia then incorporated a new company in Delaware, also called "Monsanto Co.," which is now referred to as "New Monsanto," the other Defendant in this case.  In 2002, Defendant Pharmacia spun off its interest in New Monsanto, and New Monsanto now operates as an independent corporate entity with its corporate headquarters and principal place of business in St. Louis, Missouri.

22.     In 2003, Defendant Pharmacia (what remained of "Old Monsanto") merged with Defendant Pfizer, Inc.

23.     As part of Solutia's federal bankruptcy plan of reorganization, New Monsanto agreed to indemnify Solutia for all tort "legacy liabilities" related to Old Monsanto's activities, including the production and sale of PCBs.  As a result of these various transactions, Defendants Pharmacia, Pfizer, Solutia and Monsanto collectively have legal responsibility for Old Monsanto's conduct in the production, sale, and distribution of PCBs, which is the subject of Plaintiffs' claims in this case.

24.     PCBs are a class of 209 discrete chemical compounds, called congeners, in which one to ten chlorine atoms are attached to biphenyl.  From 1929, when Monsanto's predecessor Swann Chemical Co. (which merged into Monsanto in 1935) first began producing PCBs, until 1977, when Congress banned the manufacture of PCBs, Monsanto produced and sold more than 99 percent of all the PCBs that were ever sold in the United States.  Over those six decades, Monsanto sold those PCBs as liquid mixtures, under the trade name "Aroclor," to a variety of industrial customers, for a wide variety of industrial uses.  Each of Monsanto's Aroclor products contained a combination of different PCB congeners.

6

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

25.     Many of Monsanto's PCBs were used by its customers as insulating fluids, also known as "dielectric fluids," in certain electrical equipment, including high-temperature transformers and capacitors.  However, Monsanto's Aroclor and other PCB products were also marketed and used for many other purposes, including in inks, paints, dedusting agents, pesticides, plasticizers, hydraulic fluids, lubricants, adhesives, and carbonless copy paper.  Until 1971, approximately 40 percent of Monsanto's PCBs were sold for purposes other than use as insulating fluid for electrical equipment.  From 1971 to 1977, Monsanto sold PCBs exclusively for use as insulating fluid in transformers and capacitors.

26.     Like other chlorinated organic compounds, such as dioxins, which are collectively known as "organochlorines," PCBs are considered "persistent organic pollutants," because they do not readily degrade in the environment after disposal, and they are not easily metabolized or broken down by humans or animals after absorption.  PCBs are lipophilic, and are stored in the fat tissue of humans and animals who have been exposed. Because PCBs were dumped into the environment over decades by Monsanto, its customers, and the end users of various PCB-containing products, PCBs are now ubiquitous in the environment.  PCBs can be found in most animals, as well as in water, soil, sediment, and numerous other environmental media.  Thus, measurable quantities of PCBs are typically found in most of the foods that most Americans consume on a daily basis, including fish, beef, poultry, dairy products, and event fruits and vegetables. Throughout the six decades that Monsanto produced and sold PCBs, the company knew or should have known that many of its PCBs would ultimately be disposed of in ways that would allow those PCBs to enter the environment.

7

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

27.     Because Monsanto's PCBs have contaminated the food chain and continue to be ubiquitous contaminants of the air, water, and soil, all Americans, including Plaintiffs, have been substantially exposed to Monsanto's PCBs through their diet and through other environmental exposures. Although Monsanto's PCBs were incorporated into many other products before being dumped into the environment, those PCBs themselves, to which Plaintiffs have been exposed, are substantially the same chemicals as when they left Monsanto's possession.

28.     Throughout the decades during which Monsanto produced PCBs, the company was aware that exposure to PCBs carried significant health risks. Despite this knowledge, and despite the availability of substitute products, Monsanto continued to produce and market PCBs, while hiding from the public, its customers, and applicable governmental authorities the true health risks associated with PCBs. Such conduct was despicable and done with a willful disregard of the rights and safety of others. In other words, Monsanto was aware that its continued production and sale of PCBs would result in probable dangerous consequences in the form of environmental devastation and significant health risks for users and others exposed to its PCBs, and Monsanto deliberately chose to market its PCBs over the course of decades, despite this knowledge.

**IV. DISCOVERY RULE**

29.     Plaintiffs hereby plead and invoke the "discovery rule." Plaintiffs will show that after reasonably exercising due diligence, they did not learn the nature of the cause of their cancers or that such cancers were chemically-related until less than two years prior

8

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

to the filing of the Plaintiffs' causes of action herein. Plaintiffs also specifically invoke the Federally Required Commencement Date, pursuant to 42 U.S.C. § 9658.

## V.  CAUSE OF ACTION:
## STRICT LIABILITY FOR DESIGN DEFECT

30.     Plaintiffs incorporate herein each allegation set forth above.

Because Plaintiffs were exposed to Monsanto's PCBs and developed lymphohematopoietic cancer while living in Alabama, Arizona, California, Florida, Georgia, Illinois and Louisiana, their claims for compensatory damages in this case are governed by the laws in those states.

31.     Plaintiffs allege that Monsanto's various PCB products were unreasonably dangerous, and that those unreasonably dangerous products were a producing cause in the development of each Plaintiff's cancer.  Specifically, Plaintiffs allege that Monsanto sold its PCBs under the trade name Aroclor (and other trade names), and that through the foreseeable dumping of those Aroclor and other PCB-containing products by Monsanto itself, by its customers, and by end users, Monsanto's PCBs ultimately made their way to the environment and to the food chain.  Throughout the time that Monsanto marketed its unreasonably dangerous Aroclor products, there were safer alternatives to PCBs available.  Because of the persistence of PCBs, those PCBs to which Plaintiffs were environmentally exposed were in substantially the same condition as when Monsanto sold them.  Plaintiffs' environmental exposures to Monsanto's PCBs were a producing cause of Plaintiffs' cancers.

## VI.  CAUSE OF ACTION: NEGLIGENCE

33.     Plaintiffs incorporate herein each allegation set forth above.

9

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

34. Monsanto's decisions to market and distribute its various PCB products were negligent. As described above, for decades, the company was aware of the hazards of PCBs, and either knew or should have known that its PCBs would be released into the environment. Despite this actual and constructive knowledge, and despite the availability of numerous alternatives to PCBs for each of their uses, Monsanto continued to market PCBs. Monsanto's ongoing negligent decisions to market and distribute those PCBs for decades led to Plaintiffs' environmental exposures, and were a substantial factor in the development of Plaintiffs' cancers.

35. The Plaintiffs were all exposed to Monsanto's PCBs less than 15 years after Monsanto sold them, but the symptoms of Plaintiffs' cancers did not manifest within that time frame.

## VII. DAMAGES

36. As a direct and proximate result of Defendants' conduct described above, PLAINTIFFS ROGER BAILEY, NICOLETTA CALHOUN, THOMAS E. CLEARY, CATHERINE GUIDROZ, CINDY HANNON, STANLEY JOHNSON, PAMELA G. KLES, REBECCA P. MACKEL, TOMMY D. MOORE, LOUIS D. OLANDESE, ANN H. PILACKAS, and ANN M. STAFFORD sustained damages, including past and future medical expenses, past and future pain and suffering, past and future mental anguish and disfigurement, past and future earnings loss and all other applicable damages. As a result of Defendants' complete indifference or conscious disregard for the safety of others, malice and oppression described above, Plaintiffs hereby seek punitive damages.

## VIII. PRAYER FOR RELIEF

10

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

37.    WHEREFORE, Plaintiffs pray judgment against all Defendants herein for all actual

damages, pre-judgment and post-judgment interest, costs of suit, and all such other and

further relief to which Plaintiffs may show themselves to be justly entitled.

## IX.  JURY DEMAND

38.    PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS.

Respectfully submitted,
By: /s/ John G. Simon

**THE SIMON LAW FIRM, P.C.**
John G. Simon, MO Bar No. 35231
Erica F. Blume, MO Bar No. 63716
800 Market St., Suite 1700
St. Louis, MO 63101
(314) 241-2929 Phone
(314) 241-2029 Facsimile
jsimon@simonlawpc.com
eblume@simonlawpc.com

**ALLEN STEWART, P.C.**
Allen M. Stewart, MO Bar No. 60331
Steve Baughman Jensen, TX Bar No. 00783615
Scott R. Frieling, TX Bar No. 24012659
325 N. St. Paul St., Suite 4000
Dallas, Texas 75201
(214) 965-8700 Office
(214) 965-8701 Facsimile
astewart@allenstewart.com
sjensen@allenstewart.com
sfrieling@allenstewart.com

**WILLIAMS KHERKHER**
Steven Kherkher, MO Bar #64648
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
(713) 230-2200 Phone
(713) 643-6226 Facsimile
skerkher@williamskherkher.com
***ATTORNEYS FOR PLAINTIFFS***

11

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 10

**15SL-CC03845**

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

MISSOURI CIRCUIT COURT
TWENTY-FIRST JUDICIAL CIRCUIT
ST. LOUIS COUNTY

| | | |
|---|---|---|
| THOMAS KELLY and | § | |
| MICHAEL KRZESZEWSKI, | § | Cause No. |
| | § | |
| **Plaintiffs**, | § | Division |
| | § | |
| v. | § | Jury Trial Requested |
| | § | |
| **MONSANTO CO**. | § | |
| Serve: Registered Agent | § | |
|     CSC - Lawyers | § | |
| Incorporating | § | |
|     Service Co. | § | |
|     221 Bolivar St. | § | |
|     Jefferson City, MO | § | |
|     65101 | § | |
| | § | |
| **SOLUTIA, INC.** | § | |
| Serve:  Registered Agent | § | |
|     The Corporation Co. | § | |
|     120 South Central Ave. | § | |
|     Clayton, MO 63105 | § | |
| | § | |
| **PHARMACIA LLC.** | § | |
|  Serve: Registered Agent | § | |
|     CT Corporation System | § | |
|     120 South Central Ave. | § | |
|     Clayton, MO 63105 | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

## PETITION

COME NOW PLAINTIFFS THOMAS KELLY and MICHAEL KRZESZEWSKI who

allege as follows:

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

## I.  PARTIES

1.      Plaintiff THOMAS KELLY resides at 40 CEDAR STREET, KINGSPARK, NEW YORK 11754 and is a citizen of New York.

2.      Plaintiff MICHAEL KRZESZEWSKI resides at 337A CANTERBURY COURT, LAKEWOOD, NEW JERSEY 08701 and is a citizen of New Jersey.

3.      Defendant MONSANTO CO. ("NEW MONSANTO") is a Delaware corporation that has its corporate headquarters and principal place of business in St. Louis County, Missouri. Monsanto can be served through its registered agent, CSC - Lawyers Incorporating Services, Inc., 221 Bolivar St., Jefferson City, Missouri 65101.

4.      Defendant SOLUTIA, INC. ("SOLUTIA") is a Delaware corporation that has its corporate headquarters and principal place of business in St. Louis County, Missouri. Solutia can be served through its registered agent, The Corporation Co., 120 South Central Ave., Clayton, Missouri 63105.

5.      Defendant PHARMACIA LLC ("PHARMACIA" a/k/a "OLD MONSANTO") is a Delaware limited liability corporation that is a subsidiary of Pfizer, Inc., and is headquartered and has its principal place of business in Peapack, New Jersey. Because Pfizer, Inc. is a member (owner) of Pharmacia, LLC, and Pfizer, Inc. is a citizen of New York, Pharmacia is also a New York citizen. Pharmacia can be served through its registered agent, CT Corporation System, 120 South Central Ave., Clayton, Missouri 63105.

## II.  JURISDICTION AND VENUE

6.      Venue is proper in St. Louis County under MO. STAT. § 508.010(5)(2) because this is a tort case in which Plaintiffs and Decedents were first injured outside of Missouri, and the registered agent for Defendants Solutia and Pharmacia are located in St. Louis County.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

7.     THIS CAUSE IS NOT REMOVABLE.  There is no diversity of citizenship among the parties because Defendants Solutia, Inc. and Monsanto Co. are citizens of the State of Missouri for purposes of federal diversity jurisdiction and removal statutes, and Defendant Pharmacia is a citizen of New York.  *See* 28 U.S.C.§ 1332(c)(1) ("a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business..."); *GMAC Commercial Credit LLC v. Dillard Dep't Stores, Inc.*, 357 F.3d 827, 829 (8th Cir. 2004) ("an LLC's citizenship for purposes of diversity jurisdiction is the citizenship of its members").  Moreover, because at least one Defendant is a resident of Missouri, where this action is filed, Defendants could not, in any event, remove this action on the basis of diversity.  28 U.S.C. § 1441(b).  Plaintiffs affirmatively disclaim any damages or action arising under the constitution, treaties, or laws of the United States (including any claim arising from an act or omission on a federal enclave, or of any officer of the U.S. or any agency or person acting under him occurring under color of such office).  No claim of admiralty or maritime law is raised.  Plaintiffs sue no foreign state or agency.  The damages that are sought by the Plaintiffs, exclusive of interests and costs, exceed the minimum jurisdictional limits of this Court.

## III.  FACTUAL BACKGROUND

8.     THOMAS KELLY and MICHAEL KRZESZEWSKI are citizens of New York and New Jersey who developed Non-Hodgkin Lymphoma ("NHL") after being exposed to chemical products designed, manufactured, and distributed by Old Monsanto.  Specifically, Plaintiffs and Decedents have had substantial dietary and other environmental exposure to polychlorinated biphenyls ("PCBs"), manufactured by the original Monsanto Co. ("Old Monsanto" a/k/a "Pharmacia").

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

9.      From 1901 to 1997 the original Monsanto Co., also known as Monsanto Chemical Co., operated as a Missouri corporation manufacturing a variety of chemicals and agricultural products. This original corporate Monsanto entity, which is now sometimes referred to as "Old Monsanto," ceased to exist in 1997 as the result of a series of corporate spin-offs and acquisitions.  At that time, Old Monsanto's chemical division was split off and reformed into a newly-independent corporation, which was renamed "Solutia, Inc." one of the Defendants in this action.  As part of this 1997 spin-off, Solutia assumed certain of Old Monsanto's debts and liabilities, including all liabilities related to Old Monsanto's production and sale of PCBs.  Although Solutia was recently reorganized pursuant to Chapter 11 of the federal bankruptcy laws, it emerged from bankruptcy in February 2008.

10.     In 2000, the remaining portion of Old Monsanto, comprised of Old Monsanto's Life Sciences division, merged with Pharmacia/Upjohn Corp., which meant that Old Monsanto no longer existed as a separate corporate entity.  Defendant Pharmacia then incorporated a new company in Delaware, also called "Monsanto Co.," which is now referred to as "New Monsanto," the other Defendant in this case.  In 2002, Defendant Pharmacia spun off its interest in New Monsanto, and New Monsanto now operates as an independent corporate entity with its corporate headquarters and principal place of business in St. Louis, Missouri.

11.     In 2003, Defendant Pharmacia (what remained of "Old Monsanto") was acquired by Pfizer, Inc.

12.     In 2012, Pharmacia merged with another Pfizer subsidiary, called Pfizer Convention III, LLC.  The surviving corporation was renamed as Pharmacia LLC. Defendant Pharmacia is headquartered and has its principal place of business at 100 Route 206 North, Peapack NJ 07977.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

13.     As part of Solutia's federal bankruptcy plan of reorganization, New Monsanto agreed to indemnify Solutia for all tort "legacy liabilities" related to Old Monsanto's activities, including the production and sale of PCBs.  As a result of these various transactions, Defendants Pharmacia, Solutia and Monsanto collectively have legal responsibility for Old Monsanto's conduct in the production, sale, and distribution of PCBs, which is the subject of Plaintiffs' claims in this case.

14.     PCBs are a class of 209 discrete chemical compounds, called congeners, in which one to ten chlorine atoms are attached to biphenyl.  From 1929, when Monsanto's predecessor Swann Chemical Co. (which merged into Monsanto in 1935) first began producing PCBs, until 1977, when Congress banned the manufacture of PCBs, Monsanto  produced and sold more than 99 percent of all the PCBs that were ever sold in the United States.  Over those six decades, Monsanto sold those PCBs as liquid mixtures, under the trade name "Aroclor," to a variety of industrial customers, for a wide variety of industrial uses.  Each of Monsanto's Aroclor products contained a combination of different PCB congeners.

15.     Many of Monsanto's PCBs were used by its customers as insulating fluids, also known as "dielectric fluids," in certain electrical equipment, including high-temperature transformers and capacitors. These applications for PCBs in transformers and capacitors are known as "closed applications," or "closed uses." However, Monsanto's Aroclor and other PCB products were also marketed and sold for many other applications, including in inks, paints, dedusting agents, pesticides, plasticizers, hydraulic fluids, lubricants, adhesives, heat transfer fluids, and carbonless copy paper.  Collectively, these applications for PCBs in every product other than transformers and capacitors are known as "open applications," and/or "non-controllable applications." These applications have been described as "open" and "non-controllable" because the PCBs contained in those products are open to the environment and releases of PCBs to the environment during use

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

of such products cannot be controlled. In 1970, more than 40 percent of Monsanto's PCBs were sold for purposes other than "closed applications" in electrical equipment.  From 1971 to 1977, Monsanto sold PCBs exclusively for "closed applications," that is, as insulating fluid in transformers and capacitors.

16.     Like other chlorinated organic compounds, such as dioxins, which are collectively known as "organochlorines," PCBs are considered "persistent organic pollutants," because they do not readily degrade in the environment after disposal, and they are not easily metabolized or broken down by humans or animals after absorption.  PCBs are lipophilic, and are stored in the fat tissue of humans and animals who have been exposed.  Because PCBs were dumped into the environment over decades by Monsanto, its customers, and the end users of various PCB-containing products, PCBs are now ubiquitous in the environment.  PCBs can be found in most animals, as well as in water, soil, sediment, and numerous other environmental media.  Thus, measurable quantities of PCBs are typically found in most of the foods that most Americans consume on a daily basis, including fish, beef, poultry, dairy products, and event fruits and vegetables.  Throughout the six decades that Monsanto produced and sold PCBs, the company knew or should have known that its PCBs sold for open or non-controllable applications would ultimately result in the release of those PCBs into the environment.

17.     Because Monsanto's PCBs have contaminated the food chain and continue to be ubiquitous contaminants of the air, water, and soil, all Americans, including Plaintiffs, have been substantially exposed to Monsanto's PCBs sold for open and non-controllable applications, through diet and other environmental exposures.  Although Monsanto's PCBs were incorporated into many other products before being released into the environment, those PCBs themselves, to which Plaintiffs

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

and Decedents have been exposed, are substantially the same chemicals as when they left Monsanto's possession.

18.     Throughout the decades during which Monsanto produced PCBs, the company was aware that exposure to PCBs carried significant health risks. Despite this knowledge, and despite the availability of substitute products, Monsanto continued to produce and market PCBs for open and non-controllable applications, while hiding from the public, its customers, and applicable governmental authorities the true health risks associated with PCBs.  Such conduct was despicable and done with a willful disregard of the rights and safety of others.  In other words, Monsanto was aware that its continued production and sale of PCBs for open and non-controllable applications would result in probable dangerous consequences in the form of environmental devastation and significant health risks for users and others exposed to its PCBs, and Monsanto deliberately chose to market its PCBs for such open and non-controllable applications over the course of decades, despite this knowledge.

## IV.  DISCOVERY RULE

19.     Plaintiffs hereby plead and invoke the "discovery rule."  Plaintiffs will show that after reasonably exercising due diligence, they did not learn the nature of the cause of their cancer or that such cancer was chemically-related until less than two years prior to the filing of the Plaintiffs' and Decedents' causes of action herein. Plaintiffs also specifically invoke the Federally Required Commencement Date, pursuant to 42 U.S.C. § 9658.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

## V.  CAUSE OF ACTION:
### STRICT LIABILITY FOR DESIGN DEFECT

20.      Plaintiffs incorporate herein each allegation set forth above. Because Plaintiffs and Decedents were exposed to Monsanto's PCBs and developed Non-Hodgkin Lymphoma while living in New York and New Jersey, their claims for compensatory damages in this case are governed by the laws in those states.

21.      Plaintiffs allege that Monsanto's various PCB products sold for open and non-controllable applications were unreasonably dangerous, and that those unreasonably dangerous products were a proximate and producing cause, and a substantial factor in the development of each Plaintiff's and Decedent's NHL.  Specifically, Plaintiffs allege that Monsanto sold its PCBs under the trade name Aroclor (and other trade names) for use in a wide variety of open and non-controllable applications. Through the foreseeable environmental releases of those PCBs by Monsanto itself, by its customers, and by end users, Monsanto's PCBs sold for open and non-controllable applications ultimately made their way to the environment and to the food chain. Throughout the time that Monsanto marketed its unreasonably dangerous Aroclor products for open and non-controllable applications, there were safer alternatives to PCBs available for the same or similar applications.  Because of the persistence of PCBs, those PCBs sold for open and non-controllable applications to which Plaintiffs and Decedents were environmentally exposed were in substantially the same condition as when Monsanto sold them.  Plaintiffs' and Decedents' environmental exposures to Monsanto's PCBs sold for open and non-controllable applications were a proximate and producing cause of Plaintiffs' and Decedents' NHLs, and were also a substantial factor in the development of those cancers.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

## VI.  CAUSE OF ACTION: NEGLIGENCE

22.     Plaintiffs incorporate herein each allegation set forth above.

23.     Monsanto's decisions to market and distribute its various PCB products for open and non-controllable applications were negligent.  As described above, for decades, the company was aware of the hazards of PCBs, and either knew or should have known that its PCBs sold for open and non-controllable applications would be released into the environment. Monsanto also knew or should have known that those PCBs would persist in the environment and bioaccumulate in the food chain and in people, and that such environmental exposures could injure people in the general population who were so exposed.  Despite this actual and constructive knowledge, and despite the availability of numerous alternatives to PCBs for each of these open and non-controllable applications, Monsanto continued to market PCBs for those purposes through 1970 (and, as to certain open and non-controllable applications, through 1971).  Monsanto's ongoing negligent decisions to market and distribute those PCBs for open and non-controllable applications for decades led to Plaintiffs' and Decedents' environmental exposures, and were a producing cause, proximate cause, and substantial factor in the development of Plaintiffs' and Decedents' NHLs.

24.     The Plaintiffs and Decedents were all exposed to Monsanto's PCBs sold for open and non-controllable applications less than 15 years after Monsanto sold them, but the symptoms of Plaintiffs' and Decedents' cancers did not manifest within that time frame.

## VII.  DAMAGES

25.     As a direct and proximate result of Defendants' conduct described above, PLAINTIFFS THOMAS KELLY and MICHAEL KRZESZEWSKI sustained damages, including past and future medical expenses, past and future pain and suffering, past and future mental anguish and disfigurement, past and future earnings loss and all other applicable damages. As a result of

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Defendants' complete indifference or conscious disregard for the safety of others, malice and oppression described above, Plaintiffs hereby seek punitive damages.

## VIII.  PRAYER FOR RELIEF

26.     WHEREFORE, Plaintiffs pray judgment against all Defendants, joint and severally, herein for all actual damages, punitive damages, pre-judgment and post-judgment interest, costs of suit, and all such other and further relief to which Plaintiffs may show themselves to be justly entitled.

## IX.  JURY DEMAND

27.     PLAINTIFFS DEMAND A TRIAL BY JURY OF TWELVE ON ALL COUNTS.


Respectfully submitted,



By:   /s/ John G. Simon

**THE SIMON LAW FIRM, P.C.**
John G. Simon, MO Bar No. 35231
Erica F. Blume, MO Bar No. 63716
800 Market St., Suite 1700
St. Louis, MO 63101
(314) 241-2929 Phone
(314) 241-2029 Facsimile
jsimon@simonlawpc.com
eblume@simonlawpc.com

**ALLEN STEWART, P.C.**
Allen M. Stewart, MO Bar No. 60331
Steve Baughman Jensen, TX Bar No. 00783615
Scott R. Frieling, TX Bar No. 24012659
325 N. St. Paul St., Suite 4000
Dallas, Texas 75201
(214) 965-8700 Office
(214) 965-8701 Facsimile
astewart@allenstewart.com
sjensen@allenstewart.com
sfrieling@allenstewart.com

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

**WILLIAMS KHERKHER**
Steven Kherkher, MO Bar No. 64648
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
(713) 230-2200 Phone
(713) 643-6226 Facsimile
skherkher@williamskherkher.com

***ATTORNEYS FOR PLAINTIFFS***

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 11

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
2  John P. Fiske (SBN 249256)
655 West Broadway, Suite 1700
3  San Diego, CA 92101
Telephone: 619-237-3490
4

**BARON & BUDD P.C.**
5  Scott Summy (admitted Pro Hac Vice)
(Texas Bar No. 19507500)
6  Carla Burke (admitted Pro Hac Vice)
(Texas Bar NO. 24012490)
7  Celeste Evangelisti (SBN 225232)
3102 Oak Lawn Avenue, Suite 1100
8  Dallas, TX 75219
Telephone: 214-521-3605
9

JAN I. GOLDSMITH, City Attorney
10  California State Bar No. 70988
DANIEL F. BAMBERG, Assistant City Attorney
11  California State Bar No. 60499
PAUL F. PRATHER, Deputy City Attorney
12  California State Bar No. 252985
**OFFICE OF THE CITY ATTORNEY**
13  1200 Third Avenue, Suite 1100
San Diego, CA 92101
14  Telephone: 619-533-5800

15  *Attorneys for Plaintiff City of San Diego*

16

17          **UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**
18

19  CITY OF SAN DIEGO, a municipal )
corporation;                   )
20                              )   Case No. 3:15-cv-00578-WQH-JLB
Plaintiff,            )
21                              )   **PLAINTIFF'S FIRST AMENDED**
)   **COMPLAINT**
22  v.                          )
)
23  MONSANTO COMPANY,           )
SOLUTIA INC., and            )
24  PHARMACIA CORPORATION,      )   Assigned to Judge William Q. Hayes
)   File Date: March 13, 2015
25                              )
Defendants.          )
26  _____  )
)
27

28

---

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Plaintiff the CITY OF SAN DIEGO ("the City") hereby alleges, upon information and belief, as follows:

## I.    INTRODUCTION

1.    Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants – found in bays, oceans, rivers, streams, soil, and air.  In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.  In addition, PCBs can impair and even destroy populations of fish, birds, and other animals.

2.    Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew for decades that PCBs were toxic, knew that they could not be contained and as a result were widely contaminating all natural resources and living organisms, and knew that there was no safe way to dispose of PCBs, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture of and most uses of PCBs.

3.    PCBs have been found in and around San Diego Bay ("the Bay") at levels that require cleanup in certain areas.  At different times and locations, PCBs have been detected in the Bay's water, sediments, fish, and lobsters.  PCBs entered the Bay through a variety of ways.  PCBs regularly leach, leak, off-gas, and escape their intended applications into air, soil, and water.  PCBs also leach from landfills and other disposal locations and enter the Bay with stormwater and other runoff.

4.    As a public property owner and former trustee of the Bay, Plaintiff seeks to abate the contamination, to recover damages for injuries to property, and to

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

recover all past and future costs associated with investigating and removing PCBs from in and around the Bay and preventing future injuries.

## II.  PARTIES

### A.  Plaintiff

5.  Plaintiff City is a California Charter City and municipal corporation, duly organized and existing by virtue of the laws of the State of California. The City was the trustee of certain relevant tidelands and submerged lands in and around the Bay from the early 1900s through 1963, when that property was transferred to the Port District.

6.  Plaintiff brings this suit pursuant to California Code of Civil Procedure 731, and California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and any other applicable codes or sources of relief available for monetary damages and abatement of the public nuisance caused by PCBs in the Bay.

### B.  Defendants

7.  Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.

8.  Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

9.  Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack, New Jersey. Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

10.  The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business. Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

11.  Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.

The corporation now known as Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

12.     Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.[1]

13.     Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business – including the manufacture and sale of PCBs.[2]

14.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assumed financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[3]

---

[1] *See* MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013); *see also* Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed February 20, 2014).

[2] *See id.*

[3] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

15.     Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants" or "Monsanto."

## III.    JURISDICTION AND VENUE

16.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiff and Defendants.  Plaintiff is located in California, but no Defendant is a citizen of California.  Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

17.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.    PCBs are Toxic Chemicals that Cannot Be Contained and that Cause Environmental Contamination.

18.     Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single, unique chemical compound in the PCB category.  Over two hundred congeners have been identified.[4]

19.     PCBs were generally manufactured as mixtures of congeners.  From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[5]

---

[4] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/ pcbs/ pubs/ congeners.htm (last accessed February 20, 2014).

[5] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned ... ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. ... ."). *See also* MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

20.   Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States, including electrical equipment such as transformers, motor start capacitors and lighting ballasts.   In addition, PCBs were incorporated into a variety of products such as caulks, paints and sealants.

21.   As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

22.   PCBs easily migrate or leach out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil and other materials.   For example, PCB compounds volatilize out of building materials (such as caulk) into surrounding materials such as masonry, wood, drywall and soil, thereby causing damage to those surrounding materials.   PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials and escape into the environment.

23.   PCBs present serious risks to the health of humans, wildlife and the environment.

24.   Humans may be exposed to PCBs through ingestion, inhalation and dermal contact.   Individuals may inhale PCBs that are emitted into the air.   They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks.   And humans may absorb PCBs from physical contact with PCBs or PCB-containing materials.

25.   EPA has determined that Monsanto's PCBs are probable human

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254 and 1260.[6]  EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

26.    The International Agency for Research on Cancer published an assessment in 2015 that asserts an even stronger relationship between PCBs and human cancer.  The report explains:  "There is sufficient evidence in humans for the carcinogenicity of polychlorinated biphenyls (PCBs). PCBs cause malignant melanoma. Positive associations have been observed for non-Hodgkin lymphoma and cancer of the breast. ... PCBs are carcinogenic to humans ... ."[7]

27.    In addition, EPA concluded that PCBs are associated with serious non-cancer health effects.  From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system and the endocrine system.

28.    PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians and birds.  The presence of PCBs can cause changes in community and ecosystem structure

---

[6]  EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

[7] International Agency for Research on Cancer.  IARC monographs on the evaluation of carcinogenic risks to humans, volume 107.  Polychlorinated and Polybrominated Biphenyls (2015), available at http://monographs.iarc.fr/ENG/Monographs/vol107/ (last accessed July 31, 2015).

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

and function.[8]

**B.    Monsanto Has Long Known of PCBs' Toxicity.**

29.    Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects.[9]

30.    An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[10]

31.    A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will happen if an individual developes [*sic*] any type of liver disease and gives a history of Aroclor exposure.  I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[11]

32.    On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

---

[8] *See* EPA, Understanding PCB Risks, available at http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAssessment  (last  accessed March 5, 2015).

[9] *See* Exhibits B, C and F.

[10] MONS 061332, attached as Exhibit B.

[11] MONS 095196-7, attached as Exhibit C.

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[12]

33. On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 [which contained PCBs] is just too toxic for use in a submarine."[13]

34. In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[14] Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[15] Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[16]

35. At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds. In a 1960 brochure, Monsanto promoted the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings,

---

[12] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.

[13] MONS 095640, attached as Exhibit E.

[14] *See* JDGFOX00000037-63, attached as Exhibit F.

[15] *Id.* at JDGFOX00000039.

[16] *Id.* at JDGFOX00000037.

impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces and vacuum diffusion pumps. Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil; insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints; protective and decorative coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment; and coatings for chemical plants, boats, and highway marking.[17]

36. A 1961 brochure explained that Monsanto's Aroclors were being used in "lacquers for women's shoes," as "a wax for the flame proofing of Christmas trees," as "floor wax," as an adhesive for bookbinding, leather, and shoes, and as invisible marking ink used to make chenille rugs and spreads.[18]

37. Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods. Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

38. Years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before. In a press release, the company claimed: "What should be emphasized ... is that PCB was developed over 40 years ago primarily for use as a coolant in

---

[17] The Aroclor Compounds (hand-dated May 1960), 0509822-66, attached as Exhibit S.

[18] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[19]

39.  In 1975, William Papageorge, then Monsanto's manager of product acceptability, admitted that PCBs had been used in all types of products. Papageorge testified at a Public Hearing Before the Department of Natural Resources that "[t]he past uses [of PCBs] . . . were many and varied. . . . They go on and on.  Virtually anything you can imagine, at one time or other, someone tried PCB's in them."[20]

## C.  Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.

40.  Monsanto also knew that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[21]

41.  Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[22]  The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the coast of Scotland.  Jensen concluded that PCBs can "be presumed to be widespread throughout the world."[23]

---

[19] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit V, at MCL000648.

[20] *See* Declaration of Kathleen L. Roach, Exhibit 43, (Document 681-43), *Appleton Papers, Inc. and NCR Corp. v. George A. Whiting Paper Co.*, Case 2:08-cv-00016-WCG (E.D. Wis.), attached as Exhibit W.

[21] *See* Exhibits G, H and L.

[22] New Scientist (Dec. 15, 1966), MONSFOX00003427, attached as Exhibit G.

[23] *Id.*

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

42.    A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[24]  The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species.  The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

43.    Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

44.    On March 6, 1969, Monsanto Research Center employee W.R. Richard wrote a memorandum discussing Risebrough's article that criticized PCBs as a "toxic substance," "widely spread by air-water; therefore, an uncontrollable pollutant ... causing extinction of peregrine falcon … [and] endangering man himself."[25]  Richard explained that Monsanto could take steps to reduce PCB releases from its own plants but cautioned, "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper.  In this applications exposure to consumers is greater and the disposal problem becomes complex."[26]

45.    On September 9, 1969, W.R. Richard, by then a member of the newly-formed Aroclor "Ad Hoc" Committee, wrote an interoffice memo titled "Defense of Aroclor."[27]  He acknowledged the role of Aroclor in water pollution:  "Aroclor product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a long life."  He noted

_____

[24] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.

[25] MONS 096509-096511, attached as Exhibit I.

[26] Id.

[27] DSW 014256-014263, attached as Exhibit J.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds; and in the Great Lakes. Richard advised that the company could not defend itself against all criticism: "We can't defend vs. everything. Some animals or fish or insects will be harmed. Aroclor degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse [than] lower chlorine compounds. Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."[28]

46.   On January 29, 1970, Elmer Wheeler of Monsanto's Medical Department and Chairman of the Aroclor "Ad Hoc" Committee circulated laboratory reports discussing results of animal studies. He noted: "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[29]

47.   In a PCB Presentation to Corporate Development Committee, Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc. The report suggests possible reactions to the contamination issue. It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint." But the option of going out of the Aroclor business was also considered unacceptable:

---

[28] *Id.*

[29] MONS 098480, attached as Exhibit K.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

"there is too much customer/market need and selfishly too much Monsanto profit to go out."[30]

48. Monsanto formed an "Aroclor 'Ad Hoc' Committee" to investigate the pollution caused by PCBs. The Aroclor "Ad Hoc" Committee held its first meeting on September 5, 1969. The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[31] The meeting minutes acknowledge that PCB has been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife. Moreover, the committee implicated the normal use of PCB-containing products as the cause of the problem: "In one application alone (highway paints), one million lbs/year [of PCBs] are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[32]

49. A month later, on October 2, 1969, the Committee reported extensive environmental contamination. The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

The committee believes that there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated -- e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.

---

[30] Ex. A at 058737.

[31] Ex. K at 030483.

[32] Id. at 030485.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent completely some environmental contamination.

There are, however, a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.[33]

50.  Monsanto's desire to protect its Aroclor profits rather than the environment is reflected in the Committee's stated objectives:

1.  Protect continued sales and profits of Aroclors;
2.  Permit continued development of new uses and sales, and
3.  Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.[34]

51.  An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260:  "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment."  Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business."  To that end, it says, "We want to avoid any situation where a customer wants to return fluid. ... We would prefer that the customer use up his current inventory and purchase [new products] when available.  He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system.  We don't want to take fluid back."[35]

---

[33] DSW 014612-014624, at 014615, attached as Exhibit M (emphasis added).

[34] *Id.* at 014614.

[35] MONS 100123-100124, attached as Exhibit N.

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

52. Instead of having customers return fluids, Monsanto instructed its customers to dispose of PCB containing material in local landfills, knowing that landfills were not suitable for PCB contaminated waste. Monsanto had determined that the only effective mothed of disposing of PCBs was incineration, and it constructed an incinerator for disposal of its own PCB contaminants. Nevertheless, as William Papageorge explained in his 1975 testimony before the Department of Natural Resources, Monsanto instructed its customers to dispose of PCB contaminated waste in landfills: "lacking that resource [a commercial incinerator], we have to reluctantly suggest, because we don't have a better answer, that they find a well operated, properly operated landfill and dispose of the material in that fashion."[36]

53. In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

54. Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products. An interdepartmental task force concluded that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.[37]

55. After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than

---

[36] Exhibit W at 29.

[37] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976), available at http://nepis.epa.gov (search "560776001") (last accessed July 31, 2015).

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

had been originally realized."[38]  To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis.  That study revealed widespread occurrence of PCBs in bottom sediments in several states, including California.[39]

56.  EPA's study noted the particular burden on California.  "PCBs have become a significant component of the marine food webs of southern California," were found in sediments in the Santa Barbara Basin, and found in high levels in the San Francisco Bay.[40]

**D.    Monsanto Concealed the Nature of PCBs from Governmental Entities.**

57.  While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite – that the compounds were not toxic and that the company would <u>not</u> expect to find PCBs in the environment in a widespread manner.[41]

58.  In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[42]  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in

---

[38] *Id.* at 1.

[39] *Id., passim.*

[40] *Id.* at 78-9.

[41] *See* Exhibits O-R (letters to governmental agencies).

[42] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

the air or in the liquid discharges from a using industry."[43]  A similar letter to the San Francisco Bay Regional Water Quality Control Board explained that PCB plasticizers (found in surface coatings, such as paints, industrial adhesives and window sealants), in normal use, present no special health problems" and that, "[i]n view of PCB's chemical inertness, we would anticipate no problems associated with the environment from refuse dumps."[44]

59.    In May 1969, Monsanto's Manager, Environmental Health, Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[45]

60.    Monsanto delivered the same message to the New Jersey Department of Conservation in July 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[46]  The letter then reiterates Monsanto's position regarding environmental contamination:  "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would

---

[43] *Id.*

[44] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.

[45] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.

[46] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[47]

61.    At the same time that Monsanto was downplaying the toxicity of PCBs and inevitable widespread contamination caused by PCBs, its Aroclor "Ad Hoc" Committee acknowledged that there was nothing that could be done to prevent PCBs from becoming a global contaminant leading to contamination of the food supply, injuring marine life and possibly leading to the extinction of certain bird species. The committee reported on the probability of success of actions Monsanto might undertake to address the PCB problem and provided:

> The committee believes there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls … as nearly global environmental contaminants leading to the contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.[48]

62.    Moreover, the committee acknowledged that no course of action could be taken to prevent products containing PCBs from contaminating the environment, particularly waters and the marine environment. The committee explained "the committee believes that there is no possible course of action that can so effectively police the uses of these PCB containing products as to prevent completely some environmental contamination."[48] Further, the committee reported concern that vapor losses from PCB containing products likely results in contamination of an

---

[47] *Id.*

[48] DSW 014612-014624, at 014615, attached as Exhibit M.

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

aquatic environment because based on published reports "even minute quantities of [PCB] vapors are eventually transferred to the water environment and accumulated therein."[49]

63.　Exactly as Monsanto's committee had acknowledged, PCBs have become a global contaminant and have accumulated in the waters of the Bay to the point where they are a public nuisance and require remediation and abatement.

**F.　The San Diego Bay is a 303(d) Impaired Body of Water for PCBs.**

64.　The Bay is one of the region's most widely used natural resources, and the PCB contamination affects all San Diegans, who reasonably would be disturbed by the presence of a hazardous, banned substance in the sediment, water, and wildlife.

65.　PCBs (specifically, Aroclor compounds 1254 and 1260) have been found in samples of sediments and water taken from the Bay at varying times and locations, requiring substantial remediation work and cost.  In addition, PCBs have been identified in tissues of fish and lobster in the Bay.

66.　PCBs are identified as a Primary Chemical of Concern ("COC") in California Regional Water Quality Control Board, San Diego Region ("Regional Water Board") Cleanup and Abatement Order ("CAO") No. R9-2012-0024, dated March 14, 2012, which directed the City to, among other things, remediate PCB contaminated sediments within a discrete area known as the Shipyard Sediment Site.

67.　Other areas of PCB deposition and impacts have been located, and it is probable that the Regional Water Board may  order remediation of PCB contaminated sediments in other areas.

_____

[49] *Id.* at DWS 014618.

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

68. The Regional Water Board estimated human health risks due to the consumption of PCB contaminated fish tissue found in the Bay and employed human fish consumption rates and bioaccumulation factors in the analysis.

69. The Regional Water Board also concluded that human ingestion of seafood caught within certain assessment areas can significantly increase cancer risk, specifically identifying PCBs as a carcinogenic chemical.

70. PCBs have entered the Bay through various sources. PCBs leach from landfills and are found in commercial and industrial waste water as a result of Monsanto's directions to its customers on proper disposal methods when it knew, in fact, that disposal of PCBs in landfills was not proper. PCBs also leach out of paints, caulk, sealants and other applications and are transported by air and water to the Bay. Plaintiff also manages and operate a municipal stormwater system, which collects and transports stormwater to be discharged into the Bay. In order to discharge stormwater into the Bay, Plaintiff is required to receive a Municipal Regional Stormwater Permit from the Regional Water Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act.

71. As former and current trustees of the Bay, and as stormwater dischargers into the Bay, Plaintiff has spent substantial amounts of money to limit the amount of PCBs in the Bay. Plaintiff will also likely continue to incur costs to remove PCBs from the Bay and to keep PCBs from entering the Bay for the foreseeable future.

72. PCBs were not only a substantial factor in causing the City to incur costs and damages, but PCBs were also the primary driving force behind the need to clean up and abate the Shipyard Sediment Site. Without abatement of the health hazard caused by PCBs in the Bay, Plaintiff will continue to suffer injuries and damages.

Case: 3:19-cv-00578-WQH-JLB-3 Document 220/11 Filed 08/03/16 oPage 22 of 26
Case: 3:15-cv-00578-WQH-JLB-3 Document 220/11 Filed 08/03/16 oPage 22 of 26 Page ID #: 201
Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

73.  Monsanto's conduct, as set forth above, was committed with malice, oppression and/or fraud, as those terms are defined in Civil Code § 3294. Monsanto's conduct was despicable and in conscious disregard to the rights and safety of others, including Plaintiff. Monsanto's despicable conduct has subjected unjust hardship in conscious disregard to Plaintiff, who is the former trustee of waters, sediments, and tideland properties in and surrounding the Bay. Defendants intentionally misrepresented and concealed material facts from governmental entities in the state with the intent of causing injury. In addition to Plaintiff's entitlement to actual damages and request for abatement, Plaintiff is entitled to recover exemplary damages.

## FIRST CAUSE OF ACTION
## CONTINUING PUBLIC NUISANCE

74.  Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

75.  Monsanto manufactured, distributed, marketed and promoted PCBs in a manner that created or participated in creating a continuing public nuisance that is harmful to health and obstructs the free use of the Bay. Monsanto also directed its customers and the public to dispose of PCB containing materials improperly, resulting in PCBs leaching from landfills and entering the Bay.

76.  The presence of PCBs interferes with the comfortable enjoyment of the Bay for its customary uses for commercial and sport fishing, swimming and other water activities.

77.  The presence of PCBs interferes with the free use of the Bay for the promotion of commerce, navigation and fisheries.

78.  The presence of PCBs interferes with the free use of the Bay for ecological preservation and habitat restoration.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

79. The San Diego Bay is listed as impaired due to PCB, pursuant to the Clean Water Act and the 303(d) list.

80. The Regional Water Board found that the contamination at the Shipyard Sediment Site meets all three criteria for a "nuisance" as defined by California Water Code section 13050 (m) because it: (1) is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal; and (3) occurs during, or as a result of, the treatment or disposal of wastes.

81. The presence of PCBs adversely affects the quality of water in the Bay and causes inconvenience and annoyance to Plaintiff, who has been required to incur costs in order to protect plant and animal life, and their presence.

82. The condition affects a substantial number of people who use the Bay for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

83. An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals and humans and degrade water quality and destroy marine habitats.

84. The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

85. Plaintiff has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and Plaintiff has incurred substantial costs deriving from state-mandated PCB clean-up. In addition, the City is obligated to pay for certain remediation of the Shipyard Sediment Site pursuant to the March 14, 2012 CAO.

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

86. Plaintiff did not consent to the conduct that resulted in the contamination of the Bay.

87. Monsanto's conduct was a substantial factor in causing the harm to the City and Port District. Without an abatement of the nuisance created by Monsanto, Plaintiff will continue to suffer injuries, and the hazards caused by PCBs will continue.

88. Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in the Bay. Monsanto knew that PCBs would leach out of products and escape into the environment, that there was no way to contain PCBs and prevent such escape, and that PCBs would accumulate in an aquatic environment like the Bay. Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals. In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and knew that humans may be exposed to PCBs through ingestion and dermal contact. As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters. Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

89. As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiff has suffered and continues to suffer actual damages and injuries to property requiring abatement and other costs to be determined at trial.

## SECOND CAUSE OF ACTION

### EQUITABLE INDEMNITY

90. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

91. Monsanto is responsible for creating a continuing public nuisance by manufacturing, distributing, and promoting PCBs, resulting in contamination of water, soil, and sediment in and around the Bay.

92. Monsanto's creation of the public nuisance is a substantial factor in causing Plaintiff's injury.

93. The conduct of the City did not contribute in any way to the creation of the public nuisance.

94. The Regional Water Board has required the City, however, to remediate PCB-contaminated sediments from the Shipyard Sediment Site and may require further remediation of other areas. The City has incurred and will incur costs to remove PCBs from the Bay pursuant to the Board's order.

95. Monsanto must reimburse the City for its costs of complying with the Board's remediation order.

## PRAYER FOR RELIEF

Plaintiff prays for judgment that Defendants are liable to the City, jointly and severally, for creation of the public nuisance and must pay as follows:

1) Any and all compensatory damages according to proof including, but not limited to, all past and future costs and expenses related to the investigation, remediation, and removal of PCBs from in and around the Bay;

2) An order that Defendants pay for establishment of a fund used by the City to abate the public nuisance created by the presence of PCBs in and around the Bay, including remediating all PCB contamination in the Shipyard Sediment Site and other areas;

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

1         3) Punitive damages;

2         4) Litigation costs and attorney's fees as provided by law;

3         5) Pre-judgment and post-judgment interest;

4         6) Any other and further relief as the Court deems just, proper, and

5           equitable.

6                    **<u>DEMAND FOR JURY TRIAL</u>**

7        Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the

8  Federal Rules of Civil Procedure.

9

10  Dated:  August 3, 2015               Respectfully submitted,

11

12                                  By: s/  Carla Burke

13                                  **BARON & BUDD, P.C.**

14                                  Scott Summy (admitted Pro Hac Vice)

15                                  Carla Burke (admitted Pro Hac Vice)

                                    Celeste Evangelisti (SBN 225232)

16

17                                  **GOMEZ TRIAL ATTORNEYS**

                                John H. Gomez (SBN 171485)

18                                  John P. Fiske (SBN 249256)

19                                  **OFFICE OF THE CITY ATTORNEY**

20                                  JAN I. GOLDSMITH, City Attorney

                                California State Bar No. 70988

21                                  DANIEL F. BAMBERG,

22                                  Assistant City Attorney

                                California State Bar No. 60499

23                                  PAUL F. PRATHER, Deputy City Attorney

24                                  California State Bar No. 252985

25                                  ***Attorneys for the City of San Diego***

26

27

28

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 12

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

**OFFICE OF THE CITY ATTORNEY**
Peter S. Holmes, WSBA # 15787
Laura B. Wishik, WSBA #16682
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

**BARON & BUDD, P.C.**
Scott Summy *(pending Pro Hac Vice)*
(Texas Bar No. 19507500)
Carla Burke *(pending Pro Hac Vice)*
(Texas Bar No. 24012490)
Celeste Evangelisti *(pending Pro Hac Vice)*
(CA Bar No. 225232)
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone: (214) 521-3605

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez *(pending Pro Hac Vice)*
(CA Bar No. 171485)
John P. Fiske *(pending Pro Hac Vice)*
(CA Bar No. 249256)
655 West Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 237-3490

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CITY OF SEATTLE, a municipal corporation located in the County of King, State of Washington, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, and DOES 1 through 100, | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

CASE NO. _____

**PLAINTIFF'S ORIGINAL COMPLAINT**

///

///

PLAINTIFF'S ORIGINAL COMPLAINT - 1

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

## I.    INTRODUCTION

1.    Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants — found in bays, oceans, rivers, streams, soil, and air.  As a result, PCBs have been detected in the tissues of all living beings on earth including all forms of marine life, various animals and birds, plants and trees, and humans.

2.    The extent of environmental PCB contamination is troubling because PCBs cause a variety of adverse health effects.  In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.  In addition, PCBs destroy populations of fish, birds, and other animal life.

3.    Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew for decades that PCBs were toxic and knew that they were widely contaminating all natural resources and living organisms, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

4.    PCBs were used in many industrial and commercial applications such as paint, caulking, transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks, lubricants, and other uses.  PCBs regularly leach, leak, off-gas, and escape their intended applications, contaminating runoff during naturally occurring storm and rain events.

5.    As a result, PCBs contaminate City streets, the City's drainage systems, stormwater, and water bodies within the City of Seattle.

6.    The Duwamish River runs through the heart of the City of Seattle.  At the mouth of the Duwamish is Harbor Island, bounded on one side by the East Waterway and on the other side by the West Waterway.  Beginning at the upstream end of Harbor Island and continuing for about six miles upstream is a section known as the Lower Duwamish.

7.    PCBs were detected in seventy-five percent of more than 1,000 samples collected from catch basins and drainage lines in the Lower Duwamish drainage area.  In the East Waterway

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

drainage areas, PCBs were detected in eighty-two percent of samples collected with "in-line grabs" of sediment in drainage pipes and PCBs were detected in seventy-three percent of samples collected from catch basins in street right-of-ways.

8.     The City has incurred costs to identify and reduce sources of PCBs entering its stormwater and wastewater systems. The Washington Department of Ecology is requiring the City to increase its efforts to reduce PCBs entering its drainage systems.  The City will continue to incur costs to do so.

9.     Under a Consent Decree jointly issued by EPA and the Washington Department of Ecology, the City will be constructing a stormwater treatment plant adjacent to the Lower Duwamish River.  The plant is designed to remove PCBs from stormwater.  The cost for the plant is currently estimated to be nearly $27 Million.  The plant will treat stormwater from 1.25 percent of the 20,000 acres that drain to the Lower Duwamish.

10.     The Lower Duwamish is listed on the National Priorities List as a Superfund Site.  The City is subject to an administrative order issued jointly by the United States Environmental Protection Agency and the Washington Department of Ecology that required extensive investigation of contamination in the Lower Duwamish and preparation of a Feasibility Study identifying remedial options.  The City is continuing to incur costs to implement the order and will incur costs to implement the remedy selected by EPA.

11.     In November 2014, EPA issued its Record of Decision for the Lower Duwamish.  EPA selected a remedy that EPA estimates will cost $342 million.

12.     The City also incurred millions of dollars investigating and remediating four specific areas, called Early Action Areas, within the Lower Duwamish Site that were contaminated with PCBs, including property that the City owns in Slip 4 and City streets adjacent to Terminal 117.

13.     The other two Early Action Areas were adjacent to outfalls where discharges from the City's drainage system were contaminated with PCBs through no fault of the City.

14.     The East Waterway also is listed on the National Priorities List as a Superfund Site.  PCBs are a primary contaminant of concern.  Some of the PCB contamination got into sediments in the East Waterway through stormwater and combined sewer overflows.

PLAINTIFF'S ORIGINAL COMPLAINT - 3

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1   15.     The City is paying a substantial portion of the costs to investigate contamination in the

2   East Waterway and identify remedial options. The current draft of the Feasibility Study identifies

3   remedial options that range in cost from $267 million to $443 million. The City will continue

4   incurring costs to complete the Feasibility Study and to implement the remedy that EPA selects.

5        Plaintiff CITY OF SEATTLE hereby alleges, upon information and belief, as follows:

6   **II.    PARTIES**

7

8   16.     The CITY OF SEATTLE ("Seattle," "City," or "Plaintiff") is a municipal corporation,

9   duly organized and existing by virtue of the laws of the State of Washington.

10  17.     The City brings this suit pursuant to RCW 7.48.010, et al. and any other applicable

11  codes or forms of relief available for monetary damages and removal of the public nuisance caused by

12  Monsanto's PCBs.

13  18.     Seattle has three types of drainage systems: a municipal separated stormwater system

14  (MS4), a partially separated system, and a combined sewer system that collects stormwater and

15  sewage. The City's combined system is connected to trunk lines operated by King County that go to

16  wastewater treatment plants. Heavy rains cause the combined system to overflow through Combined

17  Sewer Outfalls ("CSOs").

18  19.     In order to discharge stormwater from the MS4, Seattle is subject to a Phase I Municipal

19  Stormwater Permit issued by the State of Washington, Department of Ecology, pursuant to the

20  National Pollutant Discharge Elimination System under the Clean Water Act.

21  20.     Seattle's other systems are subject to the National Pollutant Discharge Elimination

22  System (NPDES) Waste Discharge Permit (WDR) WA0031682.

23  21.     The City currently has one CSO outfall in the Lower Duwamish. The City's MS4

24  system discharges stormwater into the Lower Duwamish through 17 outfalls that the City owns and 12

25  outfalls owned by others. The City also has CSO and stormwater outfalls in the East Waterway.

26  22.     The City of Seattle has spent and will continue to spend significant money to reduce

27  PCBs in its discharges. Under a Consent Decree regarding the City's combined sewer overflows

28  (CSOs), the U.S. Environmental Protection Agency ("EPA") has approved the City's plan to build a

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1 stormwater treatment plant adjacent to the Lower Duwamish.  The plant will treat stormwater for

2 PCBs.  The cost for treating stormwater from this one drainage basin is currently estimated to be

3 $26,899,672.  This drainage basin contains just 1.25 percent of the twenty thousand acres that drain to

4 the Lower Duwamish.

5       23.     In November 2014, EPA issued its Record of Decision selecting a remedy for the

6 Lower Duwamish.  EPA identified PCBs in the Lower Duwamish as a significant threat to human

7 health and the environment.

8       24.     Fish and shellfish that reside in the Lower Duwamish are contaminated with PCBs at

9 levels that make them unfit for human consumption.  Despite warnings, people continue to eat them.

10 Many residents of the City of Seattle, particularly people who are recent immigrants or low income,

11 depend on fish and shellfish from the Lower Duwamish as a significant food source.

12       25.     Puget Sound is a Category 5 "impaired" water body for PCBs through at least one

13 medium: wildlife tissue. PCBs are found in the tissue of harbor seal pups in South Central Puget

14 Sound.

15       26.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its

16 principal place of business in St. Louis, Missouri.

17       27.     Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and

18 principal place of business in St. Louis, Missouri.

19       28.     Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor

20 to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack,

21 New Jersey.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.  The City is not asserting

22 claims against Pharmacia for costs of investigating and remediating contamination in the Lower

23 Duwamish.  In all other respects the City's claims apply to Pharmacia.

24       29.     The original Monsanto Company ("Old Monsanto") operated an agricultural products

25 business, a pharmaceutical and nutrition business, and a chemical products business.  Old Monsanto

26 began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late

27 1970s.

28

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1  30.  Through a series of transactions beginning in approximately 1997, Old Monsanto's

2  businesses were spun off to form three separate corporations.  The corporation now known as

3  Monsanto operates Old Monsanto's agricultural products business.  Old Monsanto's chemical products

4  business is now operated by Solutia.  Old Monsanto's pharmaceuticals business is now operated by

5  Pharmacia.

6  31.  Solutia was organized by Old Monsanto to own and operate its chemical manufacturing

7  business.  Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals

8  business.[1]

9  32.  Although Solutia assumed and agreed to indemnify Pharmacia (then known as

10  Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered

11  into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims

12  arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.[2]

13  33.  In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the

14  U.S. Bankruptcy Code.  Solutia's reorganization was completed in 2008.  In connection with Solutia's

15  Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under

16  which Monsanto continues to manage and assume financial responsibility for certain tort litigation and

17  environmental remediation related to the Chemicals Business.[3]

18  34.  Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as

19  "Defendants."

20

21

22

23  [1] See MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October

24  8, 2013);  see also Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx

25  (last accessed January 20, 2016).

26  [2] *See id.*

27  [3] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at

28  http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed January 20, 2016).

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT - 6

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

## III.    JURISDICTION AND VENUE

35.    This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiff and Defendants.  The Plaintiff is located in Washington, but no Defendant is a citizen of Washington.  Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

36.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.    PCBs are Toxic Chemicals that Cause Environmental Contamination.

37.    Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single, unique chemical compound in the PCB category.  Over two hundred congeners have been identified.[4]

38.    PCBs were generally manufactured as mixtures of congeners.  From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[5]  The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

39.    Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start capacitors, and lighting ballasts.  In addition, PCBs were incorporated into a variety of products such

---

[4] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).

[5] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned . . . ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. . . . .").  *See also* MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA.").

PLAINTIFF'S ORIGINAL COMPLAINT - 7

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1 as caulks, paints, and sealants.

2     40.     As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and

3 "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for

4 placement into trade or commerce, including any product that forms a component part of or that is

5 subsequently incorporated into another product.

6     41.     PCBs easily migrate out of their original source material or enclosure and contaminate

7 nearby surfaces, air, water, soil, and other materials. For example, PCB compounds volatilize out of

8 building materials (such as caulk) into surrounding materials such as masonry, wood, drywall, and soil,

9 thereby causing damage to those surrounding materials. PCBs can also escape from totally-enclosed

10 materials (such as light ballasts) and similarly contaminate and damage surrounding materials.

11     42.     PCBs present serious risks to the health of humans, wildlife, and the environment.

12     43.     Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact.

13 Individuals may inhale PCBs that are emitted into the air. They may also ingest PCBs that are emitted

14 into air and settle onto surfaces that come into contact with food or drinks. And they may absorb PCBs

15 from physical contact with PCBs or PCB-containing materials.

16     44.     EPA has determined that Monsanto's PCBs are probable human carcinogens. In 1996,

17 EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260.[6]

18 EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from

19 government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

20     45.     The International Agency for Research on Cancer published an assessment in 2015 that

21 asserts an even stronger relationship between PCBs and human cancer. The report explains: "There is

22 sufficient evidence in humans for the carcinogenicity of polychlorinated biphenyls (PCBs). PCBs

23 cause malignant melanoma. Positive associations have been observed for non-Hodgkin lymphoma and

24

25

26 ---
[6] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures,
27 EPA/600/P-96/001F (September 1996), available at
28 http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed January 20, 2016).

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1    cancer of the breast. ... PCBs are carcinogenic to humans ... ."[7]

2         46.    In addition, EPA concluded that PCBs are associated with serious non-cancer health

3    effects. From extensive studies of animals and primates using environmentally relevant doses, EPA

4    has found evidence that PCBs exert significant toxic effects, including effects on the immune system,

5    the reproductive system, the nervous system, and the endocrine system.

6         47.    PCBs affect the immune system by causing a significant decrease in the size of the

7    thymus gland, lowered immune response, and decreased resistance to viruses and other infections. The

8    animal studies were not able to identify a level of PCB exposure that did not affect the immune system.

9    Human studies confirmed immune system suppression.

10        48.    Studies of reproductive effects in human populations exposed to PCBs show decreased

11   birth weight and a significant decrease in gestational age with increasing exposures to PCBs. Animal

12   studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and

13   reduced sperm counts.

14        49.    Human and animal studies confirm that PCB exposure causes persistent and significant

15   deficits in neurological development, affecting visual recognition, short-term memory, and learning.

16   Some of these studies were conducted using the types of PCBs most commonly found in human breast

17   milk.

18        50.    PCBs may also disrupt the normal function of the endocrine system. PCBs have been

19   shown to affect thyroid hormone levels in both animals and humans. In animals, decreased thyroid

20   hormone levels have resulted in developmental deficits, including deficits in hearing. PCB exposures

21   have also been associated with changes in thyroid hormone levels in infants in studies conducted in the

22   Netherlands and Japan.

23        51.    PCBs have been associated with other health effects including elevated blood pressure,

24   serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and

25   humans; and liver toxicity in rodents.

26   _____

27   [7] International Agency for Research on Cancer. IARC monographs on the evaluation of carcinogenic
     risks to humans, volume 107. Polychlorinated and Polybrominated Biphenyls (2015), available at
28   http://monographs.iarc.fr/ENG/Monographs/vol107/ (last accessed January 20, 2016).

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT - 9

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

52.     Children may be affected to a greater extent than adults.  The Agency for Toxic Substances and Disease Registry explained:  "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs."[8]

53.     PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians, and birds.  Exposure is associated with death, compromised immune system function, adverse effects on reproduction, development, and endocrine function.  PCB exposure affects liver function, the digestive system, and nervous systems and can promote cancer in a number of animal species.  The presence of PCBs can cause changes in community and ecosystem structure and function.[9]

**B.      Monsanto Has Long Known of PCBs' Toxicity.**

54.     Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects.

55.     An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[10]

56.     A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will

---

[8] Agency for Toxic Substances and Disease Registry, Toxicological Profile for Polychlorinated Biphenyls (PCBs), (November 2000), at 381, available at www.atsdr.cdc.gov (last accessed January 20, 2016).

[9] *See* EPA, Understanding PCB Risks, available at http://www.epa.gov/ge-housatonic/understanding-pcb-risks-ge-pittsfieldhousatonic-river-site#WildlifeHumanHealthEffects (last accessed January 20, 2016).

[10] MONS 061332.

PLAINTIFF'S ORIGINAL COMPLAINT - 10

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

GOMEZ
TRIAL ATTORNEYS

happen if an individual develops [*sic*] any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[11]

57.     On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties.  While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[12]

58.     On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors:  "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."[13]

59.     In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[14]  Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[15]  Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[16]

60.     On January 29, 1970, Elmer Wheeler of the Medical Department circulated laboratory reports discussing results of animal studies.  He noted:  "Our interpretation is that the PCB's are

---

[11] MONS 095196-7.

[12] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number).

[13] MONS 095640.

[14] *See* JDGFOX00000037-63.

[15] *Id*. at JDGFOX00000039.

[16] *Id*. at JDGFOX00000037.

PLAINTIFF'S ORIGINAL COMPLAINT - 11

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

exhibiting a greater degree of toxicity in this chronic study than we had anticipated.  Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[17]

**C.   Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.**

61.    At the same time, Monsanto became aware that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.

62.    Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[18]  The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the coast of Scotland.  Jensen concluded that PCBs can "be presumed to be widespread throughout the world."[19]

63.    A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[20]  The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species.  The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

64.    On March 6, 1969, Monsanto employee W. M. Richard wrote a memorandum discussing Risebrough's article that criticized PCBs as a "toxic substance", "widely spread by air-water; therefore, an uncontrollable pollutant . . . causing extinction of peregrine falcon … [and] endangering man himself."[21]  Richard explained that Monsanto could take steps to reduce PCB

---

[17] MONS 098480

[18] New Scientist (December 15, 1966), MONSFOX00003427.

[19] *Id.*

[20] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968).

[21] MONS 096509-096511.

PLAINTIFF'S ORIGINAL COMPLAINT - 12

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1　releases from its own plants but cautioned, "It will be still more difficult to control other end uses such

2　as cutting oils, adhesives, plastics, and NCR paper.  In this applications exposure to consumers is

3　greater and the disposal problem becomes complex."[22]

4　　　　65.　　　On September 9, 1969, Monsanto employee W.R. Richard wrote an interoffice memo

5　titled "Defense of Aroclor."[23]  He acknowledged the role of Aroclor in water pollution:  "Aroclor

6　product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a

7　long life."  He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida

8　causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds,

9　and in the Great Lakes.  Richard advised that the company could not defend itself against all criticism:

10　"We can't defend vs. everything.  Some animals or fish or insects will be harmed.  Aroclor degradation

11　rate will be slow.  Tough to defend against.  Higher chlorination compounds will be worse [than] lower

12　chlorine compounds.  Therefore we will have to restrict uses and clean-up as much as we can, starting

13　immediately."[24]

14　　　　66.　　　The Aroclor Ad Hoc Committee held its first meeting on September 5, 1969.  The

15　committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB

16　"may be a global contaminant."[25]  The meeting minutes acknowledge that PCB has been found in fish,

17　oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine

18　River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife.  Moreover, the

19　committee implicated the normal use of PCB-containing products as the cause of the problem:  "In one

20　application alone (highway paints), one million lbs/year are used.  Through abrasion and leaching we

21　can assume that nearly all of this Aroclor winds up in the environment."[26]

22

23　―――――――――――

[22] *Id.*

24

[23] DSW 014256-014263.

25

[24] *Id.*

26

[25] MONS 030483-030486.

27

[26] *Id.* at 030485.

28

PLAINTIFF'S ORIGINAL COMPLAINT - 13

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

67. A month later, on October 2, 1969, the Committee reported extensive environmental contamination. The U.S. Department of Interior, Fish and Wildlife found PCB residues in dead eagles and marine birds. Similarly, the Bureau of Commercial Fisheries reported finding PCBs in the river below Monsanto's Pensacola plant. The U.S. Food and Drug Administration had discovered PCBs in milk supplies. The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

> There is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated – e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.
> Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination. There are, however a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.[27]

68. Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

69. Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc in a PCB Presentation to Corporate Development Committee. The report suggests possible reactions to the contamination issue. It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint." But the option of going out of the Aroclor business was also considered unacceptable: "there is too much customer/market need and selfishly too much Monsanto profit to go out."[28]

70. Monsanto's desire to protect Aroclor sales rather than the environment is reflected in the Committee's stated objectives:

> 1. Protect continues sales and profits of Aroclors;
> 2. Permit continued development of new uses and sales, and

---

[27] DSW 014612-014624, at 014615.

[28] MONS 058737.

PLAINTIFF'S ORIGINAL COMPLAINT - 14

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

3.    Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.[29]

71.    An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260: "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment." Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business." To that end, it says, "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase [new products] when available. He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system. We don't want to take fluid back." [30]

72.    Even worse, Monsanto instructed its customers to dispose of PCB containing material in local landfills, knowing that landfills were not suitable for PCB contaminated waste. Monsanto had determined that the only effective mothed of disposing of PCBs was incineration, and it constructed an incinerator for disposal of its own PCB contaminants. Nevertheless, as William Papageorge explained in his 1975 testimony before the Department of Natural Resources, Monsanto instructed its customers to dispose of PCB contaminated waste in landfills: "lacking that resource [a commercial incinerator], we have to reluctantly suggest, because we don't have a better answer, that they find a well operated, properly operated landfill and dispose of the material in that fashion." [31]

73.    In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

74.    Growing awareness of the ubiquitous nature of PCBs led the Unites States to conduct an investigation of health and environmental effects and contamination of food and other products. An

---

[29] *Id.*

[30] MONS 100123-100124.

[31] *See* Testimony of William Papageorge, Public Hearing to Review and Receive Public Comment Upon Proposed Administrative Rules Relating to the Discharge of Polychlorinated Biphenyls (PCB's) Into the Waters of the State, Before the Department of Natural Resources (August 28-29, 1975).

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

1  interdepartmental task force concluded in May 1972 that PCBs were highly persistent, could

2  bioaccumulate to relatively high levels, and could have serious adverse health effects on human

3  health.[32]

4         75.     After that report, environmental sampling and studies indicated that PCBs were a "more

5  serious and continuing environmental and health threat than had been originally realized."[33]  To

6  address these concerns, EPA undertook a study to assess PCB levels in the environment on a national

7  basis.  That study revealed widespread occurrence of PCBs in bottom sediments in several states;  in

8  fish and birds;  in lakes and rivers;  in the Atlantic Ocean, the Pacific Ocean, and the Gulf of Mexico;

9  sewage treatment facilities;  in a variety of foods including milk, poultry, eggs, fish, meat, and grains;

10  and in human tissues, blood, hair, and milk.[34]

11         76.     At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB

12  compounds.  In a 1960 brochure, Monsanto promotes the use of Aroclors in transformers and

13  capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire

14  or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food

15  cookers, potato chip fryers, drying ovens, thermostats,  furnaces, and vacuum diffusion pumps.

16  Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil;

17  insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized

18  lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics;

19  sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers;

20  masonry coatings for swimming pools, stucco homes, and highway paints;  protective and decorative

21  coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment;  and

22  coatings for chemical plants, boats, and highway marking. [35]

23

24  ─────────────────────
   [32] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976).

25  [33] Id. at 1.

26
   [34] Id., passim.

27
   [35] The Aroclor Compounds (hand dated May 1960), 0509822- 66.

28

PLAINTIFF'S ORIGINAL COMPLAINT - 16

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

77.     A 1961 brochure explains that Monsanto's Aroclors are being used in "lacquers for women's shoes,"  as "a wax for the flame proofing of Christmas trees,"  as "floor wax,"  as an adhesive for bookbinding, leather, and shoes,  and as invisible marking ink used to make chenille rugs and spreads. [36]

78.     Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods.  Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

79.     A few years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before.  In a press release, the company claimed:  " 'What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[37]

**D.     Monsanto Concealed the Nature of PCBs from Governmental Entities.**

80.     While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite — that the compounds were not toxic and that the company would <u>not</u> expect to find PCBs in the environment in a widespread manner.

81.     In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[38]  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."[39]  A similar letter to the Regional Water Quality

---

[36] Plasticizer Patter (February 1961), 0627503-21.

[37] *See* Press release (July 16, 1970), MCL000647-50.

[38] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969).

[39] *Id.*

PLAINTIFF'S ORIGINAL COMPLAINT - 17

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Control Board explained that PCBs are associated with "no special health problems" and "no problems associated with the environment."[40]

82.     In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[41]

83.     Monsanto delivered the same message to the New Jersey Department of Conservation in July, 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[42]  The letter then reiterates Monsanto's position regarding environmental contamination:  "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[43]

**E. The Duwamish River is "Impaired" Due to PCB Contamination**

84.     As described above, PCBs enter the City's stormwater and wastewater systems through no fault of the City of Seattle.  The City then lawfully discharges wastewater and stormwater into the Duwamish River in accordance with its NDPES permits.

85.     Under the Clean Water Act, Washington State has designated uses for the Lower Duwamish and the East Waterway that include commercial, recreation, navigation, boating, fishing, shellfish harvesting, and wildlife habitat.  It is also part of the Muckleshoot Tribe's commercial, ceremonial, and subsistence fishing area.[44]

---

[40] Letter from Monsanto to State of California Resources Agency (March 27, 1969).

[41] Monsanto Memorandum to W.R. Richard (May 26, 1969).

[42] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969).

[43] *Id.*

[44] U.S. Environmental Protection Agency, *Record of Decision — Lower Duwamish Waterway Superfund Site.*  WA00002329803 (November 2014) at 34, available at

PLAINTIFF'S ORIGINAL COMPLAINT - 18

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

86.     The Lower Duwamish and the East Waterway are listed on the Washington State Water Quality Assessment list of impaired water bodies, in accordance with section 303(d) of the Clean Water Act, due to PCBs in sediments.[45]

87.     PCBs are the most widespread contaminant in Lower Duwamish sediment, found in 94% of the surface sediment locations sampled for PCBs and 48% of the subsurface sediment samples.[46]

88.     The Washington State Department of Health advises "no consumption of resident fish and shellfish from the LDW,"[47] due to elevated PCB levels.

89.     The City has participated in cleanups of PCB-contaminated sediment from the Lower Duwamish Waterway.[48]

90.     PCB was also detected in almost all samples of fish, shellfish, and benthic invertebrate tissues. [49] EPA identified PCBs as presenting a human health risk for individuals engaged in netfishing, clamming, and beach play.[50]

## FIRST CAUSE OF ACTION

## PUBLIC NUISANCE

91.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this cause of action.

---

http://www.epa.gov/region10/pdf/sites/ldw/ROD_final_11-21-2014.pdf (last accessed January 20, 2016).

[45] *Id. at 14.*

[46] *Id.* at 22, 28.

[47] *Id.* at 34.

[48]*Id.* at 5.

[49] *Id.* at 28.

[50] *Id.* at 50-53.

PLAINTIFF'S ORIGINAL COMPLAINT - 19

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

92.     The City is not asserting this claim against Pharmacia for costs to investigate and remediate contamination in the Lower Duwamish.  In all other respects Pharmacia is subject to this claim.

93.     Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of the Duwamish River.

94.     Monsanto intentionally manufactured, marketed, and sold PCBs with the knowledge that they were causing global environmental contamination.

95.     Monsanto knew that PCBs would likely end up in stormwater systems, waterways, water bodies, sediments, fish and animal tissues.

96.     Monsanto's conduct and the presence of PCBs annoys, injures, and endangers the comfort, repose, health, and safety of others.

97.     Monsanto's conduct and the presence of PCBs interferes with and obstructs the public's free use and comfortable enjoyment of the Duwamish River for commerce, navigation, fishing, recreation, and aesthetic enjoyment.

98.     The presence of PCBs also interferes with the free use of Duwamish River for a healthy ecological environment.

99.     Monsanto's conduct and the presence of PCBs in the Duwamish River is injurious to human, animal, and environmental health.

100.    An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals, and humans and degrade water quality and marine habitats.

101.    The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

102.    The rights, interests, and inconvenience to the City of Seattle and general public far outweighs the rights, interests, and inconvenience to Monsanto, which profited heavily from the manufacture of PCBs and which can no longer produce PCBs.

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

103.    Monsanto's conduct caused and continues to cause harm to Seattle.

104.    The City of Seattle suffers damage from Monsanto's PCBs. The City incurs costs to remove PCBs that have invaded its drainage systems and to prevent additional PCBs from entering its systems. Many of the City's streets are contaminated with PCBs that get into the City's drainage systems. The City of Seattle suffers injuries that are different from those suffered by the public at large.

105.    Seattle has already incurred costs associated with testing and monitoring for PCBs, reducing PCBs in stormwater, and removing PCBs from the Lower Duwamish Waterway. The Washington Department of Ecology is requiring the City to increase its efforts to identify and reduce sources of PCBs to its drainage systems. Under the EPA/Ecology Consent Decree, Seattle will incur nearly $27 Million to construct a stormwater treatment plant to reduce PCBs in stormwater discharges from one drainage basin adjacent to the Lower Duwamish.

106.    The City is incurring and will continue to incur costs to investigate and remediate PCB contamination in the East Waterway.

107.    Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing and would cause the type of contamination now found in the Duwamish River. Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats and would endanger birds and animals. In addition, Monsanto knew PCBs are associated with serious illnesses and cancers in humans and that humans may be exposed to PCBs through ingestion of fish and/or dermal contact. As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters, playing on contaminated beaches, and by eating fish and shellfish from contaminated areas. Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any contaminated water body. Monsanto had a duty to cease manufacturing, distributing, selling and promoting PCBs and failed to do so. Monsanto also had a duty to warn about the dangers of PCBs and failed to do so.

108.    As a direct and proximate result of Monsanto's creation of a public nuisance, Seattle has suffered, and continues to suffer, monetary damages to be proven at trial.

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

**SECOND CAUSE OF ACTION**

**PRODUCTS LIABILITY- DEFECTIVE DESIGN**

109.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this cause of action.

110.   The City is not asserting this claim against Pharmacia for costs to investigate and remediate contamination in the Lower Duwamish.  In all other respects Pharmacia is subject to this claim.

111.   Monsanto's PCBs were not reasonably safe as designed at the time the PCBs left Monsanto's control.

112.   PCBs' toxicity and inability to be contained rendered them unreasonably dangerous at all times.

113.   Monsanto's PCBs were unsafe as designed as demonstrated by the United State Congress banning the production and sale of PCBs pursuant to the Toxic Substances Control Act in 1979.

114.   Due to their toxicity and inability to be contained, Monsanto knew its PCBs were not safe at the time the product was manufactured because it was certain that the product would become a global contaminant and cause toxic contamination of waterways and wildlife, such as Seattle's stormwater and the fish in the Duwamish River, due to the nature of PCBs.

115.   Monsanto knew its PCBs were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the overwhelming seriousness of creating global contamination.

116.   Monsanto manufactured, distributed, sold, and promoted PCBs despite such knowledge in order to maximize its profits despite the known harm.

117.   Monsanto's PCBs caused and continue to cause injury to the City of Seattle.

118.   The City of Seattle has suffered and will continue to suffer damages.

**THIRD CAUSE OF ACTION**

**PRODUCTS LIABILITY- FAILURE TO WARN**

PLAINTIFF'S ORIGINAL COMPLAINT - 22

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

119.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

120.    The City is not asserting this claim against Pharmacia for costs to investigate and remediate contamination in the Lower Duwamish.  In all other respects Pharmacia is subject to this claim.

121.    Monsanto's PCBs were not reasonably safe because they lacked adequate warnings at the time the PCBs left Monsanto's control.

122.    At the time Monsanto manufactured, distributed, sold, and promoted its PCBs, Monsanto knew it was a certainty that PCBs would become a global contaminate and contaminate waterways and wildlife such as Seattle's stormwater and fish in the Duwamish River.

123.    Despite Monsanto's knowledge, Monsanto failed to provide adequate warnings that its PCBs would become a global contaminant and contaminate waterways and wildlife, such as Seattle's stormwater and fish in the Duwamish River.

124.    Monsanto could have warned of this certainty but intentionally concealed the certainty of global contamination in order to maximize profits.

125.    Monsanto learned and concealed the dangers of PCBs after it manufactured, distributed, promoted, and sold PCBs.

126.    Without adequate warnings or instructions, Monsanto's PCBs were unsafe to an extent beyond that which would be contemplated by an ordinary person.

127.    Monsanto knowingly failed to issue warnings or instructions concerning the dangers of PCBs in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances.

128.    Monsanto's PCBs caused and continue to cause injury to the City of Seattle.

129.    The City of Seattle has suffered and will continue to suffer damages.

## FOURTH CAUSE OF ACTION

## NEGLIGENCE

130.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restates in this count.

PLAINTIFF'S ORIGINAL COMPLAINT - 23

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

131. The City is not asserting this claim against Pharmacia for costs to investigate and remediate contamination in the Lower Duwamish. In all other respects Pharmacia is subject to this claim.

132. Monsanto failed to exercise ordinary care because a reasonably careful company that learned of its product's toxicity would not manufacture that product or would warn of its toxic properties.

133. Monsanto failed to exercise ordinary care because a reasonably careful company that learned that its product could not be contained during normal production and use would not continue to manufacture that product or would warn of its dangers.

134. Monsanto failed to exercise ordinary care because a reasonably careful company would not continue to manufacture PCBs in mass quantities and to the extent that Monsanto manufactured them.

135. Monsanto was grossly negligent because it failed to exercise even slight care.

136. Monsanto's negligence caused and continues to cause injury to the City of Seattle.

137. The City of Seattle has suffered and will continue to suffer damages.

## FIFTH CAUSE OF ACTION

### EQUITABLE INDEMNITY

138. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count. The City is not asserting this claim against Pharmacia for costs to investigate and remediate contamination in the Lower Duwamish. In all other respects Pharmacia is subject to this claim.

139. The City of Seattle is subject to an administrative order issued jointly by EPA and the Washington Department of Ecology that required preparation of a Remedial Investigation and a Feasibility Study for the Lower Duwamish. The City is continuing to incur costs to implement further requirements under the order. The City will incur costs to design and implement the remedy.

140. In addition, Seattle has incurred cleanup costs for removing PCB-laden sediments from four Early Action Areas in the Lower Duwamish.

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

141. The Washington Department of Ecology is requiring Seattle to increase its efforts to identify and reduce sources of PCBs to its drainage systems.

142. Pursuant to the joint EPA/Ecology Consent Decree, Seattle will be constructing a stormwater treatment plant to remove PCBs in stormwater from one drainage basin adjacent to the Duwamish, at an estimated cost of almost $27 Million.

143. Seattle is paying a substantial portion of costs to investigate contamination in the East Waterway and will continue paying costs to implement the remedy that EPA selects.

144. Monsanto is responsible for the PCB contamination that Seattle must address pursuant to these regulatory requirements.

## **PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages according to proof;

2. Award of the present and future costs to abate the ongoing public nuisance;

3. Declaratory judgment requiring Monsanto to pay for abatement of the ongoing nuisance;

4. Litigation costs and attorney's fees as provided by law;

5. Pre-judgment and post-judgment interest;

6. Any other and further relief as the Court deems just, proper, and equitable.

Dated:    January 25, 2016                    Respectfully submitted,

PETER S. HOLMES
Seattle City Attorney


By: s/Peter S. Holmes
By: s/Laura B. Wishik
    Peter S. Holmes, WSBA # 15787
    Laura B. Wishik, WSBA #16682
**OFFICE OF THE CITY ATTORNEY**
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200
Email: Laura.Wishik@seattle.gov

**BARON & BUDD, P.C.**
Scott Summy *(pending Pro Hac Vice)*
Carla Burke *(pending Pro Hac Vice)*
Celeste Evangelisti *(pending Pro Hac Vice)*

PLAINTIFF'S ORIGINAL COMPLAINT - 25              OFFICE OF THE CITY ATTORNEY
                                                 701 Fifth Avenue, Suite 2050
                                                 Seattle, Washington 98104-7097
                                                 Telephone: (206) 684-8200

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone: (214) 521-3605
Email: SSummy@baronbudd.com
          cburkepickrel@baronbudd.com
          cevangelisti@baronbudd.com

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez *(pending Pro Hac Vice)*
John P. Fiske *(pending Pro Hac Vice)*
655 West Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 237-3490
Email:  john@gomeztrialattorneys.com
          jfiske@gomeztrialattorneys.com

Attorneys for Plaintiff

PLAINTIFF'S ORIGINAL COMPLAINT - 26

GOMEZ
TRIAL ATTORNEYS

OFFICE OF THE CITY ATTORNEY
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
Telephone: (206) 684-8200

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1  ## DEMAND FOR JURY TRIAL

2      Plaintiff demands a jury trial.

3

4  Dated: January 25, 2016               PETER S. HOLMES
                                         Seattle City Attorney
5

6                                        By: s/Peter S. Holmes
                                         By: s/Laura B. Wishik
7                                            Peter S. Holmes, WSBA # 15787
                                             Laura B. Wishik, WSBA #16682
8                                        **OFFICE OF THE CITY ATTORNEY**
                                         701 Fifth Avenue, Suite 2050
9                                        Seattle, Washington 98104-7097
                                         Telephone: (206) 684-8200
10                                       Email: Laura.Wishik@seattle.gov

11                                       **BARON & BUDD, P.C.**
                                         Scott Summy (*pending Pro Hac Vice*)
12                                       Carla Burke (*pending Pro Hac Vice*)
                                         Celeste Evangelisti (*pending Pro Hac Vice*)
13                                       3102 Oak Lawn Avenue, Suite 1100
                                         Dallas, Texas 75219-4281
14                                       Telephone: (214) 521-3605
                                         Email: SSummy@baronbudd.com
15                                              cburkepickrel@baronbudd.com
                                                cevangelisti@baronbudd.com
16
                                         **GOMEZ TRIAL ATTORNEYS**
17                                       John H. Gomez (*pending Pro Hac Vice*)
                                         John P. Fiske (*pending Pro Hac Vice*)
18                                       655 West Broadway, Suite 1700
                                         San Diego, CA 92101
19                                       Telephone: (619) 237-3490
                                         Email: john@gomeztrialattorneys.com
20                                              jfiske@gomeztrialattorneys.com

21                                       Attorneys for Plaintiff

22

23

24

25

26

27

28

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT - 27

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 13

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

**OFFICE OF THE CITY ATTORNEY**
**City of Long Beach**
Charles Parkin, City Attorney (SBN 159162)
Charles.Parkin@longbeach.gov
Amy Webber, Deputy City Attorney (SBN 132174)
Amy.Webber@longbeach.gov
Dawn McIntosh, Deputy City Attorney (SBN 162173)
Dawn.McIntosh@longbeach.gov
333 W. Ocean Blvd, 11ᵗʰ Floor
Long Beach, CA 90802
Telephone: (562) 570-2200

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
john@gomeztrialattorneys.com
John P. Fiske (SBN 249256)
fiske@gomeztrialattorneys.com
655 W. Broadway, #1700
San Diego, CA 92101
Telephone: (619) 237-3490

**BARON & BUDD, P.C.**
Scott Summy (*pending Pro Hac Vice,* Texas Bar No. 19507500)
SSummy@baronbudd.com
Carla Burke (*pending Pro Hac Vice,* Texas Bar No. 24012490)
cburkepickrel@baronbudd.com
Celeste Evangelisti (SBN 225232)
cevangelisti@baronbudd.com
3102 Oak Lawn Ave, #1100
Dallas, TX 75219
Telephone: (214) 521-3605

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| CITY OF LONG BEACH, a municipal corporation; | ) CASE NO. _____ |
| Plaintiff, | ) **PLAINTIFFS' ORIGINAL** |
| v. | ) **COMPLAINT** |
| MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, and DOES 1 through 100, | ) |
| Defendants. | ) |

1

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

## I.     INTRODUCTION

1.      Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants — found in bays, oceans, rivers, streams, soil, and air.  As a result, PCBs have been detected in the tissues of all living beings on earth including all forms of marine life, various animals and birds, plants and trees, and humans.

2.      The extent of PCB contamination is troubling because PCBs cause a variety of adverse health effects.  In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.  In addition, PCBs destroy populations of fish, birds, and other animal life.

3.      Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew for decades that PCBs were toxic and knew that they were widely contaminating all natural resources and living organisms, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

4.      U.S. EPA (2000b) has classified PCBs as 'probable human carcinogens.' Studies have suggested that PCBs may play a role in inducing breast cancer. Studies have also linked PCBs to increased risk for several other cancers including liver, biliary tract, gall bladder, gastrointestinal tract, pancreas, melanoma, and non-Hodgkin's lymphoma. PCBs may also cause non-carcinogenic effects, including reproductive effects and developmental effects (primarily to the nervous system).  PCBs tend to accumulate in the human body in the liver, adipose tissue (fat), skin, and breast milk. PCBs have also been found in human plasma, follicular fluid, and sperm fluid.  Fetuses may be exposed to PCBs in utero, and babies may be exposed to PCBs during breastfeeding.  According to U.S. EPA (2000b), '[s]ome human studies have also

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1  suggested that PCB exposure may cause adverse effects in children and developing

2  fetuses while other studies have not shown effects.  Reported effects include lower IQ

3  scores, low birth weight, and lower behavior assessment scores.

4      5.      PCBs have traveled into many Long Beach Waters by a variety of ways.

5  PCBs were used in many industrial and commercial applications such as paint, caulking,

6  transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks,

7  lubricants, and other uses.  PCBs regularly leach, leak, off-gas, and escape their

8  intended applications, causing runoff during naturally occurring storm and rain events,

9  after being released into the environment.  The runoff originates from multiple sources

10  and industries and enters Long Beach Waters with stormwater and other runoff.

11      6.      The natural fate and transport of PCBs result in the gathering and collection

12  in stormwater through no fault of the City of Long Beach, which lawfully discharges

13  water into many bodies of water through an NPDES permit.

14      7.      Many watersheds, lakes, rivers, streams, creeks, bays, ports, harbors, and

15  other bodies of water are contaminated with PCBs, which have been detected in water,

16  sediment, fish, and wildlife.  These water bodies include but are not limited to the

17  following ("Long Beach Waters"):

18          a.  The Port of Long Beach

19          b.  Colorado Lagoon

20          c.  Dominguez Watershed

21      8.      The U.S. Environmental Protection Agency ("U.S. EPA") has approved

22  several PCB Total Maximum Daily Load ("TMDL") for Long Beach Waters.

23      9.      A Total Maximum Daily Load, or TMDL, is a calculation of the maximum

24  amount of pollutant that an impaired body of water can receive and still safely meet

25  water quality standards.[1]

26

27

28

[1] United States Environmental Protection Agency,
www.water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

10.     Long Beach Waters are impaired due to the presence of PCBs.

11.     TMDLs are intended to achieve protection of the commercial sport fishing beneficial use and to the extent that other beneficial uses are affected by PCBs, the TMDLs are also intended to ensure protection of other beneficial uses, specifically, preservation of wildlife, rare and endangered species, and habitat.[2]

12.     Long Beach Waters TMDLs are expressed as water column targets, sediment targets, fish tissue targets, and/or stormwater wasteload allocations.

Plaintiff CITY OF LONG BEACH hereby alleges, upon information and belief, as follows:

**II.     PARTIES**

13.     The CITY OF LONG BEACH ("Long Beach") is a California Charter City and municipal corporation, duly organized and existing by virtue of the laws of the State of California.

14.     "Plaintiff" shall refer to the CITY OF LONG BEACH.

15.     Plaintiff brings this suit pursuant to California Code of Civil Procedure 731, and California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and any other applicable codes or forms of relief available for monetary damages and removal of the public nuisance caused by PCBs in Long Beach Waters.

16.     Plaintiff manages and operates municipal storm water systems, which collect and transport stormwater to be discharged into Long Beach Waters.  In order to discharge stormwater into Long Beach Waters, Plaintiff is required to receive a Municipal Regional Stormwater Permit from the California Regional Water Quality Control Board- Los Angeles Region, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act.

17.     Plaintiff is a permittee under a Municipal Regional Stormwater Permit, which includes TMDLs for PCBs, as Long Beach Waters are impaired due to PCBs.

---

[2] *Id.*

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1    18.     Plaintiff is subject to PCB TMDLs under respective Municipal Regional

2  Stormwater Permits. The PCB TMDLs require Plaintiff to limit its storm water

3  discharge of PCBs and engage in many water, sediment, and tissue quality objective

4  efforts.

5    19.     Thus, Plaintiff has spent money in efforts to remediate, reduce, and monitor

6  PCBs toward these state-mandated TMDL goals.  Plaintiff will spend more money in

7  the future, including possibly additional remediation efforts.

8    20.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation

9  with its principal place of business in St. Louis, Missouri.

10    21.     Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its

11  headquarters and principal place of business in St. Louis, Missouri.

12    22.     Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation"

13  and successor to the original Monsanto Company) is a Delaware LLC with its principal

14  place of business in Peapack, New Jersey.  Pharmacia is now a wholly-owned

15  subsidiary of Pfizer, Inc.

16    23.     The original Monsanto Company ("Old Monsanto") operated an

17  agricultural products business, a pharmaceutical and nutrition business, and a chemical

18  products business.  Old Monsanto began manufacturing PCBs in the 1930s and

19  continued to manufacture commercial PCBs until the late 1970s.

20    24.     Through a series of transactions beginning in approximately 1997, Old

21  Monsanto's businesses were spun off to form three separate corporations.  The

22  corporation now known as Monsanto operates Old Monsanto's agricultural products

23  business.  Old Monsanto's chemical products business is now operated by Solutia.  Old

24  Monsanto's pharmaceuticals business is now operated by Pharmacia.

25    25.     Solutia was organized by Old Monsanto to own and operate its chemical

26  manufacturing business.  Solutia assumed the operations, assets, and liabilities of Old

27

28

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT

1  Monsanto's chemicals business.[3]

2      26.     Although Solutia assumed and agreed to indemnify Pharmacia (then known

3  as Monsanto Company) for certain liabilities related to the chemicals business,

4  Defendants have entered into agreements to share or apportion liabilities, and/or to

5  indemnify one or more entity, for claims arising from Old Monsanto's chemical

6  business --- including the manufacture and sale of PCBs.[4]

7      27.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter

8  11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In

9  connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New

10 Monsanto entered into several agreements under which Monsanto continues to manage

11 and assume financial responsibility for certain tort litigation and environmental

12 remediation related to the Chemicals Business.[5]

13     28.     Monsanto, Solutia, and Pharmacia are collectively referred to in this

14 Complaint as "Defendants."

15 **III.    JURISDICTION AND VENUE**

16     29.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete

17 diversity exists between Plaintiff and Defendants. The Plaintiff is located in California,

18 but no Defendant is a citizen of California. Monsanto is a Delaware corporation with its

19 principal place of business in St. Louis, Missouri. Solutia is a Delaware corporation

20 with its principal place of business in St. Louis, Missouri. Pharmacia is a Delaware

21 limited liability company with its principal place of business in Peapack, New Jersey.

22

23

24 [3] See MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v.*
25 *Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October
8, 2013);  see also Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and
26 Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx
(last accessed February 20, 2014).
27 [4] *See id.*
28 [5] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at
http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

30.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV.   FACTUAL ALLEGATIONS

### A.   PCBs are Toxic Chemicals that Cause Environmental Contamination.

31.     Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single, unique chemical compound in the PCB category.  Over two hundred congeners have been identified.[6]

32.     PCBs were generally manufactured as mixtures of congeners.  From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[7]  The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

33.     Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start capacitors, and lighting ballasts.  In addition, PCBs were incorporated into a variety of products such as caulks, paints, and sealants.

34.     As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another

---

[6] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).
[7] See 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned . . . ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. . . . ."). See also MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1 product.

2     35.      PCBs easily migrate out of their original source material or enclosure and
3 contaminate nearby surfaces, air, water, soil, and other materials. For example, PCB
4 compounds volatilize out of building materials (such as caulk) into surrounding
5 materials such as masonry, wood, drywall, and soil, thereby causing damage to those
6 surrounding materials. PCBs can also escape from totally-enclosed materials (such as
7 light ballasts) and similarly contaminate and damage surrounding materials.

8     36.      PCBs present serious risks to the health of humans, wildlife, and the
9 environment.

10     37.      Humans may be exposed to PCBs through ingestion, inhalation, and dermal
11 contact. Individuals may inhale PCBs that are emitted into the air. They may also
12 ingest PCBs that are emitted into air and settle onto surfaces that come into contact with
13 food or drinks. And they may absorb PCBs from physical contact with PCBs or PCB-
14 containing materials.

15     38.      The EPA has determined that Monsanto's PCBs are probable human
16 carcinogens. In 1996, EPA reassessed PCB carcinogenicity, based on data related to
17 Aroclors 1016, 1242, 1254, and 1260.[8] The EPA's cancer reassessment was peer
18 reviewed by 15 experts on PCBs, including scientists from government, academia and
19 industry, all of whom agreed that PCBs are probable human carcinogens.

20     39.      In addition, the EPA concluded that PCBs are associated with serious non-
21 cancer health effects. From extensive studies of animals and primates using
22 environmentally relevant doses, EPA has found evidence that PCBs exert significant
23 toxic effects, including effects on the immune system, the reproductive system, the
24 nervous system, and the endocrine system.

25     40.      PCBs affect the immune system by causing a significant decrease in the
26

27 [8] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures,
28 EPA/600/P-96/001F (September 1996), available at
http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

size of the thymus gland, lowered immune response, and decreased resistance to viruses and other infections. The animal studies were not able to identify a level of PCB exposure that did not affect the immune system. Human studies confirmed immune system suppression.

41.     Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs. Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and reduced sperm counts.

42.     Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning. Some of these studies were conducted using the types of PCBs most commonly found in human breast milk.

43.     PCBs may also disrupt the normal function of the endocrine system. PCBs have been shown to affect thyroid hormone levels in both animals and humans. In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing. PCB exposures have also been associated with changes in thyroid hormone levels in infants in studies conducted in the Netherlands and Japan.

44.     PCBs have been associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

45.     Children may be affected to a greater extent than adults. The Agency for Toxic Substances and Disease Registry explained: "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs."[9]

---

[9] Agency for Toxic Substances and Disease Registry, Toxicological Profile for Polychlorinated Biphenyls (PCBs), (November 2000), at 405, available at www.atsdr.cdc.gov (last accessed May 1, 2014).

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

46.     PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians, and birds.  Exposure is associated with death, compromised immune system function, adverse effects on reproduction, development, and endocrine function.  PCB exposure affects liver function, the digestive system, and nervous systems and can promote cancer in a number of animal species.  The presence of PCBs can cause changes in community and ecosystem structure and function.[10]

### B.     Monsanto Has Long Known of PCBs' Toxicity.

47.     Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects. [11]

48.     An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[12]

49.     A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops [sic] any type of liver disease and gives a history of Aroclor exposure.  I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[13]

50.     On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

---

[10] See EPA, Understanding PCB Risks, available at http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAssessment (last accessed March 5, 2015).
[11] See Exhibits B, C, F
[12] MONS 061332, attached as Exhibit B.
[13] MONS 095196-7, attached as Exhibit C.

GOMEZ
TRIAL ATTORNEYS

10

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties.  While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[14]

51.    On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors:  "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."[15]

52.    In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[16]  Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[17]  Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[18]

**C.    Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.**

53.    At the same time, Monsanto became aware that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[19]

54.    Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[20]  The report noted that PCBs were also detected in the air over London and

---

[14] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.
[15] MONS 095640, attached as Exhibit E.
[16] *See* JDGFOX00000037-63, attached as Exhibit F.
[17] *Id.* at JDGFOX00000039.
[18] *Id.* at JDGFOX00000037.
[19] See Exhibits G, H, L,
[20] New Scientist (December 15, 1986), MONSFOX00003427, attached as Exhibit G.

11

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1 Hamburg and found in seals caught off the coast of Scotland. Jensen concluded that
2 PCBs can "be presumed to be widespread throughout the world."[21]

3     55.    A December 1968 article by Richard Risebrough identified chlorinated
4 hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present
5 in the global environment."[22] The article reported finding significant concentrations of
6 PCBs in the bodies and eggs of peregrine falcons and 34 other bird species. The report
7 linked PCBs to the rapid decline in peregrine falcon populations in the United States.

8     56.    Despite growing evidence of PCBs' infiltration of every level of the global
9 ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

10     57.    On March 6, 1969, Monsanto employee W. M. Richard wrote a
11 memorandum discussing Risebrough's article that criticized PCBs as a "toxic
12 substance", "widely spread by air-water; therefore, an uncontrollable pollutant . . .
13 causing extinction of peregrine falcon … [and] endangering man himself."[23] Richard
14 explained that Monsanto could take steps to reduce PCB releases from its own plants
15 but cautioned, "It will be still more difficult to control other end uses such as cutting
16 oils, adhesives, plastics, and NCR paper. In this applications exposure to consumers is
17 greater and the disposal problem becomes complex."[24]

18     58.    On September 9, 1969, Monsanto employee W.R. Richard wrote an
19 interoffice memo titled "Defense of Aroclor."[25] He acknowledged the role of Aroclor in
20 water pollution: "Aroclor product is refractive, will settle out on solids – sewerage
21 sludge – river bottoms, and apparently has a long life." He noted that Aroclors 1254
22 and 1260 had been found along the Gulf Coast of Florida causing a problem with
23 shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds; and in

24 _____

25 [21] *Id.*
26 [22] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.
27 [23] MONS 096509-096511, attached as Exhibit I.
28 [24] *Id.*
[25] DSW 014256-014263, attached as Exhibit J.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

the Great Lakes.  Richard advised that the company could not defend itself against all criticism:  "We can't defend vs. everything.  Some animals or fish or insects will be harmed.  Aroclor degradation rate will be slow.  Tough to defend against.  Higher chlorination compounds will be worse [than] lower chlorine compounds.  Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."[26]

59.     On January 29, 1970, Elmer Wheeler of the Medical Department circulated laboratory reports discussing results of animal studies.  He noted:  "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated.  Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[27]

60.     Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc in a PCB Presentation to Corporate Development Committee.  The report suggests possible reactions to the contamination issue.  It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint."  But the option of going out of the Aroclor business was also considered unacceptable:  "there is too much customer/market need and selfishly too much Monsanto profit to go out."[28]

61.     The Aroclor Ad Hoc Committee at Monsanto held its first meeting on September 5, 1969.  The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[29]  The meeting minutes acknowledge that PCB has been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife.  Moreover, the committee implicated the normal use of PCB-containing products as the cause of the

---

[26] *Id.*
[27] MONS 098480, attached as Exhibit K.
[28] Ex. A at 058737.
[29] MONS 030483-030486, attached as Exhibit L.

GOMEZ
TRIAL ATTORNEYS

13

1   problem: "In one application alone (highway paints), one million lbs/year are used.

2   Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in

3   the environment."[30]

4        62.     A month later, on October 2, 1969, the Committee reported extensive

5   environmental contamination.  The U.S. Department of Interior, Fish and Wildlife found

6   PCB residues in dead eagles and marine birds.  Similarly, the Bureau of Commercial

7   Fisheries reported finding PCBs in the river below Monsanto's Pensacola plant.   The

8   U.S. Food and Drug Administration had discovered PCBs in milk supplies.  The

9   Committee advised that Monsanto could not protect the environment from Aroclors as

10   "global" contaminants but could protect the continued manufacture and sale of

11   Aroclors:

12        There is little probability that any action that can be taken will
13   prevent the growing incrimination of specific polychlorinated
     biphenyls (the higher chlorinated – e.g. Aroclors 1254 and 1260) as
14   nearly global environmental contaminants leading to contamination
     of human food (particularly fish), the killing of some marine species
15   (shrimp), and the possible extinction of several species of fish eating
     birds.
16   Secondly, the committee believes that there is no practical course of
     action that can so effectively police the uses of these products as to
17   prevent environmental contamination.  There are, however a number
     of actions which must be undertaken to prolong the manufacture,
18   sale and use of these particular Aroclors as well as to protect the
     continued use of other members of the Aroclor series.[31]

19
20        63.     Monsanto's desire to protect Aroclor sales rather than the environment is

21   reflected in the Committee's stated objectives:

22        1.    Protect continues sales and profits of Aroclors;
23        2.    Permit continued development of new uses and sales, and
          3.    Protect the image of the Organic Division and the Corporation as members
24   of the
25   business community recognizing their responsibilities to prevent and/or con-
     trol contamination of the global ecosystem.[32]

26   _____

27   [30] Id. at 030485.
28   [31] DSW 014612-014624, at 014615, attached as Exhibit M.
     [32] Id.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

64.     An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260:  "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment."  Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business."  To that end, it says, "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase [new products] when available.  He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system.  We don't want to take fluid back." [33]

65.     In 1970, the year after Monsanto formed the Ad Hoc Committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

66.     Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products.  An interdepartmental task force concluded in May 1972 that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health. [34]

67.     After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than had been originally realized." [35]  To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis.  That study revealed widespread occurrence of PCBs in bottom sediments in several states, including California;  in fish and birds;  in lakes and rivers;  in the Atlantic Ocean, the Pacific Ocean, and the Gulf of

---

[33] MONS 100123-100124, attached as Exhibit N.
[34] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976).
[35] Id. at 1.

15

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1  Mexico; sewage treatment facilities;  in a variety of foods including milk, poultry, eggs,
2  fish, meat, and grains; and in human tissues, blood, hair, and milk.[36]

3      68.    EPA's study noted the particular burden on California.  "PCBs have
4  become a significant component of the marine food webs of southern California," were
5  found in sediments in the Santa Barbara Basin, and found in high levels in the San
6  Francisco Bay.[37]

7      69.    At the same time, Monsanto was promoting the use and sale of Aroclor and
8  other PCB compounds.  In a 1960 brochure, Monsanto promotes the use of Aroclors in
9  transformers and capacitors, utility transmission lines, home appliances, electric motors,
10  fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric
11  sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens,
12  thermostats,  furnaces, and vacuum diffusion pumps.  Aroclors could also be used, the
13  brochure advertised, as a component of automotive transmission oil; insecticides;
14  natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized
15  lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks;
16  papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt;
17  paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes,
18  and highway paints;  protective and decorative coatings for steel structures, railway tank
19  and gondola cars; wood and metal maritime equipment;  and coatings for chemical
20  plants, boats, and highway marking. [38]

21      70.    A 1961 brochure explains that Monsanto's Aroclors are being used in
22  "lacquers for women's shoes,"  as "a wax for the flame proofing of Christmas trees,"
23  as "floor wax,"  as an adhesive for bookbinding, leather, and shoes,  and as invisible
24  marking ink used to make chenille rugs and spreads. [39]

25

26  _____
[36] *Id., passim.*
27  [37] *Id.*
[38] The Aroclor Compounds (hand dated May 1960), 0509822- 66, attached as Exhibit S.
28  [39] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

71.     Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods. Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

72.     A few years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before.  In a press release, the company claimed:  " 'What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[40]

**D.     Monsanto Concealed the Nature of PCBs from Governmental Entities.**

73.     While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite — that the compounds were not toxic and that the company would <u>not</u> expect to find PCBs in the environment in a widespread manner.[41]

74.     In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[42]  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."[43]  A similar letter to the Regional Water Quality Control Board

---

[40] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit U, at MCL000648.
[41] See Exhibits O-R (letters to governmental agencies).
[42] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.
[43] *Id.*

17

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1  explained that PCBs are associated with "no special health problems" and "no problems
2  associated with the environment."[44]

3      75.      In May, 1969, Monsanto employee Elmer Wheeler spoke with a
4  representative of the National Air Pollution Control Administration, who promised to
5  relay to Congress the message that Monsanto "cannot conceive how the PCBs can be
6  getting into the environment in a widespread fashion."[45]

7      76.      Monsanto delivered the same message to the New Jersey Department of
8  Conservation in July, 1969, claiming first, "Based on available data, manufacturing and
9  use experience, we do not believe the PCBs to be seriously toxic."[46]  The letter then
10  reiterates Monsanto's position regarding environmental contamination:  "We are unable
11  at this time to conceive of how the PCBs can become wide spread in the environment. It
12  is certain that no applications to our knowledge have been made where the PCBs would
13  be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[47]

## FIRST CAUSE OF ACTION

### PUBLIC NUISANCE

16      77.      Plaintiffs reallege and reaffirm each and every allegation set forth in all
17  preceding paragraphs as if fully restated in this count.

18      78.      Monsanto manufactured, distributed, marketed, and promoted PCBs in a
19  manner that created or participated in creating a public nuisance that is harmful to health
20  and obstructs the free use of Long Beach Waters.

21      79.      The presence of PCBs interferes with the comfortable enjoyment of Long
22  Beach Waters for customary uses for fishing, swimming, and other water activities.

---

[44] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.
[45] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.
[46] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.
[47] Id.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1     80.    The presence of PCBs interferes with the free use of Long Beach Waters
2  for the promotion of commerce, navigation, and fisheries.

3     81.    The presence of PCBs interferes with the free use of Long Beach Waters
4  for ecological preservation and habitat restoration.

5     82.    The Los Angeles Regional Water Quality Control Board, pursuant to the
6  NPDES under the Clean Water Act, requires the Plaintiffs to reduce their discharge of
7  and monitor PCBs into to prevent further contamination of the already impaired body of
8  water.

9     83.    The presence of PCBs causes significant costs, inconvenience and
10  annoyance to Plaintiffs, who are charged with reducing and monitoring PCB discharge
11  toward TMDL levels, in order to protect plant and animal life, and the quality of water
12  in the bay.

13     84.    The condition affects a substantial number of people who use Long Beach
14  Waters for commercial and recreational purposes and interferes with the rights of the
15  public at large to clean and safe resources and environment.

16     85.    An ordinary person would be reasonably annoyed or disturbed by the
17  presence of toxic PCBs that endanger the health of fish, animals, and humans and
18  degrade water quality and destroy marine habitats.

19     86.    The seriousness of the environmental and human health risk far outweighs
20  any social utility of Monsanto's conduct in manufacturing PCBs and concealing the
21  dangers posed to human health and the environment.

22     87.    The Plaintiffs have suffered and will continue to suffer harm that is
23  different from the type of harm suffered by the general public, and the Plaintiffs have
24  incurred substantial costs deriving from state-mandated PCB TMDLs.

25     88.    Plaintiff did not consent to the conduct that resulted in the contamination of
26  Long Beach Waters.

27     89.    Monsanto's conduct was a substantial factor in causing the harm to the
28  Plaintiffs.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

90.     Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in Long Beach Waters.  Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals.  In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and that humans may be exposed to PCBs through ingestion and dermal contact.  As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters.  Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

91.     As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiffs have suffered, and continues to suffer, monetary damages to be proven at trial.

92.     Monsanto's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because Monsanto callously decided to increase sales and develop new ways to promote PCBs, knowing PCBs are toxic, cannot be contained, and last for centuries.

## SECOND CAUSE OF ACTION
## EQUITABLE INDEMNITY

93.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

94.     Monsanto is responsible for creating the public nuisance by manufacturing, distributing, and promoting PCBs, resulting in contamination in and around Long Beach Waters.

95.     Monsanto's creation of the public nuisance contributed as a substantial factor in causing Plaintiffs' injury and damages.

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1    96.    The conduct of Plaintiff did not contribute in any way to the creation of the
2  public nuisance.

### PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages according to proof;
2. Punitive damages;
3. Litigation costs and attorney's fees as provided by law;
4. Pre-judgment and post-judgment interest;
5. Any other and further relief as the Court deems just, proper, and equitable.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial.

Dated:  May 19, 2016                    By: /s/ John P. Fiske
                                            John P. Fiske

                                        **GOMEZ TRIAL ATTORNEYS**
                                        John H. Gomez (SBN 171485)
                                        john@gomeztrialattorneys.com
                                        John P. Fiske (SBN 249256)
                                        fiske@gomeztrialattorneys.com
                                        655 W. Broadway, #1700
                                        San Diego, CA 92101
                                        Telephone: (619) 237-3490

                                        **OFFICE OF THE CITY ATTORNEY**
                                        **City of Long Beach**
                                        Charles Parkin, City Attorney (SBN 159162)
                                        Charles.Parkin@longbeach.gov
                                        Amy Webber, Deputy City Attorney (SBN
                                        132174)
                                        Amy.Webber@longbeach.gov
                                        Dawn McIntosh, Deputy City Attorney (SBN
                                        162173)
                                        Dawn.McIntosh@longbeach.gov
                                        333 W. Ocean Blvd, 11th Floor
                                        Long Beach, CA 90802
                                        Telephone: (562) 570-2200

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BARON & BUDD, P.C.**
Scott Summy *(pending Pro Hac Vice,* Texas Bar
No. 19507500)
SSummy@baronbudd.com
Carla Burke *(pending Pro Hac Vice,* Texas Bar
No. 24012490)
cburkepickrel@baronbudd.com
Celeste Evangelisti (SBN 225232)
cevangelisti@baronbudd.com
3102 Oak Lawn Ave, #1100
Dallas, TX 75219
Telephone: (214) 521-3605

GOMEZ
TRIAL ATTORNEYS

22

PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 14

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

CITY OF PORTLAND, a municipal
corporation,

                   Plaintiff,

vs.

MONSANTO COMPANY, SOLUTIA INC.,
and PHARMACIA CORPORATION,
               Defendants.

Case No. 3:16-cv-1418 __

**PLAINTIFF'S ORIGINAL COMPLAINT**

*Demand for Jury Trial*

## I.     INTRODUCTION

1.     Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants — found in bays, oceans, rivers, streams, soil, and air.  As a result, PCBs have been detected in the tissues of all living beings on earth including all forms of marine life, various animals and birds, plants and trees, and humans.

2.     The extent of PCB contamination is troubling because PCBs cause a variety of adverse health effects.  In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.  In addition, PCBs destroy populations of fish, birds, and other animal life.

3.     Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew for decades that PCBs were toxic and knew that they were widely contaminating all natural resources and living organisms, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

Page 2 –   PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

4.     U.S. EPA (2000b) has classified PCBs as 'probable human carcinogens.' Studies have suggested that PCBs may play a role in inducing breast cancer. Studies have also linked PCBs to increased risk for several other cancers including liver, biliary tract, gall bladder, gastrointestinal tract, pancreas, melanoma, and non-Hodgkin's lymphoma. PCBs may also cause non-carcinogenic effects, including reproductive effects and developmental effects (primarily to the nervous system).  PCBs tend to accumulate in the human body in the liver, adipose tissue (fat), skin, and breast milk.  PCBs have also been found in human plasma, follicular fluid, and sperm fluid.  Fetuses may be exposed to PCBs in utero, and babies may be exposed to PCBs during breastfeeding.  According to U.S. EPA (2000b), '[s]ome human studies have also suggested that PCB exposure may cause adverse effects in children and developing fetuses while other studies have not shown effects.  Reported effects include lower IQ scores, low birth weight, and lower behavior assessment scores.

5.     PCBs have been found in sediments, water and fish in the Columbia River the Columbia Slough, the Willamette River and tributaries including Johnson Creek ("Portland Waters").  PCBs were used historically in many industrial and commercial applications such as paint, caulking, transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks, lubricants and other uses.  PCBs regularly leach, leak, off-gas, and escape their intended applications and, after being released into the environment, contaminate runoff from naturally occurring storm and rain events.  The contamination originates from multiple sources and industries and enters Portland Waters with stormwater and other runoff.

6.     The fate and transport of PCBs in stormwater causes contamination in sediments, through no fault of the City of Portland, which lawfully discharges water into several bodies of water through NPDES permits.

7.     Portland Waters are contaminated with PCBs, which have been detected in water, sediment, fish and wildlife.

Page 3 –   PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

8.      The U.S. Environmental Protection Agency ("U.S. EPA") has approved a PCB Total Maximum Daily Load ("TMDL") for certain Portland Waters.

9.      A Total Maximum Daily Load, or TMDL, is a calculation of the maximum amount of pollutant that an impaired body of water can receive and still safely meet water quality standards.[1]

10.     Portland Waters are impaired due to the presence of PCBs.

11.     Portland Harbor, a section of the Lower Willamette River, is a U.S. EPA Superfund Site. The City of Portland is subject to an administrative order issued by the U.S. Environmental Protection Agency and has spent money to investigate, monitor, and analyze PCB contamination in Portland Harbor.  The City of Portland is expected to spend significant sums in the future to further investigate, monitor, analyze, remediate and mitigate PCB contamination.

12.     Plaintiff has expended resources and money to investigate, monitor and analyze PCB contamination in the Columbia Slough, Johnson Creek and a section of the Willamette River known as the Downtown Reach.  Plaintiff also has remediated PCB contamination in the Columbia Slough

13.     Plaintiff CITY OF PORTLAND hereby alleges, upon information and belief, as follows:

## II.    PARTIES

14.     The CITY OF PORTLAND ("Portland") is a municipal corporation, duly organized and existing by virtue of the laws of the State of Oregon.

15.     Plaintiff manages and operates municipal conveyance systems, which collect and transport wastewater and stormwater to be discharged into Portland Waters pursuant to National Pollutant Discharge Elimination System permits under the Clean Water Act.

---

[1] United States Environmental Protection Agency, www.water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

16.      In addition, Plaintiff is a signatory to Agreements on Consent with EPA to investigate contamination, including PCBs, in the Portland Harbor Superfund Site.  Plaintiff also is a signatory to an Intergovernmental Agreement with Oregon DEQ to identify sources of contamination, including PCBs, to the municipal conveyance system, and to conduct sediment sampling and fish tissue studies in the Columbia Slough. Thus, Plaintiff has spent money in efforts to remediate, reduce, and monitor PCBs.  Plaintiff will spend more money in the future, including for additional remediation efforts.

17.      Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

18.      Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

19.      Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack, New Jersey.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

20.      The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business. Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

21.      Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.  The corporation now known as Monsanto operates Old Monsanto's agricultural products business.  Old Monsanto's chemical products business is now operated by Solutia.  Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

22.      Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business.  Solutia assumed the operations, assets, and liabilities of Old

Page 5 –    PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Monsanto's chemicals business.[2]

23.    Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.[3]

24.    In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.  Solutia's reorganization was completed in 2008.  In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[4]

25.    Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants."

### III.    JURISDICTION AND VENUE

26.    This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiff and Defendants.  The Plaintiff is located in Oregon, but no Defendant is a citizen of Oregon.  Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

---

[2] *See* MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013); *see also* Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed February 20, 2014).

[3] *See id.*

[4] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).

Page 6 –    PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

27.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV.    FACTUAL ALLEGATIONS

A.    PCBs are Toxic Chemicals that Cause Environmental Contamination.

28.    Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring). A "PCB congener" is any single, unique chemical compound in the PCB category. Over two hundred congeners have been identified.[5]

29.    PCBs were generally manufactured as mixtures of congeners. From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[6] Monsanto manufactured PCBs in Illinois and Alabama. The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

30.    Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start capacitors, and lighting ballasts. In addition, PCBs were incorporated into a variety of products such as caulks, paints, and sealants.

31.    As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl

---

[5] Table of PCB Congeners, available at
http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).

[6] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned . . . ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. . . . ."). *See also* MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

Page 7 –    PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

32.    PCBs easily migrate out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil, and other materials.  For example, PCB compounds escape from totally-enclosed materials (such as transformers or capacitors) and contaminate and damage surrounding materials.

33.    PCBs present serious risks to the health of humans, wildlife, and the environment.

34.    Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact.  Individuals may inhale PCBs that are emitted into the air.  They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks.  And they may absorb PCBs from physical contact with PCBs or PCB-containing materials.  PCBs are known to bioaccumulate in fish and other species; some human health risks are attributable to eating contaminated fish. EPA has determined that Monsanto's PCBs are probable human carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260.[7]  EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

35.    In addition, EPA concluded that PCBs are associated with serious non-cancer health effects.  From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system, and the endocrine system.

36.    PCBs affect the immune system by causing a significant decrease in the size of the thymus gland, lowered immune response, and decreased resistance to viruses and other

---

[7] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

infections.  The animal studies were not able to identify a level of PCB exposure that did not affect the immune system.  Human studies confirmed immune system suppression.

37.     Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs.  Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and reduced sperm counts.

38.     Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning. Some of these studies were conducted using the types of PCBs most commonly found in human breast milk.

39.     PCBs may also disrupt the normal function of the endocrine system.  PCBs have been shown to affect thyroid hormone levels in both animals and humans.  In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing.  PCB exposures have also been associated with changes in thyroid hormone levels in infants in studies conducted in the Netherlands and Japan.

40.     PCBs have been associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

41.     Children may be affected to a greater extent than adults.  The Agency for Toxic Substances and Disease Registry explained: "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs."[8]

---

[8] Agency for Toxic Substances and Disease Registry, Toxicological Profile for Polychlorinated Biphenyls (PCBs), (November 2000), at 405, available at www.atsdr.cdc.gov (last accessed May 1, 2014).

Page 9 –   PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

42.     PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians, and birds.  Exposure is associated with death, compromised immune system function, adverse effects on reproduction, development, and endocrine function.  PCB exposure affects liver function, the digestive system, and nervous systems and can promote cancer in a number of animal species.  The presence of PCBs can cause changes in community and ecosystem structure and function.[9]

B.      Monsanto Has Long Known of PCBs' Toxicity.

43.     Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects. [10]

44.     An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[11]

45.     A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops [sic] any type of liver disease and gives a history of Aroclor exposure.  I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[12]

46.     On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

---

[9] See EPA, Understanding PCB Risks, available at
http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAssessment
(last accessed March 5, 2015).
[10] See Exhibits B, C, F
[11] MONS 061332, attached as Exhibit B.
[12] MONS 095196-7, attached as Exhibit C.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[13]

47.      On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."[14]

48.      In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[15] Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[16] Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[17]

C.      Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.

49.      At the same time, Monsanto became aware that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[18]

50.      Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[19] The

---

[13] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.
[14] MONS 095640, attached as Exhibit E.
[15] *See* JDGFOX00000037-63, attached as Exhibit F.
[16] *Id.* at JDGFOX00000039.
[17] *Id.* at JDGFOX00000037.
[18] See Exhibits G, H, L,
[19] New Scientist (December 15, 1986), MONSFOX00003427, attached as Exhibit G.

Page 11 –  PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the coast of Scotland. Jensen concluded that PCBs can "be presumed to be widespread throughout the world."[20]

51.     A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[21] The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species. The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

52.     Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

53.     On March 6, 1969, Monsanto employee W. M. Richard wrote a memorandum discussing Risebrough's article that criticized PCBs as a "toxic substance," "widely spread by air-water; therefore, an uncontrollable pollutant . . . causing extinction of peregrine falcon [and] endangering man himself."[22] Richard explained that Monsanto could take steps to reduce PCB releases from its own plants but cautioned, "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper. In this applications exposure to consumers is greater and the disposal problem becomes complex."[23]

54.     On September 9, 1969, Monsanto employee W.R. Richard wrote an interoffice memo titled "Defense of Aroclor."[24] He acknowledged the role of Aroclor in water pollution: "Aroclor product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a long life." He noted that Aroclors 1254 and 1260 had been found along the

---

[20] *Id.*

[21] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.

[22] MONS 096509-096511, attached as Exhibit I.

[23] *Id.*

[24] DSW 014256-014263, attached as Exhibit J.

Page 12 –  PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Gulf Coast of Florida causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds; and in the Great Lakes. Richard advised that the company could not defend itself against all criticism: "We can't defend vs. everything. Some animals or fish or insects will be harmed. Aroclor degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse [than] lower chlorine compounds. Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."[25]

55.      On January 29, 1970, Elmer Wheeler of the Medical Department circulated laboratory reports discussing results of animal studies. He noted: "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[26]

56.      Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc in a PCB Presentation to Corporate Development Committee. The report suggests possible reactions to the contamination issue. It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint." But the option of going out of the Aroclor business was also considered unacceptable: "there is too much customer/market need and selfishly too much Monsanto profit to go out."[27]

57.      The Aroclor Ad Hoc Committee held its first meeting on September 5, 1969. The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[28] The meeting minutes acknowledge that PCB has been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western

---

[25] *Id.*
[26] MONS 098480, attached as Exhibit K.
[27] Ex. A at 058737.
[28] MONS 030483-030486, attached as Exhibit L.

Page 13 –  PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

wildlife.  Moreover, the committee implicated the normal use of PCB-containing products as the cause of the problem:  "In one application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[29]

58.     A month later, on October 2, 1969, the Committee reported extensive environmental contamination.  The U.S. Department of Interior, Fish and Wildlife found PCB residues in dead eagles and marine birds.  Similarly, the Bureau of Commercial Fisheries reported finding PCBs in the river below Monsanto's Pensacola plant.   The U.S. Food and Drug Administration had discovered PCBs in milk supplies.  The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

> There is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated – e.g. Aroclors 1254 and 1260) as nearly <u>global environmental contaminants</u> leading to <u>contamination of human food</u> (particularly fish), the <u>killing of some marine species</u> (shrimp), and the possible extinction of several species of fish eating birds.
> Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination.   <u>There are, however a number of actions</u> which must be undertaken <u>to prolong the manufacture, sale and use of these particular Aroclors</u> as well as to protect the continued use of other members of the Aroclor series.[30]

59.     Monsanto's desire to protect Aroclor sales rather than the environment is reflected in the Committee's stated objectives:

1.     Protect continues sales and profits of Aroclors;
2.     Permit continued development of new uses and sales, and
3.     Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or con-

---

[29] *Id.*at 030485.
[30] DSW 014612-014624, at 014615, attached as Exhibit M.

Page 14 –  PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

trol contamination of the global ecosystem.[31]

60.    An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260: "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment." Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business." To that end, it says, "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase [new products] when available. He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system. We don't want to take fluid back." [32]

61.    In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

62.    Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products. An interdepartmental task force concluded in May 1972 that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.[33]

63.    After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than had been originally realized."[34] To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis. That study revealed widespread occurrence of PCBs in bottom sediments in several states, including California; in fish and birds; in lakes and rivers; in the

---

[31] *Id.*

[32] MONS 100123-100124, attached as Exhibit N.

[33] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976).

[34] *Id.* at 1.

Page 15 – PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Atlantic Ocean, the Pacific Ocean, and the Gulf of Mexico; sewage treatment facilities; in a variety of foods including milk, poultry, eggs, fish, meat, and grains; and in human tissues, blood, hair, and milk.[35]

64.     EPA's study noted the particular burden on California.  "PCBs have become a significant component of the marine food webs of southern California," were found in sediments in the Santa Barbara Basin, and found in high levels in the San Francisco Bay.[36]

65.     At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds.  In a 1960 brochure, Monsanto promotes the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces, and vacuum diffusion pumps.  Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil; insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints;  protective and decorative coatings for steel structures, railway tank and gondola cars;  wood and metal maritime equipment;  and coatings for chemical plants, boats, and highway marking. [37]

66.     A 1961 brochure explains that Monsanto's Aroclors are being used in "lacquers for women's shoes,"  as "a wax for the flame proofing of Christmas trees,"  as "floor wax,"  as an adhesive for bookbinding, leather, and shoes,  and as invisible marking ink used to make chenille rugs and spreads. [38]

---

[35] *Id., passim.*

[36] *Id.*

[37] The Aroclor Compounds (hand dated May 1960), 0509822- 66, attached as Exhibit S.

[38] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.

Page 16 –  PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

67.     Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods.  Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

68.     A few years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before.  In a press release, the company claimed:  " 'What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[39]

D.     Monsanto Concealed the Nature of PCBs from Governmental Entities.

69.     While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite — that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner.[40]

70.     In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[41]  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."[42]  A similar letter to the Regional Water Quality Control Board explained that PCBs are associated with "no special health problems" and "no problems associated with the environment."[43]

---

[39] See Press release (July 16, 1970), MCL000647-50, attached as Exhibit U, at MCL000648.
[40] See Exhibits O-R (letters to governmental agencies).
[41] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.
[42] Id.
[43] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.

Page 17 –  PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

71.    In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of
the National Air Pollution Control Administration, who promised to relay to Congress the
message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a
widespread fashion."[44]

72.    Monsanto delivered the same message to the New Jersey Department of
Conservation in July, 1969, claiming first, "Based on available data, manufacturing and use
experience, we do not believe the PCBs to be seriously toxic."[45]  The letter then reiterates
Monsanto's position regarding environmental contamination:  "We are unable at this time to
conceive of how the PCBs can become wide spread in the environment. It is certain that no
applications to our knowledge have been made where the PCBs would be broadcast in the same
fashion as the chlorinated hydrocarbon pesticides have been."[46]

E.    Portland Waters are Impaired Due to PCB Contamination

73.    As described above, PCBs enter Portland's stormwater and wastewater systems
through no fault of the City.  Portland then lawfully discharges wastewater and stormwater into
Portland Waters in accordance with the terms of its NPDES permits.

74.    Under the Clean Water Act, Oregon has designated uses for Portland Waters that
include commercial, recreation, navigation, boating fishing and wildlife habitat.

75.    Portland Waters are listed by the State of Oregon on its list of impaired water
bodies, in accordance with section 303(d) of the Clean Water Act.

76.    PCBs are a widespread contaminant in Portland waters and have been detected in
water, fish tissue and sediment samples in the Willamette River, Johnson Creek and the
Columbia Slough and other Portland area tributaries.

---

[44] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.
[45] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.
[46] *Id.*

Page 18 –  PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

77.    The Oregon Health Authority has issued fish consumption advisories for all resident fish in the Willamette River and Columbia Slough due to contamination from PCBs[47].

78.    Monsanto's PCBs have continuously and systematically contaminated Portland Waters through discharges from stormwater and wastewater systems since Monsanto placed PCBs, one of the most ubiquitous contaminants in the world, into the stream of commerce.

79.    By the time Congress passed the Toxic Substances Reform Act, which became effective October 11, 1976, Monsanto's PCBs had already begun to vaporize, leach, leak, and volatilize into Portland stormwater collection systems, including the City's, contaminating Portland Waters, the environment, water, sediment, fish, and wildlife.

80.    Since at least 1976, PCBs have continuously and systematically entered and contaminated stormwater collection systems, including the City's.

81.    Monsanto's PCBs pass into and through Portland's stormwater collection systems, including the City's, and have been doing so continuously since before 1976.

82.    Monsanto PCBs will continue to contaminate stormwater collection systems, including the City's, for years to come if not remediated.

## FIRST CAUSE OF ACTION

### PUBLIC NUISANCE

83.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

84.    Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of Portland Waters.

85.    The presence of PCBs interferes with the comfortable enjoyment of Portland Waters for customary uses for fishing, swimming, and other water activities.

---

[47]https://public.health.oregon.gov/HealthyEnvironments/Recreation/FishConsumption/Pages/fish advisories.aspx

Page 19 – PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

86.    The presence of PCBs interferes with the free use of Portland Waters for the promotion of commerce, navigation, and fisheries.

87.    The presence of PCBs interferes with the free use of Portland Waters for ecological preservation and habitat restoration.

88.    The Clean Water Act, through the NPDES Permit system, requires the Plaintiff to reduce its discharge of contaminants in stormwater to the maximum extent practicable; CERCLA and its Oregon counterpart assign cleanup liability to parties that discharge hazardous substances to the environment.

89.    The presence of PCBs causes inconvenience and annoyance to Plaintiffs, who are charged with reducing and monitoring PCB discharges in order to protect human health and the environment.

90.    The condition affects a substantial number of people who use Portland Waters for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

91.    An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals, and humans and degrade water quality and destroy marine habitats.

92.    The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

93.    The Plaintiff has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and the Plaintiff has incurred substantial costs from investigating, monitoring and remediating PCB contamination.

94.    Plaintiff did not consent to the conduct that resulted in the contamination of Portland Waters.

Page 20 –  PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

95.    Monsanto's conduct was a substantial factor in causing the harm to the Plaintiffs.

96.    Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in Portland Waters.  Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals.  In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and that humans may be exposed to PCBs through ingestion and dermal contact.  As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters.  Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

97.    As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiffs have suffered, and continues to suffer, monetary damages to be proven at trial.

98.    Monsanto's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because Monsanto callously decided to increase sales and develop new ways to promote PCBs, knowing PCBs are toxic, cannot be contained, and last for centuries.

## SECOND CAUSE OF ACTION

## COMMON LAW INDEMNITY

99.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

100.    Plaintiff has incurred costs to remediate, monitor, and investigate Monsanto's PCBs in City stormwater and wastewater systems and Portland Waters.

101.    Monsanto is responsible for creating the public nuisance by manufacturing, distributing, and promoting PCBs, resulting in contamination in and around Portland Waters.

Page 21 –  PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

102.     Between Monsanto and the Plaintiff, Monsanto should be responsible for the costs to address PCB contamination, as the conduct of Plaintiff did not contribute in any way to the creation of the public nuisance.

### THIRD CAUSE OF ACTION

### PRODUCTS LIABILITY - DESIGN DEFECT

103.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

104.     When PCBs left Monsanto's hands, they were in a condition that was not contemplated by the ultimate users and consumers and was unreasonably dangerous to all persons and property exposed due to the design of Monsanto's PCBs.

105.     Monsanto sold PCBs and was engaged in the business of selling PCBs.

106.     Monsanto's PCBs were in a defective condition that was unreasonably dangerous to the ultimate users, consumers, and population at large when the product left the defendant's hands.

107.     Monsanto's PCBs were intended to and did reach users and consumers without substantial change in condition.

### FOURTH CAUSE OF ACTION

### PRODUCTS LIABILITY - FAILURE TO WARN

108.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

109.     Monsanto failed to give adequate warnings or instructions regarding the use of PCBs.  Without adequate warnings or instructions, Monsanto's PCBs were unreasonably dangerous.

110.     When PCBs left Monsanto's hands, they were in a condition that was not contemplated by the ultimate users and consumers and was unreasonably dangerous to all

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

persons and property exposed due to Monsanto's failure to give adequate warning or instructions relating to its PCBs.

## FIFTH CAUSE OF ACTION

### NEGLIGENCE

111.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

112.    Monsanto's conduct was negligent.

113.    Monsanto's negligent conduct was a cause of harm to the plaintiff.

114.    The harm was reasonably foreseeable.

## SIXTH CAUSE OF ACTION

### TRESPASS

115.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

116.    Monsanto's PCBs have, without authorization, entered Plaintiff's property.

117.    Monsanto acted negligently and/or recklessly in manufacturing PCBs and marketing and selling them for widespread use.  This negligent and/or reckless conduct caused the PCBs to trespass upon Plaintiff's property.

118.    Monsanto acted intentionally, knowing that a trespass would result from its actions, as PCBs cannot be contained.  As a result of these actions, PCBs have trespassed upon Plaintiff's property.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1.    Compensatory damages according to proof;

2.    Punitive damages;

3.    Litigation costs and attorney's fees as provided by law;

Page 23 –  PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

4.    Pre-judgment and post-judgment interest;

5.    Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial.


Dated:  July 12, 2016                    Respectfully submitted,



                                         *s/ Tracy Reeve*
                                         **OFFICE OF THE CITY ATTORNEY**
                                         **City of Portland**
                                         TRACY REEVE, OSB # 891123
                                         City Attorney
                                         J. SCOTT MOEDE, OSB #934816
                                         Chief Deputy City Attorney
                                         JAN V.V. BETZ, OSB # 871670
                                         Sr. Deputy City Attorney
                                         NANCI KLINGER, OSB # 940140
                                         Sr. Deputy City Attorney
                                         Telephone: (503) 823-4047

                                         **GOMEZ TRIAL ATTORNEYS**
                                         John H. Gomez *(Pro Hac Vice to be submitted)*
                                         John P. Fiske *(pending Pro Hac Vice)*
                                         655 West Broadway, Suite 1700
                                         San Diego, California 92101

                                         **BARON & BUDD, P.C.**
                                         Scott Summy *(Pro Hac Vice to be submitted)*
                                         Carla Burke *(Pro Hac Vice to be submitted)*
                                         Celeste Evangelisti *Pro Hac Vice to be submitted)*
                                         3102 Oak Lawn Avenue, Suite 1100
                                         Dallas, Texas 75219-4281



Page 24 –  PLAINTIFF'S ORIGINAL COMPLAINT

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 15

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1  **GOMEZ TRIAL ATTORNEYS**
   John H. Gomez (SBN 171485)
2  John P. Fiske (SBN 249256)
   655 West Broadway, Suite 1700
3  San Diego, CA 92101
   Telephone:  619-237-3490
4
   **BARON & BUDD, P.C.**
5  Scott Summy *(pending Pro Hac Vice)*
   (Texas Bar No. 19507500)
6  Carla Burke *(pending Pro Hac Vice)*
   (Texas Bar No. 24012490)
7  Celeste Evangelisti (SBN 225232)
   3102 Oak Lawn Avenue, Suite 1100
8  Dallas, Texas 75219-4281
   Telephone: 214-521-3605
9
   **OFFICE OF THE CITY ATTORNEY**
10 **City of Oakland**
   Barbara Parker (SBN 69722)
11 Otis McGee, Jr. (SBN 71885)
   Maria Bee (SBN 167716)
12 1 Frank H. Ogawa Place, 6th Floor
   Oakland, CA 94612
13
14 Attorneys for Plaintiff

15                 UNITED STATES DISTRICT COURT

16          NORTHERN DISTRICT OF CALIFORNIA- OAKLAND DIVISION

17 CITY OF OAKLAND, a municipal corporation;  )  CASE NO. _____
                                             )
18 Plaintiff,                                )  **PLAINTIFF'S ORIGINAL**
                                             )  **COMPLAINT**
19 v.                                        )
                                             )
20 MONSANTO COMPANY,                         )
   SOLUTIA INC., and                         )
21 PHARMACIA CORPORATION, and DOES 1         )
   through 100,                              )
22                                           )
   Defendants.                               )
23 _____ )

24

25     **I.     INTRODUCTION**

26         1.      Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have

27 become notorious as global environmental contaminants — found in bays, oceans, rivers, streams, soil,

28 and air.  As a result, PCBs have been detected in the tissues of all living beings on earth including all

                                               1

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1   forms of marine life, various animals and birds, plants and trees, and humans.

2       2.      The extent of PCB contamination is troubling because PCBs cause a variety of adverse

3   health effects.  In humans, PCB exposure is associated with cancer as well as serious non-cancer health

4   effects, including effects on the immune system, reproductive system, nervous system, endocrine

5   system and other health effects.  In addition, PCBs destroy populations of fish, birds, and other animal

6   life.

7       3.      Monsanto Company was the sole manufacturer of PCBs in the United States from 1935

8   to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew

9   for decades that PCBs were toxic and knew that they were widely contaminating all natural resources

10  and living organisms, Monsanto concealed these facts and continued producing PCBs until Congress

11  enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of

12  PCBs as of January 1, 1979.

13      4.      U.S. EPA (2000b) has classified PCBs as 'probably human carcinogens.' Studies have

14  suggested that PCBs may play a role in inducing breast cancer. Studies have also linked PCBs to

15  increased risk for several other cancers including liver, biliary tract, gall bladder, gastrointestinal tract,

16  pancreas, melanoma, and non-Hodgkin's lymphoma. PCBs may also cause non-carcinogenic effects,

17  including reproductive effects and developmental effects (primarily to the nervous system).  PCBs tend

18  to accumulate in the human body in the liver, adipose tissue (fat), skin, and breast milk.  PCBs have

19  also been found in human plasma, follicular fluid, and sperm fluid.  Fetuses may be exposed to PCBs

20  in utero, and babies may be exposed to PCBs during breastfeeding.  According to U.S. EPA (2000b),

21  '[s]ome human studies have also suggested that PCB exposure may cause adverse effects in children

22  and developing fetuses while other studies have not shown effects.  Reported effects include lower IQ

23  scores, low birth weight, and lower behavior assessment scores.

24      5.      PCBs have traveled into San Francisco Bay by a variety of ways.  PCBs were used in

25  many industrial and commercial applications such as paint, caulking, transformers, capacitors,

26  coolants, hydraulic fluids, plasticizers, sealants, inks, lubricants, and other uses.  PCBs regularly leach,

27  leak, off-gas, and escape their intended applications, causing runoff during naturally occurring storm

28  and rain events, after being released into the environment.  The runoff originates from multiple sources

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

and industries and enters the Bay with stormwater and other runoff.

6.　　The natural fate and transport of PCBs result in the gathering and collection in stormwater through no fault of the City of Oakland, which lawfully discharges water into San Francisco Bay through its NPDES permit.

7.　　San Francisco Bay ("the Bay") is contaminated with PCBs, which have been detected in the Bay's water, sediments, fish, and wildlife.  All segments of the Bay have been identified as impaired due to elevated levels of PCBs in sport fish.[1]  The U.S. Environmental Protection Agency ("U.S. EPA") has approved a PCB Total Maximum Daily Load ("TMDL") for the Bay.

8.　　A Total Maximum Daily Load, or TMDL, is a calculation of the maximum amount of pollutant that an impaired body of water can receive and still safely meet water quality standards.[2]

9.　　The San Francisco Bay is impaired due to the presence of PCBs.

10.　　The TMDL is intended to achieve protection of the commercial sport fishing beneficial use and to the extent that other beneficial uses are affected by PCBs, the TMDL will also ensure protection of other beneficial uses, specifically, preservation of rare and endangered species, estuarine habitat and wildlife habitat.[3]

Plaintiff CITY OF OAKLAND hereby alleges, upon information and belief, as follows:

**II.　　PARTIES**

11.　　The CITY OF OAKLAND ("Oakland" or "Plaintiff") is a California Charter City and municipal corporation, duly organized and existing by virtue of the laws of the State of California.

12.　　Plaintiff brings this suit pursuant to California Code of Civil Procedure 731, and California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and any other applicable codes or forms of relief available for monetary damages and removal of the public nuisance caused by PCBs in the Bay.

---

[1] San Francisco Bay Regional Water Quality Control Board, California Environmental Protection Agency, ww.waterboards.ca.gov/sanfranciscobay/water_issues/programs/planningtmdls/basinplan/web/bp_ch7 b.shtml#7.2.3.
[2] United States Environmental Protection Agency, www.water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/
[3] *Id.*

GOMEZ
TRIAL ATTORNEYS

13.     Plaintiff manages and operates a municipal stormwater system, which collects and transports stormwater to be discharged into the Bay.  In order to discharge stormwater into the Bay, Plaintiff is required to receive a Municipal Regional Stormwater Permit from the San Francisco Bay Regional Water Quality Control Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act.

14.     Plaintiff is a permittee under a Municipal Regional Stormwater Permit, which includes a TMDL for PCBs, as the Bay is impaired due to PCBs.

15.     Therefore, Plaintiff is subject to a PCB TMDL under a Municipal Regional Stormwater Permit. The PCB TMDL requires Plaintiff to limit its stormwater discharge of PCBs into the Bay.

16.     Thus, Plaintiff has spent money in efforts to reduce PCB discharge toward these state-mandated TMDL goals.

17.     Recently, the San Francisco Bay Regional Water Quality Control Board increased the standards for the PCB TMDL, which now requires the Plaintiff to further limit its PCB discharge into the Bay.

18.     On May 11, 2015, a new draft Municipal Regional Stormwater Permit, to govern the next permit period, became the Tentative Order, requiring stricter standards and further, significant reduction in PCB discharge into the Bay.[4]

19.     The new, stricter TMDL requirements will cost Plaintiff additional money in order to improve procedures, methods, and facilities, in order to reduce PCB discharge to new and future TMDL levels.

20.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

21.     Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

22.     Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor

---

[4] California Regional Water Quality Control Board, San Francisco Bay Region, Municipal Regional Stormwater NPDES Permit, Order R2-2015-XXX, NPDES Permit No. CAS612008.

GOMEZ TRIAL ATTORNEYS

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

1    to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack,

2    New Jersey.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

3          23.      The original Monsanto Company ("Old Monsanto") operated an agricultural products

4    business, a pharmaceutical and nutrition business, and a chemical products business.  Old Monsanto

5    began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late

6    1970s.

7          24.      Through a series of transactions beginning in approximately 1997, Old Monsanto's

8    businesses were spun off to form three separate corporations.  The corporation now known as

9    Monsanto operates Old Monsanto's agricultural products business.  Old Monsanto's chemical products

10   business is now operated by Solutia.  Old Monsanto's pharmaceuticals business is now operated by

11   Pharmacia.

12         25.      Solutia was organized by Old Monsanto to own and operate its chemical manufacturing

13   business.  Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals

14   business.[5]

15         26.      Although Solutia assumed and agreed to indemnify Pharmacia (then known as

16   Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered

17   into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims

18   arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.[6]

19         27.      In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the

20   U.S. Bankruptcy Code.  Solutia's reorganization was completed in 2008.  In connection with Solutia's

21   Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under

22   which Monsanto continues to manage and assume financial responsibility for certain tort litigation and

23

24   _____

25   [5] See MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v.*

26   *Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October
     8, 2013);  see also Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and

27   Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx
     (last accessed February 20, 2014).

28   [6] *See id.*

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

1  environmental remediation related to the Chemicals Business.[7]

2      28.      Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as

3  "Defendants."

4      **III.    JURISDICTION AND VENUE**

5      29.      This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity

6  exists between Plaintiff and Defendants.  The Plaintiff is located in California, but no Defendant is a

7  citizen of California.  Monsanto is a Delaware corporation with its principal place of business in St.

8  Louis, Missouri.  Solutia is a Delaware corporation with its principal place of business in St. Louis,

9  Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in

10  Peapack, New Jersey.

11      30.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a)

12  because a substantial part of the property that is the subject of the action is situated in this judicial

13  district.

14      **IV.    FACTUAL ALLEGATIONS**

15          **A.      PCBs are Toxic Chemicals that Cause Environmental Contamination.**

16      31.      Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms

17  attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single,

18  unique chemical compound in the PCB category.  Over two hundred congeners have been identified.[8]

19      32.      PCBs were generally manufactured as mixtures of congeners.  From approximately

20  1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally

21  produced PCBs for commercial use.[9]  The most common trade name for PCBs in the United States was

22  "Aroclor," which was trademarked by Old Monsanto.

23  _____

24  [7] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at
   http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).

25  [8] Table of PCB Congeners, available at
26  http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).
   [9] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole

27  manufacturer of PCB's is concerned . . . ."); 121 Cong. Record 33879, 94th Congress, (October 23,
   1975) ("The sole U.S. producer, Monsanto Co. . . . .").  *See also* MONS 058730-058752 at 058733

28  (identifying other producers as "all ex-USA."), attached as Exhibit A.

6

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1      33.     Monsanto's commercially-produced PCBs were used in a wide range of industrial

2 applications in the United States including electrical equipment such as transformers, motor start

3 capacitors, and lighting ballasts. In addition, PCBs were incorporated into a variety of products such

4 as caulks, paints, and sealants.

5      34.     As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and

6 "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for

7 placement into trade or commerce, including any product that forms a component part of or that is

8 subsequently incorporated into another product.

9      35.     PCBs easily migrate out of their original source material or enclosure and contaminate

10 nearby surfaces, air, water, soil, and other materials. For example, PCB compounds volatilize out of

11 building materials (such as caulk) into surrounding materials such as masonry, wood, drywall, and soil,

12 thereby causing damage to those surrounding materials. PCBs can also escape from totally-enclosed

13 materials (such as light ballasts) and similarly contaminate and damage surrounding materials.

14      36.     PCBs present serious risks to the health of humans, wildlife, and the environment.

15      37.     Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact.

16 Individuals may inhale PCBs that are emitted into the air. They may also ingest PCBs that are emitted

17 into air and settle onto surfaces that come into contact with food or drinks. And they may absorb PCBs

18 from physical contact with PCBs or PCB-containing materials.

19      38.     EPA has determined that Monsanto's PCBs are probable human carcinogens. In 1996,

20 EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260.[10]

21 EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from

22 government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

23      39.     In addition, EPA concluded that PCBs are associated with serious non-cancer health

24 effects. From extensive studies of animals and primates using environmentally relevant doses, EPA

25 has found evidence that PCBs exert significant toxic effects, including effects on the immune system,

26 _____

27 [10] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at

28 http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

the reproductive system, the nervous system, and the endocrine system.

40. PCBs affect the immune system by causing a significant decrease in the size of the thymus gland, lowered immune response, and decreased resistance to viruses and other infections. The animal studies were not able to identify a level of PCB exposure that did not affect the immune system. Human studies confirmed immune system suppression.

41. Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs. Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and reduced sperm counts.

42. Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning. Some of these studies were conducted using the types of PCBs most commonly found in human breast milk.

43. PCBs may also disrupt the normal function of the endocrine system. PCBs have been shown to affect thyroid hormone levels in both animals and humans. In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing. PCB exposures have also been associated with changes in thyroid hormone levels in infants in studies conducted in the Netherlands and Japan.

44. PCBs have been associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

45. Children may be affected to a greater extent than adults. The Agency for Toxic Substances and Disease Registry explained: "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

the lipophilic PCBs."[11]

46.    PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians, and birds.  Exposure is associated with death, compromised immune system function, adverse effects on reproduction, development, and endocrine function.  PCB exposure affects liver function, the digestive system, and nervous systems and can promote cancer in a number of animal species.  The presence of PCBs can cause changes in community and ecosystem structure and function.[12]

**B.    Monsanto Has Long Known of PCBs' Toxicity.**

47.    Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects. [13]

48.    An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[14]

49.    A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops [*sic*] any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[15]

50.    On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

---

[11] Agency for Toxic Substances and Disease Registry, Toxicological Profile for Polychlorinated Biphenyls (PCBs), (November 2000), at 405, available at www.atsdr.cdc.gov (last accessed May 1, 2014).
[12] *See* EPA, Understanding PCB Risks, available at http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAssessment (last accessed March 5, 2015).
[13] See Exhibits B, C, F
[14] MONS 061332, attached as Exhibit B.
[15] MONS 095196-7, attached as Exhibit C.

9

GOMEZ
TRIAL ATTORNEYS

1
2
3
4

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[16]

5　　51.　　On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S.

6　Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was

7　impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."[17]

8　　52.　　In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated

9　that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[18] Jensen refers to a

10　1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant

11　women and persons who have at any time had any liver disease are particularly susceptible."[19] Kelly

12　does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is

13　concerned, it is true that chloracne and liver trouble can result from large doses."[20]

14　　**C.　Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing**

15　**Harm to Animals and Fish.**

16　　53.　　At the same time, Monsanto became aware that PCBs were causing widespread

17　contamination of the environment, far beyond the areas of its use.[21]

18　　54.　　Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen,

19　who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[22] The report noted

20　that PCBs were also detected in the air over London and Hamburg and found in seals caught off the

21
22
23

_____

24　[16] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.

25　[17] MONS 095640, attached as Exhibit E.

26　[18] *See* JDGFOX00000037-63, attached as Exhibit F.

27　[19] *Id.* at JDGFOX00000039.

　　[20] *Id.* at JDGFOX00000037.

28　[21] See Exhibits G, H, L,

　　[22] New Scientist (December 15, 1986), MONSFOX00003427, attached as Exhibit G.

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

1    coast of Scotland.  Jensen concluded that PCBs can "be presumed to be widespread throughout the

2    world."[23]

3        55.    A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons

4    (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[24]

5    The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine

6    falcons and 34 other bird species.  The report linked PCBs to the rapid decline in peregrine falcon

7    populations in the United States.

8        56.    Despite growing evidence of PCBs' infiltration of every level of the global ecology,

9    Monsanto remained steadfast in its production of Aroclors and other PCBs.

10       57.    On March 6, 1969, Monsanto employee W. M. Richard wrote a memorandum

11   discussing Risebrough's article that criticized PCBs as a "toxic substance", "widely spread by air-

12   water; therefore, an uncontrollable pollutant . . .  causing extinction of peregrine falcon … [and]

13   endangering man himself."[25]  Richard explained that Monsanto could take steps to reduce PCB

14   releases from its own plants but cautioned, "It will be still more difficult to control other end uses such

15   as cutting oils, adhesives, plastics, and NCR paper.  In this applications exposure to consumers is

16   greater and the disposal problem becomes complex."[26]

17       58.    On September 9, 1969, Monsanto employee W.R. Richard wrote an interoffice memo

18   titled "Defense of Aroclor."[27]  He acknowledged the role of Aroclor in water pollution:  "Aroclor

19   product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a

20   long life.  He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida

21   causing a problem with shrimp;  in San Francisco Bay, where it was reported to thin egg shells in

22   birds; and in the Great Lakes.  Richard advised that the company could not defend itself against all

23   criticism:  "We can't defend vs. everything.  Some animals or fish or insects will be harmed.  Aroclor

---

[23] *Id.*

[24] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.

[25] MONS 096509-096511, attached as Exhibit I.

[26] *Id.*

[27] DSW 014256-014263, attached as Exhibit J.

GOMEZ
TRIAL ATTORNEYS

11

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

1  degradation rate will be slow.  Tough to defend against.  Higher chlorination compounds will be worse

2  [than] lower chlorine compounds.  Therefore we will have to restrict uses and clean-up as much as we

3  can, starting immediately."[28]

4       59.     On January 29, 1970, Elmer Wheeler of the Medical Department circulated laboratory

5  reports discussing results of animal studies.  He noted:  "Our interpretation is that the PCB's are

6  exhibiting a greater degree of toxicity in this chronic study than we had anticipated.  Secondly,

7  although there are variations depending on species of animals, the PCB's are about the same as DDT in

8  mammals."[29]

9       60.     Monsanto expressed a desire to keep profiting from PCBs despite the environmental

10  havoc in a PCB Presentation to Corporate Development Committee.  The report suggests possible

11  reactions to the contamination issue.  It considered that doing nothing was "unacceptable from a legal,

12  moral, and customer public relations and company policy viewpoint."  But the option of going out of

13  the Aroclor business was also considered unacceptable:  "there is too much customer/market need and

14  selfishly too much Monsanto profit to go out."[30]

15       61.     The Aroclor Ad Hoc Committee held its first meeting on September 5, 1969.  The

16  committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB

17  "may be a global contaminant."[31]  The meeting minutes acknowledge that PCB has been found in fish,

18  oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine

19  River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife.  Moreover, the

20  committee implicated the normal use of PCB-containing products as the cause of the problem:  "In one

21  application alone (highway paints), one million lbs/year are used.  Through abrasion and leaching we

22  can assume that nearly all of this Aroclor winds up in the environment."[32]

23       62.     A month later, on October 2, 1969, the Committee reported extensive environmental

24  contamination.  The U.S. Department of Interior, Fish and Wildlife found PCB residues in dead eagles

---

[28] *Id.*
[29] MONS 098480, attached as Exhibit K.
[30] Ex. A at 058737.
[31] MONS 030483-030486, attached as Exhibit L.
[32] *Id.* at 030485.

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

and marine birds.  Similarly, the Bureau of Commercial Fisheries reported finding PCBs in the river below Monsanto's Pensacola plant.   The U.S. Food and Drug Administration had discovered PCBs in milk supplies.  The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

> There is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated – e.g. Aroclors 1254 and 1260) as nearly <u>global environmental contaminants</u> leading to <u>contamination of human food</u> (particularly fish), the <u>killing of some marine species</u> (shrimp), and the possible extinction of several species of fish eating birds.
> Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination.  <u>There are, however a number of actions</u> which must be undertaken <u>to prolong the manufacture, sale and use of these particular Aroclors</u> as well as to protect the continued use of other members of the Aroclor series.[33]

63.    Monsanto's desire to protect Aroclor sales rather than the environment is reflected in the Committee's stated objectives:

> 1.    Protect continues sales and profits of Aroclors;
> 2.    Permit continued development of new uses and sales, and
> 3.    Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or con-trol contamination of the global ecosystem.[34]

64.    An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260:  "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment."  Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business."  To that end, it says, "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase [new products] when available.  He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system.  <u>We don't want to take fluid back.</u>"[35]

---

[33] DSW 014612-014624, at 014615, attached as Exhibit M.
[34] *Id.*
[35] MONS 100123-100124, attached as Exhibit N.

13

GOMEZ
TRIAL ATTORNEYS

65.     In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

66.     Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products. An interdepartmental task force concluded in May 1972 that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.[36]

67.     After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than had been originally realized."[37] To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis. That study revealed widespread occurrence of PCBs in bottom sediments in several states, including California; in fish and birds; in lakes and rivers; in the Atlantic Ocean, the Pacific Ocean, and the Gulf of Mexico; sewage treatment facilities; in a variety of foods including milk, poultry, eggs, fish, meat, and grains; and in human tissues, blood, hair, and milk.[38]

68.     EPA's study noted the particular burden on California. "PCBs have become a significant component of the marine food webs of southern California," were found in sediments in the Santa Barbara Basin, and found in high levels in the San Francisco Bay.[39]

69.     At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds. In a 1960 brochure, Monsanto promotes the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces, and vacuum diffusion pumps. Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil;

---

[36] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976).
[37] Id. at 1.
[38] Id., passim.
[39] Id.

14

PLAINTIFF'S ORIGINAL COMPLAINT

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints; protective and decorative coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment; and coatings for chemical plants, boats, and highway marking. [40]

70.     A 1961 brochure explains that Monsanto's Aroclors are being used in "lacquers for women's shoes," as "a wax for the flame proofing of Christmas trees," as "floor wax," as an adhesive for bookbinding, leather, and shoes, and as invisible marking ink used to make chenille rugs and spreads. [41]

71.     Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods. Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

72.     A few years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before. In a press release, the company claimed: " 'What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors. It is also used in commercial heating and cooling systems. It is not a 'household' item.'" [42]

**D.     Monsanto Concealed the Nature of PCBs from Governmental Entities.**

73.     While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite — that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner. [43]

---

[40] The Aroclor Compounds (hand dated May 1960), 0509822- 66, attached as Exhibit S.
[41] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.
[42] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit U, at MCL000648.
[43] See Exhibits O-R (letters to governmental agencies).

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

74.     In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[44] Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."[45] A similar letter to the Regional Water Quality Control Board explained that PCBs are associated with "no special health problems" and "no problems associated with the environment."[46]

75.     In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[47]

76.     Monsanto delivered the same message to the New Jersey Department of Conservation in July, 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[48] The letter then reiterates Monsanto's position regarding environmental contamination: "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[49]

///

///

///

---

[44] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.
[45] Id.
[46] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.
[47] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.
[48] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.
[49] Id.

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

**FIRST CAUSE OF ACTION**

**PUBLIC NUISANCE**

77. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

78. Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of the Bay.

79. The presence of PCBs interferes with the comfortable enjoyment of the Bay for customary uses for fishing, swimming, and other water activities.

80. The presence of PCBs interferes with the free use of the Bay for the promotion of commerce, navigation, and fisheries.

81. The presence of PCBs interferes with the free use of the Bay for ecological preservation and habitat restoration.

82. The San Francisco Bay Regional Water Quality Control Board, pursuant to the NPDES under the Clean Water Act, requires the Plaintiff to reduce their discharge of PCBs into the Bay to prevent further contamination of the already impaired body of water.

83. The presence of PCBs causes inconvenience and annoyance to Plaintiff, who is charged with reducing the PCB discharge toward TMDL levels, in order to protect plant and animal life, and the quality of water in the bay.

84. The condition affects a substantial number of people who use the Bay for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

85. An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals, and humans and degrade water quality and destroy marine habitats.

86. The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

17

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

87.     The Plaintiff has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and the Plaintiff has incurred substantial costs deriving from state-mandated PCB TMDLs.

88.     Plaintiff did not consent to the conduct that resulted in the contamination of the Bay.

89.     Monsanto's conduct was a substantial factor in causing the harm to the Plaintiff.

90.     Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in the Bay.  Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals.  In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and that humans may be exposed to PCBs through ingestion and dermal contact.  As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters.  Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

91.     As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiff has suffered, and continues to suffer, monetary damages to be proven at trial.

92.     Monsanto's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because Monsanto callously decided to increase sales and develop new ways to promote PCBs, knowing PCBs are toxic, cannot be contained, and last for centuries.

## SECOND CAUSE OF ACTION

## EQUITABLE INDEMNITY

93.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

94.     Monsanto is responsible for creating the public nuisance by manufacturing, distributing, and promoting PCBs, resulting in contamination in and around the Bay.

95.     Monsanto's creation of the public nuisance contributed as a substantial factor in causing Plaintiff's injury and damages.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1    96.    The conduct of Plaintiff did not contribute in any way to the creation of the public

2 nuisance.

### PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages according to proof;

2. Punitive damages;

3. Litigation costs and attorney's fees as provided by law;

4. Pre-judgment and post-judgment interest;

5. Any other and further relief as the Court deems just, proper, and equitable.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial.

Dated: November 10, 2015             By: /s/ John P. Fiske

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
John P. Fiske (SBN 249256)
655 West Broadway, Suite 1700
San Diego, California 92101

**BARON & BUDD, P.C.**
Scott Summy (pending Pro Hac Vice)
Carla Burke (pending Pro Hac Vice)
Celeste Evangelisti (SBN 225232)
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281

**OFFICE OF THE CITY ATTORNEY**
**City of Oakland**
Barbara Parker (SBN 69722)
Otis McGee, Jr. (SBN 71885)
Maria Bee (SBN 167716)
1 Frank H. Ogawa Place, 6th Floor
Oakland, CA 94612

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 16

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

FILED

18 MAY 09 PM 4:09

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 18-2-11915-4 SEA

SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

| | |
|---|---|
| CEANNA N. HEIT, as litigation guardian for minors S.A.H. and E.M.H.; HOLLY MILLS HILEY, as legal and litigation guardian of minors A.S.M.H., D.C.H.M., G.A.H.M. and S.S.H.M.; BRETT C. HILEY, individually and as legal guardian of minors A.S.M.H., D.C.H.M., G.A.H.M. and S.S.H.M.; KERRY L. ERICKSON; MARC D. ERICKSON; MICHELLE M. LEAHY; RICHARD A. LEAHY; JOYCE E. MARQUARDT; KELSIE R. SILVA; and DOES 1-237; | No. |
| | **COMPLAINT FOR DAMAGES** |
| Plaintiffs, | |
| v. | |
| MONSANTO COMPANY, a Delaware corporation; SOLUTIA, INC., a Delaware corporation; PHARMACIA LLC, a Delaware limited liability corporation, f/k/a Pharmacia Corporation; STATE OF WASHINGTON; MONROE SCHOOL DISTRICT NO. 103 d/b/a MONROE PUBLIC SCHOOLS; UNION HIGH SCHOOL DISTRICT NO. 402; SNOHOMISH HEALTH DISTRICT; and ROES 1-10; | |
| Defendants. | |

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1

2

**TABLE OF CONTENTS**

<u>Page</u>

I.    INTRODUCTION TO THE SKY VALLEY EDUCATION CENTER CASE........ 1

II.   IDENTITY OF THE PARTIES.................................................................................. 3

    A.   Identities of the Defendants........................................................................ 3

    B.   Identities of the Plaintiffs .......................................................................... 7

III.  VENUE AND JURISDICTION .............................................................................. 7

    A.   Venue is proper in King County ................................................................ 7

    B.   King County Superior Court has jurisdiction........................................... 8

IV.   COMPLIANCE WITH STATUTORY NOTICE REQUIREMENTS ................... 8

    A.   Plaintiffs complied with the statutory claim notice requirements and waiting
       periods for the following public entity Defendants: ............................... 8

       1.   The State of Washington; ................................................................ 8

       2.   Monroe School District No. 103, a/k/a Monroe Public Schools; .................. 8

       3.   Union High School No. 402; and ................................................... 9

       4.   Snohomish Health District................................................................ 9

    B.   Plaintiffs are not required to give any statutory claim notice to the following
       non-public entity Defendants: ................................................................... 9

       1.   Monsanto Company ......................................................................... 9

       2.   Solutia, Inc. ...................................................................................... 9

       3.   Pharmacia LLC, f/k/a Pharmacia Corporation ............................... 9

V.    FACTS REGARDING CONTAMINATION, EXPOSURE, AND POISONING ... 9

    A.   Monsanto produced and promoted PCBs from the 1930s to the 1970s............... 9

    B.   Monsanto's PCBs are "extremely toxic" synthetic chemicals............................ 10

COMPLAINT - i

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

C.    Monsanto knew PBCs were toxic, but promoted them without warnings.........22

D.    PCB-caulking and PCB-light ballasts cause PCB-contamination. ...................33

E.    The school buildings became toxic, injuring children and adults.....................47

VI.    LEGAL CONTEXT AND CAUSES OF ACTION .................................................92

A.    State law protects individual rights ...................................................................92

B.    Plaintiffs are fault-free .....................................................................................93

C.    Negligence claims are covered claims ..............................................................93

D.    Defendants' joint and several liabilities............................................................94

E.    Monsanto Defendants' product liabilities to the Plaintiffs ...............................94

F.    Public entity negligence. ................................................................................102

G.    Roes.................................................................................................................107

H.    Admonition of the *Environmental Defense Fund* decision..............................108

I.    Accountability .................................................................................................108

VII.    PRAYERS FOR RELIEF ....................................................................................108

A.    Request for preservation of evidence ..............................................................108

B.    Ex parte contact is prohibited.........................................................................108

C.    Limited waiver of physician-patient privilege ................................................109

D.    Motion practice ...............................................................................................109

E.    Judgment for damages................................................................................10918

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# I.      INTRODUCTION TO THE SKY VALLEY EDUCATION CENTER CASE

Monsanto intentionally produced and promoted in the U.S. more than 1.25 billion pounds of synthetic chemicals called Polychlorinated Biphenyls (PCBs). According to U.S. government agencies, PCBs are "extremely toxic" and damage essentially every system of the human body. Since the 1930s, Monsanto has known that PCBs are toxic, yet promoted them without adequate warnings for electrical, construction, and other applications—until they were banned. Internal memoranda, however, show that while Monsanto knew PCBs are toxic, Monsanto made decisions based on PCB profits. As a consequence, PCBs were produced and incorporated into public buildings, including school buildings. Today up to 14 million school children in roughly 20,000 U.S. school buildings may be exposed to PCBs, as estimated by a Harvard School of Public Health study. Monsanto still fails to adequately warn about the extreme toxicity of its PCBs.

In this case, the contaminated school buildings are called Sky Valley Education Center. They contained PCBs and other toxic chemicals, exposing the children and adults who used the buildings. As a result, these individuals have been coping with adverse medical effects, including neurological damage, autoimmune and endocrine diseases, and cancers. The State, the School District, and the Health District negligently allowed the toxic chemicals to exist in the buildings, due in part to Monsanto's ongoing failure to warn about PCBs' extreme toxicity. Regardless, the public entities had joint duties of reasonable care to provide, maintain, inspect, operate, and supervise public education for the children and adults at Sky Valley. The public entities violated their duties by allowing the toxic chemicals to remain in the school buildings and poison these children and adults.

This case is about school safety and the toxic chemicals in school buildings that poisoned children and adults, and whether under state law the manufacturer will be held accountable for its toxic products, and whether the public entities that are obligated to provide safe school buildings will be held accountable for the toxic school buildings.

The following EPA slide demonstrates the mechanism of the toxic poisoning:

COMPLAINT - 1

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM



# PCBs - A Complex Problem in Buildings

- Over 100 PCB chemicals
- Multiple primary sources possible
- Transport from sources to air, surfaces, dust, soil
- Secondary sources created
- Exposures through multiple pathways
- Ventilation and temperature effects

Example Scenario

Primary Sources
● Caulk
■ Light Ballast

Secondary Sources/Sinks
Surrounding Materials
Paint
Dust

HVAC Unit



Ventilation   Primary PCB Source   Secondary PCB Sources and Sinks   Dust/Soil

**Office of Research and Development**
National Exposure Research Laboratory
COMPLAINT - 2

United States
Environmental Protection
Agency

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

## II.      IDENTITY OF THE PARTIES

### A.           Identities of the Defendants.

1.      In 2015 and 2016, the Cities of Spokane and Seattle and the State of Washington each separately sued the Monsanto Defendants for their role in contaminating Washington public resources with Monsanto's PCBs. Many of the following allegations have been made or admitted to by the State and Monsanto Company, Solutia, Inc., and Pharmacia LCC, through the State's Complaint for Damages, and Monsanto, et al.'s Answer to the Complaint, or are sourced from other public documents. *See* State's Complaint for Damages, *State v. Monsanto, et al.*, King County Case No. 16-2-29591-6-SEA (December 16, 2016), and Defendant Monsanto Company et al.'s Answer to Complaint, *State v. Monsanto Company, et al.*, No. 2:17-cv-00053 (W.D. Wash. Jan. 12, 2017); *see also City of Seattle v. Monsanto Co.*, 237 F. Supp. 3d 1096, 1100, fn 2 (W.D. Wash. 2017) ("The original Monsanto Company operated within three main industries: agricultural products, chemical products, and pharmaceuticals. In the late 1990s, Monsanto Company spun off into three separate corporations, each responsible for a different industry: Monsanto Company retained the agricultural products business; Solutia, Inc. assumed the chemical products business; and Pharmacia Corporation assumed the pharmaceutical business. Each assumed certain assets and liabilities from the original Monsanto Company, and all are defendants in this case"); *City of Spokane v. Monsanto Co.*, Case No. 2:15-cv-00201-SMJ (E.D. Wash. July 31, 2015); *see also Solutia, Inc. v. McWane, Inc.*, 726 F.Supp.2d 1316, 1318-19 (N.D. Ala. 2010) ("Monsanto Company and its predecessors produced polychlorinated biphenyls ('PCBs')… In 1997, Monsanto created Solutia in a spin-off transaction… In 2000, Pharmacia was formed by the merger of Monsanto and Pharmacia & Upjohn").

2.      Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis County, Missouri.

3.      Defendant Solutia, Inc. is a Delaware corporation with its principal place of business in St. Louis County, Missouri.

COMPLAINT - 3

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

4.    Defendant Pharmacia LLC is formerly known as Pharmacia Corporation and is successor to the original Monsanto Company. Pharmacia is a Delaware limited liability corporation and is a citizen of the states of New York and Delaware. Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

5.    The original Monsanto Company ("Old Monsanto") operated agricultural, chemical, and pharmaceutical businesses.

6.    Old Monsanto began manufacturing PCBs around the 1930s and continued to manufacture commercial PCBs, including PCBs used in electrical equipment applications such as light ballasts, through the 1940s, 1950s, 1960s, and 1970s, until approximately 1977.

7.    Around 1997, Old Monsanto spun-off its chemical business to Solutia. Since 2000, the present or current Monsanto Company has operated the agricultural business, while Pharmacia retained the pharmaceutical business.

8.    Old Monsanto is now known as Pharmacia LLC.

9.    Old Monsanto organized Solutia to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemical business.

10.   Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Monsanto, Solutia, and Pharmacia have also entered into agreements to share or apportion liabilities, and/or to indemnify one or more entities, for claims arising from Old Monsanto's chemical business, including the manufacture and sale of PCBs.

11.   According to Monsanto, Solutia, and Pharmacia, the three entities have entered into complex corporate transactions and agreements that determine their respective legal or financial obligations for claims arising from Old Monsanto's manufacture and sale of PCBs.

12.   In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

connection with Solutia's Plan of Reorganization, Solutia, Pharmacia, and new Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the chemicals business.

13.    Monsanto represented in a recent Form 10-K (for the fiscal year ending August 31, 2016): "Monsanto is involved in environmental remediation and legal proceedings to which Monsanto is party in its own name and proceedings to which its former parent, Pharmacia LLC ('Pharmacia') or its former subsidiary, Solutia, Inc. ('Solutia') is a party but that Monsanto manages and for which Monsanto is responsible pursuant to certain indemnification agreements. In addition, Monsanto has liabilities established for various product claims. With respect to certain of these proceedings, Monsanto has established a reserve for the estimated liabilities." The document specifies that the company holds $545,000,000.00 in that reserve.

14.    For the Monsanto Defendants' wrongdoing that lead to PCB contamination and toxic poisonings at the school buildings in this case, Monsanto, Solutia, and Pharmacia are liable to the Plaintiffs under state tort law. These Defendants may be obligated to one another in contract for PCB tort liabilities as set out in their complex corporate agreements, but that is not the subject of this lawsuit. For purposes of this Complaint, these Defendants are referred to as "Monsanto."

15.    Monsanto's conduct is a legal cause of damages to the Plaintiffs because the Sky Valley Education Center school buildings never would have become contaminated with "extremely toxic" PCBs if Monsanto had not intentionally produced and promoted PCBs in building construction applications.

16.    The State of Washington is a sovereign that has constitutional and statutory duties to citizens of the State of Washington, including the Plaintiffs, through State departments, agencies, and employees at the Department of Health, the Office of the Superintendent of Public Instruction, and other offices. *See, e.g.,* Wash. State Depart. of Health, Office of Environmental Health and Safety. June 2005, p. 8, available at

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

https://www.doh.wa.gov/CommunityandEnvironment/Schools/EnvironmentalHealth (last visited November 15, 2017).

17.     The Department of Health is the state agency that supervises and partners with health districts, such as the Snohomish Health District, and school districts, such as Monroe School District and Union High, regarding public health safety requirements in school buildings, including the school buildings in this case. *Id.*

18.     The Office of the Superintendent of Public Instruction is the state agency that supervises the public education system, which includes administrative and support responsibilities, for school districts such as Monroe School District and Union High. *Id.*

19.     The Office of Superintendent of Public Instruction also partners with the Department of Health and other agencies to support student health and safety in relation to indoor air quality, including the air quality in the school buildings in this case. *Id.*

20.     Monroe School District No. 103, d/b/a Monroe Public Schools, is a Washington school district.

21.     Monroe School District provides educational services to families who live in King and Snohomish Counties.

22.     Union High School District No. 402 is a Washington school district.

23.     According to tax accessor records, Union High appears to be the owner of the land and school buildings formerly known as Monroe High School (1950-1977), Monroe Junior High (1977-1987), Monroe Middle School (1987-2011), and now known as the Sky Valley Education Center (2011-present), located at 351 Short Columbia Street at Hill and Kelsey Streets, in Monroe. In this Complaint, this location may be referred to as Sky Valley Education Center, Sky Valley, or the school buildings.

24.     The Snohomish Health District ("Health District") is a Washington independent special purpose district.

25.     The Health District is the municipal corporation responsible for public health in Snohomish County, in part by inspecting and enforcing minimal environmental safety requirements in educational facilities, including the school buildings in this case.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

**B. Identities of the Plaintiffs.**

1.      The Plaintiffs are residents of King and Snohomish Counties.

2.      The Plaintiffs identified in the caption by their initials are minor children who were or are students served by the Monroe School District. These Plaintiffs spent time in the school buildings. Due to the Defendants' wrongful conduct, the Plaintiffs were exposed to toxic chemicals and have suffered adverse medical consequences.

3.      The Plaintiffs identified in the caption by their full names are adults who spent time in the school buildings. Due to the Defendants wrongful conduct, these Plaintiffs were exposed to toxic chemicals and have suffered adverse medical consequences. *Plaintiffs Erickson, Leahy, and Marquardt do not sue the School District.*

4.      The Plaintiffs identified in the caption as Does 1-237 are individuals who spent time in the school buildings. These Plaintiffs may have been exposed to toxic chemicals and suffered adverse medical consequences, as discovery may reveal. In 2016, environmental testing publicly revealed the toxic contamination in the school buildings.

5.      In all, the Plaintiffs are children, parents, spouses, and Monroe School District staff members, including teachers, who were harmed due to the corporate and governmental wrongdoing of the Defendants. The Plaintiffs bring claims against the Defendants for products liability and negligence. The Plaintiffs bring claims for personal injuries as well as societal and consortium injuries to their family members.

6.      The Plaintiffs will move to appoint the required guardians *ad litem* to represent and review the litigation and settlement interests of the minor children.

## III.     VENUE AND JURISDICTION

**A.        Venue is proper in King County.**

1.      King County venue is proper because one or more of the Monsanto Defendants transacts business in King County, including Monsanto, Solutia, and/or Pharmacia. RCW 4.12.025(1).

2.      King County venue is proper because suit is against the State, and the Plaintiffs are residents of King and Snohomish Counties. RCW 4.92.010 ("Any person or

COMPLAINT - 7

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

corporation having any claim against the state of Washington shall have a right of action against the state in the superior court. The venue for such action shall be as follows: (1) The county of the residence or principal place of business of one or more of the plaintiffs").

3.      King County venue is also proper because the Monroe School District transacts business in King County. RCW 4.12.025(1). A school district is a "municipal corporation." RCW 39.69.010. Venue is proper "in any county in which the defendant resides… the residence of a corporation defendant shall be deemed to be in any county where the corporation: (a) Transacts business [or] (c) transacted business at the time the cause of action arose." RCW 4.12.025(1). Although the School District has offices and buildings in Snohomish County, it transacts business in King County as well as Snohomish County by providing educational services to children and families within King County, including the Plaintiffs, who are King County residents. The School District provides educational and outreach services in King County, while also receiving compensation from King County residents for providing these services.

4.      King County venue is also proper to the extent any Defendant alleges legal fault to a third-party corporate resident of King County. Such corporation may be cross-claimed against or added in an amended complaint by Plaintiffs.

5.      King County venue is also proper to the extent any Defendant alleges legal fault to third-party Snohomish County and if the County becomes a party.

**B.      King County Superior Court has jurisdiction.**

1.      This Court has jurisdiction over this case. Wash. Const. Art. 4, §6; RCW 2.08.010; RCW 4.12.020(3).

## IV.   COMPLIANCE WITH STATUTORY NOTICE REQUIREMENTS

**A.      Plaintiffs complied with the statutory claim notice requirements and waiting periods for the following public entity Defendants:**

1.      The State of Washington;

2.      Monroe School District No. 103, a/k/a Monroe Public Schools;

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

3.      Union High School No. 402; and

4.      Snohomish Health District.

**B.      Plaintiffs are not required to give any statutory claim notice to the following non-public entity Defendants:**

1.      Monsanto Company;

2.      Solutia, Inc.; or

3.      Pharmacia LLC, f/k/a Pharmacia Corporation.

## V.      FACTS REGARDING CONTAMINATION, EXPOSURE, AND POISONING

### A.      Monsanto produced and promoted PCBs from the 1930s to the 1970s.

1.      Polychlorinated biphenyls, or "PCBs," are mixtures of synthetic organic chemicals comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring). U.S. EPA. PCBS: CANCER DOSE-RESPONSE ASSESSMENT AND APPLICATION TO ENVIRONMENTAL MIXTURES (1996) at 1. U.S. Environmental Protection Agency, Office of Research and Development, National Center for Environmental Assessment, Washington Office, Washington, DC, EPA/600/P-96/001F, 1996, available at https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=12486 (last accessed November 6, 2017). "Different mixtures can take on forms ranging from oily liquids to waxy solids." *Id.*

2.      PCBs are comprised of many similar semi-volatile chemicals called congeners. A "PCB congener" is any single, unique chemical compound in the PCB category. Two hundred nine congeners have been identified.

3.      From approximately the 1930s to 1977, Monsanto was the only manufacturer in the United States that intentionally produced and promoted PCBs for commercial use. *Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1267, 1281 fn 37 (1980) ("From the sparse legislative history of § 6(e), it also appears that Congress focused its attention on the deliberate use, manufacture, and distribution of PCBs. Throughout the congressional debate, members of Congress referred to Monsanto Company as the sole producer of PCBs. *See* 122 Cong.Rec. 8294

COMPLAINT - 9

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

(1976), reprinted in Legislative History, *supra* note 7, at 240 (Senator Tunney, speaking in support of the section, referred to Monsanto as the "sole domestic manufacturer of PCB's"); *id*. at 27187, reprinted in Legislative History, *supra* note 7, at 588 (Congressman Leggett, speaking in support of the corresponding section in the House bill, referred to Monsanto as "the only American manufacturer of PCB's")."). *See also* 116 Cong. Record 11,695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned....") and 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co......"); *and see* Sky Valley Complaint, **Exhibit A** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-1 (E.D. Wash. July 31, 2015), Bates Nos. MONS 058730-058752, entitled "PCB Presentation to Corporate Development Committee") at MONS 058733 (identifying other producers as "all ex-USA").

4.     The most common trade name for PCBs in the United States is "Aroclor." 21 CFR § 500.45(a) ("Polychlorinated biphenyls (PCBs) represent a class of toxic industrial chemicals manufactured and sold under a variety of trade names, including Aroclor (United States)").

5.     Aroclor is a name that was trademarked by Monsanto.

6.     "Between 1929 and 1977, more than 1.25 billion pounds of PCBs were produced in the United States." Agency for Toxic Substances and Disease Registry (ATSDR). 2014. Case Studies in Environmental Medicine: Polychlorinated Biphenyls (PCBs) Toxicity. Atlanta, GA: U.S. Department of Health and Human Services, at 21, available at https://www.atsdr.cdc.gov/csem/csem.asp?csem=30&po=10, last visited on November 7, 2017.

**B.     Monsanto's PCBs are "extremely toxic" synthetic chemicals.**

1.     "PCBs are extremely toxic to humans and wildlife." *Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1267, 1270 (D.C. Cir. 1980).

2.     PCBs are a "keystone pollutant" and "a prime motivator for the enactment

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

of TSCA," the Toxic Substances Control Act. "By most accounts, PCBs are the archetypical chemical villains against which the contemporary pollution laws are directed." William H. Rodgers, Jr. and Elizabeth Burleson, *Polychlorinated biphenyls (PCBs)*, 3 Envtl. L. (West) §6:9 (July 2017) (internal citations omitted).

3.      By the late 1970s, the United States banned the "manufacture, processing, distribution in commerce, and use of polychlorinated biphenyls (PCBs)." 44 Fed. Reg. 31514 (May 31, 1979). The ban remains in effect. "The TSCA prohibits the manufacture, processing, distribution, and use (other than in a 'totally enclosed manner') of polychlorinated biphenyls (PCBs) unless the EPA determines that the activity will not result in an 'unreasonable risk of injury to health or the environment.'" *General Electric Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) (holding that an EPA-issued guidance document was a legislative rule requiring prior notice and opportunity for public comment), citing 15 U.S.C. § 2605(e) (2) & (3).

4.      PCBs are "among the most stable chemicals known and decompose very slowly once they are in the environment... In the environment, **PCBs are toxic at low concentrations to a wide variety of species**, marine mammals included. Once PCBs reach the environment, they tend to stay there, or move slowly in damaging cycles…" William H. Rodgers, Jr. and Elizabeth Burleson, *Polychlorinated biphenyls (PCBs)*, 3 Envtl. L. (West) §6:9 (July 2017) (emphasis added), citing in part Response to Exemption Petitions, 50 Fed. Reg. 35,184 (August 29, 1985) ("**PCBs are also toxic to mammals at very low exposure levels.** The survival rate and reproductive success of fish can be adversely affected in the presence of PCBs. Various sublethal physiological effects attributed to PCBs have been recorded in the literature") (emphasis added); *see also* 21 CFR § 500.45(a) ("Since PCBs are toxic chemicals, the PCB contamination of food as a result of these and other incidents represent a hazard to public health.").

5.      "For humans, exposures cause acute effects such as skin rashes, vomiting, abdominal pain, and temporary blindness and are suspected of causing birth defects, miscarriages, and cancer." William H. Rodgers, Jr. and Elizabeth Burleson,

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1   *Polychlorinated biphenyls (PCBs)*, 3 Envtl. L. (West) §6:9 (July 2017) (internal citations

2   omitted). *See also Solutia, Inc. v. McWane, Inc*., 726 F. Supp. 2d 1316, 1319 (N.D. Ala.

3   2010) ("PCBs have been found to cause cancer, decreased fertility, still births, and birth

4   defects in test animals.") (Monsanto cleanup contribution case), citing *Dickerson, Inc. v.

5   United States,* 875 F.2d 1577, 1579, 1583 (11th Cir.1989) ("PCBs are highly toxic

6   chemicals frequently used in electrical transformers… Scientists have found PCB

7   concentrations far below those involved in this case to cause cancer, decreased fertility,

8   still births, and birth defects in test animals.") (affirming judgment against the United

9   States for PCB liability). Both *Solutia, Inc.* and *Dickerson* cited *Environmental Defense

10   Fund v. Environmental Protection Agency,* 636 F.2d 1267 (D.C. Cir. 1980), *infra.*

11        6.     The *Environmental Defense Fund* decision summarized research available

12   to the scientific community by the late 1970s:

> Polychlorinated biphenyls (PCBs) have been manufactured and used
> commercially for fifty years for their chemical stability, fire resistance, and
> electrical resistance properties. They are frequently used in electrical
> transformers and capacitors. However, PCBs are extremely toxic to humans
> and wildlife. The extent of their toxicity is made clear in the EPA Support
> Document accompanying the final regulations, in which the EPA Office of
> Toxic Substances identified several adverse effects resulting from human
> and wildlife exposure to PCBs.
>
> Epidemiological data and experiments on laboratory animals indicate that
> exposure to PCBs pose carcinogenic and other risks to humans.
> Experimental animals developed tumors after eating diets that included
> concentrations of PCBs as low as 100 parts per million (ppm). Experiments
> on monkeys indicate that diets with PCB concentrations of less than ten
> ppm reduce fertility and cause still births and birth defects. Other data show
> that PCBs may adversely affect enzyme production, thereby interfering
> with the treatment of diseases in humans. Support Document, *supra* note 4,
> at 9-18.
>
> EPA has found that PCBs will adversely affect wildlife as well as humans.
> Concentrations below one ppb (part per billion) are believed to impair
> reproductivity of aquatic invertebrates and fish. Some birds suffered
> "severe reproductive failure" when fed diets containing concentrations of
> only ten ppm of PCBs. *Id*. at 19. Because PCBs collect in waterways and
> bioaccumulate in fish, fish-eating mammals run a special risk of adverse

COMPLAINT - 12

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1
2

effects. Such mammals may have "significantly higher concentrations of PCBs in their tissues than the aquatic forms they feed on." *Id*. at 36.

3
4
5
6
7
8

EPA estimates that by 1975 up to 400 million pounds of PCBs had entered the environment. Approximately twenty-five to thirty percent of this amount is considered "free," meaning that it is a direct source of contamination for wildlife and humans. The rest, "mostly in the form of industrial waste and discarded end use products, is believed to be in landfill sites and thus constitutes a potential source of new free PCBs." *Id*. at 33-34. Other significant sources of PCBs include atmospheric fallout and spills associated with the use or transportation of PCBs. *Id*. at 29.

9
10
11

EPA concluded in the Support Document that "the additional release of PCBs" into the environment would result in widespread distribution of the PCBs and "will eventually expose large populations of wildlife and man to PCBs." *Id*. at 36-37. EPA concluded further that:

12
13
14
15
16

> As a practical matter, it is not possible to determine a "safe" level of exposure to these chemicals. Because PCBs are already widely distributed throughout the **\*1271** biosphere, they currently pose a significant risk to the health of man as well as that of numerous other living things. As a consequence, any further increase in levels of PCBs in the biosphere is deemed undesirable by EPA.

17
18
19

*Id*. at 38. Because "PCBs released anywhere into the environment will eventually enter the biosphere ... EPA has determined that any such release of PCBs must be considered 'significant.'" *Id*.

20
21
22
23

In 1972, Monsanto, the major American manufacturer of PCBs, limited its sales of PCBs to manufacturers of transformers and capacitors. It ceased all manufacture of PCBs in 1977 and shipped the last of its inventory before the end of that year. Today, PCBs are produced in this country only as incidental byproducts of industrial chemical processes. There are no known natural sources of PCBs. *Id*. at 2.

24
25
26

*Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1267, 1270-71 (D.C. Cir. 1980) (holding, in part, that there was no substantial evidence to support EPA's decision to establish a regulatory cutoff below 50 ppm).

27
28

7.      The decision made other findings: "Most importantly, EPA expressly found that any exposure of PCBs to the environment or humans could cause adverse effects."

COMPLAINT - 13

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1  *Environmental Defense Fund*, 636 F.2d at 1283-84.

2       8.   **Closed PCB systems develop leaks.** Another issue in the decision related
3  to the regulation of non-enclosed uses of PCBs, such as "carbonless paper, paints,
4  coatings, soaps, and copying ink toners," versus so-called "totally enclosed uses" of
5  PCBs such as "transformers, capacitors, and electromagnets." *Environmental Defense
6  Fund*, 636 F.2d at 1285. The court ruled against the EPA on this artificial distinction
7  because of something that is also true in this case: "put simply, closed systems develop
8  leaks." *Id.* at 1285; *see also* 1286 (witness "recognized that environmental losses can
9  occur through accidental rupture or leakage.").

10      9.   In the years following the ban, the EPA confirmed that PCBs are toxic, may
11 cause reproductive and developmental effects, and may cause tumors ("oncogenic
12 potential") in people exposed:

13      *Health effects.* EPA has determined that PCBs are toxic and persistent.
14      PCBs can enter the body through the lungs, gastrointestinal tract, and skin,
15      circulate throughout the body, and be stored in the fatty tissue.

16      Available animal studies indicate an oncogenic potential, the degree to
17      which would depend on exposure… Further epidemiological research is
18      needed to correlate human and animal data, but EPA finds no evidence to
19      suggest that the animal data would not predict an oncogenic potential in
        humans.

20      In addition, EPA finds that PCBs may cause reproductive effects,
21      developmental toxicity, and oncogenicity in humans exposed to PCBs.
22      Available data show that some PCBs have the ability to alter reproductive
        processes in mammalian species, sometimes even at doses that do not cause
23      other signs of toxicity. Animal data and limited available human data
24      indicate that prenatal exposure to PCBs can result in various degrees of
        developmental toxic effects. Postnatal effects have been demonstrated in
25      immature animals following exposure to PCBs prenatally and via breast
        milk.

26      In some cases chloracne may occur in humans exposed to PCBs. Severe
27      cases of chloracne are painful and disfiguring, and symptoms may persist
        for an extended time…

28

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

50 Fed. Reg. 35182, 35183-84 (August 29, 1985).

10.    The EPA also determined that Monsanto's PCBs are probable human carcinogens. In 1996, the EPA reassessed PCB carcinogenicity based on data related to Aroclors 1016, 1242, 1254, and 1260. The EPA's cancer reassessment was peer reviewed by experts on PCBs, including scientists from government, academia, and industry. U.S. EPA. PCBs: Cancer Does-Response Assessment and Application to Environmental Mixtures (1996). U.S. EPA, Office of Research and Development, National Center for Environmental Assessment, Washington Office, Washington, DC, EPA/600/P-96/001F, 1996, available at https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=12486 (last accessed November 6, 2017).

11.    This EPA report found that "[j]oint consideration of cancer studies and environmental processes leads to a conclusion that environmental PCB mixtures are highly likely to pose a risk of cancer to humans." *Id.* at 57. In addition, "PCBs persist in the body, providing a continuing source of internal exposure after external exposure stops. There may be greater-than-proportional effects from less-than-lifetime exposure, especially for persistent mixtures and for early-life exposure." *Id.* at 58-59.

12.    The 1996 EPA report also noted that "PCBs also have significant ecological and human health effects other than cancer, including neurotoxicity, reproductive and developmental toxicity, immune system suppression, liver damage, skin irritation, and endocrine disruption. Toxic effects have been observed from acute and chronic exposures to PCB mixtures with varying chlorine content." *Id.* at vi.

13.    In 2000, the Agency for Toxic Substances and Disease Registry (ATSDR), issued a public health statement regarding PCB exposure. It noted that "[s]kin conditions, such as acne and rashes, may occur in people exposed to high levels of PCBs… Some studies in workers suggest that exposure to PCBs may also cause irritation of the nose and lungs, gastrointestinal discomfort, changes in the blood and liver, and depression and fatigue." Agency for Toxic Substances and Disease Registry (ATSDR). 2000. Toxicological profile for polychlorinated biphenyls (PCBs). Atlanta, GA: U.S.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Department of Health and Human Services, Public Health Service, at 4. The public health statement summarized experimental animal studies finding liver damage, anemia, acne-like skin conditions, stomach injuries, thyroid injuries, kidney damage, impaired immune system function, behavioral alterations, endocrine disruption, and impaired reproduction. *Id.* at 5.

14. **Children are more vulnerable to PCB exposure.** The 2000 ATSDR statement also summarized studies tending to show effects in PCB-exposed children: low birthweight; problems with motor skills; decreases in short-term memory; and effects on the immune system. *Id.* at 6. The report noted that children are more vulnerable to PCB exposure than adults, although the routes of exposure are the same:

> Children are exposed to PCBs in the same way as are adults: by eating contaminated food, breathing indoor air in buildings that have electrical devices containing PCBs, and drinking contaminated water. Because of their smaller weight, children's intake of PCBs per kilogram of body weight may be greater than that of adults.
> …
> It is possible that children could be exposed to PCBs following transport of the chemical on clothing from the parent's workplace to the home. House dust in homes of workers exposed to PCBs contained higher than average levels of PCBs. PCBs have also been found on the clothing of firefighters following transformer fires. The most likely way infants will be exposed is from breast milk that contains PCBs. Fetuses in the womb are also exposed from the exposed mother.
> .…
> Because the brain, nervous system, immune system, thyroid, and reproductive organs are still developing in the fetus and child, the effects of PCBs on these target systems may be more profound after exposure during the prenatal and neonatal periods, making fetuses and children more susceptible to PCBs than adults.

*Id.* at 5-6. In addition, "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs." *Id.* at 381.

15. **Children are not small adults.** The ATSDR toxicological profile for PCBs

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

reiterated these developmental concerns while cautioning against the fallacy that children possess the same level of resilience to toxic exposure as adults: "Children are not small adults… Children also have a longer remaining lifetime in which to express damage from chemicals; this potential is particularly relevant to cancer." *Id.* at 380-81.

16. **Workplace PCB exposure can contaminate homes.** The ATSDR statement reiterated that workplace exposure to PCBs can result in the worker's home becoming contaminated with PCBs: "If you are exposed to PCBs in the workplace, it may be possible to carry them home from work… If this is the case, you should shower and changing clothing before leaving work, and your work clothes should be kept separate from other clothes and laundered separately." *Id.* at 7.

17. **PCB exposure and cardiovascular damage.** A 2011 ATSDR addendum to the toxicological profile for PCBs reported on more recent research, including animal studies showing cardiovascular damage following PCB exposure. Agency for Toxic Substances and Disease Registry (ATSDR). 2011. Addendum to the toxicological profile for polychlorinated biphenyls (PCBs). Atlanta, GA: U.S. ATSDR, Division of Toxicology and Environmental Medicine, at 1.

18. **PCB exposure and type 2 diabetes.** The 2011 addendum reported research that "PCB exposure was strongly related to prevalence of type 2 diabetes mellitus." *Id.* at 2-3.

19. **PCB exposure and deficient immune function.** The 2011 addendum reported research "suggesting possible impaired immunologic development" in children, and the results of another study that "implied that exposure to PCBs is a possible cause of deficient immune function in children." *Id.* at 4.

20. **PCB exposure and neurodegenerative diseases.** The 2011 addendum reported other research "that exposure to PCBs likely has an effect on neurodegenerative diseases for women but not men," including amyotrophic lateral sclerosis (ALS, also known as motor neuron disease), Parkinson's disease, and dementia. *Id.* at 4.

21. **PCB exposure and neurobehavioral effects, anxiety.** The 2011

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

addendum reported animal studies research "that exposure to PCBs may exert anxiogenic behavior." *Id.* at 5. An anxiogenic or panicogenic substance is one that causes anxiety.

22.     **PCB exposure and central nervous system effects.** The 2011 addendum reported animal studies research showing inhibited and depressed central nervous system effects following PCB exposure. *Id.* at 5-6.

23.     **PCB exposure and children's permanent teeth.** The 2011 addendum reported human studies showing "a dose-response relationship between PCB exposure and development enamel defects of permanent teeth in children." *Id.* at 7.

24.     **PCB exposure and sexual development.** The 2011 addendum reported human studies research showing impaired sexual development, including a positive association between high total PCB concentrations and cryptorchidism (undescended testicles) in boys. Another study "suggested that even low levels of PCBs had a robust negative impact on gonadal hormones in newborns." *Id.* at 7-8. Another study of girls exposed to PCBs "suggested that even at low levels of estrogenic PCBs, the time to menarche attainment was decreased," and the "median age at menarche for this cohort (138 girls) was 12.2 years." *Id.* at 9. Another study found "that exposure to certain PCB congeners may interfere with human reproductive development" in both boys and girls. *Id.* at 9. Animal studies also found "dose-related prolongation of the estrous cycle in female offspring," and "changes in body weight, body length, tail length, and weights of kidneys, testes, ovaries, and uterus." *Id.* at 9.

25.     **Broad spectrum of effects.** A 2014 ATSDR publication stated that occupational exposure to PCBs can result in a "broad spectrum of effects that includes increased levels of some liver enzymes, with possible hepatic damage, chloracne and related dermal lesions, and respiratory problems." Agency for Toxic Substances and Disease Registry (ATSDR). 2014. Case Studies in Environmental Medicine: Polychlorinated Biphenyls (PCBs) Toxicity. Atlanta, GA: U.S. Depart. of Health and Human Services, at 39, available at https://www.atsdr.cdc.gov/csem/csem.asp?csem=30&po=10, last visited on November 7, 2017. The following information references this 2014

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

ATSDR publication.

26. **Acute exposure to PCBs.** Signs and symptoms of acute exposure to PCBs can include chloracne, eye irritation, nausea, vomiting, and elevated liver enzymes and altered liver function. *Id.* at 55-56.

27. **Chronic exposure to PCBs.** Signs and symptoms of chronic exposure to PCBs can include abdominal pain, anorexia, jaundice, nausea, vomiting, weight loss, uroporphyria, headache, dizziness, and edema. *Id.* at 56-57.

28. **Toxic responses to PCBs.** Animal studies have shown that "commercial PCBs elicit a broad range of toxic responses including:

- Acute lethality,
- Body weight loss,
- Carcinogenesis,
- Dermal toxicity,
- Fatty liver,
- Genotoxicity,
- Hepatomegaly,
- Immunosuppressive effects,
- Neurotoxicity,
- Porphyria,
- Reproductive and developmental toxicity,
- Thymic atrophy, and
- Thyroid hormone-level alterations."

*Id.* at 39-40.

29. **Dermatological effects.** "Conclusive evidence that exposure to PCBs induces adverse dermal effects in humans exists":

Chloracne and related dermal lesions have been reported in workers occupationally exposed to PCBs.
…
The chin, periorbital, and malar areas are most often involved, although lesions might also appear in areas not usually affected by acne vulgaris (e.g., the chest, arms, thighs, genitalia, and buttocks). The most distinctive lesions are cystic and measure 1-10 mm, although comedonal lesions can also be present.
…
Chloracne generally indicates systemic toxicity and can be caused by not

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

only dermal contact but also ingestion of PCBs… Chloracne typically develops weeks or months after exposure. The lesions are often refractory to treatment and can last for years or decades.

In addition to chloracne, other dermal effects noted some PCB-exposed workers include pigmentation disturbances of skin and nails, erythema and thickening of the skin, and burning sensations.

*Id.* at 41-42 (internal citations omitted).

30.     **Reproductive and developmental effects.** "Reproductive function may be disrupted by exposure to PCBs," and "neurobehavioral and development deficits have been reported in newborns exposed to PCBs in utero." *Id.* at 45. Children born to women exposed to PCBs exhibited statistically significant decreases in gestational age, birth weight, and head circumference. *Id.* at 43. Higher levels of PCB exposure correlated with weaker reflexes, greater motor immaturity, and more pronounced startle responses. *Id.* at 43-44. Follow-up studies of the children of that cohort "demonstrated that the effects of perinatal exposure to PCBs are persistent." *Id.* at 44. At four years of age, the children still had deficits in weight gain, depressed responsiveness, and reduced performance on the visual recognition memory test. *Id.* at 44. "At 11 years of age, the children of highly exposed mothers were three times more likely than controls to have low full-scale IQ scores; twice as likely to lag behind at least 2 years in reading comprehension; and more likely to have difficulty paying attention." *Id.* at 44 (internal citation omitted).

31.     **Endocrine effects.** "The epidemiological studies suggest a link between exposure to PCBs and thyroid hormone toxicity in humans." *Id.* at 46. "Thyroid hormones are essential for normal behavioral, intellectual, and neurologic development. Thus, the deficits in learning, memory, and attention processes among the offspring of women exposed to PCBs are partially or predominantly mediated by alterations in hormonal binding to the thyroid hormone receptor." *Id.* "Recent studies in populations exposed to PCBs and chlorinated pesticides found a dose-dependent elevated risk of diabetes." *Id.*

32.     **Hepatic effects.** "Although liver damage is common in animals exposed to

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

PCBs, overt hepatotoxicity is uncommon in humans. Exposure to PCBs can increase serum levels of hepatic enzymes and can induce microsomal enzyme function." *Id.* at 46-48.

33.   **Neurological effects.** Adults exposed to PCBs have been shown to have significantly greater motor retardation; poorer results on certain memory and attention tests; and higher scores on standardized confusion scale than did control adults. *Id.* at 51.

34.   **Additional adverse effects.** "Occupational and epidemiologic studies have suggested or demonstrated other adverse health effects from exposure to PCBs," including cardiovascular, gastrointestinal, genetic, immune, musculoskeletal, and neurological systems. *Id.* at 51-52.

35.   **Additional signs and symptoms.** The ATSDR "advises patients to consult their physicians if they develop signs or symptoms of PCB exposure such as: appetite loss; joint pain; nausea; skin disorders, changes, or discoloration; breast changes or lumps; and/or stomach distress and pain." *Id.* at 68.

36.   **Highly toxic PCDDs and PCDFs.** "Occupational exposure to PCBs may be accompanied by exposure to chlorinated dibenzodioxin and dibenzofuran contaminants, which are much more toxic than PCBs in comparative animal studies. These substances can cause chronic fatigue and elevated liver enzymes." *Id.* at 57.

37.   **PCBs are a "probable human carcinogen."** The Department of Health and Human Services and the Environmental Protection Agency "consider PCBs a probable human carcinogen." *Id.* at 51. In addition, and "on the basis of sufficient evidence of carcinogenicity in humans and experimental animals, the IARC [International Agency for Research on Cancer] classified PCBs as carcinogenic to humans." *Id*. PCB exposure has been linked to cancers of the liver, gallbladder, biliary tract, brain, stomach, intestinal, thyroid, myeloma (cancer of plasma cells, which can damage the bones, immune system, kidneys, and red blood cell count), non-Hodgkin lymphoma (a cancer that starts in the lymphatic system), and the skin, such as malignant melanomas. *Id.* at 48-50. In addition, "data from animal studies have shown that PCBs

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

cause gastrointestinal tract tumors, hepatocarcinomas, leukemia, lymphomas, and pituitary tumors." *Id.* at 50.

38.    **IARC: "PCBs are carcinogenic to humans."** In 2016, the International Agency for Research on Cancer published an assessment on the carcinogenicity of PCBs. International Agency for Research on Cancer. IARC monographs on the evaluation of carcinogenic risks to humans, volume 107. Polychlorinated and Polybrominated Biphenyls (2016), available at http://monographs.iarc.fr/ENG/Monographs/vol107/index.php (last accessed November 6, 2017. The IARC report concluded, "There is *sufficient evidence* in humans for the carcinogenicity of polychlorinated biphenyls (PCBs). PCBs cause malignant melanoma. Positive associations have been observed for non-Hodgkin lymphoma and cancer of the breast... PCBs are *carcinogenic to humans.*" *Id.* at 439 (emphasis in original).

39.    **Wide range of cancers and lesions.** Animal and human studies show associations between PCB exposure and other cancers and lesions not specifically enumerated above. These can include prostate cancer, testicular cancer, pancreatic cancer, lung cancer, mouth cancer, uterine cancer, and non-neoplastic lesions of the liver, thyroid gland, ovary, oviduct, uterus, lung, adrenal cortex, pancreas, kidney, heart, thymus, spleen, clitoral gland, mesenteric artery, oral mucosa, bone marrow, and bladder. *See, e.g.,* Agency for Toxic Substances and Disease Registry (ATSDR). 2011. Addendum to the toxicological profile for polychlorinated biphenyls (PCBs). Atlanta, GA: U.S. ATSDR, Division of Toxicology and Environmental Medicine, at 10-14.

**C.**    **Monsanto knew PBCs were toxic, but promoted them without warnings.**

1.    "Monsanto was well aware of scientific literature published in the 1930s that established that inhalation of PCBs in industrial settings resulted in toxic systemic effects in humans." State of Washington's Complaint for Damages against Monsanto, p. 12, ¶ 49, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

2.    A 1937 Monsanto memorandum advised that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

by repeated oral ingestion will lead to systemic toxic effects. Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption." *Id.* at ¶ 50; *see* Sky Valley Complaint, **Exhibit B** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-2 (E.D. Wash. July 31, 2015), MONS 061332).

3.       A 1955 memorandum entitled "AROCLOR TOXICITY" by Monsanto Medical Director Emmet Kelly summarized Monsanto's position on PCB toxicity: "We know Aroclors are toxic but the actual limit has not been precisely defined. It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to MACs [maximum allowable concentrates]." State of Washington's Complaint for Damages against Monsanto, p. 12, ¶ 51, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016); *see* Sky Valley Complaint, **Exhibit C** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-3 (E.D. Wash. July 31, 2015), MONS 095196-97) at 2.

4.       A 1955 "CONFIDENTIAL" memorandum by Monsanto's Medical Department stated that workers should not be allowed to eat lunch in the Aroclor department. Three reasons were provided, including the fact that "Aroclor vapors and other process vapors could contaminate the lunches unless they were properly protected." *See* Sky Valley Complaint, **Exhibit D** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-4 (E.D. Wash. July 31, 2015) at 2.

5.       In addition, after noting that "the chance of contaminating hands and subsequently contaminating the food is a definite possibility," the Medical Department stated that

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because **early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.** In any case where a workman claimed physical harm from any contaminated food, it would be extremely difficult on the basis of past literature reports to counter such claims.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

COMPLAINT - 23

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

*Id.* (emphasis added); *see also* State of Washington's Complaint for Damages against Monsanto, pp. 12-13, ¶ 52, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

6.    A 1957 internal memorandum by Monsanto Medical Director Emmet Kelly reported that, after it conducted its own tests, the U.S. Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was impossible to change their thinking that [Aroclor-containing] Pydraul 150 is just too toxic for use in a submarine." State of Washington's Complaint for Damages against Monsanto, p. 13, ¶ 53, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016); *see* Sky Valley Complaint, **Exhibit E** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-5 [E.D. Wash. July 31, 2015]) at 2.

7.    Therefore, by the 1950s, Monsanto knew that its PCBs a/k/a "Aroclors are toxic but the actual limit has not been precisely defined." *Supra* at ¶ V.C.3. Perhaps reflecting on this, Monsanto's Medical Director Kelly made the reasonable observation that "juries would not pay a great deal of attention" to exposure limits set by the industry. *Id.* This is reasonable because so-called exposure limits have not been based on human subject testing, which would be unethical. Instead, the industry extrapolated so-called human exposure limits from laboratory tests of small mammals like rats, guinea pigs, rabbits, and dogs, who have a limited ability to report or demonstrate complaints following PCB exposure before dying—or being killed—and then dissected for the pathological examination of lesions. *See, e.g.*, **Exhibits L** and **R**. Regardless, Monsanto also knew that "early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation." *Supra* at ¶ V.C.5.

8.    In 1966 or 1967, Monsanto Medical Director Emmet Kelly reviewed a scientific presentation by University of Stockholm researcher Soren Jensen, who stated that PCBs "appear to be the most injurious chlorinated compounds of all tested." *See* Sky Valley Complaint, **Exhibit F** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-6 [E.D. Wash. July 31, 2015]), at JDGFOX00000038 (at

COMPLAINT - 24

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

bottom). Researcher Jensen referred to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible." *Id.* at JDGFOX00000039. Monsanto Medical Director Kelly did not dispute the researcher's remarks, noting in the 1967 letter to the Research Division of National Cash Register, that "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses." *Id.* at JDGFOX00000037; *see also* State of Washington's Complaint for Damages against Monsanto, p. 13, ¶ 54, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016). Medical Director Kelly did not define the term "large doses."

9.      By the latter half of the 1960s, Monsanto became aware that PCBs were causing widespread contamination of the environment. *See* Sky Valley Complaint, **Exhibits G, H,** and **L** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-7, 1-8, 1-13 [E.D. Wash. July 31, 2015]); *see also* State of Washington's Complaint for Damages against Monsanto, p. 14, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

10.     Despite the growing evidence of harm caused to living things by PCB contamination, Monsanto remained steadfast in its production of PCBs. *See* State of Washington's Complaint for Damages against Monsanto, p. 19, ¶ 60, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

11.     In March of 1969, Monsanto employee W.M. Richard wrote a memorandum entitled "AROCLOR WILDLIFE ACCUSATIONS" to Monsanto employee Elmer Wheeler. *See* Sky Valley Complaint, **Exhibit I** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-9 [E.D. Wash. July 31, 2015]), Bates No. MONS 096509-11. In the memorandum, Richard responded to a 1968 article in *Nature* criticizing PCBs as being (in Richard's paraphrasing) "a pollutant… a toxic substance—with no permissible allowable levels… [and] a toxic substance endangering man himself, implying that the [extinction] of the peregrine falcon is a leading indicator of things to come." *Id.* at MONS 096509. Richard also responded to a 1969 article in

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

*Science* regarding the Environmental Defense Fund's legal strategy, which Richard summarized in part by writing that

> These people at EDF are saying we must not put stress on any living thing through a change in air or water environment. Eagles, plant life, anything which lives or breathes. This group is pushing hard on the extension of the word harmful. They claim <u>'enzyme inducer' activity is the real threat</u> of DDT and PCB's and are using these arguments to prove that very small amounts of chlorinated hydrocarbons are 'harmful.'

*Id.* (emphasis in original). Richards also explained that Monsanto could take steps to reduce PCB releases from its own factories, but he cautioned that "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper. In these applications, exposure to consumers is greater and the disposal problem becomes complex." *Id.* at MONS 096510; *see also* State of Washington's Complaint for Damages against Monsanto, pp. 14-15, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

12. During this time period, "the coordination of the Division effort has been principally the responsibility W.R. Richard and E.P. Wheeler with support from R.E. Keller and Cumming Paton." *See* Sky Valley Complaint, **Exhibit M** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-13 [E.D. Wash. July 31, 2015]), Bates No. DSW 014623.

13. In September of 1969, Monsanto employee W.R. Richard wrote an interoffice memorandum entitled "DEFENSE OF AROCLOR." *See* Sky Valley Complaint, **Exhibit J** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-10 [E.D. Wash. July 31, 2015]), Bates No. DSW 014256-63. The memorandum set out Monsanto's general policy on defending litigation against the public: "Make the Govt., States and Universities prove their case." The memorandum acknowledged, however, that Monsanto

> can't defend vs. everything. **Some animals or fish or insects will be harmed.** Aroclor degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse [than] lower chlorine

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

compounds. Therefore we will have to restrict uses and clean-up as much as we can, starting immediately.

*Id.* at DSW 014256 (emphasis added). Based on this, Monsanto knew by the late 1960s that "some animals or fish or insects will be harmed" in the general environment, where PCB contamination is low and diffuse—as opposed to PCB contamination in a more enclosed space such as a classroom, as shown below. The 1969 memorandum also outlined Monsanto's plans for challenging scientific studies of the toxicity of PCBs:



*Id.* at DSW 014256. The memorandum also outlined Monsanto's own plans for chronic toxicity studies using animals. *Id.* at DSW 014262-63; *see also* State of Washington's Complaint for Damages against Monsanto, p. 15, ¶ 60, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

14.    In January of 1970, Elmer Wheeler of Monsanto's Medical Department circulated laboratory results of its animal studies. The memorandum was entitled "Status of Aroclor Toxicological Studies." *See* Sky Valley Complaint, **Exhibit K** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-11 [E.D. Wash. July 31, 2015]), Bates No. MONS 098480. Wheeler stated, "Our interpretation is that **the PCBs are exhibiting a greater degree of toxicity in this chronic study than we had anticipated.** Secondly, although there are variations depending on species of animals, the PCBs are about the same as DDT in mammals." *Id.* (emphasis added).

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

15.    Monsanto expressed a desire to keep profiting from PCBs despite the research showing PCB toxicity. *See* Sky Valley Complaint, **Exhibit A**. In the "PCB Presentation to Corporate Development Committee," Monsanto stated that "Do[ing] nothing was considered unacceptable from a legal, moral, customer, public relations & company policy viewpoint." *Id.* at MONS 058737. But the alternative of stopping PCB production and promotion, and instead going out of the Aroclor business, "was considered unacceptable from a Divisional viewpoint… there is too much customer/market need and selfishly too much Monsanto profit to go out." *Id*.

16.    Monsanto formed an internal Aroclor Ad Hoc Committee whose objectives, "agreed to by the Committee," were to "submit recommendations for action which will: 1. Permit continued sales and profits of Aroclors and Terphenyls. 2. Permit continued development of uses and sales. 3. Protect image of Organic Division and of the Corporation." State of Washington's Complaint for Damages against Monsanto, pp. 15-16, ¶ 62, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016); *see* Sky Valley Complaint, **Exhibit L** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-12 [E.D. Wash. July 31, 2015]), Bates No. MONS 030483-86 ("CONFIDENTIAL MINUTES OF AROCLOR 'AD HOC' COMMITTEE"). Monsanto set these business objectives despite knowing that PCBs had been found in the environment, wildlife, and the food chain, as PCBs "may be a global contaminant." *Id.* In these confidential minutes, Monsanto recognized the problem of PCB "environmental contamination by customers." *Id.* at MONS 030485 ("Our in-plant problems are very small vs. problems of dealing with environmental contamination by customers.").

17.    In October of 1969, Monsanto's Aroclor "Ad Hoc" Committee issued its confidential report. *See* Sky Valley Complaint, **Exhibit M** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-13 [E.D. Wash. July 31, 2015]), Bates No. DSW 014612-24. The committee reported environmental PCB contamination causing the killing of marine species and the possible extinction of several species of birds. *Id.* at DSW 014615. In addition, "the committee believes that there is no ~~possible~~

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

practical course of action that can so effectively police the uses of these products as to prevent completely some environmental contamination." *Id.* (underscore and strikethrough in original). The report outlined a plan to protect Monsanto's corporate interests: "There are, however a number of ~~possible~~ actions which must be undertaken in order to prolong the manufacture, sale, and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series." *Id.* (strikethrough and underscore in original).

18. The committee offered recommendations, including notifying PCB "customers of environmental contamination problems." *Id.* at DSW 014616. The basis for the recommendation, in part, concerned reports of PCB environmental contamination and Monsanto's knowledge of the mechanisms of PCB releases:

> It has been recognized from the beginning that other functional fluid uses could lead to losses of the Aroclors to liquid waste streams from the customers' plants. Losses could occur from spills, unusual leakage of large volumes and daily losses of smaller volumes.
>
> It has also been recognized that there could be vapor losses but it has been felt that these were perhaps of less significance than the vapor losses in plasticizer applications. The concern for vapor losses rises from the published proposed theory that even minute quantities of vapors are eventually transferred to the water environment and accumulated therein.
>
> Another possible source of air environmental contamination is the eventual destruction of materials which have Aroclors in them. Of particular significance might be the burning or partial incineration of waste or used products containing the Aroclors.

*Id.* at DSW 014618.

COMPLAINT - 29

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

19.     Despite the environmental damage caused by its PCB products, Monsanto was clearly concerned about losing the production of PCBs and the associated "sales of this very profitable series of compounds":

> **Budgetary Considerations**
>
> The committee recognizes the restrictions placed on those currently involved by mandates to operate within normal or proposed reduced budgets. It should be clear, however, that the product groups, the Division and the Corporation are faced with an extraordinary situation. There can not be too much emphasis given to the threat of curtailment or outright discontinuance of the manufacture and sales of this very profitable series of compounds. If the products, the Division and the Corporation are to be adequately protected, adequate funding is necessary.

*Id.* at DSW 014624.

20.     Therefore, by 1970, the escape of PCBs into surrounding environments and the resulting contamination was not only reasonably foreseeable, but the problem was known to Monsanto. In addition, the escape of Monsanto's PCBs *by PCB customers and users* into surrounding environments was not only reasonably foreseeable, but was known to Monsanto. *See also* State of Washington's Complaint for Damages against Monsanto, pp. 23-24, ¶ 99, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

21.     By 1970, Monsanto also knew that its PCBs exhibited a greater degree of toxicity than Monsanto previously anticipated. *Supra* at ¶ V.C.14.

22.     Despite this knowledge, Monsanto chose not to warn its customers and the public regarding the human health dangers of Monsanto's PCBs. Any statements made by Monsanto in that regard have been insufficient to convey the actual dangers posed by PCBs. Instead, Monsanto's efforts were and continue to be focused on protecting its own profits.

23.     An interoffice memorandum circulated in February of 1970 that provided talking points for discussions by Monsanto representatives with PCB customers.

COMPLAINT - 30

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Monsanto informed its PCB representatives that Monsanto "can't afford to lose one dollar of business." To that end, Monsanto stated, "We want to avoid any situation where a customer wants to return fluid… We would prefer that the customer use up his current inventory and purchase [new products] when available. He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system. We don't want to take fluid back." *See* Sky Valley Complaint, **Exhibit N** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-14 [E.D. Wash. July 31, 2015]), at 2 (emphasis in original); *see also* State of Washington's Complaint for Damages against Monsanto, p. 17, ¶ 67, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

24.    In roughly this same time period, Monsanto advised public officials that Monsanto's PCBs "are not particularly toxic by oral ingestion or skin absorption" and "infrequent exposure to PCB vapor should not cause ill effects." *See* Sky Valley Complaint, **Exhibits O** and **P** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-15, 1-16 [E.D. Wash. July 31, 2015]); *see also* State of Washington's Complaint for Damages against Monsanto, p. 20, ¶ 76, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016) ("While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly mispresented these facts, telling governmental entities the exact opposite— that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner.").

25.    Monsanto also offered the message to a member of Congress that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion." *See* Sky Valley Complaint, **Exhibits Q** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-17 [E.D. Wash. July 31, 2015]); *see also* State of Washington's Complaint for Damages against Monsanto, p. 21, ¶ 79, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

26.    Monsanto also represented to another governmental official that "Based on

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

available data, manufacturing and use experience, we do not believe the polychlorinated biphenyls to be seriously toxic." *See* Sky Valley Complaint, **Exhibit R** (from *City of Spokane v. Monsanto Co.*, Case 2:15-cv-00201-SMJ, ECF No. 1-18 [E.D. Wash. July 31, 2015]) at 3; *see also* State of Washington's Complaint for Damages against Monsanto, p. 21, ¶ 80, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

27.     Clearly, Monsanto's knowledge of PCB toxicity deepened between the 1930s and the 1970s. Despite its knowledge of PCB toxicity, Monsanto intentionally produced and promoted PCBs "for use in a wide range of industrial and household goods, including electrical equipment, paint, sealants, food cookers, furnaces, floor wax, insecticides, lubricants, moisture-proof coatings, papers, asphalt, leather adhesive, and stucco." *City of Seattle v. Monsanto Co.*, 237 F. Supp. 3d 1096, 1100 (W.D. Wash. 2017).

28.     "Though Monsanto was aware of PCBs' toxicity and propensity to leach, it denied or misrepresented those facts to government investigators. Monsanto continued to manufacture, promote, and profit from its PCBs." *Id.* (internal citations omitted) (holding that Seattle's claims against Monsanto for public nuisance and equitable indemnity are not preempted by Washington's Product Liability Act (WPLA); Seattle's common law product liability claims are not preempted by WPLA to the extent they arose on or before 1981; Seattle's claims are not time-barred; **Seattle stated a claim for public nuisance, the court rejecting Monsanto's argument that any intervening acts of third parties cut off proximate causation, because such acts were foreseeable**; Seattle lacked standing to bring product liability claims; Seattle stated a claim for negligence; and Seattle failed to allege facts supporting its claim for equitable indemnity).

29.     Monsanto intentionally failed to warn customers and the public regarding the toxicity and hazards of its PCB products. *See, e.g., Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1306-07 (9th Cir. 1992) ("Nevada Power discovered internal documents of the Manufacturers which Nevada Power contends show that the Manufacturer's understanding of the dangers of PCBs in the 1960s and early 1970s was much more advanced than the general state of knowledge in the scientific community")

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1  (holding, in part, that it was a fact question as to whether Nevada Power's fraud and
2  failure to warn claims were barred by the Nevada statute of limitations).

3       30.    Monsanto's PCBs were not reasonably safe in construction because they
4  were unsafe—"extremely toxic"—to an extent beyond that which would be contemplated
5  by an ordinary consumer. The extreme toxicity of Monsanto's PCBs was a proximate
6  cause of Plaintiffs' damages.

7       31.    Monsanto's PCBs were not reasonably safe as designed under a balancing
8  test or under a consumer expectations test, which was a proximate cause of Plaintiffs'
9  damages.

10      32.    Monsanto's PCBs were an unavoidably unsafe product, which was a
11 proximate cause of Plaintiffs' damages.

12      33.    Monsanto's PCBs were not reasonably safe due to inadequate warnings
13 when manufactured or after manufacture.

14      34.    Any Monsanto warnings to the non-Monsanto parties in this case at the
15 time of manufacture regarding the extreme toxicity of PCBs, were inadequate and a
16 proximate cause of Plaintiffs' damages.

17      35.    Any Monsanto warnings to the non-Monsanto parties in this case after
18 manufacture—and up to the present day—regarding the extreme toxicity of Monsanto's
19 PCBs, have been inadequate, which was a proximate cause of Plaintiffs' damages.

20      36.    Due to their extreme toxicity, Monsanto's PCBs never had a "useful safe
21 life."

22      37.    Monsanto had actual knowledge of the defect and the danger of its PCBs,
23 but showed complete indifference or conscious disregard for the safety of others by
24 producing and promoting PCBs anyway.

25      **D.      PCB-caulking and PCB-light ballasts cause PCB-contamination.**

26      1.     Monsanto manufactured PCBs that were incorporated by Monsanto's
27 customers as plasticizers in caulking, paints, and sealants. In these forms, Monsanto's
28 PCBs were used in interior and exterior windows, doors, and masonry joints.

FRIEDMAN | RUBIN PLLP
51 University Street, Suite 201
Seattle WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

2. Even today, caulking with high PCB levels are usually still flexible and often largely intact.

3. PCB-caulking emits PCBs, which migrate into the air and nearby materials, including adjoining wood, cement, and brick; air and dust inside schools; soil near school buildings, and other materials and furnishing.

4. The following information comes from a publication of the United States Environmental Protection Agency (2014, pp. 7-9). Thomas, K. (2014). PCBs in school buildings: sensible steps to healthier school environments. Washington, DC: U.S. EPA Office of Research and Development.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

COMPLAINT - 34

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# PCB Sources – Caulk and Other Sealants

➤ U.S. Production of Aroclors as a plasticizer ingredient

- ▪ 1958 - 4 million lbs.
- ▪ 1969 - 19 million lbs.
- ▪ 1971 – 0 lbs.

➤ PCBs were sometimes added to caulk during construction

➤ Used for

- ▪ Exterior and interior windows and doors
- ▪ Exterior and interior joints
- ▪ Window glazing
- ▪ Other locations/seams (plumbing, casework, etc.)

➤ Caulk with PCBs > 50 parts per million (ppm) is not an allowed use






**EPA**
United States
Environmental Protection
Agency

**Office of Research and Development**
National Exposure Research Laboratory

COMPLAINT - 35

7

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# PCB Sources – Caulk and Other Sealants

**EPA**
United States
Environmental Protection
Agency

➢ In several northeastern schools:

- 18% of 427 interior caulk/sealant samples >50 ppm PCBs
  - 6% of interior samples >100,000 ppm (10% by weight)

- 63% of 73 exterior caulk/sealant samples >50 ppm PCBs
  - 34% of exterior samples >100,000 ppm

- Highest level was 440,000 ppm PCBs (44% by weight)

➢ We have found that caulk with high PCB levels is usually still flexible and often largely intact

➢ Visual identification of caulk with PCBs is not reliable







**Office of Research and Development**
National Exposure Research Laboratory

COMPLAINT - 36

8

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# PCB Sources – Caulk and Other Sealants



➢ PCBs in caulk/sealants move over time into:

- Adjoining wood, cement, brick
- Air and dust inside schools
- Soil near school buildings
- Other materials/furnishings

➢ Emissions of PCBs into the air can be quite substantial

- Emissions can create indoor air levels above recommended concentrations
- As the temperature increases, emissions increase
- Ventilation is an important factor

➢ Although installed 40 – 60 years ago, high PCB levels remain and emissions will continue far into the future

➢ Other PCB sources, like coatings and paints, will act much like caulk in releasing PCBs into the environment



**Office of Research and Development**
National Exposure Research Laboratory

COMPLAINT - 37

9

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

5.      As stated by the EPA (*supra*, p. 9), PCB-caulking and other sealants in school buildings can create indoor air levels above recommended concentrations. In addition, "high PCB levels remain and emissions will continue far into the future." *Id.*

6.      Monsanto's PCBs were also produced and promoted as components of electrical equipment such as transformers, motor start capacitors, and lighting ballasts.

7.      "Commercial PCB mixtures vary from colorless to dark brown oils, and from viscous liquids to sticky resinous semisolids. Although PCBs evaporate slowly at room temperature, the volatility of PCBs increases dramatically with even a small rise in temperature. Equipment that contains PCBs can overheat and vaporize significant quantities of these compounds, creating an inhalation hazard that can be magnified by poor ventilation" (ATSDR, 2014, p. 25).

8.      As stated by the State of Washington, "PCBs easily migrate or volatilize out of their original source material or enclosure and contaminate environmental media such as air, soil, stormwater, and sediment. For example, **PCB compounds volatilize out of building materials (such as caulk) and into the surrounding environment. PCBs can also escape from totally enclosed materials (such as light ballasts) and similarly contaminate and damage the environment.**" State of Washington's Complaint for Damages against Monsanto, p. 9, ¶ 37, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016) (emphasis added).

9.      As stated by the State of Washington, "PCBs present serious risks to the health of humans… Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact. Individuals may inhale PCBs that are emitted into the air. They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks. And they may absorb PCBs from physical contact with PCBs or PCB-containing materials." State of Washington's Complaint for Damages against Monsanto, p. 9, ¶ 38-39, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

10.     **PCB light ballasts release PCBs.** The preceding information comes from the same EPA publication regarding PCBs in school buildings (EPA, 2014, pp. 10-11).

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# PCB Sources – Fluorescent Light Ballasts

EPA
United States
Environmental Protection
Agency

10

⋀ Fluorescent and high intensity light ballast capacitors

▪ Prior to 1977 - Many (most?) contained PCBs

▪ 1977 – 1978 - Some new ballasts contained PCBs

▪ After 1978   - No new ballasts manufactured w PCBs

⋀ Some PCB-containing ballasts remain in place

▪ In several northeastern schools, 24% - 95% of the light ballasts likely contained PCBs

⋀ Most PCB-containing ballasts have exceeded their expected lifetimes

⋀ Failure and release of PCBs will continue and may increase





**Office of Research and Development**
National Exposure Research Laboratory

COMPLAINT - 39

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# PCB Sources – Fluorescent Light Ballasts

- PCBs are continuously released into the air from intact, functioning light ballasts
  - When lights are off, emissions are low
  - When lights are on, the ballast heats up, and emissions increase several-fold

- PCB ballasts can fail, releasing PCB vapors into the air and liquid PCBs onto surfaces
  - Air levels of PCBs can become quite large
  - Surfaces can be contaminated
  - Significant impact/costs to remediate

- Residues from previously failed ballasts can remain in light fixtures even if the ballast is replaced
  - The impact on PCBs in the school environment has not been determined





**Office of Research and Development**
National Exposure Research Laboratory

COMPLAINT - 40

11

United States
Environmental Protection
Agency

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

As stated (p. 10), PCB-containing light ballasts were manufactured until the late 1970s. ("Light ballasts" are components of light fixtures in buildings.) The "failure and release of PCBs will continue and may increase" in school buildings containing PCB-light ballasts. *Id.* This is because "PCBs are continuously released into the air from intact, functioning light ballasts. When lights are off, emissions are low. When lights are on, the ballast heats up, and emissions increase several-fold." *Id.* at 11.

11.   **Failed PCB ballasts cause high levels of PCB contamination.** In addition, "PCB ballasts can fail, releasing PCB vapors into the air and liquid PCBs onto surfaces." *Id.* When that occurs, "Air levels of PCBs can become quite large. Surfaces can be contaminated." *Id.*

12.   **Toxic PCDDs and PCDFs.** Also of concern are the extremely toxic chemical byproducts of failing PCB-light ballasts, including dioxins and furans. Failing PCB-ballasts that pyrolyze their PCB contents generate and emit additional toxic chemicals called polychlorinated dibenzodioxins (PCDDs) and polychlorinated dibenzofurans (PCDFs). 50 Fed. Reg. 29,171 (July 17, 1985); *Ahrens v. Pacific Gas & Electric Co.*, 197 Cal.App.3d 1134, 1139, fn 2, 243 Cal.Rptr. 420 (1988).

13.   Over time, school building materials become secondary sources of PCB contamination after absorbing PCBs emitting from the primary contamination sources, as illustrated in this diagram and in the following EPA slides (2014, pp. 12, 2):



| Ventilation | Primary PCB Source | Secondary PCB Sources and Sinks | Dust/Soil |

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# PCB Sources – Secondary Sources/Sinks

∧ PCBs released from primary sources are absorbed into other materials in the school environment over time

∧ Following removal of primary sources, PCBs in secondary sources may be released into the school environment and result in continuing exposures

∧ In some cases, secondary sources may need to be considered for additional remedial actions following removal/remediation of primary sources






**EPA**
United States
Environmental Protection
Agency

12

**Office of Research and Development**
National Exposure Research Laboratory

COMPLAINT - 42

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# PCBs - A Complex Problem in Buildings


United States
Environmental Protection
Agency

■ Over 100 PCB chemicals

■ Multiple primary sources possible

■ Transport from sources to air, surfaces, dust, soil

■ Secondary sources created

■ Exposures through multiple pathways

■ Ventilation and temperature effects

Example Scenario

Primary Sources
● Caulk
■ Light Ballast

Secondary Sources/Sinks
| Surrounding Materials
| Paint
| Dust

HVAC Unit



Ventilation

Primary PCB Source

Secondary PCB Sources and Sinks

Dust/Soil

**Office of Research and Development**
National Exposure Research Laboratory

COMPLAINT - 43

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

14.    For these and other reasons, school buildings should not contain Monsanto's PCBs.

15.    When a reasonably careful manufacturer learns that its product is toxic and poses public health hazards, the manufacturer stops manufacturing it, recalls its product, and warns the public about the product.

16.    But Monsanto never recalled PCBs, despite knowing their toxicity and danger to public health. Instead, Monsanto continued to promote PCBs, particularly in electrical applications, until PCBs were banned.

17.    Monsanto did not warn users of PCBs, such as the State, the School District, Union High, the Health District, or the Plaintiffs, that Monsanto's PCBs are extremely toxic and pose a public health hazard.

18.    Monsanto provided the public with no warnings, notices, bulletins, or information that PCBs are extremely toxic and pose a public health hazard. Any information provided by Monsanto during or after manufacture has been inadequate.

19.    Monsanto's PCBs have contaminated school buildings in Washington, including the school buildings in this case, causing harm to occupants of the buildings, including the Plaintiffs. As shown above, this was not only reasonably foreseeable, it was actually known to Monsanto that such harm would come to third parties such as the Plaintiffs. Accordingly, the Plaintiffs seek damages against Monsanto.

20.    It was also reasonably foreseeable, based on Monsanto's history of experience with PCB customers and users, that some inspectors, owners, operators, providers, or maintainers of buildings would engage in negligent conduct that causes harm to third parties by exposing them to Monsanto's PCBs.

21.    Unfortunately, Monsanto's PCBs continue to contaminate school buildings built before 1980, including the school buildings in this case. As shown above, this is because Monsanto intentionally produced and promoted PCBs in a variety of construction applications. As a result of Monsanto's conduct, it was reasonably foreseeable that Monsanto's PCBs would be incorporated in buildings, including the

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

school buildings in this case, and would contaminate classrooms used by people, including the Plaintiffs, causing them damages. Monsanto's PCB contamination of Sky Valley Education Center was a legal cause of injury to the Plaintiffs.

22.    As shown in the following EPA slide (2014, p. 16), "Occupants in schools with interior PCB sources will be exposed to PCBs in the indoor air, dust, and on surfaces through their normal activities." For the Plaintiffs and others in such school buildings, "Exposures will occur through inhalation, ingestion, and dermal contact."



The full EPA slide appears on the following page:

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# Exposures to PCBs in the School Environment



United States
Environmental Protection
Agency

➤ Occupants in schools with interior PCB sources will be exposed to PCBs in the indoor air, dust, and on surfaces through their normal activities

➤ In school buildings with exterior PCB sources, exposures may occur through contact with contaminated soil

➤ Exposures will occur through inhalation, ingestion, and dermal contact





Inhalation

Ingestion

Dermal
Exposure

*Figure from 2009 NIEHS  L. Birnbaum presentation*

**Office of Research and Development**
National Exposure Research Laboratory

COMPLAINT - 46

16

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

23.     As shown in the history below, the Sky Valley Education Center buildings were contaminated with Monsanto's PCBs. This fact was publicly revealed in 2016 following environmental testing done in response to severely sickened and diseased teachers and over one hundred Sky Valley individuals reporting to the Snohomish Health District illnesses related to the school buildings. The Defendants' wrongdoing led to the PCB contamination and caused PCB exposure in the Plaintiffs, causing them damages.

24.     "Monsanto's PCB contamination constitutes injury to the State's public natural resources and to other property and waters of the State [of Washington], for which the State seeks damages, including on behalf of itself and on behalf of its residents in its *parens patriae* capacity." State of Washington's Complaint for Damages against Monsanto, p. 5, ¶ 16, Case No. 16-2-29591-6, King County Superior Court (Dec. 8, 2016).

**E.      The school buildings became toxic, injuring children and adults.**

1.      **History of the school buildings.** Starting in the 1950s, the school campus located in Monroe at 351 Short Columbia Street, near Hill, Kelsey, and Sams Streets, was known as Monroe Union High School or Monroe High School.

2.      Today, the tax accessor records identify the property as belonging to Union High School District 402:

UNION HIGH SCHOOL DIST 402
HILL & KELSEY ST
MONROE, WA   98372

SEC 01 TWP 27 RGE 0651/2 SE1/4 SW1/4
NE1/4 LESS W 30FT POR ST PER AF
9001110281
V 2299 P 941

3.      The following page is a true and correct copy of a page of this government record, which is also attached as **Exhibit S**:

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM



270601001023200   UNION HIGH SCHOOL DIST 402      HILL & KELSEY ST,MONROE,WA,98272,USA      681

UNION HIGH SCHOOL DIST 402
HILL & KELSEY ST
MONROE, WA  98272
SEC 01 TWP 27 RGE 06S1/2 SE1/4 SW1/4
NE1/4 LESS W 30FT FOR ST PER AF
900111(02&1
V 2299 P 941

Tax ID 01270610230003          Printed 08/09/2016          Card No. 1 of 1

Neighborhood Number
%018001

Neighborhood Name
City of Monroe secondary

TAXING DISTRICT INFORMATION
Jurisdiction Name    Snohomish
Area                 001
Corporation          103
Section & Plat       0
Routing Number       2706011

**Transfer of Ownership**

**Valuation Record**

| Assessment Year | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Reason for Change | Reval | Reval | Reval | Reval | Reval | Reval | Reval |
| 0 | L | 1401500 | 1214700 | 1121200 | 1121200 | 1121200 | 1121200 | 1214700 |
|   | I | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 |
|   | T | 7995400 | 7808600 | 7715100 | 0 | 7715100 | 7715100 | 7808600 |
| 0 | L | 6593900 | 0 | 0 | 0 | 0 | 0 | 0 |
|   | I | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 |
|   | T | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 | 6593900 |

**Site Description**
Topography

Public Utilities
Water, Sewer, Electric
Street or Road
Paved
Neighborhood

Zoning

Legal Acres:
4.2900

**Land Size**

| Land Type | Rating Soil ID - or - Actual Frontage | Acreage - or - Effective Frontage | Square Feet - or - Effective Depth | Influence Factor |
|---|---|---|---|---|
| 74  Commercial V | | | 186872.00 | |

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

4.     Other pages in the tax accessor's file for this property reference Union High School District 402 as well as "School District 103," including this excerpt dated April 13, 1990:



A "SITE SKETCH" of the campus shows school buildings built in 1950, 1963, 1965, and 1968. The site sketch is shown on the following page. The configuration of the school buildings at the campus appears the same today:

COMPLAINT - 49

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM



FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

5.      This school campus is located in Monroe, Washington, within the inspection jurisdiction of the Snohomish Health District.

6.      According to its own statements, "[t]he Snohomish Health District inspects all schools (public and private) in order to verify compliance with minimal environmental standards for education facilities, as per WAC 246-366-040." Health District "inspectors may check lighting, ventilation, and safety equipment." The enforcement requirements are stated in Health District letters and Washington law. RCW 43.20.050(5).

7.      The facts of the following inspections—and the lack of annual inspections in recent decades—is based on Snohomish Health District's responses to Public Records Act requests.

8.      From the late 1950s through 1990, the Snohomish Health District conducted inspections of these school buildings on a roughly annual basis. During this time, inspectors regularly cited Monroe School District for violating requirements for minimum lighting intensities for these school buildings. Despite these citations, apparently no penalties or enforcement actions were taken.

9.      For example, a Snohomish Health District school inspection report, dated 1973, recorded code violations for ventilation, lighting, and safety for these school buildings. The inspector wrote, "Lighting is substandard in a number of places in this building as has been underlined reported every year since the school was built." Oct. 15, 1973 School Inspection report by Snohomish Health District, to Monroe #103, Monroe High School (Bates stamped 000054) (emphasis in original).

10.     Lighting continued to be substandard in subsequent decades. This is significant because, years later, the same substandard lighting fixtures in these school buildings exposed the Plaintiffs to PCBs and other toxic chemicals.

11.     Around 1977, the usage of the school buildings changed from the High School program to the Monroe Junior High.

12.     Although Monroe Public Schools corrected some safety standard violations over the years, other safety standard violations in the school buildings persisted. For

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

example, a letter dated 1980 from the Health District to Monroe School District reported complaints related to ventilation, sanitation and environmental conditions, and noted that, "with little exception, these problems have been noted on our inspection reports for the past several years. Because of the possible health and safety impact upon your students and staff, we feel it is important that substantial changes be made." June 13, 1980 Snohomish Health District letter to Monroe School District (Bates stamped 000080-81).

13.    The 1981 Health District inspection report for these school buildings cited deficiencies in areas related to ventilation and lighting, stating "lighting is poor in classrooms and restrooms in the pods [classrooms]." 1981 Health District inspection report to Monroe School District (Bates stamped 000105-08).

14.    The 1982, 1984, and 1985 inspection reports noted similar deficiencies. For example, the 1984 report stated, "As we have pointed out for several years now, pod classroom lighting is poor." 1984 Health District inspection report to Monroe School District (Bates stamped 000118-24).

15.    Around 1987, the usage of the school buildings changed from being the Monroe Junior High to the Monroe Middle School.

16.    In the 1990s, the Health District only conducted safety inspections in 1990 and 1996. (In 1999, there was a complaint investigation report—not an inspection report—regarding poor kitchen ventilation.) There were no Health District inspections of the school buildings in 1991, 1992, 1993, 1994, or 1995. In the 1996 inspection report, the Health District again cited Monroe School District for ventilation and lighting code violations in these school buildings.

17.    The Health District did not conduct a regular inspection of these school buildings in 1997, 1998, 1999, 2000, 2001, 2002, 2003, or 2004.

18.    By the year 2000, Monroe Public Schools had actual knowledge that its school buildings built before 1980 may contain PCB-light ballasts. The Monroe School District ~~through a policy apparently promulgated by a State agency~~ established a "LIGHTING AND BALLAST DISPOSAL PROCEDURES" policy. It required

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

inspection of all light ballasts during the summer of 2000. *See* ¶ 3. PCB-light ballasts must then be marked for identification. *Id.* Then "**All ballasts that are assumed to contain PCBs must be disposed of as hazardous waste.**" *Id.* at ¶ 4 (emphasis added).

19.     The State, the Health District, Monroe School District, and Union High all should have ensured the removal and remediation of PCBs and other toxic chemicals from the school buildings. The public entity Defendants were negligent in not doing so, which was a proximate cause of Plaintiffs' damages.

20.     The Health District should have enforced the minimum environmental safety standards relating to lighting intensities. If the Health District had done so since 1980, the new light fixtures would have been PCB-free. The Health District's lack of action, particularly in light of its actual knowledge of decades of safety code violations, was negligent and a proximate cause of Plaintiffs' damages.

21.     The 2003 "Health and Safety Guide" by the State Department of Health and Superintendent of Public Instruction specifically recognized the existence of PCBs in school buildings:

## I. LIGHTING

| | | Recommended | Required | WAC or Other Code Reference | Plans Review |
|---|---|---|---|---|---|
| I 010<br>S  U<br>☐  ☐ | Inspect all fluorescent light ballasts for PCB content, being careful to wear rubber gloves and goggles. Identify PCB ballasts for future replacement. Almost all fluorescent light fixtures made before July 1979 contain small amounts of highly concentrated PCB's in their ballasts, that can leak PCB contaminated oil. See website: www.epa.gov/pcb | x | | EPA | |
| I 011<br>S  U<br>☐  ☐ | Clean all PCB leakage, including any oil-like film, and replace all leaking ballasts. Dispose of leaking ballasts and cleaning materials in accord with EPA and DOE regulations. Wearing gloves and goggles is important for personal protection as PCB's are absorbed through the skin. Call 1-800-424-4372 or see website: www.epa.gov/r10earth/pcb.htm | | x | 40 CFR Part 761 | |
| I 012<br>S  U<br>☐  ☐ | Under the Federal Toxic Substances Control Act, a leaking ballast containing PCB's must be packaged in a container approved for PCB disposal, marked "contains PCB's" and have an accompanying manifest. It must be shipped by an authorized PCB transporter to a licensed PCB disposal facility. See web: www.epa.gov/r10earth/pcb.htm | | x | TSCA<br>40 CFR Part 761 | |

Office of Superintendent of Public Instruction and Department of Health. OSPI-DOH School Health and Safety Guide, January 2003, p. 26.

22.     The State's failure to require the removal of PCBs from the school buildings was negligent and a proximate cause of Plaintiffs' damages.

23.     The negligence of the public entity Defendants allowed PCBs to remain in

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

the school buildings, which was a proximate cause of PCBs remaining in the old Monroe Middle School, later known as Sky Valley Education Center, which contaminated the indoor air and subsequently poisoned children and adults, including the Plaintiffs.

24.     It may be that the State, its departments, its employees, or other public entity Defendants, were not fully aware of the dangers of PCBs due to a lack of warnings from Monsanto. Monsanto's statements regarding PCBs have historically and consistently minimized the risk of PCBs to human health. Such statements may have deceived, misled, or lulled the State or other public entity Defendants into inaction regarding the removal of PCBs from school buildings.

25.     The 2003 State policy also required minimum light intensities in school buildings. Here is excerpt from that policy requiring minimum lighting:

## I. LIGHTING

| | | Required Recommended | WAC or Other Code Reference | Plans Review |
|---|---|---|---|---|
| I 001 <br> S ☐ U ☐ | Minimum light intensity of 10 foot candles, from general, task, or natural lighting shall be provided in non-instructional areas including auditoriums, lunchrooms, assembly areas, toilet and store rooms, corridors, and stairs. | x | 246-366-120(1) | x |
| I 002 <br> S ☐ U ☐ | Minimum light intensity of 20 foot candles, from general, task, or natural lighting shall be provided in gymnasiums including main and auxiliary spaces, and shower and locker rooms. | x | 246-366-120(1) | x |
| I 003 <br> S ☐ U ☐ | Minimum light intensity of 30 foot candles, from general, task, or natural lighting shall be provided in kitchen areas including food storage and preparation rooms. | x | 246-366-120(1) | x |
| I 004 <br> S ☐ U ☐ | Minimum light intensity of 30 foot candles, from general, task, or natural lighting shall be provided in instructional areas including study halls, lecture rooms, and libraries. In rooms with computers, or during audio-visual presentations, lighting may be reduced. | x | 246-366-120(1) | x |
| I 005 <br> S ☐ U ☐ | Minimum light intensity of 50 foot candles, from general, task or natural lighting shall be provided in special instructional areas including sewing rooms, laboratories (including chemical storage areas), CTE (voc-ed) trade, industrial shops, drafting rooms, and visual & performing arts rooms. | x | 246-366-120(1) | x |

26.     As stated above, if these minimum lighting requirements had been enforced by the Health District, Union High, Monroe Public Schools, or the State at any time since 1980, Monroe School District would have uninstalled the PCB-light ballasts at the school buildings and installed code compliant, non-PCB light ballasts. This would have

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

prevented or minimized much of the PCB contamination and subsequent PCB poisoning of the Plaintiffs. Because the public entity Defendants did not do this, however, the Plaintiffs were exposed to PCB contamination. The public entity Defendants' negligence was a proximate cause of Plaintiffs' damages.

27.     The State and other public entity Defendants knew or should have known that the existence of PCBs in school buildings poses a danger to children and adults. The potential ignorance of the State, though negligent, is reflected in the absence of PCB discussion in the State's School Indoor Air Quality Best Management Practices Manual (Nov. 2003), available at https://www.doh.wa.gov/CommunityandEnvironment/Schools/EnvironmentalHealth (last visited November 15, 2017). Presumably, adequate warnings or instructions by Monsanto should have rectified or ameliorated the negligence of the public entity Defendants and prevented some or all of Plaintiffs' damages.

28.     In the 2000s, the Health District only conducted safety inspections of these school buildings in 2005, 2007, and 2009.

29.     In the 2005 inspection letter and report, the Health District stated, as usual, that its "inspectors may check lighting, ventilation, and safety equipment" to "verify compliance with minimal environmental standards for educational facilities, as per WAC 246-366-040." The Health District cited Monroe School District for ventilation and lighting standard violations, but again failed to enforce compliance. 2005 Health District letter and inspection report to Monroe School District (Bates stamped 000146-51).

30.     For $CO_2$ concentration limits, ASHRAE Standard 62-2001 recommends no more than 700 ppm above the outdoor concentration as the upper limit for occupied classrooms, which is usually around 1,000 ppm. Carbon dioxide is an asphyxiate that, when measured, serves as a proxy for the quality of ventilation in occupied classrooms.

31.     The 2005 inspection report was the first Health District report to measure and record carbon dioxide air quality violations at the school buildings. The report recorded 25 readings in 25 separate classrooms at these school buildings that exceeded 1,000 ppm of carbon dioxide. Six readings were above 1,500 ppm. Four readings were

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

above 2,000 ppm. Two readings were above 3,000 ppm. *Id.* at 149.

32.     As in past years, however, the Health District did not enforce compliance with the minimal environmental standards for the school buildings.

33.     In 2005, the State published its familiarity with poor indoor air quality and how it affects children. The State compared sensitive or vulnerable individuals like children to "canaries in the coal mine." The introduction is reprinted here:

**Background**

Students and school staff deserve and expect a healthy and comfortable environment in which to learn and teach. Similarly, parents expect schools to provide a healthy environment conducive to student learning and one that does not promote or exacerbate illnesses in their children. Within the school environment, reduced indoor air quality (IAQ) due to a lack of fresh air, chemical and biological contaminants, temperature, and humidity has resulted in student and staff health concerns. These concerns may be expressed as complaints of: headaches, rashes, tiredness, respiratory or eye irritation; and may result from single or multiple factors. Since individuals respond to stressors differently, it's likely that individuals that respond initially may be more sensitive than others and are in essence like the "canary in the coal mine," providing an early indication of poor or reduced IAQ. Therefore, it is important that all concerns be taken seriously and investigated thoroughly. An open and proactive response to an expressed IAQ concern can prevent a minor situation from becoming a major problem.

Considerable evidence exists supporting a relationship between poor IAQ and student learning and illness. Children spend between 80 and 85 percent of their time indoors, which includes about seven hours per day in school. Poor indoor air quality in schools is associated with increased student absenteeism and reduced student academic performance. As an example, a recent study involving Washington and Idaho schools found that classroom carbon dioxide ($CO_2$) concentrations greater than 1000 ppm, due to inadequate fresh make-up air, were associated with a 10 to 20 percent increase in student absenteeism. During the 1990s, the incidence of asthma in young children rose by nearly 60 percent and was responsible for ten million missed school days per year nationwide. In the mid 1990s, one in five schools across the United States, representing 8.4 million students, was identified as having IAQ problems. Furthermore, maintenance and operations budgets have declined as a percentage of school operating budgets from nearly 12 percent in 1990 to nine percent in 2000, which may contribute to poor indoor air quality in both new and aging school buildings.

Washington State has 296 school districts with more than 2,200 buildings and over one million students. While the total number of IAQ concerns reported in Washington State schools is unknown, several school districts have experienced severe IAQ events that have resulted in temporary school closures. Discussions with officials from these districts highlight the need for a clear and systematic approach that enables school administrators to quickly and effectively investigate and resolve IAQ concerns.

Wash. State Department of Health, Office of Environmental Health & Safety.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Responding to Indoor Air Quality Concerns in our Schools. June 2005, p. 5, available at https://www.doh.wa.gov/CommunityandEnvironment/Schools/EnvironmentalHealth (last visited November 15, 2017).

34.    Despite this knowledge, the State did not supervise the removal of toxic and hazardous substances such as PCBs from the school buildings. This was negligent and a proximate cause of Plaintiffs' damages.

35.    In 2006, the Health District did not conduct an inspection of these school buildings.

36.    In 2007, the Health District inspected the school buildings and noted "there were several items noted during this safety inspection that appear **not to have been addressed** since the last inspection conducted in 2005." 2007 Health District letter and inspection report to Monroe Public Schools (Bates stamped 000153-59) (emphasis added). This included ventilation violations as well as more than a dozen CO2 measurements in different classrooms that exceeded 1,000 ppm, with five measurements that exceeded 1,500 ppm. *Id.* at 154, 156-57. The Health District also cited Monroe School District for violating minimum light intensity standards in the Music rooms, the Library, and a half-dozen classrooms. *Id.* at 153, 155.

37.    In 2007, the Health District did not enforce compliance with the minimal environmental standards for the school buildings.

38.    In 2007, the School District received its State Study and Survey by an architecture firm, Hutteball & Oremus, regarding the District's public educational facilities. The study reported to the School District that the school buildings, then known as the Monroe Middle School, have safety issues. The Monroe Middle School "is deteriorating at a rate which exceeds that of normal maintenance efforts and funding." 2007 Hutteball & Oremus State Study and Survey for Monroe School District, p. 219. "The level of deterioration at this facility is the most severe of any school within the District." *Id.* at Executive Summary. The study recommended demolishing the existing classrooms and library. *Id.* at 19. "None of the existing HVAC equipment is in

COMPLAINT - 57

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

compliance with current codes." *Id.* at 69. The study reported that the lighting was deficient, and recommended that the lighting system be upgraded and replaced throughout the facility. *Id.* at 70, 18. Hazardous material existed in the school buildings: "The campus is reported to contain friable asbestos containing material such as pipe insulation and non-friable vinyl asbestos floor tile. The Classroom/Library building contains insulated asbestos panels at the window areas." *Id.* at 11. The study did not mention PCBs, but recommended a hazardous material survey by an independent consultant in conjunction with planning of future modernization, additions, or replacements. *Id.* The study stated that "the Monroe Middle School is in need of immediate renovation and upgrades… **Existing life safety issues, energy inefficiencies, and code issues will continue to exist until significant action is taken to correct these deficiencies**." *Id.* at Summary, 25 (emphasis added).

39.    The Monroe School District did not follow these recommendations in 2007, but instead continued to use the school buildings in their condition for several more years.

40.    In 2008, the Health District did not conduct an inspection of these school buildings.

41.    In 2009, the Health District inspected the school buildings and noted "there were several items noted during this safety inspection that appear **not to have been addressed** since the last inspection conducted in 2007." 2009 Health District letter and inspection report to Monroe School District (Bates stamped 000254-62) (emphasis added). The repeated violations included safety standards relating to ventilation, lighting, and air quality, including roughly a dozen rooms where $CO_2$ levels exceeded 1,000 ppm. *Id.* at 254-61.

42.    Again, the Health District did not enforce compliance with the minimal environmental safety requirements for these school buildings.

43.    In 2010, the Health District did not conduct an inspection of these school buildings. The Health District also did not enforce compliance.

FRIEDMAN | RUBIN PLLP
51 University Street, Suite 201
Seattle WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

44.     In May of 2011, the Health District inspected the school buildings and noted "there were several items noted during this safety inspection that appear **not to have been addressed** since the last inspection conducted in 2009." 2011 Health District letter and inspection report to Monroe School District (Bates stamped 000270) (emphasis added). Repeated violations included safety standards relating to ventilation and lighting. *Id.* at 266-70. This report did not measure and record CO2 levels.

45.     But the Health District did not enforce compliance with the minimal environmental safety requirements for these school buildings.

46.     If the Health District or the State had enforced compliance with minimum lighting safety requirements in 2011, then Monroe School District (or Union High) would have uninstalled the toxic PCB-light ballasts at the school buildings and installed code compliant, non-PCB light ballasts. This would have reduced the PCB contamination and subsequent PCB poisoning of the Plaintiffs. But the Health District and the State did not enforce compliance. That was negligent and a proximate cause of Plaintiffs' damages.

47.     Following the spring of 2011, the Monroe School District removed the middle school program from the school buildings.

48.     The School District chose to move an education program called Sky Valley Education Center into the school buildings.

49.     Sky Valley Education Center was and is an alternative kindergarten through twelfth grade education program. Often, parents spent time with their children in the classrooms. Many mothers were also pregnant or had infants with them at school.

50.     The program was formerly situated in a warehouse space in Monroe. The use of the warehouse space cost the Monroe School District several hundred thousand dollars per year in rent. To avoid paying that money, the School District chose to break its lease with the warehouse landlord, sue the landlord, and move the Sky Valley program into the old Monroe Middle School. The litigation led to a 2013 settlement in which the School District paid $900,000 to parties related to the interests of the warehouse landlord.

51.     In the summer of 2011, the Monroe School District did not conduct a

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

hazardous material survey of the old Monroe Middle School. The School District also failed to conduct any hazardous material abatement or renovation work of the school buildings.

52.     Instead, the Monroe School District, or the administrators for the Sky Valley Education Program, invited Sky Valley program teachers, parents, and children to volunteer to clean the old Monroe Middle School. As a result, Sky Valley program teachers, parents, and children worked during the summer to remove some old carpets, paint some walls, and clean classrooms. This was the first exposure that these individuals, including some of the Plaintiffs, had to the toxic contamination at these school buildings.

53.     The Monroe School District administered the Sky Valley Education program at this location, starting in September of 2011.

54.     In the 2010s, the Health District only conducted safety inspections of these school buildings in 2011, 2013, and 2016.

55.     In December of 2011, the Health District inspected Sky Valley Education Center, now occupying the site of the old Monroe Middle School buildings. As in past years, the Health District cited the Monroe School District for violations of primary and secondary school safety requirements, WAC 246-366. Jan. 2011 Health District letter and report to the Monroe School District (Bates stamped 000273-79). The Health District cited the School District for violations of ventilation and lighting intensity requirements.

56.     In 2011, the Health District did not enforce compliance with minimal environmental safety requirements for these school buildings.

57.     In 2012, the Health District did not conduct an inspection of these school buildings. The Health District also did not enforce compliance.

58.     In 2013, the Health District inspected Sky Valley Education Center. As in past years, the Health District cited the School District for violations of primary and secondary school safety requirements, WAC 246-366, including lighting intensity and ventilation requirements. 2013 Health District letter and report to the School District (Bates stamped 000283-87). The carbon dioxide levels in four classrooms was measured

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

and exceeded 1,000 ppm. *Id.* at 283.

59.     In 2013, the Health District did not enforce compliance with minimal environmental requirements for these school buildings.

60.     In 2014, the Health District did not conduct an inspection of these school buildings. The Health District also did not enforce compliance.

61.     From 2011 through 2016, the school buildings continued to have PCB-caulking and PCB-light ballasts, some of which failed over time and leaked PCBs and pyrolyzed PCB byproducts such as dioxins and furans into the indoor air of the school buildings.

62.     It is unknown exactly how many PCB-light ballasts failed, fumed, leaked, or smoked PCBs or PCB byproducts into the Sky Valley classrooms between 2011 and 2016. According to a 2014 School District memorandum, however, by that time it appears that more than 100 light ballasts had failed, resulting in "Fixtures requiring maintenance cleaning." *See* MSDG_014266.

63.     From 2011 through 2016, the Monroe School District does not appear to have conducted any environmental testing regarding the various levels of PCBs, dioxins, or furans in the school buildings during PCB-light ballast failure events or in their immediate aftermath.

64.     Students and teachers witnessed different PCB-light ballast failures in different classrooms. The failing PCB-light ballasts burned, fumed, or smoked vapors into the classrooms. Some failing PCB-light ballasts also dripped PCB fluids onto the desks and carpets. The Monroe School District's solution for one such PCB leak was to put a bucket under the leaking ballast, which collected a puddle of PCB fluid. This open collection of PCB fluids was done while children used the classroom. The bucket was left in place for several days. The PCB-stained carpet was left in place even longer.

65.     One Sky Valley teacher recorded some PCB-light ballast failures and probable failures during this time period. For example, in April 2014 a "ballast in Nona's room caught fire and we could smell the smoke in rooms A, C and D and the hallways."

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Another ballast failed and created "a bad smell" the following week. Some teachers began researching the issue, inspecting overhead lights in the rooms, and reporting their concerns to the Monroe School District. Here is one photo (taken by a teacher during that time) of stained light fixture housing, along with the teacher's notes:

ballast plates with dried black/brown residue assumed to be previous ballast oil leaks. I remember that there at least two (first ballast on left as enter the room from the hallway and one near the back of the room on the window side) and maybe three lighting plates with brown residue that I assumed was oil from ballast (See Figure 1). We also looked at the fixture in room A that had leaked in 2010 and found that it also had brown residue.



Figure 1: Ballast leak in Room C (Note: photo taken April 2014, tray replaced May 2016)

66.     In response to other light ballast failures, the Monroe School District maintenance department staff often put the stained light fixture housing materials (along with cleaning rags) in hallways or leaning against classroom walls. Some such housing materials were left in common areas for weeks.

67.     In 2014, at least three Sky Valley teachers submitted indoor air quality reports for classrooms, reporting symptoms of acute headaches, sinus issues, burning eyes, "pressure" in the head," sneezing, and neck pain. Nov. 14, 2014 SVEC Preliminary

FRIEDMAN | RUBIN PLLP
51 University Street, Suite 201
Seattle WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Indoor Air Quality Assessment, East Pod, by EHSI, p. 2.

68.     The Monroe School District knew that the Sky Valley Education Center classrooms and common areas contained PCB-light ballasts. The Monroe School District also knew that the PCB-ballasts would fail and make "a very nasty smell filling a classroom." The Sky Valley principal acknowledged this to the Sky Valley staff, although the principal assured staff that the building is "safe." Here is part of the Sky Valley principal's message to the staff in April of 2014:

Hi SVEC Staff,

I wanted to let you know about a challenge we are having with the lighting in our school and make sure you are aware how to get your lighting fixed should you have an issue. Please know that we are complying with Risk Management policies and procedures regarding these light fixtures; and as you all know, Risk Management takes its job of protecting staff and students very, very seriously!

I have met with the Maintenance and Facilities Director, Ralph Yingling, consulted with the Assistant Superintendent of Operations, John Mannix (who among other things is in charge of Facilities and Risk Management) and talked with our custodians Dean and Tim to review our procedures to ensure safety.

Some of the lighting ballasts in our building (as with several other schools in the district and many schools nationwide) are quite old and contain material with PCBs. This material requires special care.  At this time, there are some of these old ballasts in many of our classrooms and common areas. As these ballasts go out, we are replacing them with new ballasts that do not contain PCBs.

In the meantime, we want you to be sure to follow the procedure below to prevent any issues from happening in your classroom. The issues we have experienced are a very nasty smell filling a classroom and the large bulbs getting extremely hot then producing a gooey substance around the lighting in the fixture. Do not attempt to mess with or fix the light on your own. That job must be done by one of our custodians who knows what equipment to use, how to take care of the problem safely, and how to dispose of the materials properly.

...

the number one priority of a school district. Our building is quirky and old and sometimes a challenge. But it is ours. And it is safe.

Karen

69.     The Sky Valley principal also told parents that they should not complain about the condition of the school buildings or else they could lose their program. Instead, the principal said that parents should be grateful to have the campus.

70.     In response to complaints in 2014 by some teachers, however, the Monroe School District maintenance department conducted some inspections and drew some maps of the school building ceilings and light fixtures. Some maps are attached to this

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

complaint as **Exhibit T**. Different areas of the school buildings are depicted as showing PCB-light ballast leaks. Here is a portion of one of the maps (a later draft version of MSDG_014453), looking up at the ceiling of the south pod:



71.     In October of 2014, the Monroe School District director of facilities and operations recorded carbon dioxide levels of 1,700 ppm in one classroom. *EHSI 2014*

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

*Report.* In November of 2014, roughly ten measurements of classroom areas showed $CO_2$ above 1,000 ppm. *Id.* at 7. An independent contractor, EHS-International, Inc., concluded that "there is not a mold problem in the classrooms assessed," and stated that "the reported symptoms which include headaches, sinus issues and sneezing are more likely related to under-ventilation of the spaces as indicated by indoor carbon dioxide concentrations that exceed 1,000 parts per million (ppm) during classroom sessions." *Id.* at 1. Although "carbon dioxide is considered a surrogate for other airborne contaminants," neither the School District nor EHSI appear to have measured the concentrations of PCBs or other toxins in the classrooms at this time. *Id.* at 12.

72.     By 2014, if not earlier, the State (through its Department of Health) had actual knowledge of PCB-light ballast failures and PCB contamination at the Sky Valley school buildings. The State also knew that even apparently intact and non-leaking PCB-light ballasts can release PCBs into the air. (See below.) Despite this knowledge, the State took no action to prevent toxic exposure and protect the children and adults who used those school buildings.

73.     In response to one student's complaints of headaches, the Health District conducted a field investigation and found that classroom "airflow was low (CO2 high)." Jan. 2015 Health District Field Investigation Report (Bates No. 000289).

74.     Apart from that field investigation, the Health District conducted no regular, comprehensive inspection of the school buildings in 2015.

75.     Despite the Health District's lack of inspections in the fall of 2015, the Health District had actual knowledge that Sky Valley teachers reported being sickened by the school buildings.

76.     In the fall of 2015, one Sky Valley teacher was taken away from the school buildings by ambulance due to neurological symptoms. She later resigned due to illnesses she attributed to the school buildings. The substitute teacher who took her place began having neurological symptoms in the weeks that followed, including a seizure, until he also resigned within three months of assuming the post. Many other teachers developed

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

diseases like thyroid disorders, Hashimoto's Disease, and cancers. Roughly a dozen, if not more, teachers resigned from working in these school buildings. Later, roughly a dozen teachers also filed a union grievance against the Monroe School District for the toxic contamination in the school buildings. Children and parents in these classrooms also developed concerning symptoms and diseases, as outlined below.

77.   Because the cafeteria "gathering area" was too small to accommodate everyone for mealtimes, children and adults regularly ate lunches and snacks in their classrooms.

78.   By the end of 2015, if not earlier, the Health District had actual knowledge that the school buildings contained PCB spills and PCB-containing materials.

79.   Despite this knowledge, and upon request by the School District, in 2015 the Health District canceled the regular inspection of the school buildings. The Health District canceled the inspection scheduled for September of 2015, and instead rescheduled it to December of 2015. Upon request by the School District, however, the Health District also canceled the inspection scheduled for December of 2015. The Health District delayed the inspection until January of 2016.

80.   As in 2014 and previous years, the Health District did not enforce compliance with the minimum environmental safety requirements for these buildings in 2015.

81.   During 2015 and 2016, the Health District received and compiled complaints about illnesses associated with the buildings.

82.   But Health District staff told complaining Sky Valley families and teachers that the Health District would not take any enforcement action against the School District unless eventually many people became sick.

83.   Between March of 2013 and January of 2016, the Health District conducted no regular inspection and issued no regular inspection report to the Monroe School District regarding these school buildings.

84.   In December of 2015 and January of 2016, the Monroe School District

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

contracted with environmental engineers to conduct indoor air quality samples, which were then analyzed in a laboratory for PCB content. Some air samples were taken while classes were in session. Apparently unbeknownst to the environmental engineers, this air quality sampling of indoor classroom air was done with exterior windows and doors wide open, rendering the results invalid. During the testing, teachers and students wore their winter coats in the classrooms. Other air samples were apparently taken over the holiday break when classroom air temperatures were low. One State (Department of Health) official emailed other officials, questioning the validity of these results:

> I do not know the purpose of the PCB testing--is it to address this cluster of exposed students/concerned parents, or to address the ballast that smoked in August, or for another reason? I do agree with Nancy that the air test results are not representative of school exposures if the school temperature was low on the day of the testing. From the EPA info I've read, temperature should be taken into consideration when conducting air tests due to the volatility of PCBs. I also find it odd that the LOD for this set of samples of <200 ng/m3, is 5x higher that the LOD for the May 2014 report (<40 ng/m3). The author refers to the duration of sampling but that was the same (24 hours). For the above reasons, can't agree with the report conclusions about PCBs in air are less than the EPA guidelines.

*See* Snohomish Health District Response to Public Record Requests, Bates No. 000379.

85.     By December of 2015, the Health District and the State Department of Health received reports that "multiple teachers have adverse health issues including dizziness, nausea and headaches," and that the school buildings contained both live and failed PCB light ballasts, according to a timeline created by Health District investigator Amanda Zych:

> 11/30/15 – Amanda Zych received call from Nancy Bernard, DOH School Program – They received a complaint from a teacher with health issues at the school.
>
> 12/1/15 – Amanda Zych received call from original complainant – Complainant #1. Complainant #1 (teacher) reported that multiple teachers have adverse health issues including dizziness, nausea and headaches. Complainant stated that 4 light ballasts burst (catch on fire and then oil was noted leaking out of the fixture) in Spring – 2014. Complainant #1 reported that consultants were hired by the Monroe School District to address. It was reported that another bulb burst and leak this Fall – August 2015 - after the consultants completed their work. Complainant #1 also alleged that the PCB light fixture that burst in August 2015 had oil that leaked onto the carpet in Room D and the School District covered the oil stain with duct tape.

*See* Snohomish Health District Response to Public Record Requests, Bates No. 000468.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

86.     By this time, if not earlier, the Health District was aware of reports of sickened children ("endocrine or hormonal issues") in addition to the "multiple teachers with adverse health issues," according to inspector Zych's chronology:

> 1/8/16 – Amanda Zych received call from Complainant #2 – 5 children in the school, parent. All 5 children are sick with endocrine or hormonal issues. All 5 are in the Montessori pod. Forwarded her to the Pediatric Environmental Health Specialty Unit (PEHSU).

*See* Snohomish Health District Response to Public Record Requests, Bates No. 000467.

87.     Meanwhile, the Health District received report of multiple teachers who were "out on medical leave":

> 1/20/16 – Amanda Zych received call from Complainant #3 - parent has children at the school. Worried because multiple teachers are out on medical leave. Wondering if the school is safe. Knows about PCB ballasts. Forwarded her to PEHSU.

*Id.*

88.     Despite this knowledge, no public entity Defendant conducted a health impact assessment on the Sky Valley population. Instead, the public entity Defendants kept the school buildings open and in use.

89.     In January of 2016, the Health District conducted an inspection and issued a report to the Monroe School District. As in previous years, the Health District cited the School District for numerous violations of WAC 246-366, including roughly twenty violations of minimum lighting intensity safety requirements as well as violations of ventilation standards.

90.     The Health District report to the School District did not mention PCBs, PCB spills, or the sicknesses of Sky Valley teachers, parents, and children.

91.     Meanwhile, the public entity Defendants learned that, in addition to the PCB contamination, the school buildings were contaminated with metals (including lead) in the school drinking water, radon in the indoor air, disturbed asbestos fibers, and molds, including black mold.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

92.     By March, Health District inspector Zych noted a report that people had been ill from the school buildings for years, back when the campus was the Monroe Middle School. Separately, the *Everett Herald* newspaper published the fact that the School District "received eight complaints about illnesses potentially linked to air quality from 2001 to 2015." *See* Snohomish Health District Response to Public Record Requests at Bates No. 000465. The March complainant to the Health District reported that "70 people are known to be ill from Sky Valley. More don't want to be added to the list for fear of repercussions… People are very scared to report symptoms and join group." *Id*. at Bates No. 000475. This number grew in the coming months.

93.     A Monroe School District administrator, John Mannix, dismissed these parental and teacher concerns at a community meeting, stating that "If only 10% of the population ever reacted to the environment, that would be normal." *See* Snohomish Health District Response to Public Record Requests, Bates No. 000474. Mannix also reportedly stated that the reported illnesses could not be caused by the disturbed asbestos fibers in the school buildings, because lung diseases caused by asbestos fiber exposure do not appear until decades after exposure.

94.     Meanwhile, Health District inspector Zych reported to her colleagues regarding a dozen known cases of Sky Valley children experiencing "precocious puberty," which is a pathological early-onset of puberty caused by hormonal or endocrine disruptions. *Id.* at Bates No. 000585.

95.     By April, Health District inspector Zych updated her chronology to reflect additional information, including notes on an environmental report on the buildings:

4/21/16 – Update. Continue to receive calls from numerous complainants. Printing out emails and adding additional service records to the file. Received a copy of the PBS Environmental report on 4/18/16. The report states that PCB levels were above the Rfd in 7 areas of the school. The report states that PCB-containing paint was noted on some interior walls in the school. The report states that some caulk used exterior and interior was noted to contain levels of PCBS.

*Id.* at 000592.

96.     Health District inspector Zych created a spreadsheet of some symptoms and

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

diseases of 63 Sky Valley complainants who had come forward to report adverse medical affects. The Health District spreadsheet is attached as **Exhibit U** (Bates No. 000593-96).

97.     Despite this knowledge, the public entity Defendants still kept the school buildings open and in use.

98.     The Monroe School District's environmental contractors created a map entitled "PCB Light Fixture Cleaning," in which red dots showed the light fixtures throughout the school buildings. It is attached as **Exhibit V** along with a map showing School District remediation activities in the spring of 2016**.**

99.     The school building maps show the room names and the rooms' PCB light fixtures—the **red dots**—that needed cleaning. Here was the Music Room and its red dots:

 

100.    Here was the Gathering Area, where children and adults ate and socialized:

 

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

101.    Here was Building 2, Annex, which housed classrooms A, B, C, D, and F, marked with the red dots in the classrooms, along with Building 1, the Office:



102.    Here were the numerous PCB light fixtures that needed cleaning in Building 5, where the Library and the pod classrooms 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20 were located. Note the frequency of red dots:



FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

103.    By the end of April of 2016, 81 individuals had come forward to report to Health District inspector Zych regarding their diseases and symptoms they associated with Sky Valley Education Center:

| | |
|---|---|
| **From:** | Amanda Zych |
| **Sent:** | Friday, April 29, 2016 4:01 PM |
| **To:** | Kevin Plemel; Jeff Ketchel |
| **Subject:** | Updated SVEC Complainant Summary |

FYI –
Since December 2015, I have recorded 81 individuals that have complained of health effects that they associate with Sky Valley Education Center.

Of these individuals:
- 17 – thyroid issues (including 3 Grave's disease, 5 precocious puberty, 5 Hasimoto's disease and 1 hypothyroid)
- 29 – report fatigue
- 24 – report asthma/cough
- 23 report headache
- 21 report GI issues and nausea
- 17 report cognitive issues – "foggy brain"
- 11 report sore throat
- 7 Burning of lungs
- 9 dizziness, fatigue

Thanks!

**Amanda Zych**  | Environmental Health Specialist  | Environmental Health
3020 Rucker Avenue, Ste 104 | Everett, WA 98201 | **425.339.8774** | azych@snohd.org

SNOHOMISH
HEALTH DISTRICT
WWW.SNOHD.ORG
*Public Health: Always working for a safer & healthier Snohomish County*

*See* Snohomish Health District Response to Public Record Requests, Bates No. 000633.

104.    The Health District sent at least two letters in June to the School District regarding elevated PCB levels, the closure of some classrooms, and required summertime remediation of the buildings. *See* **Exhibits W1** and **W2**. The Health District letters cited WAC 246-366-140, stating "the existence of unsafe conditions which present a potential hazard to occupants of the school are in violation of these regulations." *Id.* By the end of June, the Health District was aware of "over 100 parents, teachers and children [who] have reported illness that they associate with the building." *Id.* at W2.

105.    Apart from a closed classroom or two, Sky Valley Education Center remained open through June of 2016.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

106.    Another name for PCB-light ballasts is "**T-12 lights**." The Monroe School District made a map of affected classrooms at the Sky Valley campus:



*See* Monroe School District's Response to Public Records Requests, Bates No. MSDG_014499.

107.    Before the 2016 school year was over, the Monroe School District had disposed of at least 1,648 pounds of PCB-light ballasts:

678 LBS. PCB BALLAST, DRUM # 2769
628 LBS. PCB BALLAST, DRUM # 2770
342 LBS. PCB BALLAST, DRUM # 2771

*See* MSDG_014240-41 (hazardous waste disposal manifest).

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

COMPLAINT - 73

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

108.    Around this same time, the Monroe School District appeared to have possessed a PowerPoint regarding the dangers of PCB-light ballasts. Here are two of the slides:

## Common Health Effects

Chloracne and fingernail discoloration.
Skin and mucous membrane inflammation.
Swollen eyelids, excessive eye discharge and burning eyes.
Burning and edema of the face and hands.
Acute contact dermatitis.
Chronic absorption cause fatty degeneration of the liver.
Probable human carcinogen
Cause cancer in animals

## Chronic Health Effects

Chronic = long term.
Evidence of skin cancer.
Evidence of liver cancer.
Respiratory Tract Irritation.
Gastrointestinal Problems.
Bioaccummulation: builds up along the food chain; builds up in organic tissue.

*See* MSDG_014128, 014135. As shown earlier in this Complaint, the list of these adverse health effects due to PCB exposure is not complete.

109.    The Monroe School District's environmental consultants conducted a litany of air, wipe, and caulking sample tests for PCBs between January and June of 2016. Results varied at different locations and different times within the school buildings, with some results as "none detected," other results characterized as being "low" or "safe" by the public entity Defendants, and with other results recognized as being "high." Many

COMPLAINT - 74

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

wipe samples appear to have been taken *after* deep cleaning. Despite the cleaning efforts, PCB test results in May of 2016 were among the more elevated levels of PCBs detected.

110.    By the spring of 2016, some families had unenrolled from Sky Valley due to the adverse medical effects that they associated with the school buildings. Other families stayed enrolled until June of 2016, having been either unaware of the reports and tests of environmental contamination, or having been assured by the Monroe School District that the school buildings were safe.

111.    After some remediation in the summer of 2016, the Monroe School District resumed Sky Valley classes in September.

112.    Some families attempted to return to Sky Valley in the fall, but unenrolled after re-experiencing adverse medical symptoms that they previously experienced in the school buildings. With the knowledge that the school buildings had been contaminated with toxic chemicals, these families unenrolled. Their spots were then filled by other families on the waitlist for the school program (Sky Valley is a popular program), while the Monroe School District assured the public that the school buildings were safe.

113.    The Health District and School District had some knowledge that this was happening, as shown in this fall 2016 email by inspector Zych to school administrators:

From:          Amanda Zych
Sent:          Friday, September 30, 2016 3:10 PM
To:            'Piplic, Devlin'; Mannix, John
Cc:            Kevin Plemel; Jeff Ketchel
Subject:       Complaint - SVEC

John and Devlin,

For your awareness, I talked to a parent today on the phone that has concerns about Sky Valley. She stated that her daughter had rashes and her son had nose bleeds last year and were both fine over the summer. She went on to say now that they have been back for 2 weeks, symptoms have reoccurred. She stated that her daughter was in Music and Art on Tuesday and then her hands swelled up and had a red rash or hives on them. She stated that her son was in Robotics #1 , #18 and Art and then had a bad nose bleed last night.

**Amanda Zych**  | Environmental Health Specialist  | Environmental Health
3020 Rucker Avenue, Ste 104 | Everett, WA 98201 | **425.339.8774** | azych@snohd.org


SNOHOMISH
HEALTH DISTRICT
WWW.SNOHD.ORG
*Public Health: Always working for a safer & healthier Snohomish County*

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA  98101
(206) 501-4446

*See* Snohomish Health District Response to Public Record Requests, Bates No. 001398; *see also* Bates No. 001820 (Sky Valley parent emailing Zych that "Hope to hear something will change for our kids and families. We do love this program. As so many that cry that they still feel sick when they come near the building so cannot come [*sic*].").

114.    Decades of PCB off-gassing, leaks, spills, and fume events, however, caused these school buildings to become secondarily contaminated as large toxic "sinks." That is, porous materials like library books, papers, bricks, and carpets absorbed the PCBs over the years and now release PCBs back into the indoor air. Plaintiffs who have been sensitized to PCB contamination after suffering PCB poisoning still cannot enter or use these school buildings without suffering uncomfortable, painful, or debilitating reactions, despite the School District purportedly uninstalling the primary sources of PCBs (the PCB-caulking and the PCB-light ballasts) by the summer of 2016.

115.    Environmental tests during the 2016-2017 school year continued to detect levels of PCBs in the air and classrooms of these school buildings to varying degrees, although many results showed "none detected" at the reporting limits. (There is a limit to the sensitivity of the air sampling and laboratory testing.)

116.    As before, at least some environmental tests were conducted with the classroom windows "wide open," as reported to Health District inspector Zych:

3/1/2017 – phone call from Shamus Neary teacher – 360 – 348 – 6764 – Room F

He stated that he was concerned that the levels in the quarterly testing were 42,000 in his room. He stated that he was upset that the district didn't let him know of this sooner. I stated that we just received the information on 2/23/17.

He stated that when he came back from winter break he noticed the air sampling machine in his room and didn't understand why – he thought the testing was completed. He also stated that the window in his room was wide open. He stated he believes that this occurred on January 7th.

*See* Snohomish Health District Response to Public Record Requests, Bates No. 001517.

117.    According to the Health District, "Seven of the rooms that were tested during the PCB air sampling indicated levels in excess of established exposure limits."

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

COMPLAINT - 76

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

*Id.* at 001524.

118.    The Monroe School District went to the press to claim that such year-2017 PCB results were "false positives." Superintendent Smith made this claim to reporters. She also claimed that any past symptoms reported by members of the Sky Valley Education community were minor and like "colds." This was not true. She knew this statement was not true because parents and teachers had previously reported to her serious illnesses and diseases, including sexual developmental disorders in young children after they began attending classes in the school buildings.

119.    The services of the environmental consultant were terminated.

120.    Subsequent PCB testing results appeared to be lower (or "none detected") than the pre-remediation testing results.

121.    Until last year, when the PCB and other toxic contamination became public, the School District kept the Sky Valley staff, parents, and children in the dark about the actual toxic contamination in the school buildings.

122.    Two out of three STEM teachers at the program have reportedly had cancer since 2011. Three young parents of STEM students have died of cancer. Two children have reportedly died of cancer. Other children and adults who spent time in the school buildings have also suffered cancers, endocrine disorders, autoimmune disorders, neurological disorders, and miscarriages.

123.    Since the Monroe School District moved the Sky Valley Education program into the old Monroe Middle School in 2011, many but perhaps not all children and adults who spent time in the school buildings developed symptoms. The symptoms varied in their type and intensity. They included eye irritation, vision difficulties, frequent colds and infections, throat irritation, nose bleeds, allergies, asthma, persistent coughs, difficulty breathing, heart palpitations, headaches, tremors, numbness, tingling, confusion, memory loss, concentration difficulties, depression, anxiety, learning problems, dizziness, nausea, vomiting, abdominal pain, gastrointestinal issues, joint pain, thyroid issues, puberty abnormalities, weight issues, weakness, fatigue, chills, night

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

sweats, skin rashes or hives or blisters, skin cysts, peeling skin, and other complaints.

124.    The frequency and severity of the symptoms appeared to be positively correlated with the vulnerability of the individual and the amount of time spent in the school buildings. The symptoms and diseases worsened over time for these individuals.

125.    Symptom severity generally improved during holiday breaks, when the children and adults spent time away from the school buildings.

126.    At different times during the past few years, some Sky Valley parents and teachers raised serious health concerns associated with the school buildings to the Monroe School District and the Health District. Until mid-2016, the School District and the Health District did not appear to take the concerns seriously.

127.    For example, in 2014 the Monroe School District head of maintenance, Ralph Yingling, told two teachers that they should not be concerned about the PCB-light ballasts. He added that he was in Vietnam and exposed to Agent Orange, and PCB-light ballasts are nothing to worry about in comparison.

128.    Administrators for the School District promised some teachers that all PCB-light ballasts would be removed and replaced with safe light fixtures during the summer of 2014. This clearly was not done.

129.    Another School District administrator ridiculed parents of "sick children" as not being interested in going to school.

130.    The Monroe School District, or its Sky Valley principal, actively discouraged Sky Valley teachers from sharing environmental safety concerns with Sky Valley families.

131.    The Monroe School District, or its Sky Valley principal, also actively discouraged parents from filing indoor air quality complaints with the School District.

132.    The Sky Valley principal also admonished one teacher for cancelling classes due to her concerns about safety in her classroom.

133.    That same teacher developed Hashimoto's Disease (a thyroid disorder) after teaching in that classroom.

FRIEDMAN | RUBIN PLLP
51 University Street, Suite 201
Seattle WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

134.   Some people who spent time in these school buildings cope with skin issues. Unlike headaches, gastro-intestinal pain, or other internal maladies, skin disorders can be photographed. Here are photographs of children, parents, and teachers showing skin sloughing, blisters, rashes, pigmentation changes, a neurological disorder, and a cyst:



FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM





COMPLAINT - 80

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16
17
18
19
20
21
22
23
24
25
26
27



28    These photos (above) show blisters and sloughing skin in Sky Valley adults and children.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Many flares have spread since the fall of 2014, some flares lasting weeks or months. At least four were so painful that they interfered with sleep or required medical attention. This photo shows the start of a flare. In just a week, it got quite a bit worse. First photo was 2/13/15.



Second photo shows the rash spreading onto back of neck on 2/21/15.



3rd photo was 4/11/2015.



COMPLAINT - 82

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM





Here are skin pigmentation changes in a Sky Valley adult and a child (above and below):

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM





COMPLAINT - 84

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Here is chloracne on the back of a Sky Valley parent:



FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM



Sky Valley children and adults also cope with hives, rashes, and acne. Here are photos of full body hives (above) and acne and rashes (below) in Sky Valley children:



COMPLAINT - 86

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM





COMPLAINT - 87

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1
2
3
4
5
6
7
8
9
10





11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27



28 This is the first cyst (of a cluster) removed from a Sky Valley girl's scalp this past year.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

The photographs above are of about a dozen different Sky Valley individuals who developed skin, neurological, and other disorders as part of the constellation of symptoms they attribute to time spent in the school buildings before the School District remediated the buildings. Other photographs of children and adults in the hospital, whether due to encephalitis, cardiac problems, breathing problems, and neurological disorders—all of which have happened to Sky Valley children and adults—are not included. Plaintiffs will request entry of a protective order regarding Plaintiffs' medical records, identifiable photographs, and related personal information.

135.    According to the Monroe School District's attorney, one defense asserted by the School District is that the levels of toxic contamination were never high enough to cause anyone harm.

136.    The Health District's history of citing Monroe Public Schools for code and safety deficiencies at these school buildings establishes two basic facts: (1) Monroe School District and Union High have had a history since the 1950s of poor maintenance and safety compliance for these school buildings up to present-day; and (2) Snohomish Health District knew that these school buildings suffered from poor maintenance and non-compliance with safety requirements, particularly in areas of ventilation and lighting.

137.    Despite this knowledge, the Monroe School District and Union High did not enforce compliance with the minimum safety requirements at these school buildings. That was negligent and a proximate cause of Plaintiffs' damages.

138.    Despite this knowledge, the Snohomish Health District did not enforce "compliance with minimal environmental standards for education facilities, as per WAC 246-366-040," which was the purpose of the Health District's inspections, until late last year. That was negligent and a proximate cause of Plaintiffs' damages.

139.    The State has constitutional and statutory duties to provide for and supervise the administration of educational services in Washington.

140.    The State also knew that many of its school building in general—and these school buildings specifically—contained toxic chemicals such as PCBs.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

COMPLAINT - 89

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

141.    The State Departments of Ecology and Health both recognized that PCBs "can cause adverse health effects in humans and wildlife including cancer and harm to immune, nervous, and reproductive systems. PCBs disrupt thyroid hormone levels in animals and humans, hindering growth and development." State of Wash. Department of Ecology and Department of Health. PCB Chemical Action Plan (Feb. 2015), p. 12, available at https://fortress.wa.gov/ecy/publications/SummaryPages/1507010.html, (last accessed November 14, 2017).

142.    These departments of the State have also been aware that toxic PCBs persist in school buildings built before 1979, and are aware that this represents a danger to the occupants of the buildings: "We are especially concerned about exposure to children in school buildings with old lamp ballasts and other PCB-containing building materials." *Id.* at 12.

143.    The departments of the State know that old ballasts "are at a high risk for failing (dripping, smoking, and catching fire)." *Id.* at 15 (parenthetical explanation in original). The State recognized that the old ballasts release PCBs into the air breathed by children and other people in school buildings:

> Ballast failures can expose children to concentrated PCB oils and elevated PCBs in air. Low concentrations of lower chlorinated PCB congeners are continually released from lamp ballasts. When ballasts fail, high concentrations of a broader spectrum of congeners are released, so it is important to find and remove the lamp ballasts before they fail.

*Id.*

144.    Despite recognizing this danger, the State did not require and supervise the removal of PCBs from these school buildings. The State's inaction created or increased the risk of harm to the Plaintiffs, causing them damages. This was negligent and a proximate cause of Plaintiffs' damages.

145.    Stated differently, a reasonably careful governmental entity establishes and enforces policies to remove toxic chemicals such as PCBs from school buildings to prevent toxic exposure and to protect children, teachers, and parents from sickness, disease, and death.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

146.    A reasonably careful provider of school buildings removes toxic chemicals such as PCBs to prevent toxic exposure and to protect children, teachers, and parents from sickness, disease, and death.

147.    Broadly speaking, a reasonably careful school building inspector requires a building owner or operator to comply with the minimum environmental safety requirements to prevent injury and to protect the building's occupants from harm.

148.    Specifically, a reasonably careful school building inspector requires a school building owner or operator to remove toxic chemicals such as PCBs to prevent toxic exposure and to protect children, teachers, and parents from sickness, disease, and death.

149.    The public entity Defendants' failures to protect the Sky Valley children and adults from reasonably foreseeable harms were negligent.

150.    The public entity Defendants' negligence in these and other ways was reasonably foreseeable to Monsanto and does not serve to cut off the chain of causation of Plaintiffs' damages.

151.    Specifically, the State, the Monroe School District, and Union High used Monsanto's PCBs in a reasonably foreseeable manner, *i.e.* as components of caulking and light fixtures integral to the structures of the school buildings. The use of PCBs by the public entity Defendants was not so highly extraordinary as to be unforeseeable. In fact, the use of PCBs by these Defendants was consistent with Monsanto's intended promotion of its PCBs, *i.e.*, as components of caulking and light fixtures. In addition, the continued use of PCBs in school buildings is also reasonably foreseeable, as thousands of school buildings across the United States continue to use and contain PCBs.

152.    Due to the negligence of the public entity Defendants, however, the Plaintiffs were exposed to PCBs and other toxic contamination. Their negligence was a proximate cause of Plaintiffs' damages.

153.    Although the public entity Defendants and the Plaintiffs "used" Monsanto's PCBs as components of the structures and fixtures of the school buildings, the Plaintiffs

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1    themselves did not "misuse" Monsanto's PCBs.

2      154.    The public entity Defendants' failures to require and supervise the removal

3 of PCBs from the school buildings was caused in part by Monsanto's wrongful conduct.

4 This is because Monsanto intentionally misrepresented facts about its PCB products, or

5 intentionally concealed information about PCBs, and this wrongful conduct was a

6 proximate cause of Plaintiffs' damages.

7      155.    Specifically, Monsanto provided no warnings, notices, or bulletins to the

8 State, the Snohomish Health District, the Monroe School District, Union High, or the

9 Plaintiffs, which would have alerted them to the full extent of the dangers of toxic PCB

10 exposure in school buildings. The reason is this: Monsanto profited for decades by

11 producing and promoting PCBs, and Monsanto continues to have a strong financial

12 interest in denying the environmental dangers and health hazards associated with toxic

13 contamination caused by Monsanto's PCBs.

14      156.    Due to the Defendants' wrongful conduct, the Plaintiffs have suffered past

15 damages and will suffer future damages. Damages includes reasonable fears of present

16 and future adverse medical consequences. *Wilson v. Key Tronic Corp.*, 40 Wn. App. 802,

17 701 P.2d 518 (1985) (where defendant operated a toxic landfill that poisoned local well

18 water, plaintiffs' fears of present and future health problems stemming from actual

19 ingestion of the toxic chemicals are reasonable and therefore compensable).

20 **VI.    LEGAL CONTEXT AND CAUSES OF ACTION**

21    **A.      State law protects individual rights.** Plaintiffs bring claims for damages

22 against the named Defendants under state law only for strict products liability, negligence,

23 and exemplary damages, as outlined below, and under other applicable state law remedies

24 as discovery may reveal.

25      The Plaintiffs respectfully request that the guarantees of the Washington State

26 Constitution weigh in the consideration of legal rulings in this case. "All political power

27 is inherent in the people, and governments derive their just powers from the consent of

28 the governed, and are established to protect and maintain individual rights." Wash.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Const., Art. I, § 1. The Washington Supreme Court recognizes "that the judiciary has ample power to protect constitutional provisions that look to protection of personal 'guarantees,'" including "judicially enforceable affirmative duties of the State." *Seattle School Dist. No. 1 v. State of Washington*, 90 Wn.2d 476, 502, 585 P.2d 71 (1978). This includes the "paramount duty on the State to make ample provision for the education" of children. *Id.* Courts have "ample power" to protect such constitutional guarantees and personal rights:

> When it comes to considering individual rights such as are protected by the guaranties, that the right to trial by jury shall remain inviolate; that no person shall be deprived of life, liberty or property without due process of law; that no law shall grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens; and many other constitutional guaranties that look to protection of personal rights, the courts have ample power, and will go to any length within the limits of judicial procedure, to protect such constitutional guaranties.

*Seattle School Dist. No. 1 v. State of Washington*, 90 Wn.2d 476, 501, 585 P.2d 71 (1978) (holding in part that the school district, parents, and school children who were faced with deteriorating buildings and other shortfalls, had standing to sue the State for its violations of its paramount duty to make ample provision for the education of children), quoting *Gottstein v. Lister*, 88 Wash. 462, 493, 153 P. 595 (1915).

**B.      Plaintiffs are fault-free.** Defendants cannot allege or show facts that would support a claim that the Plaintiffs, who spent time in these school buildings, are somehow at-fault for the toxic contamination and poisoning. The Plaintiffs are fault-free.

**C.      Negligence claims are covered claims.** The claims against the public entities are for negligent provision, establishment, maintenance, inspection, and supervision of the school buildings, which were a legal cause of Plaintiffs' damages. Stated differently, the public entities negligently managed the safety of the school buildings, which caused the Plaintiffs' to suffer damages. No "pollution exclusion" would apply to deny coverage, even if such an exclusion exists in any policy of insurance in this case. *Xia v. ProBuilders*

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1  *Specialty Insur. Co.*, 188 Wn.2d 171, 393 P.3d 748 (2017).

2  **D.       Defendants' joint and several liabilities.** These claims relate to negligence
3  and product liability for "hazardous substances" that contaminated the school buildings and
4  poisoned the Plaintiffs. As a result, all Defendants are jointly and severally liable for all of
5  Plaintiffs' damages. RCW 4.22.070(3); *Coulter v. Asten Group, Inc.*, 135 Wn. App. 613,
6  146 P.3d 444 (2006), reconsideration denied, review denied, 161 Wn.2d 1011, 166 P.3d
7  1217.

8  **E.       Monsanto Defendants' product liabilities to the Plaintiffs.**

9  1.       **PCBs are a product.** Monsanto's PCBs are a "product" under Washington
10  law. RCW 7.72.010(3).

11  2.       **Strict product liability, not reasonably safe in construction (WPI
12  110.01).** A manufacturer of a product is liable if its product was not reasonably safe in
13  construction and this was a proximate cause of plaintiff's damages. 6 Wash. Prac., Wash.
14  Pattern Jury Instr. Civ. WPI 110.01 (6th ed.). A product is not reasonably safe in
15  construction when it is "unsafe to an extent beyond that which would be contemplated by
16  the ordinary consumer." *Id.*, citing RCW 7.72.030(3). Monsanto's PCBs are extremely
17  toxic, and their toxicity was a proximate cause of Plaintiffs' damages. The existence of
18  Monsanto's PCBs in the construction materials, caulking, and light ballasts of the school
19  building was unsafe to an extent beyond that which was contemplated by the other
20  Defendants, their employees, and the Plaintiffs who "used" the PCB-containing materials
21  in the school buildings, which contaminated the buildings and caused PCB-poisoning in
22  the Plaintiffs and others. Monsanto is strictly liable for Plaintiffs' damages.

23  3.       **Strict product liability, not reasonably safe as designed (WPI 110.02).**
24  A manufacturer of a product is liable if its product was not reasonably safe as designed at
25  the time it left the manufacturer's control and this was a proximate cause of plaintiff's
26  damages. A product may be not reasonably safe as designed under either a balancing test
27  or a consumer expectations test. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI
28  110.02 (6th ed.).

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1    At the time Monsanto manufactured PCBs, there was a high likelihood that the
2    PCBs would cause injuries similar to that claimed by the Plaintiffs, and the seriousness of
3    the injuries is significant. This outweighed any "burden" on Monsanto to design a
4    product that would have prevented the injuries (*i.e.*, alternative chemicals or mechanisms
5    used in caulking, light ballasts, and other applications, that are not "extremely toxic"),
6    and any adverse effect that a practical and feasible alternative design would have on the
7    usefulness of the product. *Id.* Monsanto is also liable under the consumer expectations
8    test, considering the following factors: the relative cost to the School District of replacing
9    the caulking, light ballast fixtures, and other materials later discovered to be
10   contaminated with Monsanto's PCBs; the seriousness of harm caused by exposure to
11   PCBs is high; the cost to Monsanto of eliminating PCB production would have
12   eliminated PCB profits, while the feasibility of eliminating or minimizing the risk was
13   readily available to Monsanto; and other factors as may be revealed in discovery. *Id.*

14   Monsanto's PCBs were not reasonably safe as designed and this was a proximate
15   cause of Plaintiffs' injuries following exposure to Monsanto's PCBs. This was reasonably
16   foreseeable by Monsanto. In addition, any claimed "misuse" of toxic PCB-containing
17   products by other Defendants, third parties, or even the Plaintiffs, was also reasonably
18   foreseeable. Regardless, a product can be "not reasonably safe" even though the risk that
19   it would cause the plaintiff's harm or similar harms was not foreseeable by the
20   manufacturer at the time the product left the manufacturer's control. *Id.* (bracketed
21   material). As designed, PCBs were not reasonably safe, and Monsanto is strictly liable for
22   Plaintiffs' damages.

23   **4.    Liability for negligence, "Comment K" unavoidably unsafe products**
24   **(WPI 110.02.01).** A chemical manufacturer has a duty to use reasonable care to design
25   chemicals that are reasonably safe. "Reasonable care" means the care that a reasonably
26   prudent chemical manufacturer would exercise in the same or similar circumstances. A
27   failure to use reasonable care is negligence. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ.
28   WPI 110.02.01 (6th ed.).

COMPLAINT - 95

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1    The question of whether a manufacturer exercised reasonable care is to be

2    determined by what the manufacturer knew or reasonably should have known at the time

3    of the plaintiff's injury. In determining what a manufacturer reasonably should have

4    known in regard to designing its product, a jury should consider the following: a

5    chemical manufacturer has a duty to use reasonable care to test, analyze, and inspect the

6    product it sells, and is presumed to know what tests would have revealed; and a chemical

7    manufacturer has a duty to use reasonable care to keep abreast of scientific knowledge,

8    discoveries, advances, and research in the field, and is presumed to know what is

9    imparted thereby. *Id.*

10    From the first decade of manufacture, Monsanto knew that its PCBs were toxic.

11    The scientific research regarding the toxicity of PCBs increased over time. Despite the

12    actual and imparted knowledge of PCB toxicity, Monsanto continued producing PCBs so

13    Monsanto profited from their sales. Monsanto only stopped producing PCBs due to

14    federal action banning their production. PCBs were never reasonably safe. They are

15    toxic, durable, persistent, bioaccumulate, and are known to migrate from their source

16    material to contaminate the surrounding environment. By their very nature as synthetic

17    chemicals, PCBs were and are unavoidably unsafe products. Monsanto was negligent and

18    is liable for Plaintiffs' damages.

19    5.    **Liability for failure to provide warnings when manufactured (WPI**

20    **110.03).** A manufacturer has a duty to supply products that are reasonably safe. A

21    product may be not reasonably safe because adequate warnings or instructions were not

22    provided with the product. This can be proven either through a balancing test or a

23    consumer expectations test. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 110.03

24    (6th ed.).

25    The balancing test establishes that Monsanto is liable: at the time of manufacture,

26    there was a likelihood that PCBs would cause injury or damage similar to that claimed by

27    the Plaintiffs, and given the seriousness of the injuries or damages, the lack of warnings

28    by Monsanto were inadequate; and Monsanto could have provided adequate warnings or

COMPLAINT - 96

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

instructions. Monsanto could have provided warnings—but chose not to provide any warnings—such as "**CAUTION: CONTAINS PCBS (Polychlorinated Biphenyls), A TOXIC ENVIRONMENTAL CONTAMINANT REQUIRING SPECIAL HANDLING AND DISPOSAL**." Monsanto presumably chose not to provide such PCB warnings because the warnings would have reduced PCB sales and profits.

The consumer expectations test also proves that Monsanto is liable: the construction materials and fixtures containing PCBs are not cheap, and their replacement by the School District and the State would likely be a factor considered; the seriousness of potential disorders and diseases (including reproductive toxicity and cancers) caused by PCB exposure is extremely high, especially considering the vulnerability of children; the cost and feasibility of eliminating or minimizing the risk are substantial; and other factors as discovery may reveal. *Id.*

Monsanto's PCBs were not reasonably safe because adequate warnings or instructions were not provided, and this was a proximate cause of Plaintiffs' injuries. As a result, Monsanto is liable for Plaintiffs' damages.

6. **Liability for failure to provide warnings after manufacture (WPI 110.03.01).** A manufacturer has a duty to supply products that are reasonably safe. A product may be not reasonably safe because adequate warnings or instructions were not provided after the product was manufactured. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 110.03.01 (6th ed.). PCBs are not reasonably safe because adequate warnings or instructions were not provided after they were manufactured: (1) Monsanto learned, or a reasonably prudent manufacturer should have learned, about the dangers connected with PCBs (while and) after they were manufactured; (2) without adequate warnings or instructions, PCBs are unsafe to an extent beyond that which would be contemplated by an ordinary user such as the School District, the State, or the Plaintiffs; and (3) Monsanto failed to provide warnings or instructions concerning the dangers of PCBs in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances. Because Monsanto did not provide adequate warnings or instructions after its PCBs were

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1  manufactured and this was a proximate cause of Plaintiffs' injuries, Monsanto is liable
2  for Plaintiffs' damages.

3       7.     **No "useful safe life" defense, statute does not apply.** A statute of repose
4  enacted in 1981 provides a defense to some product manufacturers. It provides that "a
5  product seller shall not be subject to liability to a claimant for harm under this chapter if
6  the product seller proves by a preponderance of the evidence that the harm was caused
7  after the product's 'useful safe life' had expired." RCW 7.72.060(1). The statute also
8  provides that "'Useful safe life' beings at the time of delivery of the product and extends
9  for the time during which the product would normally be likely to perform or be stored in
10  a safe manner." RCW 7.72.060(1). The statute creates a presumption: "If the harm was
11  caused more than twelve years after the time of delivery [of the product], a presumption
12  arises that the harm was caused after the useful safe life had expired. This presumption
13  may only be rebutted by a preponderance of the evidence." RCW 7.72.060(2).

14       Monsanto's PCBs were installed in the school buildings from the 1950s through
15  the 1970s. Although the PCB-caulking and PCB-light ballasts continued to have *useful*
16  product lives up to the time of remediation in 2016, the PCBs themselves never had *safe*
17  lives due to their extreme toxicity. Monsanto knew that PCBs were toxic, but it provided
18  no adequate warnings. As a result, the public entity Defendants were left uninformed by
19  the manufacturer about the extent of the true dangers of PCBs. Up to the present day,
20  PCBs remained as toxic as they were when Monsanto produced and promoted them. By
21  the 1980s, the EPA termed PCBs "extremely toxic." The statute of repose requires a
22  product to have had a useful safe life when manufactured; the plain meaning of "safe,"
23  however, does not include "extremely toxic." Due to their extreme toxicity, Monsanto's
24  PCBs never had a safe life. PCBs are not and were not reasonably safe products. PCBs
25  were and still are unavoidably unsafe products. A defense that applies to products having
26  a "useful safe life" cannot and does not apply to PCBs.

27       8.     **No "useful safe life" defense, the indefinite persistence of PCBs means**
28  **an indefinite "useful" life.** In the alternative, the chemical stability and persistence of

COMPLAINT - 98

FRIEDMAN | RUBIN PLLP
51 University Street, Suite 201
Seattle WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

PCBs means they have an indefinitely long "useful" life. In the school buildings, the PCB-light ballasts continued to perform their functions for decades, in fact, until 2016 when they were uninstalled. Likewise, the PCB-containing caulking continued to perform its function of sealing gaps between walls, window frames, and masonry joints, until the caulking was removed in 2016. The utility of the PCBs continued uninterrupted from the time of their installation in the school buildings until 2016, and the PCBs performed their functions throughout that time. RCW 7.72.060(1) ("'Useful safe life' begins at the time of delivery of the product and extends for the time during which the product would normally be likely to perform…"). The product seller statute of repose provides Monsanto no defense in this case.

9. **No "useful safe life" defense, statutory exception applies.** In the alternative, if the Court finds that PCBs had a safe life, then a statutory exception applies to deprive Monsanto of the defense. "A product seller may be subject to liability for harm caused by a product beyond its useful safe life if… The product seller intentionally misrepresents facts about its product, or intentionally conceals information about it, and that conduct was a proximate cause of the claimant's harm." RCW 7.72.060(1)(b). Monsanto has intentionally misrepresented facts about PCBs, or has intentionally concealed information about them, and that conduct was a proximate cause of Plaintiffs' harms. No "useful safe life" defense applies under this statutory exception.

10. **Statute of limitations.** For the Plaintiffs, the product liability claims did not accrue until spring of 2016, when the School District's environmental hygienists reported that Monsanto's PCBs contaminated the school buildings. RCW 7.72.060(3); *North Coast Air Services, Ltd. v. Grumman Corp.*, 111 Wn.2d 315, 759 P.2d 405 (1988); 16 Wash. Prac., Tort Law and Practice § 10:16 (4th ed.) (Oct. 2017 update) ("A three year discovery rule applies, with the provision that the statute begins to run when 'the claimant discovered or in the exercise of due diligence should have discovered the harm and its cause.'"). "The Washington Supreme Court has held that this statute extends the limitations period beyond the time when the harm occurred in circumstances when the

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1    claimant would have no reason to know about the causal connection to a defective

2    product." *Id.*, citing *North Coast Air Services, Ltd.*, 111 Wn.2d 315. Before spring of

3    2016, the Plaintiffs had no reason to know that any harm that occurred was caused by

4    PCBs and that they were manufactured by Monsanto.

5           11.    **Foreseeability.** For decades, Monsanto produced and promoted PCBs for a

6    wide variety of applications, including building materials and fixtures such as caulking

7    and light ballasts. Monsanto's PCBs were installed in these school buildings between the

8    1950s and the 1970s. These building applications—and Monsanto's PCBs—are stable

9    and durable. It was foreseeable that Monsanto's PCBs would be installed in such

10    buildings, would persist up to the present day, and would harm people such as the

11    Plaintiffs. This is due to several factors. The first is the stability and durability of PCBs,

12    known to Monsanto. PCBs do not readily breakdown or decompose. This is one of their

13    utilities and a reason that Monsanto produced and promoted them.

14          The second is the known propensity of PCBs to migrate from their sources and

15    contaminate the surrounding environment. Monsanto has known for several decades that

16    PCBs migrate from their sources into their surrounding environments and harm the

17    organisms that live in those environments. Over the years, the PCBs migrated from their

18    sources in caulking and light ballasts into the surrounding building materials such as

19    bricks, carpets, and library books, all of which are absorptive and act as a toxic "sink." As

20    shown by the EPA, the toxic sink then acts as a secondary source of toxic exposure to

21    occupants of the school buildings, in addition to the ongoing primary sources of PCB

22    exposure. In recent years, spikes in indoor air toxicity occurred due to PCB-light ballast

23    failures in which PCB liquid dripped onto carpets and desks in classrooms, and in which

24    failing PCB-light ballasts vented vapors and pyrolyzed byproducts such as dioxins and

25    furans—which are highly toxic as well as foreseeable byproducts—into classroom air.

26    The overall toxicity of the school buildings gradually increased every year until 2016,

27    when inspectors discovered the PCB contamination and the Health District ordered the

28    School District to remediate the buildings.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1    The third factor making the persistence of PCBs foreseeable in these school
2  buildings is that Monsanto provided no warnings regarding their toxicity. Monsanto's
3  knowing inaction made it more likely that the other Defendants would not act, causing
4  more people, including school children, to become poisoned by Monsanto's PCBs. In
5  short, it was foreseeable that Monsanto's PCBs would be left in place for decades in the
6  school buildings while contaminating those buildings and slowly poisoning the people
7  who use the buildings.

8    It was also foreseeable that other people and entities may be negligent in their
9  provision, maintenance, inspection, or supervision of the school buildings, especially due
10  to Monsanto's failures to warn. Any allegation by Monsanto of "misuse" of toxic PCB-
11  containing products by other Defendants, third parties, or even the Plaintiffs, was a
12  foreseeable "misuse" in part for this reason. Regardless, a product can be "not reasonably
13  safe" even though the risk that it would cause the plaintiff's harm or similar harms was
14  not foreseeable by the manufacturer at the time the product left the manufacturer's
15  control. *See* WPI 111.02, -.03 (bracketed material). PCBs were not and still are not
16  reasonably safe. Monsanto is strictly liable for Plaintiffs' damages.

17    12.    **Missouri exemplary damages apply.** "Washington courts will apply the
18  punitive damages law of other jurisdictions in product liability cases, if warranted under
19  choice of law principles. In such a situation, the jury instructions on punitive damages
20  should conform to the laws of the other state." 6 Wash. Prac., Wash. Pattern Jury Instr.
21  Civ. WPI 110.00 (6th ed.), citing *Singh v. Edwards Lifesciences Corp.*, 151 Wn. App.
22  137, 143-44, 210 P.3d 337 (2009). Under a choice of law analysis, the Missouri law of
23  punitive damages applies because Monsanto's reckless decisions and reprehensible
24  conduct took place at Monsanto's headquarters in Missouri. In products liability cases
25  under Missouri law, exemplary or punitive damages are available "if the defendant had
26  actual knowledge of the defect and the danger and showed complete indifference or
27  conscious disregard for the safety of others by selling the product anyway." 34 Mo. Prac.,
28  Personal Injury and Torts Handbook § 5.4 (2017 ed.), ¶ 17(e). Monsanto produced and

COMPLAINT - 101

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1   promoted PCBs, an unreasonably dangerous product, with actual knowledge of their
2   dangers. *Id.* at ¶ 11. Monsanto knowingly concealed the hazards of its PCBs and
3   marketed them as safe for open and closed applications in order to maximize Monsanto's
4   profits from PCB sales. *See, e.g., City of San Jose v. Monsanto Co.*, 231 F. Supp. 3d 357,
5   366 (N.D. Cal. 2017) (denying Monsanto's motion to dismiss the claim for punitive
6   damages on these facts while holding that the Cities stated a claim for public nuisance
7   based on PCB contamination).

8   **F.      Public entity negligence.**

9       1.   **Standing of the State to be sued.** The State may be sued for its
10  wrongdoing that damages its residents: "The state of Washington, whether acting in its
11  governmental or proprietary capacity, shall be liable for damages arising out of its
12  tortious conduct to the same extent as if it were a private person or corporation." RCW
13  4.92.090. The State's "waiver [of immunity] is very broad." State of Washington JLARC
14  Report 11-8 (2011): State Risk Management Practices in Washington at 5.

15      2.   **State's direct liability for negligence.** "A person conducting an activity
16  through servants or other agents is subject to liability for harm resulting from his conduct
17  if he is negligent or reckless (a) in giving improper or ambiguous orders or in failing to
18  make proper regulations." Restatement (Second) of Agency, § 213(a); *see also* Comment
19  g ("Inadequate regulations. A master is negligent if he fails to use care to provide such
20  regulations as are reasonably necessary to prevent undue risk of harm to third persons or
21  to other servants from the conduct of those working under him. See § 508 and the
22  Restatement of Torts, § 317. One who engages in an enterprise is under a duty to
23  anticipate and to guard against the human traits of his employees which unless regulated
24  are likely to harm others. He is likewise required to make such reasonable regulations as
25  the size or complexity of his business may require."). The State gave improper or
26  ambiguous orders or failed to make proper regulations reasonably necessary to prevent
27  undue risk of harm to children and adults at Sky Valley Education Center. The State
28  negligently provided, maintained, and supervised education in these school buildings.

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

The State's negligence exposed the Plaintiffs to toxic chemicals and caused harm. The State is directly liable to the Plaintiffs for its own negligence.

3. **State's vicarious liability through negligence of its agents.** Any negligence of a State agent within the scope of his or her authority is the negligence of the State. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 50.03 (6th ed.) (modified). Constitutional and statutory provisions "impose on the state an obligation to provide an integrated system of agencies for the acquisition, construction, financing, administration, supervision, maintenance, and operation of public schools." Robert F. Utter and Hugh D. Spitzer, The Washington State Constitution 154 (2002); *State ex. Rel. DuPont-Fort Lewis School Dist. No. 7 v. Bruno*, 62 Wn.2d 790, 384 P.2d 608 (1963). "The state exercises its sovereign powers and fulfills its duties of providing education largely by means of a public school system under the direction and administration of the State Superintendent of Public Instruction, State Board of Education, school districts, and county school boards." *Edmonds School Dist. No. 15 v. City of Mountlake Terrace*, 77 Wn.2d 609, 611, 465 P.2d 177 (1970); *see also* Restatement (Second) of Agency, § 214 (1958). State employees negligently provided, inspected, maintained, operated, and supervised the education in these school buildings, causing Plaintiffs to become exposed to toxic chemicals and suffer damages. The State is vicariously liable for this negligent conduct.

4. **State's vicarious liability through acting in concert.** The State, Monroe School District, and Union High are bound together in a joint obligation: "a school district is a corporate arm of the state established as a means of carrying out the state's constitutional duties and exercising the sovereign's powers in providing education." *Edmonds School Dist. No. 15 v. City of Mountlake Terrace*, 77 Wn.2d 609, 611-12, 465 P.2d 177 (1970). Specifically, "in the matter of education, a school district is deemed to be an arm of the state for the administration of the school system." *Edmonds School Dist.*, 77 Wn.2d at 614, citing *Howard v. Tacoma School Dist. No. 10*, 88 Wash. 167, 152 P. 1004 (1915). "It follows that the school district exercises the paramount power of the state in providing education and carries out the will of the sovereign state as to all matters

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

involved in the educational processes and in the conduct, operation, and management of the schools." *Id.* at 614-615; *see also State ex rel. DuPont-Fort Lewis School Dist. No. 7, Pierce County v. Bruno*, 62 Wn.2d 790, 384 P.2d 608 (1963). As a legal consequence, the State is vicariously liable for the negligence of its "arms," the Monroe School District and Union High, that caused damage to the Plaintiffs in this case.

5. **State's paramount, nondelegable duty.** "It is the paramount duty of the state to make ample provision for the education of all children residing within its borders…" Wash. Const., Art. IX, § 1; *McCleary v. State*, 173 Wn.2d 477, 520, 269 P.3d 227 (2012) ("paramount" means "having the highest rank that is superior to all others… the State's first and highest priority before any other State programs or operations"); *Seattle School Dist. v. State*, 90 Wn.2d 476, 511, 514, 585 P.2d 71 (1978). This is the only declaration in the State Constitution "that a specified state function is the state's 'paramount duty.'" Robert F. Utter and Hugh D. Spitzer, The Washington State Constitution 154 (2002); *Seattle School Dist.*, 90 Wn.2d at 523. This paramount duty is "mandatory" on the State, and "the State may discharge its duty only by performance." *Seattle School Dist.*, 90 Wn.2d at 500, 513; Wash. Const., Art. I, § 29. The paramount duty of the State "creates a correlative right on behalf of all children residing within the borders of the state." *Seattle School Dist. v. State*, 90 Wn.2d 476, 510-13, 585 P.2d 71 (1978). This is a "true right" created by a "positive constitutional grant." "Positive constitutional rights do not restrain government action; they require it." *McCleary v. State*, 173 Wn.2d 477, 518-19, 269 P.3d 227 (2012).

6. **State's duty to provide, establish, maintain, and supervise reasonably safe school buildings.** "Provision shall be made for the establishment and maintenance of systems of public schools free from sectarian control which shall be open to all the children of the said state." Wash. Const., Art. XXVI, § 4. The State "shall provide for a general and uniform system of public schools." Wash. Const., Art. IX, § 2. "The establishment and maintenance of the public schools throughout the state are essential and are primarily a state purpose." Robert F. Utter and Hugh D. Spitzer, The Washington

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

State Constitution 156 (2002). "The superintendent of public instruction shall have supervision over all matters pertaining to public schools, and shall perform such specific duties as may be prescribed by law." Wash. Const., Art. III, § 22. These constitutional provisions impose duties on the State to provide, establish, maintain, and supervise "all matters pertaining to public schools."

In addition, the State has the "fundamental responsibility" to protect the public's health. RCW 43.70.512(1) ("Protecting the public's health across the state is a fundamental responsibility of the state"); RCW 43.70.005 ("The legislature finds and declares that it is of importance to the people of Washington state to live in a healthy environment"). This includes the safe management of hazardous waste. The State knows that the "[s]afe and responsible management of hazardous waste is necessary to prevent adverse effects on the environment and to protect public health and safety." RCW 70.105.005(2). "The health and welfare of the people of the state depend on clean and pure environmental resources unaffected by hazardous waste contamination." RCW 70.105.005(1). Specifically, to protect health in school buildings, the State must "adopt rules controlling public health related to environmental conditions including but not limited to heating, lighting, ventilation, sanitary facilities, and cleanliness in public facilities including… schools." RCW 43.20.050(2)(d). To protect children and adults in school buildings, the State must exercise its duties in part through the State Department of Health, the Board of Health, and in conjunction with local boards of health that "shall enforce all rules adopted by the state board of health." RCW 43.20.050(5).

It was foreseeable—and the State actually knew—that these school buildings were or have been contaminated with hazardous waste or toxic substances such as PCBs, and that mismanagement can harm the occupants of those buildings, including the school buildings in this case. The State's neglect and negligent inaction regarding toxic chemicals in these school buildings caused foreseeable harm to the Plaintiffs.

7.   **State's standard of reasonable care for provision, establishment, maintenance, and supervision of these school buildings.** Together with local

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

governmental entities, the State must provide, establish, maintain, and supervise reasonably safe school buildings for the Sky Valley Education community to prevent injury and to protect the children and adults who use those buildings. Reasonably safe school buildings do not expose their occupants to toxic or hazardous chemicals that cause injury or disease. Stated differently, school buildings that expose their occupants to toxic or hazardous chemicals that cause injury or disease are not reasonably safe. Through its agencies and employees, the State must also provide reasonably careful supervision of school districts in their provision and maintenance of school buildings. Although this paramount duty to provide and maintain reasonably safe school buildings primarily benefits children, the duty extends to reasonably foreseeable third parties such as teachers, parents, and other members of the community.

8.      **State violated its duty.** The existence of inadequate or unhealthful school buildings can constitute violations of the State's constitutional duty to children. *Seattle School Dist. v. State*, 90 Wn.2d 476, 524-526, 585 P.2d 71 (1978) (State violated its constitutional duty to school district, parents, and children who were "faced with a deteriorating physical plant" and lacked other educational necessities); *Ramsdell v. North River School Dist.*, 104 Wn.2d 264, 704 P.2d 606 (1985) (citing *Seattle School Dist.* and noting that inadequacy of facilities may be a constitutional violation). The State violated its duty of reasonable care by allowing PCBs and other toxic contamination to remain in these school buildings. The toxic poisoning of the Plaintiffs was a foreseeable and avoidable consequence of the State's negligence.

During the several years of the negligent acts and omissions that caused the school buildings to poison the Plaintiffs by toxic contamination, the State was meanwhile violating its duty to make ample provision for education. *McCleary v. State*, 173 Wn.2d 477, 532-537, 269 P.3d 227 (2012) (finding education to be "woefully underfunded"). "The State has failed to meet its duty under Art. IX, sec. 1 by consistently providing school districts with a level of resources that falls short of the actual costs of the basic education program." *McCleary*, 173 Wn.2d at 547. "School districts" include Monroe

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

School District and Union High. This may be relevant to the extent Monroe School District or Union High allege that any negligence on their part was a consequence of underfunding by the State, although the School District was clearly able to remediate the buildings in 2016, regardless of budgetary constraints, when ordered to do so by the Health District.

Through its agencies, departments, and employees, the State breached its duties of reasonable care to the Plaintiffs by not providing reasonably safe school buildings; by not maintaining the school buildings free of toxic and hazardous substances that cause injury and disease; and by not providing reasonably careful supervision of Snohomish Health District, Monroe School District, and Union High, as they inspected, maintained, and administered educational services at the school buildings now known as Sky Valley Educational Center. Based on the known facts, the State breached its duties in these and other ways as discovery and legal research may reveal.

9.    **The State remains in contempt of the Supreme Court of Washington.** The State has been in contempt of the Supreme Court's *McCleary* decision while the negligence regarding the school buildings caused the Plaintiffs to be exposed to toxic contamination. *McCleary v. State*, No. 84362-7 (Wash. Sept. 11, 2014) (order of contempt); (Wash. August 13, 2015) (order imposing sanction of $100,000 per day penalty on the State for each day it fails to adopt a complete plan to comply with its constitutional duty); (Wash. Oct. 6, 2016) ("monetary sanction of $100,000 per day shall remain in place and continue to accrue until the State purges its contempt by adopting a complete legislative plan demonstrating how it will fully comply with article IX, section 1 of the Washington Constitution by September 1, 2018); (Wash. Nov. 15, 2017) (same).

10.   **State's violations caused Plaintiffs' damages.** The State's breaches of its duties exposed the Plaintiffs to toxic and hazardous substances that caused injury and disease. The State's negligence is a legal cause of Plaintiffs' damages.

11.   **No Title 51 immunity.** The State is not an employer of any Plaintiff and therefore is not entitled to claim immunity under Title 51. RCW 51.08.070; *Afoa v. Port*

COMPLAINT - 107

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

*of Seattle*, 176 Wn.2d 460, 482, 296 P.3d 800 (2013) (Port of Seattle liable in tort to injured worker employed by third-party employer). There are no express contracts or acts that show any of the Plaintiffs or the State recognized one as the employee and the other as the employer. *Hubbard v. Dept. of Labor and Indus.*, 198 Wash. 354, 88 P.2d 423 (1939); *Fisher v. City of Seattle*, 62 Wn.2d 800, 384 P.2d 852 (1963) (relationship of employer and employee cannot exist without consent of employee for purposes of workers compensation laws).

12.    **State and public entity claims against Monsanto.** In 2016, the State sued Monsanto Company, Solutia, Inc., and Pharmacia Corporation for PCB contamination in Washington, alleging public nuisance, products liability (defective design), products liability (failure to warn), negligence, equitable indemnity, and statutory trespass. King County Superior Court, Case No. 16-2-29591-6-SEA. Against the Monsanto Defendants, "the State seeks damages, including on behalf of itself and on behalf of its residents in its *parens patriae* capacity," for Monsanto's PCB contamination in the State of Washington. Complaint for Damages at 5. Under the *nullum tempus* doctrine, no statute of limitations defense shall apply to the State's claims or to the claims of other public entity Defendants bringing claims for the benefit of the State. RCW 4.16.160 ("except as provided in RCW 4.16.310, there shall be no limitation to actions brought in the name or for the benefit of the state, and no claim of right predicated upon the lapse of time shall ever be asserted against the state"); *State v. LG Electronics, Inc.*, 186 Wn.2d 1, 8, 12, 375 P.3d 636 (2016) (noting that "the legislature has expressly instructed that the State shall not be subject to policies of preventing stale claims inherent in statute of limitations because of competing policy considerations regarding the public welfare and the State's purse.") (antitrust *parens patriae* case). While the public entity Defendants may have claims against Monsanto arising out of the damages in this case, Monsanto does not have viable counterclaims against non-Monsanto parties in this case. *See, e.g., City of Spokane v. Monsanto Co.*, No. 2:15-CV-00201-SMJ, 2017 WL 2945729 (E.D. Wash. July, 10, 2017) (dismissing Monsanto's counterclaims against plaintiff City of Spokane).

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

13.     **Standing of Monroe School District No. 103.** The School District shall be liable for damages arising out of its tortious conduct. RCW 4.96.010; RCW 4.08.120 ("An action may be maintained… for an injury to the rights of the plaintiff arising from some act or omission of such county or other public corporation."); RCW 39.50.010(c).

14.     **Monroe School District's direct liability for negligence.** The School District shall be liable for its own failures to hire, train, or supervise its employees in the performance of the duties of provision, inspection, and maintenance of the environmental safety requirements for the school buildings. *Id.*; Restatement (Second) of Agency, § 213(a).

15.     **Monroe School District's vicarious liability for negligence.** Any negligence of a school district board member, administrator, or employee within the scope of his or her authority is the negligence of the school district. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 50.03 (6th ed.) (modified). The law "guarantee[s] that each common school district board of directors, whether or not acting through its respective administrative staff, be held accountable for the proper operation of their district to the local community and its electorate." RCW 28A.150.230.

16.     **Statutory duties.** Monroe School District "shall: (a) Cause all school buildings to be properly heated, lighted, and ventilated and maintained in a clean and sanitary condition; and (b) Maintain and repair, furnish, and insure such school buildings." RCW 28A.335.010(1). It is "the responsibility of the certificated teaching and administrative staff in each common school to: …(e) Give careful attention to the maintenance of a healthful atmosphere in the classroom. [And] (f) Give careful attention to the safety of the student in the classroom and report any doubtful or unsafe conditions to the building administrator." RCW 28A.150.240(2); 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 60.01 (6th ed.); *Swank v. Valley Christian School*, 188 Wn.2d 663, 398 P.3d 1108 (2017) (holding that a statute enacted to protect student safety created an implied remedy for violations of the statute).

17.     **Common law duty to students.** School districts "have a special

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

relationship with the students in their custody," and "[b]ased on this relationship, school districts have a duty to anticipate dangers which may reasonably be anticipated, and then to take precautions to protect the pupils in [their] custody from such dangers." *Henrickson v. Moses Lake School Dist.*, 199 Wn. App. 244, 249, 398 P.3d 1199 (2017), citing *McLeod v. Grant County School Dist.*, 42 Wn.2d 316, 320, 255 P.2d 360 (1953). The duty is based on "the well-established law in Washington that a school district has an enhanced and solemn duty to protect minor students in its care." *Quynn v. Bellevue School District.*, 195 Wn. App. 627, 634, 383 P.3d 1053 (2016), citing *Christensen v. Royal School Dist. No. 160*, 156 Wn.2d 62, 67, 124 P.3d 283 (2005).

18.    **Monroe School District's duty.** The School District must provide and maintain reasonably safe school buildings to prevent injury and to protect the children and adults who use those school buildings. The School District must provide and maintain school buildings free of PCBs and other toxic chemicals to prevent injury and to protect the children and adults who use those school buildings.

19.    **Monroe School District violated its statutory duty.** Monroe School District violated its statutory duty to cause the school buildings to be properly lighted, ventilated, and maintained in a clean and sanitary condition. Monroe School District also violated its statutory duty to give careful attention to the maintenance of a healthful atmosphere and the safety of the students. The School District's violations of the statutes were negligent and legal causes of harm to students and their parents, including the Plaintiffs. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 60.03 (6th ed.). The violations occurred over many years and were multiple and separate negligent acts and omissions during those years. Discovery and legal research may reveal more violations.

20.    **Monroe School District violated its common law duty.** Monroe School District violated its common law duties, based on its special relationship with the students in its custody, to anticipate the dangers of toxic contamination within the old school buildings, and then to take precautions to protect the students from exposure to the toxic contamination. The School District's violations of its common law duties were negligent

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

and legal causes of harm to students and their parents, including the Plaintiffs. Discovery and legal research may reveal more violations.

21. **Monroe School District's duty to public invitees**. Monroe School District owes to its public invitees a duty to exercise ordinary care. This includes the exercise of ordinary care to maintain in a reasonably safe condition those portions of the premises that the invitee is expressly or impliedly invited to use or might reasonably be expected to use. 6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 120.06 (6th ed.).

22. **Monroe School District is liable for violating its duty to public invitees.** Monroe School District is liable for any injuries to its public invitees caused by a condition on the premises if the School District (a) knows of the condition or fails to exercise ordinary care to discover the condition, and should realize that it involves an unreasonable risk of harm to public invitees; (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it; and (c) fails to exercise ordinary care to protect them against the danger. 6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 120.07 (6th ed.). *See also* Restatement (Second) of Torts § 343 "Dangerous Conditions Known to or Discoverable by Possessor," (1965), which Washington courts have cited for the duties owners or occupiers of land owed to invitees. *See, e.g.*, *Tincani v. Inland Empire Zoological Soc.*, 124 Wn.2d 121, 875 P.2d 621 (1994); *Ford v. Red Lion Inns*, 67 Wn. App. 766, 840 P.2d 198 (1992). Landowners owe to invitees a duty of reasonable care requiring them to inspect for dangerous conditions and to make such repair, safeguards, or warnings as may be reasonably necessary for the protection of invitees under the circumstances. *Tincani v. Inland Empire Zoological Soc.*, 124 Wn.2d at 139. This duty of reasonable care includes an "affirmative duty to discover dangerous conditions." *Egede-Nissen v. Crystal Mountain, Inc.*, 93 Wn.2d 127, 132, 606 P.2d 1214 (1980) (citing Restatement (Second) of Torts § 343, comment b); *Jarr v. Seeco Const. Co.*, 35 Wn. App. 324, 326, 666 P.2d 392 (1983).

23. **Monroe School District violated its duty to public invitees.** For years, Monroe School District invited members of the public to use the school buildings,

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1    including parents, staff members, and community members, including the Plaintiffs. The

2    Monroe School District: knew or should have known that the school buildings contained

3    toxic contamination; knew or should have known that the toxic contamination involved

4    an unreasonable risk of harm to the Plaintiffs; and knew or should have known that the

5    Plaintiffs would not discover or realize the danger of the toxic contamination. Despite

6    this knowledge, Monroe School District failed to exercise ordinary care to protect

7    Plaintiffs from exposure to the toxic contamination in the school buildings. Due to its

8    negligent acts and omissions, the Monroe School District caused the Plaintiffs to suffer

9    injuries. The negligent acts and omissions occurred over many years and were multiple

10    and separate negligent acts and omissions during those years. Discovery and legal

11    research may reveal more violations.

12    24.    **Monroe School District's duty to staff members.** "In Washington, an

13    employer has an affirmative and continuing duty to provide all employees a reasonably

14    safe place to work." *McCarthy v. Dept. of Social and Health Services*, 110 Wn.2d 812,

15    818, 759 P.2d 351 (1988).

16    25.    **Monroe School District violated its duty and may be liable to Plaintiffs**

17    **who were staff members.** Due to the toxic contamination at the school buildings,

18    Monroe School District failed to provide its employees with a reasonably safe place to

19    work. Monroe School District is liable to staff member Plaintiffs to the extent their

20    damages fall outside the scope of Title 51. *McCarthy v. Dept. of Social and Health*

21    *Services*, 110 Wn.2d 812, 818, 759 P.2d 351 (1988); *Birklid v. Boeing Co.*, 127 Wn.2d

22    853, 904 P.2d 278 (2003); WPI 32.04 (Measure of Damages—Loss of Consortium—

23    Spouse); WPI 32.05 (Measure of Damages—Loss of Consortium—Parent).

24    26.    **Union High as landowner and school district.** According to Snohomish

25    County tax assessor records, Union High School District No. 402 is the owner of the land

26    occupied by the old Monroe Middle School, currently known as Sky Valley Education

27    Center, and used by the Monroe School District. Union High is also a school district and

28    is liable to Plaintiffs in the same ways as Monroe School District, although Union High is

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

not an employer of any Plaintiff and cannot allege Title 51 immunity. Union High violated its statutory and common law duties to the Plaintiffs in the same manner as did Monroe School District, outlined above. The violations were a legal cause of damages to Plaintiffs. Union High failed to maintain safe premises, violated common law and statutory duties to maintain a safe workplace, and is jointly and severally liable with the State and other Defendants to all Plaintiffs. *Afoa v. Port of Seattle*, 176 Wn.2d 460, 482, 296 P.3d 800 (2013); *Afoa v. Port of Seattle*, 198 Wn. App. 206, 393 P.3d 802 (2017). Discovery and legal research may reveal more violations.

27.    **Joint liability.** Each school district "is a corporate arm of the state established as a means of carrying out the state's constitutional duties and exercising the sovereign's powers in providing education." *Edmonds School Dist. No. 15 v. City of Mountlake Terrace*, 77 Wn.2d 609, 611, 465 P.2d 177 (1970). The State, Monroe School District, and Union High are bound together in this joint duty. *Id.*; RCW 28.A.150.070; Wash. Const., Art. IX, § 2. Two or more governmental entities act in concert if they consciously act together in an unlawful manner, although it is not necessary that they intend to harm the plaintiff. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 50.20 (6th ed.). One governmental entity is liability for the fault of another if both were acting in concert with respect to a particular act or omission and that act or omission was a proximate cause of the plaintiff's injuries. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 50.21 (6th ed.). Monroe School District, Union High, and the State acted in concert to provide to Plaintiffs the school buildings contaminated with toxic chemicals, which was a proximate cause of exposing Plaintiffs to the toxins and injuring them. Each of these three entities is liable for the fault of the other two.

28.    **Monroe School District and Union High, causes of action.** Monroe School District and Union High may have causes of action against the State and the product manufacturer Defendants in this case. RCW 4.08.110; *Seattle School Dist. No. 1 v. State*, 90 Wn.2d 476, 490, 585 P.2d 71 (1978) (holding in part that the school district faced with deteriorating buildings and other shortfalls had standing to sue the State for its

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

violations of its paramount duty to make ample provision for the education of children). No statute of limitations applies as a defense against school district claims brought to benefit the State against a corporate defendant such as Monsanto. *Bellevue School Dist. No. 405 v. Brazier Constr. Co.,* 103 Wn.2d 111, 114, 691 P.2d 178 (1984); *cf. Wash. State Major League Baseball Stadium Public Dist. v. Huber, Hunt & Nichols-Kiewit Constr. Co.*, 176 Wn.2d 502, 514, 296 P.3d 821 (2013) (noting statutory amendment after *Brazier Constr.* to RCW 4.16.160 and -.310, providing that "the State is subject to the construction statute of repose"); RCW 4.16.160 ("except as provided in RCW 4.16.310, there shall be no limitation to actions brought in the name or for the benefit of the state, and no claim of right predicated upon the lapse of time shall ever be asserted against the state").

29.    **Standing of the Snohomish Health District.** The Health District shall be liable for damages arising out of its tortious conduct. RCW 4.96.010; RCW 4.08.120 ("An action may be maintained… for an injury to the rights of the plaintiff arising from some act or omission of such county or other public corporation."); RCW 39.50.010(c).

30.    **Health District's direct liability for negligence.** The Health District shall be liable for its own failures to hire, train, or supervise its employees in the performance of the duties of inspection and enforcement of minimal environmental safety requirements for the school buildings. *Id.*; Restatement (Second) of Agency, § 213(a).

31.    **Health District's vicarious liability for negligence.** Any negligence of a Health District board member, administrator, or employee within the scope of his or her authority is the negligence of the Health District. 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 50.03 (6th ed.) (modified).

32.    **Health District's joint obligation with the State to enforce safety requirements in the school buildings.** The State Board of Health and the Snohomish Health District have a joint obligation to protect public health in school buildings in Snohomish County. To protect public health, the State Board of Health shall establish safety requirements for water quality, air quality, and environmental conditions in school

FRIEDMAN | RUBIN PLLP
51 University Street, Suite 201
Seattle WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

1  buildings, "including but not limited to heating, lighting, ventilation, sanitary facilities,
2  and cleanliness." RCW 43.20.050(2)(d). The Snohomish Health District shall enforce
3  these requirements. RCW 43.20.050(5). The requirements are designed for the benefit
4  and protection of the children and adults who use public school buildings. *Bailey v. Town*
5  *of Forks*, 108 Wn.2d 262, 268, 737 P.2d 1257 (1987) (noting one exception to the public
6  duty doctrine is "when the terms of a legislative enactment evidence an intent to identify
7  and protect a particular and circumscribed class of persons (legislative intent)").

8      33.  **Healthy District's duty to inspect school buildings.** The Health District
9  must inspect school buildings and enforce safety requirements to prevent injury and to
10 protect the children and adults who use the school buildings.

11     34.  **Health District's duty to take corrective action and enforce safety**
12 **requirements.** The Health District must take corrective action and enforce safety
13 requirements in school buildings to prevent injury and to protect the children and adults
14 who use the school buildings.

15     35.  **Health District breached its duties to the Plaintiffs, causing them harm.**
16 For years, the Health District knew that the school buildings were violating
17 environmental safety requirements. For those same years, the Health District had a duty
18 to inspect, verify compliance, and order compliance with environmental safety
19 requirements at the school buildings. But the Health District failed to enforce compliance
20 until the spring of 2016, by which time many people, including the Plaintiffs, had
21 suffered toxic poisoning. In addition, the Health District knowingly and negligently
22 delayed enforcement and waited while dozens of people reported illnesses and diseases
23 attributed to the school buildings. The Health District specifically told Plaintiffs and
24 others harmed by the hazardous conditions in the school buildings that the Health District
25 would take no enforcement action until many people became sickened by the
26 contamination at the school buildings. The Health District chose not to act until 2016,
27 when it finally ordered environmental testing and remediation of the hazardous
28 substances in the school buildings. The Health District violations of its duties were legal

COMPLAINT - 115

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

causes of harm to the Plaintiffs.

The Health District is liable to the Plaintiffs and other reasonably foreseeable occupants of the school buildings for the toxic exposures that caused them harm. *Campbell v. City of Bellevue*, 85 Wn.2d 1, 530 P.2d 234 (1975) (duty imposed on electrical inspector who knew of nonconforming electrical system but failed to enforce electrical code compliance, causing injury and death); *Halvorson v. Dahl*, 89 Wn.2d 673, 574 P.2d 1190 (1978) (claim may be made against city for its long-term knowledge of, and inadequate response to, hotel's noncompliance with safety codes); *Bailey v. Town of Forks*, 108 Wn.2d 262, 737 P.2d 1257 (1987) (liability against police officer who allowed drunk driver to drive his truck, hitting motorcyclist). When the Health District finally acted in 2016 on the school buildings, it found "[t]he existence of unsafe conditions which present a potential hazard to occupants of the school [which] are in violation of these regulations." WAC 246-366-140(1); RCW 43.20.050 (health district shall enforce minimum safety requirements in school buildings); *Swank v. Valley Christian School*, 188 Wn.2d 663, 398 P.3d 1108 (2017) (holding that a statute enacted to protect student safety created an implied remedy for violations of the statute). The same "unsafe conditions" had been present for months, years, and decades beforehand, had harmed the children and adults in the school buildings, and had been known to the Health District. The Health District's failure to enforce the safety requirements at the school buildings was a proximate cause of Plaintiffs' damages.

**G.      Roes.** Roes 1 through 10 are public entities or public or private corporations who may be liable for causing injuries to the Plaintiffs. Currently, it is not known if named Defendants will allege fault against these entities or corporations. Plaintiffs request leave to amend this Complaint if Defendants allege fault against third parties, or if facts become known showing liability against third parties. Third parties Snohomish County, Northwest Education Service District #189, City of Monroe, EHS-International, and McKinstry Corp. are being given notice of this lawsuit. If they or another third party are added as Defendants, the new claims in the amended pleadings relate back to the original complaint. CR 15(c).

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

**H.**       **Admonition of the *Environmental Defense Fund* decision**. Years before many of the Plaintiffs in this case were born, the federal district court for the District of Columbia advised that action must be taken to prevent toxic environmental poisoning and to protect future generations:

> We feel constrained to add one final note to emphasize our concern in this case. Human beings have finally come to recognize that they must eliminate or control life threatening chemicals, such as PCBs, if the miracle of life is to continue and if earth is to remain a living planet. This is precisely what Congress sought to do when it enacted section 6(e) of the Toxic Substances Control Act. Yet, we find that forty-six months *1287 after the effective date of an act designed to either totally ban or closely control the use of PCBs, 99% of the PCBs that were in use when the Act was passed are still in use in the United States. With information such as this in hand, timid souls have good reason to question the prospects for our continued survival, and cynics have just cause to sneer at the effectiveness of governmental regulation.

*Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1267, 1286-87 (D.C. Cir. 1980) (internal citation omitted).

**I.**       **Accountability.** The Plaintiffs respectfully request that each of the Defendants be held accountable for their roles in causing the toxic poisonings in this case.

**VII.   PRAYERS FOR RELIEF**

**A.**       **Request for preservation of evidence.** Plaintiffs request that all Defendants and third parties given notice of this lawsuit preserve all evidence that may potentially be relevant.

**B.**       **Ex parte contact is prohibited.** Many Plaintiffs are individuals who attend, visit, or work at locations within the School District. Plaintiffs request that defense attorneys instruct their agents, employees, defendant employees, and defendants' agents to please refrain from any ex parte contact with Plaintiffs regarding the subject matter of this lawsuit, whether in school buildings, hospitals, or other locations. This request includes the non-physician State or University of Washington Medical Center employee(s) who have observed or attempted to observe clinical evaluations of injured Sky Valley teachers,

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

parents, and children.

**C.      Limited waiver of physician-patient privilege.** Under RCW 5.60.060(4)(b), Plaintiffs hereby waive the physician-patient privilege only insofar as necessary to place damages at issue at the time of trial. Plaintiffs' actions do not constitute a waiver of any of their constitutional or statutory rights. Defendants, defense attorneys, and their agents are not to contact any treating physicians without first notifying plaintiff counsel, so the matter may be negotiated or brought to the attention of the Court. *Loudon v. Mhyre*, 110 Wn.2d 675 (1988); *Smith v. Orthopedics International, Ltd.*, *P.S.*, 170 Wn.2d 659 (2010).

**D.      Motion practice.**

1.      Plaintiffs' attorneys will move for the appointment of appropriate guardians *ad litem* to represent the interests of Plaintiffs who are minors.

2.      Plaintiffs will request relief during litigation through stipulation or motion practice for a limited protective order to provide appropriate psychological, privacy, and personal identification information protections for Plaintiffs.

3.      Plaintiffs may request leave to amend the complaint, as discovery or Defendants' answers may require.

4.      Plaintiffs may request leave to reform the caption to reflect the addition or deletion of parties.

5.      Plaintiffs may request other relief as may be appropriate during litigation.

**E.      Judgment for damages.** Plaintiffs demand judgment against Defendants, and each of them, individually, jointly, and severally, for monetary damages to make Plaintiffs whole, together with interest, expenses, costs of suit, attorney fees, as appropriate, and all such other relief as the Court deems just and proper, including:

1.      Full compensatory damages to the Plaintiffs for past, present, and future general damages as allowed by law;

2.      Full compensatory damages to the Plaintiffs for past, present, and future special damages as allowed by law;

3.      Exemplary or punitive damages against Monsanto, Solutia, and/or

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Pharmacia, under the applicable law of foreign jurisdiction(s); and

4.      All other damages allowed by law, rule, or equity.


DATED this 9th day of May, 2018.

FRIEDMAN | RUBIN PLLP

By: _____
    Sean J. Gamble, WSBA No. 41733
    James A. Hertz, WSBA No. 35222
    Richard H. Friedman, WSBA No. 30626
    Henry G. Jones, WSBA No. 45684

*Attorneys for Plaintiffs*

FRIEDMAN | RUBIN PLLP
51 UNIVERSITY STREET, SUITE 201
SEATTLE WA 98101
(206) 501-4446

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 17

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK COUNTY, ss.

SUPERIOR COURT
CIVIL ACTION NO.: 16-0503 E

CRAIG LAMKIN and SUSAN LAMKIN

*Plaintiffs,*

vs.

JURY TRIAL DEMANDED

MONSANTO COMPANY,

COOPER POWER SYSTEMS, as a division of EATON'S ELECTRICAL,

MCGRAW- EDISON COMPANY, as a subdivision of COOPER POWER SYSTEMS and EATON ELECTRICAL,

O'CONNOR CORPORATION INC. f/k/a SOLUTIA INC.,

GENERAL ELECTRIC CO.,

SOLUTIA INC.,

PHARMACIA LLC f/k/A PHARMACIA CORPORATION as *successor in interest to* OLD MONSANTO.,

PFIZER INC.,

CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION,

NSTAR ELECTRIC f/k/a BOSTON EDISON COMPANY,

INTERNATIONAL PAPER COMPANY,

VERIZON COMMUNICATIONS INC., f/k/a VERIZON NYNEX PERKINELMER, INC.



1

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

**JOHN DOE.**

> *Defendants.*

---

## COMPLAINT

COMES NOW Plaintiffs, CRAIG LAMKIN and SUSAN LAMKIN, and allege as follows:

## INTRODUCTION

1.      On or about July of 2013, Plaintiff Craig Lamkin was diagnosed with primary retroperitoneal sarcoma of the colon, small bowel, pancreas, spleen, and left adrenal gland which required Plaintiff to undergo a radical resection of his left abdomen.   Plaintiff's cancer was caused by exposure to polychlorinated biphenyls (PCBs) manufactured, sold and controlled by Defendants as well as chemical derivatives and contaminants contained within the PCBs known as dioxins.   PCBs were manufactured, sold, and utilized by Defendants for use as a coolant and lubricant in electrical machinery including transformers.   Plaintiff Craig Lamkin was exposed to Defendants' PCBs and dioxins during the course of his employment working with power transformers and other electrical equipment manufactured by Defendants.   Plaintiff Craig Lamkin was regularly and routinely exposed to these PCBs and dioxins with sufficient regularity to cause his disease.   At all times material to this action, Defendants had or should have had actual knowledge of the toxicity of PCBs and dioxins and failed to warn the Plaintiff.   Moreover, at all times material to this action, alternative safer materials were available to Defendants for use as a chemical lubricant and coolant.   Despite the knowledge of the hazards associated with PCBs and dioxins, Defendants made the affirmative decision to utilize these

2

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

carcinogenic materials and affirmatively choose not to warn the Plaintiff.  Defendants' PCBs and

dioxins, as well as the machinery sold containing this material, were unreasonably dangerous and unfit

for the purposes that they were designed and sold for. As a result of the allegations listed above and

herein, Mr. Lamkin has suffered, and continues to suffer, debilitating injuries.  Mr. Lamkin, and his wife

Susan Lamkin, bring this suit for damages relating to those injuries.

## **PARTIES**

2.     Plaintiff, Craig Lamkin ("Plaintiff-worker), was and is a citizen and resident of the State

of Massachusetts during all times relevant.  He brings this action individually.

3.     Plaintiff, Susan Lamkin ("Plaintiff-spouse), was and is a citizen and resident of the State

of Massachusetts during all times relevant and also makes a claim for loss of consortium due to her

husband's PCB/dioxin-related disease.

4.     Defendant Monsanto Company ("New Monsanto"), is a Delaware Corporation with its

principle place of business in St. Louis, Missouri.  At all relevant times it did business in the State of

Massachusetts.

5.     Defendant Cooper Power Systems ("Cooper"), a division of Eaton's Electrical, is a

Delaware Corporation with its principle place of business in St. Louis, Missouri.  At all relevant times it

did business in the State of Massachusetts.

6.     Defendant McGraw-Edison Company, a subdivision of Cooper Power Systems and Eaton

Electrical Delaware Corporation, is a Delaware Corporation, with its principle place of business in

Elgin, Illinois, and it's Registered Agent in Boston, Massachusetts.  At all relevant times it did business

in the State of Massachusetts.

7.     Defendant O'Connor Corporation Inc. (formerly known as "O'Conner Constructers" and

successor to Thomas O'Connor & Company), is a Delaware Corporation with its principle place of

3

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

business in St. Louis, Missouri.  At all relevant times it did business in the State of Massachusetts.

8.      Defendant General Electric Company is a New York corporation with its principal place of business in New York. At all relevant times it did business in the State of Massachusetts.

9.      Defendant Solutia Inc. ("Solutia") is a Delaware Corporation with its principle place of business in St. Louis, Missouri.  At all relevant times it did business in the State of Massachusetts.

10.     Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to Old Monsanto) is a Delaware LLC that since its merger with Defendant Pfizer Inc. in 2003, has had its headquarters and its principal place of business New York, New York.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.  At all relevant times it did business in the State of Massachusetts.

11.     Defendant Pfizer Inc. ("Pfizer") is a Delaware corporation that has its corporate headquarters and principal place of business in New York, New York.  At all relevant times it did business in the State of Massachusetts.

12.     Defendant CBS Corporation f/k/a Westinghouse Electric Corporation is a Delaware corporation with its principal place of business in New York.  At all relevant times it did business in the State of Massachusetts.

13.     Defendant NSTAR Electric f/k/a Boston Edison Company is a Massachusetts corporation with its principal place of business in Massachusetts.

14.     Defendant International Paper Company is a Maine corporation with its principal place of business in Maine.  At all relevant times it did business in the State of Massachusetts.

15.     Defendant Verizon Communications Inc., f/k/a Verizon Nynex ("Verizon") is a Delaware corporation with a Registered Agent in Massachusetts.   At all relevant times it did business in the State of Massachusetts.

16.     PerkinElmer, Inc. is a Massachusetts corporation with its principal office and Registered Agent in Massachusetts.  At all relevant times it did business in the State of Massachusetts.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

17.     Defendant JOHN DOE (fictitious) represents one or more business entities whose real names and identities are presently unknown to Plaintiffs.

18.     The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceuticals and nutrition business, and a chemical products business. Old Monsanto began manufacturing PCBS in the 1940s and continued to manufacture commercial PCBS, until the late 1970s. At all relevant times it did business in the State of Massachusetts.

19.     Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations. The corporation now known as Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

20.     Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.

21.     Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.

22.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.

23.     At all times herein mentioned, each of the defendants was the agent, servant, employee and/or joint venture of his co-defendants, and each of them, and at all said times each defendant was acting in full course and scope of said agency, service, employment and/or joint venture.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

24.     The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants are not fully known to Plaintiffs at this time, who there're sues said defendants by such fictitious names.  When the true names and capacities of said defendants have been ascertained, Plaintiffs will amend this complaint accordingly.  Plaintiffs are informed and believe, and thereon allege, that each defendant designated herein as JOHN DOE is responsible, negligently or in some other actionable matter, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to the Plaintiffs, as hereinafter alleged.

25.     Plaintiffs are informed and believe, and thereon allege that at all times herein mentioned, defendants Monsanto Company (New Monsanto) (sued individually and as successor in interest to Pharmacia Corporation, Which Will Do Business in Massachusetts as Pharmacia Pharmaceutical Corporation), Solutia Inc. (sued individually and as successor-in-interest to Monsanto Chemical Co.(Old Monsanto)), Pharmacia (sued individually and as successor-in-interest to Monsanto Chemical Co.(Old Monsanto)), Pfizer (sued individually and as successor-in-interest to Pharmacia Corporation, Which Will Do Business in Massachusetts as Pharmacia Pharmaceutical Corporation), and JOHN DOES were and are authorized to do and are doing business in the State of Massachusetts, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the state of Massachusetts, and that said defendants have regularly conducted business in the state of Massachusetts.

26.     Plaintiffs are informed and believe that each of the defendants is responsible, negligently, intentionally and/or in some actionable manner, including as corporate successors liable for the acts of their predecessors, for the events and happenings referred to herein, and caused and continue to cause injuries and damages to Plaintiffs, as alleged herewith, either through each defendant's own conduct, or through the conduct of its agents, servants, or employees, or due to ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

6

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

27.     Collectively, the following Defendants are known as the Manufacturing Defendants for purposes of this Complaint.  They are listed as follows: Monsanto Company; Cooper Power Systems; O'Connor Corporation; General Electric's manufacturing division; Pfizer; Solutia; Pharmacia; CBS; PerkinElmer, Inc., and JOHN DOE defendants.

28.     Collectively, the following Defendants are known as Premises Defendants for purposes of this Complaint.  They are listed as follows: McGraw Edison; NSTAR; International Paper Company; Verizon Communications; General Electric's facility located in Pittsfield, Massachusetts; and JOHN DOE defendants.

## VENUE JURISDICTION

29.     Suffolk County Superior Court is a proper venue for this action, since Plaintiff's exposure and Defendants actions and selling of products which led to such exposure took place in the State Massachusetts.

30.     Jurisdiction is proper in this Court because Plaintiff are seeking damages in excess of twenty-five thousand dollars ($25,000) and Defendants' conduct giving rise to Plaintiffs' causes of action occurred in the state of Massachusetts.  See MGL c. 223A, § 3.

31.     This Court has jurisdiction of this matter because the amount in controversy exceeds its jurisdictional minimum, exclusive of costs and interest. Moreover, this Court has jurisdiction over this matter and these defendants because these defendants have done business in the State of Massachusetts, committed torts, in whole or in part, in the State of Massachusetts, and/or have continuing contacts with the State of Massachusetts resulting in Plaintiff Craig Lamkin's injuries.

32.     In the event that the parties do not maintain principal places of residence and/or business within the Commonwealth of Massachusetts, the Massachusetts Long Arm Statute (M.G.L. c.223 A, § 3) provides personal jurisdiction in the Superior Court Department of the Trial Court over all parties.

7

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

33.     This action involves claims by Massachusetts Plaintiffs against at least one defendant who has a principle place of business in Massachusetts through which the injuries alleged were caused. "[An] action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." (28 U.S.C. § 1441(b)).

## FACTUAL ALLEGATIONS

### A.  Background.

34.     This is a personal injury case brought by Plaintiffs, Craig Lamkin and his wife Susan Lamkin for injuries caused by Plaintiff Craig Lamkin's exposure to polychlorinated biphenyls (PCBs) manufactured and sold and controlled by Defendants as well as chemical derivatives and contaminants contained within the PCBs known as dioxins.  At all times relevant to the allegations listed herein, Plaintiff, Craig Lamkin was employed by (1) Laidlaw Environmental Services in North Andover, Massachusetts, where he worked as an environmental chemist from approximately October of 1992 through December of 1994; (2) Enpro Services in Newburyport, Massachusetts, where he worked as a compliance manager from approximately December of 1994 through July of 2001; and (3) Cyn Environmental Services in Stoughton, Massachusetts, where he worked as a corporate compliance manager from approximately July of 2001 through June of 2008.  Throughout Mr. Lamkin's employment he worked at the various premises sites listed in count 28, herein aforementioned.

35.     PCBs were used as coolants and lubricants in transformers, capacitors, and other electrical equipment from 1929 to 1979.

36.     The manufacture of PCBs was stopped in the U.S. in 1979 because of evidence of harmful health effects and impacts on the environment.

37.     'Dioxins' refers to two groups of compounds: Polychlorinated dibenzo-p-dioxins (PCDDs) and dibenzofurans (PCDFs).

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

38.     Dioxins have no technological or other use, but are generated in a number of thermal and industrial processes including the use as coolants and lubricants in electrical equipment as unwanted and unavoidable by-products. Moreover, dioxins are present as contaminants within PCBs that have not been subject to thermal or industrial processes.

39.     Dioxins and PCBs been shown to cause a range of adverse effects including cancer, impairment of the nervous, immune, endocrine, and reproductive systems.

40.     Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979. Although Monsanto knew for decades that PCBs were toxic and presented a human health risk, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture use of most PCBs as of January 1, 1979. The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

41.     Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start capacitors, and lighting ballasts.

42.     From the 1930s to 1979, Westinghouse and General Electric Co. were the biggest purchasers of PCBs for use in electrical components including transformers.

43.     Other big users included electrical-equipment companies such as McGraw Edison, NStar Electric, and telephone companies like NYNEX Corporation.

44.     As used in this Complaint, the terms " "PCB-containing products" and "PCB products" refer to products containing PCBs, as well as breakdown products and contaminants PCDDs and PCDFs, manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

**B.  PCB Containing Products are Human Carcinogens.**

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

45.     Humans may be exposed to PCB products through ingestion, inhalation, and dermal contact. Individuals may inhale PCBs that are emitted into the air. They may also ingest PCB products that are emitted into air and settle onto surfaces that come into contact with food or drinks. Humans may also PCBs from physical contact with PCBs or PCB-containing materials.

46.     EPA has determined that PCBs are probable human carcinogens. In 1996, EPA reassessed PCB carcinogenic to Plaintiff, based on data related to Aroclors 1016, 1242, 1254, and 1260.   EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

47.     The International Agency for Research on Cancer published an assessment in 2013 that reinforcing the probable carcinogenicity of PCBs.

48.     The International Agency for Research on Cancer published an assessment in 1997 that asserts an even stronger relationship between dioxins and human cancer. The International Agency for Research on Cancer (IARC) classified TCDD in Group 1 (carcinogenic to humans). In addition, IARC recently classified 2,3,4,7,8-pentachlorodibenzofuran and 3,3',4,4',5-pentachlorobiphenyl in Group 1.

## C. Defendants Have Long Known of PCBs' Toxicity

49.     All of the Defendants were well aware of the decades of scientific literature first published in the 1930s that established that PCBs were toxic to humans.

50.     As a result, all of the Defendants knew or should have known of the actual dangers associated with PCB products that Mr. Lamkin worked with.

51.     Despite this, Defendants never warned Mr. Lamkin of the hazards associated with their PCB products or advised him of the proper protective measures to avoid exposure.

52.     In 1936, Dr. Lewis Schwartz, Senior Surgeon with the United States Public Health Service, wrote a paper in which he warned of the dangers of Pyrenol, the version of PCBs used by GE. In it Dr.

10

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Schwartz said:

"In addition to the skin lesions, symptoms of systematic poisoning have occurred among workers inhaling the fumes. Those working with the chloro diphenyls (PCBs) have complained of digestive disturbances, burning of the eyes, impotence and hematuria. The latter symptom developed among a number of men making amino diphenyl, which is used in the making of a rubber antioxidant. Causes of death from yellow atrophy of the liver have been reported among workers exposed to the fumes of the chloro naphthalenes."

53.     Also in 1936, Dr. Schwartz cautioned in an article that "workers in chlorinated naphthalenes and di phenyls (PCBs) should be periodically examined for symptoms of systemic poisoning."

54.     An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects. Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."

55.     In a letter dated Sept. 15, 1947, E. C. Barnes of Westinghouse's medical department wrote that long-term exposure to PCB fumes "may produce internal bodily injury which may be disabling or could be fatal."

56.     A September 20, 1955, memo from Emmet Kelly stated:

"We know Aroclors are toxic but the actual limit has not been precisely defined. It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops [sic] any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."

57.     On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department.

"It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation."

58.     On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. 1`

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."

59.     In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested." Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible." Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."

60.     On January 29, 1970, Elmer Wheeler of the Medical Department of Monsanto circulated laboratory reports discussing results of animal studies. He noted: "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."

### D. Defendants Concealed the Nature of PCBs from Governmental Entities.

61.     Upon information and belief, while the scientific community and Defendants knew that PCBs were toxic and becoming a global contaminant, Defendants repeatedly misrepresented these facts, telling governmental entities the exact opposite — that the compounds were not toxic and that the company would *not* expect to find PCBs in the environment in a widespread manner.

62.     For example, in a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption." Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry." A similar letter to the Regional Water Quality Control Board explained that PCBs are associated with "no special health problems" and "no problems associated with the environment."

12

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

63.     In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."

64.     Monsanto delivered the same message to the New Jersey Department of Conservation in July, 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic." The letter then reiterates Monsanto's position regarding environmental contamination: "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."

### E. Plaintiff Craig Lamkin's Experience and Exposure to Defendants PCB products.

65.     Plaintiff, Craig Lamkin was employed by (1) Laidlaw Environmental Services in North Andover, Massachusetts, where he worked as an environmental chemist from approximately October of 1992 through December of 1994; (2) Enpro Services in Newburyport, Massachusetts, where he worked as a compliance manager from approximately December of 1994 through July of 2001; and (3) Cyn Environmental Services in Stoughton, Massachusetts, where he worked as a corporate compliance manager from approximately July of 2001 through June of 2008.

66.     During the course of his employment with each of these entities, Mr. Lamkin worked with each of the Manufacturing Defendants' PCB containing products including, but not limited to electrical transformers and other electrical equipment.

67.     While working with the Manufacturing Defendants' PCB containing products, Mr. Lamkin was repeatedly exposed to PCB products through inhalation, ingestion, and dermal exposure.

68.     Mr. Lamkin's exposure to these PCB products occurred at facilities including but not limited to those of the Premises Defendants.

13

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

**Count I:  Breach of Warranty- Defective Design (Against Manufacturing Defendants)**

**(Incorporating Strict Liability Principles as Set Forth in the Restatement (Third) of Torts)**

69.   Plaintiffs repeat and reallege all allegations contained in all paragraphs above as if fully set forth herein.

70.   Defendants were the producers of PCBs and PCB products intended for commercial use.

71.   Defendants were in the business of producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing PCBs and PCB-containing products for placement into trade or commerce.

72.   Defendants' PCB products were manufactured for placement into trade or commerce.

73.   Defendants' PCB products may have formed component parts of or may have been subsequently incorporated into other products and equipment.

74.   As a manufacturer, Defendants owed a duty to all persons to whom PCBs and PCB containing products might foreseeably harm, including Plaintiffs,

75.   Defendants had a further duty not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

76.   By manufacturing and selling PCB products, Defendants warranted that those PCB products are merchantable, safe, and fit for ordinary purposes.

77.   Defendants breached that warranty as PCBs and PCB-containing products are unreasonably dangerous for their reasonably anticipated use because:

a.   PCB readily migrates from the site of its original application and contaminates
b.   adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;
c.   PCB persists in the environment;
d.   PCB is invisible to the naked eye;
e.   Individuals may be exposed to PCB through inhalation, ingestion, and dermal contact.
f.   PCB products are is a known carcinogens and are associated with other serious health risks;

78.     Defendants knew of the risks associated with PCB products and failed to use reasonable care in the design of its products.

79.     Products containing PCBs or dioxins pose greater than would be expected by ordinary persons such as Plaintiffs and the general public.

80.     There existed an alternative design for Defendants' products that was capable of preventing the Plaintiffs' cancer.

81.     The risks posed by PCBs and PCB products outweigh the products' utility as an electrical coolant and lubricant.

82.     The likelihood that PCBs would cause cancer or other disease outweighed any burden on Defendants to adopt an alternative design and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

83.     Plaintiff was exposed to Defendants' PCB products during the course of his employment from October of 1992 through June of 2009.

84.     Plaintiff was exposed at sufficient level to cause his cancer in June 2013.

85.     As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of PCB-containing products, Plaintiffs have suffered, and continue to suffer injuries and damages.

86.     Wherefore, Plaintiffs demand judgment for damages, including costs, interest as applicable, punitive damages and a trial by jury.

## COUNT II: Breach of Warranty- Defective Warning (Against Manufacturing Defendants)
### (Incorporating Strict Liability Principles as Set Forth in the Restatement (Third) of Torts)

87.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

88.     As a manufacturer of PCBs and PCB-containing products, Defendants had a duty to provide adequate warnings to Plaintiffs, the public, and public officials of the risks posed by PCBs and PCB-containing products.

89.     PCBs and PCB-containing products are unreasonably dangerous for their reasonably anticipated use because:

    a.     PCB readily migrates from the site of its original application and contaminates
    b.     adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;
    c.     PCB persists in the environment;
    d.     PCB is invisible to the naked eye;
    e.     Individuals may be exposed to PCB through inhalation, ingestion, and dermal contact.
    f.     PCB products are is a known carcinogens and are associated with other serious health risks;

90.     Defendants knew of the risks associated with PCBs and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with PCB-containing products or an instruction that would have allowed Plaintiffs to avoid his injurious exposure.

91.     Despite Defendants' knowledge of the presence of PCB-containing products in electrical transformers and other equipment, Defendants have not issued any warning, instruction, or special guidance regarding the removal and disposal of PCBs and PCB products.

92.     Plaintiffs would have heeded legally adequate warnings and would have taken additional special precautions when handling products containing PCBs and would have taken steps to ensure that PCBs were treated differently to prevent potential exposure.

93.     Plaintiff was exposed to Defendants' PCB products during the course of his employment from October of 1992 through June of 2009.

94.     Plaintiff was exposed at sufficient level to cause his cancer in June 2013.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

95.     As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of PCB-containing products, Plaintiffs have suffered, and continue to suffer injuries and damages.

96.     Wherefore, Plaintiffs demand judgment for damages, including costs, interest as applicable, punitive damages and a trial by jury.

## COUNT III: Negligence (Manufacturing Defendants)

97.     Plaintiff re-alleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restates in this count.

98.     Plaintiff used, handled, inhaled, ingested, consumed, absorbed or been otherwise exposed to PCBs and PCB-containing products referred to herein in a manner that was reasonably foreseeable.

99.     Plaintiff Craig Lamkin suffers permanent injuries to his person, body and health, including, but not limited to cancer in the form of retroperitoneal sarcoma diagnosed on July 13, 2013.

100.    Defendants, and each of them, and their officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

101.    Defendants, and each of them, and their officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

102.    Defendants failed to exercise ordinary care because a reasonably careful company that learned of its product's toxicity would not manufacture that product or would warn of its toxic properties.

103.    Defendants failed to exercise ordinary care because a reasonably careful company that learned that its product could not be contained during normal production and use would not continue to manufacture that product or would warn of its dangers.

104.    Defendants failed to exercise ordinary care because a reasonably careful company would

17

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

not continue to manufacture PCB products in mass quantities and to the extent that Defendants manufactured them and without sufficient warnings.

105.   Defendants were negligent because they failed to exercise reasonable care.

106.   The Defendants, and each of them, and their officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

107.   The herein-described conduct of said Defendants, and each of them, was and is willful, malicious, fraudulent, outrageous, and in conscious disregard and indifference to the safety and health of Plaintiff. Plaintiff, for the sake of example and by way of punishing said defendants, and each of them, seek punitive damages according to proof.

108.   Wherefore, Plaintiffs demand judgment for damages, including costs, interest as applicable, and a trial by jury.

## COUNT IV: Premises Liability

109.   Plaintiffs adopt and re-allege each prior paragraph, where relevant, as if set forth fully herein.

110.   At all times relevant to Plaintiffs' Complaint, Plaintiff, Craig Lamkin was an invitee on the premises of the above Defendants, which were operated, owned, and/or controlled by the above Defendants, for purposes beneficial to the Defendants.

111.   Defendants owed a duty to Plaintiff, Craig Lamkin, to maintain said premises in a safe manner, free and clear of toxic chemicals, materials and substances and to provide Plaintiff with a reasonably safe place to work and a duty to exercise reasonable care in protecting Plaintiff from workplace hazards.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

112.    Defendants breached these duties and exposed Plaintiff to various PCB-containing products at said premises during operation, construction and/or repair of said premises by Plaintiff and/or outside contractors and co-employees, and Plaintiff was injured as previously described.

113.    As set forth above, Defendants' failure to maintain the premises of the above worksites in a safe manner was intentional, reckless and wrongful, such that Plaintiffs are entitled to all actual and compensatory damages as well as for punitive damages and for such other further relief as this Honorable Court and/or jury may deem just and proper.

## COUNT V: Punitive Damages as to all Defendants

114.    Plaintiffs repeat and reallege all allegations contained in all paragraphs above as if fully set forth herein.

115.    The acts and omissions of Defendants that were the direct and proximate cause of Plaintiffs' injuries were willful, malicious, wanton, undertaken with reckless disregard of the rights of Plaintiffs, and were grossly negligent.

116.    WHEREFORE Plaintiffs demand judgment and punitive damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

## COUNT VI:  Loss of Consortium

117.    Plaintiffs repeat and reallege all allegations contained in all paragraphs above as if fully set forth herein.

118.    As a direct and proximate result of Defendants' negligence and conduct as detailed above, Plaintiff Susan Lamkin was caused to lose the consortium and society of her spouse, Plaintiff Craig Lamkin.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

119.    Wherefore, Plaintiffs demand judgment for damages, including costs, interest as applicable, and a trial by jury.

## DEMAND FOR JURY TRIAL

120.    Plaintiff hereby demands trial by jury as to all issues so triable.

Dated: February 10, 2016

PLAINTIFFS BY THEIR ATTORNEYS,

MOTLEY RICE LLC
Robert J. McConnell, BBO #550625
Jonathan D. Orent, BBO #660571
321 South Main Street
Providence, RI 02903
401-457-7700
401-457-7708 Fax

Of Counsel:
Vincent L. Greene IV
321 South Main Street
Providence, RI 02903
401-457-7700
401-457-7708 Fax

20

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 18

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM


## THOMPSON COBURN LLP

Christopher M. Hohn
P 314.552.6159
F 314.552.7000
chohn@thompsoncoburn.com

August 29, 2016

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL**

Scott S. Cramer
Magnetek, Inc.
N49 W13650 Campbell Dr
Menomonee Falls, WI 53051
Scramer@magnetek.com

***Re:***     ***Tender of Defense & Demand for Indemnification Under Special Undertaking by Purchasers of Polychlorinated Biphyenls contract dated January 7, 1972***

        ***Protected Communication:   Indemnitee-Indemnitor Privilege; Common Interest Doctrine***

Dear Mr. Cramer:

We understand that you are authorized to receive this demand on behalf of Magnetek, Inc. If that understanding is incorrect, please advise immediately and we will redirect this correspondence as necessary.

We write on behalf of our clients Monsanto Company ("New Monsanto"), Pharmacia LLC, f/k/a Monsanto ("Old Monsanto"), and Solutia Inc. (collectively the "Monsanto Defendants"). The Monsanto Defendants have been sued in certain lawsuits by a number of individuals, cities, municipal agencies, and school districts seeking to recover for claimed personal injuries, environmental clean-up and permit costs, property damage, and other damages allegedly caused by exposure to or contamination by Polychlorinated Biphenyls ("PCBs") manufactured and sold by Old Monsanto.

It is the Monsanto Defendants' understanding that Magnetek, Inc. is the successor in interest to Universal Manufacturing Corporation's obligations under the Special Undertaking By Purchasers of Polychlorinated Biphenyls contract Universal Manufacturing Corporation entered into with Old Monsanto on January 7, 1972 (the "Special Undertaking Contract"), a copy of which is enclosed for your reference.

The Special Undertaking Contract states in pertinent part that Magnetek, Inc. will:

       defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities,

Thompson Coburn LLP | Attorneys at Law | One US Bank Plaza | St. Louis, Missouri 63101
P 314.552.6000 | F 314.552.7000 | www.thompsoncoburn.com

Chicago • Los Angeles • St. Louis • Southern Illinois • Washington, D.C.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

claims, damages, penalties, actions, suits, losses, costs and expenses (except to the extent arising from failure of PCB to conform to specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale, or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

Special Undertaking Contract at 1.

By copy of this letter, demand is made for Magnetek, Inc. to defend, indemnify and hold harmless Old Monsanto (and related entities as specified in the Special Undertaking Contract), in connection with all current and future PCB-related litigation wherein Old Monsanto is, or will be, named as a defendant, and for the amount of any resulting judgments (if any) and settlements, to the full extent required by the Special Undertaking Contract.  You are hereby formally tendered the defense of the Food Chain Cases, the Water Cases, the School Cases, the Occupational Case, and any other lawsuits on the enclosed list of PCB-related litigation. Copies of the complaints in each case will be provided upon request. Pending the establishment of a reasonable and acceptable arrangement regarding this tender, the cases will continue to be defended and/or settled and Magnetek, Inc. will be held liable for the amount of the resulting settlements or judgments (if any) as well as the incurred costs, expert witness fees, attorney's fees, and all other reasonable expense incurred in defending these actions. You are expressly notified that settlement negotiations relating to certain of the listed cases are currently underway.

The Monsanto Defendants expressly reserve all of their rights of any sort, at law or in equity, including but not limited to those under the Special Undertaking Contract, whether or not identified herein.  The Monsanto Defendants also expressly reserve the right to engage in settlement discussions and/or to settle some or all of the above cases, while holding Magnetek, Inc. responsible for those settlements.

The current breakdown of the PCB-related litigation involving the Monsanto Defendants is as follows:

53. The Monsanto Defendants are defending a series of personal injury cases in which plaintiffs are contending that they suffer from various types of cancer (primarily non-Hodgkin lymphoma) as a result of their environmental, non-employment exposure to PCBs (the "Food Chain Cases").  The Food Chain Cases currently are pending in state court in Los Angeles County, California and in state and federal courts in St. Louis, Missouri.  At present, the Food Chain Cases include approximately 700 plaintiffs. On May 26, 2016, a Judgment was entered against Monsanto in one such case in the total amount of $46,500,000.00 for alleged personal injuries and punitive damages arising out of the exposure to PCBs in a case captioned *Benito Walker et al. v. Monsanto Co., et al.,* Case No. 1122-CC09621-01 (Cir. Court City of St. Louis May 26, 2016).

54. The Monsanto Defendants also face a group of lawsuits (currently eight suits have been filed) on the West Coast in which cities and various municipal agencies are

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

alleging that the Monsanto Defendants should bear some cost of water clean up and wastewater permit costs due to PCB contamination (the "Water Cases").

55. The Monsanto Defendants also are defending four cases in which certain school districts allege that they should bear some cost of clean-up and/or rebuilding of schools due to alleged PCB contamination (the "School Cases").

56. The Monsanto Defendants also were recently named along with several other defendants in an occupational exposure case filed in state court in Massachusetts (the "Occupational Case").

A current list of all PCB-related litigation wherein the Monsanto Defendants are named as defendants (including court, case caption, and civil docket number) is enclosed.  Please note that the next Food Chain Case is currently set for trial on September 12, 2016.

We request acknowledgement that Magnetek, Inc. received this communication and confirmation that Magnetek, Inc. intends to honor its contractual obligations of defense and indemnification under the Special Undertaking Contract within **ten (10) days** from the date of this communication.  We also request that you immediately notify your primary and excess insurer(s) of the demand for defense and indemnity set forth above.

Our Client would welcome the opportunity to discuss the PCB-related litigation referenced above (and on the enclosed list) and the scope of Magnetek, Inc.'s obligations under the Special Undertaking Contract with you.  New Monsanto expects to put a process in place for the resolution of this obligation, and those obligations of other similarly situated parties.  Please, at your earliest convenience, contact Monsanto's Assistant General Counsel, Litigation, Molly Jones at (314) 694-5425 to discuss this matter.

Thank you for your attention to this matter.  We look forward to hearing from you.

Sincerely,

Thompson Coburn LLP

*Chris Hohn*

By
   Christopher M. Hohn

Enclosures

cc: Magnetek, Inc.
     c/o CSC-Lawyers Incorporating Service Company
     221 Bolivar Street
     Jefferson City, MO 65101
     *(via Federal Express)*

| Matter Name | Group Reference | Jurisdiction Type | Court | Docket Number | File Date |
|---|---|---|---|---|---|
| Grant Parish School Board v. Monsanto Company (PCB) | PCB - Building | Federal | LA - Western District | 1:15-cv-01719-DDD-JDK | 5/19/2015 |
| City of Hartford and Hartford Board of Education v. Monsanto (SOI)(PCBO | PCB - Building | Federal | CT - U.S. District | 2015-004301 | 10/23/2015 |
| Town of Princeton, MA v. Monsanto Company (SOI) (PCB) | PCB - Building | Federal | MA - U.S. District | 4:15-cv-40096-DJC | 7/11/2015 |
| Town of Westport and Westport Community Schools v. Monsanto (SOI) (PCB) | PCB - Building | Federal | MA - U.S. District | 1:14-CV-12041-DJC | 5/7/2014 |
| Abston, Bertha v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01495 | 4/23/2012 |
| Aiken, Ronald v. Monsanto Company (SOI) (PCB food chain case) | PCB - Food Chain | State | MO - St. Louis County | 1422-CC09436 | 8/15/2014 |
| Ashley, Jerry v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01499 | 4/23/2012 |
| Bailey, Roger v. Monsanto Company (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 15SL-CC01768 | 5/22/2015 |
| Blum, Robert J., Jr. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00928 | 6/28/2010 |
| Brownlee, Paul v. Monsanto Company (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC02866 | 4/23/2010 |
| Brown, Paulette v. Monsanto Company (SOI) (PCB Food Chain case) | PCB - Food Chain | State | CA - LA County | 1222-CC10374 | 12/14/2012 |
| Burford, Kent N. et al. v. Monsanto, et al. (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00928 | 3/10/2016 |
| Burke, Angela v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | 1222-CC10374 | 12/14/2012 |
| Carter, Kevin v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | BC484608 | 5/11/2012 |
| Clair, Sanford v. Monsanto Company (SOI) (PCB) | PCB - Food Chain | State | MO-St. Louis County | 095L-CC01964 | |
| Craig, Gary v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01496 | 4/23/2012 |
| Dauber, Roslyn v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC483342 | 4/23/2012 |
| Dublin, Sydell v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC03822 | 9/22/2010 |
| Ferrell, Marinda v. Monsanto (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis City | 1322-CC08915 | 7/22/2013 |
| Gibson, Dennis L. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - Eastern District | 11SL-CC04951 | |
| Goodman, Betty v. Monsanto (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis City | 1322-CC09213 | 8/26/2013 |
| Granger, Jacqueline v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC459770 | 4/19/2011 |
| Guenther, Valerie Anna v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC480068 | 3/5/2012 |
| Hearon, Leslie v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12S--CC01497 | 4/23/2012 |
| Kelly, Thomas v. Monsanto Company (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 15SL-CC03845 | 11/9/2015 |

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

- 2 -

| Case | Category | State/Federal | Location | Case Number | Date |
|---|---|---|---|---|---|
| LaBarge, Dale L. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01263 | 4/5/2012 |
| Mosby, Keith v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 1122-CC02206 | |
| Murphy, Deborah D. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1222-CL09174 | 7/6/2012 |
| Naihe, Edward v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 12SL-CC02117 | 6/5/2012 |
| Nishida Nicolas White, Ruth v. Monsanto and Solutia (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 09SL-CC01964 | 5/1/2009 |
| Nunn, Mary vs. Monsanto Co., (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 1122-CC01207 | 3/10/2016 |
| Olson Kathleen R. v. Monsanto Company, et al. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 16SL-CC00919 | |
| Rodriguez, Guillermo v. Monsanto Co., (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 1122CC09622 | 9/9/2011 |
| Stapleton, Bernadette v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SLCC03408 | |
| Varela, Jesse v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO-St. Louis City | BC509170 | 5/16/2013 |
| Walker, Benito v. Monsanto Company, et al. (SOI) (PCB) | PCB - Food Chain | State | MO-St. Louis City | 1122CC09621 | |
| Lamkin, Craig, et ux. v. Monsanto Company, et al. (SOI) (PCB) | PCB - Personal Injury | State | MA – Suffolk County | 16-0563 | 2/19/2016 |
| City of Berkeley v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 5:16-cv-00071 | 1/6/2016 |
| City of Oakland v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 4:15-cv-06152 | 11/10/2015 |
| City of San Jose v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 5:15-cv-03178-NC | 7/10/2015 |
| City of Seattle v. Monsanto, et al. (SOI) (PCB) | PCB - Water Contamination | Federal | WA - Western District | 2:16-cv-00107 | 1/25/2016 |
| City of Spokane v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | WA - Eastern District | 2:15-cv-00201-SMJ | 7/31/2015 |
| Monsanto PCB Water Contamination Litigation (SOI) (PCB) | PCB - Water Contamination | Federal | Judicial Panel/Multidistrict | MDL No. 2697 | 1/28/2016 |
| San Diego Unified Port and City of San Diego v. Monsanto Co., et al. | PCB - Water Contamination | Federal | CA - Southern District | 3:15-cv-00578-WQH-JLB | 8/3/15 |
| City of Long Beach v. Monsanto Co., et al. | PCB – Water Contamination | Federal | CA – Central District | 2:16-cv-03493-FMO-AS | 5/19/16 |
| City of Portland v. Monsanto Co., et al. | PCB – Water Contamination | Federal | OR – Dist. of Oregon, Portland Division | 3:16-cv-1418-PK | 7/12/16 |

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM



**UNIVERSAL MANUFACTURING CORPORATION**

29-51 EAST SIXTH STREET, PATERSON, NEW JERSEY 07509 • PHONE: (201) 271-3100 • TWX. NO. 710 988-5934

January 7, 1972

Mr. H.S. Bergen
Monsanto Company
P.O. Box 14817
St. Louis, Missouri  63178

Dear Mr. Bergen:

Enclosed is the undertaking you requested in connection
with our purchase of PCB.  As previously discussed, we
are executing the undertaking in our own name and are
excepting any liability arising from failure of the
product to conform to specifications.

This undertaking will be covered by a blanket liability
policy with the Travelers Insurance Company having limits
of 10 million dollars.  As of December 31, 1970, Universal's
consolidated net worth was 16.8 million and its current
ratio was 1.7 to 1.

Very truly yours,

UNIVERSAL MANUFACTURING CORPORATION

Paul H. Einhorn
President

PHE/paz

0167252

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Vault

## Special Undertaking by Purchasers of Polychlorinated Biphenyls

Monsanto Company (Monsanto) manufacturers certain polychlorinated biphenyls products (PCB's) which Universal Manufacturing Corporation (Buyer) desires to purchase.  While buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in the handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or delivery of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses (except to the extent arising from failure of PCB to conform with specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through or under Buyer, whether alone or in combination with any other substance, including without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provision set forth above.

Nothing herein shall create or imply, any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer.  No conditions, under-takings or agreements purporting to modify the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effective by the acknow-ledgment or acceptance of any sale document, purchase order, shipping instructions or other forms containing terms or conditions at variance herewith.

Universal Manufacturing Corporation
(Buyer)

BY: _____

TITLE:  President

DATE:  January 7, 1972

MONSANTO COMPANY

BY: _____

0167253

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

ORIGIN ID:CPSA   (314) 552-6393
DAVID MANGIAN
THOMSON COBURN LLP
505 N 7TH

ST LOUIS MO 63101
UNITED STATES US

TO  SCOTT S. CRAMER
MAGNETEK, INC.
N49W13650 CAMPBELL DR

MENOMONEE FALLS WI 53051
(314) 552-6000
INV:
PO:                                        DEPT:

REF 5601215718B4C327

SHIP DATE: 29AUG16
ACTWGT: 0.50LB
CAD: 103289583/WSXI2750

BILL SENDER

SY RRLA

TRK#  7839 4119 2677
0201

THU - 01 SEP 4:30P
EXPRESS SAVER

53051
WI-US   MKE

REL#
3785346

FedEx
Express

J162016070501uv

544J1/A053/14E8

- - - - - - - - - - FOLD on this line and place in shipping pouch with **bar code and delivery address** visible

1. Fold the first printed page in half and use as the shipping label.
2. Place the label in a waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
3. Keep the second page as a receipt for your records. The receipt contains the terms and conditions of shipping and information useful for tracking your package.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 19

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM



**Phillips Lytle** LLP

<u>**VIA E-MAIL & U.S. MAIL**</u>                                   September 14, 2016

Christopher M. Hohn
Thompson Coburn LLP
One US Bank Plaza
St. Louis, MO 63101
(chohn@thompsoncoburn.com)

Re:  Monsanto's Purported Tender of Defense & Demand for Indemnification

Dear Mr. Hohn:

Enclosed and attached, please find a corrected version of the letter sent to you
yesterday.

Very truly yours,

Phillips Lytle LLP

By  *Craig A. Leslie*

Craig A. Leslie

CALram
Enclosure
Doc #01-2981673.1

ATTORNEYS AT LAW

CRAIG A. LESLIE, PARTNER  DIRECT 716 847 7012  CLESLIE@PHILLIPSLYTLE.COM

ONE CANALSIDE  125 MAIN STREET  BUFFALO, NY 14203-2887  PHONE 716 847 8400  FAX 716 852 6100
NEW YORK: ALBANY, BUFFALO, CHAUTAUQUA, GARDEN CITY, NEW YORK, ROCHESTER  |  WASHINGTON, DC  |  CANADA: WATERLOO REGION  |  PHILLIPSLYTLE.COM

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

**Phillips Lytle** LLP

<u>VIA E-MAIL & U.S. MAIL</u>                                         September 13, 2016

Christopher M. Hohn
Thompson Coburn LLP
One US Bank Plaza
St. Louis, MO 63101
(chohn@thompsoncoburn.com)

Re:   Monsanto's Purported Tender of Defense & Demand for Indemnification
       Under Special Undertaking dated January 7, 1972

Dear Mr. Hohn:

Please be advised that our firm has been retained to assist Magnetek in regards to your correspondence dated August 29, 2016, addressed to Mr. Scott S. Cramer, purporting to: (a) tender to Magnetek the defense of Monsanto Company ("New Monsanto"), Pharmacia LLC f/k/a Monsanto ("Old Monsanto"), and Solutia Inc. (collectively, "Monsanto") in the 46 cases identified in the accompanying attachment to your correspondence; and (b) demanding that Magnetek indemnify Monsanto with respect to any damages that might be awarded against Monsanto in those cases, pursuant to the accompanying "Special Undertaking," dated January 7, 1972.

Initially, please note that Mr. Cramer is no longer with Magnetek and that any future correspondence regarding this matter should, therefore, be directed to the undersigned.

Your correspondence is the first notice to Magnetek of the 46 cases identified in the accompanying attachment, in spite of the fact that many of those cases have been pending for years, at least one has already gone to trial and verdict, and another is apparently set for trial this week.  Based upon the scant information that Monsanto has provided, Magnetek presently has no reason to believe that it is required to either defend or indemnify Monsanto and, therefore, rejects Monsanto's tender or demand.

ATTORNEYS AT LAW

CRAIG A. LESLIE, PARTNER   DIRECT 716 847 7012   CLESLIE@PHILLIPSLYTLE.COM

ONE CANALSIDE  125 MAIN STREET  BUFFALO, NY 14203-2887  PHONE 716 847 8400  FAX 716 852 6100

NEW YORK: ALBANY, BUFFALO, CHAUTAUQUA, GARDEN CITY, NEW YORK, ROCHESTER  |  WASHINGTON, DC  |  CANADA: WATERLOO REGION  |  PHILLIPSLYTLE.COM

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM



Christopher M. Hohn                                    September 13, 2016
Page 2


Magnetek also reserves all of its rights with respect to Monsanto's tender and demand including, specifically, but without limitation, its right to specify further and additional grounds for rejecting the same as Magnetek's investigation of Monsanto's tender and demand continues.


Very truly yours,

Phillips Lytle LLP

By

Craig A. Leslie

CALram
Doc #01-2981303.1

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 20

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

ROBERT J. SHAUGHNESSY
(202) 434-5564
bshaughnessy@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

October 19, 2016

**BY EMAIL AND FEDEX**

Randy R. Mariani, Esq.
Law Department
Monsanto Company
800 North Lindbergh Boulevard
St. Louis, MO  63167
*randy.r.mariani@monsanto.com*

Christopher M. Hohn, Esq.
Thompson Coburn LLP
One U.S. Bank Plaza
St. Louis, MO  63101
*chohn@thompsoncoburn.com*

Re:   Monsanto Tender of Defense and Demand for Indemnification

Dear Messrs. Mariani and Hohn:

This firm represents General Electric Company and General Electric Canada Company (collectively, GE).  I respond on their behalf to Mr. Mariani's August 18, 2016 letter to Thomas Hill of GE and Mr. Hohn's August 29, 2016 letter to Kathryn Bogdanowicz of GE.  Each letter demands that GE indemnify Monsanto and accept its tender of defense in connection with various litigations related to polychlorinated biphenyls (PCBs) that Monsanto is currently defending.[1]  The basis for the demand is GE's alleged indemnification obligation under the "Special Undertaking by Purchasers of Polychlorinated Biphenyls" that the company executed in early 1972.

GE rejects Monsanto's demand for indemnity.  The demand is deficient on its face and does not provide any reasonable basis for GE to evaluate it.  GE denies that the demand preserves any alleged right of indemnity against GE or effectively tenders the defense of the underlying litigations.

---

[1]  Multiple now-separate entities have been known as "Monsanto" at some point over the past 50 years.  Mr. Hohn's letter makes the demand only on behalf of "Old Monsanto," now known as Pharmacia LLC.  Mr. Mariani's letter, written on the letterhead of the firm currently known as Monsanto Company, appears to make the demand solely on behalf of that entity.  For purposes of this letter, we refer to both entities as "Monsanto" without distinguishing between them and without conceding that either has enforceable rights against GE under the Special Undertaking.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Randy R. Mariani, Esq.
Christopher M. Hohn, Esq.
October 19, 2016
Page 2

An addendum to the Special Undertaking, requested by GE and executed by Monsanto, requires Monsanto to provide "timely notice of any claims to which the indemnity applies" (see the attached). Monsanto has not provided GE with meaningful notice of the claims at issue. It has simply proffered a chart listing the case caption, docket information, and filing date for forty-six litigations, along with an unexplained entry entitled "Group Reference" apparently based on Monsanto's internal classification of the cases.

Nor has Monsanto provided GE with any notice of facts suggesting that the Special Undertaking applies to those litigations. The Special Undertaking applies only to PCBs that Monsanto sold or delivered to GE after the effective date of the agreement, and it requires GE to indemnify Monsanto only as to claims "arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCBs by, through or under [GE]." In your letters and in Monsanto's prior oral communications on this matter, Monsanto has not identified any facts showing that the pending lawsuits arise from the use or disposition "by, through or under" GE of PCBs that Monsanto ever sold or delivered to GE, much less PCBs that Monsanto provided to GE after the agreement. For example, Monsanto does not identify any GE product incorporating PCBs sold after the agreement that allegedly caused injury to any plaintiff in the underlying litigations.

In addition to being substantively deficient, Monsanto's demand for indemnity is not "timely" as required by the addendum to the Special Undertaking. The list of cases you have provided includes one filed in 2009 and more than a dozen others that have been pending for three years or more.

All of this said, however, GE is willing to consider any further information that Monsanto wishes to provide bearing on the question of indemnification under the Special Undertaking. If Monsanto provides information in a timely fashion identifying claims where facts reveal that the Special Undertaking may apply, we can then discuss the best way to use mediation or other ADR or negotiation mechanisms to continue our discussions.

This letter does not purport to identify all defenses that GE would have to a properly pre-sented claim for indemnity by Monsanto, and GE reserves all of its rights and defenses to such a claim.

Please direct to me all further communications to GE relating to this matter.

Sincerely yours,

Robert J. Shaughnessy

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

GENERAL ⬡ ELECTRIC
COMPANY
570 LEXINGTON AVE, NEW YORK, N.Y. 10022

WALTER A. SCHLOTTERBECK
VICE PRESIDENT AND CORPORATE COUNSEL

January 21, 1972

E. J. Putzell, Esq.
Vice President and General Counsel
Monsanto Company
800 North Lindbergh Boulevard
St. Louis, Missouri

Dear Mr. Putzell:

I have executed the "Special Undertaking by Purchasers of Polychlorinated Biphenyls" on behalf of General Electric subject to the following understandings, which Mr. Stapleton has informed me Monsanto will accept:

1. The Special Undertaking applies only to PCB's after risk of loss has passed to General Electric from Monsanto;

2. The Special Undertaking is not applicable to PCB's after their return to Monsanto or its agent for disposal or otherwise;

3. Monsanto shall provide General Electric with timely notice of any claims to which the indemnity applies and shall provide General Electric with reasonable assistance (at General Electric's expense) in the defense of any claim covered by the indemnity.

I would appreciate your indicating Monsanto's acceptance of these conditions by signing the copy of this letter and returning it to me.

Very truly yours,

Walter A. Schlotterbeck

ACCEPTED:

By: _____
Vice President

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 21

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM


**THOMPSON COBURN** LLP

Christopher M. Hohn
P 314.552.6159
F 314.552.7000
chohn@thompsoncoburn.com

August 29, 2016

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL**

Lawrence P. Tu
CBS Corporation
51 W 52nd Street
New York, NY 10019
Ltu@cbs.com

**Re:**   *Tender of Defense & Demand for Indemnification Under Special Undertaking by Purchasers of Polychlorinated Biphyenls contract dated January 15, 1972*

> *Protected Communication: Indemnitee-Indemnitor Privilege; Common Interest Doctrine*

Dear Mr. Tu:

We understand that you are authorized to receive this demand on behalf of CBS Corporation. If that understanding is incorrect, please advise immediately and we will redirect this correspondence as necessary.

We write on behalf of our clients Monsanto Company ("New Monsanto"), Pharmacia LLC, f/k/a Monsanto ("Old Monsanto"), and Solutia Inc. (collectively the "Monsanto Defendants"). The Monsanto Defendants have been sued in certain lawsuits by a number of individuals, cities, municipal agencies, and school districts seeking to recover for claimed personal injuries, environmental clean-up and permit costs, property damage, and other damages allegedly caused by exposure to or contamination by Polychlorinated Biphenyls ("PCBs") manufactured and sold by Old Monsanto.

It is the Monsanto Defendants' understanding that CBS Corporation is the successor in interest to Westinghouse Electric Corporation's obligations under the Special Undertaking By Purchasers of Polychlorinated Biphenyls contract Westinghouse Electric Corporation entered into with Old Monsanto on January 15, 1972 (the "Special Undertaking Contract"), a copy of which is enclosed for your reference.

The Special Undertaking Contract states in pertinent part that CBS Corporation will:

> defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities,

Thompson Coburn LLP | Attorneys at Law | One US Bank Plaza | St. Louis, Missouri 63101
P 314.552.6000 | F 314.552.7000 | www.thompsoncoburn.com

Chicago • Los Angeles • St. Louis • Southern Illinois • Washington, D.C.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

> claims, damages, penalties, actions, suits, losses, costs and expenses arising out of
> or in connection with the receipt, purchase, possession, handling, use, sale, or
> disposition of such PCB's by, through or under Buyer, whether alone or in
> combination with other substances, including, without implied limitation, any
> contamination of or adverse effect on humans, marine and wildlife, food, animal
> feed or the environment by reason of such PCB's.

Special Undertaking Contract at 1.

By copy of this letter, demand is made for CBS Corporation to defend, indemnify and hold
harmless Old Monsanto (and related entities as specified in the Special Undertaking Contract), in
connection with all current and future PCB-related litigation wherein Old Monsanto is, or will
be, named as a defendant, and for the amount of any resulting judgments (if any) and
settlements, to the full extent required by the Special Undertaking Contract.  You are hereby
formally tendered the defense of the Food Chain Cases, the Water Cases, the School Cases, the
Occupational Case, and any other lawsuits on the enclosed list of PCB-related litigation. Copies
of the complaints in each case will be provided upon request. Pending the establishment of a
reasonable and acceptable arrangement regarding this tender, the cases will continue to be
defended and/or settled and CBS Corporation will be held liable for the amount of the resulting
settlements or judgments (if any) as well as the incurred costs, expert witness fees, attorney's
fees, and all other reasonable expense incurred in defending these actions. You are expressly
notified that settlement negotiations relating to certain of the listed cases are currently underway.

The Monsanto Defendants expressly reserve all of their rights of any sort, at law or in equity,
including but not limited to those under the Special Undertaking Contract, whether or not
identified herein.  The Monsanto Defendants also expressly reserve the right to engage in
settlement discussions and/or to settle some or all of the above cases, while holding CBS
Corporation responsible for those settlements.

The current breakdown of the PCB-related litigation involving the Monsanto Defendants is as
follows:

57. The Monsanto Defendants are defending a series of personal injury cases in which
    plaintiffs are contending that they suffer from various types of cancer (primarily non-
    Hodgkin lymphoma) as a result of their environmental, non-employment exposure to
    PCBs (the "Food Chain Cases").  The Food Chain Cases currently are pending in
    state court in Los Angeles County, California and in state and federal courts in St.
    Louis, Missouri.  At present, the Food Chain Cases include approximately 700
    plaintiffs. On May 26, 2016, a Judgment was entered against Monsanto in one such
    case in the total amount of $46,500,000.00 for alleged personal injuries and punitive
    damages arising out of the exposure to PCBs in a case captioned *Benito Walker et al.
    v. Monsanto Co., et al.,* Case No. 1122-CC09621-01 (Cir. Court City of St. Louis
    May 26, 2016).

58. The Monsanto Defendants also face a group of lawsuits (currently eight suits have
    been filed) on the West Coast in which cities and various municipal agencies are

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

alleging that the Monsanto Defendants should bear some cost of water clean up and wastewater permit costs due to PCB contamination (the "Water Cases").

59. The Monsanto Defendants also are defending four cases in which certain school districts allege that they should bear some cost of clean-up and/or rebuilding of schools due to alleged PCB contamination (the "School Cases").

60. The Monsanto Defendants also were recently named along with several other defendants in an occupational exposure case filed in state court in Massachusetts (the "Occupational Case").

A current list of all PCB-related litigation wherein the Monsanto Defendants are named as defendants (including court, case caption, and civil docket number) is enclosed.  Please note that the next Food Chain Case is currently set for trial on September 12, 2016.

We request acknowledgement that CBS Corporation received this communication and confirmation that CBS Corporation intends to honor its contractual obligations of defense and indemnification under the Special Undertaking Contract within **ten (10) days** from the date of this communication.  We also request that you immediately notify your primary and excess insurer(s) of the demand for defense and indemnity set forth above.

Our Client would welcome the opportunity to discuss the PCB-related litigation referenced above (and on the enclosed list) and the scope of CBS Corporation's obligations under the Special Undertaking Contract with you.  New Monsanto expects to put a process in place for the resolution of this obligation, and those obligations of other similarly situated parties.  Please, at your earliest convenience, contact Monsanto's Assistant General Counsel, Litigation, Molly Jones at (314) 694-5425 to discuss this matter.

Thank you for your attention to this matter.  We look forward to hearing from you.

Sincerely,

Thompson Coburn LLP

By
   Christopher M. Hohn

Enclosures

cc: CBS Corporation
    c/o CSC-Lawyers Incorporating Service Company
    221 Bolivar Street
    Jefferson City, MO 65101
    *(via Federal Express)*

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

| Matter Name | Group Reference | Jurisdiction Type | Court | Docket Number | File Date |
|---|---|---|---|---|---|
| Grant Parish School Board v. Monsanto Company (PCB) | PCB - Building | Federal | LA - Western District | 1:15-cv-01719-DDD-JDK | 5/19/2015 |
| City of Hartford and Hartford Board of Education v. Monsanto (SOI)(PCBO | PCB - Building | Federal | CT- U.S. District | 2015-004301 | 10/23/2015 |
| Town of Princeton, MA v. Monsanto Company (SOI) (PCB) | PCB - Building | Federal | MA – U.S. District | 4:15-cv-40096-DJC | 7/1/2015 |
| Town of Westport and Westport Community Schools v. Monsanto (SOI) (PCB) | PCB - Building | Federal | MA - U.S. District | 1:14-CV-12041-DJC | 5/7/2014 |
| Abston , Bertha v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01495 | 4/23/2012 |
| Aiken, Ronald v. Monsanto Company (SOI) (PCB Food chain case) | PCB - Food Chain | State | MO - St. Louis City | 1422-CC09436 | 8/15/2014 |
| Ashley, Jerry v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO – St. Louis County | 12SL-CC01499 | 4/23/2012 |
| Bailey, Roger v. Monsanto Company (PCB Food Chain case) | PCB - Food Chain | State | MO - Eastern District | 15SL-CC01768 | 5/22/2015 |
| Blum, Robert J., Jr. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC02866 | 6/28/2010 |
| Brownlee, Paul v. Monsanto Company (SOI) (PCB Food Chain) | PCB - Food Chain | State | CA – LA County | BC497582 | 12/14/2012 |
| Brown, Paulette v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01498 | 4/23/2012 |
| Burford, Kent N, et al. v. Monsanto, et al. (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00928 | 3/10/2016 |
| Burke, Angela v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1222-CC10374 | |
| Carter, Kevin v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA – LA County | BC484608 | 5/11/2012 |
| Clair, Sanford v. Monsanto Company (SOI) (PCB) | PCB - Food Chain | State | MO-St. Louis County | 095L-CC01964 | |
| Craig, Gary v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01496 | 4/23/2012 |
| Dauber, Roslyn v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA – LA County | BC483342 | 4/23/2012 |
| Dublin, Sydell v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC03822 | 9/22/2010 |
| Ferrell, Marinda v. Monsanto (SOI) (PCB Food Chain case). | PCB - Food Chain | State | MO - St. Louis City | 1322-CC08915 | 7/22/2013 |
| Gibson , Dennis L. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - Eastern District | 11SL-CC04951 | |
| Goodman, Betty v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1322-CC09213 | 8/26/2013 |
| Granger, Jacqueline v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA – LA County | BC459770 | 4/19/2011 |
| Guenther, Valerie Anna v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | CA – LA County | BC480068 | 3/5/2012 |
| Hearon, Leslie v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12S--CC01497 | 4/23/2012 |
| Kelly ,Thomas v. Monsanto Company (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 15SL-CC03845 | 11/9/2015 |

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

| Case | Type | State/Federal | Jurisdiction | Case Number | Date |
|---|---|---|---|---|---|
| LaBarge, Dale L. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01263 | 4/5/2012 |
| Mosby, Keith v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 1122-CC02206 | |
| Murphy, Deborah D. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1222-CLO9174 | 7/6/2012 |
| Naihe, Edward v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC02117 | 6/5/2012 |
| Nishida Nicolas White, Ruth v. Monsanto and Solutia (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 09SL-CC01964 | 5/1/2009 |
| Nunn, Mary vs. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1122-CC01207 | |
| Olson Kathleen R. v. Monsanto Company, et al. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis  County | 16SL-CC00919 | 3/10/2016 |
| Rodriguez, Guillermo v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SLCC03408 | |
| Stapleton, Bernadette v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1122CC09622 | 9/9/2011 |
| Varela, Jesse v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO-St. Louis City | BC509170 | 5/16/2013 |
| Walker, Benito v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO-St. Louis City | 1122CC09621 | |
| Lamkin, Craig, et ux. v. Monsanto Company, et al. (SOI) (PCB) | PCB - Personal Injury | State | MA - Suffolk County | 16-0563 | 2/19/2014 |
| City of Berkeley v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 5:16-cv-00071 | 1/6/2016 |
| City of Oakland v. Monsanto Company (SOI)(PCB) | PCB - Water Contamination | Federal | CA - Northern District | 4:15-cv-05152 | 11/10/2015 |
| City of San Jose v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 5:15-cv-03178-NC | 7/10/2015 |
| City of Seattle v. Monsanto, et al. (SOI) (PCB) | PCB - Water Contamination | Federal | WA - Western District | 2:16-cv-00107 | 1/25/2016 |
| City of Spokane v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | WA- Eastern District | 2:15-cv-00201-SMJ | 7/31/2015 |
| Monsanto PCB Water Contamination Litigation (SOI) (PCB) | PCB - Water Contamination | Federal | Judicial Panel /Multidistrict | MDL No. 2697 | 1/28/2014 |
| San Diego Unified Port and City of San Diego  v. Monsanto Co., et al. | PCB – Water Contamination | Federal | CA – Southern District | 3:15-cv-00578-WQH-JLB | 8/3/15 |
| City of Long Beach v. Monsanto Co., et al. | PCB-Water Contamination | Federal | CA – Central District | 2:16-cv-03493-FMO-AS | 5/19/16 |
| City of Portland v. Monsanto Co., et al. | PCB – Water Contamination | Federal | OR – Dist. of Oregon, Portland Division | 3:16-cv-1418-PK | 7/12/16 |

- 2 -

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM



.inghouse Electric Corporation

S W Herwald
Vice President
Engineering and Development

Westinghouse Building
Gateway Center
Pittsburgh Pennsylvania 15222

January 15, 1972

Monsanto Industrial Chemicals Co.
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166

Gentlemen:

Monsanto Company ("Monsanto") manufactures certain polychlorinated biphenyl products ("PCB's") which Westinghouse Electric Corporation ("Buyer") desires to purchase. While Buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to or for the account of Buyer on or after the date hereof, and in consideration of any such sale or delivery, Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employes and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of

MONS 077866

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Monsanto Industrial Chemicals Co.
Page Two
January 15, 1972

such PCB's by, through or under Buyer, whether alone or in
combination with other substances, including, without implied
limitation, any contamination of or adverse effect on humans,
marine and wildlife, food, animal feed or the environment by
reason of such PCB's.

The point at and after which the provisions of this
agreement shall apply to PCB's sold or delivered by or on
behalf of Monsanto to or for the account of Buyer on or after
the date hereof, and the point at which title and risk of loss
with respect to such PCB's shall pass from Monsanto to Buyer,
shall be the F.O.B. point at the location from which delivery
to Buyer is initiated by Monsanto, and shall refer to the point
of transfer of possession of the drum, tank car, tank truck,
or other container for such PCB's, from Monsanto to Buyer or
the first receiving carrier utilized to effect delivery of
such PCB's to Buyer.

The provisions of this agreement shall not be applicable
to any PCB's delivered to Buyer prior to the date hereof; and
nothing herein shall create or imply any duty or obligation:
(i) of Monsanto to sell or deliver any PCB's to Buyer; or
(ii) of Buyer to defend, indemnify or hold harmless Monsanto
or any other corporation, or any person, for any damages
resulting from the negligence of Monsanto (in the absence of
negligence of Buyer) in its packaging or shipping of PCB's or
from the failure of PCB's to comply with the contract specifi-
cations applicable to such PCB's.  No conditions, understandings
or agreements purporting to modify or vary the terms hereof
shall be binding unless hereafter made in writing specifically
referring to this agreement and signed by the party to be bound
and no modification or variance of this agreement shall be
effected by the acknowledgment or acceptance of any sale document,
purchase order, shipping instruction or other forms containing
terms or conditions at variance herewith.

MONS 077867

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Monsanto Industrial Chemicals Co.
Page Two
January 15, 1972


In the event of litigation to which these indemnity
provisions shall apply, Monsanto will make available to Buyer
such information as Monsanto has (excluding trade secrets or
proprietary information of Monsanto, or any other information
which Monsanto is not legally free to disclose) which may
reasonably be required by Buyer in the defense of such litigation,
and otherwise will cooperate with Buyer in connection therewith.

This agreement shall be governed by and be construed
according to the laws of the State of Missouri.

All existing contracts for the sale of PCB's by Monsanto
to Buyer for delivery in the future are hereby amended to contain
the provisions set forth herein.

WESTINGHOUSE ELECTRIC CORPORATION

By _____

Title   Vice President

Date    January 15, 1972


MONSANTO COMPANY
        ORIGINAL SIGNED BY:

By _____ E. J. Putzell _____


MONS  077868

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM



FOLD on this line and place in shipping pouch with **bar code and delivery address** visible

1. Fold the first printed page in half and use as the shipping label.
2. Place the label in a waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
3. Keep the second page as a receipt for your records. The receipt contains the terms and conditions of shipping and information useful for tracking your package.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 22

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

**CBS**

20 STANWIX STREET, 10ᵗʰ FLOOR
PITTSBURGH, PENNSYLVANIA 15222

Robert A. Noethiger
Vice President and Senior Counsel
Telephone: 412.642.4924
Fax: 412.642.3014
Robert.Noethiger@cbs.com

**UPS OVERNIGHT MAIL**

September 22, 2016

Ms. Molly Jones
Assistant General Counsel
Monsanto
800 North Lindbergh Boulevard
St. Louis, MO  63167

Dear Ms. Jones:

Correspondence from Christopher Hohn, Thompson Coburn LLP, dated August 29, 2016, addressed to Lawrence P. Tu, CBS Corporation, requesting indemnity from CBS Corporation ("CBS") for the "Monsanto Defendants" in regard to a list of PCB cases has been referred to me.  Please direct all future correspondence regarding this request to me at my address above.

As a threshold matter, CBS hereby rejects the request completely as to each and every case listed.  CBS believes that your request does not adequately put CBS on notice of any alleged indemnity claim as your request provides no information about the PCB cases for which you are requesting indemnity other than a case caption and a generic description (Water Cases, School Cases, and Occupational Case).  With such scant information, it is impossible for CBS to even evaluate your request.  On this basis alone your request for indemnity is defective on its face.

Further, your alleged indemnity claim is untimely, as some of the case captions have filing dates as far back as 2009 and your letter references a judgement that has already been entered in St. Louis.  Likewise, you purport to assert this claim in reliance on a January 15, 1972, document, yet you provide no facts supporting any claim that this 1972 document is in any way related to the underlying claims listed by you, nor that any damages alleged in said underlying claims are remotely traceable to this 1972 document.  CBS wholly denies any allegation that this 1972 document gives rise to any claim for indemnity.

CBS forwards this response without prejudice to its rights, as this letter is not an attempt at an exhaustive and complete listing of all of the defenses that CBS believes it would have to any claim for indemnity.  To that end, CBS reserves all of its rights and defenses to your request for indemnity for each and every case listed.  To be clear, CBS does not agree that this limited and uninformative notice preserves any purported right of  indemnity against CBS, particularly while you are, at the same time, defending, settling, and trying the underlying claims. Please govern your actions in the underlying claims accordingly.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

September 22, 2016
Page 2

Of course, we are glad to consider any further information you wish to provide in support of this claim, and we trust that you will act in good faith in the defense of the underlying claims.

Very truly yours,

Robert A. Noethiger
Vice President and Senior Counsel

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 23

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

**THOMPSON COBURN** LLP

Christopher M. Hohn
P 314.552.6159
F 314.552.7000
chohn@thompsoncoburn.com

August 29, 2016

**VIA FEDERAL EXPRESS**

Evan Slavitt
AVX Corporation
1 AVX Blvd
Fountain Inn, SC 29644

*Re:*     *Tender of Defense & Demand for Indemnification Under Special Undertaking by Purchasers of Polychlorinated Biphyenls contracts dated February 7, 1972 and March 20, 1972*

         *Protected Communication:   Indemnitee-Indemnitor Privilege; Common Interest Doctrine*

Dear Mr. Slavitt:

We understand that you are authorized to receive this demand on behalf of AVX Corporation.  If that understanding is incorrect, please advise immediately and we will redirect this correspondence as necessary.

We write on behalf of our clients Monsanto Company ("New Monsanto"), Pharmacia LLC, f/k/a Monsanto ("Old Monsanto"), and Solutia Inc. (collectively the "Monsanto Defendants").  The Monsanto Defendants have been sued in certain lawsuits by a number of individuals, cities, municipal agencies, and school districts seeking to recover for claimed personal injuries, environmental clean-up and permit costs, property damage, and other damages allegedly caused by exposure to or contamination by Polychlorinated Biphenyls ("PCBs") manufactured and sold by Old Monsanto.

It is the Monsanto Defendants' understanding that AVX Corporation is the successor in interest to Aerovox Corporation & Aerovox Canada Limited's obligations under the Special Undertaking By Purchasers of Polychlorinated Biphenyls contracts Aerovox Corporation & Aerovox Canada Limited entered into with Old Monsanto on February 7, 1972 and March 20, 1972 (the "Special Undertaking Contracts"), copies of which are enclosed for your reference.

The Special Undertaking Contracts state in pertinent part that AVX Corporation will:

    defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employes [sic] and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling,

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

use, sale, or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

Special Undertaking Contracts at 1.

By copy of this letter, demand is made for AVX Corporation to defend, indemnify and hold harmless Old Monsanto (and related entities as specified in the Special Undertaking Contracts), in connection with all current and future PCB-related litigation wherein Old Monsanto is, or will be, named as a defendant, and for the amount of any resulting judgments (if any) and settlements, to the full extent required by the Special Undertaking Contracts. You are hereby formally tendered the defense of the Food Chain Cases, the Water Cases, the School Cases, the Occupational Case, and any other lawsuits on the enclosed list of PCB-related litigation. Copies of the complaints in each case will be provided upon request. Pending the establishment of a reasonable and acceptable arrangement regarding this tender, the cases will continue to be defended and/or settled and AVX Corporation will be held liable for the amount of the resulting settlements or judgments (if any) as well as the incurred costs, expert witness fees, attorney's fees, and all other reasonable expense incurred in defending these actions. You are expressly notified that settlement negotiations relating to certain of the listed cases are currently underway.

The Monsanto Defendants expressly reserve all of their rights of any sort, at law or in equity, including but not limited to those under the Special Undertaking Contracts, whether or not identified herein. The Monsanto Defendants also expressly reserve the right to engage in settlement discussions and/or to settle some or all of the above cases, while holding AVX Corporation responsible for those settlements.

The current breakdown of the PCB-related litigation involving the Monsanto Defendants is as follows:

1. The Monsanto Defendants are defending a series of personal injury cases in which plaintiffs are contending that they suffer from various types of cancer (primarily non-Hodgkin lymphoma) as a result of their environmental, non-employment exposure to PCBs (the "Food Chain Cases"). The Food Chain Cases currently are pending in state court in Los Angeles County, California and in state and federal courts in St. Louis, Missouri. At present, the Food Chain Cases include approximately 700 plaintiffs. On May 26, 2016, a Judgment was entered against Monsanto in one such case in the total amount of $46,500,000.00 for alleged personal injuries and punitive damages arising out of the exposure to PCBs in a case captioned *Benito Walker et al. v. Monsanto Co., et al.,* Case No. 1122-CC09621-01 (Cir. Court City of St. Louis May 26, 2016).

2. The Monsanto Defendants also face a group of lawsuits (currently eight suits have been filed) on the West Coast in which cities and various municipal agencies are alleging that the Monsanto Defendants should bear some cost of water clean up and wastewater permit costs due to PCB contamination (the "Water Cases").

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

3.   The Monsanto Defendants also are defending four cases in which certain school districts allege that they should bear some cost of clean-up and/or rebuilding of schools due to alleged PCB contamination (the "School Cases").

4.   The Monsanto Defendants also were recently named along with several other defendants in an occupational exposure case filed in state court in Massachusetts (the "Occupational Case").

A current list of all PCB-related litigation wherein the Monsanto Defendants are named as defendants (including court, case caption, and civil docket number) is enclosed.  Please note that the next Food Chain Case is currently set for trial on September 12, 2016.

We request acknowledgement that AVX Corporation received this communication and confirmation that AVX Corporation intends to honor its contractual obligations of defense and indemnification under the Special Undertaking Contracts within **ten (10) days** from the date of this communication.  We also request that you immediately notify your primary and excess insurer(s) of the demand for defense and indemnity set forth above.

Our Client would welcome the opportunity to discuss the PCB-related litigation referenced above (and on the enclosed list) and the scope of AVX Corporation's obligations under the Special Undertaking Contracts with you.  New Monsanto expects to put a process in place for the resolution of this obligation, and those obligations of other similarly situated parties.  Please, at your earliest convenience, contact Monsanto's Assistant General Counsel, Litigation, Molly Jones at (314) 694-5425 to discuss this matter.

Thank you for your attention to this matter.  We look forward to hearing from you.

Sincerely,

Thompson Coburn LLP

By
    Christopher M. Hohn

Enclosures

cc: AVX Corporation
    c/o Corporation Service Company
    2711 Centerville Rd, Suite 400
    Wilmington, DE 19808
    *(via Federal Express)*

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

| Matter Name | Group Reference | Jurisdiction Type | Court | Docket Number | File Date |
|---|---|---|---|---|---|
| Grant Parish School Board v. Monsanto Company (PCB) | PCB - Building | Federal | LA - Western District | 1:15-cv-01719-DDD-JDK | 5/19/2015 |
| City of Hartford and Hartford Board of Education v. Monsanto (SOI)(PCBO | PCB - Building | Federal | CT - U.S. District | 2015-004301 | 10/23/2015 |
| Town of Princeton, MA v. Monsanto Company (SOI) (PCB) | PCB - Building | Federal | MA - U.S. District | 4:15-cv-40096-DJC | 7/1/2015 |
| Town of Westport and Westport Community Schools v. Monsanto (SOI) (PCB) | PCB - Building | Federal | MA - U.S. District | 1:14-CV-12041-DJC | 5/7/2014 |
| Abston, Bertha v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01495 | 4/23/2012 |
| Aiken, Ronald v. Monsanto Company (SOI) (PCB Food chain case) | PCB - Food Chain | State | MO - St. Louis City | 1422-CC09436 | 8/15/2014 |
| Ashley, Jerry v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01499 | 4/23/2012 |
| Bailey, Roger v. Monsanto Company (PCB Food Chain case) | PCB - Food Chain | State | MO - Eastern District | 15SL-CC01768 | 5/22/2015 |
| Blum, Robert J., Jr. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC02866 | 6/28/2010 |
| Brownlee, Paul V. Monsanto Company (SOI) (PCB Food Chain) | PCB - Food Chain | State | CA - LA County | BC497582 | 12/14/2012 |
| Brown, Paulette v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01498 | 4/23/2012 |
| Burford, Kent N, et al.. v. Monsanto, et al. (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00928 | 3/10/2016 |
| Burke, Angela v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1222-CC10374 | |
| Carter, Kevin v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC484608 | 5/11/2012 |
| Clair, Sanford v. Monsanto Company (SOI) (PCB) | PCB - Food Chain | State | MO-St. Louis County | 095L-CC01964 | |
| Craig, Gary v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01496 | 4/23/2012 |
| Dauber, Roslyn v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC483342 | 4/23/2012 |
| Dublin, Sydell v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC03822 | 9/22/2010 |
| Ferrell, Marinda v. Monsanto (SOI) (PCB Food Chain case). | PCB - Food Chain | State | MO - St. Louis City | 1322-CC08915 | 7/22/2013 |
| Gibson, Dennis L. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - Eastern District | 11SL-CC04951 | |
| Goodman, Betty v. Monsanto (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis City | 1322-CC09213 | 8/26/2013 |
| Granger, Jacqueline v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC459770 | 4/19/2011 |
| Guenther, Valerie Anna v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC480068 | 3/5/2012 |
| Hearon, Leslie v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12S-CC01497 | 4/23/2012 |
| Kelly, Thomas v. Monsanto Company (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 15SL-CC03845 | 11/9/2015 |

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

| Case | Type | Court | Jurisdiction | Case Number | Date |
|---|---|---|---|---|---|
| LaBarge, Dale L. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01263 | 4/5/2012 |
| Mosby, Keith v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 1122-CC02206 | |
| Murphy, Deborah D. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1222-CLO9174 | 7/6/2012 |
| Naihe, Edward v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC02117 | 6/5/2012 |
| Nishida Nicolas White, Ruth v. Monsanto and Solutia (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 09SL-CC01964 | 5/1/2009 |
| Nunn, Mary vs. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1122-CC01207 | |
| Olson Kathleen R. v. Monsanto Company, et al. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00919 | 3/10/2016 |
| Rodriguez, Guillermo v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SLCC03408 | |
| Stapleton, Bernadette v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1122CC09622 | 9/9/2011 |
| Varela, Jesse v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO-St. Louis City | BC509170 | 5/16/2013 |
| Walker, Benito v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO-St. Louis City | 1122CC09621 | |
| Lamkin, Craig, et ux. v. Monsanto Company, et al. (SOI) (PCB) | PCB - Personal Injury | State | MA - Suffolk County | 16-0563 | 2/19/2016 |
| City of Berkeley v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 5:16-cv-00071 | 1/6/2016 |
| City of Oakland v. Monsanto Company (SOI)(PCB) | PCB - Water Contamination | Federal | CA - Northern District | 4:15-cv-05152 | 11/10/2015 |
| City of San Jose v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 5:15-cv-03178-NC | 7/10/2015 |
| City of Seattle v. Monsanto, et al. (SOI) (PCB) | PCB - Water Contamination | Federal | WA - Western District | 2:16-cv-00107 | 1/25/2016 |
| City of Spokane v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | WA- Eastern District | 2:15-cv-00201-SMJ | 7/31/2015 |
| Monsanto PCB Water Contamination Litigation (SOI) (PCB) | PCB - Water Contamination | Federal | Judicial Panel/Multidistrict | MDL No. 2697 | 1/28/2016 |
| San Diego Unified Port and City of San Diego  v. Monsanto Co., et al. | PCB – Water Contamination | Federal | CA – Southern District | 3:15-cv-00578-WQH-JLB | 8/3/15 |
| City of Long Beach v. Monsanto Co., et al. | PCB-Water Contamination | Federal | CA – Central District | 2:16-cv-03493-FMO-AS | 5/19/16 |
| City of Portland v. Monsanto Co., et al. | PCB – Water Contamination | Federal | OR – Dist. of Oregon, Portland Division | 3:16-cv-1418-PK | 7/12/16 |

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

*Original to Styblin*
*7/8/72*

# Monsanto

**MONSANTO INDUSTRIAL CHEMICALS CO.**
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166
Phone: (314) 694-1000

## SPECIAL UNDERTAKING BY
### PURCHASERS OF POLYCHLORINATED BIPHENYLS

Monsanto Company ("Monsanto") manufactures certain poly-
chlorinated biphenyl products ("PCB's") which Aerovox Corporation
~~and~~ Aerovox Canada Limited ("Buyer") desires to purchase.  While
Buyer desires to purchase PCB's because of certain
desirable flame resistant and insulator properties, Buyer
acknowledges that it is aware and has been advised by
Monsanto that PCB's tend to persist in the environment;
that care is required in their handling, possession, use
and disposition; that tolerance limits have been or are
being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies
with respect to its further production, sale and delivery
of PCB's, including the receipt of undertakings from its
customers as set forth below, and Buyer is willing to agree
to such undertakings with respect to sales and/or deliveries
of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with
respect to any and all PCB's sold or delivered by or on
behalf of Monsanto to Buyer on or after the date hereof
and in consideration of any such sale or delivery, Buyer
shall defend, indemnify and hold harmless Monsanto, its
present, past and future directors, officers, employes and
agents, from and against any and all liabilities, claims,
damages, penalties, actions, suits, losses, costs and
expenses arising out of or in connection with the receipt,
purchase, possession, handling, use, sale or disposition of
such PCB's by, through or under Buyer, whether alone or in
combination with other substances, including, without implied
limitation, any contamination of or adverse effect on humans,
marine and wildlife, food, animal feed or the environment by
reason of such PCB's.

*(except to the extent arising from the failure of PCB's to
conform to specifications)

a unit of Monsanto Company          MGNS   078867

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

-2-

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provisions set forth above.

Nothing herein shall create or imply any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer. No conditions, understandings or agreements purporting to modify or vary the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effected by the acknowledgment or acceptance of any sale document, purchase order, shipping instruction or other forms containing terms or conditions at variance herewith.

AEROVOX CORPORATION
(Buyer)

BY: _Sonneborn_

TITLE: Vice President, Manufacturing

DATE: February 7, 1972

MONSANTO COMPANY

BY: _CR Cummings_

AEROVOX CANADA LIMITED
(Buyer)

BY: _Sonneborn_

TITLE: Vice President

DATE: February 7, 1972

MONS C78868

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# Monsanto

**MONSANTO INDUSTRIAL CHEMICALS CO.**
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166
Phone: (314) 694-1000

### SPECIAL UNDERTAKING BY
### PURCHASERS OF POLYCHLORINATED BIPHENYLS

The undersigned Aerovox Corporation and Aerovox Canada Limited
("Buyer" as used herein shall refer to either or both of such
companies) desire to purchase certain polychlorinated biphenyl
products ("PCB's") which are manufactured by Monsanto Company
and distributed in Canada by Monsanto Canada Limited ("Monsanto"
as used herein shall refer to both of such Monsanto companies).
While Buyer desires to purchase PCB's because of certain desirable
flame resistant and insulator properties, Buyer acknowledges
that it is aware and has been advised by Monsanto that PCB's
tend to persist in the environment; that care is required in
their handling, possession, use and disposition; that tolerance
limits have been or are being established for PCB's in various
food products.

Monsanto has therefore adopted certain restrictive policies
with respect to its further production, sale and delivery
of PCB's, including the receipt of undertakings from its
customers as set forth below, and Buyer is willing to agree
to such undertakings with respect to sales and/or deliveries
of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect
to any and all PCB's sold or delivered by or on behalf of Monsanto
to Buyer on or after the date hereof and in consideration of any
such sale or delivery, Buyer shall defend, indemnify and hold
harmless Monsanto, its present, past and future directors,
officers, employes and agents, from and against any and all
liabilities, claims, damages, penalties, actions, suits, losses,
costs and expenses (except to the extent arising from the failure
of PCB's to conform to specifications) arising out of or in
connection with the receipt, purchase, possession, handling, use,
sale or disposition of such PCB's by, through or under Buyer,
whether alone or in combination with other substances, including,
without implied limitation, any contamination of or adverse effect
on humans, marine and wildlife, food, animal feed or the environ-
ment by reason of such PCB's.

a unit of Monsanto Company                    0474401

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

-2-

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provisions set forth above.

Nothing herein shall create or imply any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer. No conditions, understandings or agreements purporting to modify or vary the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effected by the acknowledgment or acceptance of any sale document, purchase order, shipping instruction or other forms containing terms or conditions at variance herewith.

AEROVOX CORPORATION

By: _____

Title: _____

Date: _____

MONSANTO COMPANY

By: _____

AEROVOX CANADA LIMITED

By: _____

Title: _____

Date: _____

MONSANTO CANADA LIMITED

By: _____

0479402

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM



– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

**FOLD on this line and place in shipping pouch with bar code and delivery address visible**

1. Fold the first printed page in half and use as the shipping label.
2. Place the label in a waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
3. Keep the second page as a receipt for your records. The receipt contains the terms and conditions of shipping and information useful for tracking your package.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 24

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM



September 1, 2016


Re:     *Tender of Defense & Demand for Indemnification Under Special Undertaking by Purchasers of Polychlorinated Biphenyls contracts dated February 7, 1972, and March 20, 1972*

Christopher M. Hohn
Thompson Coburn LLP
One US Bank Plaza
St. Louis, Missouri 63101


Dear Mr. Hohn:

Thank you for your letter dated August 29. 2016. You are correct that I am authorized to receive this demand on behalf of AVX Corporation.

AVX has reviewed this demand carefully and cannot agree with your analysis. Under the Special Undertaking By Purchasers of Polychlorinated Biphenyls dated February 7, 1972 ("February Undertaking"). The relevant language is set forth below:

> Buyer hereby covenants and agrees that, ***with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer*** on or after the date hereof and in consideration of any such sale or deliver, Buyer shall defend, indemnify and hold harmless Monsanto . . . from and against any and all liabilities . . . . ***arising out or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through, or under Buyer*** . . . .

February Undertaking (emphasis added). The identical language appears in the Special Undertaking By Purchasers of Polychlorinated Biphenyls dated March 20, 1972 ("March Undertaking"). You apparently recognize the importance of this provision although your quotation omits some key language.

A plain reading of this unambiguous language makes clear that the indemnification obligation relates only to PCBs that were sold/delivered to Buyer. Put another way, this was not a free-floating, general obligation that related to every PCB-containing material manufactured by Monsanto and sold anywhere in the country to any person, but only to those that were sold to the counterparties, Aerovox Corporation and Aerovox Canada Limited. This is confirmed by the use

Sept. 1, 2016
Page 2 of 3

of the phrase "such PCBs" which can only be read to mean those PCBs sold or delivered to the counterparties.

Accordingly, any obligation that might arise under either the February Undertaking or the March Undertaking is limited only to liabilities that arise from PCBs sold/delivered to the Aerovox Corporation or Aerovox Canada Limited. A canvass of your letter reveals no assertion of a connection between those specific PCBs and any of the claimed liabilities. Indeed, given that the only product manufactured by either entity were sealed capacitors, it seems unlikely in the extreme that these PCBs could possibly be connected in any way to any of the claimed liabilities.

I should also draw to your attention several other matters that may be relevant. First, Aerovox Corporation sold all of its assets to Belleville Industries, Inc. on January 2, 1973, at a time when Aerovox Corporation still had a separate existence from AVX Corporation. As a result, while you assert that AVX Corporation is responsible for the liabilities of Aerovox Canada Limited, in fact, that is not the case. Aerovox Canada Limited was a subsidiary of Aerovox Corporation and was sold with the other assets. Accordingly, there are no circumstances under which AVX Corporation is responsible for any claims made against Aerovox Canada Limited. Instead, you must look to the entity that purchased that corporation from Aerovox Corporation. As a further result of the 1973 sale, AVX's contractual liability under either Special Undertaking, if any, would be limited to liability arising only from PCBs sold in the time period between February 7, 1972 and January 2, 1973, less than one year out of decades of operations.

Second, in light of the fact that the sales and delivery of the PCBs to Aerovox Corporation took place in Massachusetts, AVX expects that its laws will apply. As a result, at least with respect to any claim or liability which was known to your client for more than six years, any contract claim would be barred by the statute of limitations. An inspection of the list provided strongly suggests that most, if not all, would, therefore be barred. I also note that the doctrine of laches could also prove a substantial barrier – for example, it appears that Monsanto's counsel failed to avoid an award of $46,500,000 in just one case. By delaying the assertion of this claim, Monsanto precluded AVX – or any other recipient(s) – of the possibility of hiring other counsel who might not have reached such a disastrous result.

Third, to the extent your clients seek to invoke either Special Undertaking, you would be obliged to provide all the relevant documents to determine which cases, if any, might fall within the scope of the agreements. Mere provision of a docket sheet is facially inadequate. Accordingly, to the extent that your client intends to press any claims, it must provide all delivery records on which it intends to rely, all the pleadings in cases that are still under litigation and all settlement documentation for cases that are settled or are in the process of being settled. Until then, AVX must deem your demand to be inadequate.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Sept. 1, 2016
Page 3 of 3

        Under these circumstances, AVX must decline your invitation. Please also note that this letter is not intended to be comprehensive account of all relevant facts, circumstances and defenses.


                    Sincerely,


                    *Evan Slavitt*
                    Evan Slavitt
                    Senior Vice President, General Counsel and
                    Corporate Secretary

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 25

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM


**THOMPSON COBURN** LLP

Christopher M. Hohn
P 314.552.6159
F 314.552.7000
chohn@thompsoncoburn.com

August 29, 2016

**VIA FEDERAL EXPRESS**

Cornell-Dubilier Electronics Corp.
Attn: President
140 Technology Pl
Liberty, SC 29657-3300

*Re:*   ***Tender of Defense & Demand for Indemnification Under Special Undertaking by Purchasers of Polychlorinated Biphyenls contract dated January 26, 1972***

> ***Protected Communication:   Indemnitee-Indemnitor Privilege; Common Interest Doctrine***

Dear Sir/Madam:

We understand that you are authorized to receive this demand on behalf of Cornell-Dubilier Electronics Corp. If that understanding is incorrect, please advise immediately and we will redirect this correspondence as necessary.

We write on behalf of our clients Monsanto Company ("New Monsanto"), Pharmacia LLC, f/k/a Monsanto ("Old Monsanto"), and Solutia Inc. (collectively the "Monsanto Defendants"). The Monsanto Defendants have been sued in certain lawsuits by a number of individuals, cities, municipal agencies, and school districts seeking to recover for claimed personal injuries, environmental clean-up and permit costs, property damage, and other damages allegedly caused by exposure to or contamination by Polychlorinated Biphenyls ("PCBs") manufactured and sold by Old Monsanto.

It is the Monsanto Defendants' understanding that Cornell-Dubilier Electronics Corp. entered into a Special Undertaking By Purchasers of Polychlorinated Biphenyls contract with Old Monsanto on January 26, 1972 (the "Special Undertaking Contract"), a copy of which is enclosed for your reference.

The Special Undertaking Contract states in pertinent part that Cornell-Dubilier Electronics Corp. will:

> defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale, or disposition of such PCB's by, through or under Buyer, whether alone or in

Thompson Coburn LLP | Attorneys at Law | One US Bank Plaza | St. Louis, Missouri 63101
P 314.552.6000 | F 314.552.7000 | www.thompsoncoburn.com

Chicago • Los Angeles • St. Louis • Southern Illinois • Washington, D.C.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

Special Undertaking Contract at 1.

By copy of this letter, demand is made for Cornell-Dubilier Electronics Corp. to defend, indemnify and hold harmless Old Monsanto (and related entities as specified in the Special Undertaking Contract), in connection with all current and future PCB-related litigation wherein Old Monsanto is, or will be, named as a defendant, and for the amount of any resulting judgments (if any) and settlements, to the full extent required by the Special Undertaking Contract.  You are hereby formally tendered the defense of the Food Chain Cases, the Water Cases, the School Cases, the Occupational Case, and any other lawsuits on the enclosed list of PCB-related litigation. Copies of the complaints in each case will be provided upon request. Pending the establishment of a  reasonable and acceptable arrangement regarding this tender, the cases will continue to be defended and/or settled and Cornell-Dubilier Electronics Corp. will be held liable for the amount of the resulting settlements or judgments (if any) as well as the incurred costs, expert witness fees, attorney's fees, and all other reasonable expense incurred in defending these actions. You are expressly notified that settlement negotiations relating to certain of the listed cases are currently underway.

The Monsanto Defendants expressly reserve all of their rights of any sort, at law or in equity, including but not limited to those under the Special Undertaking Contract, whether or not identified herein.  The Monsanto Defendants also expressly reserve the right to engage in settlement discussions and/or to settle some or all of the above cases, while holding Cornell-Dubilier Electronics Corp. responsible for those settlements.

The current breakdown of the PCB-related litigation involving the Monsanto Defendants is as follows:

1. The Monsanto Defendants are defending a series of personal injury cases in which plaintiffs are contending that they suffer from various types of cancer (primarily non-Hodgkin lymphoma) as a result of their environmental, non-employment exposure to PCBs (the "Food Chain Cases").  The Food Chain Cases currently are pending in state court in Los Angeles County, California and in state and federal courts in St. Louis, Missouri.  At present, the Food Chain Cases include approximately 700 plaintiffs. On May 26, 2016, a Judgment was entered against Monsanto in one such case in the total amount of $46,500,000.00 for alleged personal injuries and punitive damages arising out of the exposure to PCBs in a case captioned *Benito Walker et al. v. Monsanto Co., et al.,* Case No. 1122-CC09621-01 (Cir. Court City of St. Louis May 26, 2016).

2. The Monsanto Defendants also face a group of lawsuits (currently eight suits have been filed) on the West Coast in which cities and various municipal agencies are alleging that the Monsanto Defendants should bear some cost of water clean up and wastewater permit costs due to PCB contamination (the "Water Cases").

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

3.  The Monsanto Defendants also are defending four cases in which certain school districts allege that they should bear some cost of clean-up and/or rebuilding of schools due to alleged PCB contamination (the "School Cases").

4.  The Monsanto Defendants also were recently named along with several other defendants in an occupational exposure case filed in state court in Massachusetts (the "Occupational Case").

A current list of all PCB-related litigation wherein the Monsanto Defendants are named as defendants (including court, case caption, and civil docket number) is enclosed.  Please note that the next Food Chain Case is currently set for trial on September 12, 2016.

We request acknowledgement that Cornell-Dubilier Electronics Corp. received this communication and confirmation that Cornell-Dubilier Electronics Corp. intends to honor its contractual obligations of defense and indemnification under the Special Undertaking Contract within **ten (10) days** from the date of this communication.  We also request that you immediately notify your primary and excess insurer(s) of the demand for defense and indemnity set forth above.

Our Client would welcome the opportunity to discuss the PCB-related litigation referenced above (and on the enclosed list) and the scope of Cornell-Dubilier Electronics Corp.'s obligations under the Special Undertaking Contract with you.  New Monsanto expects to put a process in place for the resolution of this obligation, and those obligations of other similarly situated parties.  Please, at your earliest convenience, contact Monsanto's Assistant General Counsel, Litigation, Molly Jones at (314) 694-5425 to discuss this matter.

Thank you for your attention to this matter.  We look forward to hearing from you.

Sincerely,

Thompson Coburn LLP

By

   Christopher M. Hohn

Enclosures

cc: Cornell-Dubilier Electronics Corp.
    c/o The Corporation Trust Company
    Corporation Trust Center
    1209 Orange Street
    Wilmington, DE 19801
    (via Federal Express)

| Matter Name | Group Reference | Jurisdiction Type | Court | Docket Number | File Date |
|---|---|---|---|---|---|
| Grant Parish School Board v. Monsanto Company (PCB) | PCB - Building | Federal | LA - Western District | 1:15-cv-01719-DDD-JDK | 5/19/2015 |
| City of Hartford and Hartford Board of Education v. Monsanto (SOI)(PCBO | PCB - Building | Federal | CT- U.S. District | 2015-004301 | 10/23/2015 |
| Town of Princeton, MA v. Monsanto Company (SOI) (PCB) | PCB - Building | Federal | MA – U.S. District | 4:15-cv-40096-DJC | 7/1/2015 |
| Town of Westport and Westport Community Schools v. Monsanto (SOI) (PCB) | PCB - Building | Federal | MA – U.S. District | 1:14-CV-12041-DJC | 5/7/2014 |
| Alston, Bertha v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01495 | 4/23/2012 |
| Aiken, Ronald v. Monsanto Company (SOI) (PCB Food chain case) | PCB - Food Chain | State | MO - St. Louis City | 1422-CC09436 | 8/15/2014 |
| Ashley, Jerry v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01499 | 4/23/2012 |
| Bailey, Roger v. Monsanto Company (PCB Food Chain case) | PCB - Food Chain | State | MO - Eastern District | 15SL-CC01768 | 5/22/2015 |
| Blum, Robert J., Jr. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC02866 | 6/28/2010 |
| Brownlee, Paul v. Monsanto Company (SOI) (PCB Food Chain) | PCB - Food Chain | State | CA – LA County | BC497582 | 12/14/2012 |
| Brown, Paulette v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01498 | 4/23/2012 |
| Burford, Kent N, et al. v. Monsanto, et al. (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00928 | 3/10/2016 |
| Burke, Angela v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1222-CC10374 | |
| Carter, Kevin v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA – LA County | BC484608 | 5/11/2012 |
| Clair, Sanford v. Monsanto Company (SOI) (PCB) | PCB - Food Chain | State | MO-St. Louis County | 095L-CC01964 | |
| Craig, Gary v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01496 | 4/23/2012 |
| Dauber, Roslyn v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA – LA County | BC483342 | 4/23/2012 |
| Dublin, Sydell v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC03822 | 9/22/2010 |
| Ferrell, Marinda v. Monsanto (SOI) (PCB Food Chain case). | PCB - Food Chain | State | MO - St. Louis City | 1322-CC08915 | 7/22/2013 |
| Gibson, Dennis L. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - Eastern District | 11SL-CC04951 | |
| Goodman, Betty v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1322-CC09213 | 8/26/2013 |
| Granger, Jacqueline v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA – LA County | BC459770 | 4/19/2011 |
| Guenther, Valerie Anna v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | CA – LA County | BC480068 | 3/5/2012 |
| Hearon, Leslie v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12S.-CC01497 | 4/23/2012 |
| Kelly, Thomas v. Monsanto Company (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 15SL-CC03845 | 11/9/2015 |

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

| Case | Category | Court | Jurisdiction | Case No. | Date |
|---|---|---|---|---|---|
| LaBarge, Dale L. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01263 | 4/5/2012 |
| Mosby, Keith v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 1122-CC02206 | 7/6/2012 |
| Murphy, Deborah D. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO- St. Louis City | 1222-CLO9174 | 6/5/2012 |
| Naihe, Edward v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC02117 | 6/5/2012 |
| Nishida Nicolas White, Ruth v. Monsanto and Solutia (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 09SL-CC01964 | 5/1/2009 |
| Nunn, Mary vs. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1122-CC01207 | |
| Olson Kathleen R. v. Monsanto Company, et al. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00919 | 3/10/2016 |
| Rodriguez, Guillermo v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO-St. Louis County | 10SLCC03408 | |
| Stapleton, Bernadette v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO-St. Louis City | 1122CC09622 | 9/9/2011 |
| Varela, Jesse v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO-St. Louis City | 1122CC09621 | 5/16/2013 |
| Walker, Benito v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | | | | |
| Lamkin, Craig, et ux. v. Monsanto Company, et al. (SOI) (PCB) | PCB – Personal Injury | State | MA - Suffolk County | 16-0563 | 2/19/2016 |
| City of Berkeley v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA – Northern District | 5:16-cv-00071 | 1/6/2016 |
| City of Oakland v. Monsanto Company (SOI)(PCB) | PCB - Water Contamination | Federal | CA - Northern District | 4:15-cv-05152 | 11/10/2015 |
| City of San Jose v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 5:15-cv-03178-NC | 7/10/2015 |
| City of Seattle v. Monsanto, et al. (SOI) (PCB) | PCB - Water Contamination | Federal | WA - Western District | 2:16-cv-00107 | 1/25/2016 |
| City of Spokane v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | WA- Eastern District | 2:15-cv-00201-SMJ | 7/31/2015 |
| Monsanto PCB Water Contamination Litigation (SOI) (PCB) | PCB - Water Contamination | Federal | Judicial Panel /Multidistrict | MDL No. 2697 | 1/28/2016 |
| San Diego Unified Port and City of San Diego v. Monsanto Co., et al. | PCB-Water Contamination | Federal | CA – Southern District | 3:15-cv-00578-WQH-JLB | 8/3/15 |
| City of Long Beach v. Monsanto Co., et al. | PCB - Water Contamination | Federal | CA – Central District | 2:16-cv-03493-FMO-AS | 5/19/16 |
| City of Portland v. Monsanto Co., et al. | PCB – Water Contamination | Federal | OR – Dist. of Oregon, Portland Division | 3:16-cv-1418-PK | 7/12/16 |

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

MONSANTO INDUSTRIAL CHEMICALS CO.
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166
Phone (314) 694-1000

SPECIAL UNDERTAKING BY
PURCHASERS OF POLYCHLORINATED BIPHENYLS

Monsanto Company ("Monsanto") manufactures certain poly-
chlorinated biphenyl products ("PCB's") which Cornell
Dubilier ("Buyer") desires to purchase. While
Buyer desires to purchase PCB's because of certain
desirable flame resistant and insulator properties, Buyer
acknowledges that it is aware and has been advised by
Monsanto that PCB's tend to persist in the environment;
that care is required in their handling, possession, use
and disposition; that tolerance limits have been or are
being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies
with respect to its further production, sale and delivery
of PCB's, including the receipt of undertakings from its
customers as set forth below, and Buyer is willing to agree
to such undertakings with respect to sales and/or deliveries
of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with
respect to any and all PCB's sold or delivered by or on
behalf of Monsanto to Buyer on or after the date hereof
and in consideration of any such sale or delivery, Buyer
shall defend, indemnify and hold harmless Monsanto, its
present, past and future directors, officers, employes and
agents, from and against any and all liabilities, claims,
damages, penalties, actions, suits, losses, costs and
expenses arising out of or in connection with the receipt,
purchase, possession, handling, use, sale or disposition of
such PCB's by, through or under Buyer, whether alone or in
combination with other substances, including, without implied
limitation, any contamination of or adverse effect on humans,
marine and wildlife, food, animal feed or the environment by
reason of such PCB's.

0426380

a unit of Monsanto Company

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

-2-

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provisions set forth above.

Nothing herein shall create or imply any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer.  No conditions, understandings or agreements purporting to modify or vary the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effected by the acknowledgment or acceptance of any sale document, purchase order, shipping instruction or other forms containing terms or conditions at variance herewith.

Cornell-DuBilier Elec. Corp.              MONSANTO COMPANY
        (Buyer)

BY: _____        BY: _____

TITLE: _____

DATE: _1-26-72_____

0426381

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM



FedEx Express

ORIGIN ID:CPSA    (314) 552-6393
DAVID D. HANGAN
THOMPSON COBURN LLP
505 N 7TH
ST. LOUIS, MO 63101
UNITED STATES US

SHIP DATE: 29AUG16
ACTWGT: 0.45LB
CAD: 103288533/WSXI02750

BILL SENDER

TO  ATTN: PRESIDENT
CORNELL-DUBILIER ELECTRONICS, INC.
140 TECHNOLOGY PL

LIBERTY SC 29657
(314) 552-6000
INV:
PO:
DEPT:

REF: 56012/15/11694/327

THU - 01 SEP 4:30P
EXPRESS SAVER

TRK#  7839 4210 1337    0201

SX LQKA

SC-US    29657
GSP

REL#
3785346

544J1/A053/14E9

J162016070501us

— — — — — — FOLD on this line and place in shipping pouch with **bar code and delivery address** visible

1. Fold the first printed page in half and use as the shipping label.
2. Place the label in a waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
3. Keep the second page as a receipt for your records. The receipt contains the terms and conditions of shipping and information useful for tracking your package.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 26

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM



FOLEY
HOAG LLP

Seaport West
155 Seaport Boulevard
Boston, MA 02210-2600

617.832.1000 main
617.832.7000 fax

Jonathan M. Ettinger
617-832-1195 direct
jettinger@foleyhoag.com

May 18, 2017

**By Email and U.S. Mail**

Christopher M. Hohn, Partner
Thompson Coburn LLP
One US Bank Plaza
St. Louis, MO 63101

Re:    *Tender of Defense & Demand for Indemnification Under Special Undertaking
by Purchasers of Polychlorinated Biphenyls contract January 26, 1972*

Dear Mr. Hohn:

I write on behalf of Cornell-Dubilier Electronics, Inc. ("CDE") in response to your letter dated August 29, 2016 and the follow up letters dated December 23, 2016 and April 7, 2017 concerning the demand by the entities you refer to as the "Monsanto Defendants" for defense and indemnification in connection with certain lawsuits (the "Demand").[1]  Having carefully reviewed the allegations in the Demand, CDE does not see any justification for Monsanto's claims.  It is plain from the Special Undertaking that it only applies to claims made against Monsanto with respect to PCBs sold to CDE after January 26, 1972.  In the Demand, Monsanto makes no attempt to identify any particular PCBs sold to CDE that caused any underlying claim.  Moreover, even if it could link particular PCBs sold to CDE with any claims against Monsanto, Monsanto has made no attempt to segregate damage caused solely by PCBs sold to CDE after January 26, 1972.  Indeed, it seems unlikely Monsanto could ever do so.  Thus, CDE sees no basis for Monsanto to invoke the Special Undertaking.

Monsanto's Demand suffers from other serious defects.  For instance, Monsanto's claims are likely time-barred by either applicable statutes of limitations or laches.  For over thirty years Monsanto has been litigating claims concerning PCBs, in some cases side-by-side with CDE, and has never asserted a claim under the Special Undertaking.  The facts as alleged

---

[1] At the outset, I want to thank Monsanto for the extension of time it provided for CDE's response while CDE resolved certain issues relating to representation.  Now that those issues have been resolved, CDE provides this response.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Christopher M. Hohn, Partner
May 18, 2017
Page 2

in the Demand also confirm that Monsanto has been dilatory in asserting its claims and deprived CDE of any meaningful opportunity to defend.

Finally, I note that when Monsanto induced CDE to execute the Special Undertaking, it did so while concealing from CDE material facts about PCBs which Monsanto had known for years.  Thus, CDE believes that the obligation is unenforceable.

Accordingly, without attempting to provide an exhaustive list of the reasons, CDE declines Monsanto's invitation.  Of course, if Monsanto insists on pursuing its Demand, CDE demands that with respect to any specific claim for which Monsanto alleges CDE is responsible, it immediately:

(1) Provide all documents or other information linking CDE with the claim;
(2) Identify what portion of the claim is attributable to PCBs sold to CDE (and explain how that was determined);
(3) Identify what portion of the claim is attributable to PCBs sold to CDE after January 26, 1972 (and explain how that was determined);
(4) Provide all delivery records of PCBs sold to CDE;
(5) Provide all pleadings from any litigation relating to the claim;
(6) Provide any settlement agreement relating to the claim; and
(7) Provide all communications concerning settlement of the claim.

CDE reserves all of its rights with respect to the Demand.

Kindly direct any future communications to my attention.

Sincerely,

Jonathan M. Ettinger

cc:   Victor Whitworth, CFO

JME:nw

B4687571.1

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 27

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM



One US Bank Plaza
St. Louis, MO 63101

314 552 6000  main
314 552 7000  fax
thompsoncoburn.com

**David M. Mangian**
314 552 6540  direct
dmangian@thompsoncoburn.com

May 13, 2022

**VIA ELECTRONIC MAIL & FEDEX**

The Gillette Company LLC
c/o Deborah Majoras
Chief Legal Officer
The Proctor & Gamble Company
1 Procter And Gamble Plz.
Cincinnati, OH 45202

Email:  majoras.DP@pg.com

***Re:***      ***Tender of Defense & Demand for Indemnification Under Special Undertaking by
Purchasers of Polychlorinated Biphyenls contract dated February 4, 1972***

           ***Protected Communication:  Indemnitee-Indemnitor Privilege; Common Interest
           Doctrine; Settlement Communication***

Dear Ms. Majoras:

We write on behalf of our clients Monsanto Company ("New Monsanto"), Pharmacia LLC, f/k/a
Monsanto ("Old Monsanto"), and Solutia Inc. (collectively the "Monsanto Defendants").  By this
letter, the Monsanto Defendants demand that The Gillette Company LLC ("Gillette") defend,
indemnify, and hold harmless Old Monsanto in certain lawsuits pursuant to the enclosed Special
Undertaking By Purchasers of Polychlorinated Biphenyls (the "Special Undertaking Contract").
This letter also seeks to open a dialogue about potentially resolving Gillette's obligations under
the Special Undertaking Contract through confidential mediation or other alternative dispute
resolution.

As an initial matter, we understand that you—as Chief Legal Officer for The Procter & Gamble
Company—are authorized to receive this demand on behalf of Gillette.  If that understanding is
incorrect, please advise immediately and we will redirect this correspondence as necessary.

The Monsanto Defendants have been sued by a number of individuals, cities, municipal agencies,
and school districts seeking to recover for claimed personal injuries, environmental clean-up and
permit costs, property damage, and other damages allegedly caused by exposure to or
contamination by Polychlorinated Biphenyls ("PCBs") manufactured and sold by Old Monsanto
(the "PCB Lawsuits").  These cases include (1) a group of lawsuits in which the plaintiffs allege
that the Monsanto Defendants should bear some cost of water clean-up and wastewater permit
costs due to PCB contamination (the "Water Cases"), and (2) cases in which the plaintiffs allege
that the Monsanto Defendants should bear some cost of clean-up and/or rebuilding of schools

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

May 13, 2022
Page 2

due to alleged PCB contamination (the "School Cases").  A current list of the PCB Lawsuits is enclosed.  The operative complaints and/or petitions in the PCB Lawsuits are too voluminous to enclose with this letter, but are publicly available and can also be made available to you upon request.

The Special Undertaking Contract was signed by P.R. Mallory & Co. Inc.  It states in pertinent part that P.R. Mallory & Co. Inc. will:

> defend, indemnify, and hold harmless [Old] Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses . . . arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through, or under [P.R. Mallory & Co. Inc.], whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's

It is the Monsanto Defendants' understanding that Gillette is the successor in interest to P.R. Mallory & Co. Inc.'s obligations under the Special Undertaking Contract through a series of corporate mergers and name changes.[1]

Gillette has a duty to defend Old Monsanto in the PCB Lawsuits because the plaintiffs' allegations in the PCB Lawsuits fall squarely within the scope of the Special Undertaking Contract.  For example:

- The claims and actions arise out of or in connection with P.R. Mallory & Co. Inc.'s post-February 4, 1972 *purchases* of PCBs because plaintiffs seek to impose liability on Old Monsanto for those sales/purchases.

- The claims and actions also arise out of or in connection with P.R. Mallory & Co. Inc.'s *possession, handling, use, sale, and/or disposition* of PCBs purchased after February 4, 1972, because the plaintiffs assert injuries allegedly caused by general environmental and food chain exposure to PCBs, or environmental PCB contamination, and P.R. Mallory & Co. Inc.'s possession, handling, use, sale and disposition of PCBs purchased after February 4, 1972 contributed to the amount of PCBs in the environment and food chain.

---

[1] Specifically, and as you may know, P.R. Mallory & Co. Inc. changed its name to Duracell International Inc. on February 28, 1980.  Duracell International Inc. merged into Duracell Inc. on June 29, 1989.  Duracell Inc. merged into a different Duracell International Inc. (formed in 1988) on July 28, 1997.  The surviving corporation, Duracell International Inc., changed its name to Duracell Inc. as part of the merger.  Duracell Inc. merged into The Gillette Company on December 31, 1998.  The Procter & Gamble Company purchased the stock of The Gillette Company in 2005.  On August 25, 2016, The Gillette Company entered into a merger agreement with The Gillette Company LLC effective September 1, 2016.  The Gillette Company LLC is a subsidiary of The Procter & Gamble Company.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

May 13, 2022
Page 3

- Gillette cannot credibly deny that P.R. Mallory & Co. Inc.'s possession, handling, use, sale and/or disposition of PCBs purchased after February 4, 1972 contributed to the amount of PCBs in the environment and food chain.  P.R. Mallory & Co. Inc. was one of the largest purchasers of PCBs between 1972 and 1977, purchasing more than 7 million pounds of PCBs from Old Monsanto during that time period.  P.R. Mallory & Co. Inc.'s handling and sale of those PCBs led to the presence of PCBs in the environment.  *See, e.g. Emhart Industries, Inc. v. Duracell Intern. Inc.*, 665 F. Supp. 549, 554-55 (M.D. Tenn. 1987) (noting that an underground storage tank containing PCBs located at a former P.R. Mallory & Co. Inc. manufacturing plant leaked and that "[t]he parties have stipulated that the use of PCBs before Emhart purchased the [P.R. Mallory & Co. Inc.] plant led to the PCB contamination on the floor, roof and ground."); *id.*, at 558 n.14 (noting that there were additional "leaking drums" that contained "PCBs that were flowing across the pavement and into the North Drain," which "empties into the Green River."); *id*, at 560 (expert concluding that "the PCB contamination of the [former P.R. Mallory & Co. Inc.] facility was surprisingly widespread . . . very high levels."); *id*, at 566 (noting PCB contamination was found at other former P.R. Mallory & Co. sites).

- The claims and actions in the PCB Lawsuits also arise out of or in connection with P.R. Mallory & Co. Inc.'s *possession, handling, use, sale, and/or disposition* of PCBs purchased after February 4, 1972, because the plaintiffs specifically allege that their injuries were caused by the improper dumping of PCBs into the environment by Old Monsanto's customers, which include P.R. Mallory & Co. Inc.

In short, the claims asserted in the PCB Lawsuits arise out of, and/or are in connection with, the PCBs P.R. Mallory & Co. Inc. purchased after February 4, 1972 that have been released into the environment in combination with all other PCBs in the environment.  The Special Undertaking Contract, by its express terms, includes liabilities arising out of or in connection with PCBs purchased after February 4, 1972 "*alone or in combination with other substances*."  Thus, Gillette has a duty to defend Old Monsanto in the PCB Lawsuits.

By copy of this letter, demand is made for Gillette to defend, indemnify and hold harmless Old Monsanto in connection with all current PCB Lawsuits wherein Old Monsanto is named as a defendant, and for the amount of any resulting judgments (if any) and settlements, to the full extent required by the Special Undertaking Contract.  You are hereby formally tendered the defense of the PCB Lawsuits on the enclosed list.  Pending the establishment of a reasonable and acceptable arrangement regarding this tender, the cases will continue to be defended and/or settled and Gillette will be held liable for the amount of the resulting settlements or judgments (if any) as well as the incurred costs, expert witness fees, attorney's fees, and all other reasonable expense incurred in defending these actions. The Monsanto Defendants also expressly reserve the right to engage in settlement discussions and/or to settle some or all of the PCB Lawsuits, while holding Gillette responsible for those settlements.  You are expressly notified that settlement negotiations relating to certain of the listed PCB Lawsuits are currently underway.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

May 13, 2022
Page 4

While the Monsanto Defendants obviously dispute and contest the claims and allegations in these matters and the other pending PCB Lawsuits, they face significant potential liability in each of the pending PCB Lawsuits, and Gillette is contractually obligated to defend, indemnify, and hold Old Monsanto harmless in each of those cases.

In addition to the foregoing, Gillette is also liable for some or all of the amounts already paid, or agreed to be paid, by the Monsanto Defendants to resolve PCB Lawsuits under the theory of common law/equitable contribution. These amounts include, but are not limited to: (1) $280 million that the Monsanto Defendants paid to settle a group of personal injury cases known as the Food Chain Cases[2]; (2) $650 million that the Monsanto Defendants have agreed to pay to settle Water Cases brought by certain municipal entities; and (3) amounts paid or agreed to be paid by the Monsanto Defendants to separately resolve Water Cases filed by the Attorneys General of New Hampshire, New Mexico, Ohio, Washington, D.C., and Washington.  The Monsanto Defendants vigorously defended these actions and contested the plaintiffs' claims and allegations in each instance prior to settling.

The Monsanto Defendants would prefer to resolve any disputes regarding Gillette's obligations under the Special Undertaking Contract and/or to reimburse the Monsanto Defendants for amounts paid to resolve certain PCB Lawsuits outside of formal litigation.  We believe the best medium to accomplish that is confidential mediation.  Accordingly, we request that Gillette do the following:

1. Acknowledge in writing that it received this communication within ten (10) days from the date of this communication;

2. Immediately notify its primary and excess insurer(s) of the Monsanto Defendant's demand for defense and indemnity set forth above; and

3. Contact me as soon as possible so that we can discuss potential mediation, including mediator selection and proposed dates.

Thank you for your attention to this matter.  We look forward to hearing from you.

The Monsanto Defendants expressly reserve all of their rights of any sort, at law or in equity, including but not limited to those under the Special Undertaking Contract, whether or not identified herein.

---

[2] The plaintiffs in the Food Chain Cases alleged that they suffer from various types of cancer (primarily non-Hodgkin lymphoma) as a result of their environmental, non-employment exposure to PCBs.

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

May 13, 2022
Page 5


Very truly yours,

Thompson Coburn LLP

By
    David M. Mangian
    Partner

Enclosures

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

SPECIAL UNDERTAKING BY

PURCHASERS OF POLYCHLORINATED BIPHENYLS

Monsanto Company ("Monsanto") manufactures certain polychlorinated biphenyl products ("PCB's") which P. R. Mallory & Co. Inc. ("Buyer") desires to purchase. While Buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employes and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses (except to the extent arising from the failure of PCB's to conform with specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provisions set forth above and such provisions shall be applied to and considered part of each future contract for the sale of PCB's by Monsanto to Buyer.

0422151

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

-2-

Nothing herein shall create or imply any duty or obligation of Monsanto
to sell or deliver any PCB's to Buyer.  No conditions, understandings
or agreements purporting to modify or vary the terms hereof shall be
binding unless hereafter made in writing specifically referring to this
agreement and signed by the party to be bound and no modification or
variance of the above undertaking shall be effected by the acknowledgment
or acceptance of any sale document, purchase order, shipping instruction
or other forms containing terms or conditions at variance herewith.


P. R. MALLORY & CO. INC.              MONSANTO COMPANY
       (Buyer)

BY: _____              BY: _____

TITLE: _____

DATE: _____

0422152

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

| CASE | NUMBER | JURISDICTION |
|------|--------|--------------|
| ADKINS, Melinda, et al. v. Monsanto, et al. | 2:21-cv-01818-APG-VCF | USDC, District of Nevada |
| ALLISON, Dana, et al. v. Monsanto, et al. | 18-2-26074-4 SEA | King County Superior Court WA |
| BACK, David, et al. v. Monsanto, et al. | 18SL-CC03530 | St. Louis County, MO |
| BALTIMORE, Mayor and City Council v. Monsanto, et al. | 1:19-cv-00483-RDB | USDC, District of Maryland |
| BARD, Angela et al. v. Monsanto, et al. | 21-2-14305-5 SEA | King County Superior Court WA |
| BERKELEY, City of v. Monsanto, et al. | 5:16-cv-00071-EJD | USDC, Northern District of California |
| BEUTLER, John et al. v. Monsanto, et al. | 21-2-14302-1 SEA | King County Superior Court WA |
| BISHOP, Patricia v. Monsanto, et al. | 2020L 001815 | Madison County, Illinois |
| BODEY, Belva and Emmett v. Monsanto, et al. | 19-2-00605-05 | Clallam County, WA |
| BURKE, Leah, et al. v. Monsanto, et al. | 18-2-58379-9 SEA | King County Superior Court WA |
| CALDWELL-ELEAZER, Maya, et al. v. Monsanto, et al. | 18-2-54572-2 SEA | King County Superior Court WA |
| CALIFORNIA, People of the State of v. Monsanto, et al. | 22STCV07958 | Los Angeles County, CA |
| CHULA VISTA, City of v. Monsanto, et al. | 3:18-cv-01942-TWR-AGS | USDC, Southern District of California |
| DELAWARE, State of v. Monsanto, et al. | N21C-09-179 MMJ | New Castle County, Delaware |
| DISTRICT OF COLUMBIA v. Monsanto, et al. | 2020-CA-002445-B | Superior Court of the District of Columbia |
| DONHAM, Edith, et al. v. Monsanto, et al. | 19-2-02161-6 SEA | King County Superior Court WA |
| EAST ST. LOUIS, City of v. Monsanto, et al. | 3:21-cv-232-DWD | USDC, Southern District of Illinois |

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

| | | |
|---|---|---|
| ERICKSON, Kerry, et al. v. Monsanto, et al. | 18-2-11915-4 SEA | King County Superior Court WA |
| FAYETTE COUNTY, The County of Commission of v. Bayer CropScience, et al. | 21-C-42 | Fayette County, WV |
| FLOREY, Catherine, et al. v. Monsanto, et al. | 19-2-02266-7 SEA | King County Superior Court WA |
| GRADY, Michael and Kathleen, v. Monsanto, et al. | 2022-CC09797 | City of St. Louis, MO |
| GRANT, Donya et al. v. Monsanto, et al. | 21-2-14304-7 SEA | King County Superior Court WA |
| HARRIS, Alexander, et al. v. Monsanto, et al. | 20STCV33399 | Los Angeles County, CA |
| HARTFORD, City of v. Monsanto, et al. | 3:15-CV-01544 (RNC) | USDC, District of Connecticut |
| HEIT, Angela, et al. v. Monsanto, et al. | 18-2-55641-4 SEA | King County Superior Court WA |
| KEELEY, Nicole, et al. v. Monsanto, et al. | 19-2-02170-5 SEA | King County Superior Court WA |
| KELLER, Rebecca, et al. v. Monsanto, et al. | 19-2-02173-0 SEA | King County Superior Court WA |
| KEYSER, Shelby, et al. v. Monsanto, et al. | 18-2-58331-4 SEA | King County Superior Court WA |
| LARSON, Corrina et al. v. Monsanto, et al. | 19-2-09686-1 SEA | King County Superior Court WA |
| LONG BEACH, City of v. Monsanto, et al. | 2:16-cv-03493-FMO-AS | USDC, Central District of California |
| LONG, Melanie et al. v. Monsanto, et al. | 18-2-00001-7 SEA | King County Superior Court WA |
| LOS ANGELES, City of v. Monsanto, et al. | 2:19-CV-04694-GW-AFM | USDC, Central District of California |
| MARSHALL, Eugene and Trudy, v. Monsanto, et al. | 19-L-0584 | St. Clair County, IL |
| MARYLAND, State of v. Monsanto, et al. | 24C21005251 | Baltimore City, Maryland |
| MILLS HILEY, Holly et al. v. Monsanto, et al. | 21-2-14303-9 SEA | King County Superior Court WA |

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

| | | |
|---|---|---|
| NEW HAMPSHIRE, State of v. Monsanto, et al. | 217-2020-CV-00573 | Merrimack County, NH |
| NEW MEXICO, State of v. Monsanto, et al. | 19-cv-01139 | USDC, District of New Mexico |
| OAKLAND, City of v. Monsanto, et al. | 5:15-cv-05152-EJD | USDC, Northern District of California |
| OHIO, State of v. Monsanto, et al. | A 1801237 | Hamilton County, OH |
| OREGON, State of v. Monsanto, et al. | 18CV00540 | Multnomah County, OR |
| PENNSYLVANIA, Commonwealth of v. Monsanto, et al. | 668 MD 2020 | Commonwealth of PA |
| PORT of PORTLAND v. Monsanto, et al. | 3:17-cv-00015-MO | USDC, District of Oregon |
| PORTLAND, City of v. Monsanto, et al. | 3:16-cv-01418-MO | USDC, District of Oregon |
| ROSE, Merrilee, et al. v. Monsanto, et al. | 18-2-58239-3 SEA | King County Superior Court WA |
| SAN DIEGO, Unified Port District v. Monsanto, et al. | 15-CV-578 TWR (AGS) | USDC, Southern District of California |
| SAN JOSE, City of v. Monsanto, et al. | 5:15-cv-03178-EJD | USDC, Northern District of California |
| SAN MATEO, County of, et al. v. Monsanto, et al. | 22-CIV-01667 | San Mateo County, CA |
| SEATTLE, City of v. Monsanto, et al. | 2:16-cv-00107-RSL | USDC, Western District of Washington |
| SOLEY, Hope, et al. v. Monsanto, et al. | 18-2-23255-4 SEA | King County Superior Court WA |
| SPOKANE, City of v. Monsanto, et al. | 15-cv-00201-SMJ | USDC, Eastern District of Washington |
| STEINMAN, Susan, et al. v. Monsanto, et al. | 19-2-02176-4 SEA | King County Superior Court WA |

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

| | | |
|---|---|---|
| STRATTON, Victoria, et al. v. Monsanto, et al. | 19-2-02178-1 SEA | King County Superior Court WA |
| TARBELL, Russell, v. Monsanto, et al. | 20SL-CC01017 | St. Louis County, MO |
| TEMPLETON, Jay S. and Dawn L. v. Monsanto, et al. | 21-C-340 | Kanawha County, WV |
| WASHINGTON, State of v. Monsanto, et al. | 16-2-29591-6 SEA | King County Superior Court WA |
| WILLIAMSON, Vanessa, et al. v. Monsanto, et al. | 19-2-02181-1 SEA | King County Superior Court WA |

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

# EXHIBIT 28

Electronically Filed - St. Louis County - August 03, 2022 - 02:35 PM

# Monsanto

*Letter #1*
*Letter sent out over*
*period 12-20-71, 1/17*
*and in Feb. 1972*

**MONSANTO INDUSTRIAL CHEMICALS CO.**
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166
Phone: (314) 694-1000

We are writing to advise you that Monsanto has adopted
certain restrictive policies with respect to its further
sale and delivery of all polychlorinated biphenyl (PCB's)
products used as dielectric fluids in transformers and
capacitors including but not limited to those sold under
tradenames such as Aroclor®, Inerteen®, Pyranol® and
under the generic term askarel.

Effective 15 January 1972 Monsanto will sell and deliver
these products only to manufacturers of transformers or
capacitors who have entered into agreement to indemnify
and hold harmless Monsanto in the use of these products,
and whose financial responsibility makes such agreements
meaningful in Monsanto's opinion.  Two copies of such
an agreement are attached.

As we have previously advised you, studies indicate PCB's
may be accumulating in the environment.  In some instances,
PCB's have been found in food or in the food chain.
Because of Monsanto's concern over this problem, we are
discontinuing sales of PCB's in all applications except
as dielectric fluids for use in transformers and
capacitors.

If you have any questions or if you wish to meet with
representatives of Monsanto management relative to this
agreement, please telephone (314) 694-2455, or write
directly to Mr. H. S. Bergen, Monsanto Company,
P. O. Box 14617, St. Louis, Missouri 63178.  Otherwise,
please have the attached two copies of the hold harmless

a unit of Monsanto Company

Electronically Filed - St Louis County - August 03, 2022 - 02:35 PM

Page 2

agreement signed on behalf of your company by an authorized
officer and return one fully signed copy to Monsanto.  If
we do not receive a signed copy of the agreement in the
form attached by 15 January, it may not be possible to sell
further quantities of these products to your company.

We sincerely regret any hardships that this decision may
cause you but it is taken in an effort to continue to make
available these products for critical electrical applications.

Very truly yours,

Howard Bergen, Director
Specialty Products Group
Monsanto Industrial Chemical Co.

/jf

Enclosures

MCL001250