# Exhibit E1



## Your Missouri Courts

Search for Cases by: Select Search Method...

Judicial Links | eFiling | Help | Contact Us | Print Logon

### 17SL-CC03368 - MONSANTO COMPANY ET AL V MAGNETEK, INC. (E-CASE)

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |
|---|---|---|---|---|---|---|---|---|

Sort Date Entries: ● Descending ○ Ascending     Display Options: All Entries

---

**02/07/2023**   **Motion Granted/Sustained**

Richard P. Cassetta and Bryan Cave Leighton Paisner LLP and hereby withdraw as counsel for Plaintiffs Monsanto Company, Pharmacia, LLC, and Solutia, Inc. SO ORDERED: JUDGE RICHARD STEWART

  **Associated Entries: 01/30/2023 - Notice** ±

---

  **Motion Granted/Sustained**

The Court grants Defendant Cornell Dubilier Electronics, Inc., motion and admits Aaron Lang to practice pro hac vice in this matter. SO ORDERED: JUDGE RICHARD STEWART

  **Associated Entries: 01/24/2023 - Motion Filed** ±

---

  **Motion Granted/Sustained**

The Court grants Defendant Cornell Dubilier Electronics, Inc., motion and admits Jonathan M. Ettinger to practice pro hac vice in this matter. SO ORDERED: JUDGE RICHARD STEWART

  **Associated Entries: 01/24/2023 - Motion Filed** ±

---

  **Motion Granted/Sustained**

A. Elizabeth Blackwell and Bryan Cave Leighton Paisner LLP and hereby withdraw as counsel for Plaintiffs Monsanto Company, Pharmacia, LLC, and Solutia, Inc. SO ORDERED: JUDGE RICHARD STEWART

  **Associated Entries: 01/30/2023 - Notice** ±

---

  **Order Granting Ext of Time**

ORDER GRANTING DEFENDANT THE GILLETTE COMPANY, LLC'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' AMENDED PETITION SO ORDERED: JUDGE RICHARD STEWART

  **Associated Entries: 01/30/2023 - Motion Filed** ±

---

  **Order Granting Ext of Time**

SECOND CONSENT MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' FIRST AMENDED PETITION SO ORDERED: JUDGE RICHARD STEWART

  **Associated Entries: 01/24/2023 - Consent Filed** ±

---

**01/31/2023**   **Order Granting Ext of Time**

SO ORDERED: JUDGE ELLEN RIBAUDO

  **Associated Entries: 01/20/2023 - Motion for Extension of Time** ±

---

**01/30/2023**   **Proposed Order Filed**

The Gillette Company, LLCs Proposed Order for its Consent Motion for Extension of Time to Respond to Plaintiffs First Amended Petition; Electronic Filing Certificate of Service.

  **Filed By:** PAUL L KNOBBE

---

  **Motion Filed**

The Gillette Company, LLCs Consent Motion for Extension of Time to Respond to Plaintiffs First Amended Petition; Electronic Filing Certificate of Service.

  **Filed By:** PAUL L KNOBBE

**On Behalf Of:** THE GILLETTE COMPANY LLC
**Associated Entries:** 02/07/2023 - Order Granting Ext of Time ⊞

---

**Entry of Appearance Filed**

The Gillette Company, LLCs Entry of Appearance; Electronic Filing Certificate of Service.
**Filed By:** PAUL L KNOBBE
**On Behalf Of:** THE GILLETTE COMPANY LLC

---

**Motion of Withdrawl of Counsel**

Notice of Withdrawal; Electronic Filing Certificate of Service.
**Filed By:** HERBERT RICHARD GIORGIO JR
**On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC.

---

**Notice**

Notice of Withdrawal; Electronic Filing Certificate of Service.
**Filed By:** ANN ELIZABETH BLACKWELL
**On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC.
**Associated Entries:** 02/07/2023 - Motion Granted/Sustained ⊞

---

**Notice**

Notice of Withdrawal; Electronic Filing Certificate of Service.
**Filed By:** RICHARD PAUL CASSETTA
**On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC.
**Associated Entries:** 02/07/2023 - Motion Granted/Sustained ⊞

---

01/24/2023 | **Motion Filed**

Motion to Admit Pro Hac Vice - Jonathan M.. Ettinger; Exhibit A; Exhibit B; Exhibit C; Electronic Filing Certificate of Service.
**Filed By:** BENJAMIN J WILSON
**On Behalf Of:** CORNELL DUBILIER ELECTRONICS INC.
**Associated Entries:** 02/07/2023 - Motion Granted/Sustained ⊞

---

**Motion Filed**

Motion to Admit Pro Hac Vice - Aaron Long; Exhibit A; Exhibit B; Exhibit C; Electronic Filing Certificate of Service.
**Filed By:** BENJAMIN J WILSON
**On Behalf Of:** CORNELL DUBILIER ELECTRONICS INC.
**Associated Entries:** 02/07/2023 - Motion Granted/Sustained ⊞

---

**Consent Filed**

Second Consent Motion for Extension of Time to Respond to Plaintiffs First Amended Petition; Electronic Filing Certificate of Service.
**Filed By:** BENJAMIN J WILSON
**On Behalf Of:** CORNELL DUBILIER ELECTRONICS INC.
**Associated Entries:** 02/07/2023 - Order Granting Ext of Time ⊞

---

01/20/2023 | **Stipulation Filed**

Joint Stipulation; Electronic Filing Certificate of Service.
**Filed By:** SARAH A MILUNSKI
**On Behalf Of:** MAGNETEK, INC.

---

**Answer Filed**

Amended Answer to First Amended Petition; Electronic Filing Certificate of Service.
**Filed By:** SARAH A MILUNSKI

---

**Proposed Order Filed**

Order Granting Defendant Kyocera AVX Components Corporations Second Unopposed Motion for Extension of Time to Respond to Plaintiffs Amended Petition; Electronic Filing Certificate of Service.

**Filed By:** DAVID BRADLEY HELMS
**On Behalf Of:** KYOCERA AVX COMPONENTS CORPORATION

---

**Motion for Extension of Time**
Second Unopposed Motion for Extension of Time to Respond to Plaintiffs Amended Petition; Electronic Filing Certificate of Service.
**Filed By:** DAVID BRADLEY HELMS
**Associated Entries:** 01/31/2023 - Order Granting Ext of Time

---

**01/06/2023**    **Notice of Service**
Notice of Filling Waivers of Service of Process; Acknowledgement and Waiver of Service of Process - Paramount Global; Acknowledgement and Waiver of Service of Process - General Electric; Electronic Filing Certificate of Service.
**Filed By:** BRITTNEY KATHERINE AMANN
**On Behalf Of:** MONSANTO COMPANY

---

**12/20/2022**    **Case Mgmt Conf Scheduled**
**Scheduled For:** 02/22/2023;  8:45 AM ;  RICHARD M STEWART;  St Louis County

**Case Mgmt Conf Held**
**Scheduled For:** 12/14/2022;  8:45 AM ;  RICHARD M STEWART;  St Louis County

---

**12/19/2022**    **Proposed Order Filed**
Proposed Order; Electronic Filing Certificate of Service.
**Filed By:** DAVID MICHAEL MANGIAN
**On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC.

---

**12/16/2022**    **Order Granting Ext of Time**
SO ORDERED: JUDGE RICHARD STEWART
**Associated Entries:** 12/07/2022 - Motion for Extension of Time

**Order Granting Ext of Time**
SO ORDERED: JUDGE RICHARD STEWART
**Associated Entries:** 12/12/2022 - Consent Filed

---

**12/14/2022**    **Order Granting Ext of Time**
SO ORDERED: JUDGE RICHARD STEWART
**Associated Entries:** 12/12/2022 - Consent Filed

---

**12/12/2022**    **Consent Filed**
Consent Motion for Extension of Time to Respond to Plaintiffs First Amended Petition; Electronic Filing Certificate of Service.
**Filed By:** BENJAMIN J WILSON
**On Behalf Of:** CORNELL DUBILIER ELECTRONICS INC.
**Associated Entries:** 12/14/2022 - Order Granting Ext of Time
**Associated Entries:** 12/16/2022 - Order Granting Ext of Time

---

**12/07/2022**    **Entry of Appearance Filed**
Entry of Appearance; Electronic Filing Certificate of Service.
**Filed By:** BENJAMIN DAVID MOONEYHAM
**On Behalf Of:** KYOCERA AVX COMPONENTS CORPORATION

---

**Proposed Order Filed**
Order Granting Defendants Unopposed Motion for Extension of Time to Respond to Plaintiffs Amended Petition; Electronic Filing Certificate of Service.
**Filed By:** DAVID BRADLEY HELMS

On Behalf Of: KYOCERA AVX COMPONENTS CORPORATION

**Motion for Extension of Time**
**Filed By:** DAVID BRADLEY HELMS
**Associated Entries:** 12/16/2022 - Order Granting Ext of Time ⊞

**Entry of Appearance Filed**
Entry of Appearance; Electronic Filing Certificate of Service.
**Filed By:** DAVID BRADLEY HELMS

| 12/06/2022 | **Alias Summons Issued** |
| | Document ID: 22-SMCC-9821, for GENERAL ELECTRIC CO.Summons Attached in PDF Form for Attorney to Retrieve from Secure Case.Net and Process for Service. |

| 12/02/2022 | **Entry of Appearance Filed** |
| | Special and Limited Entry of Appearance on behalf of Cornell Dubilier Electronics, Inc.; Electronic Filing Certificate of Service. |
| | **Filed By:** BENJAMIN J WILSON |
| | **On Behalf Of:** CORNELL DUBILIER ELECTRONICS INC. |

| 11/30/2022 | **Motion to Strike** |
| | Plaintiffs Motion to Strike Magnetek, Inc.s Affirmative Defenses or in the Alternative, For More Definite Statement; Exhibit A - Magneteks Answer; Electronic Filing Certificate of Service. |
| | **Filed By:** DAVID MICHAEL MANGIAN |
| | **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC. |

| 11/29/2022 | **Motion Special Process Server** |
| | SPS APPROVED Revised Request for Appointment of Process Server; Electronic Filing Certificate of Service. |
| | **Filed By:** CHRISTOPHER MARTIN HOHN |
| | **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC. |

**Alias Summons Issued**
Document ID: 22-SMCC-9503, for PARAMOUNT GLOBAL.Summons Attached in PDF Form for Attorney to Retrieve from Secure Case.Net and Process for Service.

**Judge/Clerk - Note**
PLEASE SUBMIT THE SHERIFF FEE OF $36 OR A REQUEST FOR PROCESS SERVER FORM FOR DEFENDANT GENERAL ELECTRIC CO

| 11/21/2022 | **Request Filed** |
| | Request for Issuance of Alias Summons - General Electric; Electronic Filing Certificate of Service. |
| | **Filed By:** DAVID MICHAEL MANGIAN |
| | **On Behalf Of:** MONSANTO COMPANY, SOLUTIA, INC. |

**Request Filed**
Request for Alias Summons - Paramount Global; Electronic Filing Certificate of Service.
**Filed By:** DAVID MICHAEL MANGIAN
**On Behalf Of:** PHARMACIA, LLC

**Agent Served**
Document ID - 22-SMOS-950; Served To - THE GILLETTE COMPANY LLC; Server - ; Served Date - 16-NOV-22; Served Time - 00:00:00; Service Type - Special Process Server; Reason Description - Served

**Agent Served**
Document ID - 22-SMOS-948; Served To - CORNELL DUBILIER ELECTRONICS INC.; Server - ; Served Date - 16-NOV-22; Served Time - 00:00:00; Service Type - Special Process Server; Reason Description - Served

**Agent Served**
Document ID - 22-SMOS-949; Served To - KYOCERA AVX COMPONENTS CORPORATION; Server - ;
Served Date - 16-NOV-22; Served Time - 00:00:00; Service Type - Special Process Server; Reason
Description - Served

| | |
|---|---|
| 11/18/2022 | **Notice of Service** |

Return of Service; Exhibit A; Electronic Filing Certificate of Service.
    **Filed By:** NICHOLAS SCHNELL
    **On Behalf Of:** MONSANTO COMPANY

| | |
|---|---|
| 11/07/2022 | **Entry of Appearance Filed** |

Entry of Appearance of Nicholas T. Schnell; Electronic Filing Certificate of Service.
    **Filed By:** NICHOLAS SCHNELL
    **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC.

**Note to Clerk eFiling**
    **Filed By:** BRITTNEY KATHERINE AMANN

**Entry of Appearance Filed**
Entry of Appearance - B. Mollman; Electronic Filing Certificate of Service.
    **Filed By:** BRITTNEY KATHERINE AMANN
    **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC.

| | |
|---|---|
| 11/01/2022 | **Notice to Take Deposition** |

Deft. Magneteks Notice of Deposition to Pharmacia; Electronic Filing Certificate of Service.
    **Filed By:** SARAH A MILUNSKI
    **On Behalf Of:** MAGNETEK, INC.

**Notice to Take Deposition**
Deft. Magneteks Notice of Deposition to Solutia; Electronic Filing Certificate of Service.
    **Filed By:** SARAH A MILUNSKI

**Notice to Take Deposition**
Deft. Magneteks Notice of Deposition to Monsanto Company; Electronic Filing Certificate of Service.
    **Filed By:** SARAH A MILUNSKI

**Answer Filed**
Magneteks Answer to Am. Pet., Aff. Def. and Crossclaim; Electronic Filing Certificate of Service.
    **Filed By:** JOHN MICHAEL HESSEL
    **On Behalf Of:** MAGNETEK, INC.

| | |
|---|---|
| 10/21/2022 | **Order Granting Ext of Time** |

SO ORDERED: JUDGE RICHARD STEWART
    **Associated Entries:** 10/14/2022 - Motion Filed  ±

| | |
|---|---|
| 10/20/2022 | **Alias Summons Issued** |

Document ID: 22-SMOS-950, for THE GILLETTE COMPANY LLC. Summons Attached in PDF Form for
Attorney to Retrieve from Secure Case.Net and Process for Service.

**Alias Summons Issued**
Document ID: 22-SMOS-949, for KYOCERA AVX COMPONENTS CORPORATION. Summons
Attached in PDF Form for Attorney to Retrieve from Secure Case.Net and Process for Service.

**Alias Summons Issued**
Document ID: 22-SMOS-948, for CORNELL DUBILIER ELECTRONICS INC.. Summons Attached in
PDF Form for Attorney to Retrieve from Secure Case.Net and Process for Service.

**Alias Summons Issued**

Document ID: 22-SMCC-8402, for GENERAL ELECTRIC CO. Summons Attached in PDF Form for Attorney to Retrieve from Secure Case.Net and Process for Service.

**Alias Summons Issued**

Document ID: 22-SMCC-8401, for PARAMOUNT GLOBAL. Summons Attached in PDF Form for Attorney to Retrieve from Secure Case.Net and Process for Service.

**Motion Special Process Server**

Request for Appointment of Process server; Electronic Filing Certificate of Service.

   **Filed By:** CHRISTOPHER MARTIN HOHN

   **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC.

**Motion Special Process Server**

Request for Appointment of Process server; Electronic Filing Certificate of Service.

   **Filed By:** CHRISTOPHER MARTIN HOHN

| | |
|---|---|
| 10/19/2022 | **Judge/Clerk - Note** |
| | PER LOCAL RULE 28(E), YOU MUST SUBMIT THE REQUEST FOR PROCESS SERVER FORM WHICH MAY BE FOUND ON THE ST LOUIS COUNTY COURT'S WEB SITE |
| 10/14/2022 | **Motion Filed** |
| | Consent Motion for Additional Time to Answer Pltfs 1st Am. Petition; Electronic Filing Certificate of Service. |
| |    **Filed By:** SARAH A MILUNSKI |
| |    **On Behalf Of:** MAGNETEK, INC. |
| |    **Associated Entries:** 10/21/2022 - Order Granting Ext of Time  ⊞ |
| 10/07/2022 | **Case Mgmt Conf Scheduled** |
| |    **Associated Entries:** 12/20/2022 - Case Mgmt Conf Held |
| |    **Scheduled For:** 12/14/2022;  8:45 AM ;  RICHARD M STEWART;  St Louis County |
| | **Motion Denied** |
| | Magnetek's Renewed Motion to Dismiss or to Stay DENIED: JUDGE RICHARD STEWART |
| |    **Associated Entries:** 09/02/2022 - Motion to Dismiss  ⊞ |
| | **Motion Hearing Held** |
| |    **Scheduled For:** 10/07/2022;  9:00 AM ;  RICHARD M STEWART;  St Louis County |
| 10/05/2022 | **Reply** |
| | Magneteks Reply Memo of Law iso Renewed Motion to Dismiss; Electronic Filing Certificate of Service. |
| |    **Filed By:** SARAH A MILUNSKI |
| |    **On Behalf Of:** MAGNETEK, INC. |
| 09/23/2022 | **Response Filed** |
| | Plaintiffs Memorandum in Opposition to Defendant Magnetek, Inc.s Renewed Motion to Dismiss or Stay This Action; Kaley Affidavit; Exhibit A to Kaley Affidavit; Exhibit B to Kaley Affidavit; Exhibit C to Kaley Affidavit; Exhibit D to Kaley Affidavit; Exhibit E to Kaley Affidavit; Exhibit F to Kaley Affidavit; Exhibit G to Kaley Affidavit; Exhibit H to Kaley Affidavit; Exhibit I to Kaley Affidavit; Exhibit J to Kaley Affidavit; Exhibit K to Kaley Affidavit; Exhibit L to Kaley Affidavit; Exhibit M to Kaley Affidavit; Exhibit N to Kaley Affidavit; Exhibit O to Kaley Affidavit; Exhibit P to Kaley Affidavit; Hohn Affidavit; Exhibit Q to Hohn Affidavit; Exhibit R to Hohn Affidavit; Exhibit S to Hohn Affidavit; Exhibit T to Hohn Affidavit; Exhibit U to Hohn Affidavit; Exhibit V to Hohn Affidavit; Exhibit W to Hohn Affidavit; Electronic Filing Certificate of Service. |
| |    **Filed By:** CHRISTOPHER MARTIN HOHN |
| |    **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC. |
| 09/02/2022 | **Suggestions in Support** |
| | Defendant Magneteks Memorandum in Support of its Renewed Motion to Dismiss or Stay; Electronic Filing Certificate of Service. |

Filed By: SARAH A MILUNSKI
On Behalf Of: MAGNETEK, INC.

---

**Motion to Dismiss**

Defendant Magneteks Renewed Motion to Dismiss or Stay; Affidavit of Ryan Lema; Affidavit of David Pierce; Electronic Filing Certificate of Service in response to Petition or Motion to Modify - Amended filed on 08/03/2022.

    **Filed By:** SARAH A MILUNSKI
    **On Behalf Of:** MAGNETEK, INC.
    **Associated Entries:** 10/07/2022 - Motion Denied  ⊞

---

**Entry of Appearance Filed**

Entry of Appearance; Electronic Filing Certificate of Service.

    **Filed By:** RICHARD PAUL CASSETTA
    **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC.

---

| | |
|---|---|
| 09/01/2022 | **Order** |

IT IS HEREBY ORDERED that Magnetek shall file its motion to dismiss the First Amended Petition on or before September 2, 2022; IT IS FURTHER ORDERED that Plaintiffs shall file their response in opposition to Magnetek's motion to dismiss on or before September 23, 2022; IT IS FURTHER ORDERED that Magnetek shall file its reply in further support of its motion to dismiss, if any, on or before October 5, 2022; SO ORDERED: JUDGE RICHARD STEWART

---

**Motion Hearing Scheduled**

    **Associated Entries:** 10/07/2022 - Motion Hearing Held
    **Scheduled For:** 10/07/2022; 9:00 AM ; RICHARD M STEWART; St Louis County

---

| | |
|---|---|
| 08/30/2022 | **Entry of Appearance Filed** |

Entry of Appearance; Electronic Filing Certificate of Service.

    **Filed By:** SARAH A MILUNSKI
    **On Behalf Of:** MAGNETEK, INC.

---

| | |
|---|---|
| 08/23/2022 | **Proposed Order Filed** |

Order proposed; Electronic Filing Certificate of Service.

    **Filed By:** DAVID MICHAEL MANGIAN
    **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC.

---

| | |
|---|---|
| 08/09/2022 | **Case Mgmt Conf Held** |

via Webex

    **Scheduled For:** 08/09/2022; 8:30 AM ; RICHARD M STEWART; St Louis County

---

**Hearing/Trial Cancelled**

    **Scheduled For:** 05/22/2020; 3:00 PM ; MARY ELIZABETH OTT; St Louis County

---

| | |
|---|---|
| 08/03/2022 | **Note to Clerk eFiling** |

    **Filed By:** CHRISTOPHER MARTIN HOHN

---

**Motion Special Process Server**

Request for Appointment of Process server; Electronic Filing Certificate of Service.

    **Filed By:** CHRISTOPHER MARTIN HOHN
    **On Behalf Of:** PHARMACIA, LLC, SOLUTIA, INC.

---

**Amend Pet/Mot to Modfy Filed**

First Amended Petition; Exhibit 1; Exhibit 2; Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6; Exhibit 7; Exhibit 8; Exhibit 9; Exhibit 10; Exhibit 11; Exhibit 12; Exhibit 13; Exhibit 14; Exhibit 15; Exhibit 16; Exhibit 17; Exhibit 18; Exhibit 19; Exhibit 20; Exhibit 21; Exhibit 22; Exhibit 23; Exhibit 24; Exhibit 25; Exhibit 26; Exhibit 27; Exhibit 28; Electronic Filing Certificate of Service.

    **Filed By:** CHRISTOPHER MARTIN HOHN

| | |
|---|---|
| | **On Behalf Of:** MONSANTO COMPANY |
| | **Associated Entries:** 09/01/2017 - Pet Filed in Circuit Ct ⊞ |
| | |
| | **Other Proposed Document Filed** |
| | Filing Information Sheet; Electronic Filing Certificate of Service. |
| | **Filed By:** CHRISTOPHER MARTIN HOHN |
| 06/28/2022 | **Judge/Clerk - Note** |
| | CASE MANAGEMENT CONFERENCE SCHEDULED FOR AUGUST 9, 2022 TO BE CONDUCTED VIA WEBEX Meeting Link: https://mocourts.webex.com/meet/vcdiv2mtg Call in number: 1-408-418-9388 (tolls apply) Meeting number: 146 275 0933 |
| | **Case Mgmt Conf Scheduled** |
| | **Associated Entries:** 08/09/2022 - Case Mgmt Conf Held ⊞ |
| | **Scheduled For:** 08/09/2022;  8:30 AM ;  RICHARD M STEWART;  St Louis County |
| 12/30/2021 | **Judge Assigned** |
| | CAUSE REASSIGNED TO JUDGE RICHARD STEWART, FOR HEARING AND DETERMINATION EFFECTIVE JANUARY 1, 2022 PER ADMINISTRATIVE ORDER. |
| 10/05/2021 | **Judge Assigned** |
| 09/23/2021 | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 06/03/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 06/02/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 06/01/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 05/31/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 05/27/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 05/26/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 05/25/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 05/24/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 05/23/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 05/20/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 05/19/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 05/18/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 05/17/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing/Trial Cancelled** |
| | **Scheduled For:** 05/13/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |

|  | **Hearing/Trial Cancelled** |
|---|---|
|  | **Scheduled For:** 05/12/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
|  | **Hearing/Trial Cancelled** |
|  | **Scheduled For:** 05/11/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
|  | **Hearing/Trial Cancelled** |
|  | **Scheduled For:** 05/10/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
|  | **Hearing/Trial Cancelled** |
|  | **Scheduled For:** 05/06/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
|  | **Hearing/Trial Cancelled** |
|  | **Scheduled For:** 05/05/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
|  | **Hearing/Trial Cancelled** |
|  | **Scheduled For:** 05/04/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
|  | **Hearing/Trial Cancelled** |
|  | **Scheduled For:** 05/03/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
|  | **Hearing/Trial Cancelled** |
|  | **Scheduled For:** 05/02/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
|  | **Hearing/Trial Cancelled** |
|  | **Scheduled For:** 04/20/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
|  | **Hearing/Trial Cancelled** |
|  | **Scheduled For:** 05/16/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
|  | **Judge Assigned** |
|  | The Above Cause has been randomly Assigned to Division \_\_21\_\_ per Admin order 21-25 |
| 09/30/2020 | **Order** |
|  | STIPULATED PROTECTIVE ORDER - GRANTED SO ORDERED: JUDGE MARY ELIZABETH OTT |
| 09/22/2020 | **Motion Filed** |
|  | Joint Motion for Entry of Stipulated Protective Order; Exhibit A - Stipulated Protective Order; Electronic Filing Certificate of Service. |
|  | **Filed By:** DAVID MICHAEL MANGIAN |
|  | **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC. |
| 07/20/2020 | **Cert Serv Resp Req Prod Doc Th** |
|  | Certificate of Service; Electronic Filing Certificate of Service. |
|  | **Filed By:** SARAH A MILUNSKI |
|  | **On Behalf Of:** MAGNETEK, INC. |
|  | **Cert Serv of Interrog Filed** |
|  | Certificate of Service; Electronic Filing Certificate of Service. |
|  | **Filed By:** SARAH A MILUNSKI |
|  | **On Behalf Of:** MAGNETEK, INC. |
| 03/25/2020 | **Testimony Motion Hearing Sched** |
|  | **Associated Entries: 08/09/2022 - Hearing/Trial Cancelled** |
|  | **Scheduled For:** 05/22/2020;  3:00 PM ;  MARY ELIZABETH OTT;  St Louis County |
|  | **Hearing Continued/Rescheduled** |
|  | **Hearing Continued From:** 04/09/2020;  1:30 PM Testimony Motion Hrng Sched |
| 02/26/2020 | **Testimony Motion Hearing Sched** |
|  | **Associated Entries: 03/25/2020 - Hearing Continued/Rescheduled** |

**Scheduled For:** 04/09/2020; 1:30 PM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 10/01/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/30/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/29/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/28/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/27/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/24/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/23/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/22/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/21/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/20/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/17/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/16/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/15/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/14/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/13/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/10/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/09/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/08/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Hearing/Trial Cancelled**
 **Scheduled For:** 09/07/2021; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Trial Setting Scheduled**
 **Associated Entries:** 09/23/2021 - Hearing/Trial Cancelled
 **Scheduled For:** 05/31/2022; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Trial Setting Scheduled**
 **Associated Entries:** 09/23/2021 - Hearing/Trial Cancelled
 **Scheduled For:** 05/23/2022; 9:00 AM ; MARY ELIZABETH OTT; St Louis County

**Trial Setting Scheduled**

| | |
|---|---|
| | **Associated Entries:** 09/23/2021 - Hearing/Trial Cancelled<br>**Scheduled For:** 05/16/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Trial Setting Scheduled**<br>**Associated Entries:** 09/23/2021 - Hearing/Trial Cancelled<br>**Scheduled For:** 05/10/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Trial Setting Scheduled**<br>**Associated Entries:** 09/23/2021 - Hearing/Trial Cancelled<br>**Scheduled For:** 05/02/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Pre-trial Conference Scheduled**<br>**Associated Entries:** 09/23/2021 - Hearing/Trial Cancelled<br>**Scheduled For:** 04/20/2022;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing Continued/Rescheduled**<br>**Hearing Continued From:** 08/30/2021;  9:00 AM Trial Setting |
| | **Hearing Continued/Rescheduled**<br>**Hearing Continued From:** 08/27/2021;  2:00 PM Pre-trial Conference |
| | **Hearing Held**<br>**Scheduled For:** 02/26/2020;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| 02/25/2020 | **Entry of Appearance Filed**<br>Entry of Appearance for Herbert R Giorgio, Jr; Electronic Filing Certificate of Service.<br>**Filed By:** HERBERT RICHARD GIORGIO JR<br>**On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC. |
| 01/22/2020 | **Trial Setting Scheduled**<br>**Associated Entries:** 02/26/2020 - Hearing/Trial Cancelled<br>**Scheduled For:** 09/27/2021;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Trial Setting Scheduled**<br>**Associated Entries:** 02/26/2020 - Hearing/Trial Cancelled<br>**Scheduled For:** 09/20/2021;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Trial Setting Scheduled**<br>**Associated Entries:** 02/26/2020 - Hearing/Trial Cancelled<br>**Scheduled For:** 09/13/2021;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Trial Setting Scheduled**<br>**Associated Entries:** 02/26/2020 - Hearing/Trial Cancelled<br>**Scheduled For:** 09/07/2021;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Trial Setting Scheduled**<br>**Associated Entries:** 02/26/2020 - Hearing Continued/Rescheduled<br>**Scheduled For:** 08/30/2021;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Pre-trial Conference Scheduled**<br>**Associated Entries:** 02/26/2020 - Hearing Continued/Rescheduled<br>**Scheduled For:** 08/27/2021;  2:00 PM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Counsel Status Hrng Scheduled**<br>**Associated Entries:** 02/26/2020 - Hearing Held<br>**Scheduled For:** 02/26/2020;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| | **Hearing Held**<br>**Scheduled For:** 01/22/2020;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |
| 11/21/2019 | **Counsel Status Hrng Scheduled** |

|  | **Associated Entries:** 01/22/2020 - Hearing Held |
|  | **Scheduled For:** 01/22/2020;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |

| 11/12/2019 | **Hearing Continued/Rescheduled** |
|  | **Hearing Continued From:** 11/12/2019;  9:00 AM Counsel Status Hearing |

| 08/13/2019 | **Counsel Status Hrng Scheduled** |
|  | **Associated Entries:** 11/12/2019 - Hearing Continued/Rescheduled |
|  | **Scheduled For:** 11/12/2019;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |

|  | **Hearing Continued/Rescheduled** |
|  | **Hearing Continued From:** 08/13/2019;  8:45 AM Counsel Status Hearing |

| 05/15/2019 | **Counsel Status Hrng Scheduled** |
|  | **Associated Entries:** 08/13/2019 - Hearing Continued/Rescheduled |
|  | **Scheduled For:** 08/13/2019;  8:45 AM ;  MARY ELIZABETH OTT;  St Louis County |

|  | **Hearing Continued/Rescheduled** |
|  | **Hearing Continued From:** 05/31/2019;  9:00 AM Settlement Conference |

| 03/05/2019 | **Settlement Conf Scheduled** |
|  | **Associated Entries:** 05/15/2019 - Hearing Continued/Rescheduled |
|  | **Scheduled For:** 05/31/2019;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |

|  | **Order for Stay** |
|  | **Associated Entries:** 01/16/2019 - Hearing Continued/Rescheduled |
|  | **Associated Entries:** 01/16/2019 - Case Mgmt Conf Scheduled ⊞ |
|  | **Scheduled For:** 05/15/2019;  8:45 AM ;  MARY ELIZABETH OTT;  St Louis County |

| 02/21/2019 | **Notice of Hearing Filed** |
|  | Notice of Hearing; Electronic Filing Certificate of Service. |
|  | **Filed By:** DAVID MICHAEL MANGIAN |
|  | **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC. |

| 01/16/2019 | **Case Mgmt Conf Scheduled** |
|  | SO ORDERED: JUDGE MARY ELIZABETH OTT |
|  | **Associated Entries:** 03/05/2019 - Order for Stay |
|  | **Scheduled For:** 05/15/2019;  8:45 AM ;  MARY ELIZABETH OTT;  St Louis County |

|  | **Hearing Continued/Rescheduled** |
|  | **Hearing Continued From:** 01/16/2019;  9:15 AM Case Management Conference |

| 12/13/2018 | **Case Mgmt Conf Scheduled** |
|  | **Associated Entries:** 01/16/2019 - Hearing Continued/Rescheduled |
|  | **Scheduled For:** 01/16/2019;  9:15 AM ;  MARY ELIZABETH OTT;  St Louis County |

|  | **Order** |
|  | **Associated Entries:** 09/10/2018 - Hearing Continued/Rescheduled |
|  | **Associated Entries:** 09/10/2018 - Case Mgmt Conf Scheduled |
|  | **Scheduled For:** 12/13/2018;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |

| 09/10/2018 | **Order for Stay** |
|  | ORDER STAYING PROCEEDINGS SO ORDERED: JUDGE MARY ELIZABETH OTT |

|  | **Case Mgmt Conf Scheduled** |
|  | **Associated Entries:** 12/13/2018 - Order |

Scheduled For: 12/13/2018;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County

**Hearing Continued/Rescheduled**
**Hearing Continued From:** 09/13/2018;  9:00 AM Case Management Conference

| | |
|---|---|
| 06/14/2018 | **Case Mgmt Conf Scheduled** |
| | **Associated Entries: 09/10/2018 - Hearing Continued/Rescheduled** |
| | Scheduled For: 09/13/2018;  9:00 AM ;  MARY ELIZABETH OTT;  St Louis County |

**Hearing Held**
Scheduled For: 06/14/2018;  9:15 AM ;  MARY ELIZABETH OTT;  St Louis County

**Order for Stay**
ORDER STAYING PROCEEDINGS UNTIL 09/12/2018. SO ORDERED: JUDGE MARY ELIZABETH OTT
**Associated Entries: 06/07/2018 - Motion Hearing Scheduled**
Scheduled For: 06/14/2018;  9:15 AM ;  MARY ELIZABETH OTT;  St Louis County

| | |
|---|---|
| 06/07/2018 | **Motion Hearing Scheduled** |
| | **Associated Entries: 06/14/2018 - Order for Stay**  ⊞ |
| | Scheduled For: 06/14/2018;  9:15 AM ;  MARY ELIZABETH OTT;  St Louis County |

**Notice of Hearing Filed**
Notice of Hearing; Electronic Filing Certificate of Service.
**Filed By:** JOHN MICHAEL HESSEL
**On Behalf Of:** MAGNETEK, INC.

