# Exhibit E2

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

_____

MONSANTO COMPANY, PHARMACIA, LLC,
and SOLUTIA, INC.

                Plaintiffs,                          Case No. 17SL-CC03368

         v.                                  Hon. Dean Paul Waldemer

MAGNETEK, INC.                        ORAL ARGUMENT
                                        REQUESTED
                Defendant.

_____

**MAGNETEK'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION TO DISMISS OR STAY THIS ACTION**

Respectfully submitted,

LEWIS RICE LLC
Scott. A. Wissel, #49805
1010 Walnut, Suite 500
Kansas City, Missouri 64106
Telephone No. (816) 421-2500

PHILLIPS LYTLE LLP
Craig A. Leslie (*pro hac vice* motion to be filed)
Ryan A. Lema (*pro hac vice* motion to be filed)
One Canalside
125 Main Street
Buffalo, New York 14203
Telephone No. (716) 847-8400

Attorneys for Defendant
*Magnetek, Inc.*

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES...................................................................................II

PRELIMINARY STATEMENT ...................................................................... 1

BACKGROUND FACTS ................................................................................ 2

ARGUMENT ................................................................................................... 5

POINT I THIS CASE SHOULD BE DISMISSED BECAUSE THERE IS AN
          EARLIER-FILED ACTION PENDING IN NEW JERSEY ...................... 5

POINT II MAGNETEK IS NOT SUBJECT  TO PERSONAL JURISDICTION IN
          MISSOURI ..................................................................................... 8

      A.     Magnetek is not subject to jurisdiction under Missouri's Long Arm
          Statute9

      B.     Magnetek lacks sufficient contacts with Missouri for the Court to
          exercise personal jurisdiction within the limits of Due Process ..........12

            1.     Magnetek is not subject to general jurisdiction in Missouri.....12

            2.     Magnetek is not subject to specific jurisdiction in this case .....13

                  a.     Magnetek does not have the requisite minimum contacts
          with Missouri to support an exercise of specific
          jurisdiction ...............................................................14

                  b.     An exercise of personal jurisdiction over Magnetek
          would not comport with fair play and substantial justice17

POINT III PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENT
          MISREPRESENTATION ........................................................19

POINT IV IN THE ALTERNATIVE, THIS ACTION SHOULD BE STAYED IN
          FAVOR OF THE FIRST-FILED ACTION IN NEW JERSEY.................21

CONCLUSION .............................................................................................23

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## TABLE OF AUTHORITIES

Page

**Cases**

*Bell Paper Box, Inc. v. Trans W. Polymers, Inc.*,
  53 F.3d 920 (8th Cir. 1995) ..................................................................15

*Brooks Erection & Construction Co. v. William R. Montgomery & Assoc.*,
  613 S.W.2d 859 (Mo. App. 1981) ...................................................... 6, 8, 21

*Bryant v. Smith Interior Design Group, Inc.*,
  310 S.W. 3d 227 (Mo. 2010) .................................................................12

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ...........................................................................14

*Cepia, LLC v. Universal Pictures Visual Programming Ltd.*,
  177 F. Supp. 3d 1129 (E.D. Mo. 2016) .....................................................15

*Chromalloy Am. Corp. v. Elyria Foundry Co.*,
  955 S.W.2d 1 (Mo. banc 1997) ............................................................. 9

*Cole v. Homier Distributing Co.*,
  599 F.3d. 856 (8th Cir. 2010) ...............................................................20

*Colgan v. Washington Realty Co.*,
  879 S.W.2d 686 (Mo. App. 1994) ..........................................................20

*Conway v. Royalite Plastics, Ltd.*,
  12 S.W.3d 314 (Mo. banc 2000) ........................................................... 9

*CPC–Rexcell, Inc. v. La Corona Foods, Inc.*,
  912 F.2d 241 (8th Cir. 1990) ...............................................................16

*Cutten v. Latshaw*,
  344 S.W.2d 257 (Mo. App. 1961) ......................................................... 8

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014) ..................................................................... 12, 13

*Dillaplain v. Lite Indus., Inc.*,
  788 S.W.2d 530 (Mo. App. 1990) ..........................................................17

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011)....................................................................... 12, 13

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

*Grey v. Independent Order of Foresters,*
196 S.W. 779 (Mo. App. 1917) ................................................................. 7

*Hale v. Hale,*
781 S.W.2d 815 (Mo. App. 1989) .......................................................... 6, 21

*Hanson v. Denckla,*
357 U.S. 235 (1958) ................................................................................ 14

*Institutional Marketing Assoc., Ltd. v. Golden State Strawberries, Inc.,*
747 F.2d 448 (8th Cir. 1984) .................................................................. 16

*Int'l Shoe Co. v. Washington,*
326 U.S. 310 (1945) ................................................................................ 13

*Jewell v. Jewell,*
484 S.W.2d 668 (Mo. App. 1972) .......................................................... 6, 7

*Johnson Heater Corp. v. Deppe,*
86 S.W.3d 114 (Mo. App. 2002) ........................................................... 9, 10

*Moore v. Christian Fidelity Life Ins. Co.,*
687 S.W.2d 210 (Mo. App. 1984) ........................................................... 11

*Mountaire Feeds, Inc. v. Agro Impex, S. A.,*
677 F.2d 651 (8th Cir. 1982) .................................................................. 15

*Nelson v. R. Greenspan & Co.,*
613 F. Supp. 342 (E.D. Mo. 1985) ......................................................... 11

*Norman v. Fischer Chevrolet - Oldsmobile, Inc.,*
50 S.W.3d 313 (Mo. App. 2001) ............................................................. 14

*Panavision Int'l, L.P. v. Toeppen,*
141 F.3d 1316 (9th Cir. 1998) ................................................................ 18

*Renaissance Leasing, LLC v. Vermeer Mfg. Co.,*
322 S.W.3d 112 (Mo. 2010) ............................................................... 19, 20

*Scullin Steel Co. v. Nat'l Ry. Utilization Corp.,*
676 F.2d 309 (8th Cir. 1982) ............................................................. 15, 16

*Searles v. Searles,*
495 S.W.2d 759 (Mo. App. 1973) ........................................................... 22

*State, ex rel. Barnes v. Gerhard,*
834 S.W.2d 902 (Mo. App. 1992) ........................................................... 10

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

*State ex rel. Miller v. Jones*,
    349 S.W.2d 534 (Mo. App. 1961) ...................................................8, 21

*State ex rel. Norfolk S. Ry. Co. v. Dolan*,
    512 S.W.3d 41 (Mo. 2017)....................................................................12

*State, ex rel. Perkins Coie L.L.P. v. Messina*,
    138 S.W.3d 815 (Mo. App. 2004) .........................................................10

*Sun World Lines, Ltd. v. March Shipping Corporation*,
    585 F. Supp. 580 (E.D. Mo.1984) .........................................................11

*T.S.E. Supply Co. v. Cumberland Natural Gas Co.*,
    648 S.W.2d 169, 170 (Mo. App. 1983) ................................................16

*Trotter's Corp. v. Ringleader Restaurants, Inc.*,
    929 S.W.2d. 935 (Mo. App. 1996) .......................................................20

*Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*,
    75 F.3d 147 (3d Cir. 1996) ...................................................................16

*Wilson Tool & Die, Inc., v. TBDN - Tennessee Co.*,
    237 S.W.3d 611 (Mo. App. 2007) ..........................................................9

*World Wide Volkswagon Corp. v Woodson*,
    444 U.S. 286 (1980)......................................................................12, 14

*Ziegler v. Indian River Cty.*,
    64 F.3d 470, 476 (9th Cir. 1995 ...........................................................18

**Statutes**

Mo. Rev. Stat. § 375.906..............................................................................11

Mo. Rev. Stat. § 506.500...........................................................................9, 11

Mo. Sup. Ct. R. 55.27(a)(9) ...........................................................................5

Mo. Sup. Ct. R. 55.27(a)(2)............................................................................1

Mo. Sup. Ct. R. 55.27(a)(6)............................................................................1

**Other Authorities**

Personal jurisdiction, *12 Mo. Prac., Jurisdiction Venue Limitations*, § 2:35 (3d
    ed.) ......................................................................................................11

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## PRELIMINARY STATEMENT

Defendant Magnetek, Inc. ("Magnetek") submits this memorandum in support of its motion to dismiss the petition brought by Pharmacia, LLC ("Old Monsanto"), Monsanto Company ("New Monsanto") and Solutia, Inc. ("Solutia") (collectively, "Monsanto" or "Plaintiffs").  In their petition, Plaintiffs seeks to enforce a contractual undertaking – specifically, an indemnity agreement, known as the "Special Undertaking" – which was executed in New Jersey by Magnetek's predecessor in interest, Universal Manufacturing Company.  Plaintiffs' petition should be dismissed for at least two separate, and independent, reasons.

First, Plaintiffs' petition should be dismissed because Plaintiffs commenced this duplicative action against Magnetek months after Magnetek had commenced an action in New Jersey regarding the same underlying dispute (the "New Jersey Action").  In the first-filed New Jersey Action, Plaintiffs have already made motions to dismiss, which were denied by the New Jersey Superior Court.  Plaintiffs have since answered the complaint and joined issue in the New Jersey Action, and discovery is now underway.  In light of the pendency of the first-filed New Jersey Action, Plaintiffs' petition should be dismissed on grounds of comity and equity, as the pending New Jersey Action involves the exact same parties and arises out of the exact same transactions and occurrences.

Second, and in the alternative, Plaintiffs' petition should either be dismissed, in its entirety, pursuant to Rule 55.27(a)(2) – because Magnetek is not subject to personal jurisdiction in Missouri; or dismissed, in part, pursuant to Rule 55.27(a)(6) – because Plaintiffs' count for negligent misrepresentation fails to state a claim upon which relief can be granted.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

At a minimum, however, if the Court declines to dismiss Plaintiffs' petition, this action should be stayed based on grounds of comity and equity. Doing so will allow the first-filed New Jersey Action to proceed, will avoid a race to judgment (along with the duplicative expenditures of money and judicial resources that will otherwise result), and will avoid the risk of inconsistent outcomes.

## BACKGROUND FACTS

The dispute between Magnetek and Plaintiffs arises out of a "Special Undertaking" executed by Magnetek's predecessor in interest, Universal Manufacturing Company ("UMC"), in New Jersey in 1972.

Magnetek is the successor by merger to UMC, having purchased UMC's stock from its former parent and later merging with UMC. Pierce Aff.[1] at ¶ 2. Prior to its acquisition by Magnetek, UMC was a New Jersey corporation with a principal place of business in Paterson, New Jersey and a manufacturing facility in Totowa, New Jersey. *Id.* Part of UMC's business was to manufacture capacitors, which were either incorporated into lighting ballasts manufactured by UMC or, in some instances, sold to other companies as component parts. *Id.* at ¶ 3.

Prior to 1979, certain of the capacitors and lighting ballasts manufactured by UMC incorporated polychlorinated biphenyls ("PCBs"). *Id.* at ¶ 4. UMC acquired the PCBs that it incorporated into those products from Old Monsanto. *Id.* at ¶ 5; Lema Aff.[2], Ex. A ("Petition") at ¶¶ 41-50. From 1935 until 1979, when the manufacture and sale of

---

[1]    Citations to the "Pierce Aff." are to the affidavit of David Pierce, sworn to December 7, 2017.

[2]    Citations to the "Lema Aff." are to the affidavit of Ryan A. Lema, sworn to December 8, 2017.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

PCBs was banned in the United States, Old Monsanto was the sole manufacturer of PCBs in the United States.  *See* Petition at ¶ 21.

In 1972, as a pre-condition to the continued sale of PCBs to UMC, Old Monsanto required that UMC execute the so-called Special Undertaking.  Pierce Aff. at ¶ 6; Petition at ¶ 41.  The Special Undertaking purports to require UMC to defend and indemnify Old Monsanto for liabilities, claims, and damages arising out of or in connection with UMC's receipt, purchase, possession, handling, use, sale or disposition of PCBs, except to the extent that PCBs failed to conform with specifications.  *See* Petition, Ex 1.  With no apparent alternatives available at the time (*see* Petition at ¶¶ 28-35), UMC was forced to execute the agreement and continued using PCBs as dielectric insulating fluids in capacitors.

Forty-four years later, on August 29, 2016, Plaintiffs demanded that Magnetek, as the successor in interest to UMC, defend and indemnify them in connection with "all current and future PCB-related litigation wherein Old Monsanto is, or will be, named as a defendant" (the "2016 Demand").  Petition, Ex. 11.  Plaintiffs identified 46 then-pending actions as the subject of their tender (the "Underlying Actions").  *Id.*  The first of the Underlying Actions had been commenced in 2009 and, by the time Plaintiffs made their 2016 Demand, at least one case had already been litigated to a $46 million verdict against Monsanto, and Monsanto was then in the final stages of negotiations to settle another group of claims for $280 million.  *See* Lema Aff., ¶ 7; Petition, Ex. 13.

On May 12, 2017, over eight months after Plaintiffs issued their 2016 Demand, Magnetek commenced a declaratory judgment action against Old Monsanto, New Monsanto and Solutia (the exact same parties that are Plaintiffs here) in New Jersey

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Superior Court, Law Division, Docket No. L-003362 (the "New Jersey Action"). Lema Aff. at ¶ 8. In its complaint, Magnetek alleges that Old Monsanto had unique and superior knowledge about, *inter alia*, the toxicity, harmful health effects, environmental persistence, and bioaccumulation of PCBs, but failed to disclose those facts to UMC. Lema Aff., Ex. B ("New Jersey Complaint"). Instead, Old Monsanto assured UMC that the use of PCBs in "closed" applications, such as capacitors, was safe. *Id.* at ¶ 112.

Old Monsanto's requirement that PCB users execute special undertakings was part of its strategy to conceal the hazards and risks of PCBs, deflect government and regulatory attention from Monsanto's PCB business, preserve Monsanto's profits from the continued sale of PCBs, and shift potential liability for any harmful effects of PCBs to others. *Id.* at ¶ 45. Magnetek's New Jersey Complaint seeks a declaration that the Special Undertaking is unenforceable, in whole or in part, based on, *inter alia*, Old Monsanto's fraudulent inducement of UMC, its own tortious conduct, the doctrines of economic duress and unconscionability, and New Jersey public policy. *Id.* at ¶¶ 68-126.

Rather than interposing an answer in Magnetek's first-filed New Jersey Action, Plaintiffs filed their Petition on September 1, 2017 – four months after Magnetek commenced the New Jersey Action. Plaintiffs' Petition is essentially a mirror-image of Magnetek's pending complaint in New Jersey: it seeks declarations as to the enforceability of the Special Undertaking and alleges breaches of the same. In the alternative, Plaintiffs allege that Magnetek is liable at common law for negligent handling and use of PCBs (in effect, a contribution claim) and that Magnetek negligently misrepresented the insurance coverage available to cover UMC's liabilities, if any, under the Special Undertaking.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

On September 5, 2017, after Plaintiffs commenced this action (but before they had served their Petition on Magnetek), Plaintiffs moved to dismiss the New Jersey Action. In connection with the two separate motions to dismiss that Plaintiffs filed in New Jersey, New Monsanto and Solutia argued that they are not subject to jurisdiction in New Jersey, and Old Monsanto argued that the case could not proceed without New Monsanto and Solutia as parties. All of the Monsanto entities also argued that the New Jersey court should dismiss the case in favor of this later-filed Missouri action. By orders dated October 13, 2017, the New Jersey Superior Court (Hon. Robert C. Wilson, J.S.C.) denied Monsanto's motions to dismiss. Lema Aff., ¶ 10, Exs. C and D.

Plaintiffs answered Magnetek's New Jersey Complaint on November 29, 2017. *See* Lema Aff, Ex. E. Magnetek served initial discovery demands and deposition notices on Plaintiffs on December 8, 2017, and discovery is now underway in the New Jersey Action. Lema Aff. at ¶ 12.

## ARGUMENT

## POINT I

### THIS CASE SHOULD BE DISMISSED BECAUSE THERE IS AN EARLIER-FILED ACTION PENDING IN NEW JERSEY

Missouri law recognizes the general rule forbidding parties from bringing multiple actions in different courts that arise out of the same transactions or occurrences. With respect to duplicative lawsuits that are brought within Missouri, this "doctrine of abatement" has been codified, and mandates dismissal of the second-filed intrastate action. *See* Mo. Sup. Ct. R. 55.27(a)(9). While the codified doctrine of abatement applies only to cases pending within Missouri, Missouri's courts recognize that principles of both comity and equity ensure that "parallel results should normally be expected" as to cases pending in

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

courts of different states.  *Jewell v. Jewell*, 484 S.W.2d 668, 674 (Mo. App. 1972); *see also Hale v. Hale*, 781 S.W.2d 815 (Mo. App. 1989).

Under the doctrine of comity, a Missouri court has inherent power to refuse to entertain a second-filed action in Missouri (and dismiss such an action) in favor of a first-filed action pending in another state, in order to advance "the orderly administration of justice." *Brooks Erection & Construction Co. v. William R. Montgomery & Assoc.,* 613 S.W.2d 859, 863 (Mo. App. 1981); *see also*, *Hale*, 781 S.W.2d at 820.  Accordingly, where multiple actions have been filed in *different states*, the second-filed action should be dismissed pursuant to the doctrines of comity and equity, thus allowing the first-filed action to proceed in the jurisdiction in which the dispute was first filed.  *See Hale*, 781 S.W.2d at 820.

The decision of the Court of Appeals in *Hale* is on point.  In that case, concerning a dispute over a divorce decree that had previously been issued by a Missouri court, the plaintiff husband filed a proceeding in Oklahoma seeking review of an award of past due support by an administrative hearing board.  *Id.* at 820.  In a second-filed proceeding, in Missouri, the husband sought, among other relief, a modification of the underlying Missouri divorce decree.  *Id.* at 817.  The trial court refused to entertain that count of the husband's petition, and dismissed it, on the ground that comity required that the issue of past-due support be litigated in the first-filed proceeding in Oklahoma.  *Id.* at 820.  On appeal, the Court of Appeals affirmed the dismissal of that count, holding that:

> Both parties concede that appellant has filed a petition in Oklahoma for judicial review of the administrative hearing board's award of past due support.  ***Under the principle of comity, when two state courts have jurisdiction to determine an issue between the same parties, the court whose jurisdiction attached first should proceed to render a final judgment.***

*Id.* (citing *Jewell*) (emphasis added).

- 6 -

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

The Court of Appeals decision in *Grey v. Independent Order of Foresters*, 196 S.W. 779, 783 (Mo. App. 1917), is also instructive. In that case, the parties disputed the plaintiff's entitlement to the proceeds of a life insurance policy. After a first-filed action was commenced in Missouri, the defendant commenced a second-filed action in Canada. Although the second-filed action in Canada was the first to reach judgment, the Missouri trial court refused to recognize the resulting judgment as a bar to the first-filed action in Missouri. *Grey*, 196 S.W. at 783. The Court of Appeals affirmed, holding that the first-filed action in Missouri justified the trial court's refusal to recognize the judgment in the second-filed Canadian action. The Court of Appeals also held that "[w]hen two courts have co-ordinate jurisdiction, ***the one whose jurisdiction first attaches will retain it and proceed to final judgment regardless of the action of the other court.***" *Id.* (emphasis added). Thus, because the Missouri court first acquired jurisdiction, when the first-filed action was brought there, principles of comity did not require the Missouri court to recognize the judgment rendered in the second-filed action. *Id.* at 784.

Finally, in *Jewell*, 484 S.W.2d 668 (Mo. App. 1972), the plaintiff first filed a divorce action in Missouri, before filing a second action in Arkansas. Judgment was entered in favor of the defendant in the first-filed Missouri action, and plaintiff thereafter filed a motion to set aside the Missouri divorce order by arguing that Arkansas was the more appropriate forum. *Id.* at 671. The Court of Appeals, citing *Grey,* rejected the plaintiff's arguments, and held that: "Missouri is the state in which the current pending litigation was *first* instituted. ***This is the forum whose jurisdiction was first invoked*** by the husband himself before he decided to file a second suit in the state of Arkansas. Under the rule stated in the *Grey* case, jurisdiction in the Missouri court should be given priority." *Id.* at 674 (emphasis

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

added); *see also Cutten v. Latshaw*, 344 S.W.2d 257, 261-62 (Mo. App. 1961) ("*[p]riority in time gives preference in law*") (emphasis added); *State ex rel. Miller v. Jones*, 349 S.W.2d 534, 538-39 (Mo. App. 1961) ("the court in which the second action is brought may in its discretion stay or suspend that suit, awaiting decision in the first one, *or, influenced by a spirit of comity, may refuse to entertain it*, if the same relief may be awarded in the prior suit" (emphasis added)).

Here, Magnetek's action in New Jersey was not only first-filed, it is also at a more advanced stage, which is an additional factor supporting dismissal of Monsanto's second-filed action. In *Brooks Erection & Const. Co. v. William R. Montgomery & Assocs., Inc.*, 613 S.W.2d 859 (Mo. App. 1981), for example, the court deferred to litigation in Kentucky based on principles of comity and judicial efficiency because that case was at a more advanced stage (despite the fact that the Missouri action was, in that case, filed first).

Accordingly, in light of Magnetek's first-filed action in New Jersey, involving the exact same parties and arising out of the exact same transactions and occurrences, which is at a more advanced stage, Magnetek submits that this Court should dismiss this later-filed action based on principles of comity and equity. Doing so will promote the orderly administration of justice, prevent duplicative expenses, preserve judicial resources, and avoid the potential for inconsistent outcomes.

## POINT II

### MAGNETEK IS NOT SUBJECT TO PERSONAL JURISDICTION IN MISSOURI

Alternatively, if the Court declines to dismiss this action in favor of Magnetek's first-filed New Jersey action based upon principles of comity and equity, Magnetek is still entitled to dismissal because it is not subject to personal jurisdiction in

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Missouri.  As discussed below, Monsanto has not, and cannot, meet its burden of establishing jurisdiction over Magnetek.

Monsanto bears the burden of establishing that this Court has personal jurisdiction over Magnetek.  *See Conway v. Royalite Plastics, Ltd.*, 12 S.W.3d 314, 318 (Mo. banc 2000).  "In order for a non-resident defendant to subject itself to the long-arm jurisdiction of this state, two elements must be present.  First, the suit must arise out of the activities enumerated in the long arm statute; second, the defendant must have sufficient minimum contacts with Missouri to satisfy due process requirements."  *Chromalloy Am. Corp. v. Elyria Foundry Co.,* 955 S.W.2d 1, 4 (Mo. banc 1997).  Missouri courts analyze the two inquiries separately ***and both elements must be satisfied*** for personal jurisdiction to exist.  *See Conway*, 12 S.W.3d at 318.

## A.    Magnetek is not subject to jurisdiction under Missouri's Long Arm Statute

Missouri's Long Arm Statute, Mo. Rev. Stat. § 506.500, provides that a person or firm may be subject to jurisdiction in Missouri for certain enumerated acts, including "(1) The transaction of any business within this state; (2) The making of any contract within this state; (3) The commission of a tortious act within this state, . . . [or] (5) The contracting to insure any person, property or risk located within Missouri."  Mo. Rev. Stat. § 506.500.1.  Because neither Magnetek nor its predecessor UMC did any of the acts enumerated in the statute, Magnetek is not subject to the Court's long-arm jurisdiction.

First, Magnetek's predecessor did not make its contract with Monsanto in Missouri or transact business within Missouri.  For purposes of long-arm jurisdiction, a contract is made where acceptance occurs.  *Wilson Tool & Die, Inc., v. TBDN - Tennessee Co.*, 237 S.W.3d 611, 615 (Mo. App. 2007) (citing *Johnson Heater Corp. v. Deppe*, 86 S.W.3d 114,

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

119 (Mo. App. 2002)). Here, UMC's President, Paul Einhorn, executed the Special Undertaking from UMC's offices in Paterson, New Jersey, and thus the contract was made in New Jersey. *See* Petition, Exs. 1 and 2. Second, neither Magnetek nor its predecessor "transact business" within Missouri. Old Monsanto contacted UMC in New Jersey to solicit and negotiate the Special Undertaking. Pierce Aff. at ¶ 7. After UMC executed the Special Undertaking in New Jersey, Old Monsanto continued to market and advertise its PCBs to UMC in New Jersey, continued to communicate with UMC regarding its PCBs, and continued to sell and ship PCBs to UMC for use in UMC's New Jersey manufacturing plant. Pierce Aff., Ex. 8.[3]

There is no allegation that UMC traveled to Missouri, conducted business in Missouri, or purposefully availed itself of the benefits of Missouri law. Although Missouri courts construe the "transaction of business" broadly, it is well settled that communication through mail or telephonic means is insufficient. *Johnson Heater Corp.,* 86 S.W.3d at 120; *see also State, ex rel. Barnes v. Gerhard,* 834 S.W.2d 902 (Mo. App. 1992) (Missouri could not exercise personal jurisdiction over Illinois lawyer based on the lawyer's trips to Missouri or telephone calls with persons in Missouri); *State, ex rel. Perkins Coie L.L.P. v. Messina,* 138 S.W.3d 815, 818 (Mo. App. 2004) (electronic and written communications between out-of-state lawyers and a Missouri client, the execution of an engagement letter by the client and the payment of attorney's fees out of a Missouri bank were insufficient to establish personal jurisdiction). Here, UMC's only identified contact with Missouri in connection with the Special Undertaking was via letter to Monsanto returning the executed Special Undertaking.

---

[3]    Although Plaintiffs unsuccessfully moved to dismiss Magnetek's New Jersey Action as against New Monsanto and Solutia on jurisdictional grounds, Old Monsanto did not contest that it was subject to personal jurisdiction in New Jersey based upon these facts.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Indeed, the parties' arrangement was such that *Monsanto* was the party conducting business in another state by reaching into New Jersey to sell PCBs to UMC, purposefully availing itself of the benefits and burdens of New Jersey law.

UMC also did not commit a tortious act within Missouri.  Monsanto alleges two causes of action sounding in tort, for negligence and negligent misrepresentation.  Monsanto does not (and cannot) allege that the tortious conduct took place within Missouri.  Although the Missouri Long Arm Statute will apply to certain extraterritorial acts producing actionable consequences in Missouri, courts have held that such extraterritorial acts must have set in motion a course of action intentionally designed to have consequences in Missouri.  *See Nelson v. R. Greenspan & Co.*, 613 F. Supp. 342, 345 (E.D. Mo. 1985) (*citing Sun World Lines, Ltd. v. March Shipping Corporation*, 585 F. Supp. 580 (E.D. Mo.1984)).  Here, Monsanto does not allege that the consequences of Magnetek or UMC's actions were directed to Missouri.  Indeed, Monsanto's negligence cause of action is really a claim for contribution – the allegation is that UMC's alleged actions outside of Missouri caused harms to third parties who then sued Monsanto, causing Monsanto to incur costs.  UMC is not alleged to have directly caused any harm to Monsanto in Missouri.

Finally, UMC did not contract to insure a person or risk within Missouri within the meaning of § 506.500.1(5).  That subsection of the Long Arm Statute seeks to confer jurisdiction over non-resident *insurance companies* and works in concert with Mo. Rev. Stat. § 375.906 to confer personal jurisdiction over such insurers.  *See* Personal jurisdiction, *12 Mo. Prac., Jurisdiction Venue Limitations*, § 2:35 (3d ed.) (citing *Moore v. Christian Fidelity Life Ins. Co.*, 687 S.W.2d 210, 213 (Mo. App. 1984)).  It does not apply to non-insurers such as Magnetek, or its predecessor UMC.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Based on all of the foregoing, Magnetek is not subject to jurisdiction under Missouri's Long Arm Statute. Even if it were, as discussed below, Magnetek also does not have sufficient minimum contacts with New Jersey to satisfy due process requirements.

**B.** **Magnetek lacks sufficient contacts with Missouri for the Court to exercise personal jurisdiction within the limits of Due Process**

Even if long arm jurisdiction existed in this case (which it does not), Monsanto would still need to demonstrate sufficient minimum contacts between Magnetek and Missouri to satisfy due process (which Monsanto cannot). *See Bryant v. Smith Interior Design Group, Inc.*, 310 S.W. 3d 227, 232 (Mo. 2010). In this regard, Monsanto has the burden to prove that Magnetek had sufficient, purposeful minimum contacts with Missouri such that the lawsuit does not offend traditional notions of fair play and substantial justice, and that Magnetek should reasonably have anticipated being brought into court here. *World Wide Volkswagon Corp. v Woodson*, 444 U.S. 286, 297 (1980). As a practical matter, this means that Monsanto must demonstrate that the Missouri courts have either general jurisdiction or specific jurisdiction over Magnetek. *E.g. State ex rel. Norfolk S. Ry. Co. v. Dolan*, 512 S.W.3d 41, 46 (Mo. 2017) (basis of court's jurisdiction over a foreign corporation may be general or specific, *i.e.* "conduct-linked"). Monsanto has not met, and cannot meet, either of these burdens.

**1.** **Magnetek is not subject to general jurisdiction in Missouri**

A court may acquire general jurisdiction over a defendant that exhibits such systematic and continuous contacts with the forum as to render it essentially at home. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). In *Goodyear*, the Supreme Court "made clear that only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Daimler AG v. Bauman*, 134 S. Ct.

746, 760 (2014).  For a corporation, general jurisdiction lies only where the corporation can be "fairly regarded as at home."  *Id.* (quoting *Goodyear*, 564 U.S. at 924).  Consequently, "[w]ith respect to a corporation, the place of incorporation and principal place of business are [the] 'paradig[m]. . . bases for general jurisdiction.'"  *Id.* at 760 (third alteration in original) (quotation and citation omitted).

Here, Magnetek is incorporated under the laws of Delaware and has its principal place of business in Wisconsin.  Monsanto's petition does not contain any allegation that Magnetek carries on any systematic or continuous activity that would approximate the activities of a corporation "at home" in Missouri.  Accordingly, the Court lacks general jurisdiction over Magnetek.[4]

### 2.    Magnetek is not subject to specific jurisdiction in this case

A court may exercise specific personal jurisdiction over a foreign defendant only where the plaintiff's claims specifically relate to or arise out of the defendant's contacts with the forum.  If the litigation arises out of the defendant's contacts with the forum state, courts then employ a two-part test to determine whether they may assert specific jurisdiction.  First, the defendant must "have certain minimum contacts" with the forum

---

[4]    To the extent that Plaintiffs may argue that this position is somehow inconsistent with the position that Magnetek has taken in the New Jersey Action, with respect to the New Jersey Court's ability to exercise jurisdiction over Monsanto, it is not.  The New Jersey Court has specific jurisdiction over Old Monsanto based upon Old Monsanto's contacts with New Jersey in connection with the Special Undertaking (which Old Monsanto has not disputed); and (b) also has specific jurisdiction over New Monsanto and Solutia because they are successors to Old Monsanto, having expressly assumed liabilities of Old Monsanto when each company was spun off from Old Monsanto, and thus each company inherited the jurisdictional contacts of Old Monsanto.

Moreover, the nature and character of the contacts between Old Monsanto, New Monsanto and Solutia and New Jersey are intrinsically different from the nature and character of the contacts between Magnetek and Missouri – such that jurisdiction exists in New Jersey over Plaintiffs but does not exist in Missouri over Magnetek.  Regardless, the New Jersey Court denied Plaintiffs' motion to dismiss New Monsanto and Solutia, and Magnetek is currently engaged in discovery with Old Monsanto, New Monsanto, and Solutia on the issue of jurisdiction in New Jersey.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

state.  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Such contacts require that the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State."  *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  A defendant has purposefully availed itself of such a privilege when "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."  *World-Wide Volkswagen Corp.*, 444 U.S. at 297.  Second, if the defendant has the requisite minimum contacts, courts ask whether the exercise of jurisdiction "would comport with 'fair play and substantial justice.'"  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 486 (1985) (quotations omitted).  In the second part of the analysis, Missouri courts consider factors including: (1) the nature and quality of the contacts; (2) the quantity of the contacts; (3) the relationship of the cause of action to the contacts; (4) Missouri's interest in providing a forum for its residents; and (5) the convenience or inconvenience to the parties.  *Norman v. Fischer Chevrolet - Oldsmobile, Inc.*, 50 S.W.3d 313, 317 (Mo. App. 2001).

     **a.**    **Magnetek does not have the requisite minimum contacts with Missouri to support an exercise of specific jurisdiction**

Here, neither Magnetek, nor its predecessor in interest UMC, purposefully availed itself of the privilege of conducting activities within Missouri such that Magnetek could reasonably anticipate being haled into Court here.  This dispute centers on the enforceability of a 1972 Special Undertaking, executed by UMC in New Jersey as a precondition to continuing to receive shipments of PCBs to a UMC facility in New Jersey.  Plaintiffs do not allege any actions by Magnetek or its predecessor purposefully directed toward Missouri with respect to the Special Undertaking or UMC's use of PCBs.  Indeed, UMC merely purchased PCBs for manufacture from its headquarters in New Jersey from a

- 14 -

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

supplier that happened to be based in Missouri, and executed the Special Undertaking from its offices in New Jersey.  UMC did not, therefore, direct its conduct toward Missouri.

An agreement by parties from two different states (such as the Special Undertaking) is not, standing alone, sufficient to establish the requisite minimum contacts to permit an exercise of jurisdiction.  *See, e.g., Bell Paper Box, Inc. v. Trans W. Polymers, Inc.*, 53 F.3d 920, 922–23 (8th Cir. 1995).  Instead, the defendant "must have conducted 'some activity, directly or indirectly related to the transaction in question' in Missouri; and that activity must then give rise to the cause of action asserted in this case."  *Cepia, LLC v. Universal Pictures Visual Programming Ltd.*, 177 F. Supp. 3d 1129, 1139, 1143 (E.D. Mo. 2016) (quoting *Scullin Steel Co. v. Nat'l Ry. Utilization Corp.*, 676 F.2d 309, 312 (8th Cir. 1982)).

For example, in *Cepia*, the defendant was approached regarding the distribution of movies outside of the US; it did not reach out into Missouri and initiate business and had no physical presence in the state.  Because the contract was not sufficient in and of itself to establish personal jurisdiction, and the defendant's contacts with Missouri were only sporadic, the Court held that minimum contacts did not exist to support an exercise of jurisdiction.  *Id.* at 1143.  The Court also held that, even though the plaintiff alleged that defendant's conduct was tortious and that its effects were felt in Missouri, the plaintiff failed to show that the alleged tortious conduct was uniquely or expressly aimed at Missouri.  *Id.*

Additionally, in the context of the sale of goods (such as the PCBs at issue here), the seller's unilateral performance in the forum state is generally insufficient to support an exercise of personal jurisdiction over an out-of-state purchaser.  *Mountaire Feeds, Inc. v. Agro Impex, S. A.*, 677 F.2d 651, 655 (8th Cir. 1982) (seller's performance in the forum

- 15 -

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

state did not create minimum contacts to support exercise of jurisdiction over the buyer; "[i]t is the defendant's contacts with the forum state that are of interest in determining if *in personam* jurisdiction exists, not its contacts with a resident").

Nor can communications with a resident of the forum state in furtherance of or in connection with a contract establish sufficient minimum contacts to support an exercise of jurisdiction. *See, e.g., Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 152 (3d Cir. 1996) ("informational communications in furtherance of [a contract between a resident and nonresident] do[] not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over [the nonresident defendant]") (citation omitted); *CPC–Rexcell, Inc. v. La Corona Foods, Inc.*, 912 F.2d 241 (8th Cir. 1990) (non-resident defendant's telephone and telefax orders, plus payments to Missouri seller, were insufficient to satisfy due process requirements); *Institutional Marketing Assoc., Ltd. v. Golden State Strawberries, Inc.*, 747 F.2d 448 (8th Cir. 1984) (phone conversations and written correspondence to Missouri corporations were insufficient to satisfy due process requirements); *Scullin Steel, Co.*, 676 F.2d at 309 (8th Cir. 1982) (plaintiff's performance under the contract within the forum state could not supply defendant's required minimum contacts; use of interstate facilities such as the mail and telephone cannot supply the minimum contacts); *T.S.E. Supply Co. v. Cumberland Natural Gas Co.*, 648 S.W.2d 169, 170 (Mo. App. 1983) (Tennessee defendant made phone calls to Missouri to order pipe and sent a letter of credit; use of interstate mail and telephone facilities insufficient to satisfy due process as a matter of law).

Based on all of the foregoing, neither Magnetek, nor its predecessor UMC, engaged in the type of activity purposefully directed to Missouri that would amount to

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

minimum contacts sufficient to satisfy due process. Accordingly, the Court should dismiss this action against Magnetek.

**b.    An exercise of personal jurisdiction over Magnetek would not comport with fair play and substantial justice**

Even assuming, *arguendo*, that Magnetek had sufficient minimum contacts with Missouri to support an exercise of personal jurisdiction, the Court still cannot exercise personal jurisdiction over Magnetek unless the exercise of jurisdiction would also comport with "traditional notions of fair play and substantial justice." This test requires a review of factors including (1) the burden on the defendant, (2) the interest of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the inter-state judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Dillaplain v. Lite Indus., Inc.,* 788 S.W.2d 530, 535 (Mo. App. 1990). Here, even if Monsanto could establish sufficient minimum contacts by Magnetek (which it cannot), personal jurisdiction still would not comply with traditional notions of "fair play and substantial justice" because of the burden on Magnetek, the pendency of the first-filed New Jersey action, and the interstate judicial system's interest in obtaining the most efficient resolution of the controversy.

First, the burden to Magnetek of litigating this action in Missouri would be significant, as the manufacturing sites at which Magnetek incorporated Monsanto's PCBs into its product are outside of Missouri, including in Paterson, New Jersey. Many of the documents and witnesses relevant to the dispute will be located in New Jersey. Moreover, as discussed at length above, the parties are already litigating in New Jersey, and this action would be proceeding behind the first-filed New Jersey Action and would require the parties to duplicate their efforts and expenses litigating these issues in two separate forums.

- 17 -

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Second, Missouri's interest in the litigation is attenuated, as the Special Undertaking was accepted and entered into in the State of New Jersey and the alleged conduct by UMC which forms the basis of Monsanto's claims under the Special Undertaking took place outside Missouri, particularly in New Jersey.  To the extent that Monsanto alleges that UMC was negligent in its handling and disposal of PCBs or negligently manufactured PCB-containing products in New Jersey, New Jersey has a unique interest in the determination of those issues.

Third, Plaintiffs' interest in obtaining relief is not furthered by a Missouri court's exercise of jurisdiction here.  Although Missouri may be Plaintiffs' preferred forum, the parties are already engaged in litigation in New Jersey involving the exact same issues and there is no doubt that the New Jersey court is fully capable of adjudicating the parties' dispute and affording appropriate relief.  Federal courts do not consider the convenience to the plaintiff of litigating in its preferred forum to carry much weight when analyzing the reasonableness of an exercise of jurisdiction.  *See, e.g., Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1324 (9th Cir. 1998), *citing Ziegler v. Indian River Cty.*, 64 F.3d 470, 476 (9th Cir. 1995 (litigating in Florida would inconvenience plaintiff, but "neither the Supreme Court nor our court has given much weight to inconvenience to the plaintiff").

Fourth, as discussed above in Point I, the interstate judicial system's interest in obtaining the most-efficient resolution of this controversy would best be fulfilled by dismissing this second-filed action and allowing the first-filed action in New Jersey to proceed without a race to judgment or the risk of inconsistent results.

Finally, Missouri and New Jersey have a shared interest in the orderly administration of justice and comity between the states.  Moreover, New Jersey has an

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

interest in the dispute in that much of the conduct which allegedly forms the basis for Magnetek's obligations under the Special Undertaking necessarily took place at UMC's former New Jersey manufacturing plants.

Accordingly, even if Monsanto could establish jurisdiction under Missouri's Long Arm Statute (which it cannot) *and* that Magnetek had sufficient minimum contacts with Missouri to satisfy due process requirements (which it cannot), an exercise of jurisdiction here still would not comport with traditional notions of fair play and substantial justice, and the Court should dismiss Plaintiffs' petition as a result.

## POINT III

### PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION

In the alternative, if the court does not dismiss this action based on either the pendency of the first-filed New Jersey action or the lack of personal jurisdiction over Magnetek, Magnetek requests that the Court dismiss plaintiffs' cause of action for negligent misrepresentation.

A claim for negligent misrepresentation requires that a plaintiff allege that: (1) the speaker supplied information in the course of his business; (2) because of the speaker's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of limited persons in a particular business transaction; (4) the hearer justifiably relied on the information; and (5) due to the hearer's reliance on the information, the hearer suffered a pecuniary loss.  *See Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 134 (Mo. 2010).  A negligent misrepresentation claim is premised upon the theory that the speaker believed that the

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

information supplied was correct, but was negligent in so believing. *Colgan v. Washington Realty Co.*, 879 S.W.2d 686, 689 (Mo. App. 1994).

Here, Plaintiffs allege that Magnetek's predecessor UMC "told Monsanto that it only intended to use PCBs purchased from Monsanto for closed uses such that PCBs would not escape Defendant's products and enter the environment, and that the Special Undertaking Contract was 'covered by a blanket liability policy with the Travelers Insurance Company.'" Petition at ¶ 161. Plaintiffs allege that this information was false "due to Defendant's failure to exercise reasonable care," and that "Defendant intentionally supplied the false information regarding its use of PCB's and the insurance coverage."[5] *Id.* at ¶¶ 162, 164.

Plaintiffs' fail to allege any facts to support the assertion that UMC was negligent in stating that it intended to use the PCBs for closed uses and that it would procure liability insurance to cover the Special Undertaking. Plaintiffs do not allege that UMC used PCBs in any non-closed applications[6], and they do not specifically allege that any UMC products are the cause of PCB contamination or exposure in any of the underlying actions. Moreover, Plaintiffs acknowledge that UMC did not negligently make a false statement

---

[5]        Whether pleaded as a negligent misrepresentation or as an intentional/fraudulent misrepresentation, plaintiffs fail to state a claim for which relief can be granted. Plaintiffs do not allege that UMC made these alleged misrepresentations with a present intent not to perform, and "the necessary intent cannot be established merely be pointing to the defendant's subsequent breach." *Cole v. Homier Distributing Co.*, 599 F.3d. 856, 864 (8th Cir. 2010); *see also Trotter's Corp. v. Ringleader Restaurants, Inc.*, 929 S.W.2d. 935, 940 (Mo. App. 1996) ("[t]he mere breach of promise or failure to perform does not constitute a misrepresentation of fact or create a separate claim for fraud"); *see also, Renaissance Leasing, Inc.*, 322 S.W.3d. at 133 ("[t]he failure of performance does not establish intent").

[6]        In contrast to "closed" applications of PCBs, like dielectric fluids inside of capacitors which are sealed from the outside elements, so-called "open" applications of PCBs included paints and caulks, which are open to the environment and could permit PCBs to escape from such products.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

with respect to its procurement of insurance coverage: UMC *did* in fact acquire insurance policies to cover potential liability under the Special Undertaking, and Magnetek is currently litigating coverage disputes regarding a number of those policies.[7]  *See* Petition at ¶ 163.  As a result, Plaintiffs have failed to adequately allege the second element of the claim and their cause of action for negligent misrepresentation should be dismissed.

<u>**POINT IV**</u>

**IN THE ALTERNATIVE, THIS ACTION SHOULD BE STAYED
IN FAVOR OF THE FIRST-FILED ACTION IN NEW JERSEY**

In the event that the Court does not dismiss Plaintiffs' petition outright, this action should be stayed in favor of Magnetek's first-filed action in New Jersey.  Again, principals of comity and equity support granting this relief.

As discussed in Point I above, Missouri courts recognize that, where two actions have been brought involving the same parties, and arising out of the same transaction(s) or occurrence(s), "the court in which the second action is brought may in its discretion stay or suspend that suit, awaiting decision in the first one, or, influenced by a spirit of comity, may refuse to entertain it, if the same relief may be awarded in the prior suit."  *State ex rel. Miller v. Jones*, 349 S.W.2d at 538-39 (*citing* 1 Am. Jur. 44); *see also Hale v. Hale*, 781 S.W.2d at 820, n.6 (recognizing that court's power to dismiss second-filed action, without prejudice, based upon pendency of first-filed action in a sister jurisdiction is, in effect, the equivalent of a "stay" of the second-filed action); *Brooks Erection and Const. Co. v. Montgomery*, 613 S.W.2d at 863 (Mo. App. 1981) (holding that "the efficient administration

---

[7]     In addition to the action cited by plaintiffs in their Petition, *Velsicol Chemical LLC and Transportation Insurance Company v. Magnetek*, Circuit Court of Cook County, Illinois Index No. 2017-CH-02118, Magnetek is also litigating a coverage dispute with Travelers Insurance Company in the Northern District of Illinois, Civ. Action No. 17-cv-3173 wherein Magnetek seeks coverage related to Plaintiffs' 2016 demand and the Special Undertaking.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

of justice and comity considerations mitigated against continuing the Missouri proceedings," even though the Missouri proceedings were, in that instance, first-filed); *cf. Searles v. Searles*, 495 S.W.2d 759 (Mo. App. 1973) (recognizing trial court's authority to stay second-filed Missouri proceeding, but declining to stay the second-filed Missouri proceeding where, unlike here, one of the parties could not obtain complete relief in the jurisdiction where the first-filed proceeding was pending).

Here, of course, it is Magnetek's position that this Court should refuse to entertain this second-filed action, and should dismiss it for the reasons already discussed above.  If the Court does not dismiss this action, Magnetek submits that it is appropriate to stay this action in favor of the first-filed action brought by Magnetek in New Jersey.  There can be no dispute that the New Jersey court can afford complete relief to the parties, that court has already acknowledged probable jurisdiction over the dispute, and discovery is now underway in the New Jersey Action.  Absent the requested relief, a race to judgment will ensue (along with duplicative expenditures of money and judicial resources), a perverse incentive for Plaintiffs to attempt to delay the proceeding in the New Jersey Action will be created, and the risk of inconsistent outcomes will arise – which are exactly the concerns that principles of comity and equity seek to avoid.  *See* Point I, *supra*.  Accordingly, if Plaintiffs' petition is not dismissed outright, Plaintiffs' action should at least be stayed pending the outcome of the first-filed action brought by Magnetek in New Jersey.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## **CONCLUSION**

Based on the foregoing, Magnetek respectfully requests that the Court enter an Order dismissing Plaintiffs' petition in its entirety or, in the alternative, dismissing Plaintiffs' petition in part and otherwise staying this action pending the outcome of the first-filed action brought by Magnetek in New Jersey, together with such other and further relief as the Court deems just and proper.

LEWIS RICE LLC

By: /s/ Scott A. Wissel
Scott. A. Wissel, #49085
1010 Walnut, Suite 500
Kansas City, Missouri 64106
Telephone No. (816) 421-2500
sawissel@lewisricekc.com

PHILLIPS LYTLE LLP
Craig A. Leslie (*pro hac vice* motion to be filed)
Ryan A. Lema (*pro hac vice* motion to be filed)
One Canalside
125 Main Street
Buffalo, New York 14203
Telephone No. (716) 847-8400

Attorneys for Defendant
*Magnetek, Inc.*

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2017, I electronically filed the foregoing with the Clerk of the Court by using the Court's electronic filing system, which will automatically send a notice of electronic filing to interested parties.


     /s/ Scott A. Wissel     


Doc #01-3086554

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

# Exhibit 1

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

MONSANTO COMPANY, PHARMACIA,
LLC, and SOLUTIA, INC.,

                Plaintiffs,

    v.

MAGNETEK, INC.,

                Defendant.

Case No. 17SL-CC03368

Hon. Dean Paul Waldemer

**AFFIDAVIT OF DAVID PIERCE**

STATE OF TENNESSEE    )
                       ) ss:
COUNTY OF HENDERSON  )

DAVID PIERCE, being duly sworn, deposes and says:

1.     I am the Corporate Manager of Environmental Systems at Columbus McKinnon Corporation.  Plaintiff, Magnetek, Inc. ("Magnetek"), is a wholly-owned subsidiary of Columbus McKinnon.

2.     I submit this affidavit in support of Magnetek's motion to dismiss, and it is made based on my own personal knowledge and my review of Magnetek's business records maintained in the regular course of business.

3.     Magnetek is the successor to Universal Manufacturing Corporation ("UMC").  UMC was a New Jersey corporation with a principal place of business in Paterson, New Jersey.  Magnetek acquired UMC pursuant to a 1986 Stock Purchase Agreement before later merging with UMC, leaving Magnetek as the surviving corporation.

4.     Prior to Magnetek's acquisition of UMC, UMC's business was to manufacture, among other things, capacitors and fluorescent light fixtures and ballasts.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Certain of these products incorporated polychlorinated biphenyls ("PCBs") as a dielectric insulating fluid.

5.      From 1968 until July 1983, UMC operated a manufacturing plant in Totowa, New Jersey at which it manufactured capacitors.  Until the manufacture of PCBs was discontinued in 1979, UMC incorporated PCBs into certain capacitors that it manufactured at the Totowa plant.

6.      UMC acquired PCBs from defendant Pharmacia LLC f/k/a Monsanto Company ("Old Monsanto").  Old Monsanto marketed its various PCB formulations under the trade name "Aroclors."

7.      In 1972, as a condition to continuing to sell PCBs to UMC, Old Monsanto required UMC to execute the so-called "Special Undertaking" that is at issue in this action.

8.      Old Monsanto contacted UMC in New Jersey to solicit and negotiate the Special Undertaking, and UMC's president executed the Special Undertaking in New Jersey.

9.      Following execution of the Special Undertaking, Old Monsanto continued to market and advertise its PCBs to UMC, a New Jersey corporation, continued to communicate with UMC regarding its PCBs, continued to sell PCBs to UMC for use in UMC's Totowa, New Jersey manufacturing plant, and continued to ship those PCBs into New Jersey for use at UMC's Totowa, New Jersey manufacturing plant.

David Pierce

Sworn to before me this 7th day
of December, 2017

*Deborah S. Eddlemon*
_____
Notary Public

Commission Expires 9-22-2020

Doc #01-3085148



Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

# Exhibit 2

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

MONSANTO COMPANY, PHARMACIA,
LLC, and SOLUTIA, INC.,

    Plaintiffs,

  v.

MAGNETEK, INC.,

    Defendant.

Case No. 17SL-CC03368

Hon. Dean Paul Waldemer

**AFFIDAVIT OF RYAN A. LEMA**

STATE OF NEW YORK  )
         ) ss:
COUNTY OF ERIE    )

    RYAN A. LEMA, being duly sworn, deposes and says:

    1.  I am an associate with Phillips Lytle LLP, counsel to defendant,

Magnetek, Inc. ("Magnetek"). I am admitted to practice before the courts of the State of

New York and will be submitting an application to be admitted *pro hac vice* in Missouri in

connection with this matter. I am also admitted *pro hac vice* in Bergen County, New Jersey

in connection with an existing action by Magnetek against these plaintiffs.

    2.  I submit this affidavit in support of Magnetek's motion to dismiss,

and it is made based on my own personal knowledge.

    3.  Plaintiffs Pharmacia, LLC ("Old Monsanto"), Monsanto Company

("New Monsanto") and Solutia, Inc. ("Solutia") (collectively, "Monsanto" or "Plaintiffs")

commenced this action by filing a petition on September 1, 2017 and a summons was issued

on September 7, 2017. A true and correct copy of Plaintiffs' Summons and Petition is

attached hereto as Exhibit "A."

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

4.      Plaintiffs' petition concerns their attempt to enforce a 1972 contractual undertaking (the "Special Undertaking") given by Magnetek's predecessor in interest, Universal Manufacturing Company ("UMC"), to Old Monsanto. A true and correct copy of the Special Undertaking is attached as Exhibit 1 to Plaintiff's Petition.

5.      The Special Undertaking purports to require UMC to defend and indemnify Old Monsanto for liabilities, claims, and damages arising out of or in connection with UMC's receipt, purchase, possession, handling, use, sale or disposition of PCBs, except to the extent that PCBs failed to conform with specifications.

6.      On August 29, 2016, Plaintiffs demanded that Magnetek, as the successor to UMC, defend and indemnify them in connection with "all current and future PCB-related litigation wherein Old Monsanto is, or will be, named as a defendant" (the "2016 Demand"). Monsanto identified 46 then-pending actions as the subject of the tender (the "Underlying Actions"). A true and correct copy of the 2016 Demand is attached as Exhibit 11 to Plaintiff's Petition.

7.      Plaintiffs did not issue their 2016 Demand until years after some of the Underlying Actions had been commenced. The first of the Underlying Actions was commenced in 2009 and, by the time Monsanto made its 2016 Demand to Magnetek, at least one case had already been litigated to a $46 million verdict against Monsanto. Additionally, upon information and belief, Monsanto was then in the final stages of negotiations to settle another group of claims for $280 million.

8.      On May 12, 2017, over eight months after Monsanto issued its 2016 Demand, Magnetek commenced a declaratory judgment action in New Jersey Superior Court, Law Division, Docket No. L-003362, seeking a declaration that the Special Undertaking is unenforceable, in whole or in part (the "New Jersey Action"). A true and

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

correct copy of Magnetek's complaint in the New Jersey Action is attached hereto as Exhibit "B."

9.   Four months after Magnetek commenced the New Jersey Action, Monsanto filed the instant Petition.

10.   After commencing this action, but before serving the Petition on Magnetek, Plaintiffs filed two separate motions to dismiss the New Jersey Action. New Monsanto and Solutia argued that they are not subject to jurisdiction in New Jersey, and Old Monsanto argued that the case could not proceed without joining those two indispensable parties. All of the Monsanto entities argued that the New Jersey court should dismiss the case in favor of this later-filed Missouri action. By orders dated October 13, 2017, the New Jersey Superior Court (Hon. Robert C. Wilson, J.S.C.) denied Monsanto's motions to dismiss. True and correct copies of those orders are attached hereto as Exhibits "C" and "D."

11.   Monsanto answered Magnetek's New Jersey complaint on November 29, 2017. A true and correct copy of Monsanto's Answer in the New Jersey Action is attached hereto as Exhibit "E."

12.   Magnetek served initial discovery demands and deposition notices on December 8, 2017, and discovery is now underway in the New Jersey action.

Ryan A. Lema

Sworn to before me this $8th$ day
of December, 2017

Notary Public

Doc #01-3086221.1

MARIAN SARZYNIAK
No. 01SA6206283
Notary Public, State of New York
Qualified in Niagara County
My Commission Expires 05/18/20

- 3 -

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

# Exhibit A

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>DEAN PAUL WALDEMER | Case Number: 17SL-CC03368 |
|---|---|
| Plaintiff/Petitioner:<br>MONSANTO COMPANY<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>CHRISTOPHER MARTIN HOHN<br>ONE US BANK PLAZA<br>SUITE 2600<br>SAINT LOUIS, MO 63101 |
| Defendant/Respondent:<br>MAGNETEK, INC. | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE |
| Nature of Suit:<br>CC Breach of Contract | CLAYTON, MO 63105                    (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: MAGNETEK, INC.
Alias:

CSC-LAWYERS INC SERVICE CO
221 BOLIVAR STREET
JEFFERSON CITY, MO 65101

COURT SEAL OF



ST. LOUIS COUNTY

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739 or TTY at 314-615-4567, at least three business days in advance of the court proceeding.

07-SEP-2017
**Date**

**Further Information:**
AMH

_____
Clerk

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____ (title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server          Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

(Seal) .

My commission expires: _____          _____
                                    Date                                            Notary Public

| Sheriff's Fees, if applicable | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ ( _____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (7-99) SM30 (SMCC) *For Court Use Only*: **Document ID# 17-SMCC-7510**    |    (Civil Procedure Form No. 1, Rules 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI

Twenty First Judicial Circuit

## NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES

### Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place. This is often true even when the parties initially believe that settlement is not possible. A settlement reduces the expense and inconvenience of litigation. It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost. Often such services are most effective in reducing costs if used early in the course of a lawsuit. Your attorney can aid you in deciding whether and when such services would be helpful in your case.

### Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so. In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below. These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended. Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether or not you use an alternative dispute resolution procedure or not. **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

### Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits. Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party. The services are provided by individuals and organizations who may charge a fee for this help. Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case. The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit. An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties. The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement. An effective mediator may offer solutions that have not been considered by the parties or their lawyers. A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator. The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions. While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations. The neutral third party may issue an advisory opinion regarding the merits of the case. The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations. A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed. After the "trial", the jurors retire to deliberate and then deliver an advisory verdict. The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral. As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals. The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list. The Circuit Clerk also has Neutral Qualifications Forms on file. These forms have been submitted by the neutrals on the list and provide information on their background and expertise. They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105. The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral. The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

OSCA (7-99) SM30 (SMCC) *For Court Use Only:* **Document ID# 17-SMCC-7510**   3   (Civil Procedure Form No. 1, Rules 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

**17SL-CC03368**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| MONSANTO COMPANY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PHARMACIA, LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SOLUTIA, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| MAGNETEK, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## PETITION

COME NOW Plaintiffs Monsanto Company, Pharmacia, LLC, and Solutia, Inc. ("Plaintiffs"), for their Petition against Magnetek, Inc. ("Defendant" or "Magnetek"), and allege as follows:

## NATURE OF THE CASE

1.     This action arises out of Defendant's breach of its contractual obligation to defend, indemnify, and hold harmless old Monsanto Company a/k/a Monsanto Chemical Co. ("Old Monsanto"), now known as Pharmacia LLC ("Pharmacia"), under a certain "Special Undertaking by Purchasers of Polychlorinated Biphenyls" contract ("Special Undertaking Contract") entered into by the parties, or their predecessors in interest.

2.     On January 7, 1972, Defendant's predecessor in interest, Universal Manufacturing Corporation, entered into a Special Undertaking Contract with Pharmacia.

1

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

3.      Pursuant to that Special Undertaking Contract, Universal Manufacturing Corporation purchased polychlorinated biphenyls ("PCBs") from Pharmacia from January 1972 to 1977.

4.      Universal Manufacturing Corporation purchased more than eleven million pounds of PCBs from Pharmacia during that period.

5.      Defendant and Universal Manufacturing Corporation released or permitted the release of some or all of those PCBs into the environment.

6.      The Special Undertaking Contract executed by Universal Manufacturing Corporation obligates Defendant to defend, indemnify and hold Pharmacia harmless from "any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through, or under [Defendant], whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's."

7.      Under the Special Undertaking Contract, Defendant has a contractual duty to defend, indemnify, and hold Pharmacia harmless in approximately 46 separate lawsuits filed against Pharmacia for damages allegedly caused by the release of PCBs into the environment and predicating Pharmacia's liability on, inter alia, its manufacturing of PCBs for purchase by Defendant.

8.      Pharmacia tendered the defense of those lawsuits to Defendant in 2016 and demanded indemnification from Defendant.

9.      Defendant refused to provide Pharmacia with a defense and refused to indemnify Pharmacia in any of the lawsuits.

2

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

10.     Such refusal breached Defendant's Special Undertaking Contract, causing damage to Pharmacia.

## THE PARTIES

11.     Plaintiff Monsanto Company ("Monsanto," or "New Monsanto") is a corporation organized and existing under the laws of the State of Delaware with its corporate headquarters and principal place of business in St. Louis County, Missouri.

12.     Plaintiff Pharmacia, LLC ("Pharmacia") is a limited liability company organized and existing under the laws of the State of Delaware.

13.     Plaintiff Solutia, Inc. ("Solutia") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in St. Louis County, Missouri.

14.     Defendant Magnetek is a corporation organized and existing under the laws of the State of Delaware.

15.     Magnetek is the successor in interest to Universal Manufacturing Corporation. Universal Manufacturing Corporation merged into Magnetek, Inc. (d/b/a Delaware Magnetek, Inc.) on or about July 11, 1986, with Magnetek as the surviving corporation.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over Plaintiffs' breach of contract, negligence, and negligent misrepresentation claims pursuant to Art. 5, § 14 of the Missouri Constitution because circuit courts have original jurisdiction over all civil matters and because Plaintiffs seek recovery of money in excess of $25,000, so Mo. Rev. Stat. § 517.011 does not apply. The Court has subject matter jurisdiction over Plaintiffs' declaratory judgment claims pursuant to Mo. Rev. Stat. §§ 527.010, 527.020, and 527.030.

3

17.    This Court has personal jurisdiction over Defendant under Mo. Rev. Stat. § 506.500 because Defendant transacted business within Missouri, made contracts within Missouri, and contracted to insure a person, property or risk located within Missouri at the time of contracting. Defendant is also registered to do business in Missouri.

18.    Venue is proper in St. Louis County, Missouri pursuant to Mo. Rev. Stat. § 508.010.4, because Plaintiffs allege a tort claim against Defendant and Plaintiffs were first injured by Defendant's tortious conduct in St. Louis County, Missouri.

## GENERAL ALLEGATIONS

19.    From 1901 to 1997, Old Monsanto operated as a Missouri corporation manufacturing a variety of chemicals and agricultural products.

20.    PCBs are a class of chemicals that were sold in the United States between approximately 1930 and 1977. They are extremely stable, chemically inert, resistant to heat and fire, and highly electrically resistive.

21.    Until 1977, Old Monsanto sold PCBs in bulk to a number of industrial customers who incorporated them into a wide variety of finished products.

22.    The finished products into which Old Monsanto's customers incorporated PCBs included dielectric fluids used in electrical equipment such as transformers and capacitors, hydraulic fluids, lighting ballasts, lubricants, adhesives, inks, paints, caulk, plasticizers, carbonless copy paper, and others.

23.    For much of the twentieth century, PCBs were recognized as an essential fire retardant in many types of electrical equipment and machinery to mitigate very serious risks, including risk of fatal accidents from fire and explosions. The National Electrical Code, other

4

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

industry codes, and state and federal government regulations required the use of PCBs in certain electrical applications.

24.    Because PCBs are "virtually free of fire and explosion hazards," they were "used in locations where failures of oil-insulated transformers would present a potential danger to life and property." Interdepartmental Task Force on PCBs, ITF-PCB-72-1, Polychlorinated Biphenyls and the Environment, at 12, 76 (May 1972) ("Interdepartmental Task Force Report").

### Environmental Persistence

25.    In the late 1960s, PCBs were found to persist in the environment. *See* Interdepartmental Task Force Report at 2.

26.    In 1970, Old Monsanto announced a preliminary decision to cease all production of PCBs, which would have eliminated all then-existing PCB production in the United States.

27.    Because its decision would have left members of the U.S. electric industry without a domestic source for the PCBs required by existing industry standards, and deemed "necessary" by the federal government, Old Monsanto revised its approach.

28.    Old Monsanto agreed to continue to supply PCBs for certain electrical applications until the U.S. Environmental Protection Agency ("EPA"), members of the transformer and capacitor industries, and Old Monsanto could reach a consensus judgment that suitable alternatives to PCBs were available.

29.    In September 1971, the U.S. government convened an Interdepartmental Task Force on PCBs. Interdepartmental Task Force Report at 1.

30.    The Task Force "included operating units of five Executive Branch departments," namely: the Department of Agriculture; Department of Commerce; EPA; Department of Health, Education, and Welfare; and Department of the Interior. *Id.*

5

31.     The purpose of the Task Force was to "coordinate the scientific efforts of the Government aimed at understanding [PCBs], and to strengthen the Government's ability to protect the public from actual or potential hazards from PCBs." *Id.*

32.     In 1972, the Task Force issued a major report on PCBs, which "reflect[ed] the position of the operating agencies of the Federal Government which have major responsibilities concerning such chemicals as PCBs in food and in the environment." *Id.*

33.     After reviewing "all of the available scientific information on various aspects of the PCB problem," the Task Force agreed on nine separate conclusions relating to PCBs, including the following:

> The use of PCBs should not be banned entirely. ***Their continued use for transformers and capacitors in the near future is considered necessary*** because of the significantly increased risk of fire and explosion and the disruption of electrical service which would result from a ban on PCB use. Also, continued use of PCBs in transformers and capacitors presents a minimal risk of environmental contamination.

*Id.* at 2,4 (emphasis added).

34.     The report found that PCBs had certain "essential or non-replaceable uses." *Id.* at 3. For example, the report states: "[c]learly, there is no substitute for PCB-filled transformers where fire protection is required." *Id.* at 78.

35.     The Task Force explained that continued use of PCBs was essential, because there were no present substitutes for the use of PCBs, and that purchasers and users of PCBs understood the need for unusual protective measure to prevent their release into the environment:

> The advantages to the public in terms of safe, reliable, and efficient electrical equipment made possible by the use of PCBs have been documented in the body of, and especially Appendix B to, this report. It is also clear that there are no present or prospective substitutes for these materials, and that the functions they perform are essential. Thus the continuing need for PCBs in closed electrical system applications is conclusive. The electrical industry well understands,

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

however, that continued use of these materials requires unusual protective measures.

*Id.* at 81.

36.     From 1971 forward, Old Monsanto worked hand-in-hand with the EPA to determine when acceptable substitutes were available and Old Monsanto could stop production of PCBs. *See* EPA, Industry Views on the Use of PCBs (1976) at 7 (Statement of F.J. Fitzgerald, Vice-President, Monsanto Chemical Company) (Old Monsanto "reaffirm[ing]" its "commitment to continue working with the EPA and the electrical industry in finding solutions to the PCB issue.").

37.     In January 1976, EPA Administrator Russell Train met with manufacturers and users of PCB to discuss the availability of suitable alternatives to PCBs. EPA, Industry Views on the Use of PCBs (1976) at i.

38.     At the meeting, and other follow-up meetings, representatives from several manufacturers who used PCBs in electrical products reported that, despite considerable effort, acceptable substitutes remained unavailable for many electrical applications.

39.     In 1976, Congress enacted the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 *et seq.*, regulating PCBs. The TSCA provided the EPA broad power, which the EPA seized, to promulgate a comprehensive regulatory scheme governing the manufacture, use, distribution, disposal, and remediation of PCBs. *See* 40 C.F.R. §761.1 *et seq.*

40.     The TSCA barred new manufacture of PCBs after January 1, 1979; however, it delegated to EPA the authority to allow continuing use of existing PCBs where it did not present an "unreasonable risk of injury to health." *See* 15 U.S.C § 2605(e).

7

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## The Special Undertaking Contracts

41.     Old Monsanto continued to produce PCBs for its customers to use in electrical applications after 1971, if they would agree to defend and indemnify Old Monsanto against future PCB-related claims.

42.     Defendant entered into such an agreement with Old Monsanto.

43.     On January 7, 1972, Magnetek's predecessor in interest Universal Manufacturing Corporation and Old Monsanto executed a written agreement entitled "Special Undertaking by Purchasers of Polychlorinated Biphenyls" (the "Special Undertaking Contract"). A true and correct copy of the Special Undertaking Contract is attached hereto as **Exhibit 1** and incorporated herein by reference.

44.     Magnetek is the successor in interest to Universal Manufacturing Corporation's obligations under the Special Undertaking Contract.

45.     The Special Undertaking Contract identifies Magnetek's predecessor in interest as the "Buyer" and states:

> While Buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.
>
> Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Exhibit 1 at 1.

8

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

46.     The Special Undertaking Contract further states that Magnetek will defend,

indemnify and hold Monsanto harmless against future PCB-related claims as follows:

> Accordingly, Buyer hereby covenants and agrees that, with respect
> to any and all PCB's sold or delivered by or on behalf of Monsanto
> to Buyer on or after the date hereof and in consideration of any
> such sale or delivery, Buyer shall defend, indemnify and hold
> harmless Monsanto, its present, past and future directors, officers,
> employees and agents, from and against any and all liabilities,
> claims, damages, penalties, actions, suits, losses, costs and
> expenses (except to the extent arising from failure of PCB to
> conform to specifications) arising out of or in connection with the
> receipt, purchase, possession, handling, use, sale, or disposition of
> such PCB's by, through or under Buyer, whether alone or in
> combination with other substances, including, without implied
> limitation, any contamination of or adverse effect on humans,
> marine and wildlife, food, animal feed or the environment by
> reason of such PCB's.

Exhibit 1 at 1.

47.     Further, the Special Undertaking Contract states that "[a]ll existing contracts for

the sale of PCB's by Monsanto to Buyer are·hereby amended to contain the provision set forth

above." Exhibit 1 at 1.

48.     As shown, the Special Undertaking Contract broadly covers all claims "arising

out of" or having any "connection with" the receipt or purchase of PCBs by Magnetek after

January 7, 1972.

49.     The Special Undertaking Contract is not limited to claims connected only to PCBs

purchased by Magnetek after January 7, 1972, but also applies to claims connected to those

PCBs "in combination with other substances."

50.     Old Monsanto continued to supply Magnetek or its predecessors with PCB's

pursuant to the Special Undertaking Contract until 1977.

9

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

51.    On January 7, 1972, the President of Magnetek's predecessor in interest sent a letter to Old Monsanto stating that the Special Undertaking Contract is covered by a blanket liability policy with Travelers Insurance Company having limits of $10 million dollars.  A true and accurate copy of the January 7, 1972 letter is attached hereto as **Exhibit 2** and incorporated herein by reference.

52.    On March 31, 2000, Old Monsanto merged with Pharmacia & Upjohn, Inc. and took the name Pharmacia Corporation ("Pharmacia" or "Old Monsanto").

53.    New Monsanto has the right to enforce the Special Undertaking Contract to seek indemnification and defense of Old Monsanto (n/k/a Pharmacia) by Defendant.

### Defendant Released PCBs into the Environment

54.    Defendant was aware of the potential for PCBs to persist in the environment and of the need to use care in the use and handling of PCBs.

55.    Nevertheless, Defendant and its products have been a major source of environmental PCB contamination, and it has released PCBs purchased both before and after signing the Special Undertaking Contract into the environment.

56.    PCBs have been released into the environment by Defendant through their release from products manufactured by Defendant, improper disposal of PCB-containing products, leaks, accidental spills, improper dumping and disposal of industrial wastes, and through other means.

57.    Once they are released into the environment, many PCBs do not break down readily and may remain there for long periods of time.

58.    Reports state that PCBs cycle between air, water and soil and can be carried long distances from the site of original release.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**The Underlying Lawsuits**

59.    A number of lawsuits have been filed against Plaintiffs seeking to impose liability on the Plaintiffs for injuries or damages allegedly caused by the release of PCBs into the environment (the "PCB Lawsuits"). A list of those lawsuits is attached hereto as **Exhibit 3** and incorporated herein by reference.

60.    Defendant was provided access to a copy of the complaint in each of the lawsuits listed on Exhibit 3.

61.    The lawsuits can be grouped into four categories.

**A.    The Food Chain Cases**

62.    Plaintiffs were named as defendants in a series of personal injury cases in which the plaintiffs contended that they suffered from various types of cancer (primarily non-Hodgkin lymphoma) as a result of non-employment, environmental and food chain exposure to PCBs (the "**Food Chain Cases**").

63.    Plaintiffs in the Food Chain Cases alleged that PCBs are now ubiquitous in the environment because, *inter alia*, the products into which PCBs were incorporated by Old Monsanto's customers permitted their release into the environment. Plaintiffs also alleged that PCBs were dumped into the environment over decades by Old Monsanto's customers, the end-users of various PCB-containing products, and Old Monsanto itself.

64.    Plaintiffs in the Food Chain Cases alleged that it is impossible to "disaggregate" the environmental PCBs to which they were exposed and which they alleged caused their injuries or determine their more particular source.

65.    Accordingly, the Food Chain Plaintiffs alleged generally that their injuries were caused by their exposure to the combination of PCBs released into the environment.

66.    The Food Chain Plaintiffs sought to impose liability on Pharmacia for manufacturing any and all PCBs, including those purchased by Defendant's predecessor before and after it signed the Special Undertaking Contracts.

67.    Thus, the Food Chain Cases present "liabilities, claims, damages, penalties, actions, suits, losses, costs [or] expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of ... PCBs [purchased on or after Defendant's predecessor entered into the Special Undertaking Contracts] by, through or under [Defendant's predecessor]...alone or in combination with other substances," within the meaning of the Special Undertaking Contracts.

68.    The Food Chain Cases were filed in state court in Los Angeles County, California, and in state and federal courts in St. Louis, Missouri. The Food Chain Cases included approximately 700 plaintiffs.

69.    In September 2016, Monsanto settled all of the Food Chain Cases, including those on appeal, for approximately $280 million.

70.    The full set of complaints filed in the Food Chain Cases is voluminous and attachment of all such pleadings to this Complaint is impracticable for filing purposes, but examples of complaints filed in the Food Chain Cases are attached hereto as **Exhibits 4 and 5**.

71.    More specifically, Exhibit 4 is a true and accurate copy of the complaint in *Bailey, et al. v. Monsanto Co., et al.*, Case 4:15-cv-00844-AGF, United States District Court for the Eastern District of Missouri, Eastern Division. Exhibit 5 is a true and accurate copy of the complaint in *Kelly, et al. v. Monsanto Co., et al.*, Case 4:15-cv-01825-JMB, United States District Court for the Eastern District of Missouri, Eastern Division.

12

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

### B.   The Water Cases

72.   Plaintiffs have been named as defendants in a group of lawsuits in which cities and various municipal agencies are alleging that the Plaintiffs should bear some cost for water clean-up and wastewater permit costs due to PCB contamination (the "**Water Cases**").

73.   Plaintiffs in the Water Cases allege generally that PCBs have entered the subject body of water through various sources, including improper disposal by Old Monsanto's customers, PCB releases from products manufactured by Old Monsanto's customers, and leaching from landfills. Plaintiffs in the Water Cases allege that PCBs easily migrate or leach out of their original source material or enclosure and that "PCBs can also escape from totally-enclosed materials (such as light ballasts) and …escape into the environment." *See* San Diego Complaint at ¶ 22. Plaintiffs in the Water Cases specifically allege that Old Monsanto sold PCBs for use in electric transformers and capacitors, and that PCBs escape from such products and cause environmental contamination. Plaintiffs in the Water Cases do not identify more specifically the sources of the PCBs found in the water.

74.   PCBs purchased by Universal Manufacturing Corporation both before and after it signed the Special Undertaking Contract have been released into the environment and are part of the combined environmental load of PCBs alleged to have contaminated the waterways at issue in the Water Cases.

75.   The Water Cases Plaintiffs sought to impose liability on Pharmacia for manufacturing any and all PCBs, including those purchased by Defendant's predecessor before and after it signed the Special Undertaking Contracts.

76.   Thus, the Water Cases present "liabilities, claims, damages, penalties, actions, suits, losses, costs [or] expenses arising out of or in connection with the receipt, purchase,

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

possession, handling, use, sale or disposition of ... PCBs [purchased on or after Defendant's predecessor entered into the Special Undertaking Contracts] by, through or under [Defendant's predecessor]...alone or in combination with other substances," within the meaning of the Special Undertaking Contracts.

77.    Ten separate Water Cases have been filed and they are all pending on the West coast.

78.    The full set of complaints filed in the Water Cases is voluminous and attachment of all such pleadings to this Complaint is impracticable for filing purposes, but examples of complaints filed in the Water Cases are attached hereto as **Exhibits 6 and 7.**

79.    More specifically, Exhibit 6 is a true and accurate copy of the complaint in *City of Oakland v. Monsanto Company, et al.*, Case 4:15-cv-05152, United States District Court for the Northern District of California – Oakland Division.  Exhibit 7 is a true and accurate copy of the complaint in *San Diego Unified Port District, et al. v. Monsanto Company, et al.*, Case 3:15-cv-00578-WQH-JLB, United States District Court for the Southern District of California.

   **C.    The School Cases**

80.    Plaintiffs have been named as defendants in four cases in which the plaintiffs allege that the Plaintiffs should bear some cost of clean-up and/or rebuilding of schools due to alleged PCB contamination (the "**School Cases**").

81.    Plaintiffs in the School Cases allege that PCBs were used in building products such as electrical equipment, lighting ballasts and other materials that were used in the construction of school buildings.

14

82.     Defendant's predecessor manufactured PCB-containing lighting ballasts and other electrical equipment using PCBs purchased both before and after they signed the Special Undertaking Contracts.

83.     The PCBs at issue in the School Cases may include PCBs Defendant's predecessor purchased after signing the Special Undertaking Contracts.

84.     Thus, the School Cases present "liabilities, claims, damages, penalties, actions, suits, losses, costs [or] expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of … PCBs [purchased on or after Defendant's predecessor entered into the Special Undertaking Contracts] by, through or under [Defendant's predecessor]…alone or in combination with other substances," within the meaning of the Special Undertaking Contracts.

85.     The full set of complaints filed in the School Cases is voluminous and attachment of all such pleadings to this Complaint is impracticable for filing purposes, but examples of complaints filed in the School Cases are attached hereto as **Exhibits 8 and 9.**

86.     More specifically, Exhibit 8 is a true and accurate copy of the complaint in *Town of Westport, et al., v. Monsanto Company, et al.*, Case 1:14-cv-12041-DJC, United States District Court, District of Massachusetts.  Exhibit 9 is a true and accurate copy of the complaint in *City of Hartford, et al. v. Monsanto Company*, Case 2:15-cv-01544, United States District Court, District of Connecticut.

**D.      The Occupational Case**

87.     Plaintiffs have been named as defendants, along with GE, in an occupational exposure case filed in state court in Massachusetts (the "**Occupational Case**").

88.     Plaintiff in the Occupational Case alleges that he developed cancer as a result of his exposure to PCBs. Plaintiff alleges that he was exposed to PCBs during the course of his employment, from 1992 through 2008, working with power transformers and other electrical equipment.

89.     Thus, the Occupational Case presents "liabilities, claims, damages, penalties, actions, suits, losses, costs [or] expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of ... PCBs [purchased on or after Defendant's predecessor entered into the Special Undertaking Contracts] by, through or under [Defendant's predecessor]...alone or in combination with other substances," within the meaning of the Special Undertaking Contracts.

90.     A copy of the complaint filed in the Occupational Case is attached hereto as **Exhibit 10**.

91.     More specifically, Exhibit 10 is a true and accurate copy of the complaint in *Lamkin, et al. v. Monsanto Company, et al.*, Case 16-0563, Suffolk County Superior Court, Massachusetts.

92.     The Food Chain Cases, Water Cases, School Cases, and the Occupational Case are referred to throughout this Petition as the PCB Lawsuits.

93.     Plaintiffs have incurred significant costs in defending the PCB Lawsuits, and will continue to incur significant costs defending the PCB Lawsuits in the foreseeable future.

94.     Plaintiffs also have paid significant amounts to resolve certain claims premised on environmental exposure to PCBs.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**Defendant's Refusal to Defend and Indemnify**

95.     Counsel for Plaintiffs notified Defendant of the PCB Lawsuits, informed
Defendant that the Special Undertaking Contracts applied to the PCB Lawsuits, and demanded
that Defendant defend and indemnify Old Monsanto in the litigation.

96.     On August 29, 2016, counsel for Plaintiffs sent a letter to Magnetek notifying
Magnetek of the PCB Lawsuits, informing Magnetek that the Special Undertaking Contract
applied to the PCB Lawsuits, and demanded that Magnetek defend and indemnify Monsanto in
the litigation. A true and accurate copy of the August 29, 2016, letter to Magnetek is attached
hereto as **Exhibit 11** and incorporated herein by reference.

97.     On September 13, 2016, counsel for Magnetek sent a letter to counsel for
Plaintiffs rejecting their tender of the defense of the PCB Lawsuits and demand for defense and
indemnification under the Special Undertaking Contract. A true and accurate copy of the
September 13, 2016, letter to Magnetek is attached hereto as **Exhibit 12** and incorporated herein
by reference.

98.     On December 23, 2016, counsel for Plaintiffs sent a letter to Magnetek suggesting
that the parties schedule a meeting to discuss their positions regarding the Special Undertaking
Contract. A true and accurate copy of the December 23, 2016, letter to Magnetek is attached
hereto as **Exhibit 13** and incorporated herein by reference.

99.     The parties scheduled a meeting in St. Louis, Missouri for May 16, 2017, to
discuss the Special Undertaking Contract, potential standstill and tolling agreements, and
potential resolution of the parties' disputes.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

100.    Immediately prior to the parties' scheduled meeting, on May 12, 2017, Magnetek filed an eight-count declaratory judgment Complaint against Plaintiffs in the Superior Court of New Jersey, Case No. BER-L-3362-17.

101.    On May 16, 2017, counsel for Magnetek appeared in St. Louis, Missouri for the parties' scheduled meeting, but did not inform Monsanto or Monsanto's counsel that Magnetek had filed the declaratory judgment action.  When confronted with the declaratory judgment complaint, counsel for Magnetek stated that the lawsuit was a "placeholder" and that Magnetek did not intend to immediately serve Monsanto.

102.    Due to the filing of the declaratory judgment complaint, Magnetek did not participate in the meeting scheduled for May 16, 2017.

103.    On June 2, 2017, Magnetek served Plaintiffs with the declaratory judgment complaint.

104.    Magnetek has continued to refuse Plaintiffs' demand that Magnetek assume the defense of the PCB Lawsuits and provide indemnification for amounts expended to resolve certain of the Food Chain Cases.

### COUNT I
### (Breach of Contract – Refusal to Defend)

105.    Paragraphs 1 through 104 above are incorporated herein by reference.

106.    Old Monsanto provided valuable consideration to Defendant in exchange for Defendant's agreement to defend Old Monsanto against future PCB-related claims.

107.    For example, Old Monsanto agreed to continue, and did continue, to manufacture PCBs for Defendant for an agreed price for an additional five years, in exchange for Defendant's promise to defend Old Monsanto against future PCB-related claims.

18

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

108.    Old Monsanto has performed all obligations and responsibilities required of Old Monsanto under the Special Undertaking Contract.

109.    The Special Undertaking Contract is a valid contract that is enforceable against Defendant.

110.    Under the Special Undertaking Contract, Defendant is obligated to provide a defense for Old Monsanto (n/k/a Pharmacia) in the PCB Lawsuits, including, but not limited to, payment of attorneys' fees, expert fees, and costs incurred to defend Old Monsanto (Pharmacia) in the Pending PCB Litigation.

111.    The PCB Lawsuits fall within the scope of claims against which Defendant agreed to defend Old Monsanto (Pharmacia).

112.    Monsanto is entitled to enforce Old Monsanto's (Pharmacia's) rights under the Special Undertaking Contract as the assignee of those rights.

113.    Monsanto is indemnifying and defending Pharmacia (Old Monsanto) and Solutia in the PCB Lawsuits.

114.    Counsel for Monsanto notified Defendant of the PCB Lawsuits and demanded that Defendant defend Old Monsanto (Pharmacia) in the PCB Lawsuits.

115.    Defendant has failed and refused to defend Old Monsanto (Pharmacia) in the PCB Lawsuits.

116.    Defendant has breached its contractual obligation to defend Old Monsanto (Pharmacia) in the PCB Lawsuits.

117.    As a result of Defendant's breach of its contractual obligation to defend and indemnify Old Monsanto (Pharmacia), Monsanto already has been damaged in an amount exceeding $25,000.00 for defense costs incurred prior to the date of this filing, and such costs

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

will continue to accrue, plus foreseeable consequential damages, pre-judgment interest for such liquidated sums and attorneys' fees and costs in this action, all to be proven at the time of trial.

118.    Monsanto continues to incur attorneys' fees, expert fees, and other litigation costs and expenses in the PCB Lawsuits that constitute part of its damages resulting from Defendant's breach(es) and as such, expressly reserves its right to seek damages in excess of the amounts referenced in the foregoing paragraph.

## COUNT II
### (Breach of Contract – Refusal to Indemnify)

119.    Paragraphs 1 through 104 above are incorporated herein by reference.

120.    Old Monsanto provided valuable consideration to Defendant in exchange for Defendant's agreement to indemnify Old Monsanto·against future PCB-related claims.

121.    For example, Old Monsanto agreed to continue, and did continue, to manufacture PCBs for Defendant for an agreed price for an additional five years, in exchange for Defendant's promise to indemnify Old Monsanto against future PCB-related claims.

122.    Old Monsanto has performed all obligations and responsibilities required of Old Monsanto under the Special Undertaking Contract.

123.    The Special Undertaking Contract is a valid contract that is enforceable against Defendant.

124.    Under the Special Undertaking Contract, Defendant is obligated to indemnify Old Monsanto (n/k/a Pharmacia) for its losses and liabilities in connection with  claims covered by the Special Undertaking Contract.

125.    The PCB Lawsuits fall within the scope of claims against which Defendant agreed to indemnify Old Monsanto (Pharmacia).

20

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

126.     The settlement of the Food Chain Cases falls within the scope of liabilities or losses against which Defendant agreed to indemnity Old Monsanto (Pharmacia).

127.     Monsanto is entitled to enforce Old Monsanto's (Pharmacia's) rights under the Special Undertaking Contract as the assignee of those rights.

128.     Monsanto is indemnifying and defending Pharmacia (Old Monsanto) and Solutia in the PCB Lawsuits.

129.     Counsel for Monsanto notified Defendant of the PCB Lawsuits, the potential settlement of the Food Chain Cases, and demanded that Defendant indemnify Old Monsanto (Pharmacia) in the litigation.

130.     Defendant has breached its contractual obligations to indemnify Old Monsanto (Pharmacia) for its liabilities and losses in connection with claims covered by the Special Undertaking Contract, including the settlement of the Food Chain Cases.

131.     As a result of Defendant's breaches of its contractual obligations to indemnify Old Monsanto (Pharmacia), Monsanto has been damaged in an amount exceeding $25,000.00, for the settlement of the Food Chain Cases, and amounts Monsanto reasonably has paid to resolve claims covered by the Special Undertaking Contract prior to the date of this filing, plus foreseeable consequential damages, pre-judgment interests for such liquidated sums and attorneys' fees and costs in this action, all to be proven at the time of trial.

## COUNT III
### (Declaratory Judgment – Contractual Duty to Defend)

132.     Paragraphs 1 through 104 above are incorporated herein by reference.

133.     This Court has the power to grant a declaratory judgment concerning the rights and obligations of Monsanto and Defendant, pursuant to Mo. Stat. §§ 527.010, 527.020, and 527.030, as an actual controversy exists between Monsanto and Defendant concerning the

parties' respective rights and obligations under the Special Undertaking Contract, including Defendant's duty to defend Old Monsanto (n/k/a Pharmacia) in the PCB Lawsuits.

134.    The Special Undertaking Contract requires Defendant to defend Old Monsanto (Pharmacia) in the PCB Lawsuits.

135.    Defendant's refusal to satisfy its obligations to defend Old Monsanto (Pharmacia) or pay its defense costs in the PCB Lawsuits is contrary to the Special Undertaking Contract and the law. Monsanto is entitled to enforce Old Monsanto's (Pharmacia's) rights under the Special Undertaking Contract as the assignee of those rights.

136.    Monsanto is indemnifying and defending Pharmacia (Old Monsanto) and Solutia in the PCB Lawsuits.

137.    Justiciable controversies have arisen between Monsanto and Defendant concerning interpretation of the Special Undertaking Contract and Defendant's obligation to defend Old Monsanto (Pharmacia) in the PCB Lawsuits.

138.    This actual controversy is definite and concrete, in that the parties' positions are adverse and Defendant's refusal to defend Old Monsanto (Pharmacia) pursuant to the Special Undertaking Contract causes direct legal injury to Monsanto.

139.    This controversy is real and substantial, and ripe for adjudication. A judicial declaration as to Defendant's obligation to defend Old Monsanto (Pharmacia) in the PCB Lawsuits under the Special Undertaking Contract will resolve the present controversy, and provide conclusive relief.

140.    The harm to Monsanto if Defendant is allowed to avoid their obligation to defend Old Monsanto (Pharmacia) in the PCB Lawsuits is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment clarifying the legal relations of the parties.

22

Without a declaration of rights, Monsanto will continue to incur attorney's fees, expert fees and other costs and expenses in the PCB Lawsuits.

141.    Monsanto therefore requires a declaratory judgment declaring that Defendant has a duty to defend Old Monsanto (Pharmacia) in the PCB Lawsuits under the Special Undertaking Contracts.

## COUNT IV
### (Declaratory Judgment – Contractual Duty to Indemnify)

142.    Paragraphs 1 through 104 above are incorporated herein by reference.

143.    The Special Undertaking Contract requires Defendant to indemnify Old Monsanto in the Pending PCB Litigation.

144.    Defendant's denial of its obligations to indemnify Old Monsanto (n/k/a Pharmacia) in the PCB Lawsuits is contrary to the Special Undertaking Contract and the law.

145.    Justiciable controversies have arisen between Monsanto and Defendant concerning interpretation of the Special Undertaking Contract and Defendant's obligation to indemnify Old Monsanto (Pharacia) in the PCB Lawsuits.

146.    Monsanto is entitled to enforce Old Monsanto's (Pharmacia's) rights under the Special Undertaking Contract as the assignee of those rights.

147.    Monsanto is indemnifying and defending Pharmacia (Old Monsanto) and Solutia in the PCB Lawsuits.

148.    This actual controversy is definite and concrete, in that the parties' positions are adverse and Defendant's refusal to indemnify Old Monsanto (Pharmacia) pursuant to the Special Undertaking Contracts causes direct legal injury to Monsanto.

149.    This controversy is real and substantial, and ripe for adjudication. A judicial declaration as to Defendant's obligation to defend Old Monsanto (Pharmacia) in the PCB

23

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Lawsuits under the Special Undertaking Contracts will resolve the present controversy, and provide conclusive relief.

150.    The harm to Monsanto if Defendant is allowed to avoid their obligation to defend Old Monsanto (Pharmacia) in the PCB Lawsuits is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment clarifying the legal relations of the parties. Without a declaration of rights, Monsanto will continue to incur expenses in resolving the PCB Lawsuits.

151.    Monsanto therefore requires a declaratory judgment declaring that Defendant has a duty to indemnify Old Monsanto (Pharmacia) for all  amounts paid by Monsanto to resolve the PCB Lawsuits (whether through settlement, verdict, judgment, or otherwise), under the Special Undertaking Contract.   Specifically, Monsanto requests and is entitled to a declaration that Defendant has a duty to indemnify Old Monsanto (Pharmacia) in all of the PCB Lawsuits and the settlement of the Food Chain Cases.

## COUNT V
### (Negligence)

152.    Paragraphs 1 through 104 above are incorporated herein by reference.

153.    Defendant was aware of the potential for PCBs to persist in the environment and of the need to use care in the use and handling of PCBs when it purchased PCBs from Pharmacia.

154.    Defendant had a duty to possess, handle, use, sell, and dispose of PCBs purchased from Pharmacia with reasonable care so that they would not be released into the environment.

155.    Defendant breached that duty of care by allowing PCBs purchased from Pharmacia both before and after signing the Special Undertaking Contract to be released into the environment through products manufactured by Defendant, improper disposal of PCB-containing

24

products, leaks, accidental spills, improper dumping and disposal of industrial wastes, and through other means.

156.   The PCB Lawsuits have been filed against Plaintiffs as a result of Defendant's breaches and release of PCBs into the environment.

157.   As a result of Defendant's breaches, Monsanto has been damaged in an amount exceeding $25,000.00, for the costs of defending the PCB Lawsuits, the settlement of the Food Chain Cases, and amounts Monsanto reasonably has paid to resolve claims covered by the Special Undertaking Contract prior to the date of this filing.

158.   Monsanto continues to incur attorneys' fees, expert fees, and other litigation costs and expenses in the PCB Lawsuits that constitute part of its damages resulting from Defendant's breach(es) and as such, expressly reserves its right to seek damages in excess of the amounts referenced in the foregoing paragraph,.

**COUNT VI**
**(Negligent Misrepresentation)**

159.   Paragraphs 1 through 104 above are incorporated herein by reference.

160.   Prior to signing the Special Undertaking Contract, Pharmacia supplied Monsanto with certain information regarding Defendant's intended use of the PCBs and coverage of the Special Undertaking Contract by insurance.

161.   Specifically, Defendant told Monsanto that it only intended to use PCBs purchased from Monsanto for closed uses such that PCBs would not escape Defendant's products and enter the environment, and that the Special Undertaking Contract was "covered by a blanket liability policy with the Travelers Insurance Company."

162.   The information supplied by Defendant to Pharmacia was false due to Defendant's failure to exercise reasonable care.

25

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

163.    Defendant released or permitted the release of some or all of the PCBs purchased from Pharmacia after execution of the Special Undertaking Contract into the environment. Magnetek's insurer has also recently alleged in a lawsuit against Magnetek that the Special Undertaking Contract is not covered by any insurance policy, or the insurance policy has been released. *See Velsicol Chemical LLC et al. v. Magnetek, Inc.*, Case No. 2017 CH 02118, Complaint (Cook County, Illinois Cir. Court Feb. 14, 2017).

164.    Defendant intentionally supplied the false information regarding its use of the PCBs and the insurance coverage to Pharmacia in order to induce Pharmacia to sell its PCBs after Pharmacia had announced a preliminary decision to cease all production of PCBs.

165.    Pharmacia justifiably relied on the information supplied by Defendant when it decided to sell PCBs to Defendant pursuant to the Special Undertaking Contract. Pharmacia would not have sold PCBs to Defendant if Defendant had not supplied the information regarding its intended use of the PCBs and the insurance coverage for the Special Undertaking Contract.

166.    Plaintiffs have suffered loss in the form of attorneys' fees, costs, settlement amounts, judgments, and other damages in an amount in excess of $25,000 as a result of Defendant's negligent misrepresentations.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**PRAYER FOR RELIEF**

WHEREFORE, Monsanto respectfully requests that this Honorable Court enter an order and judgment granting the following relief in Monsanto's favor and against Defendant:

A.     Awarding Monsanto a sum greater than Twenty-Five Thousand Dollars ($25,000.00) reflective of the damages incurred by Monsanto and to be proven prior to the time of such judgment, including such damages Monsanto incurred in defending and resolving the PCB Lawsuits;

B.     A declaration that the Special Undertaking Contract applies to the PCB Lawsuits and imposes on Defendant a duty to defend Old Monsanto (Pharmacia) in the PCB Lawsuits;

C.     A declaration that Defendant shall bear responsibility for any and all of Old Monsanto's (Pharmacia's) defense costs (including attorneys' fees, costs, and expenses) in the PCB Lawsuits, which are being paid by Monsanto;

D.     A declaration that Defendant shall indemnify Monsanto for any and all judgments Monsanto is required to pay in the PCB Lawsuits;

E.     A declaration that Defendant shall indemnify Monsanto for the total amount of the settlement of the Food Chain Cases;

F.     A declaration that Defendant shall honor all of their obligations and responsibilities set forth in the Special Undertaking Contract for the underling lawsuits;

G.     Awarding Monsanto pre-judgment interest with respect to its damages;

H.     Awarding Monsanto post-judgment interest with respect to its damages;

I.     Awarding Monsanto its attorneys' fees and costs for prosecution of this lawsuit;

J.     Such other and further relief as the Court deems just and proper.

27

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Respectfully Submitted,

THOMPSON COBURN LLP

By: /s/ Christopher M. Hohn
    John R. Musgrave #20358
    Christopher M. Hohn #44124
    A. Elizabeth Blackwell #50270
    Susan L. Werstak, #55689
    David M. Mangian #61728
    One U.S. Bank Plaza
    St. Louis, Missouri 63101
    (314) 552-6000 (telephone)
    (314) 552-7000 (facsimile)
    Email: jmusgrave@thompsoncoburn.com
    Email: chohn@thompsoncoburn.com
    Email: eblackwell@thompsoncoburn.com
    Email: swerstak@thompsoncoburn.com
    Email: dmangian@thompsoncoburn.com

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

# Exhibit A (continued)

17SL-CC03368

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 03:14 PM

Special Undertaking by Purchasers of Polychlorinated Biphenyls

Monsanto Company (Monsanto) manufacturers certain polychlorinated biphenyls products (PCB's) which Universal Manufacturing Corporation (Buyer) desires to purchase. While buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in the handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or delivery of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses (except to the extent arising from failure of PCB to conform with specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through or under Buyer, whether alone or in combination with any other substances including without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provision set forth above.

Nothing herein shall create or imply, any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer. No conditions, under-takings or agreements purporting to modify the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effective by the acknow-ledgement or acceptance of any sale document, purchase order, shipping instruction or other forms containing terms or conditions at variance herewith.

Universal Manufacturing Corporation                    MONSANTO COMPANY
                   (Buyer)

BY:                                                    BY:

TITLE:   President

DATE:    January 7, 1972

0167253

EXHIBIT 1

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**17SL-CC03368**

UNIVERSAL MANUFACTURING CORPORATION
29-51 EAST SIXTH STREET, PATERSON, NEW JERSEY 07509 • PHONE (201) 271-3100 • TWX NO. 710 988-5934

January 7, 1972

Mr. H.S. Bergen
Monsanto Company
P.O. Box 14817
St. Louis, Missouri  63178

Dear Mr. Bergen:

Enclosed is the undertaking you requested in connection
with our purchase of PCB. As previously discussed, we
are executing the undertaking in our own name and are
excepting any liability arising from failure of the
product to conform to specifications.

This undertaking will be covered by a blanket liability
policy with the Travelers Insurance Company having limits
of 10 million dollars. As of December 31, 1970, Universal's
consolidated net worth was 16.8 million and its current
ratio was 1.7 to 1.

Very truly yours,

UNIVERSAL MANUFACTURING CORPORATION

Paul H. Einhorn
President

PHE/paz

0167252

**EXHIBIT 2**

17SL-CC03368

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

| Matter Name | Group Reference | Jurisdiction Type | Court | Docket Number | File Date |
|---|---|---|---|---|---|
| Grant Parish School Board v. Monsanto Company (PCB) | PCB - Building | Federal | LA - Western District | 1:15-cv-01719-DDD-JDK | 5/19/2015 |
| City of Hartford and Hartford Board of Education v. Monsanto (SOI)(PCB0 | PCB - Building | Federal | CT - U.S. District | 2015-004301 | 10/23/2015 |
| Town of Princeton, MA v. Monsanto Company (SOI) (PCB) | PCB - Building | Federal | MA - U.S. District | 4:15-cv-40096-DJC | 7/1/2015 |
| Town of Westport and Westport Community Schools v. Monsanto (SOI) (PCB) | PCB - Building | Federal | MA - U.S. District | 1:14-CV-12041-DJC | 5/7/2014 |
| Abston, Bertha v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01495 | 4/23/2012 |
| Aiken, Ronald v. Monsanto Company (SOI) (PCB Food chain case) | PCB - Food Chain | State | MO - St. Louis City | 1422-CC09436 | 8/15/2014 |
| Ashley, Jerry v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01499 | 4/23/2012 |
| Bailey, Roger v. Monsanto Company (PCB Food Chain case) | PCB - Food Chain | State | MO - Eastern District | 15SL-CC01768 | 5/22/2015 |
| Blum, Robert J., Jr. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC02866 | 6/28/2010 |
| Brownlee, Paul v. Monsanto Company (SOI) (PCB Food Chain) | PCB - Food Chain | State | CA - LA County | BC497582 | 12/14/2012 |
| Brown, Paulette v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01498 | 4/23/2012 |
| Burford, Kent N, et al., v. Monsanto, et al. (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00928 | 3/10/2016 |
| Burke, Angela v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1222-CC10374 | 4/23/2012 |
| Carter, Kevin v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC484608 | 5/11/2012 |
| Clair, Sanford v. Monsanto Company (SOI) (PCB) | PCB - Food Chain | State | MO-St. Louis County | 096L-CC01964 | |
| Craig, Gary v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01496 | 4/23/2012 |
| Dauber, Roslyn v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC483342 | 4/23/2012 |
| Dublin, Sydell v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC03822 | 9/22/2010 |
| Ferrell, Marinda v. Monsanto (SOI) (PCB Food Chain Case). | PCB - Food Chain | State | MO - St. Louis City | 1322-CC08915 | 7/22/2013 |
| Gibson, Dennis L. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - Eastern District | 11SL-CC04951 | |
| Goodman, Betty v. Monsanto (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis City | 1322-CC09213 | 8/26/2013 |
| Granger, Jacqueline v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC459770 | 4/19/2011 |
| Guenther, Valerie Anna v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC480068 | 3/5/2012 |
| Hearon, Leslie v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12S -CC01497 | 4/23/2012 |
| Kelly, Thomas v. Monsanto Company (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 15SL-CC03845 | 11/9/2015 |

EXHIBIT 3

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**EXHIBIT 3**

| Case | Type | State/Federal | Jurisdiction | Case Number | Date |
|---|---|---|---|---|---|
| LaBarge, Dale L. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01263 | 4/5/2012 |
| Mosby, Keith v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 1122-CC02206 | |
| Murphy, Deborah D. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO- St. Louis City | 1222-CL09174 | 7/6/2012 |
| Naihe, Edward v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC02117 | 6/5/2012 |
| Nishida Nicolas White, Ruth v. Monsanto and Solutia (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 09SL-CC01964 | 5/1/2009 |
| Nunn, Mary vs. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1122-CC01207 | |
| Olson Kathleen R. v. Monsanto Company, et al. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00919 | 3/10/2016 |
| Rodriguez, Guillermo v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SLCC03408 | |
| Stapleton, Bernadette v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO-St. Louis City | 1122CC09622 | 9/9/2011 |
| Vareia, Jesse v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO-St. Louis City | BC509170 | 5/16/2013 |
| Walker, Benito v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO-St. Louis City | 1122CC09621 | |
| Lamkin, Craig, et ux. v. Monsanto Company, et al. (SOI) (PCB) | PCB - Personal Injury | State | MA - Suffolk County | 16-0563 | 2/19/2016 |
| City of Berkeley v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 5:16-cv-00071 | 1/6/2016 |
| City of Oakland v. Monsanto Company (SOI)(PCB) | PCB - Water Contamination | Federal | CA - Northern District | 4:15-cv-05152 | 11/10/2015 |
| City of San Jose v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 5:15-cv-03178-NC | 7/10/2015 |
| City of Seattle v. Monsanto, et al. (SOI) (PCB) | PCB - Water Contamination | Federal | WA - Western District | 2:16-cv-00107 | 1/25/2016 |
| City of Spokane v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | WA - Eastern District | 2:15-cv-00201-SMJ | 7/31/2015 |
| Monsanto PCB Water Contamination Litigation (SOI) (PCB) | PCB - Water Contamination | Federal | Judicial Panel /Multidistrict | MDL No. 2697 | 1/28/2016 |
| San Diego Unified Port and City of San Diego v. Monsanto Co., et al. | PCB - Water Contamination | Federal | CA – Southern District | 3:15-cv-00578-WQH-JLB | 8/3/15 |
| City of Long Beach v. Monsanto Co., et al. | PCB-Water Contamination | Federal | CA – Central District | 2:16-cv-03493-FMO-AS | 5/19/16 |
| City of Portland v. Monsanto Co., et al. | PCB – Water Contamination | Federal | OR – Dist. of Oregon, Portland Division | 3:16-cv-1418-PK | 7/12/16 |

Case: 4:23-cv-00204-HEA   Doc. #: 1-6   Filed: 02/20/23   Page: 76 of 299 PageID
#: 844
Case: 4:15-cv-00844-AGF   Doc. #: 5   Filed: 05/28/15   Page: 1 of **17SL-CC03368**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

MISSOURI CIRCUIT COURT
TWENTY-FIRST JUDICIAL CIRCUIT
ST. LOUIS COUNTY

ROGER BAILEY, NICOLETTA CALHOUN,
THOMAS E. CLEARY, CATHERINE
GUIDROZ, CINDY M. HANNON, STANLEY           Cause No.:
JOHNSON, PAMELA G. KLES, REBECCA P.
MACKEL, TOMMY D. MOORE, LOUIS D.            Division No.
OLANDESE, ANN H. PILACKAS, and ANN
M. STAFFORD,                                JURY TRIAL DEMANDED

**Plaintiffs,**

v.

**MONSANTO CO.**
Serve: Registered Agent
      CSC - Lawyers Incorporating
      Service Co.
      221 Bolivar St.
      Jefferson City, MO 65101

**SOLUTIA, INC.**
Serve: Registered Agent
      The Corporation Co.
      120 South Central Ave.
      Clayton, MO 63105

**PHARMACIA CORP.**
Serve: Registered Agent
      CT Corporation Systems
      120 South Central Ave.
      Clayton, MO 63105

**PFIZER, INC.**
Serve: Registered Agent
      CT Corporation Systems
      120 South Central Ave.
      Clayton, MO 63105

**Defendants.**

1

**EXHIBIT 4**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## PETITION

COME NOW PLAINTIFFS ROGER BAILEY, NICOLETTA CALHOUN, THOMAS E. CLEARY, CATHERINE GUIDROZ, CINDY HANNON, STANLEY JOHNSON, PAMELA G. KLES, REBECCA P. MACKEL, TOMMY D. MOORE, LOUIS D. OLANDESE, ANN H. PILACKAS, and ANN M. STAFFORD who allege as follows:

## I. PARTIES

1.   Plaintiff ROGER BAILEY resides at 1209 US HIGHWAY 31 SOUTH, ALABAMA 35611.

2.   Plaintiff NICOLETTA CALHOUN resides at 6410 WESTERN AVENUE, WILLOBROOK, IL 60527.

3.   Plaintiff THOMAS E. CLEARY resides at 6671 W. PLACITA DE LAS BOTAS, TUCSON, ARIZONA 85743.

4.   Plaintiff CATHERINE GUIDROZ resides at 12912 PECAN STREET, PORT ALLEN, LOUISIANA 70767.

5.   Plaintiff CINDY M. HANNON resides at 4702 FLATBRUSH AVENUE, SARASOTTA, FLORIDA 34233.

6.   Plaintiff STANLEY JOHNSON resides at 21 ENGLISH ISLE ONE, LINCOLN, ALABAMA 35096.

7.   Plaintiff PAMELA G. KLES resides at 12177 17TH STREET, YUCAIPA, CALIFORNIA 92708.

2

EXHIBIT 4

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

8.    Plaintiff REBECCA P. MACKEL resides at 1006 MARVIN GARDEN WAY, LOGANVILLE, GA 30052.

9.    Plaintiff TOMMY D. MOORE resides at 180 SIMS LANE, SYLACAUGA, ALABAMA 35150.

10.    Plaintiff LOUIS D. OLANDESE resides at 5509 MAY AVENUE, RICHMOND, ILLINOIS 60071.

11.    Plaintiff ANN H. PILACKAS resides at 1083 MEADOWSONG ROAD, LEBONON, ILLINOIS 62254.

12.    Plaintiff ANN M. STAFFORD resides at 11361 DELPHENIUM AVENUE, FOUNTAIN VALLEY, CALIFORNIA 92708.

13.    Defendant MONSANTO CO. ("NEW MONSANTO") is a Delaware corporation that has its corporate headquarters and principal place of business in St. Louis County, Missouri.    Monsanto can be served through its registered agent, CSC - Lawyers Incorporating Services, Inc., 221 Bolivar St., Jefferson City, Missouri 65101.

14.    Defendant SOLUTIA, INC. ("SOLUTIA") is a Delaware corporation that has its corporate headquarters and principal place of business in St. Louis County, Missouri. Solutia can be served through its registered agent, The Corporation Co., 120 South Central Ave., Clayton, Missouri 63105.

15.    Defendant PHARMACIA CORP. ("PHARMACIA" a/k/a "OLD MONSANTO") is a Delaware corporation that, since its merger with Defendant Pfizer, Inc. in 2003, has had its headquarters and principal place of business in New York, NY. Pharmacia can be served through its registered agent, CT Corporation System, 120 South Central Ave., Clayton, Missouri 63105.

3

**EXHIBIT 4**

Case: 4:23-cv-00204-HEA   Doc. #: 1-6   Filed: 02/20/23   Page: 79 of 299 PageID
#: 847
Case: 4:15-cv-00844-AGF   Doc. #: 5   Filed: 05/28/15   Page: 4 of 11 PageID #: 64

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

16.     Defendant PFIZER, INC. ("PFIZER") is a Delaware corporation that has its
corporate headquarters and principal place of business in New York, NY.  Pfizer can be
served through its registered agent, CT Corporation System, 120 South Central Ave.,
Clayton, Missouri 63105.

## II. JURISDICTION AND VENUE

17.     Venue is proper in St. Louis County under MO. STAT. § 508.010(5)(2) because
this is a tort case in which Plaintiffs were first injured outside of Missouri, and the
registered agent for Defendants Solutia and Pfizer are located in St. Louis County.

18.     THIS CAUSE IS NOT REMOVABLE.  There is no diversity of citizenship
among the parties because Defendants Solutia, Inc. and Monsanto Co. are citizens of the
State of Missouri for purposes of federal diversity jurisdiction and removal statutes.  *See*
28 U.S.C.§ 1332(c)(1) ("a corporation shall be deemed to be a citizen of any State by
which it has been incorporated and of the State where it has its principal place of
business...").  Moreover, because at least one Defendant is a resident of Missouri, where
this action is filed, Defendants could not, in any event, remove this action on the basis of
diversity.  28 U.S.C. § 1441(b).  Plaintiffs affirmatively disclaim any damages or action
arising under the constitution, treaties, or laws of the United States (including any claim
arising from an act or omission on a federal enclave, or of any officer of the U.S. or any
agency or person acting under him occurring under color of such office).  No claim of
admiralty or maritime law is raised.  Plaintiffs sue no foreign state or agency.  The
damages that are sought by the Plaintiffs, exclusive of interests and costs, exceed the
minimum jurisdictional limits of this Court.

## III. FACTUAL BACKGROUND

4

EXHIBIT 4

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 03:14 PM

19.     PLAINTIFFS ROGER BAILEY, NICOLETTA CALHOUN, THOMAS E. CLEARY, CATHERINE GUIDROZ, CINDY HANNON, STANLEY JOHNSON, PAMELA G. KLES, REBECCA P. MACKEL, TOMMY D. MOORE, LOUIS D. OLANDESE, ANN H. PILACKAS, and ANN M. STAFFORD are Alabama, Arizona, California, Florida, Georgia, Illinois, and Louisiana residents who developed lymphohematopietic cancer after being exposed to chemical products designed, manufactured, and distributed by Defendants.   Specifically, Plaintiffs have had substantial dietary and other environmental exposure to polychlorinated biphenyls ("PCBs"), manufactured by the original Monsanto Co. ("Old Monsanto" a/k/a "Pharmacia").

20.     From 1901 to 1997 the original Monsanto Co., also known as Monsanto Chemical Co., operated as a Missouri corporation manufacturing a variety of chemicals and agricultural products.  This original corporate Monsanto entity, which is now sometimes referred to as "Old Monsanto," ceased to exist in 1997 as the result of a series of corporate spin-offs and acquisitions.  At that time, Old Monsanto's chemical division was split off and reformed into a newly-independent corporation, which was renamed "Solutia, Inc." one of the Defendants in this action.  As part of this 1997 spin-off, Solutia assumed certain of Old Monsanto's debts and liabilities, including all liabilities related to Old Monsanto's production and sale of PCBs.   Although Solutia was recently reorganized pursuant to Chapter 11 of the federal bankruptcy laws, it emerged from bankruptcy in February 2008.

21.     In 2000, the remaining portion of Old Monsanto, comprised of Old Monsanto's Life Sciences division, merged with Pharmacia/Upjohn Corp., which meant that Old

5

EXHIBIT 4

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 03:14 PM

Monsanto no longer existed as a separate corporate entity. Defendant Pharmacia then incorporated a new company in Delaware, also called "Monsanto Co.," which is now referred to as "New Monsanto," the other Defendant in this case. In 2002, Defendant Pharmacia spun off its interest in New Monsanto, and New Monsanto now operates as an independent corporate entity with its corporate headquarters and principal place of business in St. Louis, Missouri.

22.     In 2003, Defendant Pharmacia (what remained of "Old Monsanto") merged with Defendant Pfizer, Inc.

23.     As part of Solutia's federal bankruptcy plan of reorganization, New Monsanto agreed to indemnify Solutia for all tort "legacy liabilities" related to Old Monsanto's activities, including the production and sale of PCBs. As a result of these various transactions, Defendants Pharmacia, Pfizer, Solutia and Monsanto collectively have legal responsibility for Old Monsanto's conduct in the production, sale, and distribution of PCBs, which is the subject of Plaintiffs' claims in this case.

24.     PCBs are a class of 209 discrete chemical compounds, called congeners, in which one to ten chlorine atoms are attached to biphenyl. From 1929, when Monsanto's predecessor Swann Chemical Co. (which merged into Monsanto in 1935) first began producing PCBs, until 1977, when Congress banned the manufacture of PCBs, Monsanto produced and sold more than 99 percent of all the PCBs that were ever sold in the United States. Over those six decades, Monsanto sold those PCBs as liquid mixtures, under the trade name "Aroclor," to a variety of industrial customers, for a wide variety of industrial uses. Each of Monsanto's Aroclor products contained a combination of different PCB congeners.

6

**EXHIBIT 4**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

25.     Many of Monsanto's PCBs were used by its customers as insulating fluids, also known as "dielectric fluids," in certain electrical equipment, including high-temperature transformers and capacitors. However, Monsanto's Aroclor and other PCB products were also marketed and used for many other purposes, including in inks, paints, dedusting agents, pesticides, plasticizers, hydraulic fluids, lubricants, adhesives, and carbonless copy paper. Until 1971, approximately 40 percent of Monsanto's PCBs were sold for purposes other than use as insulating fluid for electrical equipment. From 1971 to 1977, Monsanto sold PCBs exclusively for use as insulating fluid in transformers and capacitors.

26.     Like other chlorinated organic compounds, such as dioxins, which are collectively known as "organochlorines," PCBs are considered "persistent organic pollutants," because they do not readily degrade in the environment after disposal, and they are not easily metabolized or broken down by humans or animals after absorption. PCBs are lipophilic, and are stored in the fat tissue of humans and animals who have been exposed. Because PCBs were dumped into the environment over decades by Monsanto, its customers, and the end users of various PCB-containing products, PCBs are now ubiquitous in the environment. PCBs can be found in most animals, as well as in water, soil, sediment, and numerous other environmental media. Thus, measurable quantities of PCBs are typically found in most of the foods that most Americans consume on a daily basis, including fish, beef, poultry, dairy products, and event fruits and vegetables. Throughout the six decades that Monsanto produced and sold PCBs, the company knew or should have known that many of its PCBs would ultimately be disposed of in ways that would allow those PCBs to enter the environment.

7

**EXHIBIT 4**

27.     Because Monsanto's PCBs have contaminated the food chain and continue to be ubiquitous contaminants of the air, water, and soil, all Americans, including Plaintiffs, have been substantially exposed to Monsanto's PCBs through their diet and through other environmental exposures.   Although Monsanto's PCBs were incorporated into many other products before being dumped into the environment, those PCBs themselves, to which Plaintiffs have been exposed, are substantially the same chemicals as when they left Monsanto's possession.

28.     Throughout the decades during which Monsanto produced PCBs, the company was aware that exposure to PCBs carried significant health risks.   Despite this knowledge, and despite the availability of substitute products, Monsanto continued to produce and market PCBs, while hiding from the public, its customers, and applicable governmental authorities the true health risks associated with PCBs.   Such conduct was despicable and done with a willful disregard of the rights and safety of others.   In other words, Monsanto was aware that its continued production and sale of PCBs would result in probable dangerous consequences in the form of environmental devastation and significant health risks for users and others exposed to its PCBs, and Monsanto deliberately chose to market its PCBs over the course of decades, despite this knowledge.

## IV. DISCOVERY RULE

29.     Plaintiffs hereby plead and invoke the "discovery rule."   Plaintiffs will show that after reasonably exercising due diligence, they did not learn the nature of the cause of their cancers or that such cancers were chemically-related until less than two years prior

8

EXHIBIT 4

to the filing of the Plaintiffs' causes of action herein. Plaintiffs also specifically invoke the Federally Required Commencement Date, pursuant to 42 U.S.C. § 9658.

## V. CAUSE OF ACTION:
## STRICT LIABILITY FOR DESIGN DEFECT

30.     Plaintiffs incorporate herein each allegation set forth above.

Because   Plaintiffs   were   exposed   to   Monsanto's   PCBs   and   developed lymphohematopoietic cancer while living in Alabama, Arizona, California, Florida, Georgia, Illinois and Louisiana, their claims for compensatory damages in this case are governed by the laws in those states.

31.     Plaintiffs allege that Monsanto's various PCB products were unreasonably dangerous, and that those unreasonably dangerous products were a producing cause in the development of each Plaintiff's cancer. Specifically, Plaintiffs allege that Monsanto sold its PCBs under the trade name Aroclor (and other trade names), and that through the foreseeable dumping of those Aroclor and other PCB-containing products by Monsanto itself, by its customers, and by end users, Monsanto's PCBs ultimately made their way to the environment and to the food chain. Throughout the time that Monsanto marketed its unreasonably dangerous Aroclor products, there were safer alternatives to PCBs available. Because of the persistence of PCBs, those PCBs to which Plaintiffs were environmentally exposed were in substantially the same condition as when Monsanto sold them. Plaintiffs' environmental exposures to Monsanto's PCBs were a producing cause of Plaintiffs' cancers.

## VI. CAUSE OF ACTION: NEGLIGENCE

33.     Plaintiffs incorporate herein each allegation set forth above.

9

EXHIBIT 4

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

34.    Monsanto's decisions to market and distribute its various PCB products were negligent. As described above, for decades, the company was aware of the hazards of PCBs, and either knew or should have known that its PCBs would be released into the environment. Despite this actual and constructive knowledge, and despite the availability of numerous alternatives to PCBs for each of their uses, Monsanto continued to market PCBs. Monsanto's ongoing negligent decisions to market and distribute those PCBs for decades led to Plaintiffs' environmental exposures, and were a substantial factor in the development of Plaintiffs' cancers.

35.    The Plaintiffs were all exposed to Monsanto's PCBs less than 15 years after Monsanto sold them, but the symptoms of Plaintiffs' cancers did not manifest within that time frame.

## VII.  DAMAGES

36.    As a direct and proximate result of Defendants' conduct described above, PLAINTIFFS ROGER BAILEY, NICOLETTA CALHOUN, THOMAS E. CLEARY, CATHERINE GUIDROZ, CINDY HANNON, STANLEY JOHNSON, PAMELA G. KLES, REBECCA P. MACKEL, TOMMY D. MOORE, LOUIS D. OLANDESE, ANN H. PILACKAS, and ANN M. STAFFORD sustained damages, including past and future medical expenses, past and future pain and suffering, past and future mental anguish and disfigurement, past and future earnings loss and all other applicable damages. As a result of Defendants' complete indifference or conscious disregard for the safety of others, malice and oppression described above, Plaintiffs hereby seek punitive damages.

## VIII.  PRAYER FOR RELIEF

10

EXHIBIT 4

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

37.   WHEREFORE, Plaintiffs pray judgment against all Defendants herein for all actual

damages, pre-judgment and post-judgment interest, costs of suit, and all such other and

further relief to which Plaintiffs may show themselves to be justly entitled.

### IX.  JURY DEMAND

38.   PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS.

Respectfully submitted,
By: /s/ John G. Simon

**THE SIMON LAW FIRM, P.C.**
John G. Simon, MO Bar No. 35231
Erica F. Blume, MO Bar No. 63716
800 Market St., Suite 1700
St. Louis, MO 63101
(314) 241-2929 Phone
(314) 241-2029 Facsimile
jsimon@simonlawpc.com
eblume@simonlawpc.com

**ALLEN STEWART, P.C.**
Allen M. Stewart, MO Bar No. 60331
Steve Baughman Jensen, TX Bar No.
00783615
Scott R. Frieling, TX Bar No. 24012659
325 N. St. Paul St., Suite 4000
Dallas, Texas 75201
(214) 965-8700 Office
(214) 965-8701 Facsimile
astewart@allenstewart.com
sjensen@allenstewart.com
sfrieling@allenstewart.com

**WILLIAMS KHERKHER**
Steven Kherkher, MO Bar #64648
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
(713) 230-2200 Phone
(713) 643-6226 Facsimile
skerkher@williamskherkher.com
*ATTORNEYS FOR PLAINTIFFS*

11

**EXHIBIT 4**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

MISSOURI CIRCUIT COURT
TWENTY-FIRST JUDICIAL CIRCUIT
ST. LOUIS COUNTY

| | | |
|---|---|---|
| THOMAS KELLY and | § | |
| MICHAEL KRZESZEWSKI, | § | Cause No. |
| | § | |
| **Plaintiffs,** | § | Division |
| | § | |
| v. | § | Jury Trial Requested |
| | § | |
| **MONSANTO CO.** | § | |
| Serve: Registered Agent | § | |
| CSC - Lawyers | § | |
| Incorporating | § | |
| Service Co. | § | |
| 221 Bolivar St. | § | |
| Jefferson City, MO | § | |
| 65101 | § | |
| | § | |
| **SOLUTIA, INC.** | § | |
| Serve: Registered Agent | § | |
| The Corporation Co. | § | |
| 120 South Central Ave. | § | |
| Clayton, MO 63105 | § | |
| | § | |
| **PHARMACIA LLC.** | § | |
| Serve: Registered Agent | § | |
| CT Corporation System | § | |
| 120 South Central Ave. | § | |
| Clayton, MO 63105 | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

## PETITION

COME NOW PLAINTIFFS THOMAS KELLY and MICHAEL KRZESZEWSKI who

allege as follows:

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## I. PARTIES

1.      Plaintiff THOMAS KELLY resides at 40 CEDAR STREET, KINGSPARK, NEW YORK 11754 and is a citizen of New York.

2.      Plaintiff MICHAEL KRZESZEWSKI resides at 337A CANTERBURY COURT, LAKEWOOD, NEW JERSEY 08701 and is a citizen of New Jersey.

3.      Defendant MONSANTO CO. ("NEW MONSANTO") is a Delaware corporation that has its corporate headquarters and principal place of business in St. Louis County, Missouri. Monsanto can be served through its registered agent, CSC - Lawyers Incorporating Services, Inc., 221 Bolivar St., Jefferson City, Missouri 65101.

4.      Defendant SOLUTIA, INC. ("SOLUTIA") is a Delaware corporation that has its corporate headquarters and principal place of business in St. Louis County, Missouri. Solutia can be served through its registered agent, The Corporation Co., 120 South Central Ave., Clayton, Missouri 63105.

5.      Defendant PHARMACIA LLC ("PHARMACIA" a/k/a "OLD MONSANTO") is a Delaware limited liability corporation that is a subsidiary of Pfizer, Inc., and is headquartered and has its principal place of business in Peapack, New Jersey. Because Pfizer, Inc. is a member (owner) of Pharmacia, LLC, and Pfizer, Inc. is a citizen of New York, Pharmacia is also a New York citizen. Pharmacia can be served through its registered agent, CT Corporation System, 120 South Central Ave., Clayton, Missouri 63105.

## II. JURISDICTION AND VENUE

6.      Venue is proper in St. Louis County under MO. STAT. § 508.010(5)(2) because this is a tort case in which Plaintiffs and Decedents were first injured outside of Missouri, and the registered agent for Defendants Solutia and Pharmacia are located in St. Louis County.

**EXHIBIT 5**

Case: 4:23-cv-00204-HEA  Doc. #: 1-6  Filed: 02/20/23  Page: 89 of 299 PageID
#: 857
Case: 4:15-cv-01825-JMB  Doc. #: 7  Filed: 12/11/15  Page: 3 of 11 PageID #: 183

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

7.     THIS CAUSE IS NOT REMOVABLE.  There is no diversity of citizenship among the

parties because Defendants Solutia, Inc. and Monsanto Co. are citizens of the State of Missouri for

purposes of federal diversity jurisdiction and removal statutes, and Defendant Pharmacia is a

citizen of New York.  *See* 28 U.S.C.§ 1332(c)(1) ("a corporation shall be deemed to be a citizen

of any State by which it has been incorporated and of the State where it has its principal place of

business..."); *GMAC Commercial Credit LLC v. Dillard Dep't Stores, Inc.*, 357 F.3d 827, 829 (8th

Cir. 2004) ("an LLC's citizenship for purposes of diversity jurisdiction is the citizenship of its

members").  Moreover, because at least one Defendant is a resident of Missouri, where this action

is filed, Defendants could not, in any event, remove this action on the basis of diversity.  28 U.S.C.

§ 1441(b).  Plaintiffs affirmatively disclaim any damages or action arising under the constitution,

treaties, or laws of the United States (including any claim arising from an act or omission on a

federal enclave, or of any officer of the U.S. or any agency or person acting under him occurring

under color of such office).  No claim of admiralty or maritime law is raised.  Plaintiffs sue no

foreign state or agency.  The damages that are sought by the Plaintiffs, exclusive of interests and

costs, exceed the minimum jurisdictional limits of this Court.

## III. FACTUAL BACKGROUND

8.     THOMAS KELLY and MICHAEL KRZESZEWSKI are citizens of New York and New

Jersey who developed Non-Hodgkin Lymphoma ("NHL") after being exposed to chemical

products designed, manufactured, and distributed by Old Monsanto.  Specifically, Plaintiffs and

Decedents have had substantial dietary and other environmental exposure to polychlorinated

biphenyls ("PCBs"), manufactured by the original Monsanto Co. ("Old Monsanto" a/k/a

"Pharmacia").

EXHIBIT 5

Case: 4:23-cv-00204-HEA   Doc. #: 1-6   Filed: 02/20/23   Page: 90 of 299 PageID
Case: 4:15-cv-01825-JMB   Doc. #: 7   Filed: 12/11/15   Page: 4 of 11 PageID #: 184
#: 858

9.      From 1901 to 1997 the original Monsanto Co., also known as Monsanto Chemical Co.,

operated as a Missouri corporation manufacturing a variety of chemicals and agricultural products.

This original corporate Monsanto entity, which is now sometimes referred to as "Old Monsanto,"

ceased to exist in 1997 as the result of a series of corporate spin-offs and acquisitions. At that

time, Old Monsanto's chemical division was split off and reformed into a newly-independent

corporation, which was renamed "Solutia, Inc." one of the Defendants in this action. As part of

this 1997 spin-off, Solutia assumed certain of Old Monsanto's debts and liabilities, including all

liabilities related to Old Monsanto's production and sale of PCBs. Although Solutia was recently

reorganized pursuant to Chapter 11 of the federal bankruptcy laws, it emerged from bankruptcy in

February 2008.

10.     In 2000, the remaining portion of Old Monsanto, comprised of Old Monsanto's Life

Sciences division, merged with Pharmacia/Upjohn Corp., which meant that Old Monsanto no

longer existed as a separate corporate entity. Defendant Pharmacia then incorporated a new

company in Delaware, also called "Monsanto Co.," which is now referred to as "New Monsanto,"

the other Defendant in this case. In 2002, Defendant Pharmacia spun off its interest in New

Monsanto, and New Monsanto now operates as an independent corporate entity with its corporate

headquarters and principal place of business in St. Louis, Missouri.

11.     In 2003, Defendant Pharmacia (what remained of "Old Monsanto") was acquired by Pfizer,

Inc.

12.     In 2012, Pharmacia merged with another Pfizer subsidiary, called Pfizer Convention III,

LLC. The surviving corporation was renamed as Pharmacia LLC. Defendant Pharmacia is

headquartered and has its principal place of business at 100 Route 206 North, Peapack NJ 07977.

EXHIBIT 5

Case: 4:23-cv-00204-HEA   Doc. #: 1-6   Filed: 02/20/23   Page: 91 of 299 PageID
#: 859
Case: 4:15-cv-01825-JMB   Doc. #: 7   Filed: 12/11/15   Page: 5 of 11 PageID #: 185

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

13.    As part of Solutia's federal bankruptcy plan of reorganization, New Monsanto agreed to indemnify Solutia for all tort "legacy liabilities" related to Old Monsanto's activities, including the production and sale of PCBs. As a result of these various transactions, Defendants Pharmacia, Solutia and Monsanto collectively have legal responsibility for Old Monsanto's conduct in the production, sale, and distribution of PCBs, which is the subject of Plaintiffs' claims in this case.

14.    PCBs are a class of 209 discrete chemical compounds, called congeners, in which one to ten chlorine atoms are attached to biphenyl. From 1929, when Monsanto's predecessor Swann Chemical Co. (which merged into Monsanto in 1935) first began producing PCBs, until 1977, when Congress banned the manufacture of PCBs, Monsanto produced and sold more than 99 percent of all the PCBs that were ever sold in the United States. Over those six decades, Monsanto sold those PCBs as liquid mixtures, under the trade name "Aroclor," to a variety of industrial customers, for a wide variety of industrial uses. Each of Monsanto's Aroclor products contained a combination of different PCB congeners.

15.    Many of Monsanto's PCBs were used by its customers as insulating fluids, also known as "dielectric fluids," in certain electrical equipment, including high-temperature transformers and capacitors. These applications for PCBs in transformers and capacitors are known as "closed applications," or "closed uses." However, Monsanto's Aroclor and other PCB products were also marketed and sold for many other applications, including in inks, paints, dedusting agents, pesticides, plasticizers, hydraulic fluids, lubricants, adhesives, heat transfer fluids, and carbonless copy paper. Collectively, these applications for PCBs in every product other than transformers and capacitors are known as "open applications," and/or "non-controllable applications." These applications have been described as "open" and "non-controllable" because the PCBs contained in those products are open to the environment and releases of PCBs to the environment during use

Case: 4:23-cv-00204-HEA   Doc. #: 1-6   Filed: 02/20/23   Page: 92 of 299 PageID
#: 860
Case: 4:15-cv-01825-JMB   Doc. #: 7   Filed: 12/11/15   Page: 6 of 11 PageID #: 186

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

of such products cannot be controlled. In 1970, more than 40 percent of Monsanto's PCBs were sold for purposes other than "closed applications" in electrical equipment. From 1971 to 1977, Monsanto sold PCBs exclusively for "closed applications," that is, as insulating fluid in transformers and capacitors.

16.     Like other chlorinated organic compounds, such as dioxins, which are collectively known as "organochlorines," PCBs are considered "persistent organic pollutants," because they do not readily degrade in the environment after disposal, and they are not easily metabolized or broken down by humans or animals after absorption. PCBs are lipophilic, and are stored in the fat tissue of humans and animals who have been exposed. Because PCBs were dumped into the environment over decades by Monsanto, its customers, and the end users of various PCB-containing products, PCBs are now ubiquitous in the environment. PCBs can be found in most animals, as well as in water, soil, sediment, and numerous other environmental media. Thus, measurable quantities of PCBs are typically found in most of the foods that most Americans consume on a daily basis, including fish, beef, poultry, dairy products, and event fruits and vegetables. Throughout the six decades that Monsanto produced and sold PCBs, the company knew or should have known that its PCBs sold for open or non-controllable applications would ultimately result in the release of those PCBs into the environment.

17.     Because Monsanto's PCBs have contaminated the food chain and continue to be ubiquitous contaminants of the air, water, and soil, all Americans, including Plaintiffs, have been substantially exposed to Monsanto's PCBs sold for open and non-controllable applications, through diet and other environmental exposures. Although Monsanto's PCBs were incorporated into many other products before being released into the environment, those PCBs themselves, to which Plaintiffs

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 11, 2017 - 03:14 PM

and Decedents have been exposed, are substantially the same chemicals as when they left
Monsanto's possession.

18.    Throughout the decades during which Monsanto produced PCBs, the company was aware
that exposure to PCBs carried significant health risks. Despite this knowledge, and despite the
availability of substitute products, Monsanto continued to produce and market PCBs for open and
non-controllable applications, while hiding from the public, its customers, and applicable
governmental authorities the true health risks associated with PCBs. Such conduct was despicable
and done with a willful disregard of the rights and safety of others. In other words, Monsanto was
aware that its continued production and sale of PCBs for open and non-controllable applications
would result in probable dangerous consequences in the form of environmental devastation and
significant health risks for users and others exposed to its PCBs, and Monsanto deliberately chose
to market its PCBs for such open and non-controllable applications over the course of decades,
despite this knowledge.

## IV. DISCOVERY RULE

19.    Plaintiffs hereby plead and invoke the "discovery rule." Plaintiffs will show that after
reasonably exercising due diligence, they did not learn the nature of the cause of their cancer or
that such cancer was chemically-related until less than two years prior to the filing of the Plaintiffs'
and Decedents' causes of action herein. Plaintiffs also specifically invoke the Federally Required
Commencement Date, pursuant to 42 U.S.C. § 9658.

## V. CAUSE OF ACTION:
## STRICT LIABILITY FOR DESIGN DEFECT

20.     Plaintiffs incorporate herein each allegation set forth above. Because Plaintiffs and Decedents were exposed to Monsanto's PCBs and developed Non-Hodgkin Lymphoma while living in New York and New Jersey, their claims for compensatory damages in this case are governed by the laws in those states.

21.     Plaintiffs allege that Monsanto's various PCB products sold for open and non-controllable applications were unreasonably dangerous, and that those unreasonably dangerous products were a proximate and producing cause, and a substantial factor in the development of each Plaintiff's and Decedent's NHL. Specifically, Plaintiffs allege that Monsanto sold its PCBs under the trade name Aroclor (and other trade names) for use in a wide variety of open and non-controllable applications. Through the foreseeable environmental releases of those PCBs by Monsanto itself, by its customers, and by end users, Monsanto's PCBs sold for open and non-controllable applications ultimately made their way to the environment and to the food chain. Throughout the time that Monsanto marketed its unreasonably dangerous Aroclor products for open and non-controllable applications, there were safer alternatives to PCBs available for the same or similar applications. Because of the persistence of PCBs, those PCBs sold for open and non-controllable applications to which Plaintiffs and Decedents were environmentally exposed were in substantially the same condition as when Monsanto sold them. Plaintiffs' and Decedents' environmental exposures to Monsanto's PCBs sold for open and non-controllable applications were a proximate and producing cause of Plaintiffs' and Decedents' NHLs, and were also a substantial factor in the development of those cancers.

PLAINTIFF'S ORIGINAL PETITION                                                                                   8

**EXHIBIT 5**

## VI.  CAUSE OF ACTION: NEGLIGENCE

22.    Plaintiffs incorporate herein each allegation set forth above.

23.    Monsanto's decisions to market and distribute its various PCB products for open and non-controllable applications were negligent. As described above, for decades, the company was aware of the hazards of PCBs, and either knew or should have known that its PCBs sold for open and non-controllable applications would be released into the environment. Monsanto also knew or should have known that those PCBs would persist in the environment and bioaccumulate in the food chain and in people, and that such environmental exposures could injure people in the general population who were so exposed. Despite this actual and constructive knowledge, and despite the availability of numerous alternatives to PCBs for each of these open and non-controllable applications, Monsanto continued to market PCBs for those purposes through 1970 (and, as to certain open and non-controllable applications, through 1971). Monsanto's ongoing negligent decisions to market and distribute those PCBs for open and non-controllable applications for decades led to Plaintiffs' and Decedents' environmental exposures, and were a producing cause, proximate cause, and substantial factor in the development of Plaintiffs' and Decedents' NHLs.

24.    The Plaintiffs and Decedents were all exposed to Monsanto's PCBs sold for open and non-controllable applications less than 15 years after Monsanto sold them, but the symptoms of Plaintiffs' and Decedents' cancers did not manifest within that time frame.

## VII. DAMAGES

25.    As a direct and proximate result of Defendants' conduct described above, PLAINTIFFS THOMAS KELLY and MICHAEL KRZESZEWSKI sustained damages, including past and future medical expenses, past and future pain and suffering, past and future mental anguish and disfigurement, past and future earnings loss and all other applicable damages. As a result of

Defendants' complete indifference or conscious disregard for the safety of others, malice and oppression described above, Plaintiffs hereby seek punitive damages.

## VIII. PRAYER FOR RELIEF

26.     WHEREFORE, Plaintiffs pray judgment against all Defendants, joint and severally, herein for all actual damages, punitive damages, pre-judgment and post-judgment interest, costs of suit, and all such other and further relief to which Plaintiffs may show themselves to be justly entitled.

## IX. JURY DEMAND

27.     PLAINTIFFS DEMAND A TRIAL BY JURY OF TWELVE ON ALL COUNTS.

Respectfully submitted,


By:   /s/ John G. Simon


**THE SIMON LAW FIRM, P.C.**
John G. Simon, MO Bar No. 35231
Erica F. Blume, MO Bar No. 63716
800 Market St., Suite 1700
St. Louis, MO 63101
(314) 241-2929 Phone
(314) 241-2029 Facsimile
jsimon@simonlawpc.com
eblume@simonlawpc.com


**ALLEN STEWART, P.C.**
Allen M. Stewart, MO Bar No. 60331
Steve Baughman Jensen, TX Bar No. 00783615
Scott R. Frieling, TX Bar No. 24012659
325 N. St. Paul St., Suite 4000
Dallas, Texas 75201
(214) 965-8700 Office
(214) 965-8701 Facsimile
astewart@allenstewart.com
sjensen@allenstewart.com
sfrieling@allenstewart.com

**EXHIBIT 5**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**WILLIAMS KHERKHER**
Steven Kherkher, MO Bar No. 64648
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
(713) 230-2200 Phone
(713) 643-6226 Facsimile
skherkher@williamskherkher.com

*ATTORNEYS FOR PLAINTIFFS*

11
**EXHIBIT 5**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
John P. Fiske (SBN 249256)
655 West Broadway, Suite 1700
San Diego, CA 92101
Telephone: 619-237-3490

**BARON & BUDD, P.C.**
Scott Summy *(pending Pro Hac Vice)*
(Texas Bar No. 19507500)
Carla Burke *(pending Pro Hac Vice)*
(Texas Bar No. 24012490)
Celeste Evangelisti (SBN 225232)
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone: 214-521-3605

**OFFICE OF THE CITY ATTORNEY**
**City of Oakland**
Barbara Parker (SBN 69722)
Otis McGee, Jr. (SBN 71885)
Maria Bee (SBN 167716)
1 Frank H. Ogawa Place, 6th Floor
Oakland, CA 94612

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA- OAKLAND DIVISION

| | |
|---|---|
| CITY OF OAKLAND, a municipal corporation; | )  CASE NO. _____ |
| | ) |
| Plaintiff, | )  **PLAINTIFF'S ORIGINAL** |
| | )  **COMPLAINT** |
| v. | ) |
| | ) |
| MONSANTO COMPANY, | ) |
| SOLUTIA INC., and | ) |
| PHARMACIA CORPORATION, and DOES 1 | ) |
| through 100, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### I.   INTRODUCTION

1.     Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants — found in bays, oceans, rivers, streams, soil, and air. As a result, PCBs have been detected in the tissues of all living beings on earth including all

1

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1  forms of marine life, various animals and birds, plants and trees, and humans.

2      2.      The extent of PCB contamination is troubling because PCBs cause a variety of adverse
3  health effects. In humans, PCB exposure is associated with cancer as well as serious non-cancer health
4  effects, including effects on the immune system, reproductive system, nervous system, endocrine
5  system and other health effects. In addition, PCBs destroy populations of fish, birds, and other animal
6  life.

7      3.      Monsanto Company was the sole manufacturer of PCBs in the United States from 1935
8  to 1979, and trademarked the name "Aroclor" for certain PCB compounds. Although Monsanto knew
9  for decades that PCBs were toxic and knew that they were widely contaminating all natural resources
10 and living organisms, Monsanto concealed these facts and continued producing PCBs until Congress
11 enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of
12 PCBs as of January 1, 1979.

13     4.      U.S. EPA (2000b) has classified PCBs as 'probably human carcinogens.' Studies have
14 suggested that PCBs may play a role in inducing breast cancer. Studies have also linked PCBs to
15 increased risk for several other cancers including liver, biliary tract, gall bladder, gastrointestinal tract,
16 pancreas, melanoma, and non-Hodgkin's lymphoma. PCBs may also cause non-carcinogenic effects,
17 including reproductive effects and developmental effects (primarily to the nervous system). PCBs tend
18 to accumulate in the human body in the liver, adipose tissue (fat), skin, and breast milk. PCBs have
19 also been found in human plasma, follicular fluid, and sperm fluid. Fetuses may be exposed to PCBs
20 in utero, and babies may be exposed to PCBs during breastfeeding. According to U.S. EPA (2000b),
21 '[s]ome human studies have also suggested that PCB exposure may cause adverse effects in children
22 and developing fetuses while other studies have not shown effects. Reported effects include lower IQ
23 scores, low birth weight, and lower behavior assessment scores.

24     5.      PCBs have traveled into San Francisco Bay by a variety of ways. PCBs were used in
25 many industrial and commercial applications such as paint, caulking, transformers, capacitors,
26 coolants, hydraulic fluids, plasticizers, sealants, inks, lubricants, and other uses. PCBs regularly leach,
27 leak, off-gas, and escape their intended applications, causing runoff during naturally occurring storm
28 and rain events, after being released into the environment. The runoff originates from multiple sources

GOMEZ
TRIAL ATTORNEYS

2

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1  and industries and enters the Bay with stormwater and other runoff.

2      6.      The natural fate and transport of PCBs result in the gathering and collection in

3  stormwater through no fault of the City of Oakland, which lawfully discharges water into San

4  Francisco Bay through its NPDES permit.

5      7.      San Francisco Bay ("the Bay") is contaminated with PCBs, which have been detected in

6  the Bay's water, sediments, fish, and wildlife. All segments of the Bay have been identified as

7  impaired due to elevated levels of PCBs in sport fish.[1] The U.S. Environmental Protection Agency

8  ("U.S. EPA") has approved a PCB Total Maximum Daily Load ("TMDL") for the Bay.

9      8.      A Total Maximum Daily Load, or TMDL, is a calculation of the maximum amount of

10  pollutant that an impaired body of water can receive and still safely meet water quality standards.[2]

11      9.      The San Francisco Bay is impaired due to the presence of PCBs.

12      10.      The TMDL is intended to achieve protection of the commercial sport fishing beneficial

13  use and to the extent that other beneficial uses are affected by PCBs, the TMDL will also ensure

14  protection of other beneficial uses, specifically, preservation of rare and endangered species, estuarine

15  habitat and wildlife habitat.[3]

16      Plaintiff CITY OF OAKLAND hereby alleges, upon information and belief, as follows:

17  **II.      PARTIES**

18      11.      The CITY OF OAKLAND ("Oakland" or "Plaintiff") is a California Charter City and

19  municipal corporation, duly organized and existing by virtue of the laws of the State of California.

20      12.      Plaintiff brings this suit pursuant to California Code of Civil Procedure 731, and

21  California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and any other applicable codes or

22  forms of relief available for monetary damages and removal of the public nuisance caused by PCBs in

23  the Bay.

24

25  [1] San Francisco Bay Regional Water Quality Control Board, California Environmental Protection Agency,

26  ww.waterboards.ca.gov/sanfranciscobay/water_issues/programs/planningtmdls/basinplan/web/bp_ch7 b.shtml#7.2.3.

27  [2] United States Environmental Protection Agency, www.water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/

28  [3] *Id.*

GOMEZ
TRIAL ATTORNEYS

3

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 101 of 299 PageID
#: 869
Case 3:15-cv-05152-MEJ   Document 1   Filed 11/10/15   Page 4 of 19

Electronically Filed - St. Louis County - December 11, 2017 - 04:27 PM

1      13.     Plaintiff manages and operates a municipal stormwater system, which collects and

2 transports stormwater to be discharged into the Bay. In order to discharge stormwater into the Bay,

3 Plaintiff is required to receive a Municipal Regional Stormwater Permit from the San Francisco Bay

4 Regional Water Quality Control Board, pursuant to the National Pollutant Discharge Elimination

5 System under the Clean Water Act.

6      14.     Plaintiff is a permittee under a Municipal Regional Stormwater Permit, which includes

7 a TMDL for PCBs, as the Bay is impaired due to PCBs.

8      15.     Therefore, Plaintiff is subject to a PCB TMDL under a Municipal Regional Stormwater

9 Permit. The PCB TMDL requires Plaintiff to limit its stormwater discharge of PCBs into the Bay.

10     16.     Thus, Plaintiff has spent money in efforts to reduce PCB discharge toward these state-

11 mandated TMDL goals.

12     17.     Recently, the San Francisco Bay Regional Water Quality Control Board increased the

13 standards for the PCB TMDL, which now requires the Plaintiff to further limit its PCB discharge into

14 the Bay.

15     18.     On May 11, 2015, a new draft Municipal Regional Stormwater Permit, to govern the

16 next permit period, became the Tentative Order, requiring stricter standards and further, significant

17 reduction in PCB discharge into the Bay.[4]

18     19.     The new, stricter TMDL requirements will cost Plaintiff additional money in order to

19 improve procedures, methods, and facilities, in order to reduce PCB discharge to new and future

20 TMDL levels.

21     20.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its

22 principal place of business in St. Louis, Missouri.

23     21.     Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and

24 principal place of business in St. Louis, Missouri.

25     22.     Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor

26

27

[4] California Regional Water Quality Control Board, San Francisco Bay Region, Municipal Regional
28 Stormwater NPDES Permit, Order R2-2015-XXX, NPDES Permit No. CAS612008.

GOMEZ
TRIAL ATTORNEYS

4

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 102 of 299 PageID
#: 870
Case 3:15-cv-05152-MEJ    Document 1    Filed 11/10/15    Page 5 of 19

Electronically Filed – St Louis County – December 11, 2017 – 04:27 PM

1  to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack,

2  New Jersey. Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

3      23.    The original Monsanto Company ("Old Monsanto") operated an agricultural products

4  business, a pharmaceutical and nutrition business, and a chemical products business. Old Monsanto

5  began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late

6  1970s.

7      24.    Through a series of transactions beginning in approximately 1997, Old Monsanto's

8  businesses were spun off to form three separate corporations. The corporation now known as

9  Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products

10  business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by

11  Pharmacia.

12      25.    Solutia was organized by Old Monsanto to own and operate its chemical manufacturing

13  business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals

14  business.[5]

15      26.    Although Solutia assumed and agreed to indemnify Pharmacia (then known as

16  Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered

17  into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims

18  arising from Old Monsanto's chemical business — including the manufacture and sale of PCBs.[6]

19      27.    In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the

20  U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's

21  Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under

22  which Monsanto continues to manage and assume financial responsibility for certain tort litigation and

23

24

25  [5] See MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v.*
26  *Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October
    8, 2013); see also Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and
27  Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx
    (last accessed February 20, 2014).
28  [6] *See id.*

GOMEZ
TRIAL ATTORNEYS

5

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1    environmental remediation related to the Chemicals Business.[7]

2        28.    Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as
3    "Defendants."

4        **III.    JURISDICTION AND VENUE**

5        29.    This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity
6    exists between Plaintiff and Defendants. The Plaintiff is located in California, but no Defendant is a
7    citizen of California. Monsanto is a Delaware corporation with its principal place of business in St.
8    Louis, Missouri. Solutia is a Delaware corporation with its principal place of business in St. Louis,
9    Missouri. Pharmacia is a Delaware limited liability company with its principal place of business in
10   Peapack, New Jersey.

11       30.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a)
12   because a substantial part of the property that is the subject of the action is situated in this judicial
13   district.

14       **IV.    FACTUAL ALLEGATIONS**

15           **A.    PCBs are Toxic Chemicals that Cause Environmental Contamination.**

16       31.    Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms
17   attached to a double carbon-hydrogen ring (a "biphenyl" ring). A "PCB congener" is any single,
18   unique chemical compound in the PCB category. Over two hundred congeners have been identified.[8]

19       32.    PCBs were generally manufactured as mixtures of congeners. From approximately
20   1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally
21   produced PCBs for commercial use.[9] The most common trade name for PCBs in the United States was
22   "Aroclor," which was trademarked by Old Monsanto.

23

24   ───────────────
     [7] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at
25   http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).
     [8] Table of PCB Congeners, available at
26   http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).
     [9] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole
27   manufacturer of PCB's is concerned . . . ."); 121 Cong. Record 33879, 94th Congress, (October 23,
     1975) ("The sole U.S. producer, Monsanto Co. . . . ."). *See also* MONS 058730-058752 at 058733
28   (identifying other producers as "all ex-USA."), attached as Exhibit A.

6

GOMEZ
TRIAL ATTORNEYS

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 104 of 299 PageID
Case 3:15-cv-05152-MEJ    Document 1    Filed 11/10/15    Page 7 of 19
#: 872

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1    33.    Monsanto's commercially-produced PCBs were used in a wide range of industrial

2  applications in the United States including electrical equipment such as transformers, motor start

3  capacitors, and lighting ballasts. In addition, PCBs were incorporated into a variety of products such

4  as caulks, paints, and sealants.

5    34.    As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and

6  "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for

7  placement into trade or commerce, including any product that forms a component part of or that is

8  subsequently incorporated into another product.

9    35.    PCBs easily migrate out of their original source material or enclosure and contaminate

10  nearby surfaces, air, water, soil, and other materials. For example, PCB compounds volatilize out of

11  building materials (such as caulk) into surrounding materials such as masonry, wood, drywall, and soil,

12  thereby causing damage to those surrounding materials. PCBs can also escape from totally-enclosed

13  materials (such as light ballasts) and similarly contaminate and damage surrounding materials.

14    36.    PCBs present serious risks to the health of humans, wildlife, and the environment.

15    37.    Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact.

16  Individuals may inhale PCBs that are emitted into the air. They may also ingest PCBs that are emitted

17  into air and settle onto surfaces that come into contact with food or drinks. And they may absorb PCBs

18  from physical contact with PCBs or PCB-containing materials.

19    38.    EPA has determined that Monsanto's PCBs are probable human carcinogens. In 1996,

20  EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260. [10]

21  EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from

22  government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

23    39.    In addition, EPA concluded that PCBs are associated with serious non-cancer health

24  effects. From extensive studies of animals and primates using environmentally relevant doses, EPA

25  has found evidence that PCBs exert significant toxic effects, including effects on the immune system,

26

27  [10] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures,
EPA/600/P-96/001F (September 1996), available at

28  http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

GOMEZ
TRIAL ATTORNEYS

7

Electronically Filed - St Louis County - December 11, 2017 - 05:14 PM

1   the reproductive system, the nervous system, and the endocrine system.

2   40.   PCBs affect the immune system by causing a significant decrease in the size of the
3   thymus gland, lowered immune response, and decreased resistance to viruses and other infections. The
4   animal studies were not able to identify a level of PCB exposure that did not affect the immune system.
5   Human studies confirmed immune system suppression.

6   41.   Studies of reproductive effects in human populations exposed to PCBs show decreased
7   birth weight and a significant decrease in gestational age with increasing exposures to PCBs. Animal
8   studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and
9   reduced sperm counts.

10   42.   Human and animal studies confirm that PCB exposure causes persistent and significant
11   deficits in neurological development, affecting visual recognition, short-term memory, and learning.
12   Some of these studies were conducted using the types of PCBs most commonly found in human breast
13   milk.

14   43.   PCBs may also disrupt the normal function of the endocrine system. PCBs have been
15   shown to affect thyroid hormone levels in both animals and humans. In animals, decreased thyroid
16   hormone levels have resulted in developmental deficits, including deficits in hearing. PCB exposures
17   have also been associated with changes in thyroid hormone levels in infants in studies conducted in the
18   Netherlands and Japan.

19   44.   PCBs have been associated with other health effects including elevated blood pressure,
20   serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and
21   humans; and liver toxicity in rodents.

22   45.   Children may be affected to a greater extent than adults. The Agency for Toxic
23   Substances and Disease Registry explained: "Younger children may be particularly vulnerable to
24   PCBs because, compared to adults, they are growing more rapidly and generally have lower and
25   distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering

26

27

28

GÓMEZ
TRIAL ATTORNEYS

8

PLAINTIFF'S ORIGINAL COMPLAINT          **EXHIBIT 6**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1  the lipophilic PCBs."[11]

2      46.     PCBs are known to be toxic to a number of aquatic species and wildlife including fish,

3  marine mammals, reptiles, amphibians, and birds.  Exposure is associated with death, compromised

4  immune system function, adverse effects on reproduction, development, and endocrine function.  PCB

5  exposure affects liver function, the digestive system, and nervous systems and can promote cancer in a

6  number of animal species.  The presence of PCBs can cause changes in community and ecosystem

7  structure and function.[12]

8          **B.     Monsanto Has Long Known of PCBs' Toxicity.**

9      47.     Monsanto was well aware of scientific literature published in the 1930s that established

10  that inhalation in industrial settings resulted in toxic systemic effects.[13]

11     48.     An October 11, 1937, Monsanto memorandum advises that "Experimental work in

12  animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated

13  oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may

14  lead to an acne-form skin eruption."[14]

15     49.     A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with

16  respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely

17  defined.  It does not make too much difference, it seems to me, because our main worry is what will

18  happen if an individual develops [sic] any type of liver disease and gives a history of Aroclor exposure.

19  I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[15]

20     50.     On November 14, 1955, Monsanto's Medical Department provided an opinion that

21  workers should not be allowed to eat lunch in the Aroclor department:

22

23  _____

[11] Agency for Toxic Substances and Disease Registry, Toxicological Profile for Polychlorinated
24  Biphenyls (PCBs), (November 2000), at 405, available at www.atsdr.cdc.gov (last accessed May 1,
2014).
25  [12] *See* EPA, Understanding PCB Risks, available at
http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAssessment (last
26  accessed March 5, 2015).
[13] See Exhibits B, C, F
27  [14] MONS 061332, attached as Exhibit B.
[15] MONS 095196-7, attached as Exhibit C.
28

9

GOMEZ
TRIAL ATTORNEYS

1  It has long been the opinion of the Medical Department that eating in process
2 departments is a potentially hazardous procedure that could lead to serious
  difficulties. While the Aroclors are not particularly hazardous from our own
  experience, this is a difficult problem to define because early literature work
3 claimed that chlorinated biphenyls were quite toxic materials by ingestion or
  inhalation.[16]
4

5   51.  On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S.

6 Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was

7 impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."[17]

8   52.  In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated

9 that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[18]  Jensen refers to a

10 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant

11 women and persons who have at any time had any liver disease are particularly susceptible."[19]  Kelly

12 does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is

13 concerned, it is true that chloracne and liver trouble can result from large doses."[20]

14   **C.  Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing**

15 **Harm to Animals and Fish.**

16   53.  At the same time, Monsanto became aware that PCBs were causing widespread

17 contamination of the environment, far beyond the areas of its use.[21]

18   54.  Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen,

19 who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[22]  The report noted

20 that PCBs were also detected in the air over London and Hamburg and found in seals caught off the

21

22

23

---

24 [16] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates
25 number), attached as Exhibit D.
  [17] MONS 095640, attached as Exhibit E.
26 [18] *See* JDGFOX00000037-63, attached as Exhibit F.
  [19] *Id.* at JDGFOX00000039.
27 [20] *Id.* at JDGFOX00000037.
  [21] See Exhibits G, H, L.
28 [22] New Scientist (December 15, 1986), MONSFOX00003427, attached as Exhibit G.

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 03:14 PM

Electronically Filed – St Louis County – December 11, 2017 – 04:27 PM

1  coast of Scotland. Jensen concluded that PCBs can "be presumed to be widespread throughout the
2  world."[23]

3       55.     A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons
4  (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[24]
5  The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine
6  falcons and 34 other bird species. The report linked PCBs to the rapid decline in peregrine falcon
7  populations in the United States.

8       56.     Despite growing evidence of PCBs' infiltration of every level of the global ecology,
9  Monsanto remained steadfast in its production of Aroclors and other PCBs.

10      57.     On March 6, 1969, Monsanto employee W. M. Richard wrote a memorandum
11  discussing Risebrough's article that criticized PCBs as a "toxic substance", "widely spread by air-
12  water; therefore, an uncontrollable pollutant . . . causing extinction of peregrine falcon ... [and]
13  endangering man himself."[25] Richard explained that Monsanto could take steps to reduce PCB
14  releases from its own plants but cautioned, "It will be still more difficult to control other end uses such
15  as cutting oils, adhesives, plastics, and NCR paper. In this applications exposure to consumers is
16  greater and the disposal problem becomes complex."[26]

17      58.     On September 9, 1969, Monsanto employee W.R. Richard wrote an interoffice memo
18  titled "Defense of Aroclor."[27] He acknowledged the role of Aroclor in water pollution: "Aroclor
19  product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a
20  long life." He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida
21  causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in
22  birds; and in the Great Lakes. Richard advised that the company could not defend itself against all
23  criticism: "We can't defend vs. everything. Some animals or fish or insects will be harmed. Aroclor

24  
---

25  [23] Id.
26  [24] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.
27  [25] MONS 096509-096511, attached as Exhibit I.
    [26] Id.
28  [27] DSW 014256-014263, attached as Exhibit J.

GOMEZ
TRIAL ATTORNEYS

11

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1  degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse

2  [than] lower chlorine compounds. Therefore we will have to restrict uses and clean-up as much as we

3  can, starting immediately."[28]

4      59.    On January 29, 1970, Elmer Wheeler of the Medical Department circulated laboratory

5  reports discussing results of animal studies. He noted: "Our interpretation is that the PCB's are

6  exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly,

7  although there are variations depending on species of animals, the PCB's are about the same as DDT in

8  mammals."[29]

9      60.    Monsanto expressed a desire to keep profiting from PCBs despite the environmental

10  havoc in a PCB Presentation to Corporate Development Committee. The report suggests possible

11  reactions to the contamination issue. It considered that doing nothing was "unacceptable from a legal,

12  moral, and customer public relations and company policy viewpoint." But the option of going out of

13  the Aroclor business was also considered unacceptable: "there is too much customer/market need and

14  selfishly too much Monsanto profit to go out."[30]

15      61.    The Aroclor Ad Hoc Committee held its first meeting on September 5, 1969. The

16  committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB

17  "may be a global contaminant."[31] The meeting minutes acknowledge that PCB has been found in fish,

18  oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine

19  River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife. Moreover, the

20  committee implicated the normal use of PCB-containing products as the cause of the problem: "In one

21  application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we

22  can assume that nearly all of this Aroclor winds up in the environment."[32]

23      62.    A month later, on October 2, 1969, the Committee reported extensive environmental

24  contamination. The U.S. Department of Interior, Fish and Wildlife found PCB residues in dead eagles

25

26  [28] *Id.*
    [29] MONS 098480, attached as Exhibit K.
27  [30] Ex. A at 058737.
    [31] MONS 030483-030486, attached as Exhibit L.
28  [32] *Id.* at 030485.

GOMEZ
TRIAL ATTORNEYS

12

PLAINTIFF'S ORIGINAL COMPLAINT                    **EXHIBIT 6**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1  and marine birds.  Similarly, the Bureau of Commercial Fisheries reported finding PCBs in the river

2  below Monsanto's Pensacola plant.  The U.S. Food and Drug Administration had discovered PCBs in

3  milk supplies.  The Committee advised that Monsanto could not protect the environment from

4  Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors:

> There is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated – e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.
> Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination.  There are, however a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.[33]

12  63.  Monsanto's desire to protect Aroclor sales rather than the environment is reflected in

13  the Committee's stated objectives:

> 1.  Protect continues sales and profits of Aroclors;
> 2.  Permit continued development of new uses and sales, and
> 3.  Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or con-trol contamination of the global ecosystem.[34]

18  64.  An interoffice memorandum circulated on February 16, 1970, provided talking points

19  for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and

20  1260:  "We (your customer and Monsanto) are not interested in using a product which may present a

21  problem to our environment."  Nevertheless, the memo acknowledges that Monsanto "can't afford to

22  lose one dollar of business."  To that end, it says, "We want to avoid any situation where a customer

23  wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase

24  [new products] when available.  He will then top off with the new fluid and eventually all Aroclor

25  1254 and Aroclor 1260 will be out of his system.  We don't want to take fluid back."[35]

26  —————————————

27  [33] DSW 014612-014624, at 014615, attached as Exhibit M.
   [34] Id.

28  [35] MONS 100123-100124, attached as Exhibit N.

13

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 03:14 PM

1    65.    In 1970, the year after Monsanto formed the "ad hoc" committee, and despite

2    Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States

3    peaked at 85 million pounds.

4    66.    Growing awareness of the ubiquitous nature of PCBs led the United States to conduct

5    an investigation of health and environmental effects and contamination of food and other products. An

6    interdepartmental task force concluded in May 1972 that PCBs were highly persistent, could

7    bioaccumulate to relatively high levels, and could have serious adverse health effects on human

8    health.[36]

9    67.    After that report, environmental sampling and studies indicated that PCBs were a "more

10   serious and continuing environmental and health threat than had been originally realized."[37]   To

11   address these concerns, EPA undertook a study to assess PCB levels in the environment on a national

12   basis. That study revealed widespread occurrence of PCBs in bottom sediments in several states,

13   including California; in fish and birds; in lakes and rivers; in the Atlantic Ocean, the Pacific Ocean,

14   and the Gulf of Mexico; sewage treatment facilities; in a variety of foods including milk, poultry,

15   eggs, fish, meat, and grains; and in human tissues, blood, hair, and milk.[38]

16   68.    EPA's study noted the particular burden on California. "PCBs have become a

17   significant component of the marine food webs of southern California," were found in sediments in the

18   Santa Barbara Basin, and found in high levels in the San Francisco Bay.[39]

19   69.    At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB

20   compounds. In a 1960 brochure, Monsanto promotes the use of Aroclors in transformers and

21   capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire

22   or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food

23   cookers, potato chip fryers, drying ovens, thermostats, furnaces, and vacuum diffusion pumps.

24   Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil;

25

26   [36] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976).
27   [37] Id. at 1.
     [38] Id., passim.
28   [39] Id.

GOMEZ
TRIAL ATTORNEYS

14

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

1  insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized
2  lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics;
3  sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers;
4  masonry coatings for swimming pools, stucco homes, and highway paints;  protective and decorative
5  coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment;  and
6  coatings for chemical plants, boats, and highway marking. [40]

7        70.      A 1961 brochure explains that Monsanto's Aroclors are being used in "lacquers for
8  women's shoes,"  as "a wax for the flame proofing of Christmas trees,"  as "floor wax,"  as an
9  adhesive for bookbinding, leather, and shoes,  and as invisible marking ink used to make chenille rugs
10 and spreads. [41]

11       71.      Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used
12 in a variety of industrial, commercial, household, and consumer goods.  Moreover, Monsanto
13 affirmatively encouraged these uses by encouraging salesmen to market products for these and other
14 applications.

15       72.      A few years later, in 1970, Monsanto tried to distance itself from the variety of
16 applications of Aroclors that it proudly espoused a few years before.  In a press release, the company
17 claimed: " 'What should be emphasized . . . is that PCB was developed over 40 years ago primarily
18 for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and
19 cooling systems.  It is not a 'household' item." [42]

20            **D.      Monsanto Concealed the Nature of PCBs from Governmental Entities.**

21       73.      While the scientific community and Monsanto knew that PCBs were toxic and
22 becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental
23 entities the exact opposite — that the compounds were not toxic and that the company would not
24 expect to find PCBs in the environment in a widespread manner. [43]

25

26 ————————————————
   [40] The Aroclor Compounds (hand dated May 1960), 0509822- 66, attached as Exhibit S.
27 [41] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.
   [42] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit U, at MCL000648.
28 [43] See Exhibits O-R (letters to governmental agencies).

                                         15

GOMEZ
TRIAL ATTORNEYS

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 113 of 299 PageID
Case 3:15-cv-05152-MEJ   Document 1   Filed 11/10/15   Page 16 of 19
#: 891

1    74.    In a March 24, 1969 letter to Los Angeles County Air Pollution Control District,

2  Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin

3  absorption."[44]  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance

4  as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or

5  in the liquid discharges from a using industry."[45]  A similar letter to the Regional Water Quality

6  Control Board explained that PCBs are associated with "no special health problems" and "no problems

7  associated with the environment."[46]

8    75.    In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of the

9  National Air Pollution Control Administration, who promised to relay to Congress the message that

10  Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread

11  fashion."[47]

12    76.    Monsanto delivered the same message to the New Jersey Department of Conservation

13  in July, 1969, claiming first, "Based on available data, manufacturing and use experience, we do not

14  believe the PCBs to be seriously toxic."[48]  The letter then reiterates Monsanto's position regarding

15  environmental contamination: "We are unable at this time to conceive of how the PCBs can become

16  wide spread in the environment. It is certain that no applications to our knowledge have been made

17  where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides

18  have been."[49]

19  ///

20  ///

21  ///

22

23
[44] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969),
24  attached as Exhibit O.
[45] Id.
25  [46] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as
Exhibit P.
26  [47] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.
[48] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969),
27  attached as Exhibit R.
[49] Id.
28

16

GOMEZ
TRIAL ATTORNEYS

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1    **FIRST CAUSE OF ACTION**

2    **PUBLIC NUISANCE**

3    77.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding

4    paragraphs as if fully restated in this count.

5    78.    Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that

6    created or participated in creating a public nuisance that is harmful to health and obstructs the free use

7    of the Bay.

8    79.    The presence of PCBs interferes with the comfortable enjoyment of the Bay for

9    customary uses for fishing, swimming, and other water activities.

10    80.    The presence of PCBs interferes with the free use of the Bay for the promotion of

11    commerce, navigation, and fisheries.

12    81.    The presence of PCBs interferes with the free use of the Bay for ecological preservation

13    and habitat restoration.

14    82.    The San Francisco Bay Regional Water Quality Control Board, pursuant to the NPDES

15    under the Clean Water Act, requires the Plaintiff to reduce their discharge of PCBs into the Bay to

16    prevent further contamination of the already impaired body of water.

17    83.    The presence of PCBs causes inconvenience and annoyance to Plaintiff, who is charged

18    with reducing the PCB discharge toward TMDL levels, in order to protect plant and animal life, and

19    the quality of water in the bay.

20    84.    The condition affects a substantial number of people who use the Bay for commercial

21    and recreational purposes and interferes with the rights of the public at large to clean and safe

22    resources and environment.

23    85.    An ordinary person would be reasonably annoyed or disturbed by the presence of toxic

24    PCBs that endanger the health of fish, animals, and humans and degrade water quality and destroy

25    marine habitats.

26    86.    The seriousness of the environmental and human health risk far outweighs any social

27    utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human

28    health and the environment.

17

GOMEZ
TRIAL ATTORNEYS

**EXHIBIT 6**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1    87.    The Plaintiff has suffered and will continue to suffer harm that is different from the type

2    of harm suffered by the general public, and the Plaintiff has incurred substantial costs deriving from

3    state-mandated PCB TMDLs.

4    88.    Plaintiff did not consent to the conduct that resulted in the contamination of the Bay.

5    89.    Monsanto's conduct was a substantial factor in causing the harm to the Plaintiff.

6    90.    Monsanto knew or, in the exercise of reasonable care, should have known that the

7    manufacture and sale of PCBs was causing the type of contamination now found in the Bay. Monsanto

8    knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish

9    species, and would endanger birds and animals. In addition, Monsanto knew that PCBs are associated

10   with serious illnesses and cancers in humans and that humans may be exposed to PCBs through

11   ingestion and dermal contact. As a result, it was foreseeable to Monsanto that humans may be exposed

12   to PCBs through swimming in contaminated waters or by eating fish from those waters. Monsanto

13   thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere

14   with the ordinary comfort, use, and enjoyment of any coastal marine areas.

15   91.    As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiff

16   has suffered, and continues to suffer, monetary damages to be proven at trial.

17   92.    Monsanto's conduct was malicious, oppressive, wanton, willful, intentional, and shocks

18   the conscience, warranting punitive and exemplary damages, because Monsanto callously decided to

19   increase sales and develop new ways to promote PCBs, knowing PCBs are toxic, cannot be contained,

20   and last for centuries.

21                           **SECOND CAUSE OF ACTION**

22                            **EQUITABLE INDEMNITY**

23   93.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding

24   paragraphs as if fully restated in this count.

25   94.    Monsanto is responsible for creating the public nuisance by manufacturing, distributing,

26   and promoting PCBs, resulting in contamination in and around the Bay.

27   95.    Monsanto's creation of the public nuisance contributed as a substantial factor in causing

28   Plaintiff's injury and damages.

GOMEZ
TRIAL ATTORNEYS

18

1    96.    The conduct of Plaintiff did not contribute in any way to the creation of the public

2    nuisance.

3                                    **PRAYER FOR RELIEF**

4    Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

5        1.  Compensatory damages according to proof;

6        2.  Punitive damages;

7        3.  Litigation costs and attorney's fees as provided by law;

8        4.  Pre-judgment and post-judgment interest;

9        5.  Any other and further relief as the Court deems just, proper, and equitable.

10

11                                  **DEMAND FOR JURY TRIAL**

12   Plaintiff demands a jury trial.

13

14   Dated: November 10, 2015                   By: /s/ John P. Fiske

15                                              **GOMEZ TRIAL ATTORNEYS**
                                                John H. Gomez (SBN 171485)
16                                              John P. Fiske (SBN 249256)
                                                655 West Broadway, Suite 1700
17                                              San Diego, California 92101

18
                                                **BARON & BUDD, P.C.**
19                                              Scott Summy (pending Pro Hac Vice)
                                                Carla Burke (pending Pro Hac Vice)
20                                              Celeste Evangelisti (SBN 225232)
                                                3102 Oak Lawn Avenue, Suite 1100
21                                              Dallas, Texas 75219-4281

22
                                                **OFFICE OF THE CITY ATTORNEY**
23                                              **City of Oakland**
                                                Barbara Parker (SBN 69722)
24                                              Otis McGee, Jr. (SBN 71885)
                                                Maria Bee (SBN 167716)
25                                              1 Frank H. Ogawa Place, 6th Floor
                                                Oakland, CA 94612

26

27

28

GOMEZ
TRIAL ATTORNEYS                                      19

                           PLAINTIFF'S ORIGINAL COMPLAINT                   **EXHIBIT 6**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1  **GOMEZ TRIAL ATTORNEYS**
   John H. Gomez (SBN 171485)
2  John P. Fiske (SBN 249256)
   655 West Broadway, Suite 1700
3  San Diego, CA 92101
   Telephone: 619-237-3490
4
   **BARON & BUDD P.C.**
5  Scott Summy (admitted Pro Hac Vice)
   (Texas Bar No. 19507500)
6  Carla Burke (admitted Pro Hac Vice)
   (Texas Bar NO. 24012490)
7  Celeste Evangelisti (SBN 225232)
   3102 Oak Lawn Avenue, Suite 1100
8  Dallas, TX 75219
   Telephone: 214-521-3605
9
   JAN I. GOLDSMITH, City Attorney
10 California State Bar No. 70988
   DANIEL F. BAMBERG, Assistant City Attorney
11 California State Bar No. 60499
   PAUL F. PRATHER, Deputy City Attorney
12 California State Bar No. 252985
   **OFFICE OF THE CITY ATTORNEY**
13 1200 Third Avenue, Suite 1100
   San Diego, CA 92101
14 Telephone: 619-533-5800

15 *Attorneys for Plaintiff City of San Diego*

16

17               **UNITED STATES DISTRICT COURT**
                 **SOUTHERN DISTRICT OF CALIFORNIA**
18

19 CITY OF SAN DIEGO, a municipal          )
   corporation;                            )        Case No.  3:15-cv-00578-WQH-JLB
20                                          )
        Plaintiff,                          )
21                                          )        **PLAINTIFF'S FIRST AMENDED**
                                            )        **COMPLAINT**
22 v.                                       )
                                            )
23                                          )
   MONSANTO COMPANY,                        )
24 SOLUTIA INC., and                        )        Assigned to Judge William Q. Hayes
   PHARMACIA CORPORATION,                   )        File Date:  March 13, 2015
25                                          )
                                            )
26      Defendants.                         )
   ─────────────────────────────           )
27
28

────────────────────────────────────────────────────────

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Plaintiff the CITY OF SAN DIEGO ("the City") hereby alleges, upon information and belief, as follows:

## I.   INTRODUCTION

1.   Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants – found in bays, oceans, rivers, streams, soil, and air. In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects. In addition, PCBs can impair and even destroy populations of fish, birds, and other animals.

2.   Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds. Although Monsanto knew for decades that PCBs were toxic, knew that they could not be contained and as a result were widely contaminating all natural resources and living organisms, and knew that there was no safe way to dispose of PCBs, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture of and most uses of PCBs.

3.   PCBs have been found in and around San Diego Bay ("the Bay") at levels that require cleanup in certain areas. At different times and locations, PCBs have been detected in the Bay's water, sediments, fish, and lobsters. PCBs entered the Bay through a variety of ways. PCBs regularly leach, leak, off-gas, and escape their intended applications into air, soil, and water. PCBs also leach from landfills and other disposal locations and enter the Bay with stormwater and other runoff.

4.   As a public property owner and former trustee of the Bay, Plaintiff seeks to abate the contamination, to recover damages for injuries to property, and to

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1    recover all past and future costs associated with investigating and removing

2    PCBs from in and around the Bay and preventing future injuries.

3    **II.**    **PARTIES**

4        **A.**    **Plaintiff**

5    5.    Plaintiff City is a California Charter City and municipal corporation, duly

6      organized and existing by virtue of the laws of the State of California. The

7      City was the trustee of certain relevant tidelands and submerged lands in

8      and around the Bay from the early 1900s through 1963, when that property

9      was transferred to the Port District.

10    6.    Plaintiff brings this suit pursuant to California Code of Civil Procedure 731,

11      and California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and

12      any other applicable codes or sources of relief available for monetary

13      damages and abatement of the public nuisance caused by PCBs in the Bay.

14        **B.**    **Defendants**

15    7.    Defendant Monsanto Company is a Delaware corporation with its principal

16      place of business in St. Louis, Missouri.

17    8.    Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its

18      headquarters and principal place of business in St. Louis, Missouri.

19    9.    Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation"

20      and successor to the original Monsanto Company) is a Delaware LLC with

21      its principal place of business in Peapack, New Jersey. Pharmacia is now a

22      wholly-owned subsidiary of Pfizer, Inc.

23    10.    The original Monsanto Company ("Old Monsanto") operated an agricultural

24      products business, a pharmaceutical and nutrition business, and a chemical

25      products business. Old Monsanto began manufacturing PCBs in the 1930s

26      and continued to manufacture commercial PCBs until the late 1970s.

27    11.    Through a series of transactions beginning in approximately 1997, Old

28      Monsanto's businesses were spun off to form three separate corporations.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1   The corporation now known as Monsanto operates Old Monsanto's
2   agricultural products business. Old Monsanto's chemical products business
3   is now operated by Solutia. Old Monsanto's pharmaceuticals business is
4   now operated by Pharmacia.

5   12.   Solutia was organized by Old Monsanto to own and operate its chemical
6   manufacturing business.    Solutia assumed the operations, assets, and
7   liabilities of Old Monsanto's chemicals business.[1]

8   13.   Although Solutia assumed and agreed to indemnify Pharmacia (then known
9   as Monsanto Company) for certain liabilities related to the chemicals
10   business, Defendants have entered into agreements to share or apportion
11   liabilities, and/or to indemnify one or more entity, for claims arising from
12   Old Monsanto's chemical business – including the manufacture and sale of
13   PCBs.[2]

14   14.   In 2003, Solutia filed a voluntary petition for reorganization under Chapter
15   11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in
16   2008.    In connection with Solutia's Plan of Reorganization, Solutia,
17   Pharmacia and New Monsanto entered into several agreements under which
18   Monsanto continues to manage and assumed financial responsibility for
19   certain tort litigation and environmental remediation related to the
20   Chemicals Business.[3]

21

22   [1] *See* MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company,*
23   C.A. No. 12-CV-11645, D. Mass. (October 8, 2013); *see also* Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc.,
24   http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed February 20, 2014).

25   [2] *See id.*

26

27   [3] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last
28   accessed February 20, 2014).

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1  15.  Monsanto, Solutia, and Pharmacia are collectively referred to in this

2  Complaint as "Defendants" or "Monsanto."

3  **III.  JURISDICTION AND VENUE**

4  16.  This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete

5  diversity exists between Plaintiff and Defendants.  Plaintiff is located in

6  California, but no Defendant is a citizen of California. Monsanto Company

7  is a Delaware corporation with its principal place of business in St. Louis,

8  Missouri.  Solutia is a Delaware corporation with its principal place of

9  business in St. Louis, Missouri.  Pharmacia is a Delaware limited liability

10  company with its principal place of business in Peapack, New Jersey.

11  17.  Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a)

12  because a substantial part of the property that is the subject of the action is

13  situated in this judicial district.

14  **IV.  FACTUAL ALLEGATIONS**

15          **A.  PCBs are Toxic Chemicals that Cannot Be Contained and
                   that Cause Environmental Contamination.**
16

17  18.  Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine

18  atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A

19  "PCB congener" is any single, unique chemical compound in the PCB

20  category.  Over two hundred congeners have been identified.[4]

21  19.  PCBs were generally manufactured as mixtures of congeners.    From

22  approximately 1935 to 1979, Monsanto Company was the only manufacturer

23  in the United States that intentionally produced PCBs for commercial use.[5]

24

---

25  [4] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/
pcbs/ pubs/ congeners.htm (last accessed February 20, 2014).

26
27  [5] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the
Monsanto Co., the sole manufacturer of PCB's is concerned ... ."); 121 Cong.
Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer,
28  Monsanto Co. ... ."). *See also* MONS 058730-058752 at 058733 (identifying other
producers as "all ex-USA."), attached as Exhibit A.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1  The most common trade name for PCBs in the United States was "Aroclor,"
2  which was trademarked by Old Monsanto.

3  20.  Monsanto's commercially-produced PCBs were used in a wide range of
4  industrial applications in the United States, including electrical equipment
5  such as transformers, motor start capacitors and lighting ballasts.  In
6  addition, PCBs were incorporated into a variety of products such as caulks,
7  paints and sealants.

8  21.  As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing
9  products," and "PCB products" refer to products containing polychlorinated
10  biphenyl congener(s) manufactured for placement into trade or commerce,
11  including any product that forms a component part of or that is subsequently
12  incorporated into another product.

13  22.  PCBs easily migrate or leach out of their original source material or
14  enclosure and contaminate nearby surfaces, air, water, soil and other
15  materials.  For example, PCB compounds volatilize out of building materials
16  (such as caulk) into surrounding materials such as masonry, wood, drywall
17  and soil, thereby causing damage to those surrounding materials.  PCBs can
18  also escape from totally-enclosed materials (such as light ballasts) and
19  similarly contaminate and damage surrounding materials and escape into the
20  environment.

21  23.  PCBs present serious risks to the health of humans, wildlife and the
22  environment.

23  24.  Humans may be exposed to PCBs through ingestion, inhalation and dermal
24  contact.  Individuals may inhale PCBs that are emitted into the air.  They
25  may also ingest PCBs that are emitted into air and settle onto surfaces that
26  come into contact with food or drinks.  And humans may absorb PCBs from
27  physical contact with PCBs or PCB-containing materials.

28  25.  EPA has determined that Monsanto's PCBs are probable human

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1    carcinogens. In 1996, EPA reassessed PCB carcinogenicity, based on data

2    related to Aroclors 1016, 1242, 1254 and 1260.[6] EPA's cancer reassessment

3    was peer reviewed by 15 experts on PCBs, including scientists from

4    government, academia and industry, all of whom agreed that PCBs are

5    probable human carcinogens.

6  26.    The International Agency for Research on Cancer published an assessment

7    in 2015 that asserts an even stronger relationship between PCBs and human

8    cancer. The report explains: "There is sufficient evidence in humans for the

9    carcinogenicity of polychlorinated biphenyls (PCBs). PCBs cause malignant

10    melanoma. Positive associations have been observed for non-Hodgkin

11    lymphoma and cancer of the breast. ... PCBs are carcinogenic to

12    humans ... ."[7]

13  27.    In addition, EPA concluded that PCBs are associated with serious non-

14    cancer health effects. From extensive studies of animals and primates using

15    environmentally relevant doses, EPA has found evidence that PCBs exert

16    significant toxic effects, including effects on the immune system, the

17    reproductive system, the nervous system and the endocrine system.

18  28.    PCBs are known to be toxic to a number of aquatic species and wildlife

19    including fish, marine mammals, reptiles, amphibians and birds. The

20    presence of PCBs can cause changes in community and ecosystem structure

21

22

23

24  [6] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

25

26  [7] International Agency for Research on Cancer. IARC monographs on the

27  evaluation of carcinogenic risks to humans, volume 107. Polychlorinated and Polybrominated Biphenyls (2015), available at

28  http://monographs.iarc.fr/ENG/Monographs/vol107/ (last accessed July 31, 2015).

1  and function.[8]

2  **B.    Monsanto Has Long Known of PCBs' Toxicity.**

29.  Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects.[9]

30.  An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[10]

31.  A September 20, 1955, memo from Emmet Kelly set out Monsanto's position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will happen if an individual developes [*sic*] any type of liver disease and gives a history of Aroclor exposure.  I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[11]

32.  On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

---

[8] *See* EPA, Understanding PCB Risks, available at http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAssessment (last accessed March 5, 2015).

[9] *See* Exhibits B, C and F.

[10] MONS 061332, attached as Exhibit B.

[11] MONS 095196-7, attached as Exhibit C.

---

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[12]

33. On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 [which contained PCBs] is just too toxic for use in a submarine."[13]

34. In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[14] Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[15] Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[16]

35. At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds. In a 1960 brochure, Monsanto promoted the use of Aroclors in transformers and capacitors, utility transmission lines, home appliances, electric motors, fluorescent light ballasts, wire or cable coatings,

---

[12] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.

[13] MONS 095640, attached as Exhibit E.

[14] *See* JDGFOX00000037-63, attached as Exhibit F.

[15] *Id.* at JDGFOX00000039.

[16] *Id.* at JDGFOX00000037.

---

Case: 4:23-cv-00204-HEA     Doc. #: 1-6     Filed: 02/20/23     Page: 126 of 299 PageID
#: 894
Case 3:15-cv-00578-WQH-JLB   Document 24   Filed 08/03/15   Page 10 of 26

1    impregnants for insulation, dielectric sealants, chemical processing vessels,
2    food cookers, potato chip fryers, drying ovens, thermostats, furnaces and
3    vacuum diffusion pumps.   Aroclors could also be used, the brochure
4    advertised, as a component of automotive transmission oil; insecticides;
5    natural waxes used in dental casting, aircraft parts, and jewelry; abrasives;
6    specialized lubricants; industrial cutting oils; adhesives; moisture-proof
7    coatings; printing inks; papers; mastics; sealant; caulking compounds; tack
8    coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers;
9    masonry coatings for swimming pools, stucco homes, and highway paints;
10   protective and decorative coatings for steel structures, railway tank and
11   gondola cars; wood and metal maritime equipment; and coatings for
12   chemical plants, boats, and highway marking.[17]

13  36.  A 1961 brochure explained that Monsanto's Aroclors were being used in
14       "lacquers for women's shoes," as "a wax for the flame proofing of
15       Christmas trees," as "floor wax," as an adhesive for bookbinding, leather,
16       and shoes, and as invisible marking ink used to make chenille rugs and
17       spreads.[18]

18  37.  Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were
19       being used in a variety of industrial, commercial, household, and consumer
20       goods.   Moreover, Monsanto affirmatively encouraged these uses by
21       encouraging salesmen to market products for these and other applications.

22  38.  Years later, in 1970, Monsanto tried to distance itself from the variety of
23       applications of Aroclors that it proudly espoused a few years before.  In a
24       press release, the company claimed: "What should be emphasized ... is that
25       PCB was developed over 40 years ago primarily for use as a coolant in

26

27  [17] The Aroclor Compounds (hand-dated May 1960), 0509822-66, attached as
     Exhibit S.

28  [18] Plasticizer Patter (February 1961), 0627503-21, attached as Exhibit T.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

electrical transformers and capacitors. It is also used in commercial heating and cooling systems. It is not a 'household' item."[19]

39. In 1975, William Papageorge, then Monsanto's manager of product acceptability, admitted that PCBs had been used in all types of products. Papageorge testified at a Public Hearing Before the Department of Natural Resources that "[t]he past uses [of PCBs] . . . were many and varied. . . . They go on and on. Virtually anything you can imagine, at one time or other, someone tried PCB's in them."[20]

## C. Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.

40. Monsanto also knew that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[21]

41. Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[22] The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the coast of Scotland. Jensen concluded that PCBs can "be presumed to be widespread throughout the world."[23]

---

[19] *See* Press release (July 16, 1970), MCL000647-50, attached as Exhibit V, at MCL000648.

[20] *See* Declaration of Kathleen L. Roach, Exhibit 43, (Document 681-43), *Appleton Papers, Inc. and NCR Corp. v. George A. Whiting Paper Co.*, Case 2:08-cv-00016-WCG (E.D. Wis.), attached as Exhibit W.

[21] *See* Exhibits G, H and L.

[22] New Scientist (Dec. 15, 1966), MONSFOX00003427, attached as Exhibit G.

[23] *Id.*

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

42. A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[24] The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species. The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

43. Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

44. On March 6, 1969, Monsanto Research Center employee W.R. Richard wrote a memorandum discussing Risebrough's article that criticized PCBs as a "toxic substance," "widely spread by air-water; therefore, an uncontrollable pollutant ... causing extinction of peregrine falcon ... [and] endangering man himself."[25] Richard explained that Monsanto could take steps to reduce PCB releases from its own plants but cautioned, "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper. In this applications exposure to consumers is greater and the disposal problem becomes complex."[26]

45. On September 9, 1969, W.R. Richard, by then a member of the newly-formed Aroclor "Ad Hoc" Committee, wrote an interoffice memo titled "Defense of Aroclor."[27] He acknowledged the role of Aroclor in water pollution: "Aroclor product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a long life." He noted

---

[24] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968), attached as Exhibit H.

[25] MONS 096509-096511, attached as Exhibit I.

[26] Id.

[27] DSW 014256-014263, attached as Exhibit J.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 06:14 PM

1    that Aroclors 1254 and 1260 had been found along the Gulf Coast of
2    Florida causing a problem with shrimp; in San Francisco Bay, where it was
3    reported to thin egg shells in birds; and in the Great Lakes. Richard advised
4    that the company could not defend itself against all criticism: "We can't
5    defend vs. everything. Some animals or fish or insects will be harmed.
6    Aroclor degradation rate will be slow. Tough to defend against. Higher
7    chlorination compounds will be worse [than] lower chlorine compounds.
8    Therefore we will have to restrict uses and clean-up as much as we can,
9    starting immediately."[28]

10   46.   On January 29, 1970, Elmer Wheeler of Monsanto's Medical Department
11         and Chairman of the Aroclor "Ad Hoc" Committee circulated laboratory
12         reports discussing results of animal studies. He noted: "Our interpretation
13         is that the PCB's are exhibiting a greater degree of toxicity in this chronic
14         study than we had anticipated. Secondly, although there are variations
15         depending on species of animals, the PCB's are about the same as DDT in
16         mammals."[29]

17   47.   In a PCB Presentation to Corporate Development Committee, Monsanto
18         expressed a desire to keep profiting from PCBs despite the environmental
19         havoc. The report suggests possible reactions to the contamination issue. It
20         considered that doing nothing was "unacceptable from a legal, moral, and
21         customer public relations and company policy viewpoint." But the option
22         of going out of the Aroclor business was also considered unacceptable:

26   [28] *Id.*

27   [29] MONS 098480, attached as Exhibit K.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1    "there is too much customer/market need and selfishly too much Monsanto

2    profit to go out."[30]

3    48.    Monsanto formed an "Aroclor 'Ad Hoc' Committee" to investigate the

4    pollution caused by PCBs. The Aroclor "Ad Hoc" Committee held its first

5    meeting on September 5, 1969. The committee's objectives were to

6    continue sales and profits of Aroclors in light of the fact that PCB "may be

7    a global contaminant."[31] The meeting minutes acknowledge that PCB has

8    been found in fish, oysters, shrimp, birds, along coastlines of industrialized

9    areas such as Great Britain, Sweden, Rhine River, low countries, Lake

10   Michigan, Pensacola Bay, and in Western wildlife. Moreover, the

11   committee implicated the normal use of PCB-containing products as the

12   cause of the problem: "In one application alone (highway paints), one

13   million lbs/year [of PCBs] are used. Through abrasion and leaching we can

14   assume that nearly all of this Aroclor winds up in the environment."[32]

15   49.    A month later, on October 2, 1969, the Committee reported extensive

16   environmental contamination. The Committee advised that Monsanto could

17   not protect the environment from Aroclors as "global" contaminants but

18   could protect the continued manufacture and sale of Aroclors:

19   The committee believes that there is little probability that any action
     that can be taken will prevent the growing incrimination of specific
20   polychlorinated biphenyls (the higher chlorinated -- e.g. Aroclors
     1254 and 1260) as nearly <u>global environmental contaminants</u> leading
21   to <u>contamination of human food</u> (particularly fish), the <u>killing of</u>
     <u>some marine species</u> (shrimp), and the possible extinction of several
22   species of fish eating birds.
23
24
25

26   [30] Ex. A at 058737.

27   [31] Ex. K at 030483.

28   [32] *Id.* at 030485.

PLAINTIFF'S FIRST AMENDED COMPLAINT – PAGE 14          **EXHIBIT 7**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent completely some environmental contamination.

There are, however, a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.[33]

50.   Monsanto's desire to protect its Aroclor profits rather than the environment is reflected in the Committee's stated objectives:

    1.   Protect continued sales and profits of Aroclors;
    2.   Permit continued development of new uses and sales, and
    3.   Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.[34]

51.   An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260: "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment." Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business." To that end, it says, "We want to avoid any situation where a customer wants to return fluid. ... We would prefer that the customer use up his current inventory and purchase [new products] when available. He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system. We don't want to take fluid back."[35]

---

[33] DSW 014612-014624, at 014615, attached as Exhibit M (emphasis added).

[34] Id. at 014614.

[35] MONS 100123-100124, attached as Exhibit N.

52. Instead of having customers return fluids, Monsanto instructed its customers to dispose of PCB containing material in local landfills, knowing that landfills were not suitable for PCB contaminated waste. Monsanto had determined that the only effective mothed of disposing of PCBs was incineration, and it constructed an incinerator for disposal of its own PCB contaminants. Nevertheless, as William Papageorge explained in his 1975 testimony before the Department of Natural Resources, Monsanto instructed its customers to dispose of PCB contaminated waste in landfills: "lacking that resource [a commercial incinerator], we have to reluctantly suggest, because we don't have a better answer, that they find a well operated, properly operated landfill and dispose of the material in that fashion."[36]

53. In 1970, the year after Monsanto formed the "ad hoc" committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

54. Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products. An interdepartmental task force concluded that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.[37]

55. After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than

---

[36] Exhibit W at 29.

[37] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976), available at http://nepis.epa.gov (search "560776001") (last accessed July 31, 2015).

Electronically Filed - St. Louis County - December 11, 2017 - 04:27 PM

1  had been originally realized."[38] To address these concerns, EPA undertook

2  a study to assess PCB levels in the environment on a national basis. That

3  study revealed widespread occurrence of PCBs in bottom sediments in

4  several states, including California.[39]

5  56.  EPA's study noted the particular burden on California.  "PCBs have

6  become a significant component of the marine food webs of southern

7  California," were found in sediments in the Santa Barbara Basin, and found

8  in high levels in the San Francisco Bay.[40]

### D.  Monsanto Concealed the Nature of PCBs from Governmental Entities.

57.  While the scientific community and Monsanto knew that PCBs were toxic

and becoming a global contaminant, Monsanto repeatedly misrepresented

these facts, telling governmental entities the exact opposite – that the

compounds were not toxic and that the company would not expect to find

PCBs in the environment in a widespread manner.[41]

58.  In a March 24, 1969 letter to Los Angeles County Air Pollution Control

District, Monsanto advised that the Aroclor compounds "are not particularly

toxic by oral ingestion or skin absorption."[42]  Addressing reports of PCBs

found along the West Coast, Monsanto claimed ignorance as to their origin,

explaining that "very little [Aroclor] would normally be expected either in

---

[38] *Id.* at 1.

[39] *Id.*, *passim*.

[40] *Id.* at 78-9.

[41] *See* Exhibits O-R (letters to governmental agencies).

[42] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969), attached as Exhibit O.

the air or in the liquid discharges from a using industry."[43]  A similar letter to the San Francisco Bay Regional Water Quality Control Board explained that PCB plasticizers (found in surface coatings, such as paints, industrial adhesives and window sealants), in normal use, present no special health problems" and that, "[i]n view of PCB's chemical inertness, we would anticipate no problems associated with the environment from refuse dumps."[44]

59.  In May 1969, Monsanto's Manager, Environmental Health, Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[45]

60.  Monsanto delivered the same message to the New Jersey Department of Conservation in July 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[46]  The letter then reiterates Monsanto's position regarding environmental contamination: "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would

---

[43] *Id.*

[44] Letter from Monsanto to State of California Resources Agency (March 27, 1969), attached as Exhibit P.

[45] Monsanto Memorandum to W.R. Richard (May 26, 1969), attached as Exhibit Q.

[46] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969), attached as Exhibit R.

Electronically Filed - St. Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St. Louis County - September 01, 2017 - 03:14 PM

be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[47]

61.   At the same time that Monsanto was downplaying the toxicity of PCBs and inevitable widespread contamination caused by PCBs, its Aroclor "Ad Hoc" Committee acknowledged that there was nothing that could be done to prevent PCBs from becoming a global contaminant leading to contamination of the food supply, injuring marine life and possibly leading to the extinction of certain bird species.  The committee reported on the probability of success of actions Monsanto might undertake to address the PCB problem and provided:

The committee believes there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls ... as nearly global environmental contaminants leading to the contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.[48]

62.   Moreover, the committee acknowledged that no course of action could be taken to prevent products containing PCBs from contaminating the environment, particularly waters and the marine environment.  The committee explained "the committee believes that there is no possible course of action that can so effectively police the uses of these PCB containing products as to prevent completely some environmental contamination."[48]  Further, the committee reported concern that vapor losses from PCB containing products likely results in contamination of an

---

[47] *Id.*

[48] DSW 014612-014624, at 014615, attached as Exhibit M.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1      aquatic environment because based on published reports "even minute
2      quantities of [PCB] vapors are eventually transferred to the water
3      environment and accumulated therein."[49]

4 63.   Exactly as Monsanto's committee had acknowledged, PCBs have become a
5      global contaminant and have accumulated in the waters of the Bay to the
6      point where they are a public nuisance and require remediation and
7      abatement.

8    **F.**    **The San Diego Bay is a 303(d) Impaired Body of Water for PCBs.**

9 64.   The Bay is one of the region's most widely used natural resources, and the
10      PCB contamination affects all San Diegans, who reasonably would be
11      disturbed by the presence of a hazardous, banned substance in the sediment,
12      water, and wildlife.

13 65.   PCBs (specifically, Aroclor compounds 1254 and 1260) have been found in
14      samples of sediments and water taken from the Bay at varying times and
15      locations, requiring substantial remediation work and cost. In addition,
16      PCBs have been identified in tissues of fish and lobster in the Bay.

17 66.   PCBs are identified as a Primary Chemical of Concern ("COC") in
18      California Regional Water Quality Control Board, San Diego Region
19      ("Regional Water Board") Cleanup and Abatement Order ("CAO") No. R9-
20      2012-0024, dated March 14, 2012, which directed the City to, among other
21      things, remediate PCB contaminated sediments within a discrete area
22      known as the Shipyard Sediment Site.

23 67.   Other areas of PCB deposition and impacts have been located, and it is
24      probable that the Regional Water Board may order remediation of PCB
25      contaminated sediments in other areas.

26

27 _____

28 [49] *Id.* at DWS 014618.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

68.   The Regional Water Board estimated human health risks due to the consumption of PCB contaminated fish tissue found in the Bay and employed human fish consumption rates and bioaccumulation factors in the analysis.

69.   The Regional Water Board also concluded that human ingestion of seafood caught within certain assessment areas can significantly increase cancer risk, specifically identifying PCBs as a carcinogenic chemical.

70.   PCBs have entered the Bay through various sources.  PCBs leach from landfills and are found in commercial and industrial waste water as a result of Monsanto's directions to its customers on proper disposal methods when it knew, in fact, that disposal of PCBs in landfills was not proper.  PCBs also leach out of paints, caulk, sealants and other applications and are transported by air and water to the Bay.  Plaintiff also manages and operate a municipal stormwater system, which collects and transports stormwater to be discharged into the Bay.  In order to discharge stormwater into the Bay, Plaintiff is required to receive a Municipal Regional Stormwater Permit from the Regional Water Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act.

71.   As former and current trustees of the Bay, and as stormwater dischargers into the Bay, Plaintiff has spent substantial amounts of money to limit the amount of PCBs in the Bay.  Plaintiff will also likely continue to incur costs to remove PCBs from the Bay and to keep PCBs from entering the Bay for the foreseeable future.

72.   PCBs were not only a substantial factor in causing the City to incur costs and damages, but PCBs were also the primary driving force behind the need to clean up and abate the Shipyard Sediment Site.  Without abatement of the health hazard caused by PCBs in the Bay, Plaintiff will continue to suffer injuries and damages.

73. Monsanto's conduct, as set forth above, was committed with malice, oppression and/or fraud, as those terms are defined in Civil Code § 3294. Monsanto's conduct was despicable and in conscious disregard to the rights and safety of others, including Plaintiff. Monsanto's despicable conduct has subjected unjust hardship in conscious disregard to Plaintiff, who is the former trustee of waters, sediments, and tideland properties in and surrounding the Bay. Defendants intentionally misrepresented and concealed material facts from governmental entities in the state with the intent of causing injury. In addition to Plaintiff's entitlement to actual damages and request for abatement, Plaintiff is entitled to recover exemplary damages.

**FIRST CAUSE OF ACTION**

**CONTINUING PUBLIC NUISANCE**

74. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

75. Monsanto manufactured, distributed, marketed and promoted PCBs in a manner that created or participated in creating a continuing public nuisance that is harmful to health and obstructs the free use of the Bay. Monsanto also directed its customers and the public to dispose of PCB containing materials improperly, resulting in PCBs leaching from landfills and entering the Bay.

76. The presence of PCBs interferes with the comfortable enjoyment of the Bay for its customary uses for commercial and sport fishing, swimming and other water activities.

77. The presence of PCBs interferes with the free use of the Bay for the promotion of commerce, navigation and fisheries.

78. The presence of PCBs interferes with the free use of the Bay for ecological preservation and habitat restoration.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

79. The San Diego Bay is listed as impaired due to PCB, pursuant to the Clean Water Act and the 303(d) list.

80. The Regional Water Board found that the contamination at the Shipyard Sediment Site meets all three criteria for a "nuisance" as defined by California Water Code section 13050 (m) because it: (1) is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal; and (3) occurs during, or as a result of, the treatment or disposal of wastes.

81. The presence of PCBs adversely affects the quality of water in the Bay and causes inconvenience and annoyance to Plaintiff, who has been required to incur costs in order to protect plant and animal life, and their presence.

82. The condition affects a substantial number of people who use the Bay for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

83. An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals and humans and degrade water quality and destroy marine habitats.

84. The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

85. Plaintiff has suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and Plaintiff has incurred substantial costs deriving from state-mandated PCB clean-up. In addition, the City is obligated to pay for certain remediation of the Shipyard Sediment Site pursuant to the March 14, 2012 CAO.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

86. Plaintiff did not consent to the conduct that resulted in the contamination of the Bay.

87. Monsanto's conduct was a substantial factor in causing the harm to the City and Port District. Without an abatement of the nuisance created by Monsanto, Plaintiff will continue to suffer injuries, and the hazards caused by PCBs will continue.

88. Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in the Bay. Monsanto knew that PCBs would leach out of products and escape into the environment, that there was no way to contain PCBs and prevent such escape, and that PCBs would accumulate in an aquatic environment like the Bay. Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals. In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and knew that humans may be exposed to PCBs through ingestion and dermal contact. As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters. Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

89. As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiff has suffered and continues to suffer actual damages and injuries to property requiring abatement and other costs to be determined at trial.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

## SECOND CAUSE OF ACTION

## EQUITABLE INDEMNITY

90. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

91. Monsanto is responsible for creating a continuing public nuisance by manufacturing, distributing, and promoting PCBs, resulting in contamination of water, soil, and sediment in and around the Bay.

92. Monsanto's creation of the public nuisance is a substantial factor in causing Plaintiff's injury.

93. The conduct of the City did not contribute in any way to the creation of the public nuisance.

94. The Regional Water Board has required the City, however, to remediate PCB-contaminated sediments from the Shipyard Sediment Site and may require further remediation of other areas. The City has incurred and will incur costs to remove PCBs from the Bay pursuant to the Board's order.

95. Monsanto must reimburse the City for its costs of complying with the Board's remediation order.

## PRAYER FOR RELIEF

Plaintiff prays for judgment that Defendants are liable to the City, jointly and severally, for creation of the public nuisance and must pay as follows:

1) Any and all compensatory damages according to proof including, but not limited to, all past and future costs and expenses related to the investigation, remediation, and removal of PCBs from in and around the Bay;

2) An order that Defendants pay for establishment of a fund used by the City to abate the public nuisance created by the presence of PCBs in and around the Bay, including remediating all PCB contamination in the Shipyard Sediment Site and other areas;

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

1      3) Punitive damages;

2      4) Litigation costs and attorney's fees as provided by law;

3      5) Pre-judgment and post-judgment interest;

4      6) Any other and further relief as the Court deems just, proper, and

5          equitable.

6                    **DEMAND FOR JURY TRIAL**

7      Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the

8  Federal Rules of Civil Procedure.

9

10 Dated: August 3, 2015                    Respectfully submitted,

11

12
                                   By: s/ Carla Burke
13                                 **BARON & BUDD, P.C.**
                                   Scott Summy (admitted Pro Hac Vice)
14                                 Carla Burke (admitted Pro Hac Vice)
                                   Celeste Evangelisti (SBN 225232)
15

16
                                   **GOMEZ TRIAL ATTORNEYS**
17                                 John H. Gomez (SBN 171485)
                                   John P. Fiske (SBN 249256)
18

19                                 **OFFICE OF THE CITY ATTORNEY**
                                   JAN I. GOLDSMITH, City Attorney
20                                 California State Bar No. 70988
21                                 DANIEL F. BAMBERG,
                                   Assistant City Attorney
22                                 California State Bar No. 60499
23                                 PAUL F. PRATHER, Deputy City Attorney
                                   California State Bar No. 252985
24

25                                 *Attorneys for the City of San Diego*

26

27

28

                    PLAINTIFF'S FIRST AMENDED COMPLAINT - PAGE 26        **EXHIBIT 7**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

TOWN OF WESTPORT and )
WESTPORT COMMUNITY SCHOOLS, )
         )
    Plaintiffs, )
         )     C.A. No. 1:14-CV-12041-DJC
v. )
         )     **Leave to file granted on May 9, 2016**
MONSANTO COMPANY, )
SOLUTIA INC., and )
PHARMACIA CORPORATION, )
         )
    Defendants. )

## PLAINTIFFS' FIRST AMENDED COMPLAINT

### INTRODUCTION

1.      Plaintiffs Town of Westport ("Town") and Westport Community Schools ("Westport")

own and operate public schools and buildings in Westport, Massachusetts. Westport has

detected toxic chemical compounds identified as Aroclor 1248 and Aroclor 1254 in the window

caulk, glazing, and ceiling mastic adhesive present in Westport Middle School.

2.      Defendant Monsanto Company made Aroclors 1248 and 1254, plasticizers unique to, and

trademarked by, Monsanto for use in caulks and paints, among other products.

3.      Aroclors 1248 and 1254 are dangerous because they were formulated and designed with

polychlorinated biphenyls ("PCBs"), compounds that cause a variety of adverse health effects.

Exposure to Aroclors 1248 and 1254 is associated with cancer and a variety of serious non-

cancer health effects including effects on the immune system, reproductive system, nervous

system, endocrine system and other health effects.

4.      Wherever Aroclor 1248 or 1254 is used as plasticizers, the PCBs easily escape into the

atmosphere through the normal, intended uses of products that contain these Aroclors. PCBs

**EXHIBIT 8**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

migrate out of their original source products, including Aroclors 1248 and 1254 used to plasticize caulks and paints, and contaminate air, dust, and adjacent substrate materials, causing extensive property damage and presenting an exposure risk for teachers, students, and employees who occupy contaminated classrooms.

5.    This Complaint generally refers to Aroclor plasticizers made with PCBs as "PCB-Aroclors."

6.    As a result of their propensity to migrate out of products that used PCB-Aroclors, PCBs have become a near global environmental contaminant. To stem the contamination, to prevent health risks associated with exposure to PCBs, and for other reasons, Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979. The Act forbids the continued use of in-place caulk or paint that contains PCBs at a concentration above 50 parts per million ("ppm").

7.    The Plaintiffs seek damages for the costs of investigating, removing toxic Aroclors 1248 and 1254 compounds, remediating all Aroclors 1248 and 1254 contamination, and other damages resulting from the contamination of their school buildings and properties.

## PARTIES

8.    Westport is a school district that operates public schools in the Town of Westport. The district has detected Aroclors 1248 and 1254 in one of its school buildings. In Massachusetts, a school district is a body politic with the power to sue and be sued as provided by Mass. G.L. ch. 71, § 16. School districts are authorized to construct, maintain, renovate, remodel, and repair school buildings. *Id.*

EXHIBIT 8

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 03:14 PM

9.      The Town has a property interest in buildings used by the school district as schools. The Town also has the financial obligation for investigation and remediation activities conducted at school buildings. A town may sue and be sued as provided by Mass. G.L. ch. 40, § 2.

10.     Plaintiffs are located in Westport, Massachusetts.

11.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

12.     Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

13.     Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to Old Monsanto) is a Delaware LLC with its principal place of business in Peapack, New Jersey. Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

14.     The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceuticals and nutrition business, and a chemical products business. Old Monsanto began manufacturing Aroclor plasticizers in the 1930s and continued to manufacture them until the late 1970s.

15.     Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations. The corporation now known as Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

16.     Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.

**EXHIBIT 8**

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 146 of 299 PageID
Case 1:14-cv-12041-DJC   Document 119   Filed 05/10/16   Page 4 of 27
#: 914

Electronically Filed - St. Louis County - December 11, 2017 - 04:27 PM

17.    Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto

Company) for certain liabilities related to the chemicals business, Defendants have entered into

agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims

arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.

18.    In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S.

Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's

Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements

under which Monsanto continues to manage and assume financial responsibility for certain tort

litigation and environmental remediation related to the Chemicals Business.

19.    Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as

"Defendants."

## JURISDICTION AND VENUE

20.    This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists

between Plaintiffs and Defendants. Each Plaintiff is a citizen of Massachusetts, but no

Defendant is a citizen of Massachusetts. Monsanto is a Delaware corporation with its principal

place of business in St. Louis, Missouri. Solutia is a Delaware corporation with its principal

place of business in St. Louis, Missouri. Pharmacia is a Delaware limited liability company with

its principal place of business in Peapack, New Jersey.

21.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a)

because a substantial part of the property that is the subject of the action is situated in this

judicial district.

**EXHIBIT 8**

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 147 of 299 PageID
Case 1:14-cv-12041-DJC    Document 119    Filed 05/10/16    Page 5 of 27
#: 915

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

## FACTUAL ALLEGATIONS

22.    A plasticizer is a commercial product that adds flexibility and other qualities to plastic and other materials. Plasticizers are not natural raw materials but commercial products that companies including Monsanto synthesized specifically for their plasticizing properties.

23.    Monsanto developed an expansive line of plasticizers, some of which were known by the trade name "Aroclors." Although the majority of Monsanto's plasticizers did not contain PCBs, at least ten of the Aroclor products were made with PCBs. These include Aroclor 1016, 1221, 1232, 1242, 1248, 1254, 1260, 1262, 1268, and 1270. The specific products at issue in this case are Aroclors 1248 and 1254, PCB-containing plasticizer products unique to, and trademarked by, Monsanto.

24.    Between approximately 1950 and 1970, Monsanto promoted and sold PCB-Aroclors, including Aroclors 1248 and 1254, for formulators to use in window caulks, paints, sealants, and mastics for the construction and renovation of buildings throughout the United States.

25.    In addition to developing plasticizers, Monsanto created the Plasticizer Council to recommend particular plasticizers to formulators for specific applications. The company instructed formulators in product selection, formulation, use, and applications. Monsanto would also formulate a particular plasticizer for a customer's needs.

26.    Upon information and belief, it was Monsanto --- and not the formulator --- that decided whether that formulator would use a PCB-Aroclor or a non-PCB plasticizer.

27.    Only Monsanto, and not the formulators, had full knowledge of the risks of using Aroclors 1248, 1254 and other PCB-Aroclors.

**EXHIBIT 8**

Electronically Filed – St Louis County – December 11, 2017 - 04:27 PM

28.    Monsanto did not market plasticizers to formulators as "PCBs" but as "Aroclors." The marketing materials neither disclose which Aroclors contained PCBs nor explain the properties and potential risks of using plasticizers containing PCBs.

29.    Although Monsanto eventually withdrew PCB-containing plasticizers from the market in 1970, the company never advised either the formulators or the foreseeable users of plasticizer-containing products of the dangers of PCBs or attempt to recall the products. In fact, Monsanto continued to urge customers to purchase PCB-Aroclors until the very end of production, even encouraging them to stockpile product for use after production ceased. Accordingly, PCB-containing products are likely to remain present in any number of materials present in a school built or renovated during this period.

30.    Because PCBs are highly volatile, they evaporate out of whatever products contain them.

31.    Plasticizer applications are known as "open uses" or "open systems" because no physical barrier prevents PCBs from direct contact with the surrounding environment. In open uses, Aroclors 1248 and 1254 readily shed PCBs. These PCBs then migrate into and contaminate surrounding materials including "adjacent substrates" such as masonry, wood, drywall, and soil. PCBs also contaminate the air, dust, and indoor surfaces. Caulks, paints, sealants, and mastics are "open uses." The caulks, paints, sealants, and mastics that contain PCB-Aroclors in the Westport schools are "open uses."

32.    PCB-Aroclors including Aroclor 1254 were also occasionally used in the electrical capacitors attached to fluorescent lights. Because the PCB-Aroclor in that application is contained within the hardware, this is considered an "enclosed use" or "closed system." Despite the physical enclosure of the Aroclor, PCBs can leak from light fixtures and similarly contaminate and damage surrounding materials.

EXHIBIT 8

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 149 of 299 PageID
#: 917
Case 1:14-cv-12041-DJC    Document 119    Filed 05/10/16    Page 7 of 27

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

33.    The Environmental Protection Agency ("EPA") conducted research of PCBs in school

buildings and confirmed that emissions from PCB-Aroclors including 1254 in caulk and

fluorescent light ballasts cause elevated PCBs in the surrounding air.

34.    EPA concluded that some building materials (*e.g.*, paint and masonry walls), adjacent

substrates, and indoor dust can absorb PCB emissions and become potential secondary sources of

contamination that begin emitting PCBs on their own.

**EXPOSURE TO PCBs IS ASSOCIATED WITH SERIOUS HEALTH EFFECTS**

35.    The emissions of PCBs from PCB-Aroclors including 1248 and 1254 and resulting

contamination of school buildings poses serious health risks to building occupants including

students, teachers, other employees, and visitors.

36.    PCBs can enter the human body through ingestion, inhalation, and dermal contact.

37.    Children, teachers, and employees who work in school buildings may inhale PCBs that

are emitted into the air from Aroclors 1248 and 1254 in caulk, paint, light ballasts, and other

secondary sources.   They may also ingest PCBs that are emitted into air and settle onto surfaces

that come into contact with food or drinks.  And they may absorb PCBs from physical contact

with Aroclor 1248- and 1254-containing materials, secondary sources, or surfaces that have

become contaminated by air or dust.

38.    Any exposure is a concern to a reasonable school district because Aroclors 1248 and

1254 and PCBs are associated with serious health risks.

39.    In 2015, the International Agency for Research on Cancer (IARC) published Monograph

107, finding that sufficient scientific exists to conclude that PCBs are carcinogenic to humans.

The United States EPA has likewise determined that the PCBs in Monsanto's PCB-Aroclors are

probable human carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data

**EXHIBIT 8**

related to Aroclors 1016, 1242, 1254, and 1260. EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

40.    In addition, EPA concluded that PCBs are associated with serious non-cancer health effects. From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system, and the endocrine system.

41.    PCBs affect the immune system by causing a significant decrease in the size of the thymus gland, lowered immune response, and decreased resistance to viruses and other infections. The animal studies were not able to identify a level of PCB exposure that did not affect the immune system. Human studies confirmed immune system suppression.

42.    Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs. Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and reduced sperm counts.

43.    Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning. Some of these studies were conducted using the types of PCBs most commonly found in human breast milk.

44.    PCBs may also disrupt the normal function of the endocrine system. PCBs have been shown to affect thyroid hormone levels in both animals and humans. In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing.

EXHIBIT 8

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

PCB exposures have also been associated with changes in thyroid hormone levels in infants in studies conducted in the Netherlands and Japan.

45.    PCBs have been associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

46.    Children may be affected to a greater extent than adults. The Agency for Toxic Substances and Disease Registry explained: "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs."

47.    Even unborn infants and future generations may be affected by a exposure to PCBs. Prenatal exposure to low doses of PCBs can change the developing brain in an area involved in metabolism, and some effects are apparent even two generations later. These changes may affect body weight, hormones and hypothalamic gene expression.

48.    Monsanto's internal documents show that Monsanto knew that PCB-Aroclors were toxic as early as the 1930s.

49.    A 1937 memorandum reflects the company's knowledge that studies of animal exposure by inhalation or ingestion led to systemic toxic effects.

50.    Monsanto specifically advised against exposure to airborne PCB-Aroclor vapors in the 1940s.

51.    Emmet Kelly, Monsanto's Medical Director, acknowledged in 1955 that the company knew that PCB-Aroclors are toxic. Later that year, Monsanto's Medical Department advised that

EXHIBIT 8

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

workers should not be allowed to eat lunch in the Aroclor department because these compounds are quite toxic by ingestion or inhalation.

52.      Monsanto's potential customers also reported the results of their own toxicity studies to the company. After conducting its own tests, the U.S. Navy decided against using Monsanto's PCB-Aroclors because the Navy felt them too toxic for use in submarines.

53.      In 1966, Kelly reviewed and did not dispute a presentation that referred to a 1939 study associating PCBs with the deaths of three young workers and concluding that pregnant women and persons who have at any time had any liver disease are particularly susceptible to their effects.

**PCBs CANNOT BE CONTAINED IN PLASTICIZERS**

54.      Monsanto's documents also show that the company knew that Aroclors emitted PCBs that could not be contained in products or applications and recognized that, as a result, PCBs were becoming a widespread environmental contaminant.

55.      In the early 1950s, Monsanto became aware that research indicated that Aroclors volatilized out of indoor paints plasticized with PCB-Aroclors, resulting in vapor concentrations that exceeded safe levels. Based on this evidence, Monsanto acknowledged that "[t]here must clearly be circumstances under which the use of Aroclor containing paints will constitute a health hazard," and recognized the need to test each paint for safety before distributing it freely for household use. Monsanto had specifically "barred" the use of certain PCB-Aroclors as plasticizers intended for use in indoor home paints for these reasons.

56.      The company's own testing of paint plasticized with Aroclor 1248 provided evidence that airborne PCB concentrations persisted for at least a month. Monsanto also recognized that using

**EXHIBIT 8**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

such a paint over a large area could create a hazardous condition, especially considering the long exposure to these concentrations.

57.    Monsanto was also aware by the mid-1960s that PCBs were becoming a major environmental contaminant due, in large part, to the use of PCB-Aroclors as plasticizers. A Monsanto consultant advised that a substantial percentage of the PCB used in plasticizers and other products escapes into the environment. He urged the company to stop using PCBs in Aroclor plasticizers: "it seems to the writer that the evidence regarding PCB effects of environmental quality is sufficiently substantial, widespread, and alarming to require immediate corrective action on the part of Monsanto."

58.    Despite the clear knowledge of the dangers posed by selling PCB-Aroclors as plasticizers, Monsanto did not immediately discontinue the sale of these products, recall the products, and ensure that no additional PCB-Aroclors be used in open systems. Rather, Monsanto continued to manufacture, market, promote, and sell these plasticizers for several more years to maximize profits. Had Monsanto stopped selling these products when it unquestionably became aware of the risks --- *i.e.*, by the mid-1960s --- the Westport school would not be contaminated.

59.    Monsanto's Aroclor Ad Hoc Committee held its first meeting on September 5, 1969. The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant." The meeting minutes acknowledge that PCB-containing products rapidly contaminate the environment and specifically implicate highway paints: "In one application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."

EXHIBIT 8

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

60.    The Committee reported in 1969 significant vapor losses from plasticizers used in paints and caulks. One employee recognized that releases from end uses would result in greater consumer exposure.

61.    Still, the Committee identified a number of actions to prolong the manufacture, sale, and use of PCB-containing Aroclors.

62.    By May 1970, Monsanto internally admitted that the potential harm to human health and the environment required that they no longer sell PCB-Aroclors (including Aroclors 1248 and 1254) for open uses including paints, caulks, and sealants.

63.    Despite this decision, however, the company continued to sell these Aroclors until August 1970.

64.    In 1970, after Monsanto had acknowledged the catastrophic problem of PCB contamination and exposure, PCB production in the United States peaked at 85 million pounds.

65.    During the summer of 1970, Monsanto encouraged its customers to stockpile these plasticizers to use after that date.

66.    Monsanto urged a customer in Cambridge, Massachusetts to "stock up" on sufficient quantities of Aroclor 1200 series products to cover its needs for up to two years. Monsanto was aware that another customer stockpiled enough Aroclor 1254 to last through 1971.

67.    At the same time, Monsanto began trying to downplay the ubiquity of PCB-Aroclors that remain present in open uses, like caulk and paint. In a press release, the company claimed: "What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors. It is also used in commercial heating and cooling systems. It is not a 'household' item."

**EXHIBIT 8**

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 155 of 299 PageID
Case 1:14-cv-12041-DJC    Document 119    Filed 05/10/16    Page 13 of 27
#: 923

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

68.    At no point did Monsanto contradict this statement by alerting foreseeable users of

plasticizer-containing products, including Plaintiffs, that PCB-Aroclors could be found in "open"

use building materials, including paint and caulk, and could cause contamination and property

damage. Plaintiffs would have acted on this alert had they received it.

69.    As a result, Aroclor 1248 and 1254 products remain in use in schools and buildings

across the United States, notwithstanding the ban.

**LEGAL AND REGULATORY STANDARDS APPLICABLE TO PCBs**

70.    Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the

manufacture and most uses of all PCB-containing products as of January 1, 1979.

71.    More than thirty years passed before EPA announced that homes, schools, and other

commercial buildings may have been built with PCB-containing materials. In a press release

issued on September 25, 2009, EPA advised that although PCBs were banned by 1979, they

remained in place in buildings that were constructed before the ban.

72.    On December 12, 2013, EPA issued a press release advising that PCB-containing

fluorescent light ballasts that were installed prior to the ban may still be in use in schools and

may leak PCBs.

73.    EPA has held that allowing caulk or paint with a PCB concentration over 50 ppm to

remain in place is prohibited "use" under TSCA.

74.    EPA has not issued any information regarding possible PCB-Aroclor contamination in

schools in Massachusetts.

75.    The Massachusetts Department of Environmental Protection has not issued any

information regarding possible PCB-Aroclor contamination in schools in Massachusetts.

**EXHIBIT 8**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## PLAINTIFFS' SCHOOL BUILDINGS ARE CONTAMINATED WITH PCB-PLASTICIZERS

76.     Plaintiff Westport operates a public school system in the Town of Westport, Massachusetts.

77.     Westport Middle School was built in 1969. In May 2011, dangerous levels of Aroclors 1248 and 1254 were detected at Westport Middle School, necessitating removal and remediation.

78.     The primary sources were identified as interior window glazing compound, interior and exterior door caulking, exterior window caulking, and interior ceiling mastic adhesive, all of which were sampled and found to contain Aroclors 1248 and/or 1254.

79.     The school also detected Aroclors 1248 and 1254 in nearby substrate materials including brick masonry, concrete columns, beams, interior brick, and concrete sidewalks.

80.     Aroclor 1254 was also detected in the soil adjacent to exterior masonry walls.

81.     Aroclor 1254 was detected in indoor dust samples taken from interior floors, interior window sills, and various indoor surfaces in the kitchen, cafeteria, guidance office, hallways, and boys locker room.

82.     By 1969, when the school at issue was built, Monsanto had accumulated decades of evidence that PCB-Aroclors were toxic to humans, that PCBs would volatilize out of Aroclors 1248 and 1254 used in indoor paints and caulks reaching dangerous levels in indoor air, that PCBs would migrate onto and contaminate nearby materials causing property damage, and that occupants of buildings would be exposed to potentially dangerous levels of PCBs.

83.     In fact, the company had actual knowledge about the dangers associated with the use of PCB-Aroclors in paints.


### FIRST CAUSE OF ACTION

EXHIBIT 8

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 157 of 299 PageID
#: 925
Case 1:14-cv-12041-DJC    Document 119    Filed 05/10/16    Page 15 of 27

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 03:14 PM

## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY DEFECTIVE DESIGN

84.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding

paragraphs as if fully restated in this cause of action.

85.     Monsanto created a line of commercial plasticizer products including Aroclors 1248 and

1254. Although Aroclors 1248 and 1254 were made with PCBs, Monsanto made Aroclor

plasticizers that did not contain PCBs. As a large and sophisticated chemical company,

Monsanto was in the business of producing, making, fabricating, constructing, designing,

marketing, and selling PCB-containing Aroclors for placement into trade or commerce.

86.     All of Monsanto's Aroclor plasticizers were manufactured for placement into trade or

commerce.

87.     Monsanto marketed and sold PCB-Aroclors as commercial plasticizers for incorporation

into other products, including those for "open use" applications in schools and other buildings.

88.     Monsanto was heavily involved in determining which plasticizer to sell to a formulator

for a particular use. Monsanto recognized that "even the most experienced formulator is

bewildered by the maze of possibilities from which to select" a plasticizer "for his particular

application" and advertised that its Plasticizer Council provided "much more than simply the

products;" it also provided "expert guidance in their use." The Council studied applications in

its laboratory and recommended specific plasticizers to its customers.

89.     Monsanto alone controlled the formulation of its plasticizer products and determined

which ones would contain PCBs and which would not.

90.     Monsanto also provided advice and recommendations as to whether PCB-Aroclor

plasticizer should be used in a particular formulator's application.

EXHIBIT 8

91.    Monsanto's customers used the plasticizers in the intended manner and in a substantially
unchanged way.

92.    As a manufacturer, Monsanto owed a duty to all persons whom its products might
foreseeably harm, including Plaintiffs, not to market any product which is unreasonably
dangerous in design for its reasonably anticipated use.

93.    By manufacturing and selling PCB-Aroclors, Monsanto warranted that those plasticizers
are merchantable, safe, and fit for ordinary purposes.

94.    Monsanto breached that warranty as PCB-containing plasticizers are unreasonably
dangerous for their reasonably anticipated uses in school buildings for the following reasons:

      a.    Monsanto selected a plasticizer for a formulator's needs without disclosing
          whether that plasticizer was a PCB-Aroclor;

      b.    Monsanto did not advise the formulators regarding which Aroclor plasticizers
          contained PCBs and which did not;

      c.    When PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are used in
          open applications, the PCB compounds readily volatilize out of the original
          application;

      d.    PCB volatilization begins soon after the Aroclor-containing product is installed or
          put into use;

      e.    Once volatilized, PCBs migrate to and contaminate adjacent materials, dust, air,
          interior surfaces, exterior surfaces, and soil;

      f.    PCBs can then volatilize out of these materials and contaminate still other
          materials;

EXHIBIT 8

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 159 of 299 PageID
#: 927
Case 1:14-cv-12041-DJC   Document 119   Filed 05/10/16   Page 17 of 27

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

g.  When PCBs volatilize, building occupants including students, teachers,

employees, and visitors may be exposed to PCBs via inhalation, ingestion, and

dermal contact;

h.  PCB is human and animal carcinogen and is associated with other serious health

risks;

i.  PCB exposure may be halted and prevented only by physical removal of the

original PCB-Aroclors and any secondary materials that have become

contaminated;

j.  Because remediation involves removal of all damaged property, it can require

removal of building materials such as interior walls and brick that were not made

with PCB-Aroclors;

k.  Such remediation is extremely expensive to undertake, disrupts normal classroom

activities, and may cause undue concern on the part of students, teachers, school

employees, and parents.

95.    Monsanto knew of these risks associated with PCB-Aroclor plasticizers, including

Aroclors 1248 and 1254, and failed to use reasonable care in the design of its plasticizer

products.

96.    PCB-Aroclor plasticizers for open uses, including Aroclors 1248 and 1254, pose greater

dangers to school buildings than would be expected by ordinary persons such as Plaintiffs,

schoolchildren, teachers and employees, and the general public.

97.    At all times, Monsanto and other companies made plasticizers that did not contain PCBs.

These were reasonable alternative designs capable of preventing the Plaintiffs' damage.

**EXHIBIT 8**

98.    The risks posed by PCB-Aroclors far outweigh the products' utility as plasticizers in indoor applications.

99.    The likelihood that PCBs would migrate out of Aroclor plasticizers, including Aroclors 1248 and 1254, and contaminate Plaintiffs' property and the gravity of that damage far outweighed any burden on Monsanto to adopt an alternative design and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

100.    The PCBs began to volatilize and migrate of their applications shortly after the products were installed or applied. The migration contaminated underlying and adjacent materials while the paint, caulk, and other plasticizer-containing materials remained intact and performed their intended functions.

101.    Plaintiffs' buildings were contaminated by Aroclors 1248 and 1254 after their application in paint or caulk when the Westport Middle School building was constructed in 1969. The contamination began while the paint or caulk was in its useful safe life.

102.    Monsanto also fraudulently concealed information about PCB-Aroclors' dangers in open uses in school and other buildings.

103.    At least twenty years before the Westport Middle School was constructed, Monsanto had actual knowledge that the use of PCB-Aroclors in paints resulted in air concentrations that exceeded the accepted safe maximum for continuous exposure. By the mid-1950s, Monsanto acknowledged that the use of Aroclor paints will constitute a health hazard in some circumstances. The company also had actual knowledge that exposure to airborne Aroclors 1248 and 1254, the plasticizers used in Westport, caused injury to test animals and led to the conclusion that a painted room could be hazardous.

**EXHIBIT 8**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

104.    Monsanto also had actual knowledge that PCB-Aroclors emanated out of open uses causing contamination. It knew, too, that plasticizer use and volatilization represented a substantial percentage of the contamination found in the environment.

105.    Despite the company's growing awareness of the dangers of open-use plasticizers containing PCBs, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite – that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner.

106.    In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."

107.    A similar letter to the San Francisco Bay Regional Water Quality Control Board explained that PCB plasticizers (found in surface coatings, such as paints, industrial adhesives and window sealants), in normal use, present no special health problems."

108.    In May 1969, Monsanto's Manager, Environmental Health, Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."

109.    Monsanto delivered the same message to the New Jersey Department of Conservation in July 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic." The letter then reiterates Monsanto's position regarding environmental contamination: "We are unable at this time to conceive of how the PCBs can become wide spread in the environment."

**EXHIBIT 8**

110.    One year later, in a letter to Congressman William Ryan dated April 28, 1970, Monsanto disclaimed all potential human health threats and misrepresented the risk facing occupants of schools and other buildings where plasticizers remained in open uses: "It should be emphasized that the apparent PCB problem relates only to the possible effects on some species of birds. Manufacturing and use experience for thirty years, earlier animal toxicity studies, and the interim reports on current extensive toxicological studies with various species of animals indicate that there is no threat to the public health."

111.    Monsanto, thus, had actual knowledge of and misrepresented the very dangers alleged here --- the volatilization of PCBs from plasticizers in open-use applications. And knew of and concealed these dangers before the Westport Middle School was constructed.

112.    Had Plaintiffs known of these dangers, they would not have purchased products containing PCB-Aroclor plasticizers.

113.    Plaintiffs relied on Monsanto's implied warranty that their PCB-Aroclor plasticizers were safe for open use applications.

114.    As a direct and proximate result of Monsanto's unreasonably dangerous design, manufacture, and sale of PCB-Aroclor plasticizers, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

115.    Monsanto knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of commercial and school properties. Monsanto committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

EXHIBIT 8

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## SECOND CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF
### MERCHANTABILITY FAILURE TO WARN

116.   Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

117.   As a manufacturer of PCB-Aroclor plasticizers, Monsanto had a duty to provide adequate warnings of the risks of these products to all persons whom its product might foreseeably harm, including Plaintiffs, the public, and public officials.

118.   PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are unreasonably dangerous for their reasonably anticipated use in school buildings for the following reasons:

> a.   When PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are used in open applications, the PCB compounds readily volatilize out of the original application;

> b.   PCB volatilization begins soon after the plasticizer-containing product is installed or put into use;

> c.   Once volatilized, PCBs migrate to and contaminate adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;

> d.   PCBs can then volatilize out of these secondary materials and contaminate still other materials;

> e.   When PCBs volatilize, building occupants including students, teachers, employees, and visitors may be exposed to PCBs via inhalation, ingestion, and dermal contact;

> f.   PCB is human and animal carcinogen and is associated with other serious health risks;

**EXHIBIT 8**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

g.  PCB exposure may be halted and prevented only by physical removal of the
    original PCB-Aroclor products and any secondary materials that have become
    contaminated;

h.  Because remediation involves removal of all damaged property, it can require
    removal of building materials such as interior walls and brick that were not made
    with PCB-plasticizers;

i.  Such remediation is extremely expensive to undertake, disrupts normal classroom
    activities, and may cause undue concern on the part of students, teachers, school
    employees, and parents.

119.    Monsanto knew of the health and property damage risks associated with PCB-Aroclor
plasticizers, including Aroclors 1248 and 1254, and failed to provide a warning that would lead
an ordinary reasonable user or handler of a product to contemplate the dangers associated with
PCB-Aroclor plasticizers or an instruction that would have allowed Plaintiffs to avoid the
damage to their property.

120.    Despite Monsanto's knowledge of the presence of PCB-Aroclor plasticizers that remain
present in "open uses" in commercial buildings and schools nationwide, including Aroclors 1248
and 1254, Monsanto has not issued any warning, instruction, recall, or advice regarding PCB-
containing products to schools, communities, parents, or governmental agencies.

121.    Plaintiffs would have heeded legally adequate warnings and would not have purchased
products containing PCB-Aroclors or would have taken steps to ensure that PCB-Aroclors were
treated differently to prevent potential exposure and contamination of the environment.

EXHIBIT 8

122.    As a direct and proximate result of Monsanto's failure to warn, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

123.    Monsanto knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of commercial and school properties. Monsanto committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

### THIRD CAUSE OF ACTION

#### NEGLIGENCE

124.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

125.    As a manufacturer and seller of PCB-Aroclor plasticizers, Monsanto owed a duty to Plaintiffs and to all persons whom its products might foreseeably harm to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PCB-Aroclor plasticizers including Aroclors 1248 and 1254.

126.    Monsanto held itself out as an industry expert in plasticizers. Through its Plasticizer Council, Monsanto advised customers regarding plasticizers for their needs and suggested particular plasticizers for specific applications.

127.    Monsanto sold Aroclor and PCB-Aroclor plasticizers to be used in a wide variety of applications including paints, glues, sealants, caulks, mastics, and others. Each of those applications could then be used in many different settings – indoor, outdoor, commercial, residential.

**EXHIBIT 8**

Electronically Filed - St Louis County - December 11, 2017 - 05:14 PM

128.   Monsanto knew or should have known that Aroclors were volatilizing out of open use applications including Aroclor 1248 and 1254 plasticizers used in indoor paints by the early 1950s. Monsanto recognized a need to perform testing of Aroclor plasticizers used in paints.

129.   Despite this knowledge, Monsanto breached its duty of care to Plaintiffs by

   a.   intentionally deciding not to perform testing on all PCB-containing plasticizers, including Aroclors 1248 and 1254, used in indoor paints to determine the rate and concentration of air dispersion and toxicity levels;

   b.   intentionally deciding not to perform studies of the long-term health effects of exposure to PCB-containing plasticizers, including Aroclors 1248 and 1254, used in indoor open use applications;

   c.   intentionally deciding not to perform studies of the causes and extent of environmental PCB contamination;

   d.   intentionally advising formulators to use PCB-Aroclors, including Aroclors 1248 and 1254, for indoor open use applications;

   e.   intentionally marketing plasticizers as "Aroclors" with no distinction between PCB-Aroclors and available alternatives;

   f.   intentionally concealing, or failing to disclose to formulators whether the Aroclor plasticizer selected for their applications contained PCBs;

   g.   failing to require product labeling warning of the risks of exposure to PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, used in open use indoor applications;

**EXHIBIT 8**

Electronically Filed - St. Louis County - December 11, 2017 - 04:27 PM

    h.  intentionally deciding not to stop the use of PCB-Aroclor plasticizers, including

        Aroclor 1254, for indoor open use applications in schools, commercial buildings,

        hospitals, etc.;

    i.  intentionally concealing information from or misleading regulatory agencies

        about the potential for open use PCB-Aroclor plasticizers to volatilize and to

        cause dangerous indoor air conditions;

    j.  intentionally mischaracterizing PCB-Aroclors, including Aroclor 1254, as

        nontoxic;

    k.  intentionally concealing the fact that PCBs migrate from PCB-Aroclors onto

        adjacent materials including substrate, causing extensive property damage; and

    l.  intentionally allowing open use PCB-Aroclor plasticizers including Aroclors 1248

        and 1254 to remain in place for decades after concerns about toxicity and

        volatility led Monsanto to stop selling these products for open uses.

130.    As a direct and proximate result of Monsanto's negligence, Plaintiffs have suffered, and

continue to suffer, property damage requiring investigation, remediation, and monitoring costs to

be determined at trial.

131.    Monsanto knew that it was substantially certain that its acts and omissions described

above would threaten public health and cause extensive contamination of commercial and school

properties. Monsanto committed each of the above described acts and omissions knowingly,

willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard

for the health and safety of others, and for Plaintiffs' property rights.

EXHIBIT 8

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1.    Compensatory damages according to proof including, but not limited to:

    a.    the costs of investigating, sampling, testing, and assessing the extent of PCB

        contamination at Westport Middle School;

    b.    the costs of removing PCBs and PCB-containing materials (including, but not

        limited to, secondary sources and adjacent substrates) from school property;

    c.    the costs of informing parents and community members about the efforts to

        remove PCBs from school property.

2.    Punitive damages;

3.    Pre-judgment and post-judgment interest;

4.    Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial.

Dated:    May 10, 2016

                       /s/ Carla Burke Pickrel
                       Scott Summy *(Pro Hac Vice)*
                       Carla Burke Pickrel *(Pro Hac Vice)*
                       Celeste A. Evangelisti *(Pro Hac Vice)*
                       **BARON & BUDD, P.C.**
                       3102 Oak Lawn Avenue, Suite 1100
                       Dallas, TX  75219-4281
                       Telephone: (214) 521-3605

                       /s/ Richard M. Sandman
                       Richard M. Sandman (BBO # 440940)
                       **RODMAN, RODMAN & SANDMAN, P.C.**
                       442 Main Street, Suite 300
                       Malden, MA  02148-5122
                       Telephone: (781) 322-3720

                       *Attorneys for Plaintiffs*

**EXHIBIT 8**

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above and foregoing document has been served upon the following counsel or record via the Court's ECF system on this 10th day of May, 2016.

    Richard P. Campbell
    Richard L. Campbell
    Brandon L. Arber
    Diana A. Chang
    Sean M. Hickey
    CAMPBELL CAMPBELL EDWARDS & CONROY, P.C.
    One Constitution Center, 3rd Floor
    Boston, MA 02129

    Carol A. Rutter
    Robyn D. Buck
    HUSCH BLACKWELL LLP
    The Plaza in Clayton
    190 Carondelet Plaza, Suite 600
    St. Louis, MO 63105

/s/ Carla Burke Pickrel

**EXHIBIT 8**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

# Exhibit A (continued)

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CITY OF HARTFORD and
HARTFORD BOARD OF EDUCATION,                    Case No. 3:15-cv-01544 (RNC)

    Plaintiffs,

vs.

MONSANTO COMPANY,
SOLUTIA INC., and
PHARMACIA CORPORATION,

    Defendants.

---

## PLAINTIFFS' FIRST AMENDED COMPLAINT

---

### I.    INTRODUCTION

1. Plaintiffs CITY OF HARTFORD ("City") and HARTFORD BOARD OF EDUCATION
   ("Board") operate public schools and buildings in Hartford, Connecticut. The City has
   detected toxic chemical compounds identified as Aroclors 1248 and 1254 in one or more of
   its school buildings. Working with the US Environmental Protection Agency ("EPA"), the
   Board has closed one school until these chemicals can be removed or reduced to a safe level
   for children.

2. Defendant Monsanto Company made Aroclors 1248 and 1254, plasticizers unique to, and
   trademarked by, Monsanto for use in caulks and paints, among other products.

3. Aroclors 1248 and 1254 are dangerous because they were formulated and designed with
   polychlorinated biphenyls ("PCBs"), compounds that cause a variety of adverse health

Page 1

EXHIBIT 9

Electronically Filed - St Louis County - December 11, 2017 - 03:14 PM

effects. Exposure to Aroclors 1248 and 1254 is associated with cancer and serious non-cancer health effects including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.

4. Wherever Aroclor 1248 or 1254 is used as a plasticizer, the PCBs easily escape into the atmosphere through the normal, intended uses of products that contain these Aroclors. PCBs migrate out of their original source products, including Aroclors 1248 and 1254 used to plasticize caulks and paints, and contaminate air, dust, and adjacent substrate materials, causing extensive property damage and presenting an exposure risk for teachers, students, and employees who occupy contaminated classrooms.

5. This Complaint generally refers to Aroclor plasticizers made with PCBs as "PCB-Aroclors."

6. As a result of their propensity to migrate out of products that used PCB-Aroclors, PCBs have become a near global environmental contaminant. To stem the contamination, to prevent health risks associated with exposure to PCBs, and for other reasons, Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979. The Act forbids the continued use of in-place caulk or paint that contains PCBs at a concentration above 50 parts per million ("ppm").

7. The Plaintiffs seek damages for the costs of investigating, removing toxic Aroclors 1248 and 1254 compounds, remediating all Aroclors 1248 and 1254 contamination, and other damages resulting from the contamination of their school buildings and properties.

## II. PARTIES

8. The Board and City share responsibility for operating and maintaining public schools in Hartford, Connecticut and have detected Aroclors 1248 and 1254 in one or more school buildings.

EXHIBIT 9

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

9.  The City owns the buildings, facilities, and properties of public schools in Hartford and has
    the authority to construct, renovate, and remodel school buildings and school property.
    C.G.S.A. § 10-241. The City also has the financial obligation for investigation and
    remediation activities conducted at school buildings and school properties.

10. In Connecticut, towns are considered "school districts" for educational purposes. C.G.S.A. §
    10-240. Therefore, the City of Hartford is a school district and may sue and be sued as
    provided by C.G.S.A. § 10-241.

11. The Board maintains public schools in the City of Hartford and has a duty imposed by the
    Connecticut General Assembly to provide an appropriate learning environment for its
    students, which requires the Board to provide adequate facilities, proper maintenance of
    facilities, and a safe school setting. C.G.S.A. § 10-220. The Board, as it relates to this
    action, is acting as an agent of the City and may sue and be sued as provided by C.G.S.A. §
    52-73.

12. Plaintiffs and all of Plaintiffs' school buildings and properties are located in Hartford,
    Connecticut.

13. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal
    place of business in St. Louis, Missouri.

14. Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and
    principal place of business in St. Louis, Missouri.

15. Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to
    Old Monsanto) is a Delaware LLC with its principal place of business in Peapack, New
    Jersey.

EXHIBIT 9

Electronically Filed - St. Louis County - December 11, 2017 - 04:27 PM

16. The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceuticals and nutrition business, and a chemical products business. Old Monsanto began manufacturing Aroclor plasticizers in the 1930s and continued to manufacture them until the late 1970s.

17. Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations. The corporation now known as Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

18. Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.

19. Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business — including the manufacture and sale of PCBs.

20. In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia, and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.

Page 4

EXHIBIT 9

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

21. Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as
"Defendants."

## III.    JURISDICTION AND VENUE

22. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists
between Plaintiffs and Defendants. Each Plaintiff is a citizen of Connecticut, but no
Defendant is a citizen of Connecticut. Monsanto is a Delaware corporation with its principal
place of business in St. Louis, Missouri. Solutia is a Delaware corporation with its principal
place of business in St. Louis, Missouri. Pharmacia is a Delaware limited liability company
with its principal place of business in Peapack, New Jersey.

23. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a
substantial part of the property that is the subject of the action is situated in this judicial
district.

## IV.    FACTUAL ALLEGATIONS

### A.    Monsanto Manufactured PCBs for Use in the United States Until the 1979 Ban.

24. A plasticizer is a commercial product that adds flexibility and other qualities to plastic and
other materials. Plasticizers are not natural raw materials but commercial products that
companies including Monsanto synthesized specifically for their plasticizing properties.

25. Monsanto developed an expansive line of plasticizers, some of which were known by the
trade name "Aroclors." Although the majority of Monsanto's plasticizers did not contain
PCBs, at least ten of the Aroclor products were made with PCBs. These include Aroclor
1016, 1221, 1232, 1242, 1248, 1254, 1260, 1262, 1268, and 1270. The specific products at
issue in this case are Aroclors 1248 and 1254, PCB-containing plasticizer products unique to,
and trademarked by, Monsanto.

EXHIBIT 9

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

26. Between approximately 1950 and 1970, Monsanto promoted and sold PCB-Aroclors, including Aroclors 1248 and 1254, for formulators to use in window caulks, paints, sealants, and mastics for the construction and renovation of buildings throughout the United States.

27. In addition to developing plasticizers, Monsanto created the Plasticizer Council to recommend particular plasticizers to formulators for specific applications. The company instructed formulators in product selection, formulation, use, and applications. Monsanto would also formulate a particular plasticizer for a customer's needs.

28. Upon information and belief, it was Monsanto --- and not the formulator --- that decided whether that formulator would use a PCB-Aroclor or a non-PCB plasticizer.

29. Only Monsanto, and not the formulators, had full knowledge of the risks of using Aroclors 1248, 1254 and other PCB-Aroclors.

30. Monsanto did not market plasticizers to formulators as "PCBs" but as "Aroclors." The marketing materials neither disclose which Aroclors contained PCBs nor explain the properties and potential risks of using plasticizers containing PCBs.

31. Although Monsanto eventually withdrew PCB-containing plasticizers from the market in 1970, the company never advised either the formulators or the foreseeable users of plasticizer-containing products of the dangers of PCB-Aroclors or attempt to recall the products. In fact, Monsanto continued to urge customers to purchase PCB-Aroclors until the very end of production, even encouraging them to stockpile product for use after production ceased. Accordingly, PCB-containing products are likely to remain present in any number of materials present in a school built or renovated during this period.

32. Because PCBs are highly volatile, they evaporate out of whatever products contain them.

EXHIBIT 9

33. Plasticizer applications are known as "open uses" or "open systems" because no physical
barrier prevents PCBs from direct contact with the surrounding environment. In open uses,
Aroclors 1248 and 1254 readily shed PCBs. These PCBs then migrate into and contaminate
surrounding materials including "adjacent substrates" such as masonry, wood, drywall, and
soil. PCBs also contaminate the air, dust, and indoor surfaces. Caulks, paints, sealants, and
mastics are "open uses." The caulks, paints, and other materials that contain PCB-Aroclors
in the Hartford schools are "open uses." PCB-Aroclors including Aroclor 1254 were also
occasionally used in the electrical capacitors attached to fluorescent lights. Because the
PCB-Aroclor in that application is contained within the hardware, this is considered an
"enclosed use" or "closed system." Despite the physical enclosure of the Aroclor, PCBs can
leak from light fixtures and similarly contaminate and damage surrounding materials.

34. The Environmental Protection Agency ("EPA") conducted research of PCBs in school
buildings and confirmed that emissions from PCB-Aroclors including 1254 in caulk and
fluorescent light ballasts cause elevated PCBs in the surrounding air.

35. EPA concluded that some building materials (*e.g.*, paint and masonry walls), adjacent
substrates, and indoor dust can absorb PCB emissions and become potential secondary
sources of contamination that begin emitting PCBs on their own.

**EXPOSURE TO PCBs IS ASSOCIATED WITH SERIOUS HEALTH EFFECTS**

36. The emissions of PCBs from PCB-Aroclors including 1248 and 1254 and resulting
contamination of school buildings may present health risks to building occupants including
students, teachers, other employees, and visitors.

37.    PCBs can enter the human body through ingestion, inhalation, and dermal contact.

EXHIBIT 9

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 178 of 299 PageID
Case 3:15-cv-01544-RNC    Document 22    Filed 12/23/15    Page 8 of 29
#: 946

38.    Children, teachers, and employees who work in school buildings may inhale PCBs that

are emitted into the air from Aroclors 1248 and 1254 in caulk, paint, light ballasts, and other

secondary sources.    They may also ingest PCBs that are emitted into air and settle onto surfaces

that come into contact with food or drinks.    And they may absorb PCBs from physical contact

with Aroclor 1248- and 1254-containing materials, secondary sources, or surfaces that have

become contaminated by air or dust.

39.    Any exposure is a concern to a reasonable school district because Aroclors 1248 and

1254 and PCBs are associated with serious health risks.

40.    In 2015, the International Agency for Research on Cancer (IARC) published Monograph

107, finding that sufficient scientific exists to conclude that PCBs are carcinogenic to humans.

The United States EPA has likewise determined that the PCBs in Monsanto's PCB-Aroclors are

probable human carcinogens.

41.    In addition, EPA concluded that PCBs are associated with serious non-cancer health

effects.    EPA has found evidence that PCBs may exert effects on the immune system, the

reproductive system, the nervous system, and the endocrine system.

42.    Children may be affected to a greater extent than adults.    The Agency for Toxic

Substances and Disease Registry explained: "Younger children may be particularly vulnerable

to PCBs because, compared to adults, they are growing more rapidly and generally have lower

and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for

sequestering the lipophilic PCBs."

43.    Monsanto's internal documents show that Monsanto knew that PCB-Aroclors were toxic

as early as the 1930s.

Page 8

EXHIBIT 9

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 179 of 299 PageID
Case 3:15-cv-01544-RNC  Document 22  Filed 12/23/15  Page 9 of 29
#: 847

Electronically Filed - St Louis County - December 11, 2017 - 03:14 PM

44.    A 1937 memorandum reflects the company's knowledge that studies of animal exposure by inhalation or ingestion led to systemic toxic effects.

45.    Monsanto specifically advised against exposure to airborne PCB-Aroclor vapors in the 1940s.

46.    Emmet Kelly, Monsanto's Medical Director, acknowledged in 1955 that the company knew that PCB-Aroclors are toxic. Later that year, Monsanto's Medical Department advised that workers should not be allowed to eat lunch in the Aroclor department because these compounds are quite toxic by ingestion or inhalation.

47.    Monsanto's potential customers also reported the results of their own toxicity studies to the company. After conducting its own tests, the U.S. Navy decided against using Monsanto's PCB-Aroclors because the Navy felt them too toxic for use in submarines.

48.    In 1966, Kelly reviewed and did not dispute a presentation that referred to a 1939 study associating PCBs with the deaths of three young workers and concluding that pregnant women and persons who have at any time had any liver disease are particularly susceptible to their effects.

### PCBs CANNOT BE CONTAINED IN PLASTICIZERS

49. Monsanto's documents also show that the company knew that Aroclors emitted PCBs that could not be contained in products or applications and recognized that, as a result, PCBs were becoming a widespread environmental contaminant.

50. In the early 1950s, Monsanto became aware that research indicated that Aroclors volatilized out of indoor paints plasticized with PCB-Aroclors, resulting in vapor concentrations that exceeded safe levels. Based on this evidence, Monsanto acknowledged that "[t]here must clearly be circumstances under which the use of Aroclor containing paints will constitute a

Page 9

EXHIBIT 9

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

health hazard," and recognized the need to test each paint for safety before distributing it freely for household use. Monsanto had specifically "barred" the use of certain PCB-Aroclors as plasticizers intended for use in indoor home paints for these reasons.

51. The company's own testing of paint plasticized with Aroclor 1248 provided evidence that airborne PCB concentrations persisted for at least a month. Monsanto also recognized that using such a paint over a large area could create a hazardous condition, especially considering the long exposure to these concentrations.

52. Monsanto was also aware by the mid-1960s that PCBs were becoming a major environmental contaminant due, in large part, to the use of PCB-Aroclors as plasticizers. A Monsanto consultant advised that a substantial percentage of the PCB used in plasticizers and other products escapes into the environment. He urged the company to stop using PCBs in Aroclor plasticizers: "it seems to the writer that the evidence regarding PCB effects of environmental quality is sufficiently substantial, widespread, and alarming to require immediate corrective action on the part of Monsanto."

53. Despite the clear knowledge of the dangers posed by selling PCB-Aroclors as plasticizers, Monsanto did not immediately discontinue the sale of these products, recall the products, and ensure that no additional PCB-Aroclors be used in open systems. Rather, Monsanto continued to manufacture, market, promote, and sell these plasticizers for several more years to maximize profits. Had Monsanto stopped selling these products when it unquestionably became aware of the risks --- *i.e.*, by the mid-1960s --- the Hartford schools would not be contaminated.

54. Monsanto's Aroclor Ad Hoc Committee held its first meeting on September 5, 1969. The committee's objectives were to continue sales and profits of Aroclors in light of the fact that

EXHIBIT 9

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 181 of 299 PageID
#: 949
Case 3:15-cv-01544-RNC   Document 22   Filed 12/23/15   Page 11 of 29

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

PCB "may be a global contaminant." The meeting minutes acknowledge that PCB-containing products rapidly contaminate the environment and specifically implicate highway paints: "In one application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."

55. The Committee reported in 1969 significant vapor losses from plasticizers used in paints and caulks. One employee recognized that releases from end uses would result in greater consumer exposure.

56. Still, the Committee identified a number of actions to prolong the manufacture, sale, and use of PCB-containing Aroclors.

57. By May 1970, Monsanto internally admitted that the potential harm to human health and the environment required that they no longer sell PCB-Aroclors (including Aroclors 1248 and 1254) for open uses including paints, caulks, and sealants.

58. Despite this decision, however, the company continued to sell these Aroclors until August 1970.

59. In 1970, after Monsanto had acknowledged the catastrophic problem of PCB contamination and exposure, PCB production in the United States peaked at 85 million pounds.

60. During the summer of 1970, Monsanto encouraged its customers to stockpile these plasticizers to use after that date.

61. Monsanto urged a customer in Cambridge, Massachusetts to "stock up" on sufficient quantities of Aroclor 1200 series products to cover its needs for up to two years. Monsanto was aware that another customer stockpiled enough Aroclor 1254 to last through 1971.

EXHIBIT 9

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

62. At the same time, Monsanto began trying to downplay the ubiquity of PCB-Aroclors that remain present in open uses, like caulk and paint. In a press release, the company claimed: "What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors. It is also used in commercial heating and cooling systems. It is not a 'household' item."

63. At no point did Monsanto contradict this statement by alerting foreseeable users of plasticizer-containing products, including Plaintiffs, that PCB-Aroclors could be found in "open" use building materials, including paint and caulk, and could cause contamination and property damage. Plaintiffs would have acted on this alert had they received it.

64. As a result, Aroclor 1248 and 1254 products remain in use in schools and buildings across the United States, notwithstanding the ban.

**LEGAL AND REGULATORY STANDARDS APPLICABLE TO PCBs**

65. Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of all PCB-containing products as of January 1, 1979.

66. More than thirty years passed before EPA announced that homes, schools, and other commercial buildings may have been built with PCB-containing materials. In a press release issued on September 25, 2009, EPA advised that although PCBs were banned by 1979, they remained in place in buildings that were constructed before the ban.

67. On December 12, 2013, EPA issued a press release advising that PCB-containing fluorescent light ballasts that were installed prior to the ban may still be in use in schools and may leak PCBs.

68. EPA has held that allowing caulk or paint with a PCB concentration over 50 ppm to remain in place is prohibited "use" under TSCA.

EXHIBIT 9

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

69. EPA has not issued any information regarding possible PCB-Aroclor contamination in schools in Hartford.

**PLAINTIFFS' SCHOOL BUILDINGS ARE CONTAMINATED WITH PCB-PLASTICIZERS.**

70. Plaintiffs Board and City operate and maintain a public school system in Hartford, Connecticut and have detected PCBs in one or more of its schools that were built or renovated between 1950 and 1978. Plaintiffs have detected Aroclors 1248 and 1254 in one or more of its schools that were built or renovated between 1950 and 1978.

71.    Clark Elementary School was built in 1971. In 2014, dangerous levels of Aroclors 1248 and 1254 were detected in indoor paint samples taken at the school, necessitating removal and remediation.

72. Further testing showed PCBs in the school's air at concentrations exceeding EPA's recommended levels. The Board, with EPA oversight, has closed the school until all PCB 1248 and 1254 contamination can be identified and removed.

73. Fox Middle School and Quirk Middle School (now Global Communications School) were both built in 1972. Dangerous levels of Aroclors 1248 and 1254 were detected at both schools, necessitating removal and remediation.

74. Plaintiffs were not aware of potential harms related to PCB-Aroclors at the time of renovations or constructions that used these plasticizers. Had they known, Plaintiffs would not have used PCB-Aroclors or products plasticized with PCB-Aroclors.

75. Pursuant to the educational interests of the state, the State of Connecticut imposes a duty upon Plaintiffs to provide adequate facilities, proper maintenance of schools, and a safe school setting. C.G.S.A. § 10-220.

EXHIBIT 9

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 184 of 299 PageID
#: 952
Case 3:15-cv-01544-RNC Document 22  Filed 12/23/15  Page 14 of 29

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

76. The State of Connecticut imposes a duty upon Plaintiffs to "adopt and implement an indoor

air quality program that provides for ongoing maintenance and facility reviews necessary for

the maintenance and improvement of the indoor air quality of its facilities[.]" C.G.S.A. § 10-

220.

77.    By 1969, before these schools were built, Monsanto had accumulated decades of

evidence that PCB-Aroclors were toxic to humans, that PCBs would volatilize out of Aroclors

1248 and 1254 used in indoor paints and caulks reaching dangerous levels in indoor air, that

PCBs would migrate onto and contaminate nearby materials causing property damage, and that

occupants of buildings would be exposed to potentially dangerous levels of PCBs.

78.    In fact, the company had actual knowledge about the dangers associated with the use of

PCB-Aroclors in paints.

79. Migration of PCBs may begin as soon as PCBs or PCB-containing products are installed or

applied, regardless of climate and without any prior deterioration.

80. At no point did Monsanto warn or alert the City or Board that PCBs may migrate and

contaminate ambient air or secondary sources.

## FIRST CAUSE OF ACTION

### CONNECTICUT PRODUCTS LIABILITY ACT
### STRICT LIABILITY

81. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding

paragraphs as if fully restated in this cause of action.

82. Monsanto created a line of commercial plasticizer products including Aroclors 1248 and

1254. Although Aroclors 1248 and 1254 were made with PCBs, Monsanto made Aroclor

plasticizers that did not contain PCBs. As a large and sophisticated chemical company,

Page 14

EXHIBIT 9

Monsanto was in the business of producing, making, fabricating, constructing, designing, marketing, and selling PCB-containing Aroclors for placement into trade or commerce.

83. All of Monsanto's Aroclor plasticizers were manufactured for placement into trade or commerce.

84. Monsanto marketed and sold PCB-Aroclors as commercial plasticizers for incorporation into other products, including those for "open use" applications in schools and other buildings.

85. Monsanto was heavily involved in determining which plasticizer to sell to a formulator for a particular use. Monsanto recognized that "even the most experienced formulator is bewildered by the maze of possibilities from which to select" a plasticizer "for his particular application" and advertised that its Plasticizer Council provided "much more than simply the products;" it also provided "expert guidance in their use." The Council studied applications in its laboratory and recommended specific plasticizers to its customers.

86. Monsanto alone controlled the formulation of its plasticizer products and determined which ones would contain PCBs and which would not.

87. Monsanto also provided advice and recommendations as to whether PCB-Aroclor plasticizer should be used in a particular formulator's application.

88. Monsanto's customers used the plasticizers in the intended manner and in a substantially unchanged way.

89. As a manufacturer, Monsanto owed a duty to all persons whom its products might foreseeably harm, including Plaintiffs, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

90. PCB-Aroclors are in a defective condition and are unreasonably dangerous for their reasonably anticipated use in school buildings for the following reasons:

EXHIBIT 9

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 186 of 299 PageID
Case 3:15-cv-01544-RNC  Document 22  Filed 12/23/15  Page 16 of 29
#: 954

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

a.  Monsanto selected a plasticizer for a formulator's needs without
    disclosing whether that plasticizer was a PCB-Aroclor;

b.  Monsanto did not advise the formulators regarding which Aroclor
    plasticizers contained PCBs and which did not;

c.  When PCB-Aroclor plasticizers, including Aroclors 1248 and 1254,
    are used in open applications, the PCB compounds readily volatilize
    out of the original application;

d.  PCB volatilization begins soon after the Aroclor-containing product is
    installed or put into use;

e.  Once volatilized, PCBs migrate to and contaminate adjacent materials,
    dust, air, interior surfaces, exterior surfaces, and soil;

f.  PCBs can then volatilize out of these materials and contaminate still
    other materials;

g.  When PCBs volatilize, building occupants including students,
    teachers, employees, and visitors may be exposed to PCBs via
    inhalation, ingestion, and dermal contact;

h.  PCB is human and animal carcinogen and is associated with other
    serious health risks;

i.  PCB exposure may be halted and prevented only by physical removal
    of the original PCB-Aroclors and any secondary materials that have
    become contaminated;

EXHIBIT 9

Electronically Filed - St. Louis County - December 11, 2017 - 04:27 PM

      j.  Because remediation involves removal of all damaged property, it can require removal of building materials such as interior walls and brick that were not made with PCB-Aroclors;

      k.  Such remediation is extremely expensive to undertake, disrupts normal classroom activities, and may cause undue concern on the part of students, teachers, school employees, and parents.

91. At the time of sale, Monsanto knew of these risks associated with PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, and failed to use reasonable care in the design of its plasticizer products.

92. PCB-Aroclor plasticizers for open uses, including Aroclors 1248 and 1254, pose greater dangers to school buildings than would be expected by ordinary persons such as Plaintiffs, schoolchildren, teachers and employees, and the general public.

93. At all times, Monsanto and other companies made plasticizers that did not contain PCBs. These were reasonable alternative designs capable of preventing the Plaintiffs' damage.

94. The risks posed by PCB-Aroclors far outweigh the products' utility as plasticizers in indoor applications.

95. The likelihood that PCBs would migrate out of Aroclor plasticizers, including Aroclors 1248 and 1254, and contaminate Plaintiffs' property and the gravity of that damage far outweighed any burden on Monsanto to adopt an alternative design and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

96. The PCBs began to volatilize and migrate of their applications shortly after the products were installed or applied. The migration contaminated underlying and adjacent materials while the

Page 17

EXHIBIT 9

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 188 of 299 PageID
#: 956
Case 3:15-cv-01544-RNC   Document 22   Filed 12/23/15   Page 18 of 29

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

paint, caulk, and other plasticizer-containing materials remained intact and performed their intended functions.

97. Plaintiffs' buildings were contaminated by Aroclors 1248 and 1254 after their application in paint or caulk when the building was constructed in 1969. The contamination began while the paint or caulk was in its useful safe life.

98. Monsanto also fraudulently concealed information about PCB-Aroclors' dangers in open uses in school and other buildings.

99. At least twenty years before the Hartford schools were constructed, Monsanto had actual knowledge that the use of PCB-Aroclors in paints resulted in air concentrations that exceeded the accepted safe maximum for continuous exposure. By the mid-1950s, Monsanto acknowledged that the use of Aroclor paints will constitute a health hazard in some circumstances. The company also had actual knowledge that exposure to airborne Aroclors 1248 and 1254, the plasticizers used in Hartford, caused injury to test animals and led to the conclusion that a painted room could be hazardous.

100.     Monsanto also had actual knowledge that PCB-Aroclors emanated out of open uses causing contamination. It knew, too, that plasticizer use and volatilization represented a substantial percentage of the contamination found in the environment.

101.     Despite the company's growing awareness of the dangers of open-use plasticizers containing PCBs, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite – that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner.

EXHIBIT 9

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 189 of 299 PageID
Case 3:15-cv-01544-RNC   Document 22   Filed 12/23/15   Page 19 of 29
#: 957

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

102.    In a March 24, 1969 letter to Los Angeles County Air Pollution Control District,
        Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or
        skin absorption."

103.    A similar letter to the San Francisco Bay Regional Water Quality Control Board
        explained that PCB plasticizers (found in surface coatings, such as paints, industrial
        adhesives and window sealants), in normal use, present no special health problems."

104.    In May 1969, Monsanto's Manager, Environmental Health, Elmer Wheeler spoke with a
        representative of the National Air Pollution Control Administration, who promised to relay to
        Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the
        environment in a widespread fashion."

105.    Monsanto delivered the same message to the New Jersey Department of Conservation in
        July 1969, claiming first, "Based on available data, manufacturing and use experience, we do
        not believe the PCBs to be seriously toxic." The letter then reiterates Monsanto's position
        regarding environmental contamination: "We are unable at this time to conceive of how the
        PCBs can become wide spread in the environment."

106.    One year later, in a letter to Congressman William Ryan dated April 28, 1970, Monsanto
        disclaimed all potential human health threats and misrepresented the risk facing occupants of
        schools and other buildings where plasticizers remained in open uses: "It should be
        emphasized that the apparent PCB problem relates only to the possible effects on some
        species of birds. Manufacturing and use experience for thirty years, earlier animal toxicity
        studies, and the interim reports on current extensive toxicological studies with various
        species of animals indicate that there is no threat to the public health."

EXHIBIT 9

107.   Monsanto, thus, had actual knowledge of and misrepresented the very dangers alleged here — the volatilization of PCBs from plasticizers in open-use applications. And Monsanto knew of and concealed these dangers before the Hartford schools were constructed.

108.   Had Plaintiffs known of these dangers, they would not have purchased products containing PCB-Aroclor plasticizers.

109.   Plaintiffs relied on Monsanto's implied warranty that their PCB-Aroclor plasticizers were safe for open use applications.

110.   As a direct and proximate result of Monsanto's unreasonably dangerous design, manufacture, and sale of PCB-Aroclor plasticizers, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

111.   Monsanto knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of commercial and school properties. Monsanto committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

112.   Monsanto knew and expected that PCB-Aroclors would be used as plasticizers in building materials. In these materials, Monsanto's PCB-Aroclors would have been expected to and did reach consumers, like Plaintiffs, without substantial change in chemical condition.

### SECOND CAUSE OF ACTION

### CONNECTICUT PRODUCTS LIABILITY ACT
### FAILURE TO WARN

113.   Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

Page 20

EXHIBIT 9

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

114.    As a manufacturer of PCB-Aroclor plasticizers, Monsanto had a duty to provide adequate
        warnings of the risks of these products to all persons whom its product might foreseeably
        harm, including Plaintiffs, the public, and public officials.

115.    PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are unreasonably dangerous
        for their reasonably anticipated use in school buildings for the following reasons:

        a.  When PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are used in
            open applications, the PCB compounds readily volatilize out of the original
            application;

        b.  PCB volatilization begins soon after the plasticizer-containing product is installed
            or put into use;

        c.  Once volatilized, PCBs migrate to and contaminate adjacent materials, dust, air,
            interior surfaces, exterior surfaces, and soil;

        d.  PCBs can then volatilize out of these secondary materials and contaminate still
            other materials;

        e.  When PCBs volatilize, building occupants including students, teachers,
            employees, and visitors may be exposed to PCBs via inhalation, ingestion, and
            dermal contact;

        f.  PCB is human and animal carcinogen and is associated with other serious health
            risks;

        g.  PCB exposure may be halted and prevented only by physical removal of the
            original PCB-Aroclor products and any secondary materials that have become
            contaminated;

EXHIBIT 9

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 192 of 299 PageID
#: 960
Case 3:15-cv-01544-RNC    Document 22    Filed 12/23/15    Page 22 of 29

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 03:14 PM

h.  Because remediation involves removal of all damaged property, it can require
remediation of building materials such as interior walls and brick that were not made
with PCB-plasticizers;

i.  Such remediation is extremely expensive to undertake, disrupts normal classroom
activities, and may cause undue concern on the part of students, teachers, school
employees, and parents.

116.  Monsanto knew of the health and property damage risks associated with PCB-Aroclor
plasticizers, including Aroclors 1248 and 1254, and failed to provide a warning that would
lead an ordinary reasonable user or handler of a product to contemplate the dangers
associated with PCB-Aroclor plasticizers or an instruction that would have allowed Plaintiffs
to avoid the damage to their property.

117.  At the time of manufacture, Monsanto knew or should have reasonably anticipated that
formulators and foreseeable users would not be aware of the risks and nature of potential
harm of its PCB-Aroclor plasticizer products.

118.  Despite Monsanto's knowledge of the presence of PCB-Aroclor  plasticizers that remain
present in "open uses" in commercial buildings and schools nationwide, including Aroclors
1248 and 1254, Monsanto has not issued any warning, instruction, recall, or advice regarding
PCB-containing products to schools, communities, parents, or governmental agencies.

119.  Plaintiffs would have heeded legally adequate warnings and would not have purchased
products containing PCB-Aroclors or would have taken steps to ensure that PCB-Aroclors
were treated differently to prevent potential exposure and contamination of the environment.

EXHIBIT 9

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 193 of 299 PageID
Case 3:15-cv-01544-RNC   Document 22   Filed 12/23/15   Page 23 of 29
#: 961

120.   As a direct and proximate result of Monsanto's failure to warn, Plaintiffs have suffered,
       and continue to suffer, property damage requiring investigation, remediation, and monitoring
       costs to be determined at trial.

121.   Monsanto knew that it was substantially certain that its acts and omissions described
       above would threaten public health and cause extensive contamination of commercial and
       school properties. Monsanto committed each of the above described acts and omissions
       knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or
       reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

## THIRD CAUSE OF ACTION

### CONNECTICUT PRODUCTS LIABILITY ACT
### NEGLIGENCE

122.   Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding
       paragraphs as if fully restated in this count.

123.   As a manufacturer and seller of PCB-Aroclor plasticizers, Monsanto owed a duty to
       Plaintiffs and to all persons whom its products might foreseeably harm to exercise due care
       in the formulation, manufacture, sale, labeling, warning, and use of PCB-Aroclor plasticizers
       including Aroclors 1248 and 1254.

124.   Monsanto held itself out as an industry expert in plasticizers. Through its Plasticizer
       Council, Monsanto advised customers regarding plasticizers for their needs and suggested
       particular plasticizers for specific applications.

125.   Monsanto sold Aroclor and PCB-Aroclor plasticizers to be used in a wide variety of
       applications including paints, glues, sealants, caulks, mastics, and others. Each of those
       applications could then be used in many different settings – indoor, outdoor, commercial,
       residential.

Page 23

EXHIBIT 9

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

126.   Monsanto knew or should have known that Aroclors were volatilizing out of open use

applications including Aroclor 1248 and 1254 plasticizers used in indoor paints by the early

1950s. Monsanto recognized a need to perform testing of Aroclor plasticizers used in paints.

127.   Despite this knowledge, Monsanto breached its duty of care to Plaintiffs by:

  a.   intentionally deciding not to perform testing on all PCB-containing plasticizers,

        including Aroclors 1248 and 1254, used in indoor paints to determine the rate and

        concentration of air dispersion and toxicity levels;

  b.   intentionally deciding not to perform studies of the long-term health effects of

        exposure to PCB-containing plasticizers, including Aroclors 1248 and 1254, used

        in indoor open use applications;

  c.   intentionally deciding not to perform studies of the causes and extent of

        environmental PCB contamination;

  d.   intentionally advising formulators to use PCB-Aroclors, including Aroclors 1248

        and 1254, for indoor open use applications;

  e.   intentionally marketing plasticizers as "Aroclors" with no distinction between

        PCB-Aroclors and available alternatives;

  f.   intentionally concealing, or failing to disclose to formulators whether the Aroclor

        plasticizer selected for their applications contained PCBs;

  g.   failing to require product labeling warning of the risks of exposure to PCB-

        Aroclor plasticizers, including Aroclors 1248 and 1254, used in open use indoor

        applications;

EXHIBIT 9

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

> h.  intentionally deciding not to stop the use of PCB-Aroclor plasticizers, including
>     Aroclor 1254, for indoor open use applications in schools, commercial buildings,
>     hospitals, etc.;
>
> i.  intentionally concealing information from or misleading regulatory agencies
>     about the potential for open use PCB-Aroclor plasticizers to volatilize and to
>     cause dangerous indoor air conditions;
>
> j.  intentionally mischaracterizing PCB-Aroclors, including Aroclor 1254, as
>     nontoxic;
>
> k.  intentionally concealing the fact that PCBs migrate from PCB-Aroclors onto
>     adjacent materials including substrate, causing extensive property damage; and
>
> l.  intentionally allowing open use PCB-Aroclor plasticizers including Aroclors 1248
>     and 1254 to remain in place for decades after concerns about toxicity and
>     volatility led Monsanto to stop selling these products for open uses.

128.    Damage and contamination of Plaintiffs' property is the result of Monsanto's reckless

disregard for the safety of consumers and users of PCB-Aroclors and products plasticized

with PCB-Aroclors. Monsanto knew that it was substantially certain that its acts and

omissions described above would threaten public health and cause extensive contamination

of commercial and school properties. Monsanto committed each of the above described acts

and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with

conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs'

property rights.

Page 25

EXHIBIT 9

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 196 of 299 PageID
#: 964
Case 3:15-cv-01544-RNC   Document 22   Filed 12/23/15   Page 26 of 29

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

129.    As a direct and proximate result of Monsanto's negligence, Plaintiffs have suffered, and

continue to suffer, property damage requiring investigation, remediation, and monitoring

costs to be determined at trial.

### FOURTH CAUSE OF ACTION

### PUBLIC NUISANCE

130.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding

paragraphs as if fully restated in this count.

131.    Monsanto manufactured, distributed, marketed, and promoted PCB-Aroclors including

1248 and 1254 in a manner that created or participated in creating a public nuisance that

unreasonably endangers or injures the property, health, safety, and comfort of the general

public and Plaintiffs, causing inconvenience and annoyance.

132.    Monsanto's intentional, negligent, and reckless acts and omissions have created

widespread contamination of property with Aroclors 1248 and 1254, and possibly others.

133.    By their conduct, Monsanto violated and continues to violate public rights and rights of

the community at large to a clean and unpolluted natural environment and school buildings.

134.    The presence of PCB-Aroclors interferes with Plaintiffs' use and/or enjoyment of their

property in a way that an ordinary, reasonable person would find is a substantial

inconvenience and annoyance.

135.    Monsanto knew or, in the exercise of reasonable care, should have known that the

manufacture and sale of PCB-Aroclors, including 1248 and 1254, would seriously and

unreasonably interfere with the ordinary comfort, use, and enjoyment of any property where

PCB-Aroclor-plasticized products were used.

EXHIBIT 9

136. As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiffs have suffered, and continue to suffer, contamination requiring investigation, remediation, and monitoring costs to be determined at trial.

## FIFTH CAUSE OF ACTION

### PRIVATE NUISANCE

137. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

138. Plaintiffs' school buildings and grounds have been contaminated with Aroclors 1248 and 1254.

139. The presence of these PCB-Aroclors unreasonably interferes with Plaintiffs' use, benefit, and enjoyment of their property.

140. Monsanto knew or, in the exercise of reasonable care, should have known that the design, manufacture, marketing, promotion, and sale of PCB-Aroclors would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any property where products plasticized with PCB-Aroclors, including 1248 and 1254, were used.

141. Monsanto's intentional, negligent, and reckless acts and omissions have contaminated Plaintiffs' property with Aroclors 1248 and 1254.

142. As a direct and proximate result of Monsanto's creation of a private nuisance, Plaintiffs have suffered, and continue to suffer, contamination requiring investigation, remediation, and monitoring costs to be determined at trial.

## SIXTH CAUSE OF ACTION

### TRESPASS

Page 27

EXHIBIT 9

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

143.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

144.    Plaintiffs are the owners, operators, and/or actual possessor of real property and improvements used for public schools in Hartford, Connecticut.

145.    Monsanto manufactured, distributed, marketed, and promoted PCB-Aroclors with the actual knowledge and/or substantial certainty that PCB-Aroclors, including 1248 and 1254, would, through normal use, release PCBs that would migrate throughout ambient air and onto adjacent surfaces, causing property contamination.

146.    Monsanto negligently, recklessly, and/or intentionally produced and marketed PCB-Aroclors in a manner that caused them to contaminate Plaintiffs' property.

147.    As a direct and proximate result of Monsanto's trespass, Plaintiffs have suffered and continue to suffer contamination requiring investigation, remediation, and monitoring costs to be determined at trial.

### PRAYER FOR RELIEF

Plaintiffs prays for judgment against Defendants, jointly and severally, as follows:

1.   Compensatory damages according to proof including, but not limited to:

(a) the costs of investigating, sampling, testing, and assessing the extent of Aroclor 1248 and 1254 contamination on Plaintiffs' properties;

(b) the costs of interim measures implemented to reduce further contamination prior to complete removal of Aroclors 1248 and 1254;

(c) the costs of removing adjacent substrates and other contaminated materials from Plaintiffs' properties;

Page 28

EXHIBIT 9

Case: 4:23-cv-00204-HEA    Doc. #: 1-6    Filed: 02/20/23    Page: 199 of 299 PageID
Case 3:15-cv-01544-RNC    Document 22    Filed 12/23/15    Page 29 of 29
#: 967

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

    (d) the costs of informing parents and community members about the efforts to

    remove Aroclors 1248 and 1254 from schools.

    (e) Costs of relocating students and staff, e.g. portable classrooms, swing space,

    and transportation.

2. Punitive damages;

3. Prejudgment and post-judgment interest;

4. Any other and further relief as the Court deems just, proper, and equitable.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial.

Dated: December 23, 2015

> /s/ Scott Summy
> **BARON & BUDD, P.C.**
> Scott Summy (*Pro Hac Vice*)
> Carla Burke Pickrel (*Pro Hac Vice*)
> Celeste A. Evangelisti (*Pro Hac Vice*)
> 3102 Oak Lawn Avenue, Suite 1100
> Dallas, TX 75219
> Tel: (214) 521-3605
> Fax: (214) 520-1181
> ssummy@baronbudd.com
> evangelisti@baronbudd.com
> cburkepickrel@baronbudd.com
>
> Henri Alexandre, Corporation Counsel
> City of Hartford
> 550 Main Street, Suite 210
> Hartford, CT 06103
> Tel: (860) 757-9700
> Fax: (860) 722-8114
> Henri.alexandre@hartford.gov

Page 29

**EXHIBIT 9**

**17SL-CC03368**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK COUNTY, ss.**

SUPERIOR COURT
CIVIL ACTION NO.: 16-0503 E

---

**CRAIG LAMKIN and SUSAN LAMKIN**

*Plaintiffs,*

vs.

**MONSANTO COMPANY,**

**COOPER POWER SYSTEMS, as a division of EATON'S ELECTRICAL,**

**MCGRAW- EDISON COMPANY, as a subdivision of COOPER POWER SYSTEMS and EATON ELECTRICAL,**

**O'CONNOR CORPORATION INC. f/k/a SOLUTIA INC.,**

**GENERAL ELECTRIC CO.,**

**SOLUTIA INC.,**

**PHARMACIA LLC f/k/a PHARMACIA CORPORATION as *successor in interest to* OLD MONSANTO.,**

**PFIZER INC.,**

**CBS CORPORATION f/k/a WESTINGHOUSE ELECTRIC CORPORATION,**

**NSTAR ELECTRIC f/k/a BOSTON EDISON COMPANY,**

**INTERNATIONAL PAPER COMPANY,**

**VERIZON COMMUNICATIONS INC., f/k/a VERIZON NYNEX PERKINELMER; INC.**

JURY TRIAL DEMANDED



16-0503E

1

**EXHIBIT 10**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**JOHN DOE.**

*Defendants.*

---

## COMPLAINT

COMES NOW Plaintiffs, CRAIG LAMKIN and SUSAN LAMKIN, and allege as follows:

## INTRODUCTION

1.    On or about July of 2013, Plaintiff Craig Lamkin was diagnosed with primary retroperitoneal sarcoma of the colon, small bowel, pancreas, spleen, and left adrenal gland which required Plaintiff to undergo a radical resection of his left abdomen. Plaintiff's cancer was caused by exposure to polychlorinated biphenyls (PCBs) manufactured, sold and controlled by Defendants as well as chemical derivatives and contaminants contained within the PCBs known as dioxins. PCBs were manufactured, sold, and utilized by Defendants for use as a coolant and lubricant in electrical machinery including transformers. Plaintiff Craig Lamkin was exposed to Defendants' PCBs and dioxins during the course of his employment working with power transformers and other electrical equipment manufactured by Defendants. Plaintiff Craig Lamkin was regularly and routinely exposed to these PCBs and dioxins with sufficient regularity to cause his disease. At all times material to this action, Defendants had or should have had actual knowledge of the toxicity of PCBs and dioxins and failed to warn the Plaintiff. Moreover, at all times material to this action, alternative safer materials were available to Defendants for use as a chemical lubricant and coolant. Despite the knowledge of the hazards associated with PCBs and dioxins, Defendants made the affirmative decision to utilize these

2

**EXHIBIT 10**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

carcinogenic materials and affirmatively choose not to warn the Plaintiff. Defendants' PCBs and dioxins, as well as the machinery sold containing this material, were unreasonably dangerous and unfit for the purposes that they were designed and sold for. As a result of the allegations listed above and herein, Mr. Lamkin has suffered, and continues to suffer, debilitating injuries. Mr. Lamkin, and his wife Susan Lamkin, bring this suit for damages relating to those injuries.

## PARTIES

2.    Plaintiff, Craig Lamkin ("Plaintiff-worker"), was and is a citizen and resident of the State of Massachusetts during all times relevant. He brings this action individually.

3.    Plaintiff, Susan Lamkin ("Plaintiff-spouse"), was and is a citizen and resident of the State of Massachusetts during all times relevant and also makes a claim for loss of consortium due to her husband's PCB/dioxin-related disease.

4.    Defendant Monsanto Company ("New Monsanto"), is a Delaware Corporation with its principle place of business in St. Louis, Missouri. At all relevant times it did business in the State of Massachusetts.

5.    Defendant Cooper Power Systems ("Cooper"), a division of Eaton's Electrical, is a Delaware Corporation with its principle place of business in St. Louis, Missouri. At all relevant times it did business in the State of Massachusetts.

6.    Defendant McGraw-Edison Company, a subdivision of Cooper Power Systems and Eaton Electrical Delaware Corporation, is a Delaware Corporation, with its principle place of business in Elgin, Illinois, and it's Registered Agent in Boston, Massachusetts. At all relevant times it did business in the State of Massachusetts.

7.    Defendant O'Connor Corporation Inc. (formerly known as "O'Conner Constructers" and successor to Thomas O'Connor & Company), is a Delaware Corporation with its principle place of

3

EXHIBIT 10

business in St. Louis, Missouri: At all relevant times it did business in the State of Massachusetts.

8.      Defendant General Electric Company is a New York corporation with its principal place of business in New York. At all relevant times it did business in the State of Massachusetts.

9.      Defendant Solutia Inc. ("Solutia") is a Delaware Corporation with its principle place of business in St. Louis, Missouri. At all relevant times it did business in the State of Massachusetts.

10.     Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to Old Monsanto) is a Delaware LLC that since its merger with Defendant Pfizer Inc. in 2003, has had its headquarters and its principal place of business New York, New York. Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc. At all relevant times it did business in the State of Massachusetts.

11.     Defendant Pfizer Inc. ("Pfizer") is a Delaware corporation that has its corporate headquarters and principal place of business in New York, New York. At all relevant times it did business in the State of Massachusetts.

12.     Defendant CBS Corporation f/k/a Westinghouse Electric Corporation is a Delaware corporation with its principal place of business in New York. At all relevant times it did business in the State of Massachusetts.

13.     Defendant NSTAR Electric f/k/a Boston Edison Company is a Massachusetts corporation with its principal place of business in Massachusetts.

14.     Defendant International Paper Company is a Maine corporation with its principal place of business in Maine. At all relevant times it did business in the State of Massachusetts.

15.     Defendant Verizon Communications Inc., f/k/a Verizon Nynex ("Verizon") is a Delaware corporation with a Registered Agent in Massachusetts. At all relevant times it did business in the State of Massachusetts.

16.     PerkinElmer, Inc. is a Massachusetts corporation with its principal office and Registered Agent in Massachusetts. At all relevant times it did business in the State of Massachusetts.

4

**EXHIBIT 10**

17. Defendant JOHN DOE (fictitious) represents one or more business entities whose real names and identities are presently unknown to Plaintiffs.

18. The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceuticals and nutrition business, and a chemical products business. Old Monsanto began manufacturing PCBS in the 1940s and continued to manufacture commercial PCBS, until the late 1970s. At all relevant times it did business in the State of Massachusetts.

19. Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations. The corporation now known as Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

20. Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.

21. Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.

22. In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.

23. At all times herein mentioned, each of the defendants was the agent, servant, employee and/or joint venture of his co-defendants, and each of them, and at all said times each defendant was acting in full course and scope of said agency, service, employment and/or joint venture.

5

**EXHIBIT 10**

24.    The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants are not fully known to Plaintiffs at this time, who there're sues said defendants by such fictitious names. When the true names and capacities of said defendants have been ascertained, Plaintiffs will amend this complaint accordingly. Plaintiffs are informed and believe, and thereon allege, that each defendant designated herein as JOHN DOE is responsible, negligently or in some other actionable matter, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to the Plaintiffs, as hereinafter alleged.

25.    Plaintiffs are informed and believe, and thereon allege that at all times herein mentioned, defendants Monsanto Company (New Monsanto) (sued individually and as successor in interest to Pharmacia Corporation, Which Will Do Business in Massachusetts as Pharmacia Pharmaceutical Corporation), Solutia Inc. (sued individually and as successor-in-interest to Monsanto Chemical Co.(Old Monsanto)), Pharmacia (sued individually and as successor-in-interest to Monsanto Chemical Co.(Old Monsanto)), Pfizer (sued individually and as successor-in-interest to Pharmacia Corporation, Which Will Do Business in Massachusetts as Pharmacia Pharmaceutical Corporation), and JOHN DOES were and are authorized to do and are doing business in the State of Massachusetts, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the state of Massachusetts, and that said defendants have regularly conducted business in the state of Massachusetts.

26.    Plaintiffs are informed and believe that each of the defendants is responsible, negligently, intentionally and/or in some actionable manner, including as corporate successors liable for the acts of their predecessors, for the events and happenings referred to herein, and caused and continue to cause injuries and damages to Plaintiffs, as alleged herewith, either through each defendant's own conduct, or through the conduct of its agents, servants, or employees, or due to ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

**EXHIBIT 10**

27.  Collectively, the following Defendants are known as the Manufacturing Defendants for purposes of this Complaint. They are listed as follows: Monsanto Company; Cooper Power Systems; O'Connor Corporation; General Electric's manufacturing division; Pfizer; Solutia; Pharmacia; CBS; PerkinElmer, Inc., and JOHN DOE defendants.

28.  Collectively, the following Defendants are known as Premises Defendants for purposes of this Complaint. They are listed as follows: McGraw Edison; NSTAR; International Paper Company; Verizon Communications; General Electric's facility located in Pittsfield, Massachusetts; and JOHN DOE defendants.

## VENUE JURISDICTION

29.  Suffolk County Superior Court is a proper venue for this action, since Plaintiff's exposure and Defendants actions and selling of products which led to such exposure took place in the State Massachusetts.

30.  Jurisdiction is proper in this Court because Plaintiff are seeking damages in excess of twenty-five thousand dollars ($25,000) and Defendants' conduct giving rise to Plaintiffs' causes of action occurred in the state of Massachusetts. See MGL c. 223A, § 3.

31.  This Court has jurisdiction of this matter because the amount in controversy exceeds its jurisdictional minimum, exclusive of costs and interest. Moreover, this Court has jurisdiction over this matter and these defendants because these defendants have done business in the State of Massachusetts, committed torts, in whole or in part, in the State of Massachusetts, and/or have continuing contacts with the State of Massachusetts resulting in Plaintiff Craig Lamkin's injuries.

32.  In the event that the parties do not maintain principal places of residence and/or business within the Commonwealth of Massachusetts, the Massachusetts Long Arm Statute (M.G.L. c.223 A, § 3) provides personal jurisdiction in the Superior Court Department of the Trial Court over all parties.

7

**EXHIBIT 10**

33.     This action involves claims by Massachusetts Plaintiffs against at least one defendant who has a principle place of business in Massachusetts through which the injuries alleged were caused. "[An] action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." (28 U.S.C. § 1441(b)).

## FACTUAL ALLEGATIONS

### A. Background.

34.     This is a personal injury case brought by Plaintiffs, Craig Lamkin and his wife Susan Lamkin for injuries caused by Plaintiff Craig Lamkin's exposure to polychlorinated biphenyls (PCBs) manufactured and sold and controlled by Defendants as well as chemical derivatives and contaminants contained within the PCBs known as dioxins. At all times relevant to the allegations listed herein, Plaintiff, Craig Lamkin was employed by (1) Laidlaw Environmental Services in North Andover, Massachusetts, where he worked as an environmental chemist from approximately October of 1992 through December of 1994; (2) Enpro Services in Newburyport, Massachusetts, where he worked as a compliance manager from approximately December of 1994 through July of 2001; and (3) Cyn Environmental Services in Stoughton, Massachusetts, where he worked as a corporate compliance manager from approximately July of 2001 through June of 2008. Throughout Mr. Lamkin's employment he worked at the various premises sites listed in count 28, herein aforementioned.

35.     PCBs were used as coolants and lubricants in transformers, capacitors, and other electrical equipment from 1929 to 1979.

36.     The manufacture of PCBs was stopped in the U.S. in 1979 because of evidence of harmful health effects and impacts on the environment.

37.     'Dioxins' refers to two groups of compounds: Polychlorinated dibenzo-p-dioxins (PCDDs) and dibenzofurans (PCDFs).

**EXHIBIT 10**

38.    Dioxins have no technological or other use, but are generated in a number of thermal and industrial processes including the use as coolants and lubricants in electrical equipment as unwanted and unavoidable by-products. Moreover, dioxins are present as contaminants within PCBs that have not been subject to thermal or industrial processes.

39.    Dioxins and PCBs been shown to cause a range of adverse effects including cancer, impairment of the nervous, immune, endocrine, and reproductive systems.

40.    Monsanto Company was the sole manufacturer of PCBs in the United States from 1935 to 1979. Although Monsanto knew for decades that PCBs were toxic and presented a human health risk, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture use of most PCBs as of January 1, 1979. The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

41.    Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start capacitors, and lighting ballasts.

42.    From the 1930s to 1979, Westinghouse and General Electric Co. were the biggest purchasers of PCBs for use in electrical components including transformers.

43.    Other big users included electrical-equipment companies such as McGraw Edison, NStar Electric, and telephone companies like NYNEX Corporation.

44.    As used in this Complaint, the terms " "PCB-containing products" and "PCB products" refer to products containing PCBs, as well as breakdown products and contaminants PCDDs and PCDFs, manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

**B.  PCB Containing Products are Human Carcinogens.**

9

EXHIBIT 10

45.    Humans may be exposed to PCB products through ingestion, inhalation, and dermal contact. Individuals may inhale PCBs that are emitted into the air. They may also ingest PCB products that are emitted into air and settle onto surfaces that come into contact with food or drinks. Humans may also PCBs from physical contact with PCBs or PCB-containing materials.

46.    EPA has determined that PCBs are probable human carcinogens. In 1996, EPA reassessed PCB carcinogenic to Plaintiff, based on data related to Aroclors 1016, 1242, 1254, and 1260.    EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

47.    The International Agency for Research on Cancer published an assessment in 2013 that reinforcing the probable carcinogenicity of PCBs.

48.    The International Agency for Research on Cancer published an assessment in 1997 that asserts an even stronger relationship between dioxins and human cancer. The International Agency for Research on Cancer (IARC) classified TCDD in Group 1 (carcinogenic to humans). In addition, IARC recently classified 2,3,4,7,8-pentachlorodibenzofuran and 3,3',4,4',5-pentachlorobiphenyl in Group 1.

## C. Defendants Have Long Known of PCBs' Toxicity

49.    All of the Defendants were well aware of the decades of scientific literature first published in the 1930s that established that PCBs were toxic to humans.

50.    As a result, all of the Defendants knew or should have known of the actual dangers associated with PCB products that Mr. Lamkin worked with.

51.    Despite this, Defendants never warned Mr. Lamkin of the hazards associated with their PCB products or advised him of the proper protective measures to avoid exposure.

52.    In 1936, Dr. Lewis Schwartz, Senior Surgeon with the United States Public Health Service, wrote a paper in which he warned of the dangers of Pyrenol, the version of PCBs used by GE. In it Dr.

10

**EXHIBIT 10**

Schwartz said:

"In addition to the skin lesions, symptoms of systematic poisoning have occurred among workers inhaling the fumes. Those working with the chloro diphenyls (PCBs) have complained of digestive disturbances, burning of the eyes, impotence and hematuria. The latter symptom developed among a number of men making amino diphenyl, which is used in the making of a rubber antioxidant. Causes of death from yellow atrophy of the liver have been reported among workers exposed to the fumes of the chloro naphthalenes."

53.    Also in 1936, Dr. Schwartz cautioned in an article that "workers in chlorinated naphthalenes and di phenyls (PCBs) should be periodically examined for symptoms of systemic poisoning."

54.    An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects. Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."

55.    In a letter dated Sept. 15, 1947, E. C. Barnes of Westinghouse's medical department wrote that long-term exposure to PCB fumes "may produce internal bodily injury which may be disabling or could be fatal."

56.    A September 20, 1955, memo from Emmet Kelly stated:

"We know Aroclors are toxic but the actual limit has not been precisely defined. It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops [sic] any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."

57.    On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department.

"It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation."

58.    On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. 1'

11

EXHIBIT 10

Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."

59.    In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested." Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible." Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."

60.    On January 29, 1970, Elmer Wheeler of the Medical Department of Monsanto circulated laboratory reports discussing results of animal studies. He noted: "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."

**D. Defendants Concealed the Nature of PCBs from Governmental Entities.**

61.    Upon information and belief, while the scientific community and Defendants knew that PCBs were toxic and becoming a global contaminant, Defendants repeatedly misrepresented these facts, telling governmental entities the exact opposite — that the compounds were not toxic and that the company would *not* expect to find PCBs in the environment in a widespread manner.

62.    For example, in a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption." Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry." A similar letter to the Regional Water Quality Control Board explained that PCBs are associated with "no special health problems" and "no problems associated with the environment."

12

EXHIBIT 10

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

63.    In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."

64.    Monsanto delivered the same message to the New Jersey Department of Conservation in July, 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic." The letter then reiterates Monsanto's position regarding environmental contamination: "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."

### E. Plaintiff Craig Lamkin's Experience and Exposure to Defendants PCB products.

65.    Plaintiff, Craig Lamkin was employed by (1) Laidlaw Environmental Services in North Andover, Massachusetts, where he worked as an environmental chemist from approximately October of 1992 through December of 1994; (2) Enpro Services in Newburyport, Massachusetts, where he worked as a compliance manager from approximately December of 1994 through July of 2001; and (3) Cyn Environmental Services in Stoughton, Massachusetts, where he worked as a corporate compliance manager from approximately July of 2001 through June of 2008.

66.    During the course of his employment with each of these entities, Mr. Lamkin worked with each of the Manufacturing Defendants' PCB containing products including, but not limited to electrical transformers and other electrical equipment.

67.    While working with the Manufacturing Defendants' PCB containing products, Mr. Lamkin was repeatedly exposed to PCB products through inhalation, ingestion, and dermal exposure.

68.    Mr. Lamkin's exposure to these PCB products occurred at facilities including but not limited to those of the Premises Defendants.

13

**EXHIBIT 10**

**Count I: Breach of Warranty- Defective Design (Against Manufacturing Defendants)**

**(Incorporating Strict Liability Principles as Set Forth in the Restatement (Third) of Torts)**

69.    Plaintiffs repeat and reallege all allegations contained in all paragraphs above as if fully set forth herein.

70.    Defendants were the producers of PCBs and PCB products intended for commercial use.

71.    Defendants were in the business of producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing PCBs and PCB-containing products for placement into trade or commerce.

72.    Defendants' PCB products were manufactured for placement into trade or commerce.

73.    Defendants' PCB products may have formed component parts of or may have been subsequently incorporated into other products and equipment.

74.    As a manufacturer, Defendants owed a duty to all persons to whom PCBs and PCB containing products might foreseeably harm, including Plaintiffs,

75.    Defendants had a further duty not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

76.    By manufacturing and selling PCB products, Defendants warranted that those PCB products are merchantable, safe, and fit for ordinary purposes.

77.    Defendants breached that warranty as PCBs and PCB-containing products are unreasonably dangerous for their reasonably anticipated use because:

    a.    PCB readily migrates from the site of its original application and contaminates
    b.    adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;
    c.    PCB persists in the environment;
    d.    PCB is invisible to the naked eye;
    e.    Individuals may be exposed to PCB through inhalation, ingestion, and dermal contact.
    f.    PCB products are is a known carcinogens and are associated with other serious health risks;

14

**EXHIBIT 10**

78.    Defendants knew of the risks associated with PCB products and failed to use reasonable care in the design of its products.

79.    Products containing PCBs or dioxins pose greater than would be expected by ordinary persons such as Plaintiffs and the general public.

80.    There existed an alternative design for Defendants' products that was capable of preventing the Plaintiffs' cancer.

81.    The risks posed by PCBs and PCB products outweigh the products' utility as an electrical coolant and lubricant.

82.    The likelihood that PCBs would cause cancer or other disease outweighed any burden on Defendants to adopt an alternative design and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

83.    Plaintiff was exposed to Defendants' PCB products during the course of his employment from October of 1992 through June of 2009.

84.    Plaintiff was exposed at sufficient level to cause his cancer in June 2013.

85.    As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of PCB-containing products, Plaintiffs have suffered, and continue to suffer injuries and damages.

86.    Wherefore, Plaintiffs demand judgment for damages, including costs, interest as applicable, punitive damages and a trial by jury.

**COUNT II: Breach of Warranty- Defective Warning (Against Manufacturing Defendants)**
**(Incorporating Strict Liability Principles as Set Forth in the Restatement (Third) of Torts)**

87.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

15

**EXHIBIT 10**

88.    As a manufacturer of PCBs and PCB-containing products, Defendants had a duty to provide adequate warnings to Plaintiffs, the public, and public officials of the risks posed by PCBs and PCB-containing products.

89.    PCBs and PCB-containing products are unreasonably dangerous for their reasonably anticipated use because:

a.    PCB readily migrates from the site of its original application and contaminates adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;
b.    
c.    PCB persists in the environment;
d.    PCB is invisible to the naked eye;
e.    Individuals may be exposed to PCB through inhalation, ingestion, and dermal contact.
f.    PCB products are is a known carcinogens and are associated with other serious health risks;

90.    Defendants knew of the risks associated with PCBs and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with PCB-containing products or an instruction that would have allowed Plaintiffs to avoid his injurious exposure.

91.    Despite Defendants' knowledge of the presence of PCB-containing products in electrical transformers and other equipment, Defendants have not issued any warning, instruction, or special guidance regarding the removal and disposal of PCBs and PCB products.

92.    Plaintiffs would have heeded legally adequate warnings and would have taken additional special precautions when handling products containing PCBs and would have taken steps to ensure that PCBs were treated differently to prevent potential exposure.

93.    Plaintiff was exposed to Defendants' PCB products during the course of his employment from October of 1992 through June of 2009.

94.    Plaintiff was exposed at sufficient level to cause his cancer in June 2013.

16

**EXHIBIT 10**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

95.     As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of PCB-containing products, Plaintiffs have suffered, and continue to suffer injuries and damages.

96.     Wherefore, Plaintiffs demand judgment for damages, including costs, interest as applicable, punitive damages and a trial by jury.

### COUNT III: Negligence (Manufacturing Defendants)

97.     Plaintiff re-alleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restates in this count.

98.     Plaintiff used, handled, inhaled, ingested, consumed, absorbed or been otherwise exposed to PCBs and PCB-containing products referred to herein in a manner that was reasonably foreseeable.

99.     Plaintiff Craig Lamkin suffers permanent injuries to his person, body and health, including, but not limited to cancer in the form of retroperitoneal sarcoma diagnosed on July 13, 2013.

100.    Defendants, and each of them, and their officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

101.    Defendants, and each of them, and their officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

102.    Defendants failed to exercise ordinary care because a reasonably careful company that learned of its product's toxicity would not manufacture that product or would warn of its toxic properties.

103.    Defendants failed to exercise ordinary care because a reasonably careful company that learned that its product could not be contained during normal production and use would not continue to manufacture that product or would warn of its dangers.

104.    Defendants failed to exercise ordinary care because a reasonably careful company would

17

**EXHIBIT 10**

not continue to manufacture PCB products in mass quantities and to the extent that Defendants manufactured them and without sufficient warnings.

105.    Defendants were negligent because they failed to exercise reasonable care.

106.    The Defendants, and each of them, and their officers, directors, and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

107.    The herein-described conduct of said Defendants, and each of them, was and is willful, malicious, fraudulent, outrageous, and in conscious disregard and indifference to the safety and health of Plaintiff. Plaintiff, for the sake of example and by way of punishing said defendants, and each of them, seek punitive damages according to proof.

108.    Wherefore, Plaintiffs demand judgment for damages, including costs, interest as applicable, and a trial by jury.

## COUNT IV: Premises Liability

109.    Plaintiffs adopt and re-allege each prior paragraph, where relevant, as if set forth fully herein.

110.    At all times relevant to Plaintiffs' Complaint, Plaintiff, Craig Lamkin was an invitee on the premises of the above Defendants, which were operated, owned, and/or controlled by the above Defendants, for purposes beneficial to the Defendants.

111.    Defendants owed a duty to Plaintiff, Craig Lamkin, to maintain said premises in a safe manner, free and clear of toxic chemicals, materials and substances and to provide Plaintiff with a reasonably safe place to work and a duty to exercise reasonable care in protecting Plaintiff from workplace hazards.

**EXHIBIT 10**

112.    Defendants breached these duties and exposed Plaintiff to various PCB-containing products at said premises during operation, construction and/or repair of said premises by Plaintiff and/or outside contractors and co-employees, and Plaintiff was injured as previously described.

113.    As set forth above, Defendants' failure to maintain the premises of the above worksites in a safe manner was intentional, reckless and wrongful, such that Plaintiffs are entitled to all actual and compensatory damages as well as for punitive damages and for such other further relief as this Honorable Court and/or jury may deem just and proper.

### COUNT V: Punitive Damages as to all Defendants

114.    Plaintiffs repeat and reallege all allegations contained in all paragraphs above as if fully set forth herein.

115.    The acts and omissions of Defendants that were the direct and proximate cause of Plaintiffs' injuries were willful, malicious, wanton, undertaken with reckless disregard of the rights of Plaintiffs, and were grossly negligent.

116.    WHEREFORE Plaintiffs demand judgment and punitive damages against the Defendants, jointly and severally, plus interest, costs, and whatever other further relief this Honorable Court deems right and just.

### COUNT VI: Loss of Consortium

117.    Plaintiffs repeat and reallege all allegations contained in all paragraphs above as if fully set forth herein.

118.    As a direct and proximate result of Defendants' negligence and conduct as detailed above, Plaintiff Susan Lamkin was caused to lose the consortium and society of her spouse, Plaintiff Craig Lamkin.

EXHIBIT 10

119. Wherefore, Plaintiffs demand judgment for damages, including costs, interest as applicable, and a trial by jury.

## DEMAND FOR JURY TRIAL

120. Plaintiff hereby demands trial by jury as to all issues so triable.

Dated: February 10, 2016

PLAINTIFFS BY THEIR ATTORNEYS,

MOTLEY RICE LLC
Robert J. McConnell, BBO #550625
Jonathan D. Orent, BBO #660571
321 South Main Street
Providence, RI 02903
401-457-7700
401-457-7708 Fax

Of Counsel:
Vincent L. Greene IV
321 South Main Street
Providence, RI 02903
401-457-7700
401-457-7708 Fax

20

**EXHIBIT 10**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM



**EXHIBIT 10**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**17SL-CC03368**



THOMPSON
COBURN LLP

Christopher M. Hohn
P 314.552.6159
F 314.552.7000
chohn@thompsoncoburn.com

August 29, 2016

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL**

Scott S. Cramer
Magnetek, Inc.
N49 W13650 Campbell Dr
Menomonee Falls, WI 53051
Scramer@magnetek.com

*Re:    Tender of Defense & Demand for Indemnification Under Special Undertaking by
Purchasers of Polychlorinated Biphyenls contract dated January 7, 1972*

*Protected    Communication:    Indemnitee-Indemnitor    Privilege;    Common    Interest
Doctrine*

Dear Mr. Cramer:

We understand that you are authorized to receive this demand on behalf of Magnetek, Inc. If
that understanding is incorrect, please advise immediately and we will redirect this
correspondence as necessary.

We write on behalf of our clients Monsanto Company ("New Monsanto"), Pharmacia LLC, f/k/a
Monsanto ("Old Monsanto"), and Solutia Inc. (collectively the "Monsanto Defendants"). The
Monsanto Defendants have been sued in certain lawsuits by a number of individuals, cities,
municipal agencies, and school districts seeking to recover for claimed personal injuries,
environmental clean-up and permit costs, property damage, and other damages allegedly caused
by exposure to or contamination by Polychlorinated Biphenyls ("PCBs") manufactured and sold
by Old Monsanto.

It is the Monsanto Defendants' understanding that Magnetek, Inc. is the successor in interest to
Universal Manufacturing Corporation's obligations under the Special Undertaking By
Purchasers of Polychlorinated Biphenyls contract Universal Manufacturing Corporation entered
into with Old Monsanto on January 7, 1972 (the "Special Undertaking Contract"), a copy of
which is enclosed for your reference.

The Special Undertaking Contract states in pertinent part that Magnetek, Inc. will:

> defend, indemnify and hold harmless Monsanto, its present, past and future
> directors, officers, employees and agents, from and against any and all liabilities,

Thompson Coburn LLP | Attorneys at Law | One US Bank Plaza | St. Louis, Missouri 63101
P 314.552.6000 | F 314.552.7000 | www.thompsoncoburn.com

Chicago • Los Angeles • St. Louis • Southern Illinois • Washington, D.C.

**EXHIBIT 11**

claims, damages, penalties, actions, suits, losses, costs and expenses (except to the extent arising from failure of PCB to conform to specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale, or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

Special Undertaking Contract at 1.

By copy of this letter, demand is made for Magnetek, Inc. to defend, indemnify and hold harmless Old Monsanto (and related entities as specified in the Special Undertaking Contract), in connection with all current and future PCB-related litigation wherein Old Monsanto is, or will be, named as a defendant, and for the amount of any resulting judgments (if any) and settlements, to the full extent required by the Special Undertaking Contract. You are hereby formally tendered the defense of the Food Chain Cases, the Water Cases, the School Cases, the Occupational Case, and any other lawsuits on the enclosed list of PCB-related litigation. Copies of the complaints in each case will be provided upon request. Pending the establishment of a reasonable and acceptable arrangement regarding this tender, the cases will continue to be defended and/or settled and Magnetek, Inc. will be held liable for the amount of the resulting settlements or judgments (if any) as well as the incurred costs, expert witness fees, attorney's fees, and all other reasonable expense incurred in defending these actions. You are expressly notified that settlement negotiations relating to certain of the listed cases are currently underway.

The Monsanto Defendants expressly reserve all of their rights of any sort, at law or in equity, including but not limited to those under the Special Undertaking Contract, whether or not identified herein. The Monsanto Defendants also expressly reserve the right to engage in settlement discussions and/or to settle some or all of the above cases, while holding Magnetek, Inc. responsible for those settlements.

The current breakdown of the PCB-related litigation involving the Monsanto Defendants is as follows:

53. The Monsanto Defendants are defending a series of personal injury cases in which plaintiffs are contending that they suffer from various types of cancer (primarily non-Hodgkin lymphoma) as a result of their environmental, non-employment exposure to PCBs (the "Food Chain Cases"). The Food Chain Cases currently are pending in state court in Los Angeles County, California and in state and federal courts in St. Louis, Missouri. At present, the Food Chain Cases include approximately 700 plaintiffs. On May 26, 2016, a Judgment was entered against Monsanto in one such case in the total amount of $46,500,000.00 for alleged personal injuries and punitive damages arising out of the exposure to PCBs in a case captioned *Benito Walker et al. v. Monsanto Co., et al.*, Case No. 1122-CC09621-01 (Cir. Court City of St. Louis May 26, 2016).

54. The Monsanto Defendants also face a group of lawsuits (currently eight suits have been filed) on the West Coast in which cities and various municipal agencies are

**EXHIBIT 11**

alleging that the Monsanto Defendants should bear some cost of water clean up and wastewater permit costs due to PCB contamination (the "Water Cases").

55. The Monsanto Defendants also are defending four cases in which certain school districts allege that they should bear some cost of clean-up and/or rebuilding of schools due to alleged PCB contamination (the "School Cases").

56. The Monsanto Defendants also were recently named along with several other defendants in an occupational exposure case filed in state court in Massachusetts (the "Occupational Case").

A current list of all PCB-related litigation wherein the Monsanto Defendants are named as defendants (including court, case caption, and civil docket number) is enclosed. Please note that the next Food Chain Case is currently set for trial on September 12, 2016.

We request acknowledgement that Magnetek, Inc. received this communication and confirmation that Magnetek, Inc. intends to honor its contractual obligations of defense and indemnification under the Special Undertaking Contract within **ten (10) days** from the date of this communication. We also request that you immediately notify your primary and excess insurer(s) of the demand for defense and indemnity set forth above.

Our Client would welcome the opportunity to discuss the PCB-related litigation referenced above (and on the enclosed list) and the scope of Magnetek, Inc.'s obligations under the Special Undertaking Contract with you. New Monsanto expects to put a process in place for the resolution of this obligation, and those obligations of other similarly situated parties. Please, at your earliest convenience, contact Monsanto's Assistant General Counsel, Litigation, Molly Jones at (314) 694-5425 to discuss this matter.

Thank you for your attention to this matter. We look forward to hearing from you.

Sincerely,

Thompson Coburn LLP

By
   Christopher M. Hohn

Enclosures

cc: Magnetek, Inc.
    c/o CSC-Lawyers Incorporating Service Company
    221 Bolivar Street
    Jefferson City, MO 65101
    *(via Federal Express)*

**EXHIBIT 11**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

| Matter Name | Group Reference | Jurisdiction Type | Court | Docket Number | File Date |
|---|---|---|---|---|---|
| Grant Parish School Board v. Monsanto Company (PCB) | PCB - Building | Federal | LA - Western District | 1:15-cv-01719-DDD-JDK | 5/19/2015 |
| City of Hartford and Hartford Board of Education v. Monsanto (SOI)(PCBO | PCB - Building | Federal | CT - U.S. District | 2015-004301 | 10/23/2015 |
| Town of Princeton, MA v. Monsanto Company (SOI) (PCB) | PCB - Building | Federal | MA - U.S. District | 4:15-cv-40096-DJC | 7/1/2015 |
| Town of Westport and Westport Community Schools v. Monsanto (SOI) (PCB) | PCB - Building | Federal | MA - U.S. District | 1:14-CV-12041-DJC | 5/7/2014 |
| Abston, Bertha v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01495 | 4/23/2012 |
| Aiken, Ronald v. Monsanto Company (SOI) (PCB Food chain case) | PCB - Food Chain | State | MO - St. Louis City | 1422-CC09436 | 8/15/2014 |
| Ashley, Jerry v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01499 | 4/23/2012 |
| Bailey, Roger v. Monsanto Company (PCB Food Chain case) | PCB - Food Chain | State | MO - Eastern District | 16SL-CC01768 | 5/22/2015 |
| Blum, Robert J., Jr. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC02866 | 6/28/2010 |
| Brownlee, Paul v. Monsanto Company (SOI) (PCB Food Chain) | PCB - Food Chain | State | CA - LA County | BC497582 | 12/14/2012 |
| Brown, Paulette v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01498 | 4/23/2012 |
| Burford, Kent N, et al.. v. Monsanto, et al. (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00928 | 3/10/2016 |
| Burke, Angela v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1222-CC10374 | |
| Carter, Kevin v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC484608 | 5/11/2012 |
| Clair, Sanford v. Monsanto Company (SOI) (PCB) | PCB - Food Chain | State | MO-St. Louis County | 09SL-CC01984 | |
| Craig, Gary v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01496 | 4/23/2012 |
| Dauber, Roslyn v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC483342 | 4/23/2012 |
| Dublin, Sydell v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 10SL-CC03822 | 9/22/2010 |
| Ferrell, Marinda v. Monsanto (SOI) (PCB Food Chain case). | PCB - Food Chain | State | MO - St. Louis City | 1322-CC08915 | 7/22/2013 |
| Gibson, Dennis L. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - Eastern District | 11SL-CC04951 | |
| Goodman, Betty v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1322-CC09213 | 8/26/2013 |
| Granger, Jacqueline v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC459770 | 4/19/2011 |
| Guenther, Valerie Anna v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | CA - LA County | BC480068 | 3/5/2012 |
| Hearon, Leslie v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12S-CC01497 | 4/23/2012 |
| Kelly, Thomas v. Monsanto Company (SOI) (PCB Food Chain case) | PCB - Food Chain | State | MO - St. Louis County | 15SL-CC03845 | 11/9/2015 |

**EXHIBIT 11**

Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

| Case | PCB Type | State/Federal | Jurisdiction | Case Number | Date |
|---|---|---|---|---|---|
| LaBarge, Dale L. v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC01263 | 4/5/2012 |
| Mosby, Keith v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 1122-CC02206 | |
| Murphy, Deborah D. v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO- St. Louis City | 1222-CLO9174 | 7/6/2012 |
| Naihe, Edward v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO - St. Louis County | 12SL-CC02117 | 6/5/2012 |
| Nishida Nicolas White, Ruth v. Monsanto and Solutia (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 09SL-CC01964 | 5/1/2009 |
| Nunn, Mary vs. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis City | 1122-CC01207 | |
| Olson Kathleen R. v. Monsanto Company, et al. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 16SL-CC00919 | 3/10/2016 |
| Rodriguez, Guillermo v. Monsanto Co. (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO - St. Louis County | 10SLCC03408 | |
| Stapleton, Bernadette v. Monsanto (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO-St. Louis City | 1122CC09622 | 9/9/2011 |
| Varela, Jesse v. Monsanto (SOI) (PCB Food Chain) | PCB - Food Chain | State | MO-St. Louis City | BC509170 | 5/16/2013 |
| Walker, Benito v. Monsanto Company (SOI) (PCB Food Chain Case) | PCB - Food Chain | State | MO-St. Louis City | 1122CC09621 | |
| Lamkin, Craig, et ux. v. Monsanto Company, et al. (SOI) (PCB) | PCB - Personal Injury | State | MA – Suffolk County | 16-0563 | 2/19/2016 |
| City of Berkeley v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 5:16-cv-00071 | 1/6/2016 |
| City of Oakland v. Monsanto Company (SOI)(PCB) | PCB - Water Contamination | Federal | CA - Northern District | 4:15-cv-05152 | 11/10/2015 |
| City of San Jose v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | CA - Northern District | 5:15-cv-03178-NC | 7/10/2015 |
| City of Seattle v. Monsanto, et al. (SOI) (PCB) | PCB - Water Contamination | Federal | WA - Western District | 2:16-cv-00107 | 1/25/2016 |
| City of Spokane v. Monsanto Company (SOI) (PCB) | PCB - Water Contamination | Federal | WA- Eastern District | 2:15-cv-00201-SMJ | 7/31/2015 |
| Monsanto PCB Water Contamination Litigation (SOI) (PCB) | PCB - Water Contamination | Federal | Judicial Panel /Multidistrict | MDL No. 2697 | 1/28/2016 |
| San Diego Unified Port and City of San Diego v. Monsanto Co., et al. | PCB - Water Contamination | Federal | CA – Southern District | 3:15-cv-00578-WQH-JLB | 8/3/15 |
| City of Long Beach v. Monsanto Co., et al. | PCB-Water Contamination | Federal | CA – Central District | 2:16-cv-03493-FMO-AS | 5/19/16 |
| City of Portland v. Monsanto Co., et al. | PCB – Water Contamination | Federal | OR – Dist. of Oregon, Portland Division | 3:16-cv-1418-PK | 7/12/16 |

**EXHIBIT 11**

**UNIVERSAL MANUFACTURING CORPORATION**
2951 EAST SIXTH STREET, PATERSON, NEW JERSEY 07509 • PHONE: (201) 271-3100 • TWX NO. 710 988-5934

January 7, 1972

Mr. H.S. Bergen
Monsanto Company
P.O. Box 14817
St. Louis, Missouri  63178

Dear Mr. Bergen:

Enclosed is the undertaking you requested in connection
with our purchase of PCB.  As previously discussed, we
are executing the undertaking in our own name and are
excepting any liability arising from failure of the
product to conform to specifications.

This undertaking will be covered by a blanket liability
policy with the Travelers Insurance Company having limits
of 10 million dollars.  As of December 31, 1970, Universal's
consolidated net worth was 16.8 million and its current
ratio was 1.7 to 1.

Very truly yours,

UNIVERSAL MANUFACTURING CORPORATION

Paul H. Einhorn
President

PHE/paz

0167252

**EXHIBIT 11**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 03:14 PM

( )  ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶    Vault

Special Undertaking by Purchasers of Polychlorinated Biphenyls

Monsanto Company (Monsanto) manufacturers certain polychlorinated
biphenyls products (PCB's) which Universal Manufacturing Corporation
(Buyer) desires to purchase.  While buyer desires to purchase PCB's
because of certain desirable flame resistant and insulator properties,
Buyer acknowledges that it is aware and has been advised by Monsanto
that PCB's tend to persist in the environment; that care is required in
the handling, possession, use and disposition; that tolerance limits
have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with
respect to its further production, sale and delivery of PCB's, including
the receipt of undertakings from its customers as set forth below, and
Buyer is willing to agree to such undertakings with respect to sales
and/or delivery of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to
any and all PCB's sold or delivered by or on behalf of Monsanto to
Buyer on or after the date hereof and in consideration of any such
sale or delivery, buyer shall defend, indemnify and hold harmless
Monsanto, its present, past and future directors, officers, employees
and agents, from and against any and all liabilities, claims, damages,
penalties, actions, suits, losses, costs and expenses (except to the
extent arising from failure of PCB to conform with specifications)
arising out of or in connection with the receipt, purchase, possession,
handling, use, sale or disposition of such PCB's by, through or under
Buyer, whether alone or in combination with any other substances,
including without implied limitation, any contamination of or adverse
effect on humans, marine and wildlife, food, animal feed or the
environment by reason of such PCB's.

All existing contracts for the sale of PCB's by Monsanto to Buyer are
hereby amended to contain the provision set forth above.

Nothing herein shall create or imply, any duty or obligation of
Monsanto to sell or deliver any PCB's to Buyer.  No conditions, under-
takings or agreements purporting to modify the terms hereof shall be
binding unless hereafter made in writing specifically referring to
this agreement and signed by the party to be bound and no modification
or variance of the above undertaking shall be effective by the acknow-
ledgement or acceptance of any sale document, purchase order, shipping
instructions or other forms containing terms or conditions at variance
herewith.

Universal Manufacturing Corporation                MONSANTO COMPANY
                    (Buyer)

BY:  _____            BY: _____

TITLE:  President

DATE:  January 7, 1972

                                                    0167253

**EXHIBIT 11**

PS|Ship - FedEx Label

Page 1 of 2



Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

FOLD on this line and place in shipping pouch with bar code and delivery address visible

1. Fold the first printed page in half and use as the shipping label.
2. Place the label in a waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
3. Keep the second page as a receipt for your records. The receipt contains the terms and conditions of shipping and information useful for tracking your package.

**EXHIBIT 11**
8/29/2016

**17SL-CC03368**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM



**Phillips Lytle LLP**

**VIA E-MAIL & U.S. MAIL**                                    September 13, 2016

Christopher M. Hohn
Thompson Coburn LLP
One US Bank Plaza
St. Louis, MO 63101
chohn@thompsoncoburn.com

Re:   Monsanto's Purported Tender of Defense & Demand for Indemnification
      Under Special Undertaking dated January 7, 1972

Dear Mr. Hohn:

Please be advised that our firm has been retained to assist MagneTek in regards to your
correspondence dated August 29, 2016, addressed to Mr. Scott S. Cramer, purporting to:
(a) tender to MagneTek the defense of Monsanto Company ("New Monsanto"),
Pharmacia LLC f/k/a Monsanto ("Old Monsanto"), and Solutia Inc. (collectively,
"Monsanto") in the 46 cases identified in the accompanying attachment to your
correspondence; and (b) demanding that MagneTek indemnify Monsanto with respect
to any damages that might be awarded against Monsanto in those cases, pursuant to the
accompanying "Special Undertaking," dated January 7, 1972.

Initially, please note that Mr. Cramer is no longer with MagneTek and that any future
correspondence regarding this matter should, therefore, be directed to the undersigned.

Your correspondence is the first notice to MagneTek of the 46 cases identified in the
accompanying attachment, in spite of the fact that many of those cases have been
pending for years, at least one has already gone to trial and verdict, and another is
apparently set for trial this week.  Based upon the scant information that Monsanto has
provided, MagneTek presently has no reason to believe that it is required to either
defend or indemnify Monsanto and, therefore, rejects Monsanto's tender or demand.

ATTORNEYS AT LAW

CRAIG A. LESLIE, PARTNER  DIRECT 716 847 7012  CLESLIE@PHILLIPSLYTLE.COM

ONE CANALSIDE  125 MAIN STREET  BUFFALO, NY 14203-2887  PHONE 716 847 8400  FAX 716 852 6100

NEW YORK: ALBANY, BUFFALO, CHAUTAUQUA, GARDEN CITY, NEW YORK, ROCHESTER  |  WASHINGTON, DC  |  CANADA: WATERLOO REGION  |  PHILLIPSLYTLE.COM

**EXHIBIT 12**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM



Christopher M. Hohn                                        September 13, 2016
Page 2

MagneTek also reserves all of its rights with respect to Monsanto's tender and demand including, specifically, but without limitation, its right to specify further and additional grounds for rejecting the same as MagneTek's investigation of Monsanto's tender and demand continues.


Very truly yours,

Phillips Lytle LLP

By

Craig A. Leslie

CALram

**EXHIBIT 12**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**17SL-CC03368**


**THOMPSON COBURN** LLP

One US Bank Plaza
St. Louis, MO 63101

314 552 6000 main
314 552 7000 fax
thompsoncoburn.com

**Christopher M. Hohn**

314 552 6159  direct
chohn@thompsoncoburn.com

December 23, 2016

## VIA FEDERAL EXPRESS

Scott S. Cramer
N49 W13650 Campbell Drive
Menomonee Falls, Wisconsin 53051

Scramer@magnetek.com

***Protected Communication:  Indemnitee-Indemnitor Privilege;  Common Interest Doctrine***

Re:    Magnetek, Inc.'s obligations under Special Undertaking Agreement

Dear Mr. Cramer:

This letter is a follow-up to my August 29, 2016 correspondence to you regarding Magnetek, Inc.'s ("Magnetek") contractual obligation to defend and indemnify Monsanto in the pending PCB lawsuits referenced in my letter.  Specifically, I write to suggest that we schedule a meeting to discuss our clients' respective positions regarding those obligations.

The information Monsanto previously provided demonstrates Magnetek's duty to defend Monsanto in the pending PCB litigation.  The duty to defend is determined by comparing the allegations of the complaints to the language of the parties' agreement.  Where the allegations give rise to a claim potentially within the scope of the agreement, the duty to defend arises. Monsanto has provided Magnetek with a copy of the Special Undertaking Agreement its predecessor in interest, Universal Manufacturing Corporation ("Universal"), entered into with Monsanto, and docket information to facilitate Magnetek's review of each individual complaint.[1] These materials are sufficient to demonstrate Magnetek's obligation to defend Monsanto in the pending litigation.

Magnetek has a duty to defend Monsanto in the pending litigation because the plaintiffs' allegations fall squarely within the scope of the Special Undertaking Agreement.  Magnetek through its predecessor in interest, Universal, agreed to defend and indemnify Monsanto against

---

[1] As a courtesy, copies of the complaints are available for your review at the following link: https://thompsoncoburn.box.com/s/j00ik2j3ofpvm69xojoa3im88ic8afa1.  We will provide the password needed to access these documents via separate correspondence.

**EXHIBIT 13**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM
Electronically Filed - St Louis County - September 01, 2017 - 05:14 PM

any and all liabilities, claims, and actions arising out of or in connection with Universal's "receipt, purchase, possession, handling, use, sale or disposition" of PCBs after January 7, 1972. The pending claims and actions fall within the scope of the agreement for several reasons. For example:

- The claims and actions "aris[e] out of or in connection with" Universal's post-January 1972. PCB *purchases*, because the plaintiffs seek to impose liability on Monsanto for its manufacture and sale of all PCBs, including those purchased by Universal after January 7, 1972.

- The claims and actions also arise out of or in connection with Universal's *possession, handling, use, sale, and/or disposition* of PCBs purchased after January 7, 1972, because plaintiffs assert injuries allegedly caused by general environmental and food chain exposure to PCBs, and Universal's possession, handling, use, sale and disposition of PCBs purchased after January 7, 1972 contributed to the amount of PCBs in the environment and food chain.

- Magnetek cannot credibly deny that Universal's possession, handling, use, sale and/or disposition of PCBs purchased after January 7, 1972 contributed to the amount of PCBs in the environment and food chain. Universal purchased almost 12 million pounds of PCBs after January 7, 1972, which led to the presence of PCBs in various locations across the country including the areas in and around Bridgeport, Connecticut and Totowa, New Jersey. In addition, in 1981, an EPA inspection report cited Universal for several violations including improper disposal and storage of PCBs.

- The claims and actions also arise out of or in connection with Universal's *possession, handling, use, sale, and/or disposition* of PCBs purchased after January 7, 1972, because the plaintiffs specifically allege that their injuries were caused by the improper dumping of PCBs into the environment by Monsanto's customers, which include Universal.[2]

Furthermore, Monsanto was recently served with a new Water Case: State of Washington v. Monsanto Company et al., Superior Court of King County, Washington. A copy of the complaint filed in this case is included in the link referenced in Footnote 1 above. In this action, the State of Washington asserts claims for public nuisance, product liability, negligence, equitable indemnity, and statutory trespass, seeking to recover for alleged injury to state natural

---

[2] These descriptions are only examples of the manner in which the allegations and claims made in the PCB litigation fall within the scope of the Special Undertaking Agreement; they should not be construed as an exhaustive list of the grounds on which Monsanto may seek defense costs and indemnity from Magnetek.

**EXHIBIT 13**

resources, including waterways, clean-up costs, and other alleged damages. Magnetek has a duty to defend Monsanto in this case, as it does in the other Water Cases.

The claims asserted in the pending litigation arise out of or in connection with the PCBs Universal purchased after January 7, 1972 that have been released into the environment (whether by Universal or those to whom Universal sold them) in combination with all other PCBs in the environment. The Special Undertaking Agreement, by its express terms, includes liabilities arising out of "*or in connection with*" PCBs purchased after January 7, 1972 "*alone or in combination with other substances*." Thus, Magnetek has a duty to defend Monsanto in the litigation.

Since putting Magnetek on notice, Monsanto has incurred approximately $4.2 million in attorneys' fees defending the PCB litigation, and those fees continue to accrue. Monsanto also recently agreed to pay up to $280 million dollars to settle all of the pending PCB Food Chain Cases. Under the terms of the Special Undertaking Agreement and the governing law, each indemnitor, including Magnetek, is jointly and severally liable to Monsanto for its cost of defending the PCB litigation, as well as amounts paid to resolve the Food Chain Cases. Prejudgment interest is currently accruing on amounts Magnetek owes to Monsanto.

According to our sales records, Magnetek's predecessor in interest, Universal, purchased at least 11,918,600 pounds of PCBs from Monsanto after signing the Special Undertaking Agreement. That represents 8.34% of all PCBs purchased after January 1972 by domestic indemnitors who remain viable companies.

Monsanto would prefer to resolve the parties' disagreement over the scope of Magnetek's obligations under the Special Undertaking Agreement without resorting to formal litigation. Informal resolution of the dispute will be more cost-effective for both sides, and allow greater flexibility in crafting a solution. Please let us know by January 20, 2017, if we can schedule a meeting to discuss our respective clients' positions in the near term.

Please note that Monsanto expressly reserves all of its rights of any sort, at law or in equity, including but not limited to common law contribution and indemnity, in addition to those under the Special Undertaking Agreement, whether or not identified herein.

We would appreciate your prompt attention to this matter, and look forward to hearing from you.

Sincerely,

Thompson Coburn LLP

By
Christopher M. Hohn
Partner

- 3 -

**EXHIBIT 13**

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

# Exhibit B

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

JOHN R. ALTIERI
ATTORNEY ID NO.: 024991978
Attorney at Law
25 East Salem Street
Hackensack, NJ 07601
(201) 343-6525
Attorney for Magnetek, Inc.





---

| | |
|---|---|
| MAGNETEK, INC., | SUPERIOR COURT OF NEW JERSEY |
| Plaintiff, | LAW DIVISION : BERGEN COUNTY |
| v. | |
| MONSANTO COMPANY, PHARMACIA LLC f/k/a MONSANTO, and SOLUTIA INC., | Docket No.:BER-L- |
| Defendants. | **COMPLAINT and JURY DEMAND** |

---

Plaintiff, Magnetek, Inc. ("Magnetek"), by its attorneys, Phillips Lytle LLP,

for its complaint against the defendants ("Defendants," or "Monsanto"), alleges as follows:

## NATURE OF THE ACTION

1.    This declaratory judgment action concerns Defendants' demand that

Magnetek defend and indemnify them for claims arising out of their predecessor's

manufacture, marketing, and sale of polychlorinated biphenyls ("PCBs") pursuant to a 1972

"Special Undertaking."  Magnetek seeks a declaration that the Special Undertaking is void

and unenforceable as against Magnetek, in whole or in part.

## PARTIES

2.    Magnetek is a corporation incorporated under the laws of Delaware

and has a principal place of business in Menomonee Falls, Wisconsin.  It is the successor by

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

merger to Universal Manufacturing Corporation ("UMC"), which was a New Jersey corporation with a principal place of business in Paterson, New Jersey.

3.      Defendant Monsanto Company ("New Monsanto") is a corporation incorporated under the laws of Delaware and has a principal place of business in St. Louis, Missouri.

4.      Defendant Pharmacia LLC f/k/a Monsanto ("Pharmacia") is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

5.      Defendant Solutia Inc. ("Solutia") is a corporation incorporated under the laws of Delaware and has a principal place of business in St. Louis, Missouri.

## BACKGROUND

A.    Polychlorinated biphenyls ("PCBs")

6.      From 1935 until 1979, when the manufacture and sale of PCBs were banned in the United States, the Monsanto Company ("Old Monsanto") was the sole manufacturer of PCBs in the United States.

7.      PCBs are chemical compounds consisting of carbon-hydrogen ("biphenyl") rings and from 1 to 10 attached chlorine atoms.  Based upon the number of chlorine atoms, and their locations on the biphenyl rings, there are 209 possible PCB variants, all known as "congeners."

8.      Old Monsanto marketed various PCB congeners under the trade name "Aroclor."

9.      Prior to 1971, Old Monsanto's PCBs were used in a wide variety of products and industrial applications, including, without limitation, coolants, transformers

and capacitors, lighting ballasts, hydraulic fluids, lubricating and cutting oils, carbonless copy paper, plasticizers in paints and cements (including paints used to coat the inside of silos and coal-tar formulations used to coat water tanks, bridges and similar structures), stabilizers in PVC coatings of electrical cables and components, pesticide extenders, flame retardants, sealants for caulking, adhesives, wood floor finishes, waterproofing compounds, and casting agents.

10.     The United States EPA has determined that Old Monsanto's PCBs are probable human carcinogens and are associated with other serious health effects.

11.     Because PCBs are lipophilic, they tend to bioaccumulate in adipose tissue of wildlife, livestock, and humans.

**B.      Old Monsanto's early knowledge of the hazards of PCBs**

12.     Monsanto has long known of the toxic nature of PCBs.  As the sole United States manufacturer of PCBs from 1935 until 1979, Old Monsanto developed an intimate knowledge of the characteristics of PCBs, including their toxicity, volatility, persistence and tendency to bioaccumulate.

13.     Despite this knowledge, and in its admitted pursuit of profits from its sale of Aroclors, Old Monsanto ignored and intentionally concealed the full scope of the hazards of PCBs from its customers, product end-users, and governmental entities, including Magnetek's predecessor, UMC.

14.     Internal company memoranda record that Old Monsanto was aware of the toxic health effects of PCBs as early as the 1930s.

15.     For example, an Old Monsanto memorandum dated October 11, 1937 advised that "[e]xperimental work in animals shows that prolonged exposure to Aroclor

vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects. Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."

16.    An Old Monsanto memorandum dated September 20, 1955 from R. Emmet Kelly, M.D. (a physician employed by Old Monsanto in its Medical Department), addressing the topic of "Aroclor Toxicity" similarly acknowledged Old Monsanto's knowledge of PCB toxicity, and the fact that the toxicity of congeners increased with added chlorination, but expressed indifference to those hazards:

> [Monsanto Chemical Company's] position can be summarized in this fashion. We know Aroclors are toxic but the actual limit has not been precisely defined. It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops [sic] any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to [Maximum Allowable Concentrations].

17.    Because of the toxicity of PCBs, Old Monsanto's internal medical department concluded – in November 1955 – that Old Monsanto's workers should not be allowed to eat lunch in the Aroclor department because of the potential hazards of ingesting or inhaling PCBs, including PCBs from vapors that might contaminate their food.

18.    On January 21, 1957, Dr. Kelly wrote another memorandum describing testing done by the United States Navy, pursuant to which the Navy declined to use Old Monsanto's PCB-containing hydraulic fluid because the materials were "just too toxic for use in a submarine."

19.    A third memorandum from Dr. Kelly, dated February 27, 1967, discussed his review of a research paper by Dr. Soren Jensen, a Swedish researcher,

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

regarding the toxicology of PCBs. Dr. Jensen's paper states that PCBs were "the most injurious chlorinated compounds of all tested."

20.    Similarly, a March 6, 1969 memorandum by W. M. Richard, employed in Monsanto's Research Center, discussed a 1968 journal article that suggested PCBs were toxic pollutants and harmful to humans. Mr. Richard concluded that "Monsanto is preparing to challenge certain aspects of this problem but we are not prepared to defend against all of the accusations."

21.    Mr. Richard further noted that Old Monsanto could take steps to minimize pollution from its own PCB plants, but could not control pollution arising from certain end products such as cutting oils, adhesives, plastics, and NCR paper.

22.    On January 29, 1970, Dr. Elmer Wheeler, Monsanto's Manager of Environmental Health, circulated a memorandum enclosing the results of laboratory studies commissioned by Old Monsanto to study PCB toxicity on animals. Dr. Wheeler summarized: "PCBs are exhibiting a greater degree of toxicity in this chronic study than we had anticipated."

C.    **Old Monsanto conceals the hazards of PCBs to preserve its most profitable business**

23.    Throughout the 1950s, 60s, and 70s, as Old Monsanto became increasingly aware that PCBs were toxic and could not be contained, PCBs came under increasing government and regulatory scrutiny. Old Monsanto, however, decided to conceal those facts from its customers, including Magnetek's predecessor, UMC, product end-users, and government agencies.

24.    Old Monsanto also developed strategies to deflect additional scrutiny, avoid bans on PCBs, and to preserve the profits from its Aroclor line of business.

25.     Specifically, on September 9, 1969, W. R. Richard circulated a memorandum titled "Defense of Aroclor." The memorandum expressed a general policy to "[m]ake the Govt., States and Universities prove their case" on a case by case basis and to question any evidence against Old Monsanto and its PCBs. Mr. Richard concluded that PCB degradation would be slow and that the company "can't defend vs. everything."

26.     Mr. Richard also acknowledged that PCBs would escape from capacitor products, and that Old Monsanto should find a substitute product.

27.     Throughout this time period, as Old Monsanto continued to develop detailed knowledge of the hazards of PCBs, Old Monsanto continued promoting their sale and use across a wide range of applications.

28.     For example, Old Monsanto's 1960s brochures promoted the use of Aroclors in, among other applications, transformers, capacitors, fluorescent light ballasts, utility transmission lines, home appliances, electric motors, wire coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, food fryers, drying ovens, thermostats, furnaces, automotive fluids, insecticides, waxes for dental casting, aircraft parts, lubricants, cutting oils, adhesives, coatings, sealants, paints, varnishes, lacquers for women's' shoes, floor waxes, and bookbinding adhesive.

29.     During the same period, Old Monsanto misrepresented the toxicity of PCBs to government entities and regulators. As just one example, a July 23, 1969 letter to the New Jersey Department of Conservation claimed that Old Monsanto did not believe PCBs to be toxic and that the company could not conceive of how PCBs could become widespread in the environment. Old Monsanto also feigned incredulity that any applications of Old Monsanto's PCBs were accumulating in the environment.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

30.    In the fall of 1969, Old Monsanto convened an "Aroclor Ad Hoc Committee" and determined that its chief objective was to "protect continued sales and profits of Aroclors" and continue to develop new uses and sales of Aroclors while trying to protect the image of the company.

31.    Minutes of Old Monsanto's Aroclor Ad Hoc Committee's first meeting acknowledge that PCBs had been found in milk, wildlife, and along coastlines of industrialized areas. Old Monsanto's Committee recorded its knowledge that PCBs "may be a global contaminant."

32.    Old Monsanto's Ad Hoc Committee also acknowledged the toxicity of PCBs, that the use of PCB-containing products were the sources of environmental contamination, that PCBs would enter the environment through abrasion or leaching of certain end products, and that the slow rate of natural bio-degradation would result in build-up of contamination.

33.    In October and November 1969, Old Monsanto's Aroclor Ad Hoc Committee prepared a report discussing extensive environmental contamination from PCBs and advised that while Old Monsanto could not protect the environment from Aroclors, it could protect its continued sale and manufacture of them.

34.    Specifically, Old Monsanto's Committee reported:

There is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated – e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds. Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination. There are, however, *a number of*

- 7 -

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

> *actions which must be undertaken to prolong the manufacture, sale*
> *and use of these particular Aroclors as well as to protect the*
> *continued use of other members of the Aroclor series.*

(emphasis added.)

35.     The Committee's October 1969 report restated Old Monsanto's objective to preserve continued Aroclor sales and profits while protecting the company's image.

36.     Old Monsanto's Aroclor Ad Hoc Committee also considered numerous alternative strategies, including creating a "smoke screen" to delay any restrictive action by governmental agencies and selling "the hell out of" Aroclors as long as they could.

37.     While the Committee also considered discontinuing the manufacture of PCBs, it rejected that alternative because "there is too much customer/market need *and selfishly too much Monsanto profit to go out*."

38.     Based upon the foregoing, Old Monsanto decided to stay in the PCB business, but to adopt a retrenchment strategy – sacrificing a portion of its PCB business in order to deflect government and regulatory attention, while preserving the most profitable part of its PCB business.

39.     Monsanto did so even though it knew that the part of its PCB business that it sought to preserve would continue to result in additional PCBs escaping to the environment and that such escape was unavoidable.

40.     As part of that strategy, Old Monsanto stopped manufacturing two Aroclors – Aroclors 1254 and 1260.

- 8 -

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

41.    A February 16, 1970 Old Monsanto memorandum provided talking points to answer customer questions once the customers received so-called "pollution letters" from Old Monsanto, advising customers that these products would be discontinued.

42.    Once again elevating profit above the health and well-being of its customers, end users, and the public in general, Old Monsanto instructed employees not to put anything in writing and to discourage customers from returning any fluid, as Old Monsanto "*can't afford to lose one dollar of business*." (emphasis added)

43.    As a further part of its retrenchment strategy, Old Monsanto also decided to stop selling Aroclors for so-called "open" uses (i.e., in paints, caulks, etc.), and to only sell Aroclors for so-called "closed" uses (i.e., in capacitors and transformers).

44.    Old Monsanto's sales and profits for "open" uses were far less than its sales and profits for "closed" uses. Monsanto therefore sacrificed the least profitable part of its PCB business to save the most profitable part of it – and to preserve that business so Old Monsanto could "sell the hell" out of it as long as possible.

**D.    As part of its concealment strategy, Old Monsanto Required Universal Manufacturing Corporation to execute a Special Undertaking**

45.    In 1972, as part of Old Monsanto's strategy to protect its profits, conceal the hazards of PCBs from customers, end users, and regulators, and to insulate itself from liability, Old Monsanto began to require its customers to execute so-called "special undertakings," in which customers purportedly agreed to defend and indemnify Old Monsanto for PCB-related claims. At the same time, Old Monsanto continued to misrepresent to its customers – including Magnetek's predecessor, UMC – the hazards posed by all PCBs.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

46.    Magnetek is the successor by merger to UMC. Magnetek acquired UMC from UMC's former parent, Farley/Northwest Industries, Inc. ("Farley/NWI") pursuant to a Stock Purchase Agreement dated January 9, 1986 (the "SPA") and ancillary agreements.

47.    Prior to Magnetek's acquisition of UMC, a part of UMC's business was to manufacture small capacitors, which were incorporated into lighting ballasts manufactured by UMC and were also sold to other companies as component parts.

48.    Certain of the capacitors and lighting ballasts manufactured by UMC prior to 1979 incorporated Old Monsanto's PCBs as a dielectric/insulating fluid.

49.    In 1972, Old Monsanto required UMC to execute a "Special Undertaking by Purchasers of Polychlorinated Biphenyls" (the "Special Undertaking"). UMC executed the Special Undertaking on January 7, 1972, a copy of which is attached as Exhibit A.

50.    The Special Undertaking purports to require UMC to defend and indemnify Old Monsanto for liabilities, claims, and damages arising out of or in connection with UMC's receipt, purchase, possession, handling, use, sale or disposition of PCBs – except to the extent that PCBs failed to conform with specifications.

51.    The Special Undertaking was prospective only, and did not apply to liabilities, claims and damages arising out of or in connection with UMC's possible receipt, purchase, possession, handling, use, sale or disposition of PCBs prior to January 7, 1972.

52.    At the time Old Monsanto required UMC to execute the Special Undertaking, Old Monsanto was uniquely aware of the toxicity of PCBs, that PCBs could

not be contained within their intended applications, that they would not degrade and that they would instead accumulate in the environment.

53.    At the time Old Monsanto required UMC to execute the Special Undertaking, Old Monsanto misrepresented the safety of PCBs to UMC, misrepresented Old Monsanto's detailed knowledge regarding the dangers of PCBs, and failed to disclose its knowledge of the hazards of PCBs to UMC.

54.    Around the time Old Monsanto required UMC to execute the Special Undertaking, Monsanto also required UMC to switch from using Aroclor 1242 to a "new" Aroclor – Aroclor 1016 – and UMC did so.

55.    Aroclor 1016 was merely a re-worked version of Aroclor 1242, with only a slightly reduced chlorine content.

56.    Aroclor 1016 continued to contain highly chlorinated PCBs, including pentachlorinated and hexachlorinated biphenyl congeners – it just contained somewhat fewer of these congeners.

57.    Prior to the introduction of Aroclor 1016, Old Monsanto had named its Aroclors so that the final two numbers in their names represented their percentage chlorine content. Thus, for example, Aroclor 1242 contained 42% chlorine.

58.    Aroclor 1016 broke this pattern. It was not 16% chlorine, but was, instead, 41% chlorine.

59.    Monsanto misrepresented to UMC that Aroclor 1016 was more biodegradable than Aroclor 1242, was less toxic than Aroclor 1242, and was free of impurities that might heighten the toxic effects of PCBs.

60.     The introduction of Aroclor 1016, and Old Monsanto's misrepresentation of the hazards posed by Aroclor 1016, were all part of Old Monsanto's strategy to deflect government and regulatory attention, preserve its profits and shift potential liability to others.

**E.     Old Monsanto's successors tender their defense and indemnification of certain claims based on the Special Undertaking**

61.     In recent years, hundreds of claimants have filed lawsuits or asserted claims against Old Monsanto's alleged successors (the "Monsanto Successors") and affiliates, alleging various personal injuries and/or property damage allegedly related to PCBs.

62.     On August 29, 2016, the Monsanto Successors demanded that Magnetek, as the successor to UMC, defend and indemnify the Monsanto Successors in connection with "all current and future PCB-related litigation wherein Old Monsanto is, or will be, named as a defendant" (the "Monsanto Demand"). The Monsanto Successors identified 46 then-pending actions as the subject of the tender (the "Underlying Actions").

63.     Among the Underlying Actions identified in the Monsanto Demand, at least one had already been litigated to verdict unsuccessfully by the Monsanto Successors.

64.     Upon information and belief, the Monsanto Successors have also agreed to settle or are currently negotiating to settle some of the Underlying Actions as part of a broader group of so-called "Food Chain Cases."

65.     Upon information and belief, the Monsanto Successors have made demands similar to the Monsanto Demand on other companies that executed similar special undertakings.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

66.     The Monsanto Successors have taken the erroneous position that each surviving company that executed a Special Undertaking is jointly and severally liable for the full amount of all PCB-related claims, regardless of whether any particular claim implicates that company's products and regardless of the Monsanto Successors' decision to litigate a case to verdict without notice to UMC and possibly others similarly situated.

67.     The Monsanto Successors have also taken the erroneous position that each surviving company that executed a Special Undertaking can be held liable to Monsanto under a theory of market share liability.

### FIRST CLAIM
**(Declaratory Judgment - Fraudulent Inducement)**

68.     The foregoing paragraphs are realleged.

69.     At the time Old Monsanto required UMC to execute the Special Undertaking, it was the sole United States manufacturer of PCBs and had unique and vastly superior knowledge regarding the hazards of PCBs.

70.     Old Monsanto misrepresented the safety and toxicity of PCBs to UMC.

71.     Old Monsanto misrepresented its own knowledge regarding the safety of PCBs to UMC.

72.     Old Monsanto failed to disclose to UMC its knowledge regarding the nature and extent of the hazards posed by PCBs.

73.     At the time Old Monsanto made representations regarding the safety and toxicity of PCBs (and Old Monsanto's own knowledge of same), Old Monsanto knew those representations to be false and intended UMC to rely upon them so that UMC would

execute the Special Undertaking while Old Monsanto could preserve its profits on the sales of PCBs to UMC and shield itself from liability.

74.    As Old Monsanto was the only United States supplier of PCBs and held itself out as having unique and superior knowledge concerning the safety and toxicity of PCBs, UMC reasonably relied on Old Monsanto's representations as to the safety and toxicity of PCBs and Old Monsanto's knowledge regarding the safety and toxicity of them.

75.    UMC has been and will be damaged by its reliance on Old Monsanto's misrepresentations.

76.    Based on the foregoing, UMC's Special Undertaking was induced by fraud and is void and unenforceable against Magnetek, and a declaration to that effect should be ordered.

## SECOND CLAIM
### (Declaratory Judgment - Old Monsanto's Tortious Conduct)

77.    The foregoing paragraphs are realleged.

78.    A party may not claim indemnification against another for its own negligent conduct unless the agreement for indemnification expressly provides for such indemnity. The intent to indemnify another for the indemnitee's own negligence must be unequivocally expressed, and any ambiguities are strictly construed against the indemnitee.

79.    A party may not claim indemnification for its own reckless and/or intentional acts as a matter of law and public policy.

80.    The Special Undertaking does not contain any provision purporting to require UMC to defend or indemnify Old Monsanto for Old Monsanto's negligent, reckless, or intentional conduct.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

81.    Monsanto was negligent, reckless and/or acted intentionally in its continued sale and marketing of PCBs after it became aware of the dangers associated with their use and by failing to disclose those dangers to UMC.

82.    The Underlying Actions reveal that Monsanto was negligent, reckless and/or acted intentionally in its manufacture, sale, and/or marketing of PCBs and, in one such action, Monsanto has already been adjudged to have been sufficiently culpable to justify a jury's award of significant compensatory and punitive damages against it.

83.    Based on the foregoing, Magnetek is not required to defend or indemnify the Monsanto Successors in connection with the Underlying Actions, and a declaration to that effect should be ordered.

## THIRD CLAIM
### (Declaratory Judgment - Laches/Delay/Waiver)

84.    The foregoing paragraphs are realleged.

85.    The Monsanto Successors unreasonably delayed in notifying Magnetek of the Underlying Actions and seeking defense and indemnification concerning the Underlying Actions.

86.    By the time the Monsanto Successors notified Magnetek of the Underlying Actions, at least one case had already been tried to verdict in which compensatory and punitive damages were imposed, and others had progressed to dispositive motion practice or the late stages of discovery.

87.    Additionally, upon information and belief, the Monsanto Successors have been negotiating settlements of some of the other Underlying Actions.

88.   The Monsanto Successors' unreasonable delay in providing notice to Magnetek has prejudiced Magnetek by depriving it of the ability to participate in the investigation and defense of the Underlying Actions.

89.   Based on the foregoing, Magnetek is not obligated to defend or indemnify the Monsanto Successors with respect to any underlying claims for which the Monsanto Successors failed to provide timely notice, and a declaration to that effect should be ordered.

## FOURTH CLAIM
### (Declaratory Judgment - Limited Scope of Special Undertaking)

90.   The foregoing paragraphs are realleged.

91.   Agreements to defend or indemnify another party are narrowly construed against the party seeking indemnity.

92.   The Special Undertaking purported to obligate UMC to defend and indemnify Old Monsanto only in instances where PCBs purchased by UMC from Old Monsanto were specifically implicated.  Accordingly, the amount of insurance Old Monsanto required UMC to carry in order to cover UMC's obligations under the Special Undertaking was tied to the amount of UMC's estimated annual purchases of PCBs from Monsanto.

93.   The Special Undertaking also excluded any claims relating to the failure of PCBs to conform with specifications.

94.   Upon information and belief, the Underling Actions against the Monsanto Successors have not alleged PCB exposure or contamination from products manufactured by UMC or, in fact, any products manufactured after January 7, 1972, or

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

from UMC's receipt, purchase, possession, handling, use, sale or disposition of PCBs after January 7, 1972.

95.    Magnetek does not owe the Monsanto Successors a defense or indemnity for any of the Underlying Actions that do not specifically implicate products manufactured by UMC before January 7, 1972.

96.    Magnetek does not owe the Monsanto Successors a defense or indemnity in any instance where PCBs failed to conform to specifications.

97.    Old Monsanto represented and warranted to UMC, other customers, the public, and the government that its PCBs were safe for use in capacitors and in lighting ballasts.

98.    Old Monsanto further represented and warranted to UMC that Aroclor 1016 was biodegradable and safe for use in capacitors and in lighting ballasts, and safer than the Aroclors previously supplied by Old Monsanto for such use.

99.    The Aroclors sold to UMC did not conform to Old Monsanto's representations, warranties, and specifications.

100.    Based on the foregoing, Magnetek is not obligated to defend or indemnify the Monsanto Successors with respect to any claims that (1) do not specifically implicate UMC's products, (2) do not specifically implicate products manufactured after January 7, 1972, or (3) arise from the failure of Old Monsanto's PCBs to conform with specifications, including Old Monsanto's representations that PCBs were safe and suitable for use in capacitors and lighting ballasts, and a declaration to that effect should be ordered.

## FIFTH CLAIM
### (Declaratory Judgment - Preemption)

101.    The foregoing paragraphs are realleged.

102. The United States Government affirmatively concluded in 1971 that the continued use of PCBs in capacitors and transformers was necessary because there were no existing substitutes for PCBs in those applications. The Government further concluded that the functions performed by PCBs in transformers and capacitors were essential, and banning the use of them in such applications would have resulted in significant disruption to the U.S. capacitor and transformer industry.

103. At relevant times, the then-existing National Electrical Code, which was incorporated by reference into OSHA regulations, generally prohibited the use of alternative dielectric fluid that did not contain PCBs, particularly in indoor electrical and lighting equipment, because those alternatives were considered flammable.

104. Monsanto has elsewhere taken the position that, as a result of the foregoing and the provisions of the Toxic Substances Control Act, claims against it arising out of its manufacture and sale of PCBs during the period allegedly covered by the Special Undertaking are preempted.

105. Because the US government expressly determined that the benefits of PCBs in capacitor and lighting ballast applications outweighed any risks posed by PCBs, and manufacturers had no choice but to continue using PCBs at that time, claims relating to or arising out of UMC's use of PCBs in capacitors and lighting ballasts are also preempted, and a declaration to that effect should be ordered.

## SIXTH CLAIM
### (Declaratory Judgment - Unconscionability/Economic Duress/Mistake)

106. The foregoing paragraphs are realleged.

107. The Special Undertaking is void in whole or in part based upon the doctrines of unconscionability and duress.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

108.    Old Monsanto required UMC to execute the Special Undertaking as a condition precedent to UMC's ability to continue to purchase PCBs.

109.    At the time Old Monsanto required UMC to execute the Special Undertaking, Old Monsanto was the only United States supplier of PCBs.

110.    At the time Old Monsanto required UMC to execute the Special Undertaking, PCBs were the only known chemical suitable for use in capacitors and transformers and the United States Government had concluded (based upon representations by Monsanto and others) that the use of PCBs in such applications was essential. Moreover, the National Electrical Code and many local building codes generally prohibited the use of alternative dielectric fluids that did not contain PCBs in indoor electrical and lighting equipment.

111.    The use of alternative dielectric fluid that did not contain PCBs, including mineral oil, would have required changes to the National Electric Code and local building codes, as well as the redesign and re-approval of every capacitor that relied upon dielectric fluids containing PCBs.

112.    Old Monsanto represented to the U.S. Government and others that the resulting disruption of U.S. industry could be safely avoided by confining the use of PCBs to "closed" electrical equipment.

113.    This representation was false, inasmuch as the restriction of sales to PCBs would not and did not prevent the escape of PCBs to the environment and Old Monsanto knew it to be false.

114.    This representation was also a key component of Old Monsanto's retrenchment strategy, intended to save its most profitable PCB business by sacrificing its less profitable business of selling PCB's for so-called "open" uses (i.e. paint, caulk, etc.).

115.    Old Monsanto possessed superior knowledge and superior bargaining power and wrongfully used it to extract the Special Undertaking from UMC.  UMC had no alternative but to accede to Old Monsanto's demand.

116.    The Special Undertaking is, therefore, void and unenforceable as unconscionable, the product of economic duress, and the product of mistake, and a declaration to that effect should be ordered.

## SEVENTH CLAIM
**(Declaratory Judgment - Special Undertaking is Void as Against Public Policy)**

117.    The foregoing paragraphs are realleged.

118.    The Special Undertaking was designed and used by Old Monsanto as part of its retrenchment strategy, and to allow Old Monsanto to continue to manufacture, market, sell, and distribute what it knew to be a dangerous and toxic product (which Old Monsanto knew would escape to the environment) while maintaining and expanding the profitability of that line of business.

119.    By requiring UMC and other customers to sign the Special Undertaking, Old Monsanto also sought to further protect its profitability by attempting to shift to UMC and others liability for its own negligent, reckless and/or intentional conduct and resulting, unavoidable environmental contamination.

120.    At the same time it demanded the Special Undertaking, Old Monsanto concealed adverse health and safety information from its customers, end users, government

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

agencies, and the public generally, and made affirmative misrepresentations to them about the hazards of Old Monsanto's Aroclor products.

121.   By doing so, Old Monsanto not only deceived UMC and its other customers, it endangered the environment and the public in general by introducing additional hazardous PCBs into the market and, ultimately, the environment.

122.   Based on the foregoing, the Special Undertaking is void as against public policy, and a declaration to that effect should be ordered.

## EIGHTH CLAIM
### (Declaratory Judgment - Market-Share Liability)

123.   The foregoing paragraphs are realleged.

124.   In the alternative, if the Special Undertaking is held to be enforceable in any respect against Magnetek, Magnetek requests a declaration that the Monsanto Successors may not apportion liability to Magnetek based on a theory of market share liability.

125.   The Monsanto Successors have taken the position that Magnetek is jointly and severally liable for all PCB-related claims and/or that Magnetek can be held liable based on its total purchases of PCBs relative to "other domestic indemnitors who remain viable companies."

126.   Under New Jersey law, and consistent with New Jersey public policy, market share liability is only applicable in situations where multiple manufacturers produced a product to a single specification and where a plaintiff, through circumstances beyond its control, cannot determine which manufacturer supplied the product that injured the plaintiff.  Market share liability is inapplicable to Monsanto's request for contractual

indemnification under the Special Undertaking, and a declaration to that effect should be ordered.

## JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues triable of right by jury.

**WHEREFORE**, Magnetek, Inc. demands judgment against defendants:

(a)     Declaring that (i) the Special Undertaking is void and/or unenforceable against Magnetek, in whole or in part or, alternatively, (ii) to the extent the Special Undertaking is or may be enforceable against Magnetek by the Monsanto Successors, Magnetek's liability shall be limited to those claims arising out of UMC's receipt, purchase, possession, handling, use, sale or disposition of PCBs after January 7, 1972 (and, in particular, from products UMC manufactured after that date) and shall not include Monsanto's defense costs or liability attributable to Monsanto's own negligent, reckless, or intentional conduct, and that the Monsanto Successors cannot rely on a market-share liability theory;

(b)     Granting Magnetek the costs and disbursements of this action, including its attorneys' fees; and

(c)     Granting such other relief as the Court deems just and proper.

## CERTIFICATION

I certify that the matter in controversy is not the subject of any other action pending in any court, or of a pending arbitration proceeding, and there is no other action or arbitration proceeding contemplated. I know of no other party who should be joined in the

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

action pursuant to R.4:28 or who is subject to joinder pursuant to R.4:29-1(b) because of

potential liability to any party on the basis of the same transactional facts.

Dated:  Hackensack, New Jersey
       May 12, 2017

                                     John R. Altieri
                                     Attorneys for Plaintiff
                                     *Magnetek, Inc.*

                                     Of Counsel:

                                     PHILLIPS LYTLE LLP
                                     Joseph B. Schmit
                                     Ryan A. Lema
                                     340 Madison Avenue
                                     17th Floor
                                     New York, New York  10173-1922
                                     Telephone No. (212) 759-4888
                                     jschmit@phillipslytle.com
                                     rlema@phillipslytle.com

Doc #01-3034852

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

# EXHIBIT A

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**UNIVERSAL MANUFACTURING CORPORATION**

2945 EAST SIXTH STREET, PATERSON, NEW JERSEY 07503 • PHONE (201) 271-3100 • TWX NO. 710 988-6324

January 7, 1972

Mr. H.S. Bergen
Monsanto Company
P.O. Box 14817
St. Louis, Missouri 63178

Dear Mr. Bergen:

Enclosed is the undertaking you requested in connection
with our purchase of PCB. As previously discussed, we
are executing the undertaking in our own name and are
excepting any liability arising from failure of the
product to conform to specifications.

This undertaking will be covered by a blanket liability
policy with the Travelers Insurance Company having limits
of 10 million dollars. As of December 31, 1970, Universal's
consolidated net worth was 16.8 million and its current
ratio was 1.7 to 1.

Very truly yours,

UNIVERSAL MANUFACTURING CORPORATION

Paul H. Einhora
President

PHE/paz

0167252

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

 

## Special Undertaking by Purchasers of Polychlorinated Biphenyls

Monsanto Company (Monsanto) manufactures certain polychlorinated biphenyls products (PCB's) which Universal Manufacturing Corporation (Buyer) desires to purchase. While buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in the handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or delivery of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses (~~including those~~ ~~arising out of failure of PCB to conform~~ with specifications) arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through or under Buyer, whether alone or in combination with any other substances, including without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provision set forth above.

Nothing herein shall create or imply, any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer. No conditions, undertakings or agreements purporting to modify the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effected by the acknowledgement or acceptance of any sale document, purchase order, shipping instruction or other forms containing terms or conditions at variance herewith.

Universal Manufacturing Corporation                     MONSANTO COMPANY
              (Buyer)

BY:                                                     BY:

TITLE:  President

DATE:   January 7, 1972

0167253

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

# Exhibit C

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**FILED**

OCT 1 8 2017

ROBERT C. WILSON, J.S.C.

**WHITE AND WILLIAMS, LLP**
Andrew I. Hamelsky, Esq. (NJ Attorney ID 045111994)
The Legal Center – One Riverfront Plaza
1037 Raymond Blvd. Suite 230
Newark, New Jersey 07102
*Attorneys for Monsanto Company, Pharmacia LLC f/k/a Monsanto, and Solutia, Inc.*

| | |
|---|---|
| **MAGNETEK, INC,** | : |
| **Plaintiff,** | : SUPERIOR COURT OF NEW JERSEY |
| | : LAW DIVISION: BERGEN COUNTY |
| | : |
| **vs.** | : |
| | : Docket No.: BER-L-3362-17 |
| **MONSANTO COMPANY, PHARMACIA** | : |
| **LLC f/k/a MONSANTO, and SOLUTIA,** | : Civil Action |
| **INC.,** | : |
| | : **ORDER** |
| **Defendants.** | : |

     **THIS MATTER** having been opened to the Court by Defendants, Monsanto Company and Solutia, Inc. ("Defendants") by way of a Motion to Dismiss the Complaint For Lack of Personal Jurisdiction pursuant to R. 4:6-2(b), and upon notice to Plaintiff, and upon all the papers and proceedings heretofore, and for good cause shown:

     **IT IS** on this 18th day of October, 2017,

     **ORDERED** that Motion to Dismiss the Complaint For Lack of Personal Jurisdiction pursuant to R. 4:6-2(b) is ~~GRANTED~~ *Denied*; and it is

     ~~**FURTHER ORDERED** that Plaintiff's Complaint is dismissed in its entirety with prejudice as to Defendants Monsanto Company and Solutia, Inc.; and it is~~

     **FURTHER ORDERED** that a copy of this Order shall be served upon all parties within 7 days of receipt.

                                   _____
                                   Honorable Robert C. Wilson, J.S.C

Motion:

Opposed:    ( ✓ )

Unopposed:  (   )

*See attached opinion*

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

NOT TO BE PUBLISHED WITHOUT THE APPROVAL
OF THE COMMITTEE ON OPINIONS

|  |  |
|---|---|
| MAGNETEK INC, | SUPERIOR COURT OF NEW JERSEY |
| Plaintiffs, | LAW DIVISION |
|  | BERGEN COUNTY |
| vs. | DOCKET NO.  BER-L-3362-17 |
| MONSANTO COMPANY, PHARMACIA LLC f/k/a/ MONSANTO and SOLUTIA, INC., | CIVIL ACTION |
|  | OPINION |
| Defendant. |  |

| | |
|---|---|
| **Argued:** | **October 13, 2017** |
| **Decided:** | **October 18, 2017** |

**Honorable Robert C. Wilson, J.S.C.**

John Altieri, Esq., Joseph Schmit, Esq., and Ryan Lema, Esq appearing for the Plaintiffs Magnetek Inc. (from the Law Office of John Altieri, Esq. and Phillips Lytle LLP respectively)

Andrew Hamelsky, Esq., Elizabeth Blackwell, Esq., and Christopher Hohn, Esq. appearing for the Defendants Monsanto Company, Pharmacia LLC, and Solutia Inc. (from the law offices of White and Williams, LLP and Thompson Coburn LLP respectively).

## FACTUAL BACKGROUND

The instant matter comes by way of Monsanto Company, Pharmacia LLC, and Solutia Inc.'s (hereinafter "Defendants") motions to dismiss, first as to the claims against Monsanto Company ("New Monsanto") and Solutia Inc., and then against the Plaintiff's remaining claims against Pharmacia ("Old Monsanto") for failure to join New Monsanto and Solutia Inc. as indispensable parties.

The conflict underlying Plaintiff Magnetek's claim results from the execution of a Special Undertaking Agreement which its predecessor company, Universal Manufacturing Corporation ("UMC") executed with Old Monsanto (now Pharmacia) relating to the sale of polychlorinated biphenyls ("PCBs") in 1972.  Magnetek filed this case to obtain a declaratory judgment in order

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

to relieve it from any purported obligations it has to the Defendants under the Special Undertaking Agreement. The agreement provided in part that UMC would defend and indemnify Old Monsanto "from any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses…arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of" PCBs which UMC had purchased from Old Monsanto.

Similar agreements were executed by Old Monsanto relating to their continued production and sale of PCBs from 1935 through 1979, during which time they were the sole producer of such chemical compounds in the United States. At the time that the Special Undertaking Agreement was executed between UMC and Old Monsanto, Old Monsanto was a Delaware corporation with its principal place of business in Missouri, while UMC was a New Jersey corporation with its principle place of business in New Jersey. Subsequently, in 1986, UMC and Magnetek merged, with Magnetek as the surviving company. As a result, Magnetek is a party to the Special Undertaking Agreement.

Following the execution of the Special Undertaking Agreement, Old Monsanto underwent a corporate restructuring which resulted in the creation of Defendants "New" Monsanto Company and Solutia Inc. On September 1, 1997 Solutia Inc. was incorporated in the State of Delaware as a wholly-owned subsidiary of Old Monsanto in order to operate Old Monsanto's chemical business. The agreement memorializing the spin-off of Solutia was also executed on September 1, 1997 and stated that Old Monsanto assigned its chemical assets including any rights under the Special Undertaking Agreement to Solutia. Both Old Monsanto and Solutia were Delaware corporations at the time, and the agreement stated that Delaware law would control.

Similarly, "New" Monsanto (Defendant Monsanto Company) was formed as a wholly-owned subsidiary and spun off by Old Monsanto in 2000. By this time, Old Monsanto had merged with and was doing business as Pharmacia. Defendants contend that Monsanto Company's rights

2

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

under the Special Undertaking Agreement were created through a 2008 "Amended and Restated Settlement Agreement" between Solutia, SFC LLC, and New Monsanto. This agreement was a result of Solutia's 2003 bankruptcy proceedings and required Solutia to use commercially reasonable efforts to enforce the Special Undertaking Agreement for the benefit of Monsanto Company, which assumed financial responsibility for Legacy Tort Claims and liabilities related to Legacy Sites. These liabilities included certain PCB litigation claims. Defendants claim that (1) all the signatories to this agreement were Delaware Corporations at the time of the execution, and that (2) the agreement specifies that Delaware law controls.

The disputes between the parties to this case have resulted in two separate lawsuits. The first was the instant case, filed by Plaintiff Magnetek, in the midst of negotiations with the defendants about the Special Undertaking Agreement. As explained above, Magnetek seeks a declaratory judgment releasing them from any purported obligations pursuant the Special Undertaking Agreement. The second lawsuit was subsequently filed by the Defendants in Missouri state court alleging breach of contract and misrepresentation.

## **RULE OF LAW**

Under the New Jersey Court Rules, a party may raise a defense of lack of in personam jurisdiction through a motion to dismiss. According to R. 4:6-2(b) a "lack of jurisdiction over the person" may be made by motion to the court before any pleading is made. R. 4:6-2(b). The Appellate Division has explained: A court's jurisdiction is a "mixed question of law and fact that must be resolved at the outset before the matter may proceed…" Rippon v. Smigel, 449 N.J. Super. 344, 359 (App. Div. 2017) (quoting Citibank, N.A. v. Estate of Simpson, 290 N.J. Super. 519, 532 (App. Div. 1996). A defendant is subject to general jurisdiction when that defendant has

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

"maintained continuous and systematic activities in the forum state…irrespective of its relation to the state." Rippon, 449 N.J. Super. at 358-59 (quoting Lebel v. Everglades Marina, Inc., 115 N.J. 317, 323 (1989). A court may exercise only specific jurisdiction over a defendant when the cause of action arises "directly out of the defendant's contacts with the forum state" and that defendant has "minimum contacts" with the jurisdiction. Id. at 359.

The plaintiff has the burden to show that there are sufficient facts to support a finding of personal jurisdiction over the defendant. Id. at 360. Further, the courts should allow for jurisdictional discovery unless the plaintiff's claims are "clearly frivolous". Id. (quoting Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir. 2003). New Jersey Courts have generally held that "the record must support the existence of disputed or conflicting facts to warrant jurisdictional discovery." Id.

## DECISION

The Defendants' motions to dismiss are denied subject to further jurisdictional discovery proceedings. As stated above, New Jersey Courts have generally allowed for jurisdictional discovery proceedings in order to develop a record of facts which with to the make necessary jurisdictional findings before litigation commences. See Rippon, 449 N.J. Super. at 360 (determining that the trial court had prematurely determined issues of jurisdiction before an adequate record was developed through discovery).

Here, the Plaintiff has asserted that Defendants Solutia has a multitude of contacts with New Jersey, including real estate ownership, operation of a manufacturing plant, business registration, and the designation of a registered agent for service in New Jersey. Plaintiff has also shown that Defendant Monsanto Company is registered to do business in New Jersey, has a registered agent in New Jersey, and appears to have employees working in the state. However, the

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Defendants argue that Solutia and Monsanto Company are both incorporated in Delaware and that neither company has taken any action giving rise to the litigation in the state of New Jersey. They further argue that the only action taken that relates to New Jersey is the execution of the Special Undertaking Agreement, which cannot provide for jurisdiction over Solutia and Monsanto Company because they did not exist at the time of the agreement's execution.

This Court has determined that the Defendants' motions to dismiss must be denied to allow for further jurisdictional discovery proceedings. Considering the disputed, fact sensitive nature of the Defendants' corporate structure and activities, a more robust record must be cultivated by the Plaintiff in order for this Court to make the necessary determination as to its jurisdiction over the Defendants. Therefore, the Defendants' motion to dismiss the claims against Solutia and Monsanto Company is hereby denied. As a result, the court must also deny the Defendants' companion motion to dismiss for failure to join indispensable parties because no determination as to the ability to join the Defendants can be made at this time.

For the foregoing reasons, Defendants' two Motions to Dismiss are **DENIED**.

It is so ordered.

HON. ROBERT C. WILSON

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

# Exhibit D

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**FILED**

OCT 1 3 2017

ROBERT C. WILSON, J.S.C.

**WHITE AND WILLIAMS, LLP**
Andrew I. Hamelsky, Esq. (NJ Attorney ID 045111994)
The Legal Center – One Riverfront Plaza
1037 Raymond Blvd. Suite 230
Newark, New Jersey 07102
*Attorneys for Monsanto Company, Pharmacia LLC f/k/a Monsanto, and Solutia, Inc.*

| | |
|---|---|
| **MAGNETEK, INC,** | : |
| **Plaintiff,** | : SUPERIOR COURT OF NEW JERSEY |
| | : LAW DIVISION: BERGEN COUNTY |
| | : |
| **vs.** | : |
| | : Docket No.: BER-L-3362-17 |
| **MONSANTO COMPANY, PHARMACIA** | : |
| **LLC f/k/a MONSANTO, and SOLUTIA,** | : Civil Action |
| **INC.,** | : |
| | : **ORDER** |
| **Defendants.** | : |

      **THIS MATTER** having been opened to the Court by Defendants, Monsanto Company,

Pharmacia LLC f/k/a Monsanto, and Solutia, Inc. ("Defendants") by way of a Motion to Dismiss

the Complaint For Failure to Join Indispensable Parties pursuant to R. 4:6-2(f), and upon notice

to Plaintiff, and upon all the papers and proceedings heretofore, and for good cause shown:

      **IT IS** on this 18ᵗʰ day of October , 2017,

      **ORDERED** that Motion to Dismiss the Complaint For Failure to Join Indispensable

Parties pursuant to R. 4:6-2(f) is ~~GRANTED~~ *Denied*; and it is

      ~~**FURTHER ORDERED** that Plaintiff's Complaint is dismissed in its entirety with~~

~~prejudice; and it is~~

      **FURTHER ORDERED** that a copy of this Order shall be served upon all parties within

7 days of receipt.

Honorable Robert C. Wilson, J.S.C

Motion:

Opposed:   ( ✓ )

Unopposed:   (   )

*See attached opinion*

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

NOT TO BE PUBLISHED WITHOUT THE APPROVAL
OF THE COMMITTEE ON OPINIONS

| | |
|---|---|
| MAGNETEK INC, <br><br>      Plaintiffs, <br><br> vs. <br><br> MONSANTO COMPANY, PHARMACIA LLC f/k/a/ MONSANTO and SOLUTIA, INC., <br><br>      Defendant. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION <br><br> BERGEN COUNTY <br><br> DOCKET NO.  BER-L-3362-17 <br><br> CIVIL ACTION <br><br> OPINION |

**Argued:**    **October 13, 2017**
**Decided:**    **October 18, 2017**

**Honorable Robert C. Wilson, J.S.C.**

John Altieri, Esq., Joseph Schmit, Esq., and Ryan Lema, Esq appearing for the Plaintiffs Magnetek Inc. (from the Law Office of John Altieri, Esq. and Phillips Lytle LLP respectively)

Andrew Hamelsky, Esq., Elizabeth Blackwell, Esq., and Christopher Hohn, Esq. appearing for the Defendants Monsanto Company, Pharmacia LLC, and Solutia Inc. (from the law offices of White and Williams, LLP and Thompson Coburn LLP respectively).

## FACTUAL BACKGROUND

The instant matter comes by way of Monsanto Company, Pharmacia LLC, and Solutia Inc.'s (hereinafter "Defendants") motions to dismiss, first as to the claims against Monsanto Company ("New Monsanto") and Solutia Inc., and then against the Plaintiff's remaining claims against Pharmacia ("Old Monsanto") for failure to join New Monsanto and Solutia Inc. as indispensable parties.

The conflict underlying Plaintiff Magnetek's claim results from the execution of a Special Undertaking Agreement which its predecessor company, Universal Manufacturing Corporation ("UMC") executed with Old Monsanto (now Pharmacia) relating to the sale of polychlorinated biphenyls ("PCBs") in 1972. Magnetek filed this case to obtain a declaratory judgment in order

to relieve it from any purported obligations it has to the Defendants under the Special Undertaking Agreement. The agreement provided in part that UMC would defend and indemnify Old Monsanto "from any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses...arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of" PCBs which UMC had purchased from Old Monsanto.

Similar agreements were executed by Old Monsanto relating to their continued production and sale of PCBs from 1935 through 1979, during which time they were the sole producer of such chemical compounds in the United States. At the time that the Special Undertaking Agreement was executed between UMC and Old Monsanto, Old Monsanto was a Delaware corporation with its principal place of business in Missouri, while UMC was a New Jersey corporation with its principle place of business in New Jersey. Subsequently, in 1986, UMC and Magnetek merged, with Magnetek as the surviving company. As a result, Magnetek is a party to the Special Undertaking Agreement.

Following the execution of the Special Undertaking Agreement, Old Monsanto underwent a corporate restructuring which resulted in the creation of Defendants "New" Monsanto Company and Solutia Inc. On September 1, 1997 Solutia Inc. was incorporated in the State of Delaware as a wholly-owned subsidiary of Old Monsanto in order to operate Old Monsanto's chemical business. The agreement memorializing the spin-off of Solutia was also executed on September 1, 1997 and stated that Old Monsanto assigned its chemical assets including any rights under the Special Undertaking Agreement to Solutia. Both Old Monsanto and Solutia were Delaware corporations at the time, and the agreement stated that Delaware law would control.

Similarly, "New" Monsanto (Defendant Monsanto Company) was formed as a wholly-owned subsidiary and spun off by Old Monsanto in 2000. By this time, Old Monsanto had merged with and was doing business as Pharmacia. Defendants contend that Monsanto Company's rights

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

under the Special Undertaking Agreement were created through a 2008 "Amended and Restated Settlement Agreement" between Solutia, SFC LLC, and New Monsanto. This agreement was a result of Solutia's 2003 bankruptcy proceedings and required Solutia to use commercially reasonable efforts to enforce the Special Undertaking Agreement for the benefit of Monsanto Company, which assumed financial responsibility for Legacy Tort Claims and liabilities related to Legacy Sites. These liabilities included certain PCB litigation claims. Defendants claim that (1) all the signatories to this agreement were Delaware Corporations at the time of the execution, and that (2) the agreement specifies that Delaware law controls.

The disputes between the parties to this case have resulted in two separate lawsuits. The first was the instant case, filed by Plaintiff Magnetek, in the midst of negotiations with the defendants about the Special Undertaking Agreement. As explained above, Magnetek seeks a declaratory judgment releasing them from any purported obligations pursuant the Special Undertaking Agreement. The second lawsuit was subsequently filed by the Defendants in Missouri state court alleging breach of contract and misrepresentation.

## RULE OF LAW

Under the New Jersey Court Rules, a party may raise a defense of lack of in personam jurisdiction through a motion to dismiss. According to R. 4:6-2(b) a "lack of jurisdiction over the person" may be made by motion to the court before any pleading is made. R. 4:6-2(b). The Appellate Division has explained: A court's jurisdiction is a "mixed question of law and fact that must be resolved at the outset before the matter may proceed…" Rippon v. Smigel, 449 N.J. Super. 344, 359 (App. Div. 2017) (quoting Citibank, N.A. v. Estate of Simpson, 290 N.J. Super. 519, 532 (App. Div. 1996). A defendant is subject to general jurisdiction when that defendant has

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

"maintained continuous and systematic activities in the forum state…irrespective of its relation to the state." Rippon, 449 N.J. Super. at 358-59 (quoting Lebel v. Everglades Marina, Inc., 115 N.J. 317, 323 (1989). A court may exercise only specific jurisdiction over a defendant when the cause of action arises "directly out of the defendant's contacts with the forum state" and that defendant has "minimum contacts" with the jurisdiction. Id. at 359.

The plaintiff has the burden to show that there are sufficient facts to support a finding of personal jurisdiction over the defendant. Id. at 360. Further, the courts should allow for jurisdictional discovery unless the plaintiff's claims are "clearly frivolous". Id. (quoting Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir. 2003). New Jersey Courts have generally held that "the record must support the existence of disputed or conflicting facts to warrant jurisdictional discovery." Id.

## DECISION

The Defendants' motions to dismiss are denied subject to further jurisdictional discovery proceedings. As stated above, New Jersey Courts have generally allowed for jurisdictional discovery proceedings in order to develop a record of facts which with to the make necessary jurisdictional findings before litigation commences. See Rippon, 449 N.J. Super. at 360 (determining that the trial court had prematurely determined issues of jurisdiction before an adequate record was developed through discovery).

Here, the Plaintiff has asserted that Defendants Solutia has a multitude of contacts with New Jersey, including real estate ownership, operation of a manufacturing plant, business registration, and the designation of a registered agent for service in New Jersey. Plaintiff has also shown that Defendant Monsanto Company is registered to do business in New Jersey, has a registered agent in New Jersey, and appears to have employees working in the state. However, the

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Defendants argue that Solutia and Monsanto Company are both incorporated in Delaware and that neither company has taken any action giving rise to the litigation in the state of New Jersey. They further argue that the only action taken that relates to New Jersey is the execution of the Special Undertaking Agreement, which cannot provide for jurisdiction over Solutia and Monsanto Company because they did not exist at the time of the agreement's execution.

This Court has determined that the Defendants' motions to dismiss must be denied to allow for further jurisdictional discovery proceedings. Considering the disputed, fact sensitive nature of the Defendants' corporate structure and activities, a more robust record must be cultivated by the Plaintiff in order for this Court to make the necessary determination as to its jurisdiction over the Defendants. Therefore, the Defendants' motion to dismiss the claims against Solutia and Monsanto Company is hereby denied. As a result, the court must also deny the Defendants' companion motion to dismiss for failure to join indispensable parties because no determination as to the ability to join the Defendants can be made at this time.

For the foregoing reasons, Defendants' two Motions to Dismiss are **DENIED**.


It is so ordered.


HON. ROBERT C. WILSON

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

# Exhibit E

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Andrew I. Hamelsky, Esquire (NJ attorney identification number 045111994)
Zaara Bajwa Nazir, Esq. (NJ attorney identification number 026662011)
**WHITE AND WILLIAMS LLP**
The Legal Center
One Riverfront Plaza
1037 Raymond Boulevard, Suite 230
Newark, NJ 07102-5425
Phone No.:201.368.7206
*Attorneys for Defendants Monsanto Company,*
*Pharmacia LLC f/k/a Monsanto and Solutia, Inc.*

| | |
|---|---|
| MAGNETEK, INC,<br><br>Plaintiff,<br><br>vs.<br><br>MONSANTO COMPANY, PHARMACIA LLC f/k/a MONSANTO, and SOLUTIA, INC.,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: BERGEN COUNTY<br><br>DOCKET NO.: BER-L-3362-17<br><br>**ANSWER TO COMPLAINT,<br>AFFIRMATIVE DEFENSES,<br>DESIGNATION OF TRIAL<br>COUNSEL, JURY DEMAND** |

Defendants Monsanto Company, Pharmacia LLC f/k/a Monsanto and Solutia, Inc. (collectively, "Defendants"), by and through their attorneys, White and Williams, LLP, provide the following Answer to Plaintiff Magnetek, Inc.'s ("Plaintiff") Complaint:

1.    Defendants admit that the Complaint purports to state multiple claims for declaratory judgment relating to a certain Special Undertaking Agreement ("SUA") entered into by Pharmacia LLC ("Pharmacia" or "Old Monsanto") and Plaintiff's predecessor in interest, Universal Manufacturing Company ("UMC"). Defendants further admit that the Complaint purports to seek a declaration that the SUA is void and unenforceable, in whole or in part. Defendants deny that the SUA is void and unenforceable and deny all remaining allegations in Paragraph 1 of the Complaint.

1

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

2.  Defendants admit the allegations in Paragraph 2 of the Complaint.

3.  Defendants admit the allegations in Paragraph 3 of the Complaint.

4.  Defendants admit that Pharmacia is incorporated in Delaware.  Defendants deny the allegations in Paragraph 4 of the Complaint.

5.  Defendants admit the allegations in Paragraph 5 of the Complaint.

6.  Defendants deny the allegations in Paragraph 6 of the Complaint.

7.  Defendants admit that PCBs are a class of chlorinated organic chemical compounds, comprising the potential for 209 different chemical compounds, which are separately identified by number.  Each individual PCB compound is known as a different "congener." Defendants deny the remaining allegations in Paragraph 7 of the Complaint.

8.  Defendants deny the allegations in Paragraph 8 of the Complaint.

9.  Defendants admit that many of Old Monsanto's PCBs were used by its customers as insulating fluid, also known as dielectric fluid, in certain enclosed electrical and other equipment, including high-temperature transformers and capacitors and that, prior to 1971, PCBs were used to a lesser extent for other purposes.  Defendants deny the remaining allegations in Paragraph 9 of the Complaint.

10.  Defendants admit that the EPA has published reports and/or promulgated regulations regarding PCBs, including discussions about possible carcinogenicity in humans. Defendants deny that PCBs are carcinogenic or that the EPA or any other regulatory agency or entity or person has established with good and reliable science that PCBs are carcinogenic. Defendants deny all remaining allegations in Paragraph 10 of the Complaint.

2

20044854v.1

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

11.     Defendants admit that some, but not all, types of PCBs have been reported by various sources as not readily degrading in the environment.  Defendants deny the remaining allegations of Paragraph 11.

12.     Defendants deny the allegations in Paragraph 12 of the Complaint.

13.     Defendants deny the allegations in Paragraph 13 of the Complaint.

14.     Defendants state that the allegations of Paragraph 14 purport to characterize and/or reference certain documents and/or statements.  Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves.  Defendants deny the remaining allegations of Paragraph 14.

15.     Defendants state that the allegations of Paragraph 15 purport to selectively quote, characterize and/or reference certain documents and/or statements.  Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves.  Defendants deny the remaining allegations of Paragraph 15.

16.     Defendants state that the allegations of Paragraph 16 purport to selectively quote, characterize and/or reference certain documents and/or statements.  Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves.  Defendants deny the remaining allegations of Paragraph 16.

17.     Defendants state that the allegations of Paragraph 17 purport to selectively quote, characterize and/or reference certain documents and/or statements.  Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 17.

18.     Defendants state that the allegations of Paragraph 18 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 18.

19.     Defendants state that the allegations of Paragraph 19 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 19.

20.     Defendants state that the allegations of Paragraph 20 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 20.

21.     Defendants state that the allegations of Paragraph 21 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 21.

20044854v.1

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

22.    Defendants state that the allegations of Paragraph 22 purport to selectively quote, characterize and/or reference certain documents and/or statements.  Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves.  Defendants deny the remaining allegations of Paragraph 22.

23.    Defendants deny the allegations in Paragraph 23 of the Complaint.

24.    Defendants deny the allegations in Paragraph 24 of the Complaint.

25.    Defendants state that the allegations of Paragraph 25 purport to selectively quote, characterize and/or reference certain documents and/or statements.  Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves.  Defendants deny the remaining allegations of Paragraph 25.

26.    Defendants state that the allegations of Paragraph 26 purport to selectively quote, characterize and/or reference certain documents and/or statements.  Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves.  Defendants deny the remaining allegations of Paragraph 26.

27.    Defendants admit that Old Monsanto sold PCBs in the 1960s.  Defendants deny each and every allegation contained in Paragraph 27 not specifically admitted herein.

28.    Defendants state that the allegations of Paragraph 28 purport to selectively quote, characterize and/or reference certain documents and/or statements.  Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

the documents and/or statements themselves.  Defendants deny the remaining allegations of Paragraph 28.

29.     Defendants state that the allegations of Paragraph 29 purport to selectively quote, characterize and/or reference certain documents and/or statements.  Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves.  Defendants deny the remaining allegations of Paragraph 29.

30.     Defendants admit the formation of an Aroclor Ad Hoc Committee.  The remainder of the allegations of Paragraph 30 purport to selectively quote, characterize and/or reference certain documents and/or statements.  Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves.  Defendants deny the remaining allegations of Paragraph 30.

31.     Defendants state that the allegations of Paragraph 31 purport to selectively quote, characterize and/or reference certain documents and/or statements.  Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves.  Defendants deny the remaining allegations of Paragraph 31.

32.     Defendants state that the allegations of Paragraph 32 purport to selectively quote, characterize and/or reference certain documents and/or statements.  Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves.  Defendants deny the remaining allegations of Paragraph 32.

20044854v.1

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

33.     Defendants state that the allegations of Paragraph 33 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 33.

34.     Defendants state that the allegations of Paragraph 34 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 34.

35.     Defendants state that the allegations of Paragraph 35 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 35.

36.     Defendants state that the allegations of Paragraph 36 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 36.

37.     Defendants state that the allegations of Paragraph 37 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 37.

38.     The Monsanto Company admits that it voluntarily ceased production of PCBs for use in "open applications" in 1971, but continued to produce PCBs for use in closed electrical applications because the federal government determined that continued production of PCBs for use in closed electrical applications remained "necessary" to protect against fires and explosions and to prevent disruption of the nation's electrical service. Defendants deny each and every allegation contained in Paragraph 38 not specifically admitted herein.

39.     Defendants deny the allegations in Paragraph 39 of the Complaint.

40.     Defendants deny the allegations in Paragraph 40 of the Complaint.

41.     Defendants state that the allegations of Paragraph 41 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 41.

42.     Defendants deny that Old Monsanto elevated profit above health and well-being of its customers, end users, and the public in general. Defendants state that the remaining allegations of Paragraph 42 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 42.

43.     Defendants admit that Old Monsanto voluntarily ceased production of PCBs for use in all but a single open application in 1970 then entirely by 1971, and all remaining non-

8

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

electric uses by 1972, but continued to produce PCBs exclusively for use as insulating fluid in closed electrical applications (e.g., enclosed transformers and capacitors) because the federal government determined that continued production of PCBs for use in closed electrical applications remained "necessary" to protect against fires and explosions and to prevent disruption of the nation's electrical service. Defendants deny each and every allegation contained in Paragraph 43 not specifically admitted herein.

44.    Defendants deny the allegations in Paragraph 44 of the Complaint.

45.    Defendants admit that, after 1971, Old Monsanto continued to manufacture PCBs for certain companies, and those companies executed certain special undertaking agreements. Defendants further admit that Magnetek's predecessor, UMC, negotiated and signed the SUA, the terms of which speaks for itself. Defendants deny each and every allegation contained in Paragraph 45 not specifically admitted herein.

46.    Defendants admit that Plaintiff is the successor by merger to UMC. Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 46 and therefore deny the same.

47.    Defendants admit that part of UMC's business was to manufacture small capacitors, which were incorporated into lighting ballasts manufactured by UMC. Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 47 and therefore deny the same.

48.    Defendants admit the allegations in Paragraph 48 of the Complaint.

49.    Defendants admit that UMC executed the SUA in 1972, and that a copy of the SUA executed by UMC is attached to the Complaint as Exhibit A. Defendants deny each and every allegation contained in Paragraph 49 not specifically admitted herein.

9

50.    The SUA speaks for itself, and Defendants deny all allegations contained in Paragraph 50 that are inconsistent with the terms of the SUA. Defendants admit the allegations contained in Paragraph 50 to the extent they are consistent with the terms of the SUA. Defendants deny each and every allegation contained in Paragraph 50 not specifically admitted herein.

51.    Defendants deny the allegations in Paragraph 51 of the Complaint.

52.    Defendants deny the allegations in Paragraph 52 of the Complaint.

53.    Defendants deny the allegations in Paragraph 53 of the Complaint.

54.    Defendants admit that UMC purchased Aroclor 1016 from Old Monsanto in 1971, 1972, 1973, 1974, 1975, 1976, and 1977. Defendants further admit that UMC signed the SUA in 1972. Defendants deny all remaining allegations in Paragraph 54 of the Complaint.

55.    Defendants admit that the total chlorine content of Aroclor 1016 was 2-3% less than the total chlorine content of Aroclor 1242, however the congener mix in Aroclor 1016 was different from Aroclor 1242 at the high end.  Defendants deny the remaining allegations in Paragraph 55 of the Complaint.

56.    Defendants deny the allegations in Paragraph 56 of the Complaint.

57.    Defendants deny the allegations in Paragraph 57 of the Complaint.

58.    Defendants admit that Aroclor 1016 contained 41% chlorine.  Defendants deny the remaining allegations in Paragraph 58 of the Complaint.

59.    Defendants deny the allegations in Paragraph 59 of the Complaint.

60.    Defendants deny the allegations in Paragraph 60 of the Complaint.

61.    Defendants state that the allegations of Paragraph 61 purport to selectively quote, characterize and/or reference certain documents and/or statements.  Defendants state that the

20044854v.1

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 61.

62. Defendants state that the allegations of Paragraph 62 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 62.

63. Defendants state that the allegations of Paragraph 63 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 63.

64. Defendants state that the allegations of Paragraph 64 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 64.

65. Defendants state that the allegations of Paragraph 65 purport to selectively quote, characterize and/or reference certain documents and/or statements. Defendants state that the complete language and/or content of the documents and/or statements can be ascertained from the documents and/or statements themselves. Defendants deny the remaining allegations of Paragraph 65.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

66.    Defendants admit that Plaintiff and every other entity that executed a SUA is liable for the full amount of all PCB-related claims. Defendants deny each and every allegation contained in Paragraph 66 not specifically admitted herein.

67.    Defendants deny the allegations contained in Paragraph 67.

## FIRST CLAIM

68.    Defendants repeat and re-allege the allegations contained in Paragraphs 1 through 67 of its Answer as if fully set forth herein.

69.    Defendants deny the allegations in Paragraph 69 of the Complaint.

70.    Defendants deny the allegations in Paragraph 70 of the Complaint.

71.    Defendants deny the allegations in Paragraph 71 of the Complaint.

72.    Defendants deny the allegations in Paragraph 72 of the Complaint.

73.    Defendants deny the allegations in Paragraph 73 of the Complaint.

74.    Defendants deny the allegations in Paragraph 74 of the Complaint.

75.    Defendants deny the allegations in Paragraph 75 of the Complaint.

76.    Defendants deny the allegations in Paragraph 76 of the Complaint.

## SECOND CLAIM

77.    Defendants repeat and re-allege the allegations contained in Paragraphs 1 through 76 of its Answer as if fully set forth herein.

78.    Paragraph 78 of the Complaint states conclusions of law to which no response is required. To the extent a response is deemed required, Defendants deny the allegations in Paragraph 78 of the Complaint.

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

79.    Paragraph 79 of the Complaint states conclusions of law to which no response is required.    To the extent a response is deemed required, Defendants deny the allegations in Paragraph 79 of the Complaint.

80.    Defendants deny the allegations in Paragraph 80 of the Complaint.

81.    Defendants deny the allegations in Paragraph 81 of the Complaint.

82.    Defendants deny the allegations in Paragraph 82 of the Complaint.

83.    Defendants deny the allegations in Paragraph 83 of the Complaint.

## THIRD CLAIM

84.    Defendants repeat and re-allege the allegations contained in Paragraphs 1 through 83 of its Answer as if fully set forth herein.

85.    Defendants deny the allegations in Paragraph 85 of the Complaint.

86.    Defendants state that the allegations of Paragraph 86 purport to selectively quote, characterize and/or reference certain pleadings and litigation events. Defendants state that the complete language and/or content of the pleadings and/or litigation events can be ascertained from the documents themselves.   Defendants deny the remaining allegations of Paragraph 86 of the Complaint.

87.    Defendants admit that there was a negotiated resolution of the Food Chain Cases. Defendants deny all remaining allegations in Paragraph 87 of the Complaint.

88.    Defendants deny the allegations in Paragraph 88 of the Complaint.

89.    Defendants deny the allegations in Paragraph 89 of the Complaint.

## FOURTH CLAIM

90.    Defendants repeat and re-allege the allegations contained in Paragraphs 1 through 89 of its Answer as if fully set forth herein

13

20044854v.1

91.    Paragraph 91 of the Complaint states conclusions of law to which no response is required.  To the extent a response is deemed required, Defendants deny the allegations in Paragraph 91 of the Complaint.

92.    Defendants deny the allegations in Paragraph 92 of the Complaint.

93.    The SUA speaks for itself, and Defendants deny all allegations contained in Paragraph 93 that are inconsistent with the terms of the SUA.  Defendants deny each and every allegation contained in Paragraph 93 not specifically admitted herein.

94.    Defendants deny the allegations in Paragraph 94 of the Complaint.

95.    Defendants deny the allegations in Paragraph 95 of the Complaint.

96.    Defendants deny the allegations in Paragraph 96 of the Complaint.

97.    Defendants deny the allegations in Paragraph 97 of the Complaint.

98.    Defendants deny the allegations in Paragraph 98 of the Complaint.

99.    Defendants deny the allegations in Paragraph 99 of the Complaint.

100.   Defendants deny the allegations in Paragraph 100 of the Complaint.

### FIFTH CLAIM

101.   Defendants repeat and re-allege the allegations contained in Paragraphs 1 through 100 of its Answer as if fully set forth herein

102.   Defendants admit the allegations in Paragraph 102 of the Complaint, except to state that the governments' conclusions occurred in 1972.

103.   Defendants admit that in 1972, the United States Department of Labor, Occupational Safety & Health Administration ("OSHA") adopted electrical standards requiring the use of PCBs in a number of applications consistent with the 1971 National Electrical Code.

Defendants deny each and every allegation in Paragraph 103 of the Complaint not specifically admitted herein.

104.    Defendants admit that they have asserted a federal preemption defense in certain PCB actions.  Defendants deny each and every allegation in Paragraph 104 not specifically admitted herein.

105.    Paragraph 105 of the Complaint states conclusions of law to which no response is required.  To the extent a response is deemed required, Defendants deny the allegations in Paragraph 105 of the Complaint. Defendants.

## SIXTH CLAIM

106.    Defendants repeat and re-allege the allegations contained in Paragraphs 1 through 105 of its Answer as if fully set forth herein

107.    Defendants deny the allegations in Paragraph 107 of the Complaint.

108.    Defendants admit that UMC negotiated and executed the SUA as part of an agreement to purchase PCBs from Old Monsanto. Defendants deny all remaining allegations in Paragraph 108 of the Complaint.

109.    Defendants deny the allegations in Paragraph 109 of the Complaint.

110.    Defendants  deny the allegations in Paragraph 110 of the Complaint.

111.    Defendants  lack  sufficient  information  to  admit  or  deny  the  allegations  in Paragraph 111 and therefore deny the same.

112.    Defendants  state  that  the  allegations  of  Paragraph  112  purport  to  selectively quote, characterize and/or reference certain documents and/or statements.  Defendants state that the complete language and/or content of the documents and/or statements can be ascertained

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

from the documents and/or statements themselves.  Defendants deny the remaining allegations of Paragraph 112.

113.   Defendants deny the allegations in Paragraph 113 of the Complaint.

114.   Defendants deny the allegations in Paragraph 114 of the Complaint.

115.   Defendants deny the allegations in Paragraph 115 of the Complaint.

116.   Defendants deny the allegations in Paragraph 116 of the Complaint.

## SEVENTH CLAIM

117.   Defendants repeat and re-allege the allegations contained in Paragraphs 1 through 116 of its Answer as if fully set forth herein

118.   Defendants deny the allegations in Paragraph 118 of the Complaint.

119.   Defendants deny the allegations in Paragraph 119 of the Complaint.

120.   Defendants deny the allegations in Paragraph 120 of the Complaint.

121.   Defendants deny the allegations in Paragraph 121 of the Complaint.

122.   Defendants deny the allegations in Paragraph 122 of the Complaint.

## EIGHTH CLAIM

123.   Defendants repeat and re-allege the allegations contained in Paragraphs 1 through 122 of its Answer as if fully set forth herein

124.   Defendants deny the allegations in Paragraph 124 of the Complaint.

125.   Defendants admit Plaintiff was served with a demand for indemnification for PCB-related claims, which speaks for itself.  Defendants deny the remaining allegations in Paragraph 125 of the Complaint.

126.   Defendants deny the allegations in Paragraph 126 of the Complaint. Defendants further deny that New Jersey law or New Jersey public policy are applicable to the SUA or to

16

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

this litigation. The SUA was executed in Missouri, and Missouri law applies to the interpretation and enforcement of the SUA.

**WHEREFORE**, Defendants having fully answered, deny that Plaintiff is entitled to any relief whatsoever and ask this Court to grant judgment in its favor, dismiss Plaintiff's Complaint with prejudice, award Defendants their costs and expenses incurred herein, and grant Defendants any further relief the Court deems proper.

## AFFIRMATIVE DEFENSES

1.      The Complaint fails to state a cause of action up on which relief can be granted.

2.      As set forth in the September 5, 2017 Motion to Dismiss for Lack of Personal Jurisdiction, there is no personal jurisdiction over Defendants Monsanto Company and Solutia, Inc. in New Jersey. Defendants incorporate the arguments set forth in the September 5, 2017 Motion to Dismiss for Lack of Personal Jurisdiction and the October 10, 2017 Reply in Further Support of Motion to Dismiss for Lack of Personal Jurisdiction by reference as if fully set forth herein.

3.      As set forth in the September 5, 2017 Motion to Dismiss for Failure to Join Indispensable Parties, the Complaint fails as a matter of law because Defendants Monsanto Company and Solutia, Inc. are indispensable parties over which this Court does not have personal jurisdiction. Defendants incorporate the arguments in the September 5, 2017 Motion to Dismiss for Failure to Join Indispensable Parties and October 10, 2017 Reply in Further Support of Motion to Dismiss for Failure to Join Indispensable Parties by reference as if fully set forth herein.

20044854v.1

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

4.      The Complaint should be dismissed on the basis of comity in favor of the lawsuit filed by Defendants and currently pending in the Circuit Court of St. Louis County, Missouri, Case No. 17SL-CC03368.

5.      The SUA is valid and enforceable against Plaintiff.

6.      The SUA was not procured by fraud.

7.      Defendants did not fraudulently induce Plaintiff to execute the SUA, but rather Plaintiff knowingly and willingly negotiated and entered into the SUA and assumed any risks associated therewith.  For example, the Appellate Court of Illinois found in 1996 that: (a) Old Monsanto placed warning labels on its Aroclor products purchased by UMC concerning toxicity, and distributed product bulletins informing UMC of toxicity and safe handling of Aroclor as early as 1963; (b) Old Monsanto advised UMC of "PCBs' harmful effects on the environment" in March 1969; (c) Old Monsanto "specifically advised [UMC] to keep all chemicals well contained and, subsequently, to exercise the highest degree of control in its storage of PCB products"; (d) in May 1970 Old Monsanto began labeling Aroclor 1242 with a caution stating "[e]treme care should be taken to prevent any entry into the environment through spills, leakage, use, disposal, vaporixation or otherwise"; (e) Aroclor 1016 was labeled similarly to Aroclor 1242; (f) Old Monsanto's "warnings about the dangers of PCBs also were placed on its shipping documents and invoices"; and (g) "in July of 1971, [Old] Monsanto sent a product bulletin to [UMC], urging that 'every care should be taken by users of PCB-containing products to prevent entry into the environment.'" See Fruit of the Loom, Inc. v. Travelers Indem. Co., 284 Ill. App. 3d 485, 487-88 (Ill. App. Ct. 1996).  The SUA also provides: "[UMC] acknowledges that it is aware and has been advised by Monsanto that PCBs tend to persist in the environment; that care

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

is required in the handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products."

8. The SUA does not violate public policy.

9. The SUA requires Plaintiff to defend and indemnify Old Monsanto for alleged negligent, reckless, or intentional conduct.

10. Defendants did not unreasonably delay in notifying Plaintiff of the Underlying Actions or in seeking defense and indemnification under the SUA.

11. The SUA is not limited to instances where PCBs were purchased by UMC from Old Monsanto after January 7, 1972.

12. Plaintiff's obligations to defend and indemnify Old Monsanto under the SUA is not preempted by the Toxic Substances Control Act.

13. The SUA is not substantively or procedurally unconscionable.

14. The SUA was not the product of economic duress.

15. The SUA was not the product of mistake.

16. The law of the State of Missouri, not the State of New Jersey, applies to the interpretation and enforcement of the SUA.

17. Plaintiff's claims fail because a declaratory judgment action is an improper method to declare the validity or sufficiency of defenses to the Defendants' claims for enforcement of the SUA.

18. Plaintiff's claims fail because there is an adequate remedy available to Plaintiff to resolve its claims relating to the SUA other than pursuit of this action, namely the action filed by the Defendants in the Circuit Court of St. Louis County, Missouri.

20044854v.1

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

### RULE 4:5-1 DESIGNATION OF TRIAL COUNSEL

Andrew I. Hamelsky, Esq. has been designated as trial counsel for the Defendants in the above entitled Action.

### JURY TRIAL

Defendants hereby demand a trial by jury as to all issues.

### RULE 4:5-1 CERTIFICATION

I hereby certify that, except as stated herein relating to the action pending in Missouri, the matter in controversy is not the subject of any other action or proceeding, pending or contemplated, and that I know of no other parties who should be joined in this action at this time.

### RULE 4:6 CERTIFICATION

I hereby certify that the foregoing pleading was filed and served within the time period provided under R. 4:6, et seq. together with any extensions of time granted thereunder.

20044854v.1

Dated: November 29, 2017

Respectfully Submitted,

WHITE AND WILLIAMS LLP

BY:

Andrew I. Hamelsky (N.J. Bar # 045111994)
The Legal Center, One Riverfront Plaza
1037 Raymond Blvd., Suite 230
Newark, NJ 07102-5425
(201) 631-4406
(201) 368-7246 (facsimile)
Email: hamelskya@whiteandwilliams.com

And

THOMPSON COBURN LLP

A. Elizabeth Blackwell, (MO Bar #50270;
*admitted pro hac vice*);
Christopher M. Hohn (MO Bar # 44124;
*admitted pro hac vice*)
One US Bank Plaza
St. Louis, Missouri 63101
(314) 552-6000
(314) 552-7000 (Facsimile)
Email: eblackwell@thomsponcoburn.com
Email: chohn@thompsoncoburn.com

*Attorneys for Defendants Monsanto Company,*
*Pharmacia LLC f/k/a Monsanto and Solutia,*
*Inc.*

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

**WHITE AND WILLIAMS, LLP**
Andrew I. Hamelsky, Esq. (NJ Attorney ID 045111994)
The Legal Center – One Riverfront Plaza
1037 Raymond Blvd. Suite 230
Newark, New Jersey 07102
*Attorneys for Monsanto Company, Pharmacia LLC f/k/a Monsanto, and Solutia, Inc.*

| | |
|---|---|
| **MAGNETEK, INC,** | : |
| | : SUPERIOR COURT OF NEW JERSEY |
| **Plaintiff,** | : LAW DIVISION: BERGEN COUNTY |
| | : |
| vs. | : |
| | : Docket No.: BER-L-3362-17 |
| **MONSANTO COMPANY, PHARMACIA** | : |
| **LLC f/k/a MONSANTO, and SOLUTIA,** | : Civil Action |
| **INC.,** | : |
| | : **CERTIFICATION OF SERVICE** |
| **Defendants.** | : |

I, Zaara Bajwa Nazir, of full age, do hereby certify as follows:

1.  I am an attorney-at-law of the State of New Jersey and I am an associate at White and Williams LLP.

2.  On **November 29, 2017**, I caused to be served by electronic filing a copy of Defendants' Monsanto Company, Pharmacia LLC f/k/a Monsanto, and Solutia Inc.'s Answer to Complaint, Affirmative Defenses, Designation of Trial Counsel and Jury Demand.

3.  The service was accomplished by sending said documents through electronically filing to the following:

John R. Altieri, Esq.
25 East Salem Street
Hackensack, New Jersey 07601
*Attorney for Magnetek, Inc*

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

20043944v.1

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

Respectfully submitted,

By: _____

Zaara Bajwa Nazir, Esq.

Date: November 29, 2017

-2-

Electronically Filed - St Louis County - December 11, 2017 - 04:27 PM

# Civil Case Information Statement

## Case Details: BERGEN | Civil Part Docket# L-003362-17

**Case Caption:** MAGNETEK INC VS MONSANTO COMPANY

**Case Initiation Date:** 05/12/2017

**Attorney Name:** ZAARA BAJWA NAZIR

**Firm Name:** WHITE AND WILLIAMS LLP

**Address:** ONE RIVERFRONT PLAZA 1037 RAYMOND BLVD STE 230
NEWARK NJ 07102

**Phone:**

**Name of Party:** DEFENDANT : MONSANTO COMPANY

**Name of Defendant's Primary Insurance Company (if known):** None

**Case Type:** ASBESTOS

**Document Type:** Answer

**Jury Demand:** YES - 6 JURORS

**Hurricane Sandy related?** NO

**Is this a professional malpractice case?** NO

**Related cases pending:** YES

**If yes, list docket numbers:** Circuit Court St. Louis, Missouri 17SL-CC03368

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Business

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

| 11/29/2017 | /s/ ZAARA BAJWA NAZIR |
|---|---|
| Dated | Signed |