UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MONSANTO COMPANY, et al.,           )
                                    )
            Plaintiffs,             )
                                    )
v.                                  )          No. 4:23-CV-00204-HEA
                                    )
MAGNETEK, INC., et al.,             )
                                    )
            Defendants.             )

**MONSANTO'S RESPONSE IN OPPOSITION TO
DEFENDANTS' JOINT MOTION TO DISMISS**

Christopher M. Hohn #44124
Nicholas J. Lamb #33486
David M. Mangian #61728
Nicholas Schnell #73932
Brittney K. Mollman #65745
THOMPSON COBURN LLP
One U.S. Bank Plaza
St. Louis, Missouri 63101
(314) 552-6000 (Telephone)
(314) 552-7000 (Facsimile)
chohn@thompsoncoburn.com
nlamb@thompsoncoburn.com
dmangian@thompsoncoburn.com
nschnell@thompsoncoburn.com
bmollman@thompsoncoburn.com

*Attorneys for Plaintiffs Monsanto
Company, Pharmacia, LLC, and
Solutia, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 4

    I.      Old Monsanto Manufactured And Sold PCBs To Defendants, Who, In Turn, Sold PCB-Containing Products Throughout The Country. ................................... 4

    II.     Defendants Negotiated And Entered Into The Special Undertaking Contracts. ............................................................................................................... 4

    III.   Defendants Released PCBs Into The Environment Both Before And After They Entered Into The Special Undertaking Contracts. ........................................ 6

    IV.   Defendants Have Refused To Honor Their Contractual Commitments To Defend And Indemnify Monsanto For PCB-Related Lawsuits. ............................ 6

    V.     Monsanto Filed The FAP To Enforce The Special Undertaking Contracts. .......... 7

    VI.   GE and Paramount Seek To Reopen Solutia's Bankruptcy. .................................. 8

LEGAL STANDARD ............................................................................................. 8

ARGUMENT ........................................................................................................... 9

    I.      The Court Should Remand This Case And Allow The Circuit Court Of St. Louis County To Resolve Defendants' Motions To Dismiss. ............................... 9

    II.     Monsanto Plausibly Alleges That The Underlying PCB Lawsuits Are Covered By The Broad Scope Of The Special Undertaking Contracts. ............... 10

          A.    The Special Undertaking Contracts Require Defendants To Defend And Indemnify Monsanto in Claims That Involve Both Post-Special Undertaking PCBs And Other Substances. ............................................... 10

          B.    Monsanto Has Sufficiently Alleged That The Claims In The PCB Lawsuits Arise Out Of Or Are Connected With Defendants' Post-Special Undertaking PCBs. ...................................................................... 13

               i.    Monsanto Has Surpassed The Low Threshold For Alleging A Claim For Breach Of The Special Undertaking Contracts. ...................................................................................................... 14

               ii.   Monsanto Has Sufficiently Alleged The Underlying PCB Lawsuits Are Covered By The Special Undertaking Contracts. ........................................................................................ 15

iii.    Monsanto Has Specifically Connected Some Defendants To Certain Underlying PCB Lawsuits................................................. 19

III.    Monsanto's Declaratory Relief Claims Are Ripe. ................................................. 20

A.    Declaratory Relief Claims Regarding The Scope Of Defendants' Duty To Indemnify Under The Special Undertakings Are Ripe As To Pending Lawsuits Because Defendants Have Rejected Monsanto's Tenders.................................................................................... 20

B.    Monsanto's Claims Regarding The Scope Of Coverage For Future Lawsuits Are Ripe.......................................................................... 23

IV.    Old Monsanto And New Monsanto Have The Legal Right To Pursue Claims Relating To The Special Undertaking Contracts. ...................................... 25

A.    Old Monsanto Is A Proper Party To This Lawsuit. ................................. 25

B.    New Monsanto Is A "Future Agent" Of Old Monsanto. .......................... 27

V.    Monsanto Has Adequately Alleged Its Contribution Claim. ............................... 30

CONCLUSION................................................................................................................. 33

## INTRODUCTION

The Court does not need to address Defendants'[1] Joint Motion to Dismiss (ECF #90) because this case should be remanded in light of GE's untimely notice of removal and failure to provide sufficient evidence supporting federal officer jurisdiction.  If, however, the Court determines it has jurisdiction over this case, it should deny Defendants' Motion because it is based on an unreasonably narrow and incomplete interpretation of the Special Undertaking Contracts, ignores well-pleaded allegations in the First Amended Petition ("FAP"), and disregards authority—including the Missouri Court of Appeals decision in *Monsanto Co. v. Gould Elecs., Inc.*, 965 S.W.2d 314, 317 (Mo. Ct. App. 1998) ("*Gould*")—that is directly on point.  Simply put, the extensive and detailed allegations in the FAP are more than sufficient to plausibly allege claims for breach of contract (Counts I-II), declaratory judgment (Counts III-IV), and contribution against Defendants (Count VII).

Defendants' arguments regarding Monsanto's breach of contract claims suffer from two insuperable flaws.  First, Defendants' argument is premised on a narrow interpretation of the Special Undertaking Contracts that is not supported by the clear language used by the parties and is contrary to how the Missouri Court of Appeals interpreted the same language in *Gould*.  Although Defendants' contractual duties to defend and indemnify Monsanto relate to post-Special Undertaking PCBs, the scope of Defendants' duties extend to (i) "***any and all*** liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses," (ii) "***arising out of or in connection with***" post-Special Undertaking PCBs, (iii) "***whether alone or in combination with other substances***."  The Missouri Court of Appeals held in *Gould* that this language means Defendants

---

[1] Defendants General Electric Co. ("GE"), Paramount Global ("Paramount"), Kyocera AVX Components Corporation ("KAVX"), Cornell-Dubilier Electronics, Inc. ("CDE"), and The Gillette Company, LLC ("Gillette") are collectively referred to herein as "Defendants."  Unless noted otherwise, "Monsanto" collectively refers to Pharmacia LLC ("Old Monsanto"), Monsanto Co. ("New Monsanto"), and Solutia, Inc. ("Solutia").

are required to defend and indemnify Monsanto for claims that involve both pre- and post-Special Undertaking PCBs.  Second, Defendants' argument ignores the detailed allegations in the FAP establishing that the claims in the underlying PCB lawsuits arise out of or are connected with Defendants' post-Special Undertaking PCBs.  The specific facts alleged by Monsanto in the FAP (*see, e.g.,* ¶¶ 2, 4, 24, 26, 110, 167-202, 236-84) are more than sufficient to state a plausible claim for breach of the Special Undertaking Contracts by Defendants.

Defendants' claim that portions of Monsanto's declaratory judgment claims are not ripe is contrary to well-established Eighth Circuit case law.  According to the Eighth Circuit, Monsanto's declaratory judgment claims are "unquestionably ripe for adjudication" even though some of the underlying PCB lawsuits remain pending, because Defendants have rejected Monsanto's tenders. Defendants fail to mention this Eighth Circuit precedent.  Instead, they attempt to rely on two decisions that Judge Fleissig from this Court very recently found are contrary to Eighth Circuit ripeness standards.  The Defendants' remaining arguments with regard to Monsanto's declaratory judgment claims fare no better.  In the Eighth Circuit, declaratory judgment claims concerning coverage of future claims are ripe if there is a "substantial probability" of future lawsuits.  It cannot be disputed that there is a "substantial probability" Monsanto will face future PCB lawsuits as it is a matter of public record that Monsanto has been named as a defendant in multiple PCB lawsuits since it filed the FAP.  There is no merit to Defendants' attacks on Monsanto's declaratory judgment claims.

Defendants' "standing" argument is part of a larger defense strategy to expand these proceedings and have this case heard and decided by a court outside Missouri.  Shortly after Defendants filed this Joint Motion, and without notifying this Court, GE and Paramount filed a motion in the United States Bankruptcy Court for the Southern District of New York seeking to

reopen Solutia's bankruptcy (which has been closed since 2009).  GE and Paramount want to reopen the Solutia bankruptcy so they can argue to the bankruptcy court that Solutia can no longer enforce its rights in the Special Undertaking Contracts as a result of its discharge from bankruptcy. Neither Court should condone Defendants' gamesmanship.  Nor should this Court find that Old Monsanto or New Monsanto lack "standing" to enforce the Special Undertaking Contracts.  Old Monsanto is a party to the Special Undertaking Contracts — the party to whom indemnification is owed — and the allegations in the FAP that Defendants rely on do not establish a complete assignment of all Old Monsanto's rights in the Special Undertaking Contracts to Solutia.  And New Monsanto is a third-party beneficiary of the Special Undertaking Contracts because it is unquestionably a "future . . . agent" of Old Monsanto entitled to defense and indemnity under the plain language of the Special Undertaking Contracts.

Finally, the Court should reject Defendants' claim that Monsanto has not sufficiently alleged the elements of a contribution claim under Missouri law.  The extensive allegations in paragraphs 1 through 235 of the FAP, which are incorporated by reference into Monsanto's contribution claim, and the specific allegations of Monsanto's contribution claim are more than sufficient to state a plausible claim against Defendants.  These allegations establish that Defendants are alleged joint tortfeasors with Monsanto in the underlying PCB lawsuits and put Defendants on notice of the claims against them.  Further, to the extent necessary to plead a contribution claim under Missouri law, Monsanto adequately alleges that some underlying PCB lawsuits were settled, that the settlements were reasonable, and that the settlements extinguished Defendants' liability in those cases.

