UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MONSANTO COMPANY, et al., | ) | |
| | ) | |
| Monsanto, | ) | |
| | ) | |
| v. | ) | No. 4:23-CV-00204-HEA |
| | ) | |
| MAGNETEK, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MONSANTO'S RESPONSE IN OPPOSITION TO DEFENDANTS KYOCERA AVX COMPONENTS CORPORATION, CORNELL-DUBILIER ELECTRONICS, INC., AND THE GILLETTE COMPANY LLC'S MOTIONS TO DISMISS**

Christopher M. Hohn #44124
Nicholas J. Lamb #33486
David M. Mangian #61728
Nicholas Schnell #73932
Brittney K. Mollman #65745
THOMPSON COBURN LLP
One U.S. Bank Plaza
St. Louis, Missouri 63101
(314) 552-6000 (Telephone)
(314) 552-7000 (Facsimile)
chohn@thompsoncoburn.com
nlamb@thompsoncoburn.com
dmangian@thompsoncoburn.com
nschnell@thompsoncoburn.com
bmollman@thompsoncoburn.com

*Attorneys for Plaintiffs Monsanto Company, Pharmacia, LLC, and Solutia, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND .................................................................................................. 3

I.     Defendants Purchased PCBs From Old Monsanto And Agreed To Defend
And Indemnify Monsanto Against Certain PCB-related Liabilities. ........................... 3

II.    Defendants Have Significant Contacts With Missouri Arising Out Of Or
Relating To The Special Undertaking Contracts. ............................................. 3

     A.     Gillette's Missouri Contacts ................................................. 3

     B.     CDE's Missouri Contacts ..................................................... 5

     C.     KAVX's Missouri Contacts .................................................... 6

LEGAL STANDARD .......................................................................................... 8

ARGUMENT ...................................................................................................... 8

I.     Defendants Are Subject To Specific Personal Jurisdiction In Missouri. .................... 8

     A.     The Circuit Court of St. Louis County Has Already Found Magnetek is
Subject to Personal Jurisdiction in Missouri. ................................... 9

     B.     Defendants' Conduct Establishes Jurisdiction Under Missouri's Long-
Arm Statute. ........................................................................ 9

          i.     Defendants Made Multiple Contracts in Missouri. ....................... 10

          ii.     Defendants Transacted Business in Missouri. ........................... 13

          iii.     Defendants Committed Tortious Acts Producing Actionable
Consequences In Missouri. ............................................. 16

          iv.     Defendants Contracted To Insure A Person, Property, Or Risk
Located Within Missouri At The Time Of Contracting. ................... 17

     C.     Defendants' Substantial Suit-Related Contacts With Missouri Satisfy
Due Process. ........................................................................ 18

          i.     The Nature, Quality, and Quantity of Defendants' PCB-Related
Contacts with Missouri Support Personal Jurisdiction. ................ 18

ii.      Exercising Personal Jurisdiction Over Defendants is
Reasonable Because Missouri Has an Interest in Providing a
Forum for its Residents and Litigating the Current Action in
Missouri Would Not Inconvenience the Parties. ................................ 22

II.     Monsanto's Breach of Contract, Contribution, and Negligence Claims Are
Not Time Barred. .............................................................................................. 23

A.      Monsanto's Breach of Contract Claims Are Timely. ...................................... 24

B.      Monsanto's Contribution Claim Is Timely. .................................................... 28

C.      Monsanto's Negligence Claim Is Timely. ....................................................... 29

III.    Monsanto' Negligence Claims Are Sufficiently Pleaded and Are Not Barred
by the Economic Loss Doctrine. ....................................................................... 30

A.      Monsanto Sufficiently Alleges That Defendants Breached a Duty to
Monsanto............................................................................................. 30

B.      Monsanto's Negligence Claim Is Not Barred by the Economic Loss
Doctrine............................................................................................... 31

IV.     Monsanto Has Sufficiently Alleged That Gillette Breached Its Duty to
Defend. ............................................................................................................... 32

CONCLUSION............................................................................................................... 33

## INTRODUCTION

The Court does not need to address Defendants'[1] Motions to Dismiss (ECF #82, 85, 92) because this case should be remanded in light of GE's untimely notice of removal and failure to provide sufficient evidence supporting federal officer jurisdiction.[2]   If, however, the Court determines it has jurisdiction over this case, it should deny Defendants' Motions to Dismiss because (i) Monsanto's claims arise out of and relate to Defendants' significant suit-related contacts with the State of Missouri, and (ii) Defendants' other timeliness and pleading arguments lack merit under Missouri law and federal pleading standards.   Monsanto has sufficiently alleged its claims against Defendants, and Missouri is the most appropriate forum for determining Defendants' liability stemming from the Special Undertaking Contracts and the millions of pounds of polychlorinated biphenyls ("PCBs") that Defendants purchased from Old Monsanto in Missouri.

Monsanto filed this lawsuit to enforce Defendants' contractual defense and indemnity obligations and to recover amounts Monsanto paid or agreed to pay relating to certain underlying PCB lawsuits.   In 1972, Defendants entered into written defense and indemnity contracts with Monsanto denominated as "Special Undertaking by Purchasers of Polychlorinated Biphenyls" (the "Special Undertaking Contracts").   The Special Undertaking Contracts were executed by Old Monsanto in Missouri and require Defendants to defend, indemnify, and hold harmless Old Monsanto—a Missouri company at the time the Special Undertaking Contracts were executed—

---

[1] Defendants Kyocera AVX Components Corporation ("KAVX"), Cornell-Dubilier Electronics, Inc. ("CDE"), and The Gillette Company, LLC ("Gillette") are collectively referred to herein as "Defendants."  Unless noted otherwise, "Monsanto" collectively refers to Pharmacia LLC ("Old Monsanto"), Monsanto Co. ("New Monsanto"), and Solutia, Inc. ("Solutia").

[2] Monsanto incorporates by reference Section I of the Argument portion of its Response in Opposition to Defendants' Joint Motion to Dismiss as if fully restated herein.

- 1 -

for claims relating to certain PCBs.  Defendants' entry into the Special Undertaking Contracts, purchase of millions of pounds of PCBs pursuant to those contracts from Monsanto in Missouri, and numerous other suit-related contacts with Missouri (e.g., communications directed to and visits with Monsanto in Missouri regarding PCBs, delivering purchase orders and/or payments to Missouri), described in detail below, plainly establish that the Court has specific personal jurisdiction over each Defendant.  Indeed, that is exactly the conclusion reached by the Circuit Court of St. Louis County, Missouri before this case was removed when it denied Defendant Magnetek, Inc.'s motion to dismiss Monsanto's claims for lack of personal jurisdiction.

The Court should also reject Defendants' various statute of limitations arguments and challenges to Monsanto's negligence claim.  As an initial matter, Defendants apply the wrong limitations period to Monsanto's breach of contract claims—the applicable period is ten years under RSMo. § 516.110, not five years under RSMo. § 516.120.  But even if the five year period applies, Monsanto's breach of contract (and contribution) claims are timely because those claims do not accrue under Missouri law until Monsanto sustains actual loss—i.e., actually *pays* a settlement.  The allegations in the First Amended Petition ("FAP") are sufficient to state a claim for negligence under Missouri law based on Defendants' negligent releases of PCBs into the environment both before and after they entered into the Special Undertaking Contracts.  The economic loss doctrine does not apply to Monsanto's negligence claim because that claim does not stem from the Special Undertaking Contracts (or any other contract).  Finally, Monsanto's negligence claim is timely because Defendants' releases of PCBs into the environment are an ongoing and continuing wrong that continues to create new and fresh injuries.

# BACKGROUND

## I.    Defendants Purchased PCBs From Old Monsanto And Agreed To Defend And Indemnify Monsanto Against Certain PCB-related Liabilities.

This lawsuit is about enforcing contracts Defendants entered into to defend and indemnify Monsanto with regard to lawsuits involving PCBs per the terms of those contracts.  A summary of the relevant background regarding Monsanto's manufacture and sale of PCBs, Defendants' negotiation and entry into the Special Undertaking Contracts, the underlying PCB lawsuits, and the procedural history of this case are set out in Monsanto's Response in Opposition to Defendants' Joint Motion to Dismiss.  Monsanto incorporates by reference that background as if it was fully stated herein.

## II.    Defendants Have Significant Contacts With Missouri Arising Out Of Or Relating To The Special Undertaking Contracts.

Monsanto has not yet had the benefit of discovery.  However, based on its available records, and as detailed below, Defendants, among other things, (i) negotiated and/or entered into Special Undertaking Contracts with Old Monsanto in Missouri; (ii) frequently purchased substantial amounts of PCBs from Old Monsanto, a Missouri corporation with its principal place of business in Missouri, by contacting Old Monsanto in Missouri and/or sending purchase orders into Missouri; (iii) made multiple PCB-related visits to Missouri; (iv) breached their agreement to defend and indemnify Old Monsanto; and/or (v) had many other relevant contacts with Missouri that gave rise to this lawsuit.

### A.    Gillette's Missouri Contacts

Gillette, through its predecessor P.R. Mallory & Co. Inc. ("Mallory"), entered into a Special Undertaking Contract with Old Monsanto in February 1972.  Ex. 6 to FAP, (ECF #4-6). Throughout January 1972, Mallory representatives negotiated the terms of the Special Undertaking with Old Monsanto representatives in St. Louis, and Mallory representatives visited St. Louis to

negotiate the terms of the defense and indemnity agreement with Old Monsanto representatives in person. Ex. A to Affidavit of Robert Kaley ("Kaley Aff.") (memorandum scheduling meeting with Mallory, a "main customer for capacitor Aroclor[,] . . . regarding the PCB matter" and notes on phone calls regarding the negotiations). Following this meeting, Mallory continued to negotiate the Special Undertaking with Monsanto representatives by communicating with Old Monsanto representatives in St. Louis. *See, e.g.*, Ex. A to Kaley Aff. When Mallory ultimately executed the agreement, it sent partially executed drafts of the agreement to Old Monsanto in St. Louis and requested that "[Old] Monsanto execute both copies and return one copy to [Mallory.]" Ex. B to Kaley Aff. at 5. Old Monsanto executed the agreements in St. Louis and returned a copy to Mallory, as requested. *Id.* at 6 (Monsanto transmittal letter "return[ing] a copy of the signed agreement for your files"); *see also* FAP, (ECF #4) ¶ 97 (alleging Old Monsanto executed the Special Undertaking Contract in Missouri).

