Exhibit F

N. S. BERGEN - B2SL

May 22, 1972

P. R. MALLORY CO.
JOHN COX, PURCHASING AGENT

C. Paton - B2SN
E. L. Shimley - AKRON 10:0

T. L. Gossage - B2SL


John Cox called for the third time today requesting that
a Monsanto salesman visit with him to explain the price
increases on dielectric Aroclors.

This request has been relayed several times to Cumming
Paton in the past and he has talked with Shimley, but we
still have an unsatisfied customer.

According to Mr. Cox, to make things even worse, today
they got their first freight bill and he said neither he
nor the plant people was aware that we'd gone to FOB
pricing.  He was also unaware of no more trip leasing of
tankcars.

Mallory is too big a customer to be handled in this manner
and I want a complete report on the following items:

1) Who called on their Waynesville, Tenn. plant and when?
2) What was the information given at that time?
3) Give me a copy of the information we sent to them on
   the price increase.
4) An immediate personal visit should be made to Mallory
   either by Shimley or Rego, and preferrably both.
5) I'd like to have a report of this call (#4 above)
   indicating the customer's reaction to our
   explanation for our poor communications.


N. S. BERGEN

/jf

0422153

February 22, 1973


Mr. J. R. Wood
Corporate Purchasing
P. R. Mallory & Co., Inc.
3029 E. Washington Street
Indianapolis, Indiana 46206

Dear Mr. Wood:

I have received your Purchase Order No. 36127
of February 13 requesting Aroclor 1016 stan-
dards and am enclosing a Request for Sample
Quantity of Product Containing PCBs. If you
will return the completed form to me I will
make arrangements to have this standard for-
warded to you.

If I can be of further service, please let me
know.

Sincerely,



W. B. Papageorge
Manager
Product Acceptability

WBP/bt

Enclosure


0003030

**Monsanto**

FROM (NAME & LOCATION): **B2SC   P. G. Benignus**

DATE: **June 14, 1974**

SUBJECT: **Phone Call Report**

REFERENCE:

TO: **C. PATON**

CC: H. S. Bergen
T. L. Gossage
W. R. Richard - T3A
R. H. Munch --- T1B
J. G. Bryant -- T1B
D. L. Mellon -- 1010
W. C. Moore --- 1010

PHONE CALL FROM:
P. R. Mallory
3029 East Washington St.
Indianapolis 6, Indiana

PERSONS CALLING:
Lyle Shoot
Bernard Schock

Summary

These people phoned to get our present views on PCBs relative to the EPA effluent limits - hearings in Washington and will Monsanto go to court and will we continue to supply, etc.

Mallory are not along far enough to make judgments about non-PCBs. They strive to keep informed and plan to move slowly pending a possible major impact.

They gave me their following views about non-PCBs at this time:

1. GE's units are larger than at first, but within EIA specs. To the contrary, Mallory feel need to step up the paper and offer a larger size.

2. Notwithstanding pressure from their sales department Mallory will not go to market soon. Plant conversion would be required. This is expensive.

3. Mallory have life-tested GE and Sprague commercial non-PCB units but only in limited numbers (2s or 3s). Mallory finds them not as good as similar units made in Mallory's laboratory using our non-PCBs.

4. Mallory finds 1588 to vaporize much more than 1475 and for this reason say that it is much worse than 1475, in handling.

5. So far performance-wise 1475 and 1588 look comparable but Mallory emphasize that especially with 1588 they have not yet gotten down to reclaiming and recycling.

   This is limited laboratory experience - not plant.

0452664

6. Mallory are a long way from assessing these things
   on a plant basis.

7. They strive to keep talking with Monsanto and asked
   relative to my retirement that we advise about
   change in contacts.

P. G. Benignus

cs

**Monsanto**

FROM (NAME & LOCATION):   C. Paton – B2SC

DATE:   September 10, 1974

SUBJECT:   Mallory/MCS 1489

REFERENCE:

cc:   H. R. Ford – 1070
     C. L. Clay – 1070
     Mallory af

TO   :   D. L. Mellon – 1010

John Cox, purchasing agent of Mallory in Indianapolis called.  He wanted pricing and availability informa- tion on MCS 1489.  Apparently R&D in Indianapolis are requesting this and John feels they may soon be in a position to buy Aroclor 1489.

I quoted:

| | | |
|---|---|---|
| Bulk: | $0.47/lb. | |
| T/L: | 0.51 | |
| LTL: | 0.53 | |

All prices are FOB Sauget.

I told him we would have T/L drum availability in December and bulk could probably be arranged 2-3 months after that.  I told him we'd be happy to see this go commercially but we needed to get as much lead time as possible.  John agreed.

