# Exhibit M

# Monsanto

FROM (NAME & LOCATION): D. Wood, B2SD

DATE: February 25, 1976

CC: J. A. Alley
M. A. Petrilli
R. E. Hatton
C. Paton

SUBJECT: Summary Report of Calls following Dielectrics price increase

REFERENCE:

TO: File

This report covers M. A. Petrilli's comments on calls with Aerovox, Cornell-Dubilier, Universal, G. E. Pittsfield, Jard and DW call at EUC.

1. **Aerovox, New Bedford**

   Surprised by magnitude of increase but appalled by timing. Could accept even greater increase if bad timing could be rectified. A paper increase of 11¢ per lb., equivalent in impact to our increase, is in place for May 1. Aerovox prepared to accept greater increase and interim allocation to support delay in our price increase. The short notice we gave detracts from Monsanto image of knowing industry and working with it. Accept underlying reason but argue that our objectives can be met within a time frame more helpful to the capacitor industry.

2. **Cornell-Dubilier**

   Aggressively resist our increase. Spoke of legal consultation on Monsanto 'monopoly' position. Added that this untimely action does not encourage long term confidence in relying upon Monsanto as a sole supplier of MCS 1238. Reported problems with MCS 1238 at same meeting. Request at least we hold off increase to May 1.

3. **G. E. Pittsfield**

   Initially reacted against what they regard as electrical industry paying Monsanto's way out of PCB business. Their current escalator clauses do not permit immediate pass thru of PCB increase. Requested an impossible 6 months relief but any relief would help.

4. **EUC**

   Appreciated reason for increase. They have just completed price increase on all capacitors. This creates problem in immediate initiation of new increase. However, they are faced with May 1 paper increase and intend to initiate immediate price action

0023731

IN - 10 REV. 1/72

File -2- February 25, 1976

    even at the risk of losing volume. Quote Hauser (President) "We are in business to sell capacitors for profit, not just to sell a lot of capacitors." They are just pulling back into the black after a lean 1975 and request any help we can give in delay of March 1 date. They will take advantage of every day we give them to push increase.

5. Universal

    Frustrated by lack of notice. Accept underlying reasons. Need at least 2 months to pass on increase. Ray Clark (General Manager), an old and good friend of Monsanto, is feeling somewhat negative now because this increase follows on a Monsanto decision to cut off supply of Aroclor 1254. Ray conferred he used 1254 in his vacuum pumps and not his capacitors. We refused to supply more 1254.

6. Jard

    Have been at breakeven point thru 1975 because of major dependence on depressed air-conditioner market. January/February '76 represented a return to profits which we almost wiped out by our February 13 announcement. Explained difficulty in major price move in middle of peak air-conditioner season (for capacitors December-May). Stressed some helplessness in their raising price unless a major such as G. E. also increasing. Urged us to phase increase closer to paper May 1 increase to assist pass thru of costs in more orderly fashion.

                                   David Wood

dw

0023732

ST. LOUIS, MISSOURI                                 cc: R.E. Hatton
                                                        D. Wood

CALL REPORT NO. 76-42

CORNELL-DUBILIER
NEW BEDFORD, MASS.

DATE OF CALL:   October 13, 1976

FOR CORNELL-DUBILIER:    Charlie Rebello, Sr. Buyer
                         Chet Lalli, Materials Mgr.
                         Bob Stone, Director of Marketing
                         Phil Murray, Gen. Mgr.

FOR MONSANTO:            J. A. Alley
                         C. Paton

RESULTS:

Reviewed industry forecast and Monsanto phase out plans.

C-D's future use of 1016 is dependent on an EPA Region 1 discharge permit. C-D cannot meet 10 ppb, January 1, 1978. They will seek an adjudicatory hearing to extend the time that they can use PCB's. A meeting was scheduled for Friday, October 15 to try to obtain a compromise from EPA.

C-D wants to use PCB's as long as they are permitted and their customers want 1016 in their capacitors.

