# Exhibit F

EXECUTION VERSION

---

# DISTRIBUTION AGREEMENT

by and between

**MONSANTO COMPANY,**
**a Delaware corporation,**

and

**SOLUTIA INC.,**
**a Delaware corporation**

**As of September 1, 1997**

# DISTRIBUTION AGREEMENT

DISTRIBUTION AGREEMENT, dated as of September 1, 1997 (this "Agreement"), by and between Monsanto Company, a Delaware corporation ("Monsanto"), and Solutia Inc., a newly-formed Delaware corporation ("Chemicals").

## WITNESSETH:

WHEREAS, the Board of Directors of Monsanto has determined that it is appropriate and desirable to separate Monsanto and its subsidiaries into two publicly traded organizations by: (1) consolidating into Chemicals and its newly formed subsidiaries certain of the businesses conducted by Monsanto directly and through certain of its other subsidiaries and (2) distributing to the holders of the issued and outstanding shares of common stock, par value $2.00 per share, of Monsanto all of the issued and outstanding shares of common stock, par value $.01 per share, of Chemicals in accordance with Article III hereof (the "Distribution");

WHEREAS, the Distribution is intended to qualify as a tax-free spinoff under Section 355 of the Internal Revenue Code of 1986, as amended;

WHEREAS, the parties hereto have determined that it is necessary and desirable to set forth the principal corporate transactions required to effect the Distribution and to set forth other agreements that will govern certain other matters prior to and following such Distribution;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

1.01 **General.** As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

*1.* *Action:* any demand, action, suit, countersuit, arbitration, inquiry, proceeding or investigation by or before any federal, state, local, foreign or international Governmental Authority or any arbitration or mediation tribunal.

*2.* *Affiliate:* with respect to any specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person; provided, however, that for purposes of this

Agreement, no member of either Group shall be deemed to be an Affiliate of any member of the other Group.

3. *Agent:* the distribution agent appointed by Monsanto to distribute the shares of Chemicals Common Stock pursuant to the Distribution.

4. *Arbitration Act:* the United States Arbitration Act, 9 U.S.C. §§1-14, as the same may be amended from time to time.

5. *Arbitration Demand Date:* as defined in Section 7.03(a) hereof.

6. *Arbitration Demand Notice:* as defined in Section 7.03(a) hereof.

7. *Assets:* any and all assets, properties and rights (including goodwill), wherever located (including in the possession of vendors or other third parties or elsewhere), whether real, personal or mixed, tangible, intangible or contingent, in each case whether or not recorded or reflected or required to be recorded or reflected on the books and records or financial statements of any Person, including, without limitation, the following:

(i) all accounting and other books, records and files whether in paper, microfilm, microfiche, computer tape or disc, magnetic tape or any other form;

(ii) all apparatus, computers and other electronic data processing equipment, fixtures, trade fixtures, machinery, equipment, capital and other spares, furniture, office equipment, automobiles, trucks, aircraft, rolling stock, vessels, motor vehicles, trailers and other transportation equipment, special and general tools, test devices, prototypes and models and any other tangible personal property;

(iii) all inventories of materials, raw materials, catalysts, precious metals, stores inventories, supplies, work-in-process, consigned goods and finished goods and products and product samples;

(iv) all interests in real property of whatever nature, including easements, leases and licenses, whether as owner, mortgagee or holder of a Security Interest in real property, lessor, sublessor, lessee, sublessee or otherwise;

(v) all buildings and other improvements to real property and all leasehold improvements;

(vi) all bonds, notes, debentures or other securities issued by any Subsidiary or any other Person, all loans, advances or other extensions of credit or capital contributions to any Subsidiary or any other Person, all certificates of deposit, bankers' acceptances, certificates of interest or participation in profit sharing agreements, collateral trust certificates, preorganization certificates or subscriptions, transferable shares, investment contracts, voting trust certificates, fractional

undivided interests in oil, gas or other mineral rights, puts, calls, straddles, options and other securities of any kind;

(vii) all license agreements, leases of personal property and other leases, open purchase orders for raw materials, supplies, parts or services, unfilled orders for the manufacture or sale of products, other sales or purchase agreements, other commitments or arrangements, permits, distribution arrangements, and other contracts, agreements or commitments;

