# Exhibit B

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| MONSANTO COMPANY, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 649249 |
| | ) | Team A |
| GOULD ELECTRONICS, INC., | ) | |
| Defendant. | ) | |

**AMENDED PETITION**

Comes now plaintiff Monsanto Company, and for its Amended Petition for damages against defendant Gould Electronics, Inc., states:

THE PARTIES

1. Plaintiff Monsanto Company ("Monsanto") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in St. Louis County, Missouri.

2. Defendant Gould Electronics, Inc. ("Gould") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in the State of Ohio.

JURISDICTION

3. Gould has registered with the Missouri Secretary of State as a foreign corporation authorized to do business in the State of Missouri and has consented to personal jurisdiction in

the State of Missouri by appointing a registered agent for receiving service of process, pursuant to § 351.630 Mo. Rev. Stat. (1986).

4. The matter in controversy arises out of a contract negotiated and made in the State of Missouri between Monsanto and ITE Imperial Corporation, Inc. ("ITE"), the predecessor corporation to Gould. Gould and its predecessor ITE are engaging and/or have engaged in the transaction of business in the State of Missouri.

5. From the 1930's until the 1970's, Monsanto manufactured and sold industrial fluids containing polychlorinated biphenyls ("PCBs"). PCB fluids are fire-resistant and have excellent insulating characteristics. Manufacturers of electrical equipment, including ITE, specified PCBs as an insulating "dielectric" fluid in electrical transformers and capacitors.

6. The PCBs were movable at the time of identification to the sale, and thus constitute goods as defined in Article 2 of the Uniform Commercial Code (U.C.C.), § 400.2-105(1), R.S. Mo.

7. In 1971 and 1972, ITE was the third largest manufacturer of electrical transformers in the United States, with approximately a 10% market share. ITE was knowledgeable and sophisticated in the safe handling, storage and use of PCBs, by virtue of its manufacture of transformers containing PCBs from the mid-1950's, and by virtue of the substantial experience and expertise with such fluids of its engineer employees. As such,

ITE was a merchant with respect to PCBs as defined in the U.C.C., § 400.2-104(1), R.S.Mo.

8. In the late 1960's, PCBs were discovered in the environment in minute quantities. Reports were made that PCBs possibly might persist in the environment. After conducting research and scientific investigation, Monsanto discontinued sales of PCB industrial fluids for all uses, except for sales to electrical equipment manufacturers.

9. PCB dielectric fluids were of vital importance to the nation's electrical supply. United States governmental agencies and manufacturers of transformers and capacitors advised Monsanto that black outs and brown outs were likely to occur if Monsanto ceased the sale of PCB dielectric fluids before an acceptable substitute could be developed. At the request of electrical equipment manufacturers, and with the concurrence of the United States Government, Monsanto agreed that it would continue to sell PCB dielectric fluids to certain electrical equipment manufacturers. In return, Monsanto required a written acknowledgment from the electrical equipment manufacturers that PCB fluids must be handled with care and a broad indemnification agreement, indemnifying and holding Monsanto harmless against any and all claims arising out of such sales of PCB fluids.

10. On or about January 12, 1972, Monsanto and ITE entered into a broad written indemnity agreement, which provided in pertinent part:

SPECIAL UNDERTAKING BY
PURCHASERS OF POLYCHLORINATED BIPHENYLS

Monsanto Company ("Monsanto") manufactures certain polychlorinated biphenyl products ("PCBs") which Transformer & Rectifier Division - ITE Imperial ("Buyer") desires to purchase. While buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.

. . . .

STL-304796

A true copy of this agreement (hereinafter "the ITE Indemnity Agreement") is attached hereto as Exhibit 1 and incorporated herein by reference.

11. The intention of this agreement was to transfer from Monsanto to ITE any and all risks of damages from claims arising out of the sale of PCBs to ITE by Monsanto.

