UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MONSANTO COMPANY, et al.,         )
         )
        Plaintiffs,         )
         )
v.         )      No. 4:23-CV-00204-HEA
         )
MAGNETEK, INC., et al.,         )
         )
        Defendants.         )

**MONSANTO'S SUR-REPLY IN OPPOSITION TO
DEFENDANTS' JOINT MOTION TO DISMISS**

This sur-reply responds to two unfounded and completely new arguments in Defendants' Reply in Support of their Joint Motion To Dismiss (ECF #113) ("Defendants' Reply").[1]

**I.    Monsanto Is Not Estopped From Enforcing The Plain Language Of The Special Undertaking Contracts.**

After completely disregarding *Gould* in their opening brief, Defendants in their Reply now claim that Monsanto should be estopped from arguing that the phrase "arising out of or in connection with" has a much broader meaning than "caused by" based on arguments Monsanto made in *Gould*. Putting aside that this new argument reaches well outside the pleadings and thus not proper support for a motion to dismiss, Defendants do not (and cannot) satisfy the threshold requirement for estoppel because Monsanto's interpretation of the Special Undertaking Contracts in this case is not "clearly inconsistent" with its statements to the Missouri Court of Appeals in the Gould appeal. *See Hossaini v. W. Missouri Med. Ctr.*, 140 F.3d 1140, 1143 (8th Cir. 1998) (cited in Defendants' Reply (ECF #113) at 4); *see also Kirk v. Schaeffler Grp. USA, Inc.*, 887 F.3d 376,

---

[1] All terms are used as defined in Monsanto's Response In Opposition To Defendants' Joint Motion To Dismiss (ECF #103) ("Monsanto Resp.").

385 (8th Cir. 2018) ("Under Missouri law, . . . whether a party's positions are clearly inconsistent, is the threshold essential to a judicial estoppel defense.") (citations and quotation marks omitted).

In response to Defendants' Joint Motion to Dismiss in this case, Monsanto accurately argues that the disjunctive phrase "arising out of or in connection with" does not require a causal nexus between Defendants' post-Special Undertaking PCBs and the claims in the underlying PCB lawsuits.   Monsanto Resp. (ECF #103) at 14.  Monsanto's argument focuses on the second part of this phrase—"in connection with"—and cites authority (which Defendants do not refute) establishing that courts have consistently construed that phrase broadly.  *See id.* (collecting authorities regarding the breadth of the phrase "in connection with").  In particular, Monsanto directed the Court to authority explaining that certain phrases, including "in connection with," are "broader in scope than the term 'arising out of,' . . . broader than the concept of a causal connection, and . . . mean[s] simply 'connected by reason of an established or discoverable relation.'" *Huffington v. T.C. Grp., LLC*, 637 F.3d 18, 22 (1st Cir. 2011) (quoting *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128–29 (2d Cir. 2001) (Sotomayor, J.)) (cited in Monsanto Resp. (ECF #103) at 14).

Monsanto's briefing in *Gould* focused on the first portion of the disjunctive phrase— "arising out of."  There, Monsanto argued correctly that the words "arising out of" as used in the Special Undertaking Contracts established a form of causal connection requirement between the underlying claim and the defendant's use of the post-Special Undertaking PCBs.  *See* Ex. 1, Gould Br. at 42 ("A claim 'arises out of' the use of a product if there is a clear causal connection between the claim and the use[.]").  Monsanto supported its argument in *Gould* by citation to *Pope v. Stolts* where the Missouri Court of Appeals explained that although "arising out of" does not require the PCBs to be a "direct and proximate cause of the injury in the strict legal sense of causation

permeating general tort law, there must be some causal connection between an injury and the use in order for there to be recovery." *Id.* at 42-43 (citing *Pope v. Stolts*, 712 S.W.2d 434, 436-37 (Mo. Ct. App. 1986)).[2]   Nowhere in its briefing in *Gould* did Monsanto address the meaning of the second portion of the phrase—"in connection with."[3]

There is no tension between Monsanto's interpretations of the two separate portions of the relevant disjunctive phrase.  Those separate interpretations are consistent with Missouri law.  They are also in accord with basic canons of contractual interpretation, which establish that the use of "or" means that both "arising out of" and "in connection with" have separate and distinct meanings. *Gasconade Cnty. Counseling Servs., Inc. v. Missouri Dep't of Health*, 314 S.W.3d 368, 376 (Mo. Ct. App. 2010) ("The word 'or' is typically used as a function word to indicate a choice between alternative things, states, or courses").

