# EXHIBIT A

# EXHIBIT A

STOCK PURCHASE AGREEMENT

by and between

KRAFT, INC.

and

DURACELL HOLDINGS CORPORATION

dated

May 4, 1988

as amended and restated
as of June 23, 1988

**101**

# STOCK PURCHASE AGREEMENT

## INDEX

|  |  | Page Number |
|---|---|---|
| ARTICLE I | CERTAIN DEFINITIONS | 2 |
| ARTICLE II | SALE OF STOCK; CLOSING | 9 |
| 2.1 | Purchase and Sale | 9 |
| 2.2 | Time and Place of Closing | 9 |
| 2.3 | Purchase Price Adjustment | 10 |
| 2.4 | Deferred Transfers | 15 |
| ARTICLE III | REPRESENTATIONS AND WARRANTIES OF SELLER | 20 |
| 3.1 | Incorporation; Authorization; etc. | 20 |
| 3.2 | Capitalization; Structure | 23 |
| 3.3 | Financial Statements | 24 |
| 3.4 | Undisclosed Liabilities | 25 |
| 3.5 | Properties | 26 |
| 3.6 | Absence of Certain Changes | 27 |
| 3.7 | Litigation; Orders | 27 |
| 3.8 | Intellectual Property | 28 |
| 3.9 | Licenses, Approvals, Other Authorizations, Consents, Reports, etc. | 29 |
| 3.10 | Labor Matters | 31 |
| 3.11 | Compliance with Laws | 31 |
| 3.12 | Insurance | 32 |
| 3.13 | Material Contracts | 32 |
| 3.14 | Brokers, Finders, etc. | 34 |
| 3.15 | Transactions with Affiliates | 34 |
| 3.16 | Conduct of Business | 35 |
| 3.17 | No Implied Representation | 35 |
| 3.18 | Construction of Certain Provisions | 36 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF BUYER | 36 |
| 4.1 | Incorporation; Authorization; etc. | 36 |
| 4.2 | Brokers, Finders, etc. | 38 |
| 4.3 | Licenses, Approvals, Other Authorizations, Consents, Reports, etc. | 38 |
| 4.4 | Acquisition of Shares for Investment | 39 |

102

| | | Page Number |
|---|---|---|
| ARTICLE V | COVENANTS OF SELLER AND BUYER | 40 |
| 5.1 | Investigation of Business; Access to Properties, Records and Employees | 40 |
| 5.2 | Best Efforts; Obtaining Consents | 43 |
| 5.3 | Further Assurances | 47 |
| 5.4 | Conduct of Business | 47 |
| 5.5 | Preservation of Business | 51 |
| 5.6 | Public Announcements | 52 |
| 5.7 | Non-Solicitation | 52 |
| 5.8 | Intercompany Accounts; Guaranties | 53 |
| 5.9 | Affiliate Sale Agreements | 56 |
| 5.10 | Performance of Company Obligations | 57 |
| 5.11 | Insurance | 57 |
| 5.12 | Cash Management | 63 |
| 5.13 | Post-Closing Cooperation | 64 |
| 5.14 | Financing Documents | 66 |
| ARTICLE VI | EMPLOYEE BENEFITS | 66 |
| 6.1 | Employee Benefit Plans | 66 |
| 6.2 | Termination of Participation | 71 |
| 6.3 | Collective Bargaining Agreements | 71 |
| 6.4 | Pension Plans | 72 |
| 6.5 | Welfare Plans | 72 |
| 6.6 | Buyer's Obligations | 73 |
| ARTICLE VII | TAX MATTERS | 82 |
| 7.1 | Tax Returns of the Company, the Subsidiaries and the Affiliates | 82 |
| 7.2 | Section 338 Elections and Forms | 83 |
| 7.3 | Tax Indemnification by Seller | 84 |
| 7.4 | Tax Indemnity by Buyer | 87 |
| 7.5 | Allocation of Certain Taxes | 88 |
| 7.6 | Filing Responsibility | 90 |
| 7.7 | Refunds and Carrybacks | 93 |
| 7.8 | Cooperation and Exchange of Information | 95 |
| 7.9 | Definitions | 100 |

**103**

|  |  | Page Number |
|---|---|---|
| ARTICLE VIII | CONDITIONS OF BUYER'S OBLIGATION TO CLOSE | 104 |
| 8.1 | Representations, Warranties and Covenants of Seller | 104 |
| 8.2 | Filings; Consents; Waiting Periods | 105 |
| 8.3 | No Injunction | 106 |
| 8.4 | Transfers of Assets and Liabilities | 106 |
| 8.5 | Affiliate Stock Purchases | 107 |
| 8.6 | Financing | 108 |
| ARTICLE IX | CONDITIONS TO SELLER'S OBLIGATION TO CLOSE | 108 |
| 9.1 | Representations, Warranties and Covenants of Buyer | 108 |
| 9.2 | Filings; Consents; Waiting Periods | 109 |
| 9.3 | No Injunction | 109 |
| ARTICLE X | SURVIVAL; INDEMNIFICATION | 110 |
| 10.1 | Survival Periods | 110 |
| 10.2 | Indemnification | 112 |
| 10.3 | Third Party Claims | 114 |
| ARTICLE XI | TERMINATION | 115 |
| 11.1 | Termination | 115 |
| 11.2 | Procedure and Effect of Termination | 116 |
| ARTICLE XII | MISCELLANEOUS | 116 |
| 12.1 | Counterparts | 116 |
| 12.2 | Governing Law | 117 |
| 12.3 | Entire Agreement | 117 |
| 12.4 | Expenses | 117 |
| 12.5 | Notices | 118 |
| 12.6 | Successors and Assigns | 119 |
| 12.7 | Headings; Definitions | 119 |
| 12.8 | Amendments and Waivers | 120 |
| 12.9 | Interpretation | 120 |
| 12.10 | Schedules | 120 |

Exhibit A  Affiliates
Schedule 3.2

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "Agreement"), dated May 4, 1988 as amended and restated as of June 23, 1988, is by and between Kraft, Inc., a Delaware corporation ("Seller"), and Duracell Holdings Corporation, a Delaware corporation ("Buyer").

WHEREAS, Duracell Inc., a Delaware corporation and a wholly owned subsidiary of Seller (the "Company"), and its Subsidiaries (as hereinafter defined) and the Company's affiliates listed on Exhibit A hereto (the "Affiliates") conduct the entire battery business and related businesses of Seller;

WHEREAS, (a) Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, 100% of the outstanding shares of common stock of the Company upon the terms and subject to the conditions set forth herein (the sale and purchase of stock of the Company being referred to herein as the "Stock Purchase"), and (b) Buyer and/or one or more wholly owned subsidiaries of Buyer desires to purchase from the subsidiaries of Seller that are the owners of stock of the Affiliates and of N.V. Duracell Batteries S.A. (Belgium) and Duracell Inc. (Canada), and Seller desires to cause to be sold to Buyer and/or one or more wholly owned subsidiaries of Buyer all stock of the Affiliates and of N.V.

105

Duracell Batteries S.A. (Belgium) and Duracell Inc. (Canada)
owned directly or indirectly by Seller other than stock of
the Affiliates owned by the Company or its Subsidiaries (the
"Affiliate Shares") upon the terms and subject to the condi-
tions set forth herein and to be set forth in the agreements
(collectively, the "Affiliate Sale Agreements") relating to
such sales (collectively, the "Affiliate Stock Purchases"),
which Affiliate Sale Agreements will be in form and sub-
stance reasonably satisfactory to Buyer and Seller and will
contain only the representations and warranties set forth on
Exhibit B in substantially the form set forth thereon, and
such representations and warranties shall terminate at the
times the analogous representations and warranties under
this Agreement terminate;

WHEREAS, Buyer and Seller have entered into a Stock
Purchase Agreement dated May 4, 1988 and now desire to amend
and restate that agreement in its entirety;

NOW, THEREFORE, the parties hereto agree as follows:

## ARTICLE I

## Certain Definitions

As used in this Agreement the following terms shall
have the following respective meanings:

-2-

106

Section 1.1. "Action" shall mean any actual or threatened action, suit, arbitration, inquiry, proceeding or investigation by or before any court, governmental or other regulatory or administrative agency or commission.

Section 1.2. "Battery Business" shall mean the battery and lighting products businesses conducted by the Company, the Subsidiaries and the Affiliates, taken as a whole.

Section 1.3. "Business Condition" shall have the meaning set forth in Section 3.1 hereof.

Section 1.4. "Cash" shall mean all cash, time deposits, certificates of deposit and short-term investments of the Company, the Subsidiaries and the Affiliates.

Section 1.5. "Closing" shall mean the consummation of the transactions contemplated by Section 2.1 of this Agreement.

Section 1.6. "Closing Date" shall mean June 24, 1988 (or such later date as soon as practicable after all the conditions to the Closing set forth in Articles VIII and IX shall be satisfied or duly waived), or if Seller and Buyer mutually agree on a different date, the date upon which they have mutually agreed.

-3-

Section 1.7. "Code" shall mean the Internal Revenue Code of 1986, as amended, and any successor thereto.

Section 1.8. "Covered Business Liability" shall mean any Covered Liability which arises out of or in connection with any of the businesses, assets, operations or activities of the Company, any of the Subsidiaries or any of the Affiliates (including any predecessor or successor of the Company, any Subsidiary or any Affiliate, and any former or future business, asset, operation, activity or subsidiary of any of the foregoing) heretofore, currently or hereafter owned or conducted, as the case may be.

Section 1.9. "Covered Liabilities" shall mean any and all debts, losses, liabilities, claims, damages, obligations, payments (including, without limitation, those arising out of any demand, assessment, settlement, judgment or compromise relating to any Action), costs and expenses (including, without limitation, any attorneys' fees and any and all expenses whatsoever incurred in investigating, preparing or defending any Action), mature or unmatured, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, known or unknown, including without limitation any of the foregoing arising under, out of or in connection with any Action, order or consent decree of any governmental entity or award of any arbitrator of any kind, or any law, rule, regulation, contract, commitment or undertaking.

-4-

108

Section 1.10.  "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

Section 1.11.  "Initial Purchase Price" shall mean the Total Initial Purchase Price less the aggregate consideration to be paid by Buyer pursuant to the Affiliate Sale Agreements.

Section 1.12.  "Net Assets" shall mean the total assets (except for Cash, tax refunds to which Seller is entitled under Article VII and intercompany receivables) less total liabilities (except for taxes for which Seller has liability under Article VII, intercompany payables and intercompany loans), which in each case relate to the Battery Business.

Section 1.13.  "Seller Liability" shall mean any Covered Business Liability solely to the extent that such Covered Business Liability (i) (A) does not arise out of or relate to the Battery Business as presently, heretofore or hereafter conducted or to any business, asset (other than assets formerly owned by the Company, any Subsidiary or Affiliate or any predecessor of the foregoing and reacquired by Buyer, the Company, any Subsidiary or Affiliate or any successor of the foregoing in connection with the resolution of any environmental claim), operation or activity of the Company, any Subsidiary or Affiliate commenced or acquired

-5-

109

subsequent to the Closing and (B) arises out of or relates
to (or is alleged by a third party claimant, including with-
out limitation, any governmental entity to arise out of or
relate to) the past or present use or discharge or, except
for acts or omissions of Buyer, the Company, any Subsidiary
or Affiliate or any successor of any of the foregoing taken
or omitted otherwise than pursuant to the instructions of
Seller, future use or discharge into the environment or
workplace of substances alleged to be or become hazardous or
polluting (or which are, or the discharge or use of which
is, not in compliance with applicable federal, state or
local laws, regulations or guidelines) or from exposure to
such substances (including, without limitation, Covered
Business Liabilities, meeting the requirements of this
clause (i)(B), with respect to the former Crawfordsville,
Indiana facility and the facilities sold by a subsidiary of
the Company to Emhart Industries, Inc.), or (ii) arises out
of any business, asset, operation, activity or subsidiary
(other than any Subsidiary to which the provisions of Sec-
tion 2.4 apply or any Affiliate to which provisions analo-
gous to those of Section 2.4 apply) that has been or is
transferred to Seller or one of its affiliates (other than
the Company, any Subsidiary or any Affiliate) prior to the
Closing pursuant to Section 5.4 or otherwise in connection
with the transactions contemplated by this Agreement or

-6-

110

(iii) is retained or assumed by Seller in Sections 6.4, 6.5 or 7.3.

Section 1.14. "Shares" shall mean the shares of common stock, par value $1.00 per share, of the Company.

Section 1.15. "Subsidiary" shall mean each subsidiary and partnership listed on Schedule 3.2 hereto, which includes all direct or indirect subsidiaries of the Company and all partnerships or other legal entities engaged in the Battery Business in which the Company holds a direct or indirect equity interest.

Section 1.16. "Total Initial Purchase Price" shall mean $1,800,000,000 less, if the Trademark Purchase occurs, $459,000,000, representing the aggregate consideration to be paid by Buyer pursuant hereto and pursuant to the Affiliate Sale Agreements, before giving effect to any adjustments pursuant to Section 2.3.

Section 1.17. "Total Purchase Price" shall mean the aggregate consideration to be paid by Buyer pursuant hereto (including the Trademark Purchase Price) and pursuant to the Affiliate Sale Agreements, after adjusting the Total Initial Purchase Price to give effect to any adjustments pursuant to Section 2.3.

Section 1.18. "Trademark Cash Purchase Price" shall mean $209,000,000.

-7-

111

Section 1.19. "Trademark Purchase" shall mean the purchase, if any, pursuant to one or more purchase agreements in form and substance reasonably satisfactory to Buyer and Seller (which purchase agreement or purchase agreements may include representations and warranties of Seller so long as such representations and warranties are not less favorable, individually or in the aggregate, to Seller than the representations and warranties of Seller contained in this Agreement), by the Trademark Purchaser from the Trademark Sellers of the Trademark Sellers' respective trademarks, trade names, brand marks, brand names, logos, package designs and package coloring in consideration for the Trademark Purchase Price.

Section 1.20. "Trademark Purchase Price" shall mean the combination of the Trademark Cash Purchase Price and one or more trademark contingent purchase agreements upon terms to be mutually determined by Buyer and Seller.

Section 1.21. "Trademark Purchaser" shall mean Buyer or any company or companies or other person or persons designated by Buyer.

Section 1.22. "Trademark Sellers" shall mean the Company and Duracell International Inc., a Delaware corporation.

## ARTICLE II

### Sale of Stock; Closing

Section 2.1.  **Purchase and Sale.**  On the basis of the representations, warranties, covenants and agreements and subject to the satisfaction or waiver of the conditions set forth herein, (a) if the Trademark Purchaser so elects and Buyer and Seller are able to agree on the terms of a trademark purchase agreement, immediately prior to the consummation of the transactions contemplated by the following clause (b), the Trademark Purchase shall be made by the Trademark Purchaser and (b) in any event, at the Closing Seller will sell and Buyer will purchase 100 Shares owned by Seller, which constitute, and will constitute as of the Closing, 100% of the issued and outstanding Shares. In payment for such Shares, simultaneously with the delivery by Seller of certificates for 100 Shares, with appropriate stock powers attached, properly signed, Buyer will wire transfer the Initial Purchase Price in immediately available funds to the account specified by Seller. Notwithstanding anything contained in this Agreement to the contrary, Seller shall cause the Trademark Sellers to transfer the Trademark Purchase Price to Seller prior to the Closing.

Section 2.2.  **Time and Place of Closing.**  The Closing shall take place on the Closing Date at 4:00 A.M., New

-9-

113

York City time, at the offices of Sidley & Austin, 520
Madison Avenue, New York, New York or such other place as
the parties may agree.

Section 2.3.  Purchase Price Adjustment.  (a)  As
soon as practicable, but in no event later than 60 days fol-
lowing the Closing Date, Seller shall prepare a consolidated
and combined balance sheet of the Company, the Subsidiaries
and the Affiliates as of the close of business on the day
prior to the Closing Date (including the notes thereto, the
"Closing Date Balance Sheet").  The Closing Date Balance
Sheet shall fairly present the financial position of the
Company, the Subsidiaries and the Affiliates in accordance
with United States generally accepted accounting principles
consistently applied other than to the same extent, as set
forth in the notes thereto, that the Financial Statements
were not prepared in accordance with United States generally
accepted accounting principles consistently applied; pro-
vided that (i) the reserve for contingencies on the Closing
Date Balance Sheet with respect to all environmental and
other contingencies described in Schedule 3.7D shall equal
the reserve for such contingencies contained in the Balance
Sheet (as defined in Section 3.4) less any amounts actually
paid in respect of such reserves subsequent to the date of
the Balance Sheet, (ii) the idle or phase-out reserves, if
any, related to the Valdese, North Carolina, Crawley,

-10-

England and Cologne, West Germany facilities on the Closing Date Balance Sheet shall equal such reserves, if any, contained in the Balance Sheet less any amounts actually paid in respect of such reserves subsequent to the date of the Balance Sheet, (iii) recognition shall not be given in the Closing Date Balance Sheet to the effects, if any, of the Trademark Purchase, if any, the Affiliate Stock Purchases, the payment to be made by Seller pursuant to 6.6(j) hereof, or to the transactions contemplated by Section 8.4(c) hereof and (iv) Cash (other than as provided in the preceding clause (iii)) is to be included in the Closing Date Balance Sheet.

