**AFFIDAVIT OF REAR ADMIRAL JOHN B. PADGETT, III [U.S.N., Ret.]**

I, John B. Padgett, III, declare:

1. I am a retired Rear Admiral of the United States Navy, in which I served from 1969 until 2003.

2. I began my Navy career in 1969, receiving my commission immediately after being awarded a Bachelor of Science degree in Mechanical Engineering from the United States Naval Academy.

3. I was a career submarine officer and, throughout my career, I was assigned to various duty stations in which I exercised supervisory authority over the operation, maintenance, and repair of Navy combat vessels.

4. In addition to my various assignments as an officer aboard specific Navy vessels, I served the Navy in various shore-based capacities throughout my career.

5. In addition to my ongoing Navy education and training throughout my career (including, but not limited to, my completion of Naval Nuclear Power School at Vallejo, California; nuclear propulsion training on the Navy's S5G nuclear reactor prototype at the Naval Reactors Facility near Idaho Falls, Idaho; Prospective Commanding Officer training in Washington, D.C; and Operational Prospective Commanding Officer training in Hawaii), I obtained a Master of Science degree in Engineering Science and Mechanics from the Georgia Institute of Technology in July 1970.

6. As a practical result of the various positions in which I served, and the extensive Navy training and education I received, I have personal knowledge of the Navy's vessel design, construction, maintenance, and repair practices throughout the period of my Navy service and of the strategic and tactical considerations which shape those practices.

7. Following my Navy service, I joined Electric Boat Corporation (*i.e.*, Electric Boat Division of General Dynamics Corporation, formerly known as "Electric Boat Company") as a Vice President, serving in that capacity from December 2003 until my retirement in October 2010.

8. By virtue of my Navy service and my employment with Electric Boat Corporation, I am familiar with the history and operation of both Naval and private shipyards, and with the practices and procedures associated with the construction, maintenance, repair, and modernization of Navy vessels in both Naval and private shipyards.

9. Accordingly the statements and opinions offered herein are based on my personal knowledge arising from my experience as a Navy officer and as an executive officer of a private shipyard which contracts with the Navy for the construction, maintenance, and/or repair of Navy vessels.

10. In particular, the statements and opinions offered herein are based on my personal knowledge that: through contractual requirements incorporating and mandating full compliance with the Navy's own detailed military specifications, the Navy maintained total command and ultimate decision-making authority over all relevant aspects of the design, manufacture, installation, maintenance, repair, overhaul, and/or modernization of all major items of Navy vessel equipment; that the Navy ensured strict compliance with its specifications as to equipment design by means of continuous inspections and tests; that no equipment would be accepted by the Navy absent full compliance with specifications; and that no deviation from the specifications was permitted absent the Navy's express prior authorization.

11. In fact, in various of my Navy duty assignments, I was personally involved in monitoring and ensuring contractor compliance with specifications as imposed and interpreted by the Navy.

12. I have personally inspected various items of shipboard equipment to verify their conformance with specifications and with other requirements imposed by Navy contract, although more immediate oversight in this regard was typically exercised by Navy officers and other Navy personnel acting under my command or the command of NAVSEA.

13. All of the Navy's various activities and functions – from designing and constructing ships, to sustaining a trained base of personnel, to continually developing and utilizing state-of-the-art equipment and materials, to keeping its vessels and their equipment in good repair, to communicating hazard-related information to sailors and shipyard personnel – are essential, inextricable, aspects of the Navy's combat-readiness, allowing the Navy to stand ready to successfully fight wars and to deter enemy aggression in the interests of national defense.

14. In furtherance of its efforts to ensure mission success, the Navy retains ultimate decision-making authority as to its military vessels and platforms, undertaking detailed direction of all relevant aspects of the design, manufacture, installation, maintenance, repair, overhaul and/or modernization of Navy vessels and of the various items of equipment installed aboard such vessels, thereby ensuring that Naval ships are designed, built, and maintained to meet the rigorous demands of Navy Combatant Commanders around the world, and to operate reliably in the most arduous environments, including combat.

