**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

MONSANTO COMPANY et al.,

    *Plaintiff,*

v.

MAGNETEK, INC. et al.,

    *Defendant.*

)
)
)
)
)
)
)
)  No. 4:23-cv-00204-JMD
)
)
)
)
)
)

**<u>ORDER DENYING MOTION TO REMAND</u>**

For decades, Monsanto manufactured polychlorinated biphenyls, also known as PCBs, and sold those chemicals to the defendants here.  Those defendants then used the chemicals in electrical products that they sold.  In recent years, Monsanto incurred substantial costs defending hundreds of lawsuits alleging that the PCBs it produced caused harm.  Monsanto sued Magnetek, General Electric, and others in state court, seeking to compel them to cover the "full amount of the defense costs" Monsanto incurred from those hundreds of lawsuits.  ECF 4 ¶ 235.  General Electric removed the suit under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

Monsanto seeks remand.  But removal was proper.  Section 1442 allows a company to remove a case to federal court if the company was "acting under" a federal officer and the suit "relat[es] to" any act under color of federal office.  General Electric acted under federal officers in supplying the Federal Government with products containing PCBs, especially during WWII.  The Federal Government needed fluids to cool and insulate high-voltage equipment, and PCBs were the "only nonflammable dielectric fluid" available for much of the twentieth century.  ECF 4 ¶ 2.  Their use in electrical equipment "mitigate[d] very serious risks . . . of fatal accidents from fire and explosions."  ECF 4 ¶ 22.  For that reason, the United States

1

Navy declared that procuring General Electric's PCB-containing products was "essential." ECF 205-24 at 2 (1974 letter from the Navy's Acting Director of the Contracts Division).  And it gave General Electric millions of dollars during World War II to build millions of capacitors and thousands of transformers for the American war effort.

This suit also satisfies the second element for removal: it relates to the defendants' supplying the Federal Government with PCB products.  Monsanto has defended against hundreds of suits that claim damages related to PCBs that allegedly affected the environment and workers throughout the twentieth century.  General Electric and the other defendants, acting under federal officers, greatly contributed to introducing PCBs to the environment and workers.  And Monsanto seeks to recoup from the defendants "the full amount of the defense costs" that Monsanto has and will incur in these lawsuits.  ECF 4 ¶ 235.  General Electric has provided enough evidence to remain in federal court.  The Court denies Monsanto's motion to remand.

### Background

Popularized around the 1930s, PCBs were particularly valuable for use in electrical equipment.  Monsanto[1] started selling PCBs around 1935 but "never sold finished electrical devices containing PCBs."  ECF 4 ¶ 29.  Instead, companies like General Electric pioneered using that raw material in electrical equipment.

Unlike other fluids that could be used in electrical equipment, PCBs had the "distinctive property of being non-flammable."  ECF 1-20 at 2.  The substance "was developed to meet a specific need—the elimination of the fire and explosive hazard inherent in [other substitutes available at the time] in capacitors, regulators, and transformers."  *Id.*  "This

---

[1] Where relevant, the Court refers to the plaintiffs and their predecessors-in-interest collectively as Monsanto.

2

safety factor" was "the only advantage" PCBs had over alternatives; PCBs were otherwise heavier and more expensive.  ECF 1-4 at 11.  PCBs thus were used only "where considerations of safety and reliability [were] paramount."  *Id.*

The desire for nonflammable fluids in electrical equipment was widespread.  For decades, industry codes and government regulations required using PCBs.  ECF 4 ¶ 22.  An estimated 75 percent of all PCBs manufactured in the United States between 1930 and 1975 were used in electrical transformers and capacitors.  *Id.* ¶ 28 (citing EPA, *PCBs in the United States Industrial Use and Environmental Distribution* at 215 (Feb. 1976)).

