IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MONSANTO COMPANY, )
)
PLAINTIFF, )
) No. 4:23-CV-00204-JMD
vs. )
)
MAGNETEK, INC., ET AL, )
)
DEFENDANTS. )

MOTION HEARING

**BEFORE THE HONORABLE JOSHUA M. DIVINE**
**UNITED STATES DISTRICT JUDGE**

**AUGUST 5, 2026**

Reported by: Erikia T. Schuster, RPR
Official Court Reporter
United States District Court
111 South Tenth Street, Third Floor
St. Louis, MO 63102 (314) 244-7926

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

APPEARANCES:

For Plaintiff Monsanto:

DAVID M. MANGIAN
SHARON B. ROSENBERG
THOMPSON COBURN LLP
One US Bank Plaza
505 N. 7th Street, 28th Floor
St. Louis, MO 63101

For Defendant General Electric:

MICHAEL T. WILLIAMS
WHEELER TRIGG LLP
370 17th Street
Suite 4500
Denver, CO 80202

For Defendant Paramount Global:

YEHUDAH L. BUCKWEITZ
WEIL GOTSHALL LLP
767 Fifth Avenue
Concourse
New York, NY 10153

For Defendant The Gillette Company, LLC:

ROBERT P. BERRY
BERRY SILBERBERG PC
16150 Main Circle Drive
Suite 120
St. Louis, MO 63017

(The hearing commenced at 10:32 a.m.)

THE COURT: We are here today in case number 4:23-CV-204, *Monsanto v. Magnetek, et al.* I think probably the most appropriate way to do this is just raise your hand if you're a lawyer representing one of the people in this case. Okay. Raise your hand if you represent Monsanto. When I say Monsanto, I'm talking about Monsanto, Solutia -- you know who I'm talking about.

Okay. So these four individuals over here; is that right?

MR. MANGIAN: Yes, Your Honor.

THE COURT: Raise your hand if you're representing Magnetek.

Okay. And General Electric.

Paramount.

Kyocera.

Cornell.

Gillette.

Okay. Do the defendants more or less have one person who can speak for them? And who is that going to be?

MR. WILLIAMS: Your Honor, we've allocated our arguments three ways, and I can explain if you'd like.

THE COURT: Okay. Please do.

MR. WILLIAMS: I am going to cover the joint motion to dismiss as to the first four counts, two breach of contract

counts and two declaratory judgment counts.

THE COURT: And your name, sir?

MR. WILLIAMS: Oh, I'm sorry. Mike Williams for General Electric.

THE COURT: Okay.

MR. WILLIAMS: My brother, Mr. Buchweitz, will be arguing the standing, real party in interest and the remainder of the arguments, equitable contribution, and Mr. Berry will be covering the negligence and personal jurisdiction arguments.

THE COURT: Your name is Weitz?

MR. BUCHWEITZ: Buchweitz. Yehludah Buchweitz, sir. Nice to meet you, and to the extent that Paramount's individual motion to dismiss comes up, I would address that as well.

THE COURT: And your name, sir?

MR. BERRY: Robert Berry, Your Honor.

THE COURT: Robert Berry. And you'll be arguing what?

MR. BERRY: Both personal jurisdiction and any matters related to torts from the Court's list of questions.

THE COURT: Okay. Generally speaking, who will speak on behalf of Monsanto?

MR. MANGIAN: Good morning, Your Honor, Dave Mangian.

I'll be covering personal jurisdiction and the real party in interest standing.

THE COURT: Okay.

MS. ROSENBERG: Your Honor, Sharon Rosenberg, for Monsanto.

I'll be covering the text of the special undertakings and any question about the tort claims.

THE COURT: Okay. Today, we have -- I'm focusing on the motions to dismiss. Typically, what I do -- obviously, you-all briefed this well before I was even on the bench and so my general rules don't apply with respect to that.

But typically what I do is I request one consolidated briefing by all defendants, et cetera. That kind of streamlines things. Obviously, we don't have that kind of situation here.

So what I'm reviewing today are the series of motions to dismiss, which are roughly allocated around ECF 83 going into 113, et cetera.

Is there anything else that you-all were expecting to discuss today that is not within the range of what I just discussed? I'm sorry. More like ECF 82 to ECF 121 essentially.

MR. MANGIAN: Your Honor, from the plaintiff's side, we would like to, if we could, after we get done talking about the motions to dismiss talk about next steps, Rule 26(f), Rule

16, those issues.

THE COURT: Since everybody is here today, I think that would be appropriate.

The way I do oral argument, especially when you have a situation like this, it is not going to be helpful to me if I have one person get up, rattle through all of the arguments and then, you know, a long time later have somebody else respond. And so I'd like to as much as possible do this on an issue-by-issue basis. I think the first issue that I'm most interested in is special undertakings, essentially the first four counts, breach of contract and declaratory judgment.

And ordinarily, we would start with the movant. However, I think in this case I'm going to want to start with Monsanto. So go ahead and start arguing your case on those issues, and I'll interrupt as necessary.

MS. ROSENBERG: Your Honor, would you prefer I argue from the table, or do you have a preference?

THE COURT: That is fine. I am probably going to interrupt. I am probably going to ask for the other side to respond, and so we may have a fair back and forth and so sitting at the table may be the most efficient thing.

MS. ROSENBERG: All right. So the heart of the plausibility inquiry, of course, centers -- for the four counts that Your Honor referenced -- centers on the meaning of the special undertaking agreements and what the special

undertaking agreements mean with respect to the scope of coverage -- well, let me back up. So the question for plausibility for the duty of indemnification, is it within the coverage of the special undertaking agreements for the duty to defend? Is it potentially within the coverage of the special undertaking agreements?

And what the special undertaking agreements call for in terms of the scope of coverage is it is a one-drop rule of connection, and the connection being, two, PCBs sold to each defendant on or after the date of the special undertaking.

The special undertaking agreements do not require that the connection be exclusively to post-special undertaking PCBs, and it does not require a causation element, and those are the cases we cite on the meaning of in connection with -- excuse me -- its breadth, that it is broader than causal. I direct you to Huffington or Municipal Lawyers.

Now, I know you asked about the text so I want to get down to interpreting the text, but I think the important place to start there is the rule of Missouri law that the contract must be construed as a whole. And so when we construe the contract as a whole, you start actually with the purpose of the contract, and the TAP Pharmaceutical's case is citing a brief that is Missouri Supreme Court decision that looks to the subject matter.

So here the subject matter is you have an

indemnification agreement where that is its sole purpose. That actually distinguishes it from a lot of cases cited in the brief where in a commercial indemnity context, you're talking about, say, a sales agreement that has an indemnification clause. So you start with -- looking at the contract as a whole, you start with its purpose, the subject matter.

Then the next place that I would direct Your Honor in looking at the contracts as a whole is to the prefatory language. And I assume Your Honor has a copy of one of the special undertakings handy. If not, I am happy to hand one up as I go through the text.

THE COURT: I do have an electronic version. I'm happy to take a paper copy as well so I'm not having to shift pages through on my PDFs.

MS. ROSENBERG: Sure. I am going to hand up Your Honor a copy of General Electric's. Obviously, there are some issues that come up with respect to differing language in Paramount's that we'll get to, but for the exemplar, as I'll say, to talk about --

THE COURT: This is the representative contract?

MS. ROSENBERG: Correct. Your Honor, returning to the prefatory language, sort of the setting up the context and we're looking at the agreement as a whole, each defendant acknowledges that they are aware of and have been advised of

and then we are talking about environmental risk. So we're talking about indemnification agreement as to environmental risk. In particular, in a prefatory language, I would point Your Honor to the language that each defendant is aware that PCBs tend to persist in the environment, and that the concern surrounds food products, the tolerance levels are being set for PCBs in food products.

Next, Your Honor, in terms of the language of the agreement I would move onto the breadth of the liability risk that the parties contemplated given the environmental risk of the PCBs.

So in terms of the breadth of the liability, and these are obligations which the parties foresaw that Monsanto might be held liable for, and that the defendants would have a duty to defend and indemnify for, it talks about the possibility of claims relating to contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment.

Now, obviously, none of the defendants here, you know, make food products, right? So what the parties were contemplating was the idea of a general environmental contamination and all sorts of liabilities that might arise.

Now, then focusing on the rest of the language in that same paragraph, so the scope of coverage, in each and every case the parties used the broadest possible language.

And actually, if I may hand up one more thing, Your Honor. I put together something that includes the language of the special undertaking agreements, and I think is reflective in each case with the actual text, because your order had referred to the text of the special undertaking agreement, sort of what Monsanto's position as to the meaning and then the meaning when you put it all together. It is a one-page handout. May I hand it up?

THE COURT: So you mention that this was the broadest sort of language possible, and it is quite broad, and I tend to agree that you have good arguments for this being a one-drop rule, no causation required. The thing that obviously would make it broader, and I think I understand the defendants' argument to be this, this applies to PCBs sold or delivered on or after the date hereof, so 1972, more or less, depending on the party, and not just sold or delivered on or after that date, but sold or delivered on or after that date to the buyer.

And so you have a situation here where -- I take your point. You have -- 93 percent of all the PCBs have been sold to these -- or at least the electrical transformer PCBs have gone through these six companies -- and I guess let me just ask the question there. 93 percent, is that just the electrical part of PCBs? I know there are other applications of PCBs, and it wasn't clear to me what the denominator is

there.

MS. ROSENBERG: So all the special undertakings, we're roughly talking January of 1972. From that period through the end of the manufacture, we're talking about PCBs were only used in the electrical products because those were the closed applications. Open use applications ceased at that point.

THE COURT: Only closed applications.

MS. ROSENBERG: Or roughly around that time, anyway.

THE COURT: What were the open applications before then?

MS. ROSENBERG: So open applications could consist of -- and I will give you some examples that come up in the briefs -- in terms of plasticizers, and what that means is the products used in paints or caulks rather than in capacitors or transformers. Now, there were instances where Monsanto sold -- pre-special undertakings sold PCBs for that purpose to various customers. I believe also some of the defendants secondhand sold scrap or might have sold for those uses. Those are examples of open uses.

THE COURT: The 93 percent, you have paragraph 51, defendants were the top six purchasers of those PCBs, purchasing 133 million pounds or 93 percent of those PCBs. What is this 93 percent number referring to? Is this 93 percent of PCBs in the 1972 to 1977 range? Is this 93 percent

of all PCBs going back from the 1930s to the 1970s? What is that?

MS. ROSENBERG: It is of the 1972 to 1977 sold to currently viable customers.

THE COURT: And so I guess here is what I understand the defendants' argument to be and they can correct me if I'm wrong, but you've got this language in here that says must be something that was sold on or after this date, 1972, and must be sold to the buyer and we've got all kinds of PCBs that were sold for decades beforehand, and what they're saying is you haven't connected it. You've got all these cases all across the nation and you haven't connected -- you know, maybe there is some quibbling over like one or two down in New Mexico or something, but you haven't really connected those cases to PCBs sold after 1972, specifically sold to these individuals.

MS. ROSENBERG: I do understand that to be the crux of defendants' argument, and for that I think it requires getting into some of what our allegations are about the connection, so both about the defendants and about the underlying lawsuit.

Just pausing briefly before I get to those allegations on the connection, it is not clear to me whether defendants agree with this or not, but let's say -- I think Paramount gives the example, well, we only sold 3 percent of the total PCBs ever sold, so for the entire period of time

over six decades what was sold to their predecessor in interest Westinghouse. And of course, the connection that the contract requires is it can be 60 percent or 50 percent or 3 percent or under 1 percent going back to that one-drop.

THE COURT: One drop, but you still need to tie it to them.

MS. ROSENBERG: Absolutely. Your Honor, the complaint, I would refer to it as a fairly substantial complaint, right? And it is 70 pages, 313 paragraphs, 27 exhibits, there are a lot of allegations there. And what plaintiffs are basically arguing that to establish the one drop connection, we should allege frankly essentially 3,000 counts. For each count, you know, six common counts, 85 underlying suits, a connection to each defendant.

And while we don't obviously plead that way, what we do plead -- obviously, some specific examples, and I can talk about those, but in terms of what we allege for each and every defendant is that they purchase PCBs post-special undertaking, that they use them and use them in products that were shipped throughout the United States. And I am pointing you there to paragraphs 4 and 110. We allege the volumes, as Your Honor just pointed out, in paragraphs 51 and 52. We also allege that each defendant released post-special undertaking PCBs into the environment. We allege that as to all defendants in paragraph 104. We have an allegation about that as to each

paragraph. For instance, GE is paragraph 122.

And finally, as to all the defendants, we talk not only about their release, but paragraph 30 that PCBs persist in the environment and also paragraph 107, that they travel great distances. That is the conduct that we have of defendants.

