**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| MONSANTO COMPANY et al., | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | No. 4:23-cv-00204-JMD |
| MAGNETEK, INC. et al., | ) | |
| *Defendants*. | ) | |

## <u>ORDER GRANTING MOTION TO DISMISS</u>

For decades during the twentieth century, Monsanto manufactured polychlorinated biphenyls, also known as PCBs, and sold those chemicals to other companies. These synthetic chemicals were highly useful, especially in electrical equipment. But at least some forms of PCBs later proved to be toxic. Because those chemicals were still critical in electrical applications—PCBs were the only nonflammable fluid available at the time—Monsanto kept manufacturing them for limited purposes during a phase-out period. In exchange, Monsanto insisted that companies purchasing PCBs agree to indemnify and defend Monsanto from certain future lawsuits. The defendants are six companies who signed those contracts in 1972 to purchase PCBs.

Monsanto has now been sued many, many times, with plaintiffs alleging that PCBs have polluted food sources, water sources, and various schools and workplaces. Monsanto has incurred liabilities in the hundreds of millions of dollars or more in cases that have gone to judgment or settled. Many cases remain pending. Monsanto now seeks to force the purchaser defendants here to pay the "full amount of the defense costs" Monsanto has or will incur. ECF 4 ¶ 235.

But Monsanto fails to connect any of the underlying suits to any chemical sold to any defendant. The contracts Monsanto signed with each company apply only to the extent Monsanto can connect an underlying liability to PCBs sold to a specific purchaser defendant after 1972. Monsanto makes no real effort to do so. It instead seeks collective guilt against "the six largest purchasers" of PCBs; it assumes that because those companies represent a large market share, then chemicals sold to each of those companies after 1972 must have contributed to pollution in every one of the hundreds of cases filed against Monsanto. ECF 4 ¶ 4; ECF 4-18 at 5–6.

Monsanto's alternative claims for negligence and equitable contribution fail for similar reasons. Negligence requires proximate causation, which is an even stronger connection than required by the contracts. Monsanto pleads nothing to satisfy that requirement. Nor does Monsanto explain why the Court should entertain a freewheeling action for equitable contribution if Monsanto had an opportunity to implead the purchaser defendants in the underlying lawsuits that were filed against Monsanto.

**Background**

PCBs are a group of man-made, heat-resistant chemicals that were used for almost half a century in the United States in industrial and commercial applications such as electrical transformers, caulks, paints, and sealants. Once released into the environment, some PCBs do not break down readily and may persist for long periods of time. The chemicals cycle between air, water, and soil and can be carried long distances from the site of original release. By 1979, because of their potential toxicity to humans, federal regulations prohibited the manufacture or use of PCBs outside a few limited exceptions. But from 1935 to 1977, Monsanto sold millions of pounds of PCBs to industrial customers who incorporated them into a wide variety of products sold throughout the United States.

As early as the "late 1960s," Monsanto knew that PCBs "persist[ed] in the environment." ECF 4 ¶ 30. In early 1970, Monsanto announced it would phase out production of PCBs for certain uses. In April 1970, Monsanto began labeling its PCB products, shipping documents, and invoices with a warning that extreme care should be taken to prevent any entry of PCBs into the environment. By November 1971, Monsanto decided to phase out sales for all nonelectrical applications of PCBs. In December 1971, Monsanto sent a letter to its customers advising them that effective January 15, 1972, Monsanto would restrict its sales of PCBs to those customers who had entered into defend-and-indemnify contracts with Monsanto. In 1972, Monsanto entered into those contracts with dozens of PCB customers, including each of the six purchaser defendants in this case or their predecessors-in-interest. Those purchaser defendants are Magnetek, General Electric, Paramount Global, KYOCERA AVX Components, Cornell Dubilier Electronics, and Gillette.