**Hearing Scheduled**
**Associated Entries: 06/14/2018 - Hearing Held**
Scheduled For: 06/14/2018;  9:15 AM ;  MARY ELIZABETH OTT;  St Louis County

| | |
|---|---|
| 04/02/2018 | **Judge Assigned** |
| | Cause reassigned to Judge Mary E. Ott for hearing and determination effective April 2, 2018, per Presiding Judges Administrative Order. |

| | |
|---|---|
| 03/15/2018 | **Hearing/Trial Cancelled** |
| | Scheduled For: 03/15/2018;  10:00 AM ;  DEAN PAUL WALDEMER;  St Louis County |

**Order**
IS ORDERED THAT THE HEARING ON THE MOTION TO DISMISS IS CONTINUED AND THIS MATTER IS STAYED FOR 90 DAYS FROM THE DATE OF THIS ORDER. COPIES SENT ELECTRONICALLY TO THE ATTYS. SO ORDERED: JUDGE DEAN P. WALDEMER - DIV. 8

| | |
|---|---|
| 03/14/2018 | **Proposed Order Filed** |
| | Order; Electronic Filing Certificate of Service. |
| | **Filed By:** JOHN MICHAEL HESSEL |

| | |
|---|---|
| 03/05/2018 | **Notc Change of Address Filed** |
| | Notice of Change of Firm and Contact Information for A Elizabeth Blackwell; Electronic Filing Certificate of Service. |
| | **Filed By:** ANN ELIZABETH BLACKWELL |
| | **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC. |

| | |
|---|---|
| 02/19/2018 | **Request for Notc of Hrg Filed** |
| | Notice of Hearing; Electronic Filing Certificate of Service. |
| | **Filed By:** JOHN MICHAEL HESSEL |
| | **On Behalf Of:** MAGNETEK, INC. |

| 02/16/2018 | **Motion Hearing Scheduled** |
| | BY CONSENT OF THE PARTIES, DEFENDANT'S MOTION TO DISMISS IS REMOVED FROM THE DOCKET OF THIS DATE, AND RESET FOR HEARING FOR 3/15/18 @ 10:00 A.M. COPIES SENT ELECTRONICALLY TO THE ATTYS. SO ORDERED: JUDGE DEAN P. WALDEMER - DIV. 8 |
| | **Associated Entries: 03/15/2018 - Hearing/Trial Cancelled** |
| | **Scheduled For:** 03/15/2018; 10:00 AM ; DEAN PAUL WALDEMER; St Louis County |

| | **Hearing Continued/Rescheduled** |
| | **Hearing Continued From:** 02/16/2018; 1:30 PM Motion Hearing |

| 02/12/2018 | **Entry of Appearance Filed** |
| | Entry of Appearance; Electronic Filing Certificate of Service. |
| | **Filed By:** NICHOLAS J LAMB |
| | **On Behalf Of:** MONSANTO COMPANY |

| 02/02/2018 | **Reply** |
| | MAGNETEKS REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO DISMISS OR STAY THIS ACTION; Reply Affidavit of Craig A Leslie; Electronic Filing Certificate of Service. |
| | **Filed By:** SCOTT A WISSEL |
| | **On Behalf Of:** MAGNETEK, INC. |

| 01/19/2018 | **Response Filed** |
| | Plaintiffs Memorandum in Opposition to Defendants Motion to Dismiss or Stay; Affidavit of R Kaley, II; Ex A to Kaley Affidavit; Ex B to Kaley Affidavit; Ex C to Kaley Affidavit; Ex D to Kaley Affidavit; EX E to Kaley Affidavit; EX F to Kaley Affidavit; EX G to Kaley Affidavit; EX H to Kaley Affidavit; EX I to Kaley Affidavit; EX J to Kaley Affidavit; EX K to Kaley Affidavit; EX L to Kaley Affidavit; EX M to Kaley Affidavit; EX N to Kaley Affidavit; EX O to Kaley Affidavit; EX P to Kaley Affidavit; Affidavit of C Hohn; EX Q to Hohn Affidavit; EX R to Hohn Affidavit; EX S to Hohn Affidavit; EX T to Hohn Affidavit; EX U to Hohn Affidavit; EX V to Hohn Affidavit; Electronic Filing Certificate of Service. |
| | **Filed By:** CHRISTOPHER MARTIN HOHN |
| | **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC. |

| 01/02/2018 | **Order** |
| | IT IS HEREBY ORDERED THAT THIS COURT GRANTS THE MOTION TO ADMIT PRO HAC VICE CRAIG A. LESLIE ("APPLICANT") IN THE ABOVE-CAPTIONED MATTER. APPLICANT IS HEREBY ADMITTED PURSUANT TO MISSOURI SUPREME COURT RULE 9.03 TO APPEAR ON BEHALF OF MAGNETEK, INC. COPIES SENT ELECTRONICALLY TO THE ATTYS. SO ORDERED: JUDGE DEAN P. WALDEMER - DIV. 8 |
| | **Associated Entries: 12/19/2017 - Motion Filed** ⊞ |

| | **Order** |
| | IT IS HEREBY ORDERED THAT THIS COURT GRANTS THE MOTION TO ADMIT PRO HAC VICE RYAN A. LEMA ("APPLICANT") IN THE ABOVE-CAPTIONED MATTER. APPLICANT IS HEREBY ADMITTED PURSUANT TO MISSOURI SUPREME COURT RULE 9.03 TO APPEAR ON BEHALF OF MAGNETEK, INC. COPIES SENT ELECTRONICALLY TO THE ATTYS. SO ORDERED: JUDGE DEAN P. WALDEMER - DIV. 8 |
| | **Associated Entries: 12/19/2017 - Motion Filed** ⊞ |

| | **Order** |
| | IT IS HEREBY ORDERED THAT THIS COURT GRANTS THE MOTION TO ADMIT PRO HAC VICE JACOB S. SONNER ("APPLICANT") IN THE ABOVE-CAPTIONED MATTER. APPLICANT IS HEREBY ADMITTED PURSUANT TO MISSOURI SUPREME COURT RULE 9.03 TO APPEAR ON BEHALF OF MAGNETEK, INC. COPIES SENT ELECTRONICALLY TO THE ATTYS. SO ORDERED: JUDGE DEAN P. WALDEMER - DIV. 8 |
| | **Associated Entries: 12/19/2017 - Motion Filed** ⊞ |

| 12/22/2017 | **Motion Hearing Scheduled** |
| | **Associated Entries: 02/16/2018 - Hearing Continued/Rescheduled** |
| | Scheduled For: 02/16/2018;  1:30 PM ;  DEAN PAUL WALDEMER;  St Louis County |

| | **Order** |
| | BY AGREEMENT OF THE PARTIES, PLAINTIFF SHALL FILE ITS MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR STAY ON OR BEFORE 1/19/18. DEFENDANT SHALL FILE ITS REPLY MEMORANDUM ON OR BEFORE 2/2/18. A HEARING FOR ORAL ARGUMENT ON THE MOTION IS SET FOR 2/16/18 @ 1:30 P.M. COPIES HANDED TO THE ATTYS. SO ORDERED: JUDGE DEAN P. WALDEMER - DIV. 8 |

| | **Hearing Held** |
| | Scheduled For: 12/22/2017;  9:45 AM ;  DEAN PAUL WALDEMER;  St Louis County |

| 12/19/2017 | **Proposed Order Filed** |
| | ORDER; Electronic Filing Certificate of Service. |
| | **Filed By:** SCOTT A WISSEL |
| | **On Behalf Of:** MAGNETEK, INC. |

| | **Motion Filed** |
| | MOTION TO ADMIT PRO HAC VICE - JACOB S SONNER; Electronic Filing Certificate of Service. |
| | **Filed By:** SCOTT A WISSEL |
| | **Associated Entries: 01/02/2018 - Order**  ⊞ |

| | **Proposed Order Filed** |
| | ORDER; Electronic Filing Certificate of Service. |
| | **Filed By:** SCOTT A WISSEL |

| | **Motion Filed** |
| | MOTION TO ADMIT PRO HAC VICE - RYAN A LEMA; Electronic Filing Certificate of Service. |
| | **Filed By:** SCOTT A WISSEL |
| | **Associated Entries: 01/02/2018 - Order**  ⊞ |

| | **Proposed Order Filed** |
| | ORDER; Electronic Filing Certificate of Service. |
| | **Filed By:** SCOTT A WISSEL |

| | **Motion Filed** |
| | MOTION TO ADMIT PRO HAC VICE - CRAIG A LESLIE; Electronic Filing Certificate of Service. |
| | **Filed By:** SCOTT A WISSEL |
| | **Associated Entries: 01/02/2018 - Order**  ⊞ |

| 12/14/2017 | **Entry of Appearance Filed** |
| | Entry of Appearance; Electronic Filing Certificate of Service. |
| | **Filed By:** JOHN MICHAEL HESSEL |
| | **On Behalf Of:** MAGNETEK, INC. |

| 12/11/2017 | **Suggestions Filed** |
| | MAGNETEKS MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS OR STAY THIS ACTION; EX 1 - PIERCE AFFIDAVIT; EX 2 - LEMA AFFIDAVIT; LEMA AFFIDAVIT - EX A; LEMA AFFIDAVIT - EX A CONT; LEMA AFFIDAVIT - EX A CONT; LEMA AFFIDAVIT - EX B; LEMA AFFIDAVIT - EX C; LEMA AFFIDAVIT - EX D; LEMA AFFIDAVIT - EX E; Electronic Filing Certificate of Service. |
| | **Filed By:** SCOTT A WISSEL |
| | **On Behalf Of:** MAGNETEK, INC. |

| | **Motion to Dismiss** |
| | DEFENDANT MAGNETEK, INCS MOTION TO DISMISS OR STAY THIS ACTION; Electronic Filing Certificate of Service. |
| | **Filed By:** SCOTT A WISSEL |

| | |
|---|---|
| | **Entry of Appearance Filed** |
| | Entry of Appearance; Electronic Filing Certificate of Service. |
| | **Filed By:** SCOTT A WISSEL |
| 11/28/2017 | **Entry of Appearance Filed** |
| | Entry of Appearance; Electronic Filing Certificate of Service. |
| | **Filed By:** ANN ELIZABETH BLACKWELL |
| | **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC. |
| 11/22/2017 | **Notice** |
| | **Case Mgmt Conf Scheduled** |
| | **Associated Entries:** 12/22/2017 - Hearing Held |
| | **Scheduled For:** 12/22/2017;  9:45 AM ;  DEAN PAUL WALDEMER;  St Louis County |
| 09/20/2017 | **Corporation Served** |
| | Document ID - 17-SMCC-7510; Served To - MAGNETEK, INC.; Server - ; Served Date - 11-SEP-17; Served Time - 00:00:00; Service Type - Sheriff Department; Reason Description - Served; Service Text - SHELLEY LEWIS, AUTHORIZED AGENT |
| | **Notice of Service** |
| | Return of Service; Servers Return; Electronic Filing Certificate of Service. |
| | **Filed By:** DAVID MICHAEL MANGIAN |
| | **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC. |
| 09/07/2017 | **Entry of Appearance Filed** |
| | Entry of Appearance; Electronic Filing Certificate of Service. |
| | **Filed By:** DAVID MICHAEL MANGIAN |
| | **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC. |
| | **Summons Issued-Circuit** |
| | Document ID: 17-SMCC-7510, for MAGNETEK, INC..Summons Attached in PDF Form for Attorney to Retrieve from Secure Case.Net and Process for Service. |
| 09/01/2017 | **Motion Special Process Server** |
| | REQUEST FOR APPOINTMENT OF SPECIAL PROCESS SERVER APPROVED 9-7-17. |
| | **Filed By:** CHRISTOPHER MARTIN HOHN |
| | **Filing Info Sheet eFiling** |
| | **Filed By:** CHRISTOPHER MARTIN HOHN |
| | **Pet Filed in Circuit Ct** |
| | Petition; Exhibit 1; Exhibit 2; Exhibit 3; Exhibit 4; Exhibit 5; Exhibit 6; Exhibit 7; Exhibit 8; Exhibit 9; Exhibit 10; Exhibit 11; Exhibit 12; Exhibit 13; Request for Issuance of Summons; Request for Appointment of Special Process Server. |
| | **On Behalf Of:** MONSANTO COMPANY, PHARMACIA, LLC, SOLUTIA, INC. |
| | **Associated Entries:** 08/03/2022 - Amend Pet/Mot to Modfy Filed  ⊞ |
| | **Judge Assigned** |
| | DIV 8 |

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| MONSANTO COMPANY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PHARMACIA, LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SOLUTIA, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| MAGNETEK, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## PETITION

COME NOW Plaintiffs Monsanto Company, Pharmacia, LLC, and Solutia, Inc. ("Plaintiffs"), for their Petition against Magnetek, Inc. ("Defendant" or "Magnetek"), and allege as follows:

### NATURE OF THE CASE

1.     This action arises out of Defendant's breach of its contractual obligation to defend, indemnify, and hold harmless old Monsanto Company a/k/a Monsanto Chemical Co. ("Old Monsanto"), now known as Pharmacia LLC ("Pharmacia"), under a certain "Special Undertaking by Purchasers of Polychlorinated Biphenyls" contract ("Special Undertaking Contract") entered into by the parties, or their predecessors in interest.

2.     On January 7, 1972, Defendant's predecessor in interest, Universal Manufacturing Corporation, entered into a Special Undertaking Contract with Pharmacia.

1

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

3.     Pursuant to that Special Undertaking Contract, Universal Manufacturing Corporation purchased polychlorinated biphenyls ("PCBs") from Pharmacia from January 1972 to 1977.

4.     Universal Manufacturing Corporation purchased more than eleven million pounds of PCBs from Pharmacia during that period.

5.     Defendant and Universal Manufacturing Corporation released or permitted the release of some or all of those PCBs into the environment.

6.     The Special Undertaking Contract executed by Universal Manufacturing Corporation obligates Defendant to defend, indemnify and hold Pharmacia harmless from "any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through, or under [Defendant], whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's."

7.     Under the Special Undertaking Contract, Defendant has a contractual duty to defend, indemnify, and hold Pharmacia harmless in approximately 46 separate lawsuits filed against Pharmacia for damages allegedly caused by the release of PCBs into the environment and predicating Pharmacia's liability on, inter alia, its manufacturing of PCBs for purchase by Defendant.

8.     Pharmacia tendered the defense of those lawsuits to Defendant in 2016 and demanded indemnification from Defendant.

9.     Defendant refused to provide Pharmacia with a defense and refused to indemnify Pharmacia in any of the lawsuits.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

10.    Such refusal breached Defendant's Special Undertaking Contract, causing damage to Pharmacia.

## THE PARTIES

11.    Plaintiff Monsanto Company ("Monsanto," or "New Monsanto") is a corporation organized and existing under the laws of the State of Delaware with its corporate headquarters and principal place of business in St. Louis County, Missouri.

12.    Plaintiff Pharmacia, LLC ("Pharmacia") is a limited liability company organized and existing under the laws of the State of Delaware.

13.    Plaintiff Solutia, Inc. ("Solutia") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in St. Louis County, Missouri.

14.    Defendant Magnetek is a corporation organized and existing under the laws of the State of Delaware.

15.    Magnetek is the successor in interest to Universal Manufacturing Corporation. Universal Manufacturing Corporation merged into Magnetek, Inc. (d/b/a Delaware Magnetek, Inc.) on or about July 11, 1986, with Magnetek as the surviving corporation.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over Plaintiffs' breach of contract, negligence, and negligent misrepresentation claims pursuant to Art. 5, § 14 of the Missouri Constitution because circuit courts have original jurisdiction over all civil matters and because Plaintiffs seek recovery of money in excess of $25,000, so Mo. Rev. Stat. § 517.011 does not apply.  The Court has subject matter jurisdiction over Plaintiffs' declaratory judgment claims pursuant to Mo. Rev. Stat. §§ 527.010, 527.020, and 527.030.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

17.    This Court has personal jurisdiction over Defendant under Mo. Rev. Stat. § 506.500 because Defendant transacted business within Missouri, made contracts within Missouri, and contracted to insure a person, property or risk located within Missouri at the time of contracting.  Defendant is also registered to do business in Missouri.

18.    Venue is proper in St. Louis County, Missouri pursuant to Mo. Rev. Stat. § 508.010.4, because Plaintiffs allege a tort claim against Defendant and Plaintiffs were first injured by Defendant's tortious conduct in St. Louis County, Missouri.

## GENERAL ALLEGATIONS

19.    From 1901 to 1997, Old Monsanto operated as a Missouri corporation manufacturing a variety of chemicals and agricultural products.

20.    PCBs are a class of chemicals that were sold in the United States between approximately 1930 and 1977.  They are extremely stable, chemically inert, resistant to heat and fire, and highly electrically resistive.

21.    Until 1977, Old Monsanto sold PCBs in bulk to a number of industrial customers who incorporated them into a wide variety of finished products.

22.    The finished products into which Old Monsanto's customers incorporated PCBs included dielectric fluids used in electrical equipment such as transformers and capacitors, hydraulic fluids, lighting ballasts, lubricants, adhesives, inks, paints, caulk, plasticizers, carbonless copy paper, and others.

23.    For much of the twentieth century, PCBs were recognized as an essential fire retardant in many types of electrical equipment and machinery to mitigate very serious risks, including risk of fatal accidents from fire and explosions.  The National Electrical Code, other

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

industry codes, and state and federal government regulations required the use of PCBs in certain electrical applications.

24.    Because PCBs are "virtually free of fire and explosion hazards," they were "used in locations where failures of oil-insulated transformers would present a potential danger to life and property." Interdepartmental Task Force on PCBs, ITF-PCB-72-1, Polychlorinated Biphenyls and the Environment, at 12, 76 (May 1972) ("Interdepartmental Task Force Report").

### Environmental Persistence

25.    In the late 1960s, PCBs were found to persist in the environment. *See* Interdepartmental Task Force Report at 2.

26.    In 1970, Old Monsanto announced a preliminary decision to cease all production of PCBs, which would have eliminated all then-existing PCB production in the United States.

27.    Because its decision would have left members of the U.S. electric industry without a domestic source for the PCBs required by existing industry standards, and deemed "necessary" by the federal government, Old Monsanto revised its approach.

28.    Old Monsanto agreed to continue to supply PCBs for certain electrical applications until the U.S. Environmental Protection Agency ("EPA"), members of the transformer and capacitor industries, and Old Monsanto could reach a consensus judgment that suitable alternatives to PCBs were available.

29.    In September 1971, the U.S. government convened an Interdepartmental Task Force on PCBs.  Interdepartmental Task Force Report at 1.

30.    The Task Force "included operating units of five Executive Branch departments," namely: the Department of Agriculture; Department of Commerce; EPA; Department of Health, Education, and Welfare; and Department of the Interior.  *Id.*

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

31.    The purpose of the Task Force was to "coordinate the scientific efforts of the Government aimed at understanding [PCBs], and to strengthen the Government's ability to protect the public from actual or potential hazards from PCBs." *Id*.

32.    In 1972, the Task Force issued a major report on PCBs, which "reflect[ed] the position of the operating agencies of the Federal Government which have major responsibilities concerning such chemicals as PCBs in food and in the environment." *Id*.

33.    After reviewing "all of the available scientific information on various aspects of the PCB problem," the Task Force agreed on nine separate conclusions relating to PCBs, including the following:

> The use of PCBs should not be banned entirely.  ***Their continued use for transformers and capacitors in the near future is considered necessary*** because of the significantly increased risk of fire and explosion and the disruption of electrical service which would result from a ban on PCB use.  Also, continued use of PCBs in transformers and capacitors presents a minimal risk of environmental contamination.

*Id*. at 2,4 (emphasis added).

34.    The report found that PCBs had certain "essential or non-replaceable uses." *Id*. at 3.  For example, the report states:  "[c]learly, there is no substitute for PCB-filled transformers where fire protection is required." *Id*. at 78.

35.    The Task Force explained that continued use of PCBs was essential, because there were no present substitutes for the use of PCBs, and that purchasers and users of PCBs understood the need for unusual protective measure to prevent their release into the environment:

> The advantages to the public in terms of safe, reliable, and efficient electrical equipment made possible by the use of PCBs have been documented in the body of, and especially Appendix B to, this report.  It is also clear that there are no present or prospective substitutes for these materials, and that the functions they perform are essential.  Thus the continuing need for PCBs in closed electrical system applications is conclusive.  The electrical industry well understands,

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

however, that continued use of these materials requires unusual protective measures.

*Id*. at 81.

36.    From 1971 forward, Old Monsanto worked hand-in-hand with the EPA to determine when acceptable substitutes were available and Old Monsanto could stop production of PCBs.  *See* EPA, Industry Views on the Use of PCBs (1976) at 7 (Statement of F.J. Fitzgerald, Vice-President, Monsanto Chemical Company) (Old Monsanto "reaffirm[ing]" its "commitment to continue working with the EPA and the electrical industry in finding solutions to the PCB issue.").

37.    In January 1976, EPA Administrator Russell Train met with manufacturers and users of PCB to discuss the availability of suitable alternatives to PCBs.   EPA, Industry Views on the Use of PCBs (1976) at i.

38.    At the meeting, and other follow-up meetings, representatives from several manufacturers who used PCBs in electrical products reported that, despite considerable effort, acceptable substitutes remained unavailable for many electrical applications.

39.    In 1976, Congress enacted the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 *et seq.*, regulating PCBs.  The TSCA provided the EPA broad power, which the EPA seized, to promulgate a comprehensive regulatory scheme governing the manufacture, use, distribution, disposal, and remediation of PCBs.  *See* 40 C.F.R. §761.1 *et seq*.

40.    The TSCA barred new manufacture of PCBs after January 1, 1979; however, it delegated to EPA the authority to allow continuing use of existing PCBs where it did not present an "unreasonable risk of injury to health."  *See* 15 U.S.C § 2605(e).

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**The Special Undertaking Contracts**

41.    Old Monsanto continued to produce PCBs for its customers to use in electrical applications after 1971, if they would agree to defend and indemnify Old Monsanto against future PCB-related claims.

42.    Defendant entered into such an agreement with Old Monsanto.

43.    On January 7, 1972, Magnetek's predecessor in interest Universal Manufacturing Corporation and Old Monsanto executed a written agreement entitled "Special Undertaking by Purchasers of Polychlorinated Biphenyls" (the "Special Undertaking Contract").  A true and correct copy of the Special Undertaking Contract is attached hereto as **Exhibit 1** and incorporated herein by reference.

44.    Magnetek is the successor in interest to Universal Manufacturing Corporation's obligations under the Special Undertaking Contract.

45.    The Special Undertaking Contract identifies Magnetek's predecessor in interest as the "Buyer" and states:

> While Buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.
>
> Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Exhibit 1 at 1.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

46.    The Special Undertaking Contract further states that Magnetek will defend, indemnify and hold Monsanto harmless against future PCB-related claims as follows:

> Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses (except to the extent arising from failure of PCB to conform to specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale, or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

Exhibit 1 at 1.

47.    Further, the Special Undertaking Contract states that "[a]ll existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provision set forth above."  Exhibit 1 at 1.

48.    As shown, the Special Undertaking Contract broadly covers all claims "arising out of" or having any "connection with" the receipt or purchase of PCBs by Magnetek after January 7, 1972.

49.    The Special Undertaking Contract is not limited to claims connected only to PCBs purchased by Magnetek after January 7, 1972, but also applies to claims connected to those PCBs "in combination with other substances."

50.    Old Monsanto continued to supply Magnetek or its predecessors with PCB's pursuant to the Special Undertaking Contract until 1977.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

51.     On January 7, 1972, the President of Magnetek's predecessor in interest sent a letter to Old Monsanto stating that the Special Undertaking Contract is covered by a blanket liability policy with Travelers Insurance Company having limits of $10 million dollars.  A true and accurate copy of the January 7, 1972 letter is attached hereto as **Exhibit 2** and incorporated herein by reference.

52.     On March 31, 2000, Old Monsanto merged with Pharmacia & Upjohn, Inc. and took the name Pharmacia Corporation ("Pharmacia" or "Old Monsanto").

53.     New Monsanto has the right to enforce the Special Undertaking Contract to seek indemnification and defense of Old Monsanto (n/k/a Pharmacia) by Defendant.

**Defendant Released PCBs into the Environment**

54.     Defendant was aware of the potential for PCBs to persist in the environment and of the need to use care in the use and handling of PCBs.

55.     Nevertheless, Defendant and its products have been a major source of environmental PCB contamination, and it has released PCBs purchased both before and after signing the Special Undertaking Contract into the environment.

56.     PCBs have been released into the environment by Defendant through their release from products manufactured by Defendant, improper disposal of PCB-containing products, leaks, accidental spills, improper dumping and disposal of industrial wastes, and through other means.

57.     Once they are released into the environment, many PCBs do not break down readily and may remain there for long periods of time.

58.     Reports state that PCBs cycle between air, water and soil and can be carried long distances from the site of original release.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

## The Underlying Lawsuits

59.    A number of lawsuits have been filed against Plaintiffs seeking to impose liability on the Plaintiffs for injuries or damages allegedly caused by the release of PCBs into the environment (the "PCB Lawsuits").  A list of those lawsuits is attached hereto as **Exhibit 3** and incorporated herein by reference.

60.    Defendant was provided access to a copy of the complaint in each of the lawsuits listed on Exhibit 3.

61.    The lawsuits can be grouped into four categories.

**A.    The Food Chain Cases**

62.    Plaintiffs were named as defendants in a series of personal injury cases in which the plaintiffs contended that they suffered from various types of cancer (primarily non-Hodgkin lymphoma) as a result of non-employment, environmental and food chain exposure to PCBs (the "**Food Chain Cases**").

63.    Plaintiffs in the Food Chain Cases alleged that PCBs are now ubiquitous in the environment because, *inter alia*, the products into which PCBs were incorporated by Old Monsanto's customers permitted their release into the environment.  Plaintiffs also alleged that PCBs were dumped into the environment over decades by Old Monsanto's customers, the end-users of various PCB-containing products, and Old Monsanto itself.

64.    Plaintiffs in the Food Chain Cases alleged that it is impossible to "disaggregate" the environmental PCBs to which they were exposed and which they alleged caused their injuries or determine their more particular source.

65.    Accordingly, the Food Chain Plaintiffs alleged generally that their injuries were caused by their exposure to the combination of PCBs released into the environment.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

66.     The Food Chain Plaintiffs sought to impose liability on Pharmacia for manufacturing any and all PCBs, including those purchased by Defendant's predecessor before and after it signed the Special Undertaking Contracts.

67.     Thus, the Food Chain Cases present "liabilities, claims, damages, penalties, actions, suits, losses, costs [or] expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of … PCBs [purchased on or after Defendant's predecessor entered into the Special Undertaking Contracts] by, through or under [Defendant's predecessor]…alone or in combination with other substances," within the meaning of the Special Undertaking Contracts.

68.     The Food Chain Cases were filed in state court in Los Angeles County, California, and in state and federal courts in St. Louis, Missouri.  The Food Chain Cases included approximately 700 plaintiffs.

69.     In September 2016, Monsanto settled all of the Food Chain Cases, including those on appeal, for approximately $280 million.

70.     The full set of complaints filed in the Food Chain Cases is voluminous and attachment of all such pleadings to this Complaint is impracticable for filing purposes, but examples of complaints filed in the Food Chain Cases are attached hereto as **Exhibits 4 and 5**.

71.     More specifically, Exhibit 4 is a true and accurate copy of the complaint in *Bailey, et al. v. Monsanto Co., et al*., Case 4:15-cv-00844-AGF, United States District Court for the Eastern District of Missouri, Eastern Division.  Exhibit 5 is a true and accurate copy of the complaint in *Kelly, et al. v. Monsanto Co., et al.*, Case 4:15-cv-01825-JMB, United States District Court for the Eastern District of Missouri, Eastern Division.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**B.     The Water Cases**

72.     Plaintiffs have been named as defendants in a group of lawsuits in which cities and various municipal agencies are alleging that the Plaintiffs should bear some cost for water clean-up and wastewater permit costs due to PCB contamination (the "**Water Cases**").

73.     Plaintiffs in the Water Cases allege generally that PCBs have entered the subject body of water through various sources, including improper disposal by Old Monsanto's customers, PCB releases from products manufactured by Old Monsanto's customers, and leaching from landfills.  Plaintiffs in the Water Cases allege that PCBs easily migrate or leach out of their original source material or enclosure and that "PCBs can also escape from totally-enclosed materials (such as light ballasts) and …escape into the environment."  *See* San Diego Complaint at ¶ 22.  Plaintiffs in the Water Cases specifically allege that Old Monsanto sold PCBs for use in electric transformers and capacitors, and that PCBs escape from such products and cause environmental contamination.  Plaintiffs in the Water Cases do not identify more specifically the sources of the PCBs found in the water.

74.     PCBs purchased by Universal Manufacturing Corporation both before and after it signed the Special Undertaking Contract have been released into the environment and are part of the combined environmental load of PCBs alleged to have contaminated the waterways at issue in the Water Cases.

75.     The Water Cases Plaintiffs sought to impose liability on Pharmacia for manufacturing any and all PCBs, including those purchased by Defendant's predecessor before and after it signed the Special Undertaking Contracts.

76.     Thus, the Water Cases present "liabilities, claims, damages, penalties, actions, suits, losses, costs [or] expenses arising out of or in connection with the receipt, purchase,

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

possession, handling, use, sale or disposition of … PCBs [purchased on or after Defendant's predecessor entered into the Special Undertaking Contracts] by, through or under [Defendant's predecessor]…alone or in combination with other substances," within the meaning of the Special Undertaking Contracts.

77.    Ten separate Water Cases have been filed and they are all pending on the West coast.

78.    The full set of complaints filed in the Water Cases is voluminous and attachment of all such pleadings to this Complaint is impracticable for filing purposes, but examples of complaints filed in the Water Cases are attached hereto as **Exhibits 6 and 7.**

79.    More specifically, Exhibit 6 is a true and accurate copy of the complaint in *City of Oakland v. Monsanto Company, et al.*, Case 4:15-cv-05152, United States District Court for the Northern District of California – Oakland Division.  Exhibit 7 is a true and accurate copy of the complaint in *San Diego Unified Port District, et al. v. Monsanto Company, et al*., Case 3:15-cv-00578-WQH-JLB, United States District Court for the Southern District of California.

### C.    The School Cases

80.    Plaintiffs have been named as defendants in four cases in which the plaintiffs allege that the Plaintiffs should bear some cost of clean-up and/or rebuilding of schools due to alleged PCB contamination (the "**School Cases**").

81.    Plaintiffs in the School Cases allege that PCBs were used in building products such as electrical equipment, lighting ballasts and other materials that were used in the construction of school buildings.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

82.     Defendant's predecessor manufactured PCB-containing lighting ballasts and other electrical equipment using PCBs purchased both before and after they signed the Special Undertaking Contracts.

83.     The PCBs at issue in the School Cases may include PCBs Defendant's predecessor purchased after signing the Special Undertaking Contracts.

84.     Thus, the School Cases present "liabilities, claims, damages, penalties, actions, suits, losses, costs [or] expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of … PCBs [purchased on or after Defendant's predecessor entered into the Special Undertaking Contracts] by, through or under [Defendant's predecessor]…alone or in combination with other substances," within the meaning of the Special Undertaking Contracts.

85.     The full set of complaints filed in the School Cases is voluminous and attachment of all such pleadings to this Complaint is impracticable for filing purposes, but examples of complaints filed in the School Cases are attached hereto as **Exhibits 8 and 9.**

86.     More specifically, Exhibit 8 is a true and accurate copy of the complaint in *Town of Westport, et al., v. Monsanto Company, et al.*, Case 1:14-cv-12041-DJC, United States District Court, District of Massachusetts.  Exhibit 9 is a true and accurate copy of the complaint in *City of Hartford, et al. v. Monsanto Company*, Case 2:15-cv-01544, United States District Court, District of Connecticut.

**D.     The Occupational Case**

87.     Plaintiffs have been named as defendants, along with GE, in an occupational exposure case filed in state court in Massachusetts (the "**Occupational Case**").

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

88.    Plaintiff in the Occupational Case alleges that he developed cancer as a result of his exposure to PCBs.  Plaintiff alleges that he was exposed to PCBs during the course of his employment, from 1992 through 2008, working with power transformers and other electrical equipment.

89.    Thus, the Occupational Case presents "liabilities, claims, damages, penalties, actions, suits, losses, costs [or] expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of … PCBs [purchased on or after Defendant's predecessor entered into the Special Undertaking Contracts] by, through or under [Defendant's predecessor]…alone or in combination with other substances," within the meaning of the Special Undertaking Contracts.

90.    A copy of the complaint filed in the Occupational Case is attached hereto as **Exhibit 10**.

91.    More specifically, Exhibit 10 is a true and accurate copy of the complaint in *Lamkin, et al. v. Monsanto Company, et al.*, Case 16-0563, Suffolk County Superior Court, Massachusetts.

92.    The Food Chain Cases, Water Cases, School Cases, and the Occupational Case are referred to throughout this Petition as the PCB Lawsuits.

93.    Plaintiffs have incurred significant costs in defending the PCB Lawsuits, and will continue to incur significant costs defending the PCB Lawsuits in the foreseeable future.

94.    Plaintiffs also have paid significant amounts to resolve certain claims premised on environmental exposure to PCBs.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**Defendant's Refusal to Defend and Indemnify**

95.     Counsel for Plaintiffs notified Defendant of the PCB Lawsuits, informed Defendant that the Special Undertaking Contracts applied to the PCB Lawsuits, and demanded that Defendant defend and indemnify Old Monsanto in the litigation.

96.     On August 29, 2016, counsel for Plaintiffs sent a letter to Magnetek notifying Magnetek of the PCB Lawsuits, informing Magnetek that the Special Undertaking Contract applied to the PCB Lawsuits, and demanded that Magnetek defend and indemnify Monsanto in the litigation.  A true and accurate copy of the August 29, 2016, letter to Magnetek is attached hereto as **Exhibit 11** and incorporated herein by reference.

97.     On September 13, 2016, counsel for Magnetek sent a letter to counsel for Plaintiffs rejecting their tender of the defense of the PCB Lawsuits and demand for defense and indemnification under the Special Undertaking Contract.  A true and accurate copy of the September 13, 2016, letter to Magnetek is attached hereto as **Exhibit 12** and incorporated herein by reference.

98.     On December 23, 2016, counsel for Plaintiffs sent a letter to Magnetek suggesting that the parties schedule a meeting to discuss their positions regarding the Special Undertaking Contract.  A true and accurate copy of the December 23, 2016, letter to Magnetek is attached hereto as **Exhibit 13** and incorporated herein by reference.

99.     The parties scheduled a meeting in St. Louis, Missouri for May 16, 2017, to discuss the Special Undertaking Contract, potential standstill and tolling agreements, and potential resolution of the parties' disputes.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

100.    Immediately prior to the parties' scheduled meeting, on May 12, 2017, Magnetek filed an eight-count declaratory judgment Complaint against Plaintiffs in the Superior Court of New Jersey, Case No. BER-L-3362-17.

101.    On May 16, 2017, counsel for Magnetek appeared in St. Louis, Missouri for the parties' scheduled meeting, but did not inform Monsanto or Monsanto's counsel that Magnetek had filed the declaratory judgment action.   When confronted with the declaratory judgment complaint, counsel for Magnetek stated that the lawsuit was a "placeholder" and that Magnetek did not intend to immediately serve Monsanto.

102.    Due to the filing of the declaratory judgment complaint, Magnetek did not participate in the meeting scheduled for May 16, 2017.

103.    On June 2, 2017, Magnetek served Plaintiffs with the declaratory judgment complaint.

104.    Magnetek has continued to refuse Plaintiffs' demand that Magnetek assume the defense of the PCB Lawsuits and provide indemnification for amounts expended to resolve certain of the Food Chain Cases.

## COUNT I
### (Breach of Contract – Refusal to Defend)

105.    Paragraphs 1 through 104 above are incorporated herein by reference.

106.    Old Monsanto provided valuable consideration to Defendant in exchange for Defendant's agreement to defend Old Monsanto against future PCB-related claims.

107.    For example, Old Monsanto agreed to continue, and did continue, to manufacture PCBs for Defendant for an agreed price for an additional five years, in exchange for Defendant's promise to defend Old Monsanto against future PCB-related claims.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

108.    Old Monsanto has performed all obligations and responsibilities required of Old Monsanto under the Special Undertaking Contract.

109.    The Special Undertaking Contract is a valid contract that is enforceable against Defendant.

110.    Under the Special Undertaking Contract, Defendant is obligated to provide a defense for Old Monsanto (n/k/a Pharmacia) in the PCB Lawsuits, including, but not limited to, payment of attorneys' fees, expert fees, and costs incurred to defend Old Monsanto (Pharmacia) in the Pending PCB Litigation.

111.    The PCB Lawsuits fall within the scope of claims against which Defendant agreed to defend Old Monsanto (Pharmacia).

112.    Monsanto is entitled to enforce Old Monsanto's (Pharmacia's) rights under the Special Undertaking Contract as the assignee of those rights.

113.    Monsanto is indemnifying and defending Pharmacia (Old Monsanto) and Solutia in the PCB Lawsuits.

114.    Counsel for Monsanto notified Defendant of the PCB Lawsuits and demanded that Defendant defend Old Monsanto (Pharmacia) in the PCB Lawsuits.

115.    Defendant has failed and refused to defend Old Monsanto (Pharmacia) in the PCB Lawsuits.

116.    Defendant has breached its contractual obligation to defend Old Monsanto (Pharmacia) in the PCB Lawsuits.

117.    As a result of Defendant's breach of its contractual obligation to defend and indemnify Old Monsanto (Pharmacia), Monsanto already has been damaged in an amount exceeding $25,000.00 for defense costs incurred prior to the date of this filing, and such costs

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

will continue to accrue, plus foreseeable consequential damages, pre-judgment interest for such liquidated sums and attorneys' fees and costs in this action, all to be proven at the time of trial.

118.    Monsanto continues to incur attorneys' fees, expert fees, and other litigation costs and expenses in the PCB Lawsuits that constitute part of its damages resulting from Defendant's breach(es) and as such, expressly reserves its right to seek damages in excess of the amounts referenced in the foregoing paragraph.

## COUNT II
### (Breach of Contract – Refusal to Indemnify)

119.    Paragraphs 1 through 104 above are incorporated herein by reference.

120.    Old Monsanto provided valuable consideration to Defendant in exchange for Defendant's agreement to indemnify Old Monsanto against future PCB-related claims.

121.    For example, Old Monsanto agreed to continue, and did continue, to manufacture PCBs for Defendant for an agreed price for an additional five years, in exchange for Defendant's promise to indemnify Old Monsanto against future PCB-related claims.

122.    Old Monsanto has performed all obligations and responsibilities required of Old Monsanto under the Special Undertaking Contract.

123.    The Special Undertaking Contract is a valid contract that is enforceable against Defendant.

124.    Under the Special Undertaking Contract, Defendant is obligated to indemnify Old Monsanto (n/k/a Pharmacia) for its losses and liabilities in connection with  claims covered by the Special Undertaking Contract.

125.    The PCB Lawsuits fall within the scope of claims against which Defendant agreed to indemnify Old Monsanto (Pharmacia).

126.    The settlement of the Food Chain Cases falls within the scope of liabilities or losses against which Defendant agreed to indemnity Old Monsanto (Pharmacia).

127.    Monsanto is entitled to enforce Old Monsanto's (Pharmacia's) rights under the Special Undertaking Contract as the assignee of those rights.

128.    Monsanto is indemnifying and defending Pharmacia (Old Monsanto) and Solutia in the PCB Lawsuits.

129.    Counsel for Monsanto notified Defendant of the PCB Lawsuits, the potential settlement of the Food Chain Cases, and demanded that Defendant indemnify Old Monsanto (Pharmacia) in the litigation.

130.    Defendant has breached its contractual obligations to indemnify Old Monsanto (Pharmacia) for its liabilities and losses in connection with claims covered by the Special Undertaking Contract, including the settlement of the Food Chain Cases.

131.    As a result of Defendant's breaches of its contractual obligations to indemnify Old Monsanto (Pharmacia), Monsanto has been damaged in an amount exceeding $25,000.00, for the settlement of the Food Chain Cases, and amounts Monsanto reasonably has paid to resolve claims covered by the Special Undertaking Contract prior to the date of this filing, plus foreseeable consequential damages, pre-judgment interests for such liquidated sums and attorneys' fees and costs in this action, all to be proven at the time of trial.

### COUNT III
### (Declaratory Judgment – Contractual Duty to Defend)

132.    Paragraphs 1 through 104 above are incorporated herein by reference.

133.    This Court has the power to grant a declaratory judgment concerning the rights and obligations of Monsanto and Defendant, pursuant to Mo. Stat. §§ 527.010, 527.020, and 527.030, as an actual controversy exists between Monsanto and Defendant concerning the

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

parties' respective rights and obligations under the Special Undertaking Contract, including Defendant's duty to defend Old Monsanto (n/k/a Pharmacia) in the PCB Lawsuits.

134.    The Special Undertaking Contract requires Defendant to defend Old Monsanto (Pharmacia) in the PCB Lawsuits.

135.    Defendant's refusal to satisfy its obligations to defend Old Monsanto (Pharmacia) or pay its defense costs in the PCB Lawsuits is contrary to the Special Undertaking Contract and the law. Monsanto is entitled to enforce Old Monsanto's (Pharmacia's) rights under the Special Undertaking Contract as the assignee of those rights.

136.    Monsanto is indemnifying and defending Pharmacia (Old Monsanto) and Solutia in the PCB Lawsuits.

137.    Justiciable controversies have arisen between Monsanto and Defendant concerning interpretation of the Special Undertaking Contract and Defendant's obligation to defend Old Monsanto (Pharmacia) in the PCB Lawsuits.

138.    This actual controversy is definite and concrete, in that the parties' positions are adverse and Defendant's refusal to defend Old Monsanto (Pharmacia) pursuant to the Special Undertaking Contract causes direct legal injury to Monsanto.

139.    This controversy is real and substantial, and ripe for adjudication.  A judicial declaration as to Defendant's obligation to defend Old Monsanto (Pharmacia) in the PCB Lawsuits under the Special Undertaking Contract will resolve the present controversy, and provide conclusive relief.

140.    The harm to Monsanto if Defendant is allowed to avoid their obligation to defend Old Monsanto (Pharmacia) in the PCB Lawsuits is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment clarifying the legal relations of the parties.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Without a declaration of rights, Monsanto will continue to incur attorney's fees, expert fees and other costs and expenses in the PCB Lawsuits.