# BACKGROUND

I.  **Old Monsanto Manufactured And Sold PCBs To Defendants, Who, In Turn, Sold PCB-Containing Products Throughout The Country.**

PCBs are a group of man-made organic chemicals that Old Monsanto manufactured and sold in bulk to Defendants and others from 1935 to 1977. FAP, (ECF #4) ¶¶ 20-21. Because PCBs are resistant to heat and fire, Defendants or their predecessors-in-interest used PCBs as dielectric fluid in electrical equipment—e.g., capacitors and transformers. *Id.* ¶¶ 22, 26. Until at least 1977, GE and Paramount sold PCB-containing transformers and all Defendants sold PCB-containing capacitors and/or other smaller PCB-containing electrical devices, including fluorescent light ballasts that were used by consumers and installed in schools, offices, homes, and other structures throughout the country. *Id.* ¶¶ 22-26, 110, 123, 142, 144-46 (GE and Westinghouse manufactured transformers); *id.* ¶¶ 2, 4 ("Defendants incorporated [post-Special Undertaking] PCBs . . . into electrical products—e.g., capacitors, transformers, and light ballasts—that were sold to customers ***throughout the United States***" (emphasis added)). Old Monsanto itself never sold finished electrical devices containing PCBs. *Id.* ¶ 29.

II.  **Defendants Negotiated And Entered Into The Special Undertaking Contracts.**

Concerns over environmental issues with PCBs started to emerge in the late 1960s. *Id.* ¶ 30. In 1970, Monsanto began labeling its PCB products with a warning that extreme care should be taken to prevent entry of PCBs into the environment. *Id.* ¶ 36. In 1970 and 1971, Monsanto directly informed Defendants of broader environmental concerns through letters and/or meetings. *Id.* ¶¶ 31-37, 44, 55, 67, 75. In 1971, Monsanto decided to phase out production and sales of PCBs for all remaining, non-electrical applications of PCBs. *Id.* ¶ 49. However, Monsanto agreed to continue to supply PCBs to certain customers for use in closed electrical applications *if and only*

*if* its customers would agree to defend and indemnify Monsanto against future PCB-related claims. *Id.*

In early 1972, Defendants negotiated and ultimately entered into company-specific, but substantially similar, written defense and indemnity contracts—known as "Special Undertakings by Purchasers of Polychlorinated Biphenyls"—with Old Monsanto. *Id.* ¶¶ 54-103. Each Special Undertaking Contract confirms that the respective Defendant is "aware and has been advised" of environmental concerns regarding PCBs and that "care is required in the[] handling, possession, use and disposition" of PCBs. *Id.* ¶¶ 57, 69, 77, 86, 92, 99. The operative language of the Special Undertaking Contracts is substantially similar and provides as follows:

> Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, ***Buyer shall defend, indemnify and hold harmless Monsanto***, its present, past and ***future*** directors, officers, employe[e]s and ***agents***, from and against ***any and all*** liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses ***arising out of or in connection with*** the receipt, purchase, possession, handling, use, sale, or disposition of such PCB's by, through or under Buyer, ***whether alone or in combination with other substances***, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

*Id.* ¶¶ 70, 78, 87, 93, 100 (emphasis added). The Special Undertaking Contracts are attached to the FAP as Exhibits 1-6.

Between 1972 and 1977, Monsanto sold PCBs to (and only to) customers who entered into Special Undertaking Contracts. *Id.* ¶ 4, 49. Defendants are the top six viable purchasers of post-Special Undertaking PCBs; they collectively purchased approximately 133 million pounds of post-Special Undertaking PCBs (or 93% of the total post-Undertaking PCBs sold to entities that remain viable). *Id.* ¶¶ 4, 51, 110. Defendants used these post-Special Undertaking PCBs in electrical

- 5 -

equipment, including transformers and capacitors, that they sold throughout the United States (and elsewhere). *Id.* ¶ 4.

III.   **Defendants Released PCBs Into The Environment Both Before And After They Entered Into The Special Undertaking Contracts.**

Defendants and their products have been a major source of environmental PCB contamination. *See id.* ¶¶ 2, 104. The FAP contains numerous, detailed allegations regarding examples of PCB contamination caused by each Defendant. *See id.* at ¶¶ 104-66. Defendants are also responsible for contamination resulting from PCBs released (both before and after they entered into the Special Undertaking Contracts) from "products they manufactured, disposal of PCB-containing products, leaks, accidental spills, dumping and disposal of industrial wastes, and through other means." *Id.* ¶ 105; *see also id.* ¶¶ 2, 4, 24, 26, 28, 46, 110, 191, 308 (allegations Defendants manufactured and distributed PCB-containing electrical equipment throughout the country, including after 1972). By 1976, the EPA estimated that more than 190 million pounds of PCBs had been released into the environment through transformers and capacitors (i.e., the types of products Defendants manufactured and sold) and that capacitors, alone, generated at least 3 million pounds of PCB waste annually. *Id.* ¶¶ 108-09, 111.

IV.   **Defendants Have Refused To Honor Their Contractual Commitments To Defend And Indemnify Monsanto For PCB-Related Lawsuits.**

Monsanto has been sued by plaintiffs seeking to impose liability on Monsanto for injuries or damages allegedly caused by PCBs (the "underlying PCB lawsuits"). *Id.* ¶ 167. The underlying PCB lawsuits can generally be broken down into four categories: (i) Food Chain Cases, (ii) Water Cases, (iii) School Cases, and (iv) Occupational Cases. The Food Chain Cases seek damages for various personal injuries caused by PCBs released from, among other things, "PCB-containing products" and impose general liability on Monsanto for *manufacturing any and all PCBs*, including post-Special Undertaking PCBs. *Id.* ¶¶ 170-72. The Water Cases "allege generally that

PCBs have entered the subject body of water through various sources, including improper disposal by Old Monsanto's customers, PCB releases from products manufactured by Old Monsanto's customers, and leaching from landfills." *Id.* ¶ 179.  The School Cases allege that PCBs used in electrical equipment, lighting ballasts, and other materials in schools caused personal injuries and property damage. *Id.* ¶¶ 189-90.  The Occupational Cases seek damages for alleged workplace PCB exposures through, among other things, leaks from light ballasts, transformers, and other electrical equipment. *Id.* ¶¶ 197-99.

Monsanto has incurred significant costs defending the underlying PCB lawsuits, has agreed to pay substantial sums to settle various underlying PCB lawsuits, and has had judgments entered against it in some underlying PCB lawsuits. *Id.* ¶¶ 5, 9, 176, 187, 200, 231-32 (settlements); *id.* ¶¶ 1, 5, 233, 255, 260 (judgments in certain PCB Lawsuits).  In 2015, Monsanto began tendering the defense of the underlying PCB lawsuits to Defendants and demanding that Defendants indemnify Monsanto pursuant to the Special Undertaking Contracts. *Id.* § V.  As detailed in the FAP, each Defendant unequivocally rejected (or, in the case of Gillette, ignored) Monsanto's tenders of defense and demands for indemnification related to the PCB Lawsuits. *Id.*

## V.     Monsanto Filed The FAP To Enforce The Special Undertaking Contracts.

Monsanto filed the FAP in the Circuit Court of St. Louis County, Missouri on August 3, 2022.  The FAP asserts claims against Defendants for breach of contract, negligence, declaratory judgment, and contribution.[2] *Id.* ¶¶ 236-313.  Monsanto's lawsuit is currently pending in this Court because GE removed it pursuant to federal officer jurisdiction. *See* Notice of Removal, (ECF #1).  Monsanto filed a Motion to Remand because GE's removal was untimely and is not supported by sufficient evidence as required by prior decisions of this Court. *See* Plaintiffs' Motion to Remand,

---

[2] The FAP is the initial pleading alleging claims against the GE, Paramount, KAVX, CDE, and Gillette.  Monsanto's original petition, filed on September 1, 2017, only named Magnetek as a defendant.

(ECF #52).  This case will move forward no matter how this Court (or, depending on how the Motion to Remand is resolved, the Circuit Court of St. Louis County, Missouri) rules on Defendants' motions to dismiss because (i) the Circuit Court of St. Louis County, Missouri denied Magnetek's motion to dismiss prior to GE's removal,[3] and (ii) GE did not move to dismiss Monsanto's negligence claim.[4]

## VI.   GE and Paramount Seek To Reopen Solutia's Bankruptcy.

On May 3, 2023, GE and Paramount filed a motion to reopen Solutia's Chapter 11 bankruptcy proceeding, which has been closed for 14 years.  *See Motion Of Paramount And GE To Reopen Solutia Inc.'s Chapter 11 Case To Require Compliance With The Chapter 11 Plan And Confirmation Order, And Enjoin Solutia From Pursuing Unpreserved Claims*, Case No. 03-17949-scc (ECF #4790) (Bankr. S.D.N.Y).  GE and Paramount's motion seeks an order enjoining Solutia from asserting the claims set forth in the FAP and argues, among other things, that Solutia is estopped from enforcing the Special Undertaking Contracts and that the Special Undertaking Contracts were rejected in Solutia's bankruptcy.  *See generally id.*

## LEGAL STANDARD

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  When considering a motion to dismiss under Rule 12(b)(6), the Court must view the allegations in the complaint liberally and in the light most favorable to the plaintiff.  *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008).  The Court

---

[3] Prior to GE's removal, the Circuit Court of St. Louis County, Missouri denied Magnetek's motion to dismiss the FAP. Ex. E1 to Notice of Removal, (ECF #1-5) at 7.  Magnetek then filed an Answer, Affirmative Defenses, and Cross-Claim, and, after Monsanto filed a Motion to Strike, Magnetek filed a First Amended Answer, Affirmative Defenses, and Cross-Claim. *Id.* at 3, 5.