Between 1972 and 1977, Mallory purchased more than 7 million pounds of PCBs from Old Monsanto pursuant to its Special Undertaking Contract. FAP, (ECF #4) ¶ 52; *see also* Ex. C to Kaley Aff. (Mallory sales summary). Mallory purchased these PCBs from Old Monsanto on a regular basis by sending purchase orders to St. Louis, communicating with Old Monsanto representatives in St. Louis, and/or sending payment for PCBs in St. Louis. FAP, (ECF #4), ¶ 53; *see, e.g.*, Ex. D to Kaley Aff. (example of purchase order sent to St. Louis); Exs. E, G to Kaley Aff. (Monsanto invoices for PR Mallory sales); Ex. F to Kaley Aff. (examples of communications with Monsanto representatives in St. Louis regarding PCB products). Notably, many of Mallory's purchases were governed by contracts containing Missouri choice of law provisions. *See, e.g.*, Ex. G to Kaley Aff. at 3, ¶ 12.

Mallory representatives visited Old Monsanto at least six times from 1974-76 for PCB-related business.  These meetings took place in St. Louis and included: a meeting regarding PCB effluent standards proposed by the U.S. Environmental Protection Agency, a Dielectrics Symposium hosted by Old Monsanto, multiple meetings between Monsanto and Mallory chemists regarding PCB testing, and a meeting regarding Mallory's plans to examine employees exposed to PCBs.  Ex. H to Kaley Aff.

    B.    CDE's Missouri Contacts

CDE entered into a Special Undertaking Contract with Old Monsanto in January 1972.  Ex. 5 to FAP, (ECF #4-5).  Prior to executing its Special Undertaking Contract, CDE negotiated the terms of the agreement through phone calls with Old Monsanto representatives in St. Louis.  Ex. I to Kaley Aff. at 2 (CDE representatives stating their "lawyers [are] working on the letter" in a phone call with Old Monsanto representatives).  On January 26, 1972, CDE sent Old Monsanto a copy of the Special Undertaking Contract, noting that the agreement was "prospective in nature only."  *Id.* at 3 (January 26, 1972 cover letter from CDE transmitting Special Undertaking Contract to Old Monsanto).  The final act creating CDE's Special Undertaking Contract—Old Monsanto's execution of the agreement—occurred in Missouri.  FAP, (ECF #4) ¶ 91.

Between 1972 and 1977, CDE purchased more than 7.4 million pounds of PCBs from Old Monsanto.  FAP, (ECF #4) ¶ 52; *see also* Ex. J to Kaley Aff. (summary of CDE PCB purchases).  CDE purchased PCBs from Old Monsanto on a regular basis by sending purchase orders to St. Louis, communicating with Old Monsanto representatives in St. Louis, and/or sending payment for PCBs in St. Louis.  FAP, (ECF #4), ¶ 53; Ex. K to Kaley Aff. (examples of purchase orders addressed to St. Louis); Ex. L to Kaley Aff. (Monsanto invoices for PCB purchases); *see also* Ex. M to Kaley Aff. (call reports and letters with CDE regarding PCBs).  Monsanto records indicate that CDE frequently purchased PCBs, as Monsanto has at least 66 invoices for sales to CDE from

- 5 -

1972-1977.  *See* Ex. L to Kaley Aff. (compilation of invoices); *see also* Ex. J to Kaley Aff. at 8-11 (showing sales almost every month from 1975-1977).  Pursuant to the Special Undertaking Contract, CDE agreed to maintain insurance that would cover PCB-related liabilities to Old Monsanto and had its insurance agents provide proof of this insurance to Old Monsanto in St. Louis.  *See* Ex. N to Kaley Aff. (correspondence regarding insurance requirements and proof of insurance provided to Old Monsanto in St. Louis).

CDE representatives met with Monsanto representatives in St. Louis on multiple occasions. Monsanto's available record demonstrate that on August 3, 1972, CDE representatives visited St. Louis to discuss the sale, use, and handling of PCBs with Old Monsanto and in 1974, a CDE representative attended the Dielectrics Symposium hosted by Old Monsanto in St. Louis.  Ex. O to Kaley Aff. (memorandum regarding August 3, 1972 meeting and confirmation of CDE's representatives attendance at the Dielectrics Symposium hosted by Old Monsanto).  Notably, Federal Pacific Electric Co. ("FPE")—of which CDE was a division—was registered to do business in Missouri from 1948 until at least 1980, had a registered agent in St. Louis, and records also indicate that CDE employed an individual who resided in St. Louis.[3]  *See* Ex. O to Kaley Aff. at 4-5 (invitation addressed to CDE employee G.B. Todd at "4480 Clayton Avenue, St. Louis, Mo" and memorandum noting, for CDE, "Todd (St. Louis)" will attend the symposium).

C.      KAVX's Missouri Contacts

KAVX, though its predecessor Aerovox Corporation ("Aerovox"), entered into multiple Special Undertaking Contracts—a February 1972 contract between Aerovox, its Canadian affiliate, and Monsanto and a March 1972 agreement between the same entities and Monsanto's

---

[3] Ex. V, Missouri Secretary of State Business details for Federal Pacific Electric Company available at https://bsd.sos.mo.gov/BusinessEntity/BusinessEntityDetail.aspx?page=beSearch&ID=479182.

Canadian affiliate.  *See* Ex. 4 to FAP, (ECF #4–4).  KAVX negotiated and discussed the terms of these agreements through phone calls and letters directed to Old Monsanto representatives in St. Louis.  Ex. P to Kaley Aff. at 5 (correspondence regarding Aerovox Special Undertaking Contracts, including letter to Old Monsanto "enclosing what [Aerovox] think[s] is an acceptable agreement which would provide indemnity protection for Monsanto").  A February 7, 1972 letter from Aerovox to Old Monsanto in St. Louis indicates that Aerovox transmitted executed copies of "modified" Special Undertaking Contracts and other documents requested by Old Monsanto.  Ex. Q to Kaley Aff.  Monsanto then executed Special Undertaking Contract in St. Louis.  FAP, (ECF #4) ¶ 83; *see* Ex. 4 to FAP, (ECF #4-4).

The parties followed a similar process for the March 1972 Special Undertaking Contract, i.e. Aerovox sent Monsanto partially executed agreements, which Old Monsanto then executed in Missouri.  Ex. R to Kaley Aff. at 2 (letter requesting Aerovox sign and representing Monsanto "will return two fully signed copies to" Aerovox).  On March 22, 1972, Aerovox signed the agreements and requested that Monsanto "return two fully executed copies."  *Id.* at 5.  Monsanto executed this agreement upon receipt.  FAP, (ECF #4) ¶ 84; Ex. 4 to FAP, (ECF # 4-4).

In 1972, alone, Aerovox purchased more 1.6 million pounds of PCBs from Old Monsanto pursuant to its Special Undertaking Contracts.  Ex. S to Kaley Affidavit (sales summary).  Aerovox sent purchase orders to Old Monsanto in St. Louis and Monsanto invoices indicate that it purchased PCBs regularly and such purchases were governed by Missouri law.  FAP, (ECF #4), ¶ 53; Ex. P to Kaley Aff. at 5 (letter addressed to St. Louis enclosing purchase order); *see also* Ex. T to Kaley Aff. (Monsanto invoices of Aerovox 1972 sales).  Aerovox also agreed to maintain insurance that would cover liabilities under the Special Undertaking Contracts.  *See* Ex. P to Kaley Aff. at 4 (January 24, 1972 letter contemplating that Aerovox would "attain[] the required $10M product

liability insurance which is required").  On April 13, 1972, Aerovox's insurer sent proof of insurance to Old Monsanto in St. Louis. Ex. U to Kaley Aff. at 6 (proof of insurance sent to Old Monsanto "on behalf of Aerovox Corporation.").

## LEGAL STANDARD

In ruling on a motion to dismiss for lack of personal jurisdiction, the Court may consider pleadings, affidavits, and other exhibits.  *Pederson v. Frost*, 951 F.3d 977, 979 (8th Cir. 2020). Monsanto is only required to make a *prima facie* showing of jurisdiction, or provide "sufficient facts supporting a reasonable inference that the defendant can be subjected to jurisdiction within the state.'" *Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021) (quoting *Whaley v. Esebag*, 946 F.3d 447, 451 (8th Cir. 2020)).  When determining whether Monsanto has met this "minimal" burden, *Zeavision, LLC v. Bausch & Lomb Inc.*, No. 4:21CV1487 HEA, 2022 WL 17092453 at *1 (E.D. Mo. Nov. 21, 2022), the Court must view all facts in the light most favorable to the Monsanto.  *Kaliannan*, 2 F.4th at 733.

## ARGUMENT

### I.     Defendants Are Subject To Specific Personal Jurisdiction In Missouri.

"Determining the propriety of an exercise of personal jurisdiction over a foreign defendant is a two-step process."  *Radaszewski by Radaszewski v. Contrux, Inc.*, 891 F.2d 672, 673 (8th Cir. 1989).  First, the Court inquires whether defendant's conduct satisfies Missouri's long-arm statute — RSMo. § 506.500.  *Id.*  If the long-arm statute is satisfied, the Court "must ensure that sufficient minimum contacts exist between the defendant and the forum state for the exercise of jurisdiction not to offend traditional notions of fair play and substantial justice."  *Id.*  Due process requires that "'the suit' must 'arise out of **or relate to** the defendant's contacts with the forum.'"  *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (emphasis added)).  A defendant's contacts with the forum state need not

*cause* the claims at issue, because the "relate to" portion of the disjunctive due process analysis merely requires "an affiliation between the forum and the underlying controversy." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Court,* 141 S.Ct. 1017, 1025 (2021) (quotation marks and citations omitted); *see also id.* at 1026 (rejecting a "causation-only approach").