I suggest we start making calls on Mallory at Indiana- polis.  I know that Ray Ford would welcome this.  Further- more, Mallory complained (just before your time) to Howard Bergen about lack of Monsanto calls at headquarters!

There are several other reasons why we need calls on Indianapolis as well as Waynesboro.

1.  Mallory have bought a capacitor company in Brazil and will be using PCB come spring 1975.  You can help us get Aroclor 1016 into the Brazilian plant.

2.  All R&D on new fluids is done at Indianapolis.  R&D personnel have visited St. Louis but we thought they were more interested in MCS 1588/1475 (our non-PCB types).  Has there been a switch in emphasis?

3.  Mallory will be well represented at our dielectric symposium.  In attendance will be:

Indianapolis:   Lyle Shoot (R&D)
                Arnold Doty (Tech. Service Lab)
                Dr. Donald Wilson (Environmental Control)
                Mark van Buskirk (Engineering)

Waynesboro:   Robert Vaught

0452661

-2-

Mark van Buskirk is very pro-Aroclor capacitors and has accepted an invitation to be on a panel as part of our symposium agenda.

Dave, I'm sure Mike Petrilli will do his usual good job here. What we need to find out is:

1. How real is Mallory's interest in Aroclor 1489?

2. How much of their Aroclor 1016 could swing to 1489?

3. What could the timing be?

4. Will the move be gradual, ie. 1-2 drum trials, T/L and then bulk or what?

5. How specific can you get Mallory to be on why they like 1489? Any drawbacks?

6. How are they coming along on their non-PCB evaluations (MCS 1475/1588). Can we expect any commercial sales soon?

7. Does Waynesboro know of R&D programs?

In turn I think Carl should find out if Waynesboro is up to date on R&D activities. If they are, we should get their answers to the above questions and see if everything is consistent.

Thank you.

C. Paton

CP/cc

P. S.  John Cox has been with Mallory 40 years and retires in 6 months.                    CP

0452662

# Monsanto

FROM (NAME & LOCATION): **D. Wood — St. Louis (B2SC)**

| | | |
|---|---|---|
| DATE | October 30, 1974 | cc: J. G. Bryant — T1J |
| | | C. L. Clay — 1070 |
| SUBJECT | Report of Meeting with | H. R. Ford — 1070 |
| | MALLORY CAPACITOR | D. R. Mellon — 1010 |
| REFERENCE | | W. C. Moore — 1010 |
| | | R. H. Munch — T1B |
| TO : | FILE | C. Paton |
| | | W. R. Richard — T3F |

DATE OF VISIT: October 29, 1974 (at St. Louis)

FOR MALLORY:   Mark Van Buskirk ⎫   Applicational
               Windsor Waits    ⎭   Engineering

FOR MONSANTO:  J. G. Bryant
               R. H. Munch
               D. Wood

Total Usage:   1973              1,547 M lbs.
               1974 Sept.          911
               1974 1st half        726
               1974 3rd quarter     185
               Budget 1975        1,000

Mark Van Buskirk attended the Dielectrics Seminar in St. Louis
but was not able to participate in the Research/Plant tour.
Since he had meetings in St. Louis with motor producers on
Monday, he asked if he could meet with us and have the tour
he missed. Windsor Waits is taking over from Mark as Appli-
cational Engineer liquid capacitors. Mark is newly assigned
to special projects including new PCB capacitors.

1.  Non-PCB Units

    Mallory position is unusual in that 10-12% of their volume
    is in data process power capacitors and Univac/Control
    Data and IBM are all actively seeking non-PCB units be-
    cause of (a) exports to Japan where PCB is banned and
    (b) inventory production requires standardization on non-
    PCB units.

    Univac want all non-PCB by January 1, 1975 and thus pres-
    sure is on Mallory to move ahead with MCS-1475 run.

0452656

IN - 10 REV. 1/72

2.  In spite of previous experience with MCS-1588, our visitors expressed interest in repeat trials once 1475 pilot run was completed.

3.  Firmly convinced that A-1016 is better as di-electric than new non-PCB fluids, and hope to see continued use in bulk of production.

4.  Main areas motor run for air conditioners/general appliance motor run and data process power capacitors, estimated about 60/30/10%.

    Central air conditioner market has not sagged yet but they expect downturn.

    Room airconditioners are way off.

    General Motor area steady.

    Data process will move to non-PCB early 1975.

5.  In order to familiarize myself with their organization, I asked for details (attached).

    Underlined are people we should regularly meet. Dotted are contacts to be made intermittently but important.