C-D will advise Monsanto regarding requirements for 1978 after discharge permit meeting with EPA. They think their 1978 requirements will drop. The 1977 requirement should hold firm barring EPA action to force the discharge issue to the point C-D would have to shut down.

C-D is actively working on DINP from Exxon as their replacement fluid. They are also looking at several other fluids. C-D has done some testing of 1889 as an additive. They have no results yet on 1889 and commented that if they used it, the volume would be small.

We advised no price increase in 1976. Further, we said that Monsanto would give sixty (60) days notice if we decide to increase prices.

C-D was informed that Monsanto has not yet decided whether to offer a PE to the capacitor industry.
0437280

Phil Murray brought up the large cash outlay problem for C-D to cover post-shutdown shipments. We advised that Monsanto had considered the subject of extended credit and decided to handle on a case by case basis. Therefore, if shipments to C-D after shutdown represent a significant figure, Monsanto would be prepared to offer some relief in the form of extended terms.

C-D asked for new forecast forms to be sent out in December. They commented their forecasts for 1978 will be downward, adding that they are getting more and more requests for non-PCB.

Short term, C-D's forecast to end of 1976 is TC per month.

No negative reaction to Monsanto phase out plans.

J. A. Alley

gh

# Monsanto

_SPECIALTY CHEMICALS DIVISION_

**MONSANTO INDUSTRIAL CHEMICALS CO.**
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166
Phone: (314) 694-1000

February 10, 1977

Mr. Charlie Rebello
Senior Buyer
Cornell-Dubilier Electronics
1605 E. Rodney French Blvd.
New Bedford, Mass. 02744

Dear Charlie:

Reference is made to our phone conversation on February 10 concerning the May 1, 1977 deadline for Aroclor 1016 orders. I am sorry, but it is not possible to give you an extension on this date. Firm orders for Aroclor 1016 must be in our hands on or before May 1, 1977. The reason for this is that Monsanto will cease production of Aroclor 1016 on August 31st and all orders must be manufactured between May 1 and August 31. We will operate at a high production rate during this period in order to achieve the date of August 31. Therefore, we must know by May 1 how much material has to be made by August 31.

We expect to be sending you letters in the near future concerning final orders and return of tank cars.

Charlie, I regret that there is no flexibility in this phase-out schedule.

Sincerely,

James A. Alley
Industry Specialist
Dielectrics

tmc

0091971

a unit of Monsanto Company

# Monsanto

SPECIALTY CHEMICALS DIVISION

MONSANTO INDUSTRIAL CHEMICALS CO.
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166
Phone: (314) 694-1000

February 21, 1977

Mr. Charles P. Rebello
Senior Buyer
Cornell Dubilier Electronics
1605 E. Rodney French Blvd.
New Bedford, Massachusetts 02744

Dear Mr. Rebello:

This letter concerns your final order of PCB dielectric fluid for delivery after May 1, 1977. The quantities specified in your order will be part of the final production run of this askarel grade. It will not be possible for Monsanto to divert this material to another customer.

Because Monsanto cannot ship this material to another customer, and would therefore have to bear the costs for raw materials, manufacture and incineration, we will require your agreement to pay Monsanto, as partial compensation to Monsanto for the above costs, 50¢/lb. for any portion of the ordered quantity which is not accepted and paid for by you. Such payment, if any, will be due within 30 days of notice to Monsanto of cancellation or by November 1, 1977, whichever date is earlier.

We also remind you that PCB fluid shipped under this order is not returnable to Monsanto. Disposition of the fluid is the responsibility of your company. We expect that the fluid will be used in your production, or the material will be moved by your company to an incinerator approved for the disposal of PCB's.

In recognition that you accept the terms stated above, please countersign this letter and return it promptly to Monsanto. Upon receipt of the countersigned letter, Monsanto will,

a unit of Monsanto Company

0091787

after receiving your final order, acknowledge the order, and undertake to manufacture and ship the product.