~~(viii) all deposits, letters of credit and performance and surety bonds;~~

(ix) all technical information, data, specifications, research and development information, engineering drawings, operating and maintenance manuals, and materials and analyses prepared by consultants and other third parties; environmental clean-up technology, safety and industrial hygiene methods and technology;

(x) all technology, domestic and foreign patents, statutory, common law and registered copyrights, trade names, registered and unregistered trademarks, service marks, service names, trade styles, product bar codes and associated goodwill, and registrations and applications for any of the foregoing, mask works, trade secrets, inventions, formulas, processes, designs, know-how, or other data or information, confidential information, other proprietary information and licenses from third Persons granting the right to use any of the foregoing and other rights in, to and under the foregoing (it being understood that the transfer of Assets described in this clause (x) shall be made pursuant to the Intellectual Property Agreements);

(xi) all computer applications, programs and other software and databases (including all embodiments or fixations thereof and related documentation, registrations and franchises, and all additions, improvements, enhancements, updates and accessions thereto), all technical manuals and documentation made in connection with the foregoing, and the right to sue for past infringement thereof, and all licenses and rights with respect to the foregoing or of like nature, including operating software, network software, firmware, middleware, design software, design tools, systems documentation and instructions;

(xii) all cost information, sales and pricing data, customer prospect lists, supplier records, customer and supplier lists, customer and vendor data, correspondence and lists, product literature, artwork, design, development and manufacturing files, vendor and customer drawings, formulations and specifications, quality records and reports, lists of advertisers, records pertaining to advertisers and accounts, and other books, records, studies, surveys, reports, plans and document forms and any other business information;

(xiii) all prepayments or prepaid expenses, trade accounts and other accounts and notes receivable and all other current assets;

(xiv) the right to receive mail, payments on accounts receivable and other communications;

(xv) all rights under contracts, agreements, warranties or guaranties, all claims or rights or judgments against any Person, all rights in connection with any bids or offers and all claims, choses in action, rights of recovery and rights of set-off or similar rights, whether accrued or contingent, refunds and deposits;

(xvi) all rights under insurance policies and all rights in the nature of insurance, indemnification or contribution;

(xvii) all licenses, permits, approvals and authorizations which have been issued by any Governmental Authority;

(xviii) advertising materials and other printed or written materials;

(xix) employee contracts, including any rights thereunder to restrict an employee or former employee from competing in certain respects, and personnel and medical files and records;

(xx) cash, cash equivalents, bank accounts, lock boxes and other deposit arrangements; and

(xxi) interest rate, currency, commodity or other swap, collar, cap, floor, or other hedging or similar agreements or arrangements.

*8.* ***Business Transfer Agreements***: the agreements which have been or will be entered into between certain wholly-owned Chemicals Subsidiaries incorporated, or having a branch or presence outside the United States and certain wholly-owned Monsanto Subsidiaries incorporated, or having a branch or presence outside the United States, providing for the transfer of Chemicals Assets and assumption of Chemicals Liabilities outside the United States from such Monsanto Subsidiaries to such Chemicals Subsidiaries. For purposes hereof, the term Business Transfer Agreement shall also include: (i) any other agreements related to the transfer of Chemicals Assets and assumption of Chemicals Liabilities outside the United States, including without limitation, those agreements which are required by local law or are executed in connection with or to implement such transfer of Chemicals Assets and assumption of Chemicals Liabilities; and (ii) the assignment from Monsanto to Chemicals transferring the operating assets in the United States.

*9.* ***Business Day:*** any day other than a Saturday, a Sunday or a day on which banking institutions located in the States of Missouri, New York or Delaware are authorized or obligated by law or executive order to close.

*10.* ***Chemicals:*** as defined in the preamble to this Agreement.