12. As a direct and proximate result of ITE's agreement to indemnify Monsanto, Monsanto continued to sell and ship PCBs to ITE. But for the ITE Indemnity Agreement, Monsanto would not have made such sales.

13. In May 1972, ITE completed manufacture of an electrical transformer, filled said transformer with PCB dielectrical fluids, and sold it to an ITE customer. But for the continued shipments of PCBs by Monsanto after the effective date of the ITE Indemnity Agreement, ITE could not have manufactured and sold such a transformer.

14. Between November 1974 and April 1976, Gould began to acquire controlling interest in ITE through public and private purchases. On April 30, 1976, Gould merged ITE into Newco, a wholly-owned subsidiary of Gould, formed for that purpose, the name of which was concurrently changed to ITE Imperial Corporation (the "successor ITE"). As a consequence of this merger, the successor ITE assumed all debts, obligations and liabilities of its predecessors, including all obligations and responsibilities to Monsanto under the ITE Indemnity Agreement.

15. On December 4, 1981, the successor ITE merged with Gould. As a consequence of this merger, Gould assumed all debts, obligations and responsibilities of the predecessor and successor ITE, including all obligations and responsibilities to Monsanto under the ITE Indemnity Agreement.

16. Gould subsequently changed its name to Gould Electronics, Inc., but continues to be liable for all liabilities of ITE under the ITE Indemnity Agreement.

17. In April of 1987, the transformer which ITE had manufactured in May 1972 failed and began to emit smoke at the Louisiana State University Medical Center power station in Shreveport, Louisiana ("the ITE transformer incident"). The ITE transformer incident ultimately gave rise to four lawsuits, filed in 1988 against Gould as the successor to ITE; Monsanto; Louisiana State University; Southwestern Electric Power Company and others (collectively referred to as the "LSU litigation").

18. Three of the four lawsuits filed involved claims for personal injuries allegedly caused by exposure to PCBs during the ITE transformer incident at the LSU Medical Center in April 1987. This litigation, involving more than 100 plaintiffs, was filed by firefighters who responded to the scene and their spouses. The City of Shreveport filed the fourth lawsuit seeking reimbursement for workers' compensation benefits paid to the firefighters who were allegedly injured by exposure to PCBs. Together, the plaintiffs in the LSU litigation claimed millions of dollars in damages.

STL-304796

19. At all relevant times, Monsanto and Gould were co-defendants in the LSU litigation and Gould had actual knowledge that Monsanto was a party to the action and was incurring costs to defend itself.

20. Monsanto vigorously and effectively defended the LSU litigation for more than four years. As a result of Monsanto's diligent defense efforts, a large number of personal injury plaintiffs ultimately dismissed their causes of action voluntarily against Monsanto, Gould and the other defendants. The claims of many other plaintiffs were dismissed involuntarily for failure to comply with the Case Management Order. By 1992, the only remaining claims at issue were those of nine firemen, several spouses and the City of Shreveport.

21. The remaining claims were consolidated and set for trial in late January 1993. By mid-January 1993, all claims of the remaining plaintiffs had been settled as to all defendants. Monsanto did not pay any plaintiff any money in judgment or settlement. Gould participated in the settlement negotiations with these remaining plaintiffs and, in partial performance of its obligations under the ITE Indemnity Agreement, obtained releases on Monsanto's behalf, as well as on its own behalf.

22. Pursuant to the terms of the ITE Indemnity Agreement, Gould, as the successor to ITE, has a duty to indemnify and hold harmless Monsanto against any and all of Monsanto's losses, costs and expenses arising out the LSU litigation.

23. Monsanto's losses, costs and expenses arising out of the LSU litigation include Monsanto's attorneys' fees and other out-of-pocket costs and expenses incurred during the lengthy pendency of the lawsuits, in amounts made known to Gould before the filing of this action. These costs and expenses were incurred with Gould's knowledge and acquiescence. Further, the costs and expenses were of mutual benefit to Gould, given the huge number of voluntary and involuntary claims dismissed due to Monsanto's diligent defense efforts.