In short, Defendants' claim that Monsanto has adopted a position that "contradict[s] [its] prior repeated statements to the Missouri Court of appeals in the *Gould* appeal" is demonstrably false.  Defendants' Reply (ECF #113) at 9.  That Monsanto chose to proceed solely under the "arising out of" portion of the contractual language in *Gould* does not prevent it from proceeding under both the "arising out of" and "in connection with" portions of the contractual language in this case.  Defendants also cannot demonstrate any risk of a "perception that [the *Gould* court] . . . was misled" by Monsanto because the court in *Gould* was not presented with and did not rule upon the meaning of the entire phrase "arising out of or in connection with."  *Gray v. City of Valley*

---

[2] Monsanto's argument on this point is and remains consistent with well-established Missouri law.  *See Schmidt v. Utilities Ins. Co.*, 182 S.W.2d 181, 183 (Mo. 1944) ("The words [arising out of], we think, are much broader than the words 'caused by'"); *Patel v. LM Gen. Ins. Co.*, 922 F.3d 875, 877 (8th Cir. 2019) (acknowledging wide recognition of *Schmidt*).

[3] Tellingly, Defendants omitted excerpts of the *Gould* Brief that further demonstrate Monsanto focused on the phrase "arising out of."  Ex. 1, Gould Br. at 7 (identifying "arising out of" — not "in connection with" — as a "salient feature" of the *Gould* Special Undertaking Contract "as it relates to this appeal").

*Park, Mo.*, 567 F.3d 976, 981 (8th Cir. 2009) (noting courts consider whether "a court accepts" a party's prior inconsistent position); *see generally Monsanto Co. v. Gould Elecs., Inc.*, 965 S.W.2d 314 (Mo. Ct. App. 1998).   Accordingly, the Court should reject Defendants new and ill-conceived claim for estoppel.  *Hossaini*, 140 F.3d at 1143 (declining to apply estoppel because positions were not "irreconcilable nor inherently inconsistent"); *Kirk*, 887 F.3d at 385 ("If a party's positions can be reconciled, there is no need to protect the integrity of the judicial process from inconsistent positions.").

Finally, Defendants include passages regarding the "alone or in combination with" clause in the Special Undertaking Contracts in a chart comparing Monsanto's current and prior "reading[s]" of the Special Undertaking Contracts, but do bother to analyze or explain how these innocuous excerpts conflict or otherwise warrant estoppel.  Defendants' Reply (ECF #113) at 10. For the avoidance of doubt, any tacit argument that Monsanto should be estopped from enforcing the Special Undertaking Contracts as to any and all "liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses" involving post-Special Undertaking PCBs "whether alone or in combination with other substances" suffers from the same defects detailed above.  FAP (ECF #4), ¶¶ 70, 78, 87, 93, 100.  In its *Gould* brief, Monsanto argued that the defendant's use of post-Special Undertaking PCBs in combination with pre-Special Undertaking PCBs (i.e., "other substances") triggered *Gould*'s obligations under a Special Undertaking Contract.  Monsanto did not imply or otherwise argue that the "in combination with other substances" clause ***only*** applies to substances an indemnitor combines with PCBs.  Further, nothing in *Gould* indicates that the Court adopted such a restrictive reading of the agreement.  *Gould Elecs., Inc.*, 965 S.W.2d at 317.  Thus, Defendants' implicit estoppel argument regarding the "in combination with other substances" clause also fails.

**II.      The Low Threshold For The Duty To Defend Is Not Limited To Insurance Contracts.**

Defendants' Reply also includes the new claim that the "possibility or potential" standard

for the duty to defend does not apply to the Special Undertaking Contracts because they are private

indemnity agreements.  *See* Defendants' Reply (ECF #113) at 11.  Not so.  It is well-established

under Missouri law that the duty to defend and the duty to indemnify are separate and distinct

duties, *and* that the duty to defend is triggered by "possibility or potential" of liability within the

scope of the relevant agreement.  *See, e.g.*, *Shapiro Sales Co. v. Alcoa, Inc.*, No. 4:06CV638 CDP,

2006 WL 2228987, at *2 (E.D. Mo. Aug. 3, 2006) (distinguishing between duty to defend and

indemnity and noting "duty to defend" stemming from indemnity agreement "'arises whenever

there is a potential or possible liability to pay at the outset of the case'") (quoting *McCormack*

*Baron Mgmt. Servs., Inc. v. Am. Guarantee & Liab. Ins. Co.*, 989 S.W.2d 168, 170 (Mo. 1999));

*Power Soak Sys., Inc. v. EMCO Holdings, Inc.*, No. 06-0314-CV-W-NKL, 2006 WL 2483215, at

*2 (W.D. Mo. Aug. 25, 2006) (defense obligations in a Stock Purchase Agreement "arise[]

whenever there is a potential or possible liability to pay based on facts at the outset of the case[.]")