(b) During the preparation of the Closing Date Balance Sheet and the period of any dispute within the contemplation of this Section 2.3, Buyer shall cause the Company and each Subsidiary and Affiliate to (i) provide Seller and Seller's authorized representatives with full access to the books, records, facilities and employees of the Company and each Subsidiary and Affiliate, (ii) provide Seller as promptly as practicable after the Closing Date (but in no event later than 20 business days after the Closing Date) with normal month-end closing financial information for the period ending on the Closing Date, and (iii) cooperate fully with Seller and Seller's authorized representatives, including the provision on a timely basis of all information necessary or useful in preparing the Closing Date Balance Sheet.

-11-

(c)  Seller shall deliver a copy of the Closing Date Balance Sheet to Buyer promptly after it has been prepared.  After receipt of the Closing Date Balance Sheet, Buyer shall have 30 days to review the Closing Date Balance Sheet, together with the workpapers used in the preparation thereof.  Buyer and its authorized representatives shall have full access to all relevant books and records and employees of Seller to the extent required to complete their review of the Closing Date Balance Sheet.  Unless Buyer delivers written notice to Seller on or prior to the 30th day after Buyer's receipt of the Closing Date Balance Sheet specifying in reasonable detail all disputed items and the basis therefor, Buyer shall be deemed to have accepted and agreed to the Closing Date Balance Sheet.  If Buyer so notifies Seller of its objection to the Closing Date Balance Sheet, Buyer and Seller shall, within 30 days following such notice (the "Resolution Period"), attempt to resolve their differences and any resolution by them as to any disputed amounts shall be final, binding and conclusive.  If following resolution of any disputed amounts there do not remain in dispute amounts the aggregate net effect of which exceeds $1,000,000, then all amounts remaining in dispute shall be deemed to have been resolved in favor of the Closing Date Balance Sheet delivered by Seller to Buyer.

(d)  If at the conclusion of the Resolution Period the aggregate net effect of all amounts remaining in dispute exceeds $1,000,000, then all amounts remaining in dispute shall be submitted to a firm of nationally recognized independent public accountants (the "Neutral Auditors") selected by Seller and Buyer within 10 days after the expiration of the Resolution Period.  If Seller and Buyer are unable to agree on the Neutral Auditors, then Buyer and Seller shall each have the right to request the American Arbitration Association to appoint the Neutral Auditors who shall not have had a material relationship with Seller, Buyer or any of their respective affiliates within the past two years. Each party agrees to execute, if requested by the Neutral Auditors, a reasonable engagement letter.  All fees and expenses relating to the work, if any, to be performed by the Neutral Auditors shall be borne equally by Seller and Buyer.  The Neutral Auditors shall act as an arbitrator to determine, based solely on presentations by Seller and Buyer, and not by independent review, only those issues still in dispute.  The Neutral Auditors' determination shall be made within 30 days of their selection, shall be set forth in a written statement delivered to Seller and Buyer and shall be final, binding and conclusive.  The term "Adjusted Closing Date Balance Sheet", as hereinafter used, shall mean the definitive Closing Date Balance Sheet agreed

-13-





# IMAGE EVALUATION
# TEST TARGET (MT-3)



"This microfiche, including title information
and format is © 1986 Bechtel Information
Services. All rights reserved."





150mm

6"



# BECHTEL
## Information Services
15740 Shady Grove Road
Gaithersburg, Maryland 20877-1454

to by Buyer and Seller in accordance with Section 2.3(c) or the definitive Closing Date Balance Sheet resulting from the determinations made by the Neutral Auditors in accordance with this Section 2.3(d) (in addition to those items theretofore agreed to by Seller and Buyer).

(e)  The Initial Purchase Price shall be.(i) increased by the amount of Cash (or decreased if such amount is negative) shown on the Adjusted Closing Date Balance Sheet and (ii) (a) increased dollar for dollar to the extent Net Assets reflected in the Adjusted Closing Date Balance Sheet exceed Net Assets reflected in the Balance Sheet (as defined in Section 3.4), or (b) decreased dollar for dollar to the extent Net Assets reflected in the Adjusted Closing Date Balance Sheet are less than Net Assets reflected in the Balance Sheet; provided, that for purposes of this Section 2.3(e), (i) the LIFO reserves, (ii) any liability or reserve related to Seller Liabilities, and (iii) any domestic deferred income taxes, shall be excluded from the Net Assets reflected in the Balance Sheet and the Net Assets reflected in the Adjusted Closing Date Balance Sheet.  Any adjustments to the Initial Purchase Price made pursuant to this Section 2.3(e) shall bear interest from the Closing Date through the date of payment at the publicly announced base interest rate of the Chase Manhattan Bank in effect from time to time for unsecured short-term commercial loans from the Closing Date

-14-

118

to the date of such payment.  Any adjustments to the Initial Purchase Price made pursuant to this Section 2.3(e) shall be paid by wire transfer in immediately available funds to the account specified by the party to whom such payment is owed within five business days after the Adjusted Closing Date Balance Sheet is agreed to by Buyer and Seller or any remaining disputed items are ultimately determined by the Neutral Auditors.

Section 2.4.  **Deferred Transfers**.  (a)  If, on the Closing Date, (i) Seller or Buyer has not obtained any authorization, approval, order, license, permit, franchise or consent from any domestic or foreign government or governmental authority (an "Approval") with respect to a Subsidiary organized outside the United States in the absence of which Approval the conditions precedent to the Closing set forth in Articles VIII and IX would nevertheless be satisfied, and which Approval is either necessary in order to transfer the securities (or other equity interest) of such Subsidiary or the failure to obtain which would be reasonably likely to subject Buyer, Seller or any Subsidiary, or any officer, director or agent of any such person to civil or criminal liability or could render such transfer void or voidable or (ii) there is in effect any injunction, restraining order or decree of any nature of any court or governmental agency or body of competent jurisdiction that

-15-

119

would not prevent the conditions precedent to the Closing set forth in Articles VIII and IX from being satisfied and that restrains or prohibits the transfer to Buyer of any securities (or other equity interest) of a Subsidiary organized outside the United States and that is not permanent and non-appealable (a "Non-Final Injunction"), the securities (or other equity interest) of such Subsidiary ("Deferred Securities") shall be transferred, by dividend or otherwise, from the Company or the Subsidiaries to Seller or a subsidiary of Seller (other than the Company, the Subsidiaries or the Affiliates) immediately prior to the Closing. From and after the Closing, Seller and/or Buyer shall continue to use reasonable efforts to obtain all Approvals relating to the Deferred Securities or the transfer thereof. and/or to cause all Non-Final Injunctions relating to the Deferred Securities or the transfer thereof to be lifted.

(b)  Until such time as any Deferred Securities have been transferred to Buyer pursuant to Section 2.4(c) or otherwise disposed of in accordance with Section 2.4(d) (each, a "Deferred Transfer"), the Subsidiaries to which such Deferred Securities relate shall be held for Buyer's benefit and shall be managed and operated by Seller for Buyer's account in the manner hereinafter provided from the Closing to the time of the respective Deferred Transfers, with all gains, income, losses, Taxes (as defined in Section

-16-

120

7.9) or other items generated thereby to be for Buyer's
account.

      Buyer shall reimburse Seller and its affiliates
(other than the Subsidiaries to which the Deferred Securi-
ties relate) (the "Nonbattery Affiliates") and shall hold
Seller and the Nonbattery Affiliates harmless from and
against all Covered Liabilities other than Seller Liabili-
ties incurred or asserted as a result of Seller's or any
Nonbattery Affiliate's post-Closing direct or indirect
ownership, management, operation or sale (other than to
Buyer) of the Subsidiaries to which the Deferred Securities
relate, including, without limitation, the amount of any
Taxes imposed upon or incurred by Seller or any of the
Nonbattery Affiliates as a result thereof in excess of the
amount of Taxes which would have been incurred by Seller or
the Nonbattery Affiliates if the Deferred Securities had
been transferred to Buyer or any of its affiliates on the
Closing Date.

      From the Closing to the date of the Deferred Trans-
fer, unless otherwise reasonably instructed in writing by
Buyer, Seller shall hold the Deferred Securities and operate
the Subsidiaries to which such Deferred Securities relate
only in the ordinary course substantially consistent with
past practice, provided, however, that Seller shall not be

-17-

121

required to finance the operations of any such Subsidiary directly or indirectly.  Subject to applicable law and regulations (including, without limitation, all laws and regulations requiring investment approvals or consents or anti-monopoly clearances, exemptions or waivers in connection with any disposition of the Deferred Securities, and all exchange controls and laws concerning foreign corrupt practices, expatriation of funds or otherwise), Seller shall, in respect of any Deferred Securities, and the Subsidiaries to which such Deferred Securities relate shall, use all reasonable efforts to follow and implement the reasonable written instructions and policies of Buyer relating to the holding of the Deferred Securities and the management and operation of Subsidiaries to which such Deferred Securities relate.

(c)   Unless otherwise disposed of upon Buyer's instructions in accordance with Section 2.4(d) hereof, certificates for the relevant Deferred Securities, duly endorsed in blank and with all necessary transfer stamps affixed thereto or such other assignments, deeds, share transfer forms or other instruments or documents, duly stamped where necessary, as are necessary in order to effectively transfer the Deferred Securities, free and clear of all liens, to Buyer will be delivered to Buyer on the date which is three (3) business days after all Approvals relating to any such Deferred Securities or the transfer thereof

-18-

122

shall have been obtained and/or after any Non-Final Injunction relating to any such Deferred Securities or the transfer thereof has been lifted.

(d)  At any time prior to the Deferred Transfer relating to any of the Deferred Securities, Seller shall, on Buyer's written instructions (subject to applicable law and regulations), or may at any time after 18 months from the Closing, with Buyer's consent (which shall not be unreasonably withheld), for Buyer's benefit, dispose of the Subsidiary related thereto, by sale of such Deferred Securities, sale of assets, or otherwise and remit the proceeds of such sale to Buyer; provided that Seller shall have no liability to any such third party arising out of such transactions other than for gross negligence or willful misconduct; and provided, further, that any amount so remitted to Buyer pursuant to this Section 2.4(d) shall be reduced by the sum of (i) the amount by which the Taxes imposed on Seller on such sale exceeds the amount of Taxes which would have been imposed on Seller with respect to the Deferred Securities had such securities been transferred on the Closing Date without regard to this Section 2.4, and (ii) to the extent not previously paid by or on behalf of Buyer pursuant to Section 2.4(b) hereof, the amount of any Covered Liabilities other than Seller Liabilities imposed upon or incurred by Seller or any of the Nonbattery Affiliates as a result of Seller's

-19-

123

or any Nonbattery Affiliate's post-Closing direct or indirect ownership, management, operation or sale of the Subsidiaries to which the Deferred Securities relate, including, without limitation, the amount of any Taxes (other than Taxes previously paid by Buyer pursuant to Section 2.4(b)) imposed upon or incurred by Seller or any of the Nonbattery Affiliates as a result thereof.

## ARTICLE III
### Representations and Warranties of Seller

Seller hereby represents and warrants to Buyer as follows:

Section 3.1.  Incorporation; Authorization; etc. (a)  Each of the Company and its Subsidiaries is duly organized and validly existing and, with respect to those corporations organized under the laws of one of the states of the United States of America or the District of Columbia (a "U.S. Corporation"), in good standing, under the laws of the jurisdiction of its organization.  Each of the Company and its Subsidiaries (i) has all requisite corporate or partnership power and authority to own its properties and assets and to carry on its business as it is now being conducted; and (ii) with respect to each U.S. Corporation, is in good standing and is duly qualified to transact business in each jurisdiction in which the nature of property owned or leased

-20-

124

by it or the conduct of its business requires it to be so qualified, except where the failure to be in good standing or to be duly qualified to transact business, would not, individually or in the aggregate, have a material adverse effect on the business, assets or financial condition (individually and/or collectively, the "Business Condition") of the Battery Business.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware with all requisite corporate power and authority to own the Shares.

(b)  Seller has full corporate power to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement, the performance of Seller's obligations hereunder and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate proceedings on the part of Seller, its Board of Directors and stockholders.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not (i) violate any provision of Seller's or the Company's certificate of incorporation or By-laws, (ii) violate any provision of any Subsidiary's or Affiliate's charter or By-laws or similar organizational instrument, (iii) except as disclosed in Schedule 3.1(b) or

-21-

125

6.1(a), violate any provision of, or be an event that is (or with the passage of time will result in) a violation of, or result in the acceleration of or entitle any party to accelerate (whether after the giving of notice or lapse of time or both) any obligation under, or result in the imposition of any lien upon or the creation of a security interest in any of the Shares or any of the Company's or any of its Subsidiaries' or any Affiliate's assets or properties pursuant to, any mortgage, lien, lease, agreement, instrument, order, arbitration award, judgment or decree to which Seller, the Company or any of its Subsidiaries or any Affiliate is a party or by which any of them is bound, or (iv) except as listed on Schedule 3.9(b) hereto, violate or conflict with any provision of law, order, judgment or ruling of any governmental authority or any other material restriction of any kind or character to which Seller, the Company or any of its Subsidiaries or any Affiliate is subject, that, in the case of any of clauses (iii) and (iv), would, individually or in the aggregate, have a material adverse effect on the Business Condition of the Battery Business or prevent the Stock Purchase. This Agreement has been duly executed and delivered by Seller, and, assuming the due execution hereof by Buyer, this Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

-22-

126

(c)   Upon consummation of the Stock Purchase at the Closing, as contemplated by this Agreement, Seller will deliver to Buyer good title to the Shares free and clear of any liens, claims, charges, security interests, options or other legal or equitable encumbrances.          ,

Section 3.2.   **Capitalization; Structure**.   The authorized capital stock of the Company consists of 100 Shares, all of which are validly issued, outstanding, fully paid and nonassessable and owned by Seller.  Except as set forth on Schedule 3.2 hereto and except for directors' qual-ifying shares and other nominal share interests issued to third parties to comply with requirements of law, all of the outstanding shares of capital stock or other equity inter-ests of each of the Company's Subsidiaries have been validly issued and are fully paid and nonassessable and are owned by the Company and/or one or more of its Subsidiaries free and clear of all liens, claims, charges, security interests, options or other legal or equitable encumbrances.  There are no outstanding options, warrants or other rights of any kind relating to the sale, issuance or voting of any shares of capital stock of any class of, or other equity interests in, the Company or of any of its Subsidiaries which have been issued, granted or entered into by the Company or any of its Subsidiaries or any securities convertible into or evidenc-ing the right to purchase any shares of capital stock of any

-23-

127

class of, or other equity interests in, the Company or any of its Subsidiaries.

Section 3.3.  Financial Statements.  Attached hereto as Exhibit G are true and complete copies of the following:  the unaudited consolidated and combined balance sheets of the Company, its Subsidiaries and the Affiliates, as of the last Saturday in December for each of the years 1986 and 1987 and as of February 20, 1988 and the related consolidated and combined statements of pre-tax income for each of the years in the three-year period ended December 26, 1987 including the notes thereto (collectively, the "Financial Statements").  The Financial Statements include the accounts of the Company and all of the Subsidiaries and Affiliates, except that, as set forth with the book values thereof as of February 20, 1988 on Schedule 3.3, certain assets owned, and certain liabilities (if any) owed, by the Company or any of the Subsidiaries or Affiliates that are not related to the Battery Business have been excluded, certain liabilities to be transferred to the Company, the Subsidiaries and the Affiliates prior to the Closing have been included and except that the Balance Sheet has been adjusted to exclude (i) the LIFO reserves, (ii) any liability or reserve related to Seller Liabilities and (iii) any domestic deferred income taxes.  The Financial Statements present the historical results of operations and financial

-24-

128

position of the Company, the Subsidiaries and the Affiliates for the periods and as of the dates set forth therein after the exclusion of assets and liabilities (if any) and the addition of liabilities, as set forth in Schedule 3.3 and adjustments to exclude (i) the LIFO reserves, (ii) any liability or reserve related to Seller Liabilities and (iii) any domestic deferred taxes.

Except as set forth in the notes thereto, the Financial Statements present fairly the financial position and results of operations of the Company, the Subsidiaries and the Affiliates for the periods or as of the dates set forth therein, in each case in accordance with United States generally accepted accounting principles consistently applied during the periods involved (except as otherwise indicated therein).

Section 3.4.  <u>Undisclosed Liabilities</u>.  Except as disclosed herein or in the schedules hereto, and except as reflected, reserved against or otherwise disclosed in the consolidated and combined balance sheet of the Company, its Subsidiaries and the Affiliates as of February 20, 1988 (including the notes thereto) (the "Balance Sheet") neither the Company nor any Subsidiary or Affiliate had, at February 20, 1988, any liabilities or obligations that would be required to be reflected on a balance sheet (or required

-25-

129

to be disclosed in the notes thereto) prepared in accordance with United States generally accepted accounting principles and would, individually or in the aggregate, have a material adverse effect on the Business Condition of the Battery Business.

Section 3.5.  **Properties**.  With the exception of properties disposed of since the date of the Balance Sheet, the Company or one of its Subsidiaries or one of the Affiliates has good and marketable title to, or holds by valid and existing lease or license, free and clear of all mortgages, pledges, liens, encumbrances or security interests, each piece of real and personal property capitalized on or included in the Balance Sheet and to each piece of real and personal property acquired by the Company or any of its Subsidiaries or any of the Affiliates since the date of the Balance Sheet that would, had it been acquired prior to such date, be capitalized on or included in the Balance Sheet, except in any of the foregoing cases for such imperfections of title, mortgages, pledges, liens, encumbrances or security interests as (i) are set forth in Schedule 3.5 hereof, (ii) are reflected or reserved against in the Balance Sheet, (iii) arise out of taxes or general or special assessments not in default and payable without penalty or interest or the validity of which is being contested in good faith by appropriate proceedings, or (iv) would not, individually or

-26-

130

in the aggregate, have a material adverse effect on the Business Condition of the Battery Business.