15. As a result, the work of designing, constructing, and maintaining Navy warships, including the design, manufacture, installation, testing, and maintenance of equipment for such ships – whether performed in a public or private shipyard – is performed in strict accordance with government contracts, in conformance with military specifications, and under the Navy's ongoing and direct supervision and oversight. Further, as to Naval shipyards, such facilities are owned and operated by the Navy, and all aspects of the work therein are performed under the direct, ongoing, control and oversight of Navy personnel, both uniformed and civilian.

16. In undertaking this crucial function, the Navy seeks to optimize its ability to satisfy the operational requirements of its Combatant Commanders within appropriate budgetary constraints, requiring it to carefully balance various concerns, including considerations of combat capability, operational flexibility, the availability and reliability of technology, risk mitigation, safety, and cost.

17. Stated differently, the design of Naval ships entails dynamic combat-related decision-making commensurate with state-of-the-art knowledge and industrial capability as it exists at the time in question, viewed through the lenses of existing budgetary restraints and the Navy's vital, and unique, combat-readiness requirements.

18. Thus, as to Naval vessel design, once the Navy identifies its long-term operational goals, it undertakes technical and engineering studies to explore the optimal use of existing or developing technologies to achieve those operational goals.

19. Once such technologies are identified, the Navy explores their viability for military use, with the cognizant technical authorities within the Navy then preparing, issuing, and/or approving detailed and technically precise specifications and/or contract requirements setting forth the Navy's physical, material, and performance requirements for the technology, and for its manufacture, construction, repair, and maintenance. The Navy then invokes these requirements as appropriate within all contracts for the design, construction, maintenance, repair, overhaul, or modernization of its ships and/or the equipment to be integrated into those Naval vessels. By incorporating these specifications and requirements into vendor contracts and undertaking an inspection process to ensure precise compliance, the Navy ensures that its ships and all material and equipment placed aboard those ships meet its desired standards of technical excellence and tactical capability, while minimizing vulnerabilities identified through prior experience.

20. As to Naval ship construction, any proposal for the construction of any Navy vessel requires the review and approval of the Secretary of Defense (as well as various Undersecretaries of Defense and the Director of Defense Research and Engineering, all of whom are engaged in the review and approval process), with the final decision to recommend construction resting with the Secretary of Defense, the President's principal advisor on defense issues.

21. Upon acceptance of such recommendation, the proposal is integrated into the President's budget and submitted to Congress for consideration, vesting Congress with the final decision-making authority to decide whether to authorize and appropriate the funds needed for the construction of the Navy vessel.

22. Upon Congressional authorization and appropriation, the Navy contracts the construction of the vessel through a shipyard, either public or private, with numerous divisions and departments within the Department of Defense and the Navy overseeing the crafting and execution of that contract. At private shipyards, the office of the Supervisor of Shipbuilding serves as the Navy's on-site representative and authority for all aspects of ship construction,

repair, and modernization, ensuring that both the government and contractors meet all contract obligations and specifications.

23. The Navy and/or Department of Defense establishes the terms and conditions of the contract, including all applicable reference materials incorporated therein, imposing the specifications, Navy requirements, and guidelines necessary for the execution of the contract.

24. Once the contract is executed, the contracting shipyard, whether public or private, is not permitted to deviate from the contract's terms, specifications, and requirements without express written authority from the Navy, and extensive audits and assessments (including, but not limited to, material and equipment inspections, both at the shipyard and at individual vendor facilities; safety inspections; and quality assurance program assessments) are undertaken by the Navy and/or Department of Defense throughout the construction process, both to ensure that the proper quality controls and safety standards relative to shipboard construction are maintained, and to confirm that the vessel, once constructed, will perform in the manner necessary to the Navy's ultimate mission and function.