Concerns later arose that PCBs were toxic to humans.  In 1971, the Federal Government convened an interdepartmental task force to "protect the public from actual or potential hazards from PCBs."  *Id.* ¶¶ 40, 46 (quoting United States Department of Agriculture et al., *Polychlorinated Biphenyls and The Environment* at 1 (May 1972)); *but see id.* (also concluding that PCBs had certain "essential or non-replaceable uses" in electrical equipment)).  In light of those concerns, Monsanto phased out sales for non-electrical applications of PCBs but entered into a number of contracts with companies in the early 1970s, agreeing to continue manufacturing PCBs for electrical use in exchange for those companies indemnifying Monsanto.  *Id.* ¶ 49.  Then, Congress enacted the 1976 Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, citing PCBs as a threat to human health.  *Id.* ¶ 48.  The legislation gave the EPA authority to regulate certain industrial chemicals.  By 1979, federal regulations prohibited the manufacture or use of PCBs outside a few limited exceptions, including for military needs.

Monsanto faced a flood of lawsuits, alleging serious injuries from PCB exposure.  Those lawsuits continue to this day.  These cases involve plaintiffs from across the United States who claim they were harmed after PCBs allegedly contaminated their food, water,

schools, and places of work.  Monsanto has paid significant amounts to resolve many of these suits, and faces mounting legal bills from ongoing litigation.

Monsanto asserts that these costs "should be borne" in "full" by the defendants. ECF 4 ¶¶ 1, 235.  Citing the indemnification contracts and general duties of care under negligence law, Monsanto insists that the defendants are liable to Monsanto for the costs of its defense for environmental and workplace harms from PCBs sold "both before and after" the 1970s contracts were signed.  ECF 4 ¶ 288.  General Electric and the other companies refused Monsanto's indemnification demand.  So Monsanto sued.  General Electric removed the case to federal court, and Monsanto moved to remand.  The sole question at issue is whether the federal officer removal statute permits removal here.

## Analysis

Under the federal officer removal statute, a defendant may remove to federal court any "civil action . . . commenced in a State court" against a person "acting under" a United States officer or agency "for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  "In evaluating the propriety of removal," the Court "must credit the defendants' theory of the case."  *Griffin v. Optum, Inc.* 175 F.4th 897, 902 (8th Cir. 2026).

The Supreme Court recently interpreted this statute to require three things.  First, the defendant must be "a person 'acting under' a federal officer, such as certain private parties hired to assist federal officers."  *Chevron USA Inc. v Plaquemines Parish, La.*, 146 S. Ct. 1052, 1057 (2026) (citation omitted).  Second, "the suit must be 'for or relating to any act under color of such office.'"  *Id.* (citation omitted).  Third, the defendant "must assert 'a colorable federal defense.'"  *Id.* at 1057–58 (citation omitted).  Courts interpret the statutory terms "broadly," *e.g.*, *id.* at 1060, and "the typical presumption against removal does not apply," *Doe v. BJC Health Sys.*, 89 F.4th 1037, 1041 (8th Cir. 2023) (citation omitted).

4

Monsanto challenges only the first two requirements, ECF 208 at 19 n.7, and the defendants prevail on both. Only one defendant needs to satisfy the removal statute. *Griffin*, 175 F.4th at 902 (quoting *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 185 (1st Cir. 2024)). So the Court focuses on General Electric.

## I.

The Court first considers whether General Electric was "acting under" an officer or agency. On this question, General Electric's status as a military contractor—most notably during wartime—is highly probative. "The classic example of a person who acts under a federal officer is a government contractor." *BJC Health Sys.*, 89 F.4th at 1044; *see Saywer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) ("[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*."). A private party generally satisfies this standard when it engages in "an effort to assist, or to help carry out, the duties or tasks of the federal superior." *BJC Health Sys.*, 89 F.4th at 1042 (citation omitted).

It is highly relevant that General Electric, under the government's supervision, provided the Federal Government with critical PCB products. "Federal courts have often held that parties may invoke the statute and remove cases when they provided the government with a product that it needed or performed a job that the government would otherwise have to perform." *Id.* at 1044 (citation omitted). Courts especially examine whether the party was "supplying the federal civilian workforce or the military with a necessary item." *Id.* at 1046 (listing "health insurance" and "earplugs" as examples of necessary items sufficient to permit removal); *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153–54 (2007) (highlighting that a company properly removed a case where it "fulfilled

5

the terms of a contractual agreement" to provide the government with a product "used to help conduct a war" that the government would have had to procure itself "in the absence of a contract").