Now, turning to the relation, the connection to the underlying lawsuits, what we allege as to those lawsuits is that they are alleging for liability for PCBs through 1977. And I'll pause there briefly because there are three lawsuits that Paramount raises in its individual motion to dismiss, certain food cases that are primarily but not exclusively about open uses. It could be with the possible exception of those three. I think fairly those three are included, but there is a maybe honest disagreement about that.

Just to give you an example of the connection to post-PCB lawsuits, I have two underlying complaints that I wanted to direct Your Honor to. First is a food chain case and this is the Bailey case, it is Exhibit 9 to the complaint. So in paragraph 5 of the underlying Bailey complaint -- I'm sorry. Not paragraph 5. Paragraph 24, rather. The underlying plaintiffs set up the time period they're talking about. So they talk about PCBs being manufactured from 1929 until 1977, and that over those six decades, so inclusive of post-special undertaking PCBs, they were used in a wide

variety of industrial uses.

And then in paragraph 26 of the Bailey complaint, it ties all of those PCBs, including the post-special undertaking PCBs, to the harm that they are alleging. Paragraph 26 of Bailey reads "because PCBs were dumped into the environment over decades, the decades including through 1977, by Monsanto, its customers and the end users of various PCB containing products, PCBs are now ubiquitous in the environment." That is the source of the exposure they claim. That is the example of the food case.

I'll also cite Your Honor to an example of one of the water cases. So the City of Portland case, which is Exhibit 14 to the complaint. In paragraph 5 about the source of the contamination, it talks about this being a multiple source case, not a single source case, and the contamination originates from multiple sources and industries.

And then if you look to paragraph 79 and 80 of the Portland complaint, it, again, talks about time period. So it talks by 1976, you had some PCBs already begin to vaporize, leak and volatilize, and then in paragraph 80, that actually even after 1976, it continued. So since at least 1976, PCBs have continuously and systematically entered and contaminated the storm water collections.

Now, defendants would like you to draw the inference that the 93 percent of PCBs sold to them after 1972, somehow

those were the only PCBs that weren't released, didn't persist in the environment and weren't part of the sources of contamination.

THE COURT: I don't understand their argument that way. I think one of the things that makes your case a little bit more difficult that has been true of the plaintiffs who have sued you is you-all manufactured pretty much all of the PCBs and then you have six people who manufactured pretty much all of the electrical applications of those PCBs. So it is very easy for somebody to say Monsanto is the one who is responsible for the PCBs. I think the harder thing for you-all to do is to identify -- I'm not sure you can lump all six defendants together, and that is my concern, and I think what the defendants are arguing.

If this were one organization and they were responsible for 93 percent, I think you would have a very plausible inference that it was that company, but you've got six different companies here.

MS. ROSENBERG: Okay. I do hear you, Your Honor, and I take your point. But remember here we're talking about two different duties, the duty to defend and the duty to indemnify. So the point that defendants were making -- so for the duty to indemnify, have we established that connection? Obviously, our answer is going to be yes. And so for instance, for the City of Portland case, GE and Paramount both

had facilities. We specifically cite an incident when a Paramount transformer leaked into the Willamette River, which forms the heart of the Portland case.

So for the duty to indemnify, there are some very specific connections and no doubt discovery will uncover more. But in terms of the duty to defend, where the question is, is there the potential that it falls within the United States when they ship products each defendant, so not collectively -- CDE used it, shipped products throughout the United States, those products released and they traveled great distances, clearly there is the potentiality that it will fall within. And whether the duty to indemnify as opposed to the duty to defend later kicks in will depend on what exactly the evidence uncovers.

THE COURT: How are you defining sort of a threshold for potentiality? I mean, in one respect -- I mean, it seems like you need some kind of threshold before something actually becomes sufficiently potential for the duty to defend to actually be triggered. Is this some pro se complaint from some sovereign citizen who lives out on the ocean somewhere and just has some very interesting theories? I would say that most people would probably say that doesn't rise to potentiality. If you have something that is naming these companies and saying, hey, these are the companies that leaked this into this river, that is a different kind of situation.

Where is that threshold? I haven't seen that in the cases that you have cited to me.

MS. ROSENBERG: So I think, Your Honor, the threshold would tend to be whether there is some possibility -- because that is the other word used in the case law, potentiality or possibility -- is there some --

THE COURT: That seems really nebulous. There is some possibility that aliens are on the moon right now. It is not a high possibility. I certainly wouldn't bring a federal lawsuit over it.

MS. ROSENBERG: I think the allegation about shipping products throughout the United States is what creates that possibility. So two -- had that allegation been missing and we just said, oh, they used them and the underlying lawsuits have to do with PCBs through 1977; therefore, there is a potentiality, that would be true, you are right, in the most nebulous, tenuous sense, yeah, that would be a potentiality.

But when you combine it -- first of all, we obviously do have specific examples like I just talked about in GE and Paramount, but as for each and every defendant for that individual connection, the shipping throughout the United States, I think that would be where Monsanto believes and has established the potentiality to proceed, again, on a motion to dismiss.

THE COURT: So that is duty to defend. Maybe that

Case: 4:23-cv-00204-JMD Doc. #: 237 Filed: 08/10/26 Page: 19 of 99 PageID #: 8243



is easier for you. Indemnify, that still seems to suggest, even under your formulation, some kind of connection to the specific defendants.

MS. ROSENBERG: Right. So indemnify does require more, Your Honor, and so for indemnify we have a couple classes of cases. We have settlements as to some of the water cases. We have settlements as to some of the food chain cases and then we have judgments in the *Sky Valley School* cases. That is the universe of cases where the duty to indemnify breach of contract count as opposed to the DJ count is ripe.

THE COURT: One second. So water, food and *Sky Valley*?

MS. ROSENBERG: Yes. Water settlements, food chain settlements and *Sky Valley* judgments. And actually I -- I'll circle back to that.

So in those three categories of cases, you know, again, we do provide specific examples, but I would point Your Honor to the *Energizer* case, an Eastern District of Missouri case that we cite in our brief, about having access in discovery to establish those sorts of connections and a source issue.

THE COURT: Normally, what you do in that kind of situation is do some kind of alternative pleading or alternative joinder like you have -- like in a medical malpractice situation where you have two doctors, you don't

know who messed up, you sue them both and you get discovery. That doesn't seem to -- I don't read your complaint to be making that kind of argument. I read your complaint to be more of a cumulative joint liability for all these individuals without having a need to draw those kinds of connections.

MS. ROSENBERG: No. That is not how we intend to plead it. The reason that we talk about collective or joint is because once the indemnification obligation is triggered, it is triggered as to any and all. So at that point each defendant is responsible for any and all, but not until that trigger is made. We do understand that for the duty to indemnify there does have to be, not a causal connection, but a one drop in connection with connection.

THE COURT: So I guess one question would be why didn't you -- I recognize, too, these are settlements, maybe you didn't get as far in the litigation. One of these did go to judgment. You make an argument that these are the sorts of things that are peculiarly within the ability of the defendants to give this kind of information. Why didn't you seek any kind of subpoena -- or maybe you did seek subpoenas in those cases, do discovery in those cases to try to figure out the source of these contaminants?

MS. ROSENBERG: I would say it was not the focus of the underlying cases and the reason that Your Honor already alluded to earlier which is that Monsanto manufactured 99

percent of the PCBs, roughly.

THE COURT: Right. But you have on your radar and you have for almost 60 years now that you were going to be trying to get these companies to cover some of the cost of this. And so when you have litigation in front of you and you have people that you can depose and you have subpoenas you can issue, why not take the opportunity at that point to try to figure out who is responsible for the Sky Valley contaminants?

MS. ROSENBERG: In discovery in those underlying cases I will point out that there was testimony about connections to a lighting ballast for Magnetek, but also a janitor talked about products from GE and from Westinghouse, Paramount's successor.

THE COURT: Okay. *Sky Valley* is the one I picked up because that is the one where you have arguably pleaded some kind of connection, but there is a lot of others.

MS. ROSENBERG: In terms of indemnification, that is the only one that has reached judgment and so that there was the underlying discovery. So the fact pattern in *Energizer* was Energizer said the Duracell bunny was trademark infringement and appeared all over the US. And Procter & Gamble said, well, there could be other sources of the Duracell bunny. Someone might have done this in China and it was exported from China to the US. And so just because you say the Duracell bunny was found doesn't mean we're the source

of it. And what the Court said is, well, for a motion to dismiss -- it is one thing at the evidentiary stage, but at the motion to dismiss we're going to give you access to discovery. So we would say there is underlying evidence in the *Sky Valley* cases about Magnetek, Westinghouse/Paramount and GE, but that discovery is going to give us the opportunity to see if for the other three defendants we can meet not just the duty to defend but the duty to indemnification. If we can't, it is subject to a summary judgment motion.

THE COURT: I guess my question is, it is far from clear to me how this is peculiarly within their ability to give you this information when you had discovery opportunities that you could have used in previous cases. Maybe that is true for future lawsuits that haven't been filed or something like that, but for past cases.

MS. ROSENBERG: All I would say, Your Honor, I think is that it then becomes -- it does become the 5,000 count complaint with the hundred plus exhibits. Because, for instance, the *Lamkin* case, it is an occupational case, duty to indemnify hasn't kicked in. It hasn't been tried. There's no judgment. There's no settlement. It specifically includes as defendants in that case GE and a successor to Westinghouse.

THE COURT: I don't know that you need a 5,000 paragraph complaint. If your theory is the one-drop rule, then you need one paragraph saying we have tied Magnetek

post-1972 PCBs to this river, we have tied General Electric post-1972 PCBs to this river, and that would be sufficient. So it is a little strange to me that the six paragraphs that you would need for each category of cases is not there.

MS. ROSENBERG: Understood, Your Honor. I would say as a practical matter then what you're talking about is a duty to defend at the outset and the duty to indemnify, the complaint would be being constantly amended as we take each and every deposition in each and every underlying case, which may ultimately be what Your Honor decides. But I would just say practically that is what it would set up is that all the duty to defend cases are in that sense ripe, but the duty to indemnify we think we've pleaded that there is coverage and ultimately evidence will show whether we have the evidence or we don't, but Your Honor is looking to the discovery phases in those underlying cases.

So as a practical matter, that may be what you decide, but I think that is what the case would look like going forward.

THE COURT: I appreciate it. I think I have at least a 30,000 foot level, if not 5 or 6,000 foot level your argument on this. Anything further that you think is important for me to know?

MS. ROSENBERG: I think on the special undertaking generally -- obviously, there are some Paramount specific

arguments if Your Honor wanted to hear, but as to the special undertaking arguments as to all the defendants I think Your Honor has given me an opportunity to explain our position. Thank you.

THE COURT: A couple of questions. Never mind. I'll wait for those. Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor. Your Honor, I think it would be helpful to respond to some of the comments that plaintiff's counsel made if I were able to hand up a few slides. I'm not going to show you all of them, but if that is okay.

THE COURT: Okay.

MR. WILLIAMS: Your Honor, the back, there's a few pages which are GE special undertaking agreement, but you already have a copy of that, but there's an extra one there for you.

There is no perfect formula, Your Honor, for what plaintiffs need to plead to survive a motion to dismiss in this case, but what plaintiffs have done in their first amended complaint is far from adequate under *Twombly Iqbal* and the line of cases that flows thereunder. At a minimum, plaintiffs must plead facts sufficient to show that each defendant breached its special undertaking agreement with respect to a particular underlying PCB lawsuit.

And what that means in this particular case -- and by

the way, there are multiple cases that stand for that, especially in the strict reading Missouri courts give to contractual indemnity cases versus insurance cases, but *Gould* actually stands for that proposition as does *Former Vacuum* and several other cases we've cited. But to do that, they have to plead sufficient facts to plausibly show that their particular losses and liabilities have a causal connection to the particular defendants uses of post-1972 PCBs.

Now, I understand your point. We're not talking --

THE COURT: Just a second. Do you disagree with that? There's going to be disagreement on the application. Do you disagree with that as a general rule?

MS. ROSENBERG: Sharon Rosenberg for Monsanto. I do disagree with it. First of all, he talked about a causal connection and the cases are very clear that is not the connection we are talking about, and he also talked about strict construction which gets into the insurance cases which I can address later. It is not the law in Missouri.

THE COURT: Okay. I appreciate that.

MR. WILLIAMS: And I think counsel is incorrect about Missouri law. I think the *Allison* case supports the causal connection. I think *Holiday Inn* supports causal connection. I think even the case they cite in their sur-reply, *Pope v. Stoltz* supports causal connection and most importantly there were 43 years of course of performance from

1972 to -- to 2015 where Monsanto read the contract our way and you don't --

THE COURT: One second. I assume from your causal connection you're taking that from -- the language that they throw against you with respect to causal connection is the language whether alone or in combination. I take it your argument is it still needs to be causal, but it can be a contributing factor rather than the sole factor; is that correct?