Under those contracts, the purchaser defendants agreed to "defend, indemnify, and hold harmless Monsanto" from "any and all liabilities" that "aris[e] out of" or are "connect[ed] with the receipt, purchase, possession, handling, use, sale or disposition" of PCBs "whether alone or in combination with any other substances including without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's." *E.g.*, ECF 4-3 at 2–3. Although the text varies between some agreements, each agreement is "substantially similar." ECF 4 ¶ 3. The key provision, which appears in similar form in each contract, is the following:

> Buyer hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of Monsanto to Buyer *on or after the date hereof* and in consideration of any such sale or delivery, Buyer *shall defend, indemnify and hold harmless* Monsanto, its present, past and future directors, officers, employees and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses *arising out of or in connection with* the receipt, purchase, possession, handling, use, sale or disposition of such PCB's by, through or under Buyer, *whether alone or in*

> *combination with other substances*, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment *by reason of* such PCB's.

ECF 4-2 at 2 (emphasis added).

Under the contracts, the purchaser defendants bought over 133 million pounds of PCBs from Monsanto. During the same period, Monsanto also sold an additional 9.5 million pounds of PCBs to other customers whom Monsanto has not sued.

Monsanto then suffered the legal fallout from its PCB sales. It faced many lawsuits alleging injuries from PCB exposure. It still faces dozens of lawsuits from plaintiffs who contend they were harmed after PCBs allegedly contaminated their food, water, schools, and places of work. Monsanto anticipates it will continue to incur costs in PCB-related lawsuits "in the foreseeable future." ECF 4 ¶ 231. In 1997, after paying significant amounts to resolve many of its PCB related suits, Monsanto "spun off" a new corporation called Solutia and assigned it legal liabilities related to the production and sale of PCBs as well as the rights to enforce the 1972 contracts. ECF 4 ¶ 8. In 2003, Solutia filed for bankruptcy, which became complete in 2008. The "Monsanto" that brought this suit is now three companies with historical roots to one Monsanto—Monsanto Company, Pharmacia, and Solutia—all of whom are referred to as "Monsanto" for purposes of this order.

Monsanto regularly enforced these contracts when Monsanto could connect an underlying liability to a post-1972 product manufactured by a purchaser defendant. ECF 237 at 66–67; *see also Monsanto Co. v. Gould Elecs., Inc.*, 965 S.W.2d 314, 316 (Mo. Ct. App. 1998). For example, when one purchaser defendant's "transformers" exploded "post-'72," the defendant "indemnified" Monsanto. ECF 237 at 67. When one defendant's "employees didn't start working until 1972, [and] got injured on the job" from exposure to PCBs, and then "sued Monsanto," the defendant indemnified Monsanto. *Id.*

Not until 2016 did Monsanto impose blanket demands on these companies. That year, after a $46.5 million adverse judgment, Monsanto sent demand letters to each defendant, asserting that each defendant was obligated to cover the costs of "all current and future PCB-related litigation." *E.g.*, ECF 4-18 at 3 (letter to Magnetek. The defendants rejected these demands.

So Monsanto sued, asserting that the defendants "individually and collectively have a contractual duty to defend, indemnify, and hold harmless" Monsanto for all "the PCB Lawsuits." ECF 4 ¶ 6. Monsanto also pressed related theories about negligence and equitable contribution. After removing the case to federal court, the defendants moved to dismiss Monsanto's petition for many reasons, including that Monsanto fails to state a claim, Monsanto's claims are barred by the statute of limitations, only Solutia can enforce the 1972 contracts, and the Court lacks personal jurisdiction over some of them.

**Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), Monsanto's petition "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "where the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Blomker v. Jewell*, 831 F.3d 1051, 1055 (8th Cir. 2016) (cleaned up). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).