141.    Monsanto therefore requires a declaratory judgment declaring that Defendant has a duty to defend Old Monsanto (Pharmacia) in the PCB Lawsuits under the Special Undertaking Contracts.

<div align="center">

**COUNT IV**
**(Declaratory Judgment – Contractual Duty to Indemnify)**

</div>

142.    Paragraphs 1 through 104 above are incorporated herein by reference.

143.    The Special Undertaking Contract requires Defendant to indemnify Old Monsanto in the Pending PCB Litigation.

144.    Defendant's denial of its obligations to indemnify Old Monsanto (n/k/a Pharmacia) in the PCB Lawsuits is contrary to the Special Undertaking Contract and the law.

145.    Justiciable controversies have arisen between Monsanto and Defendant concerning interpretation of the Special Undertaking Contract and Defendant's obligation to indemnify Old Monsanto (Pharmacia) in the PCB Lawsuits.

146.    Monsanto is entitled to enforce Old Monsanto's (Pharmacia's) rights under the Special Undertaking Contract as the assignee of those rights.

147.    Monsanto is indemnifying and defending Pharmacia (Old Monsanto) and Solutia in the PCB Lawsuits.

148.    This actual controversy is definite and concrete, in that the parties' positions are adverse and Defendant's refusal to indemnify Old Monsanto (Pharmacia) pursuant to the Special Undertaking Contracts causes direct legal injury to Monsanto.

149.    This controversy is real and substantial, and ripe for adjudication.  A judicial declaration as to Defendant's obligation to defend Old Monsanto (Pharmacia) in the PCB

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Lawsuits under the Special Undertaking Contracts will resolve the present controversy, and provide conclusive relief.

150.    The harm to Monsanto if Defendant is allowed to avoid their obligation to defend Old Monsanto (Pharmacia) in the PCB Lawsuits is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment clarifying the legal relations of the parties. Without a declaration of rights, Monsanto will continue to incur expenses in resolving the PCB Lawsuits.

151.    Monsanto therefore requires a declaratory judgment declaring that Defendant has a duty to indemnify Old Monsanto (Pharmacia) for all  amounts paid by Monsanto to resolve the PCB Lawsuits (whether through settlement, verdict, judgment, or otherwise), under the Special Undertaking Contract.  Specifically, Monsanto requests and is entitled to a declaration that Defendant has a duty to indemnify Old Monsanto (Pharmacia) in all of the PCB Lawsuits and the settlement of the Food Chain Cases.

## COUNT V
### (Negligence)

152.    Paragraphs 1 through 104 above are incorporated herein by reference.

153.    Defendant was aware of the potential for PCBs to persist in the environment and of the need to use care in the use and handling of PCBs when it purchased PCBs from Pharmacia.

154.    Defendant had a duty to possess, handle, use, sell, and dispose of PCBs purchased from Pharmacia with reasonable care so that they would not be released into the environment.

155.    Defendant breached that duty of care by allowing PCBs purchased from Pharmacia both before and after signing the Special Undertaking Contract to be released into the environment through products manufactured by Defendant, improper disposal of PCB-containing

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

products, leaks, accidental spills, improper dumping and disposal of industrial wastes, and through other means.

156.    The PCB Lawsuits have been filed against Plaintiffs as a result of Defendant's breaches and release of PCBs into the environment.

157.    As a result of Defendant's breaches,  Monsanto has been damaged in an amount exceeding $25,000.00, for the costs of defending the PCB Lawsuits, the settlement of the Food Chain Cases, and amounts Monsanto reasonably has paid to resolve claims covered by the Special Undertaking Contract prior to the date of this filing.

158.    Monsanto continues to incur attorneys' fees, expert fees, and other litigation costs and expenses in the PCB Lawsuits that constitute part of its damages resulting from Defendant's breach(es) and as such, expressly reserves its right to seek damages in excess of the amounts referenced in the foregoing paragraph,.

**COUNT VI**
**(Negligent Misrepresentation)**

159.    Paragraphs 1 through 104 above are incorporated herein by reference.

160.    Prior to signing the Special Undertaking Contract, Pharmacia supplied Monsanto with certain information regarding Defendant's intended use of the PCBs and coverage of the Special Undertaking Contract by insurance.

161.    Specifically, Defendant told Monsanto that it only intended to use PCBs purchased from Monsanto for closed uses such that PCBs would not escape Defendant's products and enter the environment, and that the Special Undertaking Contract was "covered by a blanket liability policy with the Travelers Insurance Company."

162.    The information supplied by Defendant to Pharmacia was false due to Defendant's failure to exercise reasonable care.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

163.    Defendant released or permitted the release of some or all of the PCBs purchased from Pharmacia after execution of the Special Undertaking Contract into the environment. Magnetek's insurer has also recently alleged in a lawsuit against Magnetek that the Special Undertaking Contract is not covered by any insurance policy, or the insurance policy has been released.  *See Velsicol Chemical LLC et al. v. Magnetek, Inc.*, Case No. 2017 CH 02118, Complaint (Cook County, Illinois Cir. Court Feb. 14, 2017).

164.    Defendant intentionally supplied the false information regarding its use of the PCBs and the insurance coverage to Pharmacia in order to induce Pharmacia to sell its PCBs after Pharmacia had announced a preliminary decision to cease all production of PCBs.

165.    Pharmacia justifiably relied on the information supplied by Defendant when it decided to sell PCBs to Defendant pursuant to the Special Undertaking Contract.  Pharmacia would not have sold PCBs to Defendant if Defendant had not supplied the information regarding its intended use of the PCBs and the insurance coverage for the Special Undertaking Contract.

166.    Plaintiffs have suffered loss in the form of attorneys' fees, costs, settlement amounts, judgments, and other damages in an amount in excess of $25,000 as a result of Defendant's negligent misrepresentations.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

## PRAYER FOR RELIEF

WHEREFORE, Monsanto respectfully requests that this Honorable Court enter an order and judgment granting the following relief in Monsanto's favor and against Defendant:

A.    Awarding Monsanto a sum greater than Twenty-Five Thousand Dollars ($25,000.00) reflective of the damages incurred by Monsanto and to be proven prior to the time of such judgment, including such damages Monsanto incurred in defending and resolving the PCB Lawsuits;

B.    A declaration that the Special  Undertaking Contract applies to the PCB Lawsuits and imposes on Defendant a duty to defend Old Monsanto (Pharmacia) in the PCB Lawsuits;

C.     A declaration that Defendant shall bear responsibility for any and all of Old Monsanto's (Pharmacia's) defense costs (including attorneys' fees, costs, and expenses) in the PCB Lawsuits, which are being paid by Monsanto;

D.    A declaration that Defendant shall indemnify Monsanto for any and all judgments Monsanto is required to pay in the PCB Lawsuits;

E.    A declaration that Defendant shall indemnify Monsanto for the total amount of the settlement of the Food Chain Cases;

F.    A declaration that Defendant shall honor all of their obligations and responsibilities set forth in the Special Undertaking Contract for the underling lawsuits;

G.    Awarding Monsanto pre-judgment interest with respect to its damages;

H.    Awarding Monsanto post-judgment interest with respect to its damages;

I.    Awarding Monsanto its attorneys' fees and costs for prosecution of this lawsuit;

J.    Such other and further relief as the Court deems just and proper.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Respectfully Submitted,

THOMPSON COBURN LLP

By:  /s/ Christopher M. Hohn
      John R. Musgrave #20358
      Christopher M. Hohn #44124
      A. Elizabeth Blackwell #50270
      Susan L. Werstak, #55689
      David M. Mangian #61728
      One U.S. Bank Plaza
      St. Louis, Missouri 63101
      (314) 552-6000 (telephone)
      (314) 552-7000 (facsimile)
      Email:  jmusgrave@thompsoncoburn.com
      Email:  chohn@thompsoncoburn.com
      Email:  eblackwell@thompsoncoburn.com
      Email:  swerstak@thompsoncoburn.com
      Email:  dmangian@thompsoncoburn.com

17SL-CC03368

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

### Special Undertaking by Purchasers of Polychlorinated Biphenyls

Monsanto Company (Monsanto) manufacturers certain polychlorinated biphenyls products (PCB's) which Universal Manufacturing Corporation (Buyer) desires to purchase. While buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in the handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or delivery of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses (except to the extent arising from failure of PCB to conform with specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through or under Buyer, whether alone or in combination with any other substance, including without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provision set forth above.

Nothing herein shall create or imply, any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer. No conditions, undertakings or agreements purporting to modify the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effective by the acknowledgment or acceptance of any sale document, purchase order, shipping instructions or other forms containing terms or conditions at variance herewith.

Universal Manufacturing Corporation
(Buyer)

MONSANTO COMPANY

BY: _____

BY: _____

TITLE: President

DATE: January 7, 1972

0167253

EXHIBIT 1

17SL-CC03368

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**UNIVERSAL MANUFACTURING CORPORATION**

29-51 EAST SIXTH STREET, PATERSON, NEW JERSEY 07509 • PHONE (201) 271-3100 • TWX NO. 710-988-5934

January 7, 1972

Mr. H.S. Bergen
Monsanto Company
P.O. Box 14817
St. Louis, Missouri  63178

Dear Mr. Bergen:

Enclosed is the undertaking you requested in connection
with our purchase of PCB.  As previously discussed, we
are executing the undertaking in our own name and are
excepting any liability arising from failure of the
product to conform to specifications.

This undertaking will be covered by a blanket liability
policy with the Travelers Insurance Company having limits
of 10 million dollars.  As of December 31, 1970, Universal's
consolidated net worth was 16.8 million and its current
ratio was 1.7 to 1.

Very truly yours,

UNIVERSAL MANUFACTURING CORPORATION

Paul H. Einhorn
President

PHE/paz

0167252

**EXHIBIT 2**

**17SL-CC03368**

**EXHIBIT 3**

| Matter Name | Group Reference | Jurisdiction Type | Court | Docket Number | File Date |
|---|---|---|---|---|---|
| Grant Parish School Board v. Monsanto Company (PCB) | PCB - Building | Federal | LA - Western District | 1:15-cv-01719-DDD-JDK | 5/19/2015 |
| City of Hartford and Hartford Board of Education v. Monsanto (SOI)(PCBO | PCB - Building | Federal | CT- U.S. District | 2015-004301 | 10/23/2015 |
| Town of Princeton, MA v. Monsanto Company (SOI) (PCB) | PCB - Building | Federal | MA - U.S. District | 4:15-cv-40096-DJC | 7/1/2015 |
| Town of Westport and Westport Community Schools v. Monsanto (SOI) (PCB) | PCB - Building | Federal | MA - U.S. District | 1:14-CV-12041-DJC | 5/7/2014 |
| Abston, Bertha v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01495 | 4/23/2012 |
| Aiken, Ronald v. Monsanto Company (SOI) (PCB Food chain case) | PCB - Food Chain | State | MO - St. Louis City | 1422-CC09436 | 8/15/2014 |
| Ashley, Jerry v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01499 | 4/23/2012 |
| Bailey, Roger v. Monsanto Company (PCB Food Chain case) | PCB - Food Chain | State | MO - Eastern District | 15SL-CC01768 | 5/22/2015 |
| Blum, Robert J., Jr. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC02866 | 6/28/2010 |
| Brownlee, Paul v. Monsanto Company (SOI) (PCB Food Chain) | PCB - Food Chain | State | CA - LA County | BC497582 | 12/14/2012 |
| Brown, Paulette v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01498 | 4/23/2012 |
| Burford, Kent N. et al. v. Monsanto, et al. (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00928 | 3/10/2016 |
| Burke, Angela v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1222-CC10374 | |
| Carter, Kevin v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC484608 | 5/11/2012 |
| Clair, Sanford v. Monsanto Company (SOI) (PCB) | PCB - Food Chain | State | MO-St. Louis County | 09SL-CC01964 | |
| Craig, Gary v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01496 | 4/23/2012 |
| Dauber, Roslyn v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC483342 | 4/23/2012 |
| Dubin, Sydell v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC03822 | 9/22/2010 |
| Ferrell, Marinda v. Monsanto (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis City | 1322-CC08915 | 7/22/2013 |
| Gibson, Dennis L. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - Eastern District | 11SL-CC04951 | |
| Goodman, Betty v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1322-CC09213 | 8/26/2013 |
| Granger, Jacqueline v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC459770 | 4/19/2011 |
| Guenther, Valerie Anna v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC480068 | 3/5/2012 |
| Hearon, Leslie v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12S-CC01497 | 4/23/2012 |
| Kelly, Thomas v. Monsanto Company (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 15SL-CC03845 | 11/9/2015 |

| Case | | Jurisdiction | Location | Case Number | Date |
|---|---|---|---|---|---|
| LaBarge, Dale L. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01263 | 4/5/2012 |
| Mosby, Keith v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 1122-CC02206 | |
| Murphy, Deborah D. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1222-CLO9174 | 7/6/2012 |
| Naihe, Edward v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC02117 | 6/5/2012 |
| Nishida Nicolas White, Ruth v. Monsanto and Solutia (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 09SL-CC01964 | 5/1/2009 |
| Nunn, Mary vs. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1122-CC01207 | |
| Olson Kathleen R. v. Monsanto Company, et al. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00919 | 3/10/2016 |
| Rodriguez, Gullermo v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SLCC03408 | |
| Stapleton, Bernadette v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO-St. Louis City | 1122CC09622 | 9/9/2011 |
| Varela, Jesse v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO-St. Louis City | BC509170 | 5/16/2013 |
| Walker, Benito v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO-St. Louis City | 1122CC09621 | |
| Lamkin, Craig, et ux. v. Monsanto Company, et al. (SOI) (PCB) | PCB - Personal Injury | State | MA - Suffolk County | 16-0563 | 2/19/2016 |
| City of Berkeley v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 5:16-cv-00071 | 1/6/2016 |
| City of Oakland v. Monsanto Company (SOI)(PCB) | PCB - Water Contamination | Federal | CA - Northern District | 4:15-cv-05152 | 11/10/2015 |
| City of San Jose v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 5:15-cv-03178-NC | 7/10/2015 |
| City of Seattle v. Monsanto, et al. (SOI) (PCB) | PCB - Water Contamination | Federal | WA - Western District | 2:16-cv-00107 | 1/25/2016 |
| City of Spokane v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | WA- Eastern District | 2:15-cv-0201-SMJ | 7/31/2015 |
| Monsanto PCB Water Contamination Litigation (SOI) (PCB) | PCB - Water Contamination | Federal | Judicial Panel /Multidistrict | MDL. No. 2697 | 1/28/2016 |
| San Diego Unified Port and City of San Diego v. Monsanto Co., et al. | PCB – Water Contamination | Federal | CA – Southern District | 3:15-cv-00578-WQH-JLB | 8/3/15 |
| City of Long Beach v. Monsanto Co., et al. | PCB-Water Contamination | Federal | CA – Central District | 2:16-cv-03493-FMO-AS | 5/19/16 |
| City of Portland v. Monsanto Co., et al. | PCB – Water Contamination | Federal | OR – Dist. of Oregon, Portland Division | 3:16-cv-1418-PK | 7/12/16 |

- 2 -

**EXHIBIT 3**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

17SL-CC03368

MISSOURI CIRCUIT COURT
TWENTY-FIRST JUDICIAL CIRCUIT
ST. LOUIS COUNTY

ROGER BAILEY, NICOLETTA CALHOUN,
THOMAS E. CLEARY, CATHERINE
GUIDROZ, CINDY M. HANNON, STANLEY
JOHNSON, PAMELA G. KLES, REBECCA P.
MACKEL, TOMMY D. MOORE, LOUIS D.
OLANDESE,  ANN H. PILACKAS, and ANN
M. STAFFORD,

Cause No.:

Division No.

JURY TRIAL DEMANDED

**Plaintiffs,**

v.

**MONSANTO CO.**
Serve: Registered Agent
 CSC - Lawyers Incorporating
 Service Co.
 221 Bolivar St.
 Jefferson City, MO 65101

**SOLUTIA, INC.**
Serve: Registered Agent
 The Corporation Co.
 120 South Central Ave.
 Clayton, MO 63105

**PHARMACIA CORP.**
Serve: Registered Agent
 CT Corporation Systems
 120 South Central Ave.
 Clayton, MO 63105

**PFIZER, INC.**
Serve: Registered Agent
 CT Corporation Systems
 120 South Central Ave.
 Clayton, MO 63105

**Defendants.**

1

**EXHIBIT 4**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

## PETITION

COME NOW PLAINTIFFS ROGER BAILEY, NICOLETTA CALHOUN, THOMAS E. CLEARY, CATHERINE GUIDROZ, CINDY HANNON, STANLEY JOHNSON, PAMELA G. KLES, REBECCA P. MACKEL, TOMMY D. MOORE, LOUIS D. OLANDESE, ANN H. PILACKAS, and ANN M. STAFFORD who allege as follows:

## I. PARTIES

1.    Plaintiff ROGER BAILEY resides at 1209 US HIGHWAY 31 SOUTH, ALABAMA 35611.

2.    Plaintiff NICOLETTA CALHOUN resides at 6410 WESTERN AVENUE, WILLOBROOK, IL 60527.

3.    Plaintiff THOMAS E. CLEARY resides at 6671 W. PLACITA DE LAS BOTAS, TUCSON, ARIZONA 85743.

4.    Plaintiff CATHERINE GUIDROZ resides at 12912 PECAN STREET, PORT ALLEN, LOUISIANA 70767.

5.    Plaintiff CINDY M. HANNON resides at 4702 FLATBRUSH AVENUE, SARASOTTA, FLORIDA 34233.

6.    Plaintiff STANLEY JOHNSON resides at 21 ENGLISH ISLE ONE, LINCOLN, ALABAMA 35096.

7.    Plaintiff PAMELA G. KLES resides at 12177 17TH STREET, YUCAIPA, CALIFORNIA 92708.

2

**EXHIBIT 4**

8.      Plaintiff REBECCA P. MACKEL resides at 1006 MARVIN GARDEN WAY, LOGANVILLE, GA 30052.

9.      Plaintiff TOMMY D. MOORE resides at 180 SIMS LANE, SYLACAUGA, ALABAMA 35150.

10.     Plaintiff LOUIS D. OLANDESE resides at 5509 MAY AVENUE, RICHMOND, ILLINOIS 60071.

11.     Plaintiff ANN H. PILACKAS resides at 1083 MEADOWSONG ROAD, LEBONON, ILLINOIS 62254.

12.     Plaintiff ANN M. STAFFORD resides at 11361 DELPHENIUM AVENUE, FOUNTAIN VALLEY, CALIFORNIA 92708.

13.     Defendant MONSANTO CO. ("NEW MONSANTO") is a Delaware corporation that has its corporate headquarters and principal place of business in St. Louis County, Missouri.   Monsanto can be served through its registered agent, CSC - Lawyers Incorporating Services, Inc., 221 Bolivar St., Jefferson City, Missouri 65101.

14.     Defendant SOLUTIA, INC. ("SOLUTIA") is a Delaware corporation that has its corporate headquarters and principal place of business in St. Louis County, Missouri. Solutia can be served through its registered agent, The Corporation Co., 120 South Central Ave., Clayton, Missouri 63105.

15.     Defendant PHARMACIA CORP. ("PHARMACIA" a/k/a "OLD MONSANTO") is a Delaware corporation that, since its merger with Defendant Pfizer, Inc. in 2003, has had its headquarters and principal place of business in New York, NY. Pharmacia can be served through its registered agent, CT Corporation System, 120 South Central Ave., Clayton, Missouri 63105.

3

**EXHIBIT 4**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

16.     Defendant PFIZER, INC. ("PFIZER") is a Delaware corporation that has its corporate headquarters and principal place of business in New York, NY.   Pfizer can be served through its registered agent, CT Corporation System, 120 South Central Ave., Clayton, Missouri 63105.

## II. JURISDICTION AND VENUE

17.     Venue is proper in St. Louis County under MO. STAT. § 508.010(5)(2) because this is a tort case in which Plaintiffs were first injured outside of Missouri, and the registered agent for Defendants Solutia and Pfizer are located in St. Louis County.

18.     THIS CAUSE IS NOT REMOVABLE.   There is no diversity of citizenship among the parties because Defendants Solutia, Inc. and Monsanto Co. are citizens of the State of Missouri for purposes of federal diversity jurisdiction and removal statutes.   *See* 28 U.S.C.§ 1332(c)(1) ("a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business..."). Moreover, because at least one Defendant is a resident of Missouri, where this action is filed, Defendants could not, in any event, remove this action on the basis of diversity. 28 U.S.C. § 1441(b). Plaintiffs affirmatively disclaim any damages or action arising under the constitution, treaties, or laws of the United States (including any claim arising from an act or omission on a federal enclave, or of any officer of the U.S. or any agency or person acting under him occurring under color of such office).   No claim of admiralty or maritime law is raised.   Plaintiffs sue no foreign state or agency.   The damages that are sought by the Plaintiffs, exclusive of interests and costs, exceed the minimum jurisdictional limits of this Court.

## III. FACTUAL BACKGROUND

4

**EXHIBIT 4**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

19.     PLAINTIFFS ROGER BAILEY, NICOLETTA CALHOUN, THOMAS E. CLEARY, CATHERINE GUIDROZ, CINDY HANNON, STANLEY JOHNSON, PAMELA G. KLES, REBECCA P. MACKEL, TOMMY D. MOORE, LOUIS D. OLANDESE, ANN H. PILACKAS, and ANN M. STAFFORD are Alabama, Arizona, California, Florida, Georgia, Illinois, and Louisiana residents who developed lymphohematopietic cancer after being exposed to chemical products designed, manufactured, and distributed by Defendants.   Specifically, Plaintiffs have had substantial dietary and other environmental exposure to polychlorinated biphenyls ("PCBs"), manufactured by the original Monsanto Co. ("Old Monsanto" a/k/a "Pharmacia").

20.     From 1901 to 1997 the original Monsanto Co., also known as Monsanto Chemical Co., operated as a Missouri corporation manufacturing a variety of chemicals and agricultural products. This original corporate Monsanto entity, which is now sometimes referred to as "Old Monsanto," ceased to exist in 1997 as the result of a series of corporate spin-offs and acquisitions.  At that time, Old Monsanto's chemical division was split off and reformed into a newly-independent corporation, which was renamed "Solutia, Inc." one of the Defendants in this action. As part of this 1997 spin-off, Solutia assumed certain of Old Monsanto's debts and liabilities, including all liabilities related to Old Monsanto's production and sale of PCBs.   Although Solutia was recently reorganized pursuant to Chapter 11 of the federal bankruptcy laws, it emerged from bankruptcy in February 2008.

21.     In 2000, the remaining portion of Old Monsanto, comprised of Old Monsanto's Life Sciences division, merged with Pharmacia/Upjohn Corp., which meant that Old

5

**EXHIBIT 4**

Monsanto no longer existed as a separate corporate entity. Defendant Pharmacia then incorporated a new company in Delaware, also called "Monsanto Co.," which is now referred to as "New Monsanto," the other Defendant in this case. In 2002, Defendant Pharmacia spun off its interest in New Monsanto, and New Monsanto now operates as an independent corporate entity with its corporate headquarters and principal place of business in St. Louis, Missouri.

22. In 2003, Defendant Pharmacia (what remained of "Old Monsanto") merged with Defendant Pfizer, Inc.

23. As part of Solutia's federal bankruptcy plan of reorganization, New Monsanto agreed to indemnify Solutia for all tort "legacy liabilities" related to Old Monsanto's activities, including the production and sale of PCBs. As a result of these various transactions, Defendants Pharmacia, Pfizer, Solutia and Monsanto collectively have legal responsibility for Old Monsanto's conduct in the production, sale, and distribution of PCBs, which is the subject of Plaintiffs' claims in this case.

24. PCBs are a class of 209 discrete chemical compounds, called congeners, in which one to ten chlorine atoms are attached to biphenyl. From 1929, when Monsanto's predecessor Swann Chemical Co. (which merged into Monsanto in 1935) first began producing PCBs, until 1977, when Congress banned the manufacture of PCBs, Monsanto produced and sold more than 99 percent of all the PCBs that were ever sold in the United States. Over those six decades, Monsanto sold those PCBs as liquid mixtures, under the trade name "Aroclor," to a variety of industrial customers, for a wide variety of industrial uses. Each of Monsanto's Aroclor products contained a combination of different PCB congeners.

6

**EXHIBIT 4**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

25.    Many of Monsanto's PCBs were used by its customers as insulating fluids, also known as "dielectric fluids," in certain electrical equipment, including high-temperature transformers and capacitors.  However, Monsanto's Aroclor and other PCB products were also marketed and used for many other purposes, including in inks, paints, dedusting agents, pesticides, plasticizers, hydraulic fluids, lubricants, adhesives, and carbonless copy paper.  Until 1971, approximately 40 percent of Monsanto's PCBs were sold for purposes other than use as insulating fluid for electrical equipment.  From 1971 to 1977, Monsanto sold PCBs exclusively for use as insulating fluid in transformers and capacitors.

26.    Like other chlorinated organic compounds, such as dioxins, which are collectively known as "organochlorines," PCBs are considered "persistent organic pollutants," because they do not readily degrade in the environment after disposal, and they are not easily metabolized or broken down by humans or animals after absorption.  PCBs are lipophilic, and are stored in the fat tissue of humans and animals who have been exposed.  Because PCBs were dumped into the environment over decades by Monsanto, its customers, and the end users of various PCB-containing products, PCBs are now ubiquitous in the environment.  PCBs can be found in most animals, as well as in water, soil, sediment, and numerous other environmental media.  Thus, measurable quantities of PCBs are typically found in most of the foods that most Americans consume on a daily basis, including fish, beef, poultry, dairy products, and event fruits and vegetables.  Throughout the six decades that Monsanto produced and sold PCBs, the company knew or should have known that many of its PCBs would ultimately be disposed of in ways that would allow those PCBs to enter the environment.

7

**EXHIBIT 4**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

27.     Because Monsanto's PCBs have contaminated the food chain and continue to be ubiquitous contaminants of the air, water, and soil, all Americans, including Plaintiffs, have been substantially exposed to Monsanto's PCBs through their diet and through other environmental exposures.   Although Monsanto's PCBs were incorporated into many other products before being dumped into the environment, those PCBs themselves, to which Plaintiffs have been exposed, are substantially the same chemicals as when they left Monsanto's possession.

28.     Throughout the decades during which Monsanto produced PCBs, the company was aware that exposure to PCBs carried significant health risks.   Despite this knowledge, and despite the availability of substitute products, Monsanto continued to produce and market PCBs, while hiding from the public, its customers, and applicable governmental authorities the true health risks associated with PCBs.   Such conduct was despicable and done with a willful disregard of the rights and safety of others.   In other words, Monsanto was aware that its continued production and sale of PCBs would result in probable dangerous consequences in the form of environmental devastation and significant health risks for users and others exposed to its PCBs, and Monsanto deliberately chose to market its PCBs over the course of decades, despite this knowledge.

## IV.  DISCOVERY RULE

29.     Plaintiffs hereby plead and invoke the "discovery rule."   Plaintiffs will show that after reasonably exercising due diligence, they did not learn the nature of the cause of their cancers or that such cancers were chemically-related until less than two years prior

8

**EXHIBIT 4**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

to the filing of the Plaintiffs' causes of action herein. Plaintiffs also specifically invoke the Federally Required Commencement Date, pursuant to 42 U.S.C. § 9658.

## V. CAUSE OF ACTION:
## STRICT LIABILITY FOR DESIGN DEFECT

30.    Plaintiffs incorporate herein each allegation set forth above.

Because Plaintiffs were exposed to Monsanto's PCBs and developed lymphohematopoietic cancer while living in Alabama, Arizona, California, Florida, Georgia, Illinois and Louisiana, their claims for compensatory damages in this case are governed by the laws in those states.

31.    Plaintiffs allege that Monsanto's various PCB products were unreasonably dangerous, and that those unreasonably dangerous products were a producing cause in the development of each Plaintiff's cancer. Specifically, Plaintiffs allege that Monsanto sold its PCBs under the trade name Aroclor (and other trade names), and that through the foreseeable dumping of those Aroclor and other PCB-containing products by Monsanto itself, by its customers, and by end users, Monsanto's PCBs ultimately made their way to the environment and to the food chain. Throughout the time that Monsanto marketed its unreasonably dangerous Aroclor products, there were safer alternatives to PCBs available. Because of the persistence of PCBs, those PCBs to which Plaintiffs were environmentally exposed were in substantially the same condition as when Monsanto sold them. Plaintiffs' environmental exposures to Monsanto's PCBs were a producing cause of Plaintiffs' cancers.

## VI. CAUSE OF ACTION: NEGLIGENCE

33.    Plaintiffs incorporate herein each allegation set forth above.

9

**EXHIBIT 4**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

34.   Monsanto's decisions to market and distribute its various PCB products were negligent. As described above, for decades, the company was aware of the hazards of PCBs, and either knew or should have known that its PCBs would be released into the environment. Despite this actual and constructive knowledge, and despite the availability of numerous alternatives to PCBs for each of their uses, Monsanto continued to market PCBs. Monsanto's ongoing negligent decisions to market and distribute those PCBs for decades led to Plaintiffs' environmental exposures, and were a substantial factor in the development of Plaintiffs' cancers.

35.   The Plaintiffs were all exposed to Monsanto's PCBs less than 15 years after Monsanto sold them, but the symptoms of Plaintiffs' cancers did not manifest within that time frame.

## VII. DAMAGES

36.   As a direct and proximate result of Defendants' conduct described above, PLAINTIFFS ROGER BAILEY, NICOLETTA CALHOUN, THOMAS E. CLEARY, CATHERINE GUIDROZ, CINDY HANNON, STANLEY JOHNSON, PAMELA G. KLES, REBECCA P. MACKEL, TOMMY D. MOORE, LOUIS D. OLANDESE, ANN H. PILACKAS, and ANN M. STAFFORD sustained damages, including past and future medical expenses, past and future pain and suffering, past and future mental anguish and disfigurement, past and future earnings loss and all other applicable damages. As a result of Defendants' complete indifference or conscious disregard for the safety of others, malice and oppression described above, Plaintiffs hereby seek punitive damages.

## VIII.  PRAYER FOR RELIEF

EXHIBIT 4

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

37.    WHEREFORE, Plaintiffs pray judgment against all Defendants herein for all

        actual

damages, pre-judgment and post-judgment interest, costs of suit, and all such other and

further relief to which Plaintiffs may show themselves to be justly entitled.

### IX.  JURY DEMAND

38.    PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS.

Respectfully submitted,
By: /s/ John G. Simon

**THE SIMON LAW FIRM, P.C.**
John G. Simon, MO Bar No. 35231
Erica F. Blume, MO Bar No. 63716
800 Market St., Suite 1700
St. Louis, MO 63101
(314) 241-2929 Phone
(314) 241-2029 Facsimile
jsimon@simonlawpc.com
eblume@simonlawpc.com

**ALLEN STEWART, P.C.**
Allen M. Stewart, MO Bar No. 60331
Steve Baughman Jensen, TX Bar No. 00783615
Scott R. Frieling, TX Bar No. 24012659
325 N. St. Paul St., Suite 4000
Dallas, Texas 75201
(214) 965-8700 Office
(214) 965-8701 Facsimile
astewart@allenstewart.com
sjensen@allenstewart.com
sfrieling@allenstewart.com

**WILLIAMS KHERKHER**
Steven Kherkher, MO Bar #64648
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
(713) 230-2200 Phone
(713) 643-6226 Facsimile
skerkher@williamskherkher.com
***ATTORNEYS FOR PLAINTIFFS***

11

**EXHIBIT 4**

Case: 4:23-cv-00204-HEA   Doc. #: 1-5   Filed: 02/20/23   Page: 61 of 218 PageID
Case: 4:23-cv-01926-JMB   Doc. #: 1-5   Filed: 02/20/23   Page: 61 of 218 PageID
#: 611

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

17SL-CC03368

MISSOURI CIRCUIT COURT
TWENTY-FIRST JUDICIAL CIRCUIT
ST. LOUIS COUNTY

| | | |
|---|---|---|
| THOMAS KELLY and<br>MICHAEL KRZESZEWSKI, | § | Cause No. |
| | § | |
| **Plaintiffs**, | § | Division |
| | § | |
| v. | § | Jury Trial Requested |
| | § | |
| **MONSANTO CO**. | § | |
| Serve: Registered Agent | § | |
|     CSC - Lawyers | § | |
| Incorporating | § | |
|     Service Co. | § | |
|     221 Bolivar St. | § | |
|     Jefferson City, MO | § | |
|     65101 | § | |
| | § | |
| **SOLUTIA, INC.** | § | |
| Serve:  Registered Agent | § | |
|     The Corporation Co. | § | |
|     120 South Central Ave. | § | |
|     Clayton, MO 63105 | § | |
| | § | |
| **PHARMACIA LLC.** | § | |
|  Serve: Registered Agent | § | |
|     CT Corporation System | § | |
|     120 South Central Ave. | § | |
|     Clayton, MO 63105 | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

## PETITION

COME NOW PLAINTIFFS THOMAS KELLY and MICHAEL KRZESZEWSKI who

allege as follows:

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

## I. PARTIES

1.      Plaintiff THOMAS KELLY resides at 40 CEDAR STREET, KINGSPARK, NEW YORK 11754 and is a citizen of New York.

2.      Plaintiff MICHAEL KRZESZEWSKI resides at 337A CANTERBURY COURT, LAKEWOOD, NEW JERSEY 08701 and is a citizen of New Jersey.

3.      Defendant MONSANTO CO. ("NEW MONSANTO") is a Delaware corporation that has its corporate headquarters and principal place of business in St. Louis County, Missouri. Monsanto can be served through its registered agent, CSC - Lawyers Incorporating Services, Inc., 221 Bolivar St., Jefferson City, Missouri 65101.

4.      Defendant SOLUTIA, INC. ("SOLUTIA") is a Delaware corporation that has its corporate headquarters and principal place of business in St. Louis County, Missouri. Solutia can be served through its registered agent, The Corporation Co., 120 South Central Ave., Clayton, Missouri 63105.

5.      Defendant PHARMACIA LLC ("PHARMACIA" a/k/a "OLD MONSANTO") is a Delaware limited liability corporation that is a subsidiary of Pfizer, Inc., and is headquartered and has its principal place of business in Peapack, New Jersey. Because Pfizer, Inc. is a member (owner) of Pharmacia, LLC, and Pfizer, Inc. is a citizen of New York, Pharmacia is also a New York citizen. Pharmacia can be served through its registered agent, CT Corporation System, 120 South Central Ave., Clayton, Missouri 63105.

## II. JURISDICTION AND VENUE

6.      Venue is proper in St. Louis County under MO. STAT. § 508.010(5)(2) because this is a tort case in which Plaintiffs and Decedents were first injured outside of Missouri, and the registered agent for Defendants Solutia and Pharmacia are located in St. Louis County.

Case: 4:23-cv-00204-JMB   Doc. #: 1-5   Filed: 02/14/23   Page: 3 of 13 PageID #: 963

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

7.      THIS CAUSE IS NOT REMOVABLE.  There is no diversity of citizenship among the parties because Defendants Solutia, Inc. and Monsanto Co. are citizens of the State of Missouri for purposes of federal diversity jurisdiction and removal statutes, and Defendant Pharmacia is a citizen of New York.  *See* 28 U.S.C.§ 1332(c)(1) ("a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business..."); *GMAC Commercial Credit LLC v. Dillard Dep't Stores, Inc.*, 357 F.3d 827, 829 (8th Cir. 2004) ("an LLC's citizenship for purposes of diversity jurisdiction is the citizenship of its members").  Moreover, because at least one Defendant is a resident of Missouri, where this action is filed, Defendants could not, in any event, remove this action on the basis of diversity.  28 U.S.C. § 1441(b).  Plaintiffs affirmatively disclaim any damages or action arising under the constitution, treaties, or laws of the United States (including any claim arising from an act or omission on a federal enclave, or of any officer of the U.S. or any agency or person acting under him occurring under color of such office).  No claim of admiralty or maritime law is raised.  Plaintiffs sue no foreign state or agency.  The damages that are sought by the Plaintiffs, exclusive of interests and costs, exceed the minimum jurisdictional limits of this Court.

### III.  FACTUAL BACKGROUND

8.      THOMAS KELLY and MICHAEL KRZESZEWSKI are citizens of New York and New Jersey who developed Non-Hodgkin Lymphoma ("NHL") after being exposed to chemical products designed, manufactured, and distributed by Old Monsanto.  Specifically, Plaintiffs and Decedents have had substantial dietary and other environmental exposure to polychlorinated biphenyls ("PCBs"), manufactured by the original Monsanto Co. ("Old Monsanto" a/k/a "Pharmacia").

9.      From 1901 to 1997 the original Monsanto Co., also known as Monsanto Chemical Co., operated as a Missouri corporation manufacturing a variety of chemicals and agricultural products. This original corporate Monsanto entity, which is now sometimes referred to as "Old Monsanto," ceased to exist in 1997 as the result of a series of corporate spin-offs and acquisitions.  At that time, Old Monsanto's chemical division was split off and reformed into a newly-independent corporation, which was renamed "Solutia, Inc." one of the Defendants in this action.  As part of this 1997 spin-off, Solutia assumed certain of Old Monsanto's debts and liabilities, including all liabilities related to Old Monsanto's production and sale of PCBs.  Although Solutia was recently reorganized pursuant to Chapter 11 of the federal bankruptcy laws, it emerged from bankruptcy in February 2008.

10.     In 2000, the remaining portion of Old Monsanto, comprised of Old Monsanto's Life Sciences division, merged with Pharmacia/Upjohn Corp., which meant that Old Monsanto no longer existed as a separate corporate entity.  Defendant Pharmacia then incorporated a new company in Delaware, also called "Monsanto Co.," which is now referred to as "New Monsanto," the other Defendant in this case.  In 2002, Defendant Pharmacia spun off its interest in New Monsanto, and New Monsanto now operates as an independent corporate entity with its corporate headquarters and principal place of business in St. Louis, Missouri.

11.     In 2003, Defendant Pharmacia (what remained of "Old Monsanto") was acquired by Pfizer, Inc.

12.     In 2012, Pharmacia merged with another Pfizer subsidiary, called Pfizer Convention III, LLC.  The surviving corporation was renamed as Pharmacia LLC. Defendant Pharmacia is headquartered and has its principal place of business at 100 Route 206 North, Peapack NJ 07977.