[4] GE only joined in Defendants' Joint Motion to Dismiss (ECF #90).  The Joint Motion to Dismiss does not seek to dismiss Monsanto's negligence claim against GE or any other Defendant. *See Id.*, ¶¶ 1-6 (not referencing Count V).

"must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005).

Specific facts are not necessary, and the complaint need only "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp.,* 550 U.S. at 555 (quotation marks omitted).  To survive a motion to dismiss, the plaintiff need only "state a claim to relief that is plausible on its face." *Id.* at 570.  For a claim to be "plausible," a plaintiff must plead enough factual content that, when accepted as true, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The standard "does not require great detail or recitation of all potentially relevant facts in order to put the defendant on notice of a plausible claim." *Hamilton v. Palm*, 621 F.3d 816, 819 (8th Cir. 2010).

Determining whether a claim is plausible "is a 'context-specific task'" that depends on the nature of the claim alleged. *Id.* at 818 (quoting *Iqbal*, 556 U.S. at 679).  A court should not dismiss a complaint unless "the allegations show on the face of the complaint [that] there is some insuperable bar to relief[.]" *Morningstar, LLC v. Hardee's Food Sys.*, No. 4:08CV794, 2009 WL 36406 at *1 (E.D. Mo. Jan. 6, 2009) (citation omitted).

## ARGUMENT

I. **The Court Should Remand This Case And Allow The Circuit Court Of St. Louis County To Resolve Defendants' Motions To Dismiss.**

The Court should not rule on Defendants' Motions to Dismiss.  As discussed in Monsanto's fully briefed Motion to Remand, this case should be remanded because GE's removal was untimely and is not supported by evidence sufficient to establish federal officer jurisdiction under *Kelly v. Monsanto Co.*, Case No. 15-CV-1825, 2016 WL 3543050 at *9-*11 (E.D. Mo. June 29, 2016) (Bodenhausen, J.); *Bailey v. Monsanto Co.*, 176 F. Supp.3d 853, 869-70 (E.D. Mo. 2016) (Fleissig,

J.); and *Burford v. Monsanto Co.*, Case No. 16CV536, 2017 WL 1315800 at \*5-\*6 (E.D. Mo. Apr. 10, 2017) (Cohen, J.).  Because Monsanto's Motion to Remand will determine whether this Court has subject matter jurisdiction, it should be resolved by the Court prior to the Court reaching the merits of Defendants' Motions to Dismiss.  *See, e.g.*, *Curry v. Pleasurecraft Marine Engine Co.*, No. 13-03139-CV-S-GAF, 2013 WL 12205046 at \*1 (W.D. Mo. May 28, 2013) ("Whether the Court has subject-matter jurisdiction should be addressed before the Court decides the merits of Plaintiff's Petition."); *Moss v. Def. Servs., Inc.*, No. 1:08-CV-88 CAS, 2009 WL 90136 at \*3 (E.D. Mo. Jan. 14, 2009) (reserving resolution of motions to dismiss for state court after determining remand appropriate).

## II.   Monsanto Plausibly Alleges That The Underlying PCB Lawsuits Are Covered By The Broad Scope Of The Special Undertaking Contracts.

The Court should reject Defendants' attempt to hold Monsanto to a higher pleading standard than that required under Fed. R. Civ. P. 8.   The language of the Special Undertaking Contracts is clear and broad—requiring Defendants to defend and indemnify Monsanto for "any and all liabilities" "arising out of or in connection with" post-Special Undertaking PCBs "whether alone or in combination with other substances."  *See* Exs. 1-6 to FAP, (ECF #4-1-6) (Special Undertaking Contracts). The FAP contains more than sufficient factual allegations to plausibly establish that the claims in the underlying PCB lawsuits are covered by the Special Undertaking Contracts.

### A.   The Special Undertaking Contracts Require Defendants To Defend And Indemnify Monsanto in Claims That Involve Both Post-Special Undertaking PCBs And Other Substances.

Plaintiffs' argument that Monsanto hasn't sufficiently connected the underlying PCB lawsuits with Defendants' post-Special Undertaking PCBs is based on an incomplete and narrow interpretation of the Special Undertaking Contracts.   Monsanto agrees with Defendants that the

- 10 -

operative language of the Special Undertaking Contracts is clear and unambiguous. Monsanto further agrees that because the language is clear and unambiguous, the Court must ascertain the parties' intent from the plain meaning of the language used. *See Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428-29 (Mo. 2003). It is clear from the broad language used in the Special Undertaking Contracts that the intent of the parties was to shift to Defendants the risk of loss associated with Monsanto's continued manufacture, sale, and delivery of PCBs to Defendants after they entered into the Special Undertaking Contracts.

Defendants' interpretation of the Special Undertaking Contracts ignores three key phrases. First, Defendants ignore the significance of the phrase "arising out of or in connection with[.]" Courts have universally recognized that this phrase has a much broader meaning than "caused by." *See Alltru Fed. Credit Union v. Starnet Ins. Co.*, No. 4:21-CV-01334-JAR, 2022 WL 4482405 at *6 (E.D. Mo. Sept. 27, 2022) ("Missouri courts . . . give phrases such as 'in connection with' and 'relating to' a broad meaning[.]"); *Minn. Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP*, 472 F. App'x 219, 223 (4th Cir. 2012) ("The phrase 'in connection with' . . . is given particularly broad scope."); *Huffington v. T.C. Grp., LLC*, 637 F.3d 18, 22 (1st Cir. 2011) (same). The phrase merely requires "an established or discoverable relation[ship]" between Defendants' post-Special Undertaking PCBs and the claims in the underlying PCB lawsuits. *Id.* at 22. The phrase does ***not*** (as Defendants suggest) require that Defendants' "receipt, purchase, possession, handling, use, sale or disposition of" post-Special Undertaking PCBs be the direct cause of the claims in the underlying PCB lawsuits.

Second, Defendants overlook the importance of the words "any and all" directly preceding the phrase "liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses" in its Special Undertaking Contract. The words "any and all" make this phrase—and therefore the extent

- 11 -

of Defendants' duties to defend and indemnify Monsanto—very broad.  *See, e.g. Gould*, 965 S.W.2d at 317 ("Such terms clearly and unequivocally provide for Gould to indemnify Monsanto against any and all claims."); *Economy Forms Corp. v. J.S. Alberici Const. Co.*, 53 S.W.3d 552, 556 (Mo. Ct. App. 2000) (citing *Gould* and finding that the intention of the parties that Gould would indemnify Monsanto for its own negligence is "clear from the contract" language of "any and all . . . claims" even though the contract did not use the word negligence); *Util. Serv. and Maint., Inc. v. Noranda Aluminum, Inc.*, 163 S.W.3d 910, 914 (Mo. banc 2005) (citing *Gould* and holding that "[t]here is nothing ambiguous about a requirement that one party indemnify the other for 'any and all claims'" and that such language is sufficient to require indemnity for "all claims, including those alleging negligence by [the indemnitee]"); *Nat'l Sur. Co. v. Casner*, 253 S.W. 1057, 1059 (Mo. 1923) (finding that agreement to indemnify "'against any and all demands, liabilities, loss, damage or expense of whatsoever kind or nature . . . which it should at any time sustain or incur by reason or in consequence of having executed' an attachment bond . . . is so comprehensive as to include . . . [a]ny liability or expense necessarily incurred on account of the attachment bond").

Third, and most importantly, Defendants fail to meaningfully grapple with the phrase "whether alone or in combination with other substances."  The phrase "whether alone or in combination with other substances" is clear, unambiguous, and must be considered when interpreting the Special Undertaking Contracts. *Tuttle v. Muenks*, 21 S.W.3d 6, 11 (Mo. Ct. App. 2000) (explaining that contracts should be construed to "provide[] a reasonable meaning to ***each*** phrase and clause, not one that leaves some of the provisions without function or sense" (emphasis in original) (quotation marks omitted)).  The Missouri Court of Appeals has interpreted this precise language in a Special Undertaking Contract to expand the scope of Defendants' defense and

- 12 -

indemnity obligations to apply to claims that involve both post-Special Undertaking PCBs and "other substances."[5]  *See Gould*, 965 S.W.2d at 317 ("The Undertaking provides for Gould to indemnify Monsanto for use of the PCBs delivered after January 12, 1972, either alone or in combination with other substances.  ***Thus, the Undertaking's coverage is not limited to transformers which contain PCBs delivered after January 12, 1972, exclusively***." (emphasis added)).  Defendants' conclusory analysis of the phrase (which is buried in a footnote) fails to address *Gould* and incorrectly claims that Monsanto is attempting to assert liability "without regard" to whether the underlying PCB lawsuits involve post-Special Undertaking PCBs.  *See* Joint Br., (ECF #91) at 15 n.7.