Defendants are each subject to personal jurisdiction in Missouri because their individual conduct satisfies Missouri's long-arm statute, and their numerous and substantial suit-related contacts with Missouri are more than sufficient to satisfy due process.

A.   The Circuit Court of St. Louis County Has Already Found Magnetek is Subject to Personal Jurisdiction in Missouri.

Before this case was removed by GE, Defendant Magnetek, Inc. ("Magnetek") moved to dismiss the FAP claiming, *inter alia*, that it was not subject to personal jurisdiction in Missouri and relying on the same arguments Defendants make in their Motions to Dismiss.  *See* Ex. E5 to Notice of Removal (ECF #1-9) at 472-505.  The Circuit Court of St. Louis County, Missouri (Judge Stewart) *denied* Magnetek's motion on October 7, 2022.  *See* Ex. E1 to Notice of Removal, (ECF #1-5) at 7.  In doing so, Judge Stewart rejected the arguments raised by Magnetek and found that Magnetek's contacts with Missouri (which are very similar to Defendants' contacts with Missouri) were sufficient to satisfy Missouri's long-arm statute and due process.  There is no reason for this Court to deviate from Judge Stewart's ruling with respect to Defendants.

B.   Defendants' Conduct Establishes Jurisdiction Under Missouri's Long-Arm Statute.

In Missouri, jurisdiction can be premised on any of the acts enumerated in Section 506.500.1.  RSMo. § 506.500.  Here, each Defendant committed four of the acts contemplated by Missouri's long-arm statute—each of which independently satisfies the first step of the Court's personal jurisdiction analysis.

- 9 -

i.     *Defendants Made Multiple Contracts in Missouri.*

Missouri's long-arm statute provides jurisdiction over cases involving contracts made in Missouri.  RSMo. § 506.500.1(2).  "For purposes of the long-arm statute, a contract is made where acceptance occurs."  *Walters Bender Strobehn & Vaughn, P.C. v. Mason*, 397 S.W.3d 487, 498 (Mo. Ct. App. 2013).  "A contract is made in Missouri if the final act which gives rise to a binding agreement occurs within this state."  *U.S. Durum Milling, Inc. v. Frescala Foods, Inc.*, 785 F. Supp. 1369, 1371-72 (E.D. Mo. 1992).

The Special Undertaking Contracts were "made in Missouri" because the final act creating each contract—*i.e.*, Old Monsanto's (acceptance of) and execution of the Special Undertaking Contracts—occurred in Missouri.  *See* FAP, (ECF #4) ¶¶ 83-84, 91, 97.   For bilateral contracts, the terms "must be accepted by ***both*** parties for a contract to be formed."  *See, e.g.*, *Baier v. Darden Rests.*, 420 S.W.3d 733, 738 (Mo. Ct. App. 2014) (emphasis in original).  Consistent with that requirement, Aerovox and Mallory requested that Old Monsanto return fully executed copies of the Special Undertaking Contracts to them. Ex. R to Kaley Aff. at 5 (Aerovox letter requesting Monsanto "return fully executed copies" of Special Undertaking Contracts); Ex. B to Kaley Aff. at 5 (Mallory requesting "Monsanto Company execute both copies and return one copy to the undersigned.").   Monsanto similarly alleges that it accepted the KAVX Special Undertaking Contracts by executing the agreements in Missouri. FAP, (ECF #4) ¶¶ 83-84.

Defendant also entered into multiple PCB sales contracts in Missouri when Old Monsanto accepted Defendants' purchase orders and issued invoices from its St. Louis office.  *See* Exs. D, E, G to Kaley Aff. (Mallory purchase records); Exs. K, L to Kaley Aff. (CDE purchase records); Ex. P at 5, S, T to Kaley Aff. (Aerovox purchase records).  These sales contracts are particularly relevant because the Special Undertaking Contracts, by their express terms, were incorporated into all then-existing and future contracts between Defendants and Old Monsanto for the purchase of

- 10 -

PCBs. Exs 4–6 to FAP, (ECF #4-4–6).   Because the Special Undertaking Contracts and related

PCB purchase contracts were made in Missouri and this action arises out of and/or relates to those

contracts, the long-arm statute is satisfied.  RSMo. § 506.500.1(2).[4]  *See Moses v. Burlington N.*

*R. Co.*, 854 F. Supp. 600, 603 (E.D. Mo. 1994) (contract formed in Missouri where final signature

on agreement occurs in Missouri); *Tiger Mfg. Corp. v. Loadstar Material Handling Equip., Ltd.*,

341 F. Supp. 2d 1107, 1110-11 (W.D. Mo. 2004) (defendant "made a contract within [Missouri]"

because the plaintiff "accepted [defendant]'s purchase orders at its Missouri office.").[5]

Defendants' attempt to evade Section 500.500(1).2 by asserting that the Special

Undertaking Contracts were "accepted" outside of Missouri lacks merit.  The Special Undertaking

Contracts were negotiated by the parties, and thus, could not reasonably be construed as an open

offer by Monsanto.  *See, e.g.*, Exs. A, B, I, P, Q to Kaley Aff. (negotiation of the Special

Undertaking Contracts).  Further, contemporaneous evidence demonstrates that the parties to each

Special Undertaking Contract contemplated that the agreements would become effective upon Old

Monsanto's execution of the agreements.  *See* Ex. B to Kaley Aff. at 5-6  (Mallory request for fully

executed copies of Special Undertaking Contracts); Ex. R to Kaley Aff. at 5 (Aerovox request to

"return two fully executed copies" of Special Undertaking Contract); Ex. I to Kaley Aff. at 3 (CDE

---

[4] For purposes of assessing long-arm jurisdiction, the Court may consider Defendants' Special Undertaking Contracts and purchase orders because these agreements go hand-in-hand in that the Special Undertaking Contracts are incorporated into PCB sales contracts and enabled continued purchase and sale of PCBs.  Exs. 4–6 to FAP, (ECF #4-4-6) (amending "all existing contracts for the sale of PCB's by Monsanto to Buyer").  For instant purposes, the salient point is that these contracts were accepted by Old Monsanto in Missouri.

[5] The cases Defendants cite where contracts were found to be made outside Missouri because that is where final execution of the contract occurred support Monsanto's position that the Special Undertaking Contracts and related purchase orders were made in Missouri.  *See Fru-Con Const. Corp. v. Controlled Air, Inc.*, No. 4:07CV00495 ERW, 2008 WL 544715, at *2 (E.D. Mo. Feb. 26, 2008) (contract made in Kansas because it was finally executed there); *State ex rel. Career Aviation Sales, Inc. v. Cohen*, 952 S.W.2d 324, 326 (Mo. Ct. App. 1997) (contract made in California finally executed there); *Baker Smith Sheet Metal, Inc. v. Wasco Prods., Inc.*, 705 F. Supp. 471, 472 (W.D. Mo. 1989) (parties did not dispute that the contract was accepted in Maine). Defendants' reliance on *Johnson Heater Corp. v. Deppe* decision is also misplaced because the contract at issue there "explicitly stated it was an offer" and was titled "acceptance form."  86 S.W.3d 114, 117 (Mo. Ct. App. 2002).

questioning validity of agreement after its own execution).   At best, Defendants' arguments regarding the partial execution of the Special Undertaking Contracts by them outside Missouri raise a question of fact regarding whether the parties intended to be bound by partially executed agreements, which must be resolved in favor of Monsanto.  *Baier*, 420 S.W.3d at 739-40 (holding contract not formed where only offeree signed agreement with signature lines for offeror and offeree and noting absence of the offeror's signature presents a question of fact); *Kaliannan*, 2 F.4th at 733 (facts viewed most favorably to non-movant).

Defendants' alternative position, i.e. that the Special Undertaking Contracts are unilateral agreements that became effective when Monsanto fulfilled PCB purchase orders outside of Missouri, also falls short.  Although the Special Undertaking Contracts did not obligate Monsanto to sell PCBs to Defendants, the Special Undertaking Contracts make clear that Monsanto would only continue to sell PCBs to Defendants if Defendants entered into the Special Undertaking Contracts and that the contracts were executed "in consideration of any such sale or delivery" of PCBs by Monsanto.  Exs. 4-6 to FAP, (ECF #4-4–6) ("[Old] Monsanto has adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and [Defendant] is willing to agree to such undertakings with respect to sales and/or delivery of PCB's by [Old] Monsanto to [Defendant].").   Thus, the Special Undertaking Contracts are bilateral agreements made in Missouri because Defendants' agreements to defend and indemnify Monsanto were made in exchange for, and "in consideration of," Monsanto's subsequent sales of PCBs.[6]  *Id.*

---

[6] The plain text of the Special Undertaking Contracts belies any notion that the Special Undertaking Contracts lack consideration. *See* Exs. 4–6 to FAP, (ECF #4-4–6).  The Special Undertaking Contracts' representation that the agreement did not "create or imply any duty or obligation of Monsanto to sell or deliver any PCB's to buyer" merely clarifies that the Special Undertaking Contracts did not, in of themselves, effectuate any PCB sales and does not negate the fact that the contracts were formed "in consideration of [future] sale[s] or deliver[ies] of PCBs." Exs. 4–6 to FAP, (ECF #4-4–6).