6.  Some projects may be introduced into Burlington Res in November which could be significant for us. Mark would not divulge nature but need to check him or Ed Moss early December.

7.  MCS-1489 - Non-PCB has top priority now but in view of potential metallized mylar interest, MCS-1489 should be raised again January, 1975 latest.

8.  1975 budget seems high by possibly 100 M pounds. Need to re-check December, 1974 with John Cox.

9.  Production cycle for a/c units starts October/November, ends about June. Note hot humid May tends to give good a/c season. If stays cool till June, they normally expect bad a/c year.

D. Wood

Attachment

0452657

cc:  R. E. Hatton
M. A. Petrilli

P. R. MALLORY CAPACITOR COMPANY
INDIANAPOLIS, INDIANA

DATE OF CALL:  2/20/76

TO:          David Wood

CONTACTED FOR MALLORY:  Bud Dibble, Division Gen. Mgr.
                        Len Baker, Purchasing Agent

OBJECTIVE:  Discuss reasons for price increase announced
            February 13.

NOTE:       Joint call with David Wood

RESULTS:

Dibble did not argue with the amount of the increase as
long as everybody in the industry was getting the same
treatment.  He strongly contested the timing of the increase.
He pointed out, with such short notice, Mallory can't recapture
the price increase.  He asked that we consider delaying the
price increase to May 1 to allow the industry to pass the
increase on to their customers.

Results MCS 1238

Dibble indicated that their MCS 1238 program is still at day 0.
Since Mallory has been working with MCS 1475, Mallory will
either clean out this unit and use it for 1238 or they will
establish a new unit at the plant to evaluate MCS 1238.

Bud Dibble is forecasting a very strong year for 1976 in
terms of consumption of Aroclor 1016._ He forecasted that they
will use 116 M lbs. per month or 1.4 M̄ for the entire year
of 1976.  The month of March will be a big month with probably
two cars being required in March.  Their projection is to be
taking a tank car every three weeks for most of 1976.

FUTURE ACTION:

Jim Alley:  Phone Dibble first half of March to obtain decision
   for 1238 unit.  Determine if Jim Bryant can be of assistance
   on site in getting Mallory going with their MCS 1238
   evaluation unit.  Call at Indianapolis in April.

J. A. Alley

dw

0031227

 **MALLORY CAPACITOR COMPANY**
a division of P. R. MALLORY & CO. INC.
3029 E. Washington St., Indianapolis, Indiana 46206; Telephone: 317-636-5353 / Twx: 317-634-121

PLEASE REPLY TO: Post Office Box 372, Indianapolis, Indiana 46206

March 16, 1976

Mr. Dave Wood
Monsanto Chemical Company
800 North Lindenbergh Boulevard
St. Louis, MO   63166

Dear Dave:

Enclosed find three groups of questions which we propose for discussion during our pending conference telephone call.

1. Three questions presented by Dr. S. P. Wolsky, Mallory Vice President in charge of our Laboratory for Physical Science located at Burlington, Mass, as well as Vice President for Environmental Affairs.

2. Four questions regarding employee physicals presented by Suzanne Bellamy, a member of the Mallory Legal Staff.

3. A description of our impregnation cycles and four miscellaneous questions presented by the writer.

Will phone you in a few days to set up conference call.

Sincerely,

*O P Dibble*

C. P. Dibble
General Manager

CPD/pld

P.S.  Just received call from James Alley stating that Monsanto personnel involved now request Mallory personnel plan to have meeting at St. Louis.

Will advise after contacting Dr. Wolsky.

0091336

 **MALLORY CAPACITOR COMPANY**
a division of P. R. MALLORY & CO. INC.
3029 E. Washington St., Indianapolis, Indiana 46206; Telephone: 317-636-5353/Twx: 317-634-121.

PLEASE REPLY TO: Post Office Box 372, Indianapolis, Indiana 46206

Personnel exposure to PCB's in our plant is confined to the impregnation room.

Presently, exposure is either one of two forms:

A. Liquid

Capacitors, after completion of the impregnation cycle, are removed from the tank by use of a lift truck, with all external surfaces of capacitors, as well as metal baskets containing capacitors and inner walls of impregnation tanks, covered with oil.

They are transported to and transferred from the lift truck to a roller conveyor where operators wear rubber gloves and aprons. The lift truck and conveyor is equipped so that practically all spillage or drippings of Aroclor is contained.

B. Vapors

The fill hole is solder-closed on the roller conveyor. The capacitors are then transferred to other baskets which are attached to an overhead conveyor, which travels through a trichlorethelene wash, and then through a gas fired oven to test for leakers. The overhead conveyor is continuous and later presents finished units to the final test.