All other terms and conditions of sale outlined on our standard acknowledgement form will apply to your final order. (A copy of our standard acknowledgement form is enclosed for your review.) Nothing in this letter agreement should be construed as modifying the terms of our indemnification agreement with you.

Yours very truly,

Robert G. Potter
Business Director
Functional Products

/cc

_____
Customer Signature


_____
Date

0091788

# Monsanto

*SPECIALTY CHEMICALS DIVISION*

**MONSANTO INDUSTRIAL CHEMICALS CO.**
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166
Phone: (314) 694-1000

February 21, 1977

Mr. Charles P. Rebello
Senior Buyer
Cornell Dubilier Electronics
1605 E. Rodney French Blvd.
New Bedford, Massachusetts 02744

Dear Mr. Rebello:

This letter concerns your final order of PCB dielectric fluid for delivery after May 1, 1977. The quantities specified in your order will be part of the final production run of this askarel grade. It will not be possible for Monsanto to divert this material to another customer.

Because Monsanto cannot ship this material to another customer, and would therefore have to bear the costs for raw materials, manufacture and incineration, we will require your agreement to pay Monsanto, as partial compensation to Monsanto for the above costs, 50¢/lb. for any portion of the ordered quantity which is not accepted and paid for by you. Such payment, if any, will be due within 30 days of notice to Monsanto of cancellation or by November 1, 1977, whichever date is earlier.

We also remind you that PCB fluid shipped under this order is not returnable to Monsanto. Disposition of the fluid is the responsibility of your company. We expect that the fluid will be used in your production, or the material will be moved by your company to an incinerator approved for the disposal of PCB's.

In recognition that you accept the terms stated above, please countersign this letter and return it promptly to Monsanto. Upon receipt of the countersigned letter, Monsanto will,

0021195

Mr. Charles P. Rebello
Cornell Dubilier Electronics
February 21, 1977
Page 2


after receiving your final order, acknowledge the order, and undertake to manufacture and ship the product.

All other terms and conditions of sale outlined on our standard acknowledgement form will apply to your final order. (A copy of our standard acknowledgement form is enclosed for your review.) Nothing in this letter agreement should be construed as modifying the terms of our indemnification agreement with you.

Yours very truly,

*Robert S. Potter*

Robert G. Potter
Business Director
Functional Products

/cc

*Charles Rebello*

Customer Signature

4-28-77

Date

0021196

# Monsanto

| SHIPPER'S NO. | DISTRICT | DATE ENTERED | CUSTOMER'S ORDER NO. | INVOICE DATE | INVOICE NUMBER |
|---|---|---|---|---|---|
| TERMS | | | | DATE SHIPPED | CAR INITIALS AND NO. |

PREPAID OR COLLECT-ROUTING

DELIVERY F.O.B.

| SHIPPED FROM | WHSE. CODE | BOOKED THRU | COPIES CODE | CUST. FORM | |
|---|---|---|---|---|---|

SOLD TO

SHIPPED TO

| DESCRIPTION | GROSS WEIGHT | * PRICE & UNIT | NET WEIGHT |
|---|---|---|---|

ACKNOWLEDGMENT

**NOT AN INVOICE**

* PRICE AND POINT OF DELIVERY ARE SUBJECT TO PROVISIONS OF SECTION 1 ON REVERSE SIDE.

THANK YOU FOR THE ORDER. SHIPMENT AND/OR DELIVERY WILL BE MADE ON OR ABOUT THE DATE SHOWN BELOW OR AS SOON THEREAFTER AS PRACTICAL.