*11.* *Chemicals Assets*: excluding the Excluded Chemicals Assets, and any Assets sold or otherwise disposed of on or prior to the Distribution Date (1) all Assets included on the Chemicals Balance Sheet or the accounting records supporting the Chemicals Balance Sheet, as adjusted by the pro forma adjustments thereto as set forth in the Proxy Statement and all Assets of either Group acquired between March 31, 1997 and the Distribution Date which would have been included on the Chemicals Balance Sheet had they been owned on March 31, 1997; (2) all Assets exclusively dedicated to the Chemicals Business and all Assets formerly used in the Former Chemicals Business which are not used in the Monsanto Business on the Distribution Date, which in either case, are owned, leased, licensed or held by any member of either Group on the Distribution Date; (3) real property (including the buildings, fixtures and improvements located thereon) listed on Schedule 1.01(11)(a) and such other real property interests held by members of either Group formerly used in any Former Chemicals Business which are not used in the Monsanto Business on the Distribution Date; (4) all of the outstanding shares of all classes of capital stock of the Chemicals Subsidiaries to the extent owned by any member of the Monsanto Group; (5) the partnership, joint venture and other equity interests listed on Schedule 1.01(11)(b), and Chemicals' rights with respect to and interests in the P4 Joint Venture as provided in the P4 Joint Venture Agreement; (6) all contracts, leases and licenses exclusively dedicated to the Chemicals Business, and such rights under other contracts, leases or licenses as the parties have otherwise agreed pursuant to this Agreement, the Other Agreements or in any other enforceable agreement executed on behalf of a member of the Chemicals Group, on the one hand, and a member of the Monsanto Group, on the other hand; (7) warranties, guarantees, claims or any other rights that members of either Group may have against any Third Party (including Governmental Authorities) to the extent relating to the disposition of any Former Chemicals Business; (8) those books and records to be delivered to the Chemicals Group and rights of access to other books and records as provided in Article VI of this Agreement; (9) the rights of Chemicals under the Insurance Policies as provided in Article IX of this Agreement; (10) any pension assets, pension funds or other Assets expressly contemplated to be transferred, licensed or otherwise made available to any member of the Chemicals Group pursuant to this Agreement or any Other Agreements; and (11) all of the Assets listed on Schedule 1.01(11)(c).

***Chemicals Assets*** shall also mean any and all other Assets owned or held on the Distribution Date by members of the Monsanto Group that are related to the Chemicals Business and which the parties agree should have been transferred to the Chemicals Group, if, had the parties given specific consideration to such Asset as of the date hereof, such Asset would have been classified as a Chemicals Asset; provided, however, that no Asset shall be deemed to be a Chemicals Asset solely as a result of this provision unless a claim with respect thereto is made by a member of the Chemicals Group on or prior to eighteen months after the Distribution Date.

*12.* ***Chemicals Balance Sheet:*** the unaudited combined balance sheet of the Chemicals Business as of March 31, 1997 and the notes thereto as set forth in the Proxy Statement.

Directors, as the record date for determining stockholders of Monsanto entitled to vote at the Special Meeting.

92. *Subsidiary:* with respect to any specified Person, any corporation or other legal entity of which such Person or any of its Subsidiaries controls or owns, directly or indirectly, more than 50% of the stock or other equity interest entitled to vote on the election of members to the board of directors or similar governing body; provided, however, that for purposes of this Agreement, (1) the Chemicals Subsidiaries shall be deemed to be Subsidiaries of Chemicals and (2) Chemicals and the Chemicals Subsidiaries shall not be deemed to be Subsidiaries of Monsanto or any of Monsanto's Subsidiaries.

93. *Tax:* as defined in the Tax Sharing Agreement.

94. *Tax Sharing Agreement:* the tax sharing and indemnification agreement which has been or will be entered into on or prior to the Distribution Date between Monsanto and Chemicals substantially in the form attached hereto as Exhibit 1.01(94), with such changes as may be mutually satisfactory to Monsanto and Chemicals.

95. *Third Party:* a Person who is not a party hereto or a wholly-owned Subsidiary thereof.

96. *Third Party Claim:* any claim, suit, arbitration, inquiry, proceeding or investigation by or before any court, any governmental or other regulatory or administrative agency or commission or any arbitration tribunal asserted by a Third Party.