24. Although Gould has admitted its liability to Monsanto under the ITE Indemnity Agreement by partial performance thereof, Gould has breached the ITE Indemnity Agreement by failing and refusing to indemnify Monsanto for Monsanto's attorneys' fees and other losses, costs and expenses arising out of the LSU litigation.

25. Monsanto has faithfully performed all duties, obligations and conditions on its part to be performed pursuant to the ITE Indemnity Agreement.

26. Notwithstanding demand for payment by Monsanto, Gould has failed and refused to pay to Monsanto its attorneys' fees and other losses, costs and expenses arising out of the LSU litigation.

27. As a direct and proximate result of Gould's breach of the ITE Indemnity Agreement, Monsanto has been damaged as aforesaid by Gould's failure and refusal to pay to Monsanto its attorneys' fees and other losses, costs and expenses arising out

of the LSU litigation, in amounts which have been made known to Gould before the filing of this action.

WHEREFORE, plaintiff Monsanto Company prays for judgment against defendant Gould, Inc. for damages in a sum in excess of Fifteen Thousand Dollars, plus interest thereon, and for Monsanto's attorneys' fees, costs and expenses incurred in bringing this action to enforce the ITE Indemnity Agreement and for such other and further relief as the Court deems just and proper under the circumstances.

Respectfully Submitted,

HUSCH & EPPENBERGER

By: [signature]

Thomas M. Carney, #21794
Carol A. Rutter, #29473
100 N. Broadway, Suite 1300
St. Louis, Missouri 63102
314-421-4800
314-421-0239 - FAX

Attorneys for Plaintiff
Monsanto Company

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing instrument was forwarded this 14 day of December, 1994, by first class mail, postage prepaid, to:

Joseph R. Swift, Esq.
Brown & James, P.C.
705 Olive Street, 11th Floor
St. Louis, MO 63101

[signature]

STL-304796

Monsanto

MONSANTO INDUSTRIAL CHEMICALS CO.
800 N. Lindbergh Boulevard
St. Louis, Missouri 63166
Phone: (314) 694-1000

SPECIAL UNDERTAKING BY
PURCHASERS OF POLYCHLORINATED BIPHENYLS

Monsanto Company ("Monsanto") manufactures certain polychlorinated biphenyl products ("PCB's") which Transformer & Rectifier Division - ITE Imperial ("Buyer") desires to purchase. While Buyer desires to purchase PCB's because of certain desirable flame resistant and insulator properties, Buyer acknowledges that it is aware and has been advised by Monsanto that PCB's tend to persist in the environment; that care is required in their handling, possession, use and disposition; that tolerance limits have been or are being established for PCB's in various food products.

Monsanto has therefore adopted certain restrictive policies with respect to its further production, sale and delivery of PCB's, including the receipt of undertakings from its customers as set forth below, and Buyer is willing to agree to such undertakings with respect to sales and/or deliveries of PCB's by Monsanto to Buyer.

Accordingly, Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer on or after the date hereof and in consideration of any such sale or delivery, Buyer shall defend, indemnify and hold harmless Monsanto, its present, past and future directors, officers, employes and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through or under Buyer, whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's.



EXHIBIT 1

All existing contracts for the sale of PCB's by Monsanto to Buyer are hereby amended to contain the provisions set forth above.

Nothing herein shall create or imply any duty or obligation of Monsanto to sell or deliver any PCB's to Buyer. No conditions, understandings or agreements purporting to modify or vary the terms hereof shall be binding unless hereafter made in writing specifically referring to this agreement and signed by the party to be bound and no modification or variance of the above undertaking shall be effected by the acknowledgment or acceptance of any sale document, purchase order, shipping instruction or other forms containing terms or conditions at variance herewith.

I-T-E IMPERIAL CORPORATION
(Buyer)

BY: [signature]
F. G. Schmidt

TITLE: President, Power Equipment Group

DATE: January 12, 1972

MONSANTO COMPANY

BY: [signature]