(quotation marks and citations omitted); *Direct Enterprises, Inc. v. Sensient Colors LLC*, No.

115CV01333JMSTAB, 2018 WL 1907570, at *1 (S.D. Ind. Apr. 23, 2018) (under Missouri law,

duty to defend arising from commercial agreement triggered by claim "potentially within the

agreement's coverage") (quotation marks omitted); *id.* at *2 (noting that when analyzing whether

"the duty to defend is triggered, courts applying Missouri law appear to invoke the standard

articulated in the insurance context[.]").

Defendants' reliance on *Allison v. Barnes Hosp.*, 873 S.W.2d 288 (Mo. Ct. App. 1994) to

support their argument is misplaced.  In *Allison*, the court held that a hospital could not recover

the costs of defending a negligence claim from its contractor pursuant to an Elevator Maintenance

Agreement because the claims, which alleged negligence against the hospital and not the

contractor, were outside the *scope* of the narrow indemnity provision. *Id.* at 293. In reaching this conclusion, the Court of Appeals did ***not*** reference or supplant the well-recognized test for determining when a duty to defend is triggered under Missouri law. Nor did the Court adopt the trial court's rationale that an "indemnity agreement and the agreement to defend should be strictly construed together as one agreement" as Defendants claim. *Id.* at 292. Rather, the court reasoned that "the rule recognized in *Missouri Pac. R.R. Co. v. Rental Storage and Transit Co.*, 524 S.W.2d [898], 908 [(Mo. Ct. App. 1975)] controls." *Allison*, 873 S.W.2d at 292. This "rule"—which requires that "a contract to indemnify will not be construed to include the indemnitee's own negligent acts unless such intention appears in clear and unequivocal terms," *Missouri Pac. R&R Co.*, 524 S.W.2d at 908—is inapplicable here because the Missouri Court of Appeals has held that the language in the Special Undertaking Contract satisfies the requirement for "clear, unequivocal provisions" requirement to the extent it applies to contracts between sophisticated parties. *Gould Elecs., Inc.*, 965 S.W.2d at 316.

Finally, general statements that indemnity agreements are strictly construed or "not synonymous" with contracts for insurance do not displace the standard regarding when the duty to defend is triggered. *See* Defendants' Reply (ECF #113) at 11 (quoting *Holiday Inns, Inc. v. Thirteen-Fifty Inv. Co.*, 714 S.W.2d 597, 602 (Mo. Ct. App. 1986)). Thus, the Court should reject Defendants' misguided contention that Monsanto must allege more than a "potential or possibility" of liability within the scope of the Special Undertaking Contracts to state plausible claims for Defendants' breach of the duty to defend.

## CONCLUSION

The Court should deny Defendants' Joint Motion to Dismiss for these additional reasons.

Respectfully Submitted,

THOMPSON COBURN LLP

By: /s/ Christopher M. Hohn
    Christopher M. Hohn #44124
    Nicholas J. Lamb #33486
    David M. Mangian #61728
    Nicholas Schnell #73932
    Brittney K. Mollman #65745
    One U.S. Bank Plaza
    St. Louis, Missouri 63101
    (314) 552-6000 (Telephone)
    (314) 552-7000 (Facsimile)
    chohn@thompsoncoburn.com
    nlamb@thompsoncoburn.com
    dmangian@thompsoncoburn.com
    nschnell@thompsoncoburn.com
    bmollman@thompsoncoburn.com

*Attorneys for Plaintiffs Monsanto Company,*
*Pharmacia, LLC, and Solutia, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing has been filed with the Court for service on all counsel of record via the Court's CM/ECF system on August 7, 2023.

/s/ Christopher M. Hohn

- 7 -

# Exhibit 1

IN THE MISSOURI COURT OF APPEALS
EASTERN DISTRICT

MONSANTO COMPANY,                      )
                                       )
            Plaintiff/Respondent       )
                                       )
      vs.                              )          No. 71916
                                       )
GOULD ELECTRONICS, INC.,               )
                                       )
            Defendant/Appellant        )

---

Appeal from the Circuit Court of St. Louis County
The Honorable Robert S. Cohen
Circuit Judge

---

Brief Of Respondent Monsanto Company

---

Mark G. Arnold, #28369
Husch & Eppenberger
100 North Broadway, Suite 1300
St. Louis, MO  63102
Office:  (314) 421-4800
Fax No: (314) 421-0239

Attorneys for Respondent
Monsanto Company

STL-569581.01

L.F. 89.