Section 3.6.   <u>Absence of Certain Changes</u>.  Except as disclosed herein or in the Schedules hereto, since December 26, 1987:  (i) there has been no material adverse change in the Business Condition of the Battery Business except for any change resulting from general economic, financial or market conditions and for any change resulting from conditions or circumstances generally affecting the businesses in which the Company, its Subsidiaries and/or the Affiliates operate, and (ii) there has been no physical damage, destruction or loss that would, after taking into account any insurance recoveries payable in respect thereof, have a material adverse effect on the Business Condition of the Battery Business.

Section 3.7.   <u>Litigation; Orders</u>.  Except as disclosed in Schedule 3.7 hereto, as of the date hereof, there are no lawsuits, actions, administrative or arbitration or other proceedings or governmental investigations pending or, to Seller's knowledge, threatened against the Company or any of its Subsidiaries or any Affiliate that could reasonably be expected to, individually or in the aggregate, have a material adverse effect on the Business Condition of the Battery Business.  Except as disclosed in Schedule 3.7

-27-

131

hereto, as of the date hereof, there are no judgments or outstanding orders, injunctions, decrees, stipulations or awards (whether rendered by a court or administrative agency, or by arbitration) against the Company or any of its Subsidiaries or any Affiliate or any of their respective properties or businesses that could reasonably be expected to, individually or in the aggregate, have a material adverse effect on the Business Condition of the Battery Business or that would prohibit the Stock Purchase. Except as disclosed in Schedule 3.7 hereto, as of the date hereof, to Seller's knowledge, there are no events or conditions which could reasonably be expected to result in a lawsuit, action, administrative or arbitration or other proceeding or governmental investigation of the Company or any of its Subsidiaries or any Affiliate that would, individually or in the aggregate, have a material adverse effect on the Business Condition of the Battery Business.

Section 3.8. <u>Intellectual Property</u>. Schedule 3.8 hereof lists, as of the date hereof, all material United States and foreign patents and patent applications, trademark registrations and applications therefor, registered copyrights and applications therefor and trade names (collectively, the "Patents and Trademarks") of the Company or any of its Subsidiaries or any Affiliate. The Patents and Trademarks, the brand marks, brand names, logos, package

-28-

132

designs and colorings, inventions, technical knowhow and all other proprietary rights are hereinafter collectively referred to as the "Intellectual Property", and the Intellectual Property of the Company or any of its Subsidiaries or any Affiliate is hereinafter collectively referred to as the "Company Intellectual Property". The Company, its Subsidiaries and the Affiliates own (or possess adequate and enforceable licenses or other rights to use) all Intellectual Property materially necessary to the conduct of the Battery Business as it is presently conducted. Except as set forth on Schedule 3.8 hereto, as of the date hereof, there are no existing or, to Seller's knowledge, threatened claims of any third party based on the use by, or challenging the ownership of, the Company or any Subsidiary or Affiliate of any of the Company Intellectual Property that could reasonably be expected to, individually or in the aggregate, have a material adverse effect ... Business Condition of the Battery Business. Except as set forth on Schedule 3.8 hereto, to Seller's knowledge there is no material infringing use by any person of the Company Intellectual Property.

Section 3.9. <u>Licenses, Approvals, Other Authorizations, Consents, Reports, etc.</u> (a) Schedule 3.9(a) hereto includes all material governmental licenses, permits, franchises and other authorizations of any federal, state, local

-29-

133

or foreign governmental authority possessed by or granted to any of the Company, the Subsidiaries or the Affiliates (the "Licenses").  Except as noted in Schedule 3.9(a) hereto, all such Licenses are in full force and effect except for those whose failure to be in full force and effect would not reasonably be expected to, individually or in the aggregate, have a material adverse effect on the Business Condition of the Battery Business.  As of the date hereof, to Seller's knowledge, except as noted in Schedule 3.9(a), no proceeding is pending or threatened seeking the revocation or limitation of any such license, permit, franchise or other authorization that could, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Business Condition of the Battery Business.

(b)  Schedule 3.9(b) contains a list of all registrations, filings, applications, notices, consents, approvals, orders, qualifications and waivers required to be made, filed, given or obtained with, to or from any persons or governmental authorities or private agencies in connection with the consummation of the Stock Purchase except for those (i) that become applicable solely as a result of the specific regulatory status of Buyer or its affiliates, or (ii) the failure to make, file, give or obtain which would not, individually or in the aggregate, either have a material adverse effect on the Business Condition of the Battery Business or prevent the consummation of the Stock Purchase.

-30-

134

Section 3.10.  <u>Labor Matters</u>.  Schedule 3.10 hereto sets forth, as of the date hereof, all agreements with labor unions or associations representing employees of the Company or any of its Subsidiaries or any Affiliate.  As of the date hereof, no material work stoppage against the Company or any of its Subsidiaries or any Affiliate is pending or, to Seller's knowledge, threatened.  As of the date hereof, none of the Company or any of its Subsidiaries or any Affiliate is involved in or, to Seller's knowledge, threatened with any labor dispute, arbitration, lawsuit or administrative proceeding relating to labor matters involving the employees of the Company or any of its Subsidiaries or any Affiliate (excluding routine workers' compensation claims) that could reasonably be expected to have a material adverse effect on the Business Condition of the Battery Business.

Section 3.11.  <u>Compliance with Laws</u>.  To Seller's knowledge, except as may be indicated in Schedules 3.7 and 3.11 hereto, the conduct of the business of each of the Company and its Subsidiaries and the Affiliates substantially complies with all statutes, laws, regulations, ordinances, rules, judgments, orders or decrees applicable thereto, except for violations or failures so to comply, if any, that are not reasonably expected to have a material adverse effect on the Business Condition of the Battery Business.

-31-

135

Section 3.12.   <u>Insurance</u>.   As of the date hereof, each of the Company, the Subsidiaries and the Affiliates is covered by valid and currently effective insurance policies issued in favor of Seller and/or the Company, a Subsidiary or Affiliate that, in the judgment of Seller, are customary for companies of similar size in the industry and locale in which it operates.   All such policies are in full force and effect, all premiums due thereon have been paid and Seller, the Company, its Subsidiaries and the Affiliates have com- plied (except for failures to be in full force and effect, to pay premiums and to comply which, individually or in the aggregate, would not have a material adverse effect on the Business Condition of the Battery Business) in all material respects with the provisions of such policies.

Section 3.13.   <u>Material Contracts</u>.   Except as set forth on Schedule 3.13 or 6.1(a) hereto, as of the date hereof, none of the Company or any of its Subsidiaries or any Affiliate is a party to any (a) employment or consulting agreement requiring payments of base compensation in excess of $200,000 per year or aggregate payments of base compensa- tion in excess of $400,000; (b) distributor or manufac- turer's representative contract which is not terminable on six months (or less) notice; (c) joint venture or similar contract or agreement; (d) contract that is material to the Battery Business which is terminable by the other party

-32-

136

thereto upon a change of control of the Company or one of its Subsidiaries or Affiliates; or (e) other contract, agreement or arrangement, entered into other than in the ordinary course of business, involving an estimated total future payment or payments in excess of $1,000,000 and, with respect to all such contracts and all other contracts other than contracts which in the aggregate are not material to the Business Condition of the Company, its Subsidiaries and the Affiliates taken as a whole, except as set forth on Schedule 3.13 hereto, the contracts are valid and binding and neither the Company or any of its Subsidiaries or Affiliates, nor, to Seller's knowledge, any other party to any such contract is, as of the date hereof, in material breach thereof or material default thereunder and there does not exist under any provision thereof, to Seller's knowledge, as of the date hereof, any event that, with the giving of notice or the lapse of time or both, would constitute such a breach or default, except for such failures to be valid and binding and such breaches, defaults and events as to which requisite waivers or consents have been or are obtained or which would not, individually or in the aggregate, have a material adverse effect on the Business Condition of the Battery Business.  Schedule 3.13 lists, as of the date hereof, all notes, mortgages, indentures and other obligations and agreements and other instruments for or relating

-33-

137

to any lending or borrowing (including assumed debt) of $1,000,000 or more effected by the Company or any of its Subsidiaries or Affiliates or to which any properties or assets of any of the foregoing are subject.

Section 3.14. **Brokers, Finders, etc.** Except for the services of Goldman, Sachs & Co. ("GS"), neither Seller nor the Company has employed, or is subject to any valid claim of, any broker, finder, consultant or other intermediary in connection with the transactions contemplated by this Agreement who might be entitled to a fee or commission in connection with such transactions. Seller is solely responsible for any payment, fee or commission that may be due to GS in connection with the transactions contemplated hereby.

Section 3.15. **Transactions with Affiliates.** Except as set forth in the notes to the Financial Statements or Schedule 3.3 hereto, none of the Company or any of its Subsidiaries or any Affiliate (a) has any outstanding contract, agreement or other arrangement with Seller or any of its affiliates which will continue in effect subsequent to the Closing or (b) other than the movement of monetary assets, has engaged in any transaction outside the ordinary course of business consistent with past practice, except as contemplated by Section 5.8(b) and Section 5.11, with Seller or its affiliates (other than the Company, its Subsidiaries

-34-

138

and the Affiliates) since February 20, 1988 which was (i) material to the business or operations of the Company, its Subsidiaries and the Affiliates taken as a whole or (ii) undertaken in contemplation of the sale of the Company, any of its Subsidiaries or any Affiliates.

Section 3.16. <u>Conduct of Business</u>. Except as set forth in the notes to the Financial Statements or Schedule 3.3 hereto, no event has occurred since February 20, 1988, which, had it occurred subsequent to the date of this Agreement, would have required the consent or approval of Buyer in writing pursuant to Section 5.4(d)(iv) or 5.4(e).

Section 3.17. <u>No Implied Representation</u>. It is the explicit intent of each party hereto that Seller is making no representation or warranty whatsoever, express or implied, except those representations and warranties of Seller in this Agreement or in any Schedule hereto, or in any certificate, document or other instrument contemplated hereby and delivered in connection herewith, including but not limited to any implied warranty or representation as to condition, merchantability or suitability as to any of the properties or assets of the Battery Business and that Buyer takes the Battery Business as is and where is. It is understood that any cost estimates, projections or other predictions contained or referred to in the Offering Materials

-35-

139

that have been provided to Buyer are not and shall not be deemed to be representations or warranties of Seller.

Section 3.18.  **Construction of Certain Provisions.** It is understood and agreed that the specification of any dollar amount in the representations and warranties contained in this Agreement or the inclusion of any specific item in the Schedules or Exhibits is not intended to imply that such amounts or higher or lower amounts, or the items so included or other items, are or are not material, and neither party shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Schedules in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in a Schedule or Exhibit is or is not material for purposes of this Agreement.

## ARTICLE IV
### Representations and Warranties of Buyer

Buyer hereby represents and warrants to Seller as follows:

Section 4.1.  **Incorporation; Authorization; etc.** Buyer is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.  Buyer has full corporate power to execute and deliver

-36-

140

this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement, the performance of Buyer's obligations hereunder and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate proceedings on the part of Buyer, its Board of Directors or stockholders. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not (i) violate any provision of the charter or By-laws or similar organizational instrument of Buyer, (ii) violate any provision of, or be an event that is (or with the passage of time will result in) a violation of, or result in the acceleration of or entitle any party to accelerate (whether after the giving of notice or lapse of time or both) any obligation under, or result in the imposition of any lien upon or the creation of a security interest in any of Buyer's assets or properties pursuant to, any mortgage, lien, lease, agreement, instrument, order, arbitration award, judgment or decree to which Buyer or any of its affiliates is a party or by which Buyer is bound, or (iii) violate or conflict with any provision of law, order, judgment or ruling of any governmental authority of the United States or any political subdivision thereof or any other material restriction of any kind or character (other

141

than a restriction of a governmental authority outside the United States) to which Buyer is subject, that, in the case of clauses (ii) and (iii), would, individually or in the aggregate, have a material adverse effect on the Business Condition of Buyer or of Buyer and its subsidiaries, taken as a whole, or would prevent the Stock Purchase. This Agreement has been duly executed and delivered by Buyer, and, assuming the due execution hereof by Seller, this Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

Section 4.2. <u>Brokers, Finders, etc.</u> Buyer has not employed, and is not subject to the valid claim of, any broker, finder, consultant or other intermediary in connection with the transactions contemplated by this Agreement who might be entitled to a fee or commission from Seller in connection with such transactions.

Section 4.3. <u>Licenses, Approvals, Other Authorizations, Consents, Reports, etc.</u> Other than the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), no filing with, notice to or authorization, consent or approval of, any domestic governmental agency is required to be made, filed, given or obtained by Buyer or any of its affiliates in connection with the consummation of

142

the Stock Purchase except for those (i) that become applicable solely as a result of the specific regulatory status of Seller, the Company or its Subsidiaries or (ii) the failure to make, file, give or obtain which would not, individually or in the aggregate, either have a material adverse effect on the Business Condition of Buyer or of Buyer and its subsidiaries taken as a whole or prevent the consummation of the Stock Purchase.

Section 4.4.  **Acquisition of Shares for Investment.**  Buyer has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its purchase of the Shares and the Affiliate Shares.  Buyer confirms that Seller has made available to Buyer the opportunity to ask questions of the officers and management employees of the Company and to acquire additional information about the business and financial condition of the Battery Business.  Buyer is acquiring the Shares and the Affiliate Shares for investment and not with a view toward the distribution thereof.  Buyer agrees that the Shares and the Affiliate Shares may not be sold or otherwise disposed of without registration under the Securities Act of 1933, as amended, except pursuant to an exemption from such registration available under such Act, and without compliance with foreign securities laws, in each case, to the extent applicable.

-39-

143

## ARTICLE V

## Covenants of Seller and Buyer

Section 5.1.  Investigation of Business; Access to Properties, Records and Employees.  (a)  After the date hereof, Seller shall cause the Company, its Subsidiaries and the Affiliates to afford to representatives of Buyer reasonable access to their respective offices, plants, properties, books and records during normal business hours, in order that Buyer may have full opportunity to make such investigations as it desires of the affairs of the Company and its Subsidiaries and the Affiliates; provided, however, that such investigation shall not unreasonably disrupt the personnel and operations of any of Seller, the Company, any of its Subsidiaries or any Affiliate.  If, prior to Closing, in the course of any investigation pursuant to this Section 5.1, Buyer discovers any breach of any representation or warranty contained in this Agreement or any Affiliate Sale Agreement or any circumstance or condition that upon Closing would constitute such a breach, Buyer shall endeavor promptly so to inform Seller; provided that (i) any failure so to inform Seller shall in no way affect Buyer's right, either prior to, at or subsequent to Closing (including with respect to the condition to Closing set forth in Section 8.1), to claim that a representation or warranty was breached or to recover for any such breach and (ii) the

-40-

**144**

endeavor by Buyer so to inform Seller shall not be considered a representation, warranty or covenant of Buyer for purposes of Section 9.1.

(b)   Any information provided to Buyer or its representatives pursuant to this Agreement shall be held by Buyer and its representatives in accordance with, and shall be subject to the terms of, the Confidentiality Agreement dated January 12, 1988 by and between Seller and Buyer, which is hereby incorporated in this Agreement as though fully set forth herein.

(c)   Buyer agrees to (i) hold all of the books and records of the Company and its Subsidiaries and the Affiliates existing on the Closing Date and not to destroy or dispose of any thereof for a period of seven (7) years from the Closing Date or such longer time as may be required by law, and thereafter, if it desires to destroy or dispose of such books and records, to offer first in writing at least 60 days prior to such destruction or disposition to surrender them to Seller and (ii) following the Closing Date to afford Seller, its accountants and counsel, during normal business hours, upon reasonable request, at any time, full access to such books, records and other data and to the employees of the Company and any of its Subsidiaries and any Affiliate to the extent that such access may be requested for any legiti-

-41-

145

mate purpose at no cost to Seller (other than for reasonable out-of-pocket expenses); provided, however, that (i) nothing herein shall limit any of Seller's rights of discovery and (ii) Seller agrees that all such non-public information shall be held strictly confidential.  Buyer shall have the same rights, and Seller the same obligations, as are set forth above in this Section 5.1(c) with respect to any material non-privileged records of Seller pertaining to the Company and any of its Subsidiaries and any Affiliate that are retained by Seller, with the exception of Tax Returns relating to Taxes that, pursuant to Article VII, are not the responsibility of Buyer.

(d)  Subject to the provisions of Section 10.3, Buyer agrees to cooperate with Seller and to cause the Company, its Subsidiaries and the Affiliates to cooperate with Seller in the preparation for and prosecution of the defense of any claim, action or cause of action arising out of or relating to any Seller Liability, including, without limitation, (i) by causing the Company, its Subsidiaries and the Affiliates to afford to representatives of Seller reasonable access to their respective offices, plants, properties, books and records during normal business hours in order that Seller may have full opportunity to make such investigations as may be necessary in connection therewith;

-42-

provided, however, that such investigation shall not unreasonably disrupt the personnel and operations of the Company, any of its Subsidiaries or any Affiliate, and (ii) by making available evidence within the control of Buyer, the Company, the Subsidiaries or any of the Affiliates and persons needed as witnesses employed by Buyer, the Company, the Subsidiaries or any of the Affiliates in each case as reasonably needed for such defense.  Seller shall reimburse Buyer for its, the Company's, the Subsidiaries' and the Affiliates' out of pocket costs relating to each of their cooperation under this subparagraph.