25. Accordingly, all contract work performed on Navy ships – from the manufacture of the necessary equipment and materials to actual ship assembly, maintenance, repair, overhaul or modernization – is performed in accordance with the Navy's detailed specifications under the ongoing direct supervision of Navy personnel in order to ensure that such ships will be combat-ready and mission-effective. The Navy employs both military and civilian inspectors to ensure strict contractor compliance with its specifications and requirements, and this oversight process applies equally to public and private shipyards engaged in such Naval ship work. In particular, any and all items of equipment and/or materials used in the construction, maintenance, repair, overhaul or modernization of a Navy vessel are procured based on the Navy's detailed specifications and requirements, and all such materials are inspected and/or tested by Navy personnel to ensure full compliance before their acceptance and use by the Navy.

26. Consistent with the Navy's essential need of maintaining its forces and supporting military equipment in a serviceable, reliable, and combat-ready, condition, any deviation from the applicable specifications requires specific written approval from the Navy. In particular, as Naval ships and their various items of integrated marine equipment are maintained by the Naval Supply System (which provides needed spare parts and consumables aboard ship and at various stock points), the Navy cannot tolerate variations in compliance with its detailed, uniform, requirements.

27. In particular, as reliable onboard electrical power supply is essential for effective forward-deployed presence and readiness for potential combat operations (and, thus, of the Navy's primary mission) in that Naval ships would be completely incapable of operating and performing their missions without electricity, such systems are among the most critical components of any Naval warship, and their design inherently implicates combat-readiness. Throughout most of the 20th Century, electrical power aboard Naval ships was supplied by onboard steam driven Ships Service Turbo-Generators (SSTGs). Moreover,

shipboard electrical systems could not function properly without critical electrical components such as transformers and capacitors.

28. Military contractors like General Electric (GE) and Westinghouse supplied SSTGs in compliance with the provisions of detailed contracts with the U.S. Navy, and the military specifications incorporated therein, and under strict Navy supervision, control, and inspection over all aspects of the equipment's design and manufacture. The Navy enforced such compliance in various ways, including by requiring review and approval over the contractor's engineering drawings, and by stationing resident Navy machinery inspectors at the factories where equipment like Navy turbines were manufactured. Those inspectors had to approve the materials, manufacturing, and testing of Navy SSTGs for full compliance with the Navy's contractual requirements, including applicable Navy specifications, before the Navy approved the turbines for shipment from the factory to the Navy's shipbuilder. The Navy's comprehensive exercise of authority over the design and manufacture of shipboard equipment further extended to the component parts of such equipment, e.g., as discussed below, voltage regulators (with incorporated PCB-containing capacitors) for SSTGs.

29. While a military contractor (such as a marine equipment supplier) may undertake its own parallel and complementary inspection process relative to the performance of its own work, the Navy's own independent oversight program satisfies a fundamental military objective that cannot be met by contractor inspections alone. As the contractor is bound by the terms of its contract – and as its responsibility extends only to the specific equipment, material, and/or services being produced or provided by it – its inspections are inherently limited to ensuring self-compliance with all contract requirements. Conversely, the Navy's own oversight is designed to ensure not only that the individual contractor's performance is satisfactory when viewed in isolation, but that the contractor's equipment, once fully integrated into the Naval ship, will operate as expected. For this reason, the Navy retains the ultimate decision-making authority as to the final approval and acceptance of all equipment design and installation.

30. Through contractor compliance with specifications and contract requirements, and this rigorous oversight program, the Navy ensures the final product, the Navy warship, will satisfy the strategic, tactical and operational goals of Combatant Commanders and, ultimately, support the Navy's mission. The Navy is highly dependent on having the right components in the right place. At the most benign end of the spectrum, a contractor's failure to comply with specifications could result in a costly repair or replacement effort to address the Navy's uniformity or engineering soundness requirements. At the most egregious end of the spectrum, a contractor's failure to comply could result in damaged equipment, reduced operational capability of the ship, injury to personnel, loss of life, or mission failure.