The Court examines two activities by General Electric: (A) its production of PCB products for the Navy during World War II, and (B) its production of PCB products for the Federal Government after World War II. The evidence is more than enough in combination for General Electric to prevail. The Court then explains why Monsanto's counterarguments fail.

**A.**

General Electric provided the Navy with required PCB electrical equipment during World War II. The Navy "required [General Electric] PCB-containing transformers at government facilities during World War II and purchased such transformers from [the company]." ECF 205-1 ¶ 5; *see* ECF 205-4 at 7 (1942 letter from the Navy Bureau of Ordnance discussing a "necessary requisition to secure" PCB-containing transformers for delivery to a "Naval Ammunition Depot"). During the war, the Navy even requested "by name" the proprietary trade product for General Electric's PCB-containing insulating fluid: Pyranol. ECF 205-26 ¶ 33 (Affidavit of Rear Admiral John B. Padgett, III).

Demand from the Federal Government was so great that the Federal Government invested millions into a facility that General Electric dedicated to providing PCB products solely for the Federal Government. The Navy fronted over $14 million—more than $250 million today—to fund an expansion of General Electric's facility in Pittsfield, Massachusetts. ECF 205-5 at 4 (1943 Application for a Necessity Certificate to the Department of War). And for part of World War II, "*all* of the capacitors produced at [General Electric's] facility in Pittsfield, Massachusetts, were for the federal government." ECF 205 at 10; *accord* ECF 205-3 at 3 (1942 Application for a Necessity Certificate) ("100% of the Capacitor

6

Department's facilities is being applied to war work."). According to a 1945 United States War Production Board ledger tracking "War Products and Capacity" from "War Manufacturing Facilities," General Electric's Pittsfield facility had the capacity to supply 2.5 million "capacitors" and 18,200 "modulators and transformers" each quarter. ECF 205-7 at 2. This production helped the Navy's Bureau of Ships as well as other military departments solve their "well known" and "urgent need for capacitors." ECF 205-3 at 4.

The Federal Government's need for PCB materials from General Electric was so great that the government awarded General Electric a "Necessity Certificate." ECF 208 at 12. The Federal Government established those certificates during World War II as part of "the greatest program of defense preparedness in [this nation's] history." *United States v. Allen-Bradley Co.*, 352 U.S. 306, 306 (1957). "New and improved facilities were desperately needed, not only for the production of . . . [the] obvious weapons of war, but also for the innumerable items that are essential to the production of large-scale conflict . . . ." *Id.* Businesses were "reluctan[t] to build new war plants because of widespread fears that such facilities would become wholly useless when the emergency had passed," so Congress passed tax incentives for companies that received necessity certificates. *Id.* at 307. The War Production Board was "the certifying authority," and approval by the Board certified that a company's capital "improvements were necessary to the national defense." *Id.* These certificates "contributed materially to the phenomenal expansion of our industrial plants which was so necessary for successful prosecution of the war." *Id.* at 310. General Electric's receipt of this certificate carries the imprimatur of the Federal Government's determination that General Electric's PCB products were necessary to the war effort.

To be sure, "[t]he receipt of federal funding [or tax incentives] alone cannot establish a delegation of legal authority." *BJC Health Sys.*, 89 F.4th at 1045 (citation omitted)). But General Electric was no company merely "accept[ing] federal funding for its own business

7

purposes." *Id.* Although General Electric (like every government contractor) earned business by acting under federal officials, it pursued not merely its private interests, but instead conducted manufacturing "necessary for successful prosecution of the war." *Allen-Bradley Co.*, 352 U.S. at 310. General Electric "provided the government with a product that it needed or performed a job that the government would otherwise have to perform." *BJC Health Sys.*, 89 F.4th at 1044 (citation omitted). It "suppl[ied] . . . the military with a necessary item." *Id.* at 1046. General Electric acted under the Navy during World War II by supplying it with fire-resistant PCB-containing electrical equipment that the Federal Government deemed "necessary" to the war effort.