MR. WILLIAMS: Yes, that is correct. I would say substantial cause or substantial factor under the in connection with portion. And the whether alone in combination with other substances, I just want to point out, that clause is modifying the buyer's use, purchase, possession, handling, disposition clause that immediately precedes it, which says such PCBs, meaning post-1972 PCBs, by, through or under buyer, and then qualified whether alone or in combination with other substances. So what do we know for 43 years it looked like --

THE COURT: Hold on. I want to make sure I get this point before you proceed. Am I understanding that your position is whether alone or in combination with other substances is what the buyer did to these. So you take the PCBs, you put them in something and there's a bunch of other substances, and that is what matters, not whether this PCB is in the aggregate in a river with somebody else's PCBs?

MR. WILLIAMS: That is absolutely right, and that is what they argued to the Missouri Court of Appeals in *Gould*, and that's actually what the Missouri Court of Appeals found if you look at the contract interpretation.

THE COURT: I warned you I was going to do this. I want to hear your response to that.

MS. ROSENBERG: To the *Gould* question?

THE COURT: To the whether alone or in combination, does that concern --

MS. ROSENBERG: It modifies in connection with, Your Honor, arising out of or in connection with, and the *Alltru* case talks about when you're looking at whether language modifies -- what it modifies, that you look not to just syntax, but you look to context. Again, with the breadth, the purpose, et cetera, everything that I talked about, it is modifying arising out of or in connection with.

THE COURT: I appreciate that. Thank you.

MR. WILLIAMS: And I believe that their appellate brief in *Gould* contradicts that, and I know that the Missouri Court of Appeals decision at page 965 S.W. 2d at 317 contradicts that.

THE COURT: That may be true. They wouldn't be the first attorneys to switch position on --

MR. WILLIAMS: What I will also say is if Your Honor were able to turn to what I believe is slide four where I've

broken down paragraph three of the special undertaking agreements, the common language in the agreements, that is most strictly at issue on the motion to dismiss, grammatically our interpretation makes sense. As a matter of contract interpretation under Missouri law, it also makes sense and logically it makes sense. It doesn't make sense in this situation for that whether alone or in combination to qualify a remote clause as counsel argues here. And one thing that is very important as we talk about reading the contract as a whole and understanding the context, that language actually comes out of the sale agreements. And my counterpart said that while these are just strictly indemnity agreements, they actually modify sales contracts and that language recognizes a very well-understood fact between these parties that the electrical equipment manufacturers are receiving the Aroclors, the raw PCBs, and they're mixing them with their own, they are blending them with their own formulations to improve and stabilize the dielectric fluids, and that's what that is focused on. That is why *Gould* makes sense.

And what we saw over the years is where someone is transporting a post-'72 transformer, and it falls off a truck, causes some injury, causes an accident, that gets tendered, that is a causal relationship why that lawsuit got filed, *Gould*.

Louisiana State University Medical Center, there's an

accident with a post-'72 transformer involving post-'72 PCBs that were blended with pre-'72 PCBs, but the *Gould* court recognized that was admitted on summary judgment by *Gould* Electronics. Those are the situations we saw tendered and accepted, the defense was given in those cases. It was very sparingly.

So you might justifiably ask yourself why are we here in 2022 and now moving forward to 2026 where this one-drop rule is emerging for the first time? The text of the special undertaking agreements does not support the one-drop rule. We strongly disagree with that. If that was the intention -- what that essentially would mean potentially for certain liabilities, that if there was one molecule of post-'72 PCBs that somehow got in the ocean, all six defendants would be jointly and severally liable for that entire avalanche of PCBs that Monsanto and its other customers put into the ocean.

By 1972, Your Honor, they've alleged in the complaint and by incorporating allegations by like the EPA report, there were -- more than 40 percent of PCBs were sold to other industrial customers who were not in this case who used them from inks, carbon paper, paints, plasticizers and so forth. And by the early to mid-'70s, EPA was estimating 440 million pounds of freely floating PCBs in the environment, almost all of which came from them and the open application manufacturers and not from us. When we look at the context, it

makes no sense. Why would we agree just so we can have five more years of PCBs to indemnify them against 1935 to 1977 --

THE COURT: What is five more years at this point? 1972?

MR. WILLIAMS: That was the estimate as to how long it would take to get an engineer a practical replacement solution, and that is in government documents and it is in the parties' documents and so on.

THE COURT: Is it something that you-all dispute? It is a lengthy complaint. I can't remember reading that, but I wanted --

MS. ROSENBERG: It is not in the pleadings, Your Honor. Responding just to your question, it is not in the pleadings.

THE COURT: But is that something that you dispute?

MS. ROSENBERG: I couldn't speak to that. I don't know what the facts are in that one way or the other.

MR. WILLIAMS: Even if we thought it was ten years, we knew they were being phased out. And the EPA report makes clear of what the state of the knowledge was as it evolved from the late '60s into the mid-'70s. But we indemnified them against the 1.25 billion PCBs that they sold from '35 through '77. We indemnified them against the 440 million that came from open application manufacturers pre-1972 and --

THE COURT: Tell me a little bit more about the

technology involved here. Open application and closed application. Open application, we talked about paints and things of that nature. I can see how a rainstorm comes through, it peels away paints and that gets in the river, et cetera. Electrical transformer, it is closed. That is not to say that there aren't going to be instances where PCBs leak out, but tell me a little bit more about the potential for pollution in those kinds of closed application situations.

MR. WILLIAMS: So by 1972, the disposal and handling was being regulated. The defendants had improved -- much improved disposal and handling practices and we can't plausibly assume that those 133 million pounds are what contributed to these lawsuits.

THE COURT: But I guess the leakage from an electrical transformer, it goes into a landfill and it gets crushed and now it seeps into the groundwater, is that what is going on here?

MS. ROSENBERG: There is landfills. There is issues at plants, like the Portland plant is continuously leaking so it is the manufacturing of the transformers. It could be anywhere from the manufacturing process to the landfill disposition that you talked about.

MR. WILLIAMS: These closed systems, there's no allegations of specific leaks and there should be really.

Let's talk about some of the smaller defendants here.

They didn't have operations or even theoretically releases in the vast, vast majority of any of these geographic locations and there's no allegation in the amended petition that General Electric, Paramount Global or anyone else specifically had releases that resulted in these liabilities, and they need to plead a breach of contract that is plausible. And so they have to provide some connection. Now, we think if Your Honor grants our motion, that is going to have a natural paring-down effect because consistent with Rule 11 we don't think most of these 85 grouped liabilities can be pled consistent with Rule 11. The food chain cases, I do have a slide, which is probably slides five and six, are perfect examples.

THE COURT: Let's say I agree with you, and I say, hey, they need a connection. Why don't they just do what I had said earlier, alternative joinder, and they say, well, this is just like the medical malpractice situations, we know that one of these defendants had stuff that leaked into the river or whatever, we just don't know who and so we need discovery.

MR. WILLIAMS: I don't think it is sufficient under Rule 8 and 12 and consistent with *Iqbal* and *Twombly*. They're trying to open the door to massively expensive discovery to go on a fishing expedition. Meanwhile --

THE COURT: And this isn't something that was really briefed by the parties, you have two doctors, you don't know

who harmed you. You can sue them both, and you can get discovery. If I get into a car accident, I can't sue everybody in the City of St. Louis saying one of them is responsible, I just don't know who yet. There hasn't been any kind of briefing on that, but I suspect that would be an issue if I agreed with your theory, is that is what they would try to do next.

MR. WILLIAMS: They may. We don't believe that would be sufficient. But if we talk about a water case, City of Seattle, they're going to have to plead a nexus to each defendant and each defendant's post-1972 PCBs, and we don't think they can do that. They have access to far more facts in evidence than defendants do. And that's one thing that Your Honor really ought to be aware of, but you mentioned it.

They know. They tried four food chain cases, fully tried to verdict. Several of those cases they were disclaiming any closed application releases and exposures and we are talking about open application exposures. That is actually in this record, several of the complaints that they're seeking indemnity for disclaimed closed application uses. There is no theory under which we could be responsible for contaminating the food supply from '72 to '77 with closed transformers and capacitors that are being disposed of properly so far as has been alleged, after those equipment was retired, which could be decades later, even after the food

chain cases were litigated.

So if Your Honor holds them to their pleading requirements, they can't get to joint and several liability under Missouri law. There is the *Cone v. Dwyer* case. There is multiple cases. They would have to have a joint contract or the contract would have to say that each defendant is assumed the same obligation to Monsanto, this joint and several liability, as all of the other electrical equipment manufacturers, and the text of the SUA simply doesn't support that allegation.

Now, if they come back to the one-drop rule, that is not supported by the text. We --

THE COURT: Let's set aside the contracts. Do you think their allegations are sufficient -- assume I agree with them on the one-drop rule. Are their allegations sufficient there? I mean, they say you have six companies, 93 percent, you're shipping throughout all the country, you know. Motion to dismiss, I have to draw all inferences in their favor and so can you draw an inference there that at least one drop from each of the defendants made it into each of these cases?

MR. WILLIAMS: No, Your Honor. It is not reasonable and it doesn't lead to a plausible breach of contract claim, and I'll give you an example that counsel raised which is the *Sky Valley School* case. The allegation is they removed one lighting ballast manufactured by Magnetek's predecessor that

may have used a post-'71 Arochlor and may have contained post-'72 PCBs. There is no allegation that that capacitor leaked PCBs into the school. There's a huge volume of evidence, and they know their own defense in that case was the school was built before 1967, and it is pre-1967 PCBs in the building materials that caused the exposures. The gist being we, Monsanto, did not know about these health hazards at that time.

So now let's say someone's single molecule somehow evaporated from a landfill and is found in or around the school, that is not a substantial cause of those PCBs lawsuits.

THE COURT: Again, I asked you to assume away your version of the contract and assume they're reading the contract. You just need one drop and then they can sue you. Is it not a plausible inference that companies covering 93 percent of the market here, one drop of their PCBs found its way into a river somewhere?

MR. WILLIAMS: No, it is actually not. And especially when --

THE COURT: Who would it be? Again, as I alluded to earlier, some plaintiff sues Monsanto, and they say, hey, Monsanto was like the manufacturer here. Would you agree that if somebody sues Monsanto, they are the manufacturer, it is a plausible inference that it was Monsanto's and not some

like --

MR. WILLIAMS: Absolutely.

THE COURT: And so now we have -- I recognize the situation of one lawyer representing a lot of people, and I'm not trying to pick on any company. We have General Electric at 59 million pounds. We have PR Gillette at seven million pounds. Those are all in the sort of different ends of the spectrum. Is one inference -- does one of those inferences rise to the level of plausibility and the other doesn't?

MR. WILLIAMS: It is not for a plausible claim. It still falls well short because of all of the reasons I've already given, and these molecules --

THE COURT: I'm going to go over to Monsanto. What is the level of plausibility when you have -- so it looks like General Electric -- this would be a less awkward question for you. General Electric is about half of the PCB pounds that you're alleging here. Gillette is, I don't know, 5 percent. So what is the -- can you really get a plausible inference that it was Gillette rather than General Electric in any individual case?

MS. ROSENBERG: Your Honor, if plausibility is a spectrum and there's a line drawn and you're asking where do you draw that line, they were all substantial users so I think the line is below Gillette. You are right. If you disagree and you are drawing the line somewhere else, GE and Paramount

are still left because they are -- the greater the usage, the greater the plausibility. But what reaches the plausibility level, again, it is still our view as to all of them.

I don't want to go beyond your question because I don't want to steal the argument. I think that answers your question.

THE COURT: I appreciate it.

MR. BERRY: Your Honor, if it does no violence to your one speaker rule, I do think there is something to add.

THE COURT: I did ask a very awkward question.

MR. BERRY: So a couple of ways to think about this I think are very relevant, number one, and even setting aside that I think the percentages are off here because the percentages should be our use during that time period versus the 1.4 billion that was ever sold because no one is alleging that any of these six defendants, all of those products were leaked. We are saying that they haven't alleged any that we can find.

But certainly, the numbers are off, not 93 percent. We're already in a marginal percentage. But putting aside what numbers we're going to use just for a brief moment. In a slightly different context, but I do think it is relevant here as we think about causation, for all practical purposes Monsanto has largely lost their argument. In a lot of their prior cases, there was an attempt at the MDL. I know we cite

the MDL in some of our papers, some of the things. I think we have it in one of our footnotes.

And what the Court said in denying the MDL, the commissioners of the Multidistrict District Litigation group said -- and I think this is the big takeaway -- location matters. And the MDL had a significant intellectual and sort of theoretical problem getting their mind around a claim that as Monsanto claims here, well, we put it out in commerce; therefore, that must be enough. The MDL sent all the cases back to where they came because they were filed from where, for example, the releases occurred.

I know it is not the same exact analysis. I would argue that the analysis here under *Iqbal* and *Twombly* are probably more stringent, and they would be more favorable to us. And I didn't mean to interrupt, but I do think that has some relevance, that they've addressed this before without success.