On a motion to dismiss, the Court accepts all the factual allegations contained in Monsanto's petition as true and reviews the petition to determine whether its allegations show Monsanto is entitled to relief. *Twombly*, 550 U.S. at 555–56. "This tenet does not apply, however, to legal conclusions," which "may properly be set aside." *Braden v. Wal-Mart Stores,*

*Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1056 (8th Cir. 2018) (cleaned up). The facts alleged "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

**Analysis**

The Court need only resolve three dispositive issues at this time: (1) whether Monsanto has stated a claim for breach of contract, (2) whether Monsanto has pleaded an independent tort duty, and (3) whether the Court should exercise equitable jurisdiction to entertain Monsanto's contribution claim. All other arguments raised by the defendants in their motions to dismiss are mooted by the Court's resolution of these three dispositive issues.

**I. Breach of contract**

Unlike previous demands Monsanto made for indemnification or defense, *e.g.*, *Monsanto*, 965 S.W.2d at 316, Monsanto's complaint here is a blanket demand against six purchasers of PCBs, asserting that each must defend and indemnify Monsanto against *every* potentially related PCB lawsuit that has been or will be brought against Monsanto. Monsanto articulates a "one-drop" theory that would permit Monsanto to sue purchasers on the most tenuous of connections: if even a single drop of PCBs sold after 1972 to a purchaser finds its way into a water source, food supply, or school or workplace that is the subject of a suit against Monsanto, then the purchaser must defend and indemnify Monsanto for that entire underlying liability. ECF 237 at 7. Monsanto says the Court can readily infer that a single post-1972 drop from each defendant purchaser has made its way into every contamination site in the country because the defendants were comparatively large purchasers, because "[s]ome PCBs, once released into the environment, do not break down readily and may persist for long periods of time," and because some PCBs "can be carried long distances from the site of original release." ECF 4 ¶¶ 106–07.

The Court disagrees. The contract is nowhere near capacious enough to support Monsanto's blanket-liability theory. The contract instead envisions a claim-by-claim, non-remote connection between each underlying lawsuit against Monsanto and chemicals sold to each defendant after 1972. Monsanto must plead that connection—if it can, consistent with the ethical obligations of Rule 11—if it wishes to proceed.

**A.**

Start with the text of each contract. The text must be "read as a whole" and be given its "plain, ordinary, and usual meaning." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. 2003) (per curiam). The text includes several limitations. First, each contract applies only to PCBs "sold or delivered by or on behalf of Monsanto *to Buyer*." *E.g.*, ECF 4-1 at 2 (emphasis added). Second, each contract applies only to PCBs sold to the buyer "after the date" of signature, January 1972. *Id.* So the contracts contemplate a small fraction of PCBs ever sold at all or ever sold to the purchaser defendants.

Next, each contract requires a close relationship between Monsanto's underlying liabilities and PCBs sold after 1972 to each purchaser defendant. Contending otherwise, Monsanto cites language that on its surface appears broad, ECF 103 at 13, but courts regularly construe those terms to require a close relationship. This Court does too.

Specifically, Monsanto notes that each purchaser agreed to indemnify and defend Monsanto for "any and all liabilities . . . arising out of or in connection with" PCBs sold to the purchaser after 1972. ECF 103 at 10. The Court agrees that "arising out of" has "a much broader meaning than 'caused by.'" ECF 103 at 14; *see, e.g.*, *Schmidt v. Utils. Ins. Co.*, 182 S.W.2d 181, 183 (1944) ("The words ['arising out of'], we think, are much broader than the words 'caused by' . . . ."). The Court also agrees with Monsanto that "in connection with" often carries the same meaning as "relating to." ECF 103 at 14; *see Morales v. Trans World Airlines*, 504 U.S. 374, 383 (1992) ("The ordinary meaning of ['relating to'] is a broad one—'to

stand in some relation; to have bearing or concern; to pertain; refer; to bring into association or *connection with*.'" (emphasis added) (quoting *Relate*, *Black's Law Dictionary* (5th ed. 1979)). But neither of those phrases permits highly tenuous connections like Monsanto's "one-drop" rule.