**EXHIBIT 5**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

13.     As part of Solutia's federal bankruptcy plan of reorganization, New Monsanto agreed to indemnify Solutia for all tort "legacy liabilities" related to Old Monsanto's activities, including the production and sale of PCBs.  As a result of these various transactions, Defendants Pharmacia, Solutia and Monsanto collectively have legal responsibility for Old Monsanto's conduct in the production, sale, and distribution of PCBs, which is the subject of Plaintiffs' claims in this case.

14.     PCBs are a class of 209 discrete chemical compounds, called congeners, in which one to ten chlorine atoms are attached to biphenyl.  From 1929, when Monsanto's predecessor Swann Chemical Co. (which merged into Monsanto in 1935) first began producing PCBs, until 1977, when Congress banned the manufacture of PCBs, Monsanto  produced and sold more than 99 percent of all the PCBs that were ever sold in the United States.  Over those six decades, Monsanto sold those PCBs as liquid mixtures, under the trade name "Aroclor," to a variety of industrial customers, for a wide variety of industrial uses.  Each of Monsanto's Aroclor products contained a combination of different PCB congeners.

15.     Many of Monsanto's PCBs were used by its customers as insulating fluids, also known as "dielectric fluids," in certain electrical equipment, including high-temperature transformers and capacitors. These applications for PCBs in transformers and capacitors are known as "closed applications," or "closed uses." However, Monsanto's Aroclor and other PCB products were also marketed and sold for many other applications, including in inks, paints, dedusting agents, pesticides, plasticizers, hydraulic fluids, lubricants, adhesives, heat transfer fluids, and carbonless copy paper.  Collectively, these applications for PCBs in every product other than transformers and capacitors are known as "open applications," and/or "non-controllable applications." These applications have been described as "open" and "non-controllable" because the PCBs contained in those products are open to the environment and releases of PCBs to the environment during use

of such products cannot be controlled. In 1970, more than 40 percent of Monsanto's PCBs were sold for purposes other than "closed applications" in electrical equipment. From 1971 to 1977, Monsanto sold PCBs exclusively for "closed applications," that is, as insulating fluid in transformers and capacitors.

16.     Like other chlorinated organic compounds, such as dioxins, which are collectively known as "organochlorines," PCBs are considered "persistent organic pollutants," because they do not readily degrade in the environment after disposal, and they are not easily metabolized or broken down by humans or animals after absorption. PCBs are lipophilic, and are stored in the fat tissue of humans and animals who have been exposed. Because PCBs were dumped into the environment over decades by Monsanto, its customers, and the end users of various PCB-containing products, PCBs are now ubiquitous in the environment. PCBs can be found in most animals, as well as in water, soil, sediment, and numerous other environmental media. Thus, measurable quantities of PCBs are typically found in most of the foods that most Americans consume on a daily basis, including fish, beef, poultry, dairy products, and event fruits and vegetables. Throughout the six decades that Monsanto produced and sold PCBs, the company knew or should have known that its PCBs sold for open or non-controllable applications would ultimately result in the release of those PCBs into the environment.

17.     Because Monsanto's PCBs have contaminated the food chain and continue to be ubiquitous contaminants of the air, water, and soil, all Americans, including Plaintiffs, have been substantially exposed to Monsanto's PCBs sold for open and non-controllable applications, through diet and other environmental exposures. Although Monsanto's PCBs were incorporated into many other products before being released into the environment, those PCBs themselves, to which Plaintiffs

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

and Decedents have been exposed, are substantially the same chemicals as when they left Monsanto's possession.

18.    Throughout the decades during which Monsanto produced PCBs, the company was aware that exposure to PCBs carried significant health risks. Despite this knowledge, and despite the availability of substitute products, Monsanto continued to produce and market PCBs for open and non-controllable applications, while hiding from the public, its customers, and applicable governmental authorities the true health risks associated with PCBs.  Such conduct was despicable and done with a willful disregard of the rights and safety of others.  In other words, Monsanto was aware that its continued production and sale of PCBs for open and non-controllable applications would result in probable dangerous consequences in the form of environmental devastation and significant health risks for users and others exposed to its PCBs, and Monsanto deliberately chose to market its PCBs for such open and non-controllable applications over the course of decades, despite this knowledge.

## IV.  DISCOVERY RULE

19.    Plaintiffs hereby plead and invoke the "discovery rule."  Plaintiffs will show that after reasonably exercising due diligence, they did not learn the nature of the cause of their cancer or that such cancer was chemically-related until less than two years prior to the filing of the Plaintiffs' and Decedents' causes of action herein. Plaintiffs also specifically invoke the Federally Required Commencement Date, pursuant to 42 U.S.C. § 9658.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

## V.  CAUSE OF ACTION:
## STRICT LIABILITY FOR DESIGN DEFECT

20.    Plaintiffs incorporate herein each allegation set forth above. Because Plaintiffs and Decedents were exposed to Monsanto's PCBs and developed Non-Hodgkin Lymphoma while living in New York and New Jersey, their claims for compensatory damages in this case are governed by the laws in those states.

21.    Plaintiffs allege that Monsanto's various PCB products sold for open and non-controllable applications were unreasonably dangerous, and that those unreasonably dangerous products were a proximate and producing cause, and a substantial factor in the development of each Plaintiff's and Decedent's NHL.  Specifically, Plaintiffs allege that Monsanto sold its PCBs under the trade name Aroclor (and other trade names) for use in a wide variety of open and non-controllable applications. Through the foreseeable environmental releases of those PCBs by Monsanto itself, by its customers, and by end users, Monsanto's PCBs sold for open and non-controllable applications ultimately made their way to the environment and to the food chain. Throughout the time that Monsanto marketed its unreasonably dangerous Aroclor products for open and non-controllable applications, there were safer alternatives to PCBs available for the same or similar applications.  Because of the persistence of PCBs, those PCBs sold for open and non-controllable applications to which Plaintiffs and Decedents were environmentally exposed were in substantially the same condition as when Monsanto sold them.  Plaintiffs' and Decedents' environmental exposures to Monsanto's PCBs sold for open and non-controllable applications were a proximate and producing cause of Plaintiffs' and Decedents' NHLs, and were also a substantial factor in the development of those cancers.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

## VI.  CAUSE OF ACTION: NEGLIGENCE

22.     Plaintiffs incorporate herein each allegation set forth above.

23.     Monsanto's decisions to market and distribute its various PCB products for open and non-controllable applications were negligent.  As described above, for decades, the company was aware of the hazards of PCBs, and either knew or should have known that its PCBs sold for open and non-controllable applications would be released into the environment. Monsanto also knew or should have known that those PCBs would persist in the environment and bioaccumulate in the food chain and in people, and that such environmental exposures could injure people in the general population who were so exposed.  Despite this actual and constructive knowledge, and despite the availability of numerous alternatives to PCBs for each of these open and non-controllable applications, Monsanto continued to market PCBs for those purposes through 1970 (and, as to certain open and non-controllable applications, through 1971).  Monsanto's ongoing negligent decisions to market and distribute those PCBs for open and non-controllable applications for decades led to Plaintiffs' and Decedents' environmental exposures, and were a producing cause, proximate cause, and substantial factor in the development of Plaintiffs' and Decedents' NHLs.

24.     The Plaintiffs and Decedents were all exposed to Monsanto's PCBs sold for open and non-controllable applications less than 15 years after Monsanto sold them, but the symptoms of Plaintiffs' and Decedents' cancers did not manifest within that time frame.

## VII.  DAMAGES

25.     As a direct and proximate result of Defendants' conduct described above, PLAINTIFFS THOMAS KELLY and MICHAEL KRZESZEWSKI sustained damages, including past and future medical expenses, past and future pain and suffering, past and future mental anguish and disfigurement, past and future earnings loss and all other applicable damages. As a result of

Defendants' complete indifference or conscious disregard for the safety of others, malice and oppression described above, Plaintiffs hereby seek punitive damages.

## VIII.  PRAYER FOR RELIEF

26.     WHEREFORE, Plaintiffs pray judgment against all Defendants, joint and severally, herein for all actual damages, punitive damages, pre-judgment and post-judgment interest, costs of suit, and all such other and further relief to which Plaintiffs may show themselves to be justly entitled.

## IX.  JURY DEMAND

27.     PLAINTIFFS DEMAND A TRIAL BY JURY OF TWELVE ON ALL COUNTS.


Respectfully submitted,


By:   /s/ John G. Simon

**THE SIMON LAW FIRM, P.C.**
John G. Simon, MO Bar No. 35231
Erica F. Blume, MO Bar No. 63716
800 Market St., Suite 1700
St. Louis, MO 63101
(314) 241-2929 Phone
(314) 241-2029 Facsimile
jsimon@simonlawpc.com
eblume@simonlawpc.com

**ALLEN STEWART, P.C.**
Allen M. Stewart, MO Bar No. 60331
Steve Baughman Jensen, TX Bar No. 00783615
Scott R. Frieling, TX Bar No. 24012659
325 N. St. Paul St., Suite 4000
Dallas, Texas 75201
(214) 965-8700 Office
(214) 965-8701 Facsimile
astewart@allenstewart.com
sjensen@allenstewart.com
sfrieling@allenstewart.com

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**WILLIAMS KHERKHER**
Steven Kherkher, MO Bar No. 64648
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
(713) 230-2200 Phone
(713) 643-6226 Facsimile
skherkher@williamskherkher.com

***ATTORNEYS FOR PLAINTIFFS***

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
John P. Fiske (SBN 249256)
655 West Broadway, Suite 1700
San Diego, CA 92101
Telephone: 619-237-3490

**BARON & BUDD, P.C.**
Scott Summy *(pending Pro Hac Vice)*
(Texas Bar No. 19507500)
Carla Burke *(pending Pro Hac Vice)*
(Texas Bar No. 24012490)
Celeste Evangelisti (SBN 225232)
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone: 214-521-3605

**OFFICE OF THE CITY ATTORNEY**
**City of Oakland**
Barbara Parker (SBN 69722)
Otis McGee, Jr. (SBN 71885)
Maria Bee (SBN 167716)
1 Frank H. Ogawa Place, 6th Floor
Oakland, CA 94612

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA- OAKLAND DIVISION

| | |
|---|---|
| CITY OF OAKLAND, a municipal corporation; | CASE NO. _____ |
| Plaintiff, | **PLAINTIFF'S ORIGINAL COMPLAINT** |
| v. | |
| MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, and DOES 1 through 100, | |
| Defendants. | |

### I.    INTRODUCTION

1.      Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants — found in bays, oceans, rivers, streams, soil, and air. As a result, PCBs have been detected in the tissues of all living beings on earth including all

1

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1  forms of marine life, various animals and birds, plants and trees, and humans.

2       2.      The extent of PCB contamination is troubling because PCBs cause a variety of adverse
3  health effects. In humans, PCB exposure is associated with cancer as well as serious non-cancer health
4  effects, including effects on the immune system, reproductive system, nervous system, endocrine
5  system and other health effects. In addition, PCBs destroy populations of fish, birds, and other animal
6  life.

7       3.      Monsanto Company was the sole manufacturer of PCBs in the United States from 1935
8  to 1979, and trademarked the name "Aroclor" for certain PCB compounds. Although Monsanto knew
9  for decades that PCBs were toxic and knew that they were widely contaminating all natural resources
10 and living organisms, Monsanto concealed these facts and continued producing PCBs until Congress
11 enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of
12 PCBs as of January 1, 1979.

13      4.      U.S. EPA (2000b) has classified PCBs as 'probably human carcinogens.' Studies have
14 suggested that PCBs may play a role in inducing breast cancer. Studies have also linked PCBs to
15 increased risk for several other cancers including liver, biliary tract, gall bladder, gastrointestinal tract,
16 pancreas, melanoma, and non-Hodgkin's lymphoma. PCBs may also cause non-carcinogenic effects,
17 including reproductive effects and developmental effects (primarily to the nervous system). PCBs tend
18 to accumulate in the human body in the liver, adipose tissue (fat), skin, and breast milk. PCBs have
19 also been found in human plasma, follicular fluid, and sperm fluid. Fetuses may be exposed to PCBs
20 in utero, and babies may be exposed to PCBs during breastfeeding. According to U.S. EPA (2000b),
21 '[s]ome human studies have also suggested that PCB exposure may cause adverse effects in children
22 and developing fetuses while other studies have not shown effects. Reported effects include lower IQ
23 scores, low birth weight, and lower behavior assessment scores.

24      5.      PCBs have traveled into San Francisco Bay by a variety of ways. PCBs were used in
25 many industrial and commercial applications such as paint, caulking, transformers, capacitors,
26 coolants, hydraulic fluids, plasticizers, sealants, inks, lubricants, and other uses. PCBs regularly leach,
27 leak, off-gas, and escape their intended applications, causing runoff during naturally occurring storm
28 and rain events, after being released into the environment. The runoff originates from multiple sources

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1  and industries and enters the Bay with stormwater and other runoff.

2      6.    The natural fate and transport of PCBs result in the gathering and collection in
3  stormwater through no fault of the City of Oakland, which lawfully discharges water into San
4  Francisco Bay through its NPDES permit.

5      7.    San Francisco Bay ("the Bay") is contaminated with PCBs, which have been detected in
6  the Bay's water, sediments, fish, and wildlife. All segments of the Bay have been identified as
7  impaired due to elevated levels of PCBs in sport fish.[1] The U.S. Environmental Protection Agency
8  ("U.S. EPA") has approved a PCB Total Maximum Daily Load ("TMDL") for the Bay.

9      8.    A Total Maximum Daily Load, or TMDL, is a calculation of the maximum amount of
10 pollutant that an impaired body of water can receive and still safely meet water quality standards.[2]

11     9.    The San Francisco Bay is impaired due to the presence of PCBs.

12     10.    The TMDL is intended to achieve protection of the commercial sport fishing beneficial
13 use and to the extent that other beneficial uses are affected by PCBs, the TMDL will also ensure
14 protection of other beneficial uses, specifically, preservation of rare and endangered species, estuarine
15 habitat and wildlife habitat.[3]

16     Plaintiff CITY OF OAKLAND hereby alleges, upon information and belief, as follows:

17 **II.**    **PARTIES**

18     11.    The CITY OF OAKLAND ("Oakland" or "Plaintiff") is a California Charter City and
19 municipal corporation, duly organized and existing by virtue of the laws of the State of California.

20     12.    Plaintiff brings this suit pursuant to California Code of Civil Procedure 731, and
21 California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and any other applicable codes or
22 forms of relief available for monetary damages and removal of the public nuisance caused by PCBs in
23 the Bay.

24

25 [1] San Francisco Bay Regional Water Quality Control Board, California Environmental Protection Agency,
26 ww.waterboards.ca.gov/sanfranciscobay/water_issues/programs/planningtmdls/basinplan/web/bp_ch7 b.shtml#7.2.3.
27 [2] United States Environmental Protection Agency, www.water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/
28 [3] *Id.*

GOMEZ
TRIAL ATTORNEYS

3

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1    13.    Plaintiff manages and operates a municipal stormwater system, which collects and

2  transports stormwater to be discharged into the Bay. In order to discharge stormwater into the Bay,

3  Plaintiff is required to receive a Municipal Regional Stormwater Permit from the San Francisco Bay

4  Regional Water Quality Control Board, pursuant to the National Pollutant Discharge Elimination

5  System under the Clean Water Act.

6    14.    Plaintiff is a permittee under a Municipal Regional Stormwater Permit, which includes

7  a TMDL for PCBs, as the Bay is impaired due to PCBs.

8    15.    Therefore, Plaintiff is subject to a PCB TMDL under a Municipal Regional Stormwater

9  Permit. The PCB TMDL requires Plaintiff to limit its stormwater discharge of PCBs into the Bay.

10    16.    Thus, Plaintiff has spent money in efforts to reduce PCB discharge toward these state-

11  mandated TMDL goals.

12    17.    Recently, the San Francisco Bay Regional Water Quality Control Board increased the

13  standards for the PCB TMDL, which now requires the Plaintiff to further limit its PCB discharge into

14  the Bay.

15    18.    On May 11, 2015, a new draft Municipal Regional Stormwater Permit, to govern the

16  next permit period, became the Tentative Order, requiring stricter standards and further, significant

17  reduction in PCB discharge into the Bay.[4]

18    19.    The new, stricter TMDL requirements will cost Plaintiff additional money in order to

19  improve procedures, methods, and facilities, in order to reduce PCB discharge to new and future

20  TMDL levels.

21    20.    Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its

22  principal place of business in St. Louis, Missouri.

23    21.    Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and

24  principal place of business in St. Louis, Missouri.

25    22.    Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor

26

27

---

28    [4] California Regional Water Quality Control Board, San Francisco Bay Region, Municipal Regional Stormwater NPDES Permit, Order R2-2015-XXX, NPDES Permit No. CAS612008.

4

PLAINTIFF'S ORIGINAL COMPLAINT        **EXHIBIT 6**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1  to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack,

2  New Jersey. Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

3      23.    The original Monsanto Company ("Old Monsanto") operated an agricultural products

4  business, a pharmaceutical and nutrition business, and a chemical products business. Old Monsanto

5  began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late

6  1970s.

7      24.    Through a series of transactions beginning in approximately 1997, Old Monsanto's

8  businesses were spun off to form three separate corporations. The corporation now known as

9  Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products

10 business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by

11 Pharmacia.

12     25.    Solutia was organized by Old Monsanto to own and operate its chemical manufacturing

13 business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals

14 business.[5]

15     26.    Although Solutia assumed and agreed to indemnify Pharmacia (then known as

16 Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered

17 into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims

18 arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.[6]

19     27.    In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the

20 U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's

21 Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under

22 which Monsanto continues to manage and assume financial responsibility for certain tort litigation and

23

24

---

25 [5] See MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v.*
26 *Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October
    8, 2013); see also Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and
27 Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx
    (last accessed February 20, 2014).
28 [6] *See id.*

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1    environmental remediation related to the Chemicals Business.[7]

2    28.    Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as
3    "Defendants."

4    **III.    JURISDICTION AND VENUE**

5    29.    This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity
6 exists between Plaintiff and Defendants. The Plaintiff is located in California, but no Defendant is a
7 citizen of California. Monsanto is a Delaware corporation with its principal place of business in St.
8 Louis, Missouri. Solutia is a Delaware corporation with its principal place of business in St. Louis,
9 Missouri. Pharmacia is a Delaware limited liability company with its principal place of business in
10 Peapack, New Jersey.

11    30.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a)
12 because a substantial part of the property that is the subject of the action is situated in this judicial
13 district.

14    **IV.    FACTUAL ALLEGATIONS**

15    **A.    PCBs are Toxic Chemicals that Cause Environmental Contamination.**

16    31.    Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms
17 attached to a double carbon-hydrogen ring (a "biphenyl" ring). A "PCB congener" is any single,
18 unique chemical compound in the PCB category. Over two hundred congeners have been identified.[8]

19    32.    PCBs were generally manufactured as mixtures of congeners. From approximately
20 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally
21 produced PCBs for commercial use.[9] The most common trade name for PCBs in the United States was
22 "Aroclor," which was trademarked by Old Monsanto.

23

24 [7] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at
25 http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).
[8] Table of PCB Congeners, available at
26 http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).
[9] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole
27 manufacturer of PCB's is concerned . . . ."); 121 Cong. Record 33879, 94th Congress, (October 23,
1975) ("The sole U.S. producer, Monsanto Co. . . . ."). *See also* MONS 058730-058752 at 058733
28 (identifying other producers as "all ex-USA."), attached as Exhibit A.

6

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

33. Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start capacitors, and lighting ballasts. In addition, PCBs were incorporated into a variety of products such as caulks, paints, and sealants.

34. As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

35. PCBs easily migrate out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil, and other materials. For example, PCB compounds volatilize out of building materials (such as caulk) into surrounding materials such as masonry, wood, drywall, and soil, thereby causing damage to those surrounding materials. PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials.

36. PCBs present serious risks to the health of humans, wildlife, and the environment.

37. Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact. Individuals may inhale PCBs that are emitted into the air. They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks. And they may absorb PCBs from physical contact with PCBs or PCB-containing materials.

38. EPA has determined that Monsanto's PCBs are probable human carcinogens. In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260. [10] EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

39. In addition, EPA concluded that PCBs are associated with serious non-cancer health effects. From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system,

---

[10] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

GOMEZ
TRIAL ATTORNEYS

7

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1  the reproductive system, the nervous system, and the endocrine system.

2      40.    PCBs affect the immune system by causing a significant decrease in the size of the
3  thymus gland, lowered immune response, and decreased resistance to viruses and other infections. The
4  animal studies were not able to identify a level of PCB exposure that did not affect the immune system.
5  Human studies confirmed immune system suppression.

6      41.    Studies of reproductive effects in human populations exposed to PCBs show decreased
7  birth weight and a significant decrease in gestational age with increasing exposures to PCBs. Animal
8  studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and
9  reduced sperm counts.

10      42.    Human and animal studies confirm that PCB exposure causes persistent and significant
11  deficits in neurological development, affecting visual recognition, short-term memory, and learning.
12  Some of these studies were conducted using the types of PCBs most commonly found in human breast
13  milk.

14      43.    PCBs may also disrupt the normal function of the endocrine system. PCBs have been
15  shown to affect thyroid hormone levels in both animals and humans. In animals, decreased thyroid
16  hormone levels have resulted in developmental deficits, including deficits in hearing. PCB exposures
17  have also been associated with changes in thyroid hormone levels in infants in studies conducted in the
18  Netherlands and Japan.

19      44.    PCBs have been associated with other health effects including elevated blood pressure,
20  serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and
21  humans; and liver toxicity in rodents.

22      45.    Children may be affected to a greater extent than adults. The Agency for Toxic
23  Substances and Disease Registry explained: "Younger children may be particularly vulnerable to
24  PCBs because, compared to adults, they are growing more rapidly and generally have lower and
25  distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering

26

27

28

8

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1   the lipophilic PCBs."[11]

2       46.    PCBs are known to be toxic to a number of aquatic species and wildlife including fish,
3   marine mammals, reptiles, amphibians, and birds. Exposure is associated with death, compromised
4   immune system function, adverse effects on reproduction, development, and endocrine function. PCB
5   exposure affects liver function, the digestive system, and nervous systems and can promote cancer in a
6   number of animal species. The presence of PCBs can cause changes in community and ecosystem
7   structure and function.[12]

8           **B.    Monsanto Has Long Known of PCBs' Toxicity.**

9       47.    Monsanto was well aware of scientific literature published in the 1930s that established
10  that inhalation in industrial settings resulted in toxic systemic effects.[13]

11      48.    An October 11, 1937, Monsanto memorandum advises that "Experimental work in
12  animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated
13  oral ingestion will lead to systemic toxic effects. Repeated bodily contact with the liquid Aroclors may
14  lead to an acne-form skin eruption."[14]

15      49.    A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with
16  respect to PCB toxicity: "We know Aroclors are toxic but the actual limit has not been precisely
17  defined. It does not make too much difference, it seems to me, because our main worry is what will
18  happen if an individual develops [*sic*] any type of liver disease and gives a history of Aroclor exposure.
19  I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[15]

20      50.    On November 14, 1955, Monsanto's Medical Department provided an opinion that
21  workers should not be allowed to eat lunch in the Aroclor department:

22

23  _____

24  [11] Agency for Toxic Substances and Disease Registry, Toxicological Profile for Polychlorinated Biphenyls (PCBs), (November 2000), at 405, available at www.atsdr.cdc.gov (last accessed May 1, 2014).
25  [12] *See* EPA, Understanding PCB Risks, available at
26  http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAssessment (last accessed March 5, 2015).
27  [13] See Exhibits B, C, F
    [14] MONS 061332, attached as Exhibit B.
28  [15] MONS 095196-7, attached as Exhibit C.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[16]

51.     On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."[17]

52.     In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[18] Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[19] Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[20]

**C.      Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.**

53.     At the same time, Monsanto became aware that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[21]

54.     Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[22] The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the

---

[16] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.
[17] MONS 095640, attached as Exhibit E.
[18] *See* JDGFOX00000037-63, attached as Exhibit F.
[19] *Id.* at JDGFOX00000039.
[20] *Id.* at JDGFOX00000037.
[21] See Exhibits G, H, L,
[22] New Scientist (December 15, 1986), MONSFOX00003427, attached as Exhibit G.

10

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1  coast of Scotland. Jensen concluded that PCBs can "be presumed to be widespread throughout the

2  world."[23]

3      55.      A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons

4  (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[24]

5  The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine

6  falcons and 34 other bird species. The report linked PCBs to the rapid decline in peregrine falcon

7  populations in the United States.

8      56.      Despite growing evidence of PCBs' infiltration of every level of the global ecology,

9  Monsanto remained steadfast in its production of Aroclors and other PCBs.

10      57.      On March 6, 1969, Monsanto employee W. M. Richard wrote a memorandum

11  discussing Risebrough's article that criticized PCBs as a "toxic substance", "widely spread by air-

12  water; therefore, an uncontrollable pollutant . . . causing extinction of peregrine falcon ... [and]

13  endangering man himself."[25] Richard explained that Monsanto could take steps to reduce PCB

14  releases from its own plants but cautioned, "It will be still more difficult to control other end uses such

15  as cutting oils, adhesives, plastics, and NCR paper. In this applications exposure to consumers is

16  greater and the disposal problem becomes complex."[26]

17      58.      On September 9, 1969, Monsanto employee W.R. Richard wrote an interoffice memo

18  titled "Defense of Aroclor."[27] He acknowledged the role of Aroclor in water pollution: "Aroclor

19  product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a

20  long life." He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida

21  causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in

22  birds; and in the Great Lakes. Richard advised that the company could not defend itself against all

23  criticism: "We can't defend vs. everything. Some animals or fish or insects will be harmed. Aroclor

24

_____

25  [23] *Id.*

26  [24] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.

27  [25] MONS 096509-096511, attached as Exhibit I.

  [26] *Id.*

28  [27] DSW 014256-014263, attached as Exhibit J.

11

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1  degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse
2  [than] lower chlorine compounds. Therefore we will have to restrict uses and clean-up as much as we
3  can, starting immediately."[28]

4      59.     On January 29, 1970, Elmer Wheeler of the Medical Department circulated laboratory
5  reports discussing results of animal studies. He noted: "Our interpretation is that the PCB's are
6  exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly,
7  although there are variations depending on species of animals, the PCB's are about the same as DDT in
8  mammals."[29]

9      60.     Monsanto expressed a desire to keep profiting from PCBs despite the environmental
10  havoc in a PCB Presentation to Corporate Development Committee. The report suggests possible
11  reactions to the contamination issue. It considered that doing nothing was "unacceptable from a legal,
12  moral, and customer public relations and company policy viewpoint." But the option of going out of
13  the Aroclor business was also considered unacceptable: "there is too much customer/market need and
14  selfishly too much Monsanto profit to go out."[30]

15      61.     The Aroclor Ad Hoc Committee held its first meeting on September 5, 1969. The
16  committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB
17  "may be a global contaminant."[31] The meeting minutes acknowledge that PCB has been found in fish,
18  oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine
19  River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife. Moreover, the
20  committee implicated the normal use of PCB-containing products as the cause of the problem: "In one
21  application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we
22  can assume that nearly all of this Aroclor winds up in the environment."[32]

23      62.     A month later, on October 2, 1969, the Committee reported extensive environmental
24  contamination. The U.S. Department of Interior, Fish and Wildlife found PCB residues in dead eagles

25

26  [28] *Id.*
   [29] MONS 098480, attached as Exhibit K.
27  [30] Ex. A at 058737.
   [31] MONS 030483-030486, attached as Exhibit L.
28  [32] *Id.* at 030485.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S ORIGINAL COMPLAINT      **EXHIBIT 6**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1  and marine birds. Similarly, the Bureau of Commercial Fisheries reported finding PCBs in the river

2  below Monsanto's Pensacola plant. The U.S. Food and Drug Administration had discovered PCBs in

3  milk supplies. The Committee advised that Monsanto could not protect the environment from

4  Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

> There is little probability that any action that can be taken will prevent the
> growing incrimination of specific polychlorinated biphenyls (the higher
> chlorinated – e.g. Aroclors 1254 and 1260) as nearly global environmental
> contaminants leading to contamination of human food (particularly fish), the
> killing of some marine species (shrimp), and the possible extinction of several
> species of fish eating birds.
> Secondly, the committee believes that there is no practical course of action
> that can so effectively police the uses of these products as to prevent
> environmental contamination. There are, however a number of actions which
> must be undertaken to prolong the manufacture, sale and use of these
> particular Aroclors as well as to protect the continued use of other members of
> the Aroclor series.[33]

12  63.  Monsanto's desire to protect Aroclor sales rather than the environment is reflected in

13  the Committee's stated objectives:

> 1.  Protect continues sales and profits of Aroclors;
> 2.  Permit continued development of new uses and sales, and
> 3.  Protect the image of the Organic Division and the Corporation as members of the
> business community recognizing their responsibilities to prevent and/or con-
> trol contamination of the global ecosystem.[34]

18  64.  An interoffice memorandum circulated on February 16, 1970, provided talking points

19  for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and

20  1260: "We (your customer and Monsanto) are not interested in using a product which may present a

21  problem to our environment." Nevertheless, the memo acknowledges that Monsanto "can't afford to

22  lose one dollar of business." To that end, it says, "We want to avoid any situation where a customer

23  wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase

24  [new products] when available. He will then top off with the new fluid and eventually all Aroclor

25  1254 and Aroclor 1260 will be out of his system. We don't want to take fluid back." [35]

26  _____

[33] DSW 014612-014624, at 014615, attached as Exhibit M.
[34] Id.
[35] MONS 100123-100124, attached as Exhibit N.

13

GOMEZ
TRIAL ATTORNEYS

1    65.    In 1970, the year after Monsanto formed the "ad hoc" committee, and despite
2  Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States
3  peaked at 85 million pounds.

4    66.    Growing awareness of the ubiquitous nature of PCBs led the United States to conduct
5  an investigation of health and environmental effects and contamination of food and other products. An
6  interdepartmental task force concluded in May 1972 that PCBs were highly persistent, could
7  bioaccumulate to relatively high levels, and could have serious adverse health effects on human
8  health.[36]

9    67.    After that report, environmental sampling and studies indicated that PCBs were a "more
10 serious and continuing environmental and health threat than had been originally realized."[37] To
11 address these concerns, EPA undertook a study to assess PCB levels in the environment on a national
12 basis. That study revealed widespread occurrence of PCBs in bottom sediments in several states,
13 including California; in fish and birds; in lakes and rivers; in the Atlantic Ocean, the Pacific Ocean,
14 and the Gulf of Mexico; sewage treatment facilities; in a variety of foods including milk, poultry,
15 eggs, fish, meat, and grains; and in human tissues, blood, hair, and milk.[38]

16    68.    EPA's study noted the particular burden on California. "PCBs have become a
17 significant component of the marine food webs of southern California," were found in sediments in the
18 Santa Barbara Basin, and found in high levels in the San Francisco Bay.[39]

19    69.    At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB
20 compounds. In a 1960 brochure, Monsanto promotes the use of Aroclors in transformers and
21 capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire
22 or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food
23 cookers, potato chip fryers, drying ovens, thermostats, furnaces, and vacuum diffusion pumps.
24 Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil;

25

_____

26 [36] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976).
27 [37] *Id.* at 1
   [38] *Id., passim.*
28 [39] *Id.*

14

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1  insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized
2  lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics;
3  sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers;
4  masonry coatings for swimming pools, stucco homes, and highway paints; protective and decorative
5  coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment; and
6  coatings for chemical plants, boats, and highway marking. [40]

7      70.    A 1961 brochure explains that Monsanto's Aroclors are being used in "lacquers for
8  women's shoes," as "a wax for the flame proofing of Christmas trees," as "floor wax," as an
9  adhesive for bookbinding, leather, and shoes, and as invisible marking ink used to make chenille rugs
10  and spreads. [41]

11     71.    Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used
12  in a variety of industrial, commercial, household, and consumer goods. Moreover, Monsanto
13  affirmatively encouraged these uses by encouraging salesmen to market products for these and other
14  applications.

15     72.    A few years later, in 1970, Monsanto tried to distance itself from the variety of
16  applications of Aroclors that it proudly espoused a few years before. In a press release, the company
17  claimed: " 'What should be emphasized . . . is that PCB was developed over 40 years ago primarily
18  for use as a coolant in electrical transformers and capacitors. It is also used in commercial heating and
19  cooling systems. It is not a 'household' item." [42]

20           **D.     Monsanto Concealed the Nature of PCBs from Governmental Entities.**

21     73.    While the scientific community and Monsanto knew that PCBs were toxic and
22  becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental
23  entities the exact opposite — that the compounds were not toxic and that the company would not
24  expect to find PCBs in the environment in a widespread manner. [43]

25

26  [40] The Aroclor Compounds (hand dated May 1960), 0509822- 66, attached as Exhibit S.
27  [41] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.
    [42] See Press release (July 16, 1970), MCL000647-50, attached as Exhibit U, at MCL000648.
28  [43] See Exhibits O-R (letters to governmental agencies).

15

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1    74.    In a March 24, 1969 letter to Los Angeles County Air Pollution Control District,
2 Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin
3 absorption."[44] Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance
4 as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or
5 in the liquid discharges from a using industry."[45] A similar letter to the Regional Water Quality
6 Control Board explained that PCBs are associated with "no special health problems" and "no problems
7 associated with the environment."[46]

8    75.    In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of the
9 National Air Pollution Control Administration, who promised to relay to Congress the message that
10 Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread
11 fashion."[47]

12    76.    Monsanto delivered the same message to the New Jersey Department of Conservation
13 in July, 1969, claiming first, "Based on available data, manufacturing and use experience, we do not
14 believe the PCBs to be seriously toxic."[48] The letter then reiterates Monsanto's position regarding
15 environmental contamination: "We are unable at this time to conceive of how the PCBs can become
16 wide spread in the environment. It is certain that no applications to our knowledge have been made
17 where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides
18 have been."[49]

19 ///

20 ///

21 ///

22

23

24 [44] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.
25 [45] *Id.*
26 [46] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.
27 [47] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.
28 [48] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.
[49] *Id.*

GOMEZ
TRIAL ATTORNEYS

16

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

# FIRST CAUSE OF ACTION

## PUBLIC NUISANCE

77.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

78.     Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of the Bay.

79.     The presence of PCBs interferes with the comfortable enjoyment of the Bay for customary uses for fishing, swimming, and other water activities.

80.     The presence of PCBs interferes with the free use of the Bay for the promotion of commerce, navigation, and fisheries.

81.     The presence of PCBs interferes with the free use of the Bay for ecological preservation and habitat restoration.

82.     The San Francisco Bay Regional Water Quality Control Board, pursuant to the NPDES under the Clean Water Act, requires the Plaintiff to reduce their discharge of PCBs into the Bay to prevent further contamination of the already impaired body of water.

83.     The presence of PCBs causes inconvenience and annoyance to Plaintiff, who is charged with reducing the PCB discharge toward TMDL levels, in order to protect plant and animal life, and the quality of water in the bay.

84.     The condition affects a substantial number of people who use the Bay for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

85.     An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals, and humans and degrade water quality and destroy marine habitats.

86.     The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

17

GOMEZ
TRIAL ATTORNEYS

1  87. The Plaintiff has suffered and will continue to suffer harm that is different from the type

2 of harm suffered by the general public, and the Plaintiff has incurred substantial costs deriving from

3 state-mandated PCB TMDLs.

4  88. Plaintiff did not consent to the conduct that resulted in the contamination of the Bay.

5  89. Monsanto's conduct was a substantial factor in causing the harm to the Plaintiff.

6  90. Monsanto knew or, in the exercise of reasonable care, should have known that the

7 manufacture and sale of PCBs was causing the type of contamination now found in the Bay. Monsanto

8 knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish

9 species, and would endanger birds and animals. In addition, Monsanto knew that PCBs are associated

10 with serious illnesses and cancers in humans and that humans may be exposed to PCBs through

11 ingestion and dermal contact. As a result, it was foreseeable to Monsanto that humans may be exposed

12 to PCBs through swimming in contaminated waters or by eating fish from those waters. Monsanto

13 thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere

14 with the ordinary comfort, use, and enjoyment of any coastal marine areas.

15  91. As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiff

16 has suffered, and continues to suffer, monetary damages to be proven at trial.

17  92. Monsanto's conduct was malicious, oppressive, wanton, willful, intentional, and shocks

18 the conscience, warranting punitive and exemplary damages, because Monsanto callously decided to

19 increase sales and develop new ways to promote PCBs, knowing PCBs are toxic, cannot be contained,

20 and last for centuries.

21<div align="center">**SECOND CAUSE OF ACTION**</div>

22<div align="center">**EQUITABLE INDEMNITY**</div>

23  93. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding

24 paragraphs as if fully restated in this count.

25  94. Monsanto is responsible for creating the public nuisance by manufacturing, distributing,

26 and promoting PCBs, resulting in contamination in and around the Bay.

27  95. Monsanto's creation of the public nuisance contributed as a substantial factor in causing

28 Plaintiff's injury and damages.

GOMEZ
TRIAL ATTORNEYS

<div align="center">18</div>

---

PLAINTIFF'S ORIGINAL COMPLAINT  **EXHIBIT 6**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1    96.    The conduct of Plaintiff did not contribute in any way to the creation of the public

2  nuisance.

3                              **PRAYER FOR RELIEF**

4       Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

5    1.   Compensatory damages according to proof;

6    2.   Punitive damages;

7    3.   Litigation costs and attorney's fees as provided by law;

8    4.   Pre-judgment and post-judgment interest;

9    5.   Any other and further relief as the Court deems just, proper, and equitable.