In short, Defendants' very narrow construction of the Special Undertaking Contracts is incongruous with the plain language and ignores Missouri precedent that has broadly construed the operative language in the Special Undertaking Contracts.[6]

B.   Monsanto Has Sufficiently Alleged That The Claims In The PCB Lawsuits Arise Out Of Or Are Connected With Defendants' Post-Special Undertaking PCBs.

Defendants argue that Monsanto has not sufficiently "connect[ed] PCB Lawsuits to PCBs sold to particular Defendants."  Joint Br., (ECF #91) at 16.  This argument suffers from three fatal flaws.  First, Defendants attempt to hold Monsanto to a higher standard than that required by Fed. R. Civ. P. 8.  Second, Defendants conveniently ignore numerous factual allegations in the FAP

---

[5] The term "other substances" is not defined or limited in any way in the Special Undertaking Contracts.  Thus, "other substances" can be PCBs sold to Defendants prior to entering into the Special Undertaking Contracts (as was the case in *Gould*), PCBs sold by Monsanto to other entities (including for use in open applications), or any other substance (e.g., glyphosate).

[6] At best, Defendants argue the scope of the Special Undertaking Contracts is ambiguous, and their attempt to seek dismissal based on this ground at the pleadings stage is self-defeating.  *See Shapiro Sales Co. v. Alcoa, Inc.*, No. 4:06CV638 CDP, 2006 WL 2228987 at *3 (E.D. Mo. Aug. 3, 2006) ("If [a defendant] wishes to present its own interpretation of [a defense and indemnity agreement,] it is free to do so in a motion for summary judgment, ***after appropriate discovery***. A motion to dismiss . . . is not the proper vehicle for [a defendant] to challenge [a plaintiff's] interpretation of [an indemnity agreement].") (cited in Joint Br., (ECF #91) at 22).  The analysis in *Shapiro* applies with even greater force here, where the Missouri Court of Appeals has previously enforced the operative language of the Special Undertaking Contracts consistent with Monsanto's interpretation.

establishing that the claims in the underlying PCB lawsuits are based (i) on Monsanto's manufacture of *all* PCBs, including post-Special Undertaking PCBs manufactured for Defendants, and (ii) at least in part, on post-Special Undertaking PCBs that escaped from electrical products (e.g., capacitors and transformers) Defendants manufactured and sold throughout the United States.  Third, Defendants gloss over detailed and specific allegations that directly connect some Defendants to some of the underlying PCB lawsuits.

       i.     *Monsanto Has Surpassed The Low Threshold For Alleging A Claim For Breach Of The Special Undertaking Contracts.*

Pleading a plausible claim "is a 'context-specific task'" that depends on the nature of the claim alleged.  *Hamilton*, 621 F.3d at 818 (quoting *Iqbal*, 556 U.S. at 679).  Under Missouri law, the duty to defend is broad.  *Columbia Cas. Co. v. HIAR Holding, LLC*, 411 S.W.3d 258, 265 n.10 (Mo. 2013).  A duty to defend exists "when there is a possibility or potential" that the underlying lawsuit falls within the scope of the defense agreement.  *Allen v. Bryers*, 512 S.W.3d 17, 31 (Mo. 2016) ("The duty to defend arises only when there is ***a possibility or potential*** for coverage at the outset of the case." (emphasis added)).  Thus, Monsanto was only required to, and has pleaded, the "possibility or potential" that the claims in the underlying PCB lawsuits are covered by the Special Undertaking Contracts.

Defendants contradict well-established Missouri law by arguing that Monsanto must allege "more than a 'mere possibility'" that the PCB Lawsuits are within the scope of the Special Undertakings.  Joint Br., (ECF #91) at 17 ("The Petition therefore does not show, as it must, that any Defendant's liability under its particular SU with respect to any particular PCB Lawsuit is anything more than a '***mere possibility***.'" (quoting *Iqbal*, 556 U.S. at 679) (emphasis added)).  At best, Defendants' conflation of general pleading standards and Missouri law governing the duty to defend is highly misleading, especially considering that Defendants' own authority demonstrates

- 14 -

that "[t]he duty to defend is triggered if there exists facts, known or which should be known by the insurer, which could ***potentially*** bring the underlying claim within coverage." *Alltru Fed. Credit Union*, 2022 WL 4482405 at *2 (emphasis added) (citation omitted) (cited in Joint Br., (ECF #91) at 18 n.10).  Furthermore, Defendants seemingly concede Monsanto has surpassed the low "possibility or potential" threshold by improperly arguing a higher pleading standard applies to Monsanto's claims and failing to challenge that Monsanto has alleged a possibility of coverage. The Court should reject Defendants' argument that Monsanto has not sufficiently connected Defendants' post-Special Undertaking PCBs to the underlying PCB lawsuits for this reason alone.

ii.      *Monsanto Has Sufficiently Alleged The Underlying PCB Lawsuits Are Covered By The Special Undertaking Contracts.*

Monsanto alleges that the claims in the underlying PCB lawsuits are covered by the broad scope of the Special Undertaking Contracts.  *See* FAP, (ECF #4) ¶¶ 170-73 (alleging the Food Chain Cases are covered by the Special Undertaking Contracts because they "sought to impose liability on [Monsanto] for manufacturing any and all PCBs, including those purchased by Defendants and their predecessors before and after they signed the Special Undertaking Agreements."); ¶¶ 183-84 (alleging the Water Cases are covered by the Special Undertaking Contracts because they "seek to impose liability on [Monsanto] for manufacturing any and all PCBs, including those purchased by Defendants or their predecessors before and after they signed the Special Undertaking Agreements."); ¶¶ 190-92, 195 (alleging the School Cases are covered by the Special Undertaking Contracts because they are premised on PCBs in building products that include Defendants' post-Special Undertaking PCBs); ¶¶ 198-201 (alleging the Occupational Cases are covered by the Special Undertaking Contracts because plaintiffs alleged they were exposed to PCBs during the course of their employment through various means including leaks from light ballasts and working with transformers and other electrical equipment). These

allegations are sufficient on their own to plausibly allege that the claims in the underlying PCB lawsuits arise out of or are connected with Defendants' post-Special Undertaking PCBs.

Monsanto has also sufficiently alleged that the claims in the underlying PCB lawsuits are covered by the Special Undertaking Contracts because they are based, at least in part, on alleged contamination from electrical products that Defendants manufactured and sold after they entered into the Special Undertaking Contracts.  *See* FAP, (ECF #4) ¶¶ 4, 25, 51, 52 (alleging that each Defendant purchased millions of pounds of post-Special Undertaking PCBs); *id.* ¶¶ 4, 24-26, 28, 110, 191, 308 (alleging that each Defendant incorporated post-Special Undertaking PCBs into electrical equipment (e.g. transformers, capacitors, and light ballasts)); *id.* ¶¶ 2, 4, 24, 110, 308 (alleging that each Defendant sold electrical products containing post-Special Undertaking PCBs ***throughout the country***); *id.* ¶¶ 104-05, 109-11, 112, 122, 135, 148, 155, 161 (alleging that post-Special Undertaking PCBs escaped from Defendants' products through leaks, improper disposal, or otherwise); *id.* ¶¶ 167-204 (alleging that the underlying PCB lawsuits assert liability for, among other things, the release of post-Special Undertaking PCBs from Defendants' direct PCB exposures (e.g. spills) and products, alone or in combination with other materials including pre-1972 PCBs).  These allegations are bolstered by contemporaneous EPA findings that electrical products predominantly produced by Defendants resulted in the release of millions of pounds of PCBs into the environment every year.[7]  *Id.* ¶¶ 109-11.

---

[7] Defendants' suggestion that other unidentified PCB purchasers that may have accounted for a fractional portion of PCB releases creates a "pleading and proof problem" for Monsanto defies procedural norms and the plain language of the Special Undertaking Contracts. S*ee* Joint Br., (ECF #91) at 17.  At the pleadings stage, Monsanto is not required to provide "proof," as the Court must accept Monsanto's allegations as true for purposes of a motion to dismiss. *Coons*, 410 F.3d at 1039.  Moreover, and as discussed above, Defendants are required to defend and indemnify Monsanto if the claims in the underlying PCB lawsuits arise out of or are connected with *any amount* of Defendants' post-Special Undertaking PCBs.  It does not matter that other entities may have contributed to the PCBs at issue in the underlying PCB lawsuits because Monsanto has more than sufficiently alleged that the claims in those cases are based, at least in part, on Defendants' post-Special Undertaking PCBs.

Monsanto's allegation that the claims in the underlying PCB lawsuits are based, in part, on release of post-Special Undertaking PCBs from Defendants' products is sufficient at this stage of the proceedings because more specific information regarding Defendants' distribution of PCB-containing products is "peculiarly within defendant's possession and control." *Energizer Brands, LLC v. Procter & Gamble Co.*, No. 4:16-CV-223 (CEJ), 2016 WL 2894708 at *3 (E.D. Mo. May 18, 2016) (denying motion to dismiss arguing plaintiff failed to plead specific facts regarding defendant's distribution of products); *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1129 (8th Cir. 2012) (reversing dismissal, in part, where "the custodians of the relevant corporate records seemingly must be the defendants themselves or their agents"); *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001) (holding pleadings are sufficient where "facts that would have to be alleged are known to the defendants, but the plaintiffs have not yet had a chance to find them out"). During discovery, Monsanto will obtain specific information regarding how many products containing post-Special Undertaking PCBs Defendants sold, where Defendants sold these products, and how these products were used and disposed.