Even assuming, *arguendo*, that the Special Undertaking Contracts themselves were unilateral contracts, these contracts became effective when Monsanto accepted Defendants' subsequent orders of PCBs in Missouri.  Exs. D, K, P at 5 to Kaley Aff. (records of purchase orders sent to Missouri); *see also* FAP, (ECF #4) ¶ 53 ("Old Monsanto accepted [PCB] purchase orders in Missouri").  Here, where Defendants entered into the Special Undertaking Contracts for the *opportunity to* continue to purchase PCBs,  Monsanto's acceptance of Defendants' purchase orders in Missouri—rather than production of or delivery of PCBs outside of Missouri—constitutes the "performance" contemplated by the Special Undertaking Contracts (to the extent the Court considers them unilateral agreements).[7]  This is in stark contrast to situations like in the *Garrity v. A.I. Processors* case cited by CDE (*see* CDE Br., (ECF #86) at 11) where the acceptance—depositing of funds into a specific account in a Utah bank—occurred outside Missouri.  *See* 850 S.W.2d 413, 417 (Mo. Ct. App. 1993).

     ii.  *Defendants Transacted Business in Missouri.*

Missouri courts "broadly" construe the "transaction of business" for purposes of Section 506.500.1(1).  *Newport v. Wiesman*, 627 S.W.2d 874, 876 (Mo. 1982).  "We must construe broadly the 'transaction of business' element in the long arm statute so that ***even a single transaction*** may confer jurisdiction, if that is the transaction that gives rise to the suit."  *Chromalloy Am. Corp. v. Elyria Foundry Co.*, 955 S.W.2d 1, 4 (Mo. 1997) (emphasis added), *overruled on other grounds* by *Henderson v. Asel*, 566 S.W.3d 596 (Mo. 2019); *May Dept. Stores Co. v. Wilansky,* 900 F. Supp. 1154, 1162 (E.D. Mo. 1995) ("[P]ersonal jurisdiction is appropriate under the long-arm

---

[7] The two employment cases CDE relies on (*see* CDE Br., (ECF #86) at 10) have no application here because the contracts at issue here are not unilateral, and, even if they were, CDE's cases don't address the location of performance for purposes of the long-arm statute.  *See, e.g.*, *Cook v. Coldwell Banker*, 967 S.W.2d 654, 657 (Mo. Ct. App. 1998) (addressing the sufficiency of evidence regarding contract acceptance and jury instruction issues after trial); *Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526, 534 (Mo. Ct. App. 2011) (analyzing whether a published severance policy was an offer that could be accepted to form a unilateral contract).

statute … if the nonresident defendant entered the state for even one meeting which related to the contract at issue.").

Defendants[8] had ongoing and substantial business activity with Monsanto. They "transacted business in Missouri" by (i) negotiating the terms of their defense and indemnity agreements, and ultimately, entering into the Special Undertaking Contracts in Missouri, (Exs. A, B, I, P, Q to Kaley Aff.); (ii) regularly sending purchase orders into Missouri to effectuate the purchase of millions of pounds of PCBs from Monsanto pursuant to their Special Undertaking Contracts (*see* FAP, (ECF #4) ¶ 52; Exs. D, E, G, K, L, P at 5, S, T to Kaley Aff.)[9]; and/or (iii) visiting Monsanto in Missouri for PCB-related business on multiple occasions, and, in the case of CDE, having a Missouri-based employee involved with PCBs. *See* Exs. A, H, O to Kaley Aff. (Mallory and CDE representatives visiting Missouri for PCB-related business on multiple occasions); Ex. O to Kaley Aff. at 4-5 (documents regarding CDE's "St. Louis" employee).[10]

Missouri courts have long held this kind of ongoing and substantial business activity with a Missouri resident constitutes the "transaction of business" within the meaning of Section 506.500.1(1). *See, e.g.*, *Houlihan Trading Co. v. CTI Foods, LLC,* No. 4:21-cv-01030-SRC, 2021

---

[8] The FAP collectively references to "Defendants" and describes similar conduct applicable to each defendant. *See, e.g.*, FAP, (ECF #4), ¶¶ 2 ("Defendants . . . incorporated PCBs [purchased from Old Monsanto] into a wide variety of finished products that were sold throughout the United States"), *id.,* ¶ 53 ("Defendants purchased . . . PCBs by calling Old Monsanto employees in Missouri or sending purchase orders to Old Monsanto[] in Missouri."); *see also id.*, ¶¶ 4, 17, 110. These references do not imply (as KAVX implausibly suggests) the each Defendant's suit-related contacts are applicable to one another or that every defendant was involved in the exact same act or communications. KAVX Mem. (ECF #83) at 9-10. Moreover, allegations in the FAP are bolstered by specific references regarding each Defendant's environmental releases, execution of the Special Undertaking Contract, and the exhibits attached hereto.

[9] Defendants' potential distribution of products containing these PCBs in Missouri further bolsters the fact that each Defendant transacted business in Missouri (and committed a tort in Missouri through the release of PCBs from those products). *See* FAP, (ECF #4) ¶¶ 2, 4, 17, 26, 110, 148, 155, 161 (allegations regarding Defendants' distribution of PCB-containing products throughout the country, which necessarily includes Missouri); *Nixon*, 29 S.W.3d at 835 (maintaining commercial relationships in state constitutes the transaction of business).

[10] Physical presence in the forum state is a hallmark of personal jurisdiction. "Missouri courts have held that personal jurisdiction is appropriate under the long-arm statute… if the nonresident defendant entered the state for even one meeting which related to the contract at issue." *May Dept. Stores Co.*, 900 F. Supp. at 1162.

WL 5758436 at *5-6 (E.D. Mo. 2021) (Missouri's long arm statute satisfied where parties had a "course of dealing" during their 20-year business relationship, during which defendant made countless calls and sent numerous emails for the purchase of over 25 million pounds of product costing approximately $40 million); *State ex. rel. Nixon v. Beer Nuts, Ltd.*, 29 S.W.3d 828, 835 (Mo. Ct. App. 2000) (regularly soliciting customers in and from Missouri and maintaining commercial relationships within this state constitutes the transaction of business); *Chromalloy Am. Corp.*, 955 S.W.2d at 4-5 (negotiations in Missouri sufficient to constitute transaction of business).[11]

Each of the cases Defendants rely on to argue that their contacts with Missouri are not sufficient are distinguishable on the facts. *See Scullin Steel Co. v. National Railway, Utilization Corp.*, 676 F.2d 309, 313-14 (8th Cir. 1982) (negotiations of sales contact all in Pennsylvania; no visits to Missouri); *Diary Farmers of Am.*, 702 F.3d 472, 476-77 (8th Cir. 2012) (no Missouri contracts, visits, or orders); *Arnold v. AT & T, Inc.*, 874 F. Supp. 2d 825, 836 (E.D. Mo. 2012) (only alleged contact with Missouri was a website the defendant did not even own); *TSE Supply Co. v. Cumberland Natural Gas Co.*, 648 S.W.2d 169, 169 (Mo. Ct. App. 1983) (the court did *not* decide whether the two contacts with Missouri at issue were sufficient to satisfy the long-arm statute); *Johnson Heater Corp. v. Deppe*, 86 S.W.3d 114, 119-20 (Mo. Ct. App. 2002) (contract at issue was made in Wisconsin and the only alleged contacts with Missouri were by telephone, fax, and mail); *Shady Valley Park & Pool, Inc. v. Dimmic*, 576 S.W.2d 579, 580 (Mo. Ct. App. 1979) (the only contact at issue was a single telephone call ordering fish from Missouri seller);

---

[11] In fact, Missouri courts have found that defendants transacted business in Missouri under circumstances with fewer connections than those present here. *See, e.g., Mead v. Conn*, 845 S.W.2d 109, 112 (Mo. Ct. App. 1993) (finding that non-resident defendant transacted business in Missouri by transmitting test results by telephone from Kansas to Missouri for analysis and paying Missouri company for services performed); *Watlow Elec. Mfg. Co. v. Sam Dick Industries, Inc.*, 734 S.W.2d 295, 297-98 (Mo. Ct. App. 1987) (non-resident transacted business by communicating with party in Missouri by telephone and mail and sending employee to attend single meeting in Missouri).

*Warner v. Gen. Ins. Co. of Am.*, 690 F. Supp. 830, 835 (E.D. Mo. 1988) (no allegations suggesting the defendant "engaged in any activity within Missouri"); *State ex rel. Barnes v. Gerhard*, 834 S.W.2d 902, 903-04 (Mo. Ct. App. 1992) (does not address transaction of business in Missouri).

   iii. *Defendants Committed Tortious Acts Producing Actionable Consequences In Missouri.*

Missouri's long-arm statute also provides jurisdiction over defendants who commit "a tortious act within this state." RSMo. § 506.500.1(3). This section extends jurisdiction of Missouri courts to "[e]xtraterritorial acts that produce consequence in [Missouri]." *Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 232 (Mo. 2010). Here, Monsanto alleges that Defendants breached their respective duties of care by allowing PCBs purchased from Old Monsanto to be released into the environment through products Defendants manufactured and sold throughout the United States, disposal of PCB-containing products, leaks, spills, dumping and disposal of industrial wastes, and through other means.[12] FAP, (ECF #4) ¶ 288. Monsanto has been sued in *Missouri* and other jurisdictions for manufacturing PCBs purchased by Defendants and in suits that base liability, in part, on PCBs that Defendants negligently released or permitted to be released into the environment. *Id.*, ¶¶ 288-291; Ex. 8 to FAP (ECF #4-8) (listing 28 underlying PCB lawsuits filed in Missouri). Thus, Defendants' environmental exposures of PCBs (including manufacturing and distributing PCB-containing products throughout the country) have and will continue to cause harm to Monsanto in Missouri. *Id.*, ¶¶ 2, 4, 24, 104-05, 109-11, 112, 122, 135, 148, 155, 161.

---

[12] Defendants' attempt to confine Monsanto's negligence claim to PCBs released in certain geographic areas mischaracterizes Monsanto's claim. *See* FAP, (ECF #4) ¶ 288. The Court should also ignore CDE and KAVX's specious claim that "this is . . . not a tort case." CDE Mem., (ECF #86) at 13; KAVX Mem., (ECF #83) at 15. As discussed in detail below, Monsanto has adequately alleged negligence and equitable contribution claims against all Defendants.