The station at the "solder-fill hole" closing operation is ventilated so that operators do not inhale an excessive amount of fumes. Operators wear rubber gloves and aprons at every station where wet capacitors are handled prior to trichlorethelene cleaning.

Recent air sampling indicates atmosphere to be less than $.5 \text{ mg/m}^3$ with most samples reading approximately $.2 \text{ mg/m}^3$.

A new proprietary process, scheduled to be fully in operation by April 30, 1976, will result in having all external surfaces, including capacitors, baskets and inner walls of impregnation tank, completely free of Aroclor liquid prior to opening impregnation tanks.

This process has been successfully implemented and is in operation on 20% of our impregnation tanks presently.

Case: 4:23-cv-00204-HEA   Doc. #: 105-7   Filed: 06/09/23   Page: 13 of 22 PageID #: 5068



When completely implemented (April 30), all external surfaces of capacitors, baskets and inner walls of the impregnation tanks will be completely free of Aroclor liquid and vapors should approach "0."

Plant management is particularly apprehensive toward announcing an employee physical program.

They argue that such a program in a community the size of Waynesboro, Tennessee (population 1,700-1,800) by its complexity requires a longer implementation time.  That the new process, scheduled for completion on April 30, results in a closed system with minute amounts of vapor

They further argue that time required to implement an employee physical program may approximate date of withdrawal of Aroclor from the marketplace by Monsanto.

Questions:

1. With the above knowledge and description of today's process under which the TLV atmosphere readings are under .5 mg PCB/m$^3$ as compared to OSHA TLV of 1.0 mg PCB/m$^3$, and anticipating that under the new process, which will be implemented by April 30, 1976, that the concentration of PCB's will be .1 mg/m$^3$ or less, do you feel that employee physical exams are warranted?

2. NIOSH is currently surveying Aerovox, examining their employee health records over the past 25 years.  Our Waynesboro plant has been in operation approximately six years.

   Should a decision regarding the instituting of physicals be delayed until the NIOSH-Aerovox investigation is available?

3. Concern regarding dioxanes has been raised, on heating PCB's.

   Under what conditions are they formed?  Is air and oxygen also required?  If so, are dioxanes a concern under Mallory's present impregnation process?  Under Mallory's new impregnation process.

3/16/76
CPD/pld

0091338



## MALLORY CAPACITOR COMPANY

a division of P. R. MALLORY & CO. INC.
3030 E. Washington St., Indianapolis, Indiana 46206; Telephone: 317-636-5353/Twx: 317-644

**PLEASE REPLY TO: Post Office Box 372, Indianapolis, Indiana 46206**

### JUNE 9, 1976

MR. JACK FITZGERALD
VICE PRESIDENT
MONSANTO INDUSTRIAL CHEMICAL COMPANY
800 NORTH LINDBERG BOULEVARD
ST. LOUIS, MO   36166

DEAR JACK:

THIS A.M. YOUR JAMES ALLEY, MONSANTO SALES REPRESENTATIVE, CALLED ON OUR COMPANY FOR WHAT WE ASSUMED TO BE A ROUTINE BUSINESS CALL. IT IS ALWAYS A PLEASURE TO SEE JIM AS HIS RELATIONSHIP WITH PURCHASING AND ENGINEERING PERSONNEL HAS BEEN EXCELLENT AND HE IS HIGHLY REGARDED.

DURING THIS VISIT, JIM INFORMED US THAT PRIOR TO JULY 1 WE WOULD BE VISITED BY DAVID WOOD AND HIMSELF AT WHICH TIME THEY WOULD ADVISE US OF ANOTHER INCREASE ON 1016 IN THE NEAR FUTURE.

ADDITIONALLY, DURING THIS VISIT, I BECAME AWARE THAT 1475 NON-PCB OIL HAD BEEN INCREASED FROM $1.22 PER LB. TO 1.92 PER LB. SINCE OUR LAST PURCHASE.

NEEDLESS TO SAY, I SUBJECTED JAMES ALLEY TO AN UNMERCIFUL INQUISITION. I INDICATED TO HIM THAT DAVID WOOD, WHOM VISITED WESTINGHOUSE--BLOOMINGTON THE PREVIOUS DAY WITH JIM, DID NOT SHOW MALLORY THE COURTESY, NOR HAVE THE COURAGE, TO VISIT US WITH JIM AND PERSONALLY ADVISE MALLORY OF THESE INCREASES.