IF THERE IS ANY UNUSUAL DELAY IN TRANSIT, WE SHALL BE GRATEFUL IF YOU WILL NOTIFY US.          MONSANTO COMPANY

| SHIPPING DATE | ARRIVAL DATE |
|---|---|

0021197



2

# TERMS AND CONDITIONS

**1. PRICE.** The order for the goods accepted hereby is accepted subject to delivery when available at Seller's price, point of delivery, service allowance, if any, and terms of payment in effect at date of shipment. If Seller desires to revise the applicable price, point of delivery, service allowance or terms of payment for the goods hereunder, but is restricted to any extent against so doing by reason of any governmental law, regulation, order or action, or if the price, point of delivery, service allowance or terms of payment in effect under this contract are altered by reason of any governmental law, regulation, order or action, Seller shall have the right to terminate this contract with respect to any goods not then delivered by written notice to Buyer.

**2. EXCUSE OF PERFORMANCE.** Deliveries may be suspended by either party in the event of: Act of God, war, riot, fire, explosion, accident, flood, sabotage, lack of adequate fuel, power, raw materials, labor, containers or transportation facilities, compliance with governmental requests, laws, regulations, orders or action, breakage or failure of machinery or apparatus, national defense requirements or any other event beyond the reasonable control of such party or in the event of labor trouble, strike, lockout or injunction (provided that neither party shall be required to settle a labor dispute against its own best judgment), which event makes impracticable the manufacture, transportation, acceptance or use of a shipment of the goods or of a material upon which the manufacture of the goods is dependent. If, because of any such event, it is impracticable for Seller to supply the total demand for the goods, Seller may allocate its available supply of goods, without obligation to purchase similar goods from other sources, among itself and its customers, including (at Seller's option) those not under contract, on such basis as it determines to be equitable. Deliveries suspended under this section shall be cancelled without liability, but this contract shall otherwise remain unaffected.

**3. BUYER'S CREDIT.** Seller reserves the right, among other remedies, either to terminate this contract or to suspend further deliveries thereunder in the event Buyer fails to pay for any one shipment when same becomes due. Should Buyer's financial responsibility become unsatisfactory to Seller, cash payments or satisfactory security may be required by Seller for future deliveries and for goods theretofore delivered.

**4. WEIGHTS AND CONTAINERS.** In the case of bulk carload, tank car, tank truck or barge shipments, shipper's weights shall govern unless proved to be in error. Where shipment requires use by Seller of returnable containers, title to such containers shall remain in Seller and a deposit in the amount required by Seller must be made at the time the goods are paid for. Such containers must be kept in good condition, must not be used for any material other than that shipped therein and must be returned within sixty (60) days from date of shipment. On such containers being so returned in good condition, a refund of the deposit will be made.

**5. SHIPMENTS.** The quantity shipped in any contract month may be limited by Seller to either: (a) the average of the monthly quantities ordered by Buyer hereunder for the preceding contract months, or (b) the maximum quantity covered by this contract divided by the number of months in the contract period. Seller shall not be bound to tender delivery of any quantities for which Buyer has failed to furnish shipping instructions.

**6. LIMITED WARRANTY.** Subject to the limitations of Section 7 and unless otherwise provided herein, Seller warrants title and that all goods sold hereunder shall conform to Seller's standard specifications or to the attached specifications, if any. Subject to the preceding sentence and except as otherwise expressly provided herein, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE OR ANY OTHER MATTER WITH RESPECT TO THE GOODS, whether used alone or in combination with other substances.