97. *Transition Services Agreement:* the transition services agreements which have been or will be entered into on or prior to the Distribution Date between the Monsanto Group and the Chemicals Group, substantially in the form attached hereto as Exhibit 1.01(97), with such changes as may be mutually satisfactory, providing for (1) the Monsanto Group to make available certain personnel and services to the Chemicals Group and (2) the Chemicals Group to make available certain personnel and services to the Monsanto Group, in each case for a period of up to 18 months following the Distribution Date.

**1.02 References to Time.** All references in this Agreement to times of the day shall be to St. Louis time, except as otherwise specifically provided herein.

## ARTICLE II

## CERTAIN TRANSACTIONS PRIOR TO THE DISTRIBUTION DATE

**2.01 Share Purchase Rights Plan; Certificate of Incorporation; Bylaws.** Prior to the Distribution Date, Chemicals shall adopt the Chemicals Rights Plan. Monsanto and Chemicals shall take all action necessary so that, at the Distribution Date, the Restated Certificate

of Incorporation and Bylaws of Chemicals shall be in the forms attached hereto as Exhibits 2.01(a) and 2.01(b), respectively.

**2.02 Issuance of Stock.** Prior to or as of the Distribution Date, the parties hereto shall take all steps necessary to reclassify the outstanding shares of Chemicals Common Stock so that, except as otherwise contemplated by this Agreement, immediately prior to or as of the Distribution Date the number of shares of Chemicals Common Stock outstanding and held by Monsanto shall equal the number of shares of Monsanto Common Stock outstanding on the Record Date divided by five (rounded to the next highest whole share).

**2.03 Transfer of Assets and Assumption of Liabilities.** On or prior to the Distribution Date, the parties hereto shall and shall cause their respective wholly-owned Subsidiaries (1) to execute instruments of assignment and transfer and to take such other corporate action as is necessary to transfer to Chemicals and its wholly-owned Subsidiaries all of the right, title and interest of the Monsanto Group in the Chemicals Assets; (2) to execute instruments of assignment and transfer and to take such other corporate action as is necessary to transfer to Chemicals a 40% ownership interest in the P4 Joint Venture subject to the terms and conditions set forth in the P4 Joint Venture Agreement; and (3) to take all action necessary to cause Chemicals or its wholly-owned Subsidiaries to assume all of the Chemicals Liabilities. A global assignment and assumption agreement along with Business Transfer Agreements for transfers of Chemicals Assets and assumption of Chemicals Liabilities will be executed on or prior to the Distribution Date; provided, however, that in the event of a conflict between such agreements and this Agreement, this Agreement will control; and provided further that the transfer of the operating Assets of the Chemicals Business shall be substantially completed prior to the Special Meeting.

**2.04 Financing Arrangements.** Each of the parties hereto agrees that it will use reasonable efforts to arrange the Financing Facility and Chemicals agrees that it will assume the obligations with respect to the commercial paper issued thereunder on the Distribution Date with Monsanto becoming a guarantor of the commercial paper obligations thereunder outstanding on the Distribution Date but otherwise having no further liability. Each of the parties hereto agrees that it will use reasonable efforts to obtain, prior to the Distribution Date, all necessary consents, waivers or amendments to each bank credit agreement, debt security or other financing facility to which it or any of its Subsidiaries is a party or by which it or any of its Subsidiaries is bound, or to refinance such agreement, security or facility, in each case on terms satisfactory to Monsanto and Chemicals and to the extent necessary to permit the Distribution to be consummated without any material breach of the terms of such agreement, security or facility.

**2.05 Registration and Listing.** Prior to the Distribution Date:

1. Monsanto and Chemicals shall prepare the Proxy Statement and the Registration Statement. Chemicals shall file the Registration Statement with the SEC. Monsanto shall file the Proxy Statement with the SEC and shall mail the Proxy Statement to the holders of Monsanto Common Stock as of the Special Meeting Record Date. Monsanto and Chemicals shall use reasonable efforts to cause the Registration Statement to become effective under the Exchange Act as promptly as reasonably practicable.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first above written.

MONSANTO COMPANY,
a Delaware corporation

By: ______________________
Nicholas L. Reding
Vice Chairman

SOLUTIA INC.
a Delaware corporation

By: ______________________
John C. Hunter III
President