As it relates to this appeal, that agreement had four salient features.  ITE agreed that:

A.    ITE would indemnify Monsanto for any claims "arising out of" the "receipt, . . . use, sale or disposition" of PCBs;

B.    The indemnification applied to claims arising from such receipt "on or after" the effective date – i.e., January 12, 1972;

C.    The indemnification applied whether those post-contract fluids were used "alone or in combination with other substances"; and

D.    The indemnification included claims of "any contamination or adverse effect on humans."

Mr. Cunningham and Mr. Schmidt were in agreement on what the Special Undertaking meant:  it transferred all risk associated with the sale of the PCBs from Monsanto to ITE.  Mr. Cunningham testified that the purpose of the agreement was "the transfer of that liability to the people who purchased it."  L.F. 425.  The objective of the agreement was "to protect Monsanto from every conceivable potential liability with respect to PCBs."  L.F. 426.

ITE's Mr. Schmidt testified that he understood the Special Undertaking to be "so damn broad it could include something in the middle of the ocean 30 miles down."  L.F. 494.  He further testified:

> [I]t says here that we would have to indemnify you for anything you did.  At least, that was my interpretation.

STL-569581.01                                    – 7 –

In that lawsuit, Westinghouse served interrogatories on Gould seeking, inter alia, the "date of receipt of the Askarel fluids" used in the failed transformer. L.F. 100. The response was "First Quarter, 1972." Id. In the first quarter of 1972, Monsanto made the following shipments to ITE:

| Ship Date | Poundage | GLD Page # |
|-----------|----------|------------|
| 1/10/72 | 103,700 | GLD 000233-234 |
| 1/13/72 | 95,900 | GLD 000236-237 |
| 2/14/72 | 96,700 | GLD 000261-262 |
| 2/22/72 | 95,600 | GLD 000259-260 |
| 3/13/72 | 97,300 | GLD 000263-264 |
| 3/17/72 | 98,500 | GLD 000265-266 |
| 3/21/72 | 105,600 | GLD 000267-268 |

L.F. 272-84. It usually took two or three days for each shipment to arrive. L.F. 604.

Thus, the earliest that the January 10 shipment could have arrived at ITE was January 12, 1972 – the very day ITE executed the Special Undertaking. The Special Undertaking applies to all shipments delivered "on or after the date hereof." L.F. 89. The Special Undertaking applies to each of the shipments delivered in the first quarter of 1972. Gould admits that ITE received the Askarel in the failed transformer during that time period.

Moreover, the Special Undertaking requires Gould to indemnify Monsanto for claims "arising out of . . . the receipt, . . .use, sale or disposition" of the Askarel on or after January 12, 1972. A claim "arises out of" the use of a product if there is a clear causal connection between the claim and the use:

> The words "arising out of" are ordinarily understood to mean "originating from," or "having its origin in," "growing out of" or "flowing from." . . . Although it is not required that the "use" of the automobile be the direct and proximate cause of the injury in the strict legal sense of causation permeating general tort law, there must be some causal connection between an injury and the use in order for there to be recovery.

<u>Pope v. Stolts</u>, 712 S.W.2d 434, 436-37 (Mo. App. 1986).

In the instant case, the causal connection is clear:   ITE could not have manufactured the failed transformer without the steady supply of Askarel which Monsanto supplied after the date of the Special Undertaking.  ITE tested the transformer in question on May 9, 1972.  L.F. 75, ¶ 73.  Its standard practice was to fill a transformer with Askarel fluid not more than five working days before such tests, and there is no reason to believe it departed from that practice with the failed transformer.  L.F. 75, ¶¶ 71-72.  Gould admits these facts.  L.F. 671, ¶¶ 71-73.  Thus, ITE filled the transformer with Askarel fluids not earlier than May 1, 1972.

The seven tank car loads of Askarels that Monsanto sent to ITE before that date were essential to ITE's production of the failed transformer.  In general ITE used up its supply of inventory once every three months.  L.F. 488.  In the spring of 1972, ITE's purchase of two tank car loads per month reflected "a fairly high rate of Askarel transformer production."  L.F. 479-80.  Thus, ITE would have used its existing supply of Askarels in less than three months.  ITE manufactured the failed transformer more than four and a half months after the effective date of the Special Undertaking.  Without the seven tank car loads received after that date, ITE would have run out of Askarels, and it

STL-569581.01                                    - 43 -