Section 5.2.   Best Efforts; Obtaining Consents.
(a)   Subject to the terms and conditions herein provided, Seller and Buyer each agrees to use its best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement (including without limitation the Affiliate Stock Purchases provided for pursuant to the Affiliate Sale Agreements) and to cooperate with the other in connection with the foregoing, including using its best efforts (i) to obtain all necessary waivers, consents and approvals from other parties to loan agreements, leases and other contracts, (ii) to obtain all consents, approvals and authorizations that are required to be

-43-

147

obtained under any federal, state, local or foreign law or regulation, (iii) to lift or rescind any injunction or restraining order or other order adversely affecting the ability of the parties hereto to consummate the transactions contemplated hereby, (iv) to effect all necessary registrations and filings including, but not limited to, filings under the HSR Act and submissions of information requested by governmental authorities, and (v) to fulfill all conditions to this Agreement and to the Affiliate Sale Agreements.  Seller and Buyer further covenant and agree, with respect to a threatened or pending preliminary or permanent injunction or other order, decree or ruling or statute, rule, regulation or executive order that would adversely affect the ability of the parties hereto to consummate the transactions contemplated hereby, to use their respective best efforts to prevent the entry, enactment or promulgation thereof, as the case may be.

        In furtherance and not in limitation of the foregoing, Buyer shall use its best efforts to resolve such objections, if any, as may be asserted with respect to the transactions contemplated hereby under any antitrust or trade regulatory laws of any domestic or foreign government or governmental authority or any multinational authority ("Antitrust Laws").  If any suit is instituted challenging any of the transactions contemplated hereby (including with-

-44-

148

out limitation the Affiliate Stock Purchases) as violative of any Antitrust Law, Buyer shall use its best efforts to take such action as may be required (a) by the applicable government or governmental or multinational authority (including, without limitation, the Antitrust Division of the United States Department of Justice or the Federal Trade Commission) in order to resolve such objections as such government or authority may have to such transactions under such Antitrust Law, or (b) by any domestic or foreign court or similar tribunal, in any suit brought by a private party or governmental or multinational authority challenging the transactions contemplated hereby (including without limitation the Affiliate Stock Purchases) as violative of any Antitrust Law, in order to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order that has the effect of preventing the consummation of any of such transactions.

Notwithstanding the foregoing, however, (i) neither Buyer nor any affiliate of Buyer shall be required to divest or hold separate or otherwise take or commit to take any action that materially limits its freedom of action with respect to, or its ability to retain, the Battery Business or any portion thereof or any of the businesses, product lines or assets of Buyer or any of its affiliates and (ii) Seller shall not be required to divest or hold separate or

otherwise take or commit to take any action that materially limits its freedom of action with respect to, or its ability to retain, the Battery Business or any portion thereof, or any of its other assets or businesses.

(b)  Either party hereto shall promptly inform the other of any material communication from the United States Federal Trade Commission, the Department of Justice or any other domestic or foreign government or governmental or multinational authority regarding any of the transactions contemplated hereby (including without limitation the Affiliate Stock Purchases).  If either party or any affiliate thereof receives a request for additional information or documentary material from any such government or authority with respect to the transactions contemplated hereby (including without limitation any of the Affiliate Stock Purchases), then such party will endeavor in good faith to make, or cause to be made, as soon as reasonably practicable and after consultation with the other party, an appropriate response in compliance with such request.  Buyer will advise Seller promptly in respect of any understandings, undertakings or agreements (oral or written) which Buyer proposes to make or enter into with the Federal Trade Commission, the Department of Justice or any other domestic or foreign government or governmental or multinational authority in connection with the transactions contemplated hereby.

-46-

150

Section 5.3.  **Further Assurances**.  Seller and Buyer agree that, from time to time, whether before, at or after the Closing Date, each of them will execute and deliver such further instruments of conveyance and transfer and take such other action as may be necessary to carry out the purposes and intents of this Agreement.

Section 5.4.  **Conduct of Business**.  From the date hereof through the Closing, except (i) as disclosed on Schedule 5.4 hereto (including, without limitation, certain transactions to be effected in order to reorganize certain of the Company's foreign subsidiaries and transfer certain other assets and liabilities so that, from and after the Closing Date, none of the Company, any of the Subsidiaries or any Affiliate shall have any interest in any business currently conducted by Seller or any of its subsidiaries except the Battery Business and, except as may occur pursuant to Section 2.4, none of Seller and its subsidiaries shall have any interest in the Battery Business), (ii) for any dividend of the common shares of Duracell Inc. (Canada), or (iii) as otherwise provided for in, or contemplated by, this Agreement, and, except as consented to or approved by Buyer in writing, Seller covenants and agrees that:

(a)  each of the Company and its Subsidiaries and the Affiliates shall operate its business in the ordinary

-47-

151

and usual course in all material respects in accordance with past practices;

(b)  except that Duracell Hellesens A/S, a corporation organized under the laws of Denmark and a wholly owned subsidiary of Seller ("Hellesens"), may issue up to 2,600 shares of its common stock to Kraft Holding A/S, a corporation organized under the laws of Denmark and a wholly owned subsidiary of Seller ("Denmark Holding"), in exchange for a contribution of capital, none of the Company, any of its Subsidiaries or any Affiliate shall issue, sell or agree to issue or sell (i) any shares of its capital stock or other equity interests, or (ii) any securities convertible into or evidencing the right to purchase, or options with respect to, or warrants to purchase or rights to subscribe for, any shares of its capital stock or other equity interests;

(c)  except in the ordinary course of business or as required by law or contractual obligations or other understandings or arrangements existing on the date hereof, none of the Company, any of its Subsidiaries or any Affiliate shall (i) increase in any manner the base compensation of, or enter into any new bonus or incentive agreement or arrangement with, any of its directors, officers or other employees; (ii) pay or agree to pay any pension, retirement allowance or other employee benefit to any such director,

-48-

152

officer or employee, whether past or present; (iii) enter into any new employment, severance, consulting, or other compensation agreement with any existing director, officer or employee; or (iv) commit itself to any additional pension, profit-sharing, deferred compensation, group insurance, severance pay, retirement or other employee benefit plan, fund or similar arrangement or amend or commit itself to amend any of such plans, funds or similar arrangements in existence on the date hereof; provided, however, that any bonuses or other incentives in connection with this sale (other than severance payments) payable under the Employment Agreements may be paid by the Company on the Closing Date on or prior to the Closing;

(d)   except as otherwise provided for in or contemplated by this Agreement, none of the Company, any of its Subsidiaries or any Affiliate shall (i) except that Hellesens may amend its Articles of Association to reflect the issuance of 2,600 shares of its common stock to Denmark Holding in exchange for a contribution of capital, amend its certificate of incorporation or by-laws (or analogous documents in the case of foreign companies), (ii) declare, except in the ordinary course of business consistent with past practice, any dividend or make any distribution with respect to its stock, (iii) assume, incur or guarantee, except in the ordinary course of business consistent with

-49-

past practice, any obligation for borrowed money, (iv) cancel or compromise, except in the ordinary course of business consistent with past practice, any debts owed to it, (v) waive or release any rights of material value, or (vi) close any plants or any other material facilities;

(e) except as otherwise provided for in or contemplated by the Agreement, none of the Company, any of its Subsidiaries or any Affiliate shall sell, transfer, distribute as a dividend in kind or otherwise dispose of any asset (other than inventory in the ordinary course of business consistent with past practice) the value of which is in excess of the book value as at February 20, 1988;

(f) except in the ordinary course of business consistent with past practice or as otherwise provided for in or contemplated by this Agreement, none of the Company, any of its Subsidiaries or any Affiliate shall (i) sell, transfer or otherwise dispose of any of its assets, (ii) create or permit to exist any new security interest, lien or encumbrance on its properties or assets, (iii) enter into any material contract or commitment of any kind or enter into any joint venture, partnership or other similar arrangement or form any other new material arrangement for the conduct of its business, or (iv) purchase any assets or securities of any person;

-50-

154

(g)  Seller (with respect to matters relating to the Company, any of its Subsidiaries or any of the Affiliates), and the Company, each of its Subsidiaries and each Affiliate shall (i) process insurance claims, pay insurance premiums and otherwise administer the risk management system and (ii) process receipts, process and pay bills and administer the cash management system, in each case in the ordinary course of business consistent with past practice except as otherwise provided for in or contemplated by this Agreement; and

(h)  none of the Company, any of its Subsidiaries or any Affiliate shall agree to take any action prohibited by this Section 5.4.

Section 5.5.  **Preservation of Business.**  Subject to the terms and conditions of this Agreement, Seller shall, and shall cause the Company, its Subsidiaries and the Affiliates to, use reasonable efforts to preserve the businesses of the Company and its Subsidiaries and the Affiliates intact, to keep available to the Company and its Subsidiaries, the Affiliates and Buyer the services of the employees of the Company, its Subsidiaries and the Affiliates, to preserve the good will of customers and others having business relations with the Company or any of its Subsidiaries or any Affiliate, and to maintain consistent with past prac-

-51-

155

tice and good business judgment insurance in full force and effect with responsible companies, comparable in amount to that in effect on the date of this Agreement, subject to the availability thereof at costs not materially greater than at present.

Section 5.6. <u>Public Announcements</u>. Seller and Buyer will consult with each other before issuing, or permitting any agent or affiliate to issue, any press releases or otherwise making or permitting any agent or affiliate to make, any public statements with respect to this Agreement and the transactions contemplated hereby (including, without limitation, the Affiliate Stock Purchases).

Section 5.7. <u>Non-Solicitation</u>. If this Agreement is terminated, Buyer will not, for a period of three years thereafter, without the prior written approval of Seller, directly or indirectly, solicit, encourage, entice or induce any person who is an employee of the Company or any of its Subsidiaries or any Affiliate, at the date hereof or at any time hereafter that precedes such termination, to terminate his or her employment with the Company or any of its Subsidiaries or any Affiliate. Buyer agrees that any remedy at law for any breach by it of this Section 5.7 would be inadequate, and Seller would be entitled to injunctive relief in such a case. If it is ever held that the restriction placed

-52-

156

on Buyer by this Section 5.7 is too onerous and is not nec-
essary for the protection of Seller, Buyer agrees that any
court of competent jurisdiction may impose lesser restric-
tions which such court may consider to be necessary or
appropriate to properly protect Seller.

Section 5.8.   Intercompany Accounts; Guaranties.
(a)  Effective as of the Closing, all intercompany
receivables or payables and loans then existing between
Seller or any Nonbattery Affiliate, on the one hand, and the
Company or any of its Subsidiaries or Affiliates, on the
other hand, shall be settled by way of capital contribution
(with respect to intercompany payables or loans due to
Seller or any Nonbattery Affiliate) or by way of dividend in
kind (with respect to receivables of the Company, the
Subsidiaries and the Affiliates owed by Seller or any
Nonbattery Affiliate).  Such settlement shall be accom-
plished (i) in the manner described to Buyer by Seller prior
to the date of this Agreement and (ii) without any violation
of any law or regulation or any incurrence of any tax,
penalties, interest or other charges (other than taxes with
respect to which Seller has agreed to indemnify Buyer).

(b)  Buyer shall use its best efforts (which shall
not include agreeing to any modifications of the terms of
the underlying obligations) to cause itself or one or more

-53-

157

of its affiliates to be substituted in all respects for Seller or any Nonbattery Affiliate, effective as of the later to occur of the Closing or the time of such substitution, in respect of all obligations of Seller and any Nonbattery Affiliate under each of the guaranties, letters of credit and letters of comfort set forth in Schedule 5.8 obtained by Seller or any of such subsidiaries or affiliates for the benefit of the Company or any of its Subsidiaries or Affiliates (the "Guaranties"), except for Guaranties, the obligations underlying which Buyer has elected to cancel and has notified or notifies Seller prior to August 1, 1986 of such election and is pursuing or will diligently pursue such cancellation or cancellations. If Buyer is unable to effect such a substitution with respect to any such Guaranty after using its best efforts to do so, Buyer shall obtain letters of credit, on terms and from financial institutions satisfactory to Seller, with respect to the obligations covered by each of the Guaranties for which Buyer does not effect such substitution; provided that (i) nothing contained in this Section 5.8 shall require Buyer or any Subsidiary or Affiliate to provide a letter of credit if the cost of its provision would be commercially unreasonable and, (ii) if as of August 1, 1988 Buyer has been unable to cause itself or one of its affiliates to be substituted for Seller or any Nonbattery Affiliate under any Guaranties (including guaran-

-54-

158

ties, the obligations underlying which Buyer has elected to cancel but has not yet cancelled) and Buyer has not obtained the above-referenced letters of credit with respect to such Guaranties for any reason other than that specified in clause (i) above (the "Open Guaranties"), then Buyer shall, on August 1, 1988, place in escrow with The First National Bank of Chicago, as escrow agent, or another mutually acceptable escrow agent, pursuant to a customary escrow agreement, for the sole benefit of Seller, cash or cash equivalents equal in amount to the Open Guaranties and (iii) in the event that Buyer obtains a letter or letters of credit or places cash or cash equivalents in escrow as described above and is subsequently able to cause itself or one of its affiliates to be substituted for Seller or any Nonbattery Affiliate or to obtain a letter or letters of credit, as the case may be, under any Guaranties covered by such letter or letters of credit or as to which cash or cash equivalents have been placed in escrow, Buyer may cause itself or one of its affiliates to be so substituted, or may so obtain a letter or letters of credit, and may reduce the amount of such letter or letters of credit or the amount so escrowed, as the case may be, by the amount of the obliga-tion with respect to which such substitution has been achieved or such letter or letters of credit have been obtained, as the case may be.  Subsequent to Closing, with

-55-

respect to any uncancelled Guaranty for which no substitution is effected or letter of credit is provided (except for Guaranties as to which cash or cash equivalents are placed in escrow pursuant to clause (ii) of the proviso to the preceding sentence), Buyer shall, pursuant to Section 10.2, and shall cause Duracell International Inc. to, indemnify Seller or any Non-Battery Affiliate against any Covered Liability under any such Guaranty.

Section 5.9.  **Affiliate Sale Agreements**.  Immediately prior to the Closing, Buyer or one or more wholly-owned subsidiaries of Buyer will execute and deliver to Seller, and Seller will cause its appropriate subsidiaries to execute and deliver to Buyer, the Affiliate Sale Agreements.  Buyer will or will cause its appropriate Subsidiaries to, and Seller will cause its appropriate subsidiaries to, perform such Affiliate Sale Agreements in accordance with their terms.  Buyer and Seller shall use their respective best efforts to cause the Closing and the closings under the Affiliate Sales Agreements to occur in such order as Buyer may reasonably request.  Notwithstanding anything contained in this Agreement to the contrary, Seller shall not be required to sell Duracell Inc. (Canada) directly to Buyer pursuant to an Affiliate Sale Agreement unless the Closing occurs on or prior to June 24, 1988.

160

Section 5.10.  <u>Performance of Company Obligations</u>.
Buyer agrees from and after the Closing Date to cause the
Company, its Subsidiaries and the Affiliates to perform and
fulfill all of their respective obligations and commitments
whether existing as of the Closing Date or arising or
incurred thereafter.

Section 5.11.  <u>Insurance</u>.  (a)  From and after the
Closing, Seller shall use its best efforts (which shall not
require acceptance of adverse changes in its existing insur-
ance policies or other unreasonably adverse effects on
Seller), subject to the terms of the Seller's Insurance
Policies (as hereinafter defined), to retain the right to
make claims and receive recoveries, subject to subsection
5.11(e), for the benefit of the Company, its Subsidiaries
and the Affiliates, as well as for the benefit of Seller and
its affiliates, under any insurance policies (except to the
extent that any such policy provides for coverage only if
that policy is in effect and/or the Company is a subsidiary
of Seller at the time a claim is made to the related insur-
er) maintained at any time prior to the Closing by Seller
and its predecessors and its affiliates and their predeces-
sors (collectively, the "<u>Seller's Insurance Policies</u>"), cov-
ering any loss, liability, claim, damage or expense relating
to the assets, business, operations, conduct, products and
employees (including former employees) of the Company, its

-57-

161

Subsidiaries, the Affiliates and each of their respective predecessors that relates to or arises out of occurrences prior to the Closing (a "Claim").  Seller agrees to use its best efforts (which shall not require acceptance of adverse changes in its existing insurance policies or other unreasonably adverse effects on Seller) so that the Company, its Subsidiaries and the Affiliates shall have the right, power and authority, subject to any required consent of the carriers under the Seller's Insurance Policies, in the name of Seller or any of its affiliates to make directly any Claims under the Seller's Insurance Policies and to receive directly recoveries thereunder.