31. Accordingly, to the extent materials, equipment, or equipment components used aboard a Navy vessel employed polychlorinated biphenyls (PCBs), that use of PCBs was pursuant to requirements imposed by the Navy, or which were heedfully reviewed and approved by the Navy as satisfying its then-applicable specifications, and was viewed as serving a critical role relative to combat-readiness. In transformers, for example, PCBs were used

in dielectric insulating fluids (askarels) where such equipment was required to be noncombustible. Similarly in capacitors, such askarels were employed to make the equipment noncombustible, smaller, and more efficient, and to have a longer operational lifetime. Each of these characteristics are mission critical aboard a Naval warship designed to operate under enemy fire, and where efficiency, weight, and conservation of space are at a premium.

32. Stated differently, despite any known risks associated with exposure to PCBs, the Navy made a deliberate decision to utilize and/or authorize the use of such materials until substitutes sufficient to satisfy its unique combat-related technical requirements were available, as such materials were deemed vital to the Navy's ability to reliably place its ships and their crews in harm's way when engaging enemy forces, to avoiding enemy counter-fire, to meeting the challenges of a potentially hostile ocean environment, and, ultimately, to succeeding in combat and returning its ships and crews home safely. (*See, e.g.*, Exhibit A, March 26, 1974 Department of the Navy letter to the General Electric Company stating that the continued use of askarels in certain transformers was essential, despite the known liability risks).

33. The Navy's discretionary decision to use, and to require the use of, PCB-containing askarels as transformer insulating fluid goes back many decades. The Navy was purchasing Pyranol[1] transformers by name during World War II. (*See* Exhibit B, November 23, 1942 Navy Bureau of Ordinance memorandum re: procurement of GE Pyranol transformers). By the 1950s, at latest, the Navy had incorporated PCB-containing electrical insulating oil into the Department of Defense Section of the Federal Supply Catalog, where it was issued federal stock number 9160-664-0051. (*See* Exhibit C, August 8, 1958 Federal Supply Catalog, Dept. of Defense Section C4-1, Group 91 – Fuels, Lubricants, Oils, and Waxes, at p. 61). Such inclusion demonstrates the Federal Government's approval to include this PCB-containing material in military procurement contracts. (*Id.* at p. 3)

34. Shortly thereafter, by 1961, the Federal Government had amended the listing for federal stock number 9160-664-0051 to specifically provide for General Electric Transformer Pyranol 1467. (*See* Exhibit D, January 24, 1961 Federal Supply Catalog, Dept. of Defense Section C4-1, Group 91 – Fuels, Lubricants, Oils, and Waxes, at p. 60). The government's specific inclusion of GE's proprietary formulation of PCB-containing electrical insulating fluid (*i.e.*, Transformer Pyranol 1467) as a material approved for federal procurement demonstrates (a) that the Federal government – in this case the U.S. Navy – procured significant quantities of PCB-containing transformers from GE (among other manufacturers), and (b) had expressly reviewed and approved the use of GE's specific proprietary askarel formulation for this application.

35. By 1967, at latest, the Federal Government had issued a detailed federal specification requiring the use of PCBs in electrical insulating fluids for noncombustible transformer applications. (*See* Exhibit E, March 24, 1967 Federal Specification VV-I-1219, Insulating Fluid, Electrical (Noncombustible), at p. 5 ("The electrical insulating fluid covered by this specification is a chlorinated aromatic hydrocarbon (askarels) intended for use as an insulating and cooling medium in electrical transformers when a

---

[1] Pyranol was the GE trade name for its PCB-containing electrical insulating fluid.

noncombustible fluid is required.")) As discussed above, the Navy continued to require that GE supply PCB-containing Pyranol for use in government transformer applications well into the 1970s. (*See* Exhibit A) The Pyranol supplied to the Navy by GE, or the PCB containing equipment supplied by Westinghouse, would have been required to meet the government's specification for noncombustible electrical insulating fluid. (*See* Exhibit E)

36. The Navy similarly reviewed, approved, and required the use of PCB-containing capacitors to fulfill military procurement contracts for the supply of electrical equipment for Naval warships going back to at least the early 1950s. Such capacitors were used extensively to regulate power for essential shipboard equipment such as the voltage regulators on the SSTGs that supplied onboard electricity for warships like aircraft carriers and destroyers. (*See, e.g.*, Exhibit F, March 26, 1952 Navy Ship Parts Control Center letter to Newport News Supervisor of Shipbuilding re: issuance of Navy stock numbers covering repair parts for SSTG voltage regulators aboard aircraft carrier USS Forrestal (CV-59). For the aircraft carrier USS Forrestal (CV-59) alone, the approved GE drawings for voltage regulators, for just the SSTGs, required at least four PCB-containing capacitors for each of 16 voltage regulators for the 8 separate SSTGs on the ship. (*Id.* at 2-3).