Monsanto's own documents confirm General Electric's substantial military-support activities. In a 1941 letter to the Secretary of War and the Advisory Commission to the Council of National Defense,[2] Monsanto requested a necessity certificate for itself to fund "new facilities" for "the increased production of" PCBs. ECF 68-2 at 2. Monsanto had no direct supply contract with the Federal Government, but instead intended to supply companies producing electric transformers. *Id.* at 2, 5. In its application, Monsanto specifically identified General Electric and Westinghouse—two of the defendants here—as companies that would use Monsanto's PCBs for the war effort. *Id.* at 5. Monsanto affirmed that "100%" of the PCBs it planned to sell to General Electric and other manufacturers would "directly or indirectly [be] absorbed in the Defense Program." *Id.* Monsanto highlighted General Electric's "urgent need for" PCBs to put in "transformers and condensers" and even admitted that "it is wholly due to the urgent requirements of [General Electric and others] that [it] is undertaking the extension." *Id.* at 4–5 ("[T]he entire production of these additional

---

[2] The Council of National Defense "[c]oordinated resources and industries for national defense." United States National Archives and Records Administration, *Records of the Council of National Defense*, https://perma.cc/7CWD-HDUN (2026).

facilities is required by" General Electric, Westinghouse, and two other companies for the "manufactur[e] of electrical transformers and condensers."). Critically, Monsanto emphasized that other companies's "demand for such non-inflammable transformers and condensers *is greatly increased directly for defense purposes*." *Id.* at 5 (emphasis added).

Monsanto's necessity certificate application even contained a letter from General Electric to Monsanto. In it, General Electric's Manager of the Transformer Division discussed the company's use of PCBs to support the American war effort. He stated that "[i]n view of the increased use of Pyranol transformers on defense orders, it is necessary for [Monsanto] to increase promptly [its] production facilities . . . in order that the demand for this type of [General Electric] equipment will not be delayed." *Id.* at 9. He attached a list of "priority orders involving Pyranol transformers for use in defense work." *Id.* And he included "an additional list of transformers for defense jobs which at the present time do not have priority numbers but are defense orders and would be given numbers at any time if we were unable to meet the desired delivery dates." *Id.* General Electric "wish[ed] to point out to [Monsanto] that it is almost impossible for [them] to keep [its priority order] list up to date, as for instance on the U.S. Naval Air Station, Quonset Point, blanket priority order, [because] . . . Pyranol transformers are being added *almost daily*." *Id.* (emphasis added). So Monsanto itself certified to the Federal Government that General Electric was performing governmental tasks by providing a product needed to fight a global conflict.

### B.

General Electric continued to provide critical support to the American military for decades after the war ended. The Navy "continued to require that [it] supply PCB-containing Pyranol for use in government transformer applications well into the 1970s."

ECF 205-26 ¶ 35.  For example, a 1961 Department of War[3] "Federal Supply Catalog" listed by name General Electric's Pyranol as one of products that could satisfy the demands "normally required by the Army, Navy, Air Force, and Marine Corps."  ECF 205-13 at 4, 63. These fluids received a "Standard Item" designation from the Navy identifying them as "item[s] of supply which is standard within [the Department of War] for procurement." ECF 205-13 at 5, 63.

A specific product appearing in the Federal Supply Category matters for two reasons. First, it generally shows "the Federal Government's approval to include . . . [the] material in military procurement contracts."  ECF 205-26 ¶ 33 (Affidavit of Rear Admiral Padgett). Second, it generally signifies that the Federal Government is procuring the product in "significant quantities" after having "expressly reviewed and approved" their use.  *Id.* ¶ 34. The Federal Government's specific and general acquisition of PCB products during this time underscores the necessity of PCB products to the Federal Government at that time.

**1.** To take a specific example, General Electric's contract with the Navy to provide PCB products on the U.S.S. Forrestal aircraft carrier highlights the company's contracting ties to the Federal Government.  ECF 205-8 at 2–5 (1952 letter from the Commanding Officer of the Navy's Ship Parts Control Center, Naval Supply Depot to the Supervisor of Shipbuilding, USN & NIO, Newport News, Virginia).  The Navy listed "General Electric" as the manufacturer for the "voltage regulator" located in the ship's generator.  *Id.* at 3.  The "approved" designs for the regulators "required at least four PCB-containing capacitors for each of 16 voltage regulators for the 8 separate [generators] on the ship."  ECF 205-26 ¶ 36

---

[3] At the time, the Federal Government referred to the department as the "Department of Defense."  *See* Exec. Order No. 14347, 90 Fed. Reg. 43893 (Sept. 10, 2025).  For most of American history, the department was referred to as the Department of War, which the Executive Branch recently readopted.  *Id.*

(Affidavit of Rear Admiral Padgett) (discussing the 1952 letter).  It was these generators that provided most of the electrical power for naval ships.  *Id.* ¶ 27.