THE COURT: And I appreciate that. That is helpful. I have a fundamental just much simpler question, which is let's -- take their numbers, draw the inferences in their favor. I'm going to accept the 93 percent for purposes of this question, and I've got one company is responsible for half of that. I'm going to assume this is just the entire universe of PCBs. You have got one company that is responsible for half, and you have got one company that is

Case: 4:23-cv-00204-JMD Doc. #: 237 Filed: 08/10/26 Page: 39 of 99 PageID #: 8263



responsible for 5 percent and I think you might be able to draw a reasonable inference that the company that is responsible for half is the company -- a company whose PCBs can be tied to this contamination. A company that is down in the 5 percent range is much harder to do that. And so I wanted to get your reaction there. I don't know if there is any case law on those kinds of inferences.

MR. BERRY: There is in Missouri and certainly to the extent Missouri law applies, and that, I believe, is Monsanto's claim. This notion of market liability has been rejected as a legal source of causation or even as connection in nexus and as a result of that --

THE COURT: Do you have a case that comes to mind for that?

MR. BERRY: I wasn't arguing this. I forget which case we have. I will bring it to Your Honor. I know it was in our briefing.

THE COURT: That is fine. And if you want to submit a one-page notice afterwards.

MR. BERRY: We will do that back.

MR. BUCHWEITZ: Your Honor, if you don't know, Yehludah Buchweitz, Weil Gotshal, for Paramount. I think it is really important. The 93 percent allegation -- and you even heard it from Monsanto's counsel -- is only for PCBs from 1972 to 1977.

THE COURT: I understand that. I want to take the steelman of their argument, which was actually more than the steelman of their argument. I just wanted an answer to that specific question. I understand your point.

MR. WILLIAMS: I think the bigger point is when we look at arising from, we have the case law that explains what that means under Missouri law, the ordinary meaning, and that is *Pope v. Stoltz* is one of those cases. That is originating from, flowing from and so on.

Certainly, from a water case where they have one molecule in an ocean of PCBs you cannot say that their liabilities in those water cases are flowing from any defendants. Even if you assume somehow it went from a landfill in wherever Massachusetts and got to a Seattle waterway -- which, by the way, you can digitally -- you can chemically fingerprint these chemicals, and they know that, and they haven't even attempted to do -- plead the one-drop rule.

THE COURT: You can chemically fingerprint -- you can determine whether Magnetek or General Electric --

MR. WILLIAMS: Yes.

MR. MANGIAN: Judge, Dave Mangian for Monsanto. That is not possible. It is possible to determine what Arochlors were used and where they're at, but there is not a fingerprint that says Magnetek or General Electric.

THE COURT: Say that again. It is possible to determine what?

MR. MANGIAN: What type of Arochlors. There is different -- Monsanto called their PCBs Arochlors. So say there is 1254 or 1242, 1016 --

THE COURT: Spell the word.

MR. MANGIAN: A-R-C-O-L-O-R-S [sic]. I am spelling it wrong.

THE COURT: That is okay. It is a word I haven't heard of.

MR. MANGIAN: Arochlors is the trade name for Monsanto's PCB mixtures. That is how they were sold. You can tell the gas chromatogram. You can figure out the different types of Arochlors, and then there is even a congener analysis that is more detailed than that, that help you. But this is nothing that says this PCB is Magnetek or this is GE.

THE COURT: So various different PCBs, Monsanto manufactured, you can tell what those are, but you may have sold one PCB to three different companies?

MR. MANGIAN: We sold the same types of PCBs, mixtures, Arochlors to all of these companies.

THE COURT: I appreciate that. Mr. Williams, I recognize that this is the most expensive room that I've ever been in with the billable hours that are being done right now.

I haven't heard from you about the difference, at least from their argument, about indemnification versus duty to defend.

MR. WILLIAMS: Regardless of what standard you apply, and we can debate that, they haven't gotten over the pleading hump because there still need to be -- you need to look at what the contract requires, and I focused Your Honor on the specific buyer and the specific requirement of post-'72 PCBs being -- causing that or having a causal connection, a substantial causal connection. And then you can look at the underlying complaints like you can with Exhibit 10, which is a food chain case, and you can immediately say that doesn't pass muster under the rules and that liability of that breach of contract claim needs to be dismissed on this record. And Missouri courts do not hesitate to dismiss complaints under Rule 12 just looking at the language in the contracts and then the facts in the underlying lawsuit, and occasionally, they look at the evidence as well. But we don't even need to look in the indemnity contract. The *Gorog v. Best Buy* was like an employment agreement contract and they dismissed that case because the reading of the contract was not logical and plausible, and the facts didn't support a breach, but in the indemnification contract scenario and even in the insurance contract scenario, believe it or not, Missouri courts very oftentimes just look at the language in the contract and the underlying complaint and will dismiss those counts, and we

have cited examples of that.

And so I got a little bit off track there. What was --

THE COURT: Defend versus indemnify. They're taking the position, okay, indemnify. They acknowledge they've got to draw a connection. You-all disagree about the strength of the connection that needs to be drawn. I understand the arguments on both sides about that. They say duty to defend is different. Just needs to rise to some level of potentiality or possibility, and I'll be frank, I don't understand how nebulous that can be. So I'd like your view, I guess, their distinction between duty to indemnify and duty to defend and also the nebulous issue and whatever else you think is important.

MR. WILLIAMS: They have urged this possible standard, and that standard for the most part arises only out of the insurance context. There is no contractual indemnity case where there is a decision that is either predictive of Missouri law or binding on this Court that would suggest that you should adopt that standard.

THE COURT: I suppose they would say -- and maybe I am wrong -- but although this isn't an insurance contract in the typical way that we view insurance, they weren't going to sell this to you unless you agreed that you were going to defend them, right? And so it is insurance in maybe a more

colloquial sense.

MR. WILLIAMS: Even if you apply the insurance standards here, Your Honor, if you just look at the two contractual fundamental requirements that have to be there and look at the sample complaints that they filed as exhibits in the amended petitions, you see they don't get there. Those underlying lawsuits do not name these defendants and they do not allege facts about specific releases from any of these buyers who are defendants, from '72 to '77. There is no nexus whatsoever.

And so we can debate a lot at the summary judgment standard when they actually get over the Rule 12 hurdles -- Rule 8 and Rule 12 hurdles, but they haven't done that yet. They have to at least go back to the drawing board on the pleading.

THE COURT: And again, I assume the underlying different interpretations of the contract are going to flow into this argument about whether there is possibility or potentiality?

MR. WILLIAMS: That is right. And if you look at cases like *Allison* where they talk about the duty to defend in a contractual indemnity case, they will strictly apply that, more strictly than the insurance case.

And so in *Allison*, for example, they say, you know, we reject Barnes, so that is in indemnity in that case, Barnes

Hospital. We reject Barnes' contention that Miller, elevator company, agreed to defend every claim for injury sustained by use of its elevators, which is the equivalent of what they are arguing here. During the term of the contract, both the indemnity obligation and the agreement to defend are conditional, which is exactly the situation here. It is conditioned on post-'72 PCBs sold by Monsanto, delivered to a particular buyer having a causal relationship to the underlying litigation. That is a fundamental minimum that they have not met here. And they say --

THE COURT: Give me a second. I appreciate that. Thank you.

MR. WILLIAMS: And just continuing on briefly. Miller did not agree to indemnify or defend claims asserted against Barnes based only negligence of Barnes. We have a situation here where there could be a duty to defend where negligence is pled against both old Monsanto or plaintiffs and one of the defendants. That could happen in this case. We acknowledge that, but that has not happened yet.

And so what they're doing is they're looking at this language very carefully, and they're saying the indemnification and duty to defend, those two duties, were coextensive in several of these cases, and that is what the case is here.

Now, you can say, sure, the complaint might make an

allegation against one of the buyers, who is a defendant and that gets them over the pleading hump. But then if that turns out that actually was not a cause of the underlying injuries and losses, that would be a summary judgment issue. But first, we have to get to the point where they're actually showing a nexus for these underlying PCBs lawsuits, which just hasn't happened yet.

THE COURT: We discussed earlier maybe they just plead alternative joinder. You think they can't ethically do that under Rule 11. That is essentially what you're looking for, right? I guess you want an interpretation in your contract -- or an adoption of your interpretation of the contract, and this sort of thing that although it wouldn't actually eliminate the case and they would be able to amend their complaints, you just don't think they could amend their complaints.

MR. WILLIAMS: They actually might be able to as to certain liabilities.

THE COURT: Certain liabilities, but maybe not the entire universe of things?

MR. WILLIAMS: That is right. Again, that is really why the *Iqbal* standard exists. You don't get to just have this speculative possibility and get defendants into some massive discovery and fishing expedition like this. That is why the standard actually exists. It is both a reasonable

result and it is what the contract requires under Missouri law.

And I think the joint and several, we can talk about what the causation standard is going to be and who is an agent and all these sorts of things if they get to summary judgment. But on joint and several liability, that door is just shut to them on these contracts. None of these contracts talk about multiple buyers. None of them refer to any buyers.

THE COURT: I didn't understand them to be saying that. They just think there is a lot of one drops, right?

MR. WILLIAMS: That might be what they're saying, yes.

THE COURT: Thank you.

MR. WILLIAMS: Let me just look real quick at the slides. I did mention the *Sky Valley* case and there's two paragraphs of the petition that come close. And if you're reading quickly, you might think, oh, maybe that gets them over the hump as to Magnetek, but if you actually look at those two paragraphs, one of them is 193. Again, if you read it carefully, they never say that post-1972 PCBs sold to Magnetek's predecessor got into a product in that building, was released or leaked into the environment and caused harm. They just don't say it.

And by the way, there's no way that that would be a plausible reading of why those lawsuits have been filed for

the reasons I've already said. They have to go the next step. They have to connect these dots. If they really want to sue Magnetek over a single lighting ballast, even though everyone knows the whole case is about pre-1972 PCBs, let's do that and then we'll come back and talk about whether that is sufficient and Rule 11 and everything else. Does that make sense?

THE COURT: That makes sense.

MR. WILLIAMS: I'll just close with that courts work towards reasonable interpretations with reasonable results. Our interpretation is not only reasonable, it is what the contract requires. And so to say that we agreed to defend and indemnify these third parties like new Monsanto who was created 28 years later and after the SUAs had already been assigned 100 percent from old Monsanto to Solutia and then we've agreed to defend all three of these plaintiffs, even though the contract doesn't say anything about subsidiaries, parents, affiliates and so forth, they need to also go back to the drawing board on alleging facts -- and this is Mr. Buchweitz's argument. They have to go back to the drawing board alleging facts that show that these three plaintiffs actually still have standing, including they should address the inevitable question of what is their reason and factual support for the SUAs surviving Solutia's bankruptcy proceeding in the final order in that case in 2009. We still haven't seen -- there's no allegations about why that happened in the

Case: 4:23-cv-00204-JMD Doc. #: 237 Filed: 08/10/26 Page: 49 of 99 PageID #: 8273



complaint, and then there's no allegation that new Monsanto is Solutia's agent so there's a huge disconnect there.

And so we think they really need to go back to the drawing board on all of these things to get past the motion to dismiss stage. And on the declaratory judgment claims, those are very simple. We're not talking about all declaratory judgment claims falling out of the case. What we're saying under the Missouri law and under the declaratory judgment act in Article 3, you cannot have a claim about future unknown lawsuits involving future unknown parties, making future unknown allegations, which as Mr. Berry pointed out, we won't know the identity of the buyer involved, we won't know the facts regarding any releases and this location, location, location, we don't know any of that. So the future lawsuits, even as to a duty to defend, absolutely need to go out.

And then as for the ongoing cases, we have the same problem, which is what they're defending is not about 1972 to 1977 releases by these defendants into the environment. If I'm wrong, let's have them prove me wrong, but that is not what this case is about and we should come back on any ongoing cases under the law and look at what actually played out and what the evidence was and what the plaintiffs actually said, because in our view they haven't shown us a single case where we were a but-for cause -- any defendant was a but-for cause or even a substantial factor in those underlying lawsuits.

And so I appreciate your patience, Your Honor, and I'll sit down, unless you have further questions.

THE COURT: Thank you. Ms. Rosenberg, I'll give you a couple of minutes to respond.

MS. ROSENBERG: Thank you, Your Honor. I'll come up to the podium. I think just three points that I want to hit. So on the *Twombly Iqbal* plausibility, the plausibility standard doesn't replace the elements of the case, which is here potentiality, it looks to the elements.

So in *Twombly*, it looked to what do you need for an antitrust conspiracy and *Iqbal* looked to what do you need to plead unfair discrimination. So here you look to the substance of the law, potentiality. Now, on the substance of the law, I believe I was challenged to talk about --

THE COURT: So your position is that potentiality is a substantive requirement under Missouri law, under Missouri contract law, and is not a procedural pleading requirement?