To the contrary, both phrases—although broad—still require a close relationship, just not as close as direct, proximate, or but-for causation. "Relating to" requires at least "a close relationship," not "a tenuous, remote, or peripheral one." *Chevron USA Inc. v. Plaquemines Par., La.*, 608 U.S. 1, 12 (2026); *id.* ("Ordinary readers would not understand the statement that someone is 'related to Joe' to refer to 'a mutual tie to Adam and Eve.' Nor would they understand the fluttering of a butterfly's wings to 'relate to' the next week's weather." (cleaned up)). And Missouri courts have been clear that "arising out of" means "there must be some causal connection," *Cameron Mut. Ins. Co. v. Ward*, 599 S.W.2d 13, 15 (Mo. Ct. App. 1980), even if not "direct and proximate" causation, *Schmidt*, 182 S.W.2d at 183. Under Missouri law, an injury "arises out of" an act if the "resulting injury was a natural and reasonable incident or consequence of the" act.[1] *Id.*

Any possible doubt about the text is put to rest by background principles of Missouri contract law. Those principles require clearer language for indemnity contracts. *See, e.g.*, *Cont'l Airlines, Inc. v. Boatmen's Nat. Bank of St. Louis*, 13 F.3d 1254, 1259 (8th Cir. 1994) ("Missouri courts strictly construe indemnity contracts."). Monsanto's one-drop rule would impose total liability on the defendant purchasers even for Monsanto's own negligence, so

[1] The rest of the contract also contemplates some form of causation. The contract includes a prototypical example of where a purchaser must indemnify or defend Monsanto: where Monsanto faces liability for environmental contamination "by reason of" PCBs sold to a specific purchaser after 1972. *E.g.*, ECF 4-1 at 2. The phrase "by reason of" generally means some form of causation. *E.g.*, *Burrage v. United States*, 571 U.S. 204, 213 (2014); *accord Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

long as one drop of PCBs from a purchaser was present alongside Monsanto's pollution. ECF 237 at 7 (statement of Monsanto's counsel: "[W]hat the special undertaking agreements call for in terms of the scope of coverage is it is a one-drop rule of connection . . . . The special undertaking agreements do not require that the connection be exclusively to post-special undertaking PCBs . . . ."). But it is well established in Missouri law that even "seemingly all-inclusive language in the indemnifying agreement is not sufficient to impose liability for the indemnitee's own negligence." *Kan. City Power & Light Co. v. Fed. Constr. Corp.*, 351 S.W.2d 741, 745 (Mo. 1961). Only "clear language" is sufficient to impose that kind of liability. *Id.*; *cf. United States v. Seckinger*, 397 U.S. 203, 212 (1970) ("In short, if the United States expects to shift the ultimate responsibility for its negligence to its various contractors, the mutual intention of the parties to this effect should appear with clarity from the face of the contract."). Nothing in the contracts satisfies this clear-statement hurdle. As already explained, the more natural interpretation of the contracts favors the purchasers.

In short, the contracts require pleading at minimum a close connection between one of Monsanto's underlying liabilities and PCBs sold to a specific defendant after the contracts were signed in 1972. Although the contracts do not require but-for, proximate, or direct causation, Monsanto must plead that its underlying liability was a "natural and reasonable incident or consequence" of PCBs sold to a specific purchaser defendant after 1972. *Schmidt*, 182 S.W.2d at 184. Broad as some parts of the contract may be, "[l]iability [will] not be extended to a result distinctly remote." *Id.* Monsanto thus must plausibly allege, for each underlying lawsuit in which Monsanto is a defendant and seeks defense costs or indemnification, that (1) PCBs sold to a purchaser defendant, (2) after 1972, (3) reasonably led to the alleged pollution.