10

11                              **DEMAND FOR JURY TRIAL**

12       Plaintiff demands a jury trial.

13

14  Dated:  November 10, 2015          By: /s/ John P. Fiske

15                                      **GOMEZ TRIAL ATTORNEYS**
                                        John H. Gomez (SBN 171485)
16                                      John P. Fiske (SBN 249256)
                                        655 West Broadway, Suite 1700
17                                      San Diego, California 92101

18
                                        **BARON & BUDD, P.C.**
19                                      Scott Summy (pending Pro Hac Vice)
                                        Carla Burke (pending Pro Hac Vice)
20                                      Celeste Evangelisti (SBN 225232)
                                        3102 Oak Lawn Avenue, Suite 1100
21                                      Dallas, Texas 75219-4281

22
                                        **OFFICE OF THE CITY ATTORNEY**
23                                      **City of Oakland**
                                        Barbara Parker (SBN 69722)
24                                      Otis McGee, Jr. (SBN 71885)
                                        Maria Bee (SBN 167716)
25                                      1 Frank H. Ogawa Place, 6th Floor
                                        Oakland, CA 94612
26

27

28

GOMEZ
TRIAL ATTORNEYS

                                   19

Case 3:23-cv-00578-WQH-JLB Document 1-5 Filed 02/08/23 PageID.18 Page 91 of 218
Case 3:15-cv-00578-WQH-JLB Document 242 Filed 08/03/15 PageID #: 641

17SL-CC03368

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1 | **GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
2 | John P. Fiske (SBN 249256)
655 West Broadway, Suite 1700
3 | San Diego, CA 92101
Telephone: 619-237-3490
4 |
**BARON & BUDD P.C.**
5 | Scott Summy (admitted Pro Hac Vice)
(Texas Bar No. 19507500)
6 | Carla Burke (admitted Pro Hac Vice)
(Texas Bar NO. 24012490)
7 | Celeste Evangelisti (SBN 225232)
3102 Oak Lawn Avenue, Suite 1100
8 | Dallas, TX 75219
Telephone: 214-521-3605
9 |
JAN I. GOLDSMITH, City Attorney
10 | California State Bar No. 70988
DANIEL F. BAMBERG, Assistant City Attorney
11 | California State Bar No. 60499
PAUL F. PRATHER, Deputy City Attorney
12 | California State Bar No. 252985
**OFFICE OF THE CITY ATTORNEY**
13 | 1200 Third Avenue, Suite 1100
San Diego, CA 92101
14 | Telephone: 619-533-5800

15 | *Attorneys for Plaintiff City of San Diego*

16 |

17 | **UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**
18 |

19 | CITY OF SAN DIEGO, a municipal corporation;

20 |            Plaintiff,            Case No. 3:15-cv-00578-WQH-JLB

21 |                                  **PLAINTIFF'S FIRST AMENDED COMPLAINT**

22 | v.

23 | MONSANTO COMPANY,

24 | SOLUTIA INC., and            Assigned to Judge William Q. Hayes
File Date: March 13, 2015
PHARMACIA CORPORATION,

25 |

26 |            Defendants.

27 |

28 |

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Plaintiff the CITY OF SAN DIEGO ("the City") hereby alleges, upon information and belief, as follows:

I.   **INTRODUCTION**

1.   Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants – found in bays, oceans, rivers, streams, soil, and air. In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects. In addition, PCBs can impair and even destroy populations of fish, birds, and other animals.

2.   Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds. Although Monsanto knew for decades that PCBs were toxic, knew that they could not be contained and as a result were widely contaminating all natural resources and living organisms, and knew that there was no safe way to dispose of PCBs, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture of and most uses of PCBs.

3.   PCBs have been found in and around San Diego Bay ("the Bay") at levels that require cleanup in certain areas. At different times and locations, PCBs have been detected in the Bay's water, sediments, fish, and lobsters. PCBs entered the Bay through a variety of ways. PCBs regularly leach, leak, off-gas, and escape their intended applications into air, soil, and water. PCBs also leach from landfills and other disposal locations and enter the Bay with stormwater and other runoff.

4.   As a public property owner and former trustee of the Bay, Plaintiff seeks to abate the contamination, to recover damages for injuries to property, and to

recover all past and future costs associated with investigating and removing PCBs from in and around the Bay and preventing future injuries.

## II.  PARTIES

### A.  Plaintiff

5.  Plaintiff City is a California Charter City and municipal corporation, duly organized and existing by virtue of the laws of the State of California. The City was the trustee of certain relevant tidelands and submerged lands in and around the Bay from the early 1900s through 1963, when that property was transferred to the Port District.

6.  Plaintiff brings this suit pursuant to California Code of Civil Procedure 731, and California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and any other applicable codes or sources of relief available for monetary damages and abatement of the public nuisance caused by PCBs in the Bay.

### B.  Defendants

7.  Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.

8.  Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

9.  Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack, New Jersey. Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

10. The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business. Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

11. Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.

Electronically Filed - St. Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

The corporation now known as Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

12. Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.[1]

13. Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business – including the manufacture and sale of PCBs.[2]

14. In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assumed financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[3]

---

[1] *See* MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company,* C.A. No. 12-CV-11645, D. Mass. (October 8, 2013); *see also* Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed February 20, 2014).

[2] *See id.*

[3] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).

15. Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants" or "Monsanto."

## III. JURISDICTION AND VENUE

16. This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiff and Defendants. Plaintiff is located in California, but no Defendant is a citizen of California. Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri. Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri. Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

17. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV. FACTUAL ALLEGATIONS

### A. PCBs are Toxic Chemicals that Cannot Be Contained and that Cause Environmental Contamination.

18. Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring). A "PCB congener" is any single, unique chemical compound in the PCB category. Over two hundred congeners have been identified.[4]

19. PCBs were generally manufactured as mixtures of congeners. From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[5]

---

[4] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/ pubs/ congeners.htm (last accessed February 20, 2014).

[5] See 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned ... ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. ... ."). See also MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

20. Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States, including electrical equipment such as transformers, motor start capacitors and lighting ballasts. In addition, PCBs were incorporated into a variety of products such as caulks, paints and sealants.

21. As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

22. PCBs easily migrate or leach out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil and other materials. For example, PCB compounds volatilize out of building materials (such as caulk) into surrounding materials such as masonry, wood, drywall and soil, thereby causing damage to those surrounding materials. PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials and escape into the environment.

23. PCBs present serious risks to the health of humans, wildlife and the environment.

24. Humans may be exposed to PCBs through ingestion, inhalation and dermal contact. Individuals may inhale PCBs that are emitted into the air. They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks. And humans may absorb PCBs from physical contact with PCBs or PCB-containing materials.

25. EPA has determined that Monsanto's PCBs are probable human

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254 and 1260.[6]  EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

26.  The International Agency for Research on Cancer published an assessment in 2015 that asserts an even stronger relationship between PCBs and human cancer.  The report explains: "There is sufficient evidence in humans for the carcinogenicity of polychlorinated biphenyls (PCBs). PCBs cause malignant melanoma. Positive associations have been observed for non-Hodgkin lymphoma and cancer of the breast. ... PCBs are carcinogenic to humans ... ."[7]

27.  In addition, EPA concluded that PCBs are associated with serious non-cancer health effects.  From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system and the endocrine system.

28.  PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians and birds.  The presence of PCBs can cause changes in community and ecosystem structure

---

[6]  EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

[7]  International Agency for Research on Cancer.  IARC monographs on the evaluation of carcinogenic risks to humans, volume 107.  Polychlorinated and Polybrominated Biphenyls (2015), available at http://monographs.iarc.fr/ENG/Monographs/vol107/ (last accessed July 31, 2015).

PLAINTIFF'S FIRST AMENDED COMPLAINT - PAGE 7          EXHIBIT 7

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

and function.[8]

**B. Monsanto Has Long Known of PCBs' Toxicity.**

29. Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects.[9]

30. An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects. Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[10]

31. A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity: "We know Aroclors are toxic but the actual limit has not been precisely defined. It does not make too much difference, it seems to me, because our main worry is what will happen if an individual developes [*sic*] any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[11]

32. On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

---

[8] *See* EPA, Understanding PCB Risks, available at http://www.epa.gov/housatonic/ understandingpcbrisks.html#WildlifeEcologicalRiskAssessment (last accessed March 5, 2015).

[9] *See* Exhibits B, C and F.

[10] MONS 061332, attached as Exhibit B.

[11] MONS 095196-7, attached as Exhibit C.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[12]

33. On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 [which contained PCBs] is just too toxic for use in a submarine."[13]

34. In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[14] Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[15] Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[16]

35. At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds. In a 1960 brochure, Monsanto promoted the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings,

---

[12] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.

[13] MONS 095640, attached as Exhibit E.

[14] See JDGFOX00000037-63, attached as Exhibit F.

[15] Id. at JDGFOX00000039.

[16] Id. at JDGFOX00000037.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces and vacuum diffusion pumps. Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil; insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints; protective and decorative coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment; and coatings for chemical plants, boats, and highway marking.[17]

36.    A 1961 brochure explained that Monsanto's Aroclors were being used in "lacquers for women's shoes," as "a wax for the flame proofing of Christmas trees," as "floor wax," as an adhesive for bookbinding, leather, and shoes, and as invisible marking ink used to make chenille rugs and spreads.[18]

37.    Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods. Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

38.    Years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before. In a press release, the company claimed: "What should be emphasized ... is that PCB was developed over 40 years ago primarily for use as a coolant in

---

[17] The Aroclor Compounds (hand-dated May 1960), 0509822-66, attached as Exhibit S.

[18] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

electrical transformers and capacitors. It is also used in commercial heating and cooling systems. It is not a 'household' item."[19]

39.   In 1975, William Papageorge, then Monsanto's manager of product acceptability, admitted that PCBs had been used in all types of products. Papageorge testified at a Public Hearing Before the Department of Natural Resources that "[t]he past uses [of PCBs] . . . were many and varied. . . . They go on and on. Virtually anything you can imagine, at one time or other, someone tried PCB's in them."[20]

### C. Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.

40.   Monsanto also knew that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[21]

41.   Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[22] The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the coast of Scotland. Jensen concluded that PCBs can "be presumed to be widespread throughout the world."[23]

---

[19] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit V, at MCL000648.

[20] *See* Declaration of Kathleen L. Roach, Exhibit 43, (Document 681-43), *Appleton Papers, Inc. and NCR Corp. v. George A. Whiting Paper Co.*, Case 2:08-cv-00016-WCG (E.D. Wis.), attached as Exhibit W.

[21] *See* Exhibits G, H and L.

[22] New Scientist (Dec. 15, 1966), MONSFOX00003427, attached as Exhibit G.

[23] *Id.*

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

42. A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[24] The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species. The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

43. Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

44. On March 6, 1969, Monsanto Research Center employee W.R. Richard wrote a memorandum discussing Risebrough's article that criticized PCBs as a "toxic substance," "widely spread by air-water; therefore, an uncontrollable pollutant ... causing extinction of peregrine falcon ... [and] endangering man himself."[25] Richard explained that Monsanto could take steps to reduce PCB releases from its own plants but cautioned, "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper. In this applications exposure to consumers is greater and the disposal problem becomes complex."[26]

45. On September 9, 1969, W.R. Richard, by then a member of the newly-formed Aroclor "Ad Hoc" Committee, wrote an interoffice memo titled "Defense of Aroclor."[27] He acknowledged the role of Aroclor in water pollution: "Aroclor product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a long life." He noted

---

[24] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.

[25] MONS 096509-096511, attached as Exhibit I.

[26] *Id.*

[27] DSW 014256-014263, attached as Exhibit J.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds; and in the Great Lakes. Richard advised that the company could not defend itself against all criticism: "We can't defend vs. everything. Some animals or fish or insects will be harmed. Aroclor degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse [than] lower chlorine compounds. Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."[28]

46. On January 29, 1970, Elmer Wheeler of Monsanto's Medical Department and Chairman of the Aroclor "Ad Hoc" Committee circulated laboratory reports discussing results of animal studies. He noted: "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[29]

47. In a PCB Presentation to Corporate Development Committee, Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc. The report suggests possible reactions to the contamination issue. It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint." But the option of going out of the Aroclor business was also considered unacceptable:

---

[28] *Id.*

[29] MONS 098480, attached as Exhibit K.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

"there is too much customer/market need and selfishly too much Monsanto profit to go out."[30]

48. Monsanto formed an "Aroclor 'Ad Hoc' Committee" to investigate the pollution caused by PCBs. The Aroclor "Ad Hoc" Committee held its first meeting on September 5, 1969. The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[31] The meeting minutes acknowledge that PCB has been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife. Moreover, the committee implicated the normal use of PCB-containing products as the cause of the problem: "In one application alone (highway paints), one million lbs/year [of PCBs] are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[32]

49. A month later, on October 2, 1969, the Committee reported extensive environmental contamination. The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

> The committee believes that there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated -- e.g. Aroclors 1254 and 1260) as nearly <u>global environmental contaminants</u> leading to <u>contamination of human food</u> (particularly fish), the <u>killing of some marine species</u> (shrimp), and the possible extinction of several species of fish eating birds.

---

[30] Ex. A at 058737.

[31] Ex. K at 030483.

[32] *Id.* at 030485.

Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent completely some environmental contamination.

There are, however, a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.[33]

50.  Monsanto's desire to protect its Aroclor profits rather than the environment is reflected in the Committee's stated objectives:

   1.  Protect continued sales and profits of Aroclors;
   2.  Permit continued development of new uses and sales, and
   3.  Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.[34]

51.  An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260: "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment." Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business." To that end, it says, "We want to avoid any situation where a customer wants to return fluid. ... We would prefer that the customer use up his current inventory and purchase [new products] when available. He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system. We don't want to take fluid back."[35]

---

[33] DSW 014612-014624, at 014615, attached as Exhibit M (emphasis added).

[34] *Id.* at 014614.

[35] MONS 100123-100124, attached as Exhibit N.

**EXHIBIT 7**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

52. Instead of having customers return fluids, Monsanto instructed its customers to dispose of PCB containing material in local landfills, knowing that landfills were not suitable for PCB contaminated waste. Monsanto had determined that the only effective mothed of disposing of PCBs was incineration, and it constructed an incinerator for disposal of its own PCB contaminants. Nevertheless, as William Papageorge explained in his 1975 testimony before the Department of Natural Resources, Monsanto instructed its customers to dispose of PCB contaminated waste in landfills: "lacking that resource [a commercial incinerator], we have to reluctantly suggest, because we don't have a better answer, that they find a well operated, properly operated landfill and dispose of the material in that fashion."[36]

53. In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

54. Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products. An interdepartmental task force concluded that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.[37]

55. After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than

_____

[36] Exhibit W at 29.

[37] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976), available at http://nepis.epa.gov (search "560776001") (last accessed July 31, 2015).

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

had been originally realized."[38] To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis. That study revealed widespread occurrence of PCBs in bottom sediments in several states, including California.[39]

56.   EPA's study noted the particular burden on California.   "PCBs have become a significant component of the marine food webs of southern California," were found in sediments in the Santa Barbara Basin, and found in high levels in the San Francisco Bay.[40]

**D.   Monsanto   Concealed   the   Nature   of   PCBs   from Governmental Entities.**

57.   While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite – that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner.[41]

58.   In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[42]   Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in

---

[38] *Id.* at 1.

[39] *Id., passim.*

[40] *Id.* at 78-9.

[41] *See* Exhibits O-R (letters to governmental agencies).

[42] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

the air or in the liquid discharges from a using industry."[43]  A similar letter to the San Francisco Bay Regional Water Quality Control Board explained that PCB plasticizers (found in surface coatings, such as paints, industrial adhesives and window sealants), in normal use, present no special health problems" and that, "[i]n view of PCB's chemical inertness, we would anticipate no problems associated with the environment from refuse dumps."[44]

59.   In May 1969, Monsanto's Manager, Environmental Health, Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[45]

60.   Monsanto delivered the same message to the New Jersey Department of Conservation in July 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[46]  The letter then reiterates Monsanto's position regarding environmental contamination:  "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would

---

[43] *Id.*

[44] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.

[45] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.

[46] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[47]

61. At the same time that Monsanto was downplaying the toxicity of PCBs and inevitable widespread contamination caused by PCBs, its Aroclor "Ad Hoc" Committee acknowledged that there was nothing that could be done to prevent PCBs from becoming a global contaminant leading to contamination of the food supply, injuring marine life and possibly leading to the extinction of certain bird species. The committee reported on the probability of success of actions Monsanto might undertake to address the PCB problem and provided:

> The committee believes there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls ... as nearly global environmental contaminants leading to the contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.[48]

62. Moreover, the committee acknowledged that no course of action could be taken to prevent products containing PCBs from contaminating the environment, particularly waters and the marine environment. The committee explained "the committee believes that there is no possible course of action that can so effectively police the uses of these PCB containing products as to prevent completely some environmental contamination."[48] Further, the committee reported concern that vapor losses from PCB containing products likely results in contamination of an

---

[47] *Id.*

[48] DSW 014612-014624, at 014615, attached as Exhibit M.

Electronically Filed - St. Louis County - September 01, 2017 - 05:14 PM

aquatic environment because based on published reports "even minute quantities of [PCB] vapors are eventually transferred to the water environment and accumulated therein."[49]

63.    Exactly as Monsanto's committee had acknowledged, PCBs have become a global contaminant and have accumulated in the waters of the Bay to the point where they are a public nuisance and require remediation and abatement.

**F.     The San Diego Bay is a 303(d) Impaired Body of Water for PCBs.**

64.    The Bay is one of the region's most widely used natural resources, and the PCB contamination affects all San Diegans, who reasonably would be disturbed by the presence of a hazardous, banned substance in the sediment, water, and wildlife.

65.    PCBs (specifically, Aroclor compounds 1254 and 1260) have been found in samples of sediments and water taken from the Bay at varying times and locations, requiring substantial remediation work and cost.  In addition, PCBs have been identified in tissues of fish and lobster in the Bay.

66.    PCBs are identified as a Primary Chemical of Concern ("COC") in California Regional Water Quality Control Board, San Diego Region ("Regional Water Board") Cleanup and Abatement Order ("CAO") No. R9-2012-0024, dated March 14, 2012, which directed the City to, among other things, remediate PCB contaminated sediments within a discrete area known as the Shipyard Sediment Site.

67.    Other areas of PCB deposition and impacts have been located, and it is probable that the Regional Water Board may  order remediation of PCB contaminated sediments in other areas.

---

[49] *Id.* at DWS 014618.

Electronically Filed - St. Louis County - September 01, 2017 - 05:14 PM

68.  The Regional Water Board estimated human health risks due to the consumption of PCB contaminated fish tissue found in the Bay and employed human fish consumption rates and bioaccumulation factors in the analysis.

69.  The Regional Water Board also concluded that human ingestion of seafood caught within certain assessment areas can significantly increase cancer risk, specifically identifying PCBs as a carcinogenic chemical.

70.  PCBs have entered the Bay through various sources. PCBs leach from landfills and are found in commercial and industrial waste water as a result of Monsanto's directions to its customers on proper disposal methods when it knew, in fact, that disposal of PCBs in landfills was not proper. PCBs also leach out of paints, caulk, sealants and other applications and are transported by air and water to the Bay. Plaintiff also manages and operate a municipal stormwater system, which collects and transports stormwater to be discharged into the Bay. In order to discharge stormwater into the Bay, Plaintiff is required to receive a Municipal Regional Stormwater Permit from the Regional Water Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act.

71.  As former and current trustees of the Bay, and as stormwater dischargers into the Bay, Plaintiff has spent substantial amounts of money to limit the amount of PCBs in the Bay. Plaintiff will also likely continue to incur costs to remove PCBs from the Bay and to keep PCBs from entering the Bay for the foreseeable future.

72.  PCBs were not only a substantial factor in causing the City to incur costs and damages, but PCBs were also the primary driving force behind the need to clean up and abate the Shipyard Sediment Site. Without abatement of the health hazard caused by PCBs in the Bay, Plaintiff will continue to suffer injuries and damages.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

73. Monsanto's conduct, as set forth above, was committed with malice, oppression and/or fraud, as those terms are defined in Civil Code § 3294. Monsanto's conduct was despicable and in conscious disregard to the rights and safety of others, including Plaintiff. Monsanto's despicable conduct has subjected unjust hardship in conscious disregard to Plaintiff, who is the former trustee of waters, sediments, and tideland properties in and surrounding the Bay. Defendants intentionally misrepresented and concealed material facts from governmental entities in the state with the intent of causing injury. In addition to Plaintiff's entitlement to actual damages and request for abatement, Plaintiff is entitled to recover exemplary damages.

## FIRST CAUSE OF ACTION
## CONTINUING PUBLIC NUISANCE

74. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

75. Monsanto manufactured, distributed, marketed and promoted PCBs in a manner that created or participated in creating a continuing public nuisance that is harmful to health and obstructs the free use of the Bay. Monsanto also directed its customers and the public to dispose of PCB containing materials improperly, resulting in PCBs leaching from landfills and entering the Bay.

76. The presence of PCBs interferes with the comfortable enjoyment of the Bay for its customary uses for commercial and sport fishing, swimming and other water activities.

77. The presence of PCBs interferes with the free use of the Bay for the promotion of commerce, navigation and fisheries.

78. The presence of PCBs interferes with the free use of the Bay for ecological preservation and habitat restoration.

79. The San Diego Bay is listed as impaired due to PCB, pursuant to the Clean Water Act and the 303(d) list.

80. The Regional Water Board found that the contamination at the Shipyard Sediment Site meets all three criteria for a "nuisance" as defined by California Water Code section 13050 (m) because it: (1) is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal; and (3) occurs during, or as a result of, the treatment or disposal of wastes.

81. The presence of PCBs adversely affects the quality of water in the Bay and causes inconvenience and annoyance to Plaintiff, who has been required to incur costs in order to protect plant and animal life, and their presence.

82. The condition affects a substantial number of people who use the Bay for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

83. An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals and humans and degrade water quality and destroy marine habitats.

84. The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

85. Plaintiff has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and Plaintiff has incurred substantial costs deriving from state-mandated PCB clean-up. In addition, the City is obligated to pay for certain remediation of the Shipyard Sediment Site pursuant to the March 14, 2012 CAO.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St. Louis County - September 01, 2017 - 05:14 PM

86. Plaintiff did not consent to the conduct that resulted in the contamination of the Bay.

87. Monsanto's conduct was a substantial factor in causing the harm to the City and Port District. Without an abatement of the nuisance created by Monsanto, Plaintiff will continue to suffer injuries, and the hazards caused by PCBs will continue.

88. Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in the Bay. Monsanto knew that PCBs would leach out of products and escape into the environment, that there was no way to contain PCBs and prevent such escape, and that PCBs would accumulate in an aquatic environment like the Bay. Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals. In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and knew that humans may be exposed to PCBs through ingestion and dermal contact. As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters. Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

89. As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiff has suffered and continues to suffer actual damages and injuries to property requiring abatement and other costs to be determined at trial.

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

## SECOND CAUSE OF ACTION

## EQUITABLE INDEMNITY

90. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

91. Monsanto is responsible for creating a continuing public nuisance by manufacturing, distributing, and promoting PCBs, resulting in contamination of water, soil, and sediment in and around the Bay.

92. Monsanto's creation of the public nuisance is a substantial factor in causing Plaintiff's injury.

93. The conduct of the City did not contribute in any way to the creation of the public nuisance.

94. The Regional Water Board has required the City, however, to remediate PCB-contaminated sediments from the Shipyard Sediment Site and may require further remediation of other areas. The City has incurred and will incur costs to remove PCBs from the Bay pursuant to the Board's order.

95. Monsanto must reimburse the City for its costs of complying with the Board's remediation order.

## PRAYER FOR RELIEF

Plaintiff prays for judgment that Defendants are liable to the City, jointly and severally, for creation of the public nuisance and must pay as follows:

1) Any and all compensatory damages according to proof including, but not limited to, all past and future costs and expenses related to the investigation, remediation, and removal of PCBs from in and around the Bay;

2) An order that Defendants pay for establishment of a fund used by the City to abate the public nuisance created by the presence of PCBs in and around the Bay, including remediating all PCB contamination in the Shipyard Sediment Site and other areas;

3) Punitive damages;

4) Litigation costs and attorney's fees as provided by law;

5) Pre-judgment and post-judgment interest;

6) Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated:  August 3, 2015                              Respectfully submitted,


                                        By: s/  Carla Burke
                                        **BARON & BUDD, P.C.**
                                        Scott Summy (admitted Pro Hac Vice)
                                        Carla Burke (admitted Pro Hac Vice)
                                        Celeste Evangelisti (SBN 225232)

                                        **GOMEZ TRIAL ATTORNEYS**
                                        John H. Gomez (SBN 171485)
                                        John P. Fiske (SBN 249256)

                                        **OFFICE OF THE CITY ATTORNEY**
                                        JAN I. GOLDSMITH, City Attorney
                                        California State Bar No. 70988
                                        DANIEL F. BAMBERG,
                                        Assistant City Attorney
                                        California State Bar No. 60499
                                        PAUL F. PRATHER, Deputy City Attorney
                                        California State Bar No. 252985

                                        *Attorneys for the City of San Diego*

17SL-CC03368

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TOWN OF WESTPORT and WESTPORT COMMUNITY SCHOOLS, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 1:14-CV-12041-DJC ) |
| | ) **Leave to file granted on May 9, 2016** |
| MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, | ) ) ) |
| Defendants. | ) ) |

### PLAINTIFFS' FIRST AMENDED COMPLAINT

### INTRODUCTION

1.    Plaintiffs Town of Westport ("Town") and Westport Community Schools ("Westport")
own and operate public schools and buildings in Westport, Massachusetts.  Westport has
detected toxic chemical compounds identified as Aroclor 1248 and Aroclor 1254 in the window
caulk, glazing, and ceiling mastic adhesive present in Westport Middle School.

2.    Defendant Monsanto Company made Aroclors 1248 and 1254, plasticizers unique to, and
trademarked by, Monsanto for use in caulks and paints, among other products.

3.    Aroclors 1248 and 1254 are dangerous because they were formulated and designed with
polychlorinated biphenyls ("PCBs"), compounds that cause a variety of adverse health effects.
Exposure to Aroclors 1248 and 1254 is associated with cancer and a variety of serious non-
cancer health effects including effects on the immune system, reproductive system, nervous
system, endocrine system and other health effects.

4.    Wherever Aroclor 1248 or 1254 is used as plasticizers, the PCBs easily escape into the
atmosphere through the normal, intended uses of products that contain  these Aroclors.  PCBs

**EXHIBIT 8**

migrate out of their original source products, including Aroclors 1248 and 1254 used to plasticize caulks and paints, and contaminate air, dust, and adjacent substrate materials, causing extensive property damage and presenting an exposure risk for teachers, students, and employees who occupy contaminated classrooms.

5.      This Complaint generally refers to Aroclor plasticizers made with PCBs as "PCB-Aroclors."

6.      As a result of their propensity to migrate out of products that used PCB-Aroclors, PCBs have become a near global environmental contaminant. To stem the contamination, to prevent health risks associated with exposure to PCBs, and for other reasons, Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979. The Act forbids the continued use of in-place caulk or paint that contains PCBs at a concentration above 50 parts per million ("ppm").

7.      The Plaintiffs seek damages for the costs of investigating, removing toxic Aroclors 1248 and 1254 compounds, remediating all Aroclors 1248 and 1254 contamination, and other damages resulting from the contamination of their school buildings and properties.

## PARTIES

8.      Westport is a school district that operates public schools in the Town of Westport. The district has detected Aroclors 1248 and 1254 in one of its school buildings. In Massachusetts, a school district is a body politic with the power to sue and be sued as provided by Mass. G.L. ch. 71, § 16. School districts are authorized to construct, maintain, renovate, remodel, and repair school buildings. *Id.*

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

9. The Town has a property interest in buildings used by the school district as schools. The Town also has the financial obligation for investigation and remediation activities conducted at school buildings. A town may sue and be sued as provided by Mass. G.L. ch. 40, § 2.

10. Plaintiffs are located in Westport, Massachusetts.

11. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

12. Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

13. Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to Old Monsanto) is a Delaware LLC with its principal place of business in Peapack, New Jersey. Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

14. The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceuticals and nutrition business, and a chemical products business. Old Monsanto began manufacturing Aroclor plasticizers in the 1930s and continued to manufacture them until the late 1970s.

15. Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations. The corporation now known as Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

16. Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

17.     Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.

18.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.

19.     Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants."

<div align="center">

**JURISDICTION AND VENUE**

</div>

20.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiffs and Defendants. Each Plaintiff is a citizen of Massachusetts, but no Defendant is a citizen of Massachusetts. Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri. Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri. Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

21.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

**EXHIBIT 8**

## FACTUAL ALLEGATIONS

22.     A plasticizer is a commercial product that adds flexibility and other qualities to plastic and other materials. Plasticizers are not natural raw materials but commercial products that companies including Monsanto synthesized specifically for their plasticizing properties.

23.     Monsanto developed an expansive line of plasticizers, some of which were known by the trade name "Aroclors." Although the majority of Monsanto's plasticizers did not contain PCBs, at least ten of the Aroclor products were made with PCBs. These include Aroclor 1016, 1221, 1232, 1242, 1248, 1254, 1260, 1262, 1268, and 1270. The specific products at issue in this case are Aroclors 1248 and 1254, PCB-containing plasticizer products unique to, and trademarked by, Monsanto.

24.     Between approximately 1950 and 1970, Monsanto promoted and sold PCB-Aroclors, including Aroclors 1248 and 1254, for formulators to use in window caulks, paints, sealants, and mastics for the construction and renovation of buildings throughout the United States.

25.     In addition to developing plasticizers, Monsanto created the Plasticizer Council to recommend particular plasticizers to formulators for specific applications. The company instructed formulators in product selection, formulation, use, and applications. Monsanto would also formulate a particular plasticizer for a customer's needs.

26.     Upon information and belief, it was Monsanto --- and not the formulator --- that decided whether that formulator would use a PCB-Aroclor or a non-PCB plasticizer.

27.     Only Monsanto, and not the formulators, had full knowledge of the risks of using Aroclors 1248, 1254 and other PCB-Aroclors.

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

28.     Monsanto did not market plasticizers to formulators as "PCBs" but as "Aroclors." The marketing materials neither disclose which Aroclors contained PCBs nor explain the properties and potential risks of using plasticizers containing PCBs.

29.     Although Monsanto eventually withdrew PCB-containing plasticizers from the market in 1970, the company never advised either the formulators or the foreseeable users of plasticizer-containing products of the dangers of PCBs or attempt to recall the products. In fact, Monsanto continued to urge customers to purchase PCB-Aroclors until the very end of production, even encouraging them to stockpile product for use after production ceased. Accordingly, PCB-containing products are likely to remain present in any number of materials present in a school built or renovated during this period.

30.     Because PCBs are highly volatile, they evaporate out of whatever products contain them.

31.     Plasticizer applications are known as "open uses" or "open systems" because no physical barrier prevents PCBs from direct contact with the surrounding environment. In open uses, Aroclors 1248 and 1254 readily shed PCBs. These PCBs then migrate into and contaminate surrounding materials including "adjacent substrates" such as masonry, wood, drywall, and soil. PCBs also contaminate the air, dust, and indoor surfaces. Caulks, paints, sealants, and mastics are "open uses." The caulks, paints, sealants, and mastics that contain PCB-Aroclors in the Westport schools are "open uses."

32.     PCB-Aroclors including Aroclor 1254 were also occasionally used in the electrical capacitors attached to fluorescent lights. Because the PCB-Aroclor in that application is contained within the hardware, this is considered an "enclosed use" or "closed system." Despite the physical enclosure of the Aroclor, PCBs can leak from light fixtures and similarly contaminate and damage surrounding materials.

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

33. The Environmental Protection Agency ("EPA") conducted research of PCBs in school buildings and confirmed that emissions from PCB-Aroclors including 1254 in caulk and fluorescent light ballasts cause elevated PCBs in the surrounding air.

34. EPA concluded that some building materials (*e.g.*, paint and masonry walls), adjacent substrates, and indoor dust can absorb PCB emissions and become potential secondary sources of contamination that begin emitting PCBs on their own.

**EXPOSURE TO PCBs IS ASSOCIATED WITH SERIOUS HEALTH EFFECTS**

35. The emissions of PCBs from PCB-Aroclors including 1248 and 1254 and resulting contamination of school buildings poses serious health risks to building occupants including students, teachers, other employees, and visitors.

36. PCBs can enter the human body through ingestion, inhalation, and dermal contact.

37. Children, teachers, and employees who work in school buildings may inhale PCBs that are emitted into the air from Aroclors 1248 and 1254 in caulk, paint, light ballasts, and other secondary sources. They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks. And they may absorb PCBs from physical contact with Aroclor 1248- and 1254-containing materials, secondary sources, or surfaces that have become contaminated by air or dust.

38. Any exposure is a concern to a reasonable school district because Aroclors 1248 and 1254 and PCBs are associated with serious health risks.

39. In 2015, the International Agency for Research on Cancer (IARC) published Monograph 107, finding that sufficient scientific exists to conclude that PCBs are carcinogenic to humans. The United States EPA has likewise determined that the PCBs in Monsanto's PCB-Aroclors are probable human carcinogens. In 1996, EPA reassessed PCB carcinogenicity, based on data

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

related to Aroclors 1016, 1242, 1254, and 1260. EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

40. In addition, EPA concluded that PCBs are associated with serious non-cancer health effects. From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system, and the endocrine system.

41. PCBs affect the immune system by causing a significant decrease in the size of the thymus gland, lowered immune response, and decreased resistance to viruses and other infections. The animal studies were not able to identify a level of PCB exposure that did not affect the immune system. Human studies confirmed immune system suppression.

42. Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs. Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and reduced sperm counts.

43. Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning. Some of these studies were conducted using the types of PCBs most commonly found in human breast milk.

44. PCBs may also disrupt the normal function of the endocrine system. PCBs have been shown to affect thyroid hormone levels in both animals and humans. In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing.

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

PCB exposures have also been associated with changes in thyroid hormone levels in infants in studies conducted in the Netherlands and Japan.

45.     PCBs have been associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

46.     Children may be affected to a greater extent than adults. The Agency for Toxic Substances and Disease Registry explained: "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs."

47.     Even unborn infants and future generations may be affected by a exposure to PCBs. Prenatal exposure to low doses of PCBs can change the developing brain in an area involved in metabolism, and some effects are apparent even two generations later. These changes may affect body weight, hormones and hypothalamic gene expression.

48.     Monsanto's internal documents show that Monsanto knew that PCB-Aroclors were toxic as early as the 1930s.

49.     A 1937 memorandum reflects the company's knowledge that studies of animal exposure by inhalation or ingestion led to systemic toxic effects.

50.     Monsanto specifically advised against exposure to airborne PCB-Aroclor vapors in the 1940s.

51.     Emmet Kelly, Monsanto's Medical Director, acknowledged in 1955 that the company knew that PCB-Aroclors are toxic. Later that year, Monsanto's Medical Department advised that

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

workers should not be allowed to eat lunch in the Aroclor department because these compounds are quite toxic by ingestion or inhalation.

52.     Monsanto's potential customers also reported the results of their own toxicity studies to the company. After conducting its own tests, the U.S. Navy decided against using Monsanto's PCB-Aroclors because the Navy felt them too toxic for use in submarines.

53.     In 1966, Kelly reviewed and did not dispute a presentation that referred to a 1939 study associating PCBs with the deaths of three young workers and concluding that pregnant women and persons who have at any time had any liver disease are particularly susceptible to their effects.

**PCBs CANNOT BE CONTAINED IN PLASTICIZERS**

54.     Monsanto's documents also show that the company knew that Aroclors emitted PCBs that could not be contained in products or applications and recognized that, as a result, PCBs were becoming a widespread environmental contaminant.

55.     In the early 1950s, Monsanto became aware that research indicated that Aroclors volatilized out of indoor paints plasticized with PCB-Aroclors, resulting in vapor concentrations that exceeded safe levels. Based on this evidence, Monsanto acknowledged that "[t]here must clearly be circumstances under which the use of Aroclor containing paints will constitute a health hazard," and recognized the need to test each paint for safety before distributing it freely for household use. Monsanto had specifically "barred" the use of certain PCB-Aroclors as plasticizers intended for use in indoor home paints for these reasons.

56.     The company's own testing of paint plasticized with Aroclor 1248 provided evidence that airborne PCB concentrations persisted for at least a month. Monsanto also recognized that using

**EXHIBIT 8**

such a paint over a large area could create a hazardous condition, especially considering the long exposure to these concentrations.

57.     Monsanto was also aware by the mid-1960s that PCBs were becoming a major environmental contaminant due, in large part, to the use of PCB-Aroclors as plasticizers. A Monsanto consultant advised that a substantial percentage of the PCB used in plasticizers and other products escapes into the environment. He urged the company to stop using PCBs in Aroclor plasticizers: "it seems to the writer that the evidence regarding PCB effects of environmental quality is sufficiently substantial, widespread, and alarming to require immediate corrective action on the part of Monsanto."

58.     Despite the clear knowledge of the dangers posed by selling PCB-Aroclors as plasticizers, Monsanto did not immediately discontinue the sale of these products, recall the products, and ensure that no additional PCB-Aroclors be used in open systems. Rather, Monsanto continued to manufacture, market, promote, and sell these plasticizers for several more years to maximize profits. Had Monsanto stopped selling these products when it unquestionably became aware of the risks --- *i.e.*, by the mid-1960s --- the Westport school would not be contaminated.

59.     Monsanto's Aroclor Ad Hoc Committee held its first meeting on September 5, 1969. The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant." The meeting minutes acknowledge that PCB-containing products rapidly contaminate the environment and specifically implicate highway paints: "In one application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."

EXHIBIT 8

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

60.     The Committee reported in 1969 significant vapor losses from plasticizers used in paints and caulks. One employee recognized that releases from end uses would result in greater consumer exposure.

61.     Still, the Committee identified a number of actions to prolong the manufacture, sale, and use of PCB-containing Aroclors.

62.     By May 1970, Monsanto internally admitted that the potential harm to human health and the environment required that they no longer sell PCB-Aroclors (including Aroclors 1248 and 1254) for open uses including paints, caulks, and sealants.

63.     Despite this decision, however, the company continued to sell these Aroclors until August 1970.

64.     In 1970, after Monsanto had acknowledged the catastrophic problem of PCB contamination and exposure, PCB production in the United States peaked at 85 million pounds.

65.     During the summer of 1970, Monsanto encouraged its customers to stockpile these plasticizers to use after that date.