The specific underlying PCB lawsuits Defendants raise as examples in their brief do not support Defendants' position. For example, Defendants argue that they do not need to defend or indemnify Monsanto in *New Mexico v. Monsanto, et al.* because Monsanto does not allege Defendants "caused pollution in New Mexico." Joint Br., (ECF #91) at 18. But the operative complaint in *New Mexico v. Monsanto, et al.*, reveals that the plaintiffs there (i) seek damages caused by alleged PCB contamination of water bodies that occurred until 1977, and (ii) specifically allege the PCBs at issue entered the water from electrical products sold and used in New Mexico. *See* Ex. A, *New Mexico v. Monsanto Co. et al.*, No. D101-CV-2019-01445, Complaint ¶ 53 ("PCBs entered the air, water, and soil during their ordinary use by [Old Monsanto's] commercial

customers[;]" "PCBs also entered the environment from spills or leaks . . . in transformers, capacitors, or other products containing PCBs"); *id.* ¶ 85 (alleging that PCBs were "released to the atmosphere from landfills and hazardous waste sites . . . leakage and runoff from older electrical equipment in use or improperly disposed"); *id.* ¶ 143 (noting a "large volume of . . . PCB-containing products" were sold and used in New Mexico).  Because Monsanto alleges that each Defendant sold large volumes of transformers, capacitors and/or other electrical equipment containing post-Special Undertaking PCBs throughout the country, it is certainly more than plausible that the claims in *New Mexico v. Monsanto, et al.* are covered by the Special Undertaking Contracts.[8]

Defendants' "collective liability" argument also lacks merit.  Monsanto does not allege that Defendants are collectively liable under a single contract.  Rather, Monsanto alleges that Defendants are individually and collectively liable to Monsanto because the underlying PCB lawsuits are covered by each one of their respective Special Undertaking Contracts.  The Special Undertaking Contracts require Defendants to defend and indemnify Monsanto for "***any and all*** liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of" post-Special Undertaking PCBs "whether alone or in combination with other substances." *See* Exs. 1-

---

[8]  The same is true for the Sky Valley School Cases.  Monsanto specifically alleges that the School Cases are premised on PCBs in "building products such as electrical equipment, lighting ballasts and other materials that were used in the construction of school buildings," that Defendants manufactured "PCB-containing lighting ballasts and other electrical equipment using PCBs purchased both before and after they signed the Special Undertaking Agreements," and that "the School Cases include PCBs Defendants or their predecessors purchased after signing the Special Undertaking Agreements."  *See* FAP, (ECF #4) ¶¶ 190-92.  Such allegations are sufficient to state a claim against Defendants relating to the Sky Valley School Cases.  As explained above (and further detailed in Section III.D of the Argument portion of Monsanto's Response to Paramount's Individual Motion To Dismiss, which is incorporated herein by reference), Monsanto also correctly alleges that *Stapleton et al. v. Monsanto Co. et al.*, and other Food Chain Cases, arise from all environmental PCBs, and thus, are covered by the Special Undertaking Contracts. *See, e.g.*, FAP, (ECF #4) ¶¶ 170-72.

6 to FAP, (ECF #4-1-6) (emphasis added).  Thus, under the clear language of the Special Undertaking Contracts, each Defendant is individually and collectively liable for "any and all" of the amounts Monsanto has paid to defend and resolve the underlying PCB lawsuits.[9]  *See, e.g.*, *Heartland Payment Sys., L.L.C. v. Utica Mut. Ins. Co.*, 185 S.W.3d 225, 232 (Mo. Ct. App. 2006) (noting each insurer liable to insured for full coverage amount regardless of concurrent coverage of the same risk by other policies).

### iii. *Monsanto Has Specifically Connected Some Defendants To Certain Underlying PCB Lawsuits.*

Although not required under the terms of the Special Undertaking, Monsanto has made very specific and detailed factual allegations directly connecting certain Defendants with underlying PCB lawsuits.  *See* FAP, (ECF #4) ¶¶ 120, 193-94 (alleging that the claims in the Sky Valley Education Center cases arise out of or are in connection with Magnetek's post-Special Undertaking PCBs because a light ballast manufactured by Magnetek's predecessor, Universal Manufacturing Company, that contained post-Special Undertaking PCBs was found in the Sky Valley Education Center); *id.* ¶¶ 126-27, 185 (alleging that GE released PCBs, including post-Special Undertaking PCBs that contaminated water bodies in Oregon and Washington at issue in Water Cases that were eventually resolved by Monsanto); *id.* ¶¶ 136-37, 139, 185-86 (alleging that Paramount released PCBs, including post-Special Undertaking PCBs that contaminated water bodies in Oregon, Washington, and California at issue in Water Cases that were eventually resolved by Monsanto).  These very specific and detailed allegations that directly connect Magnetek, GE, and Paramount's post-Special Undertaking PCBs to specific underlying PCB lawsuits are unquestionably sufficient to plausibly state a claim against those Defendants.

---

[9] For these reasons, the authority cited by Defendants concerning multi-party agreements (*see* Joint Br., (ECF #91) at 19-20) is inapposite and has no bearing on whether Monsanto has alleged viable claims against Defendants.

* * *

Monsanto's allegations are more than sufficient to state plausible claims against all of the Defendants.   Defendants cannot evade Monsanto's claims by advocating for a narrow interpretation of the Special Undertaking Contracts that fails to account for key language and Missouri law.   Nor can Defendants extricate themselves from this lawsuit by selectively disregarding allegations in the FAP that connect them to the underlying PCB lawsuits.   It is Defendants' burden to "demonstrate that there is no possibility of coverage" under the Special Undertaking Contracts.  *R.G. Brinkmann Co. v. Amerisure Ins. Co.*, No. 4:11CV1125 JAR, 2012 WL 5993803 at *6 (E.D. Mo. Nov. 30, 2012) (quotation marks omitted).  They clearly have not met that burden.

## III.    Monsanto's Declaratory Relief Claims Are Ripe.

Defendants concede (as they must) that Monsanto claims for declaratory relief regarding Defendants' duty to defend underlying PCB lawsuits that are currently pending are ripe.  The focus of Defendants' ripeness argument is on future PCB lawsuits and the duty to indemnify Monsanto in underlying PCB lawsuits that have not yet been resolved.  Well-settled Eighth Circuit precedent forecloses Defendants' limited challenges to the justiciability of Monsanto's declaratory claims.[10]

> A.    Declaratory Relief Claims Regarding The Scope Of Defendants' Duty To Indemnify Under The Special Undertakings Are Ripe As To Pending Lawsuits Because Defendants Have Rejected Monsanto's Tenders.

The Eighth Circuit has held that a declaratory judgment action is "unquestionably ripe for adjudication" after a party rejects a tender regardless of "whether the underlying litigation is ongoing or resolved." *Scottsdale Ins. Co. v. Universal Crop Prot. All., LLC*, 620 F.3d 926, 934

---

[10] Defendants concede federal law governs their ripeness arguments and primarily rely on federal law.  Joint Br., (ECF #91) at 20 n.11; *see also id.* 20-21. Thus, Eighth Circuit ripeness standards govern.  Further, for avoidance of doubt, Missouri and federal courts apply consistent standards regarding ripeness of declaratory relief claims.  *See, e.g.*, *Mo. Soybean Ass'n v. Mo. Clean Water Comm'n*, 102 S.W.3d 10, 26 (Mo. 2003) (stating Missouri and federal ripeness doctrines are "much the same") (cited in Joint Br., (ECF #91) at 20).

(8th Cir. 2010); *see also Aetna Cas. & Sur. Co. v. Gen. Dynamics Corp.*, 968 F.2d 707, 711 (8th Cir. 1992) (holding that "there is a live justiciable controversy" after insured demands defense and indemnity regarding filed and potential lawsuits); *Certain Underwriters at Lloyd's, London v. C&S Properties, LLC*, No. 4:21-CV-422-AGF, 2022 WL 103303 at *3-*5 (E.D. Mo. Jan. 11, 2022) (holding declaratory relief regarding duty to indemnify pending cases is ripe); *Lankford v. Webco, Inc.*, No. 06-3339-CV-S-FJG, 2007 WL 4333193 at *3 (W.D. Mo. Dec. 7, 2007) (holding indemnification claim ripe when underlying lawsuit determining liability still pending); *Allied World Specialty Ins. Co. v. City of Ferguson, Mo.*, No. 4:18-CV-827 RLW, 2019 WL 1118137 at *2 (E.D. Mo. Mar. 11, 2019) (same).  The reason for this is that once an indemnitor has rejected an indemnitee's demand, "[t]he lines are drawn, the parties are at odds, the dispute is real." *Capitol Indem. Corp. v. Miles*, 978 F.2d 437, 438 (8th Cir. 1992) (holding declaratory relief regarding duty to indemnify pending cases was ripe); *see also Scottsdale Ins. Co.*, 620 F.3d at 934 (holding claims are ripe and it is "irrelevant that factual determinations" regarding underlying lawsuits remain unresolved).