Given Defendants' long-standing business relationships with Monsanto, it was clearly foreseeable to Defendants that their acts of negligence, even when committed outside the state of Missouri, would produce actionable consequences in Missouri.  This is enough to satisfy Section 506.500.1(3).  *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 910-11 (8th Cir. 2012); *May Dept. Stores Co.,* 900 F.Supp. at 1161 ("Several cases have held that the tortious act component of the Missouri long-arm statute applies to extraterritorial acts causing consequences in the forum."). Monsanto's allegations are sufficient both to demonstrate the commission of a tortious act within Missouri under RSMo. § 506.500.1(3) and place Defendants within the reach of Missouri's long-arm statute.[13]

     iv.   *Defendants Contracted To Insure A Person, Property, Or Risk Located Within Missouri At The Time Of Contracting.*

When Defendants entered into the Special Undertaking Contracts, they each agreed to "defend, indemnify and hold harmless" Old Monsanto, a Missouri company.  Exs 4–6 to FAP, (ECF #4-4–6).  Defendants generally gloss over the fact that Missouri courts exercise jurisdiction over contracts "insur[ing] any person, property or risk located within this state at the time of contracting." RSMo. § 506.500.1(5).  CDE's and KAVX's failure to meaningfully analyze this ground for jurisdiction is even more striking because each entity was required to procure and provide Old Monsanto proof of insurance policies that would cover Old Monsanto in the event Defendants' liability under the Special Undertaking Contracts was triggered.  Exs. N, U to Kaley Aff.  Here, the defense and indemnity obligations required by the Special Undertaking Contracts (and Defendants' insurance policies required under the Contracts) insured Monsanto's risk of loss

---

[13] Gillette does not address Section 506.500.1(3) (*see* Gillette Br., (ECF #93) at 3-5) and therefore concedes Monsanto's allegations are sufficient to establish that Gillette committed a tortious act within the state for purposes of the long-arm statute.

for PCB-related litigation, and thus, the Defendants contracted to insure a person, property, or risk located within Missouri through their Special Undertaking Contracts and are subject to personal jurisdiction under RSMo. § 506.500.1(5).  *See Krien v. Harsco Corp.*, 745 F.3d 313, 318 (7th Cir. 2014) ("Indemnification is a form of insurance"); FAP, (ECF #4) ¶ 17.[14]

      C.      <u>Defendants' Substantial Suit-Related Contacts With Missouri Satisfy Due Process</u>.

In evaluating whether a defendant's jurisdictional contacts comport with due process, the Eighth Circuit examines: (1) the nature and quality of defendant's contacts with the forum state; (2) the quantity of contacts; (3) the relationship of the contacts with the cause of action; (4) Missouri's interest in providing a forum for its residents; and (5) the convenience of the parties. *Myers v. Casino Queen, Inc*., 689 F.3d 904, 911 (8th Cir. 2012).  The first three are of primary importance.  *Precision Const. Co. v. J.A. Slattery Co., Inc.*, 765 F.2d 114, 118 (8th Cir. 1985). Here, the nature, quality, and quantity of Defendants' individual contacts with Missouri as well as the relationship of those contacts with Monsanto's claims satisfy due process and the exercise of personal jurisdiction over Defendants comports with notions of fair play and substantial justice.

      i.      *The Nature, Quality, and Quantity of Defendants' PCB-Related Contacts with Missouri Support Personal Jurisdiction.*

When viewed in total, each Defendants' suit-related contacts with Missouri establish that Defendants purposefully availed themselves of the privilege of conducting activities in Missouri such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).  Defendants agreed to defend and indemnify a Missouri corporation through

---

[14] Defendants' reliance on *Babb v. Bartlett*, 638 S.W.3d 97 (Mo. Ct. App. 2021) is misplaced.  *See* Gillette Mem. (ECF #93) at 5 (citing *Babb*); CDE Mem. (ECF #86) at 10 n.5 (citing *Babb*).  In *Babb*, the Court expressly declined to the decide the issue of "whether the [relevant agreement] constitute[d] a 'contract to insure.'"  638 S.W.3d at 112.

contracts formed in Missouri, purchased millions of pounds of PCBs via purchase agreements pursuant to the Special Undertaking Contracts and entered into with Old Monsanto in Missouri, communicated with Old Monsanto regarding the Special Undertaking Contracts and PCBs in Missouri, committed a tort in Missouri that caused harm in Missouri, and CDE and Mallory were present in Missouri for PCB-related business on multiple occasions. These contacts are more than sufficient. *See K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 594 (8th Cir. 2011) (evaluating "totality of the circumstances").

The nature and terms of the Special Undertaking Contracts create substantial connections with Missouri such that Defendants should have reasonably anticipated being haled into court in Missouri. *See id*. The "contemplated future consequences" of the Special Undertaking Contracts satisfy due process because Defendants entered into the Special Undertaking Contracts to induce Old Monsanto to continue to sell PCBs. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985). The Special Undertaking Contracts also created "continuing obligations" for Defendants through defense and indemnity obligations that were not subject to any temporal or monetary cap. *Id.* at 476. After each defendant memorialized its ongoing relationship with Old Monsanto, it knew, or should have known, that it could be required to defend and indemnify Old Monsanto in Missouri. Because Defendants' Special Undertaking Contracts form the basis of Monsanto's claims, these intentional contacts combined with related Missouri contacts discussed below are sufficient to satisfy due process. *See Daimler AG*, 134 S.Ct. at 754 ("[T]he commission of some single or occasional acts . . . in a state may sometimes be enough to subject the corporation to jurisdiction in that State's tribunals with respect to suits relating to that in-state activity.").

After entering into the Special Undertaking Contracts, Defendants purchased PCBs on a regular basis in substantial quantities through a series of purchases that were accepted in Missouri.

*See* FAP, (ECF #4) ¶¶ 17, 53; *see also* Exs. D, E, G to Kaley Aff. (Mallory purchase records, including more than 30 invoices); Exs. J, K, L to Kaley Aff. (CDE purchase records, including 66 invoices); Ex.  P, S, T to Kaley Aff. (Aerovox purchase records, including six invoices in 1972 alone).  Defendants' purchases of PCBs were governed by Missouri choice-of-law provisions and often required payment to be sent to St. Louis.[15]  FAP, ¶ 17; Ex. G to Kaley Aff. (Mallory invoices requesting payment to St. Louis and containing Missouri choice of law provision in Section 12); Exs. L at 3, T at 4 to Kaley Aff. (respectively, CDE and Aerovox invoices with same choice of law provision in Section 12).  Defendants also communicated with Old Monsanto employees in St. Louis regarding PCBs.  *See, e.g.*, Exs. F, M, P, R to Kaley Aff. (records of phone calls, contracts, and letters regarding PCBs).  Defendants' regular, substantial purchases of PCBs and communications with Monsanto in Missouri weigh strongly in favor of this Court's jurisdiction. *See U.S. Durum Milling, Inc. v. Frescala Foods, Inc.*, 785 F. Supp. 1369, 1372 (E.D. Mo. 1992) (finding jurisdiction over nonresident based on two purchase orders with company in St. Louis); *Diversified Ingredients, Inc. v. Triple-T Foods, Inc.*, No. 4:09CV0956 AGF, 2010 WL 1930009, at *5 (E.D. Mo. May 10, 2010) (finding personal jurisdiction based on communications and ten purchase orders).

Physical presence in Missouri is a hallmark of due process.  *See Burnham v. Sup. Court of Cal., Cnty. of Marin*, 495 U.S. 604, 619 (1990) ("The short of the matter is that jurisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of 'traditional notions of fair play and

---

[15] "Although choice of law provisions specifying that the forum state's laws govern are insufficient on their own to confer personal jurisdiction, they provide further evidence of a defendant's 'deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.'" *K-V Pharm. Co.,* 648 F.3d at 594 (quoting *Burger King,* 471 U.S. at 482)).

substantial justice'"). As noted, Mallory representatives visited Missouri at least six different occasions for PCB-related business during the relevant time period. Exs. A, H to Kaley Aff. CDE also made multiple visits to St. Louis to discuss PCB-related business with Monsanto and had an employee located in Clayton, Missouri. Ex. O to Kaley Aff. In addition, FPE (of which CDE was a division) was registered to do business in Missouri and had a registered office and agent in St. Louis from 1948 until at least 1979. Ex. V. Defendants' visits to and physical presence in Missouri for purposes relating to PCBs purchased from Monsanto pursuant to the Special Undertaking Contracts further demonstrate that exercising personal jurisdiction over Defendants comports with due process.

Monsanto's claims are firmly connected to Defendants' contacts with Missouri. Defendants negotiated the Special Undertaking Contracts with Monsanto through communications directed into Missouri and made PCB purchase contracts in Missouri for the purpose of securing products that only Monsanto, a Missouri-based company, could provide. FAP, (ECF #4) ¶¶ 2, 50-53. Defendants' environmental release of PCBs throughout the United States caused injuries to Missouri residents and Plaintiffs, companies formerly or currently headquartered in Missouri. The strong connection between Defendants' contacts and the claims asserted further supports this Court's jurisdiction over defendants.