THIS SITUATION IS PARTICULARLY DISCONCERTING TO ME AS OUR COMPANY HAS ALWAYS BEEN AN ALLY OF MONSANTO AND HAS INDICATED FROM THE VERY BEGINNING THAT WE CHOSE TO LINK OUR FUTURE WITH MONSANTO ON WHATEVER FLUID THEY SELECTED AS THE DIELECTRIC IMPREGNANT.

ALTHOUGH REASONS SUGGESTED FOR THESE INCREASES ARE PLAUSIBLE, ONE CANNOT DISMISS THE FACT THAT MONSANTO HAS NO COMPETITOR IN THIS PRODUCT WITHIN THE UNITED STATES.

I HAVE COPIES OF YOUR PRESENTATION AND ATTENDED THE EPA CALLED MEETING IN WASHINGTON, D.C. ON JANUARY 14, 1976, IN WHICH YOU STATED QUOTE, "IT IS MONSANTO'S DESIRE TO PHASE OUT OF PRODUCTION OF PCB'S, HOWEVER, YOU INTENDED TO DO SO IN A RESPONSIBLE MANNER." UNQUOTE.

0439037

Mr. Jack Fitzgerald               -2-               June 9, 1976

Upon my recommendations, my Company took you at your word then, and we chose to stay with Monsanto with 1016 and whatever Non-PCB substitute they chose, be it 1238, 1475, 1588 or whatever, all of which have since been removed from the market.

Evidently, this was a mistake.

Monsanto's past, present and future pricing policy on PCB 1016 impregnant will result in Capacitor manufacturers, other than G.E., being forced to abandon the manufacture of these products or market a product without having subjected it to a minimal reliability testing program. I foresee no alternative.

Mallory finds itself in this position because I chose to stay with Monsanto and their recommended candidates as substitute materials rather than directing our efforts toward other materials as G.E. and others may have.

Mallory finds itself in this position because I chose to believe Monsanto when you said quote, "We will phase out the manufacturing of PCB's in a responsible manner, when alternate, acceptable materials are available." Unquote.

I do not believe Monsanto's pricing policy on 1016 or 1475 has been responsible.

Do you?

Sincerely,

C. P. Dibble
Vice President - Operations

CPD/PLD

0439038

JUL 12 1976



## MALLORY CAPACITOR COMPANY
a division of P. R. MALLORY & CO. INC.
3029 E. Washington St., Indianapolis, Indiana 46206; Telephone: 317-636-5353/Twx: 317-684-421.

PLEASE REPLY TO: Post Office Box 372, Indianapolis, Indiana 46206

July 9, 1976

Mr. Tom Lafferre
Director of Marketing
Functional Products Group
Monsanto Industrial Chemicals Co.
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166

Dear Tom:

On June 25th, Mr. Glen Baker and myself were visited by your Mr. David Wood and James Alley.

The purpose of the prearranged visit was to discuss with our Company, our forecasted usage of 1016 for the second half of 1976, the years of 1977 and 1978.

We also had the opportunity to discuss with David the previously held EIA Meeting in Chicago, which I was unable to attend, as well as the proposed draft of 307A.  In this regard David indicated that in view of the EPA draft stating "the criterion and standards proposed are for PCB's generically" that Monsanto intended to request permission from the EPA to substitute 1242 for 1016 rather then incinerate.

This, of course, would be beneficial to both Monsanto and their customers, like our Company, as it would be possible to retain present pricing, or hold future increases to a minimum.

David Wood and Jim Alley mentioned during their visit a potential price increase later in the fall.  No date or magnitude was discussed.

Not only the magnitude but perhaps more particularly the frequency of increases has been of concern to our customers as well as our managements.  You may not be aware but many of our purchase contracts with major customers are on a yearly basis, and supplier increases, in between, frequently cannot be recouped, contractionally.

For these reasons, our company would request Monsanto to delay a further increase in 1016 until as near year end as possible.

Would appreciate hearing from you on this matter.

Sincerely,

C. P. Dibble
Vice President, Operations

0148745

Monsanto

J. A. Alley-St. Louis-B2SD

DATE: August 27, 1976                        cc R. E. Hatton

SUBJECT: P. R. MALLORY CO.
BURLINGTON, MASS.

REFERENCE:

TO    :    D. Wood

Mr. Roy Davidson with P. R. Mallory Company, Burlington,
Massachusetts called me on 8-25-76 to request a visit
to St. Louis.  Davidson reports to Dr. Shep Wolsky,
who was recently promoted to Vice President, Research and
Development.  Wolsky now reports directly to the president
of P. R. Mallory Co.

Davidson stated he had phone conversations with you and
with Jim Myers, Monsanto Corporate Engineering, in the
past.  He is doing work for Wolsky on PCBs.