**7. LIMITATION OF LIABILITY.** Within thirty (30) days after receipt of each shipment of goods sold hereunder Buyer shall examine such goods for any damage, defects or shortage. All claims, including for alleged damaged or defective goods, shortage or non-delivery of goods, negligence or any other cause whatsoever ("defective performance"), shall be deemed waived unless made in writing and received by Seller within sixty (60) days after Buyer's receipt of the goods or within thirty (30) days after Buyer learns of the facts giving rise to the claim, provided, however, that as to any defective performance not disclosable within said sixty (60) day period (including that discoverable only in processing or in further manufacture) all claims shall be deemed waived unless made in writing and received by Seller within one hundred eighty (180) days after Buyer's receipt or notice of the goods or within thirty (30) days after Buyer learns of the facts giving rise to the claim, whichever shall first occur. Failure of Buyer to give notice of any claim within the applicable time period specified above shall be deemed an absolute and unconditional waiver of such claim, irrespective of whether the facts giving rise to such claim shall have then been discovered or whether processing, use or resale of the goods shall have then taken place. Buyer's exclusive remedy shall be for damages and Seller's liability for any and all losses or damages resulting from any cause whatsoever, including alleged negligence, shall in no event exceed the purchase price of the goods in respect to which the claim is made, or at the election of Seller, the repair or replacement of such goods. Seller shall not be liable and Buyer assumes responsibility for all personal injury and property damage resulting from the handling, possession, use or resale of the goods, whether such goods are used alone or in combination with other goods. In no event shall Seller be liable for special or consequential damages, whether Buyer's claim is in contract, negligence or otherwise. Transportation charges for the return of goods shall not be paid unless authorized in advance by Seller.

**8. PATENTS.** Seller warrants that any goods sold subject to this contract, except as are made especially for Buyer according to Buyer's specifications, do not infringe any valid U.S. patent. This warranty is given upon condition that Buyer promptly notify Seller of any claim or suit involving Buyer in which such infringement is alleged, and, if Seller is so elected, that Buyer permit Seller to control completely the defense or compromise of any such allegation of infringement. Seller does not warrant that the use of any goods sold hereunder or articles made therefrom, either alone or in conjunction with other materials, will not infringe a patent. Seller reserves the right to terminate Seller's obligations under this Section 8 at any time with respect to any undelivered goods. It is agreed that in the event of such termination Buyer may without charge thereafter refuse acceptance of any undelivered goods.

**9. FREIGHT-TAXES.** Any increase in freight rates paid by Seller on shipments covered by this contract and any new governmental charge or increase in same hereafter imposed effective increasing the cost to Seller of producing, selling or delivering the goods or of producing materials used therein, and any tax now in effect or increase in same hereafter payable by Seller because of the production, sale or delivery of the goods such as Sales Tax, Use Tax, Retailers Occupation Tax, Gross Receipts Tax, Value Added Tax, may, at Seller's option, be added to the price herein specified.

**10. LOSS IN TRANSIT.** In case of breakage or loss in transit, Buyer shall have notation of same made on carrier's bill before paying freight.

**11. PLASTIC MATERIALS.** Because of the conditions involved in the manufacture of plastic materials, where the order calls for a product to be made up specially for Buyer

    (1) A delivery of not less than 90% of the order will be considered a complete fulfillment of the order.

    (2) In case of an over-run, Seller may deliver to Buyer who will accept any such overrun up to 10% of the order.

**12. ASSIGNMENT.** Buyer shall not assign its rights or delegate its performance hereunder without the prior written consent of Seller, and any attempted assignment or delegation without such consent shall be void.

**13. MISCELLANEOUS.** The validity, interpretation and performance of this contract shall be governed and construed in accordance with the laws of the State of Missouri. This contract constitutes the full understanding of the parties and a complete and exclusive statement of the terms of their agreement. Except as provided in Section 1 hereof, no prior or other usage of trade, course of dealing, understanding or agreement purporting to modify, vary, explain or supplement this contract shall be binding unless hereafter made in writing and signed by the party to be bound, and no modification shall be effected by the acknowledgement or acceptance of any purchase order or shipping instruction forms containing terms or conditions at variance with or in addition to those set forth herein. Any change in the quantity stated herein requested by Buyer and accepted by Seller shall be construed as a modification of this contract only as to quantity, with none of the other provisions, terms and conditions hereof in any way affected. No waiver by either Seller or Buyer with respect to any breach or default or of any right or remedy and no course of conduct shall be deemed to constitute a continuing waiver of any other breach or default or of any other right or remedy, unless such waiver be expressed in writing signed by the party to be bound.

0021198