(b)  Buyer agrees to reimburse, indemnify and hold Seller and its affiliates harmless for out-of-pocket costs and expenses (including, without limitation, any retroactive premiums and current or prospective premium increases imposed on Seller or any of its affiliates identifiable as to Claims, but not including normal internal administrative expenses) incurred after the Closing Date to carry out any obligations pursuant to this Section 5.11 or as a result of Claims being made.  Buyer will pay and bear all amounts relating to any self retention or deductible and any gaps in or limits on coverage applicable to a Claim asserted at any time (but not with respect to any claim made by Seller and its Affiliates that is not a Claim) in effect at such time

-58-

162

with respect to the applicable Seller's Insurance Policy, after taking into account the effect of any prior claim payments under the terms of such Seller's Insurance Policy, whether or not the applicable Seller's Insurance Policy solely covers claims of the Company, its Subsidiaries and the Affiliates or covers claims of both Seller and its affiliates on the one hand, and the Company, its Subsidiaries and the Affiliates on the other hand.  In the event that any legal action, arbitration, negotiation or other proceedings are required for any of the Company, its Subsidiaries or the Affiliates to assert coverage against any insurer or to perfect its Claim, (i) Buyer shall, to the extent possible, do so at its own expense or (ii) if Buyer is not permitted to assert Coverage or perfect a Claim, Seller shall do so, and, in either event, Buyer shall hold harmless and indemnify Seller and its affiliates for any costs and expenses that they might incur because of such action (other than the incurrence of normal internal administrative expenses).

(c)  Seller shall use its best efforts (i) to cooperate fully and to cause its affiliates to cooperate fully with Buyer, the Company, its Subsidiaries and the Affiliates in submitting good faith Claims on behalf of the Company, its Subsidiaries and the Affiliates under the Seller's Insurance Policies, (ii) to execute any and all agreements and other documents, including maintaining and reporting

-59-

163

quarterly the amount of the aggregate limits under such insurance policies and including limited powers of attorney, on behalf of the Company, its Subsidiaries and the Affiliates which are reasonably necessary or appropriate in connection with any of the foregoing, including, without limitation, the assignment to the Company, its Subsidiaries and the Affiliates of any right to receive payments under all such policies in the event consent to such assignment can be or is obtained from any insurer, and (iii) to pay promptly over to Buyer any and all amounts received by Seller or its affiliates under such policies with respect to Claims.

(d)  Seller and its affiliates shall retain custody of the Seller's Insurance Policies and any and all service contracts, claim settlements and all other insurance records relating thereto and Buyer, the Company, its Subsidiaries and the Affiliates shall have access to and the right to make copies of all such documents and records upon the reasonable request to Seller or its affiliates.  If Seller desires to destroy any such policies or records it shall first notify Buyer who shall have the right to cause the same to be delivered to it upon reimbursing Seller for reasonable out-of-pocket handling and shipping expenses.

(e)  Seller agrees that, with respect to coverage of occurrences prior to the Closing, it shall use its best

-60-

164

efforts to prevent any of the Seller's Insurance Policies or the coverage provided to the Company, its Subsidiaries and the Affiliates thereunder from being terminated or voided or reduced in any way (which shall not include agreeing to payments or changes in terms or conditions which are commercially unreasonable).  If Seller receives notice of any such termination, voiding or reduction of any such policy or any written notice regarding any material Claim, Seller shall advise Buyer promptly.

(f)  Buyer acknowledges that Seller and its affiliates shall have no responsibility for obtaining any insurance or bearing any loss, liability, claim, damage or expense relating to the assets, business, operations, conduct, products and employees (including former employees) of the Company, its Subsidiaries and the Affiliates that relates to or arises out of occurrences subsequent to the Closing.  Except for its obligations to perform the covenants set forth in this Section 5.11, nothing herein shall create any obligation on the part of Seller to provide any insurance coverage for any loss, liability, lien, damage or expense of Buyer, the Company, its Subsidiaries or the Affiliates.

(g)   Nothing contained herein to the contrary shall prohibit Seller from managing its risk management program with respect to post-Closing periods, including, without limitation the cancellation or reduction of the amount or scope of insurance coverage with respect to post-Closing periods, in a manner consistent with its reasonable business judgment as applied to the continuing operations of Seller and its affiliates (other than the Company, its Subsidiaries and the Affiliates).  Seller shall endeavor to consult with and cooperate with Buyer to minimize the cost or expense of any such action to Buyer, provided that Seller shall not bear any additional costs as a result of any such cooperation.

(h)   With respect to Claims that Seller may have under any insurance policies retained by the Company, its Subsidiaries or the Affiliates which relate to or arise from Seller Liabilities, Buyer and Seller agree that Seller shall have the rights and obligations of Buyer set forth in Sections 5.11(a) through 5.11(g) to the extent applicable as if "Buyer" were substituted for "Seller" and "Seller" were substituted for "Buyer" (together with other conforming changes) throughout such sections.

Section 5.12.  <u>Cash Management</u>.  (a)  The Company and its Subsidiaries and Affiliates which participate in

-62-

166

Seller's domestic central cash management system (the "Cash Management System Participants") shall continue to so participate in accordance with prior practice prior to the Closing Date.

(b)  Effective at the opening of business on the Closing Date, Buyer shall be responsible for funding all disbursements of the Cash Management System Participants.

(c)  Effective at the opening of business on the Closing Date, none of Seller and its affiliates (other than the Company, its Subsidiaries and the Affiliates) shall have any right to any funds in any disbursement or depository account listed on Schedule 5.12(c), of the Cash Management System Participants.  Effective at the opening of business on such date, Buyer (or the Company, a Subsidiary or an Affiliate) shall take physical possession of each such account and the balance therein and of the unused check stock, if any, related to each such account.

(d)  With respect to those Subsidiaries of the Company and those Affiliates which are not Cash Management System Participants (the "Non-Participants"), prior to and on the Closing Date Seller shall cause there to be sufficient balances in the bank accounts of each Non-Participant to allow operations of each Non-Participant to continue in the ordinary course of business for a reasonable period of time

167

not to exceed three business days.  Effective the opening of
business on the Closing Date, none of Seller and its affili-
ates (other than the Company, its Subsidiaries and the
Affiliates) shall have any right to any funds in any Non-
Participant bank account, each of which is described on
Schedule 5.12(d).  Effective at the opening of business on
such date, Buyer (or a Subsidiary or an Affiliate) shall
take physical possession of each such account and the bal-
ance therein and of the unused check stock, if any, related
to each such account.

(e)  Notwithstanding anything to the contrary con-
tained in this Section 5.12, Buyer and Seller agree that
Seller is entitled to receive, and Buyer agrees to take or
cause the Company or any of its Subsidiary of any Affiliate
to take any action necessary to transfer to Seller, the
Trademark Purchase Price and the purchase price for the pur-
chase of N.V. Duracell Batteries S.A.

Section 5.13.  Post-Closing Cooperation.  (a)
Prior to, at and subsequent to the Closing, Seller shall
cooperate with Buyer and the Company in connection with the
initiation by Buyer and the Company of administrative, legal
and management functions previously provided by Seller with
respect to the Battery Business.  Such cooperation shall
include, but not be limited to, the provision by Seller of

-64-

168

any documents (or copies thereof) reasonably requested by Buyer which relate to Covered Liabilities and the provision, with respect to Covered Liabilities, by Seller of the other types of cooperation to Buyer which Buyer has agreed to make available to Seller pursuant to Section 5.1(d).

(b)   Buyer and Seller agree to use their best efforts to take and to cause their respective affiliates and subsidiaries to use their respective best efforts, prior and subsequent to the Closing, (i) to effect the conveyance from Duracell International, Inc. to Seller or its nominee for consideration in the amount of $1 of all right, title and interest to the property, plant and equipment relating to the former Mallory capacitor plants located at Waynesboro, Tennessee and Glasgow, Kentucky, (ii) to cause Seller to be substituted in all respects for Duracell International, Inc. under (A) the Settlement Agreement and Consent Order, dated April 12, 1988, among Emhart Industries, Inc., Duracell International, Inc. and Dart Industries, Inc. (the "Emhart Settlement Agreement") and (B) any consent order or settlement entered into or proposed to be entered into with respect to any Seller Liability related to the former Mallory capacitor plant at Crawfordsville, Indiana (a "Crawfordsville Settlement") and (iii) to obtain the full release of Duracell International, Inc., Buyer and any other affiliates or subsidiaries of Buyer from any obligations

-65-

169

under (A) the Emhart Settlement Agreement and (B) any Crawfordsville Settlement.  Such steps shall include using best efforts to obtain any necessary consents or approvals, including, but not limited to, with respect to the Emhart Settlement Agreement, the consent of Emhart Industries, Inc. and the approval of the United States District Court for the Middle District of Tennessee.

Section 5.14.  _Financing Documents_.  Promptly upon receipt by Buyer, Buyer shall deliver or cause to be delivered to Seller copies of any definitive financing agreements with external financing sources.  Seller agrees to hold such documents and the information contained therein strictly confidential.

## ARTICLE VI

## Employee Benefits

Section 6.1.  _Employee Benefit Plans_.  (a)  Schedule 6.1(a) lists all material compensation and benefit plans, contracts and arrangements of the Company, the Subsidiaries and the Affiliates (other than routine administrative procedures or government-required programs) in effect as of the date hereof including, without limitation, all pension, profit sharing, savings and thrift, bonus, incentive or deferred compensation, severance pay and medical and life insurance plans in which any current or former

-66-

170

employees of the Company, any of its Subsidiaries or any Affiliate or their families ("Company Employees") participate (collectively, "Company Employee Benefit Plans").

(b)  All Company Employee Benefit Plans in which Company Employees in the United States ("U.S. Company Employees") participate ("U.S. Company Employee Benefit Plans") and which are "employee benefit plans", as defined in Section 3(3) of ERISA, in all material respects are in compliance with and have been administered in compliance with all applicable requirements of law, including but not limited to the Code and ERISA, and all contributions required to be made to each such plan under the terms of such plan, ERISA or the Code for all periods of time prior to the date hereof and the Closing Date have been or will be, as the case may be, made or accrued.

(c)  With respect to any U.S. Company Employee Benefit Plan which is intended to qualify under Section 401(a) of the Code ("U.S. Company Pension Plan"), a favorable determination letter as to the qualification under Section 401(a) of the Code has been issued and the related trust has been determined to be exempt from taxation under Section 501(a) of the Code and, to Seller's knowledge, no amendment made (or the failure of such amendment to be made) to any U.S. Company Pension Plan subsequent to the date of such

171

determination letter has adversely affected the qualified status of any such plan.  The Company and its Subsidiaries have performed all material obligations required to be performed by them under, and are not in default under or in violation of, the terms of any of the U.S. Company Employee Benefit Plans in any material respect.  To the best of Seller's knowledge, neither the Company nor its Subsidiaries nor any other "disqualified person" (as defined in Section 4975 of the Code) has engaged in any "prohibited transaction" (as such term is defined in Section 4975 of the Code), which could subject any U.S. Company Pension Plan (or its related trust), the Company or any of its Subsidiaries or any officer, director or employee of the Company or any of its Subsidiaries to the tax or penalty imposed under Section 4975 of the Code; and, except as disclosed on Schedule 6.1(c), no "reportable event" within the meaning of Section 4043 of ERISA has occurred with respect to any U.S. Company Pension Plan.  The Company and its Subsidiaries have not incurred, and do not reasonably expect to incur, any material liability to the Pension Benefit Guaranty Corporation (except for required premium payments, which payments have been made when due).  Neither the Company nor any of its Subsidiaries has any "accumulated funding deficiencies," as such term is defined in ERISA, whether or not waived, with respect to any U.S. Company Pension Plan.  Except as other-

-68-

172

with set forth in Schedule 6.1(c) hereto, no U.S. Company Employee Benefit Plan is funded through a welfare benefit fund within the meaning of Section 419 of the Code, and no benefits under any U.S. Company Pension Plan are provided through a voluntary employees' beneficiary association within the meaning of Section 501(c)(9) of the Code.

(d)   Except as otherwise set forth in Schedule 6.1(d) hereto, neither the Company nor any of its Subsidiaries is required to contribute to, or during the 5-year period ending on the Closing Date will have been required to contribute to, any "multiemployer plan," as such term is defined in Section 4001(a)(3) of ERISA, and neither the Company nor any of its Subsidiaries is subject to any withdrawal or partial withdrawal liability within the contemplation of Section 4201 of ERISA and will not become subject thereto as a result of the transactions contemplated by this Agreement.

(e)   Except as otherwise set forth in Schedule 3.13 or Schedule 6.1(e) hereto, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any material payment (including, without limitation, severance, unemployment compensation, golden parachute or otherwise) becoming due to any director or Company Employee from the Company,

-69-

173

any of its Subsidiaries or any Affiliate under any Company Employee Benefit Plan or otherwise, (ii) materially increase any benefits otherwise payable under any Company Employee Benefit Plan or (iii) result in the acceleration of the time of payment or vesting of any such benefits to any material extent.

(f)  Each Company Employee Benefit Plan which is not a U.S. Company Employee Benefit Plan (a "Foreign Company Employee Benefit Plan") has been maintained in all material respects in accordance with its terms and with all legal requirements applicable thereto and is funded or provided for in accordance with applicable laws.

(g)  Notwithstanding any other provision of this Article VI, Seller shall indemnify and hold Buyer, the Company, the Subsidiaries and the Affiliates harmless from and against any Covered Liabilities resulting from or arising out of the breach of any representation or warranty contained in this Section 6.1 by any ERISA Affiliate (as defined below) as if such representation or warranty had been made by Seller with respect to any employee benefit plan maintained by, or on behalf of employees of, such ERISA Affiliate.

For purposes of this Section 6.1(g) "ERISA Affiliate" shall mean any entity (other than the Company, the

-70-

174

Subsidiaries and the Affiliates) which, as of the applicable
point in time, is a member of a group (described in Section
414(b), (c), (m), or (o) of the Code) of which the Company
is a member.

Section 6.2.  <u>Termination of Participation</u>.  Except
as provided in Section 6.3, Section 6.5 and Section 6.6,
Seller shall cause the active participation in each U.S.
Company Employee Benefit Plan, not maintained solely by the
Company, any of its Subsidiaries or the Affiliates of all
U.S. Company Employees to cease as of the Closing Date and
no additional benefits to be accrued thereunder for such
employees.

Section 6.3.   <u>Collective Bargaining Agreements</u>.
Anything herein to the contrary notwithstanding, the obliga-
tions of the Company or any of its Subsidiaries or the
Affiliates to provide continuing benefits for periods after
the Closing Date as required under collective bargaining
agreements shall remain in effect and Buyer shall indemnify
and hold Seller and its affiliates harmless from and against
any and all Covered Liabilities relating to such obligations.

Section 6.4.   <u>Pension Plans</u>.  Except as provided in
Section 6.6, Seller shall retain all assets and liabilities
accrued through the Closing Date under the U.S. Company Pen-
sion Plans and shall fully vest all U.S. Company Employees

-71-

175

'n their accrued benefits as of the Closing Date, and make all contributions (including mandatory contributions under the Duracell Inc. Thrift Plan (the "Thrift Plan")) required to be made under the terms of each U.S. Company Pension Plan for all periods prior to the Closing Date.

Section 6.5. **Welfare Plans.** (a)  Seller shall retain all assets relating to the U.S. Company Employee Benefit Plans listed on Schedule 6.5(a) and, except as provided in Section 6.6(g), shall be liable for and shall hold Buyer, the Company and its Subsidiaries harmless from and against all claims for benefits by participants of such plans which, under the terms of such plans, are incurred on or prior to the Closing Date.  A claim shall be deemed incurred for purposes of this Agreement when the service which results in such claim is rendered or the event giving rise to such claim occurs, as the case may be, determined in accordance with past practices with respect to such plan, consistently applied.

(b)  Seller shall be liable for and shall hold Buyer, the Company and its Subsidiaries harmless from and against any claims for benefits accrued as of the Closing Date or thereafter and payable to retirees of the Company and its Subsidiaries under any U.S. Company Employee Benefit Plan who have actually retired prior to the Closing Date.

-72-

176

BECHTEL

**IMAGE EVALUATION
TEST TARGET (MT-3)**

"This microfiche, including title information
and format is © 1986 Bechtel Information
Services. All rights reserved."

1.0    2.8    2.5
       3.0
1.1    3.2    2.2
       3.6
       4.0    2.0
              1.8
1.25   1.4    1.6

150mm

6"

**BECHTEL**
*Information Services*
15740 Shady Grove Road
Gaithersburg, Maryland 20877-1454

(c)  With respect to the Duracell Inc. short-term and long-term disability plans, subject in all cases to the terms of the appropriate plan, Seller shall be liable for and shall hold Buyer, the Company and its Subsidiaries harmless from and against all claims for benefits payable to or liabilities, under the terms of the appropriate plan, in respect of any participant who is, pursuant to the terms of the appropriate plan, "disabled" as of the Closing Date until such time as such participant ceases to be "disabled", under the terms of the appropriate plan, or dies.  In the event that a participant ceases to be "disabled", Buyer, the Company or its Subsidiaries shall, upon the request of such participant, offer employment to such participant to the extent that appropriate job openings are available.

Section 6.6.  **Buyer's Obligations**.  (a)  Subject to the other provisions of this Section 6.6, Buyer agrees that for a period of at least one year after the Closing Date it will (i) continue in full force and effect the Foreign Company Employee Benefit Plans in accordance with their terms without any amendment or modification which would result in a reduction, in the aggregate, of the benefits thereunder (except to the extent necessary to comply with applicable law), and (ii) provide U.S. Company Employees with benefits, in the aggregate, substantially the same as those benefits, in the aggregate, provided to Company Employees as of the

-73-

177

date hereof.  In addition, Buyer agrees to give Company Employees service credit for all periods of employment with Seller or its affiliates (including the Company and its Subsidiaries and the Affiliates) prior to the Closing Date for purposes of eligibility and vesting (but not for benefit accrual), but only to the same extent therefor credit was given under the terms of the applicable plan, under any plan adopted by Buyer, the Company, any of its Subsidiaries or any Affiliate with respect to Company Employees to provide retirement or welfare benefits.