37. These GE voltage regulator drawings further show that they were issued official Navy Bureau of Ships drawing numbers (BUSHIPS 92913-S6202-545825 & 99013-S620285), demonstrating that such drawings were carefully reviewed and approved by the U.S. Navy for compliance with applicable contract requirements and Navy specifications. (Id.) As part of this approval process, the voltage regulators and capacitors were extensively tested by GE, under Navy oversight, on at least three separate occasions for compliance with contract requirements. (*See* Exhibit G, December 31, 1952 Navy Inspector of Machinery letter to BUSHIPS and Supervisor of Shipbuilding forwarding GE progress report for CV-59). These voltage regulators and capacitors were then incorporated into the turbo-generators that supplied electrical power to the ship which, in turn, were themselves extensively inspected and tested by the Navy on multiple occasions for compliance with contract requirements and specifications. (See Exhibit H, November 16, 1955 Navy Report of Preliminary Acceptance Trials and Material Inspection, USS Forrestal (CVA-59), at p. VIII-1; Exhibit I, June 12, 1956 Navy Report of Final Acceptance Trials and Material Inspection, USS Forrestal (CVA-59), at p. VIII-1)

38. The Navy's complete oversight and control over the use of PCB-containing transformers and capacitors in electrical components thus extended from review and approval of initial design drawings, parts and materials lists, to the manufacture and testing of individual components, to the assembly, installation, and testing of equipment aboard ship. And this documentation with respect to the Navy's extensive review, supervision, testing, and approval associated with GE's use of PCB-containing capacitors in voltage regulators for SSTGs on the USS Forrestal is but one example of one piece of electrical equipment on a single Naval warship. This process would have been repeated with respect to components used in numerous other pieces of electrical equipment throughout the ship, and then multiplied over hundreds of different warships in dozens of ship classifications (carriers, cruisers, destroyers, destroyer escorts, missile frigates, tenders, troop transports, cargo

ships, etc.), by both GE and other manufacturers of PCB-containing transformers, like Westinghouse.

39. As is true relative to questions of Naval ship design or construction, the Navy's discharge of its safety-related role also entails a complex balancing of its strategic objectives and operational imperatives with its goal of maximizing personnel safety. In short, in all aspects of the design, construction, operation, maintenance, repair, overhaul, and/or modernization of its fleet, the Navy must deliberately balance the demands of maintaining an effective military posture against its concern for worker safety and sound engineering practices. In particular, as a Naval warship is, by design and intended function, an inherently hazardous workplace, the Navy's performance of its safety-related functions is necessarily tempered by the realization that it is impossible to eliminate all health risks associated with such vessels.

40. Given the complexity of a Naval vessel and its multiple integrated systems, no single consulting contractor is as well-positioned as the Navy, itself, to fully assess or address ship-wide operational hazards arising from the construction, maintenance, repair, overhaul, or modernization of such a vessel, or to balance such concerns against the competing demands of combat-effectiveness.

41. I am prepared to testify to the foregoing facts, all of which are within my own personal knowledge. I reserve the right to update, revise, or supplement my Affidavit as additional information becomes available.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9TH day of DECEMBER 2025.

[signature]
John B. Padgett, III, RADM USN (Ret.)

Sworn to and subscribed before me, in my presence, this 9 day of December, 2025.

[signature] Notary Public

GAIL C. GIARDINA
NOTARY PUBLIC
My Commission Expires Aug. 31, 2027