Because the company's equipment was being used on the U.S.S. Forrestal, the Navy exercised direct control and supervision over the devices.  The Navy issued official Bureau of Ships drawing numbers to these General Electric voltage regulator drawings.  ECF 205-8 at 3.  Those numbers signify that products "were carefully reviewed and approved by the U.S. Navy for compliance with applicable contract requirements and Navy specifications."  ECF 205-26 ¶ 37.  The Navy exercised "complete oversight" of PCB products, ranging from "approval of initial design drawings, parts, and materials lists, to the manufacture and testing of individual components, to the assembly, installation, and testing of equipment aboard ship."  *Id.* ¶ 38.

Indeed, the Navy exercised oversight of *every* aspect of ship design:

> [T]o ensure mission success, the Navy retain[ed] ultimate decision-making authority as to its military vessels and platforms, undertaking *detailed direction of all relevant aspects* of the design, manufacture, installation, maintenance, repair, overhaul, and/or modernization of Navy vessels and *of the various items of equipment installed aboard such vessels*, thereby ensuring that Naval ships [we]re designed, built, and maintained to meet the rigorous demands of Navy Combatant Commanders around the world, and to operate reliably in the most arduous environments, including combat.

*Id.* ¶ 14 (emphasis added).  Among other things, "designing and constructing ships" is an "essential, inextricable, aspect[] of the Navy's combat-readiness, allowing the Navy to stand ready to successfully fight wars and to deter enemy aggression in the interests of national defense."  *Id.* ¶ 13.

Regular reports about the condition of the voltage generators highlight the oversight the Navy exercised over General Electric.  A 1952 General Electric progress report submitted to the Navy about voltage regulators confirmed that the equipment was "extensively tested

11

by [General Electric], under Navy oversight, on at least three separate occasions for compliance with contract requirements." *Id.* ¶ 37 (discussing the report);  ECF 205-9 at 3–11 (the report).  Further reports throughout the 1950s confirmed additional "test[ing] by the Navy on multiple occasions for compliance with contract requirements and specifications." ECF 205-26 ¶ 37 (discussing the 1955 Navy Report of Preliminary Acceptance Trials and Material Inspection for the U.S.S. Forrestal as well as the 1956 Navy Report of Final Acceptance Trials and Material Inspection for the U.S.S. Forrestal).  In one report, the Navy concluded that "[t]he electrical installation was in good condition," and that "[t]he design and construction of the system could be considered outstanding" subject to limited qualifiers. ECF 205-11 at 32 (1956 Navy Report of Final Acceptance Trials).

**2.** Beyond that aircraft carrier, the Federal Government continued to demand PCB-containing equipment from General Electric throughout the 1970s, despite growing concerns about PCB-related health risks.  Indeed, Monsanto says that demand is the reason it continued manufacturing PCBs.  According to Monsanto's complaint, the "viability of the U.S. electric industry depended upon a domestic source for PCBs," so the company "agreed to continue to supply PCBs for closed electrical applications."  ECF 4 ¶ 49.  Monsanto's continued production of PCBs enabled General Electric to satisfy its "obligation to supply the federal government with PCBs to service existing transformers and other electrical devices." ECF 205 at 11.