MS. ROSENBERG: Correct. It is the substantive law for when have we established liability for the duty to defend.

THE COURT: Do you-all agree with that? Under *Erie*, I've got to do whatever the procedural requirements are in federal court and the substantive requirements of state court.

MR. BERRY: At a bare minimum, I think you'd have to do both. To the extent it is a part of the substantive law, the Court would consider it under the state law to the extent

that there's a pleading requirement on how they then state the substantive law, that would be up to *Iqbal* and *Twombly*.

THE COURT: Potentiality and plausibility, is that a substantive requirement under state law or is it a pleading requirement under state law?

MR. BERRY: I believe -- and I believe that counsel pointed this out -- I believe that the requirement is a causal connection. And I think counsel indicated there are no specific cases that we found that lay out where the line is, but I think they collapse into what this Court can decide under *Iqbal* and *Twombly*, and I would believe *Iqbal* and *Twombly* would be the touchstones by which you are making your decision.

THE COURT: Right. And I am just wondering if this is procedural in which case I'm doing *Iqbal/Twombly*, et cetera, or if it is substantive?

MS. ROSENBERG: I can give you the case law, Your Honor. Procedurally, we're talking about *Twombly* and *Iqbal* and plausibility, and substantively on the potentiality for the duty to defend, that is what you need for liability on duty to defend, and I will point you to cases applying Missouri law, *Direct Enterprises*, *Shapiro Sales*, *Power Soak*, all of those are noninsurance indemnity cases that talk about the broad duty to defend and potentiality.

THE COURT: Are these federal court cases?

Obviously, if it was a state court case, you are doing state court pleading requirements and so that wouldn't be applicable.

MS. ROSENBERG: But they would look into Missouri substantive law. For example, *Direct Enterprises* actually, oddly, is a Southern District of Indiana decision applying Missouri law, but it talks about what does Missouri law require and it says Missouri cases generally, cases applying Missouri law, for potentiality actually in that sense look to the insurance context, so they cite *McCormick*, which is a state court case. You will see it from a discussion in these cases that --

THE COURT: I understand that federal court has to apply procedural law. They said potentiality is a state substantive issue.

MS. ROSENBERG: Yes.

THE COURT: Okay. Thank you.

MS. ROSENBERG: So in terms of the -- so looking to the substantive law, opposing counsel mentioned a couple of insurance cases. He talked at length about *Allison*. What *Allison* was about was about in the indemnity context what do you need to indemnify for the indemnitee's negligence? And it doesn't come up in the insurance context. It is sort of a noninsurance idea. *Allison* said nothing about the duty to defend being separate from the duty to indemnify. It said

there both of them -- that was the argument actually made, and the Court rejected that argument. And it said duty to defend and duty to indemnify, they may be separate but here they're both subject to the same conditions and we find it doesn't extend to indemnity's own negligence. That was the holding in *Allison*.

We also mentioned that somehow the *Pope* case has to do with potentiality. The *Pope* case was about the meaning of arising under, not in connection with, which is broader. Opposing counsel ignored entirely the connection. So Pope v. Stol*tz*, for instance, was an insurance case that says here is what rising under means. It wasn't about the duty to defend, and it wasn't about connection language. So that I think gets to the pleading versus substantive that I wanted to address.

The second was there was a discussion about location matters, and I wanted to point out two things in that context. First of all, defendants' factories here have been declared Superfund sites, and that necessarily includes post-1972 PCBs because these factories were open and manufacturing and causing the contamination that led to the Superfund declaration at these factories. So that is one location.

Two, in terms of the shipping throughout the United States and what does that establish in terms of location, I would direct Your Honor to the *New York American Water* case, and that was the case about dioxins. And the defendants there

were actually differently situated so you had some defendants who were manufacturers of dioxin, but you had other defendants who were manufacturers either of Tide laundry detergent, because that is a dioxin containing product, or surfactants that went into laundry detergent.

What the Court said there is just saying that you put in a product and that product was shipped out and in the vicinity of the water that we are talking about was enough for a pleading standard. That was a motion to dismiss. That is *New York American Water*.

Lastly, Your Honor, I just wanted to talk about the reading the contract as a whole, and I just want to direct your -- because I believe what opposing counsel said was that here there really -- it is a part of sales contracts. It is not a stand-alone indemnification agreement. Really, if you understand it, it is a part of the sales contract and so why would we agree to this as a part of a sales contract.

Well, if you look at the Missouri Appellate Court case *Economy Forms*, it actually sort of distinguished the special undertaking agreement. It was looking at *Gould* and deciding whether *Gould* applied. And it said we're going to distinguish this from the normal contractual indemnity case, and it pointed you to the subject matter being solely for indemnification as to a product that was recognized as potentially dangerous. So in terms of the sort of sui generis

nature of the special undertakings, *Economy Forms* goes to that.

And as far as why defendants would agree to this one-drop rule in a sales context, it was because they essentially came to Monsanto and said we need this or the lights are going to go out in New York City. And so they brought Monsanto to the table, and Monsanto said, hey, there's a potential for huge liability here. We can't be in this alone, and the defendants said, well, we can't get the lights to go out so we're going to agree. And so I think that is relevant, again, when you are looking at the context, the agreement as a whole and what was its purpose.

Any questions, Your Honor?

THE COURT: Obviously, this is not going to be a motion where I'm ruling from the bench. And so if I ruled in your favor, obviously there's nothing for you to do. If I accepted the defendants' arguments, however, I assume you don't want me to just go through each of the many, many, many, individual lawsuits at issue and say, hey, this one is -- there's a sufficient connection here. There's not a sufficient connection there. What would you have me do? Would you have me say generally speaking you have to plead the sufficient connection? I'm going to let you replead and you'll go from there?

MS. ROSENBERG: I think what plaintiffs would be

looking for, Your Honor, is very specific direction because to the extent that if we did have to replead, we would want your view of here is what the law says about the potentiality.

THE COURT: Right. And I just wouldn't want to be applying any kind of rule without having had input from the parties on how to apply that rule.

MS. ROSENBERG: I think the sort of blanket order that you're talking about rather than an underlying case specific case, because Monsanto doesn't believe that the pleading rule that has been suggested is what applies for Rule 8 to know this pleading. We obviously didn't plead it that way so I don't know that Your Honor -- you know, to go through and make case-by-case determinations as to duty to defend for this defendant or duty to indemnify as to this defendant probably would not make a lot of sense.

THE COURT: Right. Okay. I appreciate that. We can move on to the next issue.

MR. BUCHWEITZ: Your Honor, would it be possible just to make a few very brief points about that issue?

THE COURT: Sure.

MR. BUCHWEITZ: One is one of the cases and just the question about procedural or substance, one of the cases that we rely on quite a bit in our briefing is *Alltru Federal Credit Union*, and that is a case that rejected a duty to defend because it wasn't covered by the indemnity agreement,

and it cites to *Iqbal* under 12(b)(6).

THE COURT: What is that case?

MR. BUCHWEITZ: Sure. It is cited in our brief. It is *Alltru*, A-L-L-T-R-U, *Federal Credit Union* 631 F.Supp.3d 741, and that's one example of a case -- it is in federal court and relies on 12(b)(6) to say that they need to plausibly allege the elements of their claim.

The other thing, Your Honor, just very briefly, I know that Paramount had a separate motion to dismiss on this, and I think but it is relevant not just to us, but to everybody, and it is because we were just talking about the context of the agreement and the negotiations. We have a much longer agreement. We have many more words in it, very clear words, including specifically the provisions of this agreement shall not be applicable to any PCBs delivered to buyer prior to the date hereof, as well as several other provisions saying it only applies to contracts in the future and whatnot.

And the point I'm making is if they really believed their theory and it was really true, it would mean the second we signed that and negotiated back and forth for a very long time to get many, many more provisions in place, it was completely irrelevant the second that we put ink on the paper, and that can't possibly be the intent of the parties and the meaning of the contract.

And we also said at the point at and after which the

provisions of this agreement should apply is to PCBs sold and delivered by or on behalf of Monsanto to buyer on or after the date hereof, and the point at which title and risk of loss with respect to PCBs shall pass from Monsanto to buyer shall be the FOB plant, and, you know they even admit that post-SUA PCBs. And I'm not trying to make these points to say that I think we win and everybody else doesn't. I think it is to show the meaning of the contract, which is there was always absolutely a clear intention going in that there had to be a connection to post-'72 PCBs; otherwise, we wouldn't have entered into these agreements because there was a 40-year history of PCBs being used in things other than us.

And just one other point to make, Your Honor. You asked about the tracing that Mr. Mangian identified. There is tracing. It is true. But what is not true is that they sold the same PCBs to everyone. They just didn't. They limited --

THE COURT: Is this in the complaint?

MR. BUCHWEITZ: It is not in the complaint, but it was discussed today so I thought it was really important to say.

THE COURT: We'll wait to do that until we get to the merits, if we get to the merits.

MR. BUCHWEITZ: Hopefully not. In the complaint -- and this is in our brief -- the point that Mr. Williams was saying in combination is by the buyer is fully supported by

the contract and the *Gould* case and by what this meant. Because what we were selling, all of us were selling PCBs in combination with chlorine of different types, and that's what the product was. And in *Gould*, they were combining with their post-'72 PCBs and with their pre-'72 PCBs and it was the buyer doing the combination.

So there is nothing out there -- and the last antecedent rule, of course, also applies there. And so it is -- who is the one that did this combination? It is the buyer, and the buyer puts the PCBs in combination with the chlorine and sells it out into the world. The buyer in the *Gould* case put its pre-'72 PCBs with the post-'72 PCBs and then --

THE COURT: Mr. Buchweitz?

MR. BUCHWEITZ: I will stop.

THE COURT: That is a very strong sur-reply. The issues you are arguing are standing and what?

MR. BUCHWEITZ: I've been allocated standing and equitable contribution.

THE COURT: Okay. Let's move on to that.

MR. BUCHWEITZ: Okay.

I have a slide for you.

THE COURT: Okay.

MR. BUCHWEITZ: Okay. On the question of standing or real party interest, there really are two sides of the same coin, and it's -- it's that only the party that has a right to

these SUAs is supposed to be the party who actually brings the case. And the chart shows that in 1972 we entered into these SUAs with old Monsanto. Old Monsanto had three businesses at the time, chemicals, agricultural and pharmaceuticals.

And then in 1997, it did its spinoff of its chemical business via the distribution agreement. This is alleged in the complaint, in paragraph 8, as well as in the documents incorporated by reference and submitted to the Court that Solutia was born from as the chemical company and all right, title and interest in the chemical assets and all contracts dedicated to the chemicals business, which is the SUAs, were assigned to Solutia fully and completely.

There's been quite a bit of litigation over time about what this really means, and every court that has considered it has said Solutia is the one who has the liability -- had the liabilities and who has the contracts of the business. So 1997, Solutia is born and Solutia has the SUAs full stop.

What is left of old Monsanto at that point are the agriculture and the pharmaceuticals business. That is the box across the top. Then they said, okay, let's spin off the agriculture business, and the agriculture business was spun off into what is now called new Monsanto and new Monsanto agreed to indemnify old Monsanto if Solutia failed to uphold its obligations. And that meant what was left of old Monsanto

was just the pharmaceuticals business, Pharmacia.

Now, each one of these companies has had history since then. None of them are Monsanto. Solutia became Eastman Chemical and went through a bankruptcy proceeding that we're going to talk about in a minute. New Monsanto is owned by Bayer, which, by the way, was the other major supplier of PCBs during World War II and during the period of time from 1933 on, it was supplying to Europe and Monsanto was supplying to the United States. And then Pharmacia is now part of Pfizer. None of those companies are where they were.

The question for us really is we have these SUAs, and who is the party to it and who is the contract party to it and who has the right to sue and who doesn't. It is very clear from the allegations and from the documents that Solutia is and was the only one who had the right to sue under the SUAs and is the counterparty thereto, and old Monsanto divested itself of all of those rights.

THE COURT: One of my questions for you is you're relying on -- I can't remember what paragraph it is, paragraph eight or something, where they're talking about this, and I mean, maybe, but that is their paragraph, and I've got to draw the inferences in their favor. So like maybe you could draw these inferences in your favor on that. So do you have something other than paragraph 8?

MR. BUCHWEITZ: The distribution agreement which is

also attached to --

THE COURT: And that goes to all rights, et cetera, et cetera?

MR. BUCHWEITZ: Exactly, all contracts.

THE COURT: What is to prevent old Monsanto from saying, yes, you have all rights to -- essentially duplicating the rights. We're going to give you the rights to do this, but we haven't divested ourselves of them?

MR. BUCHWEITZ: I did. That is the problem.

THE COURT: And my question is, I can see a new business organization document saying we're going to give you the rights to do all this, right? We're going to give you-all the rights to do this. You now have the duty to defend, the duty to indemnify, whatever, et cetera. We're not giving them up. We're duplicating them.