Monsanto alleges none of these things. *See* ECF 237 at 56 ("We obviously didn't plead it that way."). It asserts that each of the six purchaser defendants is individually liable for

*every* lawsuit filed against Monsanto, regardless of whether PCBs sold to that purchaser after 1972 led to the underlying liability. *E.g.*, ECF 4 ¶ 235 ("[E]ach Defendant is individually, jointly, and/or collectively liable for the full amount of the defense costs incurred by Old Monsanto in the PCB Lawsuits . . . ."). Monsanto's failure to plausibly connect the underlying lawsuits against Monsanto to the chemicals sold to each purchaser defendant after 1972 is a fatal pleading flaw.

**B.**

Resisting this conclusion, Monsanto relies on the contractual phrase "alone or in combination with other substances." ECF 103 at 15–16. In Monsanto's view, this clause means that a purchaser is still fully liable even if a single drop of post-1972 PCBs has commingled with barrels of pollution from completely different sources. But that argument runs up against normal rules of grammar and construction, specifically the last antecedent rule. That rule provides that a phrase "should ordinarily be read as modifying only" the "phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003); *GEICO Gen. Ins. Co. v. M.O.*, 109 F.4th 1125, 1130 (8th Cir. 2024) (applying the last antecedent rule). Here, the phrase that precedes "alone or in combination with" is the part of the contract that discusses (among other nouns) the "use, sale or disposition" of PCBs sold to the purchaser after 1972. ECF 4-1 at 2.

Applying the last-antecedent rule makes clear that a purchaser is not liable simply because one drop of its PCBs becomes combined with barrels of pollution released by some other company. Instead, a purchaser is liable if its "use, sale or disposition" of PCBs is combined with *its own* "use, sale or disposition" of other substances. That can occur, for example, when a purchaser of PCBs commingles post-1972 PCBs with pre-1972 PCBs in the same bulk-storage tank. *E.g.*, *Monsanto Co.*, 965 S.W.2d at 317.

No better is Monsanto's argument, citing caselaw from the insurance context, that the purchasers have a duty to defend because there is a "possibility or potential" Monsanto may be held liable in the PCB suits. ECF 103 at 14–15. The 1972 contracts are "private indemnity agreements," which the Eighth Circuit has held "are not insurance contracts." *St. John's Reg'l Health Ctr. v. Am. Cas. Co. of Reading, Pa.*, 980 F.2d 1222, 1224 (8th Cir. 1992) (applying Missouri law). Thus, the 1972 contracts cannot be "liberally construed in favor of the insured to provide the broadest possible coverage." *Alessi v. Mid-Century Ins. Co., Inc.*, 464 S.W.3d 529, 531 (Mo. Ct. App. 2015). Rather, the agreements must be "strictly construe[d]." *Cont'l Airlines*, 13 F.3d at 1259. Regardless, the purchasers have a duty to defend Monsanto only from claims falling within the scope of the 1972 contracts. *See View Home Owner's Ass'n v. The Burlington Ins. Co.*, 552 S.W.3d 726, 732 (Mo. Ct. App. 2018) ("no duty to defend" against claims "the policy did not cover"). Monsanto has not plausibly alleged that the claims it is facing fall within the scope of any specific contract it has with any specific purchaser. Under Missouri law, that is what Monsanto must do. *Am. States Ins. Co. v. Mathis*, 974 S.W.2d 647, 649 (Mo. Ct. App. 1998).

With both text and precedent against its position, Monsanto protests about the number of pages it thinks it will have to spend to state a plausible claim. At oral argument Monsanto argued it would take a "5,000" page complaint with a "hundred plus exhibits" to plead that any specific Defendant is responsible for lawsuits related to post-1972 PCB exposure. ECF 237 at 22. But the plain text of each contract requires Monsanto to draw a non-tenuous connection between each of the lawsuits filed against Monsanto and each purchaser defendant from which Monsanto seeks indemnity or defense. That may mean narrowing its claims or bringing multiple separate lawsuits. It may even mean multidistrict litigation. But the contracts simply do not permit the blanket-liability shortcut Monsanto

seeks here. Monsanto must do the hard work required by the contracts of linking each of its many underlying liabilities to one or more purchaser defendants.