66.     Monsanto urged a customer in Cambridge, Massachusetts to "stock up" on sufficient quantities of Aroclor 1200 series products to cover its needs for up to two years. Monsanto was aware that another customer stockpiled enough Aroclor 1254 to last through 1971.

67.     At the same time, Monsanto began trying to downplay the ubiquity of PCB-Aroclors that remain present in open uses, like caulk and paint. In a press release, the company claimed: "What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors. It is also used in commercial heating and cooling systems. It is not a 'household' item."

**EXHIBIT 8**

68.     At no point did Monsanto contradict this statement by alerting foreseeable users of plasticizer-containing products, including Plaintiffs, that PCB-Aroclors could be found in "open" use building materials, including paint and caulk, and could cause contamination and property damage. Plaintiffs would have acted on this alert had they received it.

69.     As a result, Aroclor 1248 and 1254 products remain in use in schools and buildings across the United States, notwithstanding the ban.

**LEGAL AND REGULATORY STANDARDS APPLICABLE TO PCBs**

70.     Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of all PCB-containing products as of January 1, 1979.

71.     More than thirty years passed before EPA announced that homes, schools, and other commercial buildings may have been built with PCB-containing materials. In a press release issued on September 25, 2009, EPA advised that although PCBs were banned by 1979, they remained in place in buildings that were constructed before the ban.

72.     On December 12, 2013, EPA issued a press release advising that PCB-containing fluorescent light ballasts that were installed prior to the ban may still be in use in schools and may leak PCBs.

73.     EPA has held that allowing caulk or paint with a PCB concentration over 50 ppm to remain in place is prohibited "use" under TSCA.

74.     EPA has not issued any information regarding possible PCB-Aroclor contamination in schools in Massachusetts.

75.     The Massachusetts Department of Environmental Protection has not issued any information regarding possible PCB-Aroclor contamination in schools in Massachusetts.

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**PLAINTIFFS' SCHOOL BUILDINGS ARE CONTAMINATED WITH PCB-PLASTICIZERS**

76.    Plaintiff Westport operates a public school system in the Town of Westport, Massachusetts.

77.    Westport Middle School was built in 1969. In May 2011, dangerous levels of Aroclors 1248 and 1254 were detected at Westport Middle School, necessitating removal and remediation.

78.    The primary sources were identified as interior window glazing compound, interior and exterior door caulking, exterior window caulking, and interior ceiling mastic adhesive, all of which were sampled and found to contain Aroclors 1248 and/or 1254.

79.    The school also detected Aroclors 1248 and 1254 in nearby substrate materials including brick masonry, concrete columns, beams, interior brick, and concrete sidewalks.

80.    Aroclor 1254 was also detected in the soil adjacent to exterior masonry walls.

81.    Aroclor 1254 was detected in indoor dust samples taken from interior floors, interior window sills, and various indoor surfaces in the kitchen, cafeteria, guidance office, hallways, and boys locker room.

82.    By 1969, when the school at issue was built, Monsanto had accumulated decades of evidence that PCB-Aroclors were toxic to humans, that PCBs would volatilize out of Aroclors 1248 and 1254 used in indoor paints and caulks reaching dangerous levels in indoor air, that PCBs would migrate onto and contaminate nearby materials causing property damage, and that occupants of buildings would be exposed to potentially dangerous levels of PCBs.

83.    In fact, the company had actual knowledge about the dangers associated with the use of PCB-Aroclors in paints.

**FIRST CAUSE OF ACTION**

**EXHIBIT 8**

## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY DEFECTIVE DESIGN

84.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this cause of action.

85.    Monsanto created a line of commercial plasticizer products including Aroclors 1248 and 1254. Although Aroclors 1248 and 1254 were made with PCBs, Monsanto made Aroclor plasticizers that did not contain PCBs. As a large and sophisticated chemical company, Monsanto was in the business of producing, making, fabricating, constructing, designing, marketing, and selling PCB-containing Aroclors for placement into trade or commerce.

86.    All of Monsanto's Aroclor plasticizers were manufactured for placement into trade or commerce.

87.    Monsanto marketed and sold PCB-Aroclors as commercial plasticizers for incorporation into other products, including those for "open use" applications in schools and other buildings.

88.    Monsanto was heavily involved in determining which plasticizer to sell to a formulator for a particular use. Monsanto recognized that "even the most experienced formulator is bewildered by the maze of possibilities from which to select" a plasticizer "for his particular application" and advertised that its Plasticizer Council provided "much more than simply the products;" it also provided "expert guidance in their use." The Council studied applications in its laboratory and recommended specific plasticizers to its customers.

89.    Monsanto alone controlled the formulation of its plasticizer products and determined which ones would contain PCBs and which would not.

90.    Monsanto also provided advice and recommendations as to whether PCB-Aroclor plasticizer should be used in a particular formulator's application.

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

91. Monsanto's customers used the plasticizers in the intended manner and in a substantially unchanged way.

92. As a manufacturer, Monsanto owed a duty to all persons whom its products might foreseeably harm, including Plaintiffs, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

93. By manufacturing and selling PCB-Aroclors, Monsanto warranted that those plasticizers are merchantable, safe, and fit for ordinary purposes.

94. Monsanto breached that warranty as PCB-containing plasticizers are unreasonably dangerous for their reasonably anticipated uses in school buildings for the following reasons:

    a. Monsanto selected a plasticizer for a formulator's needs without disclosing whether that plasticizer was a PCB-Aroclor;

    b. Monsanto did not advise the formulators regarding which Aroclor plasticizers contained PCBs and which did not;

    c. When PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are used in open applications, the PCB compounds readily volatilize out of the original application;

    d. PCB volatilization begins soon after the Aroclor-containing product is installed or put into use;

    e. Once volatilized, PCBs migrate to and contaminate adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;

    f. PCBs can then volatilize out of these materials and contaminate still other materials;

EXHIBIT 8

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

g.  When PCBs volatilize, building occupants including students, teachers, employees, and visitors may be exposed to PCBs via inhalation, ingestion, and dermal contact;

h.  PCB is human and animal carcinogen and is associated with other serious health risks;

i.  PCB exposure may be halted and prevented only by physical removal of the original PCB-Aroclors and any secondary materials that have become contaminated;

j.  Because remediation involves removal of all damaged property, it can require removal of building materials such as interior walls and brick that were not made with PCB-Aroclors;

k.  Such remediation is extremely expensive to undertake, disrupts normal classroom activities, and may cause undue concern on the part of students, teachers, school employees, and parents.

95.  Monsanto knew of these risks associated with PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, and failed to use reasonable care in the design of its plasticizer products.

96.  PCB-Aroclor plasticizers for open uses, including Aroclors 1248 and 1254, pose greater dangers to school buildings than would be expected by ordinary persons such as Plaintiffs, schoolchildren, teachers and employees, and the general public.

97.  At all times, Monsanto and other companies made plasticizers that did not contain PCBs. These were reasonable alternative designs capable of preventing the Plaintiffs' damage.

EXHIBIT 8

98.     The risks posed by PCB-Aroclors far outweigh the products' utility as plasticizers in indoor applications.

99,     The likelihood that PCBs would migrate out of Aroclor plasticizers, including Aroclors 1248 and 1254, and contaminate Plaintiffs' property and the gravity of that damage far outweighed any burden on Monsanto to adopt an alternative design and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

100.    The PCBs began to volatilize and migrate of their applications shortly after the products were installed or applied.  The migration contaminated underlying and adjacent materials while the paint, caulk, and other plasticizer-containing materials remained intact and performed their intended functions.

101.    Plaintiffs' buildings were contaminated by Aroclors 1248 and 1254 after their application in paint or caulk when the Westport Middle School building was constructed in 1969. The contamination began while the paint or caulk was in its useful safe life.

102,    Monsanto also fraudulently concealed information about PCB-Aroclors' dangers in open uses in school and other buildings.

103.    At least twenty years before the Westport Middle School was constructed, Monsanto had actual knowledge that the use of PCB-Aroclors in paints resulted in air concentrations that exceeded the accepted safe maximum for continuous exposure.  By the mid-1950s, Monsanto acknowledged that the use of Aroclor paints will constitute a health hazard in some circumstances.  The company also had actual knowledge that exposure to airborne Aroclors 1248 and 1254, the plasticizers used in Westport, caused injury to test animals and led to the conclusion that a painted room could be hazardous.

EXHIBIT 8

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

104.    Monsanto also had actual knowledge that PCB-Aroclors emanated out of open uses causing contamination. It knew, too, that plasticizer use and volatilization represented a substantial percentage of the contamination found in the environment.

105.    Despite the company's growing awareness of the dangers of open-use plasticizers containing PCBs, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite – that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner.

106.    In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."

107.    A similar letter to the San Francisco Bay Regional Water Quality Control Board explained that PCB plasticizers (found in surface coatings, such as paints, industrial adhesives and window sealants), in normal use, present no special health problems."

108.    In May 1969, Monsanto's Manager, Environmental Health, Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."

109.    Monsanto delivered the same message to the New Jersey Department of Conservation in July 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic." The letter then reiterates Monsanto's position regarding environmental contamination: "We are unable at this time to conceive of how the PCBs can become wide spread in the environment."

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

110.    One year later, in a letter to Congressman William Ryan dated April 28, 1970, Monsanto disclaimed all potential human health threats and misrepresented the risk facing occupants of schools and other buildings where plasticizers remained in open uses: "It should be emphasized that the apparent PCB problem relates only to the possible effects on some species of birds. Manufacturing and use experience for thirty years, earlier animal toxicity studies, and the interim reports on current extensive toxicological studies with various species of animals indicate that there is no threat to the public health."

111.    Monsanto, thus, had actual knowledge of and misrepresented the very dangers alleged here --- the volatilization of PCBs from plasticizers in open-use applications. And knew of and concealed these dangers before the Westport Middle School was constructed.

112.    Had Plaintiffs known of these dangers, they would not have purchased products containing PCB-Aroclor plasticizers.

113.    Plaintiffs relied on Monsanto's implied warranty that their PCB-Aroclor plasticizers were safe for open use applications.

114.    As a direct and proximate result of Monsanto's unreasonably dangerous design, manufacture, and sale of PCB-Aroclor plasticizers, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

115.    Monsanto knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of commercial and school properties. Monsanto committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

### SECOND CAUSE OF ACTION

#### BREACH OF IMPLIED WARRANTY OF
#### MERCHANTABILITY FAILURE TO WARN

116.  Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

117.  As a manufacturer of PCB-Aroclor plasticizers, Monsanto had a duty to provide adequate warnings of the risks of these products to all persons whom its product might foreseeably harm, including Plaintiffs, the public, and public officials.

118.  PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are unreasonably dangerous for their reasonably anticipated use in school buildings for the following reasons:

    a.  When PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are used in open applications, the PCB compounds readily volatilize out of the original application;

    b.  PCB volatilization begins soon after the plasticizer-containing product is installed or put into use;

    c.  Once volatilized, PCBs migrate to and contaminate adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;

    d.  PCBs can then volatilize out of these secondary materials and contaminate still other materials;

    e.  When PCBs volatilize, building occupants including students, teachers, employees, and visitors may be exposed to PCBs via inhalation, ingestion, and dermal contact;

    f.  PCB is human and animal carcinogen and is associated with other serious health risks;

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

    g.  PCB exposure may be halted and prevented only by physical removal of the original PCB-Aroclor products and any secondary materials that have become contaminated;

    h.  Because remediation involves removal of all damaged property, it can require removal of building materials such as interior walls and brick that were not made with PCB-plasticizers;

    i.  Such remediation is extremely expensive to undertake, disrupts normal classroom activities, and may cause undue concern on the part of students, teachers, school employees, and parents.

119.    Monsanto knew of the health and property damage risks associated with PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with PCB-Aroclor plasticizers or an instruction that would have allowed Plaintiffs to avoid the damage to their property.

120.    Despite Monsanto's knowledge of the presence of PCB-Aroclor plasticizers that remain present in "open uses" in commercial buildings and schools nationwide, including Aroclors 1248 and 1254, Monsanto has not issued any warning, instruction, recall, or advice regarding PCB-containing products to schools, communities, parents, or governmental agencies.

121.    Plaintiffs would have heeded legally adequate warnings and would not have purchased products containing PCB-Aroclors or would have taken steps to ensure that PCB-Aroclors were treated differently to prevent potential exposure and contamination of the environment.

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

122. As a direct and proximate result of Monsanto's failure to warn, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

123. Monsanto knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of commercial and school properties. Monsanto committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

## THIRD CAUSE OF ACTION

### NEGLIGENCE

124. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

125. As a manufacturer and seller of PCB-Aroclor plasticizers, Monsanto owed a duty to Plaintiffs and to all persons whom its products might foreseeably harm to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PCB-Aroclor plasticizers including Aroclors 1248 and 1254.

126. Monsanto held itself out as an industry expert in plasticizers. Through its Plasticizer Council, Monsanto advised customers regarding plasticizers for their needs and suggested particular plasticizers for specific applications.

127. Monsanto sold Aroclor and PCB-Aroclor plasticizers to be used in a wide variety of applications including paints, glues, sealants, caulks, mastics, and others. Each of those applications could then be used in many different settings – indoor, outdoor, commercial, residential.

**EXHIBIT 8**

128.    Monsanto knew or should have known that Aroclors were volatilizing out of open use applications including Aroclor 1248 and 1254 plasticizers used in indoor paints by the early 1950s.  Monsanto recognized a need to perform testing of Aroclor plasticizers used in paints.

129.    Despite this knowledge, Monsanto breached its duty of care to Plaintiffs by

       a.  intentionally deciding  not to perform testing on all PCB-containing plasticizers, including Aroclors 1248 and 1254, used in indoor paints to determine the rate and concentration of air dispersion and toxicity levels;

       b.  intentionally deciding not to perform studies of the long-term health effects of exposure to PCB-containing plasticizers, including Aroclors 1248 and 1254, used in indoor open use applications;

       c.  intentionally deciding not to perform studies of the causes and extent of environmental PCB contamination;

       d.  intentionally advising formulators to use PCB-Aroclors, including Aroclors 1248 and 1254, for indoor open use applications;

       e.  intentionally marketing plasticizers as "Aroclors" with no distinction between PCB-Aroclors and available alternatives;

       f.  intentionally concealing, or failing to disclose to formulators whether the Aroclor plasticizer selected for their applications contained PCBs;

       g.  failing to require product labeling warning of the risks of exposure to PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, used in open use indoor applications;

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

h. intentionally deciding not to stop the use of PCB-Aroclor plasticizers, including Aroclor 1254, for indoor open use applications in schools, commercial buildings, hospitals, etc.;

i. intentionally concealing information from or misleading regulatory agencies about the potential for open use PCB-Aroclor plasticizers to volatilize and to cause dangerous indoor air conditions;

j. intentionally mischaracterizing PCB-Aroclors, including Aroclor 1254, as nontoxic;

k. intentionally concealing the fact that PCBs migrate from PCB-Aroclors onto adjacent materials including substrate, causing extensive property damage; and

l. intentionally allowing open use PCB-Aroclor plasticizers including Aroclors 1248 and 1254 to remain in place for decades after concerns about toxicity and volatility led Monsanto to stop selling these products for open uses.

130. As a direct and proximate result of Monsanto's negligence, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

131. Monsanto knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of commercial and school properties. Monsanto committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

**EXHIBIT 8**

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1.  Compensatory damages according to proof including, but not limited to:

    a.  the costs of investigating, sampling, testing, and assessing the extent of PCB

    contamination at Westport Middle School;

    b.  the costs of removing PCBs and PCB-containing materials (including, but not

    limited to, secondary sources and adjacent substrates) from school property;

    c.  the costs of informing parents and community members about the efforts to

    remove PCBs from school property.

2.  Punitive damages;

3.  Pre-judgment and post-judgment interest;

4.  Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial.

Dated:  May 10, 2016

<div style="margin-left:40%">

/s/  Carla Burke Pickrel
Scott Summy *(Pro Hac Vice)*
Carla Burke Pickrel *(Pro Hac Vice)*
Celeste A. Evangelisti *(Pro Hac Vice)*
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219-4281
Telephone:  (214) 521-3605

/s/  Richard M. Sandman
Richard M. Sandman (BBO # 440940)
**RODMAN, RODMAN & SANDMAN, P.C.**
442 Main Street, Suite 300
Malden, MA  02148-5122
Telephone:  (781) 322-3720

***Attorneys for Plaintiffs***

</div>

**EXHIBIT 8**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above and foregoing document has been served upon the following counsel or record via the Court's ECF system on this 10th day of May, 2016.

Richard P. Campbell
Richard L. Campbell
Brandon L. Arber
Diana A. Chang
Sean M. Hickey
CAMPBELL CAMPBELL EDWARDS & CONROY, P.C.
One Constitution Center, 3rd Floor
Boston, MA 02129

Carol A. Rutter
Robyn D. Buck
HUSCH BLACKWELL LLP
The Plaza in Clayton
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105

/s/ Carla Burke Pickrel

EXHIBIT 8

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

CITY OF HARTFORD and
HARTFORD BOARD OF EDUCATION,

      Plaintiffs,

vs.

MONSANTO COMPANY,
SOLUTIA INC., and
PHARMACIA CORPORATION,

      Defendants.

Case No. 3:15-cv-01544 (RNC)

---

## PLAINTIFFS' FIRST AMENDED COMPLAINT

---

### I.    INTRODUCTION

1. Plaintiffs CITY OF HARTFORD ("City") and HARTFORD BOARD OF EDUCATION ("Board") operate public schools and buildings in Hartford, Connecticut. The City has detected toxic chemical compounds identified as Aroclors 1248 and 1254 in one or more of its school buildings. Working with the US Environmental Protection Agency ("EPA"), the Board has closed one school until these chemicals can be removed or reduced to a safe level for children.

2. Defendant Monsanto Company made Aroclors 1248 and 1254, plasticizers unique to, and trademarked by, Monsanto for use in caulks and paints, among other products.

3. Aroclors 1248 and 1254 are dangerous because they were formulated and designed with polychlorinated biphenyls ("PCBs"), compounds that cause a variety of adverse health

**EXHIBIT 9**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

effects. Exposure to Aroclors 1248 and 1254 is associated with cancer and serious non-cancer health effects including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.

4. Wherever Aroclor 1248 or 1254 is used as a plasticizer, the PCBs easily escape into the atmosphere through the normal, intended uses of products that contain these Aroclors. PCBs migrate out of their original source products, including Aroclors 1248 and 1254 used to plasticize caulks and paints, and contaminate air, dust, and adjacent substrate materials, causing extensive property damage and presenting an exposure risk for teachers, students, and employees who occupy contaminated classrooms.

5. This Complaint generally refers to Aroclor plasticizers made with PCBs as "PCB-Aroclors."

6. As a result of their propensity to migrate out of products that used PCB-Aroclors, PCBs have become a near global environmental contaminant. To stem the contamination, to prevent health risks associated with exposure to PCBs, and for other reasons, Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979. The Act forbids the continued use of in-place caulk or paint that contains PCBs at a concentration above 50 parts per million ("ppm").

7. The Plaintiffs seek damages for the costs of investigating, removing toxic Aroclors 1248 and 1254 compounds, remediating all Aroclors 1248 and 1254 contamination, and other damages resulting from the contamination of their school buildings and properties.

## II. PARTIES

8. The Board and City share responsibility for operating and maintaining public schools in Hartford, Connecticut and have detected Aroclors 1248 and 1254 in one or more school buildings.

**EXHIBIT 9**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

9. The City owns the buildings, facilities, and properties of public schools in Hartford and has the authority to construct, renovate, and remodel school buildings and school property. C.G.S.A. § 10-241. The City also has the financial obligation for investigation and remediation activities conducted at school buildings and school properties.

10. In Connecticut, towns are considered "school districts" for educational purposes. C.G.S.A. § 10-240. Therefore, the City of Hartford is a school district and may sue and be sued as provided by C.G.S.A. § 10-241.

11. The Board maintains public schools in the City of Hartford and has a duty imposed by the Connecticut General Assembly to provide an appropriate learning environment for its students, which requires the Board to provide adequate facilities, proper maintenance of facilities, and a safe school setting. C.G.S.A. § 10-220. The Board, as it relates to this action, is acting as an agent of the City and may sue and be sued as provided by C.G.S.A. § 52-73.

12. Plaintiffs and all of Plaintiffs' school buildings and properties are located in Hartford, Connecticut.

13. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

14. Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

15. Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to Old Monsanto) is a Delaware LLC with its principal place of business in Peapack, New Jersey.

**EXHIBIT 9**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

16. The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceuticals and nutrition business, and a chemical products business. Old Monsanto began manufacturing Aroclor plasticizers in the 1930s and continued to manufacture them until the late 1970s.

17. Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations. The corporation now known as Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

18. Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.

19. Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.

20. In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia, and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.

EXHIBIT 9

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

21. Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants."

## III.  JURISDICTION AND VENUE

22. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiffs and Defendants. Each Plaintiff is a citizen of Connecticut, but no Defendant is a citizen of Connecticut. Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri. Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri. Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

23. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV.  FACTUAL ALLEGATIONS

### A.  Monsanto Manufactured PCBs for Use in the United States Until the 1979 Ban.

24. A plasticizer is a commercial product that adds flexibility and other qualities to plastic and other materials. Plasticizers are not natural raw materials but commercial products that companies including Monsanto synthesized specifically for their plasticizing properties.

25. Monsanto developed an expansive line of plasticizers, some of which were known by the trade name "Aroclors." Although the majority of Monsanto's plasticizers did not contain PCBs, at least ten of the Aroclor products were made with PCBs. These include Aroclor 1016, 1221, 1232, 1242, 1248, 1254, 1260, 1262, 1268, and 1270. The specific products at issue in this case are Aroclors 1248 and 1254, PCB-containing plasticizer products unique to, and trademarked by, Monsanto.

**EXHIBIT 9**

26. Between approximately 1950 and 1970, Monsanto promoted and sold PCB-Aroclors, including Aroclors 1248 and 1254, for formulators to use in window caulks, paints, sealants, and mastics for the construction and renovation of buildings throughout the United States.

27. In addition to developing plasticizers, Monsanto created the Plasticizer Council to recommend particular plasticizers to formulators for specific applications. The company instructed formulators in product selection, formulation, use, and applications. Monsanto would also formulate a particular plasticizer for a customer's needs.

28. Upon information and belief, it was Monsanto --- and not the formulator --- that decided whether that formulator would use a PCB-Aroclor or a non-PCB plasticizer.

29. Only Monsanto, and not the formulators, had full knowledge of the risks of using Aroclors 1248, 1254 and other PCB-Aroclors.

30. Monsanto did not market plasticizers to formulators as "PCBs" but as "Aroclors." The marketing materials neither disclose which Aroclors contained PCBs nor explain the properties and potential risks of using plasticizers containing PCBs.

31. Although Monsanto eventually withdrew PCB-containing plasticizers from the market in 1970, the company never advised either the formulators or the foreseeable users of plasticizer-containing products of the dangers of PCB-Aroclors or attempt to recall the products. In fact, Monsanto continued to urge customers to purchase PCB-Aroclors until the very end of production, even encouraging them to stockpile product for use after production ceased. Accordingly, PCB-containing products are likely to remain present in any number of materials present in a school built or renovated during this period.

32. Because PCBs are highly volatile, they evaporate out of whatever products contain them.

**EXHIBIT 9**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

33. Plasticizer applications are known as "open uses" or "open systems" because no physical barrier prevents PCBs from direct contact with the surrounding environment. In open uses, Aroclors 1248 and 1254 readily shed PCBs. These PCBs then migrate into and contaminate surrounding materials including "adjacent substrates" such as masonry, wood, drywall, and soil. PCBs also contaminate the air, dust, and indoor surfaces. Caulks, paints, sealants, and mastics are "open uses." The caulks, paints, and other materials that contain PCB-Aroclors in the Hartford schools are "open uses." PCB-Aroclors including Aroclor 1254 were also occasionally used in the electrical capacitors attached to fluorescent lights. Because the PCB-Aroclor in that application is contained within the hardware, this is considered an "enclosed use" or "closed system." Despite the physical enclosure of the Aroclor, PCBs can leak from light fixtures and similarly contaminate and damage surrounding materials.

34. The Environmental Protection Agency ("EPA") conducted research of PCBs in school buildings and confirmed that emissions from PCB-Aroclors including 1254 in caulk and fluorescent light ballasts cause elevated PCBs in the surrounding air.

35. EPA concluded that some building materials (*e.g.*, paint and masonry walls), adjacent substrates, and indoor dust can absorb PCB emissions and become potential secondary sources of contamination that begin emitting PCBs on their own.

**EXPOSURE TO PCBs IS ASSOCIATED WITH SERIOUS HEALTH EFFECTS**

36. The emissions of PCBs from PCB-Aroclors including 1248 and 1254 and resulting contamination of school buildings may present health risks to building occupants including students, teachers, other employees, and visitors.

37. PCBs can enter the human body through ingestion, inhalation, and dermal contact.

**EXHIBIT 9**

38.    Children, teachers, and employees who work in school buildings may inhale PCBs that are emitted into the air from Aroclors 1248 and 1254 in caulk, paint, light ballasts, and other secondary sources.   They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks.  And they may absorb PCBs from physical contact with Aroclor 1248- and 1254-containing materials, secondary sources, or surfaces that have become contaminated by air or dust.

39.    Any exposure is a concern to a reasonable school district because Aroclors 1248 and 1254 and PCBs are associated with serious health risks.

40.    In 2015, the International Agency for Research on Cancer (IARC) published Monograph 107, finding that sufficient scientific exists to conclude that PCBs are carcinogenic to humans. The United States EPA has likewise determined that the PCBs in Monsanto's PCB-Aroclors are probable human carcinogens.

41.    In addition, EPA concluded that PCBs are associated with serious non-cancer health effects.  EPA has found evidence that PCBs may exert effects on the immune system, the reproductive system, the nervous system, and the endocrine system.

42.    Children may be affected to a greater extent than adults.  The Agency for Toxic Substances and Disease Registry explained:  "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs."

43.    Monsanto's internal documents show that Monsanto knew that PCB-Aroclors were toxic as early as the 1930s.

EXHIBIT 9

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

44.    A 1937 memorandum reflects the company's knowledge that studies of animal exposure by inhalation or ingestion led to systemic toxic effects.

45.    Monsanto specifically advised against exposure to airborne PCB-Aroclor vapors in the 1940s.

46.    Emmet Kelly, Monsanto's Medical Director, acknowledged in 1955 that the company knew that PCB-Aroclors are toxic. Later that year, Monsanto's Medical Department advised that workers should not be allowed to eat lunch in the Aroclor department because these compounds are quite toxic by ingestion or inhalation.

47.    Monsanto's potential customers also reported the results of their own toxicity studies to the company. After conducting its own tests, the U.S. Navy decided against using Monsanto's PCB-Aroclors because the Navy felt them too toxic for use in submarines.

48.    In 1966, Kelly reviewed and did not dispute a presentation that referred to a 1939 study associating PCBs with the deaths of three young workers and concluding that pregnant women and persons who have at any time had any liver disease are particularly susceptible to their effects.

### PCBs CANNOT BE CONTAINED IN PLASTICIZERS

49. Monsanto's documents also show that the company knew that Aroclors emitted PCBs that could not be contained in products or applications and recognized that, as a result, PCBs were becoming a widespread environmental contaminant.

50. In the early 1950s, Monsanto became aware that research indicated that Aroclors volatilized out of indoor paints plasticized with PCB-Aroclors, resulting in vapor concentrations that exceeded safe levels. Based on this evidence, Monsanto acknowledged that "[t]here must clearly be circumstances under which the use of Aroclor containing paints will constitute a

**EXHIBIT 9**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

health hazard," and recognized the need to test each paint for safety before distributing it freely for household use. Monsanto had specifically "barred" the use of certain PCB-Aroclors as plasticizers intended for use in indoor home paints for these reasons.

51. The company's own testing of paint plasticized with Aroclor 1248 provided evidence that airborne PCB concentrations persisted for at least a month. Monsanto also recognized that using such a paint over a large area could create a hazardous condition, especially considering the long exposure to these concentrations.

52. Monsanto was also aware by the mid-1960s that PCBs were becoming a major environmental contaminant due, in large part, to the use of PCB-Aroclors as plasticizers. A Monsanto consultant advised that a substantial percentage of the PCB used in plasticizers and other products escapes into the environment. He urged the company to stop using PCBs in Aroclor plasticizers: "it seems to the writer that the evidence regarding PCB effects of environmental quality is sufficiently substantial, widespread, and alarming to require immediate corrective action on the part of Monsanto."

53. Despite the clear knowledge of the dangers posed by selling PCB-Aroclors as plasticizers, Monsanto did not immediately discontinue the sale of these products, recall the products, and ensure that no additional PCB-Aroclors be used in open systems. Rather, Monsanto continued to manufacture, market, promote, and sell these plasticizers for several more years to maximize profits. Had Monsanto stopped selling these products when it unquestionably became aware of the risks --- *i.e.*, by the mid-1960s --- the Hartford schools would not be contaminated.

54. Monsanto's Aroclor Ad Hoc Committee held its first meeting on September 5, 1969. The committee's objectives were to continue sales and profits of Aroclors in light of the fact that

**EXHIBIT 9**

PCB "may be a global contaminant."  The meeting minutes acknowledge that PCB-containing products rapidly contaminate the environment and specifically implicate highway paints:  "In one application alone (highway paints), one million lbs/year are used.  Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."

55. The Committee reported in 1969 significant vapor losses from plasticizers used in paints and caulks.  One employee recognized that  releases from end uses would result in greater consumer exposure.

56. Still, the Committee identified a number of actions to prolong the manufacture, sale, and use of PCB-containing Aroclors.

57. By May 1970, Monsanto internally admitted that the potential harm to human health and the environment required that they no longer sell PCB-Aroclors (including Aroclors 1248 and 1254) for open uses including paints, caulks, and sealants.

58. Despite this decision, however, the company continued to sell these Aroclors until August 1970.

59. In 1970, after Monsanto had acknowledged the catastrophic problem of PCB contamination and exposure, PCB production in the United States peaked at 85 million pounds.

60. During the summer of 1970, Monsanto encouraged its customers to stockpile these plasticizers to use after that date.

61. Monsanto urged a customer in Cambridge, Massachusetts to "stock up" on sufficient quantities of Aroclor 1200 series products to cover its needs for up to two years.  Monsanto was aware that another customer stockpiled enough Aroclor 1254 to last through 1971.

EXHIBIT 9

62. At the same time, Monsanto began trying to downplay the ubiquity of PCB-Aroclors that remain present in open uses, like caulk and paint. In a press release, the company claimed: "What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors. It is also used in commercial heating and cooling systems. It is not a 'household' item."

63. At no point did Monsanto contradict this statement by alerting foreseeable users of plasticizer-containing products, including Plaintiffs, that PCB-Aroclors could be found in "open" use building materials, including paint and caulk, and could cause contamination and property damage. Plaintiffs would have acted on this alert had they received it.

64. As a result, Aroclor 1248 and 1254 products remain in use in schools and buildings across the United States, notwithstanding the ban.

**LEGAL AND REGULATORY STANDARDS APPLICABLE TO PCBs**

65. Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of all PCB-containing products as of January 1, 1979.

66. More than thirty years passed before EPA announced that homes, schools, and other commercial buildings may have been built with PCB-containing materials. In a press release issued on September 25, 2009, EPA advised that although PCBs were banned by 1979, they remained in place in buildings that were constructed before the ban.

67. On December 12, 2013, EPA issued a press release advising that PCB-containing fluorescent light ballasts that were installed prior to the ban may still be in use in schools and may leak PCBs.

68. EPA has held that allowing caulk or paint with a PCB concentration over 50 ppm to remain in place is prohibited "use" under TSCA.

**EXHIBIT 9**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

69. EPA has not issued any information regarding possible PCB-Aroclor contamination in schools in Hartford.

**PLAINTIFFS' SCHOOL BUILDINGS ARE CONTAMINATED WITH PCB-PLASTICIZERS.**

70. Plaintiffs Board and City operate and maintain a public school system in Hartford, Connecticut and have detected PCBs in one or more of its schools that were built or renovated between 1950 and 1978. Plaintiffs have detected Aroclors 1248 and 1254 in one or more of its schools that were built or renovated between 1950 and 1978.

71.   Clark Elementary School was built in 1971. In 2014, dangerous levels of Aroclors 1248 and 1254 were detected in indoor paint samples taken at the school, necessitating removal and remediation.

72. Further testing showed PCBs in the school's air at concentrations exceeding EPA's recommended levels. The Board, with EPA oversight, has closed the school until all PCB 1248 and 1254 contamination can be identified and removed.

73. Fox Middle School and Quirk Middle School (now Global Communications School) were both built in 1972. Dangerous levels of Aroclors 1248 and 1254 were detected at both schools, necessitating removal and remediation.

74. Plaintiffs were not aware of potential harms related to PCB-Aroclors at the time of renovations or constructions that used these plasticizers. Had they known, Plaintiffs would not have used PCB-Aroclors or products plasticized with PCB-Aroclors.

75. Pursuant to the educational interests of the state, the State of Connecticut imposes a duty upon Plaintiffs to provide adequate facilities, proper maintenance of schools, and a safe school setting. C.G.S.A. § 10-220.

**EXHIBIT 9**

76. The State of Connecticut imposes a duty upon Plaintiffs to "adopt and implement an indoor air quality program that provides for ongoing maintenance and facility reviews necessary for the maintenance and improvement of the indoor air quality of its facilities[.]" C.G.S.A. § 10-220.

77.    By 1969, before these schools were built, Monsanto had accumulated decades of evidence that PCB-Aroclors were toxic to humans, that PCBs would volatilize out of Aroclors 1248 and 1254 used in indoor paints and caulks reaching dangerous levels in indoor air, that PCBs would migrate onto and contaminate nearby materials causing property damage, and that occupants of buildings would be exposed to potentially dangerous levels of PCBs.

78.    In fact, the company had actual knowledge about the dangers associated with the use of PCB-Aroclors in paints.

79. Migration of PCBs may begin as soon as PCBs or PCB-containing products are installed or applied, regardless of climate and without any prior deterioration.

80. At no point did Monsanto warn or alert the City or Board that PCBs may migrate and contaminate ambient air or secondary sources.

## FIRST CAUSE OF ACTION

### CONNECTICUT PRODUCTS LIABILITY ACT
### STRICT LIABILITY

81. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this cause of action.

82. Monsanto created a line of commercial plasticizer products including Aroclors 1248 and 1254. Although Aroclors 1248 and 1254 were made with PCBs, Monsanto made Aroclor plasticizers that did not contain PCBs. As a large and sophisticated chemical company,

EXHIBIT 9

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Monsanto was in the business of producing, making, fabricating, constructing, designing, marketing, and selling PCB-containing Aroclors for placement into trade or commerce.

83. All of Monsanto's Aroclor plasticizers were manufactured for placement into trade or commerce.

84. Monsanto marketed and sold PCB-Aroclors as commercial plasticizers for incorporation into other products, including those for "open use" applications in schools and other buildings.

85. Monsanto was heavily involved in determining which plasticizer to sell to a formulator for a particular use. Monsanto recognized that "even the most experienced formulator is bewildered by the maze of possibilities from which to select" a plasticizer "for his particular application" and advertised that its Plasticizer Council provided "much more than simply the products;" it also provided "expert guidance in their use." The Council studied applications in its laboratory and recommended specific plasticizers to its customers.

86. Monsanto alone controlled the formulation of its plasticizer products and determined which ones would contain PCBs and which would not.

87. Monsanto also provided advice and recommendations as to whether PCB-Aroclor plasticizer should be used in a particular formulator's application.

88. Monsanto's customers used the plasticizers in the intended manner and in a substantially unchanged way.

89. As a manufacturer, Monsanto owed a duty to all persons whom its products might foreseeably harm, including Plaintiffs, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

90. PCB-Aroclors are in a defective condition and are unreasonably dangerous for their reasonably anticipated use in school buildings for the following reasons:

EXHIBIT 9

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

a. Monsanto selected a plasticizer for a formulator's needs without disclosing whether that plasticizer was a PCB-Aroclor;

b. Monsanto did not advise the formulators regarding which Aroclor plasticizers contained PCBs and which did not;

c. When PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are used in open applications, the PCB compounds readily volatilize out of the original application;

d. PCB volatilization begins soon after the Aroclor-containing product is installed or put into use;

e. Once volatilized, PCBs migrate to and contaminate adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;

f. PCBs can then volatilize out of these materials and contaminate still other materials;

g. When PCBs volatilize, building occupants including students, teachers, employees, and visitors may be exposed to PCBs via inhalation, ingestion, and dermal contact;

h. PCB is human and animal carcinogen and is associated with other serious health risks;

i. PCB exposure may be halted and prevented only by physical removal of the original PCB-Aroclors and any secondary materials that have become contaminated;

**EXHIBIT 9**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

    j. Because remediation involves removal of all damaged property, it can require removal of building materials such as interior walls and brick that were not made with PCB-Aroclors;

    k. Such remediation is extremely expensive to undertake, disrupts normal classroom activities, and may cause undue concern on the part of students, teachers, school employees, and parents.

91. At the time of sale, Monsanto knew of these risks associated with PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, and failed to use reasonable care in the design of its plasticizer products.

92. PCB-Aroclor plasticizers for open uses, including Aroclors 1248 and 1254, pose greater dangers to school buildings than would be expected by ordinary persons such as Plaintiffs, schoolchildren, teachers and employees, and the general public.

93. At all times, Monsanto and other companies made plasticizers that did not contain PCBs. These were reasonable alternative designs capable of preventing the Plaintiffs' damage.

94. The risks posed by PCB-Aroclors far outweigh the products' utility as plasticizers in indoor applications.

95. The likelihood that PCBs would migrate out of Aroclor plasticizers, including Aroclors 1248 and 1254, and contaminate Plaintiffs' property and the gravity of that damage far outweighed any burden on Monsanto to adopt an alternative design and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

96. The PCBs began to volatilize and migrate of their applications shortly after the products were installed or applied. The migration contaminated underlying and adjacent materials while the

EXHIBIT 9

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

paint, caulk, and other plasticizer-containing materials remained intact and performed their intended functions.