Monsanto's claim for a declaratory judgment establishing the scope of Defendants' indemnification obligations are ripe because Defendants have unequivocally rejected Monsanto's tenders of the underlying PCB lawsuits.  FAP, (ECF #4) ¶¶ 205-30; *see also* Exs. 18–27 to FAP, (ECF #4-18-27) (tender letters and responses).  The parties' antagonistic positions are clearly established, and there is no reason the Court must wait until resolution of all the underlying PCB lawsuits before adjudicating Monsanto's claim.  *McLeod v. Gen. Mills, Inc.*, 856 F.3d 1160, 1166 (8th Cir. 2017) (claims ripe where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" (quotation marks omitted)); *Pub. Water Supply Dist. No. 8 of Clay Cnty. v. City of*

*Kearney*, 401 F.3d 930, 932 (8th Cir. 2005) ("A declaratory judgment action can be sustained if no injury has yet occurred.").  In fact, forcing Monsanto to wait until the underlying claims are adjudicated before it can seek declaratory relief would undermine the notion that declaratory orders are prospective in nature and intended to guide the parties' future conduct.  *Just. Network Inc. v. Craighead Cnty.*, 931 F.3d 753, 764 (8th Cir. 2019) ("A declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of *some future conduct*, not simply to proclaim liability for a past act." (emphasis in original) (quotation marks omitted)); *see also* RSMo § 527.030 ("A contract may be construed either ***before*** or after there has been a breach thereof." (emphasis added)); *Ferguson Police Officers Ass'n v. City of Ferguson*, 670 S.W.2d 921, 925 (Mo. Ct. App. 1984) ("An injury need not have occurred prior to bringing a declaratory action; one of the main purposes of the remedy is to resolve conflicts in legal rights before a loss occurs.").

Defendants' reliance on *Shapiro* and *Paric* to support their position is misplaced.  Both of those decisions were recently rejected by Judge Fleissig as contrary to Eighth Circuit precedent. *See Certain Underwriters at Lloyd's, London*, 2022 WL 103303 at *4 (rejecting *Shapiro Sales Co. v. Alcoa, Inc.*, No. 4:06-CV-638-CDP, 2006 WL 2228987 (E.D. Mo. Aug. 3, 2006) and *Amerisure Mut. Ins. Co. v. Paric Corp.*, Case No. 4:04CV430-DJS, 2005 WL 2708873 (E.D. Mo. Oct. 21, 2005) and holding declaratory relief regarding duty to indemnify is ripe); *see also Great Am. All. Ins. Co. v. Windermere Baptist Conf. Ctr., Inc.,* No. 2:16-CV-04046-NKL, 2017 WL 4782683 at *4 (W.D. Mo. Oct. 23, 2017) (rejecting reasoning of *Shapiro Sales Co.* and *Paric* as inconsistent with Eighth Circuit precedent), *rev'd and remanded on other grounds*, 931 F.3d 771 (8th Cir. 2019).  Defendants' position is further undercut by *Hartford Acc. & Indem. Co. v. Doe Run Res. Corp.* (a case Defendants rely on in arguing against the ripeness of future lawsuits), which declares:

"Certainly, a declaratory judgment action may be justiciable despite the pendency of underlying litigation or the presence of unresolved facts."  663 F. Supp. 2d 771, 776 (E.D. Mo. 2009).

In short, the Court should not dismiss Monsanto's claims for declaratory relief regarding Defendants' duty to indemnify Monsanto in underlying PCB lawsuits that remain pending because those claims are ripe under well-settled Eighth Circuit precedent.  But even if those claims are not technically ripe because the underlying PCB lawsuits remain pending, the appropriate and efficient remedy would be to stay those portions of Monsanto's declaratory judgment claim until the underlying PCB lawsuits are resolved.

B.    Monsanto's Claims Regarding The Scope Of Coverage For Future Lawsuits Are Ripe.

The Eighth Circuit measures the ripeness of declaratory claims concerning coverage of future claims by analyzing whether there is a "substantial probability" of future lawsuits.  *See, e.g.*, *Marine Equip. Mgmt. Co. v. United States*, 4 F.3d 643, 647 (8th Cir. 1993) (quoting *In re American Commercial Lines, Inc.*, 781 F.2d 114 (8th Cir. 1985)); *see also Hartford Acc. & Indem. Co*, 663 F. Supp. 2d at 777 (determining ripeness of claim by whether there was a "substantial probability" potential lawsuit would occur (cited in Joint Br., (ECF #91) at 21)); *accord. E.R. Squibb & Sons, Inc. v. Lloyd's & Companies*, 241 F.3d 154, 160 (2d Cir. 2001) (declaratory relief regarding coverage of "settled, pending, and ***future actions***" ripe where company faced "tidal wave of litigation" (emphasis added)).  Further, the Eight Circuit has held that declaratory judgment actions regarding the duty to defend future lawsuits are ripe where, as here, the insurer or indemnitors have rejected tenders and there is a substantial likelihood of potential lawsuits.  *See Aetna Cas. and Sur. Co.*, 968 F.2d at 711 (holding there was "a live justiciable controversy between the parties" where insurer rejected tender of defense costs concerning federal and state investigation of environmental waste sites even though no suits had been filed regarding certain sites).

- 23 -

Monsanto's declaratory judgment is ripe because there is a substantial probability Monsanto will continue to be named as a defendant in additional PCB lawsuits covered by the Special Undertaking Contracts.  In fact, Monsanto has been named as a defendant in multiple new PCB lawsuits since it filed the FAP.[11]  Monsanto's claim for a declaratory judgment regarding Defendants' duty to defend future PCB Lawsuits is therefore not (as Defendants suggest) a request relief "[w]ithout a filed case or specific demand."  Joint Br., (ECF #91) at 21.  Monsanto faces an imminent injury of incurring unnecessary defense costs for future PCB lawsuits if Defendants continue to flaunt their obligations under the Special Undertaking Contracts, and there is a substantial track record that similar PCB lawsuits will continue to be filed against Monsanto.

This is not a case where Monsanto merely "fears that another person may assert a claim against" it, and thus, the inapposite cases relied on by Defendants have no application here.  *See* Joint Br., (ECF #91) at 20 (quoting *Ferrell v. Mercantile Trust Co., N.A.*, 490 S.W.2d 397, 400 (Mo. Ct. App. 1973)); *see also* Joint Br., (ECF #91) at 20-21 (citing *Hartford Acc. & Indem. Co.*, 663 F. Supp. 2d at 777 (declaratory relief not ripe for "hypothetical and speculative" future lawsuit and clarifying duty to defend is not at issue); *Admiral Ins. Co. v. Niagara Transformer Corp.*, No. 20-CV-4041-ALC, 2021 WL 4460753 (S.D.N.Y. Sept. 29, 2021) (dispute between insurer and insured not ripe where insured not "likely to incur any liability" covered by insurance policy because no suits had been filed);[12] *Ferrell*, 490 S.W.2d at 400 (not concerning defense or

---

[11] *See, e.g.*, *Burlington School District v. Monsanto, et al.*, no. 2:22-cv-215 (D. Vt. Dec. 9, 2022); *County of Contra Costa, et al., v. Monsanto Co., et al.*, no. C22-02818 (Ca. Sup. Ct., Contra Costa Cnty. Dec. 21, 2022); *City of Evanston v. Monsanto Co., et al.*, case no. 2023L002929 (Ill. Cir. Ct., Cook Cnty. Mar. 24, 2023); *Town of Lee v. Monsanto Co., et al.*, no. 3:23-cv-30035 (W.D. Mass. Mar. 30, 2023).  The Court can consider these new underlying PCB lawsuits because they are a matter of public record.  *See Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007).

[12] Despite Defendants' suggestion to the contrary, in *Admiral Ins. Co.*, the Second Circuit held that the district court applied the incorrect legal standard when determining whether declaratory relief claims concerning the duty to defend were ripe and clarified that the circuit "routinely exercise[s] . . . jurisdiction over insurers' declaratory-judgment actions . . . *before* the relevant third party had filed suit against the insured." *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 95 (2d Cir. 2023) (emphasis added); *see* Joint Br., (ECF #91) at 21 (stating *Admiral ins. Co.*, 2021

indemnity of future lawsuits).  Monsanto's declaratory relief claims regarding future lawsuits are ripe.

**IV.    Old Monsanto And New Monsanto Have The Legal Right To Pursue Claims Relating To The Special Undertaking Contracts.**

Defendants assert that Old Monsanto and New Monsanto do not have "standing"[13] because the FAP alleges that Old Monsanto assigned some of its rights in the Special Undertaking Contracts to Solutia and neither is a third-party beneficiary of the Special Undertaking Contracts.

First, the Court should reject Defendants' argument with regard to Old Monsanto because (i) Old Monsanto is a party to each Special Undertaking Contract and the party to be defended and indemnified under those contracts, (ii) the FAP does not allege that Old Monsanto assigned *all* of its rights in the Special Undertaking Contracts to Solutia, and (iii) Defendants have taken different positions with regard to the validity of Old Monsanto's assignment of rights in the Special Undertaking Contracts to Solutia.  Second, Defendants' argument with regard to New Monsanto lacks merit because the FAP plausibly alleges that New Monsanto is a "future agent" of Old Monsanto and therefore an intended third-party beneficiary to the Special Undertaking Contracts.