The various cases Defendants rely on to support their due process arguments are easily distinguishable.[16] Moreover, because courts employ a holistic analysis when evaluating due

---

[16] *See, e.g., Aaron Ferer & Sons v. Atlas Scrap Iron & Metal Co.,* 558 F.2d 450, 454-56 (8th Cir. 1977) (contract not negotiated or executed in forum and no in-person visits to forum); *Sybaritic, Inc. v. Interport Intern., Inc*., 957 F.2d 522, 524-25 (8th Cir. 1992) (contract "negotiated, drafted, presented, and executed" out of the forum state); *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 478 (8th Cir. 2012) (no negotiation of relevant contract in forum state); *Bell Paper Box, Inc. v. Trans W. Polymers, Inc.*, 53 F.3d 920, 922 (8th Cir. 1995) ("Only a single purchase order link[ed defendant] to [the forum]"); *Restoration St. Louis, Inc. v. 3RD St. IA LLC*, No. 4:13CV669 HEA, 2014 WL 722409, at *4 (E.D. Mo. Feb. 24, 2014) (holding Missouri contract as "sole" contact not sufficient for jurisdiction); *CPC-Rexcell, Inc. v. La Corona Foods, Inc*., 912 F.2d 241, 244 (8th Cir. 1990) (negotiations took place outside of the forum and defendant primarily communicated with plaintiffs' agents in another

process, *see Burger King*, 471 U.S. at 478-79, the fact that Monsanto's PCBs were not manufactured in Missouri and some payments for PCBs were sent to New York—not Missouri— does not negate Defendants' other substantial contacts with the State or mean Defendants are not subject to personal jurisdiction in Missouri. *See Houlihan Trading Co*, 2021 WL 5758436 at *6 (holding due process permitted where products sold by Missouri company were manufactured outside Missouri).  Finally, as shown above, Defendants' contacts with Missouri extend far beyond merely contracting with a Missouri entity.

> ii.     *Exercising Personal Jurisdiction Over Defendants is Reasonable Because Missouri Has an Interest in Providing a Forum for its Residents and Litigating the Current Action in Missouri Would Not Inconvenience the Parties.*

Missouri has a significant interest in adjudicating this dispute, which is brought based on contracts with Old Monsanto, a Missouri corporation during the relevant time frame.  Solutia and New Monsanto are also headquartered in Missouri.  FAP, (ECF #4) ¶¶ 8-9.  *See K–V Pharm.*, 648 F.3d at 595 ("Missouri obviously has an interest in providing a forum for [its] resident[s].").  Moreover, many of the underlying PCB lawsuits that form the basis for Monsanto's claims were and/or are venued in Missouri and involve Missouri plaintiffs. Ex. 8 to FAP, (ECF #4-8) (28 underlying PCB lawsuits filed in Missouri).

Defendants also have not established any basis for this Court to conclude that litigating this action in Missouri would place them at a severe disadvantage.  The Special Undertaking Contracts

---

forum); *Iowa Elec. Light & Power Co. v. Atlas Corp.*, 603 F.2d 1301, 1302 (8th Cir. 1979) (defendant did not solicit sales and sold products to  resident pursuant one-time contract); *Xenos Bioresources, Inc. v. Sioux Biochemical, Inc.*, No. 4:05CV0392 TCM, 2005 WL 1719912, at *4 (E.D. Mo. July 22, 2005) (defendant-seller's only connection was "receiving and signing purchase orders from a Missouri business"); *Miller v. Nippon Carbon Co., Ltd.*, 528 F.3d 1087, 1091 (8th Cir. 2008) (defendant's forum contacts not connected to incident in wrongful death suit); *Ahmed v. Bangash*, No. 4:13CV269 HEA, 2014 WL 805869, at *5 (E.D. Mo. Feb. 28, 2014) (defendants "took no affirmative actions with regard to plaintiff in Missouri"); *Porter v. Berall*, 293 F.3d 1073, 1076 (8th Cir. 2002) (communications insufficient where party did not solicit business in Missouri).

are so old that most witnesses with personal knowledge are deceased.  To the extent relevant documents, witnesses, and conduct are located out of the state, they can, like in any other modern litigation, be obtained, investigated, and/or interviewed or deposed without undue inconvenience to the parties.  In short, "[t]here is nothing unfair in requiring a defendant with minimum contacts in Missouri that has benefit from large-scale commercial transactions in Missouri to defend claims in Missouri that arise from these business transactions."  *Andra v. Left Gate Prop. Holding, Inc.*, 453 S.W.3d 216, 234 (Mo. 2015).  Nor is it unreasonable to require Defendants, who understood they were subjecting themselves to possible litigation in Missouri by agreeing to defend and indemnify a Missouri company relating to products purchased in Missouri, to litigate in this forum. *See Burger King Corp.*, 471 U.S. at 477 (requiring defendant present a "compelling case that . . . other considerations would render jurisdiction unreasonable"); *Peoples Bank v. Frazee*, 318 S.W.3d 121, 133 (Mo. 2010) (jurisdiction over out-of-state guarantor reasonable because guarantor "should have contemplated the potential future consequences in Oklahoma and the possibility of being haled into an Oklahoma court to defend a lawsuit if the loan was called").

*        *        *

Defendants' numerous suit-related contacts described above satisfy the Missouri long-arm statute and are more than sufficient to meet the requirements of due process such that requiring them to defend this lawsuit in Missouri comports with traditional notions of fair play and substantial justice.

## II. Monsanto's Breach of Contract, Contribution, and Negligence Claims Are Not Time Barred.

Defendants argue that some of Monsanto's claims are barred by the applicable statutes of limitations.  KAVX seeks partial dismissal of Monsanto's contribution and indemnification claims, arguing that "any claims for settlements, judgments, or other payments made before

August 3, 2017 are time barred" under RSMo. § 516.120(1).[17]  KAVX Mem., (ECF #83) at 19.
CDE claims that Monsanto's breach of contract and negligence claims should be dismissed
because CDE rejected Monsanto's initial tender of some underlying PCB lawsuits on May 18,
2017.[18]  *See* CDE Mem., (ECF #86) at 16-17.  Gillette claims that Monsanto's negligence claim is
time barred because Monsanto would have suffered "at least 'some' ascertainable damages before
August 3, 2017."[19]  Gillette Mem., (ECF #93) at 10-12.  Each of Defendants' various statute of
limitations arguments lack merit.

    A.   <u>Monsanto's Breach of Contract Claims Are Timely</u>.

      The Court should reject Defendants' timeliness arguments with regard to Monsanto's
breach of contract claims because Monsanto's claims are timely under the applicable ten-year
statute of limitations in RSMo. §516.110.  But even if the Court were to find that the five-year
statute of limitations in RSMo. § 516.120 applies, Defendants have not established from the
allegations in the FAP that any part of Monsanto's claims accrued prior to August 3, 2017.  *See*
*Dida v. Ascension Providence Hosp.*, No. 4:22-CV-0508-AGF, 2022 WL 2438347 at *2 (E.D. Mo.
July 5, 2022) (noting claim that a suit is barred in whole or in part by statute of limitations is an
"affirmative defense[] that a defendant bears the burden to plead and prove"); *Dougherty v.*
*Dormont Mfg. Co.*, No. 4:22CV700 HEA, 2023 WL 3376338 at *2 (E.D. Mo. May 11, 2023) ("For
the complaint to establish the statute of limitation defense, it must be apparent from the complaint

---

[17] KAVX joins and incorporates by reference CDE's statute of limitations arguments.  *See* KAVX Mem., (ECF #83) at 19 n.16.

[18] CDE refers the Court to Gillette's discussion of the statute of limitations for negligence claims and joins KAVX's statute of limitations argument regarding Monsanto's contribution claim.  *See* CDE Mem., (ECF #86) at 17 n. 10.

[19] Gillette does not adopt or incorporate any of the other Defendants' statute of limitations arguments.  *See* Gillette Mem., (ECF #93) at 10-12.

itself that it is time barred per the relevant limitations statute, and there are no facts alleged that prohibit operation of the limitation statute.").

"Missouri has two statutes of limitations relating generally to contract actions: sections 516.110(1) and 516.120."  *Rolwing v. Nestle Holdings, Inc.*, 437 S.W.3d 180, 182 (Mo. banc 2014).  Defendants claim without any analysis or support that Monsanto's breach of contract claims are subject to the five-year statute of limitations in Section 516.120.  Not so.  Monsanto's claims are subject to the ten-year statute of limitations in Section 516.110 because they seek a judgment from Defendants for payment of money that Defendants agreed to pay in the Special Undertaking Contracts.  RSMo. § 516.110; *Rolwing*, 437 S.W.3d at 183 ("[T]he 10-year statute established by section 516.110(1) 'applies to every breach of contract action in which the plaintiff seeks a judgment from the defendant *for payment of money the defendant agreed to pay in a written contract.*'") (quoting *Hughes Development Co. v. Omega Realty Co.*, 951 S.W.2d 615, 616 (Mo. 1997)) (emphasis in original)).[20]  It does not matter that the exact amount of money to be paid by Defendants under the Special Undertaking Contracts is not fixed or absolute.  *See Rolwing, 437 S.W.3d at 183*; *Hughes*, 951 S.W.2d at 617; *Community Title Co. v. Stewart Title Guaranty Co.*, 977 S.W.2d 501, 502 (Mo. banc 1998).

Defendants will likely argue in reply that some Missouri courts have applied the five-year statute of limitations to indemnity contracts.  Monsanto is aware of those decisions, but they are inapposite here because they apply Section 516.120 without analysis (mostly based on the parties' agreement) and/or predate *Hughes*, *Rolwing*, and *Spalding v. Stewart Title Guaranty Co.*, 463

---

[20] In *Hughes*, the Supreme Court of Missouri ignored prior precedent "in favor of the statute itself," which it found "not ambiguous" and "[t]aken at its plain meaning" applicable to "every breach of contract action in which the plaintiff seeks a judgment from the defendant for payment of money the defendant agreed to pay in a written contract."  951 S.W.2d at 617.  The Supreme Court further found that Section 516.110 "imposes no requirement that the amount the defendant owes as a result of the written contract be determinable without resort to extrinsic evidence" and concluded by stating the interpretation and application of Section 516.110 it adopts is "admittedly quite broad."  *Id.*

S.W.3d 770 (Mo. banc 2015).[21]   The *Hughes*, *Rolwing*, and *Spalding* decisions establish the modern broad interpretation and application of Section 516.110 described above.  Moreover, in *Spalding*, the Supreme Court of Missouri stated that the ten-year statute of limitations can apply to indemnity contracts and made clear courts must examine "[t]he particular terms of each contract . . . in accord with this Court's analysis set out in" *Rolwing* "to determine which statute of limitations applies." *Spalding*, 463 S.W.3d at n.2.  One of the examples provided by the Supreme Court of Missouri in *Spalding* is a case where the Eighth Circuit applied the ten-year statute of limitations to an insurance policy, and in doing so, gave broad interpretation to Section 516.110. *See id*. (citing *Johnson v. State Mut. Life Assur. Co. of Am.*, 942 F.2d 1260, 1263-64 (8th Cir. 1991)).[22]

This Court must predict which statute of limitations the Supreme Court of Missouri would apply to Monsanto's claims.  *White v. CitiMortgage, Inc.*, 864 F.3d 924, 927-28 (8th Cir. 2017).  Monsanto respectfully submits that based on the plain language of Section 516.110, as well as *Hughes*, *Rowling*, and *Spalding*, the Supreme Court of Missouri would apply the ten-year statute of limitations in Section 516.110 to Monsanto's breach of contract claims.  Monsanto's claims are clearly timely under Section 516.110.