The purpose of Davidson's proposed visit would be to obtain
information on methods Monsanto might recommend or discuss
for detecting PCBs in effluent.  Davidson said they are
interested in detecting ppb.  He said Mallory can detect
to this level, but they are getting a large standard devia-
tion.  Mallory wants to improve their analytical methods
so they can run larger volumes of analyses each week.  They
also want to improve their methods of extraction.

Davidson specifically asked to meet with Jim Myers to learn
what Monsanto is doing and what type of equipment we are
using.  He said a phone conversation with Jim Myers would not
be sufficient.

Davidson indicated Wolsky is pushing him hard to make a trip
to Monsanto.  He described Wolsky as now being in a "very
political" position.  Davidson said a Vice-President of the
Mallory Capacitor Co. also wanted Wolsky's new job.  He
claimed he couldn't recall the name of the Vice President.

I tried to reach Jim Myers and learned he was at Anniston.
Myers'views on such a visit are obviously important.
After contacting Myers, I'll offer a recommendation regarding
the visit.

I plan to discuss this visit with Bud Dibble ASAP (Dibble
out of town).

Jim

Jim Alley

/deb

IN - 10 REV. 1-72                                0091164

# **Monsanto**

————————————————————————————————————SPECIALTY CHEMICALS DIVISION

**MONSANTO INDUSTRIAL CHEMICALS CO.**
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166
Phone: (314) 694-1000

February 21, 1977

Mr. Glen Baker
Director of Purchasing
Mallory Capacitor Company
3029 E. Washington Street
Indianapolis, Indiana 45206

Dear Mr. Baker:

This letter concerns your final order of PCB dielectric
fluid for delivery after May 1, 1977.  The quantities
specified in your order will be part of the final produc-
tion run of this askarel grade.  It will not be possible
for Monsanto to divert this material to another customer.

Because Monsanto cannot ship this material to another
customer, and would therefore have to bear the costs for
raw materials, manufacture and incineration, we will require
your agreement to pay Monsanto, as partial compensation
to Monsanto for the above costs, 50¢/lb. for any portion of
the ordered quantity which is not accepted and paid for by
you.  Such payment, if any, will be due within 30 days of
notice to Monsanto of cancellation or by November 1, 1977,
whichever date is earlier.

We also remind you that PCB fluid shipped under this order
is not returnable to Monsanto.  Disposition of the fluid is
the responsibility of your company.  We expect that the fluid
will be used in your production, or the material will be
moved by your company to an incinerator approved for the
disposal of PCB's.

In recognition that you accept the terms stated above, please
countersign this letter and return it promptly to Monsanto.
Upon receipt of the countersigned letter, Monsanto will,

0021205

Mr. Glen Baker
Mallory Capacitor Company
February 21, 1977
Page 2


after receiving your final order, acknowledge the order,
and undertake to manufacture and ship the product.

All other terms and conditions of sale outlined on our
standard acknowledgement form will apply to your final order.
(A copy of our standard acknowledgement form is enclosed for
your review.)  Nothing in this letter agreement should be
construed as modifying the terms of our indemnification agree-
ment with you.

Yours very truly,

Robert G. Potter
Business Director
Functional Products


/cc


Customer Signature
G. J. Baker
Director of Purchases

Date   March 8, 1977

0021206

Monsanto                                ACK                    ACKNOWLEDGMENT

| SHIPPER'S NO. | DISTRICT | DATE ENTERED | CUSTOMER'S ORDER NO. | | INVOICE DATE | INVOICE NUMBER |
|---|---|---|---|---|---|---|
| TERMS | | | | | DATE SHIPPED | CAR INITIALS AND NO. |

PREPAID OR COLLECT-ROUTING

DELIVERY F.O.B.

| SHIPPED FROM | | WHSE. CODE | BOOKED THRU | | COPIES CODE | CUST FORM | |
|---|---|---|---|---|---|---|---|

**SOLD TO**

**SHIPPED TO**

| DESCRIPTION | GROSS WEIGHT | * PRICE & UNIT | NET WEIGHT |
|---|---|---|---|

A
C
K
N
O
W
L
E
D
G
M
E
N
T

## NOT AN INVOICE

* PRICE AND POINT OF DELIVERY ARE SUBJECT TO PROVISIONS OF SECTION 1 ON REVERSE SIDE.

THANK YOU FOR THE ORDER. SHIPMENT AND/OR DELIVERY WILL BE MADE ON OR ABOUT THE DATE SHOWN BELOW OR AS SOON THEREAFTER AS PRACTICAL.

IF THERE IS ANY UNUSUAL DELAY IN TRANSIT, WE SHALL BE GRATEFUL IF YOU WILL NOTIFY US.