   (b)  (i)  Except as otherwise provided hereunder, Buyer shall cause the Company on the Closing Date or as soon as practicable thereafter to assume or retain, as the case may be, and be solely responsible for, all liabilities and obligations whatsoever of Seller and its affiliates under the Thrift Plan.  Buyer and Seller shall each take, or cause to be taken, all such actions as may be necessary or appropriate in order to establish the Company as successor to Seller as to all rights, assets, duties, liabilities, and obligations under, of, or with respect to, the Thrift Plan, including, but not limited to, the rights, assets, duties, liabilities and obligations of Seller or any of its affiliates under, or with respect to, any and all trust agreements to the extent that they relate solely to the Thrift Plan. From and after the Closing Date, Seller and its affiliates

-74-

178

shall cease to have any liability or obligation whatsoever with respect to the Thrift Plan, except as otherwise provided in this Article VI.

(ii)  Seller agrees to take such actions as may be necessary to amend the Kraft, Inc. Defined Contribution Master Trust in order for the Company effectively to assume and administer the Thrift Plan, including, if necessary, to direct the trustee of such master trust to transfer to the new trustee or other funding agent appointed by Buyer or the Company the amount of assets in such master trust attributable to the Thrift Plan.  Such transfer shall be made in cash, securities, other property or a combination thereof, as determined by Seller, reasonably acceptable to Buyer; provided, however, that Buyer agrees to accept cash and guaranteed investment contracts which are substantially similar to those currently held in the Thrift Plan.

(iii)  Seller and Buyer shall, in connection with the transfers described in this Section 6.6(b) cooperate in making all appropriate filings required under the Code or ERISA, and the regulations thereunder and any applicable securities laws, and take all such action as may be necessary and appropriate to cause such transfers to take place as soon as practicable after the Closing Date; provided, however, that no transfer shall take place until the

-75-

receipt of a favorable IRS determination letter that the trust to which the assets are to be transferred (the "Buyer Trust") is exempt from taxation under Section 501(a) of the Code or the receipt of an opinion of Buyer's counsel reasonably satisfactory to Seller's counsel to the effect that the Buyer Trust is exempt from taxation under Section 501(a) of the Code.  For purposes of the opinion of Buyer's counsel referred to in the preceding sentence, Seller hereby represents and covenants that the Thrift Plan, as of the Closing Date, is or shall be assumed to be "qualified" within the meaning of Section 401(a) of the Code.

(c)  Buyer shall cause Duracell Australia Pty. Ltd. ("DAP") on the Closing Date or as soon as practicable thereafter to establish a superannuation fund (the "Duracell Fund") that satisfies the superannuation fund conditions within the meaning of sub-section 5(2) of the Occupational Superannuation Standards Act of 1987 of the Commonwealth of Australia and that provides benefits, in the reasonable opinion of Seller, in the aggregate, not less favorable than the benefits provided under the Kraft Pension Fund (the "Kraft Fund"), or is otherwise reasonably acceptable to Seller, to be operated by DAP for the benefit of employees of DAP and shall cause DAP to offer to employees of DAP who are members of the Kraft Fund membership in the Duracell Fund.

180

Buyer shall cause DAP forthwith upon a member of the Kraft Fund being accepted as a member of the Duracell Fund to terminate its contribution to the Kraft Fund in respect of that member and to direct the Trustees of the Kraft Fund to pay or transfer to the trustees of the Duracell Fund an amount equal to such amount as is agreed to by Kraft Foods Limited being not less than the greater of -

    (i)    the present value, as determined by an actuary independent of the parties, of the benefit which would have been payable to the member under the Trust Deed of the Kraft Fund had the member's employment by DAP terminated and the member ceased to be a member of the Kraft Fund on the date on which DAP's contributions terminate; or

    (ii)    such amount as is equivalent to the actuarial reserve of the member held in the Kraft Fund at the date of such transfer and determined by an actuary independent of the parties.

Notwithstanding the foregoing, Buyer and Seller shall, to the extent permitted by applicable law, cooperate to have such transfers from the Kraft Fund to the Duracell Fund be effected in a mutually acceptable fashion which avoids excessive administrative expense or inconvenience for the Duracell Fund.

-77-

181

(d)  Buyer shall cause Duracell Australia Pty. Ltd. ("DAP") on the Closing Date or as soon as practicable thereafter to establish a superannuation fund (the "Duracell Management Fund") that satisfies the superannuation fund conditions within the meaning of sub-section 5(2) of the Occupational Superannuation Standards Act of 1987 of the Commonwealth of Australia and that provides benefits, in the reasonable opinion of Seller, not less favorable, in the aggregate, than the benefits provided under the Kraft Management Superannuation Plan (the "Kraft Management Fund"), or is otherwise approved of by the Seller, to be operated by DAP for the benefit of employees of DAP and shall cause DAP to offer to employees of DAP who are members of the Kraft Management Fund membership in the Duracell Management Fund.

Buyer shall cause DAP forthwith upon a member of the Kraft Management Fund being accepted as a member of the Duracell Management Fund to terminate its contribution to the Kraft Management Fund in respect of that member and to direct the Trustees of the Kraft Management Fund to pay or transfer to the trustees of the Duracell Management Fund an amount equal to such amount as is agreed to by Kraft Foods Limited being not less than the greater of -

(i)    the present value, as determined by an actuary
independent of the parties, of the benefit
which would have been payable to the member
under the Trust Deed of the Kraft Management
Fund had the member's employment by DAP termi-
nated and the member ceased to be a member of
the Kraft Management Fund on the date on which
DAP's contributions terminate; or

(ii)   such amount as is equivalent to the actuarial
reserve of the member held in the Kraft
Management Fund at the date of such transfer
and determined by an actuary independent of
the parties.

Notwithstanding the foregoing, Buyer and Seller shall, to
the extent permitted by applicable law, cooperate to have
such transfers from the Kraft Management Fund to the
Duracell Management Fund be effected in a mutually accept-
able fashion which avoids excessive administrative expense
or inconvenience for the Duracell Management Fund.

(e)  Buyer agrees to assume any and all Covered
Liabilities accrued prior to the Closing Date with respect
to the Duracell Long Term Incentive Plan and the Duracell
Inc. Management Incentive Plan in accordance with their
terms.

(f)  For at least one year after the Closing Date, Buyer agrees to provide medical and death benefit coverage (including continuing lifetime coverage) on terms no less favorable than those provided by the U.S. Company Employee Benefit Plans listed on Schedule 6.5(a) hereto to those U.S. Company Employees who are eligible to participate in such plans and are "eligible to retire" as of the Closing Date, under the terms of such plans as in effect on the date hereof.

(g)  Notwithstanding the provisions of Section 6.5, Buyer shall be responsible for the administration of and shall assume any and all obligations arising under the continuation coverage requirements of Section 162(k) of the Code (as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985) for those plan participants in the U.S. Company Employee Benefit Plans listed on Schedule 6.5(a) who have exercised or are eligible to exercise, their rights to such coverage as of the Closing Date as a result of any qualifying event under Section 162(k) of the Code occurring prior to the Closing Date.

(h)  Buyer agrees to continue and shall assume any and all Covered Liabilities but solely with respect to the participation of the three executives listed on Schedule 6.6(h) in the Kraft, Inc. Select Career International Retirement Plan.

184

(i)  Buyer shall assume any and all Covered Liabilities with respect to, and agrees to continue in full force and effect in accordance with its terms without any reduction of benefits or other amendment or modification (except to the extent necessary to comply with applicable law) the participation of the seven executives listed on Schedule 6.6(i) in the Duracell Supplemental Life Insurance Plan.

(j)  Buyer shall cause the Company to fulfill all obligations and liabilities under the Employment Agreements referenced in Section 2 of Schedule 6.1(a) but Seller agrees to pay into a bank account or accounts designated by the Company prior to the Closing an amount equal to 100% of any bonuses or other incentives, based on a sale price for the Company of $1,800,000,000 and not subject to any subsequent adjustment in connection with this sale (other than severance payments) which are payable under the Employment Agreements.

(k)  Following the Closing Date, Buyer shall be liable for and shall hold Seller and its affiliates harmless from and against any and all Covered Liabilities with respect to Company Employees' employee benefits, including, without limitation, Covered Liabilities arising from or with respect to, the Foreign Company Employee Benefit Plans, the Thrift Plan and the participation of Company Employees in

-81-

185

the plans referred to in this Section 6.6, except to the extent that Seller has expressly retained or assumed certain Covered Liabilities pursuant to Section 6.4 or 6.5 hereof.

ARTICLE VII

Tax Matters

Section 7.1.  Tax Returns of the Company, the Subsidiaries and the Affiliates.  Seller represents and warrants that (i) all Income Tax Returns required to be filed for taxable periods ending on or prior to the Closing Date by, or with respect to any activities of, the Company or its Subsidiaries have been or will be filed in accordance with all applicable laws, and all Taxes shown to be due on such Returns have been or will be paid, and (ii) all other material Returns required to be filed before the Closing Date by, or with respect to any activities of the Company, its Subsidiaries or the Affiliates have been or will be filed in accordance with all applicable laws and all Taxes shown as due on such Returns have been or will be paid.

Section 7.2.  Section 338 Elections and Forms. (a)  With respect to Buyer's acquisition of the Shares hereunder and of the Affiliate Shares pursuant to the Affiliate Stock Purchase Agreements, Buyer shall properly make all available Section 338(g) Elections in accordance with applicable Tax Laws.  With respect to Seller's sale of the Shares

-82-

186

hereunder, Seller and Buyer shall jointly make all available Section 338(h)(10) Elections in accordance with applicable Tax Laws and as set forth herein.  Buyer and Seller agree to report the transfers under this Agreement consistent with the Section 338 Elections, and shall take no position contrary thereto unless required to do so by applicable Tax Laws pursuant to a Determination.

(b)  Buyer shall be responsible for the preparation and filing of all Section 338 Forms in accordance with applicable Tax Laws and the terms of this Agreement.  Seller shall execute and deliver to Buyer such documents or forms as are reasonably requested and are required by any Tax Laws properly to complete the Section 338 Forms, at least 20 days prior to the date such Section 338 Forms are required to be filed.

(c)  Buyer and Seller agree that they shall use their best efforts to enter into an agreement (the "Allocation Agreement") prior to the Closing Date concerning the computation of the Aggregate Deemed Sale Price (as defined under applicable Treasury Regulations) of the assets of the Company, its Subsidiaries and the Affiliates and the allocation of such Aggregate Deemed Sale Price among such assets.  Buyer and Seller agree that they shall use their best efforts to revise the Allocation Agreement to the

-83-

187

extent necessary to reflect the differences, if any, between the Financial Statements and the Adjusted Closing Date Balance Sheet no later than sixty days before the last date on which the Section 338(h)(10) election may be filed. If, sixty days before the last date on which the Section 338(h)(10) election may be filed, Buyer and Seller have not adopted or revised the Allocation Agreement as described above, any disputed aspects of the Allocation Agreement or such revision shall be resolved before the last date on which the Section 338(h)(10) election may be filed by a "big eight" accounting firm mutually agreed upon by Buyer and Seller having no material relationship with either Buyer or Seller. The costs, expenses and fees of such accounting firm shall be borne equally by Buyer and Seller. Buyer and Seller agree to act in accordance with the allocations contained in the Allocation Agreement in any relevant Tax Returns or similar filings.

Section 7.3.  <u>Tax Indemnification by Seller</u>. Seller shall be liable for, and shall hold Buyer, the Company, its Subsidiaries, the Affiliates and any successor corporations thereto or affiliates thereof harmless from and against the following Taxes with respect to the Company, its Subsidiaries and the Affiliates:

(a)   any and all Income Taxes for any taxable period ending (or deemed, pursuant to Section 7.5 hereof, to end) on or before the Closing Date due or payable by the Company, its Subsidiaries and the Affiliates or Buyer, including any Income Taxes incurred as a result of making the Section 338(h)(10) Election or Elections;

(b)   to the extent not reserved for on the Adjusted Closing Date Balance Sheet, any Other Taxes payable with respect to Domestic Returns filed or required to be filed (taking into account extensions), or otherwise properly accruable, prior to the Closing Date;

(c)   any and all Taxes resulting from or arising out of any transaction contemplated by this Agreement (including, without limitation, the Affiliate Stock Purchases) or done outside of the ordinary course of business in anticipation of the transactions contemplated by this Agreement other than on the request of Buyer;

(d)   any and all foreign Taxes to the extent that Seller or any of the Nonbattery Affiliates is the beneficiary of any rights of indemnification with respect thereto, provided, however, that to the extent any portion of a foreign Tax is borne by Seller pursuant to Section 7.3(e) or (f) hereof, Seller shall be entitled to a portion of any payments pursuant to such rights of indemnification propor-

-85-

189

tionate to the portion borne by Seller of the foreign Tax giving rise to such indemnification;

(e)  any Italian value added Taxes attributable to a failure properly to file Italian value added Tax Returns which Returns were required to be filed or were filed before the Closing Date; and

(f)  fifty percent of any and all foreign Taxes, other than foreign Taxes described in clauses (c), (d) and (e) of this Section 7.3 or reserved for on the Adjusted Closing Date Balance Sheet, for any taxable period ending (or deemed, pursuant to Section 7.5 hereof, to end) on or before the Closing Date to the extent that such foreign Taxes exceed, in the aggregate, $5 million.

Seller shall also be liable for, and shall hold Buyer, the Company, its Subsidiaries, the Affiliates and any successor corporations thereto or affiliates thereof harmless from and against, all Taxes with respect to the operations of Seller and the Nonbattery Affiliates, other than those operations conducted by the Company, its Subsidiaries and the Affiliates, including any several liability of the Company or its Subsidiaries or the Affiliates under Treasury Regulations section 1.1502-6 or under any comparable or similar provision under state, local or foreign laws or regulations, and from and against any liability for Taxes with

-86-

190

respect to any gain realized by the Seller or its Affiliates upon the sale of the Company or the Affiliates.

Section 7.4.  Tax Indemnity by Buyer.  Buyer shall be liable for, and shall hold Seller harmless from and against, the following Taxes with respect to the Company, its Subsidiaries or the Affiliates:  (i) any and all Income Taxes (other than Income Taxes referred to in Section 7.3(a)) for any taxable period beginning on or after the Closing Date, due or payable by the Company, its Subsidiaries or the Affiliates or by Seller, (ii) any and all Other Taxes (other than Taxes described in Section 7.3 for which Seller is liable) for all taxable periods (whether beginning before, on or after the Closing Date), (iii) any and all Taxes not incurred in the ordinary course of business attributable to the acts or omissions of Buyer, Buyer's affiliates, the Company, its Subsidiaries or the Affiliates after the Closing on the Closing Date, and (iv) any and all Taxes resulting from or arising out of any transaction or act done in anticipation of the transactions contemplated by this Agreement but only to the extent such transactions or acts were done on the written request of Buyer.

Section 7.5.  Allocation of Certain Taxes.  (a) Buyer and Seller agree that if the Company or any of its Subsidiaries is permitted but not required under applicable

-87-

191

state or local Income Tax laws to treat the day before the Closing Date or the Closing Date as the last day of a taxable period, Buyer and Seller shall treat such day as the last day of a taxable period.

(b)   Any Taxes for a taxable period beginning before the Closing Date and ending after the Closing Date with respect to the Company, the Subsidiaries or the Affiliates shall be apportioned for purposes of Section 7.3 and Section 7.4 between Seller and Buyer based on the actual operations of the Company, its Subsidiaries and/or the Affiliates, as the case may be, during the portion of such period ending on the Closing Date and the portion of such period beginning on the day following the Closing Date, and for purposes of the provisions of Sections 7.3, 7.4, 7.5 and 7.7, each portion of such period shall be deemed to be a taxable period (whether or not it is in fact a taxable period).

(c)   With respect to any state or local Income Taxes:

(i)   the "Hypothetical Pre-Closing Period Income Tax" shall mean the Income Tax that would have been due for the taxable period ending on the Closing Date if the Closing Date were the last day of the taxable period;

-38-

192

(ii)   fifteen days after the Adjusted Closing Date Balance Sheet is agreed to by Buyer and Seller or adopted pursuant to the determination of the Neutral Auditors, Buyer shall present Seller with a schedule detailing the computation of the Hypothetical Pre-Closing Period Income Tax;

(iii)   ten days after Buyer presents Seller with the schedule described in clause (ii) above, (x) Seller shall pay the Company the amount by which the Hypothetical Pre-Closing Period Income Tax exceeds the sum of any estimated tax payments made prior to the Closing Date with respect to such Income Tax for the current taxable year plus any amount reserved on the Adjusted Closing Date Balance Sheet with respect to such Income Tax for the current taxable year, or (y) the Company shall pay Seller the amount by which the sum of any estimated tax payments made prior to the Closing Date with respect to such Income Tax for the current taxable year plus any amount reserved on the Adjusted Closing Date Balance Sheet with respect to such Income Tax for the current taxable year exceeds the Hypothetical Pre-Closing Period Income Tax; and

193

(iv)   in the event Seller disputes Buyer's computation of the Hypothetical Pre-Closing Period Income Tax or any of the payments described in clause (iii) above, Seller shall nevertheless pay any amounts requested pending adjustment after the resolution of such dispute, which shall be resolved by the Neutral Auditors or, if none, a "big eight" accounting firm mutually agreed upon by Buyer and Seller having no material relationship with either Buyer or Seller.  The costs, expenses and fees of such accounting firm shall be borne equally by Buyer and Seller.