Contemporary evidence supports the continuing need of the Federal Government to procure PCB products.  One 1974 letter from the Navy to General Electric, for example, noted that Department of War agencies "have a substantial number of transformers and electrical devices in which the use of askarel [insulating fluid with PCBs] rather than ordinary transformer oil is essential."  ECF 205-24 at 2 (1974 letter from the Navy's Acting Director of the Contracts Division).  The Navy emphasized that "[m]any of these are products of the

General Electric Company and of course we look to General Electric for the supplies necessary to keep them operational." *Id.* The letter also confirmed that the Federal Government relied on General Electric, having concluded that in some geographic regions "contract[ing] with [other] private firms for [servicing] these devices . . . is not feasible or economical because of the distances qualified service firms would have to travel, or because of security requirements." *Id.*

All this evidence confirms that General Electric was "acting under" federal officials. Not only was General Electric a contractor, but it was a contractor for naval equipment. It typically would be the Federal Government's duty to manufacture and maintain a navy, but the government instead outsourced some of that work to General Electric. General Electric thus "provided the government with a product that it needed or performed a job that the government would otherwise have to perform." *BJC Health Sys.*, 89 F.4th at 1044 (citation omitted). And General Electric did so under governmental guidance, supervision, and control.

## C.

Monsanto cannot overcome this evidence. In a moment of irony, Monsanto appears to suggest that it *agrees* with General Electric's decision to remove. Monsanto notes that Monsanto itself tried to remove to federal court three times under this removal statute when defending against PCB-related suits. But Monsanto was unsuccessful, so it asserts that General Electric also should fail. It now claims that General Electric sold the Federal Government only "widely available off-the-shelf electrical equipment." ECF 208 at 12. And it argues that, to remove to federal court, General Electric would have needed to supply the Navy and others with "custom-made products . . . specialized . . . for military use." *Id.* at 10–11, 12 n.3. Not so.

13

Monsanto applies a far too demanding standard to a statute the Supreme Court has long construed broadly. *Watson*, 551 U.S. at 147; *see, e.g., Willingham v. Morgan*, 395 U.S. 402, 406 (1969) ("The federal officer removal statute is not 'narrow' or 'limited.'"). As relevant here, it requires only that a company—especially a military contractor like General Electric— "provide[] the government with a product that it needed." *BJC Health Sys.*, 89 F.4th at 1044. Eighth Circuit and Supreme Court case law do not limit the statute to specialized, custom-made products. *See id.* (making no mention of specialized products) (citing *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016)). That is especially true for wartime contractors. A military contractor producing military equipment for the government during World War II is "an archetypal case" that "easily satisfies the 'acting under' requirement." *Papp*, 842 F.3d at 813.

Other courts have stressed that companies that supplied equipment to the Navy qualify under the statute, and those courts did not graft onto the statute any kind of "specialized equipment" requirement. One company that provided electrical equipment (turbines) to the Navy satisfied the statute because the company's actions "assist[ed] the federal government in building warships." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012). Another court held that removal was permitted for a manufacturer of boilers for the Navy because the company's "status as a Navy contractor readily satisfie[d] the requirement that it . . . acted under the Navy." *Saywer*, 860 F.3d at 255. A third court stated that a supplier of valves and shipboard equipment for the Navy met its burden with "examples of the Navy's customary specifications [that the contractor was not allowed to deviate from] and testimony that [its] valves conformed to those specifications . . ., even absent specific evidence of [its] own contracts." *Cuomo v. Crane Co.*, 771 F.3d 113, 117 n.2 (noting that the contractor "easily clears the low threshold for asserting . . . removal").

14

General Electric performed almost exactly these same duties for the government, so it too much prevail under the statute.

Just recently, the Eighth Circuit embraced an expansive reading of the "acting under" requirement.   Examining pharmacy benefit managers that serviced both federal and non-federal sponsors of health insurance plans, the court found that the subcontractor companies had acted under federal officers. *Griffin*, 175 F.4th at 902.  Because the Federal Government provided "a comprehensive program of health insurance for federal employees" to "improve the position of the government with respect to private companies in recruiting the best talent," and because the government "contracts with private carriers" that "subcontract with pharmacy benefit managers" who "negotiate with [drug] manufacturers to obtain discounts," the court concluded that the pharmacy benefit managers "play[ed] a key role in the [government's] effort to carry out its duties . . . to provide prescription drug benefits." *Id.*  The court also highlighted that the pharmacy benefit managers were "subject to regulations . . . established to govern" them, "guidelines issued . . . such as transparency standards," and could have their performance "monitored . . . by auditing [their] work." *Id.* at 903 (cleaned up).  Nothing in *Griffin* turned on whether the pharmacy benefit managers provided specialized products to the government.  Indeed, the pharmacy benefit managers appear to have provided identical services to both governmental and nongovernmental sponsors of health insurance plans. *Id.* at 905.