MR. BUCHWEITZ: That is not what they said.

THE COURT: I guess my point is I don't get where you get from all rights to a situation where none of these rights have been duplicated. They may have allocated all of those rights, but they may also have duplicated all of those rights. What is to prevent them from doing that? And I just haven't seen any language saying that that is not the case.

MR. BUCHWEITZ: ECF 113-1 and ECF 113-2 is the distribution agreement which says all right, title and interest to all of the chemical assets and that includes all

contracts exclusively dedicated to the chemicals business which these are.

And then in addition if old Monsanto had retained these rights then why did they require Solutia to indemnify them for cases when they were, in their view, improperly sued thereafter? That was the whole crux of the bankruptcy case. Old Monsanto said, okay, Solutia, we've divested everything to you. You have all the rights. And you have all of the contracts, everything, but in addition, you have to indemnify us. If they retained rights to come after us and all these things then they wouldn't have any need to get this additional indemnity from Solutia, which they did, and then they tried to get it again from new Monsanto after but that was already after they had already divested themselves of all of the rights in the first place.

THE COURT: I am going to pause you. I have at one p.m. is going to be my next hearing, and so I just want you-all to very quickly allocate among yourselves what kind of time you're going to do for this. We're not going to go past this, okay?

MR. BUCHWEITZ: Okay. Do you want us to discuss?

THE COURT: If you need to take 60 seconds to discuss, but I just want to make sure everyone has got time to say what they need to say.

MR. BUCHWEITZ: Let us discuss, just because there

are three defendants that have a personal jurisdiction argument that others of us don't have. We'll take 60 seconds.

THE COURT: Okay. Thank you.

(Discussion held off of the record.)

THE COURT: Are you good?

MR. BUCHWEITZ: We're good.

THE COURT: Please proceed.

MR. BUCHWEITZ: And then why does all this matter? So what happened in -- and there's a lot of history to what happened with the chemical business and old Monsanto's effort to get rid of everything related to it. Right? That was their whole goal. There was the entire bankruptcy case, which we tried to reopen. And which I want to tell you about as well.

So if old Monsanto has no right to these things and new Monsanto has no right to them, then only Solutia has a right to bring these claims. And there have been multiple cases in other jurisdictions where different people --

THE COURT: And your argument for new Monsanto is everything was given to Solutia and so it doesn't matter if new Monsanto is a future agent. It didn't give this stuff.

MR. BUCHWEITZ: There was nothing to give. And there was nothing left to give is exactly right. So then -- so then if Solutia is the only party that is able to bring these, then we have a case where Solutia would be, you know, bringing

claims against us. But why is that a problem? That is a problem because these contracts didn't survive the bankruptcy process. We -- there's two very clear reasons why it didn't survive the bankruptcy process. One is that it is undisputed that all executory contracts that were not assumed were rejected in the bankruptcy proceeding. There's a dispute between us and Monsanto on whether there are executory contracts, but there's no dispute whatsoever that any executory contracts were rejected and were not assumed as part of the agreement.

The other thing is there is a very clear judicial estoppel argument as well that because Solutia did not list these agreements anywhere in their schedules, despite listing every insurance contract possible, lots of other indemnity agreements, that that judicially estops them from bringing claims after the bankruptcy. We move to reopen the bankruptcy, and we have a decision that I'd like to give you a copy that I have highlighted of it where the Court went through -- Judge Glenn went through all of the elements of the motion to reopen including the one on whether the relief on the merits would be forthcoming, and he concluded that our arguments on this were colorable arguments, but it was up to a Missouri judge to decide. And we've been waiting all this time for President Trump to appoint you and to be confirmed by the Senate until you came to decide this and now I'm going to

hand you, if you don't mind, a copy of Judge Glenn's decision, I'll give you two, which basically assigns you the obligation to find these two issues.

And it is really important and matters to our clients significantly because this whole episode in the last ten years is very difficult for them and very contrary to everything that happened for decades before. There were cases including the *Gould* case and others where Monsanto and Westinghouse, sometimes GE, sometimes CDE, were codefendants in these cases, and they never tendered to us in those instances. But they did tender to us in instances where it was our PCBs and post-'72. And Westinghouse indemnified them twice for that, including one case where Weil Gotshal represented them. We have an advanced waiver, though, so don't worry.

And so everybody knew what these contracts meant. And if Solutia is the only party to them, as it is now, as it should be following the bankruptcy, then those contracts did not survive the bankruptcy. We did not bring it up in the motion to dismiss because my papers in submission of the motion to reopen were this high, and so it was too factual, but it is something that as you will see in that decision if you haven't had a chance to read it already is the first thing that comes up if this case gets passed today.

So as I said, old Monsanto gave up everything it had, clearly and unambiguously in the allegations and in the

documents incorporated by reference as part of the spinoff and then gave rights to new Monsanto thereafter which did not include these SUAs.

And you know, people knew what these SUAs were. They knew that they were a limited thing. We had in the two instances where we indemnified them, there were ten other cases going on at once all over the country. We were defending together, no indemnity, and then there was one that shows up and it is an explosion of one of our transformers. It clearly says it is post-'72. Clearly ours, we indemnified them. One of our employees didn't start working until 1972, got injured on the job. PCBs, sued Monsanto, we indemnified them for them. Everybody knew what this was and then all of a sudden after all this time and long after they were -- they didn't survive the bankruptcy with new owners, they show up and come up with a completely new theory.

So it matters that old Monsanto and new Monsanto aren't proper plaintiffs and it matters that Solutia is the only proper plaintiff so then we can go through and follow and take the next step of what Judge Glenn ordered us to do.

THE COURT: I appreciate that. Thank you.

MR. MANGIAN: Dave Mangian for the Monsanto plaintiffs. Judge, your point about Monsanto -- old Monsanto retaining rights, totally plausible at this point, and almost everything that my friend over there just told you is a whole

lot of facts that is a different argument for a different day. He admitted he didn't brief the bankruptcy. He is talking about past history that is not pled in the complaint, and at this point, we're drawing reasonable inferences in favor of us and we're looking at our pleadings.

There was a transaction in 1997, but that transaction did not affect the novation in any way to change the agreement that we had, the special undertakings. The special undertakings say that the defendants are to indemnify and defend Monsanto, its present, past and future directors, officers, employees and agents. Defendant indemnified Monsanto. The transaction with Solutia didn't affect that right, didn't affect that change just as you just said. Old Monsanto has the right to be a defendant indemnified even if the contract was part of a transaction with Solutia. It didn't change the underlying contract, and if it did, they would be jumping up and down saying you've changed the contract. The law doesn't allow you to assign an indemnity and change our obligation. They're not saying that.

They're just trying to say, oh, well, you made an assignment. You transferred a contract and somehow that changes the parties to be indemnified so we can make this other argument. It is the same problem with the future agent issue. The contract explicitly says future agents.

THE COURT: I agree with you there. The point in

the analysis is going to be the Solutia bit. I agree with your reading of new Monsanto being a future agent. So the only question is going to be whether there is something to give to new Monsanto.

MR. MANGIAN: I don't think that that is the correct analysis, Judge, respectfully. Nothing has to be given to new Monsanto. The contract says you indemnify our future agents whenever they come, and it doesn't say anything about only if they come at this time or only if they're involved in PCBs. It is Monsanto and its future agents, wherever they came.

There is nothing that old Monsanto has to give to new Monsanto in order for them to be a future agent entitled to indemnity. Certainly, they are a third party beneficiary to the contract at minimum. They're listed in the contract. It was an intention of all the parties at the time.

Getting back to Ms. Rosenberg's argument, the point of these contracts, why they were entered into is everyone understood that PCBs had been identified in the environment at this time. Everyone understood that this is a potential legal liability in the future. And like any good corporate lawyer at the time, they're not just going to have an indemnity that runs only to the company now in its present form. They realize that there could be situations in the future where there were future agents like new Monsanto who is paying for the defense of all this litigation under the amended and

restated settlement agreement in the bankruptcy where there's a reason for that indemnification. There's a reason for those parties having rights.

And I haven't seen any case where they said -- the cases they cite on Solutia getting the contracts are about assignment of claims. I think another one is about assignment of an easement right. There's nothing about an assignment of a contractual indemnity right and that that changes somehow who the party is to be indemnified through a corporate transaction like this. And they also haven't cited any cases that say a future agent who is entitled to indemnity has to get that indemnity right from an owner of the contract that happened later.

So that is our essential argument on it, and I think none of the bankruptcy stuff and all the how it happened in the past and who did what, that is not before you right now.

And then, Judge, the only simple issue here is Magnetek, one of the other defendants, has challenged the Solutia transaction. Their answer that they filed in this case, they are the one who have answered so far. They answered in state court. And their sixth defense in their first amended answer says the special undertaking does not permit assignment and plaintiffs never provided notice of any alleged assignment to UMC, their predecessor or Magnetek. Any alleged obligation of Magnetek is owed solely only to old

Monsanto. Plaintiffs Solution and new Monsanto have no enforceable rights against Magnetek under the special undertaking or common law.

So the defendants can't even get straight their position on what -- who has rights. And in the briefing that the defendants filed, I think it was their joint brief, there's a footnote where they say, yeah, we're challenging the standing, but we're reserving all of our rights.

So what we essentially have here is them challenging the parties saying there's too many plaintiffs, but reserving their rights to then come back later and say, well, if it doesn't work out for us the assignment didn't really do what it said it did.

And Judge, real party and interest really when it comes up, Rule 17 -- because this isn't a standing issue. They're not arguing that there is a subject matter jurisdiction issue. They are arguing a prudential limitation and not a jurisdictional one. And when it comes up is situations where defendants say, hey, the right plaintiff isn't in this case, and so you've got to dismiss. And the rule says, well, wait a minute, there has to be a reasonable amount of time for the new plaintiff, the correct plaintiff, to be substituted before I dismiss, and the purposes of the rule -- the modern purposes of the rule --

THE COURT: I take it they are raising this argument

because they also think they can reopen the bankruptcy and enjoin Solutia from continuing, right? That's the reason for bringing this argument, right?

MR. MANGIAN: Certainly, that is absolutely the reason.

THE COURT: The regular operation of Rule 17 is kind of not, you know -- the regular operation of Rule 17 isn't going to be the case here because we have bankruptcy proceeding. We have a lot of other complicating factors here.

MR. MANGIAN: Right, but when you look at the mix of all the things here, we brought a case where we brought everybody that has an interest in the case so that we have one solution of the issues of the special undertaking of how they apply at least from the plaintiff side, right? They're not saying that the modern rules with Rule 17 is saying multiplicity of suits, protect from unjust loss or forfeiture of claims, those rules, they don't even cite those or talk about those. They have no concern whether there's multiplicity of suits. They're just saying you have too many plaintiffs and they're trying to narrow it down for their technical legal argument on the bankruptcy, which the bankruptcy judge said it was an issue of Missouri law, it is something that requires development of facts, whether it was an executory contract.

And by the way, on the judicial estoppel, there is a

very recent Supreme Court case that just came out where Justice Thomas, I think, basically said if I remember reading it, I'm not even sure that judicial estoppel is a thing that any judge should be applying, and it is far wider and far more of a totality of the circumstances analysis than they would like it to be.

So there's a whole bunch of issues that we can get into on that at a separate time. That is not the issue here. The issue here is they say we have too many plaintiffs. We say we quite clearly are named indemnitors under this agreement entitled the duty to defend and duty to indemnify and you can't dismiss us now on that, especially where they're taking different positions.

THE COURT: Thank you.

MR. MANGIAN: Thank you, Judge.

THE COURT: Very brief reply?

MR. BUCHWEITZ: Very brief. First, Magnetek is not a party to this motion. They answered before we were even sued. So that is irrelevant. The other thing is I pointed you to exhibit docket 113 and I specifically reference page five of that, one of the things that was assigned to all rights under contracts, agreements, warranties or guarantees, all claims or rights or judgments against any person, all rights in connection with offers, et cetera. It was an all rights thing, and the case that we would cite to and it is in our

brief about how a divestiture like this makes the assignee the real party in interest is the *McMullin v. Borgers* case, which, again, we cited in the brief. And just one last point is within the decision from Judge Glenn on --

THE COURT: Say that again, say that case again.

MR. BUCHWEITZ: *McMullin v. Borgers*, 806 S.W.2d 724, 1991, and it is on page 731 to 32 of that case. And within the In Re: Solutia decision from Judge Glenn that I mentioned there were -- on page 112 to 113, it goes through two cases where Solutia tried to get itself out of underlying PCB cases and arguing that it didn't get all of these liabilities as a part of the distribution, and they lost in both of them. One in this district and the other one in Massachusetts, and in fact, one of them they're seeking indemnity from us on. So those are my last points.

Do you have any questions, Your Honor?

THE COURT: No. Thank you.

What is the next issue?