**II. Negligence**

Monsanto next repackages its contract claims into tort claims. It asserts a claim for negligence based on the same alleged facts supporting its claims for breach of contract. But the independent-duty rule bars Monsanto from doing so for post-1972 conduct.[2] That rule provides that a negligence tort may accompany a breach of contract claim only when the defendant has a legal duty to the plaintiff arising separately from any duty imposed in the contract. *Futo v. U.S. Bancorp*, 826 F. Supp. 3d 1016, 1028–29 (D. Minn. 2026). Missouri courts recognize and apply this rule. *E.g.*, *Amesquita v. Gilster-Mary Lee Corp.*, 408 S.W.3d 293, 305 (Mo. Ct. App. 2013) ("Plaintiffs do not state a claim of negligence" because they don't allege "any independent duty owed").

The independent-duty rule applies here. It is only because of the 1972 contracts that the defendants have any obligation to safeguard Monsanto-manufactured PCBs and indemnify Monsanto for conduct occurring after 1972. This is the crux of Monsanto's breach-of-contract claim. Monsanto alleges that "[a]s a result of Defendants' breaches of their contractual obligations to indemnify" it, Monsanto has "been damaged" over "$25,000.00." ECF 4 ¶ 261. And then Monsanto repeats the same allegation to support its negligence claim: "As a result of the foregoing breaches by Defendants" Monsanto has "been damaged" over "$25,000.00." ECF 4 ¶ 290. "The negligence claim, therefore, is simply a contract claim in tort clothing." *U.S. Bank Nat'l Ass'n v. S.A. Cash Network*, 252 F. Supp. 3d 714, 719 (D. Minn. 2017).

[2] Monsanto refers to the rule as the "economic loss rule." ECF 105 at 34–35. But it is "a more accurate designation" of the rule to call it "the independent duty rule." *Best Buy Stores, L.P. v. Devs. Diversified Realty Corp.*, No. 0:05-cv-02310-DSD-JJG, 2007 WL 4191717, at *6 n.9 (D. Minn. Nov. 21) (cleaned up). Under whatever name, the "analysis" is the "same." *Id.*

Monsanto offers several unpersuasive arguments in response. Monsanto cannot circumvent the independent-duty rule by asserting that the defendants owed it independent legal duties to exercise "reasonable care" in their use, handling, and storage of PCBs. ECF 4 ¶ 287. This conclusory legal allegation simply restates black letter tort law. Everyone owes duties to those around them to exercise reasonable care to prevent foreseeable injury. "If a plaintiff could escape application of the independent-duty rule by citing the generic duty to prevent foreseeable harm, then the exception would swallow the rule, as a negligence claim would *always* lie regardless of the existence of a contract. Clearly that is not the law." *U.S. Bank Nat'l Ass'n*, 252 F. Supp. 3d at 719.

Monsanto also argues that dismissal of the negligence claim is premature because application of the independent-duty rule frequently occurs at the summary-judgment stage. ECF 105 at 35 n.30. But "courts repeatedly have granted motions to dismiss tort claims barred by the rule." *U.S. Bank Nat'l Ass'n*, 252 F. Supp. 3d at 720 (collecting cases). Because the duty supplying the basis for Monsanto's breach of contract claim is identical to the duty supplying the basis for the negligence claim, the independent-duty rule bars the negligence claim.

Assuming it could get around the statute of limitations, Monsanto perhaps could allege negligence claims for conduct that occurred before the contracts were signed in 1972. But Monsanto has not done so. To establish a negligence claim under Missouri law, a plaintiff must establish a "legal duty" on the defendant's part toward the plaintiff, "breach of that duty," "proximate cause between that conduct and the resulting injury," and "actual damages." *Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc./Special Prods., Inc.*, 700 S.W.2d 426, 431 (Mo. 1985). Monsanto has not clearly stated a duty. And because Monsanto has not even established the lesser connection required by the contracts, Monsanto necessarily has not established proximate causation.