97. Plaintiffs' buildings were contaminated by Aroclors 1248 and 1254 after their application in paint or caulk when the building was constructed in 1969. The contamination began while the paint or caulk was in its useful safe life.

98. Monsanto also fraudulently concealed information about PCB-Aroclors' dangers in open uses in school and other buildings.

99. At least twenty years before the Hartford schools were constructed, Monsanto had actual knowledge that the use of PCB-Aroclors in paints resulted in air concentrations that exceeded the accepted safe maximum for continuous exposure. By the mid-1950s, Monsanto acknowledged that the use of Aroclor paints will constitute a health hazard in some circumstances. The company also had actual knowledge that exposure to airborne Aroclors 1248 and 1254, the plasticizers used in Hartford, caused injury to test animals and led to the conclusion that a painted room could be hazardous.

100. Monsanto also had actual knowledge that PCB-Aroclors emanated out of open uses causing contamination. It knew, too, that plasticizer use and volatilization represented a substantial percentage of the contamination found in the environment.

101. Despite the company's growing awareness of the dangers of open-use plasticizers containing PCBs, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite – that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner.

**EXHIBIT 9**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

102.    In a March 24, 1969 letter to Los Angeles County Air Pollution Control District,
Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or
skin absorption."

103.    A similar letter to the San Francisco Bay Regional Water Quality Control Board
explained that PCB plasticizers (found in surface coatings, such as paints, industrial
adhesives and window sealants), in normal use, present no special health problems."

104.    In May 1969, Monsanto's Manager, Environmental Health, Elmer Wheeler spoke with a
representative of the National Air Pollution Control Administration, who promised to relay to
Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the
environment in a widespread fashion."

105.    Monsanto delivered the same message to the New Jersey Department of Conservation in
July 1969, claiming first, "Based on available data, manufacturing and use experience, we do
not believe the PCBs to be seriously toxic." The letter then reiterates Monsanto's position
regarding environmental contamination: "We are unable at this time to conceive of how the
PCBs can become wide spread in the environment."

106.    One year later, in a letter to Congressman William Ryan dated April 28, 1970, Monsanto
disclaimed all potential human health threats and misrepresented the risk facing occupants of
schools and other buildings where plasticizers remained in open uses: "It should be
emphasized that the apparent PCB problem relates only to the possible effects on some
species of birds. Manufacturing and use experience for thirty years, earlier animal toxicity
studies, and the interim reports on current extensive toxicological studies with various
species of animals indicate that there is no threat to the public health."

**EXHIBIT 9**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

107. Monsanto, thus, had actual knowledge of and misrepresented the very dangers alleged here --- the volatilization of PCBs from plasticizers in open-use applications. And Monsanto knew of and concealed these dangers before the Hartford schools were constructed.

108. Had Plaintiffs known of these dangers, they would not have purchased products containing PCB-Aroclor plasticizers.

109. Plaintiffs relied on Monsanto's implied warranty that their PCB-Aroclor plasticizers were safe for open use applications.

110. As a direct and proximate result of Monsanto's unreasonably dangerous design, manufacture, and sale of PCB-Aroclor plasticizers, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

111. Monsanto knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of commercial and school properties. Monsanto committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

112. Monsanto knew and expected that PCB-Aroclors would be used as plasticizers in building materials. In these materials, Monsanto's PCB-Aroclors would have been expected to and did reach consumers, like Plaintiffs, without substantial change in chemical condition.

## SECOND CAUSE OF ACTION

### CONNECTICUT PRODUCTS LIABILITY ACT
### FAILURE TO WARN

113. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

**EXHIBIT 9**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

114. As a manufacturer of PCB-Aroclor plasticizers, Monsanto had a duty to provide adequate warnings of the risks of these products to all persons whom its product might foreseeably harm, including Plaintiffs, the public, and public officials.

115. PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are unreasonably dangerous for their reasonably anticipated use in school buildings for the following reasons:

    a. When PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are used in open applications, the PCB compounds readily volatilize out of the original application;

    b. PCB volatilization begins soon after the plasticizer-containing product is installed or put into use;

    c. Once volatilized, PCBs migrate to and contaminate adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;

    d. PCBs can then volatilize out of these secondary materials and contaminate still other materials;

    e. When PCBs volatilize, building occupants including students, teachers, employees, and visitors may be exposed to PCBs via inhalation, ingestion, and dermal contact;

    f. PCB is human and animal carcinogen and is associated with other serious health risks;

    g. PCB exposure may be halted and prevented only by physical removal of the original PCB-Aroclor products and any secondary materials that have become contaminated;

Page 21

EXHIBIT 9

       h.  Because remediation involves removal of all damaged property, it can require removal of building materials such as interior walls and brick that were not made with PCB-plasticizers;

       i.  Such remediation is extremely expensive to undertake, disrupts normal classroom activities, and may cause undue concern on the part of students, teachers, school employees, and parents.

116.    Monsanto knew of the health and property damage risks associated with PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with PCB-Aroclor plasticizers or an instruction that would have allowed Plaintiffs to avoid the damage to their property.

117.    At the time of manufacture, Monsanto knew or should have reasonably anticipated that formulators and foreseeable users would not be aware of the risks and nature of potential harm of its PCB-Aroclor plasticizer products.

118.    Despite Monsanto's knowledge of the presence of PCB-Aroclor plasticizers that remain present in "open uses" in commercial buildings and schools nationwide, including Aroclors 1248 and 1254, Monsanto has not issued any warning, instruction, recall, or advice regarding PCB-containing products to schools, communities, parents, or governmental agencies.

119.    Plaintiffs would have heeded legally adequate warnings and would not have purchased products containing PCB-Aroclors or would have taken steps to ensure that PCB-Aroclors were treated differently to prevent potential exposure and contamination of the environment.

**EXHIBIT 9**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

120. As a direct and proximate result of Monsanto's failure to warn, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

121. Monsanto knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of commercial and school properties. Monsanto committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

## THIRD CAUSE OF ACTION

### CONNECTICUT PRODUCTS LIABILITY ACT
### NEGLIGENCE

122. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

123. As a manufacturer and seller of PCB-Aroclor plasticizers, Monsanto owed a duty to Plaintiffs and to all persons whom its products might foreseeably harm to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PCB-Aroclor plasticizers including Aroclors 1248 and 1254.

124. Monsanto held itself out as an industry expert in plasticizers. Through its Plasticizer Council, Monsanto advised customers regarding plasticizers for their needs and suggested particular plasticizers for specific applications.

125. Monsanto sold Aroclor and PCB-Aroclor plasticizers to be used in a wide variety of applications including paints, glues, sealants, caulks, mastics, and others. Each of those applications could then be used in many different settings – indoor, outdoor, commercial, residential.

Page 23

**EXHIBIT 9**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

126.  Monsanto knew or should have known that Aroclors were volatilizing out of open use applications including Aroclor 1248 and 1254 plasticizers used in indoor paints by the early 1950s. Monsanto recognized a need to perform testing of Aroclor plasticizers used in paints.

127.  Despite this knowledge, Monsanto breached its duty of care to Plaintiffs by:

    a.  intentionally deciding not to perform testing on all PCB-containing plasticizers, including Aroclors 1248 and 1254, used in indoor paints to determine the rate and concentration of air dispersion and toxicity levels;

    b.  intentionally deciding not to perform studies of the long-term health effects of exposure to PCB-containing plasticizers, including Aroclors 1248 and 1254, used in indoor open use applications;

    c.  intentionally deciding not to perform studies of the causes and extent of environmental PCB contamination;

    d.  intentionally advising formulators to use PCB-Aroclors, including Aroclors 1248 and 1254, for indoor open use applications;

    e.  intentionally marketing plasticizers as "Aroclors" with no distinction between PCB-Aroclors and available alternatives;

    f.  intentionally concealing, or failing to disclose to formulators whether the Aroclor plasticizer selected for their applications contained PCBs;

    g.  failing to require product labeling warning of the risks of exposure to PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, used in open use indoor applications;

**EXHIBIT 9**

      h.   intentionally deciding not to stop the use of PCB-Aroclor plasticizers, including

           Aroclor 1254, for indoor open use applications in schools, commercial buildings,

           hospitals, etc.;

      i.   intentionally concealing information from or misleading regulatory agencies

           about the potential for open use PCB-Aroclor plasticizers to volatilize and to

           cause dangerous indoor air conditions;

      j.   intentionally mischaracterizing PCB-Aroclors, including Aroclor 1254, as

           nontoxic;

      k.   intentionally concealing the fact that PCBs migrate from PCB-Aroclors onto

           adjacent materials including substrate, causing extensive property damage; and

      l.   intentionally allowing open use PCB-Aroclor plasticizers including Aroclors 1248

           and 1254 to remain in place for decades after concerns about toxicity and

           volatility led Monsanto to stop selling these products for open uses.

128.    Damage and contamination of Plaintiffs' property is the result of Monsanto's reckless

disregard for the safety of consumers and users of PCB-Aroclors and products plasticized

with PCB-Aroclors. Monsanto knew that it was substantially certain that its acts and

omissions described above would threaten public health and cause extensive contamination

of commercial and school properties. Monsanto committed each of the above described acts

and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with

conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs'

property rights.

EXHIBIT 9

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

129.  As a direct and proximate result of Monsanto's negligence, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

### FOURTH CAUSE OF ACTION

### PUBLIC NUISANCE

130.  Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

131.  Monsanto manufactured, distributed, marketed, and promoted PCB-Aroclors including 1248 and 1254 in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety, and comfort of the general public and Plaintiffs, causing inconvenience and annoyance.

132.  Monsanto's intentional, negligent, and reckless acts and omissions have created widespread contamination of property with Aroclors 1248 and 1254, and possibly others.

133.  By their conduct, Monsanto violated and continues to violate public rights and rights of the community at large to a clean and unpolluted natural environment and school buildings.

134.  The presence of PCB-Aroclors interferes with Plaintiffs' use and/or enjoyment of their property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

135.  Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCB-Aroclors, including 1248 and 1254, would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any property where PCB-Aroclor-plasticized products were used.

**EXHIBIT 9**

136.    As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiffs

have suffered, and continue to suffer, contamination requiring investigation, remediation, and

monitoring costs to be determined at trial.

### FIFTH CAUSE OF ACTION

### PRIVATE NUISANCE

137.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding

paragraphs as if fully restated in this count.

138.    Plaintiffs' school buildings and grounds have been contaminated with Aroclors 1248 and

1254.

139.    The presence of these PCB-Aroclors unreasonably interferes with Plaintiffs' use, benefit,

and enjoyment of their property.

140.    Monsanto knew or, in the exercise of reasonable care, should have known that the design,

manufacture, marketing, promotion, and sale of PCB-Aroclors would seriously and

unreasonably interfere with the ordinary comfort, use, and enjoyment of any property where

products plasticized with PCB-Aroclors, including 1248 and 1254, were used.

141.    Monsanto's intentional, negligent, and reckless acts and omissions have contaminated

Plaintiffs' property with Aroclors 1248 and 1254.

142.    As a direct and proximate result of Monsanto's creation of a private nuisance, Plaintiffs

have suffered, and continue to suffer, contamination requiring investigation, remediation, and

monitoring costs to be determined at trial.

### SIXTH CAUSE OF ACTION

### TRESPASS

EXHIBIT 9

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

143. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

144. Plaintiffs are the owners, operators, and/or actual possessor of real property and improvements used for public schools in Hartford, Connecticut.

145. Monsanto manufactured, distributed, marketed, and promoted PCB-Aroclors with the actual knowledge and/or substantial certainty that PCB-Aroclors, including 1248 and 1254, would, through normal use, release PCBs that would migrate throughout ambient air and onto adjacent surfaces, causing property contamination.

146. Monsanto negligently, recklessly, and/or intentionally produced and marketed PCB-Aroclors in a manner that caused them to contaminate Plaintiffs' property.

147. As a direct and proximate result of Monsanto's trespass, Plaintiffs have suffered and continue to suffer contamination requiring investigation, remediation, and monitoring costs to be determined at trial.

## PRAYER FOR RELIEF

Plaintiffs prays for judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages according to proof including, but not limited to:

   (a) the costs of investigating, sampling, testing, and assessing the extent of Aroclor 1248 and 1254 contamination on Plaintiffs' properties;

   (b) the costs of interim measures implemented to reduce further contamination prior to complete removal of Aroclors 1248 and 1254;

   (c) the costs of removing adjacent substrates and other contaminated materials from Plaintiffs' properties;

EXHIBIT 9

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

       (d) the costs of informing parents and community members about the efforts to

         remove Aroclors 1248 and 1254 from schools.

       (e) Costs of relocating students and staff, e.g. portable classrooms, swing space,

         and transportation.

2.  Punitive damages;

3.  Prejudgment and post-judgment interest;

4.  Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial.


Dated:  December 23, 2015


                    /s/  Scott Summy
                  **BARON & BUDD, P.C.**
                  Scott Summy  (*Pro Hac Vice*)
                  Carla Burke Pickrel (*Pro Hac Vice*)
                  Celeste A. Evangelisti (*Pro Hac Vice*)
                  3102 Oak Lawn Avenue, Suite 1100
                  Dallas, TX  75219
                  Tel:  (214) 521-3605
                  Fax:  (214) 520-1181
                  ssummy@baronbudd.com
                  evangelisti@baronbudd.com
                  cburkepickrel@baronbudd.com

                  Henri Alexandre, Corporation Counsel
                  City of Hartford
                  550 Main Street, Suite 210
                  Hartford, CT  06103
                  Tel:  (860) 757-9700
                  Fax:  (860) 722-8114
                  Henri.alexandre@hartford.gov

EXHIBIT 9

**17SL-CC03368**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK COUNTY, ss.**

SUPERIOR COURT
CIVIL ACTION NO.: 16-0503 E

---

CRAIG LAMKIN and SUSAN LAMKIN

*Plaintiffs,*

vs.

JURY TRIAL DEMANDED

MONSANTO COMPANY,

COOPER POWER SYSTEMS, as a division of EATON'S ELECTRICAL,

MCGRAW- EDISON COMPANY, as a subdivision of COOPER POWER SYSTEMS and EATON ELECTRICAL,

O'CONNOR CORPORATION INC. f/k/a SOLUTIA INC.,

GENERAL ELECTRIC CO.,

SOLUTIA INC.,

PHARMACIA LLC f/k/a PHARMACIA CORPORATION as *successor in interest to* OLD MONSANTO.,

PFIZER INC.,

CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION,

NSTAR ELECTRIC f/k/a BOSTON EDISON COMPANY,

INTERNATIONAL PAPER COMPANY,

VERIZON COMMUNICATIONS INC., f/k/a VERIZON NYNEX PERKINELMER, INC.



1

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**JOHN DOE.**

    *Defandants.*

---

## COMPLAINT

COMES NOW Plaintiffs, CRAIG LAMKIN and SUSAN LAMKIN, and allege as follows:

## INTRODUCTION

1.      On or about July of 2013, Plaintiff Craig Lamkin was diagnosed with primary retroperitoneal sarcoma of the colon, small bowel, pancreas, spleen, and left adrenal gland which required Plaintiff to undergo a radical resection of his left abdomen. Plaintiff's cancer was caused by exposure to polychlorinated biphenyls (PCBs) manufactured, sold and controlled by Defendants as well as chemical derivatives and contaminants contained within the PCBs known as dioxins. PCBs were manufactured, sold, and utilized by Defendants for use as a coolant and lubricant in electrical machinery including transformers. Plaintiff Craig Lamkin was exposed to Defendants' PCBs and dioxins during the course of his employment working with power transformers and other electrical equipment manufactured by Defendants. Plaintiff Craig Lamkin was regularly and routinely exposed to these PCBs and dioxins with sufficient regularity to cause his disease. At all times material to this action, Defendants had or should have had actual knowledge of the toxicity of PCBs and dioxins and failed to warn the Plaintiff. Moreover, at all times material to this action, alternative safer materials were available to Defendants for use as a chemical lubricant and coolant. Despite the knowledge of the hazards associated with PCBs and dioxins, Defendants made the affirmative decision to utilize these

2

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

carcinogenic materials and affirmatively choose not to warn the Plaintiff. Defendants' PCBs and dioxins, as well as the machinery sold containing this material, were unreasonably dangerous and unfit for the purposes that they were designed and sold for. As a result of the allegations listed above and herein, Mr. Lamkin has suffered, and continues to suffer, debilitating injuries. Mr. Lamkin, and his wife Susan Lamkin, bring this suit for damages relating to those injuries.

## PARTIES

2.     Plaintiff, Craig Lamkin ("Plaintiff-worker"), was and is a citizen and resident of the State of Massachusetts during all times relevant. He brings this action individually.

3.     Plaintiff, Susan Lamkin ("Plaintiff-spouse"), was and is a citizen and resident of the State of Massachusetts during all times relevant and also makes a claim for loss of consortium due to her husband's PCB/dioxin-related disease.

4.     Defendant Monsanto Company ("New Monsanto"), is a Delaware Corporation with its principle place of business in St. Louis, Missouri. At all relevant times it did business in the State of Massachusetts.

5.     Defendant Cooper Power Systems ("Cooper"), a division of Eaton's Electrical, is a Delaware Corporation with its principle place of business in St. Louis, Missouri. At all relevant times it did business in the State of Massachusetts.

6.     Defendant McGraw-Edison Company, a subdivision of Cooper Power Systems and Eaton Electrical Delaware Corporation, is a Delaware Corporation, with its principle place of business in Elgin, Illinois, and it's Registered Agent in Boston, Massachusetts. At all relevant times it did business in the State of Massachusetts.

7.     Defendant O'Connor Corporation Inc. (formerly known as "O'Conner Constructers" and successor to Thomas O'Connor & Company), is a Delaware Corporation with its principle place of

3

EXHIBIT 10

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

business in St. Louis, Missouri. At all relevant times it did business in the State of Massachusetts.

8.    Defendant General Electric Company is a New York corporation with its principal place of business in New York. At all relevant times it did business in the State of Massachusetts.

9.    Defendant Solutia Inc. ("Solutia") is a Delaware Corporation with its principle place of business in St. Louis, Missouri. At all relevant times it did business in the State of Massachusetts.

10.    Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to Old Monsanto) is a Delaware LLC that since its merger with Defendant Pfizer Inc. in 2003, has had its headquarters and its principal place of business New York, New York. Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc. At all relevant times it did business in the State of Massachusetts.

11.    Defendant Pfizer Inc. ("Pfizer") is a Delaware corporation that has its corporate headquarters and principal place of business in New York, New York. At all relevant times it did business in the State of Massachusetts.

12.    Defendant CBS Corporation f/k/a Westinghouse Electric Corporation is a Delaware corporation with its principal place of business in New York. At all relevant times it did business in the State of Massachusetts.

13.    Defendant NSTAR Electric f/k/a Boston Edison Company is a Massachusetts corporation with its principal place of business in Massachusetts.

14.    Defendant International Paper Company is a Maine corporation with its principal place of business in Maine. At all relevant times it did business in the State of Massachusetts.

15.    Defendant Verizon Communications Inc., f/k/a Verizon Nynex ("Verizon") is a Delaware corporation with a Registered Agent in Massachusetts. At all relevant times it did business in the State of Massachusetts.

16.    PerkinElmer, Inc. is a Massachusetts corporation with its principal office and Registered Agent in Massachusetts. At all relevant times it did business in the State of Massachusetts.

4

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

17.     Defendant JOHN DOE (fictitious) represents one or more business entities whose real names and identities are presently unknown to Plaintiffs.

18.     The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceuticals and nutrition business, and a chemical products business. Old Monsanto began manufacturing PCBS in the 1940s and continued to manufacture commercial PCBS, until the late 1970s. At all relevant times it did business in the State of Massachusetts.

19.     Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations. The corporation now known as Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

20.     Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.

21.     Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.

22.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.

23.     At all times herein mentioned, each of the defendants was the agent, servant, employee and/or joint venture of his co-defendants, and each of them, and at all said times each defendant was acting in full course and scope of said agency, service, employment and/or joint venture.

5

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

24.    The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants are not fully known to Plaintiffs at this time, who there're sues said defendants by such fictitious names.  When the true names and capacities of said defendants have been ascertained, Plaintiffs will amend this complaint accordingly.  Plaintiffs are informed and believe, and thereon allege, that each defendant designated herein as JOHN DOE is responsible, negligently or in some other actionable matter, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to the Plaintiffs, as hereinafter alleged.

25.    Plaintiffs are informed and believe, and thereon allege that at all times herein mentioned, defendants Monsanto Company (New Monsanto) (sued individually and as successor in interest to Pharmacia Corporation, Which Will Do Business in Massachusetts as Pharmacia Pharmaceutical Corporation), Solutia Inc. (sued individually and as successor-in-interest to Monsanto Chemical Co.(Old Monsanto)), Pharmacia (sued individually and as successor-in-interest to Monsanto Chemical Co.(Old Monsanto)), Pfizer (sued individually and as successor-in-interest to Pharmacia Corporation, Which Will Do Business in Massachusetts as Pharmacia Pharmaceutical Corporation), and JOHN DOES were and are authorized to do and are doing business in the State of Massachusetts, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the state of Massachusetts, and that said defendants have regularly conducted business in the state of Massachusetts.

26.    Plaintiffs are informed and believe that each of the defendants is responsible, negligently, intentionally and/or in some actionable manner, including as corporate successors liable for the acts of their predecessors, for the events and happenings referred to herein, and caused and continue to cause injuries and damages to Plaintiffs, as alleged herewith, either through each defendant's own conduct, or through the conduct of its agents, servants, or employees, or due to ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

6

EXHIBIT 10

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

27.    Collectively, the following Defendants are known as the Manufacturing Defendants for purposes of this Complaint. They are listed as follows: Monsanto Company; Cooper Power Systems; O'Connor Corporation; General Electric's manufacturing division; Pfizer; Solutia; Pharmacia; CBS; PerkinElmer, Inc., and JOHN DOE defendants.

28.    Collectively, the following Defendants are known as Premises Defendants for purposes of this Complaint. They are listed as follows: McGraw Edison; NSTAR; International Paper Company; Verizon Communications; General Electric's facility located in Pittsfield, Massachusetts; and JOHN DOE defendants.

## VENUE JURISDICTION

29.    Suffolk County Superior Court is a proper venue for this action, since Plaintiff's exposure and Defendants actions and selling of products which led to such exposure took place in the State Massachusetts.

30.    Jurisdiction is proper in this Court because Plaintiff are seeking damages in excess of twenty-five thousand dollars ($25,000) and Defendants' conduct giving rise to Plaintiffs' causes of action occurred in the state of Massachusetts.  See MGL c. 223A, § 3.

31.    This Court has jurisdiction of this matter because the amount in controversy exceeds its jurisdictional minimum, exclusive of costs and interest. Moreover, this Court has jurisdiction over this matter and these defendants because these defendants have done business in the State of Massachusetts, committed torts, in whole or in part, in the State of Massachusetts, and/or have continuing contacts with the State of Massachusetts resulting in Plaintiff Craig Lamkin's injuries.

32.    In the event that the parties do not maintain principal places of residence and/or business within the Commonwealth of Massachusetts, the Massachusetts Long Arm Statute (M.G.L. c.223 A, § 3) provides personal jurisdiction in the Superior Court Department of the Trial Court over all parties.

7

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

33.    This action involves claims by Massachusetts Plaintiffs against at least one defendant who has a principle place of business in Massachusetts through which the injuries alleged were caused. "[An] action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." (28 U.S.C. § 1441(b)).

## FACTUAL ALLEGATIONS
### A.  Background.

34.    This is a personal injury case brought by Plaintiffs, Craig Lamkin and his wife Susan Lamkin for injuries caused by Plaintiff Craig Lamkin's exposure to polychlorinated biphenyls (PCBs) manufactured and sold and controlled by Defendants as well as chemical derivatives and contaminants contained within the PCBs known as dioxins.  At all times relevant to the allegations listed herein, Plaintiff, Craig Lamkin was employed by (1) Laidlaw Environmental Services in North Andover, Massachusetts, where he worked as an environmental chemist from approximately October of 1992 through December of 1994; (2) Enpro Services in Newburyport, Massachusetts, where he worked as a compliance manager from approximately December of 1994 through July of 2001; and (3) Cyn Environmental Services in Stoughton, Massachusetts, where he worked as a corporate compliance manager from approximately July of 2001 through June of 2008.  Throughout Mr. Lamkin's employment he worked at the various premises sites listed in count 28, herein aforementioned.

35.    PCBs were used as coolants and lubricants in transformers, capacitors, and other electrical equipment from 1929 to 1979.

36.    The manufacture of PCBs was stopped in the U.S. in 1979 because of evidence of harmful health effects and impacts on the environment.

37.    'Dioxins' refers to two groups of compounds: Polychlorinated dibenzo-p-dioxins (PCDDs) and dibenzofurans (PCDFs).

8

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

38.     Dioxins have no technological or other use, but are generated in a number of thermal and industrial processes including the use as coolants and lubricants in electrical equipment as unwanted and unavoidable by-products. Moreover, dioxins are present as contaminants within PCBs that have not been subject to thermal or industrial processes.

39.     Dioxins and PCBs been shown to cause a range of adverse effects including cancer, impairment of the nervous, immune, endocrine, and reproductive systems.

40.     Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979. Although Monsanto knew for decades that PCBs were toxic and presented a human health risk, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture use of most PCBs as of January 1, 1979. The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

41.     Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start capacitors, and lighting ballasts.

42.     From the 1930s to 1979, Westinghouse and General Electric Co. were the biggest purchasers of PCBs for use in electrical components including transformers.

43.     Other big users included electrical-equipment companies such as McGraw Edison, NStar Electric, and telephone companies like NYNEX Corporation.

44.     As used in this Complaint, the terms " "PCB-containing products" and "PCB products" refer to products containing PCBs, as well as breakdown products and contaminants PCDDs and PCDFs, manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

### B.  PCB Containing Products are Human Carcinogens.

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

45.    Humans may be exposed to PCB products through ingestion, inhalation, and dermal contact. Individuals may inhale PCBs that are emitted into the air. They may also ingest PCB products that are emitted into air and settle onto surfaces that come into contact with food or drinks. Humans may also PCBs from physical contact with PCBs or PCB-containing materials.

46.    EPA has determined that PCBs are probable human carcinogens. In 1996, EPA reassessed PCB carcinogenic to Plaintiff, based on data related to Aroclors 1016, 1242, 1254, and 1260.    EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

47.    The International Agency for Research on Cancer published an assessment in 2013 that reinforcing the probable carcinogenicity of PCBs.

48.    The International Agency for Research on Cancer published an assessment in 1997 that asserts an even stronger relationship between dioxins and human cancer. The International Agency for Research on Cancer (IARC) classified TCDD in Group 1 (carcinogenic to humans). In addition, IARC recently classified 2,3,4,7,8-pentachlorodibenzofuran and 3,3',4,4',5-pentachlorobiphenyl in Group 1.

### C. Defendants Have Long Known of PCBs' Toxicity

49.    All of the Defendants were well aware of the decades of scientific literature first published in the 1930s that established that PCBs were toxic to humans.

50.    As a result, all of the Defendants knew or should have known of the actual dangers associated with PCB products that Mr. Lamkin worked with.

51.    Despite this, Defendants never warned Mr. Lamkin of the hazards associated with their PCB products or advised him of the proper protective measures to avoid exposure.

52.    In 1936, Dr. Lewis Schwartz, Senior Surgeon with the United States Public Health Service, wrote a paper in which he warned of the dangers of Pyrenol, the version of PCBs used by GE. In it Dr.

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Schwartz said:

"In addition to the skin lesions, symptoms of systematic poisoning have occurred among workers inhaling the fumes. Those working with the chloro diphenyls (PCBs) have complained of digestive disturbances, burning of the eyes, impotence and hematuria. The latter symptom developed among a number of men making amino diphenyl, which is used in the making of a rubber antioxidant. Causes of death from yellow atrophy of the liver have been reported among workers exposed to the fumes of the chloro naphthalenes."

53.    Also in 1936, Dr. Schwartz cautioned in an article that "workers in chlorinated naphthalenes and di phenyls (PCBs) should be periodically examined for symptoms of systemic poisoning."

54.    An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects. Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."

55.    In a letter dated Sept. 15, 1947, E. C. Barnes of Westinghouse's medical department wrote that long-term exposure to PCB fumes "may produce internal bodily injury which may be disabling or could be fatal."

56.    A September 20, 1955, memo from Emmet Kelly stated:

"We know Aroclors are toxic but the actual limit has not been precisely defined. It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops [sic] any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."

57.    On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department.

"It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation."

58.    On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. 1`

11

EXHIBIT 10

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."

59.    In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested." Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible." Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."

60.    On January 29, 1970, Elmer Wheeler of the Medical Department of Monsanto circulated laboratory reports discussing results of animal studies. He noted: "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."

### D. Defendants Concealed the Nature of PCBs from Governmental Entities.

61.    Upon information and belief, while the scientific community and Defendants knew that PCBs were toxic and becoming a global contaminant, Defendants repeatedly misrepresented these facts, telling governmental entities the exact opposite — that the compounds were not toxic and that the company would *not* expect to find PCBs in the environment in a widespread manner.

62.    For example, in a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption." Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry." A similar letter to the Regional Water Quality Control Board explained that PCBs are associated with "no special health problems" and "no problems associated with the environment."

12

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

63.    In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."

64.    Monsanto delivered the same message to the New Jersey Department of Conservation in July, 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic." The letter then reiterates Monsanto's position regarding environmental contamination: "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."

### E. Plaintiff Craig Lamkin's Experience and Exposure to Defendants PCB products.

65.    Plaintiff, Craig Lamkin was employed by (1) Laidlaw Environmental Services in North Andover, Massachusetts, where he worked as an environmental chemist from approximately October of 1992 through December of 1994; (2) Enpro Services in Newburyport, Massachusetts, where he worked as a compliance manager from approximately December of 1994 through July of 2001; and (3) Cyn Environmental Services in Stoughton, Massachusetts, where he worked as a corporate compliance manager from approximately July of 2001 through June of 2008.

66.    During the course of his employment with each of these entities, Mr. Lamkin worked with each of the Manufacturing Defendants' PCB containing products including, but not limited to electrical transformers and other electrical equipment.

67.    While working with the Manufacturing Defendants' PCB containing products, Mr. Lamkin was repeatedly exposed to PCB products through inhalation, ingestion, and dermal exposure.

68.    Mr. Lamkin's exposure to these PCB products occurred at facilities including but not limited to those of the Premises Defendants.

13

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**Count I: Breach of Warranty- Defective Design (Against Manufacturing Defendants)**

**(Incorporating Strict Liability Principles as Set Forth in the Restatement (Third) of Torts)**

69.   Plaintiffs repeat and reallege all allegations contained in all paragraphs above as if fully set forth herein.

70.   Defendants were the producers of PCBs and PCB products intended for commercial use.

71.   Defendants were in the business of producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing PCBs and PCB-containing products for placement into trade or commerce.

72.   Defendants' PCB products were manufactured for placement into trade or commerce.

73.   Defendants' PCB products may have formed component parts of or may have been subsequently incorporated into other products and equipment.

74.   As a manufacturer, Defendants owed a duty to all persons to whom PCBs and PCB containing products might foreseeably harm, including Plaintiffs,

75.   Defendants had a further duty not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

76.   By manufacturing and selling PCB products, Defendants warranted that those PCB products are merchantable, safe, and fit for ordinary purposes.

77.   Defendants breached that warranty as PCBs and PCB-containing products are unreasonably dangerous for their reasonably anticipated use because:

    a.   PCB readily migrates from the site of its original application and contaminates
    b.   adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;
    c.   PCB persists in the environment;
    d.   PCB is invisible to the naked eye;
    e.   Individuals may be exposed to PCB through inhalation, ingestion, and dermal contact.
    f.   PCB products are is a known carcinogens and are associated with other serious health risks;

14

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

78.     Defendants knew of the risks associated with PCB products and failed to use reasonable care in the design of its products.

79.     Products containing PCBs or dioxins pose greater than would be expected by ordinary persons such as Plaintiffs and the general public.

80.     There existed an alternative design for Defendants' products that was capable of preventing the Plaintiffs' cancer.

81.     The risks posed by PCBs and PCB products outweigh the products' utility as an electrical coolant and lubricant.

82.     The likelihood that PCBs would cause cancer or other disease outweighed any burden on Defendants to adopt an alternative design and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

83.     Plaintiff was exposed to Defendants' PCB products during the course of his employment from October of 1992 through June of 2009.

84.     Plaintiff was exposed at sufficient level to cause his cancer in June 2013.

85.     As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of PCB-containing products, Plaintiffs have suffered, and continue to suffer injuries and damages.

86.     Wherefore, Plaintiffs demand judgment for damages, including costs, interest as applicable, punitive damages and a trial by jury.

**COUNT II: Breach of Warranty- Defective Warning (Against Manufacturing Defendants)**
**(Incorporating Strict Liability Principles as Set Forth in the Restatement (Third) of Torts)**

87.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

88.    As a manufacturer of PCBs and PCB-containing products, Defendants had a duty to provide adequate warnings to Plaintiffs, the public, and public officials of the risks posed by PCBs and PCB-containing products.

89.    PCBs and PCB-containing products are unreasonably dangerous for their reasonably anticipated use because:

    a.    PCB readily migrates from the site of its original application and contaminates
    b.    adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;
    c.    PCB persists in the environment;
    d.    PCB is invisible to the naked eye;
    e.    Individuals may be exposed to PCB through inhalation, ingestion, and dermal contact.
    f.    PCB products are is a known carcinogens and are associated with other serious health risks;

90.    Defendants knew of the risks associated with PCBs and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with PCB-containing products or an instruction that would have allowed Plaintiffs to avoid his injurious exposure.

91.    Despite Defendants' knowledge of the presence of PCB-containing products in electrical transformers and other equipment, Defendants have not issued any warning, instruction, or special guidance regarding the removal and disposal of PCBs and PCB products.

92.    Plaintiffs would have heeded legally adequate warnings and would have taken additional special precautions when handling products containing PCBs and would have taken steps to ensure that PCBs were treated differently to prevent potential exposure.

93.    Plaintiff was exposed to Defendants' PCB products during the course of his employment from October of 1992 through June of 2009.

94.    Plaintiff was exposed at sufficient level to cause his cancer in June 2013.

**EXHIBIT 10**

95.     As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of PCB-containing products, Plaintiffs have suffered, and continue to suffer injuries and damages.

96.     Wherefore, Plaintiffs demand judgment for damages, including costs, interest as applicable, punitive damages and a trial by jury.

## COUNT III: Negligence (Manufacturing Defendants)

97.     Plaintiff re-alleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restates in this count.

98.     Plaintiff used, handled, inhaled, ingested, consumed, absorbed or been otherwise exposed to PCBs and PCB-containing products referred to herein in a manner that was reasonably foreseeable.

99.     Plaintiff Craig Lamkin suffers permanent injuries to his person, body and health, including, but not limited to cancer in the form of retroperitoneal sarcoma diagnosed on July 13, 2013.

100.    Defendants, and each of them, and their officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

101.    Defendants, and each of them, and their officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

102.    Defendants failed to exercise ordinary care because a reasonably careful company that learned of its product's toxicity would not manufacture that product or would warn of its toxic properties.

103.    Defendants failed to exercise ordinary care because a reasonably careful company that learned that its product could not be contained during normal production and use would not continue to manufacture that product or would warn of its dangers.

104.    Defendants failed to exercise ordinary care because a reasonably careful company would

17

EXHIBIT 10

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

not continue to manufacture PCB products in mass quantities and to the extent that Defendants manufactured them and without sufficient warnings.

105.    Defendants were negligent because they failed to exercise reasonable care.

106.    The Defendants, and each of them, and their officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

107.    The herein-described conduct of said Defendants, and each of them, was and is willful, malicious, fraudulent, outrageous, and in conscious disregard and indifference to the safety and health of Plaintiff. Plaintiff, for the sake of example and by way of punishing said defendants, and each of them, seek punitive damages according to proof.

108.    Wherefore, Plaintiffs demand judgment for damages, including costs, interest as applicable, and a trial by jury.

### COUNT IV: Premises Liability

109.    Plaintiffs adopt and re-allege each prior paragraph, where relevant, as if set forth fully herein.

110.    At all times relevant to Plaintiffs' Complaint, Plaintiff, Craig Lamkin was an invitee on the premises of the above Defendants, which were operated, owned, and/or controlled by the above Defendants, for purposes beneficial to the Defendants.

111.    Defendants owed a duty to Plaintiff, Craig Lamkin, to maintain said premises in a safe manner, free and clear of toxic chemicals, materials and substances and to provide Plaintiff with a reasonably safe place to work and a duty to exercise reasonable care in protecting Plaintiff from workplace hazards.

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

112.    Defendants breached these duties and exposed Plaintiff to various PCB-containing products at said premises during operation, construction and/or repair of said premises by Plaintiff and/or outside contractors and co-employees, and Plaintiff was injured as previously described.

113.    As set forth above, Defendants' failure to maintain the premises of the above worksites in a safe manner was intentional, reckless and wrongful, such that Plaintiffs are entitled to all actual and compensatory damages as well as for punitive damages and for such other further relief as this Honorable Court and/or jury may deem just and proper.

### COUNT V: Punitive Damages as to all Defendants

114.    Plaintiffs repeat and reallege all allegations contained in all paragraphs above as if fully set forth herein.

115.    The acts and omissions of Defendants that were the direct and proximate cause of Plaintiffs' injuries were willful, malicious, wanton, undertaken with reckless disregard of the rights of Plaintiffs, and were grossly negligent.

116.    WHEREFORE Plaintiffs demand judgment and punitive damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

### COUNT VI:  Loss of Consortium

117.    Plaintiffs repeat and reallege all allegations contained in all paragraphs above as if fully set forth herein.

118.    As a direct and proximate result of Defendants' negligence and conduct as detailed above, Plaintiff Susan Lamkin was caused to lose the consortium and society of her spouse, Plaintiff Craig Lamkin.