A.    Old Monsanto Is A Proper Party To This Lawsuit.

Defendants' argument with regard to Old Monsanto is premised on a single allegation in Paragraph 8 of the FAP.  *See* Joint Br., (ECF #91) at 24.  According to Defendants, the allegation

---

WL 4460753 at *7 was "*aff'd in relevant part*").  The Second Circuit remanded with orders that the district court determine the ripeness of declaratory claims regarding the duty to defend by analyzing whether there was a "practical likelihood" that a future lawsuit would trigger the insurer's duty to defend.  *Admiral Ins. Co.*, 57 F.4th at 101.  Here, Monsanto has already been sued in subsequent PCB lawsuits triggering Defendants' duty to defend, and thus, satisfies the "practical likelihood" test.

[13] Defendants mischaracterize their argument as relating to Old Monsanto and New Monsanto's "standing" to sue. The concept of "standing" is a constitutional doctrine relating to a federal court's subject matter jurisdiction.  *Lucas v. Lucas*, 946 F.2d 1318, 1322 n.6 (8th Cir. 1991).  What Defendants are actually arguing is that Old Monsanto and New Monsanto are not real parties in interest as required by Fed. R. Civ. P. 17.  *See* Fed. R. Civ. P. 17; *Mcklenburg Farm v. Anheuser-Busch, Inc.*, 250 F.R.D. 414, 417-18 (E.D. Mo. 2008) (Shaw, J.) (explaining the difference between constitutional standing and the real party in interest rule).

that Old Monsanto assigned "all rights in the nature of . . . indemnification" to Solutia constitutes a "pleaded" complete assignment of *all* rights in and to the Special Undertaking Contracts such that Old Monsanto no longer has any rights under the Special Undertaking Contracts. *See id*. Defendants are wrong.

The Special Undertaking Contracts impose on Defendants both a duty to defend and a duty to indemnify Old Monsanto. The duty to defend and the duty to indemnify are separate legal duties under Missouri law. *See Sprint Lumber, Inc. v. Union Ins. Co.*, 627 S.W.3d 96, 106 (Mo. Ct. App. 2021) (duties of defense and indemnity are "two distinct duties"). The allegations Defendants rely on only establish that Old Monsanto assigned all of its rights relating to *indemnification* to Solutia. *See* FAP, (ECF #4) ¶ 8 ("In connection with the spin off, Old Monsanto assigned ***certain rights to Solutia,*** including the rights to enforce the Special Undertaking Agreements. In particular, Old Monsanto assigned its 'rights, title, and interest . . . in and to all of the Chemical Assets' to Solutia, which were defined to include 'all rights under insurance policies and all rights in the nature of insurance ***indemnification*** or contribution." (emphasis added)). Nowhere in the FAP does Monsanto allege that Old Monsanto assigned its rights relating to Defendants' duty to defend to Solutia or anyone else. Nor does the FAP allege there has been a novation such that Old Monsanto is no longer entitled to defense and indemnification under the Special Undertaking Contracts.

The authorities Defendants rely on to argue Old Monsanto lacks "standing" only apply in situations where there has been a full or complete assignment. Missouri law is different where there is a partial assignment of contractual rights. In such a case, Missouri law holds that the assignee remains a real party in interest entitled to sue to enforce the contract. *See, e.g.*, *Skaggs Reg'l Med. Ctr. v. Powers*, 419 S.W.3d 920, 922 (Mo. Ct. App. 2014) (assignor of right to collect on patient accounts retained rights to sue on those accounts). In short, the Court should reject

- 26 -

Defendants' "standing" argument as it relates to Old Monsanto because the FAP does not establish a full or complete assignment of rights in the Special Undertaking Contracts by Old Monsanto.

The Court should also reject Defendants' "standing" argument as it relates to Old Monsanto because Defendants have adopted contradictory positions with regard to the assignment to Solutia. Defendants' Joint Motion to Dismiss presumes Old Monsanto assigned all of its rights and interests in the Special Undertaking Contract to Solutia, while, at the same time, reserving Defendants' right to assert contradictory arguments at a later procedural posture. *See* Joint Br., (ECF #91) at 24 n.13 (reserving all rights).   Magnetek has already taken the opposite position alleging that Old Monsanto's assignment to Solutia was invalid, and thus, Solutia has no rights under the Special Undertaking Contract.   Ex. E8 to Notice of Removal, (ECF #1-12) at 66-67, ¶¶ 323-31 (Magnetek's Amended Answer To First Amended Petition, Affirmative Defenses, and Cross-Claim).   It would be unjust and prejudicial to Monsanto for the Court to find Old Monsanto lacks "standing" at this early stage of the proceedings only to have Magnetek and/or the other Defendants argue later that Solutia cannot enforce the Special Undertaking Contracts because the assignment to it is invalid.

B.   <u>New Monsanto Is A "Future Agent" Of Old Monsanto</u>.

The Special Undertaking Contracts could not be more clear about *who* is entitled to defense and indemnification from Defendants.   Each Special Undertaking Contract states that Defendants "shall defend, indemnify and hold harmless [Old] Monsanto, its present, past and ***future*** . . . ***agents***[.]" Exs. 1-6 to FAP, (ECF #4-1–6) (emphasis added).   The clear intent of including the term "future . . . agents" in the Special Undertaking Contracts was to extend Defendants' contractual defense and indemnity obligations to entities or individuals who became Old Monsanto's agent at a later date—i.e., *in the future*.

New Monsanto is unquestionably Old Monsanto's "future . . . agent."  Defendants do not contest that fact.  Nor could they do so.  Monsanto explicitly and specifically alleges in the FAP that "Old Monsanto executed a Power of Attorney in favor of New Monsanto, which grants New Monsanto authority to take 'all actions' over claims, including the PCB Lawsuits, and provides that New Monsanto is Old Monsanto's "***true and lawful <u>agent</u> and attorney***." FAP, (ECF #4) ¶ 9 (emphasis added);[14] *see D.K.L. by K.L. v. H.P.M.*, 763 S.W.2d 212, 223 (Mo. Ct. App. 1988) ("[T]he relationship of principal and agent arises out of contract . . . whereby one person, the agent, consents with another, the principal, to act on behalf of the principal subject to the control of the principal.").  The FAP further alleges that as Old Monsanto's "future . . . agent," New Monsanto "is and has been paying the costs incurred by Plaintiffs to defend the PCB Lawsuits, and has also paid and/or agreed to pay amounts to settle some of the Food Chain cases and Water Cases . . . for the benefit of Plaintiffs."  FAP, (ECF #4) ¶ 9.  Because New Monsanto is a future agent of Old Monsanto, it is an intended third-party beneficiary to the Special Undertaking Contracts and a real party in interest in this case (or, in Defendants' incorrect terminology, has "standing").  *Torres v. Simpatico, Inc.*, 781 F.3d 963, 971 (8th Cir. 2015) (third-party beneficiaries have standing to enforce contracts).

Defendants' argument that New Monsanto is not the right kind of "future . . . agent" because it was created in 2000 (i.e., *in the future*) is nonsensical.  Nothing in the Special Undertaking Contracts restricts the term "future . . . agents" to only those entities that were in existence at the time Old Monsanto was selling post-Special Undertaking PCBs to Defendants. Nor is the term "future . . . agents" limited to Old Monsanto's agents who were involved with, or

---

[14] A copy of the Power of Attorney is attached as Exhibit B.  Monsanto did not attach a copy of the Power of Attorney to the FAP, but the Court can still consider it here because it is referenced in and embraced by the FAP.  *See Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 791 (8th Cir. 2014) (documents necessarily embraced by the complaint are not matters outside the pleadings and may be considered on a motion to dismiss).

participated in, the manufacture and sale of PCBs.  The language Defendants rely on to support their misplaced interpretation of the Special Undertaking Contracts relates to the *scope* of their defense and indemnity obligations under the Special Undertaking Contracts.  *See* Joint Br. (ECF #91) at 26.  It has nothing to do with *who* Defendants are required to defend and indemnify under the Special Undertaking Contracts.

New Monsanto also has separate and enforceable interests in the Special Undertaking Contracts.  As alleged in the FAP, in the 2008 Amended and Restated Settlement Agreement Solutia agreed to use commercially reasonable efforts to enforce the Special Undertaking Contracts for the benefit of New Monsanto and "granted New Monsanto the right to any benefits recovered by Solutia through its enforcement of" the Special Undertaking Contracts in exchange for New Monsanto's agreement to assume financial responsibility for certain Legacy Tort Claims. FAP, (ECF #4) ¶ 9.  Thus, New Monsanto has an interest in the Special Undertaking Contracts and is therefore a proper party in this case.  *See Herky, LLC v. Holman*, 277 S.W.3d 702, 704 (Mo. Ct. App. 2008).[15]  The *Herky* decision is analogous and instructive.  There, the court found that property developers who were no longer the legal owners of certain property "were nonetheless the real parties in interest" to contest increased property tax valuations by virtue of "proration agreements" that made the developers "responsible for the property taxes on the land in question." *Id.* at 704.  Like the developers in *Herky*, New Monsanto is a real party in interest because it is financially responsible for the underlying PCB lawsuits, and entitled to proceeds from enforcement of the Special Undertaking Contracts, by way of the 2008 Settlement Agreement.