---

[21] *See Burns & McDonnell Eng'g Co. v. Torson Const. Co.*, 834 S.W.2d 755, 757 (Mo. Ct. App. 1992) (applying Section 516.120 because the parties agreed it provided the application limitations period); *In re W. Robidoux, Inc.*, No. 19-50505, 2022 WL 256805 at *7 (Bankr. W.D. Mo. Jan. 27, 2022) (applying Section 516.120 without analysis and citing *Burns & McDonnell* as support); *Discovery Grp. LLC v. Chapel Dev., LLC*, 574 F.3d 986, 988 (8th Cir. 2009) (applying Section 516.120 because the parties agreed it provided the limitation period); *Superintendent of Ins. Of State of N.Y. v. Livestock Market Ins. Agency, Inc.*, 709 S.W.2d 897, 899-902 (Mo. Ct. App. 1986) (applying narrow interpretation that is directly contrary to *Hughes*, *Rowling*, and *Spalding*); *Federated Mut. Ins. Co. v. Gray*, 475 F. Supp. 679, 681 (E.D. Mo. 1979) (limitations not at issue but court cites Section 516.120 without discussion or analysis); *Kneibert Clinic, LLC v. Smith*, No. 105CV86 FRB, 2007 WL 956634 at *6 (E.D. Mo. Mar. 28, 2007) (citing *Federated Mut.* without discussion).

[22] The Eighth Circuit also noted that "[t]he Missouri courts have consistently applied the ten-year statute of limitations to suits upon insurance policies." *Johnson*, 942 F.2d at 1263-64 (citing cases).

Monsanto's claim are still timely even if the Court were to apply the five-year statute of limitations in Section 516.120.  Accrual of breach of contract claims under Missouri law is governed by Section 516.100.  Section 516.100 states in pertinent part that a claim for breach of contract "shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, ***if more than one item of damage, then the last item, so that all resulting damages may be recovered, and full and complete relief obtained***."  RSMo. § 516.100 (emphasis added).  It is well-settled under Missouri law that a claim for damages for a breach of the duty to indemnify are not sustained and capable of ascertainment until the indemnitee suffers actual loss.[23] *See Spalding*, 463 S.W.3d at 777 ("In a case involving a contract of indemnity against loss, the claim accrues when the indemnitee sustains actual loss."); *Burns & McDonnell Eng'g Co.*, 834 S.W.2d at 759 (holding claim for indemnification against both "loss" and "liability" does not accrue until a final determination of all items of damage); *see also Discovery Grp. LLC v. Chapel Dev., LLC*, 574 F.3d 986, 989 (8th Cir. 2009) (claim for indemnity not barred by statute of limitations because the underlying litigation was unresolved and not all resulting damage was sustained and capable of ascertainment).[24]

Monsanto alleges that Defendants breached the Special Undertaking Contracts by refusing to defend and indemnify Monsanto in the underlying PCB lawsuits giving rise to separate items of damage.  Monsanto's breach of contract claims are therefore timely even under the five-year statute of limitations in Section 516.120 because "the last item[s]" of damage under the Special

---

[23] There is no question that the Special Undertaking Contracts require Defendants to indemnify Monsanto against both "loss" and "liability."  *See* Ex. 1-6 to FAP, (ECF #4-1-6); *Burns & McDonnell Eng'g Co. Inc.*, 834 S.W.2d at 758-59 (finding indemnification agreement that required indemnification against "all claims, damages, losses and expenses including attorney's fees" indemnified the plaintiff from "both loss and liability").

[24] CDE's argument that Monsanto's claims accrued for purposes of the statute of limitations when CDE rejected tender is unsupported and directly contrary to this well-established Missouri law.

Undertaking Contracts were not "sustained and capable of ascertainment" until each underlying PCB lawsuit was completely resolved and Monsanto suffered "actual loss"—i.e., Monsanto actually paid a judgment or settlement.[25]  The allegations in the FAP do not clearly establish that Monsanto paid any judgment or settlement in *any* of the underlying PCB lawsuits before August 3, 2017.[26]

 B. <u>Monsanto's Contribution Claim Is Timely</u>.

 Monsanto's contribution claim is timely because such claims accrue for purposes of the statute of limitations[27] in the same manner as indemnification claims under Missouri law.  *See, e.g.*, *Greenstreet v. Rupert*, 795 S.W.2d 539, 542 (Mo. Ct. App. 1990) (applying case law "involv[ing] an indemnity claim" to determine when statute of limitations accrued for contribution action); *Safeway Stores, Inc. v. Raytown*, 633 S.W.2d 727, 732 (Mo. banc 1982) (same); *Nuspl v.*

---

[25] The Court should reject CDE's apparent attempt to impose distinct limitations periods on Monsanto's claims for breach of the duty to defend and the duty to indemnify.  Monsanto plead those breaches in separate counts, but both claims are for breach of the Special Undertaking Contracts.  In the event the Court were to consider the claims separately for purposes of the statute of limitations (which it should not under Missouri law), Monsanto respectfully submits that the Supreme Court of Missouri would adopt the majority approach that claims for breach of the duty to defend do not accrue for purposes of the statute of limitations under the underlying case is terminated.  *See, e.g. Narragansett Elec. Co. v. Am. Home Assur. Co.*, 999 F. Supp. 2d 511, 518 (S.D.N.Y. 2014) (holding that the Rhode Island Supreme Court would adopt the majority view that a claim for breach of a contractual duty to defend accrues upon final judgment against the insured and collecting cases); *Wiseman Oil Co. v. TIG Ins. Co.*, 878 F. Supp. 2d 597, 601–02 (W.D. Pa. 2012) (characterizing the rule that the statute of limitations on an action for breach of a contractual duty to defend does not begin to run until termination/judgment against the insured in the underlying litigation as "the clear majority rule."); *Brannon v. Cont'l Cas. Co.*, 137 P.3d 280, 285 (Alaska 2006) ("A majority of the courts examining this issue have determined that a cause of action for breach of the duty to defend accrues "with the termination of the underlying litigation which the insurer refused to defend."); *see also* 3 Susan M. Popkin, Law and Prac. of Ins. Coverage Litig. § 43:16 ("In most jurisdictions, a cause of action for breach of the duty to defend does not accrue until the underlying action against the insured is concluded, including the final determination of any appeal that may be taken from the judgment."); Jane Draper, Annotation, *Limitation of Action Against Insurer for Breach of the Contract to Defend*, 96 A.L.R.3d 1193, § 2(a) (Originally published in 1979) (same); Steven Plitt, et al., 17 Couch on Ins. § 236:102 (3d ed.) (same).

[26] KAVX's reference to Paragraph 176 of the FAP is unavailing. The allegation there that Monsanto "agreed to pay a significant amount to settle all of the then-pending Food Chain Cases" "[i]n September 2016" (FAC, (ECF #4) ¶ 176) does not clearly establish the *date* when Monsanto *actually paid* the Food Chain settlement. The same is true of the other settlements referenced in the FAP.  *See* FAC, (ECF #4) ¶ 187 (alleging that Monsanto agreed to pay substantial sums to settle Water Cases brought by certain municipal entities in June 2020, and also entered into separate settlements with attorneys general of certain states).

[27] The statute of limitations applicable to Monsanto's contribution claim is five-years.  RSMo. § 516.120.

*Missouri Med. Ins. Co.*, 842 S.W.2d 920, 925 (Mo. Ct. App. 1992) (Blackmar, S.J., concurring in part and dissenting in part) ("[O]ur Supreme Court [has] held that, when one has *a right of contribution or indemnity* against another, the statute of limitations does not begin to run until the party seeking indemnity is obliged to make good on the obligation for which reimbursement is sought." (emphasis added)); *Com. Union Assur. Co. of Australia, Melbourne v. Hartford Fire Ins. Co.*, 86 F. Supp. 2d 921, 930 (E.D. Mo. 2000) (applying Missouri law and holding limitations period for contribution claim did not begin to run until plaintiff had paid last of multiple settlement payments); *State ex rel. Hilker v. Sweeney*, 877 S.W.2d 624, 627 (Mo. banc 1994) (holding same where party seeking contribution was subject to judgment instead of settlement agreement).

C.   Monsanto's Negligence Claim Is Timely.

The Court should reject Defendants' argument that Monsanto's negligence claim is untimely for two reasons.  First, at this stage of the proceedings, the Court should not determine the factual issue of when Monsanto's negligence claim accrued.  Tort claims do not "accrue as soon as damages occur" under Missouri law.  *Powel v. Chaminade College Preparatory, Inc.*, 197 S.W.3d 576, 582 (Mo. 2006).  Rather, "the statute of limitations begins to run when the 'evidence was such to place a reasonably prudent person on notice of a potentially actionable injury.'" *Id.* (quoting *Bus. Men's Assurance Co. of Am. v. Graham*, 984 S.W.2d 501, 507 (Mo. banc 1999)). Whether the filing of the underlying PCB lawsuits was sufficient to place a reasonably prudent person on notice of Defendants' negligence is a question of fact that the Court should not resolve on a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  Defendants General Electric Co. and Paramount seem to agree as they did not move to dismiss Monsanto's negligence claim as untimely.