MONSANTO COMPANY

| SHIPPING DATE | ARRIVAL DATE |
|---|---|

0021207



Case: 4:23-cv-00204-HEA   Doc. #: 105-7   Filed: 06/09/23   Page: 21 of 22 PageID #: 5076

**1.   PRICE.** The order for the goods accepted hereby is accepted subject to delivery when available at Seller's price, point of delivery, service allowance, if any, and terms of payment in effect at date of shipment. If Seller desires to revise the applicable price, point of delivery, service allowance or terms of payment for the goods hereunder, but is restricted to any extent against so doing by reason of any governmental law, regulation, order or action, or if the price, point of delivery, service allowance or terms of payment in effect under this contract are altered by reason of any governmental law, regulation, order or action, Seller shall have the right to terminate this contract with respect to any goods not then delivered by written notice to Buyer.

**2.   EXCUSE OF PERFORMANCE.** Deliveries may be suspended by either party in the event of: Act of God, war, riot, fire, explosion accident, flood, sabotage, lack of adequate fuel, power, raw materials, labor, containers or transportation facilities, compliance with governmental requests, laws, regulations, orders or action; breakage or failure of machinery or apparatus, national defense requirements or any other event beyond the reasonable control of such party or in the event of labor trouble, strike, lockout or injunction (provided that neither party shall be required to settle a labor dispute against its own best judgment) which event makes impracticable the manufacture, transportation, acceptance or use of a shipment of the goods or of a material upon which the manufacture of the goods is dependent. If, because of any such event, it is impracticable for Seller to supply the total demand for the goods, Seller may allocate its available supply of goods, without obligation to purchase similar goods from other sources, among itself and its customers, including (at Seller's option) those not under contract, on such basis as it determines to be equitable. Deliveries suspended under this section shall be cancelled without liability, but this contract shall otherwise remain unaffected.

**3.   BUYER'S CREDIT.** Seller reserves the right, among other remedies, either to terminate this contract or to suspend further deliveries under it in the event Buyer fails to pay for any one shipment when same becomes due. Should Buyer's financial responsibility become unsatisfactory to Seller, cash payments or satisfactory security may be required by Seller for future deliveries and for goods theretofore delivered.

**4.   WEIGHTS AND CONTAINERS.** In the case of bulk carload tank car, truck or barge shipments, shipper's weights shall govern unless proven to be in error. Where shipment requires use by Seller of returnable containers, title to such containers shall remain in Seller and a deposit in the amount required by Seller must be made at the time the goods are paid for. Such containers must be kept in good condition, must not be used for any material other than that shipped therein and must be returned within sixty (60) days from date of shipment. On such containers being so returned in good condition, a refund of the deposit will be made.

**5.   SHIPMENTS.** The quantity shipped in any contract month may be limited by Seller to either: (a) the average of the monthly quantities ordered by Buyer hereunder for the preceding contract months, or (b) the maximum quantity covered by this contract divided by the number of months in the contract period. Seller shall not be bound to render delivery of any quantities for which buyer has not given shipping instructions.

**6.   LIMITED WARRANTY.** Subject to the limitations of Section 7 and unless otherwise provided herein, Seller warrants title and that all goods sold hereunder shall conform to Seller's standard specifications or to the attached specifications, if any. Subject to the preceding sentence and except as otherwise expressly provided herein, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE OR ANY OTHER MATTER WITH RESPECT TO THE GOODS, whether used alone or in combination with other substances.

**7.   LIMITATION OF LIABILITY.** Within thirty (30) days after receipt of each shipment of goods sold hereunder, Buyer shall examine such goods for any damage, defects or shortage. All claims, including for alleged damaged or defective goods, shortage or non-delivery of goods, negligence or any other cause whatsoever ("defective performance"), shall be deemed waived unless made in writing and received by Seller within sixty (60) days after Buyer's receipt of the goods or within thirty (30) days after Buyer learns of the facts giving rise to the claim, whichever shall first occur; provided, however, that as to proof of governmental and/or mutually recoverable within sixty (60) day period (including that discoverable only in processing) or in the first transaction) all claims shall be deemed waived unless made in writing and received by Seller within

one hundred eighty (180) days after Buyer's receipt or within thirty (30) days after Buyer learns of the facts giving rise to the claim, whichever shall first occur. Failure of Buyer to give notice of any claim within the applicable period specified above shall be deemed an absolute and unconditional waiver of such claim, irrespective of whether the facts giving rise to such claim shall have then been discovered or whether processing, use or resale of the goods shall have taken place. Buyer's exclusive remedy shall be for damages and Seller's liability for any and all losses or damages resulting from any cause whatsoever, including alleged negligence, shall in no event exceed the purchase price of the goods in respect to which the claim is made, or at the election of Seller, repair or replacement of such goods. Seller shall not be liable to Buyer assumes responsibility for all processing in connection with damage resulting from the handling, possession or use of the goods, whether such goods are used alone or in combination with other goods. In no event shall Seller be liable for special or consequential damages, whether Buyer's claim is based on negligence or otherwise. Transportation charges for the return of goods shall not be paid unless authorized in advance by Seller.