Section 7.6.  Filing Responsibility.  (a)  Seller shall prepare and file or shall cause the Company, the Subsidiaries and the Affiliates to prepare and file the following Returns with respect to the Company, its Subsidiaries and the Affiliates:

(i)   all Income Tax Returns for any taxable period ending on or before the Closing Date (including, without limitation, any deemed sale Return resulting from the filing of a Section 338 Election) other than Returns referred to in Section 7.5;

-90-

194

(ii)   all other Domestic Returns with respect to Other Taxes required to be filed (taking into account extensions) prior to the Closing Date;

(iii)   subject to Buyer's review and approval, all Returns of any Subsidiary or Affiliate required to be filed after the Closing Date and on or before the date of the Deferred Transfer, if any, with respect to such Subsidiary or Affiliate or any parent corporation thereof; and

(iv)   any Danish Return reporting items of any Affiliate required to be filed by Dart & Kraft Holding A/S ("Danish Parent").  Seller shall cause Danish Parent to consult with the relevant Affiliates concerning such Returns and to report all items of the Affiliates in accordance with the instructions of Buyer or such Affiliates, unless otherwise agreed by Danish Parent and such Affiliates.  Danish Parent shall provide the relevant Affiliates a copy of its proposed Return at least 60 days prior to the filing of such Return, and the Affiliates may provide comments to Danish Parent, which comments shall be delivered to Danish

parent within 20 days of receiving such copies from Danish Parent.

(b) Buyer, the Company, its Subsidiaries and the Affiliates shall, subject to the provisions of this Section 7.6(c) and (d), file all other Returns with respect to the Company, its Subsidiaries and the Affiliates.

(c) With respect to any state or local Income Tax Return for taxable periods beginning before the Closing Date and ending after the Closing Date Buyer shall cause the Company to consult with Seller concerning such Return and to report all items with respect to the period ending on the Closing Date in accordance with the instructions of Seller, unless otherwise agreed by Seller and Buyer or the Company. The Company shall provide Seller a copy of its proposed Return at least 15 days prior to the filing of such Return, and Seller may provide comments to the Company, which comments shall be delivered to the Company within 7 days of receiving such copies from the Company.

(d) With respect to any item for which Seller indemnifies Buyer pursuant to Section 7.3(c), Buyer shall cause the Company, its Subsidiaries and the Affiliates to solicit instructions from the Seller as to the treatment of such items in a timely manner and report such items in accordance with the instructions of the Seller.

196

Section 7.7.  <u>Refunds and Carrybacks</u>.  (a)  Seller shall be entitled to any refunds or credits of Income Taxes attributable to or arising in taxable periods ending on or before the Closing Date.

(b)  Buyer, the Company, the Subsidiaries or the Affiliates, as the case may be, shall be entitled to any refunds or credits of Income Taxes attributable to or arising in taxable periods beginning on or after the Closing Date.

(c)  Seller shall be entitled to any refunds or credits of Other Taxes for which Seller is liable pursuant to Section 7.3(b) to the extent such refund or credit is not reflected as an asset on the Adjusted Closing Date Balance Sheet.  Buyer, the Company, the Subsidiaries or the Affiliates, as the case may be, shall be entitled to any refunds or credits of Other Taxes not referred to in the preceding sentence attributable to or arising in any taxable period (whether beginning before or after the Closing Date).

(d)  Buyer shall cause the Company, its Subsidiaries and the Affiliates promptly to forward to Seller or to reimburse Seller for any refunds or credits due Seller (pursuant to the terms of this Article VII) after receipt thereof, and Seller shall promptly forward to Buyer (pursuant to the terms of this Article VII) or reimburse Buyer for any refunds or credits due Buyer after receipt thereof.

-93-

197

(e)  Buyer, the Company, the Subsidiaries and the Affiliates agree that, with respect to any Income Tax, neither the Company nor the Subsidiaries shall carry back any item of loss, deduction or credit which arises in any taxable period ending after the Closing Date ("Subsequent Loss") into any taxable period ending on or before the Closing Date.  If a Subsequent Loss with respect to any Income Tax, is carried back into any taxable period ending on or before the Closing Date, Seller shall be entitled to any refund or credit of Taxes realized as a result thereof.

(f)  If any Subsidiary or Affiliate carries back any Subsequent Loss with respect to any foreign Tax into any taxable period ending on or before the Closing Date, Buyer shall hold Seller harmless from and against any increase in United States federal Income Taxes, after using any available excess foreign tax credits of Seller, resulting from such carryback.

Section 7.8.  <u>Cooperation and Exchange of Information</u>.  (a)  Seller shall prepare and submit to Buyer no later than three months after the Closing Date, 1987 and 1988 blank tax return workpaper packages.  Buyer shall, and shall cause the Company and each of its appropriate Subsidiaries to, prepare completely and accurately and submit to Seller within three months of receipt, all information as

-94-

Seller shall reasonably request in such tax return workpaper packages.

(b)   As soon as practicable, but in any event within 45 days after Seller's request, from and after the Closing Date, Buyer shall provide Seller with such cooperation and shall deliver to Seller such information and data concerning the pre-Closing operations of the Company, its Subsidiaries and the Affiliates and make available such knowledgeable employees of the Company, its Subsidiaries and the Affiliates as Seller may request, including providing the information and data required by Seller's customary tax and accounting questionnaires, in order to enable Seller to complete and file all Returns which it may be required to file with respect to the operations and business of the Company, its Subsidiaries and the Affiliates through the Closing Date or to respond to audits by any Taxing Authorities with respect to such operations and to otherwise enable Seller to satisfy its internal accounting, tax and other legitimate requirements.  Such cooperation and information shall include without limitation provision of powers of attorney for the purpose of signing Returns and defending audits and promptly forwarding copies of appropriate notices and forms or other communications received from or sent to any Taxing Authority which relate to the Company, its Subsidiaries and the Affiliates, and providing copies of all

199

relevant Returns, together with accompanying schedules and related workpapers, documents relating to rulings or other determinations by any Taxing Authority and records concerning the ownership and tax basis of property, which Buyer, the Company, its Subsidiaries or the Affiliates may possess. Buyer, the Company, its Subsidiaries and Affiliates shall make its employees and facilities available on a mutually convenient basis to provide explanation of any documents or information provided hereunder.

(c)  For a period of ten (10) years after the Closing Date, Buyer shall, and shall cause the Company, its Subsidiaries and the Affiliates to, retain all Returns, books and records (including computer files) of, or with respect to the activities of, the Company, its Subsidiaries and the Affiliates for all taxable periods ending on or prior to the Closing Date.  Thereafter, Buyer shall not dispose of any such Returns, books or records unless it first offers such Returns, books and records to Seller and Seller fails to accept such offer within sixty (60) days of its being made.

(d)  Buyer and Seller and their respective affiliates shall cooperate in the preparation of all Returns relating in whole or in part to taxable periods ending on or before or including the Closing Date that are required to be

-96-

200

filed after such date. Such cooperation shall include, but not be limited to, furnishing prior years' Returns or return preparation packages illustrating previous reporting practices or containing historical information relevant to the preparation of such Returns, and furnishing such other information within such party's possession requested by the party filing such Returns as is relevant to their preparation. In the case of any state, local or foreign joint, consolidated, combined, unitary or group relief system Returns, such cooperation shall also relate to any other taxable periods in which one party could reasonably require the assistance of the other party in obtaining any necessary information.

(e) Seller shall have the right, at its own expense, to control any audit or examination by any Taxing Authority ("Tax Audit"), initiate any claim for refund, contest, resolve and defend against any assessment, notice of deficiency, or other adjustment or proposed adjustment relating to:

(i)  any and all Income Taxes for any taxable period ending on or before the Closing Date;

(ii)  any and all Other Taxes payable with respect to Domestic Returns filed or required to be filed (taking into account extensions) prior to the Closing Date; and

-97-

201

(iii)   any and all Italian value added Taxes referred to in Section 7.3(e),

with respect to the Company, its Subsidiaries and the Affiliates.  Seller shall also have the right, at its own expense, to control any Tax Audit, initiate any claim for refund, contest, resolve and defend against any assessment, notice of deficiency, or other adjustment or proposed adjustment relating to any Danish Taxes with respect to the Company, its Subsidiaries and the Affiliates for which Returns are filed by Danish Parent, provided that Seller shall consult with Buyer with respect to the resolution of any issue that would affect Buyer, the Company, its Subsidiaries or the Affiliates, and not settle any such issue, or file any amended return relating to any such issue, without the consent of Buyer, which consent shall not unreasonably be withheld.  Buyer shall have the right, at its own expense, to control any other Tax Audit, initiate any other claim for refund, and contest, resolve and defend against any other assessment, notice of deficiency, or other adjustment or proposed adjustment relating to the following Taxes with respect to the Company, its Subsidiaries and the Affiliates, provided that, with respect to either (i) any state and local Income Taxes for any taxable period beginning before the Closing Date and ending after the Closing Date, (ii) any item for which Seller indemnifies Buyer pursuant to

Section 7.3(c) hereof or (iii) any item for which Buyer, in good faith, determines that it may reasonably be anticipated that Seller will have to indemnify Buyer pursuant to Section 7.3(f) hereof, Buyer shall consult with Seller with respect to the resolution of any issue that would affect Seller, and not settle any such issue, or file any amended return relating to any such issue, without the consent of Seller, which consent shall not unreasonably be withheld.  Where consent to a settlement is withheld by the other party pursuant to this Section, such other party may continue or initiate any further proceedings at its own expense, provided that the liability of the first party, after giving effect to this Agreement, shall not exceed the liability that would have resulted from the settlement or amended return.  Seller shall furnish Buyer, the Company, its Subsidiaries and the Affiliates with its cooperation in a manner comparable to that described in Section 7.8(b) hereof to effect the purposes of this Section 7.8(e).

(f)   If Buyer, the Company, any of its Subsidiaries or any Affiliate, as the case may be, fails to provide any information requested by Seller in the time specified herein, or if no time is specified pursuant to this Section 7.8, within a reasonable period, or otherwise fails to do any act required of it under this Section 7.8, then Buyer shall be obligated, notwithstanding any other provision of

-99-

this Agreement, to indemnify Seller and Buyer shall so in-
demnify Seller and hold Seller harmless from and against any
and all costs, claims or damages, including, without limita-
tion, all Taxes or deficiencies thereof, payable as a result
of such failure.

Section 7.9.  Definitions.  For purposes of this
Article VII, the following terms shall have the meanings
ascribed to them below:

(a)  "Determination" means a "determination" as
defined by Section 1313(a) of the Code.

(b)  "Domestic Returns" means returns, reports and
forms required to be filed with any taxing authority of
the United States of America, any state thereof or the
District of Columbia and any local governmental subdivi-
sion thereof (a "U.S. Taxing Authority").

(c)  "Foreign Returns" means all Returns that are
not Domestic Returns.

(d)  "Income Taxes" means (a) federal, state or
local income or franchise taxes or other taxes measured
by income and all other taxes reported on Domestic
Returns which include federal, state or local income or
franchise taxes or other taxes measured by income,
together with any interest or penalties imposed with

-100-

204

respect thereto, and (b) any obligations under any agreements or arrangements with respect to any Income Taxes described in clause (a) above.

(e)  "Income Tax Returns" means federal, state or local Income Tax Returns required to be filed with any U.S. Taxing Authority that include any of the Company, its Subsidiaries or the Affiliates.

(f)  "IRS" means the Internal Revenue Service.

(g)  "Other Taxes" means all Taxes which are not Income Taxes.

(h)  "Returns" means returns, reports and forms required to be filed with any U.S. Taxing Authority or foreign taxing authority.

(i)  "Section 338 Forms" means all returns, documents, statements, and other forms that are required to be submitted to any federal, state, county, or other local Taxing Authority in connection with a Section 338(g) Election or a Section 338(h)(10) Election.  Section 338 Forms shall include, without limitation, any "statement of section 338 election" and United States Internal Revenue Service Form 8023 (together with any schedules or attachments thereto) that are required pursuant to Treas. Reg. Section 1.338-1T or Treas. Reg. Section 1.338(h)(10)-1T.

-101-

205

(j)  "Section 338 Elections" shall mean both a Section 338(g) Election and a Section 338(h)(10) Election.

(k)  "Section 338(g) Election" means an election described in Section 338(g) of the Code with respect to Buyer's acquisition of the Shares and the Affiliate Shares from Seller pursuant to this Agreement or the Affiliate Stock Purchase Agreements.  Section 338(g) Election shall include any corresponding election under any other applicable Tax Laws that requires a separate election with respect to Buyer's acquisition of the Shares or the Affiliate Shares from Seller under this Agreement or the Affiliate Stock Purchase Agreements.

(l)  "Section 338(h)(10) Election" means an election described in Section 338(h)(10) of the Code with respect to Seller's sale of the Shares to Buyer pursuant to this Agreement.  Section 338(h)(10) Election shall include any corresponding election under any other relevant Tax Laws for which a separate election is permissible with respect to Buyer's acquisition of the Shares from Seller under this Agreement.

(m)  "Tax Benefit" means the tax effect of any item of loss, deduction or credit or any other item which decreases Taxes paid or payable or increases tax basis including any interest with respect thereto or interest that would have been payable but for such item.

206

(n)  "Taxes" means (a) all taxes (whether federal, state, local or foreign) based upon or measured by income and any other tax whatsoever, including, without limitation, gross receipts, profits, sales, use, occupation, value added, ad valorem, transfer, franchise, withholding, payroll, employment, excise, or property taxes, together with any interest or penalties imposed with respect thereto and (b) any obligations under any agreements or arrangements with respect to any Taxes described in clause (a) above.

(o)  "Tax Laws" means the Code, federal, state, county, local, or foreign laws relating to Taxes and any regulations or official administrative pronouncements released thereunder.

(p)  "Taxing Authority" means any governmental authority, domestic or foreign, having jurisdiction over the assessment, determination, collection, or other imposition of Tax.

## ARTICLE VIII
### Conditions of Buyer's Obligation to Close

Buyer's obligation to consummate the Stock Purchase and, if any, the Trademark Purchase shall be subject to the satisfaction on or prior to the Closing Date of all of the following conditions:

207

**Section 8.1.** <u>Representations, Warranties and Covenants of Seller</u>. The representations and warranties of Seller in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date except for representations and warranties that speak as of a specific date or time other than the Closing Date (which need only be true and correct in all material respects as of such date or time), the covenants and agreements of Seller to be performed on or before the Closing Date in accordance with this Agreement shall have been duly performed in all material respects, and Buyer shall have received at the Closing a certificate to that effect dated the Closing Date and validly executed on behalf of Seller.

**Section 8.2.** <u>Filings; Consents; Waiting Periods</u>. All such licenses, permits, franchises, consents, approvals, waivers, authorizations, qualifications and orders of governmental authorities and parties to contracts with the Company, its Subsidiaries and the Affiliates as are necessary in connection with the transfer of the securities (or other equity interest) of the Company, its Subsidiaries and the Affiliates to Buyer (or, in the case of each of the Affiliates, to Buyer or an affiliate of Buyer) or which if not obtained would be reasonably likely to subject Buyer, Seller

-104-

208

or any Subsidiary or Affiliate, or any officer, director or agent of any such person to civil or criminal liability or could render such transfer void or voidable (the "Required Consents") shall have been obtained, except for Required Consents the failure to obtain which, individually or in the aggregate, is neither (i) material to the Business Condition of the Company, its Subsidiaries and the Affiliates taken as a whole nor (ii) in the case of Required Consents of governmental authorities, material to the foreign operations of the Company, its Subsidiaries and the Affiliates taken as a whole, and all waiting periods applicable under the HSR Act shall have expired or been terminated.

Section 8.3.  <u>No Injunction</u>.  At the Closing Date, there shall be no injunction, restraining order or decree of any nature of any court or governmental agency or body of competent jurisdiction that is in effect that restrains or prohibits the consummation of the Stock Purchase, the con-summation of an Affiliate Stock Purchase or the transfer to Buyer of any securities (or other equity interest) of a Subsidiary, except for the transfer of any securities (or other equity interest) of a Subsidiary the failure to trans-fer which or the consummation of an Affiliate Stock Purchase the failure to consummate which would not, individually or in the aggregate with all Subsidiaries the securities (or other equity interests) of which are not being transferred

-105-

on or prior to the Closing and all Affiliates for which
Affiliate Stock Purchases are not being consummated on or
prior to the Closing, be material to the foreign operations
of the Company, its Subsidiaries and the Affiliates taken as
a whole.

Section 8.4.   <u>Transfers of Assets and Liabilities</u>.
(a)  All transfers of assets and liabilities into or out of
the Company, its Subsidiaries and the Affiliates as contem-
plated by this Agreement or otherwise in connection with the
sale of the Company, its Subsidiaries and the Affiliates
shall have been accomplished in form and substance reason-
ably satisfactory to Buyer.

(b)  The Needham, Massachusetts site used by the
Company shall have been transferred from Seller to the Com-
pany.

(c)  The Company shall have taken all action neces-
sary to cause the 9-1/8% Sinking Fund Debentures due 2003
issued by P.R. Mallory & Co. Inc. to be completely redeemed.

Section 8.5.   <u>Affiliate Stock Purchases</u>.  Simulta-
neously with or immediately prior to the Closing, each
Affiliate Stock Purchase shall be or shall have been consum-
mated or the failure to consummate any such Affiliate Stock
Purchase would not, individually or in the aggregate with

-106-

all Subsidiaries the securities (or other equity interests) of which are not being transferred on or immediately prior to the Closing and all Affiliates for which Affiliate Stock Purchases are not being consummated on or immediately prior to the Closing, be material to the foreign operations of the Company, its Subsidiaries and the Affiliates taken as a whole; _provided_, _however_, that unless the Closing occurs on or prior to June 24, 1988, the consummation of the Affiliate Stock Purchase of Duracell Inc. (Canada) shall not be a condition to Buyer's obligation to consummate the Stock Purchase and, if any, the Trademark Purchase.