General Electric provides an even more compelling case than the subcontractor pharmacy benefit managers in *Griffin*.  General Electric was a direct contractor repeatedly identified by name in contracts and supply catalogs.  The pharmacy benefit managers did not even have a direct contract with the government.  They instead were "subcontractors" of a different organization that had a contract with the Federal Government. *Id.* at 901.  *Griffin* also found it meaningful that the Federal Government "may" audit the contractor at issue—

15

not even the subcontractors directly.  *Id.* at 903.  Here, the Federal Government oversaw General Electric directly.

Monsanto's argument does have some intuitive appeal.  It might stretch the removal statute beyond its text to say that a company is "acting under" a federal official simply because it has a contract to provide pencils.  Even then, the company might act under an official to the extent it is providing a common product under government specifications.  *See Graves v. 3M Co.*, 17 F.4th 764, 770, 773 (8th Cir. 2021) (removal statute applied when the military purchased common earplugs but asked that they be sold without the standard instruction booklet).  But General Electric was not providing something with readily available substitutes.  It was providing an indispensable product for naval equipment.  Those products were necessary for safe electrical supply.  Without them, the naval ships could not have operated.  Indeed, as explained above, Monsanto continued manufacturing PCBs despite growing health concerns in the 1970s in substantial part because PCB electrical products were considered critical supplies for the Federal Government.

To be sure, Monsanto tried to remove PCB-related lawsuits in this district three times, which all failed.  *Bailey v. Monsanto Co.*, 176 F. Supp. 3d 853 (E.D. Mo. 2016); *Kelly v. Monsanto Co., Solutia Inc.*, No. 4:15-cv-01825-JMB, 2016 WL 3543050 (E.D. Mo. June 29, 2016); *Burford v. Monsanto Co.*, No. 4:16-cv-00536-PLC, 2017 WL 1315800 (E.D. Mo. Apr. 10, 2017).  But those decade-old cases did not benefit from recent binding precedent that strongly favors General Electric's removal.  And as General Electric argues, its "relationship with the federal government was more direct and significant" than what Monsanto established in those earlier cases.  ECF 68 at 7.  Whereas Monsanto "sold the PCBs, by and large, to government contractors and not to the government itself," *Bailey*, 176 F. Supp. 3d at 870, General Electric was a direct government contractor.

16

Nor will the Court use the case-splitting approach that some courts have embraced. *Graves* permitted a defendant to remove cases brought by plaintiffs who used earplugs while working for defense contractors, but not cases brought by plaintiffs who purchased earplugs from the commercial marketplace. *Graves*, 17 F.4th at 773. Other cases, like *Griffin*, have rejected that case-splitting approach. 175 F.4th at 904–05 (granting removal of the case even though the plaintiff's complaint "'disclaim[ed]' all claims for relief for the defendants' actions under a federal officer"). Monsanto has neither asked for a case-splitting approach nor explained how one would be workable. It has defended and is defending many cases generally asserting pollution from PCBs. The company has provided no way to distinguish between military-related pollution and civilian-related pollution. And at the end of the day, courts generally "must credit the defendants' theory of the case." *Id.* at 902.

Based on the record evidence, the Court concludes that General Electric acted under the direction of the Navy and other federal entities. As a military contractor, it provided the Federal Government with products it needed—including during World War II. Monsanto's counterarguments ask too much in light of Eighth Circuit and Supreme Court precedent. General Electric's efforts to supply electrical equipment necessary to the national defense satisfy the first element of the removal statute.

## II.

General Electric also satisfies the second part of the removal statute: the company's work performed under federal direction "relat[es] to" the conduct for which Monsanto seeks indemnification. To satisfy this relating-to requirement, "[i]t is sufficient that a defendant plausibly alleges a 'close relationship between its challenged conduct and the performance of its federal duties.'" *Id.* at 903 (quoting *Plaquemines Parish, La.*, 146 S. Ct. at 1061). The relating-to requirement is "a low bar." *Minn. by Ellison v. Am. Petrol. Inst.*, 63 F.4th 703, 715 (8th Cir. 2023). The statutory language "sweeps broadly" and does not demand a strict

17

causal relationship: "[A] removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." *Plaquemines Parish, La.*, 146 S. Ct. at 1060.