MR. BERRY: Your Honor, I believe it would be personal jurisdiction. I have a handout that I think will hopefully streamline everything. May I approach?

THE COURT: Yes, you may.

MR. BERRY: Your Honor, thank you for taking the time to hear us today.

My name is Robert Berry, and I represent

the Gillette company. And one thing that might be helpful as we go through this record is to sort of tie up new company and old company's names. The Gillette company, my client, is the -- plaintiffs claim is liable for activities of PR Mallory. So when you see documents for PR Mallory, they are referring to Gillette.

To keep things streamlined and simple, my colleagues at CDE, who are the current name Rodney French defendants, they are CDE. They asked me to argue for them. And that would be true as well for the Kyocera AVX current defendant, which would be Aerovox would be the prior name under which they did business.

We have a 12(b)(2) motion, and it is like today, we've been here a long time and this court knows more about International Shoe and the Eighth Circuit standards than we do. What I have done and what I would like to do here is just take a moment and focus Your Honor on what I think ultimately drives the ship on this.

The handout we have provided to you effectively lays out what we view as the arguments and allegations, and it is both. This is a 12(b)(2) motion, so we have both allegations and arguments. Under which Monsanto is claiming facts support personal jurisdiction over the movants, effectively CDE, PR Mallory and Aerovox.

In each of those categories, the random numbers that

appear out of order on the left side, those tie to the Missouri Long-Arm Statute's provision that we believe that they are relying upon. So, for example, when it says one next to Monsanto alleges, we are trying to communicate that this would fall, we think, under Missouri Revised Statutes section 506500, subsection one, which is transacts business in Missouri. That is one of their primary claims.

The two would relate to their claim of making a contract in Missouri and then five would be contract for insurance.

And so in order to walk through this -- and we certainly can to the extent Your Honor needs and wants. We have all of the specific documents that were attached by Monsanto --

THE COURT: My main question on argument is on -- I understand there's a dispute where did acceptance occur, was this unilateral, was this bilateral, et cetera, but then they say -- I apologize if I'm confusing or mixing up some of the defendants together, but generally speaking, I understand their argument to be, well, okay, set aside the special undertaking, the special undertaking is part of every future contract, and they purchased more stuff from Monsanto in Missouri for the subsequent five years.

MR. BERRY: And this, I think, is what I was hoping Your Honor really wanted to get into because I think we can

walk through this. And they cite and they attach -- and these are kind of all to the Mr. Kaley declarations. They cite a bunch of billing invoices from that '72 to '75 period.

And the claim I think that is being made is this demonstrates this long extensive business relationship. We need to break that down. When you look at those invoices and the purchase orders relating to them, they do not reflect products shipped from Missouri. They do not reflect products shipped to Missouri. They do not tie any other way into the transactional facts at issue in this case. They certainly don't --

THE COURT: They're not shipped from Missouri? They're shipped from Illinois?

MR. BERRY: They're shipped from across the river, yes, sir.

THE COURT: What is the situation with Monsanto at this point? They have their headquarters here in Missouri. They have got their I guess for a lack of a better term their white collar people over here and their factories over in Illinois? What is going on there?

MR. BERRY: Well, they have factories all over. They have white collar people all over, but their headquarters are here in this time period.

THE COURT: But you're sending an invoice to Missouri and receiving shipment from Illinois?

MR. BERRY: Yes. What appears to us -- and this is the *Dairy Farmers of America* case we cited at 702 F.3d 472. What we believe their documents show is Monsanto has done a wonderful job of demonstrating its presence in Missouri, and it clearly has a PO box for which it accepted mail for processing purposes. We know it was different for different defendants. Payments were made by CDE and Kyocera. When you look at specifically the documents they attached, payments were made to New York. PR Mallory wrote payments here.

The notion of how due process is going to tie together -- and I think what this Court can fairly wrestle with is does the fact that they have PO box and accept mail here satisfy International Shoe's due process obligation even if it satisfies the more basic perfunctory first question, which is have we satisfied the Long-Arm Statute. And I just don't see that it does.

We cite the *Montair* case for you, which talks about unilateral performance by the other party, the things that Monsanto does, maintaining a PO box here among other places, is that enough?

This lawsuit is not specifically about, as Your Honor knows, and I think as we talked about causation, this is not a case where any specific purchase order, which was admittedly mailed to Missouri, that purchase order is not the issue in this case. And they're not arguing for general

jurisdiction for sufficient context to be at home in this jurisdiction for any of the moving defendants. What they have established by what they've attached, vis-a-vis these invoices is nothing but a PO box operated here. And clearly, no one disputes Monsanto is here. That is where they are. The question is where does the suit-specific conduct occur, and all of the things that are relevant of what happened here or elsewhere? For example, they allege releases. That's one of the big trigger points that they've alleged. And when you look at what they allege here, I can tell you that they alleged that the releases by Kyocera were in New Bedford, Massachusetts. That is the Aerovox. By CDE --

THE COURT: I guess their argument would be, okay, maybe some contamination occurred elsewhere, but this special undertaking is something that is incorporated into all future contracts and you sent an invoice to the state of Missouri after 1972 asking to purchase more PCBs?

MR. BERRY: Okay. So there are two issues where the future contracts comes up. It could be a question of acceptance and a question of whether this is sufficient. There's no question, Your Honor, that we sent invoices to them here. And if the case law says sending invoices, even a significant number of invoices by mail from other jurisdictions to this jurisdiction for products that are going to be delivered elsewhere and used elsewhere and alleged

breach of, if that is enough, this court has enough for jurisdiction.

The *Montair* case, which was the Eighth Circuit in 1982, from our perspective says that it is not. When we look at the total mix of contacts, even if that were to satisfy the first prong of the Missouri Long-Arm, that is not going to approach what ultimately is required by due process.

I think that is one of the reasons what Monsanto has done is we have a parade of other things that they list as we go down, and those things I think begin to demonstrate more and more the absolute tenuous thread that they're trying to put together. So there's a question of visits. That is a normal thing that courts consider. Are they physically in the jurisdiction? They neither allege nor submit any evidence that Aerovox ever came, not once. They submit no evidence that CDE came prior to the SU at any point. They submit two claimed visits after, but those are not suit-related contacts.

In both of those circumstances -- and they attached their exhibits here, and we cite them here for you where in the record we're pulling these out of the Kaley affidavit, one was a symposium on lobbying efforts and one was a meeting on monitoring efforts. That was not a suit-related conduct. It relates to PCBs but not to what is at issue in this lawsuit.

As far as PR Mallory goes, they do allege one visit

prior to the signing of the SU two or three days earlier, but what is interesting about this -- and this is a problem, Your Honor, that we're going to face in this case a lot. They attach a Monsanto-generated agenda for a meeting that they say will happen the next day and that is a 1972 document. Mr. George Kaley, however, the affiant they found -- and I assume they couldn't find anyone else -- that was not there until a year later. There is no one that can testify that meeting ever occurred, but if you take it at face value that it happened, it is one suit related or -- they came to talk about the SU, the special undertaking. They did that in advance, but the Eighth Circuit has already said in the *Sybaritic* case at 957 F.2d 522 -- that is 1992 case -- a lone visit for talks in negotiations and phone calls, it is not going to get it done.

THE COURT: I have a question for you, and it is similar to the question I asked Ms. Rosenberg. If we ended up going down a road where I adopted the defendant's position on what the special undertaking says and you need more context, more causation than the plaintiffs say, I would hate to assess personal jurisdiction with respect to every single one of these cases in a situation where they haven't necessarily pleaded, you know, what that standard would be. And so would you -- in that kind of circumstance, there are a whole bunch of things affecting a whole bunch of other things, and it

would seem silly to discuss personal jurisdiction in that circumstance given that personal jurisdiction is going to be case-by-case, contamination-by-contamination dependent. Maybe it is also the case that there are certain broader strokes principles or conclusions that I could adopt that might either reject your position or accept your position and help funnel things further down the road, but I guess I want your response to that.

MR. BERRY: And again, this is a product of plaintiffs waiting 60 years to do anything. People are dead, people are gone. What we know from the allegation --

THE COURT: They also got sued much more down the line. It is a complicated case.

MR. BERRY: I'll grant you 20 to 30 years to when it started. It is not new. And the question of what sort of nexus to the jurisdiction would I accept or think is appropriate given these facts, I don't know. I do know the only things they say we did for my client, they say we did in Indiana, Tennessee --

THE COURT: My question is much simpler, which is, it sounds like the personal jurisdiction situation might be best assessed on a case-by-case basis if the defendants are correct about the language of the contract. Now, it gets a little complicated. We have also got this tort claim out here. But if that were true, would it make sense to kind of punt on

the personal jurisdiction issue until we actually had case-specific pleadings?

MR. BERRY: Certainly, this is a 12(b)(2) motion under prima facie standards. There is no question about that, and we would have the right to preserve and to continue to argue under Rule 56 later. However, I do think Rule 12(b)(2) requires them to facially connect our defendants -- each defendant to this jurisdiction, and I'm just struggling with that.

THE COURT: And if they did that then maybe the personal jurisdiction arguments look a little different at that point?

MR. BERRY: For the tort, there is no question that is true because the alleged breach is the release. And when you read their tort claim, they say the release into the environment, that is the duty breach, violation. Now, that duty wasn't to them. Setting that aside for a second, it is economic losses is all they have claimed they were damaged on that were just attorney fees and things they had to pay. And then there's huge statute of limitations problems we think for all the defendants, most certainly one for our client who received a very late tender more than five years after the first tenders went. But in that case, there's no dispute that the nexus of the breach is tied to each individual jurisdiction.

And that is not just true for my clients. That would be true for even the nonmovants. Ultimately, that is a problem that would have to be addressed.

For the breach of contract, I think we can look at -- marked this as number two, how the Long-Arm Statute applies to the making of a contract. And we just don't see a world where the making of the contract was Missouri here. And we put all the cites, but the most interesting thing I want to point Your Honor to is Monsanto seems to argue that they were the last one to sign and that is true in order of timing and process. But that does not mean that there was an offer and acceptance that they were the final acceptor of this deal.

Right off the bat, I can tell you that they plead their case in a way that disabuses that notion. If you read FAP, it is the first amended petition, paragraphs 83, 84, 91 and 97, in each one of those provisions, they say that the execution date of the agreement was when you compared that to the Exhibits 4, 5 and 6 was the execution date by CDE, by PR Mallory and by Aerovox. And what is interesting about that is, of course, on those dates, that is what -- there's no e-mail. There's no e-mail. These three moving clients signed it and dropped it in the mail and several days later and all of these documents are included in the Kaley declaration. The folks at Monsanto said, yeah, we're done, it is signed, here it is, and they sent theirs back.

They were treating in their allegations in this case, I think correctly, the agreement as having been formed on the execution date, and they list -- they plead for all of them, including old Monsanto, on the date it was signed.

Equally interesting -- and I haven't studied all of the documents they attach for other defendants, but for PR Mallory, specifically, if you look at Exhibit B of the Kaley declaration, the very first page is a conversation note internal to old Monsanto where they talk about verbal commitments having been reached over the phone. And when PR Mallory responded by sending it back on February 4th a signed copy, they specifically reference there was -- we spoke on the phone, and there were arrangements made then.

And so I think whether there is a unilateral contract -- and I know CDE made that argument at length and Your Honor has seen that -- or whether it is a bilateral contract, either way the acceptance would have occurred in other jurisdictions. And so how that contract works, we don't think they get there.

The only other piece they make -- and again, Your Honor, we tried to use this to streamline things to give you which facts we think matter. The only other argument they make under the Long-Arm Statute is they argue effectively that, well, there's an insurance contract under Missouri law. There's only two theories that could be. I'm not 100 percent which one. If the theory is an indemnity agreement is an

insurance contract, it is not. We cite two cases there in the bottom box, but that is the -- the *Babb* case is the one I prefer at 638 S.W.3d 97. It is not. But in their briefing, what they appeared to say is certain defendants sent or brought certificates of insurance to them here in Missouri.

What they're referring to from the exhibits and from the context would be certificates of insurance issued by someone else. These would have been our clients being the insured and adding an additional insured, which is not what Missouri law contemplates by the rule that says if you issue an insurance contract, you are submitting to the jurisdiction of Missouri. That is a different context. I don't know which they mean, but neither gets you there.

THE COURT: I want to hear -- we're quickly running out of time. I want to hear from you about torts.

MR. BERRY: On the tort, I tried to do it briefly and sneak it in. I apologize for not flagging you. It is just the three issues. The duty breach, when you read the paragraph of their complaint, they say the duty and breach is the release into the environment, which they haven't pled clearly enough we think. But regardless, as to the movants, they do not allege that happened in Missouri. They affirmatively allege elsewhere. Massachusetts for CDE, Massachusetts for Aerovox, and then Kentucky, Tennessee and Indiana for my client PR Mallory.