### III. Equitable contribution

Lacking sufficient allegations to support its breach of contract and negligence claims, Monsanto seeks "equitable contribution" from the purchaser defendants "in the alternative." ECF 4 ¶ 304. Monsanto specifically asks that the defendants be held liable for "their equitable shares of the amounts paid and/or agreed to be paid by [Monsanto] to settle and/or resolve the PCB Lawsuits." *Id.* ¶ 313.

Monsanto's request is hard to assess. The company cites no source of law for its claim either in its complaint or response to the motion to dismiss. And a federal court's equitable jurisdiction is narrow. "The decision to invoke equitable jurisdiction is highly discretionary and must be exercised with caution and restraint." *In re Sixty Seven Thousand Four Hundred Seventy Dollars ($67,470.00)*, 901 F.2d 1540, 1544 (11th Cir. 1990). It "is only appropriate in exceptional cases where equity demands intervention." *Id.* In the context of the Fourth Amendment, the Eighth Circuit has held "that such jurisdiction is proper only upon a showing of callous disregard of the fourth amendment, irreparable injury if relief is not granted, and lack of an adequate remedy at law." *In re 4801 Fyler Ave.*, 879 F.2d 385, 387 (8th Cir. 1989). Monsanto identifies nothing of the type here.

Monsanto also has not explained why it sued the purchaser defendants in this action and did not try to implead any of them in the suits it has defended. At least in federal courts, the impleader rule is "liberally construed in favor of impleading a third party." *United States v. J & D Enters. of Duluth*, 955 F. Supp. 1153, 1156 (D. Minn. 1997). This is so because the purpose of impleader is to "avoid a circuity of actions and a multiplicity of suits." *Id.* The Court declines to engage in the extraordinary exercise of equitable jurisdiction when Monsanto has not established that other avenues for relief were foreclosed.

### IV. Remaining issues

Because the Court concludes that Monsanto did not draw a sufficient connection to any of the defendants who have moved to dismiss, the Court need not resolve other issues.

Because no claims remain against the companies that moved to dismiss for lack of personal jurisdiction, ECF 83 at 10–17; ECF 86 at 8–16; ECF 93 at 2–8, the Court need not resolve that issue, *see Norton v. Mathews*, 427 U.S. 524, 532 (1976) ("[T]here is no need to decide the theoretical question of jurisdiction" when "the case alternatively could be resolved on the merits in favor of the same party."). The Court appears to have jurisdiction over at least one of the parties involved in the joint motion to dismiss. Personal jurisdiction, unlike subject-matter jurisdiction, is waivable. And the "affected defendant[s] do[] not insist that the [personal] jurisdictional issue be determined first." *Feinstein v. Resol. Tr. Corp.*, 942 F.2d 34, 40 (1st Cir. 1991).

Further, the argument that only Solutia has standing to enforce the contracts, ECF 91 at 23–27, is moot because no claims remain against the defendants who have made that argument. And whether a 10-year or 5-year statute of limitations applies to Monsanto's breach of contract claims is also moot because Monsanto has failed to state those claims at least as its petition is currently constructed. *Compare* ECF 86 at 16–17; *with* ECF 105 at 5.

### Conclusion

For the forgoing reasons, the Court **GRANTS** the motion to dismiss, ECF 90, and **DISMISSES** counts I–V and VII of Monsanto's First Amended Petition, ECF 4, without prejudice. Monsanto is ordered to inform the Court by October 22, 2026, whether it plans to

amend its complaint. If Monsanto intends to do so, it must consult with the purchaser defendants and propose a reasonable schedule for doing so.

Dated this 22nd day of September, 2026

JOSHUA M. DIVINE
UNITED STATES DISTRICT JUDGE
FOR THE EASTERN AND WESTERN
DISTRICTS OF MISSOURI