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

119.    Wherefore, Plaintiffs demand judgment for damages, including costs, interest as applicable, and a trial by jury.

## DEMAND FOR JURY TRIAL

120.    Plaintiff hereby demands trial by jury as to all issues so triable.

Dated: February 10, 2016

PLAINTIFFS BY THEIR ATTORNEYS,

MOTLEY RICE LLC
Robert J. McConnell, BBO #556625
Jonathan D. Orent, BBO #660571
321 South Main Street
Providence, RI 02903
401-457-7700
401-457-7708 Fax

Of Counsel:
Vincent L. Greene IV
321 South Main Street
Providence, RI 02903
401-457-7700
401-457-7708 Fax

20

**EXHIBIT 10**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM



Monsanto Company
c/o CSC-Lawyers Inc.
Service Company
221 Bolivar Street
Jefferson City, MD
65101

**EXHIBIT 10**

**17SL-CC03368**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM



# THOMPSON COBURN LLP

Christopher M. Hohn
P 314.552.6159
F 314.552.7000
chohn@thompsoncoburn.com

August 29, 2016

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL**

Scott S. Cramer
Magnetek, Inc.
N49 W13650 Campbell Dr
Menomonee Falls, WI 53051
Scramer@magnetek.com

*Re:*    *Tender of Defense & Demand for Indemnification Under Special Undertaking by Purchasers of Polychlorinated Biphyenls contract dated January 7, 1972*

   *Protected Communication:    Indemnitee-Indemnitor Privilege; Common Interest Doctrine*

Dear Mr. Cramer:

We understand that you are authorized to receive this demand on behalf of Magnetek, Inc. If that understanding is incorrect, please advise immediately and we will redirect this correspondence as necessary.

We write on behalf of our clients Monsanto Company ("New Monsanto"), Pharmacia LLC, f/k/a Monsanto ("Old Monsanto"), and Solutia Inc. (collectively the "Monsanto Defendants"). The Monsanto Defendants have been sued in certain lawsuits by a number of individuals, cities, municipal agencies, and school districts seeking to recover for claimed personal injuries, environmental clean-up and permit costs, property damage, and other damages allegedly caused by exposure to or contamination by Polychlorinated Biphenyls ("PCBs") manufactured and sold by Old Monsanto.

It is the Monsanto Defendants' understanding that Magnetek, Inc. is the successor in interest to Universal Manufacturing Corporation's obligations under the Special Undertaking By Purchasers of Polychlorinated Biphenyls contract Universal Manufacturing Corporation entered into with Old Monsanto on January 7, 1972 (the "Special Undertaking Contract"), a copy of which is enclosed for your reference.

The Special Undertaking Contract states in pertinent part that Magnetek, Inc. will:

   defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities,

Thompson Coburn LLP | Attorneys at Law | One US Bank Plaza | St. Louis, Missouri 63101
P 314.552.6000 | F 314.552.7000 | www.thompsoncoburn.com

Chicago • Los Angeles • St. Louis • Southern Illinois • Washington, D.C.

**EXHIBIT 11**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

claims, damages, penalties, actions, suits, losses, costs and expenses (except to the extent arising from failure of PCB to conform to specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale, or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

Special Undertaking Contract at 1.

By copy of this letter, demand is made for Magnetek, Inc. to defend, indemnify and hold harmless Old Monsanto (and related entities as specified in the Special Undertaking Contract), in connection with all current and future PCB-related litigation wherein Old Monsanto is, or will be, named as a defendant, and for the amount of any resulting judgments (if any) and settlements, to the full extent required by the Special Undertaking Contract. You are hereby formally tendered the defense of the Food Chain Cases, the Water Cases, the School Cases, the Occupational Case, and any other lawsuits on the enclosed list of PCB-related litigation. Copies of the complaints in each case will be provided upon request. Pending the establishment of a reasonable and acceptable arrangement regarding this tender, the cases will continue to be defended and/or settled and Magnetek, Inc. will be held liable for the amount of the resulting settlements or judgments (if any) as well as the incurred costs, expert witness fees, attorney's fees, and all other reasonable expense incurred in defending these actions. You are expressly notified that settlement negotiations relating to certain of the listed cases are currently underway.

The Monsanto Defendants expressly reserve all of their rights of any sort, at law or in equity, including but not limited to those under the Special Undertaking Contract, whether or not identified herein. The Monsanto Defendants also expressly reserve the right to engage in settlement discussions and/or to settle some or all of the above cases, while holding Magnetek, Inc. responsible for those settlements.

The current breakdown of the PCB-related litigation involving the Monsanto Defendants is as follows:

53. The Monsanto Defendants are defending a series of personal injury cases in which plaintiffs are contending that they suffer from various types of cancer (primarily non-Hodgkin lymphoma) as a result of their environmental, non-employment exposure to PCBs (the "Food Chain Cases"). The Food Chain Cases currently are pending in state court in Los Angeles County, California and in state and federal courts in St. Louis, Missouri. At present, the Food Chain Cases include approximately 700 plaintiffs. On May 26, 2016, a Judgment was entered against Monsanto in one such case in the total amount of $46,500,000.00 for alleged personal injuries and punitive damages arising out of the exposure to PCBs in a case captioned *Benito Walker et al. v. Monsanto Co., et al.,* Case No. 1122-CC09621-01 (Cir. Court City of St. Louis May 26, 2016).

54. The Monsanto Defendants also face a group of lawsuits (currently eight suits have been filed) on the West Coast in which cities and various municipal agencies are

**EXHIBIT 11**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

alleging that the Monsanto Defendants should bear some cost of water clean up and wastewater permit costs due to PCB contamination (the "Water Cases").

55. The Monsanto Defendants also are defending four cases in which certain school districts allege that they should bear some cost of clean-up and/or rebuilding of schools due to alleged PCB contamination (the "School Cases").

56. The Monsanto Defendants also were recently named along with several other defendants in an occupational exposure case filed in state court in Massachusetts (the "Occupational Case").

A current list of all PCB-related litigation wherein the Monsanto Defendants are named as defendants (including court, case caption, and civil docket number) is enclosed. Please note that the next Food Chain Case is currently set for trial on September 12, 2016.

We request acknowledgement that Magnetek, Inc. received this communication and confirmation that Magnetek, Inc. intends to honor its contractual obligations of defense and indemnification under the Special Undertaking Contract within **ten (10) days** from the date of this communication. We also request that you immediately notify your primary and excess insurer(s) of the demand for defense and indemnity set forth above.

Our Client would welcome the opportunity to discuss the PCB-related litigation referenced above (and on the enclosed list) and the scope of Magnetek, Inc.'s obligations under the Special Undertaking Contract with you. New Monsanto expects to put a process in place for the resolution of this obligation, and those obligations of other similarly situated parties. Please, at your earliest convenience, contact Monsanto's Assistant General Counsel, Litigation, Molly Jones at (314) 694-5425 to discuss this matter.

Thank you for your attention to this matter. We look forward to hearing from you.

Sincerely,

Thompson Coburn LLP

By     Chris Hohn

Christopher M. Hohn

Enclosures

cc: Magnetek, Inc.
    c/o CSC-Lawyers Incorporating Service Company
    221 Bolivar Street
    Jefferson City, MO 65101
    *(via Federal Express)*

**EXHIBIT 11**

Electronically Filed - St. Louis County - September 01, 2017 - 05:14 PM

| Matter Name | Group Reference | Jurisdiction Type | Court | Docket Number | File Date |
|---|---|---|---|---|---|
| Grant Parish School Board v. Monsanto Company (PCB) | PCB - Building | Federal | LA - Western District | 1:15-cv-01719-DDD-JDK | 5/19/2015 |
| City of Hartford and Hartford Board of Education v. Monsanto (SOI)(PCBO | PCB - Building | Federal | CT- U.S. District | 2015-004301 | 10/23/2015 |
| Town of Princeton, MA v. Monsanto Company (SOI) (PCB) | PCB - Building | Federal | MA - U.S. District | 4:15-cv-40096-DJC | 7/1/2015 |
| Town of Westport and Westport Community Schools v. Monsanto (SOI) (PCB) | PCB - Building | Federal | MA - U.S. District | 1:14-CV-12041-DJC | 5/7/2014 |
| Abston, Bertha v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01495 | 4/23/2012 |
| Aiken, Ronald v. Monsanto Company (SOI) (PCB Food chain case) | PCB - Food Chain | State | MO - St. Louis City | 1422-CC09436 | 8/15/2014 |
| Ashley, Jerry v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01499 | 4/23/2012 |
| Bailey, Roger v. Monsanto Company (PCB Food Chain case) | PCB - Food Chain | State | MO - Eastern District | 15SL-CC01768 | 5/22/2015 |
| Blum, Robert J., Jr. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC02866 | 6/28/2010 |
| Brownlee, Paul v. Monsanto Company (SOI) (PCB Food Chain) | PCB - Food Chain | State | CA - LA County | BC497582 | 12/14/2012 |
| Brown, Paulette v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01498 | 4/23/2012 |
| Burford, Kent N, et al. v. Monsanto, et al. (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00928 | 3/10/2016 |
| Burke, Angela v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1222-CC10374 | |
| Carter, Kevin v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC484608 | 5/11/2012 |
| Clair, Sanford v. Monsanto Company (SOI) (PCB) | PCB - Food Chain | State | MO-St. Louis County | 09SL-CC01964 | |
| Craig, Gary v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01496 | 4/23/2012 |
| Dauber, Roslyn v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC483342 | 4/23/2012 |
| Dubin, Sydell v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC03822 | 9/22/2010 |
| Ferrell, Marinda v. Monsanto (SOI) (PCB Food Chain case). | PCB - Food Chain | State | MO - St. Louis City | 1322-CC08915 | 7/22/2013 |
| Gibson, Dennis L. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - Eastern District | 11SL-CC04951 | |
| Goodman, Betty v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1322-CC09213 | 8/26/2013 |
| Granger, Jacqueline v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC459770 | 4/19/2011 |
| Guenther, Valerie Anna v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC480068 | 3/5/2012 |
| Hearon, Leslie v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12S-CC01497 | 4/23/2012 |
| Kelly, Thomas v. Monsanto Company (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 15SL-CC03845 | 11/9/2015 |

**EXHIBIT 11**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

| Case | Type | State/Federal | Jurisdiction | Case Number | Date |
|---|---|---|---|---|---|
| LaBarge, Dale L. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01263 | 4/5/2012 |
| Mosby, Keith v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 1122-CC02206 | |
| Murphy, Deborah D. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO- St. Louis City | 1222-CLO9174 | 7/6/2012 |
| Naihe, Edward v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC02117 | 6/5/2012 |
| Nishida Nicolas White, Ruth v. Mensanto and Solutia (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 09SL-CC01964 | 5/1/2009 |
| Nunn, Mary vs. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1122-CC01207 | |
| Olson Kathleen R. v. Monsanto Company, et al. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00919 | 3/10/2016 |
| Rodriguez, Guillermo v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SLCC03408 | |
| Stapleton, Bernadette v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO-St. Louis City | 1122CC09622 | 9/9/2011 |
| Varela, Jesse v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO-St. Louis City | BC509170 | 5/16/2013 |
| Walker, Benito v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO-St. Louis City | 1122CC09621 | |
| Lamkin, Craig, et ux. v. Monsanto Company, et al. (SOI) (PCB) | PCB - Personal Injury | State | MA - Suffolk County | 16-0563 | 2/19/2016 |
| City of Berkeley v. Monsanto Company (SOI) (PCB) | PCB – Water Contamination | Federal | CA – Northern District | 5:16-cv-00071 | 1/6/2016 |
| City of Oakland v Monsanto Company (SOI)(PCB) | PCB – Water Contamination | Federal | CA – Northern District | 4:15-cv-05152 | 11/10/2010 |
| City of San Jose v. Monsanto Company (SOI) (PCB) | PCB – Water Contamination | Federal | CA – Northern District | 5:15-cv-03178-NC | 7/10/2015 |
| City of Seattle v. Monsanto, et al. (SOI) (PCB) | PCB – Water Contamination | Federal | WA - Western District | 2:16-cv-00107 | 1/25/2016 |
| City of Spokane v. Monsanto Company (SOI) (PCB) | PCB – Water Contamination | Federal | WA - Eastern District | 2:15-cv-0201-SMJ | 7/31/2015 |
| Monsanto PCB Water Contamination Litigation (SOI) (PCB) | PCB – Water Contamination | Federal | Judicial Panel /Multidistrict | MDL. No. 2697 | 1/28/2016 |
| San Diego Unified Port and City of San Diego v. Monsanto Co., et al. | PCB – Water Contamination | Federal | CA – Southern District | 3:15-cv-00578-WQH-JLB | 8/3/15 |
| City of Long Beach v. Monsanto Co., et al. | PCB-Water Contamination | Federal | CA – Central District | 2:16-cv-03493-FMO-AS | 5/19/16 |
| City of Portland v. Monsanto Co., et al. | PCB – Water Contamination | Federal | OR – Dist. of Oregon, Portland Division | 3:16-cv-1418-PK | 7/12/16 |

- 2 -

**EXHIBIT 11**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

UNIVERSAL MANUFACTURING CORPORATION

29-51 EAST SIXTH STREET, PATERSON, NEW JERSEY 07509 • PHONE: (201) 271-3100 • TWX NO. 710 988-5934

January 7, 1972

Mr. H.S. Bergen
Monsanto Company
P.O. Box 14817
St. Louis, Missouri  63178

Dear Mr. Bergen:

Enclosed is the undertaking you requested in connection
with our purchase of PCB. As previously discussed, we
are executing the undertaking in our own name and are
excepting any liability arising from failure of the
product to conform to specifications.

This undertaking will be covered by a blanket liability
policy with the Travelers Insurance Company having limits
of 10 million dollars. As of December 31, 1970, Universal's
consolidated net worth was 16.8 million and its current
ratio was 1.7 to 1.

Very truly yours,

UNIVERSAL MANUFACTURING CORPORATION

Paul N. Einhorn
President

PNE/paz

0167252

**EXHIBIT 11**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

*Vault*

## Special Undertaking by Purchasers of Polychlorinated Biphenyls

Monsanto Company (Monsanto) manufacturers certain polychlorinated biphenyls products (PCB's) which Universal Manufacturing Corporation (Buyer) desires to purchase. While buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in the handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or delivery of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses (except to the extent arising from failure of PCB to conform with specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through or under Buyer, whether alone or in combination with any other substance, including without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provision set forth above.

Nothing herein shall create or imply, any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer. No conditions, undertakings or agreements purporting to modify the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effective by the acknowledgement or acceptance of any sale document, purchase order, shipping instructions or other forms containing terms or conditions at variance herewith.

Universal Manufacturing Corporation
(Buyer)

BY: _____

TITLE: President

DATE: January 7, 1972

MONSANTO COMPANY

BY: _____

0167253

**EXHIBIT 11**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM



FOLD on this line and place in shipping pouch with **bar code and delivery address** visible

1. Fold the first printed page in half and use as the shipping label.
2. Place the label in a waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
3. Keep the second page as a receipt for your records. The receipt contains the terms and conditions of shipping and information useful for tracking your package.

**EXHIBIT 11**
8/29/2016

**17SL-CC03368**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**Phillips Lytle LLP**

<u>VIA E-MAIL & U.S. MAIL</u>                                                    September 13, 2016

Christopher M. Hohn
Thompson Coburn LLP
One US Bank Plaza
St. Louis, MO 63101
chohn@thompsoncoburn.com

Re:  Monsanto's Purported Tender of Defense & Demand for Indemnification
     Under Special Undertaking dated January 7, 1972

Dear Mr. Hohn:

Please be advised that our firm has been retained to assist MagneTek in regards to your correspondence dated August 29, 2016, addressed to Mr. Scott S. Cramer, purporting to: (a) tender to MagneTek the defense of Monsanto Company ("New Monsanto"), Pharmacia LLC f/k/a Monsanto ("Old Monsanto"), and Solutia Inc. (collectively, "Monsanto") in the 46 cases identified in the accompanying attachment to your correspondence; and (b) demanding that MagneTek indemnify Monsanto with respect to any damages that might be awarded against Monsanto in those cases, pursuant to the accompanying "Special Undertaking," dated January 7, 1972.

Initially, please note that Mr. Cramer is no longer with MagneTek and that any future correspondence regarding this matter should, therefore, be directed to the undersigned.

Your correspondence is the first notice to MagneTek of the 46 cases identified in the accompanying attachment, in spite of the fact that many of those cases have been pending for years, at least one has already gone to trial and verdict, and another is apparently set for trial this week.  Based upon the scant information that Monsanto has provided, MagneTek presently has no reason to believe that it is required to either defend or indemnify Monsanto and, therefore, rejects Monsanto's tender or demand.

ATTORNEYS AT LAW

CRAIG A. LESLIE, PARTNER  DIRECT 716 847 7012  CLESLIE@PHILLIPSLYTLE.COM

ONE CANALSIDE  125 MAIN STREET  BUFFALO, NY 14203-2887  PHONE 716 847 8400  FAX 716 852 6100

NEW YORK: ALBANY, BUFFALO, CHAUTAUQUA, GARDEN CITY, NEW YORK, ROCHESTER | WASHINGTON, DC | CANADA: WATERLOO REGION | PHILLIPSLYTLE.COM

**EXHIBIT 12**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM



Christopher M. Hohn                                      September 13, 2016
Page 2


MagneTek also reserves all of its rights with respect to Monsanto's tender and demand including, specifically, but without limitation, its right to specify further and additional grounds for rejecting the same as MagneTek's investigation of Monsanto's tender and demand continues.


Very truly yours,

Phillips Lytle LLP

By

Craig A. Leslie

CALram


**EXHIBIT 12**

**17SL-CC03368**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**THOMPSON COBURN** LLP

One US Bank Plaza
St. Louis, MO 63101

314 552 6000 main
314 552 7000 fax
thompsoncoburn.com

**Christopher M. Hohn**

314 552 6159 direct
chohn@thompsoncoburn.com

December 23, 2016

**VIA FEDERAL EXPRESS**

Scott S. Cramer
N49 W13650 Campbell Drive
Menomonee Falls, Wisconsin 53051

Scramer@magnetek.com

*Protected Communication:  Indemnitee-Indemnitor Privilege; Common Interest Doctrine*

Re:    Magnetek, Inc.'s obligations under Special Undertaking Agreement

Dear Mr. Cramer:

This letter is a follow-up to my August 29, 2016 correspondence to you regarding Magnetek, Inc.'s ("Magnetek") contractual obligation to defend and indemnify Monsanto in the pending PCB lawsuits referenced in my letter.  Specifically, I write to suggest that we schedule a meeting to discuss our clients' respective positions regarding those obligations.

The information Monsanto previously provided demonstrates Magnetek's duty to defend Monsanto in the pending PCB litigation.  The duty to defend is determined by comparing the allegations of the complaints to the language of the parties' agreement.  Where the allegations give rise to a claim potentially within the scope of the agreement, the duty to defend arises. Monsanto has provided Magnetek with a copy of the Special Undertaking Agreement its predecessor in interest, Universal Manufacturing Corporation ("Universal"), entered into with Monsanto, and docket information to facilitate Magnetek's review of each individual complaint.[1] These materials are sufficient to demonstrate Magnetek's obligation to defend Monsanto in the pending litigation.

Magnetek has a duty to defend Monsanto in the pending litigation because the plaintiffs' allegations fall squarely within the scope of the Special Undertaking Agreement.  Magnetek through its predecessor in interest, Universal, agreed to defend and indemnify Monsanto against

---

[1] As a courtesy, copies of the complaints are available for your review at the following link: https://thompsoncoburn.box.com/s/j00ik2j3ofpvm69xojoa3im88ic8afa1.  We will provide the password needed to access these documents via separate correspondence.

**EXHIBIT 13**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

any and all liabilities, claims, and actions arising out of or in connection with Universal's "receipt, purchase, possession, handling, use, sale or disposition" of PCBs after January 7, 1972. The pending claims and actions fall within the scope of the agreement for several reasons. For example:

- The claims and actions "aris[e] out of or in connection with" Universal's post-January 1972. PCB *purchases*, because the plaintiffs seek to impose liability on Monsanto for its manufacture and sale of all PCBs, including those purchased by Universal after January 7, 1972.

- The claims and actions also arise out of or in connection with Universal's *possession, handling, use, sale, and/or disposition* of PCBs purchased after January 7, 1972, because plaintiffs assert injuries allegedly caused by general environmental and food chain exposure to PCBs, and Universal's possession, handling, use, sale and disposition of PCBs purchased after January 7, 1972 contributed to the amount of PCBs in the environment and food chain.

- Magnetek cannot credibly deny that Universal's possession, handling, use, sale and/or disposition of PCBs purchased after January 7, 1972 contributed to the amount of PCBs in the environment and food chain. Universal purchased almost 12 million pounds of PCBs after January 7, 1972, which led to the presence of PCBs in various locations across the country including the areas in and around Bridgeport, Connecticut and Totowa, New Jersey. In addition, in 1981, an EPA inspection report cited Universal for several violations including improper disposal and storage of PCBs.

- The claims and actions also arise out of or in connection with Universal's *possession, handling, use, sale, and/or disposition* of PCBs purchased after January 7, 1972, because the plaintiffs specifically allege that their injuries were caused by the improper dumping of PCBs into the environment by Monsanto's customers, which include Universal.[2]

Furthermore, Monsanto was recently served with a new Water Case: State of Washington v. Monsanto Company et al., Superior Court of King County, Washington. A copy of the complaint filed in this case is included in the link referenced in Footnote 1 above. In this action, the State of Washington asserts claims for public nuisance, product liability, negligence, equitable indemnity, and statutory trespass, seeking to recover for alleged injury to state natural

---

[2] These descriptions are only examples of the manner in which the allegations and claims made in the PCB litigation fall within the scope of the Special Undertaking Agreement; they should not be construed as an exhaustive list of the grounds on which Monsanto may seek defense costs and indemnity from Magnetek.

**EXHIBIT 13**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

resources, including waterways, clean-up costs, and other alleged damages. Magnetek has a duty to defend Monsanto in this case, as it does in the other Water Cases.

The claims asserted in the pending litigation arise out of or in connection with the PCBs Universal purchased after January 7, 1972 that have been released into the environment (whether by Universal or those to whom Universal sold them) in combination with all other PCBs in the environment. The Special Undertaking Agreement, by its express terms, includes liabilities arising out of "*or in connection with*" PCBs purchased after January 7, 1972 "*alone or in combination with other substances*." Thus, Magnetek has a duty to defend Monsanto in the litigation.

Since putting Magnetek on notice, Monsanto has incurred approximately $4.2 million in attorneys' fees defending the PCB litigation, and those fees continue to accrue. Monsanto also recently agreed to pay up to $280 million dollars to settle all of the pending PCB Food Chain Cases. Under the terms of the Special Undertaking Agreement and the governing law, each indemnitor, including Magnetek, is jointly and severally liable to Monsanto for its cost of defending the PCB litigation, as well as amounts paid to resolve the Food Chain Cases. Prejudgment interest is currently accruing on amounts Magnetek owes to Monsanto.

According to our sales records, Magnetek's predecessor in interest, Universal, purchased at least 11,918,600 pounds of PCBs from Monsanto after signing the Special Undertaking Agreement. That represents 8.34% of all PCBs purchased after January 1972 by domestic indemnitors who remain viable companies.

Monsanto would prefer to resolve the parties' disagreement over the scope of Magnetek's obligations under the Special Undertaking Agreement without resorting to formal litigation. Informal resolution of the dispute will be more cost-effective for both sides, and allow greater flexibility in crafting a solution. Please let us know by January 20, 2017, if we can schedule a meeting to discuss our respective clients' positions in the near term.

Please note that Monsanto expressly reserves all of its rights of any sort, at law or in equity, including but not limited to common law contribution and indemnity, in addition to those under the Special Undertaking Agreement, whether or not identified herein.

We would appreciate your prompt attention to this matter, and look forward to hearing from you.

Sincerely,

Thompson Coburn LLP

By

Christopher M. Hohn
Partner

- 3 -

**EXHIBIT 13**

**17SL-CC03368**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

**In the**

# CIRCUIT COURT
## Of St. Louis County, Missouri

September 1, 2017
Date

 MONSANTO COMPANY, et al.
Plaintiff/Petitioner

Case Number

vs.

Division

 MAGNETEK, INC.
Defendant/Respondent

For File Stamp Only

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now  MONSANTO COMPANY, et al.                                   , pursuant
                         Requesting Party
to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of
 Rufus Harmon, Harmon Legal Process Service, LLC, P.O. Box 1794, Jefferson City, MO (573) 635-6690
Name of Process Server                          Address                                              Telephone

Name of Process Server                          Address or in the Alternative                        Telephone

Name of Process Server                          Address or in the Alternative                        Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below
named parties.  This appointment as special process server does not include the authorization
to carry a concealed weapon in the performance thereof.

SERVE:                                           SERVE:
 Magnetek, Inc.
Name                                             Name
 CSC-Lawyers Incorporating Service Company
Address                                          Address
 221 Bolivar Street, Jefferson City, MO 65101
City/State/Zip                                   City/State/Zip

SERVE:                                           SERVE:

Name                                             Name

Address                                          Address

City/State/Zip                                   City/State/Zip

Appointed as requested:

**JOAN M. GILMER,** Circuit Clerk                /s/ **Christopher M. Hohn**
                                                 Signature of Attorney/Plaintiff/Petitioner
                                                  **44124**
By _____               Bar No.
      Deputy Clerk                               Thompson Coburn LLP, One US Bank Plaza, St. Louis MO 63101
                                                 Address
                                                  **(314) 552-6159**
_____                  Phone No.                              Fax No.
Date

CCADM62-WS    Rev. 08/16

**17SL-CC03368**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

# In the
# CIRCUIT COURT
## Of St. Louis County, Missouri

┌                    ┐

For File Stamp Only

**September 1, 2017**

Date

 MONSANTO COMPANY, et al.
Plaintiff/Petitioner

vs.

Case Number

 MAGNETEK, INC.
Defendant/Respondent

Division

└                    ┘

## REQUEST FOR APPOINTMENT OF PROCESS SERVER

Comes now  MONSANTO COMPANY, et al.                                    , pursuant
                        Requesting Party
to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of
 Rufus Harmon, Harmon Legal Process Service, LLC, P.O. Box 1794, Jefferson City, MO (573) 635-6690
Name of Process Server                    Address                                   Telephone

Name of Process Server                    Address or in the Alternative             Telephone

Name of Process Server                    Address or in the Alternative             Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below
named parties.  This appointment as special process server does not include the authorization
to carry a concealed weapon in the performance thereof.

SERVE:                                    SERVE:
 Magnetek, Inc.
Name                                      Name
 CSC-Lawyers Incorporating Service Company
Address                                   Address
 221 Bolivar Street, Jefferson City, MO 65101
City/State/Zip                            City/State/Zip

SERVE:                                    SERVE:

Name                                      Name

Address                                   Address

City/State/Zip                            City/State/Zip

Appointed as requested:

**JOAN M. GILMER,** Circuit Clerk                /s/ **Christopher M. Hohn**
                                          Signature of Attorney/Plaintiff/Petitioner
                                           44124
                                          Bar No.
By _____               Thompson Coburn LLP, One US Bank Plaza, St. Louis MO 63101
   Deputy Clerk                           Address
                                           (314) 552-6159
                                          Phone No.                          Fax No.
Date

CCADM62-WS   Rev. 08/16

Electronically Filed - St Louis County - September 07, 2017 - 01:48 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| MONSANTO COMPANY, | ) | |
| PHARMACIA, LLC, and | ) | |
| SOLUTIA, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No.  17SL-CC03368 |
| | ) | |
| v. | ) | |
| | ) | |
| MAGNETEK, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY OF APPEARANCE**

COMES NOW David M. Mangian of Thompson Coburn LLP and hereby enters his appearance of Plaintiffs Monsanto Company, Pharmacia, LLC, and Solutia, Inc. in the above captioned action.

Respectfully Submitted,

THOMPSON COBURN LLP

By:  /s/ David M. Mangian
    John R. Musgrave #20358
    Christopher M. Hohn #44124
    A. Elizabeth Blackwell #50270
    Susan L. Werstak, #55689
    David M. Mangian #61728
    One U.S. Bank Plaza
    St. Louis, Missouri 63101
    (314) 552-6000 (telephone)
    (314) 552-7000 (facsimile)
    Email:  jmusgrave@thompsoncoburn.com
    Email:  chohn@thompsoncoburn.com
    Email:  eblackwell@thompsoncoburn.com
    Email:  swerstak@thompsoncoburn.com
    Email:  dmangian@thompsoncoburn.com



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>DEAN PAUL WALDEMER | Case Number:  17SL-CC03368 |
|---|---|
| Plaintiff/Petitioner:<br> MONSANTO COMPANY | Plaintiff's/Petitioner's Attorney/Address<br>CHRISTOPHER MARTIN HOHN<br>ONE US BANK PLAZA<br>SUITE 2600<br>SAINT LOUIS, MO  63101 |
| Defendant/Respondent:<br> MAGNETEK, INC. | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| Nature of Suit:<br>CC Breach of Contract | (Date File Stamp) |

*vs.*

## Summons in Civil Case

**The State of Missouri to:**  MAGNETEK, INC.
**Alias:**

CSC-LAWYERS INC SERVICE CO
221 BOLIVAR STREET
JEFFERSON CITY, MO  65101



*COURT SEAL OF*

*ST. LOUIS COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739 or TTY at 314-615-4567, at least three business days in advance of the court proceeding.

<u>07-SEP-2017</u>
**Date**

**Further Information:**
AMH

*Clerk*

### Sheriff's or Server's Return

**Note to serving officer:**  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____ (title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

*(Seal)*

Subscribed and sworn to before me on _____ (date).

My commission expires: _____
Date

_____
Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $    10.00 |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

**THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

## Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

## Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

## Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

OSCA (7-99) SM30  (SMCC) *For Court Use Only*: **Document ID# 17-SMCC-7510**    2    (Civil Procedure Form No. 1, Rules 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

OSCA (7-99) SM30  (SMCC) *For Court Use Only:* **Document ID# 17-SMCC-7510**    3    (Civil Procedure Form No. 1, Rules 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Electronically Filed - St Louis County - September 20, 2017 - 10:15 AM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| MONSANTO COMPANY, | ) | |
| PHARMACIA, LLC, and | ) | |
| SOLUTIA, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No.  17SL-CC03368 |
| | ) | |
| v. | ) | |
| | ) | |
| MAGNETEK, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**RETURN OF SERVICE**

COME NOW Plaintiffs Monsanto Company, Pharmacia, LLC, and Solutia, Inc. and hereby file the attached Return of Service for the Summons served upon Defendant Magnetek, Inc. on September, 11, 2017.

Respectfully Submitted,

THOMPSON COBURN LLP

By:  /s/ David M. Mangian
    John R. Musgrave #20358
    Christopher M. Hohn #44124
    A. Elizabeth Blackwell #50270
    Susan L. Werstak, #55689
    David M. Mangian #61728
    One U.S. Bank Plaza
    St. Louis, Missouri 63101
    (314) 552-6000 (telephone)
    (314) 552-7000 (facsimile)
    Email:  jmusgrave@thompsoncoburn.com
    Email:  chohn@thompsoncoburn.com
    Email:  eblackwell@thompsoncoburn.com
    Email:  swerstak@thompsoncoburn.com
    Email:  dmangian@thompsoncoburn.com

Electronically Filed - St Louis County - September 20, 2017 - 10:15 AM



## IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>DEAN PAUL WALDEMER | Case Number:  17SL-CC03368 |
| Plaintiff/Petitioner:<br>MONSANTO COMPANY | Plaintiff's/Petitioner's Attorney/Address<br>CHRISTOPHER MARTIN HOHN<br>ONE US BANK PLAZA<br>SUITE 2600<br>SAINT LOUIS, MO  63101 |
| vs. | |
| Defendant/Respondent:<br>MAGNETEK, INC. | Court Address:<br>ST LOUIS COUNTY COURT BUILDING |
| Nature of Suit:<br>CC Breach of Contract | 105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105     (Date File Stamp) |

### Summons in Civil Case

**The State of Missouri to:**  MAGNETEK, INC.
    Alias:

CSC-LAWYERS INC SERVICE CO
221 BOLIVAR STREET
JEFFERSON CITY, MO 65101

*COURT SEAL OF*

        You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
        **SPECIAL NEEDS:** If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739 or TTY at 314-615-4567, at least three business days in advance of the court proceeding.

*ST. LOUIS COUNTY*

<u>07-SEP-2017</u>
Date                                                           Clerk

**Further Information:**
AMH

### Sheriff's or Server's Return

Note to serving officer:  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)
☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with
    _____ a person of the Defendant's/Respondent's family over the age of 15 years.
☑ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
    _Shalley Lewis_ (name) _Authorized Agent_ (title).
☐ other _____

Served at _221 Bolivar St. Jefferson City Mo_ (address)
in _Cole_ (County/City of St. Louis), MO, on _9-11-17_ (date) at _8:30 AM_ (time).

_Rufus R. Harmon_                    _Rufus R. Harmon_
Printed Name of Sheriff or Server             Signature of Sheriff or Server

DONNA R. MEYER
Notary Public - Notary Seal
STATE OF MISSOURI
Commissioned for Cole County
Commission No. 13435325
My Commission Expires 3/3/2021

Must be sworn before a notary public if not served by an authorized officer:
Subscribed and sworn to before me on _09-11-2017_ (date).
My commission expires: _03-03-2021_      _Donna R. Meyer_
                  Date                        Notary Public

Sheriff's Fees, if applicable
Summons        $_____
Non Est          $_____
Sheriff's Deputy Salary
Supplemental Surcharge  $_____10.00_____
Mileage          $_____ (_____ miles @ $._____ per mile)
Total            $_____
A copy of the summons and a copy of the petition must be served on each Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (7-99) SM30 (SMCC) *For Court Use Only:* Document ID# 17-SMCC-7510   1   (Civil Procedure Form No. 1, Rules 54.01 – 54.05,
                                              54.13, and 54.20, 506.120 – 506.140, and 506.150 RSMo

JOAN M. GILMER
CIRCUIT CLERK
ST. LOUIS COUNTY CIRCUIT COURT
105 SOUTH CENTRAL AVENUE
CLAYTON, MISSOURI  63105 -1766

SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Circuit Clerk's Office at (314) 615-8029, Fax (314) 615-8739, or TTY (314) 615-4567, at least three business days in advance of the court proceeding.

## IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

CASE NUMBER: 17SL-CC03368

MONSANTO COMPANY
VS

MAGNETEK, INC.

COURT DATE: DECEMBER 22, 2017
COURT TIME: 09:45 AM
DIVISION: RM. 389 NORTH, DIV 8

THE ABOVE STYLED CASE IS SET FOR A CASE MANAGEMENT CONFERENCE AT THE DATE, TIME AND DIVISION INDICATED ABOVE.  YOU MUST APPEAR AT THE CONFERENCE. FAILURE TO APPEAR WILL RESULT IN THE COURT'S DESIGNATION OF THE DISCOVERY SCHEDULE AND MAY RESULT IN SANCTIONS OR THE CASE BEING DISMISSED.

JOAN M. GILMER, CIRCUIT CLERK
November 22, 2017



17SL-CC03368        RM. 389 NORTH, DIV 8
CHRISTOPHER MARTIN HOHN
ONE US BANK PLAZA SUITE 2600
SAINT LOUIS, MO  63101

JOAN M. GILMER
CIRCUIT CLERK
ST. LOUIS COUNTY CIRCUIT COURT
105 SOUTH CENTRAL AVENUE
CLAYTON, MISSOURI  63105 -1766

SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Circuit Clerk's Office at (314) 615-8029, Fax (314) 615-8739, or TTY (314) 615-4567, at least three business days in advance of the court proceeding.

# IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

CASE NUMBER: 17SL-CC03368
 MONSANTO COMPANY
VS

COURT DATE: DECEMBER 22, 2017
COURT TIME: 09:45 AM
DIVISION: RM. 389 NORTH, DIV 8

 MAGNETEK, INC.


THE ABOVE STYLED CASE IS SET FOR A CASE MANAGEMENT CONFERENCE AT THE DATE, TIME AND DIVISION INDICATED ABOVE.  YOU MUST APPEAR AT THE CONFERENCE.  FAILURE TO APPEAR WILL RESULT IN THE COURT'S DESIGNATION OF THE DISCOVERY SCHEDULE AND MAY RESULT IN SANCTIONS OR THE CASE BEING DISMISSED.


JOAN M. GILMER, CIRCUIT CLERK
November 22, 2017




17SL-CC03368     RM. 389 NORTH, DIV 8
DAVID MICHAEL MANGIAN
THOMPSON COBURN LLP ONE US BANK PLAZA
SAINT LOUIS, MO  63101

Electronically Filed - St Louis County - November 28, 2017 - 09:55 AM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| MONSANTO COMPANY, | ) | |
| PHARMACIA, LLC, and | ) | |
| SOLUTIA, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No.  17SL-CC03368 |
| | ) | |
| v. | ) | |
| | ) | |
| MAGNETEK, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY OF APPEARANCE**

COMES NOW A. Elizabeth Blackwell of Thompson Coburn LLP and hereby enters her appearance on behalf of Plaintiffs Monsanto Company, Pharmacia, LLC, and Solutia, Inc. in the above captioned action.

Respectfully Submitted,

THOMPSON COBURN LLP

By:  /s/ A. Elizabeth Blackwell
  John R. Musgrave #20358
  Christopher M. Hohn #44124
  A. Elizabeth Blackwell #50270
  Susan L. Werstak, #55689
  David M. Mangian #61728
  One U.S. Bank Plaza
  St. Louis, Missouri 63101
  (314) 552-6000 (telephone)
  (314) 552-7000 (facsimile)
  Email:  jmusgrave@thompsoncoburn.com
  Email:  chohn@thompsoncoburn.com
  Email:  eblackwell@thompsoncoburn.com
  Email:  swerstak@thompsoncoburn.com
  Email:  dmangian@thompsoncoburn.com

Electronically Filed - St Louis County - November 28, 2017 - 09:55 AM

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2017, the foregoing was served via U.S. mail, postage prepaid on the following party:

Magnetek, Inc.
CSC-Lawyers Inc. Service Co.
221 Bolivar Street
Jefferson City, Missouri 65101

/s/ A. Elizabeth Blackwell