---

[15] *See also Twin Chimneys Homeowners Ass'n v. J.E. Jones Const. Co.*, 168 S.W.3d 488, 495-96 (Mo. Ct. App. 2005) (homeowners' association real party in interest because they would receive benefits of the litigation even though they were not the legal owners of the common areas at issue).

Finally, the FAP also alleges that New Monsanto has paid defense costs and settlements on behalf of Old Monsanto and Solutia (FAP, (ECF #4) ¶ 9), which, at a minimum, gives New Monsanto rights to pursue enforcement of the Special Undertaking Contracts in some form under Missouri law (e.g., conventional or equitable subrogation).[16] *See, e.g.*, *Am. Nursing Res., Inc. v. Forrest T. Jones & Co., Inc.*, 812 S.W.2d 790, 798 (Mo. Ct. App. 1991) (equitable subrogee is real party in interest).

## V.    Monsanto Has Adequately Alleged Its Contribution Claim.

Defendants' arguments regarding Monsanto's contribution claim lack merit because Defendants, once again, ignore well-pleaded facts in the FAP.  Contrary to Defendants' claims, Monsanto has alleged that each Defendant negligently released PCBs into the environment and/or exposed the plaintiffs in the underlying PCB lawsuits to PCBs, that Monsanto has settled some underlying PCB lawsuits, and that those settlements were reasonable and extinguished Monsanto's and Defendants' joint liability for the claims in those cases.  These allegations are sufficient to state a plausible claim for contribution under Missouri law.

Defendants' argument that the FAP "make[s] no mention of any factual predicate to establish that the Defendants here are liable in tort to any of the PCB Lawsuit plaintiffs" (Joint Br., (ECF #91) at 29 (emphasis in original)) is a retread of their argument that Monsanto has not connected Defendants post-Special Undertaking PCBs to the underlying PCB lawsuits.  As explained above, the FAP includes sufficient allegations establishing that (i) each Defendant negligently released PCBs into the environment through various means (*see* FAP, (ECF #4)

---

[16] At base, Defendants' real party in interest argument is a red herring because the party or parties that have rights to enforce the Special Undertaking Contracts are plaintiffs in this case and are seeking only one judgment or recovery from each Defendant. *See Holt v. Myers*, 494 S.W.2d 430, 439 (Mo. Ct. App. 1973) (trial court did not err in directing verdict on real party in interest because "defendants are not faced with a multiplicity of suits for the reason that both the subrogor and the subrogee are party plaintiffs in Count I of the petition, and only one verdict and one judgment is sought by the parties plaintiff.").

¶¶ 104-66), and (ii) the PCBs released by Defendants (both before and after entering into the Special Undertaking Contracts) are among the PCBs identified by the plaintiffs in the underlying PCB lawsuits as allegedly causing them injury or damage.  *Id.* ¶¶ 170-73, 183-84, 190-92, 195, 198-201.  Monsanto also specifically alleges that Defendants contributed to the alleged indivisible injuries in the underlying PCB lawsuits—i.e., Defendants breached their duty to possess, handle, use, sell and dispose of PCBS with reasonable care so that they would not enter the environment.  *Id.* ¶¶ 305-11.  These allegations are more than sufficient to plausibly establish that Defendants are joint tortfeasors who contributed to releases and exposures of PCBs that are the subject of the PCB Lawsuits.

Monsanto's allegations are also more than sufficient to put each Defendant on notice of the basis for Monsanto's contribution claim against them.  Defendants argue that Monsanto uses "impermissible group pleading" (Joint Br., (ECF #91) 29-30), but "[n]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant."  *New York Am. Water Co. v. Dow Chem. Co.*, No. 19CV2150NGRLM, 2020 WL 9427226 at *4 (E.D.N.Y. Dec. 11, 2020) (citations and quotation marks omitted).  Monsanto is asserting identical contribution claims against each Defendant based on their release of PCBs into the environment.  *See* FAP, (ECF #4) ¶¶ 305-10.  As discussed above, the FAP includes specific allegations relating to each Defendants' purchase, use, and disposition of PCBs (both before and after Defendants entered into the Special Undertaking Contracts), which are explicitly incorporated by reference into Monsanto's contribution claim.  *See* FAP, (ECF #4) ¶ 303 (incorporating by reference paragraphs 1 through 235 of the FAP); *see also id*. ¶¶ 105-10, 114-21, 123-34, 136-47, 185-86, 193-94 (alleging multiple examples of each Defendants' direct release of PCBs into the environment); *Id.* ¶¶ 2, 4, 104-05 (alleging PCBs were released into the

environment from PCB-containing electrical products that Defendants manufactured and sold throughout the country).  Monsanto's allegations provide Defendants sufficient notice of their alleged misconduct and bely Defendants' claims that they are "left to guess the grounds for Plaintiffs' contribution claim."  Joint Br., (ECF #91) at 29.[17]

The Court should also reject Defendants' arguments regarding the underlying PCB lawsuits that Monsanto has settled.  Defendants do not cite any Missouri authority holding that Monsanto must identify each underlying PCB lawsuit that has been settled in its FAP (or any cases dismissing an equitable contribution).  Nor do Defendant cite authority supporting their conclusion that Monsanto must plead facts establishing its settlements were reasonable to state a claim for contribution under Missouri law.  The sole federal decision Defendants rely on discusses the *evidence* needed to support a contribution claim at the summary judgment stage.  *See St. Joseph v. Southwestern Bell Tel., L.P.*, No. 03-CV-6150-SOW, 2005 WL 6125133 at *17 (W.D. Mo. Jan. 7, 2005) (granting summary judgment and dismissing contribution claim under Missouri law because the plaintiff did not present *evidence* that the settlement at issue extinguished liability between the defendant and the third party).

To the extent the Court finds such pleading is required, the allegations in the FAP are sufficient.  As Defendants concede, Monsanto alleges that (i) it settled some of the underlying PCB lawsuits, (ii) those settlements "extinguished Defendants' liabilities" in the settled cases, and (iii) those settlements were reasonable.  *See* FAP, (ECF #4) ¶¶ 176 (alleging Monsanto settled all of the then-pending Food Chain Cases in September 2016), 187 (alleging that Monsanto settled Water

---

[17] The two cases Defendants rely on to support their argument are inapposite. *See Boggs v. Am. Optical Co.*, No. 4:14-CV-1434-CEJ, 2015 WL 300509 at *2 (E.D. Mo. Jan. 22, 2015) (granting unopposed motion to dismiss where, unlike here, plaintiff failed to distinguish between thirty-two defendants); *Harvey v. Great Circle*, No. 4:19-CV-00902 NAB, 2021 WL 4552135 at *4 (E.D. Mo. Oct. 5, 2021) (granting motion to dismiss where, unlike here, plaintiff failed to include "specific factual allegations about any single defendant").

Cases brought by certain municipalities[18] and the Attorneys General in New Hampshire, New Mexico, Ohio, Washington, and Washington, D.C.), 200 (alleging that Monsanto settled a specific Occupational Case); *see also id.* ¶¶ 5, 9, 232, 235, 311-12.  It is well-settled that the reasonableness of a settlement is a fact-intensive inquiry that must be "determined by a fact finder," and thus, should not be resolved at the pleadings-stage.  *Union Elec. Co. v. Sw. Bell Tel. L.P.*, 378 F.3d 781, 789 (8th Cir. 2004) (applying Missouri law and remanding case for trial on the issue of reasonableness of a settlement agreement for which plaintiff sought repayment).  Further, Monsanto's allegation that these settlements "extinguished Defendants' liabilities" is not conclusory as it is supported by underlying allegations that the suits resolved by these settlements asserted claims involving PCBs released by Defendants or from Defendants' products.

## CONCLUSION

For the foregoing reasons, Plaintiffs Monsanto Company, Pharmacia, LLC, and Solutia, Inc. respectfully request that the Court deny the Defendants' Motion To Dismiss Counts I-IV and VII of Monsanto's First Amended Petition.

---

[18] Defendants are clearly aware of this settlement as they reference it and the settlement agreement approved by the Court in footnote 2 to their Joint Brief.  *See* Joint Br., (ECF #91) at 8 n.2.

Respectfully Submitted,

THOMPSON COBURN LLP

By: /s/ Christopher M. Hohn
      Christopher M. Hohn #44124
      Nicholas J. Lamb #33486
      David M. Mangian #61728
      Nicholas Schnell #73932
      Brittney K. Mollman #65745
      One U.S. Bank Plaza
      St. Louis, Missouri 63101
      (314) 552-6000 (Telephone)
      (314) 552-7000 (Facsimile)
      chohn@thompsoncoburn.com
      nlamb@thompsoncoburn.com
      dmangian@thompsoncoburn.com
      nschnell@thompsoncoburn.com
      bmollman@thompsoncoburn.com

*Attorneys for Plaintiffs Monsanto Company, Pharmacia, LLC, and Solutia, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing has been filed with the Court for service on all

counsel of record via the Court's CM/ECF system on June 9, 2023.

/s/ Christopher M. Hohn