Second, Monsanto's negligence claim is timely because Defendants' releases of PCBs into the environment are a continuing wrong that continues to create new and fresh injuries.  *See Cook*

*v. DeSoto Fuels, Inc.*, 169 S.W.3d 94, 105 (Mo. Ct. App. 2005) (applying continuing wrong rule to claim based on existence of a continuous, ongoing, intermittent, or repeated flow or migration of environmental contaminants); *see also Twin Chimneys Homeowners Ass'n v. J.E. Jones Const. Co*., 168 S.W.3d 488, 502 (Mo. Ct. App. 2005). The allegations in the FAP are not limited to Defendants' historic PCBs releases. Rather, Monsanto broadly alleges that Defendants "breached their respective duties of care by allowing PCBs purchased from Old Monsanto both before and after signing the Special Undertaking Agreements to be released into the environment through product manufactured by Defendants and/or their predecessors-in-interest, disposal of PCB-containing products, leaks, spills, dumping and disposal of industrial wastes, and through other means." FAP, (ECF #4) ¶ 288. This allegation clearly includes PCBs that continue to enter the environment at Defendants' current and former manufacturing and maintenance/repair sites, and from Defendants' products. Defendants' continued releases of PCBs into the environment cause Monsanto to incur new and additional injuries.[28]

## III.    Monsanto' Negligence Claims Are Sufficiently Pleaded and Are Not Barred by the Economic Loss Doctrine.

### A.    Monsanto Sufficiently Alleges That Defendants Breached a Duty to Monsanto.

KAVX argues that Monsanto does not adequately plead the elements of a negligence claim under Missouri law. The Court should reject this argument because the FAP clearly and sufficiently alleges duty (FAP, (ECF #4) ¶ 287), breach (*id.* ¶ 288), causation (*id.* ¶ 289), and

---

[28] Defendants' reliance on *Duvall* is misplaced because the alleged damages in that case arose from a single alleged wrong (i.e., the provision of legal services to the plaintiff in a single year). *See Duvall v. Yungwirth*, 613 S.W.3d 71, 81-82 (Mo. Ct. App. 2020). Monsanto's damages arose from multiple releases of PCBs by Defendants over time that continue today and that have caused various different injuries to Monsanto. Indeed, Monsanto continues to be sued by new PCB plaintiffs for different alleged injuries and accordingly continues to discover new items of damages resulting from Defendants' various negligent releases of PCBs over time.

damages.  *Id.* ¶ 289-291.  KAVX's assertions that these allegations are somehow insufficient are conclusory and unsupported.[29]  Indeed, it is notable that no other Defendant made such arguments.

KAVX's narrow view of Monsanto's negligence claim (*see* KAVX Mem. (ECF #83) 17-19) is also not supported by the FAP.  Monsanto's negligence claim is much broader than the specific releases of PCBs by KAVX in New Bedford, Massachusetts referenced in the FAP.  For example, Monsanto alleges that Defendants breached their respective duties to Monsanto by releasing PCBs into the environment "through products manufactured by Defendants."  FAP, (ECF #4), ¶ 288.  KAVX sold its products throughout the United States (*see id.* ¶¶ 105, 110), and those products have been a major source of PCB contamination.  *See id.* ¶¶ 104, 148.  Monsanto further alleges that as of 1976 the EPA estimated that at least 190 million pounds of PCBs in the environment came from capacitor production waste and obsolete equipment in landfills and dumps.  *See id.* ¶ 108.  Finally, Monsanto alleges that KAVX's predecessor (Aerovox) used the third most PCBs in U.S. capacitor manufacturing history (*id.* ¶ 110) and that the amount of PCBs currently in the environment that were released from capacitors was predicted to increase due to the cessation of PCB production and the longer product lifetime for capacitors.  *See id.* ¶ 111.

B.    Monsanto's Negligence Claim Is Not Barred by the Economic Loss Doctrine.

The Court should reject Defendants' economic loss arguments because Monsanto's negligence claim is not premised on the Special Undertaking Contracts or a duty or obligation arising from or under the Special Undertaking Contracts.  *See Laidlaw Waste Systems, Inc. v. Mallinckrodt, Inc.*, 925 F. Supp. 624, 635-36 (E.D. Mo. 1996) (economic loss doctrine did not bar claim where the plaintiffs sought "damages above and beyond any mere disappointed commercial

---

[29] The lone case relied on by KAVX to support its argument is clearly inapposite. *See Fambrough v. General Motors, LLC*, 2020 WL 13518495 at *2 (W.D. Mo. Apr. 6, 2020) (dismissing negligence claim where, unlike here, the plaintiff failed to even mention the word "duty" in their complaint).

expectations or desire to enjoy the benefits of their alleged agreement with defendants"). Monsanto's negligence claim is much broader than its breach of contract claims; it is premised on Defendants' repeated failures to exercise reasonable care in their use, handling, and storage of PCBs, despite the numerous warnings from Old Monsanto about the hazards PCBs posed and Defendants' (or their predecessors') knowledge of those hazards. *See, e.g.*, FAP, ¶¶ 33, 35-36, 39, 41, 46, 57, 68, 77, 86, 92, 99.  Defendants' negligent releases of PCBs harmed the environment and caused Monsanto to be sued in the underlying PCB lawsuits.  Because Monsanto's negligence claim does not stem from the Special Undertaking Contracts (or any other contract), the economic loss doctrine simply does not apply.  *See School Dist. Of City of Independence, Mo., No. 30 v. U.S. Gypsum Co.*, 750 S.W.2d 442, 455-57 (Mo. Ct. App. 1988) (economic loss doctrine did not bar claims relating to products that "threaten[] a substantial and unreasonable risk of harm by releasing toxic substances into the environment"); *Web Innovations & Tech. Servs., Inc. v. Bridges to Digital Excellence, Inc.*, 69 F. Supp. 3d 928, 933 (E.D. Mo. 2014).[30]

## IV.    Monsanto Has Sufficiently Alleged That Gillette Breached Its Duty to Defend.

Gillette argues that it cannot be held liable for breach of the duty to defend because some of the underlying PCB lawsuits were resolved before Monsanto tendered them to Gillette.  Gillette Mem., (ECF #93) at 9-10.  Relatedly, Gillette argues that Monsanto cannot recover attorneys' fees it incurred prior to May 13, 2022 from Gillette.  *See id*. at 13-14.  Monsanto agrees that its breach of contract claims against Gillette are uniquely limited by the date of its initial tender to Gillette.

---

[30] Although a motion to dismiss *may* raise the economic loss doctrine as grounds for dismissing a tort claim, Missouri courts proceed with caution when considering such an argument, often choosing to wait to resolve it until the arguments have been more "sufficiently developed" at a later stage of the litigation. *See Femmer v. Sephora USA, Inc*., No. 4:20 CV 676 JMB, 2021 WL 735685 at *11 (E.D. Mo. Feb. 25, 2021).  This is because it is often not clear from the face of a pleading whether the economic loss doctrine operates to bar the claim, and "[s]tate and federal case law relating to the economic loss doctrine in Missouri is fairly complex and somewhat contradictory." *Bruce Martin Const., Inc. v. CTB, Inc.*, No. 1:10CV205 SNLJ, 2012 WL 718624 at *3 (E.D. Mo. Mar. 6, 2012), *aff'd*, 735 F.3d 750 (8th Cir. 2013).

*See Monsanto Co. v. Gould Electronics, Inc.*, 965 S.W.2d 314, 318 (Mo. Ct. App. 1998).  But that does not mean Monsanto's claims should be dismissed.  Although some of the underlying PCB lawsuits were resolved prior to Monsanto's tender to Gillette, others were still pending (and remain pending).  *See* FAP, (ECF #4) ¶ 5 ("Many PCB Lawsuits remain pending against Plaintiffs . . . .").  Gillette's refusal to defend Monsanto in underlying PCB lawsuits that were pending at the time of Monsanto's tender provides a sufficient basis for Monsanto to assert a plausible claim for breach of the duty to defend by Gillette with regard to those cases, even if those cases had been pending for a period of time prior to being tendered.  Monsanto is also entitled to indemnity in *all* the underlying PCB lawsuits irrespective of when it tendered the claims to Gillette.  The only limiting factor, pointed out by Gillette, is that Monsanto cannot recover its attorneys' fees from Gillette in underlying PCB lawsuits that were fully resolved prior to Monsanto's tender to Gillette.  *See Gould*, 965 S.W.2d at 318.

In short, these arguments by Gillette do not provide a basis for the Court to dismiss Monsanto's breach of contract claims against Gillette.  Rather, and at best, they provide a basis for the Court to dismiss (i) the portion of Monsanto's duty to defend claim against Gillette that seeks the recovery of defense costs in underlying PCB lawsuits that were fully resolved prior to Monsanto's tender to Gillette, and (ii) the portion of Monsanto's indemnification claim against Gillette that seeks the recovery of attorneys' fees incurred by Monsanto prior to Monsanto's tender of the underlying PCB lawsuits to Gillette.

## CONCLUSION

For the foregoing reasons, Monsanto Company, Pharmacia, LLC, and Solutia, Inc. respectfully request that the Court deny Defendants' Motions to Dismiss.

Respectfully Submitted,

THOMPSON COBURN LLP

By: /s/ Christopher M. Hohn
    Christopher M. Hohn #44124
    Nicholas J. Lamb #33486
    David M. Mangian #61728
    Nicholas Schnell #73932
    Brittney K. Mollman #65745
    One U.S. Bank Plaza
    St. Louis, Missouri 63101
    (314) 552-6000 (Telephone)
    (314) 552-7000 (Facsimile)
    chohn@thompsoncoburn.com
    nlamb@thompsoncoburn.com
    dmangian@thompsoncoburn.com
    nschnell@thompsoncoburn.com
    bmollman@thompsoncoburn.com

*Attorneys for Plaintiffs Monsanto Company, Pharmacia, LLC, and Solutia, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing has been filed with the Court for service on all counsel of record via the Court's CM/ECF system on June 9, 2023.