**8.   PATENTS.** Seller warrants that the goods sold under this contract, except as are made specifically to Buyer, according to Buyer's specifications, do not infringe any valid U.S. patent. This warranty is given upon condition that Buyer promptly notify Seller of any claim or suit involving Buyer of which such infringement is alleged, and, if Seller is advised that Buyer permit Seller to control conduct of the defense or compromise of any such allegation of infringement. Seller does not warrant that the use of any goods sold hereunder or of articles made therefrom, either alone or in conjunction with other materials, will not infringe a patent. Seller reserves the right to terminate Seller's obligations under this Section 8 at any time with respect to any undelivered goods in the event that in the event of such termination Buyer has not then purchased thereafter refuse acceptance of any undelivered goods.

**9.   FREIGHT-TAXES.** Any increase in freight rates paid by Seller on shipments covered by this contract or in any tax, governmental charge or increase in same thereafter in effect increasing the cost to Seller of producing or delivering the goods or of procuring materials used therein, and any tax now in effect or increase in same paid by the Seller because of the production, sale or delivery of the goods such as Sales Tax, Use Tax, Retailer's Occupational Tax, Gross Receipt Tax, Value Added Tax, may, at Seller's option, be added to the price herein specified.

**10.   LOSS IN TRANSIT.** In case of shortage or loss in transit, Buyer shall have notation of same made on carrier's records before paying freight.

**11.   PLASTIC MATERIALS.** Because of the conditions involved in the manufacture of plastic materials, where an order calls for a product to be made to specifications of Buyer,
(1) A delivery of not less than 90% of the order will be considered a complete fulfillment of the order.
(2) In case of an overrun, Seller may deliver and Buyer will accept and pay for such excess amount.

**12.   ASSIGNMENT.** Buyer shall not assign or delegate its performance hereunder without the prior written consent of Seller, and any attempted assignment or delegation without such consent shall be void.

**13.   MISCELLANEOUS.** The validity, interpretation and performance of this contract shall be governed and construed in accordance with the laws of the State of Missouri. This contract constitutes the full understanding of the parties, and a complete and exclusive statement of the terms of the agreement. Except as provided in Section 1 hereof, no conditions, usage of trade, course of dealing, understanding or agreement purporting to modify, vary, explain or supplement this contract shall be binding unless hereinafter made in writing and signed by the party to be bound, and no modification shall be effected by the acknowledgement or acceptance of Buyer's order or shipping instruction forms containing terms or conditions at variance with or in addition to those set forth herein. Any change in the quantity stated herein requested by Buyer and accepted by Seller shall be construed as a modification of this contract only as to quantity with none of the other provisions, terms and conditions herein being affected. A waiver by either Seller or Buyer with respect to any one breach or default or of any right or remedy and no waiver of default or of any right or remedy shall be deemed to constitute a continuing waiver of any other breach or default or of any other right or remedy unless such waiver be expressed in writing signed by the party to be bound.

0021200

BCKA-15 (2) REV. 10-75



**MALLORY CAPACITOR COMPANY**
a division of P. R. MALLORY & CO. INC.
3029 E. Washington St., Indianapolis, Indiana 46206; Telephone: 317-636-5353 / Twx: 317-634-4214

PLEASE REPLY TO: Post Office Box 372, Indianapolis, Indiana 46206

December 28, 1977

Mr. J. A. Alley
Industry Specialist
Dielectronics
Monsanto Industrial Chemicals Co.
800 N. Lindbergh Boulevard
St. Louis, MO 63166

Dear Jim:

    Enclosed is signed copy of letter you sent me regarding our transferring one (1) tank car of Aroclor 1016 to Aerovox, New Bedford.

    It is my understanding the railroad was to pick up this car at the Lawrenceburg siding on 12/27.

    Want to wish you the very best in your new endeavor.  Let's keep in touch - please give me a call if you are in this area.

                Best of luck,

                Sincerely,

                MALLORY CAPACITOR COMPANY

                C. P. Dibble
                Vice President/Operations

/s

Enclosure

0021366