Section 8.6.  <u>Financing</u>.  Prior to the Closing, the Buyer (or the Buyer and its designated affiliate or affiliates) shall have received the proceeds of the financing required to consummate the Stock Purchase and the Affiliate Stock Purchases.

<u>ARTICLE IX</u>

<u>Conditions to Seller's Obligation to Close</u>

Seller's obligation to consummate the Stock Purchase and, if any, the Trademark Purchase is subject to the satisfaction on or prior to the Closing Date of all of the following conditions:

-107-

211

Section 9.1.  <u>Representations, Warranties and Cove-</u>
<u>nants of Buyer</u>.  The representations and warranties of Buyer
in this Agreement shall be true and correct in all material
respects on and as of the Closing Date with the same effect
as though such representations and warranties had been made
on and as of such date except for representations and war-
ranties that speak as of a specific date or time other than
the Closing Date (which need only be true and correct in all
material respects as of such date or time), the covenants
and agreements of Buyer to be performed on or before the
Closing Date in accordance with this Agreement shall have
been duly performed in all material respects, and Seller
shall have received at the Closing a certificate to that
effect dated the Closing Date and validly executed on behalf
of Buyer.

Section 9.2.  <u>Filings; Consents; Waiting Periods</u>.
All licenses, permits, franchises, consents, approvals,
waivers, authorizations, qualifications and orders of gov-
ernmental authorities, the failure to obtain any of which
would be reasonably likely to subject Seller or any of its
affiliates (other than the Company, its Subsidiaries and the
Affiliates), or any officer, director or agent of any such
person to civil or criminal liability as a result of the
transfer of the Shares to Buyer or, if an affiliate of Buyer
purchases the Shares, an affiliate of Buyer or could render

-108-

212

the transfer of the Shares void or voidable shall have been obtained, except for those related to a Subsidiary or an Affiliate to which the provisions of Section 2.4 apply, and all applicable waiting periods under the HSR Act shall have expired or been terminated.

Section 9.3.  <u>No Injunction</u>.  At the Closing Date, there shall be no injunction, restraining order or decree of any nature of any court or governmental agency or body of competent jurisdiction that is in effect that restrains or prohibits the consummation of the Stock Purchase.

<u>ARTICLE X</u>

<u>Survival; Indemnification</u>

Section 10.1.  <u>Survival Periods</u>.  All representations and warranties of the parties contained in this Agreement or in any Schedule hereto, or any certificate, document or other instrument delivered in connection herewith shall survive the Closing until December 31, 1988 (or, if later, the three month anniversary of the Closing), except that those representations and warranties contained in Sections 3.1(c), 3.2 and Article VII shall survive the Closing until the expiration of the longest statute of limitations applicable to each such representation and warranty and, solely with respect to the ownership of the Company's or any Subsidiary's trademarks listed on Schedule 3.8 hereof, in

-109-

**213**

all countries of the world outside the United States, necessary to the conduct of the Battery Business as currently conducted, Section 3.8 shall survive until the fifth anniversary of the Closing.  No action or proceeding may be brought with respect to any of the representations and warranties which survive until December 31, 1988 (or the three month anniversary of the Closing, as the case may be) unless written notice thereof, setting forth in reasonable detail the claimed misrepresentation or breach of warranty, shall have been delivered to the party alleged to have breached such representation or warranty prior to December 31, 1988 (or the three month anniversary of the Closing, as the case may be), and no action or proceeding may be brought with respect to any of the representations and warranties which survive the Closing until the expiration of the longest statute of limitations applicable to each such representation and warranty unless written notice thereof, setting forth in reasonable detail the claimed misrepresentation or warranty shall have been delivered to the party alleged to have breached such representation or warranty prior to the expiration of such statute of limitations.  Notwithstanding any provision to the contrary contained in this Agreement or under any Affiliate Sale Agreement, Seller's obligation and liability for any and all breaches of the representations and warranties set forth in this Agreement or in any of the

-110-

214

Affiliate Sale Agreements (other than the representations and warranties set forth in Section 3.2 of this Agreement and the analogous sections of the Affiliate Sale Agreements) shall not exceed in the aggregate (under all such agreements) the amount of $200,000,000; provided that Buyer shall not make any claim against Seller for breach of representations and warranties under this Agreement or any of the Affiliate Sale Agreements until the dollar amount of all such obligations and liabilities for such breaches shall equal in the aggregate (under all such agreements) the amount of $8,000,000, of which initial amount of $8,000,000 the first $4,000,000 will be solely for Buyer's account. Those covenants that contemplate, implicitly or explicitly, or may involve actions to be taken or obligations in effect after the Closing shall survive in accordance with their terms.

Section 10.2.  <u>Indemnification</u>.  (a)  From and after the Closing Date, Buyer shall indemnify and hold harmless Seller, its affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, successors and assigns of any of the foregoing (collectively, the "Seller Indemnified Parties") from and against (i) any and all Covered Business Liabilities other than Seller Liabilities incurred by or asserted against any of the Seller Indemnified Parties and/or the Buyer Indemni-

-111-

fied Parties (as hereinafter defined), including, without
limitation, any Covered Business Liability other than Seller
Liabilities based on negligence, gross negligence, strict
liability or any other theory of liability, whether in law
(whether common or statutory) or equity and (ii) any breach
of any representation or warranty which survives the Closing
made by or on behalf of Buyer under this Agreement or in any
Schedule hereto or any certificate, document or other
instrument contemplated hereby and delivered in connection
herewith.

(b)  From and after the Closing Date, Seller shall
indemnify and hold harmless Buyer, its affiliates (including
the Company, its Subsidiaries and Affiliates after the Clos-
ing Date), each of their respective directors, officers,
employees and agents, and each of the heirs, executors, suc-
cessors and assigns of any of the foregoing (collectively,
the "Buyer Indemnified Parties") from and against (i) any
and all Seller Liabilities incurred by or asserted against
any of the Buyer Indemnified Parties and/or the Seller
Indemnified Parties (including any predecessor of Seller,
the Company, its Subsidiaries or Affiliates), including,
without limitation, any Seller Liability based on negli-
gence, gross negligence, strict liability or any other the-
ory of liability, whether in law (whether common or statu-
tory) or equity, (ii) any breach of any representation or

-112-

216

warranty which survives the Closing made by or on behalf of Seller under this Agreement or in any Schedule hereto or any certificate, document or other instrument contemplated hereby and delivered in connection herewith and (iii) any tax liability incurred by Buyer or any subsidiary of Buyer in any domestic or foreign jurisdiction as a result of any assignment of Intellectual Property by Duracell International, Inc. to Duracell Inc. or by Duracell Inc. to Duracell International, Inc. prior to the Closing.

Section 10.3.  **Third Party Claims**.  If a claim by a third party is made against an indemnified party, and if such party intends to seek indemnity with respect thereto under this Article X, such indemnified party shall promptly notify the indemnifying party in writing of such claims setting forth such claims in reasonable detail.  The indemnifying party shall have 30 days after receipt of such notice to undertake, conduct and control, through counsel of its own choosing and at its own expense, the settlement or defense thereof, and the indemnified party shall cooperate with it in connection therewith; **provided that** the indemnified party may participate in such settlement or defense through counsel chosen by such indemnified party, provided that the fees and expenses of such counsel shall be borne by such indemnified party.  So long as the indemnifying party is reasonably contesting any such claim in good faith, the indemnified

-113-

217

party shall not pay or settle any such claim.  Notwithstanding the foregoing, the indemnified party shall have the right to pay or settle any such claim, provided that in such event it shall waive any right to indemnity therefor by the indemnifying party.  If the indemnifying party does not notify the indemnified party within 30 days after the receipt of the indemnified party's notice of a claim of indemnity hereunder that it elects to undertake the defense thereof, the indemnified party shall have the right to contest, settle or compromise the claim but shall not thereby waive any right to indemnity therefor pursuant to this Agreement.  The indemnifying party shall not, except with the consent of the indemnified party, enter into any settlement that does not include as an unconditional term thereof the giving by the person or persons asserting such claim to all indemnified parties (i.e. the Seller Indemnified Party or the Buyer Indemnified Party, as the case may be) of unconditional release from all liability with respect to such claim or consent to entry of any judgment.

## ARTICLE XI

### Termination

Section 11.1.  **Termination**.  This Agreement may be terminated at any time prior to the Closing by:

(a)  The mutual consent of Seller and Buyer; or

-114-

218

(b)  Either Seller or Buyer if the Closing has not
occurred by the close of business on December 31, 1988 and
if the failure to consummate the Stock Purchase on or before
such date did not result from the failure by the party
seeking termination of this Agreement to fulfill any under-
taking or commitment provided for herein that is required to
be fulfilled prior to Closing.

Section 11.2.  <u>Procedure and Effect of Termina-
tion</u>.  In the event of termination of this Agreement by
either or both of Seller and Buyer pursuant to Section 11.1,
written notice thereof shall forthwith be given by the ter-
minating party to the other party hereto, and this Agreement
shall thereupon terminate and become void and have no
effect, and the transactions contemplated hereby shall be
abandoned without further action by the parties hereto,
except that the provisions of Sections 5.1(b), 5.7 and 12.4
shall survive the termination of this Agreement; <u>provided</u>,
<u>however</u>, that such termination shall not relieve any party
hereto of any liability for any breach of this Agreement.
If this Agreement is terminated as provided herein all
filings, applications and other submissions made pursuant to
Sections 3.9 and 4.3 shall, to the extent practicable, be
withdrawn from the agency or other persons to which they
were made.

## ARTICLE XII

## Miscellaneous

Section 12.1.  Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party.

Section 12.2.  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without reference to the choice of law principles thereof.

Section 12.3.  Entire Agreement.  This Agreement (including agreements incorporated herein) and the Schedules and Exhibits hereto and the Affiliate Sale Agreements contain the entire agreement between the parties with respect to the subject matter hereof and there are no agreements, understandings, representations or warranties between the parties other than those set forth or referred to herein. Except for Sections 10.2 and 10.3, which are intended to benefit, and to be enforceable by, any of the Buyer Indemnified Parties or the Seller Indemnified Parties, as the case may be, this Agreement is not intended to confer upon any person not a party hereto (and their successors and assigns permitted by Section 12.6) any rights or remedies hereunder.

-116-

220

Section 12.4.  <u>Expenses</u>.  Except as set forth in this Agreement and the Affiliate Sale Agreements, whether the Stock Purchase is or is not consummated, all legal and other costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

Section 12.5.  <u>Notices</u>.  All notices hereunder shall be sufficiently given for all purposes hereunder if in writing and delivered personally, sent by documented over-night delivery service or, to the extent receipt is con-firmed, telecopy, telefax or other electronic transmission service to the appropriate address or number as set forth below.  Notices to Seller shall be addressed to:

> Kraft, Inc.
> Kraft Court
> Glenview, Illinois  60025
> Attn:  General Counsel
> Telecopy No:  (312) 998-4431
>
> with a copy to:
>
> Wachtell, Lipton, Rosen & Katz
> 299 Park Avenue
> New York, New York  10171
> Attn:  Daniel A. Neff, Esq.
> Telecopy No:  (212) 371-1658

or at such other address and to the attention of such other person as Seller may designate by written notice to Buyer.  Notices to Buyer shall be addressed to:

221

Duracell Holdings Corporation
c/o Kohlberg Kravis Roberts & Co.
9 West 57th Street
New York, New York  10019
Attn:  Kevin A. Bousquette
Telecopy No:  (212) 750-0003

with a copy to:

Simpson Thacher & Bartlett
1 Battery Park Plaza
New York, New York  10004
Attn:  Charles I. Cogut
Telecopy No:  (212) 908-2502

or at such other address and to the attention of such other person as Buyer may designate by written notice to Seller.

Section 12.6.  <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; <u>provided</u>, <u>however</u>, that no party hereto will assign its rights or delegate its obligations under this Agreement without the express prior written consent of each other party hereto, except that Buyer may assign its right to purchase the Shares to a wholly-owned subsidiary of Buyer so long as Buyer remains liable for all its obligations hereunder.

Section 12.7.  <u>Headings; Definitions</u>.  The section and article headings contained in this Agreement are inserted for convenience of reference only and will not affect the meaning or interpretation of this Agreement.  All

-118-

222

references to Sections or Articles contained herein mean Sections or Articles of this Agreement unless otherwise stated. All capitalized terms defined herein are equally applicable to both the singular and plural forms of such terms.

Section 12.8. <u>Amendments and Waivers</u>. This Agreement may not be modified or amended except by an instrument or instruments in writing signed by the party against whom enforcement of any such modification or amendment is sought. Either party hereto may, only by an instrument in writing, waive compliance by the other party hereto with any term or provision of this Agreement on the part of such other party hereto to be performed or complied with. The waiver by any party hereto of a breach of any term or provision of this Agreement shall not be construed as a waiver of any subsequent breach.

Section 12.9. <u>Interpretation</u>. For the purposes of this Agreement, (a) a "subsidiary" of a corporation means any corporation more than 50% of whose outstanding voting securities are directly or indirectly owned by such other corporation and (b) "as of the date hereof" means May 4, . 1988.

Section 12.10. <u>Schedules</u>. Any reference to Schedules in this Agreement refers to the Schedules delivered in connection with the Agreement on May 4, 1988 and to Schedule 5.12(d) delivered thereafter.

IN WITNESS WHEREOF, this Agreement, as amended and restated, has been signed by or on behalf of each of the parties as of June 23, 1988.

KRAFT, INC.

By: _____
Name:  Richard B. Burgess
Title: Vice President

DURACELL HOLDINGS CORPORATION

By: _____
Name:  Kevin A. Bousquette
Title: Vice President

-120-

224

Exhibit A

## Affiliates

Indented Affiliates are Subsidiaries of the Affiliate under which they are indented.  Percentages shown indicate the exact percentage of voting securities owned by Kraft, Inc. or any of its Subsidiaries when 100% owned, and approximate percentages when less than 100% owned.

| Name | Country of Incorporation | % Owned |
|---|---|---|
| Duracell Batteries Limited | The United Kingdom | 100 |
|   Duracell France S.N.C. | France | 99(a) |
| Duracell South Africa | | |
|   Proprietary Limited | South Africa | 100 |
| Duracell Hellesens A/S | Denmark | 100 |
| ASX 11362 APS | Denmark | 100 |
| OY Duracell Hellesens AB | Finland | 100 |
| Diesse S.p.A. | Italy | 99(b) |
| S.p.A. Superpila | Italy | 99 |
|   Pile Superpila S.p.A. | Italy | 100 |
|   Superpila | | |
|     Industriale S.p.A. | Italy | 100 |

(a)  1% of the stock is owned by Kraft Holdings Limited.
(b)  1% of the stock is owned by Duracell International, Inc.

225

Schedule 3.2

All Subsidiaries that are indented are owned by the Subsidiary under which they are indented; all other Subsidiaries shown are directly owned by the Company. The percentages shown indicate the exact percentage of voting securities owned by the immediate parent when 100% owned, and approximate percentages when less than 100% owned.

| Name | Place of Organization | % |
|------|----------------------|---|
| Duracell International, Inc. | Delaware | 100 |
|   Duracell Asia Limited | Hong Kong | 100 |
|   Duracell Daimon Svenska A/B | Sweden | 100 |
|     AB Tudor Hellezens | Sweden | 100 |
|   Daimon-Duracell (Pilhas) Limitada | Portugal | 100 |
|   Duracell-Hellesens Norge A/S | Norway | 100 |
|     Anker-Hellesens A/S | Norway | 100(b) |
|   Duracell Chile Sociedad Comercial Limitada | Chile | 100 |
|   Duracell (S.E.A.) PTE Limited | Singapore | 100 |
|   Duracell Argentina S.A. | Argentina | 100 |
|   Duracell Australia Pty. Limited | Australia | 100 |
|   Duracell do Brazil Industria E Comercio Ltda | Brazil | 100 |
|   Daimon-Duracell G.m.b.H. | Germany | 100 |
|     Daimon-Duracell Batterien G.m.b.H. | Germany | 99 |
|   Duracell International G.m.b.H. | Austria | 100 |
|   N.V. Duracell Batteries S.A. | Belgium | 100 |
|     S.A. Duracell Benelux N.A. | Belgium | 82.9(a) |
|   Duracell Inc. | Canada | 100 |

(a)  The remaining 17.1% is owned by Duracell Holdings B.V.
(b)  This corporation is being merged into Duracell-Hellesens Norge A/S.
(c)  This corporation is in liquidation.

226

Schedule 3.2 (continued)

| Name | Place of Organization | % |
|------|----------------------|---|
| Duracell Holdings B.V. | Netherlands | 100 |
| Insulpak N.V. | Netherlands | 100(c) |
| Duracell A.G. | Switzerland | 100 |
| Duracell Nederland B.V. | Netherlands | 100 |
| Duracell S.A. de C.V. | Mexico | 100 |
| Duracell Battery Japan Ltd. | Japan | 100 |
| Duracell Caribbean Inc. | Puerto Rico | 100 |
| Duracell New Zealand Limited | New Zealand | 100 |
| Mallory Overseas, Inc. | Delaware | 100 |

227