General Electric easily clears this low bar for Monsanto's claims concerning post-1972 conduct. Critically, a major reason General Electric signed the 1972 indemnification agreement with Monsanto was "to fulfill its obligations to the federal government." ECF 205 at 13–14. General Electric relied on PCBs from Monsanto "to maintain the substantial number of transformers and electrical devices in use by the Navy Department, and other agencies." *Id.* (cleaned up). And as late as 1974, the Navy described General Electric's ongoing services as "essential." ECF 205-24 at 2 (letter from the Navy's Acting Director of the Contracts Division).

Monsanto's lawsuit also seeks to recover for actions taken before signing the 1970s indemnification agreements. *See* ECF 4 ¶ 288 (General Electric "breached [its] respective duty of care by allowing PCBs purchased from [Monsanto] *both before and after* signing the [agreements] to be released into the environment . . . ."). So the Court must also consider the significant actions General Electric took at the government's direction during World War II and over the following decades. General Electric has sufficiently established the relationship necessary to succeed here. As above, Monsanto seeks to recover costs related to pollution litigation, and for purposes of the remand-motion, Monsanto has provided no mechanism to differentiate between pollution tied to military contracting and pollution tied to civilian contracting.

The Court rejects Monsanto's counterarguments. Monsanto primarily asserts that General Electric has not demonstrated that its "government sales of PCB-containing products were more than a *de minimis* portion of the total PCBs at issue here." ECF 208 at 16. Perhaps General Electric does not have "an airtight case on the merits," but

18

for purposes of removal "it does not have to be." *Maryland v. 3M Co.*, 130 F.4th 380, 390 (4th Cir. 2025) (citation omitted). The company's "theory of connection holds sufficient water to establish this element under the federal officer removal statute's broad scope." *Id.*; *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 944 (7th Cir. 2020) (stating that questions about whether "the Companies' pollution that allegedly caused the [plaintiffs'] injuries flowed from the Companies' specific wartime production for the federal government or from their more general manufacturing operations outside those confines" were "*merits questions* that a federal"—not state—"court should decide"). The statute even "contemplates removal of suits against officers or their agents for acts that were not done under color of their offices, so long as the suits relate to such acts." *Plaquemines Parish, La.*, 146 S. Ct. at 1063 (cleaned up). General Electric has certainly met that forgiving standard.

Many cases have ruled that removal was proper even when only a small portion of a company's relevant products related to federal activities. The Supreme Court recently ruled that the "relating to" element was satisfied where only "[s]ome of the crude oil" at issue in the environmental suit was used for the defendant's military contracts. *Plaquemines Parish, La.*, 146 S. Ct. at 1058. Other cases about chemical exposure mirror this analysis. "Even if" Monsanto eventually proves that General Electric is liable "because of acts not directed by the federal government, it is still enough for the present purposes of removal that at least some of the [harm] arose from the federal acts." *Baker*, 962 F.3d at 945 ("The Companies' wartime production was a small, yet *significant*, portion of their relevant conduct," which "supports removal."); *see 3M,* 130 F.4th at 390 ("Some of the [contamination] charged by the [plaintiffs] came from [chemical products the company manufactured for the United States military], so any remediation would necessarily implicate work that [the company] did for the federal government."). The Court finds that General Electric dedicated

19

a legally significant portion of its PCB-containing electrical equipment to the Federal Government.

## Conclusion

General Electric acted under a federal officer, and it is being sued for actions relating to its performance of those governmental duties. It purchased PCBs from Monsanto to supply the Navy and other federal entities with fire-resistant electrical equipment. Monsanto aims to hold General Electric liable for conduct relating to those acts. The federal officer removal statute guarantees a federal forum to resolve that suit. The Court **DENIES** Monsanto's motion to remand, ECF 52.


Dated this 22nd day of July, 2026

_____
JOSHUA M. DIVINE
UNITED STATES DISTRICT JUDGE
FOR THE EASTERN AND WESTERN
DISTRICTS OF MISSOURI

20