THE COURT: What about your arguments they're not a tort victim? That is the public, that is consumers, et cetera.

MR. BERRY: That is the duty. They're not saying that they suffered a direct attack by a breach of a duty at them. They're trying to convert a contract or a contract theory into a tort, and it doesn't work. And even if we could torture the concept of duty and breach, and I think you would have to torture it under the case law to get there, they affirmatively allege nothing but economic losses. The only damages they allege -- and this is without qualification -- are they had to pay for attorneys' fees, we owe moneys for judgments and settlement. By definition, those don't qualify as actual tort damages you can pursue. And then I think the parties have briefed this very well so just repeating it by going -- there is a real statute of limitations problem here, and I do think -- this would be useful.

The statute of limitations for contract and tort are and must be evaluated differently here. So for a contract for a special undertaking, no matter how you determine causation, the issue is going to be we have a tender that was wrongfully or properly denied for a specific claimed liability. Under Missouri law, the way that torts are going to be addressed once they -- once they have the claim for any loss for their alleged tort, for the release. And their argument is the

releases are all one drop is common. Under their theory, as soon as they suffer any damages, everything after that is going to be a measure of damages and these cases are passim in our brief. And why that is relevant here, I believe, so only -- three parties have moved and that is the three I'm talking about here today, CDE, Mallory and Kyocera, they filed specific briefs. I know Paramount has also joined in a footnote, so there's four parties on this. But it affects all of them.

There is nothing in this complaint as alleged that plaintiffs did not know and could not have alleged after the very, very, very first time they suffered and paid -- not just a liability damage, but paid a fee, attorneys' fees for defense. There's nothing here. Everything after the first one is an incremental increase in the measure of damages, which Missouri law tells you -- and we cite this all throughout our brief -- Missouri law tells you that is iterative damages, and it has accrued at the first time.

THE COURT: 60 seconds to wrap up. I want to give them a chance to respond.

MR. BERRY: Your Honor, I don't think I need 60. I think we can do it right there. Thank you for your time.

MR. MANGIAN: You know, we kind of split the personal jurisdiction. I was going to handle the torts. Ms. Rosenberg was going to handle -- do you want to hear from us

on the personal jurisdiction because we would like to respond briefly on that?

THE COURT: Yes. He argued both at the same time so argue whatever you want to argue on these things.

MR. MANGIAN: Sure. Thank you, Judge. On personal jurisdiction, he glossed over the standards and I think the Eighth Circuit standards and Supreme Court standards are well known, but I think they are important because it is a minimal burden. It is a prima facie case. And if you go to Supreme Court Burger King decision of 1985, seminal decision, the Court there said it is a highly realistic approach, right? You're not just looking at every individual contact in a vacuum. You are looking at it as a whole, the business relationship as a whole, the transactions as a whole. And they're not just looking at the negotiation of the contract. You're looking at the future consequences of the contract because that is all relevant to whether or not it is fair and it was reasonably foreseeable for the defendants to be hailed into court and subject to the court's jurisdiction. Here, that is clearly the case.

And I will point you to the *Houlihan* decision from Judge Clark. It is cited in our brief. It is 2021 WL 5758436. It is a 2021 decision that Judge Clark wrote. This is after the *Ford* case that came out defining what relating to means which is a big broad thing, and affiliation,

and obviously, it is obviously after *Burger King* and all of the most recent Supreme Court precedent on personal jurisdiction.

And the reason this case is I think really applicable here is it is the only case that is cited by anybody in this case that talks about a really long-standing relationship, commercial relationship. There was 20-plus years the relationship happened and there were many different contacts that are very similar here. There were, you know, orders placed by people calling the Missouri company -- and this is poultry products. They called in, they purchased the poultry products that way. The Missouri company at their headquarters in Missouri confirmed that they could provide those and confirmed they could provide them in the volume at the price that they were requested and then those products -- the Missouri company went out to its suppliers and had the suppliers ship the products.

THE COURT: Is that a tort case or a contract case?

MR. MANGIAN: It was contract, I believe, Judge. They went through this. There weren't even any visits to Missouri by the parties, but it was a longstanding business relationship, and Judge Clark said it is a highly realistic approach. We have to look at everything.

THE COURT: Tell me about your shipping stuff out of Illinois at least at the time, right?

MR. MANGIAN: The PCBs plant was in Sauget,

Illinois.

THE COURT: The invoices are going to Missouri? Or at least some of them. I understand there are some that may have gone to New York.

MR. MANGIAN: All the purchase orders came to Monsanto's corporate headquarters here in St. Louis. It wasn't a PO box. It was 800 North Lindbergh Boulevard, St. Louis, Missouri.

THE COURT: What is your best case for those invoices being sufficient for personal jurisdiction?

MR. MANGIAN: Judge, the *Houlihan* case deals with that and it cites a couple of other cases where it says those invoices came in, contracts were formed, and they were accepted here, and it is not just the invoices, judge. You have to look at this highly realistic approach totality of the circumstances analysis where the jurisdictional facts are viewed in the light most favorable to us, you have to look at everything. For example, PR Mallory, they came here to negotiate.

THE COURT: And I get all that. The invoices seems like a big deal especially with the special undertaking that you've got being incorporated into every future thing. That might be the most important thing in my mind. I understand I have to accept it all holistically, but I wanted to key in on that, so I'll make sure to go ahead and read that *Houlihan*

case.

MR. MANGIAN: Yeah. And Your Honor, it cites two other cases where the Court reaches the same analysis. And what happened is the appeals came in here and they make this argument that, well, the acceptance was the shipping. That is the factory. The people who accept it -- and we allege this. I think it is paragraph 55 of the first amended petition is where they were accepted was here.

THE COURT: What about the tort -- and maybe this is a Ms. Rosenberg question, I don't know, but tort with respect to personal jurisdiction, if the breach occurred not in Missouri, what is your personal jurisdiction argument?

MR. MANGIAN: Judge, the breach does not have to occur in Missouri for there to be the personal jurisdiction in Missouri. The cases say if the tort has foreseeable consequences to be felt in Missouri, that is sufficient for Long-Arm, and in this case, that is what we argue. I don't know if there is a whole lot more to say on that.

And then as far as the insurance contract, there are different ways to look at this. And Your Honor already said earlier that indemnity agreement -- it was only an indemnity agreement was a form of insurance, and we cited a case for that at the Seventh Circuit. You can take that and put that as one argument. It doesn't say an insurer contracting to provide insurance. It says contracting to provide insurance

in the statute, and insure risk in Missouri.

The second piece is we required -- Monsanto required CDE and KAVX to obtain insurance to contract for insurance to protect the risks under the special undertaking. And so that is a secondary basis for the satisfaction of that part of the Long-Arm Statute.

THE COURT: I want to hear about the tort.

MS. ROSENBERG: Yes, Your Honor. And for the reporter, Sharon Rosenberg for plaintiffs Monsanto.

The argument about the duty, whether duty existed and also about the economic loss doctrine, I think they sort of collapse into each other as I'll explain, but let me address the duty first.

The duty here as Your Honor has already keyed in on is about the duty to exercise care to avoid release. So we're talking about a different duty than that in the statute. It doesn't arise out of a contract, the foreseeability is the touchstone of duty under Missouri law. There were warnings, those are alleged. Create the special undertaking warnings, those are alleged in the complaint. The contracts don't create the duty, but they certainly evidence it because they recognize that defendants were aware not just of the environmental risk and the contamination, but what that meant in terms of Monsanto. That is the duty.

The question then really goes to the economic loss

doctrine, and the typical formulation of the economic loss doctrine in Missouri is you have economic only losses that are contractual in nature. Here, granted, the losses are only economic to Monsanto. So the question is, is what we're talking about contractual in nature? And the case law -- and I would direct your Honor to the *Jacobson Warehouse* case that Paramount cites in their brief with respect to partial dismissal makes clear that a claim is not barred into the economic loss doctrine just because there are economic losses and a contract exists, rather you look is it a different duty, here it is, is it a different conduct that would breach it? Failure to indemnify, failure to pay for Monsanto's losses versus releasing into the environment, so they're different.

All that said, Your Honor, even if the Court thought that somehow maybe the economic loss doctrine still applied despite it being different breaching conduct, different duty, different source of duty. There's another case that Paramount cites in their brief, the Sports Capital case. I think it is directly on point for saying for purposes of the economic loss doctrine only, you actually do look at personal injury and property damage to underlying plaintiffs. And so the fact pattern in that case was that Scottrade, right around the corner, there was an escalator malfunction in Scottrade and it injured patrons. Nonplaintiffs in the negligence suit. So the owners of Scottrade sue the escalator maintenance

company. And the escalator maintenance company said, wait, your only losses are economic. You had to fix --

THE COURT: Let me make sure -- okay. Escalator company maybe messes up. Patrons of the company where the escalator is located sue the company.

MS. ROSENBERG: Get hurt. The owner of Scottrade sues the escalator company.

THE COURT: Why does the owner of Scottrade sue the -- they got sued by the customers?

MS. ROSENBERG: Yes. I'm sorry. I wasn't sure of the antecedent.

THE COURT: Customers sue the retail establishment. The retail establishment then sues the escalator company.

MS. ROSENBERG: Correct. People go to a Blues game. They get hurt, and they sue Scottrade Center. Scottrade Center has to pay settlements and claims. It has economic-only losses in the form of settlements and demands made by these people who went to the Blues game and got hurt. So the owner of Scottrade turns around and sues the escalator maintenance company for these economic losses, the settlements they had to pay to third parties. And the economic loss doctrine came up, the Court considered it, and it said the underlying injury to the third parties that formed the economic losses that Scottrade Center had to pay in the form of settlements sufficed to exclude the bar of the

economic loss doctrine.

I believe Mr. Berry also argued the statute of limitations. We actually divided it up a third way. I don't know if you have any questions on it, but Mr. Schnell was going to address that if you did have any questions.

THE COURT: I'm going to review my notes real quick and see if there's other just general questions I have.

MS. ROSENBERG: Thank you, Your Honor.

MR. BERRY: And if I may, I have ten seconds. That is all I would need.

THE COURT: All right. Ten seconds.

MR. BERRY: And Your Honor knows how to read cases. We dispute how they were read, and we're confident in that.

THE COURT: It is helpful for me to know which cases are the ones that you-all find to be most important.

MR. BERRY: Absolutely. And we laid them out and from my perspective it is on the tort claim it is -- they all say that duty doesn't apply in this context. The economic loss cases are very good. But the only thing I want to say to you is on the issue on the incorporated Missouri law on the invoices, it is very clear that regardless of what the Court decides on which way the incorporation goes and where it is, there's no choice of forum clause. What they included was a choice of law, which has a fundamentally different impact on jurisdiction. That is all I need to say, and I think

everything else I think we've presented here and in our briefs, and I thank you for your time, Your Honor.

THE COURT: Okay. One second. I guess one final question for Monsanto. I take it that your tort injuries differ from your indemnity liability injuries only with respect to pre-1972 conduct. Is that correct? Because if we're talking about post-1972 conduct, then your view is they have to indemnify you under contract and so that would cover everything that you would be receiving under a tort.

MS. ROSENBERG: It potentially differs in two ways. One is the temporal as Your Honor referenced. The second could be in the causation because the causation is different in the tort requirement. That is actually where you get into the substantial factor that GE's counsel was arguing, which is the in connection. So there could be -- they're overlapping certainly, but one could be -- it's a Venn diagram. It could be overinclusive, underinclusive. It depends exactly on the causation that is established and then the time issue.

THE COURT: So they overlap for post-1972 conduct, but they wouldn't overlap for pre-1972 conduct?

MS. ROSENBERG: That's -- I hesitate only because the sales contracts were amended and some sales contracts that were amended actually predate 1972. So it is a little bit of a complicated question, but for the most part, yes.

THE COURT: The contracts might predate 1972, but

nothing would actually be sold -- this concerns things that were sold after 1972, even if there's a preexisting contract that gets amended and then there's another sale that occurs in February 1972?

MS. ROSENBERG: There's case law that might make it better than that in a directed application, but as a basic matter, I think Your Honor has it, yes.

THE COURT: Okay. Thank you. You-all have left me a lot to think about.

MR. BUCHWEITZ: Your Honor, just very briefly. We didn't talk equitable contribution. The only thing I'll say on that is if you're going to have them replead, they should replead for those points as well, you know, the need to be a joint tortfeasor, not group pleading and they need to actually allege that they got us releases, and they haven't.

THE COURT: Okay. I appreciate that. Thank you. Well argued on all sides. I don't want to see what the legal bills look like for this hearing. So thank you. The Court is in recess.

(The hearing adjourned at 12:57 p.m.)

CERTIFICATE

I, Erikia T. Schuster, Registered Professional Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 99 inclusive and was delivered electronically and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, 9th of August, 2026.

/s/ Erikia T. Schuster
Erikia T. Schuster, RPR
Official Court Reporter